## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### NO. 12-35986

---

TIMOTHY L. BLIXSETH

Appellant,

v.

YELLOWSTONE MOUNTAIN CLUB, LLC
YELLOWSTONE DEVEOPMENT, LLC
BIG SKY RIDGE, LLC
YELLOWSTONE CLUB CONSTRUCTION CO., LLC

Appellees.

---

### APPELLANT TIMOTHY L. BLIXSETH'S OPENING BRIEF

---

Appeal from the United States District Court for the District of Montana
Case No. 2:11-73-BU-SEH

---

Phillip H. Stillman
Stillman & Associates
300 South Pointe Drive,
Suite 4206
Miami Beach, FL 33139
Telephone: (888) 235-4279
*pstillman@stillmanassociates.com*

Patrick T. Fox
Doubek Pyfer & Fox, LLP
PO Box 236
Helena, MT 59624
Telephone: (406) 442-7830
*patrickfox@douberpyfer.com*

Christopher J. Conant
Conant Law LLC
730 17th Street
Suite 200
Denver, CO 80202
Telephone: (303) 298-1800
*cconant@conantlawyers.com*

Michael J. Ferrigno
Law Office of Michael Ferrigno,
PLLC
1200 N. Main Street, Suite 486
Meridian, ID 83680
Telephone: (208) 319-3561
*michael.ferrigno@ferrigno-law.com*

Attorneys for Appellant Timothy L. Blixseth

## <u>TABLE OF CONTENTS</u>

**1.** INTRODUCTION AND PROCEDURAL BACKGROUND ...............1

**2.** STATEMENT OF JURISDICTION ......................................................2

**3.** STANDARD OF REVIEW ................................................................4

**4.** STATEMENT OF ISSUES ................................................................5

**5.** STATEMENT OF THE CASE ...........................................................6

**6.** STATEMENT OF FACTS ..................................................................8

  A.   General Background of the Yellowstone Mountain Club
Bankruptcy ................................................................................8

  B.   Specific Facts Demanding Disqualification .................................13

    **(1)**  *Ex Parte* Communications and Advocacy..................................13

    **(2)**  Granting Critical Motions Without Allowing Mr. Blixseth the
Opportunity to Respond. ...............................................................19

    **(3)**  Using Facts Outside of the Record ...........................................22

    **(4)**  Judge Kirscher Applies an Objective Double-Standard to Mr.
Blixseth...........................................................................................24

    **(5)**  Judge Kirscher has Made Numerous Statements and Rulings
Demonstrating that he has Pre-Judged the Outcome of Various
Adversary Cases and Has Demonstrated that he is "Boxed In" Into
Certain Positions Such that a Reasonable Person Would Believe
that he is Precluded from Being Impartial.....................................26

      **(a)**   The Impact of AP-14 on On-Going Proceedings..................26

      **(b)**   Judge Kirscher Appears and in Fact is Committed to Not
Changing the Yellowstone Club Plan of Reorganization Despite
his Appellate Mandate to do so ....................................................31

i

**(6)** Denied Due Process for Sake of the YMC Reorganization.......34

**7.** SUMMARY OF ARGUMENT ..........................................................37

**8.** ARGUMENT ..................................................................................39

A. Legal Basis for Disqualification under 28 U.S.C. § 455(a); .........39

**(1)** General Standard....................................................................39

**(2)** A Judge Cannot Impose his or her Subjective Findings of Good Faith in Analyzing a § 455(a) Motion ..............................................41

    **(i)** Application ......................................................................41

**(3)** Bankruptcy Judges Must be "Especially Solicitous" in Recusing Themselves Due to the Dual-Capacity in which they Serve and the Unique Nature of Bankruptcy Proceedings....................................46

    **(a)** Application .........................................................................49

**(4)** Disqualification Required Where a Judge Entertains Ex Parte Communications and Advocacy .......................................................58

    **(a)** Application ..........................................................................60

    **(i)** *Ex Parte* advocacy against Mr. Blixseth ..........................61

    **(ii)** Ross Richardson *ex parte* communication........................62

    **(iii)** Kelly Harrington emails ...................................................64

**(5)** A Lack of Impartiality Exists Where a Judge Grants Dispositive Motions Without Affording an Opportunity to Respond or be Heard......................................................................................67

**(6)** Double Standard in Treatment of Evidence............................67

B. Remedy.....................................................................................68

C. Alternatively Reassignment is Appropriate ................................69

**9.** CONCLUSION ................................................................... 71

CERTIFICATE OF COMPLIANCE ........................................ A

STATEMENT OF RELATED CASES ..................................... B

ADDDENDUM TO APPELLANT'S BRIEF ........................... G

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3rd Cir. 1993).......... .................................................................................. 48, 50

*Blixseth v. Yellowstone Mountain Club, LLC*, 2010 WL 4371368 (D. Mont. 2010) ................................................................. passim

*Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009) ........ passim

*Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996) ...................................... 56, 59

*First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983 (9th Cir. 2000)........................................................ 60

*Frates v. Weinshienk*, 882 F.2d 1502 (10th Cir. 1989) ............. 24, 47, 48

*Hall v. Small Business Admin.*, 695 F.2d 175 (5th Cir. 1983) ............... 60

*Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir. 1995) ............. 60, 63

*In re AFI Holding, Inc.*, 525 F.3d 700 (9th Cir. 2008) .............................. 4

*In re Asbestos Litigation*, 977 F.2d 764 (3rd Cir. 1992) ............. 40, 48, 58

*In re Bearingpoint, Inc.*, 453 B.R. 486 (Bankr. S.D.N.Y. 2011) ....... 24, 47

*In re Blixseth*, 2010 WL 3824183 (Bankr. D. Mont. 2010)..................... 23

*In re Complaint of Judicial Misconduct*, 425 F.3d 1179 (9th Cir. 2005) .................................................................................. 56, 59

*In re Dawson*, 390 F. 3d 1139 (9th Cir. 2004) ......................................... 4

*In re Horton*, 621 F.2d 968 (9th Cir. 1980)............................................. 2

*In re Kesington Int'l Ltd.*, 368 F.3d 289 (3rd Cir. 2004) ........................ 59

*In re Manoa Finance Co., Inc.*, 781 F.2d 1370 (9th Cir. 1986)....... passim

*In re Marshall*, 403 B.R. 668 (C.D. Cal. 2009) .................................... 5, 40

*In re Yellowstone Mountain Club, LLC*, 415 B.R. 769, 790 (Bankr. D. Mont. 2009) ................................................................................ passim

*In re Yellowstone Mountain Club, LLC*, 460 B.R. 254 (Bankr. D. Mont. 2011) ............................................................................................ 32

*Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004) ........................................ 5

*Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847 (1988) .... 39, 44

*Liteky v. U.S.*, 510 U.S. 540 (1994) ............................................. 39, 69, 70

*Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353 (9th Cir. 2005) ............................................................... 69, 70, 71

*Mangini v. U.S.*, 314 F.3d 1158 (9th Cir. 2003) ..................................... 48

*Matter of Beverly Hills Bancorp*, 752 F.2d 1334 (9th Cir. 1984) ........... 67

*Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996) .............................. 69

*Onishea v. Hopper*, 126 F.3d 1323 (11th Cir. 1997) ............................... 60

*Pesnell v. Arsenault*, 543 F.3d 1038 (9th Cir. 2008) ................................ 4

*Preston v. U.S.*, 923 F.2d 731 (9th Cir. 2003) ........................................ 68

*Price Bros. Co. v. Philadelphia Gear Corp.*, 629 F.2d 444 (6th Cir. 1980) ............................................................................................ 60

*Stivers v. Pierce*, 71 F.3d 732 (9th Cir. 1995) ................................... 24, 48

*U.S. v. Holland*, 519 F.3d 909 (9th Cir. 2008) ........................... 40, 48, 54

*U.S. v. Thompson*, 827 F.2d 1254 (9th Cir. 1989) .................................. 59

*U.S. v. Van Griffin*, 874 F.2d 634 (9th Cir. 1989) .................................. 59

*U.S. v. Wecht*, 484 F.3d 194 (3rd Cir. 2007) ......................................... 59

*U.S. v. Wolfson*, 634 F.2d 1217 (9th Cir. 1980) .......................... 56, 58, 59

*United States v. Bremers*, 195 F.3d 221 (5th Cir.1999) ........................ 40

*United States v. Furst*, 886 F.2d 558 (3d Cir.1989) .............. 4, 41, 55, 64

*United States v. Torkington*, 874 F.2d 1441 (11th Cir.1989) ................. 39

*Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012) ................................. 35

*Webbe v. McGhie Land Title Co.*, 549 F.2d 1358 (10th Cir. 1977) .. 45, 67

## Statutes

11 U.S.C. § 1129 .................................................................................. 32

28 U.S.C. § 1291 .................................................................................... 3

28 U.S.C. § 158(a) .................................................................................. 2

28 U.S.C. § 158(d) .................................................................................. 3

28 U.S.C. § 2106 ................................................................ 2, 38, 69, 70

28 U.S.C. § 455 ........................................................................... passim

## Rules

Federal Rule of Appellate Procedure 6(b)(1) ........................................... 4

Federal Rule of Bankruptcy Procedure 5004 ......................................... 39

Federal Rule of Bankruptcy Procedure 8002(a) ...................................... 3

Federal Rule of Bankruptcy Procedure 9019 ......................................... 57

U.S. Code of Conduct for United States Canon 3(A)(4) .......................... 59

## Secondary Authority

MOORE'S FEDERAL PRACTICE 3rd ed., § 63.20[5] ............................. 40

1. <u>INTRODUCTION AND PROCEDURAL BACKGROUND</u>

This appeal arises from the District Court's November 16, 2012 order affirming the U.S. Bankruptcy Court for the District of Montana's (Bankruptcy Court) February 25, 2011 order denying Mr. Blixseth's motion to disqualify under 28 U.S.C. § 455(a)[1] (Disqualification Motion) U.S. Bankruptcy Judge Ralph B. Kirscher from presiding over *In re Yellowstone Mountain Club, LLC*, Case No. 08-61750-11 ("YMC Bankruptcy") as well as numerous related bankruptcy and adversary proceedings. On January 18, 2011, Judge Kirscher conducted a hearing on Mr. Blixseth's motion to disqualify. [ER Vol. I, 48]. On February 25, 2011 Judge Kirscher entered a 47 page Memorandum of Decision (Disqualification Memorandum) denying the motion to disqualify himself. *Id.* However, in his Disqualification Memorandum, Judge Kirscher admitted sufficient facts to warrant disqualification. Judge Kirscher also failed to apply the correct legal standard in analyzing the motion to disqualify. Both defects require reversal. For the same reason, the District Court's order affirming Judge Kirscher's decision to

---

[1] 28 U.S.C. § 455 may be alternatively referred to herein as "§ 455" or "Section 455".

not recuse himself should be reversed.  Alternatively, should this Court determine that Judge Kirscher did not abuse his discretion in denying the Disqualification Motion, this Court should nevertheless exercise its supervisory powers under 28 U.S.C. § 2106 and reassign all matters involving Mr. Blixseth to another bankruptcy judge or a district court judge.

2.  <u>STATEMENT OF JURISDICTION</u>

Pursuant to 28 U.S.C. § 158(a), the District Court has appellate jurisdiction over an appeal of a bankruptcy judge's denial of a motion to disqualify only after the bankruptcy court issues a subsequent final appealable order.  *In re Horton*, 621 F.2d 968, 970 (9th Cir. 1980).[2]

Here, the first final appealable order following the YMC Bankruptcy was entered on September 30, 2011.  [ER Vol. I, 6].  Upon entry of the September 30th order, Mr. Blixseth's Notice of Appeal of the interlocutory order denying the motion to disqualify on August 8, 2011

---

[2] Mr. Blixseth previously brought before this Court the substance of his Disqualification Motion in the form of a Motion for Reassignment Under 28 U.S.C. § 2106 in Ninth Circuit Case No. 10-36038, Docket Entry 22-2 *et seq.*  At that time this Court denied the Motion for Reassignment on ground that the issue was not yet subject to the appellate jurisdiction of this Court.  Ninth Circuit Case No. 10-36038, Docket Entry 28 (citing *In re Horton*).

2

became operative pursuant to F.R.B.P. 8002(a). On October 14, 2011, Mr. Blixseth filed his notice of appeal regarding the September 30th Order, which also included various interlocutory orders, including the Bankruptcy Court's February 25, 2011 order denying Mr. Blixseth's Motion to Disqualify. [ER Vol. III, 467]. Thus, the District Court had appellate jurisdiction to review the Bankruptcy Court's February 25, 2011 Order.

The Court of Appeals has appellate jurisdiction over the District Court's order pursuant to 28 U.S.C. § 158(d) and 28 U.S.C. § 1291 as the District Court's order was a final decision from a district court acting in its appellate capacity.

The District Court order affirming Judge Kirscher's order was entered on November 16, 2012. [ER Vol. I, 1]. The District Court's November 16, 2012 Order is a final appealable order. Less than 14 days later, on November 28, 2012, Mr. Blixseth filed a Notice of Appeal with the District Court, seeking review in this Court of both the February 25, 2011 order denying the Disqualification Motion and the November 16, 2012 Order of the U.S. District Court for the District of Montana

3

affirming the Bankruptcy Court's order.  [ER Vol. II, 95].  Mr. Blixseth's

appeal is therefore timely.  F.R.A.P. 6(b)(1).

**3.**   **STANDARD OF REVIEW**

This Court reviews *de novo* the district court's decision on an

appeal from a bankruptcy court.  *In re AFI Holding, Inc.*, 525 F.3d 700,

702 (9th Cir. 2008).  Thus, this Court applies the same standard of

review applied by the district court.  *Id.*  No deference is given to the

district court's decision.  *Id.*  Given the *de novo* and "no deference"

review of the District Court's appellate decision in this matter, for

purposes of this Brief, Mr. Blixseth will disregard the District Court's

decision and focus only on Judge Kirscher's ruling.

The denial of a recusal motion is reviewed for an abuse of

discretion.  *Pesnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008).

However, "[t]he use of an incorrect legal standard is *per se* an abuse of

discretion.  *In re Dawson*, 390 F. 3d 1139, 1151 (9th Cir. 2004).  To the

extent that the decision is based on an incorrect legal conclusion, review

is *de novo.  United States v. Furst*, 886 F.2d 558, 580 (3d Cir.1989).

Further, where a judge is given discretion to grant or deny a

motion and that motion is based on certain evidence, if the judge rules

4

on the motion while ignoring evidence upon which the motion is based, the judge fails to exercise his or her discretion and that constitutes an abuse of discretion. *See Jones v. Blanas*, 393 F.3d 918, 935 (9th Cir. 2004) ("the court 'must actually exercise its discretion' rather than simply ignore the evidence or reject it sub silentio.").

"Whether the judge was required to recuse himself under § 455 involves both a legal and factual determination: a) what the appropriate standard is for recusal; and b) whether the judge's impartiality might reasonably be questioned. To the extent that [the litigant claims that the judge's] view of the law was incorrect, the Court reviews this decision *de novo*." *In re Marshall*, 403 B.R. 668, 676-677 (C.D. Cal. 2009).

**4.**   <u>STATEMENT OF ISSUES</u>

1.   Whether Judge Kirscher applied the wrong legal standard in denying the Motion to Disqualify and does that demand reversal?

2.   Whether, under 28 U.S.C. § 455, a reasonable and informed person would question Judge Kirscher's impartiality given the totality of circumstances?

3.   Does the undisputed evidence in the Disqualification Motion

5

coupled with Judge Kirscher's admissions establish evidence of appearance of bias as a matter of law?

## 5.   <u>STATEMENT OF THE CASE</u>

The Yellowstone Mountain Club entities ("Debtors") filed their Chapter 11 petition in the Bankruptcy Court on November 10, 2008. On June 2, 2009, the Bankruptcy Court entered an order confirming the Debtors' Third Amended Plan of Reorganization ("Plan"). *Blixseth v. Yellowstone Mountain Club, LLC*, 2010 WL 4371368 at * 1 (D. Mont. 2010). The Plan contemplated Blixseth being virtually the sole litigation target to satisfy nearly $280 million of unsecured claims against the Debtors. [ER Vol. III, 479-481 at 5(c),(g),(i)(Transferred BGI Note case against Mr. Blixseth to Yellowstone Club Liquidating Trust and releasing all parties except Tim Blixseth and specifically contemplating further litigation against Mr. Blixseth in AP-14); ER Vol. III, 505 (Class 4 General Unsecured Claims "shall receive periodic distributions from the Liquidations of . . . all Avoidance Actions."); ER Vol. III, 516-519 (Lists BGI Note and Mr. Blixseth in causes of action and avoidance actions); ER Vol. III, 373-376 ("Entire trust recoveries are contingent on litigation.")]. Consistent with the Plan, since April of

2009, Blixseth has been a defendant before the Bankruptcy Court in numerous adversary proceedings in the Debtors' case and in other related bankruptcy cases pending before Judge Kirscher. *See* Adversary Case Nos. 09-14 ("AP-14"), 09-18, 10-15, 09-64 in the Yellowstone Bankruptcy, Case No. 08-61570; Adv. Case No. 10-88 in *In re Edra Blixseth*, Case No. 09-60452; Adv. Case No. 09-86 in *In re Yellowstone Club World, LLC,* Case No. 09-60061; Adv. Case No. 09-65 in *In re Big Springs Realty, LLC,* Case No. 09-61079.

On November 2, 2010, the district court reversed and remanded the Order confirming the Plan for several "plain errors," including the inclusion of an exculpation clause that was impermissible under Ninth Circuit law and the Bankruptcy Code. *Blixseth*, 2010 WL 4371368 at * 1.

Mr. Blixseth filed his Disqualification Motion on November 30, 2010. [ER Vol. III, 233]. In support of the Motion, Mr. Blixseth filed two declarations with supporting exhibits and relied primarily on the record developed in the numerous cases in the Bankruptcy Court involving him. [ER Vol. IV, 233, et seq., 522-583]. On January 18, 2011, the Judge Kirscher held a non-evidentiary hearing on Blixseth's

Disqualification Motion. [ER Vol. IV, 623-625]. On February 25, 2011,

Judge Kirscher denied Blixseth's Motion to Disqualify. [ER Vol. I, 94].

After proceedings held on July 11, 2011 to purportedly follow the

appellate mandate from the District Court reversing confirmation of the

Plan, Judge Kirscher entered a final appealable order on September 30,

2011, approving *in toto* the very same Plan with the very same

exculpation clause that the District Court found to be impermissible.

[ER Vol. I, 41]. This appeal followed.

6. <u>STATEMENT OF FACTS</u>

   A. <u>General Background of the Yellowstone Mountain Club
      Bankruptcy</u>

This appeal arises from the bankruptcy of the Yellowstone

Mountain Club, LLC, located in Big Sky, Montana. The Club was a

major asset of the marital community estate of Timothy and Edra

Blixseth. In December of 2006, Edra Blixseth filed a petition for divorce

in the California Superior Court, Riverside County. [ER Vol. III, 396 et

seq.] .[3] After nearly two years of highly contentious divorce litigation,

_____

[3] Mr. Blixseth cites from the Separate Statement of Undisputed Facts
(ER Vol. III, 395-444) to provide general background of events.
However, the YCLR in AP-18 did not dispute the statements contained

8

the Blixseths reached an arms-length agreement to divide their marital community assets. [ER Vol. III, 396 et seq.]. The Blixseths executed their Marital Settlement Agreement (MSA) in July of 2008. *Id.* As part of the MSA, both Edra and Timothy Blixseth insisted that they execute Mutual Waivers and Releases of all claims that they may have against each other and further that they each waive and release all claims against the other on behalf of the business entities each one was receiving under the MSA. [ER Vol. III, 397-401, Vol. IV, 733]. The Riverside County Superior by order dated July 3, 2008 specifically approved the Mutual Waivers and Releases. [ER Vol. III, 398].

In relevant part, the MSA provided that Edra Blixseth would receive the Yellowstone Mountain Club, LLC out of the divorce, and in total the MSA granted Edra Blixseth. [ER Vol. III, 397, 555, 572]. In receiving the Yellowstone Club out of the divorce, Edra Blixseth, on behalf of the Yellowstone Club, waived and released Mr. Blixseth of all claims.

---

therein and therefore are deemed admitted by operation of Mont. Bankr. L.B.R. 7056-1(a)(3). [ER Vol. III, 263-266].

Prior to the Blixseths executing the MSA, a hedge-fund from Boston called CrossHarbor Capital Partners, LLC, led by its principal Sam Byrne, had contracted with Mr. Blixseth to purchase the Club for $410 million. [ER Vol. III, 406-407]. However, CrossHarbor reneged on that contract and subsequently negotiated a deal with Edra Blixseth to be her partner in developing the Club if she received full ownership of the Club out of the divorce. [ER Vol. III, 407-409]. CrossHarbor promised Edra that it would "promptly" inject $100 million in capital into the Club once she received ownership thereof and promised her that she and the Club would profit by over $1 billion if she allowed CrossHarbor to become her partner in the developing and operating the Club. [ER Vol. III, 423-424].

After Edra Blixseth in fact received ownership of the Club out of the divorce, CrossHarbor did nothing of the sort. Instead, On November 10, 2008, CrossHarbor Capital Partners, LLC and Edra Blixseth put the Yellowstone Club into a Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the District of Montana. [ER Vol. III, 498]. Numerous emails from Edra Blixseth and CrossHarbor's principal, Sam Byrne, as well as CrossHarbor's agents, demonstrate that months before they put the

10

Yellowstone Club into bankruptcy, they intended to target and blame Mr. Blixseth for the Club's financial demise and bankruptcy. [ER Vol. III, 426-429]. CrossHarbor and Edra Blixseth, as the Debtor-in-Possession, as well as Credit Suisse and Mr. Blixseth's former lawyer, ultimately proposed a Chapter 11 plan of reorganization that had CrossHarbor purchase the Yellowstone Club for only $115 million free and clear of all liens and encumbrances. [ER Vol. III, 432]. This was a designed windfall to CrossHarbor because a year earlier CrossHarbor had executed a contract with Mr. Blixseth to purchase the Club for $410 million. [ER Vol. III, 407]. Nevertheless, the plan of reorganization made Mr. Blixseth the sole litigation target whereby a liquidation trustee called the Yellowstone Club Liquidating Trust ("YCLT") would sue Mr. Blixseth to recover over $300 million in judgments to repay the secured and unsecured creditors of the Club, which creditors included CrossHarbor, Credit Suisse, Edra Blixseth and Mr. Blixseth's former lawyer. [ER Vol. III, 373-376, 479, 505, 516-519, 521]. Conveniently, the plan also included an "exculpation clause" that exculpated these same parties from all liability to Mr. Blixseth but allowed them to sue him through the YCLT. [ER Vol. III, 474-475, 479-480, 520].

11

Success of the Yellowstone Club plan of reorganization was entirely dependent upon the YCLT being successful in this litigation against Mr. Blixseth. [ER Vol. III, 373-376, 479, 505, 516-519, 521].

The sole active bankruptcy judge in Montana, Ralph B. Kirscher, approved this plan of reorganization on June 2, 2009 after having private settlement communications concerning this plan with CrossHarbor, Credit Suisse and the Debtor entities (see *infra*). Although a primary component of this plan was to make Mr. Blixseth the sole litigation target upon whom successful reorganization was dependent, Mr. Blixseth was not invited to nor made aware of the fact that Judge Kirscher was engaging in these *ex parte* settlement discussions. Following confirmation, Judge Kirscher then presided as trial judge over numerous adversary proceedings filed against Mr. Blixseth by the YCLT consistent with Mr. Blixseth having been made the sole litigation target of the Yellowstone Club plan of reorganization. *See* Adv. Case Nos. 09-14, 09-18, 09-64, 09-65, 10-15 and 10-88, U.S. Bankruptcy Court for the District of Montana.

In connection with the above-proceedings and the proceedings that have transpired since, Mr. Blixseth accumulated sufficient facts as well

12

as admissions by Judge Kirscher to create in the mind of a reasonable person aware of all the facts an understanding that Judge Kirscher, and the Montana bankruptcy court in general lacks impartiality toward Mr. Blixseth.

Hence, Mr. Blixseth filed his Disqualification Motion, and supported that Motion on the following grounds.[45]

## B.   Specific Facts Demanding Disqualification

### (1)   *Ex Parte* Communications and Advocacy

Judge Kirscher and his law clerks have created the appearance of bias through their documented and admitted *ex parte* communications with parties and opposing counsel involved in the Yellowstone Club Bankruptcy.  To wit:

1.   On November 7th and 10th of 2008, Judge Kirscher's law clerk Kelli Harrington sent *ex parte* communications to the Yellowstone Club's bankruptcy counsel, Andy Patten, offering her assistance in

---

[4] Given the complexity of facts over the period of years and amongst several different cases, Mr. Blixseth will provide the court the statement of facts organized by topic, rather than chronological order as events unfolded over more than four bankruptcy cases and several related adversary proceedings.

[5] Mr. Blixseth incorporates by reference herein all the grounds for disqualification set forth in his Disqualification Motion and supporting Reply brief.

13

helping him to get the Yellowstone Club bankruptcy case initiated and even offered to help him from home and offered her home phone number, cell number and *ex parte* access to Judge Kirscher. [ER Vol. IV, 587-588].[6] In his Disqualification Memorandum, Judge Kirscher spends several pages going through numerous emails between him, his staff and various members of the local bankruptcy bar and dismisses these email correspondence as merely administrative in nature. [ER Vol. I, 77-79]. While many of the email communications Judge Kirscher chose to discuss in his Disqualification Memorandum were administrative in nature, Judge Kirscher ignored the November 7th and 10th emails entirely. These email exchanges were not administrative in nature but demonstrated an impermissible willingness on the part of Judge Kirscher's law clerks to provide after-hours and *ex parte* assistance to a favored member of the Montana bankruptcy bar. A reasonable person is left only to guess at what other type of assistance or preferred treatment Mr. Patten received to benefit his client at the expense of Mr. Blixseth.

---

[6] Attorney Andy Patten is the attorney for the Debtors. [ER Vol. V, 901].

14

2.    On April 20, 2009, one week before phase I of the trial in AP-14, where the Yellowstone Club Debtors were seeking to impose a $200+ million judgment against Mr. Blixseth, Senior Judge Peterson sent an email to Mr. Patten, attorney for the Debtors, regarding this trial and provided Mr. Patten with citations to two cases that Judge Peterson thought would be helpful to Mr. Patten in his case against Mr. Blixseth in AP-14, a case that was to be presided over by Judge Kirscher.    [ER Vol. IV, 590].    Again, in his Disqualification Memorandum, Judge Kirscher purports to review a number of emails that were "administrative" in nature but is silent regarding this email. While this email is not from Judge Kirscher, when viewed in context with the other facts described herein, it demonstrates that the Montana bankruptcy court as an institution has no appearance of impartiality toward Mr. Blixseth and this demands reassignment to another District on remand.

3.    On November 16, 2009, Mr. Patten asked Judge Kirscher's law clerk, Ms. Harrington, if he could give "the court" (presumably Judge Kirscher) a "heads up" about a new case and if the court could keep the "heads up" "confidential."  [ER Vol. IV, 592].  Judge Kirscher's

15

law clerk, responds enthusiastically, "Absolutely Andy." *Id.*. Again, in his Disqualification Memorandum, Judge Kirscher purports to review a number of emails that were "administrative" in nature but is silent regarding this email. This email is anything but "administrative" in nature. It shows that Mr. Patten has the private ear of Judge Kirscher and his staff and this "private ear" is particularly troubling for Mr. Blixseth given the fact that Mr. Patten is counsel for the Yellowstone Club Debtors and successful reorganization of Mr. Patten's client depends upon Judge Kirscher entering hundred million dollar judgments against Mr. Blixseth.

4. Judge Kirscher admitted to presiding over *ex parte* settlement negotiations between CrossHarbor and Credit Suisse that resulted in the Club's plan of reorganization which made Mr. Blixseth the sole litigation target of the plan and which required that such litigation against Mr. Blixseth be successful for the plan to succeed. Judge Kirscher then presided over and continues to preside over this litigation against Mr. Blixseth and has entered one $40 million judgment against him and will likely enter more. [ER Vol. I, 76].

5. While Adversary Proceeding No. 09-14 (AP-14) had been

16

tried and was taken under submission by Judge Kirscher, Mr. Blixseth had reached a settlement with Chapter 7 Trustee Ross Richardson in a related adversary proceeding AP 86, which was also being presided over by Judge Kirscher, but the settlement had not yet been approved. On June 12, 2010, Judge Kirscher's other law clerk, Terry Healow had an *ex parte* communication with the trustee in that case, Ross Richardson where Mr. Healow encouraged Mr. Richardson to finalize the settlement before Mr. Blixseth could "renege." [ER Vol. IV, 579-580, 594]. After Mr. Richardson took that advice and obtained approval of the multimillion dollar settlement, Judge Kirscher issued his decision in AP 14, awarding a judgment of approximately $40 million against Mr. Blixseth. [ER Vol. IV, 814-815, Vol. V, 867-868]. As Judge Kirscher's law clerk, Mr. Healow had institutional knowledge about impending decisions from Judge Kirscher that directly impacted Mr. Blixseth's willingness to finalize his settlement with Mr. Richardson. A reasonable person could only conclude that institutionally Judge Kirscher's chambers were biased against Mr. Blixseth and could not be counted upon to act impartially toward him, but had in fact given assistance to Mr. Blixseth adversaries based on their inside knowledge

17

of the workings of the court. In the Disqualification Memorandum, Judge Kirscher does not dispute that his law clerk had such a conversation with Mr. Richardson, Judge Kirscher merely disclaims responsibility for the conduct of his staff. [ER Vol. I, 68-71].

6. On January 22, 2009, Ms. Harrington sent *ex parte* communication to only Mr. Patten, attorney for the YMC, regarding steps by which Mr. Patten's cash collateral motion may be approved. [ER Vol. IV, 585].

7. On February 3, 2009, Ms. Harrington sent *ex parte* communications informing Mr. Patten that Judge Kirscher would be entering a generic order unless Mr. Patten wanted to submit proposed order. [ER Vol. IV, 586].

8. At a hearing in an adversary proceeding involving Edra Blixseth's bankruptcy trustee, Judge Kirscher *sua sponte* requested that the trustee's counsel, David Cotner, opine on the reputation of Mr. Blixseth's lead litigation counsel, Michael Flynn. Mr. Cotner then took the opportunity to malign Mr. Flynn's professional reputation. The hearing transcript demonstrates that Mr. Flynn was not present at this hearing, nor was his client a party to the adversary proceeding in

18

question, nor was Mr. Flynn nor Mr. Blixseth given any notice that Judge Kirscher would give Mr. Cotner[7] *carte blanche* opportunity to criticize Mr. Flynn on the record. [ER Vol. III, 290-292, 318-322]. As discussed below, Judge Kirscher allowed Mr. Cotner to engage in impermissible *ex parte* advocacy which raises an appearance of bias, or lack of impartiality.

### (2) Granting Critical Motions Without Allowing Mr. Blixseth the Opportunity to Respond.

Judge Kirscher has, on at least two occasions, granted motions against Mr. Blixseth before he has had the opportunity to respond.

First, on August 16, 2010, Judge Kirscher entered a "judgment" against Mr. Blixseth in Adversary Case No. 09-14. [ER Vol. IV, 815-816]. However, while Judge Kirscher fixed liability against Mr. Blixseth, Judge Kirscher did not fix a monetary damages amount against Mr. Blixseth. Judge Kirscher subsequently stated that he did not fix a monetary amount against Mr. Blixseth because he "did not have enough facts to determine what was owed to each of the

---

[7] Mr. Cotner is counsel of record for Edra Blixseth's Chapter 7 trustee in a case where the trustee is suing Mr. Blixseth to set aside the MSA and to recover a judgment for hundreds of millions of dollars. [ER Vol. IV, 610-622].

aforementioned classes." [ER Vol. V, 863]. Accordingly, on August 27, 2010, the YCLT, the plaintiff in AP-14, filed a Motion to Reconsider asking Judge Kirscher to enter an amount in the Judgment of not less than $40,067,962.43. [ER Vol. V, 847-850]. The YCLT's request for a $40 million judgment was supported by a single affidavit from its counsel, Chuck Hingle. [ER Vol. V, 851-858]. Although Mr. Blixseth's Response to the Motion to Reconsider was not due until September 10, 2010, *see* Mont. L. Bank. R. 9013-1(f), on September 7, 2010, Judge Kirscher entered a $40,067,962.43 judgment against Mr. Blixseth, without providing Mr. Blixseth the opportunity to oppose the Motion to Reconsider and Mr. Hingle's affidavit, an affidavit that was materially wrong by millions of dollars. [ER Vol. V, 867-868; Vol. 3, 260-263].

Thus, AP-14's $40 million judgment was entered against Mr. Blixseth based upon a single affidavit of opposing counsel and without giving Mr. Blixseth the opportunity to respond. In his Disqualification Memorandum, Judge Kirscher in fact admits to entering this $40 million judgment against Mr. Blixseth without providing him an opportunity to respond or be heard. [ER Vol. I, 91-92].

Next, on Thursday, September 16, 2010, the YCLT filed a motion to certify Judge Kirscher's judgment for direct appeal to the Court of Appeals to collect the additional $230 million on behalf of Credit Suisse. [ER Vol. V, 870-871]. Within five minutes of filing its certification motion, the YCLT filed a motion to expedite the certification motion. [ER Vol. V, 873-874]. Again without giving Mr. Blixseth an opportunity to respond, Judge Kirscher granted YCLT's Motion to Expedite within hours and set the certification hearing to be hearing the following Monday, September 23, 2010. [ER Vol. V, 876-877]. Judge Kirscher provided Mr. Blixseth one-and-a- half business days to file an objection and prepare for a certification hearing. Ultimately the certification motion was approved on September 20, 2010. [ER Vol. V, 879-880].[8]

In another instance, in a different but related adversary proceeding, Mr. Blixseth filed three separate motions for summary judgment, each motion raising different legal and factual issues on July 2, 2010. [ER Vol. II, 213-220]. The plaintiffs filed an omnibus opposition to Mr. Blixseth's summary judgment motions on July 26,

---

[8] This Court ultimately denied the Petition for Direct Appeal after briefing. *Blixseth v. Kirscher*, 9th Circuit Case No. 10-80198.

2010. [ER Vol. II, 221-223]. Mr. Blixseth's reply was due 14 days from July 26th, per F.R.C.P. 56(c)(1)(C) (2009 amendments, pre-2010 amendments), *i.e.*, August 9, 2010. On <u>August 4, 2010</u>, Judge Kirscher denied each of Mr. Blixseth's summary judgment motions before the 14 day deadline expired. [ER Vol. II, 227-231].

### (3) Using Facts Outside of the Record

In opening his August 16, 2010 Memorandum of Decision in AP-14, Judge Kirscher acknowledges that in forming his opinion against Mr. Blixseth, he took judicial notice of facts he learned from other cases he has presided over. In the opening paragraphs of his 135-page Memorandum of Decision, Judger Kirscher stated that "[t]his Court takes judicial notice of the proceedings in the related bankruptcy cases and adversary proceedings discussed in this Memorandum of Decision for the purpose of providing additional background regarding the nature of the dispute and the relationship of the parties." [ER Vol. IV, 683]. A review of Judge Kirscher's 135-page opinion reveals no distinction between facts of which he took "judicial notice" for providing "additional background" and the specific findings supported by evidence

properly introduced and vetted at trial in AP-14. [*See generally* ER Vol. IV, 681-816].

On September 27, 2010 in a related bankruptcy case, Judge Kirscher referred to facts outside of the record in determining motions for summary judgment involving Edra Blixseth and her divorce from Mr. Blixseth. *See In re Blixseth*, AP No. 090-100-RBK, 2010 WL 3824183, at *13 (Bankr. D. Mont. Sept. 27, 2010)(additionally, the Court does not consider WCP's motion in a vacuum, but rather, undertakes this case after having over 22 months of time on task with the Yellowstone Club and the associated proceedings, including Debtor's [i.e., Edra Blixseth] bankruptcy case").

In another related bankruptcy case, on January 3, 2012, Judge Kirscher entered an order denying Mr. Blixseth's unopposed motion to reconsider Judge Kirscher's denial of Mr. Blixseth's motion to dismiss the adversary proceeding. [ER Vol. V, 899-900]. In that order, Judge Kirscher writes,

> "[T]he evidence this Court has seen in **other related proceedings shows** that several of the assets Edra received through the MSA, such as the Yellowstone Club, ... *were financially insolvent as of the effective date of the MSA*. According to Tim's argument, if the assets had no value,

23

requiring Samson to plead restitution would be a pointless exercise.

[ER Vol. V, 890-891](Emphasis added).[9]

Although discussed in more detail below, this type of judicial fact-finding by bankruptcy judges based on their plenary knowledge gained through administering bankruptcy cases is "manifestly improper" and is why this Court admonished bankruptcy judges to be "especially solicitous" in disqualifying themselves. *In re Manoa Finance Co., Inc.*, 781 F.2d 1370, 1373 (9th Cir. 1986); *In re Bearingpoint, Inc.*, 453 B.R. 486, 493 (Bankr. S.D.N.Y. 2011) ("manifestly improper").

### (4) Judge Kirscher Applies an Objective Double-Standard to Mr. Blixseth.

Judge Kirscher has treated the use of declarations and affidavits differently depending on whether such evidence is presented to be used

---

[9] Beside the fact that Judge Kirscher made a ruling against Mr. Blixseth based on alleged evidence presented to him in other and unspecified cases which is improper and demands disqualification without more, the quoted passage also presents the fact that Judge Kirscher has pre-determined the issue of insolvency in the case from which the quoted passage derives. This pre-determination of material factual issues by the sole trier of fact demands disqualification *per se* as the cases cited below set forth. *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995); *Frates v. Weinshienk*, 882 F.2d 1502, 1504 (10th Cir. 1989).

24

for or against Mr. Blixseth. This double-standard demonstrates an objective appearance of bias.

For example, on January 17, 2011, during the scheduling of the disqualification hearing, Judge Kirscher stated to Mr. Blixseth's lawyer, "[w]ell, I guess I'm not so certain that the case law supports -- as you know from prior appearances, <u>we don't try things in this court by affidavit</u>." [ER Vol. IV, 552](emphasis added).[10]

In contrast, on September 7, 2010, Judge Kirscher entered a $40,067,962.43 judgment against Mr. Blixseth based upon a <u>single affidavit</u> from the YCLT's lawyer in AP-14, without even affording Mr. Blixseth the opportunity to respond, much less cross-examine the declarant. [ER Vol. V, 854, 867, 868].

Rejecting Mr. Blixseth's attempt to introduce evidence by declaration/affidavit for the stated reason that Judge Kirscher does not

---

[10] On an earlier occasion on February 24, 2010 during phase II of AP-14, Judge Kirscher stated the following to Mr. Blixseth's lawyer when he attempted to introduce a declaration in his favor: "THE COURT: The objection is on use of the declaration. And it's been my practice, one, I don't try cases by declaration—certainly, it's a very rare basis. And if I do, the person's got to be available for cross-examination." The transcript of this hearing is not in the record but Mr. Blixseth will be moving to supplement the record.

"try things in [his] court by affidavit", but entering a $40 million judgment against Mr. Blixseth based solely on the affidavit of opposing counsel without even offering Mr. Blixseth an opportunity to respond and cross-examine is an objective double-standard and manifests an appearance of a lack of impartiality.

> **(5)  Judge Kirscher has Made Numerous Statements and Rulings Demonstrating that he has Pre-Judged the Outcome of Various Adversary Cases and Has Demonstrated that he is "Boxed In" Into Certain Positions Such that a Reasonable Person Would Believe that he is Precluded from Being Impartial**
>
> **(a)  The Impact of AP-14 on On-Going Proceedings**

In AP-14, the Yellowstone Club Debtor entities sued Mr. Blixseth claiming that when he was manager of the Club entities, he caused the Club to take a $375 million loan from Credit Suisse and then misappropriated $209 million of those loan proceeds as a wrongful distribution. [ER Vol. IV, 747-753]. Because the Club entities through Edra Blixseth waived and released Mr. Blixseth of these claims as part of Edra Blixseth receiving full ownership of the Club entities through the Blixseth divorce proceedings following a hotly litigated divorce, the Debtor/Club entities also sued Mr. Blixseth to set aside those California court approved waivers and releases as a fraudulent transfer. [ER Vol.

26

IV, 749-753, 783-797].   Following a bench trial conducted over two phases, Judge Kirscher on August 16, 2010 found Mr. Blixseth liable in AP-14 and ultimately entered a $40 million judgment against him.  [ER Vol. V, 845-846, 867-868].  In his 135-page Memorandum of Decision, Judge Kirscher found, amongst other things, that Mr. Blixseth had misappropriated funds from the Yellowstone Club, that Mr. Blixseth was the alter ego of the Yellowstone Club and that the Yellowstone Club entities as well as related entities and Ms. Blixseth were insolvent in the summer of 2008.  [ER Vol. IV, 776, 783-787].  Judge Kirscher further found that the California Superior Court approved waivers and releases between the Yellowstone Club and Mr. Blixseth constituted fraudulent transfers, thereby making Mr. Blixseth liable to the Yellowstone Club entities for wrongful distribution claims.  [ER Vol. IV, 783-786].

In addition to AP-14, Mr. Blixseth was and is being sued before Judge Kirscher by the YCLT and Edra Blixseth's Chapter 7 Trustee in no less than four adversary proceedings (Adv. Case Nos. 09-18, 09-64, 10-15, 10-88) and Judge Kirscher also approved a plan of reorganization for another Blixseth related entity, BLX Group, Inc., the primary

27

purpose of which was to allow the YCLT to sue Mr. Blixseth in California federal court. [ER Vol. IV, 597, 605]. All these cases being pursued against Mr. Blixseth involve, in one way or another, the solvency or insolvency of the Blixseths and their various marital community estate assets in 2008 and setting aside the property divisions in the MSA and related waivers and releases in approved by the California Superior Court.

Based on Judge Kirscher's statements in other cases, he has made it clear that regardless of the facts or law presented in other bankruptcy cases and adversary proceedings involving Mr. Blixseth, he has pre-judged all remaining cases against Mr. Blixseth and will not enter any order in any other case that is contrary to his decision in AP-14. To wit:

1.      In an order entered early in Adversary Case No. 10-88 where Edra Blixseth's bankruptcy trustee is suing Mr. Blixseth to set aside the MSA and dissolve the California Superior Court final judgment of divorce, Judge Kirscher *sua sponte* went outside of the pleadings and drew from evidence presented to him in other cases to pre-judge critical factual issues. Judge Kirscher wrote:

"[T]he evidence this Court has seen in **other related proceedings shows** that several of the assets Edra received through the MSA, such as the Yellowstone Club … <u>were financially insolvent as of the effective date of the MSA</u>. According to Tim's argument, if the assets had no value, requiring Samson to plead restitution would be a pointless exercise. [ER Vol. V, 890-891](Emphasis added);

2.      On November 22, 2011, Judge Kirscher entered an order holding the BLX Group, Inc.'s (a Yellowstone Club related entity) plan of reorganization in abeyance pending further changes to the plan. [ER Vol. IV, 608-609]. The primary component of the BLX proposed plan was to allow the YCLT an allowed claim against the BLX estate based on the funds that Mr. Blixseth allegedly misappropriated from the Yellowstone Club and then to allow the YCLT to pursue more litigation against Mr. Blixseth based on that alleged misappropriation.  In his opinion rejecting that proposed plan, Judge Kirscher stated: "But as stated earlier, this Court is also not willing to enter decisions that comes to the exact opposite conclusion [in AP-14] on whether the three Promissory Notes at issue [the same Promissory Notes at issue in AP-14] are valid." [ER Vol. IV, 608-609]. Based on this statement, any reasonable person would perceive that Mr. Blixseth's fate is sealed before Judge Kirscher in all remaining cases against him.

3.     In the same opinion, Judge Kirscher also acknowledged that his August 16, 2010 judgment against Mr. Blixseth in AP-14 was not a final judgment and that the district court sitting in its appellate capacity had remanded the "judgment" back to Judge Kirscher to fix a monetary amount.  Regarding this issue, Judge Kirscher stated: "This Court's determination that the three Promissory Notes were nothing but a sham to disguise what in fact were distributions is not a final and binding decision.  Nevertheless, in the not too distant future, the Court intends to enter a final judgment from which an appeal may be taken." [ER Vol. IV, 607].   The problem with Judge Kirscher stating on November 22, 2011 that he "intends to enter a final judgment" in AP-14 is that at that time he stated this, whether Judge Kirscher could enter any final judgment in AP-14 was being litigated in AP-14 as a result of *Stern v. Marshall.  See In re Yellowstone Mountain Club, LLC*, 2012 WL 6043282, 6 (Bankr. D. Mont. 2012) (Blixseth's Motion to dismiss for lack of subject matter jurisdiction based on *Stern* was pending in November 2011).  From the perspective of a reasonable person, despite the pending issues concerning whether Judge Kirscher had constitutional authority to enter a final judgment in AP-14, his

30

statement in the BLX case made it clear that he had pre-judged that issue and therefore has pre-judged numerous pending factual and legal issues.

**(b)**     <u>Judge Kirscher Appears and in Fact is Committed to Not Changing the Yellowstone Club Plan of Reorganization Despite his Appellate Mandate to do so</u>

1.     In his Disqualification Motion, Mr. Blixseth described in detail with factual support why Judge Kirscher appeared committed to not changing the Yellowstone Club plan of reorganization on remand despite his appellate mandate and to not re-visiting the issue of whether the plan was proposed in good faith and that Judge Kirscher's committed in this regard required his disqualification. [ER Vol. III, 451-462](Refused to allow evidence of bad faith in AP-14); Vol. IV, 786-790; see *In re Yellowstone Mountain Club, LLC*, 415 B.R. 769, 790 (Bankr. D. Mont. 2009). In his Disqualification Memorandum, Judge Kirscher ignores this basis for disqualification entirely, with no mention concerning the reasonable person standard. [ER Vol. I, 82]. Yet, prophetically, Mr. Blixseth was correct. On November 2, 2010 District Court Judge Haddon reversed the Yellowstone Club's plan of

reorganization because the exculpation clauses found in Section 8.4 of the plan violated Ninth Circuit law citing *American Hardwoods* and *In re Lowenschuss*. *Blixseth*, 2010 WL 4371368, at *2. The District Court then remanded to Judge Kirscher. *Id.* Judge Kirscher on remand disagreed with the District Court's analysis of *American Hardwoods* and *Lowenschuss* on this issue and re-approved that exact same exculpation *in toto* and stated: "Unlike the exculpation clauses in *American Hardwoods* and *Lowenschuss*, … [t]he exculpation clause in the case *sub judice* is not barred by Ninth Circuit Law." *In re Yellowstone Mountain Club, LLC*, 460 B.R. 254, 277 (Bankr. D. Mont. 2011).

2. In the November 2, 2010 district court order reversing the Yellowstone Club plan of reorganization, the district court deferred ruling on whether the plan was proposed in good faith pending further remand proceedings. *Blixseth*, 2010 WL 4371368 at * 2. A reversed Chapter 11 plan on remand must still meet the requirements of 11 U.S.C. § 1129, including § 1129(a)(3) that requires that a plan is "proposed in good faith and not be any means forbidden by law." However, in his Disqualification Motion, Mr. Blixseth argued that based

on numerous rulings and statements by Judge Kirscher that he reasonably appeared unable or unwilling to evaluate impartially whether the plan was proposed in good faith. [ER Vol. III, 244-246]. For example, Judge Kirscher repeatedly refused to admit evidence demonstrating bad faith by the filers of the Yellowstone Club bankruptcy. [ER Vol. III, *id.* and 386-396(refusal to admit evidence of spoliation by Edra Blixseth), 450-462]. However, despite refusing to allow Mr. Blixseth to present evidence on whether the YMC Bankruptcy was filed in bad faith, on June 11, 2009, Judge Kirscher wrote:

> Blixseth claims that Edra, in the period of time between mid-August of 2008 and November 10, 2008, concocted a scheme with Byrne to drive the Debtors into bankruptcy so that Byrne could purchase the Debtors at a deep discount, with no apparent benefit to Edra. The Court is not persuaded by Blixseth's attempts to paint himself as a victim in these proceedings, particularly where Blixseth was at the center of the Debtors financial woes.

*In re Yellowstone Mountain Club, LLC*, 415 B.R. 769, 790 (Bankr. D. Mont. 2009). Later, on August 16, 2010, Judge Kirscher also stated, "The Court has not yet seen any credible evidence to support this particular conspiracy theory asserted by Blixseth." [ER Vol. IV, 788]. Of course, Judge Kirscher said that he had not

seen any credible evidence that the plan was filed in bad faith because he had previously excluded such evidence. [See also ER Vol. III, 244-246, 252-254].

In his Disqualification Memorandum, Judge Kirscher ignored this basis for bias. Yet, as predicted, on remand, Judge Kirscher vacated a hearing set specifically on whether the Plan was proposed in good faith. [ER Vol. I, 7-8]. Thus, Judge Kirscher has repeatedly refused to hear evidence regarding whether the YMC bankruptcy petition was filed in bad faith, while at the same time, writing in various decisions that he had seen no such evidence. The reason Judge Kirscher has refused to consider the issue of whether the plan was proposed in good faith is because evidence that it was not proposed in good faith would upset and require vacating the plan entirely after Judge Kirscher had invested so much time and effort (including ex parte settlement negotiations) in confirming the plan. [ER Vol. I, 74-75].

**(6) Denied Due Process for Sake of the YMC Reorganization.**

On March 12, 2009, the Bankruptcy Court approved an expedited discovery schedule in AP-14. *Blixseth v. Yellowstone Mountain Club, LLC*, 415 B.R. at 782. AP-14 involved a case brought by Credit Suisse against the Debtors Unsecured Creditors Committee, which involved

34

hundreds of millions of dollars in potential liability. The Bankruptcy Court ordered AP-14's trial to commence on April 22, 2009. *Id.*.

On April 3, 2009, Mr. Blixseth was named as a defendant in AP-14. [ER Vol. IV, 530]("[T]rial commenced on April 20, 2009, literally seventeen days after the UCC filed its $209 million counterclaim against me.").[11] At that time, the action brought by the UCC against Mr. Blixseth for approximately $209 million was scheduled to commence on April 22, 2009. Thus, Mr. Blixseth was required to prepare his defense in a $209 million trial in less than three weeks. Judge Kirscher later admitted that AP-14's abbreviated trial schedule during Phase I did not take the defendant's due process rights in AP-14 into consideration, but was rather driven to facilitate settlement negotiations in the YMC's plan of reorganization. [ER Vol. I, 72, 89].

AP 14 was bifurcated into two phases. After Phase I of AP-14 was completed but before Judge Kirscher ruled, material players in the

---

[11] Mr. Blixseth had originally intervened in AP-14 by filing a declaratory relief complaint in intervention. *In re Yellowstone Mountain Club*, 415 B.R. at 773. However, there is a significant distinction between simply seeking declaratory relief on an issue and being subsequently sued for hundreds of millions of dollars. *See Waldman v. Stone*, 698 F.3d 910, 921 (6th Cir. 2012).

main bankruptcy case held closed-door negotiations in May 2009 regarding the reorganization of the Debtors. [ER Vol. I., 72-73]. During those negotiations, Judge Kirscher admits having *ex parte* involvement in that process. [ER Vol. I, 74-76]. Neither Mr. Blixseth nor his counsel were invited to participate in any of the settlement negotiations, and the product of the closed door session was the Settlement Term Sheet and confirmation of the Third Amended Plan. [ER Vol. I, 73-76].

On May 19, 2009, the Debtors presented the Settlement Term Sheet in open court, settling all claims between the UCC, the Debtors and Credit Suisse and made Mr. Blixseth the litigation target of the newly created Yellowstone Club Liquidation Trust ("YCLT"). [ER Vol. III, 373-376, 479, 505, 516-519,521]. Judge Kirscher approved the settlement in open court with no notice or opportunity for any interested party to be heard. *Blixseth*, 2010 WL 4371368, at *1. A few days later, on May 22, 2009, the Debtors filed a Third Amended Plan of Reorganization ("Plan") that incorporated the terms of the Settlement Term Sheet, including exculpating Credit Suisse and numerous third parties (except Mr. Blixseth) from any claim from any person. Judge Kirscher approved the plan on June 2, 2009. *Blixseth v. Yellowstone*

36

*Mountain Club, Inc.*, 2010 WL 4371368, at *1. Mr. Blixseth appealed the confirmation order, which included the Settlement Term Sheet as well as Judge Kirscher's failure to take evidence regarding Edra Blixseth's bad faith bankruptcy filing. *Id.*

Ultimately, the District Court reversed the order confirming the Plan and the Settlement Term Sheet because the Bankruptcy Court committed plain error in (1) approving the Settlement Term Sheet without proper notice, and (2) approving exculpation clauses the "[went] well beyond the limitation of Section 524(e)." *Blixseth v. Yellowstone Mountain Club, Inc.*, 2010 WL 4371368, at *2.

## 7. <u>SUMMARY OF ARGUMENT</u>

A bankruptcy judge must disqualify himself from presiding over a case if a reasonable person with knowledge of all the facts would believe that the judge appears to lack impartiality. This Court has recognized that due to the unique nature of bankruptcy proceedings where bankruptcy judges are tasked with exercising the dual roles of administering an estate and playing a more traditional judicial role over litigation, bankruptcy judges must be "especially solicitous" in disqualifying themselves to avoid the appearance of bias. The

37

undisputed facts (most of which Judge Kirscher admitted to be true) alleged in Mr. Blixseth's Disqualification Motion raise in the mind of the hypothetical reasonable person that Judge Kirscher appears to lack impartiality toward Mr. Blixseth. In denying the Disqualification Motion, Judge Kirscher abused his discretion because he did not apply the reasonable person standard in evaluating the Disqualification Motion. Rather, Judge Kirscher explained the facts that he chose to address from the perspective of his own subjective good faith, yet the case law holds that doing was an abuse of discretion. Further, Judge Kirscher abused his discretion by flatly ignoring other facts that unequivocally required his recusal.

In the alternative, this Court should reassign all matters involving Mr. Blixseth to another bankruptcy judge under this Court's supervisory powers granted to it under 28 U.S.C. § 2106.

**8.**   <u>ARGUMENT</u>

   **A.**   <u>Legal Basis for Disqualification under 28 U.S.C. § 455(a);</u>

      **(1)**   **General Standard**

The disqualification of a bankruptcy judge is governed by 28 U.S.C. § 455. F.R.B.P. 5004. Section 455(a) states, in part, that "[a]ny . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C.§ 455(a); *In re Manoa Fin. Co.*, *Inc.,* 781 F.2d 1370, 1372 (9th Cir. 1986). A judge's impartiality is questioned using an objective standard. *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 858 n. 7, 861, 864-865 (1988). Section 455 seeks to "preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." *United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir.1989); *Liljeberg*, 486 U.S. at 865; *Liteky v. U.S.*, 510 U.S. 540, 548 (1994). While the perspective from which to determine whether a judge should be disqualified is that of an objective, informed and reasonable person, the Supreme Court believes the "reasonable person" for purposes of § 455 contemplates lay

39

people "who have not served on the bench [who] are often all too willing to indulge suspicions and doubts concerning the integrity of judges." *U.S. v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008); *Liljeberg*, at 860, 865-86; *see also* MOORE'S FEDERAL PRACTICE 3rd ed., § 63.20[5]; *In re Asbestos Litigation*, 977 F.2d 764, 782 (3rd Cir. 1992).

"'[T]he analysis of a particular section 455(a) claim must be guided, not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue.'" *Holland*, 519 F.3d at 913-914 (quoting *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir.1999)). In considering whether this standard is met, "the Court must consider the totality of the circumstances and cannot pick apart the alleged basis for recusal. If the appearance of bias or prejudice is a close call, recusal is appropriate." *In re Marshal*, 403 B.R. at 679 (citations omitted).

While this is the general statement of the law under 28 U.S.C. § 455(a), several distinct aspects of disqualification law are relevant here.

### (2) A Judge Cannot Impose his or her Subjective Findings of Good Faith in Analyzing a § 455(a) Motion

A judge abuses his or her discretion in denying a motion to disqualify if the judge's order is based on the judge's "subjective findings of impartiality." *See Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 882-884 (2009). The Third Circuit in *U.S. v. Furst*, 886 F.2d 558, 583 (3rd Cir. 1989) held that under § 455(a), where the movant submits an affidavit setting for the facts raising an appearance of bias and those basic facts are not disputed, the judge "should not minutely examine the movant's characterization of [those facts], and weigh the court's memory of what happened against that of the affiant. <u>We think it simply inappropriate in the circumstances here for the court to have made a credibility assessment of itself</u>." *Furst*, 886 F. at 583 (emphasis added).

#### (i) Application

In his Disqualification Memorandum, Judge Kirscher spent several pages (ER Vol. I, 56-58) arguing that the *Furst* court did not actually intend for this rule to apply to § 455(a) motions; but the *Furst* court specifically held that this standard applies to § 455(a) motions. *Id.* Having disregarded the rule from *Furst*, Judge Kirscher then

41

proceeded to make a credibility assessment of himself vis-à-vis the undisputed facts.

Judge Kirscher abused his discretion in denying the Disqualification Motion because not only did he analyze the bases for recusal through the lens of his own subjective findings of good faith, but he also picked apart the alleged basis for recusal, examining each individually and concluding that each basis *individually* dis not establish an appearance of bias while ignoring the totality of the facts in combination from the perspective of the reasonable person. Notably, Judge Kirscher admitted most, if not all, of the facts supporting the grounds for recusal but instead of analyzing those facts from the perspective of a reasonable person, he either ignored those most suggestive of a lack of impartiality or he explained away the facts from his subjective point of view after weighing his memory of the facts to that established by the record and the facts. However, when viewed in there totality, the enumerated facts, demonstrate that Judge Kirscher erred by not disqualifying himself.

First, Judge Kirscher dismisses Mr. Blixseth's evidence regarding *ex parte* communication by stating, "None of the emails contain

inappropriate *ex parte* communications and I certainly do not find any bias or prejudice in the emails." [ER Vol. I, 79]. Judge Kirscher provides no analysis concerning how a reasonable person would view these emails. Moreover, Judge Kirscher elects to ignore the more egregious emails, which simply reinforces the appearance of bias and constituted an abuse of discretion. Judge Kirscher ignores the emails where his law clerk, Ms. Harrington willingly invites Andy Patten's "confidential" "heads up" about a new case; Judge Kirscher ignores the emails where Ms. Harrington offers Mr. Patten her home and cell phone numbers as well as after-hours assistance and access to Judge Kirscher concerning the Yellowstone Club case.[12] Judge Kirscher ignores the email where Senior Judge Peterson sends an email to Mr. Patten with case citations that he believes will be beneficial Mr. Patten's case against Mr. Blixseth. Judge Kirscher ignores all of these emails because to address them would be to acknowledge that any reasonable person would perceive that as an institution the Montana bankruptcy court affords Mr. Patten special treatment and is therefore implicitly

---

[12] As discussed *infra*, the conduct of a judge's law clerk can be imputed to the judge for purposes of § 455(a).

biased in his favor, which puts any opponent of Mr. Patten at a disadvantage in the Montana bankruptcy court.

Next, Judge Kirscher dismisses Mr. Blixseth's evidence concerning favoritism toward Ms. Blixseth and CrossHarbor, writing, "Having made few, if any credibility findings as to Ms. Blixseth, the Court fails to see how it disrupted a criminal investigation, of which I have no knowledge nor should I have any knowledge, as Mr. Blixseth alleges." [ER Vol. I, 87]. This analysis again fails to view the evidence through the eyes of a reasonable person. Instead, Judge Kirscher ignores the legal standard and places his subjective views on the evidence.

Moreover, Judge Kirscher's legal standard is improper because his "knowledge" is not an element of § 455(a). Unlike other subsections in § 455, "[a] careful reading of the respective subsections makes clear that Congress intended . . . not to require knowledge under subsection (a) . . . whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." *Liljeburg,* at 859-860. Judge Kirscher admits that he has no evidence to dispute Mr. Blixseth's claims regarding the disruption of

44

a criminal investigation, but wrongly dismisses Mr. Blixseth's evidence because of his lack of knowledge. Similarly, Judge Kirscher disclaims responsibility for the conduct of his law clerk Terry Healow in contacting trustee Ross Richardson to finalize a settlement with Mr. Blixseth before Mr. Blixseth could renege because he did not know or direct Mr. Healow to have such a conversation. Again, Judge Kirscher disclaiming responsibility and pleading ignorance is not the controlling standard.

Finally, the District Court's concluding analysis is not seen through the reasonable person standard but of rather states that "[Judge Kirscher's] disqualification in this case is neither required nor appropriate because Mr. Blixseth has not established actual bias nor has he shown any facts which establish an appearance of such impartiality as to require recusal." [ER Vol. I, 93]. Actual bias is not required. The "appearance of impartiality is virtually as important as the fact of impartiality." *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358, 1361 (10th Cir. 1977). By repeatedly articulating the wrong standard and by relying upon subjective findings of impartiality to explain Mr. Blixseth's evidence, the Judge Kirscher abused his

45

discretion in the Disqualification Motion.  *See Caperton*, 556 U.S. at 881-883.

> **(3)** **Bankruptcy Judges Must be "Especially Solicitous" in Recusing Themselves Due to the Dual-Capacity in which they Serve and the Unique Nature of Bankruptcy Proceedings**

In the context of bankruptcy cases where one judge is presiding over both the main bankruptcy case and the adversary proceedings therefrom, the Ninth Circuit has opined as follows:

> The alleged bias in this case is said to stem from one judge's handling both administrative and adversary matters in the same case. …. To the extent a bankruptcy judge must play both administrative and judicial roles, he is an actor as well as an adjudicator; intimate contact with day-to-day affairs of an estate and close contact with the trustee may make objective appraisal difficult and may create the appearance of partiality.
>
> . . . .
>
> [W]e suggest that judges sitting in bankruptcy be especially solicitous in maintaining both the appearance and reality of impartiality when adjudicating matters with which they have had close involvement, erring on the side of recusing themselves when appropriate.

*In re Manoa Finance Co., Inc.*, 781 F.2d at 1373 (emphasis added).  This dual-capacity recognized in *Manoa* poses the very real risk that a

46

bankruptcy judge will adjudicate an adversary proceeding based not on evidence that was introduced at trial, but what the judge learned through some other means in his or her administrative role over a debtor's case or related cases. This is "manifestly improper" as noted by one bankruptcy judge and is why this Court in *Manoa* mandated bankruptcy judges to be "especially solicitous" in recusing themselves. *Id.* at 1373; *In re Bearingpoint, Inc.*, 453 B.R. at 493 ("The record as to whether [a party] did anything wrong must be made at trial . . . and on the record there presented. It would be manifestly improper for me to determine adjudicative facts on evidence from outside that record, or based on knowledge or perceptions developed in the course of the earlier chapter 11 case.").

The appearance of partiality within the bankruptcy context can also arise where "the judge appears 'boxed in' by prior rulings such that he will be forced to reach a certain result in an adversarial proceeding regardless of the merits." *Frates*, 882 F.2d at 1504. In other words, does it appear that the bankruptcy judge has "prejudged adversarial proceedings or to have placed himself in a position where it appears he will be forced to decide one or more of the adversary proceedings in [a

47

party's] favor." *Id.*; *Stivers*, 71 F.3d at 741 (pre-judging facts raises appearance of bias). In a similar vein, if a judge appears highly invested in a matter based on significant work or prior involvement in the case or related proceedings, this too will raise an impermissible appearance of bias. *See Caperton*, 556 U.S. at 880-881; *In re School Asbestos Litigation*, 977 F.2d at 785.

Similarly, disqualification is mandated where a judge is the sole trier of fact but has pre-judged substantive issues, made credibility findings of key witnesses, maligned the conduct of the parties and their counsel, and generally appeared to have formed opinions based on facts not presented at trial. *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 163-164, 166 (3rd Cir. 1993) ("when the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced") cited with approval by *Mangini v. U.S.*, 314 F.3d 1158, 1162 (9th Cir. 2003).

When a judge rushes decisions or makes rulings based on factors other than the controlling law and facts, this raises the appearance that a judge lacks impartiality. *Holland*, 519 F.3d at 913. While this rule of law applies to all cases, the nature of bankruptcy proceedings

48

inherently creates situations where judges will adjudicate adversary proceedings in a manner dictated by deadlines or complications in administering the debtor's main case, all of which Judge Kirscher admitted occurred here.

### (a)     Application

In short, the present case encompasses all the reasons this Court in *Manoa* instructed bankruptcy judges to be "especially solicitous" in recusing themselves.  Here Judge Kirscher, as the sole trier of fact in the Yellowstone Club bankruptcy and related bankruptcy cases and adversary cases has "boxed" himself into making specific rulings and keeping the Club's plan of reorganization intact, regardless of the law or the facts and has also committed himself as sole trier of fact to the credibility of Mr. Blixseth, thus placing in question his impartiality in on-going cases involving Mr. Blixseth.

For example, Judge Kirscher, has demonstrably pre-judged Mr. Blixseth's culpability and has unequivocally found Mr. Blixseth to not be credible (s*ee infra*) while at the same time finding Edra Blixseth (a key witness in all cases involving the MSA) to be credible even though Judge Kirscher acknowledged that she knowingly failed to list a $181

49

million debt on her bankruptcy schedules [ER Vol. IV, 735-736], and he further found the Yellowstone Club's demise was caused by Mr. Blixseth and not the bad-faith conduct of Edra Blixseth, CrossHarbor Capital Partners LLC and Sam Byrne; all of which are critical issues to be adjudicated in on-going proceedings against Mr. Blixseth. "When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced." *Alexander*, 10 F.3d at 166. This is particularly true when the judge sitting as the sole trier of fact has already made credibility determinations concerning key witnesses and attorneys, because it leads the reasonable person to believe that the judge has pre-determined the outcome of a case before trial or on remand. *Id.* at 164. Here, in both the Yellowstone Club bankruptcy case, in AP-14, and AP-18, Judge Kirscher has unfailingly found testimony by Mr. Blixseth to not be credible and his legal positions to be "garbage." *In re Yellowstone Mountain Club, LLC*, 415 B.R. at 790 ("The Court is not persuaded by Blixseth's attempts to paint himself as a victim in these proceedings, particularly where Blixseth was at the center of the Debtors financial woes. . . . The evidence to date is not favorable for Blixseth"); August 16, 2010 Memorandum of Decision:

50

"But Blixseth's testimony in this regard is not credible and is controverted by the evidence." [ER Vol. IV, 694]; "This latter contention by Blixseth is not supported by any credible evidence" [ER Vol. IV, 732]; "In his testimony, Blixseth claimed that he had relied heavily on Mack's opinion that a transfer to BGI 'had' to be a loan to avoid negative capital accounts. Blixseth's testimony was not credible on this point." [ER Vol. IV, 757]; "Blixseth attempted to explain these transactions, but his testimony in this regard was simply not credible." [ER Vol. IV, 783]; "The Court has not yet seen any credible evidence to support this particular conspiracy theory by Blixseth" [ER Vol. IV 788]; "Blixseth's fraudulent intent could not be more clear." [ER Vol. IV,790]; "In summary, Blixseth produced no credible evidence that the Debtors were solvent . . . ." [ER Vol. IV, 796]; "The unrealistic nature of the information provided to and relied upon by Reilly and the limited scope of his engagement leads this Court to conclude that his opinion, while generally credible, was so restricted by Blixseth and his counsel as to render his opinion in this case simply inapplicable." [ER Vol. IV, 760]; "Blixseth has wholly failed to produce any credible evidence that constitutes a tangible and concrete value flowing to the Debtors. In fact,

51

the evidence in this case is just the opposite." [ER Vol. IV,794]; "The Court elects to scrap the original 69 pages of its order and dispose of Blixseth's pending motions in a manner that is commensurate with the merits of Blixseth's arguments." [ER Vol II, 227]; "Many of Blixseth's claims to date have been nothing more than unsubstantiated rhetoric meant to divert this Court's attention away from the controlling facts.";. [ER Vol. IV, 745 at  n. 50]; 415 B.R. at 780 ("In an attempt to frustrate the trial, Blixseth filed an Expedited Motion to Bifurcate and Continue Trial of Claims Regarding Blixseth on April 21, 2009. That Motion was denied by Order entered April 24, 2009. However, in an effort to quash Blixseth's due process arguments, the Court continued the commencement of trial from April 22, 2009, to April 29, 2009."). [emphasis added] [the counterclaim against Blixseth upon which he was to be tried was filed only three weeks earlier on April 3, 3009]).

Remarkably, despite not finding any bit of testimony by Mr. Blixseth to be credible, Judge Kirscher has repeatedly found the testimony of Edra D. Blixseth, a demonstrated perjurer, to be credible. August 16, 2010 Memorandum of Decision (Judge Kirscher specifically choosing to not discredit Edra's testimony even though she knowingly

failed to list on her own bankruptcy schedules a $181 million debt that she owed to her own corporation [ER Vol. IV, 736] ("[Tim] Blixseth claims he always intended to repay the $209 million BGI note, but Blixseth's former wife testified to the contrary." [ER Vol. IV, 811].

No reasonable person with knowledge of all these facts could think that Judge Kirscher will afford Mr. Blixseth the impartial due process to which he is entitled in on-going adversary proceedings against him and in the Yellowstone Club bankruptcy case. Indeed, based on Judge Kirscher's credibility assessment to date of Mr. Blixseth, the reasonable person could only conclude that the outcome of all further adversary proceedings in which Judge Kirscher is the trier of fact is pre-determined against him. Thus, Judge Kirscher's disqualification was mandated, particularly in light of the fact he failed to address this appearance of bias in his Disqualification Memorandum.

Further, in response to Mr. Blixseth's Motion, Judge Kirscher admitted that he resolved $200+ million litigation during Phase I of AP-14 only weeks after the initial pleadings were filed in that case to assist in the settlement of the reorganization of the debtors. [ER Vol. I, 72]. Rather than resolve AP-14 on its own merits, Judge Kirscher allowed

53

expediency to trump due process. These actions demands recusal and reassignment. *Holland*, 519 F.3d at 913.

Not only did Judge Kirscher admittedly rush the decision of AP-14 for reasons other than the merits, but Judge Kirscher also admits that he engaged in *ex parte* communications with CrossHarbor and Credit Suisse during settlement negotiations of the main case that implicated Mr. Blixseth while AP-14 was pending. [ER Vol. I. 74-76]. While Judge Kirscher admitted in his Memorandum to presiding over these *ex parte* settlement discussions in a hotel in Montana [ER Vol. I, 76-77], he explained that it was not improper for him to preside *ex parte* over settlement discussions between CrossHarbor, Credit Suisse and the Debtors because Mr. Blixseth was not a proponent of the plan, Judge Kirscher's explanation ignores the obvious. Mr. Blixseth was the target of the plan and success of that plan for which Judge Kirscher was involved in private settlement discussions depended upon Judge Kirscher then entering massive judgments against Mr. Blixseth for the benefit of CrossHarbor and Credit Suisse. Judge Kirscher completely failed to analyze the appearance of bias from the perspective of a reasonable person stemming from these private discussions. Rather, he

justified his actions through his own subjective findings of good faith and completely abused his discretion in doing so. *Caperton*, 556 U.S. at 881-883; *Furst*, 886 F.2d at 583.

While there is nothing improper in traditional litigation with a judge presiding over settlement discussions because successful settlement discussions end the litigation between the parties before that judge, this was a much different beast. Judge Kirscher helped broker a settlement privately but for that settlement to be successful, Judge Kirscher was then required to enter massive judgments against Mr. Blixseth, who was not invited to the settlement discussions, and those judgments are to benefit the same settling parties with whom Judge Kirscher met privately.[13] One is left only to guess at was discussed amongst the settling parties and Judge Kirscher during those private discussions when success of their settlement dependent on Judge Kirscher entering huge judgments against Mr. Blixseth: was there a "wink and a nod?", did the settling parties explain to Judge

---

[13] Judge Kirscher not only admits to participating in these closed-door settlement negotiations, but also offered to and did meet privately with the principals of CrossHarbor and Credit Suisse to resolve the bankruptcy. [ER Vol. I., 75-76].

Kirscher all the many ways that Mr. Blixseth could and should be subjected to massive judgments so that their settlement could be successful? No one knows the answers to these questions and therein lies the appearance of impartiality and improper influence.[14]

Judge Kirscher's *ex parte* involvement in the YMC settlement, which settlement specifically contemplated Judge Kirscher then entering massive judgments against Mr. Blixseth, is analogous to the type of improper *ex parte* communications, improper "engineering", and impermissible "appearance of bias" that the now Chief Judge found to be judicial misconduct in *In re Complaint of Judicial Misconduct*, 425 F.3d 1179, 1183-1189 (9th Cir. 2005) (Kozinski, C.J.) (in dissent).[15]

---

[14] *U.S. v. Wolfson*, 634 F.2d 1217, 1221-1222 (9th Cir. 1980) ("gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure."); *Edgar v. K.L.*, 93 F.3d 256, 258-260 (7th Cir. 1996).

[15] Judge Kirscher presiding over private settlement negotiations that resulted in a plan of reorganization that made Mr. Blixseth the sole litigation target of the Debtor entities and required Judge Kirscher to then enter hundred million dollar judgments against Mr. Blixseth for the plan to be successful is analogous to a judge sitting as a one-man grand jury and then subsequently sitting as the trial judge over the accused, which of course, requires recusal. *Caperton*, 556 U.S. at 880.

The interplay between Judge Kirscher's involvement in brokering a settlement for the YMC plan of reorganization in closed-door negotiations, and success of that plan subsequently requiring Judge Kirscher to enter judgments worth of hundreds of millions of dollars against Mr. Blixseth is precisely why this Court *In re Manoa* admonished bankruptcy judges to be "especially soliticous" in recusing themselves, which Judge Kirscher should have done here.

What emerges from Judge Kirscher's admissions in the Disqualification Memorandum is a judge who, working "after hours" and meeting in hotels, became too intimate with parties and attorneys involved, too invested in a successful reorganization – a reorganization at Mr. Blixseth's expense, dependent upon a judgment against him in the then pending AP 14 and other cases -- and most importantly, too loose with the requirements of notice, opportunity to be heard and transparency that a judicial office demands.  [ER Vol. I, 72, 74-77, 89].[16] Judge Kirscher's personal investment in the Yellowstone Club case demands disqualification from proceedings involving Mr. Blixseth and

---

[16] The same settlement agreement that Judge Kirscher helped negotiate, he also approved without appropriate notice to the public required by F.R.B.P. 9019.  *See Blixseth*, 2010 WL 4371368, at *1.

is exemplified by his refusal to follow the appellate mandate from this Court after the YMC I appeal. *See e.g.*, *In re Asbestos Litigation*, 977 F.2d at 778-785.

In other respects, the nature of bankruptcy proceedings which bankruptcy judges more susceptible to the appearance of bias as discussed in *In re Manoa* are present here as manifested in: the permissive approach to *ex parte* communications with favored members of the Montana bankruptcy bar (see Section 6.B.(1) *supra*); the admitted use of the plenary knowledge of facts learned in other cases and proceedings to adjudicate substantive rights in adversary proceedings (see Section 6.B.(3) *supra*); and the pre-judging of and being "boxed into" facts and rulings in on-going adversary and appellate remand proceedings (see Section 6.B.(5) *supra*).

### (4) Disqualification Required Where a Judge Entertains Ex Parte Communications and Advocacy

A judge's entertainment of *ex parte* communications can raise, at a minimum, the appearance that a judge lacks impartiality particularly where a partisan enjoys the private "ear of the court." *U.S. v. Wolfson*, 634 F.2d at 1221-1222; *In re Complaint of Judicial Misconduct*, 425

F.3d at 1188 (Kozinski, C.J., in dissent) ("participation in *ex parte* communications will expose the judge to one-sided argumentation.... At worst, [it] is an invitation to improper influence if not outright corruption."); *U.S. v. Van Griffin*, 874 F.2d 634, 637 (9th Cir. 1989); *Edgar*, 93 F.3d at 258-260 (judge's *ex parte* preview of the evidence against a party by partisans "carries an unacceptable potential for compromising impartiality."); *U.S. v. Thompson*, 827 F.2d 1254, 1258-1259 (9th Cir. 1989); *In re Kesington Int'l Ltd.*, 368 F.3d 289, 310 (3rd Cir. 2004).

Disqualification is also mandated where a judge has invited and entertained *ex parte* advocacy. *Wolfson*, 634 F.2d at 1221-1222; *see U.S. v. Wecht*, 484 F.3d 194, 227-228 (3rd Cir. 2007) (improper ex parte advocacy justifying recusal occurs where counsel's assertions "remained unchecked by opposing counsel") (Bright, Cir. Judge, Dissenting).

In a similar vein, it is well-established that if a judge's law clerk engages in conduct that would raise the appearance of impartiality, that conduct is imputed to the judge such that the judge is required to recuse him or herself under § 455(a). *See* U.S. Code of Conduct for United States Canon 3(A)(4), Comment. ("A judge should make

59

reasonable efforts to ensure that law clerks and other court personnel comply with this provision."); *Hall v. Small Business Admin.*, 695 F.2d 175, 178-179 (5th Cir. 1983) ("the clerk is forbidden to do all that is prohibited to the judge. It is the duty of the law clerk 'as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation.'" (internal citations omitted) (cited with approval in *First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983 (9th Cir. 2000)); *Price Bros. Co. v. Philadelphia Gear Corp.*, 629 F.2d 444, 446-447 (6th Cir. 1980); *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416 (9th Cir. 1995); *Onishea v. Hopper*, 126 F.3d 1323, 1340 (11th Cir. 1997).

### (a) Application

Here, as discussed above, Judge Kirscher allowed both of his law clerks to engage in *ex parte* communications with favored members of the Montana bankruptcy bar concerning material issues involving Mr. Blixseth and the Yellowstone Club case and adversary proceedings. Judge Kirscher ignored the email most indicating a lack of impartiality, dismissed the other communications as "administrative" in nature and then disclaimed responsibility for his clerks' conduct.

60

**(i)**     <u>*Ex Parte* advocacy against Mr. Blixseth</u>

One week before Phase I of the trial in AP-14, where the Debtors were seeking to impose a $200+ million judgment against Blixseth, Senior Judge Peterson provided Mr. Patten with citations to two cases that Judge Peterson thought would be helpful to Mr. Patten in his case against Blixseth in AP-14. [ER Vol. IV, 590]. The email stated:

> "Is the case [AP-14] going forward on the 22nd? Also as to that you may want to see Schubert case at 554 f3d 382, appeal from 348 br 234 as well as 391 br 626, 631 (9 BAP) on non statutory insiders applying equitable subordination [sic]. It was bought to my attention last week in a Vegas mediation dealing with lender conduct such as Cs/Blixeth [sic]. Judge."

*Id*.

This email demonstrates that on the eve of trial, the Montana bankruptcy court affirmatively assisted Mr. Blixseth's adversaries to obtain a judgment against him. Such conduct is antithetical to due process and betrays any appearance that the Montana bankruptcy court as an institution serves as a fair tribunal for Mr. Blixseth. Rather than address this evidence of *partiality*, Judge Kirscher simply ignores it. [ER Vol. I, 77-80].

61

In his Disqualification Memorandum, Judge Kirscher similarly ignored the fact that he gave Dave Cotner who is counsel for a trustee who is suing Mr. Blixseth for hundreds of millions of dollars, *carte blanche* opportunity to malign on the record the professional reputation of Mr. Blixseth's lead litigation counsel, Mr. Flynn, without giving any notice to Mr. Flynn that Mr. Cotner would be invited to advocate against him, nor did Mr. Flynn have any opportunity to respond. [ER Vol. III, 290-292, 318-322]. Judge Kirscher's invitation to this type of *ex parte* advocacy raises an appearance of bias yet Judge Kirscher ignored to address this matter in denying the Disqualification Motion.

**(ii)** <u>Ross Richardson *ex parte* communication</u>

As detailed above on June 10, 2010, Judge Kirscher's law clerk, Terry Healow, called Ross Richardson regarding the status of Mr. Richardson's settlement discussions with Blixseth in connection with the Yellowstone Club World bankruptcy case pending before Judge Kirscher. [ER Vol. IV, 579-580, 594]. At the time, Mr. Richardson was the Chapter 7 Trustee for the Yellowstone Club World bankruptcy estate. Mr. Richardson indicated to Mr. Healow that his settlement

with Blixseth was close to being finalized. Mr. Healow then encouraged Mr. Richardson to finalize the settlement quickly before Blixseth could "renege." From a reasonable person's perspective, as Judge Kirscher's law clerk, Mr. Healow had institutional knowledge about the impending decisions from Judge Kirscher that directly impacted Mr. Blixseth's willingness to finalize his settlement with Mr. Richardson, particularly Judge Kirscher's ruling against Mr. Blixseth in AP 14. The only conclusion that can be drawn from this evidence is that Judge Kirscher held off issuing his decision in AP 14 until the settlement between Richardson and Mr. Blixseth could be finalized. A reasonable person with knowledge of these facts could only conclude that Judge Kirscher's chambers were biased against Mr. Blixseth and could not be counted upon to act impartially toward him. *Hamid*, 51 F.3d at 1416 ("Even if the judge has no reason to recuse herself based upon her own circumstances, a law clerk's relationships might cause the impartiality of decisions from that judge's chambers in which the clerk participates reasonably to be questioned.").

Judge Kirscher admits that Mr. Healow had this *ex parte* communication; however, instead of addressing whether this

conversation objectively demonstrates an appearance of bias, Judge Kirscher evades this critical evidence by disclaiming any responsibility for the conduct of his law clerk. [ER Vol. I, 68-71].

"Disclaiming responsibility" is not the controlling standard. When facts are undisputed, a judge cannot characterize them with his own subjective findings of good faith. *Furst*, 886 F.2d at 583; s*ee Caperton*, 556 U.S. at 882-883. Here, an agent of Judge Kirscher, cloaked with his authority, advocated against Mr. Blixseth by advising an adversary to hurry-up and lock Mr. Blixseth into a settlement before he "reneges." Mr. Healow's comments to counsel *ex parte* violates his duty to avoid off--the-record contacts that might influence the outcome of litigation and mandates disqualification.

**(iii)** <u>Kelly Harrington emails</u>

Judge Kirscher dismissed the remaining emails as merely "administrative" in nature and not being inappropriate *ex parte* communication and that he did not find them prejudicial. [ER Vol. I, 79]. While the emails that Judge Kirscher chose to address in his Disqualification Memorandum were administrative in nature, he

64

ignored entirely the emails that clearly raised an appearance of bias in favor of Andy Patten, a local member of the Montana bankruptcy bar who was suing Mr. Blixseth for over $200 million.

For example, a the November 7, 2008 email reveals that not only did Ms. Harrington send *ex parte* emails Mr. Patten but also provided him personal availability over the weekend via her *private* cell phone regarding the Yellowstone Club bankruptcy case. [ER Vol. IV, 588]. A November 10, 2008 email shows that Ms. Harrington offered Mr. Patten incredible access to her and Judge Kirscher by providing her home phone number to him and indicating that she would contact Judge Kirscher if necessary to help Mr. Patten file the Yellowstone Club bankruptcy case. [ER Vol. IV, 587]. While Judge Kirscher may not subjectively find fault with such practices, a reasonable person certainly would question that one-sided access, and conclude that Judge Kirscher's chambers give preferred access to select members of the local bankruptcy bar and are, at the very least, being exposed to one-sided argumentation and at worst inviting undue influence.

Indeed, exposure to one-sided argumentation is inherent in Ms. Harrington's November 19, 2009 email exchange with Mr. Patten,

where she willingly agrees to have the court (presumably Judge Kirscher) keep a "heads up" about a new case "confidential." [ER Vol. IV, 592].

Again, in his Disqualification Memorandum, Judge Kirscher purports to review a number of emails that were "administrative" in nature but is silent regarding these emails. These emails are anything but "administrative" in nature. They show that Mr. Patten has the private ear of Judge Kirscher and his staff and this "private ear" is particularly troubling for Mr. Blixseth, or any litigant who opposes Mr. Patten, given the fact that Mr. Patten is counsel for the Yellowstone Club Debtors and successful reorganization of Mr. Patten's client depends upon Judge Kirscher entering hundred million dollar judgments against Mr. Blixseth.

When viewed in totality with all the other facts described herein, these *ex parte* communications between the Montana bankruptcy court as an institution with preferred members of the Montana bankruptcy bar who are adverse to Mr. Blixseth, raises the appearance, at a minimum, that these parties have the private ear of the Court with

respect to matters involving Mr. Blixseth. Judge Kirscher ignored these emails entirely and that was an abuse of discretion.

### (5) A Lack of Impartiality Exists Where a Judge Grants Dispositive Motions Without Affording an Opportunity to Respond or be Heard

Granting a dispositive motion without waiting for a timely response from the non-moving party demonstrates a fatal appearance of bias. *Webbe*, , 549 F.2d at 1361; *cf. Matter of Beverly Hills Bancorp*, 752 F.2d 1334, 1341 (9th Cir. 1984). As described in Section 6.B.(2) *supra*, Judge Kirscher has granted and denied dispositive motions for and against Mr. Blixseth without providing him an opportunity to respond and be heard. This fact alone requires disqualification but it certainly mandates disqualification when viewed in totality of all the circumstances described herein and in the Disqualification Motion.

### (6) Double Standard in Treatment of Evidence

Mr. Blixseth submits that when viewed in totality of the facts presented herein and in the Disqualification Motion, Judge Kirscher's multiple statements to Mr. Blixseth's counsel that he does not try things in his court by affidavit but quickly fixed a $40 million judgment against Mr. Blixseth based only on the affidavit of opposing counsel (see

Section 6.B.(4) *supra*) would make a reasonable person aware of those facts question Judge Kirscher's impartiality toward Mr. Blixseth.

### B.   Remedy

Should this Court determine that Judge Kirscher abused his discretion in denying the Disqualification Motion, the appropriate remedies would be: to vacate all orders and judgments entered by Judge Kirscher which involve in any manner Mr. Blixseth; to relieve Mr. Blixseth from any impact of the Yellowstone Club and BLX Group, Inc. bankruptcy cases, including the exculpation clauses therein and the prosecution of numerous lawsuits against him by the YCLT since the filing of the Disqualification Motion; and to reassign any further matter involving Mr. Blixseth not addressed in the aforementioned remedies to another judge. *Preston v. U.S.*, 923 F.2d 731, 734-735 (9th Cir. 2003); *Mangini*, 314 F.3d at 1161-1162. Granting such remedies are the only way to purge the appearance of bias and lack of impartiality that has permeated the Yellowstone Club and related proceedings since their inception.

C. <u>Alternatively Reassignment is Appropriate</u>

Should this Court not find that Judge Kirscher abused his discretion in denying the Disqualification Motion, this Court should nevertheless reassign all matters involving Mr. Blixseth to another judge, presumably in another district.

"[An] appellate court's authority to reassign exists apart from the judicial disqualification statutes." *Mitchell v. Maynard*, 80 F.3d 1433, 1448 (10th Cir. 1996); *see* 28 U.S.C. § 2106.

This Court may grant such a reassignment or remand under its supervisory powers vested in it under 28 U.S.C. § 2106. *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 372-373 (9th Cir. 2005); *Liteky*, 510 U.S. at 554. As discussed by this Court in *Living Designs, Inc.*,:

> Absent allegations of bias, the factors th[e Ninth Circuit] considers in deciding whether "unusual circumstances" exist and remand to a different judge is appropriate are: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether

69

> reassignment would entail waste and duplication
> out of proportion to any gain in preserving the
> appearance of fairness.
>
> A finding of either the first or second factor
> supports remanding to a different district court
> judge.

*Living Designs, Inc.*, 431 F.3d at 372-373 (citations omitted).  The

grounds for re-assignment upon remand under 28 U.S.C. § 2106

dovetail with those for disqualification under § 455.  *Liteky*, 510 U.S. at

552-553.

As detailed herein, "unusual circumstance" exist which justify this

Court re-assigning Mr. Blixseth's matters.  The facts detailed below

when viewed in their totality demonstrate at a minimum that re-

assignment is required to "preserve the appearance of justice" and

because Judge Kirscher is unable to be impartial with regard to his

view of Mr. Blixseth that he reasonably can "be expected upon remand

to have substantial difficulty in putting out of his … mind previously-

expressed views or findings determined to be erroneous." *Living

Designs, Inc.*, 431 F.3d at 372-373.  Nowhere is last factor made more

apparent than in Judge Kirscher's blatant disregard of the district

court's appellate mandate to him when he re-approved *in toto* the exact

same exculpation clause in the Yellowstone Club's plan of reorganization that the district court found violated Ninth Circuit law. Simply juxtaposing the district court's statement that the exculpation clause violated Ninth Circuit law with Judge Kirscher's subsequent statement that the exculpation clause did not violate Ninth Circuit demonstrates that Judge Kirscher reasonably can "be expected upon remand to have substantial difficulty in putting out of his … mind previously-expressed views or findings determined to be erroneous." *Id.*; *see* Section 6.B.(5).b *supra*. This demands reassignment.

## 9.   <u>CONCLUSION</u>

For the foregoing reasons, Mr. Blixseth requests that this Court find that Judge Kirscher abused his discretion in denying the Disqualification Motion; that this Court then vacate all of Judge Kirscher's orders and judgments entered against Mr. Blixseth; that this Court relieve Mr. Blixseth of all impacts to him resulting from the Yellowstone Club and BLX Group, Inc. bankruptcy cases; and that another judge be reassigned to handle any matter involving Mr. Blixseth.

Dated, April 8, 2013:

/s/ Christopher J. Conant

Christopher J. Conant, Esq.
Michael J. Ferrigno
Patrick T. Fox
Phillip H. Stillman
Attorneys for the Appellants

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. Ap. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the Appellants' Opening Brief is proportionally spaced in serif font (Century style), has a typeface of 14 points, and contains 13,936 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This Brief was prepared using Microsoft Word and the word court was determined using the Microsoft Word word count application.


April 8, 2013                              /s/ Christopher J. Conant

                                           Christopher J. Conant, Esq.


A

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6 Mr. Blixseth states that the following cases are related:

1.      Ninth Circuit Case Nos. 13-35191, 13-35192, 13-35196, 13-35197, 13-35198: the cases are directly related to the pending appeal because when Mr. Blixseth filed his Disqualification Motion before Judge Kirscher, he did so not only in the main Yellowstone Club bankruptcy case (Mont. Bankr. Case No. 08-61570), but he also did so in several adversary proceedings in which he was a defendant before Judge Kirscher. When Judge Kirscher denied his Disqualification Motion he entered orders in the main Yellowstone Club case and in all the adversary proceedings in which Mr. Blixseth filed the Disqualification Motion. Mr. Blixseth filed notices of appeal to the District Court in each case in which Judge Kirscher entered his order denying the Disqualification. Each of those notices of appeal were docketed as separate cases in the District Court. However, when the District Court entered its order affirming Judge Kirscher, the District Court did so in only one of the cases. That case number was 2:11-00073 and the District Court entered that order on November 28, 2012. For

B

whatever reason, the District Court did not enter the same order on November 28, 2012 in the other appeal cases relating to the Disqualification Motion pending before it. Instead, it appears that the District Court administratively overlooked the fact that it should have entered the same order on the same day in the other cases. The District Court finally did enter its order affirming Judge Kirscher's denial of the Disqualification Motion in the other cases on or about March 13, 2013 and the appeals to this Court followed.

2.     Ninth Circuit Case No. 10-36038 (consolidation of Case Nos. 0-36038, 10-36047, 10-36048, and 10-36073): This was an appeal brought by various proponents of the Yellowstone Club's original Third Amended Plan of Reorganization following the District Court's reversal of the plan on November 2, 2010 for several "plain errors" (YMC I Appeal). In this case, Mr. Blixseth filed a motion to file an over-length brief and the over-length brief was Mr. Blixseth Motion for Reassignment under 28 U.S.C. § 2106. The Motion for Reassignment was substantially similar to Mr. Blixseth's Disqualification Motion. This Court denied the motion for lack of appellate jurisdiction over the issue at that time. This Court also dismissed the YMC I appeal for lack

C

of appellate jurisdiction.

3.      Ninth Circuit Case No. 13-35190: This case is an appeal by Mr. Blixseth of the U.S. District Court for the District of Montana's dismissal for lack of appellate standing of Mr. Blixseth appeal of the Montana bankruptcy court's order on remand (YMC II Appeal) re-confirming the Yellowstone Club's Third Amended Plan of Reorganization.

4.      Ninth Circuit Case No. 10-80198: This was a case in which the YCLT sought direct certification under 28 U.S.C. § 158(d) of the YCLT's appeal of the $40 million judgment entered by Judge Kirscher in AP-14.  This Court denied the YCLT's request to accept its appeal for direct appeal from the bankruptcy court.

5.      Ninth Circuit Case No. 13-35245: This case is a cross-appeal of Mr. Blixseth's appeal in Ninth Circuit Case No. 13-35190 brought by CrossHarbor Capital Partners LLC and the Yellowstone Club entities wherein the appellants are appealing the District Court's denial of their motion to dismiss for equitable mootness Mr. Blixseth's YMC II appeal.

6.      Ninth Circuit Case No. 12-35299: This case is an appeal brought by Mr. Blixseth of the U.S. District Court for the District of

D

Montana's dismissal for lack of appellate jurisdiction of Mr. Blixseth's appeal of Judge Kirscher's order denying Mr. Blixseth's motion asking the Judge Kirscher to abstain under 28 U.S.C. § 1334(c) from presiding over the complaint brought by the Chapter 7 trustee of Edra Blixseth's bankruptcy estate wherein the trustee seeks to set aside the final divorce judgment of and marital property divisions approved by the California Superior Court, Riverside County.

7.     Ninth Circuit Case No. 13-35113: This is an appeal brought by Mr. Blixseth of the U.S. District Court for the District of Montana's denial of his appeal of the bankruptcy court's allowance of a claim against the Yellowstone Club in favor of former minority shareholders in the Club.  The amount of the allowed claim is $22 million and is the largest component of the $40 million judgment that Judge Kirscher entered against Mr. Blixseth in AP-14.

8.     Ninth Circuit Case No. 13-35122: This is an appeal brought by Mr. Blixseth of the U.S. District Court for the District of Montana's dismissal of Mr. Blixseth appeal of the Montana bankruptcy court's approval of the BLX Group, Inc.'s, Chapter 11 plan of reorganization. The District Court dismissed Mr. Blixseth's appeal for lack of appellate

E

standing even though the plan assigned a purported $190 million claim to the YCLT to then pursue in litigation against Mr. Blixseth.

9.     Ninth Circuit Case No. 13-35246: This is an appeal brought by Mr. Blixseth wherein he is appealing the District Court's dismissal of his appeal for lack of appellate standing of the bankruptcy's court order vacating a hearing on remand as to whether the Yellowstone Club bankruptcy plan of reorganization was proposed in good faith.

F

# ADDDENDUM TO APPELLANT'S BRIEF

| Statutes | Pages |
|---|---|
| 11 U.S.C. § 1129 | 1-5 |
| 28 U.S.C. § 1291 | 6 |
| 28 U.S.C. § 158(a) and (d) | 7-10 |
| 28 U.S.C. § 2106 | 11 |
| 28 U.S.C. § 455 | 12-14 |

| Rules | Pages |
|---|---|
| Federal Rule of Appellate Procedure 6(b)(1) | 15-18 |
| Federal Rule of Bankruptcy Procedure 5004 | 19-20 |
| Federal Rule of Bankruptcy Procedure 8002(a) | 21-24 |
| Federal Rule of Bankruptcy Procedure 9019 | 25-26 |
| U.S. Code of Conduct for United States Canon 3(A)(4) | 27-32 |

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 11. Reorganization (Refs & Annos)
            Subchapter II. The Plan (Refs & Annos)

11 U.S.C.A. § 1129

§ 1129. Confirmation of plan

Effective: December 22, 2010
Currentness

**(a)** The court shall confirm a plan only if all of the following requirements are met:


**(1)** The plan complies with the applicable provisions of this title.


**(2)** The proponent of the plan complies with the applicable provisions of this title.


**(3)** The plan has been proposed in good faith and not by any means forbidden by law.


**(4)** Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.


**(5)(A)(i)** The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and


**(ii)** the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and


**(B)** the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.


**(6)** Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.


**(7)** With respect to each impaired class of claims or interests--


  **(A)** each holder of a claim or interest of such class--

**(i)** has accepted the plan; or

**(ii)** will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

**(B)** if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

**(8)** With respect to each class of claims or interests--

**(A)** such class has accepted the plan; or

**(B)** such class is not impaired under the plan.

**(9)** Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--

**(A)** with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

**(B)** with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive--

**(i)** if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

**(ii)** if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

**(C)** with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash--

**(i)** of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

**(ii)** over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

**(iii)** in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

**(D)** with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

**(10)** If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

**(11)** Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

**(12)** All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

**(13)** The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

**(14)** If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

**(15)** In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--

**(A)** the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

**(B)** the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

**(16)** All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

**(b)(1)** Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan

notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**(2)** For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

  **(A)** With respect to a class of secured claims, the plan provides--

    **(i)(I)** that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

    **(II)** that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

    **(ii)** for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

    **(iii)** for the realization by such holders of the indubitable equivalent of such claims.

  **(B)** With respect to a class of unsecured claims--

    **(i)** the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

    **(ii)** the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

  **(C)** With respect to a class of interests--

    **(i)** the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

    **(ii)** the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

**(c)** Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

**(d)** Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

**(e)** In a small business case, the court shall confirm a plan that complies with the applicable provisions of this title and that is filed in accordance with section 1121(e) not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3).

**Credits**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2635; Pub.L. 98-353, Title III, § 512, July 10, 1984, 98 Stat. 386; Pub.L. 99-554, Title II, §§ 225, 283(v), Oct. 27, 1986, 100 Stat. 3102, 3118; Pub.L. 100-334, § 2(b), June 16, 1988, 102 Stat. 613; Pub.L. 103-394, Title III, § 304(h)(7), Title V, § 501(d)(32), Oct. 22, 1994, 108 Stat. 4134, 4146; Pub.L. 109-8, Title II, § 213(1), Title III, § 321(c), Title IV, § 438, Title VII, § 710, Title XII, § 1221(b), Title XV, § 1502(a)(8), Apr. 20, 2005, 119 Stat. 52, 95, 113, 127, 196, 216; Pub.L. 111-327, § 2(a)(35), Dec. 22, 2010, 124 Stat. 3561.)

Notes of Decisions (1756)

11 U.S.C.A. § 1129, 11 USCA § 1129
Current through P.L. 112-283 approved 1-14-13

---

**End of Document**     © 2013 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 83. Courts of Appeals (Refs & Annos)

28 U.S.C.A. § 1291

§ 1291. Final decisions of district courts

Currentness

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**Credits**

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 48, 65 Stat. 726; July 7, 1958, Pub.L. 85-508, § 12(e), 72 Stat. 348; Apr. 2, 1982, Pub.L. 97-164, Title I, § 124, 96 Stat. 36.)

Notes of Decisions (3167)

28 U.S.C.A. § 1291, 28 USCA § 1291
Current through P.L. 112-283 approved 1-14-13

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part I. Organization of Courts (Refs & Annos)
            Chapter 6. Bankruptcy Judges (Refs & Annos)

28 U.S.C.A. § 158

§ 158. Appeals

Effective: December 22, 2010
Currentness

**(a)** The district courts of the United States shall have jurisdiction to hear appeals [1]

    **(1)** from final judgments, orders, and decrees;

    **(2)** from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and

    **(3)** with leave of the court, from other interlocutory orders and decrees;

and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

**(b)(1)** The judicial council of a circuit shall establish a bankruptcy appellate panel service composed of bankruptcy judges of the districts in the circuit who are appointed by the judicial council in accordance with paragraph (3), to hear and determine, with the consent of all the parties, appeals under subsection (a) unless the judicial council finds that--

    **(A)** there are insufficient judicial resources available in the circuit; or

    **(B)** establishment of such service would result in undue delay or increased cost to parties in cases under title 11.

Not later than 90 days after making the finding, the judicial council shall submit to the Judicial Conference of the United States a report containing the factual basis of such finding.

**(2)(A)** A judicial council may reconsider, at any time, the finding described in paragraph (1).

**(B)** On the request of a majority of the district judges in a circuit for which a bankruptcy appellate panel service is established under paragraph (1), made after the expiration of the 1-year period beginning on the date such service is established, the judicial council of the circuit shall determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-1, Page 94 of 119

**(C)** On its own motion, after the expiration of the 3-year period beginning on the date a bankruptcy appellate panel service is established under paragraph (1), the judicial council of the circuit may determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

**(D)** If the judicial council finds that either of such circumstances exists, the judicial council may provide for the completion of the appeals then pending before such service and the orderly termination of such service.

**(3)** Bankruptcy judges appointed under paragraph (1) shall be appointed and may be reappointed under such paragraph.

**(4)** If authorized by the Judicial Conference of the United States, the judicial councils of 2 or more circuits may establish a joint bankruptcy appellate panel comprised of bankruptcy judges from the districts within the circuits for which such panel is established, to hear and determine, upon the consent of all the parties, appeals under subsection (a) of this section.

**(5)** An appeal to be heard under this subsection shall be heard by a panel of 3 members of the bankruptcy appellate panel service, except that a member of such service may not hear an appeal originating in the district for which such member is appointed or designated under section 152 of this title.

**(6)** Appeals may not be heard under this subsection by a panel of the bankruptcy appellate panel service unless the district judges for the district in which the appeals occur, by majority vote, have authorized such service to hear and determine appeals originating in such district.

**(c)(1)** Subject to subsections (b) and (d)(2), each appeal under subsection (a) shall be heard by a 3-judge panel of the bankruptcy appellate panel service established under subsection (b)(1) unless--

    **(A)** the appellant elects at the time of filing the appeal; or

    **(B)** any other party elects, not later than 30 days after service of notice of the appeal;

to have such appeal heard by the district court.

**(2)** An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

**(d)(1)** The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.

**(2)(A)** The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that--

(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;

and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

**(B)** If the bankruptcy court, the district court, or the bankruptcy appellate panel--

(i) on its own motion or on the request of a party, determines that a circumstance specified in clause (i), (ii), or (iii) of subparagraph (A) exists; or

(ii) receives a request made by a majority of the appellants and a majority of appellees (if any) to make the certification described in subparagraph (A);

then the bankruptcy court, the district court, or the bankruptcy appellate panel shall make the certification described in subparagraph (A).

**(C)** The parties may supplement the certification with a short statement of the basis for the certification.

**(D)** An appeal under this paragraph does not stay any proceeding of the bankruptcy court, the district court, or the bankruptcy appellate panel from which the appeal is taken, unless the respective bankruptcy court, district court, or bankruptcy appellate panel, or the court of appeals in which the appeal is pending, issues a stay of such proceeding pending the appeal.

**(E)** Any request under subparagraph (B) for certification shall be made not later than 60 days after the entry of the judgment, order, or decree.

**Credits**

(Added Pub.L. 98-353, Title I, § 104(a), July 10, 1984, 98 Stat. 341; amended Pub.L. 101-650, Title III, § 305, Dec. 1, 1990, 104 Stat. 5105; Pub.L. 103-394, Title I, §§ 102, 104(c), (d), Oct. 22, 1994, 108 Stat. 4108-4110; Pub.L. 109-8, Title XII, § 1233(a), Apr. 20, 2005, 119 Stat. 202; Pub.L. 111-327, § 2(c)(1), Dec. 22, 2010, 124 Stat. 3563.)

Notes of Decisions (854)

Footnotes

1       So in original.

28 U.S.C.A. § 158, 28 USCA § 158

Current through P.L. 112-283 approved 1-14-13

---

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part V. Procedure
      Chapter 133. Review--Miscellaneous Provisions (Refs & Annos)

28 U.S.C.A. § 2106

§ 2106. Determination

Currentness

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

**Credits**
(June 25, 1948, c. 646, 62 Stat. 963.)

Notes of Decisions (291)

28 U.S.C.A. § 2106, 28 USCA § 2106
Current through P.L. 112-283 approved 1-14-13

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part I. Organization of Courts (Refs & Annos)
      Chapter 21. General Provisions Applicable to Courts and Judges

28 U.S.C.A. § 455

§ 455. Disqualification of justice, judge, or magistrate judge

Currentness

**(a)** Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

**(b)** He shall also disqualify himself in the following circumstances:

**(1)** Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

**(2)** Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

**(3)** Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

**(4)** He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

**(5)** He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

**(i)** Is a party to the proceeding, or an officer, director, or trustee of a party;

**(ii)** Is acting as a lawyer in the proceeding;

**(iii)** Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

**(iv)** Is to the judge's knowledge likely to be a material witness in the proceeding.

**(c)** A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

**(d)** For the purposes of this section the following words or phrases shall have the meaning indicated:

**(1)** "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

**(2)** the degree of relationship is calculated according to the civil law system;

**(3)** "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

**(4)** "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

**(i)** Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

**(ii)** An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

**(iii)** The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

**(iv)** Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

**(e)** No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

**(f)** Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate judge, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate judge, bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.

**Credits**

(June 25, 1948, c. 646, 62 Stat. 908; Dec. 5, 1974, Pub.L. 93-512, § 1, 88 Stat. 1609; Nov. 6, 1978, Pub.L. 95-598, Title II, § 214(a), (b), 92 Stat. 2661; Nov. 19, 1988, Pub.L. 100-702, Title X, § 1007, 102 Stat. 4667; Dec. 1, 1990, Pub.L. 101-650, Title III, § 321, 104 Stat. 5117.)

Notes of Decisions (1506)

28 U.S.C.A. § 455, 28 USCA § 455
Current through P.L. 112-283 approved 1-14-13

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Appellate Procedure (Refs & Annos)
    Title II. Appeal from a Judgment or Order of a District Court

Federal Rules of Appellate Procedure Rule 6, 28 U.S.C.A.

Rule 6. Appeal in a Bankruptcy Case From a Final Judgment,
Order, or Decree of a District Court or Bankruptcy Appellate Panel

Currentness

**(a) Appeal From a Judgment, Order, or Decree of a District Court Exercising Original Jurisdiction in a Bankruptcy Case.** An appeal to a court of appeals from a final judgment, order, or decree of a district court exercising jurisdiction under 28 U.S.C. § 1334 is taken as any other civil appeal under these rules.

**(b) Appeal From a Judgment, Order, or Decree of a District Court or Bankruptcy Appellate Panel Exercising Appellate Jurisdiction in a Bankruptcy Case.**

**(1) Applicability of Other Rules.** These rules apply to an appeal to a court of appeals under 28 U.S.C. § 158(d) from a final judgment, order, or decree of a district court or bankruptcy appellate panel exercising appellate jurisdiction under 28 U.S.C. § 158(a) or (b). But there are 3 exceptions:

**(A)** Rules 4(a)(4), 4(b), 9, 10, 11, 12(b), 13-20, 22-23, and 24(b) do not apply;

**(B)** the reference in Rule 3(c) to "Form 1 in the Appendix of Forms" must be read as a reference to Form 5; and

**(C)** when the appeal is from a bankruptcy appellate panel, the term "district court," as used in any applicable rule, means "appellate panel."

**(2) Additional Rules.** In addition to the rules made applicable by Rule 6(b)(1), the following rules apply:

**(A) Motion for rehearing.**

**(i)** If a timely motion for rehearing under Bankruptcy Rule 8015 is filed, the time to appeal for all parties runs from the entry of the order disposing of the motion. A notice of appeal filed after the district court or bankruptcy appellate panel announces or enters a judgment, order, or decree--but before disposition of the motion for rehearing--becomes effective when the order disposing of the motion for rehearing is entered.

**(ii)** Appellate review of the order disposing of the motion requires the party, in compliance with Rules 3(c) and 6(b)(1)(B), to amend a previously filed notice of appeal. A party intending to challenge an altered or amended judgment, order, or decree must file a notice of appeal or amended notice of appeal within the time prescribed by Rule 4--excluding Rules 4(a)(4) and 4(b)--measured from the entry of the order disposing of the motion.

**(iii)** No additional fee is required to file an amended notice.

**(B) The record on appeal.**

**(i)** Within 14 days after filing the notice of appeal, the appellant must file with the clerk possessing the record assembled in accordance with Bankruptcy Rule 8006--and serve on the appellee--a statement of the issues to be presented on appeal and a designation of the record to be certified and sent to the circuit clerk.

**(ii)** An appellee who believes that other parts of the record are necessary must, within 14 days after being served with the appellant's designation, file with the clerk and serve on the appellant a designation of additional parts to be included.

**(iii)** The record on appeal consists of:

• the redesignated record as provided above;

• the proceedings in the district court or bankruptcy appellate panel; and

• a certified copy of the docket entries prepared by the clerk under Rule 3(d).

**(C) Forwarding the record.**

**(i)** When the record is complete, the district clerk or bankruptcy appellate panel clerk must number the documents constituting the record and send them promptly to the circuit clerk together with a list of the documents correspondingly numbered and reasonably identified. Unless directed to do so by a party or the circuit clerk, the clerk will not send to the court of appeals documents of unusual bulk or weight, physical exhibits other than documents, or other parts of the record designated for omission by local rule of the court of appeals. If the exhibits are unusually bulky or heavy, a party must arrange with the clerks in advance for their transportation and receipt.

**(ii)** All parties must do whatever else is necessary to enable the clerk to assemble and forward the record. The court of appeals may provide by rule or order that a certified copy of the docket entries be sent in place of the redesignated record, but any party may request at any time during the pendency of the appeal that the redesignated record be sent.

**(D) Filing the record.** Upon receiving the record--or a certified copy of the docket entries sent in place of the redesignated record--the circuit clerk must file it and immediately notify all parties of the filing date.

**Credits**

(Added Apr. 25, 1989, eff. Dec. 1, 1989; amended Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 24, 1998, eff. Dec. 1, 1998; Mar. 26, 2009, eff. Dec. 1, 2009.)

**Editors' Notes**

**ADVISORY COMMITTEE NOTES**

1989 Addition

A new Rule 6 is proposed. The Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 92 Stat. 2549, the Supreme Court decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982), and the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 333, have made the existing Rule 6 obsolete.

**Subdivision (a).** Subdivision (a) provides that when a district court exercises original jurisdiction in a bankruptcy matter, rather than referring it to a bankruptcy judge for a final determination, the appeal should be taken in identical fashion as appeals from district court decisions in other civil actions. A district court exercises original jurisdiction and this subdivision applies when the district court enters a final order or judgment upon consideration of a bankruptcy judge's proposed findings of fact and conclusions of law in a non-core proceeding pursuant to 28 U.S.C. § 157(c)(1) or when a district court withdraws a proceeding pursuant to 28 U.S.C. § 157(d). This subdivision is included to avoid uncertainty arising from the question of whether a bankruptcy case is a civil case. The rules refer at various points to the procedure "in a civil case", *see,* e.g. Rule 4(a) (1). Subdivision (a) makes it clear that such rules apply to an appeal from a district court bankruptcy decision.

**Subdivision (b).** Subdivision (b) governs appeals that follow intermediate review of a bankruptcy judge's decision by a district court or a bankruptcy appellate panel.

**Subdivision (b)(1).** Subdivision (b)(1) provides for the general applicability of the Federal Rules of Appellate Procedure, with specified exceptions, to appeals covered by subdivision (b) and makes necessary word adjustments.

**Subdivision (b)(2).** Paragraph (i) provides that the time for filing a notice of appeal shall begin to run anew from the entry of an order denying a rehearing or from the entry of a subsequent judgment. The Committee deliberately omitted from the rule any provision governing the validity of a notice of appeal filed prior to the entry of an order denying a rehearing; the Committee intended to leave undisturbed the current state of the law on that issue. Paragraph (ii) calls for a redesignation of the appellate record assembled in the bankruptcy court pursuant to Rule 8006 of the Rules of Bankruptcy Procedure. After an intermediate appeal, a party may well narrow the focus of its efforts on the second appeal and a redesignation of the record may eliminate unnecessary material. The proceedings during the first appeal are included to cover the possibility that independent error in the intermediate appeal, for example failure to follow appropriate procedures, may be assigned in the court of appeals. Paragraph (iii) provides for the transmission of the record and tracks the appropriate subsections of Rule 11. Paragraph (iv) provides for the filing of the record and notices to the parties. Paragraph (ii) and Paragraph (iv) both refer to "a certified copy of the docket entries". The "docket entries" referred to are the docket entries in the district court or the bankruptcy appellate panel, not the entire docket in the bankruptcy court.

1993 Amendments

**Note to Subparagraph (b)(2)(i).** The amendment accompanies concurrent changes to Rule 4(a)(4). Although Rule 6 never included language such as that being changed in Rule 4(a)(4), language that made a notice of appeal void if it was filed before, or during the pendency of, certain posttrial motions, courts have found that a notice of appeal is premature if it is filed before the court disposes of a motion for rehearing. See, e.g., *In re X-Cel, Inc.*, 823 F.2d 192 (7th Cir.1987); *In re Shah*, 859 F.2d 1463 (10th Cir.1988). The Committee wants to achieve the same result here as in Rule 4, the elimination of a procedural trap.

1998 Amendments

Case: 12-35986  04/08/2013  ID: 8581488  DktEntry: 13-1  Page 104 of 119

The language and organization of the rule are amended to make the rule more easily understood. In addition to changes made to improve the understanding, the Advisory Committee has changed language to make style and terminology consistent throughout the appellate rules. These changes are intended to be stylistic only.

**Subdivision (b).** Language is added to Rule 6(b)(2)(A)(ii) to conform with the corresponding provision in Rule 4(a)(4). The new language is clarifying rather than substantive. The existing rule states that a party intending to challenge an alteration or amendment of a judgment must file an amended notice of appeal. Of course, if a party has not previously filed a notice of appeal, the party would simply file a notice of appeal not an amended one. The new language states that the party must file "a notice of appeal or amended notice of appeal."

2009 Amendments

**Subdivision (b)(2)(B).** The times set in the former rule at 10 days have been revised to 14 days. See the Note to Rule 26.

Notes of Decisions (2)

F. R. A. P. Rule 6, 28 U.S.C.A., FRAP Rule 6
Amendments received to 2-19-13

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Bankruptcy Rules (Refs & Annos)
        Part V. Bankruptcy Courts and Clerks

Federal Rules of Bankruptcy Procedure, Rule 5004

Rule 5004. Disqualification

Currentness

(a) Disqualification of judge

A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances [1] arises or, if appropriate, shall be disqualified from presiding over the case.

(b) Disqualification of judge from allowing compensation

A bankruptcy judge shall be disqualified from allowing compensation to a person who is a relative of the bankruptcy judge or with whom the judge is so connected as to render it improper for the judge to authorize such compensation.

**Credits**
(As amended Apr. 29, 1985, eff. Aug. 1, 1985; Mar. 30, 1987, eff. Aug. 1, 1987.)

**Editors' Notes**

**ADVISORY COMMITTEE NOTES**
**Subdivision (a).** Disqualification of a bankruptcy judge is governed by 28 U.S.C. § 455. That section provides that the judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned" or under certain other circumstances. In a case under the Code it is possible that the disqualifying circumstance will be isolated to an adversary proceeding or contested matter. The rule makes it clear that when the disqualifying circumstance is limited in that way the judge need only disqualify himself from presiding over that adversary proceeding or contested matter.

It is possible, however, that even if the disqualifying circumstance arises in connection with an adversary proceeding, the effect will be so pervasive that disqualification from presiding over the case is appropriate. This distinction is consistent with the definition of "proceeding" in 28 U.S.C. § 455(d)(1).

**Subdivision (b)** precludes a bankruptcy judge from allowing compensation from the estate to a relative or other person closely associated with the judge. The subdivision applies where the judge has not appointed or approved the employment of the person requesting compensation. Perhaps the most frequent application of the subdivision will be in the allowance of administrative expenses under § 503(b)(3) to (5) of the Code. For example, if an attorney or accountant is retained by an indenture trustee who thereafter makes a substantial contribution in a chapter 11 case, the attorney or accountant may seek compensation under § 503(b)(4). If the attorney or accountant is a relative of or associated with the bankruptcy judge, the judge may not allow compensation to the attorney or accountant. Section 101(34) defines relative and Rule 9001 incorporates the definitions of the Code. See the Advisory Committee's Note to Rule 5002.

1987 Amendments

The rule is amended to be gender neutral. The bankruptcy judge before whom the matter is pending determines whether disqualification is required.

1985 Amendments

Subdivision (a) was affected by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98-353, 98 Stat. 333. The 1978 Bankruptcy Reform Act, P.L. 95-598, included bankruptcy judges in the definition of United States judges in 28 U.S.C. § 451 and they were therefore subject to the provisions of 28 U.S.C. § 455. This was to become effective on April 1, 1984, P.L. 95-598, § 404(b). Section 113 of P.L. 98-353, however, appears to have rendered the amendment to 28 U.S.C. § 451 ineffective. Subdivision (a) of the rule retains the substance and intent of the earlier draft by making bankruptcy judges subject to 28 U.S.C. § 455.

The word "associated" in subdivision (b) has been changed to "connected" in order to conform with Rule 5002(b).

Notes of Decisions (71)

Footnotes

1        So in original. Probably should be "circumstance".

Fed.Rules Bankr.Proc. Rule 5004, 11 U.S.C.A., FRBP Rule 5004

Including Amendments Through 2-19-13

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Bankruptcy Rules (Refs & Annos)
    Part VIII. Appeals to District Court or Bankruptcy Appellate Panel

Federal Rules of Bankruptcy Procedure, Rule 8002

Rule 8002. Time for Filing Notice of Appeal

Currentness

(a) Fourteen-day period

The notice of appeal shall be filed with the clerk within 14 days of the date of the entry of the judgment, order, or decree appealed from. If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was filed, or within the time otherwise prescribed by this rule, whichever period last expires. A notice of appeal filed after the announcement of a decision or order but before entry of the judgment, order, or decree shall be treated as filed after such entry and on the day thereof. If a notice of appeal is mistakenly filed with the district court or the bankruptcy appellate panel, the clerk of the district court or the clerk of the bankruptcy appellate panel shall note thereon the date on which it was received and transmit it to the clerk and it shall be deemed filed with the clerk on the date so noted.

(b) Effect of motion on time for appeal

If any party makes a timely motion of a type specified immediately below, the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding. This provision applies to a timely motion:

**(1)** to amend or make additional findings of fact under Rule 7052, whether or not granting the motion would alter the judgment;

**(2)** to alter or amend the judgment under Rule 9023;

**(3)** for a new trial under Rule 9023; or

**(4)** for relief under Rule 9024 if the motion is filed no later than 14 days after the entry of judgment. A notice of appeal filed after announcement or entry of the judgment, order, or decree but before disposition of any of the above motions is ineffective to appeal from the judgment, order, or decree, or part thereof, specified in the notice of appeal, until the entry of the order disposing of the last such motion outstanding. Appellate review of an order disposing of any of the above motions requires the party, in compliance with Rule 8001, to amend a previously filed notice of appeal. A party intending to challenge an alteration or amendment of the judgment, order, or decree shall file a notice, or an amended notice, of appeal within the time prescribed by this Rule 8002 measured from the entry of the order disposing of the last such motion outstanding. No additional fees will be required for filing an amended notice.

(c) Extension of time for appeal

**(1)** The bankruptcy judge may extend the time for filing the notice of appeal by any party, unless the judgment, order, or decree appealed from:

    **(A)** grants relief from an automatic stay under § 362, § 922, § 1201, or § 1301;

    **(B)** authorizes the sale or lease of property or the use of cash collateral under § 363;

    **(C)** authorizes the obtaining of credit under § 364;

    **(D)** authorizes the assumption or assignment of an executory contract or unexpired lease under § 365;

    **(E)** approves a disclosure statement under § 1125; or

    **(F)** confirms a plan under § 943, § 1129, § 1225, or § 1325 of the Code.

**(2)** A request to extend the time for filing a notice of appeal must be made by written motion filed before the time for filing a notice of appeal has expired, except that such a motion filed not later than 21 days after the expiration of the time for filing a notice of appeal may be granted upon a showing of excusable neglect. An extension of time for filing a notice of appeal may not exceed 21 days from the expiration of the time for filing a notice of appeal otherwise prescribed by this rule or 14 days from the date of entry of the order granting the motion, whichever is later.

### Credits

(As amended Mar. 30, 1987, eff. Aug. 1, 1987; Apr. 30, 1991, eff. Aug. 1, 1991; Apr. 29, 1994, eff. Aug. 1, 1994; Apr. 11, 1997, eff. Dec. 1, 1997; Mar. 26, 2009, eff. Dec. 1, 2009.)

### Editors' Notes

**ADVISORY COMMITTEE NOTES**

This rule is an adaptation of Rule 4(a) F.R.App.P. The time to appeal from a judgment, order, or decree of a bankruptcy judge is 10 days, rather than the 30 days provided for in the civil practice. The shortened time is specified in order to obtain prompt appellate review, often important to the administration of a case under the Code. If a timely notice of appeal is filed, other parties have an additional 10 days within which to file a notice of appeal. A notice of appeal filed within the additional 10 day period by an appellee is a cross appeal, but there is a separate appeal if a non-appellee files a notice of appeal within that 10 day period. The district courts and bankruptcy appellate panels have inherent authority to consolidate appeals.

**Subdivision (b)** is essentially the same as Rule 4(a)(4) of the F.R.App.P.

**Subdivision (c)** is similar to former Bankruptcy Rule 802(c). To expedite the disposition of appeals the maximum extension of time is 20 days instead of the 30 days provided by Rule 4(a)(5) of the F.R.App.P. Subject to the exceptions set forth in subdivision (c), the court may extend the time for taking an appeal when a motion for extension is filed after the expiration of the original 10 day period but no later than 20 days after the expiration of the original 10 day period. Orders of the bankruptcy court relating to the sale of property, extension of credit, confirmation of a plan, dismissal or conversion of the case, and approval of

Case: 12-35986  04/08/2013  ID: 8581488  DktEntry: 13-1  Page 109 of 119

the disclosure statement are of such significance to the administration of the case, the parties in interest, and third parties that this subdivision requires that either an appeal or a motion for extension be filed within the original 10 day period.

If a timely notice of appeal is not filed, no appeal may be taken later. Former Bankruptcy Rule 803, which provided that a referee's judgment became final when the appeal period expired, has been omitted as unnecessary.

1991 Amendment

**Subdivision (a)** is amended to conform to F.R.App.P. 4(a)(2) which is designed to avoid the loss of the right to appeal when a notice of appeal is filed prematurely.

**Subdivision (b)(1)** is deleted because Rule 9015 was abrogated in 1987.

1994 Amendments

These amendments are intended to conform to the 1993 amendments to F.R.App.P. 4(a)(4) and 6(b)(2)(i).

This rule as amended provides that a notice of appeal filed before the disposition of a specified postjudgment motion will become effective upon disposition of the motion. A notice filed before the filing of one of the specified motions or after the filing of a motion but before disposition of the motion is, in effect, suspended until the motion is disposed of, whereupon, the previously filed notice effectively places jurisdiction in the district court or bankruptcy appellate panel.

Because a notice of appeal will ripen into an effective appeal upon disposition of a postjudgment motion, in some instances there will be an appeal from a judgment that has been altered substantially because the motion was granted in whole or in part. The appeal may be dismissed for want of prosecution when the appellant fails to meet the briefing schedule. But, the appellee may also move to strike the appeal. When responding to such a motion, the appellant would have an opportunity to state that, even though some relief sought in a postjudgment motion was granted, the appellant still plans to pursue the appeal. Because the appellant's response would provide the appellee with sufficient notice of the appellant's intentions, the rule does not require an additional notice of appeal in that situation.

The amendment provides that a notice of appeal filed before the disposition of a postjudgment tolling motion is sufficient to bring the judgment, order, or decree specified in the original notice of appeal to the district court or bankruptcy appellate panel. If the judgment is altered upon disposition of a postjudgment motion, however, and if a party who has previously filed a notice of appeal wishes to appeal from the disposition of the motion, the party must amend the notice to so indicate. When a party files an amended notice, no additional fees are required because the notice is an amendment of the original and not a new notice of appeal.

**Subdivision (b)** is also amended to include, among motions that extend the time for filing a notice of appeal, a motion under Rule 9024 that is filed within 10 days after entry of a judgment. The addition of this motion conforms to a similar amendment to F.R.App.P. 4(a)(4) made in 1993, except that a Rule 9024 motion does not toll the time to appeal unless it is filed within the 10-day period. The reason for providing that the motion extends the time to appeal only if it is <u>filed</u> within the 10-day period is to enable the court and the parties in interest to determine solely from the court records whether the time to appeal has been extended by a motion for relief under Rule 9024.

**1997 Amendment**

Subdivision (c) is amended to provide that a request for an extension of time to file a notice of appeal must be filed within the applicable time period. This amendment will avoid uncertainty as to whether the mailing of a motion or an oral request in court

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

is sufficient to request an extension of time, and will enable the court and the parties in interest to determine solely from the court records whether a timely request for an extension has been made.

The amendments also give the court discretion to permit a party to file a notice of appeal more than 20 days after expiration of the time to appeal otherwise prescribed, but only if the motion was timely filed and the notice of appeal is filed within a period not exceeding 10 days after entry of the order extending the time. This amendment is designed to protect parties that file timely motions to extend the time to appeal from the harshness of the present rule as demonstrated in In re Mouradick, 13 F.3d 326 (9th Cir.1994), where the court held that a notice of appeal filed within the 3-day period expressly prescribed by an order granting a timely motion for an extension of time did not confer jurisdiction on the appellate court because the notice of appeal was not filed within the 20-day period specified in subdivision (c).

The subdivision is amended further to prohibit any extension of time to file a notice of appeal--even if the motion for an extension is filed before the expiration of the original time to appeal--if the order appealed from grants relief from the automatic stay, authorizes the sale or lease of property, use of cash collateral, obtaining of credit, or assumption or assignment of an executory contract or unexpired lease under § 365, or approves a disclosure statement or confirms a plan. These types of orders are often relied upon immediately after they are entered and should not be reviewable on appeal after the expiration of the original appeal period under Rule 8002(a) and (b).

**GAP Report on Rule 8002.** No changes to the published draft.

2009 Amendments

The rule is amended to implement changes in connection with the amendment to Rule 9006(a) and the manner by which time is computed under the rules. The deadlines in the rule are amended to substitute a deadline that is a multiple of seven days. Throughout the rules, deadlines are amended in the following manner:

- 5-day periods become 7-day periods

- 10-day periods become 14-day periods

- 15-day periods become 14-day periods

- 20-day periods become 21-day periods

- 25-day periods become 28-day periods

Notes of Decisions (503)

Fed.Rules Bankr.Proc. Rule 8002, 11 U.S.C.A., FRBP Rule 8002
Including Amendments Through 2-19-13

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Bankruptcy Rules (Refs & Annos)
        Part IX. General Provisions

Federal Rules of Bankruptcy Procedure, Rule 9019

Rule 9019. Compromise and Arbitration

Currentness

(a) Compromise

On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

(b) Authority to compromise or settle controversies within classes

After a hearing on such notice as the court may direct, the court may fix a class or classes of controversies and authorize the trustee to compromise or settle controversies within such class or classes without further hearing or notice.

(c) Arbitration

On stipulation of the parties to any controversy affecting the estate the court may authorize the matter to be submitted to final and binding arbitration.

**Credits**
(As amended Mar. 30, 1987, eff. Aug. 1, 1987; Apr. 30, 1991, eff. Aug. 1, 1991; Apr. 22, 1993, eff. Aug. 1, 1993.)

**Editors' Notes**

**ADVISORY COMMITTEE NOTES**
Subdivisions (a) and (c) of this rule are essentially the same as the provisions of former Bankruptcy Rule 919 and subdivision (b) is the same as former Rule 8-514(b), which was applicable to railroad reorganizations. Subdivision (b) permits the court to deal efficiently with a case in which there may be a large number of settlements.

1991 Amendment

This rule is amended to enable the United States trustee to object or otherwise be heard in connection with a proposed compromise or settlement and otherwise to monitor the progress of the case.

1993 Amendments

**Subdivision (a)** is amended to conform to the language of § 102(1) of the Code. Other amendments are stylistic and make no substantive change.

Notes of Decisions (486)

Fed.Rules Bankr.Proc. Rule 9019, 11 U.S.C.A., FRBP Rule 9019
Including Amendments Through 2-19-13

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

membership does not by itself demonstrate a violation unless reasonable persons with knowledge of all the relevant circumstances would expect that the membership would be diverse in the absence of invidious discrimination. Absent such factors, an organization is generally said to discriminate invidiously if it arbitrarily excludes from membership on the basis of race, religion, sex, or national origin persons who would otherwise be admitted to membership.

Although Canon 2C relates only to membership in organizations that invidiously discriminate on the basis of race, sex, religion or national origin, a judge's membership in an organization that engages in any invidiously discriminatory membership practices prohibited by applicable law violates Canons 2 and 2A and gives the appearance of impropriety. In addition, it would be a violation of Canons 2 and 2A for a judge to arrange a meeting at a club that the judge knows practices invidious discrimination on the basis of race, sex, religion, or national origin in its membership or other policies, or for the judge to use such a club regularly. Moreover, public manifestation by a judge of the judge's knowing approval of invidious discrimination on any basis gives the appearance of impropriety under Canon 2 and diminishes public confidence in the integrity and impartiality of the judiciary, in violation of Canon 2A.

When a judge determines that an organization to which the judge belongs engages in invidious discrimination that would preclude membership under Canon 2C or under Canons 2 and 2A, the judge is permitted, in lieu of resigning, to make immediate and continuous efforts to have the organization discontinue its invidiously discriminatory practices. If the organization fails to discontinue its invidiously discriminatory practices as promptly as possible (and in all events within two years of the judge's first learning of the practices), the judge should resign immediately from the organization.

## CANON 3:  A JUDGE SHOULD PERFORM THE DUTIES OF THE OFFICE FAIRLY, IMPARTIALLY AND DILIGENTLY

The duties of judicial office take precedence over all other activities. In performing the duties prescribed by law, the judge should adhere to the following standards:

A.  *Adjudicative Responsibilities.*

(1)  A judge should be faithful to, and maintain professional competence in, the law and should not be swayed by partisan interests, public clamor, or fear of criticism.

(2)  A judge should hear and decide matters assigned, unless disqualified, and should maintain order and decorum in all judicial proceedings.

(3)     A judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity.  A judge should require similar conduct of those subject to the judge's control, including lawyers to the extent consistent with their role in the adversary process.

(4)     A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law.  Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested.  A judge may:

(a)     initiate, permit, or consider ex parte communications as authorized by law;

(b)     when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;

(c)     obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the person to be consulted and the subject matter of the advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received; or

(d)     with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.

(5)     A judge should dispose promptly of the business of the court.

(6)     A judge should not make public comment on the merits of a matter pending or impending in any court.  A judge should require similar restraint by court personnel subject to the judge's direction and control.  The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's

**Case No. 12-35986 - Addendum  28**

official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education.

B.    *Administrative Responsibilities.*

(1)    A judge should diligently discharge administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court personnel.

(2)    A judge should not direct court personnel to engage in conduct on the judge's behalf or as the judge's representative when that conduct would contravene the Code if undertaken by the judge.

(3)    A judge should exercise the power of appointment fairly and only on the basis of merit, avoiding unnecessary appointments, nepotism, and favoritism.  A judge should not approve compensation of appointees beyond the fair value of services rendered.

(4)    A judge with supervisory authority over other judges should take reasonable measures to ensure that they perform their duties timely and effectively.

(5)    A judge should take appropriate action upon learning of reliable evidence indicating the likelihood that a judge's conduct contravened this Code or a lawyer violated applicable rules of professional conduct.

C.    *Disqualification.*

(1)    A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

(a)    the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b)    the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or lawyer has been a material witness;

(c)    the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in

controversy or in a party to the proceeding, or any other interest that could be affected substantially by the outcome of the proceeding;

(d)    the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:

  (i)    a party to the proceeding, or an officer, director, or trustee of a party;

  (ii)   acting as a lawyer in the proceeding;

  (iii)  known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

  (iv)   to the judge's knowledge likely to be a material witness in the proceeding;

(e)    the judge has served in governmental employment and in that capacity participated as a judge (in a previous judicial position), counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy.

(2)   A judge should keep informed about the judge's personal and fiduciary financial interests and make a reasonable effort to keep informed about the personal financial interests of the judge's spouse and minor children residing in the judge's household.

(3)   For the purposes of this section:

(a)    the degree of relationship is calculated according to the civil law system; the following relatives are within the third degree of relationship:  parent, child, grandparent, grandchild, great grandparent, great grandchild, sister, brother, aunt, uncle, niece, and nephew; the listed relatives include whole and half blood relatives and most step relatives;

(b)    "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(c)    "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:

     (i)      ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

     (ii)     an office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

     (iii)     the proprietary interest of a policyholder in a mutual insurance company, or a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

     (iv)     ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities;

   (d)     "proceeding" includes pretrial, trial, appellate review, or other stages of litigation.

 (4)     Notwithstanding the preceding provisions of this Canon, if a judge would be disqualified because of a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the judge (or the judge's spouse or minor child) divests the interest that provides the grounds for disqualification.

D.     *Remittal of Disqualification.* Instead of withdrawing from the proceeding, a judge disqualified by Canon 3C(1) may, except in the circumstances specifically set out in subsections (a) through (e), disclose on the record the basis of disqualification. The judge may participate in the proceeding if, after that disclosure, the parties and their lawyers have an opportunity to confer outside the presence of the judge, all agree in writing or on the record that the judge should not be disqualified, and the judge is then willing to participate. The agreement should be incorporated in the record of the proceeding.

## COMMENTARY

**Canon 3A(3).** The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Courts can be efficient and businesslike while being patient and deliberate.

The duty under Canon 2 to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary applies to all the judge's activities, including the discharge of the judge's adjudicative and administrative responsibilities. The duty to be respectful includes the responsibility to avoid comment or behavior that could reasonably be interpreted as harassment, prejudice or bias.

**Canon 3A(4).** The restriction on ex parte communications concerning a proceeding includes communications from lawyers, law teachers, and others who are not participants in the proceeding. A judge may consult with other judges or with court personnel whose function is to aid the judge in carrying out adjudicative responsibilities. A judge should make reasonable efforts to ensure that law clerks and other court personnel comply with this provision.

A judge may encourage and seek to facilitate settlement but should not act in a manner that coerces any party into surrendering the right to have the controversy resolved by the courts.

**Canon 3A(5).** In disposing of matters promptly, efficiently, and fairly, a judge must demonstrate due regard for the rights of the parties to be heard and to have issues resolved without unnecessary cost or delay. A judge should monitor and supervise cases to reduce or eliminate dilatory practices, avoidable delays, and unnecessary costs.

Prompt disposition of the court's business requires a judge to devote adequate time to judicial duties, to be punctual in attending court and expeditious in determining matters under submission, and to take reasonable measures to ensure that court personnel, litigants, and their lawyers cooperate with the judge to that end.

**Canon 3A(6).** The admonition against public comment about the merits of a pending or impending matter continues until the appellate process is complete. If the public comment involves a case from the judge's own court, the judge should take particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality, which would violate Canon 2A. A judge may comment publicly on proceedings in which the judge is a litigant in a personal capacity, but not on mandamus proceedings when the judge is a litigant in an official capacity (but the judge may respond in accordance with Fed. R. App. P. 21(b)).

**Canon 3B(3).** A judge's appointees include assigned counsel, officials such as referees, commissioners, special masters, receivers, guardians, and personnel such as law clerks, secretaries, and judicial assistants. Consent by the parties to an appointment or an award of compensation does not relieve the judge of the obligation prescribed by this subsection.

**Canon 3B(5).** Appropriate action may include direct communication with the judge or lawyer, other direct action if available, reporting the conduct to the appropriate authorities, or, when the judge believes that a judge's or lawyer's conduct is caused by

**PROOF OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 8, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that the following individuals are not participants in this appeal but will receive service of the foregoing as they are interested parties to this appeal. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Evan R. Levy
George A. Zimmerman
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

April 8, 2013                                    /s/ Christopher J. Conant

                                                 Christopher J. Conant, Esq.