# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

## NO. 12-35986

---

TIMOTHY L. BLIXSETH

Appellant,

v.

YELLOWSTONE MOUNTAIN CLUB, LLC
YELLOWSTONE DEVEOPMENT, LLC
BIG SKY RIDGE, LLC
YELLOWSTONE CLUB CONSTRUCTION CO., LLC

Appellees.

---

## APPELLANT'S EXCERPTS OF RECORD
### Volume I of V
### Pages 1through 94

---

Appeal from the United States District Court for the District of Montana
Case No. 2:11-73-BU-SEH

---

Phillip H. Stillman
Stillman & Associates
300 South Poine Drive,
Suite 4206
Miami Beach, FL 33139
Telephone: (888) 235-4279
*pstillman@stillmanassociates.com*

Patrick T. Fox
Doubek Pyfer & Fox, LLP
PO Box 236
Helena, MT 59624
Telephone: (406) 442-7830
*patrickfox@douberpyfer.com*

Christopher J. Conant
Conant Law LLC
730 17th Street
Suite 200
Denver, CO 80202
Telephone: (303) 298-1800
*cconant@conantlawyers.com*

Michael J. Ferrigno
Law Office of Michael Ferrigno,
PLLC
1200 N. Main Street, Suite 486
Meridian, ID 83680
Telephone: (208) 319-3561
*michael.ferrigno@ferrigno-law.com*

Attorneys for Appellant Timothy L. Blixseth

**INDEX**

**APPELLANT'S EXCERPTS OF RECORD**

**TIMOTHY L. BLIXSETH**

**Appellant,**

**v.**

**YELLOWSTONE MOUNTAIN CLUB, LLC
YELLOWSTONE DEVEOPMENT, LLC
BIG SKY RIDGE, LLC
YELLOWSTONE CLUB CONSTRUCTION CO., LLC**

**Appellees.**

**NO. 12-35986**

| Docket No. | Date | Description | Volume | Pages |
|---|---|---|---|---|
| 51 | 11/16/2012 | Order Denying Blixseth's Appeal | I | 1-5 |
| 6.1, Ex. 1 | 1/3/2012 | Memorandum of Decision | I | 6-47 |
| 6.1, Ex. 3 | 1/3/2012 | Memorandum of Decision | I | 48-94 |
| 52 | 11/28/2012 | Notice of Appeal to Ninth Circuit | II | 95-153 |
| 43 | 8/24/2012 | Transcript of Motion Hearing | II | 154-209 |
| 39 | 8/24/2012 | Post Hearing Brief | II | 210-212 |
| 17-1, Ex. 26 | 2/16/2012 | Motion for Summary Judgment Concerning Derivative Claims, Alter Ego, Fiduciary Duty, and Statute of Limitation and Memorandum in Support | II | 213-215 |
| 17-2, Ex. 27 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses | II | 216-217 |

1

| 17-3, Ex. 28 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation and Supporting Memorandum | II | 218-220 |
|---|---|---|---|---|
| 17-4, Ex. 29 | 2/16/2012 | Ominbus Response to Motions for Summary Judgment | II | 221-223 |
| 18-1, Ex. 30 | 2/16/2012 | August 4, 2010 Memorandum of Decision | II | 224-228 |
| 18-2, Ex. 31 | 2/16/2012 | August 4, 2010 Order | II | 229-231 |
| 12-5 | 2/2/2012 | Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) | III | 232-462 |
| 6.1, Ex. 2 | 1/3/2012 | Notice of Appeal | III | 463-466 |
| 6.1, Ex. 2 | 1/3/2012 | Amended Notice of Appeal | III | 467-471 |
| 6.1, Ex. 4 | 1/3/2012 | Yellowstone Club Settlement Term Sheet | III | 472-491 |
| 6.2 | 1/3/2012 | Yellowstone Club Disclosure Statement | III | 492-521 |
| 7.3, Ex. 7 | 1/3/2012 | Am. Affidavit Of Timothy L. Blixseth in Support of Motion to Disqualify | IV | 522-549 |
| 7.3, Ex. 8 | 1/3/2012 | December 10, 2010 Hearing Tr. | IV | 550-552 |
| 8.1 | 1/3/2012 | Supplemental Affidavit of Timothy L. Blixseth | IV | 553-584 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Cash Collateral Email | IV | 585 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Generic Order Email | IV | 586 |
| 10-1. Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington at Home Email | IV | 587 |
| 10-1, Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Cell Phone Email | IV | 588 |

2

| 10-1, Ex. 8 | 1/3/2012 | Supp. Affidavit, Ex. 8 Peterson Email | IV | 589-590 |
|---|---|---|---|---|
| 10-1, Ex. 9 | 1/3/2012 | Supp. Affidavit, Ex. 9 Harrington "Heads Up" Email | IV | 591-592 |
| 10-1, Ex. 10 | 1/3/2012 | Supp. Affidavit, Ex. 10 Richardson Email | IV | 593-594 |
| 10-2. Ex. 12 | 1/3/2012 | Bankruptcy Court Memorandum of Decision in BLX Group, Inc., Nov. 22, 2011 | IV | 595-609 |
| 10-2, Ex. 13 | 1/3/2012 | AP-88 Complaint | IV | 610-622 |
| 10-2 | 1/3/2012 | Hearing Transcript Disqualification Hearing, Jan. 18, 2011 | IV | 623-680 |
| 10.3, Ex. 14 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, August 16, 2010 | IV | 681-816 |
| 10.3, Ex. 15 | 1/3/2012 | Memorandum of Decision in AP 09-100, September 27,2010 | V | 817-843 |
| 10.3, Ex. 16 | 1/3/2012 | AP-14 Judgment | V | 844-846 |
| 10.3, Ex. 17 | 1/3/2012 | YCLT Motion to Reconsider AP-14 | V | 847-850 |
| 10.3, Ex. 18 | 1/3/2012 | Affidavit of Charles Hingle in Support of YCLT's Motion to Reconsider AP-14 | V | 851-858 |
| 10-3, Ex. 19 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, Sept. 7, 2010 | V | 859-868 |
| 10-3, Ex. 20 | 1/3/2012 | YCLT Motion to Certify for Direct Appeal in AP-14 | V | 869-871 |
| 10-3, Ex. 21 | 1/3/2012 | YCLT Motion to Expedite Hearing on Motion to Certify for Direct appeal | V | 872-874 |
| 10-3, Ex. 22 | 1/3/2012 | Order granting Motion to Expedite Hearing | V | 875-877 |
| 10-3, Ex. 24 | 1/3/2012 | Order granting Motion to Certify Order | V | 878-880 |

3

| 10-4, Ex. 25 | 1/3/2012 | Memorandum of Decision in AP-88, January 3, 2012 | V | 881-900 |
|---|---|---|---|---|
| | | U.S. District Court, District of Montana - Docket Report | V | 901-909 |

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA **FILED**

### BUTTE DIVISION

**NOV 16 2012**

Clerk, U.S District Court
District Of Montana
Butte

In re:

YELLOWSTONE MOUNTAIN
CLUB, LLC,

        Debtor.

No. CV-11-73-BU-SEH

TIMOTHY L. BLIXSETH,

        Appellant,

**MEMORANDUM AND ORDER**

vs.

YELLOWSTONE MOUNTAIN
CLUB, LLC; CREDIT SUISSE; AD
HOC GROUP OF CLASS B UNIT
HOLDERS; CIP SUNRISE RIDGE
OWNER LLC; ROBERT SUMPTER;
NORMANDY HILL CAPITAL LP;
MARC S. KIRSCHNER; CIP
YELLOWSTONE LENDING LLC;
CROSSHARBOR CAPITAL
PARTNERS LLC,

        Appellees.

On appeal from Bankruptcy
Case No. 08-61570-11

## INTRODUCTION

Timothy L. Blixseth (Blixseth) moved to disqualify the Honorable Ralph B.

Kirscher, United States Bankruptcy Judge, in the Chapter 11 bankruptcy In re

Yellowstone Mountain Club, LLC, Cause No. 08-61570-11, and in five related

adversary proceedings.[1]  All were opposed.  Judge Kirscher denied the motions on

February 25, 2011.  Blixseth moved for reconsideration.   Judge Kirscher denied

the motions for reconsideration on July 26, 2011.  This appeal followed.[2]

## ISSUE

The single substantive issue raised by the appeal is whether under

28 U.S.C. § 455 Judge Kirscher should have disqualified himself as requested.[3]

## DISCUSSION

The disqualification statute, 28 U.S.C. § 455, provides, in pertinent part:

> "[a]ny justice, judge, or magistrate of the United States shall
> disqualify himself in any proceeding in which his impartiality
> might reasonably be questioned."

28 U.S.C. § 455(a).

Disqualification is to be granted or ordered only when the record,

appropriately assessed, so warrants.  Clemens v. U.S. Dist. Court for the Dist. of

---

[1] Adversary Proceeding Nos.  09-00014, 09-00018, 09-00064, 10-00015 and 10-00088.

[2] Similar appeals were filed in Cause Nos. CV-11-74-BU-SEH, CV-11-75-BU-SEH, CV-11-76-BU-SEH, CV-77-BU-SEH and CV-11-78-BU-SEH.

[3] The separately stated issue of whether Judge Kirscher erred in denying Blixseth's motion for reconsideration is subsumed by resolution of the substantive appeal issue.

2

<u>Cal.</u>, 428 F.3d 1175, 1179 (9th Cir. 2005) (a judge has a strong duty to sit when there is no legitimate reason to recuse).  The test to be applied is "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." <u>Pesnell v. Arsenault</u>, 543 F.3d 1038, 1043 (9th Cir. 2008).  The reasonable person, in this context, means a "well-informed, thoughtful observer," and not a "hypersensitive or unduly suspicious person." <u>Clemens</u>, 428 F.3d at 1178.[4]

Judge Kirscher's February 25, 2011, Memorandum of Decision contains an exhaustive and detailed analysis and discussion of Blixseth's involvement with the Yellowstone Mountain Club entities,[5] the history of the Yellowstone Club related bankruptcies, Blixseth's participation in those proceedings, Blixseth's contentions in seeking disqualification, and the law to be applied in addressing the motion for disqualification.  Factual matters within the Bankruptcy Court's personal knowledge are articulated in detail.

---

[4] Blixseth argues this Court adopt a standard of review grounded in the proposition that the judge's actions should be assessed from the "perspective of a reasonable person who is predisposed to suspicions about the inner workings of the judiciary." <u>See</u> Blixseth's Opening Brief at 5-6.  This suggested standard is rejected as it finds no support in the law of this Circuit, and is so lacking in specificity as to be incapable of meaningful application.

[5] The Yellowstone Club entities consist of: Yellowstone Mountain Club, LLC; Yellowstone Development, LLC; Big Sky Ridge, LLC; and Yellowstone Club Construction Company, LLC.

3

By contrast, the factual assertions advanced by Blixseth, both before Judge Kirscher and in this appeal, are grounded in his self-serving affidavits which he claims must be accepted as true. He is mistaken. The Court is not obliged to adopt, and does not adopt, the assertions of fact in the affidavits as true. In re Stasz, 2011 WL 6934442 *4 (9th Cir. BAP 2011); In re American Ready Mix, Inc., 14 F.3d 1497, 1501 (10th Cir. 1994). Moreover, many of the assertions of "fact" recited by Blixseth simply cannot be reconciled with the record. To give weight to such unsupported, or outright contradicted by the record, declarations would be entirely unwarranted.

No detailed point by point discussion of Blixseth's characterization of events occurring in the underlying bankruptcy proceeding, or of the many and frequent flaws in those characterizations, is necessary. Having carefully considered the record as a whole, including the rulings and findings made by Judge Kirscher and the bases for those rulings and findings, I conclude that no showing of bias, or prejudice or any lack of impartiality by Judge Kirscher has been demonstrated. Rather, dispassionate assessment reveals that extraordinary consideration was accorded Blixseth and his position throughout the proceedings.

## CONCLUSION

I find no basis in the record upon which to conclude that Judge Kirscher

4

erred in refusing to disqualify himself.

## ORDER

The February 25, 2011, Memorandum of Decision[6] of the United States

Bankruptcy Court is AFFIRMED.

DATED this _16th_ day of November, 2012.

SAM E. HADDON
United States District Judge

---

[6] Case No. 08-61570-11

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No. **08-61570-11** |
| Debtor. | |
| In re | |
| **YELLOWSTONE DEVELOPMENT, LLC**, | Case No. **08-61571-11** |
| Debtor. | |
| In re | |
| **YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC,** | Case No. **08-61573-11** |
| Debtor. | |
| In re | |
| **BIG SKY RIDGE, LLC**, | Case No. **08-61572-11** |
| Debtor. | |

## MEMORANDUM of DECISION

At Butte in said District this 30th day of September, 2011.

The Court is tasked with writing yet another chapter in the Yellowstone Club bankruptcy saga, which has been ongoing for almost three years.  If this were a book, the reader would most likely read the chapters of the saga in sequence and in a relatively compressed period of time.

ER00001

But this is not a novel and one cannot thumb through a prior chapter to glean a forgotten fact. Thus, the Court directs the reader to prior chapters (Memoranda of Decision and Orders) that provide some insight as to why another chapter is necessary. Relevant facts may be found in this Court's Memorandum of Decision and Order entered in this case at docket entry nos. 1025 and 1026. One may also look at the Memoranda of Decision, Order and Judgment found at docket entry nos. 292, 293, 575 and 582 in related Adversary Proceeding 09-00014, *Timothy L. Blixseth v. Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust*. Along these same lines, the Court also granted various requests for judicial notice found at docket entry nos. 2203, 2209, 2224 (including its attached Exhibit A summarizing the claims processed or prosecuted by the Liquidating Trustee under the plan), 2228 and 2240.

The matter presently before the Court stems from a Memorandum of Decision and Order entered by the Court in the above-referenced Chapter 11 bankruptcy cases on June 2, 2009, at docket entry nos. 1025 and 1026 approving the Yellowstone Club Settlement Term Sheet and confirming the Debtors' Third Amended Joint Plan of Reorganization filed May 29, 2009, at docket entry no. 995. Timothy L. Blixseth ("Blixseth") appealed this Court's June 2, 2009, Order to the United States District Court for the District of Montana on three separate grounds: (1) whether this Court erred in approving the Plan's exculpatory clauses and releases in favor of third parties in the Plan; (2) whether this Court erred in determining the Plan was proposed in good faith when the question of the Debtors' bad faith remained as an unresolved factual issue in a pending adversary proceeding; and (3) whether this Court erred in approving the settlement incorporated into the Plan without a motion to approve the settlement, notice of motion, and hearing as required under F.R.B.P. 9019(a). In a Memorandum and Order entered November 2,

ER00002

2010, United States District Judge Sam E. Haddon declined to rule on the issue of good faith, stating "determination of this issue on the present record is premature and unnecessary at this time." On the other two questions presented, Judge Haddon reversed and remanded. First, Judge Haddon held this Court erred when it proceeded to confirmation of the Debtors' Plan without appropriate notice and opportunity for all parties to object to a certain settlement that was incorporated into the Plan. Judge Haddon also reversed and remanded, so this Court could, "to the extent feasible . . . explicitly identify and delineate those persons or representatives determined to be within the scope of the release parameters of Section 524(e) and to state the reasons why it reached such conclusions."

In an Order entered May 27, 2011, this Court scheduled a hearing for July 11, 2011,

1.       To consider whether Debtor's Third Amended Joint Plan of Reorganization filed May 29, 2009, at docket entry no. 995 was proposed in good faith,

2.       To identify and delineate those persons or representatives who are properly within the scope, under 11 U.S.C. § 524(e), of the exculpation and limitation of liability clause set forth in Section 8.4 of Debtor's Third Amended Joint Plan of Reorganization, and

3.       To further consider approval of the Settlement Term Sheet found at docket entry no 947-12.

Upon motion of Blixseth, the Court entered an Order on June 16, 2011, continuing the July 11, 2011, hearing to July 25, 2011. By separate Order entered July 27, 2011, this Court vacated further hearing on whether the Debtors' plan was proposed in good faith, concluding nothing in Judge Haddon's November 2, 2010, Memorandum and Order required this Court to revisit the issue of good faith.

At the hearing held July 25 and 26, 2011, in Missoula, Blixseth was represented by Michael J. Flynn of Boston, Massachusetts ("Flynn"), Philip H. Stillman of Miami Beach, Florida ("Stillman"), Christopher J. Conant of Denver, Colorado and Patrick T. Fox of Helena, Montana; Debtors were represented by James A. Patten of Billings, Montana ("Patten") and Richard Birinyi and Larry Ream of Seattle, Washington; Credit Suisse, Cayman Island Branch ("Credit Suisse"), was represented by Evan Levy, Mark McDermott and Sean Marlaire of New York, New York and Richard J. Orizotti of Butte, Montana; the Ad Hoc Group of Class B Unit Holders was represented by Clark Whitmore of Minneapolis, Minnesota and Ronald A. Bender of Missoula, Montana; CrossHarbor Capital Partners LLC ("CrossHarbor"), New CH YMC Acquisition LLC, CrossHarbor Institutional Partners LP and CIP Yellowstone Lending LLC were represented by Paul D. Moore ("Moore") and Barry D. Green of Boston, Massachusetts and Benjamin P. Hursh of Missoula, Montana; Robert Sumpter ("Sumpter") was represented by Stephen Mackey of Billings, Montana; Normandy Hill Capital, LP was represented by Robert G. Burns of New York, New York and Quentin M. Rhoades of Missoula, Montana; Marc S. Kirschner, Trustee ("Liquidating Trustee") of the Yellowstone Club Liquidating Trust ("YCLT"), was represented by John Turner of Amarillo, Texas, Brian Glasser of Charleston, West Virginia and Shane Coleman and Charles Hingle of Billings, Montana; attorney Thomas L. Hutchinson was represented by Robert F. James of Great Falls, Montana; attorney J. Thomas Beckett ("Beckett") was represented by Trent M. Gardner of Bozeman, Montana; the law firm of Garlington, Lohn & Robinson was represented by Dale Cockrell of Kalispell, Montana; Creditor Liquidity LP was represented by Dean A. Stensland of Missoula, Montana; Debtors' attorney Patten was represented by Mike McMahon of Helena, Montana; and Big Sky Shuttle, Inc. was

ER00004

represented by Jon Binney of Missoula, Montana.  Patten, Matthew Kidd, Stephen R. Brown

("Brown"), Larry Ream, and Beckett testified.  The Court agreed to admit the transcript of

Ronald Greenspan's ("Greenspan") – the Debtors' chief restructuring officer -- Rule 2004

examination as part of the record.[1]

As noted earlier, certain matters are, at the direction of Judge Haddon's November 2,

2010, Memorandum and Order, once again before this Court.  Judge Haddon's Memorandum

and Order is clear, unambiguous and, in this Court's opinion, quite narrow.  First, Judge Haddon

held this Court erred when it proceeded to confirm the Debtors' Third Amended Joint Plan of

---

[1]  Counsel for CrossHarbor represented at the hearing that the parties had agreed prior to the hearing that Greenspan's Rule 2004 examination transcript could be admitted into evidence and used for all purposes.  Blixseth's counsel disagreed, arguing Blixseth did not agree that Greenspan's Rule 2004 examination transcript could be used at hearing for every purpose. Greenspan lives in California and was not available at the time of the July 25th hearing. Additionally, CrossHarbor's counsel, Moore, sent various parties an email on July 19, 2011, that reads:

> "Since it appears that our colloquy yesterday concerning signing the deposition and its admission at the hearing on Monday was not memorialized by the court reporter, Phil and I just spoke regarding confirming it by this email. We ordered the transcript on an expedited basis agreed that, since Ron will be travelling [sic] to New York on Sunday, he will attempt to review and sign it, and make any corrections before he leaves, in which case Andy will provide us changes at or before the hearing. If Ron is unable to do so, we all agreed that the deposition can nevertheless be used at the hearing on Monday as if signed by Mr. Greenspan.

> Andy-Let us know if this differs in any way from your recollection, and Phil, feel free to advise if I got it wrong in any way.  Otherwise, just reply all to this email confirming our agreement"

Patten responded on July 19, 2011: "That is my recollection and understanding."  Stillman did not respond, prompting Moore to send another email the  following day asking Stillman "did you confirm email yesterday?"  Stillman responded: "I didn't, but I do."  The email exchange clearly establishes that Blixseth's counsel was agreeable to using Greenspan's deposition for all purposes at the hearing scheduled for July 25, 2011.

Reorganization without appropriate notice and opportunity for all parties to object to the

Yellowstone Club Settlement Term Sheet ("Settlement Term Sheet") filed May 22, 2009, at

docket entry 947-12, which Settlement Term Sheet was incorporated into the Debtors' Third

Amended Joint Plan of Reorganization.  The Court's Orders of May 27, 2011, and June 16, 2011,

setting approval of the Settlement Term Sheet for hearing on July 25, 2011, satisfy any notice

required by F.R.B.P. 2002 and F.R.B.P. 9019.

I.    **The Settlement Term Sheet.**

In response to this Court's notice and presumably in an effort to satisfy F.R.B.P. 9019,

Debtors, CrossHarbor and New CH YMC Acquisition, LLC filed on June 10, 2011, a Joint

Motion for Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving the

Yellowstone Club Settlement Term Sheet *Nunc Pro Tunc* ("Rule 9019 Motion").  Sumpter (dkt

2186), Red Rock Investments, LLC (dkt 2189), Creditor Liquidity, LP (dkt 2196), K & L Gates

LLP (dkt 2197) and Blixseth filed objections to the Debtors, CrossHarbor and New CH YMC

Acquisition, LLC's Rule 9019 Motion.

Sumpter objects to approval of the Settlement Term Sheet on three grounds.  First,

Sumpter argues that the Settlement Term Sheet vacates the Court's Partial and Interim Order in

Adversary Proceeding 09-00014.  Second, Sumpter takes issue with the composition of YCLT's

liquidating trust board.  Finally, Sumpter raises several arguments that challenge the Settlement

Term Sheet's treatment of Class 4 claims.  In particular, Sumpter argues the Settlement Term

Sheet "is not fair and equitable or in the best interests of the estate" because of the treatment of

Class 4 creditors who were not designated as trade creditors: "the unpaid, unsecured claim

holders are now partially put into the fourth tranche on a *pari passu* basis with Credit Suisse and

**Case No. 12-35986 ER  11**

subordinate to the purchaser of the Trade Creditor claims." Red Rock Investments, LLC and K & L Gates LLP's skeletal objections echo Sumpter's objection that the Settlement Term Sheet provides for disparate treatment of Class 4 creditors. Creditor Liquidity, LP also objects to approval of the Settlement Term Sheet on grounds it violates the requirements of 11 U.S.C. § 1123(a)(4). In addition, Creditor Liquidity, LP argues the Settlement Term Sheet inequitably modified the Debtors' Second Amended Plan, the plan upon which ballots were cast. Finally, Creditor Liquidity, LP argues the Settlement Term Sheet does not result in each holder of an impaired class receiving or retaining equal or greater value than the holder would have received under a Chapter 7 liquidation in violation of 11 U.S.C. § 1129(a)(7)(A).

The Court notes that none of the aforementioned parties appeared at the duly noticed confirmation hearing held May 18, 2009. Moreover, Red Rock Investments, LLC, K & L Gates LLP and Credit Liquidity, LP did not, prior to these additional proceedings, oppose confirmation of the Debtors' plan and more importantly, were involved in subsequent proceedings that ratified the confirmation process and preclude said parties from taking a contrary position at this time. For instance, Red Rock Investments, LLC, through counsel, entered into a Stipulation dated May 27, 2010, with the Liquidating Trustee of YCLT, which Stipulation was intended "to completely resolve all claims of Red Rock in the Consolidated Cases and all objections to the Red Rock Claim by [YCLT]." Specifically, the parties stipulated post-confirmation that "Red Rock['s] Claim shall be allowed as a Class 4 General Unsecured Claim, pursuant to 11 U.S.C. § 502, in the Consolidated Cases in the amount of $136,174.00. The balance of the Red Rock Claim shall be denied. Red Rock shall have no further claims in the Consolidated Cases." In an Order entered May 28, 2010, the Court approved the stipulation between the Liquidating Trustee and

ER00007

Red Rock Investments, LLC.

Similarly, on December 21, 2009, the Liquidating Trustee objected to Proof of Claim No. 632 filed by K&L Gates LLP.  The Liquidating Trustee and K&L Gates LLP subsequently entered into a stipulation on March 29, 2010, wherein they agreed:

> 3. The Trustee has reviewed the Claim, the supporting and opposing arguments and related documentation and has conferred with the Claimant and its counsel. The Trustee has determined, and the Claimant does hereby agree, (a) the Claim shall be allowed in the amount of $91,640.03 and (b) the balance of the Claim, in the amount of $10,182.23 shall be deemed withdrawn and disallowed. Allowance of the Claim in part and withdrawal of the remainder of the Claim as set forth in the proceeding sentence shall fully settle the Claim on its merits.

> 4. In addition, the Trustee and the Claimant agree that the Claim shall be treated as a Class 4 claim, without prejudice to Claimant's rights to seek payment of such Claim from the Trade Creditor Fund established under the confirmed Plan.

> 5. Pursuant to Section 7.7.6 of the Third Amended Plan of Reorganization (Dkt. 995), the Trustee is "authorized to compromise and settle any Disputed Claim and to execute all necessary documents, including a stipulation of settlement or release, in [his] sole discretion, without notice to any party, and without the need for Bankruptcy Court's [sic] approval." Accordingly, this Stipulation shall be filed without notice of the right to object or a request for Court approval.

> 6. Nevertheless, the Trustee and Claimant believe the settlement proposed herein is fair, reasonable and adequate. F.R.Bankr.P., Rule 9019; *Martin v. Kane (In re A&C Properties)*, 784 F. 2d 1377, 1380-81 (9th Cir. 1986).

The Court approved the stipulation between Marc S. Kirschner and K&L Gates LLP by Order entered March 29, 2010.

While Creditor Liquidity, LP did not, like Red Rock Investments, LLC or K & L Gates LLP, enter into any agreement with the Liquidating Trustee, it did not appear in this case until June 9, 2009, when it filed a Notice of Transfer of Claim, giving notice that it was the transferee

of a claim held by Border States Electric Supply, Inc.  Creditor Liquidity, LP filed similar notices

on: (1) June 30, 2009, giving notice that it was the transferee of a claim held by Advanced

Chemical Solutions; (2) July 13, 2009, giving notice that it was the transferee of a claim held by

Cypress Hotel & Spa LLC; (3) July 16, 2009, giving notice that it was the transferee of claims

held by PFG Ventures d/b/a Proforma Infosystems, Robert Marx, Fastenal Company, Brower

Timing Systems and Okner Supply Co.; (4) July 17, 2009, giving notice that it was the transferee

of claims held by Overland West, Inc., S. Claus Commercial, Ralph Dunning Design, Inc., and

Smith & Tweed; and (5) July 28, 2009, giving notice that it was the transferee of a claim held by

Hagen O'Connell LLP.  Creditor Liquidity, LP purchased the claims of the above-referenced

creditors after this Court confirmed Debtors' Third Amended Joint Plan of Reorganization.

Creditor Liquidity, LP purchased said claims with full knowledge of the terms of the confirmed

Third Amended Joint Plan of Reorganization.  Additionally, on July 31, 2009, the Official

Committee of Unsecured Creditors ("Committee") of Yellowstone Mountain Club, LLC, and its

filed affiliates (collectively, the "Debtors"), and the  "CrossHarbor entities," which included YC

Holdings LLC, sought entry of an Order allowing certain "trade creditor claims."  Creditor

Liquidity, LP filed an objection to the request to allow certain trade creditor claims arguing "it

would be an abuse of discretion for the Committee not to identify the claims of Boulder [sic] and

Hagen to be paid from the Trade Creditor Fund."  Following a hearing held September 15, 2009,

the Court entered an Order on September 17, 2009, overruling Credit Liquidity, LP's objection

and holding "the Committee shall not be obligated to pay Liquidity, LP any amount on its

claims."  Creditor Liquidity, LP did not appeal the Court's September 17, 2009, Order and such

Order is now final.

Even if the Court sustained the pending objections of Creditor Liquidity, LP, Red Rock Investments, LLC and K & L Gates LLP to approval of the Rule 9019 Motion, the parties would still be bound by the prior Orders of this Court entered September 17, 2009, May 28, 2010, and March 29, 2010.  Creditor Liquidity, LP, Red Rock Investments, LLC and K & L Gates LLP's objections to the pending Rule 9019 Motion are nothing more than attempts to circumvent the effects of other final Orders entered by this Court.  Because of the final and binding Orders discussed above, the Court deems it appropriate to overrule the objections to approval of the Rule 9019 Motion lodged by Creditor Liquidity, LP, Red Rock Investments, LLC and K & L Gates LLP.

Sumpter's opposition to approval of the Rule 9019 Motion suffers from a similar defect in that Sumpter entered into a stipulation of settlement and allowance of claim with the Liquidating Trustee dated February 1, 2010, which stipulation of settlement provides in relevant part:

> 3. The Trustee has reviewed the Claim, the supporting and opposing arguments and related documentation and has conferred with the Claimant and his counsel. The Trustee has determined, and the Claimant does hereby agree, (a) the Claim shall be allowed in the amount of $393,908.20 and (b) that portion of the Claim for penalties under state law, totaling $434,343.90, shall be deemed withdrawn. Except as provided in paragraph 4(c), allowance of the Claim in part and withdrawal of the remainder of the Claim as set forth in the proceeding sentence shall fully settle the Claim on its merits.

> 4. Notwithstanding anything in this Stipulation to the contrary, Claimant may (a) maintain and assert his Class 1 priority claim of $10,950 against the Disbursing Agent, (b) may assert claims or causes of action, if any, against third parties other than the Debtors, and (c) may assert in this case a claim, subject to the Trustee's right to object, for the then-current market value of the 2004 Porsche Cayenne in this case if he is determined not to be the lawful owner of said vehicle in Adversary Proceeding No. 09-00098; provided, such claim must be asserted by written notice not less than 30 days prior to final distribution by the Trustee.

ER00010

5. In addition, the Trustee and the Claimant agree that the Claim shall be treated as a Class 4 claim. The Trustee does not oppose payment of the Claim from the Trade Creditor Fund.

6. Pursuant to Section 7.7.6 of the Third Amended Plan of Reorganization (Dkt. 995), the Trustee is "authorized to compromise and settle any Disputed Claim and to execute all necessary documents, including a stipulation of settlement or release, in [his] sole discretion, without notice to any party, and without the need for Bankruptcy Court's [sic] approval." Accordingly, this Stipulation shall be filed without notice of the right to object or a request for Court approval.

7. Nevertheless, the Trustee and Claimant believe the settlement proposed herein is fair, reasonable and adequate. F.R.Bankr.P., Rule 9019; *Martin v. Kane (In re A&C Properties)*, 784 F. 2d 1377, 1380-81 (9th Cir. 1986).

The above settlement was approved by the Court on February 2, 2010.  Sumpter's claim to the 2004 Porsche Cayenne was resolved in a Memorandum of Decision and Judgment entered June 20, 2010, in Adversary Proceeding No. 09-00098.  Sumpter did not appeal that decision.  Finally, the Court entered a Memorandum of Decision and Order on October 14, 2010, granting Sumpter a separate unsecured nonpriority claim in the amount of $250,000.  Sumpter appealed the Court's October 14, 2010, decision.  In a Memorandum and Order entered March 31, 2011, Judge Haddon affirmed this Court's October 14, 2010, decision.

While the Court has entered post-confirmation decisions involving Sumpter, such decisions do not necessarily preclude Sumpter from pursuing his objections to approval of the Rule 9019 Motion.  However, Sumpter's arguments fail to consider another post-confirmation decision this Court entered in Adversary Proceeding 09-00014 wherein the Court determined that Blixseth was required to pay: "(1) all allowed claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4 (general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9

11

(pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571, and (2) YCLT for the fees and costs it has incurred, and will incur, objecting to and liquidating such claims." Based upon a subsequent pleading, the Court entered an amended judgment concluding that the sum of all claims previously mentioned was $40,067,962.43. Sumpter should receive payment in full of all his allowed claims when Blixseth pays the foregoing judgment.

Blixseth raises four objections to approval of the Rule 9019 Motion. Blixseth first argues the Debtors are no longer debtors-in-possession and therefore, are precluded from filing the pending Rule 9019 Motion. Blixseth next argues Judge Haddon's Memorandum and Order of November 2, 2010, requires the Debtors to "amend the Plan, revise the Disclosure Statement, and set a confirmation hearing, at which time the settlement can potentially be incorporated into a Fourth Amended Plan." Third, Blixseth asserts that the existing Settlement Term Sheet can not be approved because Judge Haddon rejected this Court's approval "of an 'extraordinarily broad' exculpation clause contrary to 11 U.S.C. § 524(e)[.] Finally, Blixseth argues the Debtors "failed to meet their burden of demonstrating that the Settlement Term Sheet is reasonable, equitable and in the best interests of the estate and its creditors[.]"

Relevant exhibits identified by the parties with respect to the Rule 9019 Motion included CrossHarbor's Exhibits 16, 32, 33, 41, 45, 52, 58, 59, 60, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 96, 99, 106, 107, 109, 110, 112,

12

113, 114 and 118, Sumpter's Exhibits 2, 3, 5, 7, 8, 9, 11, 12, 13, 16, 17, 18, 19, 20, 21, 23, 24,

25, 26, 27, 29, Exhibits 1000, 1001 and 1002, along with docket entry 299 in Adversary

Proceeding 09-00014 and docket entry nos. 908, 1049 and 1411 in this case.  The Court also took

judicial notice of the documents filed at docket entry nos. 2199-1, 2199-3, 2240-1 and 2240-2 in

this case.

The Court has no doubt that this Court's June 2, 2009, Confirmation Order and the Third

Amended Joint Plan of Reorganization have been substantially consummated.[2]  Given the

substantial consummation of the Debtors' Third Amended Joint Plan of Reorganization, the

Debtors are admittedly no longer debtors-in-possession.  In an email dated June 28, 2011,

Stillman asked the Debtors' counsel "[w]ho is actually acting as the DIP currently?"  Patten

responded that "there is no dip, there is a reorganized debtor."  Blixseth's Exhibit 1001.  Based

upon the foregoing and relying on Judge Haddon's Memorandum and Order, Blixseth argues that

neither a debtor in possession nor a trustee exists to file and prosecute the pending Rule 9019

Motion.  This Court disagrees.

First, the Settlement Term Sheet was part of and incorporated into the Debtors' Third

Amended Joint Plan of Reorganization.  The Settlement Term Sheet with the attached Credit

Agreement was filed as a standalone and complete pleading on May 28, 2009, at docket entry no.

985.  Further consideration of the Settlement Term Sheet is before this Court as a result of Judge

Haddon's decision entered November 2, 2010.  Consequently, the Rule 9019 Motion filed on

---

[2] Substantial consummation is defined in 11 U.S.C. § 1101 as "(A) transfer of all or
substantially all of the property proposed by the plan to be transferred; (B) assumption by the
debtor or by the successor to the debtor under the plan of the business or of the management of
all or substantially all of the property dealt with by the plan; and (C) commencement of
distribution under the plan."

June 10, 2011, is irrelevant and unnecessary.  Blixseth's argument that no party exists to file the Rule 9019 Motion, or defend confirmation for that matter, elevates form over substance.

Blixseth also maintains that Patten is no longer the Debtors' counsel and has no authority to act on the Debtors' behalf.  Debtors filed an application to employ Patten and the law firm of Patten, Peterman, Bekkedahl & Green on November 10, 2008, to serve as attorneys for the Debtors.  Absent an objection, the Court entered an Order on November 26, 2008, approving the Debtors' employment of Patten and the law firm of Patten, Peterman, Bekkedahl & Green. Patten is still listed as the Debtors' counsel of record in this case.  The Debtors, who were the debtors-in-possession prior to substantial consummation of the Third Amended Joint Plan of Reorganization are now the Reorganized Debtors, as that term is defined in ¶ 1.107 of the Third Amended Joint Plan of Reorganization, and are entitled to representation.  As one would expect, the Reorganized Debtors are represented at this time by the same attorney who represented them from their petition date through substantial consummation of the Plan.

As noted above, the Settlement Term Sheet was part of the Debtors' Third Amended Joint Plan of Reorganization.  As such, the Court's June 2, 2009, Memorandum of Decision and Order not only approved the Settlement Term Sheet, but also confirmed the Debtors' Third Amended Joint Plan of Reorganization.  Unfortunately, while concluding that the Settlement Term Sheet was proposed in good faith and not by any means forbidden and that its provisions were reasonable and represented an appropriate compromise of disputed matters and should be approved pursuant to the provisions of Bankruptcy Rule 9019, the Court did not provide any meaningful discussion to support such ruling.  Nevertheless, this Court did consider all "factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective*

ER00014

*Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424

(1968).

In reaching its June 9, 2009, decision, the Court considered the factors articulated in

*Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986):

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be
> encountered in the matter of collection; (c) the complexity of the litigation
> involved, and the expense, inconvenience and delay necessarily attending it; and
> (d) the paramount interest of the creditors and a proper deference to their
> reasonable views in the premises.

As explained in *A & C Properties*:

> The purpose of a compromise agreement is to allow the trustee and the creditors
> to avoid the expenses and burdens associated with litigating sharply contested and
> dubious claims.  The law favors compromise and not litigation for its own sake,
> and as long as the bankruptcy court amply considered the various factors that
> determined the reasonableness of the compromise, the court's decision must be
> affirmed.

*Id*. at 1380-81 (citations omitted).  Considering all relevant factors, this Court found that the

Settlement Term Sheet was "fair and equitable" as required by *In re A&C Properties*.

As aptly explained by the proponents of the Settlement Term Sheet, the fact that the

settlement was finally reached in the early hours of May 18, 2009, the date of the confirmation

hearing, after around the clock negotiations during the preceding 48 hours, is symptomatic of the

obstacles and disputes that had to be resolved if the Debtors were to achieve a successful

reorganization.[3]  Indeed, when the multi-day auction was concluded on the evening of Friday,

---

[3]  Blixseth makes some incorrect declarations with respect to the Settlement Term Sheet.
For instance, in a Reply Brief filed July 5, 2011, Blixseth's counsel argues the "Settlement Term
Sheet had not even been finalized at the conclusion of the May 18, 2009 hearing," and then later
maintains in the same Reply Brief that when the parties announced their settlement at the May
18, 2009, hearing, it "was still not even reduced to writing[.]" The foregoing assertions are
incorrect.  I recall, and the record confirms, that the Debtors, Committee, CrossHarbor and Credit

ER00015

May 15, 2009, without declaring either Credit Suisse or CrossHarbor the successful bidder, no assurances existed that the Debtors' plan would be confirmed on Monday, May 18, 2009, and in fact, it was quite possible the Debtors' cases could be converted to chapter 7. Absent a resolution, the Debtors faced numerous obstacles to confirmation, including issues under Sections 1111(b) and 1129 of the Bankruptcy Code that could have proven insurmountable absent a consensual resolution of Credit Suisse's claims. In Greenspan's words, confirmation without the global settlement: "[W]ould have been extremely difficult, if not impossible." Furthermore, absent confirmation of a plan by late May of 2009, the Debtors would have no further access to debtor in possession financing. As Greenspan testified:

> For all practical purposes, we had none. We did not have rights to cash collateral, we had no more DIP capacity, and we had operating and administrative expenses that very substantially exceeded our recurring income.

Absent the settlement, the Debtors in all likelihood would not have survived as going concerns. In the face of those daunting threats to confirmation, and indeed to the Debtors' very existence as going concerns, the settlement forged a consensual resolution among all of the Debtors' principal constituencies. Among other things, the Settlement Term Sheet paved the way to confirmation of the Debtors' Third Amended Join Plan of Reorganization which: (i) increased payments by CrossHarbor for payment of administrative expenses and to Credit Suisse; (ii) doubled the amount of the Trade Creditor Fund from $7.5 million to $15 million; and (iii) provided a $2 million increase, from $375,000 to $2.375 million, in the funding of the Yellowstone Club Liquidating Trust. Credit Suisse, likewise, made substantial concessions critical to confirmation

---

Suisse presented the Court with a fully executed copy of the Settlement Term Sheet at the May 18, 2009, hearing.

ER00016

of the Plan, including accepting an $80 million note in satisfaction of its $232 million secured claim and agreeing to a "waterfall" that subordinated its remaining unsecured deficiency claim to up to $27 million of other claims, an amount significantly greater than that provided under this Court's Interim and Partial Order.

As discussed above, rather than an exhaustive investigation or a mini-trial on the merits, this court need only find that the settlement was negotiated in good faith and is reasonable, fair and equitable. *A & C Properties*, 784 F.2d at 1381. The testimony elicited with respect to the Settlement Term Sheet prior to the Hearing, at earlier hearings before this Court, and during Greenspan's deposition demonstrates that the Settlement Term Sheet was, and remains, fair and equitable. The Court, therefore, once again approves the Settlement Term Sheet in all respects.

## II. Identification and delineation of those persons or representatives within the scope of ¶ 8.4 of the Debtors' Third Amended Joint Plan of Reorganization.

In addition to requiring proper notice under the Bankruptcy Rules, Judge Haddon reversed and remanded confirmation of the Debtors' Third Amended Joint Plan of Reorganization so this Court could, "to the extent feasible . . . explicitly identify and delineate those persons or representatives determined to be within the scope of the release parameters of Section 524(e) and to state the reasons why it reached such conclusions." Relevant exhibits identified by the parties with respect to the exculpation clause found in the Debtors' Third Amended Joint Plan of Reorganization included CrossHarbor's Exhibits 1, 2, 3, 4, 5, 32, 44, 50, 56, 118, the Debtors' Exhibits 1 and 3, Beckett and Parsons Behle & Latimer's Exhibit 1, along with the Orders and pleadings found at docket entry nos. 220, 494, 591, 596, 1186, 1224, 1612 and 1702 in this case, and docket entry no. 292 in Adversary Proceeding 09-00014.

A recurring argument raised by Blixseth in written pleadings and during oral argument is

ER00017

**Case No. 12-35986 ER  22**

that this Court could not conduct the hearing as scheduled because, according to Blixseth, some

party would have to file a "mysterious and as-yet undisclosed new exculpation clause[.]"

Blixseth argues in an objection to the July 25, 2011, hearing, that Debtors were required to first

submit a new disclosure statement and further amended plan: "Because at the very least, ¶ 8.4 of

the Third Amended Plan must be changed, the Third Amended Plan can no longer be the

operative plan for the Court to confirm."  Objection of Timothy Blixseth to July 25, 2011

Hearing, dkt 2198, p.5.  Continuing, Blixseth asserts: "Instead of "patching up" the existing,

defective Plan, a new plan must be proposed that complies with the appellate court's mandate."

*Id.*, p.7.  In that same Objection , p.6., Blixseth offers the following argument in support of his

contention that the Debtors' Third Amended Joint Plan of Reorganization is a nullity that cannot

be modified:

> Section 1127(b) also prohibits modification of a substantially
> consummated plan.  *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 982
> F.2d 721, 747 (2nd Cir. 1992).  The modification required by the District Court
> can only be considered a material one, given that the Third Amended Plan is
> premised on the Term Sheet and the exculpation clause. The Court need only look
> at Credit Suisse's own words in responding to Highland Capital's Objection to the
> Yellowstone Term Sheet, p. 4 [Docket No. 966], stating that alteration of the
> "highly negotiated" material terms of, among things, the scope of the exculpation
> clause would require resolicitation of creditors.

> Although the issue normally arises in the context of determining the
> equitable mootness of an appeal – an exclusively appellate remedy already
> rejected by both the District Court and the Ninth Circuit – courts have has been
> repeatedly held that modifying the scope of releases is a prohibited material
> change in a confirmed plan.  In *[In re Delta Airlines, Inc.*, 374 B.R. 516 (S.D.N.Y.
> 2007], as here, the releases were an integral part of the entire Settlement and
> cannot be undone in isolation from other portions of the plan that were not
> reversed.  *In re Delta Air Lines, Inc.*, 374 B.R. at 524.  In *In re Specialty Equip.
> Cos.*, 3 F.3d 1043, 1049 (7th Cir. 1993), the court refused to nullify non-debtor
> releases because such a remedy "would amount to imposing a different plan of
> reorganization on the parties."  Similarly, in *In re Metromedia*, 416 F.3d 136 (2nd

ER00018

Case No. 12-35986 ER  23

Cir. 2005), the court prohibited an appeal which would have eliminated releases which were essential to the bargain between the parties. *See also, In re Enron Corp.*, 326 B.R. at 503 (finding appeal of exculpation provision moot where the bankruptcy court found the provision necessary for the negotiation of the reorganization plan); *In re Texaco Inc.*, 92 B.R. 38, 45-50 (S.D.N.Y. 1988) (finding appeal seeking to sever and rescind releases moot because releases were part of an "integrated settlement" and their rescission would "undermine the entire reorganization"). The underlying theme of these cases is that altering one important component of an approved plan is tantamount to "imposing a different plan of reorganization on the parties" and therefore requires a new, Fourth Amended Plan to be properly proposed for confirmation.

After much deliberation, I see nothing in the record that requires this Court to, as Blixseth suggests, put the tooth paste back in the tube. First, as Blixseth correctly acknowledges, the Debtors' plan is substantially consummated and the Court sees no conceivable or equitable way to put the parties back to their pre-confirmation position. *See In re BearingPoint, Inc.,* 453 B.R. 486, 495 (Bankr. S.D.N.Y. 2011) ("the Trustee is also correct in pointing out that the request for modification of the Confirmation Order here would have no adverse effect on creditor expectations under the plan, or raise issues as to the unscrambling of eggs that often are a concern (typically considered in mootness analysis) in modifying confirmation orders after the fact"); and *In re Public Service Co. of New Hampshire*, 963 F.2d 469, 475 (1st Cir.1992) ("unraveling the substantially consummated ... reorganization plan would work incalculable inequity to many ... who have extended credit, settled claims, relinquished collateral and transferred or acquired property in legitimate reliance on the unstayed order of confirmation").

Second, the exculpation clause was not a last minute provision added to the Debtors' Third Amended Joint Plan of Reorganization without notice to all parties. Debtors filed their first Chapter 11 Plan on February 13, 2009, at docket entry no. 384. The Plan filed February 13th contained the following Exculpation and Limitation of Liability clause:

ER00019

> None of (a) the Debtors or the Reorganized Debtors, (b) the Committee, (c) the individual members of the Committee in their capacities as such, (d) the DIP Lender, any other lenders of (or participants in) the DIP Loan and any agent thereof, (e) the Current Equity Owners, (f) CrossHarbor Capital Partners and all affiliates thereof, (g) the Acquirer, and (h) with respect to each of the foregoing Persons, each of their respective directors, officers, employees, agents (including Edra Blixseth, as managing member of the Current Equity Owners), representatives, shareholders, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Person for any act or omission in connection with, relating to or arising out of the Chapter 11 cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan; provided, however, that nothing in this Section 8.4 shall be construed to release or exculpate any Exculpated Party from willful misconduct or gross negligence as determined by a Final Order or any breach of the Definitive Agreement or any documents entered into in connection therewith.

Debtors' First Amended Joint Plan of Reorganization filed March 3, 2009, at docket entry no. 516, and Debtors' Second Amended Joint Plan of Reorganization filed April 3, 2009, at docket entry no. 691 contained the same exculpation clause found in the Plan filed February 13, 2009, except that the acronym "LLC" was added as follows: "(f) CrossHarbor Capital Partners *LLC* and all affiliates thereof[.]" The exculpation clause was finally amended in the Third Amended Joint Plan of Reorganization filed May 29, 2009, at docket entry no. 995 to read as follows:

> None of (a) the Debtors or the Reorganized Debtors, (b) the Committee, (c) the individual members of the Committee in their capacities as such, (d) the DIP Lender, any other lenders of (or participants in) the DIP Loan and any agent thereof, (e) the Current Equity Owners, (f) CrossHarbor Capital Partners and all affiliates thereof, (g) the Acquirer, *(h) the First Lien Lenders and the First Lien Agent, and (i)* with respect to each of the foregoing Persons, each of their respective directors, officers, employees, agents (including Edra Blixseth, as managing member of the Current Equity Owners), representatives, shareholders, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated

20

**Case No. 12-35986 ER  25**

Parties"), shall have or incur any liability to any Person for any act or omission in
connection with, relating to or arising out of the Chapter 11 cases, the
formulation, negotiation, implementation, confirmation or consummation of this
Plan, the Disclosure Statement, or any contract, instrument, release or other
agreement or document entered into during the Chapter 11 Cases or otherwise
created in connection with this Plan; provided, however, that nothing in this
Section 8.4 shall be construed to release or exculpate any Exculpated Party from
willful misconduct or gross negligence as determined by a Final Order or any
breach of the Definitive Agreement or any documents entered into in connection
therewith.

The latter amendment to ¶ 8.4 was specifically highlighted in a redline version of the Third

Amended Joint Plan of Reorganization filed May 22, 2009, at docket entry no. 945-1.

Blixseth first objected to confirmation of the Debtors' Second Amended Joint Plan of

Reorganization on May 11, 2009, at docket entry no. 860.  In that objection, Blixseth joined the

previously filed objections of Credit Suisse and also objected on grounds the Debtors' Second

Amended Plan was not filed in good faith.  Credit Suisse subsequently resolved and withdrew its

objections to confirmation, leaving Blixseth with his good faith objection.  However, on May 24,

2009, Blixseth filed a response to the Debtors' post-confirmation hearing report arguing that ¶

8.4 of the Debtors' Plan was unlawful and contrary to Ninth Circuit law:

> The Court will recall the reason stated for these exculpatory
> provisions—that threats were made to Mr. Greenspan about legal action against to
> be taken against him and other members of the Debtors' professional team. *He
> testified that the threats were made by Credit Suisse*. Now after the Debtors
> having settled with Credit Suisse and delivered mutual releases, the exculpatory
> language not only remains in the Plan, but *includes* Credit Suisse.

> The Ninth Circuit prohibits such non-debtor third party releases.  *Resorts
> International, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-2
> (9th Cir. 1995) ("*Lowenschuss*"). The Third Amended Plan is not confirmable
> with these exculpatory provisions. The Ninth Circuit in *Lowenschuss* stated that
> "this court has repeatedly held, without exception, that Section 524(e) [of the
> Bankruptcy Code] precludes bankruptcy courts from discharging the liabilities of
> non-debtors." *Lowenschuss*, 67 F.3d at 1401-2.  *In re American Hardwoods*, 885
> F.2d 621 (9th Cir. 1989); *Underhill v. Royal*, 769 F.2d 1426 (9th Cir. 1985).

ER00021

Blixseth's response filed May 24, 2009, at docket entry no. 956, p.12.

Contrary to Blixseth's argument, the exculpation clause, which was a "highly negotiated" component of the resolution between the Debtors, the Committee, Credit Suisse and CrossHarbor, does not violate Ninth Circuit precedent. The Ninth Circuit, in *In re American Hardwoods, Inc.,* 885 F.2d 621, 626 (9th Cir. 1989), and *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394 (9th Cir. 1995), held that under § 524(e), a bankruptcy court does not have the authority to permanently enjoin a creditor from continuing with and enforcing a state court judgment against non-debtor guarantors.[4] The ruling articulated in *American Hardwoods,* as reiterated in *Lowenschuss*, is not implicated here.

In *American Hardwoods*, a chapter 11 debtor sought to permanently enjoin a creditor from enforcing a state court judgment against the debtor's guarantors, who also happened to be the debtor's president and vice president. The Ninth Circuit held that the bankruptcy court lacked jurisdiction and power to permanently enjoin a creditor, beyond confirmation of the plan, from enforcing a state court judgment against the nondebtor guarantors. In reaching its decision, the Ninth Circuit explained:

> Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105 empowers the court to enjoin preliminarily a creditor from continuing an action or enforcing a state court judgment against a nondebtor prior to confirmation of a plan. *In re A.H. Robins Co.*, 828 F.2d 1023,

---

[4] In bankruptcy, a discharge is an involuntary release by operation of law of asserted and non-asserted claims by a creditor against an entity who has filed a petition under the Bankruptcy Code and who has abided by its rules. *In re Arrowmill Development Corp*., 211 B.R. 497, 504 (Bankr. D.N.J. 1997). Upon confirmation of a plan, a Chapter 11 debtor receives a discharge of its debts which arose before confirmation. 11 U.S.C. § 1141(d)(1). Subsection § 524(e) limits the scope of the discharge. A "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt." 11 U.S.C. § 524(e).

ER00022

1026 (4th Cir.1987), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002–03 (4th Cir.) ( *Piccinin* ), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). Furthermore, section 105 permits the court to issue both preliminary and permanent injunctions after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate. *See Burstein–Applebee*, 63 B.R. at 1020–21 (principals of debtor permanently enjoined from continuing state court action against creditors' committee); *In re Askew*, 61 B.R. 87, 89 (Bankr. S.D.Ohio 1986) (creditor permanently enjoined from continuing state court action regarding discharged debt). American, however, points to no case, and we are aware of none, in which a court permanently enjoined, past confirmation of a plan, a creditor from enforcing a state court judgment against a nondebtor guarantor of a contract liability. Deutsche argues, and the district court held, that its power under section 105(a) to order the relief sought by American ends at confirmation of the plan.

*American Hardwoods*, 885 F.2d at 624-25. The analysis in *American Hardwoods* focused on §

105 of the Bankruptcy Code, which the Court concluded "does not authorize relief inconsistent

with more specific law." *Id.*, at 625, citing with approval *In re Golden Plan of California, Inc.*,

829 F.2d 705, 713 (9th Cir.1986); and *Johnson v. First National Bank of Montevideo, Minnesota*,

719 F.2d 270, 273 (8th Cir.1983), *cert. denied* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245

(1984). The Court rejected the semantic distinction between a permanent injunction and a

discharge and viewed a permanent injunction of actions against the debtor's guarantors as being

contradictory to the specific provisions of § 524(e). The Court in *American Hardwoods* thus

concluded the court had no power to issue the injunction sought by the debtor:

> As we succinctly explained in *Underhill v. Royal*, 769 F.2d 1426 (9th Cir.1985):
>
>> Generally, discharge of the principal debtor in bankruptcy will not discharge the liabilities of codebtors or guarantors.... [Section 524(e) ] of the 1978 Bankruptcy Reform Act was a reenactment of Section 16 of the 1898 Act which provided that "[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." Act of July 1, 1898, ch. 541, § 16, 30 Stat. 550 (formerly codified at 11 U.S.C. § 34 (1976)).
>>
>> In addition, the Bankruptcy Act of 1898, as amended, provided that

a corporation's discharge in bankruptcy "shall not release its officers, the members of its board of directors or trustees or of other similar controlling bodies, or its stockholders or members, as such, from any liability under the laws of a State or of the United States." Act of June 22, 1938, ch. 575, § 4(b), 52 Stat. 845 (formerly codified at 11 U.S.C. § 22(b) (1976)). Thus, under the old Act, stockholders or directors could remain liable for substantive violations despite discharge of the corporate entity. 1A J. Moore COLLIER ON BANKRUPTCY ¶ 16.14, at 1551 (14th ed. 1978).

*Id*. at 1432; *see also id*. ("The bankruptcy court 'has no power to discharge the liabilities of a bankrupt's guarantor.' "), *quoting Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982); *id*. (" 'The bankruptcy court can affect only the relationships of debtors and creditor. It has no power to affect the obligations of guarantors.' "), q*uoting R.I.D.C. Industrial Development Fund v. Snyder*, 539 F.2d 487, 490 n. 3 (5th Cir.1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977).  Section 524(e), therefore, limits the court's equitable power under section 105 to order the discharge of the liabilities of nondebtors[.]

*Id*. at 625-26.  At that time, the Ninth Circuit reasoned, in dicta, that adoption of the rationale

discussed in in *Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694 (4th Cir.), *cert.*

*denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989), would not dictate a different result

because the facts in *American Hardwoods* were distinguishable from the unusual facts found in

*A.H. Robins*.  *Id*. at 626.  In so stating, the Ninth Circuit enumerated five factors which it

considered critical to the *A.H. Robins* holding:

(1) the reorganization plan, which included the injunction, was approved by over 94% of the claimants ..., (2) the plan provided for full payment of creditors' claims, ...; (3) the injunction affected only about 1.5% of the claimants, ...; (4) it was "essential" to the plan that claimants "either resort to the source of funds for them in the Plan ... or not be permitted to interfere with the reorganization and thus with all other creditors, ...; and (5) "the entire reorganization hing[ed] on the debtor being free from indirect claims such as suits against parties who would have indemnity or contribution claims against the debtor."

*American Hardwoods*, 885 F.2d at 626.

Six years later, in *In re Lowenschuss*, 67 F.3d 1394, the Ninth Circuit again revisited the

ER00024

scope of § 524(e) and reiterated "that bankruptcy courts do not have the equitable power under § 105(a) to discharge the liabilities of nondebtors through chapter 11 plan confirmation, contrary to the provisions of § 524(e). *Id.* at 1401-02. The Ninth Circuit clarified that in *American Hardwoods*, it "expressly declined to adopt the approach set forth in *In re A.H. Robins*[.]"

This court is bound by, and does not dispute the legal precedent established in *Lowenschuss*, *American Hardwoods*, and *Underhill*, that liabilities of nondebtors cannot be discharged through a plan. Such legal precedent, however, is inapplicable here because, unlike in *Lowenschuss*, *American Hardwoods*, and *Underhill,* ¶ 8.4 of the Debtors' Third Amended Joint Plan of Reorganization is not a broad sweeping provision that seeks to discharge or release nondebtors from any and all claims that belong to others.

Blixseth's counsel disputes that ¶ 8.4 contains a temporal component.[5] During direct examination, Beckett described the temporal component of the exculpation clause as follows: "generally with respect to the exculpation, it was negotiated carefully. And the idea was not to overreach but to capture the time period from the filing of the petition generally until the consummation -- confirmation of the plan." The temporal limitation of the exculpation clause was further discussed during Flynn's questioning of Beckett:

> FLYNN.      So please indicate to the Court where the time limitation is in the -- that you were concerned about.
>
> BECKETT.    Yes. Docket No. 995, page 40 -- or it says, upper right, "48 of 58," Section 8.4. About eight lines down on the left is the definition of "exculpated party." And so let's just -- "exculpated parties." Let's just start with that (quoted as recorded): "The exculpated parties

---

[5] Blixseth also argued in a Reply Brief filed July 5, 2011, that "[a]s written, Section 8.4 releases the Exculpated Parties from liability for pre and post-petition conduct which violates not only Section 524(e) by also Mr. Blixseth's due process rights."

ER00025

**Case No. 12-35986 ER  30**

shall have or incur – none of the exculpated parties shall have or incur any liability to any person for any act or omission in connection with, relating to, or arising out of the Chapter 11 cases."

Now, let's just stop right there for a second. That doesn't give you any dates, okay, but that's the typical language which is intended to define that we're not talking about anything that happened a year before the bankruptcy, we're not even talking about things probably that happened two days before the bankruptcy, and we're not talking about stuff that happens after confirmation or consummation.

We're talking about things that arise and relate to the Chapter 11 cases.  Then continuing (quoted as recorded): "Or" - I think is implied there - "the formulation, negotiation, implementation, confirmation, or consummation of this plan, the disclosure statement, or any contract, instrument, release, or other agreement or document entered into during the Chapter 11 case or otherwise created in connection with this plan."

And my, my point is that the doctrine of quasi-judicial immunity really pertains to a professional's activities, you know, during the pendency of the bankruptcy case, and that's really the best way here that lawyers have found over the years to define that temporal duration. So all I'm saying is that we're talking about what happened during the case, and that's how we say it.

FLYNN.    In fact, there is no, as you put it, "temporal" recitation in 8.4 by date or time limit, is there, Mr. Beckett?

BECKETT.    Yes, there is.

FLYNN.    No, other than this language that you've stated --

BECKETT.    Other, other than --

FLYNN.    -- there's no recitation of a specific "60-day," "90-day," "from the date of filing the petition until the date of the confirmation of the plan." There is no such language, is there, sir?

BECKETT.    You know, I can't change my testimony. There is, but I understand, we're arguing about how that time period is defined. I'm saying it's defined there; you're saying it's not defined by dates and times or

specific duration.  You're right.

The Court agrees with Beckett's observation that ¶ 8.4 only protects those acts that occurred in connection with the Debtors' Chapter 11 cases between November 10, 2008, and July 17, 2009. Acts falling outside the foregoing dates are not protected.

The exculpation clause is also narrow in scope.  The following colloquy between Beckett and Flynn highlights the limited scope of the exculpation clause:

> FLYNN.      The term that's used in 8.4, "relating to" or "arising out of the Chapter 11 cases," that's a very broad term, is it not, Mr. Beckett?
>
> UNIDENTIFIED SPEAKER: Objection; vague.
>
> THE COURT: I'm going to overrule and allow him to answer if he is able.
>
> BECKETT.    You know, I think, I think it comes from 28 U.S.C. § 1334(b), is my recollection. And I think that there are hundreds of cases defining what "related to," "arising under," or "in connection" -- or not "in connection"; with -- what that means. I think it's an exacting phrase.

Blixseth disagrees that the exculpation clause is limited in scope, arguing ¶ 8.4 impermissibly releases claims belonging to both the Debtors and Blixseth.  Blixseth's belief that Debtors are seeking to impermissibly release claims belonging to the Debtors is evidenced by Blixseth's motions for derivative standing filed July 19 and 20, 2011, wherein Blixseth seeks leave of this Court to pursue alleged claims belonging to the Debtors against Credit Suisse and CrossHarbor.  Notwithstanding what claims ¶ 8.4 may or may not release, 11 U.S.C. § 1123(b)(3)(a) permits a plan to settle or adjust any claim belonging to the debtor or to the estate. Subsection 524(e) does not come into play with respect to any claims belonging to the Debtors or the bankruptcy estates that may have been released by ¶ 8.4 of the Plan against Credit Suisse or CrossHarbor.

ER00027

**Case No. 12-35986 ER  32**

Blixseth's counsel also elicited testimony at the hearing held July 25th and 26th suggesting that ¶ 8.4 of the Debtors' Plan impermissibly releases claims Blixseth may have against certain of the parties, including CrossHarbor, Credit Suisse and Brown.  After Blixseth intervened in Adversary Proceeding 09-00014, he steadfastly maintained that the Debtors' bankruptcy filings were orchestrated by his ex-spouse, Edra, and CrossHarbor.  Blixseth likewise contends he has claims against Credit Suisse stemming from a 2005 loan agreement between Blixseth, on behalf of the Debtors, and Credit Suisse

Finally, Blixseth takes issue with the actions of Brown, who admittedly served as counsel for both the Debtors and Blixseth prior to November 10, 2008.  Brown is a partner in the law firm of Garlington, Lohn & Robinson.  Garlington, Lohn & Robinson was owed in excess of $300,000 by the Debtors on their petition date.  Because of the substantial unsecured claim owed Garlington, Lohn & Robinson, Brown agreed to and in fact did serve as chairman of the Committee.

Blixseth contends Brown breached Blixseth's attorney-client privilege when Brown divulged information, protected by Blixseth's attorney-client privilege, to the Committee. Blixseth complains that ¶ 8.4 of the Debtors' Plan now exculpates Brown and that Blixseth is foreclosed from pursuing a claim against Brown for breach of Blixseth's attorney-client privilege.  Blixseth also takes issue with advice Brown provided to Credit Suisse in 2005 with respect to the Credit Suisse loan transaction and advice Brown provided to Blixseth prior to August 2008 in connection with Blixseth's marital settlement agreement.

While the Court cannot anticipate every claim Blixseth may have against the parties involved in this case, the specific claims discussed during testimony are outside the scope of the

ER00028

**Case No. 12-35986 ER  33**

release provision at issue.  The release provision in this case is narrow in both scope and time, and applies only to an "act or omission in connection with, relating to or arising out of the Chapter 11 cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan[.]" For instance, any claim Blixseth may have stemming from Brown's advice with respect to Blixseth's marital settlement agreement or the Credit Suisse loan transaction is clearly outside the scope of the exculpation clause.  Moreover, while not specifically before the Court, this Court would find any question as to whether Brown breached Blixseth's attorney-client privilege as separate and distinct from the Debtors' confirmation process.  The aforementioned acts took place prior to the Debtors' petition date and have no connection whatsoever with the chapter 11 bankruptcy process.

Larry Ream[6], by way of background, explained during his testimony that exculpation clauses are intended to "prevent parties – who are disappointed subsequent to the completion of a Chapter 11 case, from suing professionals and others that are directly involved in the process of reorganization.  But they are limited, and they are intended solely to preclude litigation related to or acts and conduct related to the process of the reorganization itself."  Larry Ream explained specifically what was not covered by the exculpation clause: "willful misconduct is not exculpated, nor are gross -- conduct that constitutes gross negligence, nor is there anything within our exculpation clause . . . that affects . . . 524(e) and the discharge provision."

---

[6] Larry Ream was employed to represent the Debtors' in this bankruptcy case and was the person who drafted the Debtors' plans.

ER00029

**Case No. 12-35986 ER  34**

The parties in this case, including the Debtors, Credit Suisse, CrossHarbor, Blixseth and others, all had a lot at stake. According to Larry Ream, "[a]ll of the interested parties in this case had significant issues and important positions, and they were all taken vigorously." The vigorous jockeying by the parties created an oftentimes contentious environment. Attorney Larry Ream referenced two pre-confirmation threats made by Credit Suisse against various of the professionals involved in this case, wherein Credit Suisse alleged that the Debtors and their professional were mismanaging this case and allowing value to dissipate.

In another situation and prior to Blixseth's active involvement in either this case or any associated adversary proceeding, Beckett, who served as lead counsel for the Committee, sent Flynn a courtesy email to advise Flynn and Blixseth that Blixseth was named in a complaint the Committee had drafted, but not yet filed. Flynn responded to Beckett by email on February 7, 2009: "I strongly urge you NOT to file a lawsuit that will generate publicity that will potentially kill the deal that Tim has put together to insure full payment to the unsecured creditors comprised of the vendors, workers, contractors." Attached to Flynn's email to Beckett was correspondence between Blixseth and Flynn in which Blixseth told Flynn if the UCC filed its complaint and thereby killed Blixseth's almost completed deal, Flynn was instructed to "commence legal action against each and every person responsible, regardless of who they are." As a result of Flynn's email, the Committee removed Blixseth's name from the Complaint, leaving Credit Suisse as the sole named Defendant. However, Blixseth never proposed a deal to provide full payment to the unsecured creditors and in fact, subsequently requested leave to intervene in the Debtors and Committee's action against Credit Suisse. That action evolved into an action between Blixseth and the Liquidating Trustee. The Court eventually entered Judgment against Blixseth directing

ER00030

him to provide sufficient funds to pay the unsecured creditors.

As shown above, numerous parties were threatening others with lawsuits, and notwithstanding the exculpation clause, Blixseth, in 2009, filed a separate action against CrossHarbor in California.  In addition, prior to the July 25th hearing, Blixseth filed a complaint against: (1) Stephen Brown and his law firm, Garlington, Lohn & Robinson, PLLP; (2) James A. Patten and his law firm Patten, Peterman, Bekkedahl & Green, PLLC; (3) J. Thomas Beckett and his law firm Parsons, Behle & Latimer; (4) Thomas L. Hutchinson and his law firm Bullivant, Houser, Bailey, PC; (5) Samuel T. Byrne; and (6) CrossHarbor Capital Partners, LLC.  As the record demonstrates, litigation and the threat of litigation is and was plentiful in this case.

An exculpation clause in this case was certainly advisable given the litigious posture of the parties.  The only issue was who could legally be included in such a clause.  During cross-examination, counsel for Sumpter specifically asked Beckett what "should an exculpation clause be?"  Beckett responded:

> In my view, it should be at least as broad as the quasi-judicial immunity. The quasi-judicial immunity is there. It needs to be reduced to writing. And it is almost in the nature - it's a poor, poor reference - but it's almost in the nature of an oath where the purpose of it is to remind people of the paramount importance of repose in a bankruptcy case.
>
> Professionals and the people they represent in the cases – professionals, on behalf of the people they represent in cases, battle each other tirelessly for a period of time. And things are said, and feelings are hurt, and "oxes" are gored. And there needs to be repose at the end of the case. And the professionals, and the debtor, and the committee members, and the acquirer, the DIP lender, whoever else is put in there by contract need to know at the end of the case that everything about their behavior has been exposed, has been vetted, has been considered, and it's over.
>
> The reorganized company - in this case, the Yellowstone Club - and those of us who participated in this case need to go back to doing what we like to do: Working on other cases, selling lots and making people happy at the club, and

ER00031

**Case No. 12-35986 ER  36**

Credit Suisse is back in its business of making loans. There needs to be that repose, and for me that's the most important thing, "This is the end of it, we're done."

Beckett continued by providing additional justification for inclusion of the exculpation clause in Debtors' Third Amended Joint Plan of Reorganization:

Professionals ought to be able to do the best they can in a bankruptcy case, get a result, and then move on knowing that they're not subject to liability.

My own view has another component to it, which is that, I agree, exculpation clause -- claim -- clauses are very common, and their function is like a stoplight at the end of a long straightaway. And it's really important when a plan is filed that it have an exculpation clause in it because if the plan isn't confirmed, the exculpation clause is not yet in effect, but you have a long period of time before -- reasonably, a reasonable period of time before the plan is confirmed for people to think about the effect of the exculpation clause. And that exercise about thinking of the effect of the exculpation clause causes everybody to say, "Do I have some claim to bring?"

Because this Court, when this Court gives professionals like us authority to do things, it is this Court that should review the propriety of what we have done. And the existence of a pending exculpation clause has the function, the very important function of causing everyone to bring up everything they have to bring up before the case is confirmed, before the plan is confirmed and the exculpation clause is in effect. And so everyone brings up all the complaints they have about each other before that in this court and resolve them all. And then with that, then you have that repose, and professionals can go about their next case without being sued.

* * *

I think it's also true that there is a doctrine of quasi-judicial immunity which is parallel to the exculpation clause. I don't know the intersection of those two.

This Court agrees that the exculpation clause in this case does nothing more than provide quasi-judicial immunity to the Debtors, the Committee and their professionals.

Beckett also explained why it was necessary to include Credit Suisse and CrossHarbor:

Every party was doing something very important and giving up something very important and making very important agreements to undertake going forward. And it was,

ER00032

it was very clear that every single party there had a deal point that they were to be within the exculpation clause of whatever plan came out of the term sheet.

It was, it was a deal point, and it was a reasonable deal point, and -- absolutely. CrossHarbor was acquiring the reorganized debtor, the plan assets. CrossHarbor was paying up to $15 million for unsecured creditor claims. Credit Suisse was standing down on its appeal, which would have destroyed the plan -- or there would be no plan if Credit Suisse appealed. Credit Suisse was getting something in return.

The Court agrees that CrossHarbor should be included in the exculpation clause because of its involvement in this case by providing debtor in possession financing and because it served as the stalking horse bidder. Credit Suisse is also an expected candidate for coverage because it was, coming into this case, by far the largest creditor with a claim of $375 million. Credit Suisse was also seeking to appeal a partial and interim order entered by this Court on May 12, 2009. Credit Suisse had the ability to single-handedly disrupt the entire confirmation process.

In support of his position, Blixseth's counsel invited the Court to review *In re Lighthouse Lodge, LLC*, (slip opinion) 2010 WL 4053984 (Bankr. N.D.Cal. 2010), for "a very good analysis of just how limited these exculpation clauses need to be." *Lighthouse Lodge* provides support for approval of the instant exculpation clause. In *Lighthouse Lodge*, the court endorsed a bifurcated approach to examining release clauses contained in chapter 11 plans. *Id.* *8. According to the court in *Lighthouse Lodge*, the first prong of the analysis treats the release as "a settlement or adjustment of claims belonging to the debtor and the estate within the meaning of § 1123(b)(3)(A)" and examined such settlement or adjustment of claims under the factors articulated in *A & C Properties*, 784 F.2d 1377 (9th Cir. 1986). *Id.*, quoting *Edgewood Centre v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.)*, 370 B.R. 452 (1st Cir. BAP 2007). The second part of the analysis looks at the release as "'a release (or limitation of liability, or grant of immunity) of a party responsible for implementing the plan.'" *Id.* In reaching its decision to

ER00033

**Case No. 12-35986 ER  38**

endorse the bifurcated approach, the court in *Lighthouse Lodge* explained,

> Section 1103(c) grants to official creditors' committees broad authority in formulating a plan of reorganization and performing "such other services as are in the interest of those represented." 11 U.S.C. § 1103(c). Section 1103(c) also gives rise to "an implicit grant of limited immunity." *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr.S.D.N.Y.1992).  Hence, a plan may contain a release provision insulating a committee and its members from liability except from gross negligence or willful misconduct. *See Vasconi & Associates, Inc. v. Credit Manager Association of California*, 1997 WL 383170, *4 (N.D.Cal.1997); *In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3rd Cir.2000);

> This release of liability except from gross negligence or willful misconduct has been extended to plan proponents other than a committee. *In In re WCI Cable, Inc.*, 282 B.R. 457 (Bankr.D.Or.2002), the bankruptcy court was confronted with objections to the various release, exculpation, injunction and indemnification provisions in the debtor's plan. One of the exculpation provisions sought to limit the liability of the debtors, who were the plan proponents, "for any of their actions or omissions to act with respect to the [debtors'] bankruptcy proceedings, except for willful misconduct or gross negligence." *Id.*, at 477. Because the provision would release the debtors and their officers, members, directors, employees, representatives, attorneys, accountants, financial advisors, agents, among others, the bankruptcy court observed that "[d]ifferent liability standards may be appropriate and/or applicable under the Bankruptcy Code to these different entities and individuals in various circumstances in performing their respective functions postpetition in bankruptcy, and the lines separating actions protected by immunity from actionable conduct are neither clearly nor easily drawn." *Id.*, at 478. The court also pointed out that unlike a creditors' committee, these parties did not have statutory immunity. *Id.*, at 478. Nevertheless, noting that the debtors had a legitimate concern because the cases were bitterly contested, the court approved the exculpation clause on the condition that the exculpation exceptions were extended to cover negligence and breaches of fiduciary duty, in addition to gross negligence and willful misconduct as already stated in the release. *Id.*, at 479–80.

> Other courts have approved exculpation provisions that limited liability to gross negligence, willful misconduct, or breach of fiduciary duty. *See In re PWS Holding Corp., supra* (approved exculpation provision releasing debtors, reorganized debtors, committee, and their officers, directors, employees, advisors, professionals or agents from liability except from willful misconduct or gross negligence); *In re Western Asbestos Co.*, 313 B.R. 832, 846–47 (Bankr.N.D.Cal.2003) (approved release provision in favor of debtors, committee, futures representative, and their respective agents except for willful misconduct); *In re Firstline Corp.*, 2007 WL 269086 (Bankr.M.D.Ga.2007)(approved

ER00034

exculpation clause for the debtor, trustee, the committee and its members, and their respective advisors, attorneys, consultants or professionals with exception for gross negligence, willful misconduct, or breach of fiduciary duty); *In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y.2005)(bankruptcy court approved exculpation provision in favor of debtors, creditors' committee, employee committee, trustees, and their respective officers, employees, attorneys, and agents that excluded gross negligence or willful misconduct).

*Id*. at *7. The court went on to approve a release provision, provided it was amended to add exceptions to cover gross negligence or willful misconduct. *Id.* at *9.

Applying that *Lighthouse Lodge* analysis to the facts of this case, this Court finds, for the reasons discussed earlier, that any release of claims by the Debtors was, and remains, fair and equitable and indeed, permissible under 11 U.S.C. § 1123(b)(3)(A). As for release of liability, the Court finds that the specific facts of this case compel approval of the exculpation clause as drafted and originally approved in the Third Amended Joint Plan of Reorganization. The Debtors, Committee, Credit Suisse and CrossHarbor were all major stakeholders in this case and each party was vigorously negotiating issues they deemed signification and positions important to the respective parties. The Plan in this case was originally proposed almost exclusively by the Debtors. However, during the countless hours of negotiations between 5:00 p.m. on Friday, May 15, 2009, and 9:00 a.m. on Monday, May 18, 2009, it is clear that the Third Amended Joint Plan of Reorganization and the incorporated Settlement Term Sheet became a collaborative effort of the Debtors, Committee, Credit Suisse and CrossHarbor, who all became, in essence, plan proponents. Because the Settlement Term Sheet and exculpation clause were the cornerstones of the Plan and were highly negotiated, the ruling in *Lighthouse Lodge* would suggest that the plan proponents, namely the Debtors, the Committee, CrossHarbor and Credit Suisse, should be released pursuant to ¶ 8.4 of the Plan.

ER00035

Case No. 12-35986 ER  40

Unlike the exculpation clauses in *American Hardwoods* and *Lowenschuss*, the exculpation clause in the Debtors' confirmed Third Amended Joint Plan of Reorganization does not implicate 11 U.S.C. § 524(e). The exculpation clause in the case *sub judice* is not barred by Ninth Circuit Law. The exculpation clause is temporal in nature and covers those parties who were closely involved with drafting the Settlement Term Sheet, which became the cornerstone of the Debtors' Third Amended Joint Plan of Reorganization. As the testimony clearly shows, without the Settlement Term Sheet, it is doubtful the Debtors could have achieved confirmation of a Chapter 11 plan, and indeed it is very likely the Debtors' bankruptcies would have been converted to Chapter 7 and the assets liquidated.

Given the foregoing discussion, this Court need not correct an existing judgment or enter a new ruling and the Debtors need not start the confirmation process anew. The Court adopts in total and ratifies its earlier ruling on approval of the Settlement Term Sheet. The Rule 9019 Motion is technically irrelevant and unnecessary. The matter came before the Court, irrespective of the Rule 9019 Motion, as a result of Judge Haddon's ruling and to the extent feasible, this Court has defined the scope of the exculpation clause and the parties covered thereby.

### III. Blixseth's pending  Motion for Relief From Order Confirming Third Amended Plan of Reorganization.

Also pending is Blixseth's Motion for Relief From Order Confirming Third Amended Plan of Reorganization filed at docket entry no. 2054, together with the objections by the Liquidating Trustee at docket entry no. 2164, the Debtors, CrossHarbor and New CH YMC acquisition, LLC at docket entry no. 2184 and the Ad Hoc Group of Class B Unit Holders at docket entry no. 2191. Blixseth subsequently filed a related Motion to Strike YCLT's Opposition to Motion for Relief From Order Confirming Third Amended Plan of Reorganization

36

on June 10, 2011, at docket entry no. 2167.

In the motion for relief, Blixseth requests that the Court void in its entirety and *nunc pro tunc* all downstream effects of the Debtors' Third Amended Joint Plan of Reorganization. Blixseth argues that such request is proper because the "Plan has now been reversed by the U.S. District Court for multiple 'plain errors' including the denial of Mr. Blixseth's fundamental due process rights." For the reasons discussed earlier in this Memorandum of Decision, the Court denies Blixseth's Motion for Relief From Order Confirming Third Amended Plan of Reorganization. Blixseth's motion to strike is similarly denied.

The Court would note that in a supplemental brief filed August 8, 2011, at docket entry no. 2295, Blixseth relies solely on *Stern v. Marshall*, 131 S. Ct. 2594, 2608, 2615, 2620 (2011) and *In re BearingPoint*, 453 B.R. 486, in support his request for relief from the Order confirming the Debtor's Third Amended Joint Plan of Reorganization. More to the point, Blixseth contends this Court lacks the constitutional authority to approve the Debtors' plan because "the Exculpation Clause approved by order of this Court acted as a final order dismissing all common law causes of action against the Exculpated Parties." For reasons discussed below, the Court finds it has authority to enter binding decisions with respect to confirmation of a chapter 11 plan.

## IV.    Subject matter jurisdiction.

As just mentioned, Blixseth argues this Court lacks subject matter jurisdiction to hear the matters set on July 25 and 26, 2011, based upon the United States Supreme Court's recent ruling in *Stern v. Marshall*, 131 S.Ct. 2594. The "jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Battleground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1130 (9th Cir. 2010) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300,

307 (1995)).  A bankruptcy court's jurisdiction is, generally, prescribed by 28 U.S.C. § 1334(b).
In addition to granting jurisdiction to bankruptcy courts over bankruptcy cases, the statute
provides that  "the district courts [and by reference pursuant to 28 U.S.C. § 157, the bankruptcy
courts] shall have original but not exclusive jurisdiction of all civil proceedings arising under
title 11, or arising in or related to cases under title 11."

In recent years, various courts of appeal have articulated the limits on bankruptcy court
jurisdiction over matters arising after confirmation of a debtor's reorganization plan.  *See, e.g., In
re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004) ("the essential inquiry appears to be
whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold
bankruptcy court jurisdiction over the matter"); *Bank of La. v. Craigs Stores of Tex., Inc.*, 266
F.3d 388, 390-91 (5th Cir. 2001) (post-confirmation bankruptcy jurisdiction limited to matters
pertaining to implementation or execution of the plan).  The Ninth Circuit has adopted the "close
nexus" test of *Resorts Int'l* for measuring post-confirmation related to bankruptcy court
jurisdiction.  *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005) (reasoning that
while this test "recognizes the limited nature of post-confirmation jurisdiction, [it] retains a
certain flexibility . . . .").  In *Resorts Int'l,* the Third Circuit considered what it perceived to be
problems in its existing precedent, *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984).  In *Pacor*, the
court had held that "the test for determining whether a civil proceeding is related to bankruptcy is
whether the outcome of that proceeding could conceivably have any effect on the estate being
administered in bankruptcy." *Id*. at 994.  The *Pacor* test, however, proved less than useful in
determining related to jurisdiction after confirmation of a plan because the bankruptcy estate no
longer exists.  In *Resorts Int'l*, the court shifted the emphasis to whether "there is a close nexus to

ER00038

the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Id*. Although the Third Circuit never precisely defined what it meant by "close nexus," it cited numerous case examples of a nexus that would support jurisdiction. *In re Resorts Int'l, Inc.*, 372 F.3d at 161, citing *Donaldson v. Bernstein*, 104 F.3d 547, 552 (3d Cir. 1997) (post-confirmation proceeding concerning the reorganized debtor's failure to pay unsecured creditors according to terms in the plan); *U.S. Tr. v. Gryphon at the Stone Mansion*, 216 B.R. 764 (W.D. Pa. 1996), *aff'd* 166 F.3d 552 (3d Cir. 1999) (dispute interpreting attorney fee provision in the plan); *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 86 F.3d 364, 372-73 (4th Cir. 1996) (dispute over calculation of attorney fees that could affect treatment of remaining claims under the plan)). However, the import of the *Resorts Int'l* analysis is even more revealing by its citation of example cases where the facts did not establish a sufficiently close nexus to support bankruptcy jurisdiction. *In re Resorts Int'l, Inc.*, 372 F.3d at 168 citing *Falise v. Am. Tobacco Co.*, 241 B.R. 48, 52 (E.D.N.Y. 1999) (dispute between a plan liquidating trust and tobacco manufacturers would have "no impact on any integral aspect of the bankruptcy plan or proceeding"); *Grimes v. Graue (In re Haws)*, 158 B.R. 965, 970 (Bankr. S.D. Tex. 1993) (in an action by trustee against partner of the debtor, trustee failed to prove how any damages received from the defendant were "necessary to effectuate the terms of the plan.")). In short, under *Resorts Int'l,* as a condition for bankruptcy court post-confirmation jurisdiction, the outcome of a dispute must produce some effect on the reorganized debtor or a confirmed plan. Indeed, immediately following its review of this case law, the Third Circuit concluded "where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan

or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate." *Id.* at 168.

The Ninth Circuit most recently visited related to jurisdiction after confirmation in a chapter 11 case in *In re Ray*, 624 F.3d at 1124.  In *Ray*, the bankruptcy court had approved the sale of a parcel of property owned by the debtor and his nondebtor co-owner, free and clear of the first refusal rights previously granted by them to Battle Ground Plaza, LLC.  After the debtor's plan was confirmed and the bankruptcy case was closed, Battle Ground Plaza sued the reorganized debtor, the nondebtor co-owner, the purchaser, and the purchaser's successor in state court for breach of its contractual right of first refusal.  Because the sale was originally authorized under a bankruptcy court order, the state court, in its words, "remanded" the action to the bankruptcy court, and stayed proceedings in state court pending the bankruptcy court's determination whether it retained jurisdiction over the transaction and dispute. *In re Ray*, 624 F.3d at 1129.  The bankruptcy court assumed jurisdiction and proceeded to construe the sale order and resolve the parties' claims.

When the dispute finally reached the Ninth Circuit, the court decided that the bankruptcy court lacked jurisdiction to decide a dispute between two nondebtors over the meaning of the bankruptcy court's sale order entered in a since-closed chapter 11 bankruptcy case.  Applying *Valdez Fisheries*, the court concluded that, because the claims were all based upon Washington law, could exist entirely apart from the bankruptcy proceeding, and could not impact the closed bankruptcy case, the state court, not the bankruptcy court, should construe the sale order and adjudicate the parties' rights. *Id.* at 1134-35.

This Court distills an important lesson from these decisions for application of the close

ER00040

nexus test as developed in *Resorts Int'l*, and as adopted and refined by the Ninth Circuit. In particular, to support jurisdiction, there must be a close nexus connecting a proposed post-confirmation proceeding in the bankruptcy court with some demonstrable effect on the debtor or the plan of reorganization. Applying the Ninth Circuit case law to the facts of this case, it is clear that consideration of the Settlement Term Sheet and defining the scope of the exculpation clause in the Debtors' Third Amended Joint Plan or Reorganization directly impact the Debtors, the bankruptcy estates and implementation of the Debtors' Third Amended Joint Plan of Reorganization. This Court's retention of jurisdiction in this instance is appropriate, notwithstanding the decision in *Stern v. Marshall*. Therefore, Blixseth's standing objection to this Court's subject matter jurisdiction is overruled.

For the reasons discussed above, the Court will enter a separate order providing as follows:

IT IS ORDERED that Blixseth's Request for Judicial Notice filed July 22, 2011, at docket entry no. 2268 is granted.

IT IS FURTHER ORDERED that the Court adopts and ratifies its Memorandum of Decision and Order entered June 2, 2009, approving the Settlement Term Sheet and confirming the Debtors' Third Amended Joint Plan of Reorganization.

IT IS FURTHER ORDERED that Blixseth's Motion for Relief From Order Confirming Third Amended Plan of Reorganization filed at docket entry no. 2054, is denied.

IT IS FURTHER ORDERED that Blixseth's Motion to Strike YCLT's Opposition to Motion for Relief From Order Confirming Third Amended Plan of Reorganization Filed at Docket No. 2164 filed June 10, 2011, at docket entry no. 2167, is denied.

ER00041

IT IS FURTHER ORDERED the Joint Motion for Order Pursuant to Bankruptcy Rule

9019 Authorizing and Approving the Yellowstone Club Settlement Term Sheet *Nunc Pro Tunc*

filed by the Debtors, CrossHarbor Capital Partners, LLC and New CH YMC Acquisition, LLC

on June 10, 2011, at docket entry no. 2165 is denied as moot.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

ER00042

**Case No. 12-35986 ER  47**

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No. **08-61570-11** |
| Debtor. | |

# MEMORANDUM of DECISION

At Butte in said District this 25th day of February, 2011.

In this Chapter 11 bankruptcy, after due notice, a hearing was held January 18, 2011, in Butte on Timothy L. Blixseth's ("Mr. Blixseth") Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) filed November 30, 2010, at docket entry no. 2042. Mr. Blixseth's Motion is accompanied by an Amended Affidavit of Timothy L. Blixseth in Support of Motion to Disqualify. *See* docket entry no. 2043. Mr. Blixseth filed a Supplemental Affidavit on January 17, 2011, at docket entry no. 2117. Mr. Blixseth also filed his Amended Motion and Amended affidavit on December 14, 2010, in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088. Mr. Blixseth was represented at the January 18, 2011, hearing by Michael J. Flynn ("Mr. Flynn") of Boston, Massachusetts, Christopher J. Conant of Denver, Colorado and Patrick T. Fox of Helena, Montana. Mr. Blixseth's other counsel of record in these proceedings include Benjamin A. Schwartzman, Brent Bastian, Wade L.

Woodard, Thomas A. Banducci and Jennifer Schrack Dempsey of Boise, Idaho, Joel E. Guthals

of Billings, Montana, Philip H. Stillman of Encinitas, California, and Daniel D. Manson and

Gregory C. Black of Butte, Montana. At the conclusion of Mr. Flynn's oral argument, the Court

took the matter under advisement.

BACKGROUND

Mr. Blixseth and his former spouse, Edra Blixseth ("Ms. Blixseth"), were the founders of

Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC ("YD"), Big Sky

Ridge, LLC, and Yellowstone Club Construction Company, LLC. The four aforementioned

limited liability companies comprise the Yellowstone Club and will be referred to generally as

the Debtors or the Yellowstone Club entities. Through the Yellowstone Club entities, Mr.

Blixseth and Ms. Blixseth began development in the late 1990's of the Yellowstone Club; an

exclusive and private ski and golf community located in Big Sky, Montana.

Mr. Blixseth was the sole managing member of Big Sky Ridge, LLC from its inception to

August 12, 2008. From their inception to August 12, 2008, YMC and YD were controlled by

Mr. Blixseth through his holding company, Blixseth Group, Inc. ("BGI"). Since August of 2001,

BGI owned 82.6532 percent of the Class A stock in YMC and YD, and Blixseth Family

Investments, LLC owned 5.1020 percent of Class A stock. The Class B Members, or Class B

Shareholders--consisting of twelve individuals or entities unrelated to Mr. Blixseth or Ms.

Blixseth–collectively owned the remaining 12.25 percent of YMC and YD.

BGI, an Oregon sub-S corporation, was owned solely by Mr. Blixseth as President and

CEO from 1999 to August 12, 2008. Mr. Blixseth and Ms. Blixseth separated in December of

2006, and effective August 12, 2008, Ms. Blixseth and Mr. Blixseth agreed, pursuant to a June

ER00057

26, 2008, confidential Marital Settlement Agreement ("MSA"), that Ms. Blixseth would receive

BGI and the Yellowstone Club entities.

To finalize the MSA, Ms. Blixseth was required to make a cash payment to Mr. Blixseth.

Ms. Blixseth originally secured a commitment for funding but that commitment would not allow

Ms. Blixseth to consummate the MSA in mid-August of 2008.  Ms. Blixseth thus approached

Samuel T. Byrne ("Byrne"), the founder and managing partner of CrossHarbor Capital Partners,

LLC ("CrossHarbor") and CIP Yellowstone Acquisition LLC ("CIP"), asking for a 15-day loan

so she could finalize the MSA.   Ms. Blixseth and Byrne reached an agreement whereby CIP

would loan Ms. Blixseth $35 million ("CIP Loan").  The CIP Loan was intended to be a

short-term bridge loan that would provide Ms. Blixseth time to secure longer-term financing.

Ms. Blixseth was not able to secure long-term financing and defaulted on the CIP Loan.

Subsequently, Ms. Blixseth caused the Yellowstone Club entities to seek protection under

Chapter 11 of the Bankruptcy Code on November 10, 2008.  Various creditors filed an

involuntary Chapter 11 bankruptcy petition on behalf of BLX  on September 21, 2009.  *See*

Bankruptcy Case No. 09-61893.  Ms. Blixseth filed a voluntary Chapter 11 bankruptcy petition

on March 26, 2009.  *See* Bankruptcy Case No. 09-60452.  Ms. Blixseth's case was converted to

Chapter 7 of the Bankruptcy Code on May 29, 2009.

Mr. Blixseth and Ms. Blixseth were also the founders of Big Springs Realty, LLC and

Yellowstone Club World, LLC, both of which were awarded to Ms. Blixseth in August of 2008

under the couple's June 26, 2008, MSA.  Ms. Blixseth caused Big Springs Realty, LLC to file a

voluntary Chapter 7 bankruptcy petition on June 5, 2009.  *See* Bankruptcy Case No. 09-61079.

An involuntary Chapter 7 bankruptcy petition was filed against Yellowstone Club World, LLC

**Case No. 12-35986 ER  50**

on January 25, 2009.  *See* Bankruptcy Case No. 09-60061.  This Court generally refers to all the aforementioned bankruptcies as the Yellowstone Club related bankruptcies.

Mr. Blixseth made his first appearance in these proceedings on November 12 or 13, 2010, when one of Mr. Blixseth's counsel of record, Joel E. Guthals of Billings, Montana, appeared at a hearing on the Debtors' request for joint administration and on the Debtors' request for an interim order approving debtor-in-possession financing.  However, Mr. Blixseth did not take an active role in the Debtors' bankruptcies until February 2009 when he filed an objection to the Debtors' proposed bidding and solicitation procedures regarding the sale of 100% of the equity interests in the Debtors.  Subsequently, Mr. Blixseth sought to intervene in Adversary Proceeding 09-14 in March of 2009.

The remainder of the facts are set forth fairly extensively in the Court's Memorandum of Decision dated August 16, 2010, found at docket entry no. 575 in Adversary Proceeding 09-14.  Rather than recite the facts once again, the Court instead incorporates by reference that Memorandum of Decision.

## MR. BLIXSETH'S CONTENTIONS

In the Amended Motion filed November 30, 2010, and for the following reasons, Mr. Blixseth requests that I disqualify myself from all matters in which Mr. Blixseth is a litigant:

    1.  Without considering the evidence, Judge Kirscher has pre-judged that the Yellowstone Club bankruptcy petition was filed and plan was proposed in good [sic;]

    2.  Judge Kirscher has invited and entertained ex parte advocacy against Mr. Blixseth's counsel and Mr. Mr. Blixseth[;]

    3.  Judge Kirscher had ex parte communications in a hotel with Cross Harbor [sic] Capital Partners LLC concerning Cross Harbor's agenda for the

ER00059

**Case No. 12-35986 ER  51**

Yellowstone Club bankruptcy, which depends upon successful litigation against
Mr. Blixseth;

4.  Judge Kirscher's law clerk has engaged in ex parte communications
with one of Mr. Blixseth's adversaries, urging his adversary to finalize a
settlement with Mr. Blixseth before Mr. Blixseth could renege;

5.  Numerous times Judge Kirscher ruled on important motions against
Mr. Blixseth before Mr. Blixseth had an opportunity to file a response permitted
under the rules;

6.  Judge Kirscher entered a $40 million judgment against Mr. Blixseth
before Mr. Blixseth had an opportunity to respond to the motion to reconsider
upon which the $40 million judgment was based;

7.  Judge Kirscher has made impermissible and disparaging comments
about Mr. Blixseth and his attorneys, including one comment that essentially
compared Mr. Blixseth's meritorious summary judgments to garbage and
unworthy of the Judge's time. Such statements do not uphold the integrity of the
judiciary or avoid the appearance of impartiality;

8.  After learning that Mr. Blixseth would be moving this Court to reassign
him, Judge Kirscher appears to have retaliated against one of Mr. [sic][;]

9.  Judge Kirscher is so invested in the success of the Yellowstone Club
bankruptcy case that he is "boxed in" to ruling against Mr. Blixseth no matter the
merits of the claims against him;

10.  Judge Kirscher has demonstrably pre-judged adversary proceedings
against Mr. Blixseth[;]

11.  Judge Kirscher sitting as a trier of fact cannot reasonably be expected
to provide Mr. Blixseth a fair trial; he has consistently maligned Mr. Blixseth's
credibility and found Mr. Blixseth culpable for the demise of the Yellowstone
Club.

Amended Motion to Disqualify, docket entry no. 2042, pp 2-3.  In support of the foregoing

allegations, Mr. Blixseth filed an Amended Affidavit of Timothy L. Blixseth.  Only the following

paragraphs from Mr. Blixseth's Amended Affidavit arguably pertain to me, my conduct or my

rulings:

7.      On June 10, 2010, I received a phone call from Mr. Amsden regarding my
settlement with his client, Ross Richardson as Trustee for YCW.  During that
phone conversation, Mr. Amsden related to me that Mr. Richardson had talked on
the phone with Terry Healow who is one of Judge Kirscher's law clerks.  During
this conversation between Mr. Richardson and Mr. Healow, Mr. Healow asked
Mr. Richardson if he had finalized his settlement with me.  Mr. Richardson
responded by saying that the settlement was almost complete but that a few
matters needed to be addressed before it could be finalized.  In response, Mr.
Healow told Mr. Richardson to hurry up and get it finalized before I could
"renege."

*  *  *

16.     The bankruptcy auction for the Yellowstone Club assets occurred around May 13th
15th of 2009.  The auction for the sale of the Club assets occurred at the Billings
Crowne Plaza Hotel.  The bidders at the auction were Credit Suisse and
CrossHarbor (Byrne's company).  However, also present and participating in the
auction were the Debtor (i.e., the Yellowstone Club which was effectively
controlled by Byrne), and the Unsecured Creditors Committee.  Judge Kirscher
rented a room at the hotel to facilitate ex parte communications between the
bidders.  The auction itself was not public.  Instead it was conducted in closed
door negotiations between CrossHarbor and Credit Suisse, with the Unsecured
Creditors Committee being allowed to participate to some limited extent.
Although my local counsel Joel Guthals, was present at the hotel, he was not
allowed to participate in the auction, had no participation in the bidders' ex parte
communications with Judge Kirscher, and was otherwise locked out from the
negotiations.  Even though the negotiations were "closed door", Judge Kirscher
nevertheless met with the CrossHarbor and Credit Suisse at the hotel during their
negotiations to resolve bidding issues as they arose.  Immediately following these
closed door negotiations with CrossHarbor and Credit Suisse, Judge Kirscher
approved the Plan of Reorganization for the Yellowstone Club and sale of the
Club's assets to CrossHarbor on May 18, 2009 with no formal notice to me, or
other interested parties.  The altered Plan substantially affected creditors' rights.

18.     During the initial phase of AP-14, I raised the obvious problem that Stephen R.
Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula, Montana
was at the time of the filing of the Yellowstone Club bankruptcy, my counsel in
Montana.  Yet, Mr. Brown was also a voting member and chairman of the
Yellowstone Club Unsecured Creditors Committee, which was suing me in AP-14
for the recovery of $209 million.  Further, Mr. Brown in his capacity as a member
of the UCC had turned over to the UCC and its counsel over 400 email
communications between his firm and me or my other attorneys which could
potentially contain attorney-client privileged discussions.  When Mr. Brown

**Case No. 12-35986 ER 53**

turned over these emails to the UCC, Mr. Brown failed to inform me of this as required by the ABA Model Rules of Professional Conduct.  When I learned of this disclosure, I raised before Judge Kirscher the gross problem that my current counsel had turned over to my adversary, the UCC, over 400 potentially privileged communications.  Instead of Judge Kirscher allowing me to review these communications, Judge Kirscher reviewed these documents *in camera* without giving me a chance to review them and determine what Judge Kirscher reviewed or opinions he potentially formed by this *in camera* review.  To date, Judge Kirscher has never given me the opportunity to review these potentially attorney-client privileged documents.

* * *

20.     Despite the new lawsuit against me seeking hundreds of millions in damages filed on the eve of trial implicating numerous new defenses and required discovery, the bankruptcy court merely continued the trial for one week then subsequently and scurrilously accused me of delaying tactics by insisting on my due process rights, and most significantly refused to accept my pre-trial order with the new defenses to the one week old law suit.

* * *

23.     . . . The court had previously deprived us of critical defenses by excluding the [Marital Settlement Agreement] MSA and Releases from my proposed Pre-Trial Order.  The other side's lawyers argued that the releases were not in their Pre-Trial Order and Judge Kirscher commented that he specifically recalled not including the Releases in the PTO.  My attorney directed Judge Kirscher to where the Releases were inadvertently left in the UCC's Pre-Trial Order as a trial exhibit.  Judge Kirscher paused to thumb through his copy of the PTO and upon discovering that the Releases were included, he leaned back in his chair, gave a glaring stare at the Debtor's attorney, Andy Patten, and then threw the PTO across his desk with great force saying "Yes, it's still in" as if he had relied upon the manipulation of the UCC and the Debtor keeping my critical affirmative defenses out of the PTO.  The manner in which Judge Kirscher showed disgust with having the Releases included in the PTO inadvertently, gave the appearance that his intent and the intent of the Debtor's and the UCC was to deprive me a critical affirmative defense in a lawsuit in which I was sued literally only few days before trial commenced.

Mr. Blixseth's Supplement Affidavit, like the Amended Affidavit, alleges that this Court

denied Mr. Blixseth due process and that the Court failed to address whether the Yellowstone

Case No. 12-35986 ER  54

Club bankruptcies were filed in good faith.  Mr. Blixseth similarly argues that the Court deprived

Ms. Blixseth's bankruptcy estate of $100 million and that the Court used a states secrets privilege

and a Nevada protective order to conceal Ms. Blixseth's on-going fraud.

APPLICABLE LAW

Two provisions of the U.S. Code address recusal, 28 U.S.C. § 144 and 28 U.S.C. § 455.

In 1974, § 455 was amended to read in pertinent part:  "(a) Any . . . judge . . . shall disqualify

himself in any proceeding in which his impartiality might reasonably be questioned.  (b) He shall

also disqualify himself in the following circumstances:  (1) Where he has a personal bias or

prejudice concerning a party, or personal knowledge or disputed evidentiary facts concerning the

proceeding . . . ."  The other provisions of §455, (b)(2) through (b)(5), objectively and

specifically set forth the "interest" and "relationship" grounds of recusal covered by § 455 prior

to the 1974 amendment.  Subsection (b)(1) duplicated the grounds of "bias or prejudice" for

recusal contained in § 144, without the procedural requirements.   Subsection (a) is a "catchall"

provision covering "interest and relationship" and "bias and prejudice" requiring an objective

evaluation.  *See generally Liteky v. U.S.*, 510 U.S. 540, 114 S.Ct. 1147, 1153-54, 127 L.Ed.2d

474 (1994).  The test for disqualification under either §§ 455(a) or 455(b)(1) is "whether a

reasonable person with knowledge of all the facts would conclude that [his] impartiality might

reasonably be questioned."  *In re Focus Media, Inc.*, 378 F.3d 916, 929 (9th Cir. 2004), quoting

*United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000); and *In re Goodwin*, 194 B.R. 214,

222 (9th Cir. BAP 1996).  Given the 1974 amendment, courts have concluded that § 144 only

applies to district court judges.  *Goodwin*, 194 B.R. at 221.  *See also* FED. R. BANKR. P. 5004(a)

("A bankruptcy judge shall be governed by 28 U.S.C. § 455, . . .").  The consequence of § 144

8

not applying is that "the judge is not required to take the factual allegations as true." *Goodwin*, 194 B.R. at 222.  The obligation to recuse, if warranted, is juxtaposed with the corresponding obligation to not recuse and to serve on assigned cases when no reason to recuse exists.  *Hinman v. Rogers*, 831 F.2d 937, 339-40 (10th Cir. 1987).  Given the foregoing, I will consider the cases presented by Mr. Blixseth and discuss whether they apply to the pending motion.

Mr. Blixseth, in his amended motion, seeks my disqualification under 28 U.S.C. § 455(a), which reads: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Relying on *United States v. Furst*, 886 F.2d 558, 582 (3rd Cir. 1989); *United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985), *cert. denied sub nom. DiSalvo v. United States*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986); *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976), *cert. denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976); *United States v. Dodge*, 538 F.2d 770 (8th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); *Parrish v. Board of Comm'rs. of Alabama State Bar*, 524 F.2d 98 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); and *People v. Julien*, 47 P. 3d 1194, 1199 (Colo. 2002), Mr. Blixseth argues in his Amended Motion that "the factual allegations made in support of the motion are true [sic] are assumed as true."  Amended Motion, p.7.  While the above-cited cases are instructive, they are distinguishable.

In *Furst*, the defendant sought recusal of the presiding judge under § 455 because of ex parte communications with defense counsel.  The presiding judge denied the defendant's request for recusal.  On appeal and after noting that § 455 does not establish any form of procedure for consideration of recusal motions, the Third Circuit looked first to the procedures established

9

under 28 U.S.C. § 144:

> 28 U.S.C. § 144[1] sets forth a procedure by which a party may seek a
> judge's recusal.  Thus, we will look to section 144 and our case law under that
> recusal provision for guidance as to procedure.  *Cf.  Johnson v. Trueblood*, 629
> F.2d 287, 290 (3d Cir.1980) ( "both statutes require the same type of bias for
> recusal"), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *id.*
> (" § 455(a) was intended only to change the standard the district judge is to apply
> to his or her conduct").[2]  This seems particularly appropriate as Furst's attorney's
> affidavit filed with the motion for disqualification complied with the procedure set
> forth in section 144, and so, had the motion merely included a reference to section
> 144, we would have analyzed the motion directly under that section.

*Furst*, 886 F.2d at 582.  However, the presiding judge in *Furst* acknowledged his ex parte

communications with defendant's counsel and thus, the Third Circuit concluded:

> As a result of the extent to which the district court confirmed the
> underlying facts upon which the recusal motion relied, we need not resolve the
> issue of whether a judge need accept as true the allegations presented in a motion
> for disqualification under section 455 which asserts a basis as to which section
> 144 is applicable and which includes an affidavit sufficient under section 144. It is

---

[1]  Section 144 states:

> Whenever a party to any proceeding in a district court makes and files a
> timely and sufficient affidavit that the judge before whom the matter is pending
> has a personal bias or prejudice either against him or in favor of an adverse party,
> such judge shall proceed no further therein, but another judge shall be assigned to
> hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or
> prejudice exists, and shall be filed not less than ten days before the beginning of
> the term at which the proceeding is to be heard, or good cause shall be shown for
> failure to file it within such time. A party may file only one such affidavit in any
> case. It shall be accompanied by a certificate of counsel of record stating that it is
> made in good faith.

[2]  The major benefit that a party receives by filing a motion for disqualification under
section 455 instead of section 144 is that section 455(a) obviates the need to assert actual bias-if
it is shown that the judge's impartiality might reasonably be questioned recusal is required.  To
the extent that Furst's motion asserted only actual bias under section 455(b) he would have
received no discernable benefit from filing under this section.

> sufficient that we state that where the basic underlying facts as set forth in the affidavit supporting a recusal application are not in dispute, the district court should not minutely examine the movant's characterization of them, and weigh the court's memory of what happened against that of the affiant. We think it simply inappropriate in the circumstances here for the court to have made a credibility assessment of itself. Consequently, we hold that the district judge improperly considered the truth of the asserted grounds for his recusal.

*Id.* at 583.

In this case, Mr. Blixseth's Amended Motion does not reference 28 U.S.C. § 144 and more importantly, Mr. Blixseth's Amended Motion is not accompanied by a certificate of counsel of record stating that it is made in good faith. Under the facts of this case, it is not clear whether the *Furst* Court would apply the § 144 take-as-true requirement to Mr. Blixseth's § 455(a) motion.

The discussion of § 144 and § 455 by the court in *Balistrieri* is more relevant. In addressing § 144, the court in *Balistrieri* first noted that a judge is allowed to pass only on the timeliness and sufficiency of a party's affidavit. "[I]n passing on the legal sufficiency of the affidavit, the judge must assume that the factual averments it contains are true, even if he knows them to be false." 779 F.2d at 1199. However, the factual averments, to be accepted as true, must be more than

> mere conclusions, opinions, or rumors. *United States v. Haldeman*, 559 F.2d 31, 134 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). They must be stated with particularity, *id.* at 131, and must be definite as to times, places, persons, and circumstances. *Id.* at 134. The factual averments must show that the bias is personal rather than judicial, *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977), and that it stems from an extrajudicial source-some source other than what the judge has learned through participation in the case. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).

*Id*.  The *Balistrieri* Court went on to conclude that the judicial interpretations of "personal bias or prejudice" under § 144 were equally applicable to § 455(b)(1), even though § 455(b)(1) is not a reenactment of § 144.  The court in *Balistrieri* specifically found that a judge was not required to take all factual averments in an affidavit as true under § 455(b)(1), but rather, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his own personal knowledge." *Id*. at 1202.

The Court in *Balistrieri* provided little guidance with respect to § 455(a) other than its holding that an application for a writ of mandamus was a party's sole avenue of recourse when a judge denied a motion under § 455(a).  779 F.2d at 1205.  The court reasoned that § 455(a) was "not  intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process.*"  *Id*. at 1204.  The court therefore concluded that denial of a motion under § 455(a) was not reviewable on appeal because § 455(a) did not affect a substantial right of the appellant.  *Id*.  Rather, "if a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole and not to the substantial rights of the parties. The parties in fact receive a fair trial, even though a reasonable member of the public might be in doubt about its fairness, because of misleading appearances." *Id*. at 1204-05.

In *Ritter*, the government appropriately filed a mandamus petition under §§ 144 and 455(a).  540 F.2d 459.  The court in *Ritter* first noted that § 144 "allows a party to request disqualification of a district judge when he has a personal bias or prejudice either against him or in favor of any adverse party.  It also prescribes procedure.  The filing of the affidavit does not bring about the disqualification. The trial court determines its sufficiency. The review is,

ER00067

however, restricted to its legal sufficiency and does not include the truth of the allegations.  There

must be facts, however, to establish personal bias.  Section 455(a) is broader.  It applie[s] to any

judge and includes that he 'shall disqualify himself in any proceeding in which his impartiality

might be reasonably questioned.'"  *Ritter*, 540 F.2d at 461-62.  The court continued:

> Under the broader standard of revised Section 455(a), disqualification is
> appropriate not only where there is actual or apparent bias or prejudice, but also
> when the circumstances are such that the judge's "impartiality might be reasonably
> questioned." *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure:
> Jurisdiction, Section 3549. Thus, the grounds for disqualification set out in
> Section 144 "personal bias or prejudice either against (a party) or in favor of any
> adverse party" are included in Section 455. Moreover, the language of Section
> 455(a) allows a greater flexibility in determining whether disqualification is
> warranted in particular situations. 13 Wright, Miller & Cooper, Section 3542.

*Id*. at 462.  Although the Tenth Circuit found that the government had failed to show actual bias,

the Tenth Circuit did find that given the broad language of § 455(a), disqualification of the

presiding judge was appropriate because based upon all the facts, it was not reasonably likely that

the matter could be tried with the impartiality that litigants have a right to expect.

*U.S. v. Dodge* dealt in part with a trial judge's denial of a request to recuse himself.  538

F.2d 770.  The court in *Dodge* considered the appeal under both § 144 and § 455.  Without

providing any meaningful discussion, but instead citing only to the applicable language of §§ 144

and 455, the court in *Dodge* accepted the truth of the facts recited in the affidavits and concluded

that allegations that the trial judge had recused himself in the trials of two other defendants

arising from the same incident, that the judge had made derogatory comments about certain

Indian spectators at an earlier civil trial, that the judge had made derogatory comments about

certain members of a group to which the particular defendant belonged, that the judge had made

allegedly improper rulings in other prosecutions arising out of the same incident, and that the

ER00068

judge had failed to grant temporary injunctive relief sought by an Indian organization during the time of the incident, did not indicate that the judge possessed a personal bias or prejudice against the moving defendant sufficient to require the judge to recuse himself.

The first topic of discussion in *Parrish* was § 144. Similar to every case this Court has read on § 144, the court in *Parrish* recognized that,

> [t]he threshold requirement under the § 144 disqualification procedure is that a party file an affidavit demonstrating personal bias or prejudice on the part of the district judge against that party or in favor of an adverse party. Once the affidavit is filed, further activity of the judge against whom it is filed is circumscribed except as allowed by the statute. In terms of the statute, there are three issues to be determined: (1) was the affidavit timely filed; (2) was it accompanied by the necessary certificate of counsel of record; and (3) is the affidavit sufficient in statutory terms? *See generally* 13 Wright, Miller & Cooper, Federal Practice and Procedure ss 3541-53 (1975).
>
> We are concerned only with the third issue. As we said in *Davis v. Board of School Commissioners of Mobile County*, 5 Cir., 1975, 517 F.2d 1044:
>
> > "Once the motion is filed under § 144, the judge must pass on the legal sufficiency of the affidavit, but may not pass on the truth of the matters alleged. *See Berger v. United States*, 1921, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; *United States v. Roca-Alvarez*, 5 Cir., 1971, 451 F.2d 843, 847-48; *United States v. Townsend*, 3 Cir., 1973, 478 F.2d 1072."
>
> 517 F.2d at 1051.

*Parrish*, 524 F.2d at 100.

After concluding that the factual bases alleged for recusal were legally insufficient under § 144, the court in *Parrish* proceeded to examine § 455. In discussing § 455(a), the court wrote:

> There are now several standards in § 455. Some go to specific conduct, but one, set out in § 455(a), is general and does not rest on the personal bias and prejudice stricture of §§ 144 and 455(b)(1). As we noted in *Davis, supra*, 517 F.2d at 1052, the language of § 455(a) was intended to displace the subjective "in the opinion of the judge" test for recusal under the old statute, and the so-called "duty to sit decisions". We also noted that § 455(a) was intended to substitute a

ER00069

> "reasonable factual basis reasonable man test" in determining whether the judge
> should disqualify himself. *See* 13 Wright, Miller & Cooper, Federal Practice and
> Procedure s 3542 (1975). *See also*, Frank, Commentary on Disqualification of
> Judges-Canon 3c, 1972, Utah L.Rev. 377, 379. Note, Disqualification of Judges
> and Justices in the Federal Courts, 86 Harv.L.Rev. 736, 745-50 (1973).

*Parrish*, 524 F.2d at 103.  Applying the reasonable man test, the *Parrish* Court concluded that "a

reasonable man would not infer that [the presiding judge]'s 'impartiality might reasonably be

questioned'." *Id*.

Finally, Mr. Blixseth relies on *People v. Julien* to support his contention that the factual

allegations made in support of his motion must be assumed as true.  The issue in *Julien* was two-

fold.  First, "whether the trial judge's previous employment with the district attorney's office

constituted an appearance of impropriety mandating reversal of the defendant's judgment of

conviction where the judge had no involvement in the defendant's case while employed with the

district attorney" and second, "[w]hether, assuming there was an appearance of impropriety, the

trial judge's failure before trial to disclose to the defendant his previous employment with the

district attorney's office and to recuse himself when a motion to recuse was filed before

sentencing constituted harmless error." *Julien*, 47 P.3d at 1195.  Resolution of the issue

involving prior governmental association turned in part on the language of Canon 3 of Colorado's

Code of Judicial Conduct, which language was identical to the American Bar's Association's

Model Code of Professional Responsibility and Code of Judicial Conduct.  In construing

Colorado's Code of Judicial Conduct, the court in *Julien* looked to cases interpreting § 455(a)

and (b)(3).

The second issue in *Julien* dealing with disqualification was governed by C.R.S.A. § 16-

6-201, which read:

> A motion for change of judge on any ground must be verified and supported by
> the affidavits of at least two credible persons not related to the defendant, stating
> facts showing the existence of grounds for disqualification. If the verified motion
> and supporting affidavits state facts showing grounds for disqualification, the
> judge must enter an order disqualifying himself. After disqualifying himself, the
> judge may require a full hearing upon the issues raised by the affidavits and shall
> request that another judge conduct the hearing. The other judge shall make
> findings of fact with regard thereto, and such findings shall be included as a part
> of the trial court record.

*Julien*, 47 P.3d at 1199.  The court in *Julien* noted that:  "In ruling on the disqualification motion,

a judge must accept as true the factual statements contained in the motion and affidavits. *People*

*v. Botham*, 629 P.2d 589, 595 (Colo.1981). The judge must determine as a matter of law whether

they allege legally sufficient facts for disqualification.  *S.S. v. Wakefield*, 764 P.2d 70, 73

(Colo.1988)." *Id*.  Although the presiding judge in *Julien* had been employed by the district

attorney's office five weeks before his assignment to the moving party's case, the court in *Julien*

found that the record did not support disqualification of the presiding judge where the moving

party did not contend that the presiding judge had any actual bias or prejudice against him or any

disqualifying interest in the case.  *Id.* at 1200.  C.R.S.A. § 16-6-201 requires that a motion for

disqualification be verified and supported by the affidavits of at least two credible persons not

related to the defendant.  Section 455, unlike C.R.S.A. § 16-6-201, does not require that Mr.

Blixseth file any affidavits, particularly affidavits of unrelated persons.  If anything, C.R.S.A. §

16-6-201 is more similar to § 144, which requires that a motion for disqualification be

accompanied by a certificate of counsel stating that the motion is made in good faith.  This Court

fails to see *Julien's* relevance to this case.

Instead, this Court agrees with the court's observation in *United States v. Eisenberg*, 734

F.Supp. 1137, 1160 (D. N.J. 1990), that the procedural requirements of § 144 and § 455 differ.

ER00071

**Case No. 12-35986 ER  63**

This is so because § 455 does not contain the same procedural safeguards as § 144. *State of Idaho v. Freeman*, 507 F.Supp. 706, 715 (D. Ida. 1981) (In discussing § 21 of the Judicial Code of 1911, which was the predecessor to § 144, the court noted that it appeared "that Congress intended the perjury statute available against a false affidavit and disciplinary proceedings against the attorney to be sufficient to deter trivial and speculative allegations."). As the foregoing discussion illustrates, this Court is not required to accept all facts in Mr. Blixseth's Amended and Supplemental Affidavits as true. *In re American Ready Mix, Inc.*, 14 F.3d 1497 (10th Cir. 1994), *cert. denied*, 513 U.S. 818, 115 S.Ct. 77, 130 L.Ed.2d 31 (1994) (Under § 455, "factual allegations do not have to be taken as true," and "[t]here is as much obligation for a judge not to recuse when there is no occasion ... to do so as there is ... to [recuse] when there is."); *Goodwin*, 194 B.R. at 221("the requirement of section 144 that the judge assume that the facts asserted in the affidavit are true and examine them only to determine their legal sufficiency" does not apply to bankruptcy judges). However, even if the Court did accept all allegations as true, which it does not, Mr. Blixseth's alleged facts are not legally sufficient for recusal because the applicable factual averments in Mr. Blixseth's Amended and Supplement Affidavits are either based upon heresay or reflect Mr. Blixseth's personal conclusions and opinions.

The Ninth Circuit Court of Appeals notes that although "section 455 is stated in terms of a self-enforcing obligation upon the judge, it may be invoked by a party." *Klenske v. Goo (In re Manoa Finance Co., Inc.)*, 781 F.2d 1370, 1373 (9th Cir. 1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). The test for determining whether a judge should recuse "himself under section 455(a) is 'whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant

ER00072

doubt about the judge's impartiality.'"  *U.S. v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989),

quoting *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988).  The Tenth Circuit

Court of Appeals in *Frates v. Weinshienk*, 882 F.2d 1502, 1504 (10th Cir. 1989) further instructs

that:

> A bankruptcy judge may preside over both the administrative and
> adversarial portions of a bankruptcy case.  *See* 28 U.S.C. § 157.  But recusal is
> necessary if there is evidence of actual bias, if the bankruptcy judge by words or
> actions reasonably appears to have prejudged adversarial proceedings over which
> he is to preside, or if the judge appears "boxed in" by prior rulings such that he
> will be forced to reach a certain result in an adversarial proceeding regardless of
> the merits.  We do not, however, read our cases or any other authorities to require
> a judge who approves a Chapter 11 reorganization plan automatically to disqualify
> himself from presiding over adversarial proceedings that will affect the total
> recovery of the bankrupt's creditors.

The Court also recognizes that "familiarity with defendants and/or the facts of a case that

arises from earlier participation in judicial proceedings is not sufficient to disqualify a judge from

presiding at a later trial."  *Steering Committee v. Mead Corp. (In re Corrugated Container*

*Antitrust Litigation)*, 614 F.2d 958, 965 (5th Cir. 1980) (footnote omitted), *cert. denied*, 449 U.S.

888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).  In many ordinary litigation situations judges make

preliminary decisions on offers of evidence, or make decisions otherwise affecting the parties,

that familiarize the judge with the facts in that case or in related cases in which the judge must

rule.  The Bankruptcy Code and 28 U.S.C. § 157, by permitting the presiding judge in a

reorganization to preside over adversary proceedings affecting the assets, contemplate that

bankruptcy judges will encounter situations similar to the case *sub judice* with some frequency.

In such situations, the Ninth Circuit Court of Appeals suggests "that judges sitting in bankruptcy

be especially solicitous in maintaining both the appearance and reality of impartiality when

ER00073

**Case No. 12-35986 ER  65**

adjudicating matters with which they have had close involvement, erring on the side of recusing themselves when appropriate." *Manoa*, 781 F.2d at 1373.

The foregoing comports with the Supreme Court of the United States' decision in *Liteky*, 510 U.S. 540, wherein the Supreme Court addressed the question of whether the so-called extrajudicial source doctrine applied by lower courts under § 144 also applied to motions brought under § 455(a).  In *Liteky*, the Supreme Court concluded that the "extrajudicial source" doctrine, to the extent it exists, does indeed apply to § 455(a).  *Id.* 510 U.S. at 554.  In reaching its decision, the Supreme Court explained:

> The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a necessary condition for "bias or prejudice" recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice.  Nor is it a sufficient condition for "bias or prejudice" recusal, since some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not suffice.  Since neither the presence of an extrajudicial source necessarily establishes bias, nor the absence of an extrajudicial source necessarily precludes bias, it would be better to speak of the existence of a significant (and often determinative) "extrajudicial source" factor, than of an "extrajudicial source" doctrine, in recusal jurisprudence.
>
> The facts of the present case do not require us to describe the consequences of that factor in complete detail.  It is enough for present purposes to say the following: First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  *See United States v. Grinnell Corp.*, 384 U.S., at 583, 86 S.Ct., at 1710.  In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved.  Almost invariably, they are proper grounds for appeal, not for recusal.  Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support

ER00074

a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune.

510 U.S. at 554-56, 114 S.Ct. at 1157.

Lastly, the Ninth Circuit Court of Appeals held in *United States v. Studley*, 783 F.2d 934, 939 (9th Cir.1986), "that a [§ 144] motion for recusal filed weeks after the conclusion of a trial is presumptively untimely absent a showing of good cause for its tardiness." Section 455 does not contain such time limitations. Furthermore, I do not regard Mr. Blixseth's delay as fatal because a recusal motion should be permitted at any time it becomes apparent that a judge is biased or suffers from the appearance of bias. Mr. Blixseth's delay, though, suggests that Mr. Blixseth did not regard my prior rulings as greatly debilitating to his position.

As noted previously, after reviewing the applicable law under § 455(a), the Court disagrees with Mr. Blixseth's position that the Court must accept his factual averments as true. Rather, the Court may assign to the evidence what it believes to be its proper weight. I may also contradict the evidence with facts drawn from my own personal knowledge. After reviewing Mr. Blixseth's Amended and Supplemental Affidavits, I conclude that recusal is not necessary. The matters about which Mr. Blixseth complains occurred in the course of these proceedings and do

not show that I relied upon knowledge acquired outside these proceedings or that I have a deep-

seated and unequivocal antagonism that would render fair judgment impossible. *See Liteky*, 510

U.S. at 556, 114 S.Ct. at 1158.

DISCUSSION

Mr. Blixseth's complaints fall into four general categories: (1) ex parte communications;

(2) the Stephen Brown emails; (3) favoritism toward Ms. Blixseth and Byrne; and (4) denial of

Mr. Blixseth's due process.  Mr. Blixseth's complaints regarding ex parte communications fall

into three separate sub-categories: that my law clerk, Terry Healow, had an ex parte

communication with Ross Richardson, and that during such communication, Mr. Healow used a

word that shows bias against Mr. Blixseth; that I held ex parte meetings with parties involved in

the Yellowstone Club bankruptcy; and that I and my staff have had numerous email

communications with attorneys involved in this case which show that I have a close, personal

relationship with said attorneys, which relationship precludes me from entering fair and unbiased

decisions.

<u>Ex Parte Communications</u>.

Mr. Blixseth first argues that on June 10, 2010, he received a phone call from Mr.

Amsden regarding Mr. Blixseth's settlement with his client, the Chapter 7 Trustee in the

Yellowstone Club World bankruptcy, Ross Richardson.  During that phone conversation, Mr.

Amsden apparently relayed to Mr. Blixseth the fact that my law clerk, Terry Healow, had

telephoned Mr. Richardson inquiring as to whether Mr. Richardson had finalized a settlement

with Mr. Blixseth.  Mr. Blixseth asserts that Mr. Richardson advised Mr. Healow that the

settlement was almost complete but that a few matters needed to be addressed before it could be

21

**Case No. 12-35986 ER  68**

finalized.  In response, Mr. Healow allegedly told Mr. Richardson to hurry up and get the settlement finalized before Mr. Blixseth could "renege."

First, it is not clear from Mr. Blixseth's Affidavit and the attached Exhibit A whether my law clerk Terry Healow used the word "renege" in his conversation with Mr. Richardson, or whether that is Mr. Blixseth's interpretation of what was relayed to him through Mr. Amsden. Second, I do not recall asking Mr. Healow to place a call to Mr. Richardson and I similarly do not recall waiting for any settlement involving the Yellowstone Club World bankruptcy estate and Mr. Blixseth.

There are essentially five bankruptcies (one consisting of the four Yellowstone Club entities; the second being BLX Group, Inc.; the third being Ms. Blixseth's personal bankruptcy; the fourth being Big Springs Realty, LLC; and the fifth being Yellowstone Club World, LLC) and 28 associated Adversary Proceedings.  In an attempt to refresh my recollection, I reviewed the applicable cases and do not see anywhere in the records where the Court would have been anticipating the receipt of a settlement between the trustee of Yellowstone Club World bankruptcy and Mr. Blixseth at or around June 12, 2010, the date Mr. Amsden and Mr. Blixseth were exchanging text messages.  While the Court has not reviewed the docket in each of the 36 separate cases, the Court has reviewed the dockets in Yellowstone Mountain Club, LLC and Yellowstone Club World, LLC, including its 3 associated adversary proceedings.  The Court sees nothing in the Yellowstone Mountain Club bankruptcy that would prompt me to inquire about a stipulation between Mr. Blixseth and Mr. Richardson.  Two of the adversary proceedings tied to the Yellowstone Club World bankruptcy do not involve Mr. Blixseth.  In the third adversary proceeding, adversary proceeding no. 09-00086, it appears the Honorable John L. Peterson

ER00077

conducted a mediation on February 11, 2010, and May 5, 2010.  As noted earlier, the Court sees

no reason why it would have anticipated a settlement in Adversary Proceeding 09-86, and in fact,

the Court entered a Memorandum of Decision and Order on June 9, 2010, granting Mr.

Blixseth's motion to dismiss for lack of subject matter jurisdiction thereby dismissing a third

party complaint filed against Mr. Blixseth.  It was not until June 29, 2010, when Mr. Richardson

and Mr. Blixseth filed a joint motion to vacate deadlines, that the parties mentioned a settlement

in that matter.  Learning of a settlement on June 29, 2010, would not have prompted a telephone

call from the Court on or before June 12, 2010.

Finally, the Court can find nothing in 09-60061, the main Yellowstone Club World

bankruptcy case, that would have prompted a telephone call to the parties in early June of 2010.

The Court entered an Order on June 1, 2010, setting a telephonic status conference for June 2,

2010, on several matters, including Mr. Richardson's February 12, 2010, motion for order

approving a settlement with Mr. Blixseth.  I reviewed the transcript of the June 2, 2010, hearing

and see nothing in that transcript which would indicate that I was waiting for a further settlement

from Mr. Richardson and Mr. Blixseth.  To the contrary, I orally ruled on that date that

CrossHarbor did not have standing to object to Mr. Richardson's proposed settlement with Mr.

Blixseth.  Following the June 2, 2010, hearing and in accordance with my June 2, 2010, oral

ruling, the Court entered a Memorandum of Decision and Order on June 10, 2010, overruling

CrossHarbor Capital Partners' objection to Mr. Richardson's settlement with Mr. Blixseth,

granting Mr. Richardson's motion for order approving settlement, and approving the

"Memorandum of Understanding" between Mr. Richardson and Mr. Blixseth.

Furthermore, another law clerk in my Chambers, Kelli Harrington, has assisted me almost

ER00078

**Case No. 12-35986 ER  70**

exclusively on this case. I would not generally ask one law clerk to make an inquiry about a case

in which another law clerk is or was assisting me. Given the fact that Mr. Healow has not

generally assisted me with the Yellowstone Club bankruptcies and given the date of the text

messages between Mr. Amsden and Mr. Blixseth and their proximity to a May 2010 mediation

that was conducted by the Honorable John L. Peterson, I determined that perhaps Mr. Healow

made the referenced telephone call to Mr. Richardson's office at the direction of Judge Peterson,

and not me. To confirm my suspicions, I posed such question to Mr. Healow and he specifically

recalled placing a telephone call to Mr. Richardson regarding the whereabouts of a settlement.

However, the call was placed at the request of Judge Peterson, and not me.[3]

Next, Mr. Blixseth asserts: "The bankruptcy auction for the Yellowstone Club assets

occurred around May 13th 15th of 2009. The auction for the sale of the Club assets occurred at the

Billings Crowne Plaza Hotel. The bidders at the auction were Credit Suisse and CrossHarbor

(Byrne's company). However, also present and participating in the auction were the Debtor (*i.e.*,

the Yellowstone Club which was effectively controlled by Byrne), and the Unsecured Creditors

Committee. Judge Kirscher rented a room at the hotel to facilitate ex parte communications

between the bidders. The auction itself was not public. Instead it was conducted in closed door

negotiations between CrossHarbor and Credit Suisse, with the Unsecured Creditors Committee

being allowed to participate to some limited extent. Although my local counsel Joel Guthals,

---

[3] Mr. Healow advised me that he placed the telephone call to Mr. Richardson from his work phone in the Butte Federal building. However, as a result of that one call, Mr. Blixseth subpoenaed not only Mr. Healow's calls for the January 18, 2011, hearing, but also requested that Mr. Healow produce his cell phone records and various email communications. The subpoena was administratively denied as it was not in compliance with the Subpoena Regulations Adopted by the Judicial Conference.

ER00079

was present at the hotel, he was not allowed to participate in the auction, had no participation in the bidders' ex parte communications with Judge Kirscher, and was otherwise locked out from the negotiations.  Even though the negotiations were 'closed door', Judge Kirscher nevertheless met with CrossHarbor and Credit Suisse at the hotel during their negotiations to resolve bidding issues as they arose.  Immediately following these closed door negotiations with CrossHarbor and Credit Suisse, Judge Kirscher approved the Plan of Reorganization for the Yellowstone Club and sale of the Club's assets to CrossHarbor on May 18, 2009 with no formal notice to me, or other interested parties.  The altered Plan substantially affected creditors' rights."

A little background adds context to Mr. Blixseth's above claim.  At a hearing held April 4, 2009, the Court approved the Debtors' Disclosure Statement and scheduled the hearing on confirmation of the Debtors' Amended Joint Plan of Reorganization for May 18, 2009, in Butte.  The confirmation hearing was scheduled for May 18, 2009, to accommodate not only the Court's schedule but also the Debtors' expiring debtor-in-possession financing.  Before confirmation could occur, the Court had to resolve at least a portion of the issues in Adversary Proceeding 09-00014.  Phase one of the trial in Adversary Proceeding 09-00014 commenced on  April 29, 2009, and concluded on May 5, 2009.  The Court then granted the parties in Adversary Proceeding 09-00014 until May 11, 2009, to file post-trial briefs.  Thereafter, on May 12, 2009, the Court entered a partial and interim order equitably subordinating Credit Suisse's claim.  The Court's partial and interim order left unresolved the issues involving Mr. Blixseth, the issues regarding valuation of Debtors' assets and the question of whether Credit Suisse, whose collateral was subsequently valued on May 12, 2009, at $232 million, could credit bid at an auction of Debtors' assets.

**Case No. 12-35986 ER  72**

The Court's May 12, 2009, partial and interim order in Adversary Proceeding 09-00014 and the Court's valuation order of that same date, set off a frenzy of activity, particularly as an auction of either Debtors' assets or 100% of the Debtors' equity was scheduled for May 13, 2009.  The minute entries of the so-called closed meetings that allegedly took place at the Crowne Plaza Hotel can be found at docket entry nos. 1047 for May 12th, 1048 for May 13th, 1049 for May 14th and 1054 for May 15th.  Those hearings, which Mr. Blixseth refers to as closed meetings, which included much of the actual bidding process between CrossHarbor and Credit Suisse, were held in the Federal Courthouse in Billings, not the Crowne Plaza Hotel.  I must concede, however, that because my duty station is not in Billings and because I do not live in Billings, I did rent a hotel room at the Crowne Plaza Hotel, which is two blocks from the Federal Courthouse.  I rented a room so I would have a place to sleep and shower and not a single person, other than myself, visited the room which I rented at the Crowne Plaza Hotel.  Thus, Mr. Blixseth's statement that hearings were held in the Yellowstone Club entities' bankruptcies on May 12, 13, 14 and 15, 2009, is correct.  Mr. Blixseth is also correct that I rented a room at the Crowne Plaza Hotel.  However, Mr. Blixseth's contention that I rented a room at the Crowne Plaza Hotel to facilitate ex parte communications with parties involved in this bankruptcy proceeding is simply false.

The transcripts show that the parties were using a conference room at the Hotel to facilitate bidding.  However, they lost access to that conference room and the ongoing negotiations concerning bidding naturally moved to the Federal courthouse in Billings where I was conducting ongoing hearings in the case.  I recall during a recess from a hearing at the courthouse, I believe on May 13th, while I was visiting with court security officers that I greeted

ER00081

Mr. Blixseth's counsel, Mr. Guthals, as he was walking through the lobby on the 5th floor of the courthouse.  Mr. Guthals informed me that he was leaving the courthouse as none of the bidding parties wished to consult with him.  I do not recall if Mr. Guthals returned.  I also do not recall Mr. Blixseth personally attending any of the hearings during that week.  The exchange between Mr. Guthals and myself occurred while parties were negotiating and determining who would be qualified bidders in various courtrooms and conference rooms at the courthouse.  I was not involved in those meetings or discussions.  From time to time the various parties would provide an update on their progress so I could plan when we would continue with any auction or required hearing.  Also, they were attempting to keep me informed as to whether they were making any progress resolving contested issues involving confirmation.

The transcripts of the hearings held May 12th through May 15th show that the auction of the Debtors' assets was a collaborative effort between the Debtors, the Official Committee of Unsecured Creditors and the Ad Hoc Committee of Yellowstone Club Members.  *See* docket entry nos. 1047, 1048, 1049 and 1054.  Parties were working virtually around the clock to determine the extent of Credit Suisse's credit bid, to qualify bidders and to conclude an auction of the Debtors' assets prior to the May 18, 2009, confirmation hearing date.[4]

The long hours were taking a toll and patience was wearing thin.  During that time, the parties would think they were on the brink of a global resolution, only to discover that they might be at an impasse.  In fact, counsel for Credit Suisse commented on May 14th that there had to be an alternative to not reaching a resolution.  The credit versus cash bidding process reached

---

[4]  The hearing on confirmation of the Debtors' joint Chapter 11 plan was scheduled pursuant to an Order entered April 7, 2009.

ER00082

**Case No. 12-35986 ER  74**

another impasse on May 15th when neither Credit Suisse nor CrossHarbor would move from their respective positions.  At that time, I suggested that perhaps I should have a brief talk with Byrne from CrossHarbor and Mr. Yankauer from Credit Suisse to see whether a resolution was at all possible and whether the attorneys for the parties involved or the parties themselves were the obstacles to some resolution.  I inquired on the record if there was any objection to me talking with Byrne and Yankauer on a limited basis and all parties present at the hearing voiced their lack of objection.  It was apparent during my brief discussion with Byrne and Yankauer that the parties were close to a resolution, but at the same time, they were still very far apart.  Court reconvened only to take another recess so the parties could further negotiate and try to reduce to writing any agreement in principle.  When the Court once again reconvened, the remaining issues between Credit Suisse and CrossHarbor related to one, Credit Suisse obtaining authority from its lender groups to reach a resolution with CrossHarbor and two, the terms of a note from CrossHarbor to Credit Suisse.

Unfortunately, the parties did not come to a meeting of the minds and finally, late on Friday, May 15, 2009, at about 7:00 p.m. if my memory serves me correctly, and after the parties had gone back and forth numerous times in clearly an adversarial process and tone, I instructed all the parties to gather their belongings and leave the Billings courthouse.  I immediately left Billings to return to Butte, fully expecting that nothing would be resolved by Monday, May, 18, 2009.

During those four long days and because the parties were working almost around the clock, it became clear that the bidding parties might need the Court's assistance outside normal business hours.  I did not want to give the parties information about where I was staying or how

**Case No. 12-35986 ER  75**

they could contact me, so I advised the parties in open court that they could contact me through Ms. Harrington if they had an emergency.  As previously noted, the bidding process had to be concluded so the Court could move forward with confirmation on Monday, May 18, 2009.  On the evening of either May 13th or May 14th, or perhaps both, the parties involved in the bidding process, through Ms. Harrington, contacted me after hours to provide a status update regarding their negotiations and to notify the Court whether the bidding process could be concluded by May 15.  I met with the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Yellowstone Club Members and the two qualified bidders, CrossHarbor Capital Partners and Credit Suisse, at the Crowne Plaza Hotel.  Any meeting was very brief and did not in any way involve Mr. Blixseth.  My brief presence at the meeting obviously was not effective because we continued with bidding and auction issues through May 15th, when the auction was to have been completed on May 13th.  In fact, when I left the courtroom late on May 15th, I was not convinced that any auction or any discussion of global resolution would occur prior to the confirmation hearing scheduled for May 18th.

The meeting did not and could not have involved Mr. Blixseth because Mr. Blixseth did not seek to qualify himself as a bidder, was not a qualified bidder and was thus not involved in the actual bidding process.  Because Mr. Blixseth was not part of the bidding process and was not involved in the last minute bidding negotiations, my brief meeting with the bidding parties was not ex parte:

> The prohibition against ex parte contacts is based upon notions of procedural due process. *Guenther v. Commissioner of Internal Revenue*, 889 F.2d 882, 884 (9th Cir.1989). Procedural due process requires that a party be provided notice and an opportunity to respond. *Id*. If the party has no right to notice or an opportunity to respond, then it follows that the communication is not ex parte.

ER00084

*Goodwin*, 194 B.R at 222.

Moreover, the facts asserted by Mr. Blixseth with regard to the so-called ex parte communication do not establish bias or prejudice by the undersigned toward Mr. Blixseth.  Mr. Blixseth's apparent displeasure with the fact that the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Yellowstone Club Members, Credit Suisse, and CrossHarbor Capital Partners did not include him in all aspects of the actual bidding process between Credit Suisse and CrossHarbor Capital Partners, does not now bootstrap the parties' request for guidance from the Court during the bidding process into a demonstration of prejudice.  Such allegation by Mr. Blixseth is simply false.

Mr. Blixseth filed a Supplemental Affidavit on January 17, 2011.  In the Supplemental Affidavit, Mr. Blixseth once again takes issue with this Court's alleged ex parte communications with various partes.  In support of his claims of bias and prejudice, Mr. Blixseth filed a host of email communications between myself and various parties and Ms. Harrington and various parties.

 Many of the emails are wholly unrelated to the Yellowstone Club bankruptcies or any of the related proceedings.  For instance, the first string of email communications relate to the status of two adversary proceedings stemming from the Brenda Burkhartsmeier bankruptcy and two other bankruptcy proceedings.  The email communication is between all counsel involved in those cases and is not ex parte communication.  As stated earlier, neither the Kuntz nor the Burkhartsmeier bankruptcies have any connection to the Yellowstone Club cases.

The next string of emails was initiated by the individual in charge of organizing continuing legal education seminars for the Bankruptcy Law Section of the State Bar of Montana.

ER00085

**Case No. 12-35986 ER  77**

The email appears to have gone to all individuals who were doing presentations at the Montana Bankruptcy CLE held October 21 and 22, 2010, in Missoula, Montana. Each year, I and several other bankruptcy judges participate in the CLE. The next email communications are between me and Andy Patten regarding an article I wrote for the Bankruptcy Law Section's newsletter.

Next are emails between myself, Andy Patten and Doug James concerning the case of *Lehman Commercial Paper, Inc. v. Moonlight Basin Ranch, LP*, Adversary Proceeding No. 10-9. The email communications are administrative in nature and include counsel for the plaintiff and the defendant in that matter. The communications are not ex parte. Furthermore the communications have nothing to do with the Yellowstone Club bankruptcies.

The following string of emails relate once again to the preparation of the Bankruptcy Law Section newsletter, which is prepared by Andy Patten and other members of his firm. The next email is from Andy Patten to Ms. Harrington. The email is administrative in nature and merely transmits a proposed order concerning a matter in the case of *In re Glacier Stone Supply, Inc.*, Case No. 10-61638. It appears the email was sent to not only my law clerk, but also other interested parties in that case. The same holds true for the email that follows.

The next email was sent by my law clerk, Kelli Harrington, to Andy Patten. It appears that Mr. Patten was inquiring about my availability for a hearing regarding a new case. Counsel, including Mr. Blixseth's counsel, have been known to call my law clerks inquiring as to my availability to hold expedited hearings in various matters. This email appears to be a response to such an inquiry.

The next emails once again relate to either the 2009 Montana Bankruptcy CLE or my submission for the 2009 bankruptcy newsletter. The next emails are once again administrative

emails, generally pertaining to the submission of proposed orders in accordance with Mont. LBR
9013-1(i).  When motions contain unique language, such as property descriptions, my law clerks
often call or email counsel and request that a proposed order be filed in accordance with our
Local Rules.

In the midst of the foregoing email exchange is an email from Ms. Harrington to a person
in Andy Patten's office.  At the beginning of the hearing on confirmation of Debtors' Chapter 11
plan held May 18, 2009, the Court was advised that bidding parties had, over the weekend and in
the hours leading up to the confirmation hearing, reached a global settlement.  The parties had a
single copy of an executed term sheet, which executed term sheet the parties presented to the
Court.  At the request of Mr. Patten, the Court emailed a copy of the signed settlement term sheet
to his office so that someone other than just the Court had a copy of the executed term sheet.

The next email string involves my law clerk's inability to locate a deposition.  The email
was not ex parte as it includes most if not all counsel involved at that time in Adversary
Proceeding 09-14, including Mr. Blixseth's counsel of record; Michael Flynn at
mike@mjfesq.com and Joel E. Guthals at jeguthals@ghrtlawfirm.com.   The next emails are
between Andy Patten and Judge Peterson.  I was not privy to those emails until Mr. Blixseth filed
them on January 11, 2011.

As for the remaining emails, they, like numerous of the earlier emails, involve
administrative, as opposed to substantive matters.  In most instances, it appears parties are trying
to either schedule emergency hearings or my law clerk is trying to obtain proposed orders.  None
of the emails contain inappropriate ex parte communications and I certainly do not find any bias
or prejudice in the emails.

**Case No. 12-35986 ER  79**

As discussed above, the emails, in and of themselves, do not establish bias or prejudice. However, the argument at the January 18, 2011, hearing shows that Mr. Blixseth seeks to show that I favor in-state counsel to the detriment of out-of-state counsel:

> And particularly with a small local bankruptcy bar here in Montana, it's -- that basically makes its living off this Court's ruling, it makes the task even more difficult, particularly understanding that this Court has under -- has had a distinguished reputation. And the parties, the attorneys that have to argue this are essentially attorneys from outside Montana, except for Mr. Fox, who does not practice before this Court.

The problem with such argument is that almost all parties involved in this case have or had out-of-state counsel, including the Debtors, the unsecured creditors' committee, CrossHarbor and Credit Suisse. Moreover, Mr. Blixseth has Montana counsel who have been active in this case, namely, Joel E Guthals of Billings, Montana and Daniel D. Manson of Butte, Montana. In addition, Mr. Blixseth has produced emails between me and Debtors' local counsel, Mr. Patten, seeming to suggest that we have some relationship beyond that of judge and attorney. If one were to look, one could undoubtedly find emails between myself and Mr. Blixseth's attorney, Joel E. Guthals, because in the past, Mr. Guthals, like Mr. Patten, has been an active participant in the Montana Bankruptcy CLE. My relationship with Mr. Patten is exactly the same as my relationship with Mr. Guthals; purely professional.

The Stephen R. Brown emails.

Mr. Blixseth claims that during the initial phase of Adversary Proceeding 09-14, he raised his concern that Stephen R. Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula, Montana, was at the time of the filing of the Yellowstone Club bankruptcy, Mr. Blixseth's counsel in Montana. Yet, Mr. Brown was also a voting member and chairman of the

Yellowstone Club's unsecured creditors committee, which was suing Mr. Blixseth in Adversary

Proceeding 09-14 for the recovery of $209 million.  Brown testified, without contradiction from

Mr. Blixseth, that Mr. Blixseth had encouraged Brown to be on the unsecured creditors'

committee.  Notwithstanding his prior encouragement, Mr. Blixseth argues that Mr. Brown, in

his capacity as a member of the unsecured creditors' committee, turned over to the unsecured

creditors' committee and its counsel over 400 email communications between his firm and Mr.

Blixseth or Mr. Blixseth's other attorneys which could potentially contain attorney-client

privileged discussions.

Mr. Blixseth's counsel conceded at a hearing held December 2, 2010, that the emails

referenced in Mr. Blixseth's Amended Affidavit are in fact emails between Mr. Brown as a

member of the unsecured creditors' committee and the committee's counsel.  This Court

previously found that Mr. Brown had not disclosed any information protected by Mr. Blixseth's

attorney-client privilege.  Rather, the Court found that the emails contained information that was

protected by the unsecured creditors' committee's attorney-client privilege.  As set forth in an

Order entered by this Court on December 6, 2010, in Adversary Proceeding 09-14, "Mr. Blixseth

has not cited any legal authority which would permit this Court to violate the Official Committee

of Unsecured Creditors' attorney-client privilege without the Official Committee of Unsecured

Creditors' consent."  The Court stands by such ruling.

<u>Favoritism toward Ms. Blixseth and Byrne.</u>

In his brief and at the hearing held January 18, 2011, Mr. Blixseth's counsel argued

extensively that this Court's bias and prejudice is evident by the leniency this Court has showed

toward Ms. Blixseth.  Mr. Blixseth's argument is interesting because this Court has basically had

ER00089

only one opportunity in which it was required to rule for or against Ms. Blixseth. That one
instance arose when the Office of the United States Trustee filed a motion to convert Ms.
Blixseth's Chapter 11 bankruptcy to one under Chapter 7 of the Bankruptcy Code. Over Ms.
Blixseth's vigorous objection, this Court did in fact convert Ms. Blixseth's case to Chapter 7 on
May 29, 2009. Over Ms. Blixseth's objection, this Court has also entered orders extending the
deadline for the Chapter 7 trustee in Ms. Blixseth's bankruptcy to object to entry of Ms.
Blixseth's discharge. Pursuant to a stipulation filed January 5, 2011, Ms. Blixseth and the trustee
resolved Ms. Blixseth's then pending objection, agreeing that the trustee would have through
January 21, 2011, to file a complaint objecting to Ms. Blixseth's discharge.

Mr. Blixseth also argues that this Court has turned a blind eye to the fact that the
Yellowstone Club bankruptcies were filed in bad faith. In support of such contention, Mr.
Blixseth cites to the transcript of April 29, 2009, from Adversary Proceeding 09-14, to a
statement of uncontroverted facts filed July 2, 2010, by Mr. Blixseth in Adversary Proceeding
09-18, and a memorandum that Mr. Blixseth filed in Adversary Proceeding 09-18 on January 22,
2010. Mr. Blixseth, however, fails to acknowledge that he called not a single witness to rebut the
witness testimony presented by the Debtors at the May 18, 2009, confirmation hearing. Also
notable is that fact that Mr. Blixseth sought neither the dismissal nor conversion of either Ms.
Blixseth's bankruptcy or the Yellowstone Club bankruptcies for bad faith.

Mr. Blixseth next maintains that this Court has entered rulings to protect Ms. Blixseth,
even though Ms. Blixseth has committed millions of dollars of fraud on numerous parties. More
specifically, Mr. Flynn argues that Ms. Blixseth committed over $50 million of bank fraud which
this Court ignored. As examples, Mr. Blixseth referred to Ms. Blixseth's loans with Western

**Case No. 12-35986 ER  82**

Capital Partners and Wachovia Bank.  Mr. Flynn characterized Ms. Blixseth's loan with

Wachovia as "one of the most fraudulent loans in my 40 years of litigating, having represented

bank presidents and CEOs and white-collar criminals."  Mr. Flynn represented that "they"

pledged nonexistent technology as collateral for the Wachovia loan.  Mr. Flynn then asserts Ms.

Blixseth pledged certain noise filtering technology software technology to Wachovia Bank in

March of 2008 in violation of a Federal preliminary injunction.

   Whether Ms. Blixseth pledged non-existent technology or whether she pledged

technology in violation of an injunction, Wachovia Bank filed an adversary complaint against

Ms. Blixseth on June 10, 2009, seeking to except the Wachovia obligation from Ms. Blixseth's

discharge under 11 U.S.C. § 523(a)(2).  *See* Adversary Proceeding 09-00034.  Wachovia Bank

and Ms. Blixseth eventually stipulated to the dismissal of that action on November 18, 2009.

This Court entered three orders in that action: an order setting a pretrial scheduling conference,

an order setting trial and an order approving the parties' stipulation for dismissal.

   Before leaving this particular matter, the Court must comment on Mr. Blixseth's assertion

that Ms. Blixseth's deposition testimony from the trial in Adversary Proceeding 09-14 sets forth

the facts surrounding the bogus software.  At the trial in Adversary Proceeding 09-14, Ms.

Blixseth testified in person on May 4, 2009.  Ms. Blixseth was not asked any questions about any

software, bogus or otherwise, and because Ms. Blixseth testified in person, the Court had no

reason to allow Ms. Blixseth's deposition testimony into evidence.

   Continuing with Ms. Blixseth's fraud, Western Capital Partners filed an adversary

complaint against Ms. Blixseth on November 30, 2009, seeking to except its debt from Ms.

Blixseth's discharge under 11 U.S.C. § 523(a)(2).  *See* Adversary Proceeding 09-00100.  Mr.

Flynn argues that this Court is bootstrapped by prior rulings casting Ms. Blixseth's credibility in a favorable light, such as the Court's September 27, 2010, twenty-six page Memorandum of Decision in Adversary Proceeding 09-00100 wherein the Court denied Western Capital Partners' request for summary judgment.  The Court's discussion on the matter is as follows;

In the pending matter, WCP has two hurdles to overcome: (1) all reasonable doubt as to the existence of genuine issues of material fact must be resolved against WCP; and (2) exceptions to discharge under § 523 are narrowly construed.  Additionally, the Court does not consider WCP's motion in a vacuum, but rather, undertakes this case after having over 22 months of time on task with the Yellowstone Club and the associated proceedings, including Debtor's bankruptcy case.

The Court has heard a lot of testimony over the past 22 months about Debtor and her ex-spouse's long and bitter divorce.  Debtor and Timothy L. Blixseth separated in December of 2006 and following the separation, Debtor claims she was "frozen out" of various business affairs for about two years, or until approximately mid-August of 2008, when Debtor was awarded various assets, including BLX Group, Inc. – which owned the ultra exclusive Yellowstone Club -- under the terms of a Marital Settlement Agreement.

Debtor has testified previously that she believed that her share of the marital assets were worth well in excess of $100 million between December of 2006 and August of 2008.   The 2007 Loan Agreement at issue in this Adversary Proceeding and a modification of the Loan Agreement made in June of 2008 were all done during a period of time when Debtor was frozen out of the majority of the marital business dealings.  Such fact precludes this Court from making a summary ruling that Debtor possessed the requisite intent to deceive WCP under either § 523(a)(2)(A) or § 523(a)(2)(B).

Moreover, WCP contends that it relied on certain representations made by Debtor.  However, Debtor counters that WCP has not fully responded to discovery propounded in January of 2010.  Debtor asserts that WCP has delayed responding to all Debtor's discovery requests on grounds WCP has information showing it knew Debtor's true financial position, but nevertheless proceeded to make the loan and modification at issue.  The foregoing allegations raise a material issue of fact as to whether WCP relied on any statements made by Debtor.  Such conclusion is buttressed by the fact that one of WCP's attorneys, Christopher J. Conant, also serves as counsel for Debtor's ex-spouse.

ER00092

Finally, Debtor asserts that WCP has received payments in excess of $41 million toward the $13 million Loan Agreement.  Under such scenario, WCP may already be fully compensated, thus putting WCP's damages at zero.

In sum, after construing § 523(a)(2) narrowly, the Court cannot determine beyond a reasonable doubt that Debtor made any statements, whether oral or in writing, with the intent to deceive WCP.  The Court similarly cannot conclude that WCP relied on statements made by Debtor.  Finally, WCP has not shown that any of its alleged damages were the proximate result of statements made by Debtor.  WCP has simply failed to satisfy its burden of proof at this stage of the litigation.

This Court disputes Mr. Blixseth's contention that it made any credibility finding in the above ruling. In said ruling, this Court merely denied Western Capital Partners' request for summary judgment.  The Court did not dismiss Western Capital Partners' complaint nor did it enter any type of ruling that precluded Western Capital Partners from pursuing its claim against Ms. Blixseth.

The Western Capital Partners adversary proceeding, however, never made it to trial. Rather, Western Capital Partners filed a joint motion to dismiss its action against Ms. Blixseth on October 26, 2010, which the Court granted.  Mr. Blixseth's counsel, Christopher J. Conant, should know that said action was dismissed by agreement of the parties because he was one of Western Capital Partners' counsel of record in that proceeding.

At the January 18, 2011, hearing Mr. Flynn also referred to another action involving Western Capital Partners as a "charade":  "most recently on the timeliness issue, occurred before this Court on October 12th with Mr. Cotner and Mr. Samson where this Court unilaterally, arbitrarily, without giving Mr. Cotner or myself an opportunity to be heard, piled double layers of hearsay and then issued findings that Ms. Mr. Blixseth is credible and believable on the issue of the bank frauds and the technology frauds and that Mr. Cotner was misled by me."  Mr. Flynn

**Case No. 12-35986 ER  85**

obviously makes reference to a hearing held October 12, 2010, in Adversary Proceeding 09-00105 and the Court's resulting order entered October 25, 2010.  Contrary to what Mr. Flynn argues, Mr. Cotner, who was retained as counsel by the Chapter 7 trustee in Ms. Blixseth's bankruptcy, was heard at the October 12, 2010, hearing and the Court's subsequent Order of October 25, 2010, makes not a single credibility finding as to Ms. Blixseth.  Rather, that Order sets forth how Mr. Cotner came to file an amended counterclaim and amended third-party complaint that Mr. Cotner now believes contains numerous inaccuracies.  The Court Order of October 25, 2010, found at docket entry no. 147 speaks for itself.  In the above noted passage from the transcript of the January 18, 2011 hearing when Mr. Flynn makes reference to "Mr. Cotner or myself", I believe Mr. Flynn meant to say Mr. Conant and not Mr. Cotner.

As far as other matters involving Ms. Blixseth, other parties, including the Yellowstone Club World trustee, Source Capital, Palm Desert National Bank, Casa Captiva, Mr. Blixseth, Mr. Blixseth's attorney, Michael Flynn, and Mr. Blixseth's sons, Beau and Morgan Blixseth, have filed dischargeability complaints against Ms. Blixseth.  Stipulations were reached in the Source Capital and Casa Captiva actions, and Palm Desert National Bank dismissed its action.  Similarly, Ms. Blixseth and the Yellowstone Club World trustee just recently entered into a stipulation for dismissal of Adversary Proceeding 09-44.  The adversary proceeding commenced by Beau and Morgan Blixseth has not yet gone to trial.  Finally, both Mr. Blixseth and Mr. Flynn advised this Court during the respective pretrial scheduling conferences that they intended to voluntarily dismiss their actions against Ms. Blixseth.  True to their representations, Mr. Blixseth and Mr. Flynn filed motions to dismiss their adversary proceedings against Ms. Blixseth on February 24, 2010.  This Court entered orders granting the motions to dismiss on March 16,

2010.  Ms. Blixseth's discharge was, subject to Beau and Morgan Blixseths' still pending

adversary proceeding, entered on February 8, 2011.  As the facts demonstrate, other than the

United States Trustee's motion to convert, this Court has not been presented with an instance

where it had to rule either for or against Ms. Blixseth.

Having made few, if any credibility findings as to Ms. Blixseth, the Court fails to see how

it disrupted a criminal investigation, of which I would have no knowledge nor should I have any

knowledge, as Mr. Blixseth alleges.  Similarly, this Court fails to understand how it used a states

secrets privilege or a Nevada protective order to conceal and gloss over Ms. Blixseth's ongoing

fraud.  My knowledge of the Nevada secrecy order is limited to the facts presented to the Court

by the parties in preparation for and at the October 12, 2010, hearing.

Denial of Mr. Blixseth's due process.

Finally, Mr. Blixseth contends that this Court has denied him due process.  Under this

umbrella Mr. Blixseth asserts that this Court has precluded him from presenting facts relating to

Ms. Blixseth's spoliation of evidence.  The Court's Order of January 22, 2010, entered at docket

entry no. 546 in Adversary Proceeding 09-14 speaks for itself.  The Court would simply note that

in that Order, the Court instructed that the matter needed "to be brought before the Court in the

correct proceeding with service upon the appropriate parties." The Court noted therein that  Mr.

Blixseth had "wholly failed to show any misconduct by YCLT or the Debtors in th[at] case.  This

Court agrees with YCLT that a first party defendant is not, and should not be, responsible for the

actions of a third party spoliator who is not a party to the litigation before the Court."

Next, Mr. Blixseth claims this Court denied him due process in Adversary Proceeding 09-

14 because he was given only weeks to defend himself.  In a Memorandum of Decision entered

ER00095

June 11, 2009, at docket entry no. 292 in Adversary Proceeding 09-14, the Court explained why

it was not persuaded by Mr. Blixseth's argument.  Mr. Blixseth intervened into Adversary

Proceeding 09-14, knowing at the time that the proceeding was scheduled for trial on an

expedited bases.  Moreover, Mr. Blixseth fails to mention that he called not a single witness in

his defense at phase one of the trial in Adversary Proceeding 09-14.  Having mounted a minimal

defense after six days of trial, the Court entered its June 11, 2009, Memorandum of Decision

suggesting to Mr. Blixseth that his trial tactics at the trial in April and May of 2009 were not

particularly effective.  The Court thus proceeded to leave the record open and continued the trial

to February 24, 2010.  That continuance was for the sole benefit of Mr. Blixseth.  For the reasons

discussed, the Court finds no bias or prejudice in Mr. Blixseth's statement that "the bankruptcy

court merely continued the trial for one week then subsequently and scurrilously accused me of

delaying tactics by insisting on my due process rights[.]"

Mr. Blixseth also avers that: "The court had previously deprived us of critical defenses by

excluding the [Marital Settlement Agreement] MSA and Releases from my proposed Pre-Trial

Order.  The other side's lawyers argued that the releases were not in their Pre-Trial Order and

Judge Kirscher commented that he specifically recalled not including the Releases in the PTO.

My attorney directed Judge Kirscher to where the Releases were inadvertently left in the UCC's

Pre-Trial Order as a trial exhibit.  Judge Kirscher paused to thumb through his copy of the PTO

and upon discovering that the Releases were included, he leaned back in his chair, gave a glaring

stare at the Debtor's attorney, Andy Patten, and then threw the PTO across his desk with great

force saying "Yes, it's still in" as if he had relied upon the manipulation of the UCC and the

Debtor keeping my critical affirmative defenses out of the PTO.  The manner in which Judge

ER00096

**Case No. 12-35986 ER  88**

Kirscher showed disgust with having the Releases included in the PTO inadvertently, gave the appearance that his intent and the intent of the Debtor's and the UCC was to deprive me a critical affirmative defense in a lawsuit in which I was sued literally only few days before trial commenced."

My frustrations in Adversary Proceeding 09-14 were numerous, but those frustrations were directed at all parties, not just Mr. Blixseth, and they do not equate to bias or prejudice.  For instance, the original parties in Adversary Proceeding 09-14 consisting of the Debtors, the unsecured creditors' committee and Credit Suisse had requested that trial in that matter be set on an expedited basis because the Debtors' financing was scheduled to mature on April 30, 2009. The Court's calendar was quite full and after some rearrangement, the Court set April 22, 2009, as the date trial was to commence in Adversary Proceeding 09-14.  However, after all the parties were seated in the courtroom on April 22, 2009, the Court was advised that not all the parties had provided paper copies of their exhibits to Mr. Blixseth.[5]  The Court's calendar was very full in May and June of 2009 and any continuance of the trial in Adversary Proceeding 09-14 left the Court with very little time to issue its ruling in Adversary Proceeding 09-14 prior to the scheduled May 18, 2009, confirmation hearing.  However, to give the parties time to produce their exhibits to Mr. Blixseth in hard copy and with the understanding that the debtor-in-possession financing would be extended for a short period of time, the Court continued the first phase of trial in Adversary Proceeding 09-14 to April 29, 2009.  Thus, the Court was upset when trial finally started on April 29, 2009, and it became apparent that the parties did not know what

---

[5]  The exhibits were available to Mr. Blixseth by electronic means, but Mr. Blixseth's counsel stated they were unable to retrieve the electronic version of the exhibits.

ER00097

was and was not in the final pretrial order prepared by the parties and submitted to the Court for

approval.  But as noted earlier, that frustration does not equate to bias or prejudice and it

certainly does not equate to bias or prejudice toward Mr. Blixseth.

Mr. Blixseth then argues that this Court entered its August 16, 2010, ruling in Adversary

Proceeding 09-14 on the eve of trial in Adversary Proceeding 09-18, effectively "precluding Mr.

Blixseth from establishing at trial why the B shareholder claim against him failed both legally

and factually and therefore why he should not be required to satisfy their $22 million claim either

through being included within a judgment in AP-14, or in AP-18."  Entry of my decision in

Adversary Proceeding 09-14 was driven solely by my workload.  The second phase of the trial in

Adversary Proceeding 09-14 concluded on February 26, 2010.  I generally strive to enter rulings

within 60 days after matters are deemed submitted and ready for decision.[6]  In the case of

Adversary Proceeding 09-14, post-trial briefs and proposed findings of fact and conclusions of

law were submitted on March 19, 2010.  Thus, I would have generally tried to have a decision

entered by mid-May of 2010.  However, the parties had advised me that they planned to

participate in a mediation in early May of 2010.  I thus turned my efforts to other matters, with

the hopes that the mediation would resolve the issues in Adversary Proceeding 09-14.

I later learned from the parties at a status conference held June 2, 2010, that the mediation

---

[6]  The 60-day period is consistent with Mont. LBR 901-2, which reads:

> In the event a Judge has under advisement any matter, including, but not limited
> to, a motion or decision in a bench trial, for a period of more than sixty (60) days, each
> party affected by the undecided matter shall send to the Judge a letter particularly
> describing the matter under advisement and stating the date the matter was taken under
> advisement.  As long as the matter remains under advisement, at intervals of forty-five
> (45) days thereafter, each affected party shall send a similar letter to the Judge.

did not resolve Adversary Proceeding 09-14.  So, I and my law clerk once again turned our efforts to the decision in Adversary Proceeding 09-14 with the tacit understanding that summer vacations would be put on hold until the decision in Adversary Proceeding 09-14 was completed. To that end, my law clerk scheduled her summer family vacation for the week of August 16, 2010, and the two of us worked on drafting the decision.  As the record reflects, the decision in Adversary Proceeding was entered on August 16, 2010, the same date that Ms. Harrington started her summer vacation.  Contrary to what Mr. Blixseth may believe, workload and the scheduling of time off were the only factors that determined when the decision was entered in Adversary Proceeding 09-14.

Mr. Blixseth's final complaint stemming from Adversary Proceeding 09-14 is that this Court amended its judgment against Mr. Blixseth, without giving Mr. Blixseth an opportunity to respond.  The Court agrees that Mr. Blixseth did not have any opportunity to respond to the Yellowstone Club Liquidating Trust's motion to alter or amend the judgment and that the Court entered an judgment against Mr. Blixseth for a specific dollar amount.  The Yellowstone Club Liquidating Trust was seeking judgment against Mr. Blixseth in the amount of $286.4 million. The Court ultimately entered an amended judgment in the amount of $40,067,962.43.  Such amount is a moving target because the Yellowstone Club Liquidating Trustee was still in the process of liquidating claims when Mr. Blixseth filed his motion for recusal.  The judgment against Mr. Blixseth is necessarily decreased as claims are either disallowed or reduced.  The Court considered the amended judgment as nothing more than a more definitive embodiment of its original judgment wherein Mr. Blixseth would pay "that amount of money required to pay all allowed: (1) claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4

ER00099

(general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5

(convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection

claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12

(honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class

14 (company member rejection claims) and those claims that Mr. Blixseth identifies as "not

classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no.

571, and (2) YCLT for the fees and costs it has incurred, and will incur, objecting to and

liquidating such claims."

Moreover, entry of a judgment in a specific amount in Adversary Proceeding 09-14 paved

the way for the Court to enter an Order on October 20, 2010, in Adversary Proceeding 10-15

denying the Yellowstone Club Liquidating Trust's request for a preliminary injunction wherein

the Yellowstone Club Liquidating Trust sought an order enjoining Mr. Blixseth, and two of his

entities, Desert Ranch, LLLP and Desert Ranch Management, LLC, from transferring any assets

in an amount or of a value in excess of $5,000.00.  There, the Court reasoned:

> What the pending Adversary Proceedings show is that: (1) Plaintiff in this matter
> has a $40,067,962.43 judgment against Mr. Blixseth; and (2) Mr. Blixseth
> stipulated to the entry of an injunction which prohibits Mr. Blixseth from selling,
> transferring, disposing of, encumbering or otherwise liquidating, or causing any
> entity owned or controlled by him to sell, transfer, dispose of, encumber or
> otherwise liquidate, property valued at $40 million without prior order of the
> Court.
>
>      . . .  The Plaintiff's judgment of $40,067,962.43 is, as Mr. Blixseth's
> counsel stated, in perfect congruity with the stipulated injunction already in place.

Mr. Blixseth next takes issue with a decision entered by the Court on August 4, 2010, in

Adversary Proceeding 09-18 wherein the Court denied four motions for summary judgment filed

by Mr. Blixseth. As the Court explained, it was 69 pages into drafting that decision when it elected to scrap the 69-pages and opted instead to issue a four page memorandum. The Court had a firm grasp on the facts and was fully convinced that there were disputed issues of material fact that precluded summary judgment.

In addition to the above allegations, Mr. Blixseth's counsel made the additional argument at the January 18, 2011, hearing that "[t]here's a January 14 or 15 e-mail from, I think it was Matthew Kidd to Sam Byrne saying: How did your meetings with Ron Burkle, the governor, and Mr. Byrne go? There's an e-mail in August of 2008 when Ms. Blixseth and Mr. Byrne knew they were taking control of the Yellowstone Club involving a meeting with, with Governor Schweitzer." Mr. Flynn clearly implies that Ron Burkle, whom I have never heard of, Governor Schweitzer, whom I have never met, and Mr. Byrne, who I would recognize only from his appearances in my courtroom, met and somehow exerted pressure on me. This Court has not and will not succumb to any pressure, political or otherwise. This Court is an independent and unbiased member of the Federal judiciary. To the best of my ability, I strive to enter decisions that are based solely on the facts presented and the applicable law.

Applying the applicable law to the facts presently before me, I conclude that my disqualification in this case is neither required nor appropriate because Mr. Blixseth has not established actual bias nor has he shown any facts which establish an appearance of such impartiality as to require recusal.

It appears that Mr. Blixseth's ultimate goal is to upset what has already been done in the cases in which he is involved. Such is not the appropriate consequence of a recusal motion, particularly where Mr. Blixseth's remedies are adequately addressed through the appellate

process.  Therefore, consistent with the foregoing, the Court will enter separate orders in this case and in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088 providing as follows:

IT IS ORDERED that Timothy L. Blixseth's Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) filed November 30, 2010, at docket entry no. 2042, together with the same Amended Motion filed December 14, 2010, in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088 are DENIED.

BY THE COURT

_Ralph B. Kirscher_

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

**NO. 12-35986**

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appeallate CM/ECF system on April 8, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CB/ECF system

April 8, 2013                          s/ Christopher J. Conant

                                       Christopher J. Conant, Esq

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

## NO. 12-35986

---

TIMOTHY L. BLIXSETH

Appellant,

v.

YELLOWSTONE MOUNTAIN CLUB, LLC
YELLOWSTONE DEVEOPMENT, LLC
BIG SKY RIDGE, LLC
YELLOWSTONE CLUB CONSTRUCTION CO., LLC

Appellees.

---

## APPELLANT'S EXCERPTS OF RECORD
### Volume II of V
### Pages 95 through 231

---

Appeal from the United States District Court for the District of Montana
Case No. 2:11-73-BU-SEH

---

Phillip H. Stillman
Stillman & Associates
300 South Poine Drive,
Suite 4206
Miami Beach, FL 33139
Telephone: (888) 235-4279
*pstillman@stillmanassociates.com*

Patrick T. Fox
Doubek Pyfer & Fox, LLP
PO Box 236
Helena, MT 59624
Telephone: (406) 442-7830
*patrickfox@douberpyfer.com*

Christopher J. Conant
Conant Law LLC
730 17th Street
Suite 200
Denver, CO 80202
Telephone: (303) 298-1800
*cconant@conantlawyers.com*

Michael J. Ferrigno
Law Office of Michael Ferrigno,
PLLC
1200 N. Main Street, Suite 486
Meridian, ID 83680
Telephone: (208) 319-3561
*michael.ferrigno@ferrigno-law.com*

Attorneys for Appellant Timothy L. Blixseth

# INDEX

## APPELLANT'S EXCERPTS OF RECORD

### TIMOTHY L. BLIXSETH

**Appellant,**

**v.**

### YELLOWSTONE MOUNTAIN CLUB, LLC
### YELLOWSTONE DEVEOPMENT, LLC
### BIG SKY RIDGE, LLC
### YELLOWSTONE CLUB CONSTRUCTION CO., LLC

**Appellees.**

### NO. 12-35986

| Docket No. | Date | Description | Volume | Pages |
|---|---|---|---|---|
| 51 | 11/16/2012 | Order Denying Blixseth's Appeal | I | 1-5 |
| 6.1, Ex. 1 | 1/3/2012 | Memorandum of Decision | I | 6-47 |
| 6.1, Ex. 3 | 1/3/2012 | Memorandum of Decision | I | 48-94 |
| 52 | 11/28/2012 | Notice of Appeal to Ninth Circuit | II | 95-153 |
| 43 | 8/24/2012 | Transcript of Motion Hearing | II | 154-209 |
| 39 | 8/24/2012 | Post Hearing Brief | II | 210-212 |
| 17-1, Ex. 26 | 2/16/2012 | Motion for Summary Judgment Concerning Derivative Claims, Alter Ego, Fiduciary Duty, and Statute of Limitation and Memorandum in Support | II | 213-215 |
| 17-2, Ex. 27 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses | II | 216-217 |

1

| 17-3, Ex. 28 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation and Supporting Memorandum | II | 218-220 |
|---|---|---|---|---|
| 17-4, Ex. 29 | 2/16/2012 | Ominbus Response to Motions for Summary Judgment | II | 221-223 |
| 18-1, Ex. 30 | 2/16/2012 | August 4, 2010 Memorandum of Decision | II | 224-228 |
| 18-2, Ex. 31 | 2/16/2012 | August 4, 2010 Order | II | 229-231 |
| 12-5 | 2/2/2012 | Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) | III | 232-462 |
| 6.1, Ex. 2 | 1/3/2012 | Notice of Appeal | III | 463-466 |
| 6.1, Ex. 2 | 1/3/2012 | Amended Notice of Appeal | III | 467-471 |
| 6.1, Ex. 4 | 1/3/2012 | Yellowstone Club Settlement Term Sheet | III | 472-491 |
| 6.2 | 1/3/2012 | Yellowstone Club Disclosure Statement | III | 492-521 |
| 7.3, Ex. 7 | 1/3/2012 | Am. Affidavit Of Timothy L. Blixseth in Support of Motion to Disqualify | IV | 522-549 |
| 7.3, Ex. 8 | 1/3/2012 | December 10, 2010 Hearing Tr. | IV | 550-552 |
| 8.1 | 1/3/2012 | Supplemental Affidavit of Timothy L. Blixseth | IV | 553-584 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Cash Collateral Email | IV | 585 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Generic Order Email | IV | 586 |
| 10-1. Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington at Home Email | IV | 587 |
| 10-1, Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Cell Phone Email | IV | 588 |

2

| 10-1, Ex. 8 | 1/3/2012 | Supp. Affidavit, Ex. 8 Peterson Email | IV | 589-590 |
|---|---|---|---|---|
| 10-1, Ex. 9 | 1/3/2012 | Supp. Affidavit, Ex. 9 Harrington "Heads Up" Email | IV | 591-592 |
| 10-1, Ex. 10 | 1/3/2012 | Supp. Affidavit, Ex. 10 Richardson Email | IV | 593-594 |
| 10-2. Ex. 12 | 1/3/2012 | Bankruptcy Court Memorandum of Decision in BLX Group, Inc., Nov. 22, 2011 | IV | 595-609 |
| 10-2, Ex. 13 | 1/3/2012 | AP-88 Complaint | IV | 610-622 |
| 10-2 | 1/3/2012 | Hearing Transcript Disqualification Hearing, Jan. 18, 2011 | IV | 623-680 |
| 10.3, Ex. 14 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, August 16, 2010 | IV | 681-816 |
| 10.3, Ex. 15 | 1/3/2012 | Memorandum of Decision in AP 09-100, September 27,2010 | V | 817-843 |
| 10.3, Ex. 16 | 1/3/2012 | AP-14 Judgment | V | 844-846 |
| 10.3, Ex. 17 | 1/3/2012 | YCLT Motion to Reconsider AP-14 | V | 847-850 |
| 10.3, Ex. 18 | 1/3/2012 | Affidavit of Charles Hingle in Support of YCLT's Motion to Reconsider AP-14 | V | 851-858 |
| 10-3, Ex. 19 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, Sept. 7, 2010 | V | 859-868 |
| 10-3, Ex. 20 | 1/3/2012 | YCLT Motion to Certify for Direct Appeal in AP-14 | V | 869-871 |
| 10-3, Ex. 21 | 1/3/2012 | YCLT Motion to Expedite Hearing on Motion to Certify for Direct appeal | V | 872-874 |
| 10-3, Ex. 22 | 1/3/2012 | Order granting Motion to Expedite Hearing | V | 875-877 |
| 10-3, Ex. 24 | 1/3/2012 | Order granting Motion to Certify Order | V | 878-880 |

3

| 10-4, Ex. 25 | 1/3/2012 | Memorandum of Decision in AP-88, January 3, 2012 | V | 881-900 |
|---|---|---|---|---|
|  |  | U.S. District Court, District of Montana - Docket Report | V | 901-909 |

Patrick T. Fox (#8071)
DOUBEK, PYFER & FOX LLP
PO Box 236
Helena MT 59624
406 442 7830 ph
406 442 7839 fax
patrickfox@doubekpyfer.com

*Attorney for Appellant Timothy L. Blixseth*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA - BUTTE DIVISION

| | |
|---|---|
| In re : YELLOWSTONE MOUNTAIN CLUB, LLC ET AL | Case Nos. 2:11-00073, 74, 75, 76,77, 78-BU-SEH |
| | On appeal from Bankruptcy Case No. 08-61570 Adv. Case Nos. 09-14, 09-18, 10-15, 09-64, 10-88 |
| | **NOTICE OF APPEAL** |

PLEASE TAKE NOTICE that Timothy Blixseth hereby appeals from (1) the

February 25, 2011 Order of the U.S. Bankruptcy Court for the District of Montana

(Kirscher, J) denying Timothy Blixseth's Motion to Disqualify Judge Kirscher and

attached hereto as Exhibit 1 and (2) the November 16, 2012 Order of the U.S.

District Court for the District of Montana affirming that order, a copy of which is

attached hereto as Exhibit 2.

The names of all parties to the order appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

| PARTY | ATTORNEY |
|---|---|
| CrossHarbor Capital Partners, LLC, CIP Yellowstone Lending LLC, New CH YMC Acquisition LLC<br><br>Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Yellowstone Club Construction Company, LLC, Big Sky Ridge, LLC<br><br>The Debtors, The Reorganized Debtors | JAMES A. PATTEN<br>Attorney at Law<br>Suite 300, The Fratt Building<br>2817 Second Avenue North<br>Billings, MT 59101<br>406-545-0195 |
| Richard J. Samson, as Chapter 7 Trustee | DAVID B COTNER<br>DATSOPOULOS,    MacDONALD    &<br>LIND, P.C.<br>201 WEST MAIN<br>CENTRAL SQUARE BUILDING<br>MISSOULA, MT 59802<br>406.728.0810<br>dcotner@dmllaw.com |
| Marc S. Kirschner, as Trustee for the<br><br>Yellowstone Club Liquidating Trust | JOHN TURNER<br>Attorney at Law<br>Mullin, Hoard & Brown, LLP<br>500 South Taylor, Suite 800<br>Amarillo, TX 79101<br>(806) 337-1121<br><br>CHARLES HINGLE<br>SHANE COLEMAN<br>Holland & Hart<br>P.O. Box 639<br>Billings, MT 59103-0639<br>406-896-4606 |

//

**Case No. 12-35986 ER  96**

| | |
|---|---|
| CIP Sunrise Ridge Owner LLC<br>CIP Yellowstone Lending LLC<br>CrossHarbor Capital Partners LLC | PAUL D. MOORE<br>Attorney at Law<br>Duane Morris, LLP<br>470 Atlantic Avenue, Suite 500<br>Boston, MA 02210-2600<br>857 488 4230<br><br>BENJAMIN P. HURSH<br>Attorney at Law<br>Crowley Fleck<br>P.O. Box 7099<br>Missoula, MT 59807<br>(406) 523-3600<br><br>BARRY GREEN<br>Attorney at Law<br>Goulston & Storrs<br>400 Atlantic Avenue<br>Boston, MA 02210-3333<br>(617) 574-4121 |
| Ad Hoc Group of Class B Unit Holders | RONALD A. BENDER<br>Attorney at Law<br>Worden Thane, PC<br>P.O. Box 4747<br>Missoula, MT 59806<br>406-721-3400 |
| Credit Suisse and Prepetition Lenders | J. Richard Orizotti<br>Poore, Roth, Robinson<br>1341 Harrison Avenue<br>Butte, MT 59701<br>(406) 782-1223<br><br>Evan R. Levy<br>George A. Zimmerman<br>SKADDEN ARPS SLATE MEAGHER<br>& FLOM<br>Four Times Square<br>New York, NY 10036-6522<br>212-735-3889 |

DATED this 28th day of November, 2012.

/s/ Patrick Fox
Doubek Pyfer & Fox LLP
PO Box 236
Helena MT 59624
406 442 7830 ph
406 442 7839 fax
patrickfox@doubekpyfer.com
*Attorney for Appellant Timothy
L. Blixseth*

## CERTIFICATE OF SERVICE

I, the undersigned, certify under penalty of perjury that on November 3, 2012 or as soon as possible thereafter, true and correct electronic copies of the foregoing NOTICE OF APPEAL will be served by mailing a such copies, first class mail, postage prepaid, was made to the following persons/entities.

| PARTY | ATTORNEY |
|---|---|
| CrossHarbor Capital Partners, LLC, CIP Yellowstone Lending LLC, New CH YMC Acquisition LLC<br><br>Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Yellowstone Club Construction Company, LLC, Big Sky Ridge, LLC<br><br>The Debtors, The Reorganized Debtors | JAMES A. PATTEN<br>Attorney at Law<br>Suite 300, The Fratt Building<br>2817 Second Avenue North<br>Billings, MT 59101<br>406-545-0195 |
| Richard J. Samson, as Chapter 7 Trustee | DAVID B COTNER<br>DATSOPOULOS, MacDONALD & LIND, P.C.<br>201 WEST MAIN<br>CENTRAL SQUARE BUILDING<br>MISSOULA, MT 59802<br>406.728.0810<br>dcotner@dmllaw.com |

//

| | |
|---|---|
| Marc S. Kirschner, as Trustee for the Yellowstone Club Liquidating Trust | JOHN TURNER<br>Attorney at Law<br>Mullin, Hoard & Brown, LLP<br>500 South Taylor, Suite 800<br>Amarillo, TX 79101<br>(806) 337-1121<br><br>CHARLES HINGLE<br>SHANE COLEMAN<br>Holland & Hart<br>P.O. Box 639<br>Billings, MT 59103-0639<br>406-896-4606 |
| CIP Sunrise Ridge Owner LLC<br>CIP Yellowstone Lending LLC<br>CrossHarbor Capital Partners LLC | PAUL D. MOORE<br>Attorney at Law<br>Duane Morris, LLP<br>470 Atlantic Avenue, Suite 500<br>Boston, MA 02210-2600<br>857 488 4230<br><br>BENJAMIN P. HURSH<br>Attorney at Law<br>Crowley Fleck<br>P.O. Box 7099<br>Missoula, MT 59807<br>(406) 523-3600<br><br>BARRY GREEN<br>Attorney at Law<br>Goulston & Storrs<br>400 Atlantic Avenue<br>Boston, MA 02210-3333<br>(617) 574-4121 |
| Ad Hoc Group of Class B Unit Holders | RONALD A. BENDER<br>Attorney at Law<br>Worden Thane, PC<br>P.O. Box 4747<br>Missoula, MT 59806<br>406-721-3400 |

| Credit Suisse and Prepetition Lenders | J. Richard Orizotti<br>Poore, Roth, Robinson<br>1341 Harrison Avenue<br>Butte, MT 59701<br>(406) 782-1223<br><br>Evan R. Levy<br>George A. Zimmerman<br>SKADDEN ARPS SLATE MEAGHER<br>& FLOM<br>Four Times Square<br>New York, NY 10036-6522<br>212-735-3889 |
|---|---|

All other participants in this appeal receive service via ECF as of November 28, 2012.

DATED this 28th day of November, 2012.

/s/ Patrick Fox
Doubek Pyfer & Fox LLP

PO Box 236
Helena MT 59624
406 442 7830 ph
406 442 7839 fax
patrickfox@doubekpyfer.com
*Attorney for Appellant Timothy L. Blixseth*

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No.  **08-61570-11** |
| Debtor. | |

# MEMORANDUM of DECISION

At Butte in said District this 25th day of February, 2011.

In this Chapter 11 bankruptcy, after due notice, a hearing was held January 18, 2011, in Butte on Timothy L. Blixseth's ("Mr. Blixseth") Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) filed November 30, 2010, at docket entry no. 2042. Mr. Blixseth's Motion is accompanied by an Amended Affidavit of Timothy L. Blixseth in Support of Motion to Disqualify. *See* docket entry no. 2043. Mr. Blixseth filed a Supplemental Affidavit on January 17, 2011, at docket entry no. 2117. Mr. Blixseth also filed his Amended Motion and Amended affidavit on December 14, 2010, in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088. Mr. Blixseth was represented at the January 18, 2011, hearing by Michael J. Flynn ("Mr. Flynn") of Boston, Massachusetts, Christopher J. Conant of Denver, Colorado and Patrick T. Fox of Helena, Montana.   Mr. Blixseth's other counsel of record in these proceedings include Benjamin A. Schwartzman, Brent Bastian, Wade L.

1

Woodard, Thomas A. Banducci and Jennifer Schrack Dempsey of Boise, Idaho, Joel E. Guthals

of Billings, Montana, Philip H. Stillman of Encinitas, California, and Daniel D. Manson and

Gregory C. Black of Butte, Montana. At the conclusion of Mr. Flynn's oral argument, the Court

took the matter under advisement.

BACKGROUND

Mr. Blixseth and his former spouse, Edra Blixseth ("Ms. Blixseth"), were the founders of

Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC ("YD"), Big Sky

Ridge, LLC, and Yellowstone Club Construction Company, LLC. The four aforementioned

limited liability companies comprise the Yellowstone Club and will be referred to generally as

the Debtors or the Yellowstone Club entities. Through the Yellowstone Club entities, Mr.

Blixseth and Ms. Blixseth began development in the late 1990's of the Yellowstone Club; an

exclusive and private ski and golf community located in Big Sky, Montana.

Mr. Blixseth was the sole managing member of Big Sky Ridge, LLC from its inception to

August 12, 2008. From their inception to August 12, 2008, YMC and YD were controlled by

Mr. Blixseth through his holding company, Blixseth Group, Inc. ("BGI"). Since August of 2001,

BGI owned 82.6532 percent of the Class A stock in YMC and YD, and Blixseth Family

Investments, LLC owned 5.1020 percent of Class A stock. The Class B Members, or Class B

Shareholders--consisting of twelve individuals or entities unrelated to Mr. Blixseth or Ms.

Blixseth–collectively owned the remaining 12.25 percent of YMC and YD.

BGI, an Oregon sub-S corporation, was owned solely by Mr. Blixseth as President and

CEO from 1999 to August 12, 2008. Mr. Blixseth and Ms. Blixseth separated in December of

2006, and effective August 12, 2008, Ms. Blixseth and Mr. Blixseth agreed, pursuant to a June

2

26, 2008, confidential Marital Settlement Agreement ("MSA"), that Ms. Blixseth would receive

BGI and the Yellowstone Club entities.

To finalize the MSA, Ms. Blixseth was required to make a cash payment to Mr. Blixseth.

Ms. Blixseth originally secured a commitment for funding but that commitment would not allow

Ms. Blixseth to consummate the MSA in mid-August of 2008.  Ms. Blixseth thus approached

Samuel T. Byrne ("Byrne"), the founder and managing partner of CrossHarbor Capital Partners,

LLC ("CrossHarbor") and CIP Yellowstone Acquisition LLC ("CIP"), asking for a 15-day loan

so she could finalize the MSA.   Ms. Blixseth and Byrne reached an agreement whereby CIP

would loan Ms. Blixseth $35 million ("CIP Loan").  The CIP Loan was intended to be a

short-term bridge loan that would provide Ms. Blixseth time to secure longer-term financing.

Ms. Blixseth was not able to secure long-term financing and defaulted on the CIP Loan.

Subsequently, Ms. Blixseth caused the Yellowstone Club entities to seek protection under

Chapter 11 of the Bankruptcy Code on November 10, 2008.  Various creditors filed an

involuntary Chapter 11 bankruptcy petition on behalf of BLX  on September 21, 2009.  *See*

Bankruptcy Case No. 09-61893.  Ms. Blixseth filed a voluntary Chapter 11 bankruptcy petition

on March 26, 2009.  *See* Bankruptcy Case No. 09-60452.  Ms. Blixseth's case was converted to

Chapter 7 of the Bankruptcy Code on May 29, 2009.

Mr. Blixseth and Ms. Blixseth were also the founders of Big Springs Realty, LLC and

Yellowstone Club World, LLC, both of which were awarded to Ms. Blixseth in August of 2008

under the couple's June 26, 2008, MSA.  Ms. Blixseth caused Big Springs Realty, LLC to file a

voluntary Chapter 7 bankruptcy petition on June 5, 2009.  *See* Bankruptcy Case No. 09-61079.

An involuntary Chapter 7 bankruptcy petition was filed against Yellowstone Club World, LLC

**Case No. 12-35986 ER  104**

on January 25, 2009.  *See* Bankruptcy Case No. 09-60061.  This Court generally refers to all the aforementioned bankruptcies as the Yellowstone Club related bankruptcies.

Mr. Blixseth made his first appearance in these proceedings on November 12 or 13, 2010, when one of Mr. Blixseth's counsel of record, Joel E. Guthals of Billings, Montana, appeared at a hearing on the Debtors' request for joint administration and on the Debtors' request for an interim order approving debtor-in-possession financing.  However, Mr. Blixseth did not take an active role in the Debtors' bankruptcies until February 2009 when he filed an objection to the Debtors' proposed bidding and solicitation procedures regarding the sale of 100% of the equity interests in the Debtors.  Subsequently, Mr. Blixseth sought to intervene in Adversary Proceeding 09-14 in March of 2009.

The remainder of the facts are set forth fairly extensively in the Court's Memorandum of Decision dated August 16, 2010, found at docket entry no. 575 in Adversary Proceeding 09-14.  Rather than recite the facts once again, the Court instead incorporates by reference that Memorandum of Decision.

## MR. BLIXSETH'S CONTENTIONS

In the Amended Motion filed November 30, 2010, and for the following reasons, Mr. Blixseth requests that I disqualify myself from all matters in which Mr. Blixseth is a litigant:

1.  Without considering the evidence, Judge Kirscher has pre-judged that the Yellowstone Club bankruptcy petition was filed and plan was proposed in good [sic;]

2.  Judge Kirscher has invited and entertained ex parte advocacy against Mr. Blixseth's counsel and Mr. Mr. Blixseth[;]

3.  Judge Kirscher had ex parte communications in a hotel with Cross Harbor [sic] Capital Partners LLC concerning Cross Harbor's agenda for the

4

Yellowstone Club bankruptcy, which depends upon successful litigation against Mr. Blixseth;

    4.  Judge Kirscher's law clerk has engaged in ex parte communications with one of Mr. Blixseth's adversaries, urging his adversary to finalize a settlement with Mr. Blixseth before Mr. Blixseth could renege;

    5.  Numerous times Judge Kirscher ruled on important motions against Mr. Blixseth before Mr. Blixseth had an opportunity to file a response permitted under the rules;

    6.  Judge Kirscher entered a $40 million judgment against Mr. Blixseth before Mr. Blixseth had an opportunity to respond to the motion to reconsider upon which the $40 million judgment was based;

    7.  Judge Kirscher has made impermissible and disparaging comments about Mr. Blixseth and his attorneys, including one comment that essentially compared Mr. Blixseth's meritorious summary judgments to garbage and unworthy of the Judge's time. Such statements do not uphold the integrity of the judiciary or avoid the appearance of impartiality;

    8.  After learning that Mr. Blixseth would be moving this Court to reassign him, Judge Kirscher appears to have retaliated against one of Mr. [sic][;]

    9.  Judge Kirscher is so invested in the success of the Yellowstone Club bankruptcy case that he is "boxed in" to ruling against Mr. Blixseth no matter the merits of the claims against him;

    10.  Judge Kirscher has demonstrably pre-judged adversary proceedings against Mr. Blixseth[;]

    11.  Judge Kirscher sitting as a trier of fact cannot reasonably be expected to provide Mr. Blixseth a fair trial; he has consistently maligned Mr. Blixseth's credibility and found Mr. Blixseth culpable for the demise of the Yellowstone Club.

Amended Motion to Disqualify, docket entry no. 2042, pp 2-3.  In support of the foregoing allegations, Mr. Blixseth filed an Amended Affidavit of Timothy L. Blixseth.  Only the following paragraphs from Mr. Blixseth's Amended Affidavit arguably pertain to me, my conduct or my rulings:

5

7.    On June 10, 2010, I received a phone call from Mr. Amsden regarding my
settlement with his client, Ross Richardson as Trustee for YCW.  During that
phone conversation, Mr. Amsden related to me that Mr. Richardson had talked on
the phone with Terry Healow who is one of Judge Kirscher's law clerks.  During
this conversation between Mr. Richardson and Mr. Healow, Mr. Healow asked
Mr. Richardson if he had finalized his settlement with me.  Mr. Richardson
responded by saying that the settlement was almost complete but that a few
matters needed to be addressed before it could be finalized.  In response, Mr.
Healow told Mr. Richardson to hurry up and get it finalized before I could
"renege."

* * *

16.    The bankruptcy auction for the Yellowstone Club assets occurred around May 13th
15th of 2009.  The auction for the sale of the Club assets occurred at the Billings
Crowne Plaza Hotel.  The bidders at the auction were Credit Suisse and
CrossHarbor (Byrne's company).  However, also present and participating in the
auction were the Debtor (i.e., the Yellowstone Club which was effectively
controlled by Byrne), and the Unsecured Creditors Committee.  Judge Kirscher
rented a room at the hotel to facilitate ex parte communications between the
bidders.  The auction itself was not public.  Instead it was conducted in closed
door negotiations between CrossHarbor and Credit Suisse, with the Unsecured
Creditors Committee being allowed to participate to some limited extent.
Although my local counsel Joel Guthals, was present at the hotel, he was not
allowed to participate in the auction, had no participation in the bidders' ex parte
communications with Judge Kirscher, and was otherwise locked out from the
negotiations.  Even though the negotiations were "closed door", Judge Kirscher
nevertheless met with the CrossHarbor and Credit Suisse at the hotel during their
negotiations to resolve bidding issues as they arose.  Immediately following these
closed door negotiations with CrossHarbor and Credit Suisse, Judge Kirscher
approved the Plan of Reorganization for the Yellowstone Club and sale of the
Club's assets to CrossHarbor on May 18, 2009 with no formal notice to me, or
other interested parties.  The altered Plan substantially affected creditors' rights.

18.    During the initial phase of AP-14, I raised the obvious problem that Stephen R.
Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula, Montana
was at the time of the filing of the Yellowstone Club bankruptcy, my counsel in
Montana.  Yet, Mr. Brown was also a voting member and chairman of the
Yellowstone Club Unsecured Creditors Committee, which was suing me in AP-14
for the recovery of $209 million.  Further, Mr. Brown in his capacity as a member
of the UCC had turned over to the UCC and its counsel over 400 email
communications between his firm and me or my other attorneys which could
potentially contain attorney-client privileged discussions.  When Mr. Brown

6

turned over these emails to the UCC, Mr. Brown failed to inform me of this as
required by the ABA Model Rules of Professional Conduct.  When I learned of
this disclosure, I raised before Judge Kirscher the gross problem that my current
counsel had turned over to my adversary, the UCC, over 400 potentially
privileged communications.  Instead of Judge Kirscher allowing me to review
these communications, Judge Kirscher reviewed these documents *in camera*
without giving me a chance to review them and determine what Judge Kirscher
reviewed or opinions he potentially formed by this *in camera* review.  To date,
Judge Kirscher has never given me the opportunity to review these potentially
attorney-client privileged documents.

* * *

20.     Despite the new lawsuit against me seeking hundreds of millions in damages filed
on the eve of trial implicating numerous new defenses and required discovery, the
bankruptcy court merely continued the trial for one week then subsequently and
scurrilously accused me of delaying tactics by insisting on my due process rights,
and most significantly refused to accept my pre-trial order with the new defenses
to the one week old law suit.

* * *

23.     . . .  The court had previously deprived us of critical defenses by excluding the
[Marital Settlement Agreement] MSA and Releases from my proposed Pre-Trial
Order.  The other side's lawyers argued that the releases were not in their Pre-
Trial Order and Judge Kirscher commented that he specifically recalled not
including the Releases in the PTO.  My attorney directed Judge Kirscher to where
the Releases were inadvertently left in the UCC's Pre-Trial Order as a trial
exhibit.  Judge Kirscher paused to thumb through his copy of the PTO and upon
discovering that the Releases were included, he leaned back in his chair, gave a
glaring stare at the Debtor's attorney, Andy Patten, and then threw the PTO across
his desk with great force saying "Yes, it's still in" as if he had relied upon the
manipulation of the UCC and the Debtor keeping my critical affirmative defenses
out of the PTO.  The manner in which Judge Kirscher showed disgust with having
the Releases included in the PTO inadvertently, gave the appearance that his
intent and the intent of the Debtor's and the UCC was to deprive me a critical
affirmative defense in a lawsuit in which I was sued literally only few days before
trial commenced.

Mr. Blixseth's Supplement Affidavit, like the Amended Affidavit, alleges that this Court

denied Mr. Blixseth due process and that the Court failed to address whether the Yellowstone

7

Club bankruptcies were filed in good faith.  Mr. Blixseth similarly argues that the Court deprived Ms. Blixseth's bankruptcy estate of $100 million and that the Court used a states secrets privilege and a Nevada protective order to conceal Ms. Blixseth's on-going fraud.

APPLICABLE LAW

Two provisions of the U.S. Code address recusal, 28 U.S.C. § 144 and 28 U.S.C. § 455. In 1974, § 455 was amended to read in pertinent part:  "(a) Any . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.  (b) He shall also disqualify himself in the following circumstances:  (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge or disputed evidentiary facts concerning the proceeding . . . ."  The other provisions of §455, (b)(2) through (b)(5), objectively and specifically set forth the "interest" and "relationship" grounds of recusal covered by § 455 prior to the 1974 amendment.  Subsection (b)(1) duplicated the grounds of "bias or prejudice" for recusal contained in § 144, without the procedural requirements.   Subsection (a) is a "catchall" provision covering "interest and relationship" and "bias and prejudice" requiring an objective evaluation.  *See generally Liteky v. U.S.*, 510 U.S. 540, 114 S.Ct. 1147, 1153-54, 127 L.Ed.2d 474 (1994).  The test for disqualification under either §§ 455(a) or 455(b)(1) is "whether a reasonable person with knowledge of all the facts would conclude that [his] impartiality might reasonably be questioned."  *In re Focus Media, Inc.*, 378 F.3d 916, 929 (9th Cir. 2004), quoting *United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000); and *In re Goodwin*, 194 B.R. 214, 222 (9th Cir. BAP 1996).  Given the 1974 amendment, courts have concluded that § 144 only applies to district court judges.  *Goodwin*, 194 B.R. at 221.  *See also* FED. R. BANKR. P. 5004(a) ("A bankruptcy judge shall be governed by 28 U.S.C. § 455, . . .").  The consequence of § 144

8

not applying is that "the judge is not required to take the factual allegations as true." *Goodwin*,

194 B.R. at 222.  The obligation to recuse, if warranted, is juxtaposed with the corresponding

obligation to not recuse and to serve on assigned cases when no reason to recuse exists.  *Hinman*

*v. Rogers*, 831 F.2d 937, 339-40 (10th Cir. 1987).  Given the foregoing, I will consider the cases

presented by Mr. Blixseth and discuss whether they apply to the pending motion.

    Mr. Blixseth, in his amended motion, seeks my disqualification under 28 U.S.C. § 455(a),

which reads: "Any justice, judge, or magistrate judge of the United States shall disqualify himself

in any proceeding in which his impartiality might reasonably be questioned."  Relying on *United*

*States v. Furst*, 886 F.2d 558, 582 (3rd Cir. 1989); *United States v. Balistrieri*, 779 F.2d 1191,

1199 (7th Cir. 1985), *cert. denied sub nom. DiSalvo v. United States*, 475 U.S. 1095, 106 S.Ct.

1490, 89 L.Ed.2d 892 (1986); *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976), *cert.*

*denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976); *United States v. Dodge*, 538 F.2d

770 (8th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); *Parrish*

*v. Board of Comm'rs. of Alabama State Bar*, 524 F.2d 98 (5th Cir. 1975), *cert. denied*, 425 U.S.

944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); and *People v. Julien*, 47 P. 3d 1194, 1199 (Colo.

2002), Mr. Blixseth argues in his Amended Motion that "the factual allegations made in support

of the motion are true [sic] are assumed as true."  Amended Motion, p.7.  While the above-cited

cases are instructive, they are distinguishable.

    In *Furst*, the defendant sought recusal of the presiding judge under § 455 because of ex

parte communications with defense counsel.  The presiding judge denied the defendant's request

for recusal.  On appeal and after noting that § 455 does not establish any form of procedure for

consideration of recusal motions, the Third Circuit looked first to the procedures established

9

under 28 U.S.C. § 144:

> 28 U.S.C. § 144[1] sets forth a procedure by which a party may seek a judge's recusal.  Thus, we will look to section 144 and our case law under that recusal provision for guidance as to procedure.  *Cf. Johnson v. Trueblood*, 629 F.2d 287, 290 (3d Cir.1980) ( "both statutes require the same type of bias for recusal"), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *id.* (" § 455(a) was intended only to change the standard the district judge is to apply to his or her conduct").[2]  This seems particularly appropriate as Furst's attorney's affidavit filed with the motion for disqualification complied with the procedure set forth in section 144, and so, had the motion merely included a reference to section 144, we would have analyzed the motion directly under that section.

*Furst*, 886 F.2d at 582.  However, the presiding judge in *Furst* acknowledged his ex parte

communications with defendant's counsel and thus, the Third Circuit concluded:

> As a result of the extent to which the district court confirmed the underlying facts upon which the recusal motion relied, we need not resolve the issue of whether a judge need accept as true the allegations presented in a motion for disqualification under section 455 which asserts a basis as to which section 144 is applicable and which includes an affidavit sufficient under section 144. It is

---

[1]  Section 144 states:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of an adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

[2]  The major benefit that a party receives by filing a motion for disqualification under section 455 instead of section 144 is that section 455(a) obviates the need to assert actual bias-if it is shown that the judge's impartiality might reasonably be questioned recusal is required.  To the extent that Furst's motion asserted only actual bias under section 455(b) he would have received no discernable benefit from filing under this section.

> sufficient that we state that where the basic underlying facts as set forth in the affidavit supporting a recusal application are not in dispute, the district court should not minutely examine the movant's characterization of them, and weigh the court's memory of what happened against that of the affiant. We think it simply inappropriate in the circumstances here for the court to have made a credibility assessment of itself. Consequently, we hold that the district judge improperly considered the truth of the asserted grounds for his recusal.

*Id.* at 583.

In this case, Mr. Blixseth's Amended Motion does not reference 28 U.S.C. § 144 and more importantly, Mr. Blixseth's Amended Motion is not accompanied by a certificate of counsel of record stating that it is made in good faith. Under the facts of this case, it is not clear whether the *Furst* Court would apply the § 144 take-as-true requirement to Mr. Blixseth's § 455(a) motion.

The discussion of § 144 and § 455 by the court in *Balistrieri* is more relevant. In addressing § 144, the court in *Balistrieri* first noted that a judge is allowed to pass only on the timeliness and sufficiency of a party's affidavit. "[I]n passing on the legal sufficiency of the affidavit, the judge must assume that the factual averments it contains are true, even if he knows them to be false." 779 F.2d at 1199. However, the factual averments, to be accepted as true, must be more than

> mere conclusions, opinions, or rumors. *United States v. Haldeman*, 559 F.2d 31, 134 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). They must be stated with particularity, *id*. at 131, and must be definite as to times, places, persons, and circumstances. *Id*. at 134. The factual averments must show that the bias is personal rather than judicial, *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977), and that it stems from an extrajudicial source-some source other than what the judge has learned through participation in the case. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).

*Id.* The *Balistrieri* Court went on to conclude that the judicial interpretations of "personal bias or prejudice" under § 144 were equally applicable to § 455(b)(1), even though § 455(b)(1) is not a reenactment of § 144. The court in *Balistrieri* specifically found that a judge was not required to take all factual averments in an affidavit as true under § 455(b)(1), but rather, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his own personal knowledge." *Id.* at 1202.

The Court in *Balistrieri* provided little guidance with respect to § 455(a) other than its holding that an application for a writ of mandamus was a party's sole avenue of recourse when a judge denied a motion under § 455(a). 779 F.2d at 1205. The court reasoned that § 455(a) was "not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process.*" Id.* at 1204. The court therefore concluded that denial of a motion under § 455(a) was not reviewable on appeal because § 455(a) did not affect a substantial right of the appellant. *Id.* Rather, "if a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole and not to the substantial rights of the parties. The parties in fact receive a fair trial, even though a reasonable member of the public might be in doubt about its fairness, because of misleading appearances." *Id.* at 1204-05.

In *Ritter*, the government appropriately filed a mandamus petition under §§ 144 and 455(a). 540 F.2d 459. The court in *Ritter* first noted that § 144 "allows a party to request disqualification of a district judge when he has a personal bias or prejudice either against him or in favor of any adverse party. It also prescribes procedure. The filing of the affidavit does not bring about the disqualification. The trial court determines its sufficiency. The review is,

12

however, restricted to its legal sufficiency and does not include the truth of the allegations.  There

must be facts, however, to establish personal bias.  Section 455(a) is broader.  It applie[s] to any

judge and includes that he 'shall disqualify himself in any proceeding in which his impartiality

might be reasonably questioned.'"  *Ritter*, 540 F.2d at 461-62.  The court continued:

> Under the broader standard of revised Section 455(a), disqualification is
> appropriate not only where there is actual or apparent bias or prejudice, but also
> when the circumstances are such that the judge's "impartiality might be reasonably
> questioned." *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure:
> Jurisdiction, Section 3549. Thus, the grounds for disqualification set out in
> Section 144 "personal bias or prejudice either against (a party) or in favor of any
> adverse party" are included in Section 455. Moreover, the language of Section
> 455(a) allows a greater flexibility in determining whether disqualification is
> warranted in particular situations. 13 Wright, Miller & Cooper, Section 3542.

*Id*. at 462.  Although the Tenth Circuit found that the government had failed to show actual bias,

the Tenth Circuit did find that given the broad language of § 455(a), disqualification of the

presiding judge was appropriate because based upon all the facts, it was not reasonably likely that

the matter could be tried with the impartiality that litigants have a right to expect.

*U.S. v. Dodge* dealt in part with a trial judge's denial of a request to recuse himself.  538

F.2d 770.  The court in *Dodge* considered the appeal under both § 144 and § 455.  Without

providing any meaningful discussion, but instead citing only to the applicable language of §§ 144

and 455, the court in *Dodge* accepted the truth of the facts recited in the affidavits and concluded

that allegations that the trial judge had recused himself in the trials of two other defendants

arising from the same incident, that the judge had made derogatory comments about certain

Indian spectators at an earlier civil trial, that the judge had made derogatory comments about

certain members of a group to which the particular defendant belonged, that the judge had made

allegedly improper rulings in other prosecutions arising out of the same incident, and that the

judge had failed to grant temporary injunctive relief sought by an Indian organization during the time of the incident, did not indicate that the judge possessed a personal bias or prejudice against the moving defendant sufficient to require the judge to recuse himself.

The first topic of discussion in *Parrish* was § 144.  Similar to every case this Court has read on § 144, the court in *Parrish* recognized that,

> [t]he threshold requirement under the § 144 disqualification procedure is that a party file an affidavit demonstrating personal bias or prejudice on the part of the district judge against that party or in favor of an adverse party.  Once the affidavit is filed, further activity of the judge against whom it is filed is circumscribed except as allowed by the statute. In terms of the statute, there are three issues to be determined: (1) was the affidavit timely filed; (2) was it accompanied by the necessary certificate of counsel of record; and (3) is the affidavit sufficient in statutory terms?  *See generally* 13 Wright, Miller & Cooper, Federal Practice and Procedure ss 3541-53 (1975).
>
> We are concerned only with the third issue. As we said in *Davis v. Board of School Commissioners of Mobile County*, 5 Cir., 1975, 517 F.2d 1044:
>
>> "Once the motion is filed under § 144, the judge must pass on the legal sufficiency of the affidavit, but may not pass on the truth of the matters alleged.  *See Berger v. United States*, 1921, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; *United States v. Roca-Alvarez*, 5 Cir., 1971, 451 F.2d 843, 847-48; *United States v. Townsend*, 3 Cir., 1973, 478 F.2d 1072."
>
> 517 F.2d at 1051.

*Parrish*, 524 F.2d at 100.

After concluding that the factual bases alleged for recusal were legally insufficient under § 144, the court in *Parrish* proceeded to examine § 455.  In discussing § 455(a), the court wrote:

> There are now several standards in § 455.  Some go to specific conduct, but one, set out in § 455(a), is general and does not rest on the personal bias and prejudice stricture of §§ 144 and 455(b)(1).  As we noted in *Davis, supra*, 517 F.2d at 1052, the language of § 455(a) was intended to displace the subjective "in the opinion of the judge" test for recusal under the old statute, and the so-called "duty to sit decisions". We also noted that § 455(a) was intended to substitute a

14

"reasonable factual basis reasonable man test" in determining whether the judge
should disqualify himself. *See* 13 Wright, Miller & Cooper, Federal Practice and
Procedure s 3542 (1975). *See also*, Frank, Commentary on Disqualification of
Judges-Canon 3c, 1972, Utah L.Rev. 377, 379. Note, Disqualification of Judges
and Justices in the Federal Courts, 86 Harv.L.Rev. 736, 745-50 (1973).

*Parrish*, 524 F.2d at 103. Applying the reasonable man test, the *Parrish* Court concluded that "a

reasonable man would not infer that [the presiding judge]'s 'impartiality might reasonably be

questioned'." *Id.*

Finally, Mr. Blixseth relies on *People v. Julien* to support his contention that the factual

allegations made in support of his motion must be assumed as true. The issue in *Julien* was two-

fold. First, "whether the trial judge's previous employment with the district attorney's office

constituted an appearance of impropriety mandating reversal of the defendant's judgment of

conviction where the judge had no involvement in the defendant's case while employed with the

district attorney" and second, "[w]hether, assuming there was an appearance of impropriety, the

trial judge's failure before trial to disclose to the defendant his previous employment with the

district attorney's office and to recuse himself when a motion to recuse was filed before

sentencing constituted harmless error." *Julien*, 47 P.3d at 1195. Resolution of the issue

involving prior governmental association turned in part on the language of Canon 3 of Colorado's

Code of Judicial Conduct, which language was identical to the American Bar's Association's

Model Code of Professional Responsibility and Code of Judicial Conduct. In construing

Colorado's Code of Judicial Conduct, the court in *Julien* looked to cases interpreting § 455(a)

and (b)(3).

The second issue in *Julien* dealing with disqualification was governed by C.R.S.A. § 16-

6-201, which read:

15

> A motion for change of judge on any ground must be verified and supported by the affidavits of at least two credible persons not related to the defendant, stating facts showing the existence of grounds for disqualification. If the verified motion and supporting affidavits state facts showing grounds for disqualification, the judge must enter an order disqualifying himself. After disqualifying himself, the judge may require a full hearing upon the issues raised by the affidavits and shall request that another judge conduct the hearing. The other judge shall make findings of fact with regard thereto, and such findings shall be included as a part of the trial court record.

*Julien*, 47 P.3d at 1199. The court in *Julien* noted that: "In ruling on the disqualification motion, a judge must accept as true the factual statements contained in the motion and affidavits. *People v. Botham*, 629 P.2d 589, 595 (Colo.1981). The judge must determine as a matter of law whether they allege legally sufficient facts for disqualification. *S.S. v. Wakefield*, 764 P.2d 70, 73 (Colo.1988)." *Id*. Although the presiding judge in *Julien* had been employed by the district attorney's office five weeks before his assignment to the moving party's case, the court in *Julien* found that the record did not support disqualification of the presiding judge where the moving party did not contend that the presiding judge had any actual bias or prejudice against him or any disqualifying interest in the case. *Id.* at 1200. C.R.S.A. § 16-6-201 requires that a motion for disqualification be verified and supported by the affidavits of at least two credible persons not related to the defendant. Section 455, unlike C.R.S.A. § 16-6-201, does not require that Mr. Blixseth file any affidavits, particularly affidavits of unrelated persons. If anything, C.R.S.A. § 16-6-201 is more similar to § 144, which requires that a motion for disqualification be accompanied by a certificate of counsel stating that the motion is made in good faith. This Court fails to see *Julien's* relevance to this case.

Instead, this Court agrees with the court's observation in *United States v. Eisenberg*, 734 F.Supp. 1137, 1160 (D. N.J. 1990), that the procedural requirements of § 144 and § 455 differ.

This is so because § 455 does not contain the same procedural safeguards as § 144. *State of Idaho v. Freeman*, 507 F.Supp. 706, 715 (D. Ida. 1981) (In discussing § 21 of the Judicial Code of 1911, which was the predecessor to § 144, the court noted that it appeared "that Congress intended the perjury statute available against a false affidavit and disciplinary proceedings against the attorney to be sufficient to deter trivial and speculative allegations."). As the foregoing discussion illustrates, this Court is not required to accept all facts in Mr. Blixseth's Amended and Supplemental Affidavits as true. *In re American Ready Mix, Inc.*, 14 F.3d 1497 (10th Cir. 1994), *cert. denied*, 513 U.S. 818, 115 S.Ct. 77, 130 L.Ed.2d 31 (1994) (Under § 455, "factual allegations do not have to be taken as true," and "[t]here is as much obligation for a judge not to recuse when there is no occasion ... to do so as there is ... to [recuse] when there is."); *Goodwin*, 194 B.R. at 221("the requirement of section 144 that the judge assume that the facts asserted in the affidavit are true and examine them only to determine their legal sufficiency" does not apply to bankruptcy judges). However, even if the Court did accept all allegations as true, which it does not, Mr. Blixseth's alleged facts are not legally sufficient for recusal because the applicable factual averments in Mr. Blixseth's Amended and Supplement Affidavits are either based upon heresay or reflect Mr. Blixseth's personal conclusions and opinions.

The Ninth Circuit Court of Appeals notes that although "section 455 is stated in terms of a self-enforcing obligation upon the judge, it may be invoked by a party." *Klenske v. Goo (In re Manoa Finance Co., Inc.)*, 781 F.2d 1370, 1373 (9th Cir. 1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). The test for determining whether a judge should recuse "himself under section 455(a) is 'whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant

17

doubt about the judge's impartiality.'" *U.S. v. Torkington*, 874 F.2d 1441, 1446 (11ᵗʰ Cir. 1989),

quoting *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988).  The Tenth Circuit

Court of Appeals in *Frates v. Weinshienk*, 882 F.2d 1502, 1504 (10ᵗʰ Cir. 1989) further instructs

that:

> A bankruptcy judge may preside over both the administrative and
> adversarial portions of a bankruptcy case.  *See* 28 U.S.C. § 157.  But recusal is
> necessary if there is evidence of actual bias, if the bankruptcy judge by words or
> actions reasonably appears to have prejudged adversarial proceedings over which
> he is to preside, or if the judge appears "boxed in" by prior rulings such that he
> will be forced to reach a certain result in an adversarial proceeding regardless of
> the merits.  We do not, however, read our cases or any other authorities to require
> a judge who approves a Chapter 11 reorganization plan automatically to disqualify
> himself from presiding over adversarial proceedings that will affect the total
> recovery of the bankrupt's creditors.

The Court also recognizes that "familiarity with defendants and/or the facts of a case that

arises from earlier participation in judicial proceedings is not sufficient to disqualify a judge from

presiding at a later trial." *Steering Committee v. Mead Corp. (In re Corrugated Container

Antitrust Litigation)*, 614 F.2d 958, 965 (5th Cir. 1980) (footnote omitted), *cert. denied*, 449 U.S.

888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).  In many ordinary litigation situations judges make

preliminary decisions on offers of evidence, or make decisions otherwise affecting the parties,

that familiarize the judge with the facts in that case or in related cases in which the judge must

rule.  The Bankruptcy Code and 28 U.S.C. § 157, by permitting the presiding judge in a

reorganization to preside over adversary proceedings affecting the assets, contemplate that

bankruptcy judges will encounter situations similar to the case *sub judice* with some frequency.

In such situations, the Ninth Circuit Court of Appeals suggests "that judges sitting in bankruptcy

be especially solicitous in maintaining both the appearance and reality of impartiality when

adjudicating matters with which they have had close involvement, erring on the side of recusing themselves when appropriate." *Manoa*, 781 F.2d at 1373.

The foregoing comports with the Supreme Court of the United States' decision in *Liteky*, 510 U.S. 540, wherein the Supreme Court addressed the question of whether the so-called extrajudicial source doctrine applied by lower courts under § 144 also applied to motions brought under § 455(a). In *Liteky*, the Supreme Court concluded that the "extrajudicial source" doctrine, to the extent it exists, does indeed apply to § 455(a). *Id.* 510 U.S. at 554. In reaching its decision, the Supreme Court explained:

> The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a necessary condition for "bias or prejudice" recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a sufficient condition for "bias or prejudice" recusal, since some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not suffice. Since neither the presence of an extrajudicial source necessarily establishes bias, nor the absence of an extrajudicial source necessarily precludes bias, it would be better to speak of the existence of a significant (and often determinative) "extrajudicial source" factor, than of an "extrajudicial source" doctrine, in recusal jurisprudence.
>
> The facts of the present case do not require us to describe the consequences of that factor in complete detail. It is enough for present purposes to say the following: First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S., at 583, 86 S.Ct., at 1710. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support

19

a bias or partiality challenge.  They may do so if they reveal an opinion that
derives from an extrajudicial source; and they will do so if they reveal such a high
degree of favoritism or antagonism as to make fair judgment impossible.  An
example of the latter (and perhaps of the former as well) is the statement that was
alleged to have been made by the District Judge in *Berger v. United States*, 255
U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against
German-American defendants: "One must have a very judicial mind, indeed, not
[to be] prejudiced against the German Americans" because their "hearts are
reeking with disloyalty."  *Id*., at 28 (internal quotation marks omitted).  Not
establishing bias or partiality, however, are expressions of impatience,
dissatisfaction, annoyance, and even anger, that are within the bounds of what
imperfect men and women, even after having been confirmed as federal judges,
sometimes display.  A judge's ordinary efforts at courtroom administration-even a
stern and short-tempered judge's ordinary efforts at courtroom
administration-remain immune.

510 U.S. at 554-56, 114 S.Ct. at 1157.

Lastly, the Ninth Circuit Court of Appeals held in *United States v. Studley*, 783 F.2d 934,

939 (9th Cir.1986), "that a [§ 144] motion for recusal filed weeks after the conclusion of a trial is

presumptively untimely absent a showing of good cause for its tardiness."  Section 455 does not

contain such time limitations.  Furthermore, I do not regard Mr. Blixseth's delay as fatal because

a recusal motion should be permitted at any time it becomes apparent that a judge is biased or

suffers from the appearance of bias.  Mr. Blixseth's delay, though, suggests that Mr. Blixseth did

not regard my prior rulings as greatly debilitating to his position.

As noted previously, after reviewing the applicable law under § 455(a), the Court

disagrees with Mr. Blixseth's position that the Court must accept his factual averments as true.

Rather, the Court may assign to the evidence what it believes to be its proper weight.  I may also

contradict the evidence with facts drawn from my own personal knowledge.  After reviewing Mr.

Blixseth's Amended and Supplemental Affidavits, I conclude that recusal is not necessary.  The

matters about which Mr. Blixseth complains occurred in the course of these proceedings and do

20

not show that I relied upon knowledge acquired outside these proceedings or that I have a deep-seated and unequivocal antagonism that would render fair judgment impossible. *See Liteky*, 510 U.S. at 556, 114 S.Ct. at 1158.

DISCUSSION

Mr. Blixseth's complaints fall into four general categories: (1) ex parte communications; (2) the Stephen Brown emails; (3) favoritism toward Ms. Blixseth and Byrne; and (4) denial of Mr. Blixseth's due process.  Mr. Blixseth's complaints regarding ex parte communications fall into three separate sub-categories: that my law clerk, Terry Healow, had an ex parte communication with Ross Richardson, and that during such communication, Mr. Healow used a word that shows bias against Mr. Blixseth; that I held ex parte meetings with parties involved in the Yellowstone Club bankruptcy; and that I and my staff have had numerous email communications with attorneys involved in this case which show that I have a close, personal relationship with said attorneys, which relationship precludes me from entering fair and unbiased decisions.

<u>Ex Parte Communications</u>.

Mr. Blixseth first argues that on June 10, 2010, he received a phone call from Mr. Amsden regarding Mr. Blixseth's settlement with his client, the Chapter 7 Trustee in the Yellowstone Club World bankruptcy, Ross Richardson.  During that phone conversation, Mr. Amsden apparently relayed to Mr. Blixseth the fact that my law clerk, Terry Healow, had telephoned Mr. Richardson inquiring as to whether Mr. Richardson had finalized a settlement with Mr. Blixseth.  Mr. Blixseth asserts that Mr. Richardson advised Mr. Healow that the settlement was almost complete but that a few matters needed to be addressed before it could be

21

finalized.  In response, Mr. Healow allegedly told Mr. Richardson to hurry up and get the settlement finalized before Mr. Blixseth could "renege."

First, it is not clear from Mr. Blixseth's Affidavit and the attached Exhibit A whether my law clerk Terry Healow used the word "renege" in his conversation with Mr. Richardson, or whether that is Mr. Blixseth's interpretation of what was relayed to him through Mr. Amsden. Second, I do not recall asking Mr. Healow to place a call to Mr. Richardson and I similarly do not recall waiting for any settlement involving the Yellowstone Club World bankruptcy estate and Mr. Blixseth.

There are essentially five bankruptcies (one consisting of the four Yellowstone Club entities; the second being BLX Group, Inc.; the third being Ms. Blixseth's personal bankruptcy; the fourth being Big Springs Realty, LLC; and the fifth being Yellowstone Club World, LLC) and 28 associated Adversary Proceedings.  In an attempt to refresh my recollection, I reviewed the applicable cases and do not see anywhere in the records where the Court would have been anticipating the receipt of a settlement between the trustee of Yellowstone Club World bankruptcy and Mr. Blixseth at or around June 12, 2010, the date Mr. Amsden and Mr. Blixseth were exchanging text messages.  While the Court has not reviewed the docket in each of the 36 separate cases, the Court has reviewed the dockets in Yellowstone Mountain Club, LLC and Yellowstone Club World, LLC, including its 3 associated adversary proceedings.  The Court sees nothing in the Yellowstone Mountain Club bankruptcy that would prompt me to inquire about a stipulation between Mr. Blixseth and Mr. Richardson.  Two of the adversary proceedings tied to the Yellowstone Club World bankruptcy do not involve Mr. Blixseth.  In the third adversary proceeding, adversary proceeding no. 09-00086, it appears the Honorable John L. Peterson

22

**Case No. 12-35986 ER  123**

conducted a mediation on February 11, 2010, and May 5, 2010.  As noted earlier, the Court sees

no reason why it would have anticipated a settlement in Adversary Proceeding 09-86, and in fact,

the Court entered a Memorandum of Decision and Order on June 9, 2010, granting Mr.

Blixseth's motion to dismiss for lack of subject matter jurisdiction thereby dismissing a third

party complaint filed against Mr. Blixseth.  It was not until June 29, 2010, when Mr. Richardson

and Mr. Blixseth filed a joint motion to vacate deadlines, that the parties mentioned a settlement

in that matter.  Learning of a settlement on June 29, 2010, would not have prompted a telephone

call from the Court on or before June 12, 2010.

Finally, the Court can find nothing in 09-60061, the main Yellowstone Club World

bankruptcy case, that would have prompted a telephone call to the parties in early June of 2010.

The Court entered an Order on June 1, 2010, setting a telephonic status conference for June 2,

2010, on several matters, including Mr. Richardson's February 12, 2010, motion for order

approving a settlement with Mr. Blixseth.  I reviewed the transcript of the June 2, 2010, hearing

and see nothing in that transcript which would indicate that I was waiting for a further settlement

from Mr. Richardson and Mr. Blixseth.  To the contrary, I orally ruled on that date that

CrossHarbor did not have standing to object to Mr. Richardson's proposed settlement with Mr.

Blixseth.  Following the June 2, 2010, hearing and in accordance with my June 2, 2010, oral

ruling, the Court entered a Memorandum of Decision and Order on June 10, 2010, overruling

CrossHarbor Capital Partners' objection to Mr. Richardson's settlement with Mr. Blixseth,

granting Mr. Richardson's motion for order approving settlement, and approving the

"Memorandum of Understanding" between Mr. Richardson and Mr. Blixseth.

Furthermore, another law clerk in my Chambers, Kelli Harrington, has assisted me almost

exclusively on this case.  I would not generally ask one law clerk to make an inquiry about a case in which another law clerk is or was assisting me.  Given the fact that Mr. Healow has not generally assisted me with the Yellowstone Club bankruptcies and given the date of the text messages between Mr. Amsden and Mr. Blixseth and their proximity to a May 2010 mediation that was conducted by the Honorable John L. Peterson, I determined that perhaps Mr. Healow made the referenced telephone call to Mr. Richardson's office at the direction of Judge Peterson, and not me.  To confirm my suspicions, I posed such question to Mr. Healow and he specifically recalled placing a telephone call to Mr. Richardson regarding the whereabouts of a settlement.  However, the call was placed at the request of Judge Peterson, and not me.[3]

Next, Mr. Blixseth asserts: "The bankruptcy auction for the Yellowstone Club assets occurred around May 13[th] 15th of 2009.  The auction for the sale of the Club assets occurred at the Billings Crowne Plaza Hotel.  The bidders at the auction were Credit Suisse and CrossHarbor (Byrne's company).  However, also present and participating in the auction were the Debtor (*i.e.*, the Yellowstone Club which was effectively controlled by Byrne), and the Unsecured Creditors Committee.  Judge Kirscher rented a room at the hotel to facilitate ex parte communications between the bidders.  The auction itself was not public.  Instead it was conducted in closed door negotiations between CrossHarbor and Credit Suisse, with the Unsecured Creditors Committee being allowed to participate to some limited extent.  Although my local counsel Joel Guthals,

---

[3]  Mr. Healow advised me that he placed the telephone call to Mr. Richardson from his work phone in the Butte Federal building.  However, as a result of that one call, Mr. Blixseth subpoenaed not only Mr. Healow's calls for the January 18, 2011, hearing, but also requested that Mr. Healow produce his cell phone records and various email communications.  The subpoena was administratively denied as it was not in compliance with the Subpoena Regulations Adopted by the Judicial Conference.

was present at the hotel, he was not allowed to participate in the auction, had no participation in the bidders' ex parte communications with Judge Kirscher, and was otherwise locked out from the negotiations. Even though the negotiations were 'closed door', Judge Kirscher nevertheless met with CrossHarbor and Credit Suisse at the hotel during their negotiations to resolve bidding issues as they arose. Immediately following these closed door negotiations with CrossHarbor and Credit Suisse, Judge Kirscher approved the Plan of Reorganization for the Yellowstone Club and sale of the Club's assets to CrossHarbor on May 18, 2009 with no formal notice to me, or other interested parties. The altered Plan substantially affected creditors' rights."

A little background adds context to Mr. Blixseth's above claim. At a hearing held April 4, 2009, the Court approved the Debtors' Disclosure Statement and scheduled the hearing on confirmation of the Debtors' Amended Joint Plan of Reorganization for May 18, 2009, in Butte. The confirmation hearing was scheduled for May 18, 2009, to accommodate not only the Court's schedule but also the Debtors' expiring debtor-in-possession financing. Before confirmation could occur, the Court had to resolve at least a portion of the issues in Adversary Proceeding 09-00014. Phase one of the trial in Adversary Proceeding 09-00014 commenced on April 29, 2009, and concluded on May 5, 2009. The Court then granted the parties in Adversary Proceeding 09-00014 until May 11, 2009, to file post-trial briefs. Thereafter, on May 12, 2009, the Court entered a partial and interim order equitably subordinating Credit Suisse's claim. The Court's partial and interim order left unresolved the issues involving Mr. Blixseth, the issues regarding valuation of Debtors' assets and the question of whether Credit Suisse, whose collateral was subsequently valued on May 12, 2009, at $232 million, could credit bid at an auction of Debtors' assets.

25

The Court's May 12, 2009, partial and interim order in Adversary Proceeding 09-00014 and the Court's valuation order of that same date, set off a frenzy of activity, particularly as an auction of either Debtors' assets or 100% of the Debtors' equity was scheduled for May 13, 2009. The minute entries of the so-called closed meetings that allegedly took place at the Crowne Plaza Hotel can be found at docket entry nos. 1047 for May 12th, 1048 for May 13th, 1049 for May 14th and 1054 for May 15th. Those hearings, which Mr. Blixseth refers to as closed meetings, which included much of the actual bidding process between CrossHarbor and Credit Suisse, were held in the Federal Courthouse in Billings, not the Crowne Plaza Hotel. I must concede, however, that because my duty station is not in Billings and because I do not live in Billings, I did rent a hotel room at the Crowne Plaza Hotel, which is two blocks from the Federal Courthouse. I rented a room so I would have a place to sleep and shower and not a single person, other than myself, visited the room which I rented at the Crowne Plaza Hotel. Thus, Mr. Blixseth's statement that hearings were held in the Yellowstone Club entities' bankruptcies on May 12, 13, 14 and 15, 2009, is correct. Mr. Blixseth is also correct that I rented a room at the Crowne Plaza Hotel. However, Mr. Blixseth's contention that I rented a room at the Crowne Plaza Hotel to facilitate ex parte communications with parties involved in this bankruptcy proceeding is simply false.

The transcripts show that the parties were using a conference room at the Hotel to facilitate bidding. However, they lost access to that conference room and the ongoing negotiations concerning bidding naturally moved to the Federal courthouse in Billings where I was conducting ongoing hearings in the case. I recall during a recess from a hearing at the courthouse, I believe on May 13th, while I was visiting with court security officers that I greeted

26

Mr. Blixseth's counsel, Mr. Guthals, as he was walking through the lobby on the 5th floor of the courthouse. Mr. Guthals informed me that he was leaving the courthouse as none of the bidding parties wished to consult with him. I do not recall if Mr. Guthals returned. I also do not recall Mr. Blixseth personally attending any of the hearings during that week. The exchange between Mr. Guthals and myself occurred while parties were negotiating and determining who would be qualified bidders in various courtrooms and conference rooms at the courthouse. I was not involved in those meetings or discussions. From time to time the various parties would provide an update on their progress so I could plan when we would continue with any auction or required hearing. Also, they were attempting to keep me informed as to whether they were making any progress resolving contested issues involving confirmation.

The transcripts of the hearings held May 12th through May 15th show that the auction of the Debtors' assets was a collaborative effort between the Debtors, the Official Committee of Unsecured Creditors and the Ad Hoc Committee of Yellowstone Club Members. *See* docket entry nos. 1047, 1048, 1049 and 1054. Parties were working virtually around the clock to determine the extent of Credit Suisse's credit bid, to qualify bidders and to conclude an auction of the Debtors' assets prior to the May 18, 2009, confirmation hearing date.[4]

The long hours were taking a toll and patience was wearing thin. During that time, the parties would think they were on the brink of a global resolution, only to discover that they might be at an impasse. In fact, counsel for Credit Suisse commented on May 14th that there had to be an alternative to not reaching a resolution. The credit versus cash bidding process reached

---

[4] The hearing on confirmation of the Debtors' joint Chapter 11 plan was scheduled pursuant to an Order entered April 7, 2009.

another impasse on May 15th when neither Credit Suisse nor CrossHarbor would move from their

respective positions. At that time, I suggested that perhaps I should have a brief talk with Byrne

from CrossHarbor and Mr. Yankauer from Credit Suisse to see whether a resolution was at all

possible and whether the attorneys for the parties involved or the parties themselves were the

obstacles to some resolution. I inquired on the record if there was any objection to me talking

with Byrne and Yankauer on a limited basis and all parties present at the hearing voiced their

lack of objection. It was apparent during my brief discussion with Byrne and Yankauer that the

parties were close to a resolution, but at the same time, they were still very far apart. Court

reconvened only to take another recess so the parties could further negotiate and try to reduce to

writing any agreement in principle. When the Court once again reconvened, the remaining issues

between Credit Suisse and CrossHarbor related to one, Credit Suisse obtaining authority from its

lender groups to reach a resolution with CrossHarbor and two, the terms of a note from

CrossHarbor to Credit Suisse.

Unfortunately, the parties did not come to a meeting of the minds and finally, late on

Friday, May 15, 2009, at about 7:00 p.m. if my memory serves me correctly, and after the parties

had gone back and forth numerous times in clearly an adversarial process and tone, I instructed

all the parties to gather their belongings and leave the Billings courthouse. I immediately left

Billings to return to Butte, fully expecting that nothing would be resolved by Monday, May, 18,

2009.

During those four long days and because the parties were working almost around the

clock, it became clear that the bidding parties might need the Court's assistance outside normal

business hours. I did not want to give the parties information about where I was staying or how

28

they could contact me, so I advised the parties in open court that they could contact me through

Ms. Harrington if they had an emergency.  As previously noted, the bidding process had to be

concluded so the Court could move forward with confirmation on Monday, May 18, 2009.  On

the evening of either May 13th or May 14th, or perhaps both, the parties involved in the bidding

process, through Ms. Harrington, contacted me after hours to provide a status update regarding

their negotiations and to notify the Court whether the bidding process could be concluded by

May 15.  I met with the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc

Committee of Yellowstone Club Members and the two qualified bidders, CrossHarbor Capital

Partners and Credit Suisse, at the Crowne Plaza Hotel.  Any meeting was very brief and did not

in any way involve Mr. Blixseth.  My brief presence at the meeting obviously was not effective

because we continued with bidding and auction issues through May 15th, when the auction was to

have been completed on May 13th.  In fact, when I left the courtroom late on May 15th, I was not

convinced that any auction or any discussion of global resolution would occur prior to the

confirmation hearing scheduled for May 18th.

The meeting did not and could not have involved Mr. Blixseth because Mr. Blixseth did

not seek to qualify himself as a bidder, was not a qualified bidder and was thus not involved in

the actual bidding process.  Because Mr. Blixseth was not part of the bidding process and was not

involved in the last minute bidding negotiations, my brief meeting with the bidding parties was

not ex parte:

> The prohibition against ex parte contacts is based upon notions of procedural due
> process. *Guenther v. Commissioner of Internal Revenue*, 889 F.2d 882, 884 (9th
> Cir.1989). Procedural due process requires that a party be provided notice and an
> opportunity to respond. *Id*. If the party has no right to notice or an opportunity to
> respond, then it follows that the communication is not ex parte.

**Case No. 12-35986 ER  130**

*Goodwin*, 194 B.R at 222.

Moreover, the facts asserted by Mr. Blixseth with regard to the so-called ex parte communication do not establish bias or prejudice by the undersigned toward Mr. Blixseth. Mr. Blixseth's apparent displeasure with the fact that the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Yellowstone Club Members, Credit Suisse, and CrossHarbor Capital Partners did not include him in all aspects of the actual bidding process between Credit Suisse and CrossHarbor Capital Partners, does not now bootstrap the parties' request for guidance from the Court during the bidding process into a demonstration of prejudice. Such allegation by Mr. Blixseth is simply false.

Mr. Blixseth filed a Supplemental Affidavit on January 17, 2011. In the Supplemental Affidavit, Mr. Blixseth once again takes issue with this Court's alleged ex parte communications with various partes. In support of his claims of bias and prejudice, Mr. Blixseth filed a host of email communications between myself and various parties and Ms. Harrington and various parties.

Many of the emails are wholly unrelated to the Yellowstone Club bankruptcies or any of the related proceedings. For instance, the first string of email communications relate to the status of two adversary proceedings stemming from the Brenda Burkhartsmeier bankruptcy and two other bankruptcy proceedings. The email communication is between all counsel involved in those cases and is not ex parte communication. As stated earlier, neither the Kuntz nor the Burkhartsmeier bankruptcies have any connection to the Yellowstone Club cases.

The next string of emails was initiated by the individual in charge of organizing continuing legal education seminars for the Bankruptcy Law Section of the State Bar of Montana.

30

The email appears to have gone to all individuals who were doing presentations at the Montana Bankruptcy CLE held October 21 and 22, 2010, in Missoula, Montana. Each year, I and several other bankruptcy judges participate in the CLE. The next email communications are between me and Andy Patten regarding an article I wrote for the Bankruptcy Law Section's newsletter.

Next are emails between myself, Andy Patten and Doug James concerning the case of *Lehman Commercial Paper, Inc. v. Moonlight Basin Ranch, LP*, Adversary Proceeding No. 10-9. The email communications are administrative in nature and include counsel for the plaintiff and the defendant in that matter. The communications are not ex parte. Furthermore the communications have nothing to do with the Yellowstone Club bankruptcies.

The following string of emails relate once again to the preparation of the Bankruptcy Law Section newsletter, which is prepared by Andy Patten and other members of his firm. The next email is from Andy Patten to Ms. Harrington. The email is administrative in nature and merely transmits a proposed order concerning a matter in the case of *In re Glacier Stone Supply, Inc.*, Case No. 10-61638. It appears the email was sent to not only my law clerk, but also other interested parties in that case. The same holds true for the email that follows.

The next email was sent by my law clerk, Kelli Harrington, to Andy Patten. It appears that Mr. Patten was inquiring about my availability for a hearing regarding a new case. Counsel, including Mr. Blixseth's counsel, have been known to call my law clerks inquiring as to my availability to hold expedited hearings in various matters. This email appears to be a response to such an inquiry.

The next emails once again relate to either the 2009 Montana Bankruptcy CLE or my submission for the 2009 bankruptcy newsletter. The next emails are once again administrative

emails, generally pertaining to the submission of proposed orders in accordance with Mont. LBR 9013-1(i).  When motions contain unique language, such as property descriptions, my law clerks often call or email counsel and request that a proposed order be filed in accordance with our Local Rules.

In the midst of the foregoing email exchange is an email from Ms. Harrington to a person in Andy Patten's office.  At the beginning of the hearing on confirmation of Debtors' Chapter 11 plan held May 18, 2009, the Court was advised that bidding parties had, over the weekend and in the hours leading up to the confirmation hearing, reached a global settlement.  The parties had a single copy of an executed term sheet, which executed term sheet the parties presented to the Court.  At the request of Mr. Patten, the Court emailed a copy of the signed settlement term sheet to his office so that someone other than just the Court had a copy of the executed term sheet.

The next email string involves my law clerk's inability to locate a deposition.  The email was not ex parte as it includes most if not all counsel involved at that time in Adversary Proceeding 09-14, including Mr. Blixseth's counsel of record; Michael Flynn at mike@mjfesq.com and Joel E. Guthals at jeguthals@ghrtlawfirm.com.  The next emails are between Andy Patten and Judge Peterson.  I was not privy to those emails until Mr. Blixseth filed them on January 11, 2011.

As for the remaining emails, they, like numerous of the earlier emails, involve administrative, as opposed to substantive matters.  In most instances, it appears parties are trying to either schedule emergency hearings or my law clerk is trying to obtain proposed orders.  None of the emails contain inappropriate ex parte communications and I certainly do not find any bias or prejudice in the emails.

As discussed above, the emails, in and of themselves, do not establish bias or prejudice. However, the argument at the January 18, 2011, hearing shows that Mr. Blixseth seeks to show that I favor in-state counsel to the detriment of out-of-state counsel:

> And particularly with a small local bankruptcy bar here in Montana, it's -- that basically makes its living off this Court's ruling, it makes the task even more difficult, particularly understanding that this Court has under -- has had a distinguished reputation. And the parties, the attorneys that have to argue this are essentially attorneys from outside Montana, except for Mr. Fox, who does not practice before this Court.

The problem with such argument is that almost all parties involved in this case have or had out-of-state counsel, including the Debtors, the unsecured creditors' committee, CrossHarbor and Credit Suisse. Moreover, Mr. Blixseth has Montana counsel who have been active in this case, namely, Joel E Guthals of Billings, Montana and Daniel D. Manson of Butte, Montana. In addition, Mr. Blixseth has produced emails between me and Debtors' local counsel, Mr. Patten, seeming to suggest that we have some relationship beyond that of judge and attorney. If one were to look, one could undoubtedly find emails between myself and Mr. Blixseth's attorney, Joel E. Guthals, because in the past, Mr. Guthals, like Mr. Patten, has been an active participant in the Montana Bankruptcy CLE. My relationship with Mr. Patten is exactly the same as my relationship with Mr. Guthals; purely professional.

The Stephen R. Brown emails.

Mr. Blixseth claims that during the initial phase of Adversary Proceeding 09-14, he raised his concern that Stephen R. Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula, Montana, was at the time of the filing of the Yellowstone Club bankruptcy, Mr. Blixseth's counsel in Montana. Yet, Mr. Brown was also a voting member and chairman of the

Yellowstone Club's unsecured creditors committee, which was suing Mr. Blixseth in Adversary Proceeding 09-14 for the recovery of $209 million.  Brown testified, without contradiction from Mr. Blixseth, that Mr. Blixseth had encouraged Brown to be on the unsecured creditors' committee.  Notwithstanding his prior encouragement, Mr. Blixseth argues that Mr. Brown, in his capacity as a member of the unsecured creditors' committee, turned over to the unsecured creditors' committee and its counsel over 400 email communications between his firm and Mr. Blixseth or Mr. Blixseth's other attorneys which could potentially contain attorney-client privileged discussions.

Mr. Blixseth's counsel conceded at a hearing held December 2, 2010, that the emails referenced in Mr. Blixseth's Amended Affidavit are in fact emails between Mr. Brown as a member of the unsecured creditors' committee and the committee's counsel.  This Court previously found that Mr. Brown had not disclosed any information protected by Mr. Blixseth's attorney-client privilege.  Rather, the Court found that the emails contained information that was protected by the unsecured creditors' committee's attorney-client privilege.  As set forth in an Order entered by this Court on December 6, 2010, in Adversary Proceeding 09-14, "Mr. Blixseth has not cited any legal authority which would permit this Court to violate the Official Committee of Unsecured Creditors' attorney-client privilege without the Official Committee of Unsecured Creditors' consent."  The Court stands by such ruling.

Favoritism toward Ms. Blixseth and Byrne.

In his brief and at the hearing held January 18, 2011, Mr. Blixseth's counsel argued extensively that this Court's bias and prejudice is evident by the leniency this Court has showed toward Ms. Blixseth.  Mr. Blixseth's argument is interesting because this Court has basically had

34

**Case No. 12-35986 ER  135**

only one opportunity in which it was required to rule for or against Ms. Blixseth.  That one instance arose when the Office of the United States Trustee filed a motion to convert Ms. Blixseth's  Chapter 11 bankruptcy to one under Chapter 7 of the Bankruptcy Code.  Over Ms. Blixseth's vigorous objection, this Court did in fact convert Ms. Blixseth's case to Chapter 7 on May 29, 2009.  Over Ms. Blixseth's objection, this Court has also entered orders extending the deadline for the Chapter 7 trustee in Ms. Blixseth's bankruptcy to object to entry of Ms. Blixseth's discharge.  Pursuant to a stipulation filed January 5, 2011, Ms. Blixseth and the trustee resolved Ms. Blixseth's then pending objection, agreeing that the trustee would have through January 21, 2011, to file a complaint objecting to Ms. Blixseth's discharge.

Mr. Blixseth also argues that this Court has turned a blind eye to the fact that the Yellowstone Club bankruptcies were filed in bad faith.  In support of such contention, Mr. Blixseth cites to the transcript of April 29, 2009, from Adversary Proceeding 09-14, to a statement of uncontroverted facts filed July 2, 2010, by Mr. Blixseth in Adversary Proceeding 09-18, and a memorandum that Mr. Blixseth filed in Adversary Proceeding 09-18 on January 22, 2010.  Mr. Blixseth, however, fails to acknowledge that he called not a single witness to rebut the witness testimony presented by the Debtors at the May 18, 2009, confirmation hearing.  Also notable is that fact that Mr. Blixseth sought neither the dismissal nor conversion of either Ms. Blixseth's bankruptcy or the Yellowstone Club bankruptcies for bad faith.

Mr. Blixseth next maintains that this Court has entered rulings to protect Ms. Blixseth, even though Ms. Blixseth has committed millions of dollars of fraud on numerous parties.  More specifically, Mr. Flynn argues that Ms. Blixseth committed over $50 million of bank fraud which this Court ignored.  As examples, Mr. Blixseth referred to Ms. Blixseth's loans with Western

35

**Case No. 12-35986 ER  136**

Capital Partners and Wachovia Bank. Mr. Flynn characterized Ms. Blixseth's loan with Wachovia as "one of the most fraudulent loans in my 40 years of litigating, having represented bank presidents and CEOs and white-collar criminals." Mr. Flynn represented that "they" pledged nonexistent technology as collateral for the Wachovia loan. Mr. Flynn then asserts Ms. Blixseth pledged certain noise filtering technology software technology to Wachovia Bank in March of 2008 in violation of a Federal preliminary injunction.

Whether Ms. Blixseth pledged non-existent technology or whether she pledged technology in violation of an injunction, Wachovia Bank filed an adversary complaint against Ms. Blixseth on June 10, 2009, seeking to except the Wachovia obligation from Ms. Blixseth's discharge under 11 U.S.C. § 523(a)(2). *See* Adversary Proceeding 09-00034. Wachovia Bank and Ms. Blixseth eventually stipulated to the dismissal of that action on November 18, 2009. This Court entered three orders in that action: an order setting a pretrial scheduling conference, an order setting trial and an order approving the parties' stipulation for dismissal.

Before leaving this particular matter, the Court must comment on Mr. Blixseth's assertion that Ms. Blixseth's deposition testimony from the trial in Adversary Proceeding 09-14 sets forth the facts surrounding the bogus software. At the trial in Adversary Proceeding 09-14, Ms. Blixseth testified in person on May 4, 2009. Ms. Blixseth was not asked any questions about any software, bogus or otherwise, and because Ms. Blixseth testified in person, the Court had no reason to allow Ms. Blixseth's deposition testimony into evidence.

Continuing with Ms. Blixseth's fraud, Western Capital Partners filed an adversary complaint against Ms. Blixseth on November 30, 2009, seeking to except its debt from Ms. Blixseth's discharge under 11 U.S.C. § 523(a)(2). *See* Adversary Proceeding 09-00100. Mr.

Flynn argues that this Court is bootstrapped by prior rulings casting Ms. Blixseth's credibility in a favorable light, such as the Court's September 27, 2010, twenty-six page Memorandum of Decision in Adversary Proceeding 09-00100 wherein the Court denied Western Capital Partners' request for summary judgment. The Court's discussion on the matter is as follows;

In the pending matter, WCP has two hurdles to overcome: (1) all reasonable doubt as to the existence of genuine issues of material fact must be resolved against WCP; and (2) exceptions to discharge under § 523 are narrowly construed. Additionally, the Court does not consider WCP's motion in a vacuum, but rather, undertakes this case after having over 22 months of time on task with the Yellowstone Club and the associated proceedings, including Debtor's bankruptcy case.

The Court has heard a lot of testimony over the past 22 months about Debtor and her ex-spouse's long and bitter divorce. Debtor and Timothy L. Blixseth separated in December of 2006 and following the separation, Debtor claims she was "frozen out" of various business affairs for about two years, or until approximately mid-August of 2008, when Debtor was awarded various assets, including BLX Group, Inc. – which owned the ultra exclusive Yellowstone Club -- under the terms of a Marital Settlement Agreement.

Debtor has testified previously that she believed that her share of the marital assets were worth well in excess of $100 million between December of 2006 and August of 2008. The 2007 Loan Agreement at issue in this Adversary Proceeding and a modification of the Loan Agreement made in June of 2008 were all done during a period of time when Debtor was frozen out of the majority of the marital business dealings. Such fact precludes this Court from making a summary ruling that Debtor possessed the requisite intent to deceive WCP under either § 523(a)(2)(A) or § 523(a)(2)(B).

Moreover, WCP contends that it relied on certain representations made by Debtor. However, Debtor counters that WCP has not fully responded to discovery propounded in January of 2010. Debtor asserts that WCP has delayed responding to all Debtor's discovery requests on grounds WCP has information showing it knew Debtor's true financial position, but nevertheless proceeded to make the loan and modification at issue. The foregoing allegations raise a material issue of fact as to whether WCP relied on any statements made by Debtor. Such conclusion is buttressed by the fact that one of WCP's attorneys, Christopher J. Conant, also serves as counsel for Debtor's ex-spouse.

**Case No. 12-35986   ER   138**

> Finally, Debtor asserts that WCP has received payments in excess of $41 million toward the $13 million Loan Agreement.  Under such scenario, WCP may already be fully compensated, thus putting WCP's damages at zero.
>
> In sum, after construing § 523(a)(2) narrowly, the Court cannot determine beyond a reasonable doubt that Debtor made any statements, whether oral or in writing, with the intent to deceive WCP.  The Court similarly cannot conclude that WCP relied on statements made by Debtor.  Finally, WCP has not shown that any of its alleged damages were the proximate result of statements made by Debtor.  WCP has simply failed to satisfy its burden of proof at this stage of the litigation.

This Court disputes Mr. Blixseth's contention that it made any credibility finding in the above ruling. In said ruling, this Court merely denied Western Capital Partners' request for summary judgment.  The Court did not dismiss Western Capital Partners' complaint nor did it enter any type of ruling that precluded Western Capital Partners from pursuing its claim against Ms. Blixseth.

The Western Capital Partners adversary proceeding, however, never made it to trial. Rather, Western Capital Partners filed a joint motion to dismiss its action against Ms. Blixseth on October 26, 2010, which the Court granted.  Mr. Blixseth's counsel, Christopher J. Conant, should know that said action was dismissed by agreement of the parties because he was one of Western Capital Partners' counsel of record in that proceeding.

At the January 18, 2011, hearing Mr. Flynn also referred to another action involving Western Capital Partners as a "charade":  "most recently on the timeliness issue, occurred before this Court on October 12th with Mr. Cotner and Mr. Samson where this Court unilaterally, arbitrarily, without giving Mr. Cotner or myself an opportunity to be heard, piled double layers of hearsay and then issued findings that Ms. Mr. Blixseth is credible and believable on the issue of the bank frauds and the technology frauds and that Mr. Cotner was misled by me."  Mr. Flynn

38

obviously makes reference to a hearing held October 12, 2010, in Adversary Proceeding 09-00105 and the Court's resulting order entered October 25, 2010. Contrary to what Mr. Flynn argues, Mr. Cotner, who was retained as counsel by the Chapter 7 trustee in Ms. Blixseth's bankruptcy, was heard at the October 12, 2010, hearing and the Court's subsequent Order of October 25, 2010, makes not a single credibility finding as to Ms. Blixseth. Rather, that Order sets forth how Mr. Cotner came to file an amended counterclaim and amended third-party complaint that Mr. Cotner now believes contains numerous inaccuracies. The Court Order of October 25, 2010, found at docket entry no. 147 speaks for itself. In the above noted passage from the transcript of the January 18, 2011 hearing when Mr. Flynn makes reference to "Mr. Cotner or myself", I believe Mr. Flynn meant to say Mr. Conant and not Mr. Cotner.

As far as other matters involving Ms. Blixseth, other parties, including the Yellowstone Club World trustee, Source Capital, Palm Desert National Bank, Casa Captiva, Mr. Blixseth, Mr. Blixseth's attorney, Michael Flynn, and Mr. Blixseth's sons, Beau and Morgan Blixseth, have filed dischargeability complaints against Ms. Blixseth. Stipulations were reached in the Source Capital and Casa Captiva actions, and Palm Desert National Bank dismissed its action. Similarly, Ms. Blixseth and the Yellowstone Club World trustee just recently entered into a stipulation for dismissal of Adversary Proceeding 09-44. The adversary proceeding commenced by Beau and Morgan Blixseth has not yet gone to trial. Finally, both Mr. Blixseth and Mr. Flynn advised this Court during the respective pretrial scheduling conferences that they intended to voluntarily dismiss their actions against Ms. Blixseth. True to their representations, Mr. Blixseth and Mr. Flynn filed motions to dismiss their adversary proceedings against Ms. Blixseth on February 24, 2010. This Court entered orders granting the motions to dismiss on March 16,

Case No. 12-35986 ER  140

2010.  Ms. Blixseth's discharge was, subject to Beau and Morgan Blixseths' still pending adversary proceeding, entered on February 8, 2011.  As the facts demonstrate, other than the United States Trustee's motion to convert, this Court has not been presented with an instance where it had to rule either for or against Ms. Blixseth.

Having made few, if any credibility findings as to Ms. Blixseth, the Court fails to see how it disrupted a criminal investigation, of which I would have no knowledge nor should I have any knowledge, as Mr. Blixseth alleges.  Similarly, this Court fails to understand how it used a states secrets privilege or a Nevada protective order to conceal and gloss over Ms. Blixseth's ongoing fraud.  My knowledge of the Nevada secrecy order is limited to the facts presented to the Court by the parties in preparation for and at the October 12, 2010, hearing.

Denial of Mr. Blixseth's due process.

Finally, Mr. Blixseth contends that this Court has denied him due process.  Under this umbrella Mr. Blixseth asserts that this Court has precluded him from presenting facts relating to Ms. Blixseth's spoliation of evidence.  The Court's Order of January 22, 2010, entered at docket entry no. 546 in Adversary Proceeding 09-14 speaks for itself.  The Court would simply note that in that Order, the Court instructed that the matter needed "to be brought before the Court in the correct proceeding with service upon the appropriate parties." The Court noted therein that  Mr. Blixseth had "wholly failed to show any misconduct by YCLT or the Debtors in th[at] case.  This Court agrees with YCLT that a first party defendant is not, and should not be, responsible for the actions of a third party spoliator who is not a party to the litigation before the Court."

Next, Mr. Blixseth claims this Court denied him due process in Adversary Proceeding 09-14 because he was given only weeks to defend himself.  In a Memorandum of Decision entered

40

**Case No. 12-35986 ER  141**

June 11, 2009, at docket entry no. 292 in Adversary Proceeding 09-14, the Court explained why it was not persuaded by Mr. Blixseth's argument. Mr. Blixseth intervened into Adversary Proceeding 09-14, knowing at the time that the proceeding was scheduled for trial on an expedited bases. Moreover, Mr. Blixseth fails to mention that he called not a single witness in his defense at phase one of the trial in Adversary Proceeding 09-14. Having mounted a minimal defense after six days of trial, the Court entered its June 11, 2009, Memorandum of Decision suggesting to Mr. Blixseth that his trial tactics at the trial in April and May of 2009 were not particularly effective. The Court thus proceeded to leave the record open and continued the trial to February 24, 2010. That continuance was for the sole benefit of Mr. Blixseth. For the reasons discussed, the Court finds no bias or prejudice in Mr. Blixseth's statement that "the bankruptcy court merely continued the trial for one week then subsequently and scurrilously accused me of delaying tactics by insisting on my due process rights[.]"

Mr. Blixseth also avers that: "The court had previously deprived us of critical defenses by excluding the [Marital Settlement Agreement] MSA and Releases from my proposed Pre-Trial Order. The other side's lawyers argued that the releases were not in their Pre-Trial Order and Judge Kirscher commented that he specifically recalled not including the Releases in the PTO. My attorney directed Judge Kirscher to where the Releases were inadvertently left in the UCC's Pre-Trial Order as a trial exhibit. Judge Kirscher paused to thumb through his copy of the PTO and upon discovering that the Releases were included, he leaned back in his chair, gave a glaring stare at the Debtor's attorney, Andy Patten, and then threw the PTO across his desk with great force saying "Yes, it's still in" as if he had relied upon the manipulation of the UCC and the Debtor keeping my critical affirmative defenses out of the PTO. The manner in which Judge

41

Kirscher showed disgust with having the Releases included in the PTO inadvertently, gave the appearance that his intent and the intent of the Debtor's and the UCC was to deprive me a critical affirmative defense in a lawsuit in which I was sued literally only few days before trial commenced."

My frustrations in Adversary Proceeding 09-14 were numerous, but those frustrations were directed at all parties, not just Mr. Blixseth, and they do not equate to bias or prejudice.  For instance, the original parties in Adversary Proceeding 09-14 consisting of the Debtors, the unsecured creditors' committee and Credit Suisse had requested that trial in that matter be set on an expedited basis because the Debtors' financing was scheduled to mature on April 30, 2009. The Court's calendar was quite full and after some rearrangement, the Court set April 22, 2009, as the date trial was to commence in Adversary Proceeding 09-14.  However, after all the parties were seated in the courtroom on April 22, 2009, the Court was advised that not all the parties had provided paper copies of their exhibits to Mr. Blixseth.[5]  The Court's calendar was very full in May and June of 2009 and any continuance of the trial in Adversary Proceeding 09-14 left the Court with very little time to issue its ruling in Adversary Proceeding 09-14 prior to the scheduled May 18, 2009, confirmation hearing.  However, to give the parties time to produce their exhibits to Mr. Blixseth in hard copy and with the understanding that the debtor-in-possession financing would be extended for a short period of time, the Court continued the first phase of trial in Adversary Proceeding 09-14 to April 29, 2009.  Thus, the Court was upset when trial finally started on April 29, 2009, and it became apparent that the parties did not know what

_____

[5]  The exhibits were available to Mr. Blixseth by electronic means, but Mr. Blixseth's counsel stated they were unable to retrieve the electronic version of the exhibits.

42

was and was not in the final pretrial order prepared by the parties and submitted to the Court for approval.  But as noted earlier, that frustration does not equate to bias or prejudice and it certainly does not equate to bias or prejudice toward Mr. Blixseth.

Mr. Blixseth then argues that this Court entered its August 16, 2010, ruling in Adversary Proceeding 09-14 on the eve of trial in Adversary Proceeding 09-18, effectively "precluding Mr. Blixseth from establishing at trial why the B shareholder claim against him failed both legally and factually and therefore why he should not be required to satisfy their $22 million claim either through being included within a judgment in AP-14, or in AP-18."  Entry of my decision in Adversary Proceeding 09-14 was driven solely by my workload.  The second phase of the trial in Adversary Proceeding 09-14 concluded on February 26, 2010.  I generally strive to enter rulings within 60 days after matters are deemed submitted and ready for decision.[6]  In the case of Adversary Proceeding 09-14, post-trial briefs and proposed findings of fact and conclusions of law were submitted on March 19, 2010.  Thus, I would have generally tried to have a decision entered by mid-May of 2010.  However, the parties had advised me that they planned to participate in a mediation in early May of 2010.  I thus turned my efforts to other matters, with the hopes that the mediation would resolve the issues in Adversary Proceeding 09-14.

I later learned from the parties at a status conference held June 2, 2010, that the mediation

---

[6]  The 60-day period is consistent with Mont. LBR 901-2, which reads:

In the event a Judge has under advisement any matter, including, but not limited to, a motion or decision in a bench trial, for a period of more than sixty (60) days, each party affected by the undecided matter shall send to the Judge a letter particularly describing the matter under advisement and stating the date the matter was taken under advisement.  As long as the matter remains under advisement, at intervals of forty-five (45) days thereafter, each affected party shall send a similar letter to the Judge.

**Case No. 12-35986 ER  144**

did not resolve Adversary Proceeding 09-14. So, I and my law clerk once again turned our efforts to the decision in Adversary Proceeding 09-14 with the tacit understanding that summer vacations would be put on hold until the decision in Adversary Proceeding 09-14 was completed. To that end, my law clerk scheduled her summer family vacation for the week of August 16, 2010, and the two of us worked on drafting the decision. As the record reflects, the decision in Adversary Proceeding was entered on August 16, 2010, the same date that Ms. Harrington started her summer vacation. Contrary to what Mr. Blixseth may believe, workload and the scheduling of time off were the only factors that determined when the decision was entered in Adversary Proceeding 09-14.

Mr. Blixseth's final complaint stemming from Adversary Proceeding 09-14 is that this Court amended its judgment against Mr. Blixseth, without giving Mr. Blixseth an opportunity to respond. The Court agrees that Mr. Blixseth did not have any opportunity to respond to the Yellowstone Club Liquidating Trust's motion to alter or amend the judgment and that the Court entered an judgment against Mr. Blixseth for a specific dollar amount. The Yellowstone Club Liquidating Trust was seeking judgment against Mr. Blixseth in the amount of $286.4 million. The Court ultimately entered an amended judgment in the amount of $40,067,962.43. Such amount is a moving target because the Yellowstone Club Liquidating Trustee was still in the process of liquidating claims when Mr. Blixseth filed his motion for recusal. The judgment against Mr. Blixseth is necessarily decreased as claims are either disallowed or reduced. The Court considered the amended judgment as nothing more than a more definitive embodiment of its original judgment wherein Mr. Blixseth would pay "that amount of money required to pay all allowed: (1) claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4

44

(general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Mr. Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571, and (2) YCLT for the fees and costs it has incurred, and will incur, objecting to and liquidating such claims."

Moreover, entry of a judgment in a specific amount in Adversary Proceeding 09-14 paved the way for the Court to enter an Order on October 20, 2010, in Adversary Proceeding 10-15 denying the Yellowstone Club Liquidating Trust's request for a preliminary injunction wherein the Yellowstone Club Liquidating Trust sought an order enjoining Mr. Blixseth, and two of his entities, Desert Ranch, LLLP and Desert Ranch Management, LLC, from transferring any assets in an amount or of a value in excess of $5,000.00. There, the Court reasoned:

> What the pending Adversary Proceedings show is that: (1) Plaintiff in this matter has a $40,067,962.43 judgment against Mr. Blixseth; and (2) Mr. Blixseth stipulated to the entry of an injunction which prohibits Mr. Blixseth from selling, transferring, disposing of, encumbering or otherwise liquidating, or causing any entity owned or controlled by him to sell, transfer, dispose of, encumber or otherwise liquidate, property valued at $40 million without prior order of the Court.
>
> . . . The Plaintiff's judgment of $40,067,962.43 is, as Mr. Blixseth's counsel stated, in perfect congruity with the stipulated injunction already in place.

Mr. Blixseth next takes issue with a decision entered by the Court on August 4, 2010, in Adversary Proceeding 09-18 wherein the Court denied four motions for summary judgment filed

by Mr. Blixseth. As the Court explained, it was 69 pages into drafting that decision when it elected to scrap the 69-pages and opted instead to issue a four page memorandum. The Court had a firm grasp on the facts and was fully convinced that there were disputed issues of material fact that precluded summary judgment.

In addition to the above allegations, Mr. Blixseth's counsel made the additional argument at the January 18, 2011, hearing that "[t]here's a January 14 or 15 e-mail from, I think it was Matthew Kidd to Sam Byrne saying: How did your meetings with Ron Burkle, the governor, and Mr. Byrne go? There's an e-mail in August of 2008 when Ms. Blixseth and Mr. Byrne knew they were taking control of the Yellowstone Club involving a meeting with, with Governor Schweitzer." Mr. Flynn clearly implies that Ron Burkle, whom I have never heard of, Governor Schweitzer, whom I have never met, and Mr. Byrne, who I would recognize only from his appearances in my courtroom, met and somehow exerted pressure on me. This Court has not and will not succumb to any pressure, political or otherwise. This Court is an independent and unbiased member of the Federal judiciary. To the best of my ability, I strive to enter decisions that are based solely on the facts presented and the applicable law.

Applying the applicable law to the facts presently before me, I conclude that my disqualification in this case is neither required nor appropriate because Mr. Blixseth has not established actual bias nor has he shown any facts which establish an appearance of such impartiality as to require recusal.

It appears that Mr. Blixseth's ultimate goal is to upset what has already been done in the cases in which he is involved. Such is not the appropriate consequence of a recusal motion, particularly where Mr. Blixseth's remedies are adequately addressed through the appellate

process. Therefore, consistent with the foregoing, the Court will enter separate orders in this case and in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088 providing as follows:

IT IS ORDERED that Timothy L. Blixseth's Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) filed November 30, 2010, at docket entry no. 2042, together with the same Amended Motion filed December 14, 2010, in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088 are DENIED.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

47

Case: 12-35986  04/08/2013  ID: 8581488  DktEntry: 13-2  Page 160 of 940
Case 2:11-cv-00073-SEH  Document 52-2  Filed 11/28/12  Page 1 of 5
Case 2:11-cv-00073-SEH  Document 51  Filed 11/16/12  Page 1 of 5

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA **FILED**

### BUTTE DIVISION

NOV 16 2012

Clerk, U.S District Court
District Of Montana
Butte

|  |  |
|---|---|
| In re:<br><br>YELLOWSTONE MOUNTAIN<br>CLUB, LLC,<br><br>                Debtor. | No.  CV-11-73-BU-SEH |
| TIMOTHY L. BLIXSETH,<br><br>                Appellant,<br><br>vs.<br><br>YELLOWSTONE MOUNTAIN<br>CLUB, LLC; CREDIT SUISSE; AD<br>HOC GROUP OF CLASS B UNIT<br>HOLDERS; CIP SUNRISE RIDGE<br>OWNER LLC; ROBERT SUMPTER;<br>NORMANDY HILL CAPITAL LP;<br>MARC S. KIRSCHNER; CIP<br>YELLOWSTONE LENDING LLC;<br>CROSSHARBOR CAPITAL<br>PARTNERS LLC,<br><br>                Appellees. | **MEMORANDUM AND ORDER**<br><br>On appeal from Bankruptcy<br>Case No. 08-61570-11 |

## INTRODUCTION

Timothy L. Blixseth (Blixseth) moved to disqualify the Honorable Ralph B.

Case: 12-35986 04/08/2013 ID: 8581488 DktEntry: 13-2 Page 161 of 940
Case 2:11-cv-00073-SEH Document 52-2 Filed 11/28/12 Page 2 of 5

Case 2:11-cv-00073-SEH Document 51 Filed 11/16/12 Page 2 of 5

Kirscher, United States Bankruptcy Judge, in the Chapter 11 bankruptcy In re

Yellowstone Mountain Club, LLC, Cause No. 08-61570-11, and in five related

adversary proceedings.[1] All were opposed. Judge Kirscher denied the motions on

February 25, 2011. Blixseth moved for reconsideration. Judge Kirscher denied

the motions for reconsideration on July 26, 2011. This appeal followed.[2]

## ISSUE

The single substantive issue raised by the appeal is whether under

28 U.S.C. § 455 Judge Kirscher should have disqualified himself as requested.[3]

## DISCUSSION

The disqualification statute, 28 U.S.C. § 455, provides, in pertinent part:

> "[a]ny justice, judge, or magistrate of the United States shall
> disqualify himself in any proceeding in which his impartiality
> might reasonably be questioned."

28 U.S.C. § 455(a).

Disqualification is to be granted or ordered only when the record,

appropriately assessed, so warrants. Clemens v. U.S. Dist. Court for the Dist. of

---

[1] Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064, 10-00015 and 10-00088.

[2] Similar appeals were filed in Cause Nos. CV-11-74-BU-SEH, CV-11-75-BU-SEH, CV-11-76-BU-SEH, CV-77-BU-SEH and CV-11-78-BU-SEH.

[3] The separately stated issue of whether Judge Kirscher erred in denying Blixseth's motion for reconsideration is subsumed by resolution of the substantive appeal issue.

2

Case: 12-35986  04/08/2013  ID: 8581488  DktEntry: 13-2  Page 162 of 940
Case 2:11-cv-00073-SEH  Document 52-2  Filed 11/28/12  Page 3 of 5
Case 2:11-cv-00073-SEH  Document 51  Filed 11/16/12  Page 3 of 5

Cal., 428 F.3d 1175, 1179 (9th Cir. 2005) (a judge has a strong duty to sit when

there is no legitimate reason to recuse). The test to be applied is "whether a

reasonable person with knowledge of all the facts would conclude that the judge's

impartiality might reasonably be questioned." Pesnell v. Arsenault, 543 F.3d

1038, 1043 (9th Cir. 2008). The reasonable person, in this context, means a "well-

informed, thoughtful observer," and not a "hypersensitive or unduly suspicious

person." Clemens, 428 F.3d at 1178.[4]

Judge Kirscher's February 25, 2011, Memorandum of Decision contains an

exhaustive and detailed analysis and discussion of Blixseth's involvement with the

Yellowstone Mountain Club entities,[5] the history of the Yellowstone Club related

bankruptcies, Blixseth's participation in those proceedings, Blixseth's contentions

in seeking disqualification, and the law to be applied in addressing the motion for

disqualification. Factual matters within the Bankruptcy Court's personal

knowledge are articulated in detail.

_____

[4] Blixseth argues this Court adopt a standard of review grounded in the proposition that the judge's actions should be assessed from the "perspective of a reasonable person who is predisposed to suspicions about the inner workings of the judiciary." See Blixseth's Opening Brief at 5-6. This suggested standard is rejected as it finds no support in the law of this Circuit, and is so lacking in specificity as to be incapable of meaningful application.

[5] The Yellowstone Club entities consist of: Yellowstone Mountain Club, LLC; Yellowstone Development, LLC; Big Sky Ridge, LLC; and Yellowstone Club Construction Company, LLC.

3

Case: 12-35986  04/08/2013  ID: 8581488  DktEntry: 13-2  Page 163 of 940
Case 2:11-cv-00073-SEH  Document 52-2  Filed 11/28/12  Page 4 of 5
Case 2:11-cv-00073-SEH  Document 51  Filed 11/16/12  Page 4 of 5

By contrast, the factual assertions advanced by Blixseth, both before Judge

Kirscher and in this appeal, are grounded in his self-serving affidavits which he

claims must be accepted as true. He is mistaken. The Court is not obliged to

adopt, and does not adopt, the assertions of fact in the affidavits as true. In re

Stasz, 2011 WL 6934442 *4 (9th Cir. BAP 2011); In re American Ready Mix, Inc.,

14 F.3d 1497, 1501 (10th Cir. 1994). Moreover, many of the assertions of "fact"

recited by Blixseth simply cannot be reconciled with the record. To give weight to

such unsupported, or outright contradicted by the record, declarations would be

entirely unwarranted.

No detailed point by point discussion of Blixseth's characterization of

events occurring in the underlying bankruptcy proceeding, or of the many and

frequent flaws in those characterizations, is necessary. Having carefully

considered the record as a whole, including the rulings and findings made by

Judge Kirscher and the bases for those rulings and findings, I conclude that no

showing of bias, or prejudice or any lack of impartiality by Judge Kirscher has

been demonstrated. Rather, dispassionate assessment reveals that extraordinary

consideration was accorded Blixseth and his position throughout the proceedings.

## CONCLUSION

I find no basis in the record upon which to conclude that Judge Kirscher

4

Case: 12-35986  04/08/2013  ID: 8581488  DktEntry: 13-2  Page 164 of 940
Case 2:11-cv-00073-SEH  Document 52-2  Filed 11/28/12  Page 5 of 5
Case 2:11-cv-00073-SEH  Document 51  Filed 11/16/12  Page 5 of 5

erred in refusing to disqualify himself.

## ORDER

The February 25, 2011, Memorandum of Decision[6] of the United States

Bankruptcy Court is AFFIRMED.

DATED this **16th** day of November, 2012.

*Sam G Haddon*

SAM E. HADDON
United States District Judge

---

[6] Case No. 08-61570-11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

_____

In re:

YELLOWSTONE MOUNTAIN
CLUB, LLC,

        Debtor.

* * * * * * * * * * * * * *

| | |
|---|---|
| TIMOTHY L. BLIXSETH, | Civil Docket |
| | No. 11-72-BU-SEH & |
|     Appellant, | No. 11-73-BU-SEH & |
| | No. 11-74-BU-SEH & |
|   -vs- | No. 11-75-BU-SEH & |
| | No. 11-76-BU-SEH & |
| YELLOWSTONE MOUNTAIN | No. 11-77-BU-SEH & |
| CLUB, LLC, et al., | No. 11-78-BU-SEH |
| | |
|     Appellees. | On appeal from Bankruptcy |
| | Case No. 08-61570-11 |

_____

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

Heard in Second Floor Courtroom
Mike Mansfield Federal Courthouse
400 North Main Street
Butte, Montana
August 24, 2012
10:02 a.m.

BEFORE THE HONORABLE SAM E. HADDON

UNITED STATES DISTRICT JUDGE

```
                    TINA C. BRILZ, RPR, FCRR
                     Official Court Reporter
                   United States District Court
    Missouri River Courthouse - 125 Central Avenue West, Room 301
                   Great Falls, Montana  59404




Proceedings recorded by mechanical stenography, transcript
produced by computer.
```

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 167 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 3 of 56

3

A P P E A R A N C E S :


PRESENT ON BEHALF OF THE APPELLANT, TIMOTHY
BLIXSETH:

        MR. PATRICK T. FOX
        Attorney at Law
        DOUBEK & PYFER
        P.O. Box 236
        Helena, Montana  59624


PRESENT ON BEHALF OF THE APPELLEE, YELLOWSTONE
MOUNTAIN CLUB, LLC, et al.:

        MR. JAMES A. PATTEN
        Attorney at Law
        PATTEN PETERMAN BEKKEDAHL & GREEN
        2817 Second Avene North, Suite 300
        Billings, Montana  59101


PRESENT ON BEHALF OF THE APPELLEE, AD HOC GROUP OF
CLASS B UNIT HOLDERS:

        MR. RONALD A. BENDER
        Attorney at Law
        WORDEN THANE
        P.O. Box 4747
        Missoula, Montana  59806-4747


PRESENT ON BEHALF OF THE APPELLEES, CIP SUNRISE RIDGE
OWNER, LLC; CIP YELLOWSTONE LENDING, LLC:

        MR. BENJAMIN P. HURSH
        Attorney at Law
        CROWLEY FLECK
        305 South 4th Street East, Suite 100
        Missoula, Montana 59801

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 168 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 4 of 56

4

APPEARANCES CONTINUED:


PRESENT ON BEHALF OF THE APPELLEE, CROSSHARBOR CAPITAL
PARTNERS, LLC:

                    MR. BENJAMIN P. HURSH
                    Attorney at Law
                    CROWLEY FLECK
                    305 South 4th Street East, Suite 100
                    Missoula, Montana  59801

                         and

                    MR. MICHAEL R. LASTOWSKI
                    Attorney at Law
                    DUANE MORRIS
                    222 Delaware Avenue, Suite 1600
                    Wilmington, Delaware 19801


PRESENT ON BEHALF OF THE APPELLEE, CREDIT SUISSE AG,
Cayman Islands Branch:

                    MR. J. RICHARD ORIZOTTI
                    Attorney at Law
                    POORE ROTH & ROBINSON
                    1341 Harrison Avenue
                    Butte, Montana  59701-4898

                         and

                    MR. GEORGE A. ZIMMERMAN and
                    MR. EVAN R. LEVY
                    Attorneys at Law
                    SKADDEN ARPS SLATE MEAGHER & FLOM
                    Four Times Square
                    New York, New York  10036-6522
                    (Present by video conference)

APPEARANCES CONTINUED:


PRESENT ON BEHALF OF APPELLEE, MARC S. KIRSCHNER:

                MR. SHANE COLEMAN
                Attorney at Law
                HOLLAND & HART
                401 North 31st Street, Suite 1500
                P.O. Box 639
                Billings, Montana  59103-0639


PRESENT ON BEHALF OF APPELLEE, RICHARD J. SAMSON:

                MR. DAVID B. COTNER
                Attorney at Law
                DATSOPOULOS MacDONALD & LIND
                201 West Main
                Central Square Building, Suite 201
                Missoula, Montana  59802

```
 1   The following proceedings were had:

 2

 3          THE COURT:  Good morning, everyone.

 4       Be seated, please.

 5       Madame Clerk, if you'll call the matter for us, please.

 6          CLERK OF COURT:  The court has set aside this time to

 7   hear the matters of CV-11-72, 73, 74, 75, 76, 77, and

 8   78-BU-SEH, for an oral argument in Blixseth versus Yellowstone

 9   Mountain Club, et al.

10          THE COURT:  Thank you, Ms. Larson.

11       Counsel, I have been provided, prior to the commencement

12   of the hearing, with what I take it to be a list of those who

13   are appearing today.  I'll run through it, and as we do, I will

14   ask if you plan to have a speaking role, that you let us know.

15   Mr. Fox is here.

16          MR. FOX:  Yes.

17          THE COURT:  There he is.  All right.

18       Anyone else on your side of this issue, Mr. Fox?

19          MR. FOX:  No, Your Honor.

20          THE COURT:  All right.

21       And Mr. Coleman is here.

22          MR. COLEMAN:  Yes, Your Honor.  And I do intend to

23   address the court.

24          THE COURT:  You plan to speak.

25       Mr. Lastowski.  Am I pronouncing that correctly?
```

1          MR. LASTOWSKI:  Yes, Your Honor.  And I intend to

2   address the court in this matter.

3          THE COURT:  Welcome back.

4      Mr. Cotner.

5          MR. COTNER:  Good morning, Your Honor.  I do not have

6   a speaking role this morning.

7          THE COURT:  Okay.

8      Mr. Bender.

9          MR. BENDER:  Your Honor, I don't anticipate making

10  any argument.

11         THE COURT:  You're going to pass on the opportunity;

12  are you?

13         MR. BENDER:  I do not anticipate --

14         THE COURT:  Mr. Hursh.

15         MR.  HURSH:  Your Honor, I was tasked with preparing

16  comments related to the record.  It may not be necessary that I

17  speak, but that will be a function of the argument presented by

18  Mr. Fox.

19         THE COURT:  All right.

20      Mr. Patten.

21         MR. PATTEN:  Good morning, Your Honor.

22      I don't plan to speak unless something comes up in

23  Mr. Fox's presentation.

24         THE COURT:  And I believe we have Mr. Levy and

25  Mr. Zimmerman who are participating by video.  Do either of you

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 172 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 8 of 56

8

1  plan to speak?

2          MALE VOICE:  We do not anticipate, Your Honor.

3          THE COURT:  Well, we have a number of persons who may

4  participate, and for general guidance to everyone, I do not

5  plan to set any time limits on argument here today.  We'll take

6  whatever time is needed.

7      Mr. Fox, you have the laboring oar as the appellant,

8  you'll be entitled to speak first.  And we'll also give you an

9  opportunity to sum up after the other appellee representatives

10  have spoken.

11      You may proceed.

12          MR. FOX:  Thank you, Your Honor.

13      May it please the court, counsel, Your Honor, we're here

14  today on two issues, numerous -- expanding numerous cases by

15  virtue of the circumstances in which these appeals were made.

16      The first case, 72, has to do with the bankruptcy court,

17  Judge Kirscher's order denying Mr. Blixseth's motion for

18  reconsideration stating that it was untimely.  And really, that

19  motion hinges on disparate interpretation of the local rules.

20  In particular, Mr. Blixseth takes the position that under 90013

21  (g)(2)(U) --

22          THE COURT:  Wait a minute.  Wait just a minute,

23  counsel.  Let's get this thing in perspective.  I'm not at all

24  interested in what Mr. Blixseth's personal position may be.

25  You are his counsel of record.  I expect if you are going to

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 173 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 9 of 56

9

1   argue legal issues, that you stand behind the issues as his

2   counsel.  Mr. Blixseth is not running the store in terms of the

3   issues presented to this court.  And I want that clear.

4           MR. FOX:  Absolutely.

5           THE COURT:  All right.

6           MR. FOX:  Your Honor, our position is, is that we

7   followed what is required by the local rules, the local

8   bankruptcy rules, with a motion to recuse the judge, and that

9   we had a right to reconsideration, in fact, under the rule

10  itself.  And Judge Kirscher disagreed with that and denied the

11  motion for reconsideration.  That's 11-72.  I don't plan on

12  spending any more time on that issue, unless the court has any

13  particular questions.

14          THE COURT:  Well, I think, counsel, in all fairness,

15  what we're here about is the merits of whether or not Judge

16  Kirscher did the right thing in declining to recuse himself.

17          MR. FOX:  Yes, Your Honor.

18          THE COURT:  That's the focus of this appeal, at least

19  as this court understands it.

20      The reconsideration issue is a component, but ultimately

21  turns on whether Judge Kirscher was right or wrong in his

22  decision to maintain jurisdiction in the case.

23          MR. FOX:  I agree, Your Honor, and I simply address

24  11-72, because it's the first appeal on the docket.

25          THE COURT:  All right.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 174 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 10 of 56

10

1     Go ahead.

2          MR. FOX:  So with respect to 11-73 through 11-78, I

3     think the one that all parties agree on is the standard under

4     which a judge must recuse himself under Section 455, and that

5     standard from In Re Minoa Finance, a Ninth Circuit case, and it

6     says:  "Minoa requires the disqualification of a federal judge

7     if a reasonable person with knowledge of all the facts would

8     conclude that the judge's impartiality might reasonably be

9     questioned."

10         So this is an objective standard.  Mr. Blixseth has raised

11    numerous arguments as to why a reasonable person with knowledge

12    of the facts in this case could objectively question Judge

13    Kirscher's impartiality.  The record is replete with those.

14    And in the original briefing, much thought was given to whether

15    or not Judge Kirscher had to presume or assume that

16    Mr. Blixseth's allegations were true.

17         I don't think that this court needs to wrestle with that

18    issue, because the Judge, on February 25th, 2011, filed a

19    47-page memorandum discussing in detail the allegations that

20    Mr. Blixseth has alleged.  And it's simply confirmation of what

21    has occurred in this case that we believe, as a matter of law,

22    would lead any reasonable person to feel that Judge Kirscher's

23    impartiality could be reasonably questioned.

24         The problem in this case is that Judge Kirscher is living

25    with rulings that were necessarily made in a very stunted

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 175 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 11 of 56

11

1   timeframe.  And that's evident when you read his order.  He

2   talks always about this May 18th, 2009, confirmation hearing,

3   the bidding process at the Crowne Plaza Hotel had to be done.

4   He made himself available, as he describes it, to assist the

5   parties with bidding procedures, and held emergency hearings

6   regarding that.

7          And so the interim order came out two days before the

8   bidding process started, which ultimately resulted in the

9   settlement term sheet that was incorporated in the plan, the

10  third amended plan.  That global settlement term sheet, as this

11  court found in the YMC I appeal, wasn't properly disclosed.

12         So Judge Kirscher spends a lot of time explaining in his

13  order, you know, what happened; why he was there.  And so those

14  are the facts that the court can use sitting as a reasonable

15  person, and say:  "Is a reasonable person -- could they

16  reasonably be suspicious that Judge Kirscher's impartiality

17  might be questioned?"

18              THE COURT:  Well, let's stop right there, counsel.

19              MR. FOX:  Yes, sir.

20              THE COURT:  That argument sounds like that you are,

21  in substance, abandoning, at least in part, some of the

22  assertions about Judge Kirscher's conduct that were the basis

23  for the appeal in the first instance, with regard to meetings

24  with the lawyers and the events that happened at a hotel, et

25  cetera.  Am I accurate in that observation?

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 176 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 12 of 56

12

```
 1              MR. FOX:  No, Your Honor.

 2              THE COURT:  You still maintain that the facts are as

 3    reported, I think, in Mr. Blixseth's affidavit, rather than as

 4    Judge Kirscher's opinion asserts them to have been.

 5              MR. FOX:  I don't think the facts are mutually

 6    exclusive.  I think --

 7              THE COURT:  Well, they certainly are in some

 8    instances, counsel.  By my reading of Mr. Blixseth's assertions

 9    and the briefs on the one side, and the findings of Judge

10    Kirscher as reported in his memorandum on the other.

11              MR. FOX:  I do not agree with the court that the

12    factual allegations contained in Mr. Blixseth's declaration are

13    different from what the court has alleged.  The court has

14    simply explained --

15              THE COURT:  Well, wait a minute.  It's not

16    allegations at this point.  Judge Kirscher has made findings.

17    And those are not the same, in the mind of this court, as

18    allegations.

19              MR. FOX:  I understand.  But in this particular case,

20    Mr. Blixseth, in an affidavit in his own declaration, said:

21    "This is my perspective of why I don't believe I'm getting a

22    fair shake before Judge Kirscher."  Judge Kirscher wrote a

23    47-page memorandum explaining away those allegations.  He does

24    admit that he took a room at the Crowne Plaza, although he

25    describes it in terms of, because his duty station is not in
```

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 177 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 13 of 56

13

1   Billings.  He does admit that he spoke with Credit Suisse and

2   CrossHarbor and the debtors during this process about

3   negotiations, about the bidding process, that there were

4   emergency hearings, and as a result of that process, the

5   settlement term sheet occurred.  And the next day, Judge

6   Kirscher on May 18th said the plan would be confirmed.  And

7   within a couple of weeks, it was.  All of that occurred.  I

8   mean, the Judge has admitted or agreed with Mr. Blixseth's

9   allegations.  He's also agreed with the fact that his law clerk

10  had conversations with the trustee of an estate that had sued

11  Mr. Blixseth and told them:  "You better settle that before

12  Mr. Blixseth can renege."  He doesn't mention the fact that

13  Judge Peterson sent Mr. Patten an e-mail on the eve of the

14  AP-14 trial with respect to cases that existed there that he

15  ought to consider with respect to the C.S. Blixseth matter.

16          THE COURT:  Counsel, does that comment suggest that

17  Judge Peterson is in some way implicated in this process?

18          MR. FOX:  Your Honor, that's not a comment that I'm

19  making.  It's just a part of the record.  It's an e-mail.

20          THE COURT:  Well, why bring it up if it doesn't have

21  anything to do with the case?

22          MR. FOX:  Because it's the bench, it's the bankruptcy

23  bench here in Montana.  Judge Kirscher has separated himself

24  and distanced himself from Judge Peterson and his law clerks in

25  an effort to say:  "You know, I'm not biased here," in an

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 178 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 14 of 56

14

1  effort to prove that he's not biased.  But by doing so in his

2  47-page order, he demonstrates why a reasonable person would

3  reasonably question his impartiality in these cases, and the

4  law --

5          THE COURT:  And you draw that conclusion in part

6  because of these events that went on with Judge Peterson?

7          MR. FOX:  Yes.

8          THE COURT:  All right.  I understand.

9     Go ahead.

10          MR. FOX:  Well, we're taking the position that the

11  court is not just simply Judge Kirscher.

12          THE COURT:  But, counsel, let's keep our focus.  The

13  motion that you've filed, the ruling that I am obliged to pass

14  upon, is whether or not Judge Kirscher, not the bankruptcy

15  court as an institution, but whether Judge Kirscher as a

16  sitting judge should have recused himself.

17          MR. FOX:  Correct.

18          THE COURT:  So that's the focus.  And I don't see how

19  we can legitimately draw the court as an institution into this

20  controversy.  But I welcome your explanation if you deem that

21  to be the case.

22          MR. FOX:  The legal issue, Your Honor, is whether a

23  reasonable person, knowing all the facts, could reasonably

24  question the Judge's impartiality.  And all of those --

25          THE COURT:  Well, that's not in dispute.  That's the

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 179 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 15 of 56

15

1    standard that this court intends to apply.

2            MR. FOX:  And, Your Honor, I don't think that you can

3    parse out certain facts and say -- I mean, the standard itself

4    says "with knowledge of all the facts."  Now, as a jurist, you

5    may say that "I don't consider this to be important."  But this

6    -- I think this reasonable person that's contemplated in the

7    case in the jurisprudence regarding Section 455 is also the

8    perspective of one who is predisposed to suspicions of the

9    inner workings of the judiciary.  So this is a skeptical,

10   reasonable person.  And Mr. Blixseth is simply saying that when

11   you look at the totality of the circumstances from events up to

12   the motion for recusal of Judge Kirscher and even events after

13   the motion for recusal, you put all those in context, a

14   reasonable person would question whether or not Judge Kirscher

15   is impartial.

16       One of the issues, in addition to the various record facts

17   that Judge Kirscher discusses at length in his order, so

18   there's no dispute that they occurred, it's how Judge Kirscher

19   interprets them versus how Mr. Blixseth and his lawyers

20   interpret that.  But there's also the problem with the inherent

21   issue that Judge Kirscher, as he talks about in his order, he's

22   presided administratively over six bankruptcy cases.  And he's

23   adjudicated some 28 adversarial proceedings, Mr. Blixseth has

24   been sued in AP-14, AP-15, AP-18, AP-88, AP-64, AP-65, and the

25   YCLT is sometimes the plaintiff; Edra Blixseth's estate is the

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 180 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 16 of 56

16

1   plaintiff.  And so Judge Kirscher has administered all of these

2   cases.  And he discusses the fact in numerous orders, as

3   pointed out in our papers and in his order denying the motion

4   for disqualification, that he has, by virtue of circumstance,

5   taken into consideration and continues to consider plenary

6   facts that aren't before the judge as an adjudicator in an

7   adversarial case.  So by virtue of Montana being a small

8   jurisdiction and only having one bankruptcy judge, by virtue of

9   the fact that the Yellowstone Club bankruptcies and all this

10  related litigation has ended up in Judge Kirscher's court, a

11  bankruptcy judge should be especially solicitous of the notion

12  that he may not be able to preside impartially over proceedings

13  in which he's sat in both an administrative and an adjudicative

14  function.  And we think that over time, the facts that we point

15  out in our papers, in particular the discussions between

16  Mr. Richardson and Mr. Healow, the discussions between

17  Mr. Patten and Judge Peterson, the e-mail, the boxed-in nature

18  of Judge Kirscher's ruling, the lengths that he goes to to

19  explain it all, squarely come back to the fact that this is a

20  case where Judge Kirscher can't, regardless of his intent, he

21  just -- he can't possibly adjudicate and administer all of

22  these issues.

23       And ultimately, when you look at some of the orders that

24  have come down from Judge Kirscher, I mean, I'm not before you

25  today saying that we don't like these orders, therefore, he

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 181 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 17 of 56

17

1   should be denied.  That's not the standard, and I'm not taking

2   that position.  But if you recall, Your Honor, in AP-88,

3   December 2011, November 30, 2011, Judge Kirscher issued a

4   ruling that says -- said:  "Based upon Stern v. Marshall, I

5   have no jurisdiction to hear these fraudulent transfer actions.

6   So the parties are -- everybody needs to file a motion to

7   withdraw the reference."

8        And if you'll recall, I came before the court, and many of

9   my colleagues across the aisle came before the court on these

10  various motions to withdraw the reference.  And at one point, I

11  think the YCLT had filed a motion to withdraw the reference, we

12  filed ours, and then they withdrew theirs, and we were

13  arguing --

14        THE COURT:  You took the other side of the issue.

15  And I will acknowledge, counsel, I have never seen that happen

16  before where a lawyer takes two positions, one opposing the

17  other in the same piece of litigation, but we're past that.

18        MR. FOX:  We are.  And what this court said is:  "I'm

19  not going to take any of these cases up.  I'm not going to

20  withdraw the reference."

21        THE COURT:  That's exactly what I said.

22        MR. FOX:  And if Judge Kirscher doesn't have

23  jurisdiction, the only thing he can do is dismiss the claim,

24  that's what this court said.  After Judge Kirscher realized

25  that this court was not going to take on this litigation, he

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 182 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 18 of 56

18

1   filed an order vacating the order in AP-88.

2            THE COURT:  Well, wait a minute, counsel, you're

3   drawing a conclusion that Judge Kirscher took some action after

4   he had certain realizations about this court.  That's

5   speculative.  The man issued an opinion deciding a particular

6   issue one way.  My reading of the record is that upon

7   reconsideration, he concluded that he had made an error, and he

8   changed his position.  There's nothing unusual, out of the

9   ordinary, or, in the view of this court, inappropriate about

10  such a course of action.  It suggests to the contrary that the

11  Judge is endeavoring to do the best that he can to make an

12  appropriate decision.

13           MR. FOX:  Your Honor, we don't interpret it that way.

14  The way that the timing of the AP-88 motion came down, it's our

15  belief that if Judge Kirscher would have stuck with his

16  position that he originally took after Stern, which is going to

17  be at the Ninth Circuit, hopefully, soon, in In re Bellingham,

18  that all of these cases, AP-14, AP-15, AP-18, AP-88, would have

19  failed for lack of jurisdiction.  The plan would essentially --

20  the litigation targeted the third amended plan pursuant to the

21  term sheet, would have been undone.

22       Another issue, Your Honor, is that this court remanded the

23  -- so we're continuing to look in terms of a reasonable person

24  looking at this.  This court remanded the third amended plan

25  and said it was -- its -- confirmation was plain error.  Judge

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 183 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 19 of 56

19

1   Kirscher didn't change it at all.  He took expert witness

2   testimony from a lawyer who had previously represented the UCC

3   to interpret the exculpation clause that this court found

4   violated Ninth Circuit law, and reconfirmed the plan nunc pro

5   tunc.

6        Now, whether Judge Kirscher had a basis legally to do what

7   he did and what the court ultimately will do with that appeal,

8   11-65, I can't speculate.  I can only say that a reasonable

9   person, who's being -- who's skeptical of the judiciary, these

10  are the legal standards, who is being given this information,

11  would reasonably question Judge Kirscher's impartiality.

12            THE COURT:  Well, I understand your position on that,

13  counsel.

14            MR. FOX:  And, you know, I could go through the

15  entire record, but I'm not going to do that.  I think it's

16  enough that what the court has said in the context of all the

17  other cases, and In re Minoa, that this court could easily

18  conclude that it would be impossible for Judge Kirscher to sit

19  as trier of fact and administrator, and that a reasonable

20  person could reasonably find that he's impartial toward

21  Mr. Blixseth.  Excuse me, he lacks impartiality.  And as a

22  result of that, Mr. Blixseth has been harmed.

23       It's a very -- it's not a -- it's -- the appellants -- the

24  appellees talk in their brief about this grave issue.  The

25  Minoa court recognizes that this is inherently problematic in

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 184 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 20 of 56

20

1   bankruptcy.  And it's become apparent, both pre-filing of our

2   motion for recusal, and post-filing, that Judge Kirscher cannot

3   continue to preside over the cases administratively and

4   adjudicate them.  Especially when Mr. Blixseth is involved.

5   Examples of issues that have come up where the judge has

6   actually acknowledged being boxed in by his AP-14 ruling

7   occurred in the Blixseth bankruptcy where Mr. Blixseth's

8   adversaries are pursuing him on promissory notes that were

9   determined by Judge Kirscher in AP-14 to be a sham.  They want

10  to recover not only an alleged fraudulent transfer, or a sham,

11  but they also want to enforce the notes and Judge Kirscher

12  said:  "No, I can't do that.  It's completely inconsistent with

13  AP-14."

14      But that's -- that's where Judge Kirscher has made these

15  rulings and findings, and they've continued to filter in

16  through all the other cases that Mr. Blixseth's adversaries

17  have prosecuted against him.

18      Another thing that Judge Kirscher has admitted or

19  acknowledged, is that he has issued orders without even giving

20  Mr. Blixseth the time to respond.  The $40 million judgment,

21  the judgment that ultimately this court adjudicated was not a

22  final judgment last year, or earlier this year, Mr. Blixseth

23  was told by Judge Kirscher on numerous occasions that he does

24  not try cases on affidavit.  He was admonished to that effect.

25      Well, Mr. Hingle filed an affidavit saying:  "This is how

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 185 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 21 of 56

21

1  much money the judgment should be."  And before Mr. Blixseth

2  had even had an opportunity to respond, the judgment was

3  entered.  After the fact, Judge Kirscher has commented on that

4  judgment, and he even does so in his order when he --

5          THE COURT:  Allow me to interrupt please, counsel.

6          MR. FOX:  Yes, sir.

7          THE COURT:  You commented that Judge Kirscher has, I

8  presume, on the record in one of these matters that is on

9  appeal, has said:  "I do not try cases on affidavit."

10         MR. FOX:  That's correct.

11         THE COURT:  Where does that appear in the record?

12 Because I am not aware of that particular declaration being

13 made by Judge Kirscher.

14         MR. FOX:  I don't know where it is in this record,

15 Your Honor.  But Judge Kirscher --

16         THE COURT:  Well, if you expect me to take that into

17 account, I want that cited to this court with specificity and

18 how that relates to this later affidavit from one of counsel

19 that you have referenced.

20         MR. FOX:  Okay.  The point, Your Honor, and the --

21         THE COURT:  No.  No.  If I am to consider that, I

22 want those matters placed before this court.

23         MR. FOX:  Okay.  Your Honor, I know that I have read

24 that document, and I believe that it's in the AP-14 transcript.

25         THE COURT:  Well, you have your directive from this

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 186 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 22 of 56

22

```
1   court --
2           MR. FOX:  Yes, sir.
3           THE COURT:  -- to produce that and present it to this
4   court.
5           MR. FOX:  Yes, sir.
6           THE COURT:  If you can't produce it, I can assure
7   you, your comments are going to be totally disregarded.
8           MR. FOX:  Your Honor, notwithstanding whether or not
9   Judge Kirscher previously admonished Mr. Blixseth or any of the
10  lawyers in his court about his practice with affidavits, if the
11  court doesn't want to consider that at all, he still entered a
12  judgment based upon an affidavit.
13          THE COURT:  But that's not the argument that you
14  made, counsel.  And it's becoming difficult to follow you when
15  you premise an argument upon a certain position that Judge
16  Kirscher has made apparent:  "I don't try cases on affidavit,"
17  and then proceed to argue that he violated that principle by
18  considering an affidavit of counsel.  That's the argument that
19  you made.
20          MR. FOX:  Your Honor, forgive me if I didn't make the
21  argument clear enough.  But the argument in our papers that's
22  supported, as far as an objective person looking at this from
23  the outside, is saying -- would say there's a lack of
24  impartiality here, is the issue with the affidavit.  Nobody has
25  disputed, and Judge Kirscher even acknowledges, that he entered
```

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 187 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 23 of 56

23

1    a judgment for $40 million, before Mr. Blixseth even had a

2    response -- an opportunity to respond.

3              THE COURT:  Counsel, you're losing me.  You're

4    absolutely losing me, because you're not dealing with what you

5    presented to this court as an argument, which was that Judge

6    Kirscher does not -- by statement, has placed on record in one

7    of these cases that's on appeal, that he doesn't try cases by

8    affidavit, and then he violated that principle by considering a

9    particular affidavit.

10        That's the argument that you made.  And that's what I have

11   directed you to present by way of evidence to this court, if

12   you expect me to rely upon that particular argument.  Arguing

13   about other matters is not going to advance the cause as it

14   relates to that particular component of this whole matter.

15        So let's leave that.  You have your assignment.  You can

16   present it if you have it.  But I am giving you, I trust, fair

17   warning that if you can't present it, your argument is not

18   going to be given any weight whatsoever, and indeed, it will be

19   of concern to the court that it was ever made.

20        Go ahead.

21             MR. FOX:  Your Honor, there have been circumstances

22   when the court has, as outlined in our paper and as

23   acknowledged by Judge Kirscher himself, has issued rulings

24   before Mr. Blixseth had an opportunity to file a reply brief.

25   And in the case of the judgment, to file any brief objecting to

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 188 of 940
Case 2:11-cv-00073-SEH Document 43 Filed 09/07/12 Page 24 of 56

24

```
 1   the judgment.

 2            THE COURT:  Well, that's a separate issue totally.

 3            MR. FOX:  I'm sorry to make those two issues into

 4   one.  I don't mean to do that.  The fact -- the overarching and

 5   important issue, most important issue to somebody looking at

 6   the case, is:  Can a judge issue a judgment against somebody?

 7   Is there a seeming lack of impartiality there, when somebody

 8   files an affidavit about an amount, and a judgment's issued

 9   before the opposing party even has an opportunity to respond?

10   And it's our position that that was improper.  And that it

11   shows impartiality -- it shows a lack of impartiality to a

12   reasonably -- a cynical person reasonably informed of these

13   proceedings.

14            THE COURT:  And that's the same judgment that I have

15   determined not to have been final, and that is still a matter

16   of unresolved controversy?

17            MR. FOX:  Yes, Your Honor.

18            THE COURT:  Well, we're not to the end of the process

19   yet.

20       Go ahead.

21            MR. FOX:  No.  But the fact that that judgment's

22   still hanging out there, and the court heard argument on

23   whether it should be final and in what amount, doesn't belie

24   the fact that when the judgment was issued, it was issued based

25   upon an affidavit to which -- and a motion to which
```

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 189 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 25 of 56

25

1  Mr. Blixseth never was given the opportunity to respond.

2      The various facts that we've outlined in our papers, and

3  as Judge Kirscher discusses, would lead a reasonable person,

4  cynical of the judiciary, to come to the conclusion that Judge

5  Kirscher -- there's a reasonable basis that he's not impartial

6  in these proceedings.

7      I would be happy to answer any other questions the court

8  has.  I took more time than I meant to.

9          THE COURT:  Counsel, you weren't given any time

10 limitations.  You can have all the time you feel you need.

11         MR. FOX:  Your Honor, I don't want to beleaguer

12 what's in our papers.  And I think that if the court analyzes

13 all of the facts and circumstances that have been raised,

14 including what's happened with the third amended plan after

15 remand, that person, understanding the difficult position Judge

16 Kirscher has had to administer and adjudicate these cases,

17 would be left with a conclusion, the only reasonable

18 conclusion, that he's not impartial.

19     Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Fox.

21     Who is going to speak first for the appellees?

22         MR. COLEMAN:  I will, Your Honor.

23         THE COURT:  Mr. Coleman.  You have the floor, sir.

24         MR. COLEMAN:  Thank you, Your Honor.

25     Shane Coleman on behalf of the Yellowstone Club

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 190 of 940
Case 2:11-cv-00073-SEH Document 43 Filed 09/07/12 Page 26 of 56

26

1   Liquidating Trust.

2        Disqualification, as outlined in our briefs, in all of

3   these cases is an extreme remedy.  The standard is high.  The

4   standard of an appeal of a denial of such a motion is even

5   higher.  It's reviewed for abuse of discretion.  All of that is

6   spelled out in our briefs, I won't get into it.

7        What I want to get into, Your Honor, is what are the

8   facts?  And what we've heard a lot of, I think, was an

9   admission that the affidavit really is Mr. Blixseth's

10  perspective.  And as Mr. Fox acknowledged --

11              THE COURT:  That is the explanation that the court

12  heard today.  The affidavit on its face either will or will not

13  disclose that it is Mr. Blixseth's perspective, as distinct

14  from a declaration of fact.

15       Go ahead.

16              MR. COLEMAN:  And I believe we also -- I also heard

17  Mr. Fox to say that the facts as Mr. Blixseth perceives them

18  are not necessarily mutually exclusive with Judge Kirshcer's

19  findings on these points.

20       So in other words, what we have side-by-side are the

21  court's findings, many of which Mr. Blixseth apparently does

22  not take issue with, but he takes issue instead with, on the

23  other side, his perception of those facts.

24       I want to get into just a handful of the issues that were

25  addressed.  Again, I believe that our pleadings adequately

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 191 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 27 of 56

27

1    cover these.  And more importantly, I think the court's order,

2    the 47 pages of findings where Judge Kirscher explains these

3    facts, I think, does a much better job than we could in our

4    briefs, which also just highlights some of these things.

5         Taking these, quite frankly, Your Honor, in no particular

6    order other than as they were touched upon by Mr. Fox, I'll

7    address these kind of one at a time, a handful of issues.

8         First, I want to talk about the notion that there are all

9    of these adversary proceedings filed against Mr. Blixseth, or

10   involving Mr. Blixseth, or simply involving others in the

11   Yellowstone Club case, and that there are, in fact, many

12   related bankruptcy cases.  The Yellowstone World Club, the Edra

13   Blixseth, for instance.

14        This is honestly, Your Honor, the largest bankruptcy we've

15   seen in Montana.  It's a significant case.  It's a complicated

16   case.  It can be expected reasonably to have a number of

17   related cases, all of which Judge Kirscher presides over.

18   There's nothing unusual about that.  There's also nothing

19   unusual about having a number of adversary proceedings against

20   a gentleman who admittedly took the bulk of a $375 million

21   loan.  That part is undisputed.

22        The question in each of those adversary cases is whether

23   taking that money was wrongful, and whether it can be recovered

24   to inure to the benefit of those bankrupt estates.  That's

25   what's at issue here.  But Mr. Blixseth should not be surprised

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 192 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 28 of 56

28

1   that there are a number of adversary proceedings against him

2   given the scope of the cases, the scope of the amount of money

3   at issue, and just the nature of the Montana court system.

4   This is a huge case for us out here.

5        Other issue I want to point out here, because it gets into

6   the supposed surreptitious meeting at the hotel in Billings.

7   It also gets into a suggestion, at least in the briefs, and I'm

8   not sure if I heard it in argument, that this case -- these

9   cases were rushed through.  I want to remind the court that in

10  large part, they may seem rushed to Mr. Blixseth, because we

11  went from filing of an adversary proceeding, the so-called

12  AP-14 case that is probably at the heart of many of these

13  appeals, through trial in that case in probably six or seven

14  weeks, maybe eight weeks.  Mr. Blixseth was not originally a

15  party to that case.  He voluntarily jumped into that.  He filed

16  a motion to intervene in that case and asked Judge Kirscher:

17  "Can I be a part of this?"  And Judge Kirscher warned him at

18  the outset:  "We're moving fast.  We need to resolve this

19  issue."  At that time, the issue was the extent of the

20  pre-petition lenders' liens on the Yellowstone Club.  That was

21  important because a plan could not be confirmed until the

22  extent of those liens was known, and the parties would have no

23  way of knowing how much to bid for the assets.

24       Mr. Blixseth didn't have to be a part of that.  But he

25  jumped in.  The reason he jumped in, I can only speculate, is

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 193 of 940
Case 2:11-cv-00073-SEH Document 43 Filed 09/07/12 Page 29 of 56

29

1  that he thought he would get the thing resolved, as well.  He

2  doesn't like now the speed with which that case went to trial,

3  and he certainly doesn't like the ultimate outcome, even though

4  the case -- the claims against him were extended for a good

5  six, eight, ten months later, we retried the balance of that

6  case the following year after he was allowed additional

7  discovery.

8       But I don't think Mr. Blixseth can complain, and I don't

9  think Judge Kirscher can be faulted for having this case be so

10 expedited when Mr. Blixseth never had to be a party to it in

11 the first place.

12      That gets me into what I think is one of the more grave

13 and serious allegations of Judge Kirscher's bias.  That relates

14 to the events that occurred in Billings of the renting a hotel

15 room to facilitate the ex parte communications, as

16 Mr. Blixseth's brief alleges.

17           THE COURT:  Well now, we now have an explanation from

18 counsel that that really wasn't necessarily a statement of

19 fact.  It was a statement of Mr. Blixseth's perception.  Did

20 you hear that?

21           MR. COLEMAN:  That's what I heard.  I believe that to

22 be exactly the case, and I believe Judge Kirscher's explanation

23 is more than adequate in his findings that he made.

24           THE COURT:  Well, I have this affidavit before the

25 court at the moment.  And among other things, the affidavit

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 194 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 30 of 56

30

1  contains this quite straightforward declaration:  "Judge

2  Kirscher rented a room at a hotel to facilitate ex parte

3  communications between bidders."

4       That's a factual declaration.

5       Now, today, that is explained as Mr. Blixseth's

6  perception.  The basis for that perception is not explained in

7  the affidavit.  In fact, it's not presented as a perception.

8  It's presented as a fact in the affidavit.

9       Go ahead.

10       MR. COLEMAN:  We think that is very clearly not the

11  fact.  We think the fact is what Judge Kirscher wrote in his

12  opinion.  I would only add that -- to remind the court that

13  numerous individuals were present at the meetings that were

14  occurring at that time, including counsel not only for the

15  bidding parties, Credit Suisse and CrossHarbor, but also for

16  the debtors and for the unsecured creditors' committee, where

17  there were also representatives of the ad hoc committee of the

18  members of the club at the time.  Numerous individuals were

19  present.  Mr. Blixseth, candidly, probably could have attended

20  if he wanted.  But let's not forget, this was a meeting --

21  these were meetings to discuss bidding.  In order to bid on the

22  assets of the Yellowstone Club at the sale, one had to become a

23  qualified bidder.  Mr. Blixseth was not a qualified bidder.

24  Mr. Blixseth did nothing to try to become a qualified bidder.

25  The discussion there was how to go about bidding for these

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 195 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 31 of 56

31

1   assets in light of the fact that the pre-petition lenders,

2   represented by Credit Suisse, had certain credit bid rights

3   that extended to a certain extent of the real property and

4   improvements that were being sold.  This didn't concern

5   Mr. Blixseth.

6         And that ties in with the next suggestion that somehow

7   there was a settlement hatched at these meetings.  I think

8   "hatched" is even the word that's used in one of the pleadings

9   that I saw, "hatched" at these meetings whereby Mr. Blixseth

10  would become the litigation target of a confirmed third amended

11  plan.

12        Let's be clear, Your Honor, the record reflects that the

13  -- right from the outset, the very first proposed plan filed

14  with the bankruptcy court contemplated a sale of the club

15  assets under Section 363.  It also contemplated a very standard

16  provision that other claims not purchased as a part of the 363

17  sale, would be deposited into a liquidating trust, in some

18  courts they're called a litigation trust, because a lot of

19  those claims, a lot of those assets -- some of them may be

20  non-project assets.  My client in this case, the liquidating

21  trust, cleaned out some of those non-project assets.  But in

22  this case, as in a majority of these cases, there's a lot of

23  hanging-on litigation, claims that the debtor had against

24  others.  In this case, a lot of the debtors' claims, not

25  surprisingly, are against Mr. Blixseth, the individual who

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 196 of 940
Case 2:11-cv-00073-SEH Document 43 Filed 09/07/12 Page 32 of 56

32

1    ended up receiving the bulk of hundreds of millions of dollars.

2    There should be no surprise.  This wasn't hatched in some sort

3    of a late-May secret meeting.  This was a part of the very

4    original, first amended plan, it was in the second amended

5    plan.  This was a normal provision.  Litigation claims end up

6    -- the buyer of the club wants to run a ski resort, they want

7    to run a golf course, they want to sell lots.  They don't want

8    to buy decades-old lawsuits against folks.  Years-old lawsuits.

9    And as a result, that's why entities like a trust are formed to

10   handle that.  And that's exactly what happened here.  There's

11   nothing unusual about that.

12        Again, just touching on a handful of other issues here, on

13   this boxed-in issue, there was some reference to the BLX

14   litigation and the BLX notes with the suggestion that Judge

15   Kirscher won't, essentially, save Mr. Blixseth from litigation

16   on those notes, because he -- I hear to understand his position

17   that he has solid defenses based on Judge Kirscher's prior

18   findings in AP-14.

19        The fact is, Your Honor, that is -- those notes are being

20   pursued against Mr. Blixseth in California in separate

21   litigation.  Issues Mr. Blixseth has with regard to the

22   enforceability or non-enforceability of those notes can be

23   raised with the California court.  The fact that Judge Kirscher

24   wouldn't step in and intervene to prevent a California court

25   from doing something, doesn't show that he's biased.  It shows

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 197 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 33 of 56

33

1   that he's deferring to the California court to address those

2   issues.

3        The final issue that I want to address was taken up by

4   this court by Mr. Fox in two separate issues, that is the $40

5   million judgment that was entered, now vacated, now re-entered

6   and on appeal again before this court in a different amount.

7        The complaint, as I hear it, is that that judgment amount

8   was entered following many, many days of trial, spanning a

9   period of six to eight months, without Mr. Blixseth having an

10  opportunity to respond to the affidavit, and the court's doing

11  of that reflects, in Mr. Blixseth's perspective, a bias.

12       Two points:  One, Your Honor, after all those days of --

13  you know, I should point out the liquidating trust debtors, the

14  UCC unsecured creditors committee before it, was never seeking

15  $40 million.  We were seeking a heck of a lot more than that.

16  We were seeking approximately $286 million.  Once that judgment

17  gets entered in some amount, we've gone back and asked for

18  that.  We had originally appealed that when 40 million came

19  out.

20       At trial, however, Mr. Blixseth did not present evidence

21  of a lower amount.  Mr. Blixseth did not contest the damages in

22  that case.  Instead, he went with an all-or-nothing defense.

23  Essentially, "I'm released from liability, because I've got

24  written releases."  And that was the -- I mean, to sum up

25  probably an eight or nine-day trial, that's the gist of it.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 198 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 34 of 56

34

1      The court, Judge Kirscher, didn't agree with the full

2  amount.  He found Mr. Blixseth liable for a number of different

3  claims, fraudulent transfer, breach of fiduciary duty among

4  those.  But the court was uncomfortable ordering the full

5  amount under, essentially, a theory of in pari delicto.  What

6  the court did instead on its own is the court said the amount

7  of this judgment in AP-14 is going to be limited to certain

8  classes of claims against the bankruptcy estate.

9      Now, remember, again, we're looking at all of this under

10  the standard in this motion from the perspective of somebody

11  who's familiar with the facts of the case.  So let's look at

12  the facts surrounding all of this.

13      At this time, numerous, hundreds of claims have been filed

14  with the bankruptcy court as claims against the Yellowstone

15  Mountain Club bankruptcy estate and its affiliates.  The

16  Yellowstone Liquidating Trust was charged with administering

17  those remaining claims.  There are a series of motions

18  objecting to those claims and motions to resolve those claims,

19  to compromise them when the parties have reached agreement or

20  just to withdraw them.

21      All of those were run by the bankruptcy court.  All of

22  those were contained within a schedule.

23      Back to AP-14, when the court issues its hundred-and-

24  thirty-five-page findings and conclusions following trial, the

25  court says:  "I'm going to allow this judgment to enter in the

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 199 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 35 of 56

35

1   amount of certain allowed claims."  That's an arithmetic

2   matter, Your Honor.  We went back, as Mr. Hingle's affidavit

3   did, gave the Judge a list of those claims, based upon the

4   claims that the court had approved.  Because the court had

5   approved every last one of them.

6          Now ultimately, this court found on the merits that was

7   premature, because Judge Kirscher entered an order that said:

8   "And additionally, some claims that will be resolved in the

9   future."  That's not what's at issue here, though.  What's at

10  issue here is:  Would a person familiar with all the facts of

11  that issue believe that this shows Judge Kirscher's bias in

12  doing what he's doing?  And no reasonable person could reach

13  that conclusion.  What he did was say:  "Set forth a method by

14  which we're going to calculate the claims."  The amounts of

15  those claims are all in the judicial record before the

16  bankruptcy court, because the court entered orders approving

17  them.  It's just that they're so numerous that the court didn't

18  go through and try to add them all up.  And the court may not

19  have known exactly which one fell into which category.  It

20  doesn't show bias.

21         You know, and as one final point, Your Honor, I would only

22  point out, it's in our brief, we've explained why, but many of

23  these issues, think back to the hotel meeting, these issues

24  occurred, in many instances, many, many months before

25  Mr. Blixseth ever raised them.  We think it's untimely.  We're

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 200 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 36 of 56

36

1   happy with Judge Kirscher's analysis of it, too, that it's not

2   untimely in bringing these claims, but let's put them in

3   perspective.  How serious are these?  If he thought he had a

4   problem with the Judge being biased, he could have brought that

5   issue before the more recent rulings that are going against

6   him.

7        Your Honor, we believe the court's memorandum adequately

8   addresses these issues.  We don't think Mr. Fox and his client,

9   Mr. Blixseth, have met the high burden on this appeal showing

10  abuse of discretion in Judge Kirsher's findings.

11       THE COURT:  Thank you, counsel.

12   Mr. Lastowski, you are going to have a part?

13       MR. LASTOWSKI:  A very small one, Your Honor.

14       THE COURT:  Well, the same rule applies, take as much

15  time as you feel appropriate.  We give equal time to the

16  appellant, of course.

17       MR. LASTOWSKI:  Thank you, Your Honor.

18       Your Honor, I come here prepared to address the merits of

19  the appeal from the order denying reconsideration.  I heard

20  Your Honor's comments earlier related to that appeal, and I

21  would just as soon rest on my papers, unless Your Honor has any

22  specific questions.

23       THE COURT:  I will make clear, I think all of these

24  issues on these appeals are subsumed into the basic question of

25  did Judge Kirscher do the right thing or the wrong thing in

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 201 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 37 of 56

37

1  declining to recuse himself.

2          MR. LASTOWSKI:  With regard to the underlying merits,

3  I would join in Mr. Coleman's comments and just make the

4  following statement:  I think we heard today from

5  Mr. Blixseth's counsel that Judge Kirscher's memorandum of

6  decision actually supports their argument.  That if you were to

7  read that decision, you'd find a basis in that decision to

8  conclude that he's biased and should have recused himself.

9      We would think the exact opposite.  Judge Kirscher,

10  obviously, finds and believes the exact opposite, and we'd urge

11  the court to affirm Judge Kirscher.

12      If I could have a moment, I just want to confer.

13          THE COURT:  Certainly, take whatever time you need.

14          (A brief off-the-record discussion was had between

15          Mr. Patten and Mr. Lastowski.)

16          MR. LASTOWSKI:  Your Honor, that's all I have to add.

17  Mr. Hursh just wanted to address the court briefly.  He has

18  some citations of record that he believes might be helpful to

19  Your Honor.

20          THE COURT:  He can take whatever time he likes.

21  Mr. Patten, you're up first.

22          MR. PATTEN:  Your Honor, I just want to make one

23  point.

24          THE COURT:  Or ahead of Mr. Hursh.

25      Go ahead.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 202 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 38 of 56

38

1      MR. PATTEN:  There's been lots discussion about an

2    e-mail Judge Peterson sent to me, and I want the court to

3    appreciate that Judge Peterson was the mediator in this case.

4    And immediately before that e-mail was sent to me, we had a

5    mediation in this room with all of the parties.  And the

6    equitable subordination, which is the topic -- one of the

7    topics of Judge Peterson's e-mail to me was something that was

8    discussed with Judge Peterson and played a big part in the

9    mediation.  And for the mediator to talk to one of the parties

10   about the subject matter of the mediation is certainly not an

11   ex parte communication with Judge Kirscher.

12      Thank you.

13      THE COURT:  All right.

14   Mr. Hursh.

15      MR.  HURSH:  Yes, Your Honor.

16      Thank you.  I will not be long, recognizing I do have as

17   much time as you're willing to allow me.  However, I think

18   there are a couple of points that I would like to emphasize

19   and, in fact, provide some citations to the record, because I

20   think it's important.  As a member of this bar, I am concerned

21   by what I think are some gross mischaracterizations of the

22   record below.  And I would like to draw the court's attention

23   to some cites in the record.

24      Mr. Fox had suggested that if a reasonable person looked

25   at the totality of the circumstances, you know, it would

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 203 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 39 of 56

39

1    suggest there was perhaps some lack of impartiality or bias.  I

2    would submit to the court that, in fact, a reasonable person

3    under the standard in 455 would conclude that, in fact, Judge

4    Kirscher has exercised extraordinary restraint, patience, and

5    extended to all the litigants, including Mr. Blixseth, a

6    leniency for which he should be grateful rather than bringing

7    the present motion.

8         If I could, I'd like to turn to something that has been

9    talked about, and that is this discussion of the auction.  As

10   the court mentioned in its prior comment, Mr. Blixseth did file

11   what he represented to the court to be a factual affidavit

12   wherein he boldly asserts that the auction for the sale of the

13   club assets occurred at the Billings Crowne Plaza.  Judge

14   Kirscher rented a room to facilitate ex parte communications

15   with CrossHarbor and Credit Suisse.  The auction itself was not

16   public, and there's no record of the proceedings.

17        This is at ER-256 through 257.  I would suggest to the

18   court that this is simply irreconcilable with the more than 350

19   pages of transcripts that are found in the record spanning four

20   days, minute entries in the docket reflecting the proceedings,

21   and orders entered during the period covered of May 12th

22   through May 15th.

23        If we look at the record, we see beginning on May 12th and

24   continuing through May 15th, the bankruptcy court oversaw the

25   auction that was the subject of its prior order approving

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 204 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 40 of 56

40

1   bidding procedures.  That's at ER-3843 through 4199.  The

2   auction began, as Mr. Coleman suggested, this was a complicated

3   case.  There were a number of moving parts.  The auction began

4   with entry of the court's order valuing Credit Suisse's

5   collateral at 232 million.  That's ER-3381, 3382.

6       Next, Credit Suisse was permitted to credit bid up to 232

7   million.

8       It is suggested that all of this sort of occurred under

9   some suspicious circumstances.  None of the detail in the

10  record that I've just cited to you supports such a suggestion.

11      Now, even though Blixseth was not a qualified bidder under

12  the bankruptcy court's bidding procedures, his counsel was

13  present at some of the hearings, over the course of May 12

14  through 15th.  If we look at ER-3387 it explicitly reflects

15  that Joel Guthals was there appearing.

16      As I started out these comments regarding the auction,

17  there are 350 pages of transcript which undermine the bold

18  statement Mr. Blixseth makes in his declaration.  They show

19  multiple proceedings over multiple days occurring at the

20  Billings -- at the federal courthouse in Billings.  And I think

21  the contrast between what he states in that affidavit,

22  purportedly under penalty of perjury, and the record is

23  disturbing.

24      A second example that I think bears emphasis and

25  demonstrates how lacking much of this is, if I could direct the

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 205 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 41 of 56

41

1   court to the record ER-252, and this is from the transcript of

2   the proceedings before the bankruptcy court where it was argued

3   to Judge Kirscher, quote:  "If ever there was a kangaroo court,

4   Judge Kirscher presided over it in AP-14 when he allowed

5   Mr. Blixseth to be tried as a defendant and held liable for a

6   209 million judgment, only three weeks after the lawsuit was

7   actually filed against Mr. Blixseth."  That's ER-252, as I

8   said.

9        First off, I would submit to this court that no reviewing

10  court should condone or endorse a litigant's characterization

11  of a court in this way.  But more importantly, the foregoing is

12  another example of the gross misstatements of the record that

13  permeate this pleading.

14       In fact, Mr. Blixseth was not -- the statement suggests

15  that three weeks after a suit was filed, Mr. Blixseth was held

16  liable.  We know that not to be the case, Your Honor.  In fact,

17  as Mr. Coleman suggested, Mr. Blixseth intervened in litigation

18  in March of 2009.  I can refer back to my notes if the court

19  would like a cite for the record for that, but I don't think

20  it's in dispute.  The Judge entered a partial and interim

21  ruling two months later, or six weeks later at the end of -- or

22  beginning of May, wherein he did not address the issues

23  involving Blixseth.  He addressed issues involving Credit

24  Suisse.

25       Judge Kirscher specifically at that time acknowledged that

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 206 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 42 of 56

42

1   Blixseth had complained that the trial had moved too quickly,

2   and then afforded Blixseth an additional nine months to prepare

3   his case.

4        Thus, in fact, more than 18 months after Blixseth's

5   initial intervention in the case and the ultimate decision

6   passed, completely in contravention of the suggestion that

7   these events occurred over the span of three weeks.

8        Now, I would submit to the court that a reasonable person

9   considering the totality of circumstances would not, in fact,

10  find that there was any impartiality or bias on the part of

11  Judge Kirscher.

12       Mr. Fox points to the 47 pages in Judge Kirscher's

13  decision as some sort of acknowledgment as he characterizes it

14  or some sort of support for Mr. Blixseth's motion and

15  affidavit.

16       Judge, if we go back and we look at the underlying motion

17  which has precipitated all this at ER-217, it is, in fact, 50

18  pages of allegations for which there is little support in the

19  record, mischaracterization of the record.  I've focused on two

20  examples here today.  There are others.  And there are

21  omissions, omissions that are just as misleading as the overt

22  misstatements of fact.

23       It would seem to me it is hardly strange, or as Mr. Fox

24  said, an acknowledgment of Mr. Blixseth's charges.  I would

25  suggest that 47 pages to respond to the numerous misstatements

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 207 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 43 of 56

43

1   is nothing less than what one would expect from a court who has

2   exercised a deliberate, practical, and fair approach to

3   proceedings, as reflected in the numerous memorandums of

4   decision that are carefully authored and included throughout

5   the record of all these proceedings.

6         Thank you, Your Honor.

7            THE COURT:  All right.

8         Anyone else from the appellees wish to speak?  Apparently

9   not.

10        Then Mr. Fox, you have the opportunity for response.

11           MR. FOX:  Thank you, Your Honor.

12        The first thing I'd like to do is clarify, apparently,

13  what this court's interpretation of Mr. Blixseth's affidavit

14  is.  My position is simple:  That Mr. Blixseth's affidavit is

15  borne out by the facts as found in the Judge's ruling, that

16  there was -- that he did rent the room at the Crowne Plaza;

17  that he did assist with the --

18           THE COURT:  No.  No.  That's not what the affidavit

19  says.  The affidavit says he rented it for a particular

20  purpose.  The Judge's affidavit says he rented it as a place to

21  stay, which is quite different from renting it for the purpose

22  of conducting negotiations in the room.  If you think that's

23  not a difference, tell me why, please.

24           MR. FOX:  I think that what factually occurred is

25  that Judge Kirscher rented a room at the Crowne --

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 208 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 44 of 56

44

1          THE COURT:  You can't persuade this court on the

2    basis of what you think.  You must persuade this court on the

3    basis of the record.  And I am obliged, whether I like it or

4    not, Mr. Fox, to deal with the record as it exists.  I cannot

5    read into the record that which is not there, and I cannot read

6    out of it that which is there.  And I am faced in this

7    particular narrow component of this case with this very

8    specific declaration of your client of a fact.  And that fact

9    appears, from all that otherwise is available to this court,

10   not to be accurate.  You now characterized it here today as an

11   opinion of his position.  But that's not the way it is

12   presented.

13       I invite you to talk about where this fact comes from if

14   other than from the declaration of your client.

15          MR FOX:  The fact comes from the declaration of my

16   client.  I spoke --

17          THE COURT:  Well, let's leave it there.

18          MR. FOX:  Mr. Blixseth was represented by Joel

19   Guthals at this hearing.  I spoke with Mr. Guthals yesterday.

20          THE COURT:  Wait a minute.  Don't get into what you

21   got by way of talking with Mr. Guthals, unless it is a part of

22   the record on this appeal.

23          MR. FOX:  Okay.

24       Mr. Guthals confirmed --

25          THE COURT:  Counsel.  Counsel, please.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 209 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 45 of 56

45

1    MR. FOX:  Okay.  I understand.  Yes.

2        THE COURT:  You cannot persuade this court, because

3    it's inappropriate to try to do so, by any reference to

4    anything that is beyond the record.

5        MR. FOX:  Okay.

6    The record before the court, including Judge Kirscher's

7    findings in his February 2012 order, demonstrate that he was at

8    the Crowne Plaza, and that he was involved in the communication

9    with the bidders, and that all of that occurred.  And --

10       THE COURT:  That, I think, is not disputed.

11       MR. FOX:  Correct.  And that -- from Mr. Blixseth's

12   perspective, because shortly after the bidding procedure, the

13   term sheet was enacted, the plan was confirmed, as this court

14   later found, without due notice, and Mr. Blixseth was the

15   litigation target.  Mr. Blixseth's perspective is:  "Why was

16   the Judge there having meetings in which my counsel attempted

17   to be involved and could not be" --

18       THE COURT:  Well now, that's an assertion that

19   Mr. Guthals does not support, as I find it in this record.

20   That Mr. Guthals himself says that he was excluded.  If there

21   is such an affidavit or declaration from Mr. Guthals

22   encompassing that set of words and concepts, I will add to the

23   list of things that you are to provide to the court, specific

24   reference to it.

25       MR. FOX:  Mr. -- the argument that I'm making, Your

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 210 of 940
Case 2:11-cv-00073-SEH Document 43 Filed 09/07/12 Page 46 of 56

46

1   Honor, is quite simple, that the interim order came down, the

2   Judge clearly was constrained by May 18, the day the

3   confirmation of the hearing was going to take place. A lot of

4   things happened as the Judge describes, including him renting a

5   hotel at the same place where these negotiations were taking

6   place, overseeing the bidding process, discussing these issues

7   with the parties. Shortly thereafter, the settlement term

8   sheet is included in the third amended plan, and the plan is

9   confirmed.

10         Mr. Blixseth's position is, is that -- exactly what's in

11  his affidavit and exactly as the court describes it in his

12  findings. That all occurred. And he feels that that shows a

13  level of not -- it shows that a reasonable person would find

14  that the Judge is not impartial. The legal standard is not

15  bias. The legal standard is whether a reasonable and skeptical

16  person of the judiciary --

17              THE COURT: Let's stop right there, counsel. And I

18  want to refer you to a particular reference that appears in

19  your reply brief, it's on page 4, top of the first paragraph.

20  This declaration is made without any citation of authority, but

21  I take it to be in summary the position that your client

22  presents to this court, and perhaps you personally. "Thus, the

23  root question is whether a reasonable -- reasonable, objective

24  person living in Montana, who is also suspicious of the inner

25  workings of the judiciary, would question the court's

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 211 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 47 of 56

47

1   impartiality."  Do you see that?

2               MR. FOX:  Yes, Your Honor.

3               THE COURT:  Where does this declaration, "suspicious

4   of the inner workings of the judiciary" come from?  Would you

5   give me the case citation from which that declaration is from?

6               MR. FOX:  Yes, Your Honor.

7               THE COURT:  And where it appears in your brief.

8               MR. FOX:  Yes, Your Honor.  "In applying the

9   reasonable person standard, the Judge should" --

10              THE COURT:  Tell me the case citation first.  Let's

11  start with where it is in the record.

12              MR. FOX:  Okay.  Page 6 of Document 5 in 73.

13              THE COURT:  Is it one of the briefs on this appeal?

14              MR. FOX:  Yes.

15              THE COURT:  Well, tell me which page of which brief?

16  Is it your opening brief?

17              MR. FOX:  Yes.  It's our opening brief.

18              THE COURT:  What page?

19              MR. FOX:  Five.

20              THE COURT:  Page 5.

21      All right.

22      Go ahead.

23              MR. FOX:  And 6.  Crossing over:  "Moore's Federal

24  Practice leading, citing --

25              THE COURT:  Well, that's a Moore's Federal Practice

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 212 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 48 of 56

48

1   citation.  That's not a case citation.

2           MR. FOX:  Citing Liljeberg, which was previously

3   cited in our case --

4           THE COURT:  That's a Third Circuit case; right?

5           MR. FOX:  Correct.  In re Asbestos Litigation --

6           THE COURT:  Do you have any authority that the Ninth

7   Circuit Court of Appeals has adopted that specific "suspicious

8   of inner workings" standard, because all of the cases that you

9   otherwise cite from the Ninth Circuit state something

10  different.  They use a reasonable man standard.  And I find,

11  frankly, and I would ask for your assistance in sorting this

12  out, how one can equate a reasonable man standard with a

13  suspicious mind standard, if I am to adopt this suspicious mind

14  standard as the one to be applied in this case.

15          MR. FOX:  Your Honor, Liljeberg, which is a Third

16  Circuit case, imposes an objective standard on whether a

17  judge's impartiality might be questioned.  It goes on to

18  describe what this person's mind set would be.

19      Now, the Ninth Circuit hasn't adopted that.  It's my

20  understanding, but --

21          THE COURT:  All right.

22      You've answered my question, counsel.  I think it's clear

23  that you would agree that the Ninth Circuit has not, by any

24  case law, at least I'm not aware of any brought to the

25  attention of this court, that would adopt this suspicious mind

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 213 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 49 of 56

49

1    component of a reasonable person standard.

2           MR. FOX:  No.  But we believe that this court citing

3    that authority --

4           THE COURT:  That's the standard you want me to apply?

5           MR. FOX:  As persuasive.  And if tasked --

6           THE COURT:  Very well.

7       I think we have that framed out, and I have a very precise

8    question before me now of do I or do I not, as a part of the

9    standard that I apply, incorporate this suspicious mind of the

10   observer component?  And I will do that, certainly.  I will

11   make that decision whether it is or is not to be incorporated.

12          MR. FOX:  Okay.

13          THE COURT:  And counsel, just so that everyone will

14   understand, I take that to be a cornerstone of your argument,

15   that everything that this court does in reviewing Judge

16   Kirscher's actions should be premised upon this suspicious mind

17   concept as a part of the analysis.  So I either incorporate it

18   or I don't incorporate it, and that's why I'm quite focused

19   upon having your position clearly stated.

20          MR. FOX:  In applying Section 455 on recusal motions

21   in the Third Circuit, that's a component of the standard --

22          THE COURT:  But that's not a decided component of the

23   Ninth Circuit standard at this point, but you are urging me to

24   adopt it?

25          MR. FOX:  Correct.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 214 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 50 of 56

50

1        THE COURT:  Very well.

2     Then we have it clearly framed up.

3        MR. FOX:  Your Honor, I just want to address the

4  issues Mr. Hursh brought to the court's attention, pointing out

5  discrepancies in the record or allegations of omissions or

6  discrepancies in Mr. Blixseth's declaration and the motion.

7  And all of that -- those issues are thoroughly vetted in our

8  papers.  And all of our positions are supported in the record.

9  The defendant -- the opposing parties have their positions, but

10 to allege that Mr. Blixseth cavalierly makes these allegations

11 of appearance of lack of impartiality on the part of the

12 bankruptcy court is wrong.

13       THE COURT:  Well, we'll sort that out, counsel, based

14 upon the record.

15       MR. FOX:  Correct.  And Mr. Coleman spent a

16 considerable time explaining the AP-14 trial.  One of the

17 discrepancies that occurred with the entrance of a $40 million

18 judgment against Mr. Blixseth upon affidavit, was, A, the fact

19 that the judgment was entered against a businessman in federal

20 court, but also there was a claim in there by the

21 B shareholders for $22 million, a claim that had been made in

22 the bankruptcy that was simply added to this judgment against

23 Mr. Blixseth, and that was -- that whole claim was the subject

24 of AP-18, I believe.

25       THE COURT:  All of which is still a matter of

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 215 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 51 of 56

51

1   litigation; is it not?

2           MR. FOX:  Right.  But how can you have a matter of

3   litigation put into a judgment --

4           THE COURT:  Well, you asked me to draw conclusions

5   about motives of a judge in a matter that is still under

6   consideration by various courts, some in this court, some in

7   the Ninth Circuit Court of Appeals.  And that, I take it to be

8   a component of your position is that, "well, there was plenty

9   of record, Judge, for Judge Kirscher to have disqualified

10  himself.  And you, as a person applying the reasonable person

11  standard, either with or without the suspicious mind component,

12  should draw the conclusion, regardless of whether all of these

13  matters are yet completed, that a basis for recusal existed."

14          MR. FOX:  That's correct, Your Honor.

15          THE COURT:  All right.

16      I think the question is squarely framed up.

17          MR. FOX:  And I think that the court must also

18  consider the additional factors in Minoa about how a bankruptcy

19  judge is in a particularly difficult position as administrator

20  and arbitrator, when they've learned facts in the

21  administration of an estate, and then they're asked to find

22  facts as an adjudicator in adversary proceedings.  All of those

23  components should inform this court's inquiry as to whether

24  Judge Kirscher would appear to a reasonable person, we believe,

25  suspicious person, to have a lack of impartiality.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 216 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 52 of 56

52

1              THE COURT:  All right.

2         I think we have the issue that the court must decide, at

3    least in the mind of this court, clearly framed up.

4         Anything else that anyone else wants to bring to the

5    attention of the court before we deem the matter submitted?

6              MR.  HURSH:  Your Honor, Benjamin Hursh.

7              THE COURT:  You want the last word, I take it?

8              MR. HURSH:  Two things, Your Honor.  First off --

9    I've been instructed to go to the podium for the ease of the

10   record.  I apologize.

11        Two things:  One, if it will be helpful to the court to

12   have before it yet another example of where the allegations

13   contained in Mr. Blixseth's affidavit deviate disturbingly from

14   the record, or alternatively, are contradicted by other

15   positions he's taken in litigation, I'm happy to provide it.

16   If the court feels it has enough before it --

17             THE COURT:  Counsel, I have a responsibility to

18   review these records to the extent the court deems necessary

19   and appropriate, to sort out to the point that I can reach a

20   reasonable conclusion --

21             MR.  HURSH:  Yes, sir.

22             THE COURT:  -- what discrepancies may or may not

23   exist, what assertions made by the appellant do or do not find

24   themselves supported by the record.  And certainly, I intend to

25   apply some version of this reasonable person standard in

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 217 of 940
Case 2:11-cv-00073-SEH  Document 43  Filed 09/07/12  Page 53 of 56

53

1   analysis.  I will also, I trust, apply appropriate standards in

2   evaluating facts, factual matters, and resolution of factual

3   disputes that appear to have been resolved by Judge Kirscher in

4   his memorandum.  I have an obligation to decide what to do with

5   those, as well.  Because the appellant certainly took the

6   position earlier that the bankruptcy judge wasn't making any

7   factual determinations in his analysis of the motion to have

8   himself removed.

9       I don't think that's the present position of the

10  appellant, Mr. Fox, you can correct me, do you take the

11  position that Judge Kirscher was precluded from making factual

12  determinations in addressing this issue?

13          MR. FOX:  Your Honor, it's our position that Judge

14  Kirscher, as in our papers, that he couldn't argue the

15  sufficiency of the facts.

16          THE COURT:  No.  But that wasn't the question I asked

17  you.  I take it to be your position in your papers that what

18  your client said about facts had to be accepted as true.

19          MR. FOX:  That's our position.

20          THE COURT:  And it would follow from that that Judge

21  Kirscher would not be permitted in making his analysis by your

22  approach --

23          MR. FOX:  That's correct.

24          THE COURT:  -- from drawing any other conclusion.

25          MR. FOX:  That's correct.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 218 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 54 of 56

54

```
 1              THE COURT:  All right.

 2       I understand your position.

 3              MR.  HURSH:  Very good, Your Honor.  Then, at this

 4  point, I have nothing further.

 5       Thank you.

 6              THE COURT:  All right.

 7       Counsel, we'll deem this matter submitted subject to the

 8  responsibility of Mr. Fox to get in to us this additional

 9  material.  Mr. Fox, is a week adequate to get that before the

10  court?

11              MR. FOX:  Yes, Your Honor.

12              THE COURT:  All right.

13       Then that's what you have.  You have a week from today to

14  get that before the court.

15              MR. FOX:  Thank you, Your Honor.

16              THE COURT:  And of course, file it.  Serve all

17  counsel.  If someone feels like he or it must respond, you can

18  petition the court for an opportunity to do so.  Otherwise,

19  this matter will be, upon receipt of those documents, deemed

20  submitted for decision.

21       Thank you very much for your participation, gentlemen.

22  We've read lots of briefs and lots of cases and a lot of the

23  record, so --

24              MR. FOX:  Your Honor.

25              THE COURT:  Yes.
```

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 219 of 940
Case 2:11-cv-00073-SEH Document 43 Filed 09/07/12 Page 55 of 56

55

1          MR. FOX:  I wanted to clarify that what you had asked

2     me to provide is reference to Judge Kirscher's statements about

3     affidavits; correct?

4          THE COURT:  That's right.  If you think it's a part

5     of the record in this case in one of these appeals.

6          MR. FOX:  Correct.

7          THE COURT:  And that he violated that, which was an

8     argument that you made, then I want to know where these

9     declarations to that effect appear in the record of one of the

10    cases on appeal.

11         MR. FOX:  Yes, Your Honor.

12         MR. LASTOWSKI:  If I may, Your Honor, I thought that

13    there was also an issue as to whether Mr. Guthals was precluded

14    from the meetings with the bidders.

15         THE COURT:  No.  I don't think so.  What I said about

16    that was that I don't find anything in the record that would

17    say that Mr. Guthals ever supported the declaration that

18    appears in Mr. Blixseth's affidavit that Guthals was excluded.

19      If there is such a reference, though, Mr. Fox, you may

20    certainly bring it to my attention.

21         MR. FOX:  I do not believe there is a reference, Your

22    Honor.

23         THE COURT:  All right.

24      That was where I thought it ended, in any event.

25      All right.

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 220 of 940
Case 2:11-cv-00073-SEH   Document 43   Filed 09/07/12   Page 56 of 56

56

1          We're in recess.

2                    (The proceedings in this matter were adjourned at

3                     11:21 a.m.)

4

5

6

7

8

9

10                        C E R T I F I C A T E

11

12          I certify that the foregoing is a correct transcript from

13     the record of proceedings in the above-entitled matter.

14          /s/ Tina C. Brilz, RPR, FCRR

15          Dated this 6th day of September, 2012.

16

17

18

19

20

21

22

23

24

25

Patrick T. Fox (#8071)
DOUBEK, PYFER & FOX LLP
PO Box 236
Helena MT 59624
406 442 7830 ph
406 442 7839 fax
patrickfox@doubekpyfer.com
*Attorney for Appellant Timothy L. Blixseth*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA - BUTTE DIVISION

| | |
|---|---|
| In re : YELLOWSTONE MOUNTAIN CLUB, LLC ET AL | Case Nos. 2:11-00072, 73, 74, 75, 76, 77,78-BU-SEH<br><br>On appeal from<br>Bankruptcy Case No. 08-61570 and<br>Adv. Case Nos. 09-14, 09-18, 09-64, 10-15, 10-88.<br><br>POST-HEARING BRIEF |

Mr. Blixseth hereby files this post-hearing brief in response to the leave that this Court granted to Mr. Blixseth's counsel at the hearing in this matter on August 24, 2012.

At said August 24th hearing, this Court gave leave to Mr. Blixseth to provide it with citations to the record on appeal which supported Mr. Blixseth's contention that Bankruptcy Judge Kirscher applies a "double-standard" to Mr. Blixseth in that Judge Kirscher has previously stated he does not try cases by affidavit, yet entered a $40 million judgment against Mr. Blixseth simply on an affidavit of opposing counsel and without providing Mr. Blixseth with an opportunity to respond or examine the affiant.

Reference to Judge Kirscher's statement in this regard can be found at ER 553 and ER 874 (Case No. 11:73, Docket Nos. 7-3 and 10-1).[1]  Mr. Blixseth directs this Court's attention specifically to Judge Kirscher's statement to Mr. Blixseth's counsel, Michael J. Flynn, found on these ER pages at transcript page 18, lines 22-25 "THE COURT: Well, I guess I'm not so certain that the case law supports -- as you

---

[1] This Excerpt of Record citation should be identical in appeal case numbers 11-73 through 11-78.  Mr. Blixseth references the docket entry in Case No. 11:73 simply for the Court's convenience.

1

<u>know from prior appearances, we don't try things in this court by</u>

<u>affidavit.</u>"[2]  *Id.* (emphasis added).

Mr. Blixseth's argument concerning this issue can be found in his Opening Brief at p. 26, footnote 2.  Case No. 11:73, Docket No. 5.[3]  Upon reviewing the ER references concerning this issue in footnote 2 of the Opening Brief, it appears that Mr. Blixseth's counsel erroneously cited to ER 337-338.  Mr. Blixseth and his counsel apologize to the Court for the erroneous citation and appreciate this Court allowing Mr. Blixseth to provide this Court with the correct ER references to ER 553 and 874.

DATED this 24th day of August, 2012.

/s/ Patrick Fox
Doubek Pyfer & Fox LLP
PO Box 236
Helena MT 59624
406 442 7830 ph
406 442 7839 fax
patrickfox@doubekpyfer.com
*Attorney for Appellant Timothy
L. Blixseth*

---

[2] Judge Kirscher's reference to what Mr. Flynn knows based on his "prior appearances" refers to nearly identical statements that Judge Kirscher made to Mr. Flynn in Adversary Case No. 09-14 in 2009.  However, transcripts of the 2009 proceedings in AP-14 were not included in the record in these appeals but can be provided to this Court should it grant Mr. Blixseth leave to do so.
[3] Mr. Blixseth made this argument to Judge Kirscher in connection with his Motion to Disqualify.  ER 537 (Case No. 11-73, Docket No. 7-3), 582 (Case No. 11-73, Docket No. 8-1).

2

# Exhibit 26

Joel E. Guthals, Attorney No. 589
Guthals, Hunnes & Reuss, P.C.
P.O. Box 1977
Billings, MT 59103-1977
Telephone: 406-245-3071
Facsimile: 406-245-3074
jeguthals@ghrtlawfirm.com

Michael J. Flynn
One Center Plaza, Suite 240
Boston, MA 02018
Telephone: 858-775-7624
Facsimile: 858-759-0711
mike@mjfesq.com

Benjamin A. Schwartzman
Thomas A. Banducci
Wade L. Woodard
*Admitted Pro Hac Vice*
Banducci Woodard Schwartzman PLLC
802 West Bannock, Suite 500
Boise, Idaho 83702
Telephone: 208-342-4411
Facsimile: 208-342-4455
bschwartzman@bwslawgroup.com
tbanducci@bwslawgroup.com
wwoodard@bwslawgroup.com
Attorneys for Defendant
Timothy L. Blixseth

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| In Re: | ) | **Case No. 08-61570-11-RBK** |
| | ) | |
| **YELLOWSTONE MOUNTAIN** | ) | **Jointly Administered with 08-61571 and** |
| **CLUB, LLC, et al.,** | ) | **08-61572, 08-61573** |
| | ) | |
| **Debtors.** | ) | **Chapter 11** |
| | ) | |
| _____ | ) | |
| | ) | |
| **Michael Snow, et al.,** | ) | **Adv. Pro. No. 09-00018** |
| | ) | |
| **Plaintiffs,** | ) | **Judge: Ralph B. Kirscher** |
| **vs.** | ) | |
| | ) | |
| **BLX Group, Inc., f/k/a/ Blixseth Group,** | ) | |
| **Inc., et al.** | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## TIMOTHY BLIXSETH'S MOTION FOR SUMMARY JUDGMENT CONCERNING DERIVATIVE CLAIMS, STANDING, *ALTER EGO*, FIDUCIARY DUTY, AND STATUTES OF LIMIATION AND MEMORANDUM IN SUPPORT

Timothy Blixseth ("Blixseth"), pursuant to FED. R. BANKR. P. 7056, Local Rule 7056-1, and FED. R. CIV. P. 56, files this Motion for Summary Judgment Concerning Derivative Claims, Standing, *Alter Ego*, Fiduciary Duty, and Statutes of Limitation and Memorandum in Support. The Consolidated Statement of Undisputed Facts ("SUF") supporting this Motion is filed herewith pursuant to Local Rule 7056-1, and is incorporated herein as if fully set forth.

## I.    ARGUMENTS AND AUTHORITIES

### A.    Standard.

FED. R. BANKR. P. 7056 incorporates the standards set forth in FED. R. CIV. P. 56 when a party moves for summary judgment in an adversarial proceeding.  As this Court undoubtedly knows, summary judgment under FED. R. CIV. P. 56 is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1117 (9th Cir. 2009).

### B.    Dismissal is required because Plaintiffs have alleged a derivative cause of action without following the requirements of FED. R. CIV. P. 23.1.

#### 1.    Standard for derivative actions under Montana law and Rule 23.1.

Plaintiffs' Amended Complaint states causes of action which must be brought derivatively. Montana law is abundantly clear that a shareholder can enforce a corporate right in a derivative action, but must do so pursuant to certain procedures.  *Sax v. World Wide Press, Inc.*, 809 F.2d 610, 613 (9th Cir. 1987) (citing Montana law).  Montana courts follow the well-settled rule that an action enforces a corporate right "when the gravamen of the complaint is injury to the company and not a separate and distinct injury to the shareholders; [under these circumstances] the complaint should be brought as a derivative action."  *Id.* at 614.  Once state law characterizes the action as derivative, the procedural rules for federal actions are determined by federal law.  *Id.*

# Exhibit 27

Joel E. Guthals, Attorney No. 589
Guthals, Hunnes & Reuss, P.C.
P.O. Box 1977
Billings, MT 59103-1977
Telephone: 406-245-3071
Facsimile: 406-245-3074
E-mail: jeguthals@ghrtlawfirm.com

Benjamin A. Schwartz man
Thomas A. Banducci
Wade L. Woodard
*Admitted Pro Hac Vice*
Banducci Woodard Schwartzman PLLC
802 West Bannock, Suite 500
Boise, Idaho 83702
Telephone: 208-342-4411
Facsimile: 208-342-4455
bschwartzman@bwslawgroup.com
tbanducci@bwslawgroup.com
wwoodard@bwslawgroup.com

Michael J. Flynn, *admitted Pro Hac Vice*
One Center Plaza, Suite 240
Boston, MA 02018
Telephone: 858-775-7624
Facsimile: 858-759-0711
mike@mjfesq.com

Philip H. Stillman, *admitted Pro Hac Vice*
Stillman & Associates
508 Meadowmist Court, Suite B
Encinitas, CA 92024
Telephone: (888) 235-4279
Fax: (888) 235 4279
pstillman@stillmanassociates.com

*Attorneys for Timothy Blixseth*

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re:<br><br>YELLOWSTONE MOUNTAIN CLUB, LLC, et al.,<br><br>                Debtors.<br>_____<br>Michael Snow, Greg C. Branch, A.c. and Linda Markkula (Trustees of the Arlin Trust), Spano Yellowstone Holdings Limited Partnership, Robert P. and Katharine M. Watson, Bankers Financial Corporation and Mountain Vista Properties AG,<br>                Plaintiffs,<br>vs.<br><br>BLX Group, Inc., f/k/a/ Blixseth Group,Inc., Timothy L. Blixseth, Edra D. Blixseth, John Does 1–15, and ABC Companies 1-15.<br>                Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**Case No. 08-61570-11-RBK**<br>**Jointly Administered with 08-61571 and 08-61572, 08-61573**<br><br>**Chapter 11**<br><br>Adv. Pro. No. 09-00018<br>Judge: Ralph B. Kirscher<br><br>**DEFENDANT TIMOTHY BLIXSETH'S MOTION FOR SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSE "D"** |

# Exhibit 28

Joel E. Guthals, Attorney No. 589
Guthals, Hunnes & Reuss, P.C.
P.O. Box 1977
Billings, MT 59103-1977
Telephone: 406-245-3071
Facsimile: 406-245-3074
E-mail: jeguthals@ghrtlawfirm.com

Benjamin A. Schwartz man
Thomas A. Banducci
Wade L. Woodard
*Admitted Pro Hac Vice*
Banducci Woodard Schwartzman PLLC
802 West Bannock, Suite 500
Boise, Idaho  83702
Telephone:  208-342-4411
Facsimile:   208-342-4455
bschwartzman@bwslawgroup.com
tbanducci@bwslawgroup.com
wwoodard@bwslawgroup.com

Michael J. Flynn, *admitted Pro Hac Vice*
One Center Plaza, Suite 240
Boston, MA 02018
Telephone:  858-775-7624
Facsimile:    858-759-0711
mike@mjfesq.com

*Attorneys for Timothy Blixseth*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| *In Re:* | ) **Case No. 08-61570-11-RBK** |
| | ) **Jointly Administered with 08-61571 and** |
| YELLOWSTONE MOUNTAIN CLUB, LLC, | ) **08-61572, 08-61573** |
| et al., | ) |
| Debtors. | ) **Chapter 11** |
| _____ | ) |
| Michael Snow, Greg C. Branch, A.c. and Linda | ) Adv. Pro. No. 09-00018 |
| Markkula (Trustees of the Arlin Trust), Spano | ) Judge: Ralph B. Kirscher |
| Yellowstone Holdings Limited Partnership, | ) |
| Robert P. and Katharine M. Watson, Bankers | ) **DEFENDANT TIMOTHY BLIXSETH'S** |
| Financial Corporation and Mountain Vista | ) **MOTION FOR SUMMARY** |
| Properties AG, | ) **JUDGMENT ON AFFIRMATIVE** |
| Plaintiffs, | ) **DEFENSES "K" AND "L" ON** |
| vs. | ) **CAUSATION AND SUPPORTING** |
| | ) **MEMORANDUM** |
| BLX Group, Inc., f/k/a/ Blixseth Group,Inc., | ) |
| Timothy L. Blixseth, Edra D. Blixseth, John | ) |
| Does 1–15, and ABC Companies 1-15. | |
| Defendants | |
| _____ | |

COMES NOW, Timothy Blixseth by and through his attorneys of record and respectfully

requests that this Court enter summary judgment on his Affirmative Defenses "K" and "L" in his Answer to the First Amended Complaint in the above-captioned adversary proceeding pursuant to Fed. R. Bankr. P. 7056.

In support for his Motion, Mr. Blixseth relies on this Motion, the accompanying Memorandum, his Separate Statement of Undisputed Facts, the exhibits submitted therewith, the Affidavits of Michael J. Flynn, Timothy Blixseth and Christopher J. Conant and the pleadings in this case.

## I.

## STATEMENT OF FACTS RELEVANT TO THIS MOTION

The facts underlying this motion are set forth in detail in the Statement of Undisputed Facts filed herewith.  Essentially, Plaintiffs together own 9.75% of debtor Yellowstone Mountain Club, LLC ("YMC").  Defendant Blixseth Group, Inc. ("BGI") owned the remainder of the shares.  The First Amended Complaint can be rendered down to a simple yet faulty premise – that BGI improperly took a loan of $209 million from YMC without sharing a pro rata portion of that loan with them.[1]  Mr. Blixseth can only be individually liable, if at all, as the alter ego of BGI, a claim that belongs to the BLX Group, Inc. f/k/a BGI Trustee.  However, although it is clear that the plaintiffs in this action are attempting to assert derivative claims that belong to the Yellowstone Debtors, and although Mr. Blixseth's personal liability *must* be premised on Plaintiffs' theory in their second cause of action that Mr. Blixseth is the alter ego of BGI (which

---

[1]  This premise is nonsensical if one believes, as was asserted by the Yellowstone Club Liquidating Trust in AP 09-0014 that the $209 million loan to BGI was a fraudulent conveyance. Although Mr. Blixseth forcefully denies that the loan to BGI was a fraudulent conveyance or was in any other way improper, Plaintiffs therefore are demanding a portion of an allegedly fraudulent conveyance.

– 2 –

# Exhibit 29

Brian A. Glasser
Athanasios Basdekis
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone:  (304) 345-6555
Facsimile:  (304) 342-1110
Email:  bglasser@baileyglasser.com
Email:  tbasdekis@baileyglasser.com

Joseph W. Anthony
Mary L. Knoblauch
ANTHONY OSTLUND BAER & LOUWAGIE P.A.
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:  (612) 349-6969
Facsimile:  (612) 349-6996
Email:  janthony@aoblaw.com
Email:  mknoblauch@aoblaw.com

Ronald A. Bender (MT #106)
Matthew J. Cuffe (MT #4448)
WORDEN THANE P.C.
P.O. Box 4747
Missoula, Montana  59806
Telephone:  (406) 721-3400
Facsimile:  (406) 721-6985
Email:  rbender@wthlaw.net
Email:  mcuffe@wthlaw.net

Steven L. Hoard
John G. Turner, III
Robert R. Bell
MULLIN HOARD & BROWN, LLP
500 South Taylor, Suite 800, LB# 213
Amarillo, Texas  79120-1656
Telephone:  (806) 372-5050
Facsimile:  (806) 371-6230
Email:  shoard@mhba.com
Email:  jturner@mhba.com
Email:  rbell@mhba.com

ATTORNEYS FOR THE SNOW PLAINTIFFS

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re:<br>Yellowstone Mountain Club, LLC,<br>et al., ,[1]<br><br>            Debtors.<br>MICHAEL SNOW, Greg C. Branch, A.C.<br>Markkula, Linda Markkula, Spano<br>Yellowstone Holdings Limited Partnership,<br>Robert P. Watson, Katharine M. Watson,<br>Bankers Financial Corporation, and Mountain<br>Vista Properties AG,<br><br>            Plaintiffs.<br>vs.<br><br>BLX Group, Inc. f/k/a Blixseth Group, Inc.,<br>Timothy L. Blixseth, Edra D. Blixseth, John<br>Does 1 – 15, and ABC Companies 1 – 15<br><br>            Defendants. | Chapter 11<br><br>Case No. 08-61570-11-RBK<br><br><br><br><br>Adv. No. 09-00018<br><br>PLAINTIFFS' OMNIBUS RESPONSE<br>TO BLIXSETH'S MOTIONS FOR<br>SUMMARY JUDGMENT (DOCKET<br>NOS. 299, 302, 308 AND 330) |

---

[1] The Debtors are the following entities: Yellowstone Mountain Club, LLC, Yellowstone Development, LLC and Big Sky Ridge, LLC, which entities are substantively consolidated, and Yellowstone Club Construction Co., LLC, which is jointly administered with the other Debtors.

Plaintiffs Michael Snow, Gregory C. Branch Family Limited Partnership,[2] A.C. Markkula, Linda Markkula, Spano Yellowstone Holdings Limited Partnership, Robert P. Watson, Katharine Watson, Bankers Financial Corporation and Mountain Vista Properties, AG, file this Response to the following Motions: (1) Timothy Blixseth's Motion for Summary Judgment Concerning Derivative Claims, Standing, Alter Ego, Fiduciary Duty, and Statutes of Limitation and Memorandum in Support (Docket No. 299); (2) Timothy Blixseth's Motion for Summary Judgment on Affirmative Defense D (Docket No. 302); (3) Timothy Blixseth's Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation and Supporting Memorandum (Docket No. 308); and (4) Timothy Blixseth's Amended Motion for Summary Judgment on Plaintiffs' Damages Claims/Exclude the Expert Opinions and Testimony of Kent Mordy and Memorandum in Support (Docket No. 330) (collectively, the "Motions"). In response to the Motions, the Plaintiffs respectfully state as follows:

## INTRODUCTION

In a truly remarkable exercise, on July 2, 2010, Defendant Timothy L. Blixseth ("Blixseth") filed four separate Motions for Summary Judgment.[3] Filing four motions for summary judgment is a transparent violation of the letter and the spirit of the Local Rules, which provide a 25 page limit on Motions for Summary Judgment. Mont. LBR 9013-2(a). Ignoring this limit, and failing to seek leave to file a brief in excess of 25 pages, Blixseth simply inundates this Court with over 100 pages of summary judgment briefing and several thousand pages of

---

[2] On June, 14, 2010, this Court entered an order substituting Gregory C. Branch Family Limited Partnership in for Greg C. Branch as Plaintiff.

[3] One of these so-called Motions for Summary Judgment is also a Motion to Exclude the Opinions and Testimony of Kent Mordy ("Motion to Exclude"). This Motion to Exclude is untimely and should be summarily denied. The Court extended the deadline for "dispositive motions" to July 2, 2010 (Doc. No. 283). The Motion to Exclude is not a dispositive motion and is thus governed by the June 11, 2010 deadline set forth in the Court Scheduling Order (Doc. No. 103). Since this motion was filed on July 2, 2010, it is untimely.

2

# Exhibit 30

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC,**<br><br>Debtor. | Case No. **08-61570-11** |
| **MICHAEL SNOW**, **GREGORY C BRANCH FAMILY LIMITED PARTNERSHIP**, **A.C. Markkula**, **Linda Markkula**, **Spano Yellowstone Holdings Limited Partnership**, **Robert P. Watson**, **Katharine M. Watson**, **Bankers Financial Corporation**, and **Mountain Vista Properties AG**,<br><br>Plaintiffs.<br><br>-vs-<br><br>**BLX Group, Inc. F/k/a Blixseth Group, Inc**, **Timothy L. Blixseth**, **Edra D. Blixseth**, **John Does 1- 15**, and **ABC Companies 1-15**,<br><br>Defendants. | Adv No. **09-00018** |

## *MEMORANDUM of DECISION*

At Butte in said District this 4th day of August, 2010.

Following commencement of this Adversary Proceeding on March 3, 2009, a pretrial scheduling conference was held September 25, 2009. Pursuant to a pretrial scheduling order

1

entered that same date, trial was originally scheduled to commence on February 24, 2010.  The

Court subsequently deconsolidated this Adversary Proceeding from 09-00017 and 09-00014 on

January 14, 2010, and rescheduled the pretrial scheduling conference.  The Court then entered a

second pretrial scheduling order on January 28, 2010, setting June 11, 2010, as the deadline to

file all pretrial motions, with trial commencing on August 23, 2010.

On June 2, 2010, Plaintiffs and Blixseth filed a Stipulation to Amend Scheduling Order to

Allow Certain Discovery and Extend Motions Deadline.  In an Order entered June 3, 2010, the

Court approved the Stipulation and extended the deadline for dispositive motions to July 2, 2010,

with the deadline for responses to dispositive motions set as July 25, 2010.  On July 2, 2010,

Blixseth timely filed: (1) a Motion for Summary Judgment Concerning Derivative Claims,

Standing, Alter Ego, Fiduciary Duty, and Statutes of Limitation at docket entry no. 299; (2) a

Motion for Summary Judgment on Affirmative Defense "D" at docket entry no. 302; and (3) a

Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation at docket

entry no. 308.   Blixseth also filed on July 6, 2010, an Amended Motion for Summary Judgment

on Plaintiffs' Damages Claims/Exclude the Expert Opinions & Testimony of Kent Mordy at

docket entry no. 330.  Blixseth's Amended Motion for Summary Judgment on Plaintiffs'

Damages Claims/Exclude Expert Opinions & Testimony of Kent Mordy amends a prior motion

filed July 2, 2010, at docket entry no. 300, which motion inappropriately contains the caption of

Adversary Proceeding 09-00014 rather than this Adversary Proceeding.

The time for the Plaintiff's to respond to dispositive motions expired on July 25, 2010, a

Sunday.  The Court deems the Plaintiffs' Omnibus Response to Blixseth's Motions for Summary

Judgment filed July 26, 2010, at docket entry no. 338 as timely.  The Plaintiffs also filed a

Statement of Genuine Issues on July 26, 2010, at docket entry no. 339.

When the Court began its initial draft of this Memorandum of Decision, the Court set out to recite each of Blixseth's undisputed facts. Such undisputed facts ended on page 66 of the Court's initial draft order. The next page of the initial order was devoted to the issues posed by the Plaintiffs. Pages 68 and 69 of that initial order then set forth the Court's standard summary judgment language. In all, before reaching any analysis, the Court's order was 69 pages.

After carefully reading Blixseth's motions, briefs and undisputed facts, together with the Plaintiffs' Omnibus Response and the Plaintiffs' Statement of Genuine Issues, the Court elects to scrap the original 69 pages of its order and dispose of Blixseth's pending motions in a manner that is commensurate with the merits of Blixseth's arguments.

The parties know the standard for summary judgment, and the Court need not repeat it. Also, the Court finds the Plaintiffs' Omnibus Response well-reasoned and adopts such reasoning here. For the reasons argued by the Plaintiffs' and given the presumptions in favor of the non-moving parties, the Court will enter a separate order providing as follows:

IT IS ORDERED:

1. Blixseth's Motion for Summary Judgment Concerning Derivative Claims, Standing, Alter Ego, Fiduciary Duty, and Statutes of Limitation filed at docket entry no. 299 is DENIED.

2. Blixseth' Motion for Summary Judgment on Affirmative Defense "D" filed at docket entry no. 302 is DENIED.

3. Blixseth's Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation filed at docket entry no. 308 is DENIED.

4. Blixseth's Amended Motion for Summary Judgment on Plaintiffs' Damages

3

Case No. 12-35986 ER  227

Claims/Exclude the Expert Opinions & Testimony of Kent Mordy filed at docket entry no. 330 is

DENIED.

BY THE COURT

*[signature: Ralph B. Kirscher]*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

**Case No. 12-35986 ER 228**

# Exhibit 31

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC,**<br><br>Debtor. | Case No.  **08-61570-11** |
| **MICHAEL SNOW**, **GREGORY C BRANCH FAMILY LIMITED PARTNERSHIP**, **A.C.  Markkula**, **Linda Markkula**, **Spano Yellowstone Holdings Limited Partnership**, **Robert P. Watson**, **Katharine M. Watson**, **Bankers Financial Corporation**, and **Mountain Vista Properties AG**,<br><br>Plaintiffs.<br><br>-vs-<br><br>**BLX Group, Inc. F/k/a Blixseth Group, Inc**, **Timothy L. Blixseth**, **Edra D. Blixseth**, **John Does 1- 15**, and **ABC Companies 1-15**,<br><br>Defendants. | Adv No.  **09-00018** |

# *O R D E R*

At Butte in said District this 4th day of August, 2010.

In accordance with the Memorandum of Decision entered in the above-referenced

Adversary Proceeding on this same date,

1

**Case No. 12-35986 ER  230**

IT IS ORDERED:

1.  Blixseth's Motion for Summary Judgment Concerning Derivative Claims, Standing, Alter Ego, Fiduciary Duty, and Statutes of Limitation filed at docket entry no. 299 is DENIED.

2.  Blixseth' Motion for Summary Judgment on Affirmative Defense "D" filed at docket entry no. 302 is DENIED.

3.  Blixseth's Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation filed at docket entry no. 308 is DENIED.

4.  Blixseth's Amended Motion for Summary Judgment on Plaintiffs' Damages Claims/Exclude the Expert Opinions & Testimony of Kent Mordy filed at docket entry no. 330 is DENIED.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

2

**Case No. 12-35986 ER  231**

NO. 12-35986

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appeallate CM/ECF system on April 8, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CB/ECF system

April 8, 2013                                        s/ Christopher J. Conant

                                                     Christopher J. Conant, Esq

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

## NO. 12-35986

---

TIMOTHY L. BLIXSETH

Appellant,

v.

YELLOWSTONE MOUNTAIN CLUB, LLC
YELLOWSTONE DEVEOPMENT, LLC
BIG SKY RIDGE, LLC
YELLOWSTONE CLUB CONSTRUCTION CO., LLC

Appellees.

---

### APPELLANT'S EXCERPTS OF RECORD
### Volume III of V
### Pages 232 through 521

---

Appeal from the United States District Court for the District of Montana
Case No. 2:11-73-BU-SEH

---

Phillip H. Stillman
Stillman & Associates
300 South Poine Drive,
Suite 4206
Miami Beach, FL 33139
Telephone: (888) 235-4279
*pstillman@stillmanassociates.com*

Patrick T. Fox
Doubek Pyfer & Fox, LLP
PO Box 236
Helena, MT 59624
Telephone: (406) 442-7830
*patrickfox@douberpyfer.com*

Christopher J. Conant
Conant Law LLC
730 17th Street
Suite 200
Denver, CO 80202
Telephone: (303) 298-1800
*cconant@conantlawyers.com*

Michael J. Ferrigno
Law Office of Michael Ferrigno,
PLLC
1200 N. Main Street, Suite 486
Meridian, ID 83680
Telephone: (208) 319-3561
*michael.ferrigno@ferrigno-law.com*

Attorneys for Appellant Timothy L. Blixseth

# INDEX

## APPELLANT'S EXCERPTS OF RECORD

### TIMOTHY L. BLIXSETH

**Appellant,**

**v.**

### YELLOWSTONE MOUNTAIN CLUB, LLC
### YELLOWSTONE DEVEOPMENT, LLC
### BIG SKY RIDGE, LLC
### YELLOWSTONE CLUB CONSTRUCTION CO., LLC

**Appellees.**

### NO. 12-35986

| Docket No. | Date | Description | Volume | Pages |
|---|---|---|---|---|
| 51 | 11/16/2012 | Order Denying Blixseth's Appeal | I | 1-5 |
| 6.1, Ex. 1 | 1/3/2012 | Memorandum of Decision | I | 6-47 |
| 6.1, Ex. 3 | 1/3/2012 | Memorandum of Decision | I | 48-94 |
| 52 | 11/28/2012 | Notice of Appeal to Ninth Circuit | II | 95-153 |
| 43 | 8/24/2012 | Transcript of Motion Hearing | II | 154-209 |
| 39 | 8/24/2012 | Post Hearing Brief | II | 210-212 |
| 17-1, Ex. 26 | 2/16/2012 | Motion for Summary Judgment Concerning Derivative Claims, Alter Ego, Fiduciary Duty, and Statute of Limitation and Memorandum in Support | II | 213-215 |
| 17-2, Ex. 27 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses | II | 216-217 |

| 17-3, Ex. 28 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation and Supporting Memorandum | II | 218-220 |
|---|---|---|---|---|
| 17-4, Ex. 29 | 2/16/2012 | Ominbus Response to Motions for Summary Judgment | II | 221-223 |
| 18-1, Ex. 30 | 2/16/2012 | August 4, 2010 Memorandum of Decision | II | 224-228 |
| 18-2, Ex. 31 | 2/16/2012 | August 4, 2010 Order | II | 229-231 |
| 12-5 | 2/2/2012 | Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) | III | 232-462 |
| 6.1, Ex. 2 | 1/3/2012 | Notice of Appeal | III | 463-466 |
| 6.1, Ex. 2 | 1/3/2012 | Amended Notice of Appeal | III | 467-471 |
| 6.1, Ex. 4 | 1/3/2012 | Yellowstone Club Settlement Term Sheet | III | 472-491 |
| 6.2 | 1/3/2012 | Yellowstone Club Disclosure Statement | III | 492-521 |
| 7.3, Ex. 7 | 1/3/2012 | Am. Affidavit Of Timothy L. Blixseth in Support of Motion to Disqualify | IV | 522-549 |
| 7.3, Ex. 8 | 1/3/2012 | December 10, 2010 Hearing Tr. | IV | 550-552 |
| 8.1 | 1/3/2012 | Supplemental Affidavit of Timothy L. Blixseth | IV | 553-584 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Cash Collateral Email | IV | 585 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Generic Order Email | IV | 586 |
| 10-1. Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington at Home Email | IV | 587 |
| 10-1, Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Cell Phone Email | IV | 588 |

2

| 10-1, Ex. 8 | 1/3/2012 | Supp. Affidavit, Ex. 8 Peterson Email | IV | 589-590 |
|---|---|---|---|---|
| 10-1, Ex. 9 | 1/3/2012 | Supp. Affidavit, Ex. 9 Harrington "Heads Up" Email | IV | 591-592 |
| 10-1, Ex. 10 | 1/3/2012 | Supp. Affidavit, Ex. 10 Richardson Email | IV | 593-594 |
| 10-2. Ex. 12 | 1/3/2012 | Bankruptcy Court Memorandum of Decision in BLX Group, Inc., Nov. 22, 2011 | IV | 595-609 |
| 10-2, Ex. 13 | 1/3/2012 | AP-88 Complaint | IV | 610-622 |
| 10-2 | 1/3/2012 | Hearing Transcript Disqualification Hearing, Jan. 18, 2011 | IV | 623-680 |
| 10.3, Ex. 14 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, August 16, 2010 | IV | 681-816 |
| 10.3, Ex. 15 | 1/3/2012 | Memorandum of Decision in AP 09-100, September 27,2010 | V | 817-843 |
| 10.3, Ex. 16 | 1/3/2012 | AP-14 Judgment | V | 844-846 |
| 10.3, Ex. 17 | 1/3/2012 | YCLT Motion to Reconsider AP-14 | V | 847-850 |
| 10.3, Ex. 18 | 1/3/2012 | Affidavit of Charles Hingle in Support of YCLT's Motion to Reconsider AP-14 | V | 851-858 |
| 10-3, Ex. 19 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, Sept. 7, 2010 | V | 859-868 |
| 10-3, Ex. 20 | 1/3/2012 | YCLT Motion to Certify for Direct Appeal in AP-14 | V | 869-871 |
| 10-3, Ex. 21 | 1/3/2012 | YCLT Motion to Expedite Hearing on Motion to Certify for Direct appeal | V | 872-874 |
| 10-3, Ex. 22 | 1/3/2012 | Order granting Motion to Expedite Hearing | V | 875-877 |
| 10-3, Ex. 24 | 1/3/2012 | Order granting Motion to Certify Order | V | 878-880 |

3

| 10-4, Ex. 25 | 1/3/2012 | Memorandum of Decision in AP-88, January 3, 2012 | V | 881-900 |
|---|---|---|---|---|
| | | U.S. District Court, District of Montana - Docket Report | V | 901-909 |

# EXHIBIT
# 30

Patrick T. Fox (#8071)
DOUBEK & PYFER
PO BOX 236
Helena MT 59624
406 442 7830 ph
406 442 7839 fax
patrickfox@doubekpyfer.com

*Attorneys for Timothy L. Blixseth*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re: | **Case No. 08-61570-11-RBK** |
| | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC, et al.,** | **Jointly Administered with 08-61571 and 08-61572, 08-61573** |
| | |
| **Debtors.** | **Also applicable to Adv. Case Nos. 09-64, 09-18, 10-15, 10-88** |
| | |
| | **Chapter 11** |
| | |
| | **AMENDED MOTION TO DISQUALIFY BANKRUPTCY JUDGE KIRSCHER (WITH EXHIBITS)** |

ER001811

# TABLE OF CONTENTS

1.  Introduction ................................................................................................. 1

2.  Legal Basis for Disqualification of a Judge ......................................... 3

3.  Legal Standard for Reviewing Allegations of Impartiality.................... 7

4.  Factual Basis for Disqualification......................................................... 8

    A.  Judge Kirscher Has Pre-Judged that the Yellowstone Club Bankruptcy Petition and Reorganization Plan Were Filed in Good-Faith .................................. 9

    B.  Judge Kirscher Has Categorically Found Mr. Blixseth to Not Be a Credible Witness and Has Maligned His Legal Theories and Insistence on Due Process; This Necessitates His Disqualification on Remand and Adversary Proceedings Against Him ........................................................................... 11

    C.  Judge Kirscher Invited and Entertained Ex Parte Advocacy Against Mr. Blixseth ........................................................................ 14

    D.  Judge Kirscher's Law Clerk Engaged in Ex Parte Communications with Mr. Blixseth's Adversaries to Mr. Blixseth's Prejudice ................................ 16

    E.  Judge Kirscher Has Demonstrated a General Disdain for Mr. Blixseth........ 17

    F.  Judge Kirscher Retaliates Against Mr. Blixseth's Attorneys ........................ 19

    G.  On a Motion to Reconsider Judge Kirscher Entered a $40 Million Judgment Against Mr. Blixseth Without Affording Him an Opportunity to Respond to the Motion ................................................................................. 21

    H.  Judge Kirscher Granted the YCLT's Motion to Certify the Judgment for Direct Appeal to the Ninth Circuit Without Giving Mr. Blixseth an Opportunity to Respond ............................................................................. 22

    I.  Judge Kirscher Displayed an Appearance of Prejudice Against Mr. Blixseth When He Denied Mr. Blixseth's Motions for Summary Judgment Before the Time Expired for Mr. Blixseth to File His Reply Briefs in Support Thereof ................. 23

    J.  Judge Kirscher Abdicated His Responsibilities Under F.R.C.P. 56(d)(1) and in the Process Made Improper Remarks About Mr. Blixseth.................... 24

    K.  Judge Kirscher Appears to Have Engineered His Actions so as to Arrive at a Pre-Determined Result Against Mr. Blixseth in Numerous Adversaries ............ 25

        (1)  Judge Kirscher Appears to Have Engineered His Decision in AP-14 to

i

ER001812

Ensure that the B Shareholders Recovered Their Claim Against Mr. Blixseth Even Though They Acknowledged That They Are Not Entitled to Recovery .... 25

(2)    Judge Kirscher Issued His Decision in AP-14 When He Did to Prevent Mr. Blixseth From Presenting Evidence in AP-18 that Would Frustrate the Outcome of AP-14 and His 135 Page Memorandum of Decision in AP-14 ........ 28

L.    Judge Kirscher Denied Mr. Blixseth Due Process in AP-14 ........................... 34

M.    Judge Kirscher Has Acknowledged that He Formed His Opinion in AP-14 Based On His Involvement in Other Cases ........................................................... 37

N.    Judge Kirscher Meets with CrossHarbor/Byrne and Credit Suisse at a Hotel and Excludes Mr. Blixseth's Counsel ..................................................................... 38

O.    Judge Kirscher Appears Committed to a Negative View of Mr. Blixseth; And This Permeates Judge Kirscher's View of Credibility and His Decisions in Unrelated Cases ........................................................................................................ 42

(1)    Judge Kirscher is Committed to Exonerating Edra Blixseth of Her Fraud on Other Creditors Because He Believes She was Driven to Commit Such Fraud by Mr. Blixseth ................................................................................................ 42

(2)    Judge Kirscher Exculpates Edra from Demonstrated Bankruptcy Fraud For Failing to List a $181 Million Debt on Her Bankruptcy Schedules ............. 45

P.    Judge Kirscher Refused to Allow Mr. Blixseth to Present Sworn Testimony in AP-14 that Ms. Blixseth and Her Attorney Intentionally Concealed Evidence that Would Exculpate Mr. Blixseth ...................................................................................... 46

5.   Conclusion ............................................................................................................ 49

Case No. 12-35986 ER  235

ER001813

Timothy L. Blixseth hereby moves Judge Kirscher to disqualify himself from presiding over the Yellowstone Club bankruptcy proceedings relating to District Court Judge Haddon's Order dated November 2, 2010 reversing and remanding the order of the Bankruptcy Court confirming the third amended plan of reorganization for the Yellowstone Club.   Mr. Blixseth also moves Judge Kirscher to disqualify himself from presiding over all adversary proceedings in which Mr. Blixseth or his entities are defendants.   Mr. Blixseth is filing this motion in *pro se* because no Montana attorney would file it on my behalf for fear of retaliation.   Blixseth Affidavit at ¶ 2.  However, Mr. Blixseth's out of state counsel drafted this Motion on his behalf and affirms all representations and arguments herein.

## 1.   <u>INTRODUCTION</u>

Judge Kirscher should disqualify himself from all matters in which Mr. Blixseth is a litigant before him.  A reasonable person with knowledge of all the facts would conclude that Judge Kirscher appears to be biased against Mr. Blixseth and has pre-judged many issues that remain to be adjudicated within the Yellowstone Mountain Club bankruptcy court.

As detailed herein, Judge Kirscher should be disqualified in all matters involving Mr. Blixseth and the Yellowstone Mountain Club bankruptcy for the following reasons, separately or combined:

1.     Without considering the evidence, Judge Kirscher has pre-judged that the Yellowstone Club bankruptcy petition was filed and plan was proposed in good

**Case No. 12-35986 ER  236**

ER001814

2.      Judge Kirscher has invited and entertained *ex parte* advocacy against Mr. Blixseth's counsel and Mr. Blixseth.

3.      Judge Kirscher had *ex parte* communications in a hotel with Cross Harbor Capital Partners LLC concerning Cross Harbor's agenda for the Yellowstone Club bankruptcy, which depends upon successful litigation against Mr. Blixseth;

4.      Judge Kirscher's law clerk has engaged in *ex parte* communications with one of Mr. Blixseth's adversaries, urging his adversary to finalize a settlement with Mr. Blixseth before Mr. Blixseth could renege;

5.      Numerous times Judge Kirscher ruled on important motions against Mr. Blixseth before Mr. Blixseth had an opportunity to file a response permitted under the rules;

6.      Judge Kirscher entered a $40 million judgment against Mr. Blixseth before Mr. Blixseth had an opportunity to respond to the motion to reconsider upon which the $40 million judgment was based;

7.      Judge Kirscher has made impermissible and disparaging comments about Mr. Blixseth and his attorneys, including one comment that essentially compared Mr. Blixseth's meritorious summary judgments to garbage and unworthy of the Judge's time.  Such statements do not uphold the integrity of the judiciary or avoid the appearance of impartiality;

8.      After learning that Mr. Blixseth would be moving this Court to reassign him, Judge Kirscher appears to have retaliated against one of Mr.

**Case No. 12-35986 ER  237**

ER001815

9.      Judge Kirscher is so invested in the success of the Yellowstone Club bankruptcy case that he is "boxed in" to ruling against Mr. Blixseth no matter the merits of the claims against him;

10.     Judge Kirscher has demonstrably pre-judged adversary proceedings against Mr. Blixseth.

11.     Judge Kirscher sitting as a trier of fact cannot reasonably be expected to provide Mr. Blixseth a fair trial; he has consistently maligned Mr. Blixseth's credibility and found Mr. Blixseth culpable for the demise of the Yellowstone Club.

These facts, among others detailed below, lead the reasonable person to only one conclusion; that Judge Kirscher is unable to be impartial toward Mr. Blixseth.

## 2.      <u>LEGAL BASIS FOR DISQUALIFICATION OF A JUDGE</u>

Mr. Blixseth respectfully requests under 28 U.S.C. § 455 that this Court disqualify Judge Kirscher from any proceedings in which Mr. Blixseth is a litigant before him.

Pursuant to 28 U.S.C. § 455(a) "[a]ny . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."   As interpreted in the Ninth Circuit, § 455 "requires the disqualification of federal judges 'if a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *In re Manoa Finance Co.*, Inc., 781 F.2d 1370, 1372 (9th Cir. 1986) (quoting *Sakellar*

3

ER001816

*v. Lockheed Missiles and Space Co.*, 765 F.2d 1453, 1457 (9th Cir.1985)).

The interest served by § 455(a) is not necessarily that the movant be protected from bias, but to "preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." *United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir.1989); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 865 (1988) ("The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible."); *Liteky v. U.S.*, 510 U.S. at 548 (1994) ("what matters is not the reality of bias or prejudice but its appearance").

In the context of bankruptcy cases where one judge is presiding over both the main bankruptcy case and the adversary proceedings therefrom, the Ninth Circuit has opined as follows:

> The alleged bias in this case is said to stem from one judge's handling both administrative and adversary matters in the same case. Courts have held that bias and prejudice for the purposes of the statute must stem from an extra-judicial source, not from information gained in the course of the proceeding. Whether this rule should apply with full force is not clear when the claim of bias stems from a bankruptcy judge's acting in a dual capacity. <u>To the extent a bankruptcy judge must play both administrative and judicial roles, he is an actor as well as an adjudicator; intimate contact with day-to-day affairs of an estate and close contact with the trustee may make objective appraisal difficult and may create the appearance of partiality.</u>
> . . . .
> <u>[W]e suggest that judges sitting in bankruptcy be especially solicitous in maintaining both the appearance and reality of impartiality when adjudicating matters with which they have had close involvement, erring on the side of recusing themselves when appropriate.</u>

4

ER001817

*In re Manoa Finance Co., Inc.*, 781 F.2d at 1373 (emphasis added). The appearance of partiality within the bankruptcy context can also arise where "the judge appears 'boxed in' by prior rulings such that he will be forced to reach a certain result in an adversarial proceeding regardless of the merits." *Frates v. Weinshienk*, 882 F.2d 1502, 1504 (10th Cir. 1989). In other words, does it appear that the bankruptcy judge has "prejudged adversarial proceedings or to have placed himself in a position where it appears he will be forced to decide one or more of the adversary proceedings in [a party's] favor." *Id.* As illustrated below, the answer is "yes" as to Judge Kirscher deciding matters involving the Yellowstone Club bankruptcy and Mr. Blixseth.

Moreover, disqualification is mandated where a judge is the sole trier of fact but has pre-judged substantive issues, made credibility findings of key witnesses, maligned the conduct of the parties and their counsel, and generally appeared to have formed opinions based on facts not presented at trial. *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 163-164, 166 (3rd Cir. 1993) ("when the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced" [disqualification mandated on remand]). Here Judge Kirscher, as the sole trier of fact in the Yellowstone Club bankruptcy case and adversary cases involving Mr. Blixseth, has demonstrably pre-judged Mr. Blixseth's culpability and that the Yellowstone Club's demise was caused by Mr. Blixseth and not the bad-faith conduct of Edra Blixseth, CrossHarbor Capital Partners LLC and Sam Byrne; all of which are critical issues to be adjudicated on remand of the Yellowstone Club

**Case No. 12-35986 ER  240**

ER001818

plan of reorganization and in on-going adversary proceedings against Mr. Blixseth.

Disqualification is also mandated where a judge has invited and entertained *ex parte* advocacy by one party against the other, which is what Judge Kirscher allowed in unrelated proceedings when he invited one of Mr. Blixseth adversaries to malign the reputation of Mr. Blixseth's lead counsel. See *U.S. v. Wecht*, 484 F.3d 194, 227-228 (3rd Cir. 2007) (improper *ex parte* advocacy justifying recusal occurs where counsel's assertions "remained unchecked by opposing counsel") (Bright, Cir. Judge, Dissenting).

More generally, disqualification is appropriate where, as here, a court has engaged in conduct or remarks or that a reasonable person knowing all the facts would understand those remarks and conduct to "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, at 555.

For the reasons detailed below, Mr. Blixseth respectfully submits that Judge Kirscher should disqualify himself from any further proceedings in which Mr. Blixseth or his entities are litigants before his court and with respect to confirming a new plan of reorganization within the Yellowstone Club bankruptcy case. A reasonable person with knowledge of all the facts detailed herein would believe that that Judge Kirscher is not capable of being impartial but is in fact tainted by partiality, has been boxed into engineering certain results in the adversary cases stemming from the Yellowstone Club bankruptcy, and cannot make any fair judgment with respect to Mr. Blixseth's rights in adversary cases or in the Yellowstone Club bankruptcy.

**Case No. 12-35986 ER   241**

ER001819

## 3.   LEGAL STANDARD FOR REVIEWING ALLEGATIONS OF IMPARTIALITY

The prevailing view is that when a timely and procedurally proper disqualification motion has been filed, the factual allegations made in support of the motion are true are assumed as true.  See *United States v. Furst*, 886 F.2d 558, 582 (3rd Cir. 1989); *United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985) ("The law is clear that in passing on the legal sufficiency of the affidavit, the judge must assume that the factual averments it contains are true, even if he knows them to be false) (citing *United States v. Jeffers*, 532 F.2d 1101, 1112 (7th Cir. 1976)); *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976); *United States v. Dodge*, 538 F.2d 770 (8th Cir. 1976); *Parrish v. Board of Commrs. Of Alabama State Bar*, 524 F.2d 98 (5th Cir. 1975); *People v. Julien*, 47 P. 3d 1194, 1199 (Colo. 2002) ("a judge must accept as true the factual statements contained in the motion and affidavit … [and] determine as a matter of law whether they [are] legally sufficient.").

Therefore, the challenged judge is ordinarily not permitted to pass on the truth or falsity of any statements of fact made in the moving papers or any affidavits filed in support thereof, much less attempt to refute such allegations.  *Id.*; *see People v. Brim*, 241 Ill. App. 3d 245, 608 N.E. 2d 961 (1993); *Suarez v. State*, 527 So.2d 190, 191 (Fla. 1988); *State v. Flemming*, 245 Ga. 700, 267 S.E.2d 207 (1980); *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987); *People v. District Court*, 192 Colo. 503, 560 P.2d 828 (1977).  Indeed not only must the judge accept the factual allegations of the motion as true, but ordinarily may not question the

7

ER001820

good faith of the pleader in making those allegations.  See *In re Evans*, 411 A.2d 984 (D.C. 1980); *Duke v. Pfizer, Inc.*, 668 F.Supp. 1031, 1037 (E.D. Mich. 1987) (if the motion is sufficient, the judge must recuse regardless of alleged available proof contradicting the facts sworn to by the moving party).

### 4.   FACTUAL BASIS FOR DISQUALIFICATION

The Yellowstone Club bankruptcy and the plethora of other bankruptcies and adversary proceedings that have spawned from the Club's bankruptcy have undoubtedly consumed the time of the sole bankruptcy judge in Montana.  The Yellowstone Club bankruptcy case has given rise to not less than eight adversary proceedings as well as remand on appeal proceedings to confirm a new plan of reorganization.  Also related to the Yellowstone Club bankruptcy case is the Yellowstone Club World bankruptcy case (Case No. 09-60061)[1], with three adversary proceedings therein, the Big Springs Realty LLC bankruptcy case (No. 09-61079) with one adversary proceeding therein, the BLX Group, Inc. bankruptcy case (No. 09-61893) with three adversary proceedings therein, and the Edra D. Blixseth bankruptcy case (No. 09-60452) with thirteen adversary proceedings therein.

The enumerated facts below, when viewed together, demonstrate that, "the reasonable man, were he to know all the circumstances, would surely harbor doubts about [Judge Kirscher's] impartiality" and ability to afford Mr. Blixseth the due

---

[1] Unless otherwise specified, references to case numbers herein are to cases pending within the U.S. Bankruptcy Court for the District of Montana.  Further, leading zeros from the case numbers have been omitted.

ER001821

process to which he is entitled in each bankruptcy case and adversary proceeding before him. See *Sentis Group, Inc., Coral Group, Inc. v. Shell Oil Co.*, 559 F.3d 888, 905 (8th Cir. 2009) (quoting *United States v. Poludniak*, 657 F.2d 948, 954 (8th Cir.1981)). These facts are as follows:

### A.  Judge Kirscher Has Pre-Judged that the Yellowstone Club Bankruptcy Petition and Reorganization Plan Were Filed in Good-Faith

On November 2, 2010, District Court Judge Haddon reversed the order of Judge Kirscher confirming the third amended plan of reorganization. See Docket No. 72, U.S. District Court, District of Montana, Case No. 09-47 (hereinafter "**Reversal Order**"). The Reversal Order requires, among other things, that the Yellowstone Club plan of reorganization be approved after proper notice and a hearing are provided as required by F.R.B.P. 2002 and 9013. Inherent in Judge Haddon's Reversal Order is the requirement that any new plan of reorganization be approved pursuant to the requirements of 11 U.S.C. § 1129. Section 1129(a)(3) requires that the plan proponent demonstrate that the plan is "proposed in good faith and not by any means forbidden by law." A plan of reorganization can only be proposed in good faith if the initial bankruptcy petition was filed in good faith. *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987).

Judge Kirscher has demonstrably pre-judged the issue of good-faith and cannot on remand, be reasonably expected to find otherwise. In the Yellowstone Club bankruptcy case and in adversary proceedings involving Mr. Blixseth, Judge Kirscher has consistently refused to admit any evidence demonstrating that the Yellowstone Club bankruptcy arises from the bad faith conduct of Edra Blixseth

9

ER001822

and CrossHarbor. See Transcript Pages 20-31 of April 29, 2009 Trial, Case No. 09-14 attached hereto as **Exhibit 4** (refusal to admit testimony of bad faith conduct); See Docket Nos. 485, 532, Case No. 09-14 (without opinion, refusal to consider evidence of bad faith conduct).

Yet, without actually admitting evidence relevant to bad faith, Judge Kirscher has repeatedly stated that he finds such evidence (which he has never admitted) to not be "credible." Case No. 09-14, Docket No. 575, p. 107 (The Court has not yet seen any credible evidence to support this particular conspiracy theory asserted by Blixseth"); Case No. 09-14, Docket No. 292, p. 34 ("Blixseth claims that Edra, in the period of time between mid-August of 2008 and November 10, 2008, concocted a scheme with Byrne to drive the Debtors into bankruptcy so that Byrne could purchase the Debtors at a deep discount, with no apparent benefit to Edra. The Court is not persuaded by Blixseth's attempts to paint himself as a victim in these proceedings, particularly where Blixseth was at the center of the Debtors' financial woes.")

Because Judge Kirscher has decided that any allegations of bad faith are not credible and that Mr. Blixseth's conduct necessitated the Yellowstone Club bankruptcy, it goes without saying that neither Mr. Blixseth nor any creditor who insists on a showing of good faith as required by 11 U.S.C. § 1129(a)(3) will be successful before Judge Kirscher in insisting that any new plan of reorganization comports to that statutory requirement. From the perspective of a reasonable person knowing these facts, Judge Kirscher has prejudged the determination of

**Case No. 12-35986 ER 245**

ER001823

statutory pre-requisites to confirming any new plan of reorganization for the Yellowstone Club.  Thus, anything short of disqualifying Judge Kirscher from proceeding in the Yellowstone Club bankruptcy would "shroud" its outcome in "suspicion." *In re School Asbestos Litigation*, 977 F.2d 764, 785 (3rd Cir. 1992) (disqualification required where the outcome of the case would be "shrouded" in "suspicion" due to appearance of bias of judge who had presided over the case for years).

> ### B. Judge Kirscher Has Categorically Found Mr. Blixseth to Not Be a Credible Witness and Has Maligned His Legal Theories and Insistence on Due Process; This Necessitates His Disqualification on Remand and Adversary Proceedings Against Him

"When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced." *Alexander*, 10 F.3d at 166. This is particularly true when the judge sitting as the sole trier of fact has already made credibility determinations concerning key witnesses and attorneys, because it leads the reasonable person to believe that the judge has pre-determined the outcome of a case before trial or on remand. *See Alexander*, 10 F.3d at 164.  Here, in both the Yellowstone Club bankruptcy case, in AP-14, and AP-18, Judge Kirscher has unfailingly found testimony by Mr. Blixseth to not be credible and his legal positions to be "garbage."  Docket No. 292, Case No. 09-14 ("The Court is not persuaded by Blixseth's attempts to paint himself as a victim in these proceedings, particularly where Blixseth was at the center of the Debtor's financial woes" [p. 34] "The evidence to date is not favorable for Blixseth" [p. 34]); Docket No. 575, Case No. 09-14 ("but Blixseth's testimony in this regard is not credible and is

11

**Case No. 12-35986 ER  246**

controverted by the evidence." [p. 13] "This latter contention by Blixseth is not supported by any credible evidence" [p. 51] "In his testimony, Blixseth claimed that he had relied heavily on Mack's opinion that a transfer to BGI 'had' to be a loan to avoid negative capital accounts.  Blixseth's testimony was not credible on this point." [p. 78] "Blixseth attempted to explain these transactions, but his testimony was simply not credible." [p. 102] "The Court has not yet seen any credible evidence to support this particular conspiracy theory by Blixseth" [p. 107] "Blixseth's fraudulent intent could not be more clear" [p. 109] "In summary, Blixseth produced no credible evidence that the Debtors were solvent . . . ." [p. 115] "The unrealistic nature of the information provided to and relied upon by Reilly and the limited scope of his engagement leads this Court to conclude that his opinion, while generally credible, was so restricted by Blixseth and his counsel as to render his opinion in this case simply inapplicable." [p. 79] "Blixseth has wholly failed to produce any credible evidence that constitutes a tangible and concrete value flowing to the Debtors.  In fact, the evidence in this case is just the opposite." [p. 113]); Docket No. 347, in Case No. 09-18 ("the Court elects to scrap the original 69 pages of its order and dispose of Blixseth's pending motions in a manner that is commensurate with the merits of Blixseth's arguments."); Docket No. 575, p. 64, n. 50 ("Many of Blixseth's claims to date have been nothing more than unsubstantiated rhetoric meant to divert this Court's attention away from the controlling facts."); Docket No. 292, Case No. 09-14, p. 15 ("In an attempt to frustrate the trial, Blixseth filed an Expedited Motion to Bifurcate and Continue

**Case No. 12-35986 ER  247**

ER001825

Trial of Claims Regarding Blixseth on April 21, 2009.  That Motion was denied by Order entered April 24, 2009.  However, in an effort to <u>quash</u> Blixseth's due process arguments, the Court continued the commencement of trial from April 22, 2009, to April 29, 2009." [emphasis added] [<u>the counterclaim against Blixseth upon which he was to be tried was filed only three weeks earlier on April 3, 3009</u>, Docket No. 98, Case No. 09-14]).

Remarkably, despite not finding any bit of testimony by Mr. Blixseth to be credible, Judge Kirscher has repeatedly found the testimony of Edra D. Blixseth, a demonstrated perjurer, to be credible.  Docket No. 575 (Judge Kirscher specifically choosing to not discredit Edra's testimony even though she knowingly failed to list on her own bankruptcy schedules a $181 million debt that she owed to her own corporation [p. 55]) ("[Tim] Blixseth claims he always intended to repay the $209 million BGI note, but Blixseth's former wife testified to the contrary." [p. 130]; *see also* Docket Nos. 26, 26-1, Case No. 09-100 (establishing undisputedly that at the same time Edra was stating under penalty of perjury to her lenders that she was able to pay her bills as they came due and had no outstanding income tax liability, she was submitting affidavits to the California Superior Court that she was millions of dollars in arrears, unable to pay her bills as they came due, and owed millions in delinquent income taxes).

No reasonable person with knowledge of all these facts could think that Judge Kirscher will afford Mr. Blixseth the impartial due process to which he is entitled in on-going adversary proceedings against him and in the Yellowstone Club

Case No. 12-35986 ER  248

ER001826

bankruptcy case.  Indeed, based on Judge Kirscher's credibility assessment to date of Mr. Blixseth, the reasonable person could only conclude that the outcome of all further adversary proceedings in which Judge Kirscher is the trier of fact is pre-determined against him.  Thus, Judge Kirscher's disqualification is mandated.

## C.   Judge Kirscher Invited and Entertained Ex Parte Advocacy Against Mr. Blixseth

Disqualification is also mandated where a judge has invited and entertained *ex parte* advocacy by one party against the other.  See *U.S. v. Wecht*, 484 F.3d 194, 227-228 (3rd Cir. 2007) (improper *ex parte* advocacy justifying recusal occurs where counsel's assertions "remained unchecked by opposing counsel") (Bright, Cir. Judge, Dissenting); *In re Kesington Int'l Ltd.*, 368 F.3d 289, 310 (3rd Cir. 2004) (ex parte communications run contrary to our adversarial trial system. The adversary process plays an indispensable role in our system of justice because a debate between adversaries is often essential to the truth-seeking function of trials.... If judges engage in ex parte conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result.").  Here, Judge Kirscher unequivocally invited counsel for one of Mr. Blixseth's adversaries to opine upon the "reputation" of Mr. Blixseth's lead litigation counsel in the Montana bankruptcy court, Michael J. Flynn, when no counsel for Mr. Blixseth was present or had any notice that the Court would be inquiring about the "reputation" of Mr. Flynn.  See **Exhibit 1**, Transcript of October 12, 2010 hearing in Case No. 09-105 at pp. 30:15-33 ("The Court: Okay. Then another statement that was made, I believe in your brief, is you make some

14

reference to now you know Mr. Flynn's reputation. What is that? What did you mean by that? . . . [followed by three transcript pages of opposing counsel maligning the reputation of Mr. Flynn *carte blanche*]). Judge Kirscher allowing Mr. Blixseth's adversaries to malign Mr. Flynn's reputation unchecked by the adversary process has unquestionably given the appearance that the judicial system has broken down and is or will be biased against Mr. Blixseth. *Wecht*, 484 F.3d at 229 (impermissible ex parte advocacy includes unchecked maligning of the credibility of the opposing side's witnesses); *Professional Air Traffic Controllers Organization v. Federal Labor Relations Authority*, 685 F.2d 547, 599-600 (D.C. Cir. 1982) ([Federal Labor Relations Authority Member's] <u>unprotesting submission to blatant ex parte advocacy</u> on the merits of a case then pending before the members defies explanation.") (emphasis added). To say the least, it was bizarre for Judge Kirscher to invite a party to slander the reputation of his adversary on public record. It is more bizarre for Judge Kirscher to have done this in an *ex parte* forum that provided no notice or opportunity for Mr. Blixseth and his counsel to refute the attack on their credibility. A reasonable person knowing these facts could only conclude that, at a minimum, Judge Kirscher's view of Mr. Blixseth and his counsel have been improperly tainted as result of Judge Kirscher's bizarre invitation to allow Mr. Blixseth's adversary to unilaterally bash the reputation of Mr. Blixseth's lead counsel. At worst, the reasonable person could conclude that Judge Kirscher's "unprotesting submission" to this *ex parte* character attack was sought by Judge Kirscher because it served to reinforce his negative disposition against Mr. Blixseth

15

and his attorneys.

**D.** **Judge Kirscher's Law Clerk Engaged in Ex Parte Communications with Mr. Blixseth's Adversaries to Mr. Blixseth's Prejudice**

On June 10, 2010, one of Judge Kirscher's law clerks, Terry Healow, called Ross Richardson regarding the status of Mr. Richardson's settlement discussions with Mr. Blixseth in connection with the Yellowstone Club World bankruptcy case (Case No. 09-60061) pending before Judge Kirscher. Blixseth Aff. at ¶¶ 4-8. Mr. Richardson is the Chapter 7 Trustee for the Yellowstone Club World bankruptcy estate. Blixseth Aff. at ¶ 4. Mr. Richardson indicated to Mr. Healow that the settlement with Mr. Blixseth was close to being finalized. Blixseth Aff. at ¶ 7. Mr. Healow responded by encouraging Mr. Richardson to finalize the settlement quickly before Mr. Blixseth could renege. Blixseth Affidavit at ¶ 7-8. The settlement involves an approximately $3 million fee to the lawyers for Mr. Richardson and a substantial sum for Mr. Richarson himself. Blixseth Aff. at ¶ 5. As Judge Kirscher's law clerk, Mr. Healow had institutional knowledge about impending decisions from Judge Kirscher that directly impacted Mr. Blixseth's willingness to finalize his settlement with Mr. Richardson. A reasonable person with knowledge of these facts could only conclude that institutionally Judge Kirscher's chambers were biased against him and could not be counted upon to act impartially toward him. *Bishop v. Albertson's, Inc.*, 806 F.Supp. 897, 901 (E.D. Wash. 1992) (in the context of disqualification, "all which is forbidden to a judge is forbidden to the clerk" "a law clerk is essentially an extension of his judge"); *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416 (9th Cir. 1995) ("Even if the judge has no reason to

16

ER001829

recuse herself based upon her own circumstances, a law clerk's relationships might cause the impartiality of decisions from that judge's chambers in which the clerk participates reasonably to be questioned."); *Kennedy v. Great Atlantic & Pacific Tea Co., Inc.*, 551 F.2d 593, 596 (5th Cir. 1977) (it was the law clerk's "duty as much as that of the judge to avoid any contacts outside the record that might affect the outcome of the litigation"); *Fredonia Broadcasting Corp., Inc. v. RCA Corp.*, 569 F.2d 251, 256 (5th Cir. 1978) (stressing the nature of the judge-law clerk relationship as a basis for imputation of an appearance of partiality from law clerk to judge); *Onishea v. Hopper*, 126 F.3d 1323, 1340 (11th Cir. 1997) ("law clerk's involvement in a case and ... relationship to one of the parties may constitute grounds for the judge's disqualification.").

### E.   Judge Kirscher Has Demonstrated a General Disdain for Mr. Blixseth

For pursuing his due process rights to prevent a nearly $300 million judgment being entered against him for simply ending a contentious multi-year divorce by dividing up his marital assets through conveying the Yellowstone Club to Ms. Blixseth (Blixseth Aff. at ¶ 24), Judge Kirscher has consistently characterized Mr. Blixseth's insistence on such due process and adherence to the Federal Rules of Civil Procedure as stall and delay tactics.  Among the comments by Judge Kirscher which demonstrate his inability to be impartial toward Mr. Blixseth on remand in AP-14 or in other matters are as follows:

1.    "[T]he Court elects to scrap the original 69 pages of its order and dispose of Blixseth's pending motions in a manner that is commensurate with the

**Case No. 12-35986 ER  252**

ER001830

2.     "Blixseth's trial tactics in this proceeding and other proceedings before this Court are wearing thin on the Court.  Blixseth and his counsel are masterful in their attempts to bring the legal process to a grinding halt."  Docket No. 478, pp.13-14, Case No. 09-14.  This ruling by Judge Kirscher involved Mr. Blixseth's efforts to use the evidence of the Edra Blixseth/Sam Byrne bad faith collusion to support his affirmative defenses in AP 14.

3.     "Many of Blixseth's claims to date have been nothing more than unsubstantiated rhetoric meant to divert this Court's attention away from the controlling facts."  Docket No. 575, pg. 64, n. 50, Case No. 09-14.  These same facts are now the subject of a criminal investigation in which Judge Kirscher has the appearance of attempting to exonerate Edra Blixseth.  Blixseth Affidavit at ¶¶ 11-15.  Further, many of the "unsubstantiated claims" that Judge Kirscher complains about are unsubstantiated because Judge Kirscher has refused to allow Mr. Blixseth to present evidence on his claims.

4.     "Notwithstanding, Blixseth made every effort to slow and protract this Adversary Proceeding, including arguing ad nauseam about how he has been damaged by Stephen R. Brown's alleged divulgence of information that is protected by Blixseth's attorney-client privilege."   Docket No. 292, p. 20, Case No. 09-14.  Judge Kirscher repeatedly refuses to recognize Mr. Blixseth's rights to know what his attorney communicated in over 400 emails to his opponents, *while Mr. Brown still served as his lawyer*.  Blixseth Aff. at ¶ 18.

18

**Case No. 12-35986 ER  253**

5.      "Blixseth's arguments on this point are nothing but baseless allegations intended to derail these proceedings."  Docket No. 292, p. 32, Case No. 09-14.

6.      Judge Kirscher acted disgusted when he learned that a document critical to Mr. Blixseth's affirmative defenses had been included in the Pre-Trial Order when in both he and the plaintiff intended for this document to be omitted. Blixseth Aff. at ¶ 23.

7.      Judge Kirscher accused Mr. Blixseth of delay tactics when Mr. Blixseth asked for a continuance of a trial that was scheduled to commence <u>only three weeks</u> after the counterclaim was filed upon which Mr. Blixseth was to be tried.  And then to "quash" any due process complaints Mr. Blixseth might have about such a patently constitutionally defective trial, Judge Kirscher praised himself for continuing the trial for one week despite the great inconvenience to this calendar. Docket No. 292, Case No. 09-14, pp. 15-20 ("In an attempt to frustrate the trial, Blixseth filed an Expedited Motion to Bifurcate and Continue Trial of Claims Regarding Blixseth on April 21, 2009.  That Motion was denied by Order entered April 24, 2009.  However, in an effort to quash Blixseth's due process arguments, the Court continued the commencement of trial from April 22, 2009, to April 29, 2009." [<u>the counterclaim against Blixseth upon which he was to be tried was filed only three weeks earlier on April 3, 3009,</u> Docket No. 98, Case No. 09-14]).

## F.      <u>Judge Kirscher Retaliates Against Mr. Blixseth's Attorneys</u>

In April of 2010, attorney Christopher J. Conant was retained by Mr. Blixseth to represent him in a number of matters, including matters within the

19

ER001832

Montana bankruptcy court.  Blixseth Aff. at ¶ 10.  Mr. Conant had previously represented and continued to represent Western Capital Partners LLC ("WCP"), which is a creditor of Edra Blixseth and an active participant in Ms. Blixseth's bankruptcy case in the Montana Bankruptcy Court.  Blixseth Aff. at ¶ 10.  As part of his representation of WCP, Mr. Conant is admitted *pro hac vice* in the Montana Bankruptcy Court.  Docket No. 357, Case No. 09-61893.  At a hearing before Judge Kirscher on October 12, 2010 where Mr. Conant was not present, Judge Kirscher heard that Mr. Conant represented both WCP and Mr. Blixseth and based on this information alone, Judge Kirscher stated on the record that he would be issuing an order to show cause for Mr. Conant to explain why his *pro hac vice* admission should not be revoked as a result of him representing Mr. Blixseth and WCP.  See October 12, 2010 Transcript of Hearing in Case No. 09-105, p. 71-6-23 attached hereto as **Exhibit 1**.  A review of the entire transcript from this October 12th hearing reveals no allegations of attorney misconduct on the part of Mr. Conant, yet Judge Kirscher *sua sponte* believed it was inappropriate for Mr. Conant to be representing Mr. Blixseth and WCP concurrently.[2]  Indeed, the first thing that Judge Kirscher *sua sponte* inquired about at the beginning of the hearing was whether Mr. Conant would be appearing at the hearing.  **Exhibit 1**, pp. 5:24-6:2.  The appearance to a reasonable person knowing all these facts, is that Judge Kirscher is sending a

---

[2] Judge Kirscher is treating Mr. Conant unequally to other bankruptcy attorneys who appear before him because Judge Kirscher has made no issue or threat to other bankruptcy attorneys who represented different clients in the same matters. Specifically, Judge Kirscher has noted that within the Yellowstone Club bankruptcy, Credit Suisse and the YCLT are represented by the same local counsel, the law firm of Holland & Hart.  See Docket No. 575, p. 127, Case No. 09-14.

Case No. 12-35986 ER  255

ER001833

chilling message to other attorneys in the Montana bankruptcy bar that they should think twice about representing Mr. Blixseth in his court.

Most indicative of an appearance that Judge Kirscher is biased against Mr. Blixseth is that Judge Kirscher's threat against Mr. Blixseth's attorney came only four days after Mr. Blixseth notified the District Court that he would be requesting that Judge Kirscher be reassigned upon remand of AP-14.  See Docket Nos. 5 p. 11, 5-2, Case No. 10-49, U.S. District Court for the District of Montana.

### G.   On a Motion to Reconsider Judge Kirscher Entered a $40 Million Judgment Against Mr. Blixseth Without Affording Him an Opportunity to Respond to the Motion

On August 16, 2010, Judge Kirscher entered Judgment against Mr. Blixseth in Case No 09-14 (hereinafter "AP-14") but did not set a fixed amount.  Docket No. 576, Case No. 09-14.  On August 27, 2010, the plaintiff in AP-14, the Yellowstone Club Liquidating Trust ("YCLT"), filed a Motion to Reconsider asking Judge Kirscher to enter an amount in the Judgment of not less than $40,067,962.43. Docket No. 577 in Case No. 09-14.  The YCLT's request for a $40 million judgment was supported only by an affidavit from counsel for the YCLT.  See Docket No. 577-1, Case No. 09-14.  Mr. Blixseth's time to file an opposition brief to the Motion to Reconsider was September 10, 2010.  *See* Montana Local Bankruptcy Rule (L.B.R.) 9013-1(f).  On September 7, 2010, Judge Kirscher granted that part of the Motion to Reconsider which requested a $40,067,962.43 judgment against Mr. Blixseth without having allowed Mr. Blixseth to file his opposition to the Motion to Reconsider and defeat what was a patently inaccurate number.  Docket No. 580, Case No, 09-14 (no response from Mr. Blixseth was filed as his time to respond had

not yet expired). Judge Kirscher did so even though he acknowledged in connection with his Judgment entered on August 16th that "While the Court would have certainly preferred to enter a more definite Judgment, the Court did not have enough facts to determine what was owed to each of the aforementioned classes." Docket No. 580, Case No. 09-14, at p. 4. Apparently, having received an affidavit from the YCLT's counsel describing what was owed to the YCLT, Judge Kirscher was satisfied with that unilateral presentation of proof and entered Judgment against Mr. Blixseth accordingly.

## H. Judge Kirscher Granted the YCLT's Motion to Certify the Judgment for Direct Appeal to the Ninth Circuit Without Giving Mr. Blixseth an Opportunity to Respond

Not happy with having its requested $40 million judgment entered in its favor by Judge Kirscher, the following day the YCLT filed a notice of appeal (Docket No. 583 in Case No. 09-14) to collect an additional $230 million on behalf of Credit Suisse, even though Judge Kirscher found that Credit Suisse caused the financial ruin of the Yellowstone Club and therefore could not collect against Mr. Blixseth. Docket No. 575, pp. 127-135, Case No. 09-14. However, the YCLT on September 16, 2010 filed a motion before Judge Kirscher to certify his Judgment for direct appeal to this Court ("Certification Motion", Docket No. 587 in Case No. 09-14) and also asked that the hearing on Certification Motion be expedited ("Motion to Expedite Hearing", Docket No. 588). Within hours of the YCLT filing its Motion to Expedite Hearing and again without giving Mr. Blixseth an opportunity to respond to that motion, Judge Kirscher granted that motion and set the hearing on the Certification Motion for September 20, 2010, giving Mr. Blixseth only one-full business day to

22

ER001835

research for, draft an opposition to, and otherwise prepare for the hearing on the Certification Motion (See Docket No. 590, Objection to Motion for Certification to Court of Appeals).  Unsurprisingly, at the hearing on the Certification Motion, Judge Kirscher granted the Motion over Mr. Blixseth's objections.  Docket No. 599, Case No. 09-14.

I.   **Judge Kirscher Displayed an Appearance of Prejudice Against Mr. Blixseth When He Denied Mr. Blixseth's Motions for Summary Judgment Before the Time Expired for Mr. Blixseth to File His Reply Briefs in Support Thereof**

In addition to the above-mentioned procedural and due process violations in AP-14, Judge Kirscher engaged in overt due process and procedural irregularities in Case No. 09-18 (hereinafter "AP-18").  AP-18 was initially brought by the "B" shareholders of the Yellowstone Club against Mr. Blixseth, but the "B" shareholders subsequently assigned their litigation claims against Mr. Blixseth to the YCLT in exchange for sharing in any recovery by the YCLT in AP-14.  See Docket Nos. 1366, 1774. 1806, Case No. 08-61570.  In AP-18, Mr. Blixseth had timely and appropriately filed three separate motions for summary judgment with each one raising distinct legal and factual issues that were dispositive of the case.  Docket Nos. 299, 302, 308, Case No. 09-18.  Judge Kirscher prejudiced Mr. Blixseth by prematurely and summarily denying Mr. Blixseth's 3 separate motions for summary judgment prior to the expiration of the 14 day statutory period for filing a reply brief in support of two of the three motions for summary judgment.  Docket Nos. 347, 348, Case No. 09-18; *see* F.R.B.P. 7056 incorporating the provisions of F.R.C.P. 56 which provide for a 14 day time period for filing a reply brief when the

23

**Case No. 12-35986 ER  258**

ER001836

Local Rules do not specify another time, the Montana L.B.R. do not address the deadlines for filing a reply brief relative to a Rule 56 motion. Thus, Mr. Blixseth had a statutory right under F.R.C.P. 56(c)(1)(C) to file this reply brief up until at least August 9, 2010. Docket No. 338, Case No. 09-18. Nevertheless, Judge Kirscher denied Mr. Blixseth's right to do so by perfunctorily issuing his order denying Mr. Blixseth's motions for summary judgment on August 4, 2009. Docket Nos. 347, 348, Case No. 09-18.

### J.   Judge Kirscher Abdicated His Responsibilities Under F.R.C.P. 56(d)(1) and in the Process Made Improper Remarks About Mr. Blixseth

In AP-18, Judge Kirscher abdicated his responsibilities under F.R.C.P. 56(d)(1) when he denied without opinion Mr. Blixseth's motions for summary judgment and in doing so, made improper remarks regarding Mr. Blixseth's well-founded and dispositive legal arguments. Docket No. 347, in Case No. 09-18 ("the Court elects to scrap the original 69 pages of its order and dispose of Blixseth's pending motions in a manner that is commensurate with the merits of Blixseth's arguments."). As this Court can see, Mr. Blixseth's motions for summary judgment were more than meritorious (Docket Nos. 299, 302, 308, Case No. 09-18.) and were largely undisputed by the YCLT (Docket No. 338, Case No. 09-18). Yet Judge Kirscher offered no opinion for his denial of Mr. Blixseth's motions for summary judgment as required by F.R.C.P. 56(d)(1) but instead prematurely denied them out of hand and in the process made wholly unsupported and improper remarks about Mr. Blixseth.

**Case No. 12-35986 ER 259**

ER001837

### K.   Judge Kirscher Appears to Have Engineered His Actions so as to Arrive at a Pre-Determined Result Against Mr. Blixseth in Numerous Adversaries

#### (1)   Judge Kirscher Appears to Have Engineered His Decision in AP-14 to Ensure that the B Shareholders Recovered Their Claim Against Mr. Blixseth Even Though They Acknowledged That They Are Not Entitled to Recovery

Judge Kirscher engineered the timing of his issuance of the Judgment in AP-14 so as to guaranty that he would have to satisfy the claims of the B shareholders against Mr. Blixseth even though they acknowledged just weeks before that they were not entitled to recovery.  Specifically, when the YCLT opposed Mr. Blixseth's motions for summary judgment in AP-18, it argued extensively (and for the first time) that it would have to dismiss its case against Mr. Blixseth if Judge Kirscher ruled in AP-14 that the loan proceeds to Mr. Blixseth from Credit Suisse were improper distributions to him.  Docket No. 338, at p. 4, Case No. 09-18.  Judge Kirscher ruled as such in AP-14 but the YCLT has failed to dismiss AP-18 and even demanded and obtained recovery of the Bs' $22 million claim against Mr. Blixseth when it sought its $40 million judgment in AP-14.  See Exhibit A to Hingle Affidavit filed in Support of Motion to Reconsider at Docket # 577-1, Case No 09-14.  Indeed, Judge Kirscher was fully aware of that the Bs were not entitled to recovery when he entered the $40 million judgment but he allowed it to happen before Mr. Blixseth had the opportunity to oppose the Motion to Reconsider and contest the Hingle affidavit.

Judge Kirscher was aware of this perversion because he approved the B shareholders having an "allowed" claim of $22 million within the YCLT resulting

ER001838

from their assignment of their litigation rights against Mr. Blixseth to the YCLT.

See Docket Nos. 1366, 1774. 1806, Case No. 08-61570.  But Judge Kirscher also

knew that this $22 million claim was not intended to be a liquidated amount for

which Mr. Blixseth was to be liable in either AP-14 or AP-18.

Specifically, at the February 11, 2010 hearing before Judge Kirscher on the

YCLT's motion to approve the Bs' assignment of their claims against Mr. Blixseth to

the YCLT, the YCLT Trustee, Marc S. Kirschner represented that the Bs' $22

million claim within the YCLT was not liquidated and was subject to be determined

through litigation in AP-18.  At this February 11th hearing counsel for Mr. Blixseth

examined Mr. Kirschner, the YCLT Trustee, as follows:

> Q.  Okay. Now, one thing that I think we could, we could
> clear up is that this term sheet and the deal, the
> settlement that you're reaching with the seven B's, that
> doesn't -- it is not intended by you to liquidate the amount
> of the recovery in AP 18, is it?
> A. Could you repeat that again? First of all, it faded out a
> little; and, second, I'm not sure I understood it.
> Q. Okay, I'll rephrase it. You're not, by entering into this
> term sheet, liquidating and establishing the recovery in
> AP 18 of $22 million, are you?
> A. No, absolutely not. That's subject to litigation by the
> trust, if this is approved, against Mr. Blixseth.
> Q. Okay. So that remains open; is that correct?
> A. Success of that litigation certainly remains open.
> Q. And the amount of recovery remains open, right?
> A. Just as I indicated earlier, the entire trust recoveries
> are contingent on litigation --
> Q. Okay, thank you.
> A. -- including this claim if it's folded into the trust.

See Transcript of February 11, 2010 Hearing at p. 105:4-22 attached hereto

as **Exhibit 2** (emphasis added).  In the face of this testimony, it is clear that Judge

Kirscher's agenda against Mr. Blixseth was absolutely apparent when he fixed

judgment in the amount of $40,067,962.43 against Mr. Blixseth (without giving him an opportunity to respond) even though the YCLT, by its own admission to Judge Kirscher, has acknowledged that not only is at least $22 million of the $40 million judgment contingent upon the resolution of AP-18, but because Judge Kirscher ruled in AP-14 that the Credit Suisse loan distributions to Mr. Blixseth were illegal, then the YCLT (i.e., the B shareholders' claims) must dismiss AP-18 altogether and therefore the entire basis for the Bs' recovery of their $22 million allowed claim must be dismissed as well.[3]   Docket No. 338, at p. 4, Case No. 09-18.

Lest Judge Kirscher have given Mr. Blixseth the opportunity to raise these fatal defects relative to the YCLT's request for a $40 million judgment, Judge Kirscher nevertheless entered a $40 million judgment against Mr. Blixseth before he had an opportunity to oppose the Motion to Reconsider knowing full well that $22 million of that $40 million judgment was simply bogus.  Moreover, knowing of perverse effect of the Bs' $22 million allowed claim against the YCLT, it is no coincidence that on the eve of trial in AP-18, which was to commence on August 23, 2010, Judge Kirscher issued his Judgment in AP-14 which necessarily had the effect of precluding Mr. Blixseth from establishing at trial why the B shareholder claim against him failed both legally and factually and therefore why he should not

---

[3] In ruling that the distributions from the Credit Suisse loan to Mr. Blixseth were unlawful equity distributions from the Yellowstone Club entities, Judge Kirscher ignored almost entirely the extensive factual record that Mr. Blixseth developed at trial which established that the IRS had deemed those distributions to be "loan" distributions and that Mr. Blixseth relied on the opinion of counsel for the Yellowstone Club that those distributions were "loan" distributions and not equity distributions from the Yellowstone Club entities.

27

ER001840

be required to satisfy their $22 million claim either through being included within a judgment in AP-14, or in AP-18.

Any reasonable person knowing all these facts could only come to the conclusion that Judge Kirscher has an agenda against Mr. Blixseth and is therefore incapable of being impartial toward Mr. Blixseth in any future adversary proceedings in Montana in which Mr. Blixseth is a defendant.

### (2) Judge Kirscher Issued His Decision in AP-14 When He Did to Prevent Mr. Blixseth From Presenting Evidence in AP-18 that Would Frustrate the Outcome of AP-14 and His 135 Page Memorandum of Decision in AP-14

In AP-18, Mr. Blixseth filed a motion for summary judgment in which he presented facts that conclusively established that the financial demise of the Yellowstone Club and its bankruptcy in November of 2008 were not caused by him, but by the Club's current owner CrossHarbor Capital Partners LLC and its principal, Samuel T. Byrne in collusion with Edra Blixseth.  See **Exhibit 3** (the facts cited in this section are all undisputed and recited in the SUF Case No. 09-18, Docket No. 309).  In January of 2008, Mr. Byrne had entered into a contract to purchase the Yellowstone Club from Mr. Blixseth for $455 million.  However, by March of 2008 Mr. Byrne saw personal financial gain if the Club were to go through bankruptcy to shed some liabilities and proposed to Mr. Blixseth that they put the Club into bankruptcy.  Mr. Blixseth refused.  At the same time Edra Blixseth and her agent were secretly negotiating with Byrne to frustrate the sale notwithstanding two orders in the divorce proceedings prohibiting her from doing so.  After meeting with Ms. Blixseth's agent on March 21, 2008, five days later, Mr.

Byrne then terminated the sale, loaned Edra Blixseth $35 million knowing she was in default on over $50 million in loans, took over control of the Yellowstone Club and forced it into bankruptcy.  As part of this proposal, Mr. Byrne promised in a written contract with Ms. Blixseth to raise $100 million in capital for the Club and presented Ms. Blixseth detailed financial projections for the Club wherein Mr. Byrne represented to Ms. Blixseth that if she partnered with him, she could profit over $600 million.  Ms. Blixseth agreed to this proposal and was able to obtain the Yellowstone Club out of her divorce from Mr. Blixseth in August of 2008.

As part of the asset distribution from the divorce, Ms. Blixseth not only received the Yellowstone Club which was valued at over $450 million, but also the Blixseths' estate in Rancho Mirage, California known as Porcupine Creek and which was valued at that time at over $200 million.  Because of the value of the assets she was receiving out of the divorce, Ms. Blixseth was required to "buyout" Mr. Blixseth from these assets.  To fund this "buyout", Mr. Byrne  "loaned" Ms. Blixseth $35 million but this loan was to be secured by a first position mortgage on Porcupine Creek, and a first position mortgage on a 160 acre parcel within the Yellowstone Club known as the "Family Compound" and for which Mr. Byrne had previously offered to pay $56 million to Mr. Blixseth.  The $35 million loan was also secured by Ms. Blixseth's partnership obligations in the Yellowstone Club to Mr. Byrne; that is, if Edra did not cooperate in partnering with Mr. Byrne in the development of the Yellowstone Club, he could foreclose on the Family Compound, an asset he previously valued at $56 million.  For Mr. Byrne, this was a planned

29

ER001842

scheme because he knew that Ms. Blixseth had defrauded banks and lenders of over $50 million in order to perpetrate her part of the scheme and that she had absolutely no means to re-pay the $35 million loan because, in his words, she was not "institutionally financeable".  Docket No. 309, Case No. 09-18 at pp. 25, 28.

Ms. Blixseth received Mr. Byrne's $35 million loan on August 13, 2008 and obtained ownership of the Yellowstone Club based on their written "Agreement to Form" in which CrossHarbor/Byrne agreed to inject $100 million into the Club. This was another fraud.  Ms. Blixseth immediately turned over control of the Club's bank accounts and management to Byrne; but Byrne never raised the $100 million in capital for the Club as previously promised, but instead began implementing his previous plan to put the Club into bankruptcy.

Thus, by November 09, 2008, Mr. Byrne through Edra Blixseth forced the Yellowstone Club into bankruptcy for his own personal financial gain.  Through a questionable bidding procedure (discussed below) Mr. Byrne ended up purchasing the Yellowstone Club for a mere $115 million in early 2009; or in other words he purchased the Club for only 25% of what he had contracted to pay for it only a year earlier.  As part of the plan of reorganization, Mr. Byrne and Ms. Blixseth devised to create the YCLT for the primary purpose of pursuing litigation against Mr. Blixseth wherein the YCLT would blame Mr. Blixseth for the demise of the Yellowstone Club and seek to disgorge Mr. Blixseth of the marital assets that he obtained out of his divorce to Ms. Blixseth, which they have successfully done in AP-14.

ER001843

All of the above facts were presented in Mr. Blixseth's motion for summary judgment in AP-18. See Docket Nos. 308-309, 313-329 in Case No. 09-18. Additionally all these facts were undisputed by the YCLT when it filed its opposition to Mr. Blixseth's motion for summary judgment on July 26, 2010. See Docket No. 338 in Case No. 09-18; LBR 7056-1(a)(3) (facts not disputed are deemed admitted). These same facts were presented in May, 2010 to the senior bankruptcy judge who immediately referred the matter to the Department of Justice for a criminal investigation, which is now pending, and which involves, *inter alia*, the $50 million bank frauds of Edra Blixseth. Blixseth Aff. at ¶¶ 12-15. Judge Kirscher's superfluous findings and rulings in AP 14 relating to Edra's "requisite intent" appear designed to frustrate the criminal investigation.

Pursuant to Montana Local Bankruptcy Rule 7056-1(a)(3), the YCLT's failure to dispute any of these facts meant that those facts were deemed admitted in Case No. 09-18 and would have conclusively established that the Yellowstone Club bankruptcy was filed in bad faith by Mr. Byrne and Ms. Blixseth as a means toward their profiting from the bankruptcy process, defrauding her creditors, and destroying Mr. Blixseth.

From Judge Kirscher's perspective, such a finding of bad faith on the part of Mr. Byrne and Ms. Blixseth would have been untenable for two reasons and therefore appear to have caused him to engage in the procedurally questionable conduct discussed above. First, prior to July 26, 2010 when the bad faith facts of Mr. Byrne and Ms. Blixseth were deemed admitted, Judge Kirscher had obviously

Case No. 12-35986 ER  266

ER001844

committed himself to a specific set of facts that laid all the blame for the Yellowstone Club's financial demise on Mr. Blixseth, as that was the theme of his 135 page Memorandum of Decision that he issued in AP-14 that he filed on the eve of trial on AP-18 on August 16th.  Had Mr. Blixseth and the YCLT proceeded to trial in AP-18 with the bad faith acts of Mr. Byrne and Ms. Blixseth deemed admitted, this would have exonerated Mr. Blixseth from causing the demise of the Club, which was antithetical to Judge Kirscher's then formulated conclusion in AP-14.

A reasonable person with knowledge of all these facts would come to no other conclusion than Judge Kirscher has been so involved in the Yellowstone Club bankruptcy and its related cases that his investment in a specific version of facts has caused him to be "boxed in" and has prejudged certain cases and must now issue rulings in adversary cases against Mr. Blixseth regardless of the merits of the claims against him or the merits of his defenses in those cases.  *See Frates v. Weinshienk*, 882 F.2d at 1504.  Similarly, on remand of the proceedings to confirm the reorganization plan of the Yellowstone Club, Judge Kirscher has demonstrably pre-determined the "good faith" requirement of 11 U.S.C. § 1129, despite the undisputed facts in AP-18 and cannot therefore be expected on remand to provide an impartial confirmation hearing.  As such, Judge Kirscher must be disqualified from presiding over AP-14 upon remand of pending appeals, he must be disqualified from presiding over the remanded confirmation hearings in the Yellowstone Club bankruptcy case, and he must be disqualified from any further proceedings in which Mr. Blixseth is a defendant.

32

ER001845

Second, allowing the bad faith acts of Mr. Byrne and Ms. Blixseth to be deemed admitted in AP-18 would have caused the entire Yellowstone Club plan of reorganization to be set aside because the filing of a bad faith bankruptcy petition would potentially undo the resulting plan of reorganization. *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987) (holding that a good faith plan cannot immunize a bad faith filing).

Because the primary (if not exclusive) means of paying the unsecured creditors according to the plan of reorganization depended entirely upon success in litigation against Mr. Blixseth, Judge Kirscher had no choice but to prevent Mr. Blixseth from presenting evidence that would exculpate him while at the same time establishing that the plan proponent and current owner of the Yellowstone Club was actually the cause of the Club's financial demise. This result would have been untenable for Judge Kirscher because his docket has been consumed since November of 2008 with the Yellowstone Club bankruptcy and furthering execution of the plan of reorganization. After having invested so much time in consummating the Yellowstone Club Bankruptcy plan in this regard, Judge Kirscher could not reasonably have been expected to allow the admission of facts in AP-18 that could potentially cause him and the creditors of the Yellowstone Club to start all over from scratch. This exact situation is why the Ninth Circuit in *In re Manoa Finance Co., Inc.* encouraged bankruptcy judges to recuse themselves from adversary proceedings after they have become so invested in the success of the underlying

33

bankruptcy case.  781 F.2d at 1373.[4]

### L.    Judge Kirscher Denied Mr. Blixseth Due Process in AP-14

If ever there was a "Kangaroo Court", Judge Kirscher presided over it in AP-14 when he allowed Mr. Blixseth to be tried as a defendant and held liable for a $209 million judgment only three weeks after the lawsuit was actually filed against Mr. Blixseth.  It is clear now that the taint of injustice stemming from this mockery of due process so prejudiced Judge Kirscher against Mr. Blixseth that Judge Kirscher's attempt to mitigate against this blatant due process violation by conducting a "Phase II" trial in AP-14 was wholly ineffective to remove the gross appearance of judicial partiality in that case.

The Unsecured Creditors Committee ("UCC") filed an Answer and Counterclaim in AP-14 against Mr. Blixseth on April 3, 2009. (Docket No. 98, Case No. 09-14).  In the Counterclaim – for the very first time – the UCC sought to hold Mr. Blixseth personally liable for $209 million of the $375 million Credit Suisse loan

---

[4] The conflict between Judge Kirscher's refusal to consider any evidence that would call into doubt the veracity of the Club's plan of reorganization was the subject of an appeal to Judge Haddon relating to the exculpation clauses within the plan of reorganization *and Judge Kirscher's arbitrary exclusion of all bad faith evidence of Byrne and Edra Blixseth's following detailed offers of proof in AP 14.*  Docket Nos. 6, 55, Case No. 2:09-cv-47, U.S. District Court for the District of Montana.  These offers of proof proving bad faith were again supplemented in AP 14 in January, 2010 in a motion for reconsideration before phase 2 of the trial, and again arbitrarily rejected without hearing the evidence.  Docket Nos. 485, 532, Case No. 09-14.  Yet in AP 18, after further discovery including depositions of Byrne and his agents, forensic recovery of emails and documents from the contents of computers, which contents Edra Blixseth and her agent Jory Russell attempted to destroy, detailed facts of bad faith and collusion were recited in the AP-18 Statement of Undisputed Facts (Docket No. 309, Case No. 09-18, pp. 41-43), which remains undisputed by the YCLT but again avoided by Judge Kirscher.  See Docket Nos. 473-1 to 473-7; 504, 504-1 to 504-1 to 504-30.

as a fraudulent transfer, hold him liable as an alter ego of BGI – the recipient of the $209 million, and for breach of fiduciary duty to the Debtors. The day before trial was to commence, the Debtor also filed a counterclaim and both the UCC and the Debtor dumped approximately 400,000 pages of discovery on Mr. Blixseth. Blixseth Aff. at ¶ 19. Despite the new lawsuit against Mr. Blixseth seeking hundreds of millions in damages filed on the eve of trial implicating numerous new defenses and required discovery, the bankruptcy court merely continued the trial *for one week*, then subsequently and scurrilously accused Mr. Blixseth of delaying tactics, and most significantly refused to accept Mr. Blixseth's pre-trial order with the new defenses to the one week old law suit. Blixseth Aff. at ¶ 20. Because the proposed Pretrial Order was due on April 27, 2009 and the parties could not agree on the contents, Mr. Blixseth submitted his own Pretrial Order on April 27, 2009. Docket No. 24. Judge Kirscher adopted a modified version of the UCC's Pretrial Order and rejected Mr. Blixseth's Pretrial Order with the defenses to the new law suit.

By refusing to adopt Mr. Blixseth's Pretrial Order, Judge Kirscher intentionally eliminated Mr. Blixseth's affirmative defenses to the UCC's and Debtor's Counterclaims that would establish not only the liability of Edra Blixseth and her financier, CrossHarbor Capital Partners, LLC for any damages that any creditor may have suffered, but would establish that the Chapter 11 filing itself was a bad faith filing designed to allow CrossHarbor to purchase the Debtors for a fraction of their worth. April 29, 2009 Hearing Transcript, pp. 11-14, attached hereto as **Exhibit 4**.

35

While Mr. Blixseth was given three weeks for taking discovery and preparing for trial, trial commenced on April 20, 2009, literally seventeen days after the UCC filed its $209 million counterclaim against Mr. Blixseth. Blixseth Aff. at ¶ 21. The night before the trial began the UCC and the Debtor dumped the 400,000 pages of exhibits on Mr. Blixseth. Blixseth Aff. at ¶ 19. Trial then adjourned and continued on April 29, 2009 for six days. The court then issued its "Interim Order" on June 11, 2009 against Credit Suisse ruling that its loan was "predatory" and violated FIRREA (The Financial Institutions Reform and Recovery Act) by implementing a fraudulent appraisal scheme. Docket No. 575, pp. 130-131, Case No. 09-14. Trial was again adjourned and the court then conducted *ex parte* settlement discussions with the UCC, CrossHarbor, the Debtor and Credit Suisee without notice to or involvement of Mr. Blixseth resulting in a settlement which targeted Mr. Blixseth in proposed future litigation including the continuation of the AP 14 trial. See *infra*. The *ex parte* meetings then led to a settlement term sheet and confirmation of the plan again without the statutory required notice to Mr. Blixseth. See Docket Nos. 6, 55, Case No. 2:09-cv-00047, U.S. District Court for the District of Montana.

Then on June 11, 2009 – 9 days after the bankruptcy court confirmed the Third Amended Reorganization Plan – the bankruptcy court continued the trial to a new date to be set at some point in the future, with the appearance of already having already made up its mind as to Mr. Blixseth's liability as a result of insisting on a quick march to trial for him. Docket No. 295, 575, pp. 64-65, Case No. 09-14.

**Case No. 12-35986 ER  271**

ER001849

## M.     Judge Kirscher Has Acknowledged that He Formed His Opinion in AP-14 Based On His Involvement in Other Cases

In opening his August 16, 2010 Memorandum of Decision in AP-14, Judge Kirscher acknowledges that in forming his opinion, he has taken judicial notice of facts he has learned from other cases he has presided over. Docket No. 575, Case No. 09-14, pg. 2 ("this Court takes judicial notice of the proceedings in the related bankruptcy cases and adversary proceedings discussed in this Memorandum of Decision for the purpose of providing additional background regarding the nature of the dispute and the relationship of the parties."). This willingness to form his opinion in AP-14 based on unspecified facts that he has taken judicial notice of in other proceedings has necessitated re-assignment and disqualification in the interest of justice, to maintain the appearance of impartiality, and because Judge Kirscher cannot reasonably be expected on remand to put aside his prejudices that he formed since November of 2008. Moreover, Judge Kirscher's acknowledgment about forming his opinion in AP-14 based on other proceedings is precisely why the Ninth Circuit in *In re Manoa*, urged bankruptcy judges to disqualify themselves once they get as personally involved in cases as Judge Kirscher has here.

Specifically, because Judge Kirscher has formed his opinion based on unspecified facts he has learned in the administration of other bankruptcy cases and adversary proceedings, Judge Kirscher has maintained the appearance of being willing to try a litigant without affording that litigant a public trial of the facts which establish that litigant's liability. Indeed, Mr. Blixseth is now unaware of whether the facts for which he is being found liable, are the identical facts that he

**Case No. 12-35986 ER   272**

ER001850

Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 42 of 291

was either allowed to present at trial, oppose the admission of, or appeal in AP-14.

Additionally, and perhaps more indicative of him being "boxed in" to a certain result

in AP-14, is that if Judge Kirscher took judicial notice of the facts he has learned in

other proceedings, then he necessarily needed to take judicial notice of the

undisputed facts in AP-18 regarding the bad faith conduct of Edra Blixseth and

Sam Byrne and their calculated plan to pin the resulting liability on Mr. Blixseth,

*which Judge Kirscher precluded from hearing in AP 14 after detailed offers of proof.*

Docket Nos. 6, 55, Case No. 2:09-cv-47, U.S. District Court for the District of

Montana.   Yet, Judge Kirscher's opinion in AP-14 ignores those undisputed facts in

AP-18 entirely.   A reasonable person with knowledge of all these facts could only

conclude that Judge Kirscher is incapable of impartiality toward Mr. Blixseth and

in fact may have a certain agenda against Mr. Blixseth for which justice requires

that Mr. Blixseth's matters be reassigned to a District Court judge.

## N.  Judge Kirscher Meets with CrossHarbor/Byrne and Credit Suisse at a Hotel and Excludes Mr. Blixseth's Counsel

The Yellowstone Club bankruptcy in Montana was conducted under suspect

circumstances.   As detailed below, Judge Kirscher facilitated this unusual

procedure.   The auction for the sale of the Club assets occurred at the Billings

Crowne Plaza Hotel between May 13th and 15th.   Blixseth Aff. at ¶ 16.   Judge

Kirscher rented a room at the hotel to facilitate ex parte communications with

Cross Harbor and Credit Suisse who were the only bidders at the sale.   Blixseth Aff.

at ¶ 16.   The auction itself, however, was not public.   Blixseth Aff. at ¶ 16.   Instead

it was conducted in closed door negotiations between CrossHarbor (Mr. Byrne's

Case No. 12-35986 ER  273

company) and Credit Suisse, with the Unsecured Creditors Committee being allowed to participate to some limited extent. Blixseth Aff. at ¶ 16. Although Mr. Blixseth's local counsel was present at the hotel, he was not allowed to participate in the auction, had no participation or knowledge of the *ex parte* communications; and was otherwise locked out from the status of the negotiations. Blixseth Aff. at ¶ 16. Even though the negotiations were "closed door", Judge Kirscher nevertheless met with the bidders at the hotel during their negotiations to resolve bidding and confirmation issues as they arose. Blixseth Aff. at ¶ 16. Immediately following these closed door negotiations with the bidders, Judge Kirscher approved the plan of reorganization for the Yellowstone Club and sale of the Club's assets to CrossHarbor *with no notice to Mr. Blixseth* and no record of the proceedings available for public or appellate review. Blixseth Aff. at ¶¶ 16-17. This failure to provide the statutory required notice caused District Court Judge Haddon to reverse the order confirming the Third Amended Plan of Reorganization of the Yellowstone Club. Docket Nos. 6, 55, 72, Case No. 2:09-cv-47, U.S. District Court for the District of Montana.

As part of the Yellowstone Club plan of reorganization and the settlement term sheet approved by Judge Kirscher, shortly after his closed door meetings with the bidders, the YCLT - controlled by Credit Suisse - was formed to pursue a massive litigation strategy against Mr. Blixseth in adversary cases before Judge Kirscher *notwithstanding the fact that the $375 million loan was a non-recourse loan as to Mr. Blixseth.* Blixseth Aff. at ¶ 17. Yet Judge Kirscher approved a term

**Case No. 12-35986 ER  274**

ER001852

sheet and reorganization plan that permitted Credit Suisse through the YCLT to use his bankruptcy court to pursue almost $300 million in damages for the Credit Suisse bondholders – of which Sam Byrne is one – *while exculpating Byrn, Edra Blixseth and Credit and precluding Mr. Blixseth's cross claims!* As discussed earlier, this is the precise plan hatched by Mr. Byrne and Ms. Blixseth prior to putting the Club into bankruptcy. And this perfidious plan resulted from closed door negotiations participated in by Judge Kirscher while renting a hotel room in the same hotel where the parties were conducting the auction, *but excluding Mr. Blixseth's counsel.* Based on Judge Kirscher's unique and *ex parte* involvement in the plan confirmation process and auction of the Club's assets, a reasonable person with knowledge of all these facts can only assume that Judge Kirscher is now incapable of impartiality toward Mr. Blixseth because he was tainted by through the Debtor, the UCC, CS and CH "having his ear." *U.S. v. Wolfson*, 634 F.2d 1217, 1221-1222 (9th Cir. 1980) ("gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure."); *U.S. v. Carmichael*, 232 F.3d 510, 517-518 (6th Cir. 2000); *Kensington Int'l Ltd.*, 368 F.3d 289, 308-310 (3rd Cir. 2004) (agreeing that "off -the-record discussions on substantive issues constitutes personal or extrajudicial knowledge in the sense that the information conveyed to the judge leaves no trace in the record and cannot be controverted or tested by the tools of the adversary process").

Applying this law, Judge Kirscher's ex parte communications with

CrossHarbor and Credit Suisse, or his clerks' communications to Mr. Blixseth's adversaries (see *supra*), "raise a question about his impartiality," and that is all that is required for disqualification or reassignment.

Indeed, the *ex parte* and closed-door nature of the plan confirmation process and bidding procedures where the plan was likely hatched to pursue Mr. Blixseth to satisfy the claims of the unsecured creditors likely violated Mr. Blixseth's 6th Amendment right to a public trial.  As recently explained by the Ninth Circuit, the 6th Amendment protects a party's right to a fair trial, but the interest protected by this right expands beyond "traditional" trials and encompasses court proceedings that are "integral" to the trial itself.  *U.S. v. Waters*, __ F.3d __, 2010 WL 3565259 at **12-14 (9th Cir. September 15, 2010).  It is not only the right of the litigant that is protected by the 6th Amendment, but also the veracity of the judicial system which benefits from the "salutary effects of public scrutiny" that are necessarily attendant when competing interests from all stakeholders are considered, which is critically important in the bankruptcy context.  *See id.* at *13 (quoting *Waller v. Georgia*, 467 U.S. 39, 47 (1984)).  Here, Judge Kirscher's disqualification under § 455 is mandated because any reasonable person would question his ability to be impartial toward Mr. Blixseth after having closed door sessions with the bidders at the Billings Crowne Plaza Hotel where the most critical aspect of that case was negotiated to Mr. Blixseth's severe detriment.

41

ER001854

O.   **Judge Kirscher Appears Committed to a Negative View of Mr. Blixseth; And This Permeates Judge Kirscher's View of Credibility and His Decisions in Unrelated Cases**

(1)   **Judge Kirscher is Committed to Exonerating Edra Blixseth of Her Fraud on Other Creditors Because He Believes She was Driven to Commit Such Fraud by Mr. Blixseth**

In Edra D. Blixseth's bankruptcy case pending before Judge Kirscher (Case No. 09-60452), one of her creditors, Western Capital Partners LLC ("WCP") initiated an adversary proceeding (Adv. No. 09-100) against her to object to the dischargeability of her debt under 11 U.S.C. § 523.  WCP filed a motion for summary judgment on its non-dischargeability complaint wherein WCP proved that at the same time Ms. Blixseth was representing to WCP that she could pay her bills as they became due and that she had no outstanding federal or state income tax liability, she was filing declarations in California state court wherein she represented that she was millions of dollars in arrears to her creditors, that she owed millions of dollars in delinquent federal and state income tax obligations, that she generally had no income and that her financial situation was dire.  See Docket No, 26, Case No. 09-100.  Ms. Blixseth's opposition to motion for summary judgment was initially due on September 3, 2010 but after Judge Kirscher received an *ex parte* email from Ms. Blixseth's counsel that day requesting an extension, Judge Kirscher extended the deadline to September 24, 2010.  See Email from Joseph Sullivan to Judge Kirscher attached hereto as **Exhibit 5** (To Judge Kirscher: "If neither of these motions are deemed acceptable and you are not inclined to grant the same, please let me know and I will attempt to file some form of appropriate

responsive materials to the Summary Judgment Motion later this evening." [Mr. Sullivan also left his cell phone number in this email so that Judge Kirscher could contact him that evening, this simply demonstrates the cavalier attitude in the Montana Bankruptcy Bar to *ex parte* access to the sole bankruptcy judge in Montana]); *see also* Docket No 35, Case No. 09-100, entered September 7, 2010 extending response date for WCP's motion for summary judgment in response to this *ex parte* email.

Ms. Blixseth filed her opposition to WCP's motion for summary judgment on Friday, September 24, 2010.  The following business day on Monday September 27, 2010, Judge Kirscher denied WCP's motion for summary judgment without giving WCP its right under F.R.C.P. 56(c)(1)(C) to file a reply brief.

In denying WCP's motion for summary judgment, Judge Kirscher did not limit himself to the controverted facts that Ms. Blixseth purportedly raised in opposition to the motion for summary judgment, but openly went outside of the record that was before him and relied on the prejudices that he had gained over the past 22 months in separate litigation where Mr. Blixseth's culpability was at issue.

Judge Kirscher specifically stated:

> the Court does not consider WCP's motion in a vacuum, but rather, undertakes this case after having over 22 months of time on task with the Yellowstone Club and the associated proceedings, including Debtor's bankruptcy case.
> The Court has heard a lot of testimony over the past 22 months about Debtor [i.e., Ms. Blixseth] and her exspouse's long and bitter divorce.  Debtor claims she was "frozen out" of various business affairs for about two years, or until approximately mid-August of 2008, when

43

ER001856

> Debtor was awarded various assets, including BLX
> Group, Inc. – which owned the ultra exclusive
> Yellowstone Club – under the terms of a Marital
> Settlement Agreement.
>
> Debtor has testified previously that she believed that her
> share of the marital assets were worth well in excess of
> $100 million between December of 2006 and August of
> 2008.   The 2007 Loan Agreement at issue in this
> Adversary Proceeding and a modification of the Loan
> Agreement made in June of 2008 were all done during a
> period of time when Debtor was frozen out of the majority
> of the marital business dealings.  Such fact precludes this
> Court from making a summary ruling that Debtor
> possessed the requisite intent to deceive WCP under
> either § 523(a)(2)(A) or § 523(a)(2)(B).

See Docket No. 40, at pp. 24-25, Case No. 09-100.  It is clear that Judge Kirscher

has so committed himself to the idea that Mr. Blixseth is a devious ex-husband and

Ms. Blixseth his innocent victim (which is contrary to the uncontroverted facts that

Judge Kirscher has repeatedly kept from becoming part of the record in numerous

cases, *and the subject of the criminal investigation; and the subject of a final*

*judgment in California after almost two years of bitterly contested litigation*

[Blixseth Aff. ¶¶ 11-15, 24]) that he will openly allow that prejudice to carry over

*sua sponte* to unrelated cases involving third parties who have been injured by Ms.

Blixseth's fraudulent conduct and entertain *ex parte* emails from her counsel asking

for special accommodations in filing deadlines and then.  Moreover, the fact that

Judge Kirscher denied WCP's motion for summary judgment one business day after

Ms. Blixseth filed her opposition and before WCP's statutory time period under

F.R.C.P. 56 to file a reply brief expired, gives a very strong impression that Judge

Kirscher had pre-determined that he would exculpate Ms. Blixseth from her

fraudulent conduct no matter what because in his mind, she was the victim of Mr.

Blixseth.

          **(2)**    **Judge Kirscher Exculpates Edra from Demonstrated Bankruptcy Fraud For Failing to List a $181 Million Debt on Her Bankruptcy Schedules**

Judge Kirscher also preemptively exculpated Edra Blixseth from committing bankruptcy crimes under 18 U.S.C. §§ 152, 157.  It is established judicially that when Edra Blixseth filed her bankruptcy schedules in her personal bankruptcy, she knowingly failed to disclose that she owed a $181 million debt to her wholly-owned corporation known as BLX Group, Inc.  Docket No. 575, pp. 54-55, Case No. 09-14; See Edra's Deposition Transcript of December 17, 2009 at 234:23-235:5, **Exhibit 6**. Knowing that this patent bankruptcy crime under 18 U.S.C. §§ 152 and 157 would discredit Ms. Blixseth's testimony against Mr. Blixseth in AP-14, incredibly, Judge Kirscher excused her knowing failure to list the $181 million debt that she owed to BLX Group, Inc. on her Schedules because, in his words: "The Court is not going to discredit Edra's testimony simply because she essentially failed to list herself as a creditor on the list of 20 largest unsecured creditors."  Docket No. 575, pp. 54-55, Case No. 09-14.  It is beyond belief that a bankruptcy judge can so easily dismiss an individual's knowing omission of a $181 million debt from his or her bankruptcy schedules.[5]  Because such an omission is so incredible, the senior bankruptcy judge had the good sense to refer this specific matter to the Department of Justice. Blixseth Aff. at ¶ 11-15.

---

[5] One can only guess at the slippery-slope precedent this will set in future bankruptcy cases where individual debtors will cite to this case to excuse their failure to list on their schedules millions of dollars in debt that they owe to their companies.

**Case No. 12-35986 ER  280**

ER001858

Through the fiction of maintaining Edra's credibility in spite of her own bankruptcy frauds, Judge Kirscher was then able to use her testimony to discredit the evidence that Mr. Blixseth presented in his defense. Docket No. 575, pp. 54-55, Case No. 09-14. Judge Kirscher's chimera in this regard alone presents the appearance that he cannot reasonably be expected "upon remand to have substantial difficulty in putting out of his [] mind" his perception that Edra is a credible witness, when in fact it is now undisputed that Edra and Sam Byrne engaged in bad faith conduct that led to the Yellowstone Club's demise.

A reasonable person knowing all these facts could only arrive at the conclusion that Judge Kirscher is incapable of impartiality toward Mr. Blixseth.

P.   **Judge Kirscher Refused to Allow Mr. Blixseth to Present Sworn Testimony in AP-14 that Ms. Blixseth and Her Attorney Intentionally Concealed Evidence that Would Exculpate Mr. Blixseth**

In connection with Edra Blixseth's bankruptcy, one of her creditors served a subpoena *duces tecum* on Edra's former executive assistant, Jory Russell. A copy of that subpoena as **Exhibit 7**. The subpoena requested, among other things, "Complete copies of computer hard drives and other electronic storage media which contain any and all accounting, email, and financial information of the Debtor and or entities owned in whole or in part by the Debtor." Edra Blixseth, through her attorney, has testified that all of her financial documents, transactional documents, bank records, correspondence and emails would be stored on Jory's laptop computer. **Exhibit 8**, Edra July 9, 2009 deposition at p. 116:3-8: 213:1; **Exhibit 9**, Edra's August 6, 2009 examination at 271:25-272:2.

46

ER001859

Mr. Blixseth sought this same data from Mr. Russell, as a creditor of Ms. Blixseth's and for use in his defense of AP-14 to establish that the Yellowstone Club bankruptcy was filed in bad faith by Edra D. Blixseth and Byrne. *See* Docket No. 317, Case No. 09-60452.

On the eve of Mr. Russell producing his laptop to WCP and Mr. Blixseth, Edra Blixseth and her attorney interfered with Mr. Russell's subpoena obligations by taking possession of his laptop computer, threatening with him theft if he did not turn it over and destroy all remaining records of Ms. Blixseth that he had in his possession, and then concealing the laptop's existence from WCP, Mr. Blixseth and her creditors in general.  See July 8, 2009 deposition transcript of Jory Russell at pp. 11:4-16:20; 34:9-35:22, attached hereto as **Exhibit 10** (threatening Mr. Russell with claims of theft he did not turn over the laptop and destroy all of Ms. Blixseth records in his possession); **Exhibit 11**, Flynn Affidavit re Spoliation Motion.[6]

Unfortunately, Ms. Blixseth's intentional concealment of her financial dealings as owner of the Yellowstone Club and communications regarding the same as stored on Mr. Russell's laptop computer deprived Mr. Blixseth of discovery and therefore his ability to adequately defend himself in AP-14.

Once this occurred, Mr. Blixseth filed a motion before Judge Kirscher in AP-14 asking the Court to determine the extent to which Mr. Blixseth's due process rights had been prejudiced as a result of Ms. Blixseth's spoliation of her personal and Yellowstone Club records and to fashion an appropriate remedy for Mr.

---

[6] The facts recited in this section are all part of the record in AP-14.  See Docket Nos. 473-1 to 473-7; 504, 504-1 to 504-1 to 504-30.

47

Blixseth to mitigate against that prejudice.  See Docket No. 473 in Case No. 09-14 ("Spoliation Motion").  The Spoliation Motion was supported by an extensive factual record containing the deposition testimony of Jory Russell and expert reports.  See Docket Nos. 473, 473-1 to 473-7; 504, 504-1 to 504-1 to 504-30.

Despite the intentional concealment and destruction of critical evidence by Ms. Blixseth and her counsel to the extreme prejudice of Mr. Blixseth in AP-14, Judge Kirscher <u>refused to consider the motion altogether, and refused to allow Mr. Blixseth to present any evidence at the hearing on the Spoliation Motion.</u> Transcript of Hearing on February 11, 2010, pg. 119:21-136:3, **Exhibit 2**.  While this fact alone may not be a ground for disqualification or reassignment, what reveals Judge Kirscher's bias against Mr. Blixseth is that in his August 16, 2010 Memorandum of Decision, Judge Kirscher referred to Mr. Blixseth's Spoliation Motion as "unsubstantiated rhetoric meant to divert this Court's attention away from the controlling facts."  Docket No. 575, pg. 64, n. 50, Case No. 09-14.  Of course, it was Judge Kirscher who refused to allow Mr. Blixseth to "substantiate" the Spoliation Motion in the first place.  Thus, Judge Kirscher's partiality toward Mr. Blixseth could be no more apparent than in his statement that he believes Mr. Blixseth's allegations to all be unsubstantiated, when in fact it is Judge Kirscher who repeatedly refuses to allow Mr. Blixseth to substantiate his defenses.[7]  Such deep-seated bias toward Mr. Blixseth more than justifies Judge Kirscher's

---

[7] Judge Kirscher has similarly refused to allow Mr. Blixseth to substantiate his allegations regarding Sam Byrne's and Ms. Blixseth's bad faith conduct in filing the Yellowstone Club bankruptcy, yet also refers to these allegations as unsubstantiated.

**Case No. 12-35986 ER  283**

disqualification under § 455.

## 5.   <u>CONCLUSION</u>

Mr. Blixseth does not here complain about the underlying due process injuries he has suffered in the Montana Bankruptcy Court.  Mr. Blixseth's remedies for those violations are through appeal.  Instead, it is the pattern and volume of repeated due process injuries and other questionable judicial conduct suffered by Mr. Blixseth, when viewed in their totality, and with an understanding of all the intricacies of the Yellowstone Club bankruptcies and related cases, that a reasonable person with knowledge of all these facts would believe that Judge Kirscher is incapable of being impartial toward Mr. Blixseth.

Therefore to maintain the appearance of an impartial judiciary within the U.S. Bankruptcy Court for the District of Montana, all adversary proceedings and contested matters in which Mr. Blixseth is a litigant before Judge Kirscher, and the remand proceedings in the Yellowstone Club bankruptcy, must be re-assigned to the District Court of Montana and/or Judge Kirscher must be disqualified from presiding over such matters.

DATED this <u>30<u>th</u></u> day of November, 2010.

/s/ Patrick T. Fox
_____
Patrick T. Fox

/s/ Michael J. Flynn
_____
Michael J. Flynn
One Center Plaza, Suite 240
Boston, MA 02018
Telephone:  858-775-7624
Facsimile:   858-759-0711
mike@mjfesq.com

**Case No. 12-35986 ER  284**

ER001862

/s/ Philip H. Stillman

Philip H. Stillman, CA #152861
508 Meadowmist Court, Ste B
Olivenhain,  CA 92024
Tel.  (888) 235-4279
Fax. (888) 235-4279
pstillman@stillmanassociates.com

*Attorneys for Timothy L. Blixseth*

50

**Case No. 12-35986 ER  285**

ER001863

# CERTIFICATE OF SERVICE

I, the undersigned, certify under penalty of perjury that on November 30, 2010, or as soon as possible thereafter, copies of the foregoing *Amended Motion to Disqualify Bankruptcy Judge Kischer (with exhibits)* will be effected on all ECF registered users once it is filed and entered on the Court's docket, and that in addition, service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following parties who are not ECF registered users:

JERRY ABEL
PO BOX 725
MANHATTAN, MT 59741-0725

Argo Partners
12 W 37th St 9th Fl
New York, NY 10018

BANKERS FINANCIAL CORP
|c/o MICHAEL GROOM, ESQ.
1570 THE ALAMEDA, STE 100
SAN JOSE, CA 95126,

BIG SKY FLORAL & DESIGN
PO BOX 160940
BIG SKY, MT 59716

BILL LERCH FLY FISHING
64035 GALLATIN RD
GALLATIN GATEWAY, MT 59730

Blue Heron Micro Opportunities Fund LLP
PO Box 14610
Surfside Beach, CA 29587

Steven R. Bradley
PO BOX 611543
ROSEMARY BEACH, FL 32461

CURT ELECTRIC & SUPPLY INC
92 BULLRUSH AVE
BELGRADE, MT 59714

Debt Acquisition Company of America V, LLC
1565 Hotel Circle South
Suite 310
San Diego, CA 92108

51

ER001864

EULER HERMES ACI
|AGENT OF HORNY TOAD ACTIVEWEAR, INC|800 RED BROOK
BOULEVARD|OWINGS MILLS, MD 21117,

AMBER L GODBOUT
POORE, ROTH & ROBINSON, PC
1341 HARRISON AVE
BUTTE, MT 59701

LIQUIDITY SOLUTIONS INC
1 UNIVERSITY PLAZA STE 312|HACKENSACK, NJ 07601

GEORGE HAMILTON MEHLMAN
29 GEORGE LANE
BROOKLINE, MA 02445,

MORRISON MAIERLE, INC.
P O BOX 1113
BOZEMAN, MT 59771

New West Publishing, LLC
640 Big Flat Road
Missoula, MT 59804

Normandy Hill Capital, LP
150 East 52nd Street
10th Floor
New York, NY 10022

PIMA DIRECT
ATTN: ROLLIE KILLEEN
14694 WICKS BLVD
SAN LEANDRO, CA 94577

RED TIGER DRILLING, INC
PO BOX 659
MANHATTAN, MT 59741

REPORTER BIG SKY
212 ZOOT WAY
BOZEMAN, MT 59718

Case No. 12-35986 ER  287

ER001865

JONATHAN LEE RICHES
FEDERAL MEDICAL CENTER
PO BOX 14500
LEXINGTON, KY 40512

DAVID B RUBENSTEIN
140 GOLF HOUSE RD
HAVERFORD, PA 19041,

GERALD N. SIMS
PYLE SIMS DUNCAN & STEVENSON
401 B STREET SUITE 1500
SAN DIEGO, CA 92101
jerrys@psdslaw.com

LEWIS T STEVENS
WARNER STEVENS LLP
301 COMMERCE ST, STE 1700
FORT WORTH, TX 76102

TODD A STUBBS
MOORE, O'CONNELL & REFLING PC
PO BOX 1288
BOZEMAN, MT 59771-1288

The Cincinnati Insurance Company
c/o Hanson Peters Nye
1000 Hart Road, Suite 300
Barrington, IL 60010

                          /s/ Patrick T. Fox
                          Patrick T. Fox
                          Doubek & Pyfer LLP

53

**Case No. 12-35986 ER  288**

.

.

.

**EXHIBIT 1**

**Case No. 12-35986 ER  289**

ER001867

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____

|  |  |  |
|---|---|---|
| In Re: | ) | Case No. 09-60452 |
|  | ) |  |
| Edra D. Blixseth, | ) |  |
|  | ) |  |
| Debtor. | ) |  |
| _____ | ) |  |
|  | ) |  |
| Atigeo, LLC, et al., | ) | Adversary Cause No. 09-00105 |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| Samson, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
| _____ | ) |  |

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
October 12, 2010

Transcript Services:

Jonny B. Nordhagen
Nordhagen Court Reporting
1734 Harrison Avenue
Butte, Montana
(406) 494-2083

Proceedings recorded by electronic recording;
transcript produced by reporting service.

**Exhibit 1**

08-61570-RBK12 Doc#820-18 Filed: 11/30/10 Entered: 11/30/10 16:58:30 Page 3 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 60 of 291

2

```
1                          APPEARANCES

2

3       FOR ATIGEO, LLC; and xPATTERNS:

4            BRIAN PARK

5            Attorney at Law

6            Dorsey & Whitney, LLP

7            701 Fifth Avenue, Suite 6100

8            Seattle, WA  98104

9

10      FOR TRUSTEE RICHARD J. SAMSON:

11           DAVID B. COTNER

12           Attorney at Law

13           Datsopoulos MacDonald & Lind

14           201 West Main Street

15           Central Square Building

16           Missoula, MT  59802

17

18      FOR MICHAEL SANDOVAL; HEATHER SANDOVAL; and HMJZ, LLC:

19           ROLAND TELLIS

20           Attorney at Law

21           Bingham McCutchen, LLP

22           1620 26th Street, 4th Floor, North Tower

23           Santa Monica, CA  90404

24

25
```

08-61570-RBK11 Doc#82048-08/Filed: 11/30/10 Entered 11/19/10 P15583:19 Page 4 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 61 of 291

3

```
1                    APPEARANCES (Continued)

2

3       FOR WESTERN CAPITAL PARTNERS:

4           ROBERT HATCH

5           Attorney at Law

6           Hatch Halstead, LLC

7           730 17th Street, Suite 200

8           Denver, CO  80202

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      BLIXSETH BANKRUPTCY

 2                       BUTTE, MONTANA

 3                          -  -  -

 4         BE IT REMEMBERED THAT this matter came on for

 5   hearing on October 12, 2010, in the United States

 6   Bankruptcy Court, District of Montana, The Hon. Ralph B.

 7   Kirscher, presiding:

 8

 9   The following proceedings were had:

10

11         THE COURT:  Please be seated.  Mr. Hatch, we're

12   happy to have you join us.

13         MR. HATCH:  I'm glad to be here, Judge.  Sorry

14   for the confusion.  We had -- (inaudible, audio cuts out.)

15         THE COURT:  Okay.  This is the time set for --

16   the only matter we have left in the Edra Blixseth case is

17   the Adversary 09-00105.  The other matters that were set in

18   related cases in the main case have been already dealt

19   with, so we're just dealing with the pending matters in

20   09-00105.

21         And we have before us a motion to bifurcate and

22   objection thereto, we have a motion to file second amended

23   counterclaim and third-party complaint, and also Western

24   Capital Partners' motion to file third-party complaint and

25   objections thereto.  We have pretrial scheduling and status
```

08-61570-RBK Doc#8 2048-18 Filed: 11/30/10 48 Entered: 11/19/10 18:58:11 Page 6 of 83
Case 2:11-cv-00073-SEH  Document 12-5  Filed 02/02/12  Page 63 of 291

5

```
1    conference, and we also have -- actually that's it.  The

2    rest are just replies and responses to the prior motions.

3    I think I've covered everything.  If I've missed something,

4    please let me know, and I know you will.

5            Before we start, let's do appearances since we're

6    in about five different locations here.

7            Mr. Cotner.

8            MR. COTNER:  Your Honor, Dave Cotner,

9    representing Dick Samson, the trustee of the Edra Blixseth

10   estate.

11           THE COURT:  Thank you.  There's no one here in

12   Butte.  I'll go to California.

13           MR. TELLIS:  Good morning from California, Your

14   Honor.  Roland Tellis on behalf of Third-Party Defendants

15   Michael Sandoval; Heather Sandoval; and HMJZ, LLC.

16           THE COURT:  Okay.

17           MR. PARK:  Also in California, Your Honor, Brian

18   Park of Dorsey & Whitney on behalf of the corporate

19   plaintiffs, Atigeo and xPatterns.

20           THE COURT:  Okay, very good.  I was hoping you

21   were there because I didn't see anybody in any other

22   location, so very good.

23           And, Mr. Hatch, I think you're the last one.

24           MR. HATCH:  Good morning, Your Honor.  Robert

25   Hatch on behalf of Western Capital Partners.
```

6

```
 1            THE COURT:  Now, is Mr. Conant appearing as well,

 2    or not?

 3            MR. HATCH:  No, it's just me, Judge.

 4            THE COURT:  Okay, okay.  I'll tell you, in

 5    reviewing these papers - and I wasn't going to lead with

 6    this and let you state your respective arguments on these

 7    matters, but let me start with this because I think it's

 8    important - in reading through the briefs, the replies, the

 9    responses, and the attachments, I'll be quite candid with

10    you:  I'm very concerned about representations and filings

11    that have been made with this Court that maybe didn't have

12    a sufficient factual basis prior to their filing.

13            And I suspect -- well, I know, based upon your

14    prior conduct before this Court, that you're all very

15    competent, capable attorneys.  And I guess I'm concerned

16    when some of the allegations that I've seen set forth in

17    these documents are made against -- some of you I've known

18    for less time than others, but I'm quite troubled.  And I

19    will have some questions for all of you as to what's going

20    on, why these things are happening, and if we have

21    inappropriate conduct being done.  I'm very concerned.

22            So I will leave it at that so that you can state

23    your arguments.  And if you feel you wish to add anything

24    based upon my concern, that's fine; if you don't, I mean I

25    have some questions in any event.
```

7

```
1              So is there a preference as to what we take up

2    first?  Do we wish to take up the trustee's motion to file

3    a second amended counterclaim and third-party complaint?

4    Maybe that's where we should start, and the objections

5    thereto.

6              MR. COTNER:  Judge, this is Mr. Cotner.

7              Could I just apprise the Court procedurally?  I

8    think it may be a proper manner to handle the issues before

9    the Court.

10             THE COURT:  Absolutely.

11             MR. COTNER:  Judge, yesterday we had a chance to

12   talk to counsel on a conference call.  And, frankly, I

13   think the decision was made -- and what I would advise the

14   Court is that, given the objections that have been filed

15   and the fact that the motion to amend has not been granted,

16   we believe the motion to bifurcate should be continued

17   until the November calendar.

18             In other words, let's deal with the two motions

19   to amend today as Step 1; then dependent on the Court's

20   rulings, we may or may not need the bifurcation request.

21   And as we discussed yesterday, there's the potential of

22   having that issue resolved after we obtain rulings from you

23   today.

24             THE COURT:  Does anyone else wish to make any

25   statement concerning the motion to bifurcate?
```

08-61570-RBK12 Doc#82048-18/Filed: 11/30/1048 Entered 11/19/10 Page 311 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 66 of 291

8

1              MR. TELLIS:  Your Honor, it's Roland Tellis on

2      behalf of the third-party defendants.  I was going to take

3      the lead on the arguments.  To be as efficient as we can

4      here today, I was going to take the lead on the arguments

5      on the motion to bifurcate, and Mr. Park was going to

6      address the defendants and respective oppositions to the

7      motions for leave to amend.

8              Mr. Cotner is correct, we spoke yesterday.  And

9      it was our position with Mr. Cotner that the claims that he

10     is proposing in the amended complaint need to first be

11     dealt with before we should turn to the motion to

12     bifurcate.  In our, in our view, Your Honor, respectfully,

13     we think that the motion to bifurcate is premature because

14     the claims are not ripe.  If Your Honor grants the leave to

15     amend, we would then address these claims through a motion

16     to dismiss.  We don't think they would survive those

17     claims.

18             So it seems best to all parties if we table the

19     motion to bifurcate until we see what pleading emerges from

20     the motions for leave to amend and then address the issue

21     of bifurcation.

22             THE COURT:  Okay.  Mr. Hatch, do you have any

23     comment?

24             MR. HATCH:  Your Honor, we're not a party to the

25     motion to bifurcate, but I do agree that it makes sense to

08-61570-RBK 1 Doc#:2049-08 Filed: 10/30/08 48 Entered: 11/30/12 18:58:33 Page 10 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 67 of 291

9

```
1    frame the pleadings and have those pleadings determined

2    before we go forward and determine whether there ought to

3    be bifurcated trials.  So I would concur with counsel on

4    those -- on that suggestion.

5              THE COURT:  Okay.  As I understand it, the

6    bifurcation involves, what is it, Count 1 which is dealing

7    with the release, correct?

8              MR. COTNER:  Judge, I'm sorry.  This is

9    Mr. Cotner.  I'm having trouble hearing I think generally

10   today.  Could you repeat that?  I'm sorry.

11             THE COURT:  The reason for the bifurcation is to

12   separate Count 1, I believe it is, from the other counts,

13   Count 1 being the allegations concerning the release and

14   the validity or enforcement thereof, correct?

15             MR. COTNER:  Judge, your summary of Count 1 is

16   correct.  The motion to bifurcate actually is to remove

17   from the case, if you will, as presently pled the

18   counterclaim and third-party complaint that is asserted by

19   the trustee because it is, in fact, contingent on Count 1.

20   And so the motion to bifurcate, as we proposed it to the

21   Court, was for Western Capital, in its present status of

22   holding the contract claim, and the Atigeo parties to

23   litigate the enforceability of that contract as one of

24   their issues.

25             If and only if the Court were to determine that
```

08-61570-RBK 1 Doc# 82043-08/File# 10/30/804 Entered 11/30/12 18:58:336 Page 011 of 83
Case 2:11-cv-00073-SEH  Document 12-5  Filed 02/02/12  Page 68 of 291

10

1   the contract is not enforceable and is revoked as is

2   requested by the Atigeo parties in Count 1, that would then

3   put all the parties back into the status they had prior to

4   the settlement agreement.  And it's only under those

5   circumstances that we believe the third-party complaint and

6   counterclaim would exist.

7              THE COURT:  Right.  So I mean is Count 1

8   something that can be dealt with on summary judgment?

9              MR. COTNER:  Judge, I think that's a question for

10  Mr. Tellis, most likely, or Mr. Park.

11             MR. TELLIS:  I think it depends on the state of

12  discovery, Your Honor.  That is a count that was brought by

13  not my clients but Mr. Park's clients to essentially

14  rescind the letter agreement on grounds that had not yet --

15  there was no consideration, there was no - (inaudible) -

16  satisfaction, etc.  It would depend on, obviously, the

17  discovery.

18             But the motion to bifurcate is troubling in other

19  aspects in that it just, it doesn't just depend on the

20  validity of the release -- well, in theory, it does, but

21  Mr. Cotner is asserting tort claims now which are

22  admittedly not ripe.  They are not even actionable at the

23  moment.  They would only become actionable if the release

24  is rescinded.

25             And so in a sense, what he's asking is to file a

```
 1   placeholder action, is how I've described it, which would
 2   remain dormant while the litigation continues; and then
 3   depending on the outcome of Count 1 of Mr. Park's
 4   complaint, then only would they be appropriate.  And it's
 5   our view that that would violate the ripeness doctrine and
 6   those claims would be, would be essentially dormant.  They
 7   wouldn't even spring into existence until some event down
 8   the road, and it would be prejudicial to have to litigate
 9   those claims, etc.  I don't think Rule 42 permits that type
10   of a procedure where you just file a placeholder action and
11   hold it in abeyance until some event down the road.
12             MR. PARK:  Your Honor, if I may, this is Brian
13   Park on behalf of Atigeo and xPatterns.
14             Count 1 is the plaintiff's claim, that's correct.
15   As to your question about whether it's amenable to summary
16   judgment under Rule 56, I think that remains to be seen.
17   That's one of the reasons the parties are anxious,
18   especially on the plaintiff's side, to close the initial
19   pleadings and get on with the rest of the case so we can
20   engage in discovery and evaluate the evidence that's
21   developed.
22             But as Mr. Tellis points out, the motion to
23   bifurcate is much broader than only Count 1.  It basically
24   seeks to bifurcate all the so-called "contingent tort
25   claims" from the contract claims that Western Capital
```

```
 1    asserts at this time.  And for the reasons that Mr. Tellis

 2    outlined, we think that that procedural mechanism of

 3    bifurcation for that purpose is not proper.

 4              MR. TELLIS:  The reason, Your Honor, if I may,

 5    that we view, the parties all view that it's premature is:

 6    If Your Honor hypothetically does not permit the trustee to

 7    amend its complaint, then it has to revert back to the

 8    complaint that it had previously filed which does not

 9    contain contingent tort claims.  And so it seemed to us

10    that we ought to first see what complaint emerges from the

11    trustee's side, because it would then impact whether we

12    then bring a 12(b) motion because we view the claims as not

13    being ripe or whether we have to take a different approach.

14    And in some ways, it was putting the cart before the horse.

15    Until we know what pleading the trustee will be permitted

16    to proceed with, we really can't talk about a bifurcation

17    of the trial of those claims.

18              THE COURT:  Well, I guess I'm not certain why I

19    don't just deny the motion for bifurcation until you get

20    into the case and see if it's necessary rather than just

21    leaving it dangle out there.

22              MR. TELLIS:  Well, that -- I don't want to, I

23    don't want to go back on the discussion we had yesterday

24    where we would agree this was premature, but that certainly

25    would be fine with us.  In fact, we are opposing the motion
```

13

```
1    and seeking that it be denied.
2            THE COURT:  We get to the same place one way or
3    the other anyway.  It would be without prejudice.  You can
4    refile the motion depending upon the nature of the
5    proceedings and the discovery in the case.
6            Any response to that?
7            MR. COTNER:  Judge, from Mr. Cotner's
8    perspective --
9            THE COURT:  Pardon?
10           MR. COTNER:  I'm trying to figure out how to best
11   respond to that, Judge.  If it's your intention to deny the
12   motion to bifurcate today, that's certainly within your
13   prerogative.  And we still need to proceed with the motion
14   to amend to determine what to do with the status of the
15   pleadings.
16           THE COURT:  Exactly.
17           MR. COTNER:  If it's dismissed without prejudice
18   and the parties have the right to then discuss what steps
19   they take post your ruling today, frankly, that's
20   acceptable to the trustee as well.
21           THE COURT:  Okay.  Well, as it relates to the
22   motion to bifurcate, I'm going to deny that motion at this
23   time without prejudice.  You can raise it later depending
24   upon where you think the case is at.
25           Okay, so we have that matter out of the way.  I
```

```
1    think now we're down to probably the primary issue, which
2    is the motion to file second amended counterclaim and
3    third-party complaint, and Western Capital's motion to file
4    third-party complaint, correct?
5              MR. COTNER:  That's correct, Judge.
6              THE COURT:  Okay.  I'll let the trustee proceed.
7              MR. COTNER:  Thank you, Judge.  As you know, for
8    the record, Dave Cotner representing the trustee.
9              Judge, you began today by saying you're troubled,
10   and you have every right to read briefs and look at the
11   lawyers and say that you have that instant reaction.  I too
12   am troubled.  I've practiced for 27 years.  I haven't found
13   myself in a situation where I have even had to start a
14   conversation with a judge such as yourself and say, "Judge,
15   I'm troubled by things that have happened" until now.  But
16   to put this into light and to characterize how we got from
17   the start to where we are, I need to back up and apprise
18   the Court of some of the details that we now know.
19             Judge, as you know, this complaint was filed late
20   last year by the Atigeo parties.  At that time, it's true,
21   I was counsel for the trustee.  It's also true that by that
22   date, we recognized the existence of a contract claim based
23   upon a settlement agreement that had been negotiated
24   between the Atigeo/Sandoval parties, and I'll call them the
25   "Edra Blixseth parties."  And under that contract claim,
```

15

1    there was an agreed amount to be paid by xPatterns and

2    Atigeo guaranteed by Mr. Sandoval, in part, to the Edra

3    Blixseth parties.

4         We recognized from Ms. Blixseth's schedules that

5    that was a contract receivable.  We also recognized that

6    Western Capital was asserting a security interest in all

7    contract claims, which arguably would extend to that

8    particular contract.  And so in some of our initial

9    assessments with my client and myself - and without

10   discussing a great deal with regard to the confidential

11   discussions that took place - we recognized that that was a

12   claim that should not be our priority in terms of looking

13   at it.  Instead, we continued to focus on claims that may

14   or may not exist involving Tim Blixseth, CrossHarbor,

15   Western Capital, and other parties.

16        So when Atigeo filed this lawsuit, it wasn't to

17   file a lawsuit saying "we want to pay our money to be

18   done"; it was a lawsuit that was filed to void that

19   contractual obligation, in part, and/or to seek contract

20   defenses to that claim.  That was filed in December, or so.

21        At that time, obviously when a complaint is filed

22   and your party is named as a client, you do what's prudent

23   under the circumstances.  And while I had met personally

24   with Edra Blixseth on at least four occasions prior to that

25   date and talked to her on multiple occasions, none of those

16

1    discussions with me at that time had focused on Atigeo.

2         At the time that this was filed, my relationship

3    with Edra Blixseth was one where I was given permission by

4    her counsel to contact her directly.  And so when the

5    complaint was filed, I forwarded it to her and I set up a

6    conference call.  She contacted me and indicated that we

7    should have another individual in that conference call as

8    well, and that individual was Nick Rhoades, who had some

9    involvement in these computer technology companies.  That

10   conference took place in mid January.

11        And in mid January, I interviewed her with regard

12   to the basis of the claims, as I understood them to be, and

13   understood from Edra that she believed that she had been

14   duped into the investment; and secondly, at one point in

15   time she alleged that Mr. Sandoval had wrongfully diverted

16   money to his benefit.

17        Unfortunately for me, Judge, the focus of that

18   discussion, because it was early in the proceeding did not

19   focus on a precise timeline.  And the timeline becomes

20   critical, Judge, because what happened before the

21   settlement agreement and what happened after the settlement

22   agreement is really what created the confusion in my mind

23   that ultimately resulted in the filing of the pleading that

24   was filed.

25        So that conference took place for a couple of

08-61570-RBK 1 Doc#: 820-3 Filed: 11/30/10 Entered: 11/30/10 18:58:33 Page 18 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 75 of 291

17

1    hours by phone, conference phone.  Mr. Samson was on it;

2    myself; I believe Mr. Hallihan, [phonetic] who was in a

3    position of representing Edra Blixseth; Edra; and Nick

4    Rhoades.  And after that conversation, Edra also provided

5    us input in writing with regard to the various admissions

6    and denials.

7         Shortly after that meeting, before we filed our

8    initial answer, we were invited to attend a meeting in

9    Butte with Tim Blixseth, with Mike Flynn, and with CJ

10   Conant.  We - (inaudible, static in microphone) - that

11   meeting for the purpose of discussing what we thought was

12   more of the potential claims involving Mr. Blixseth.  What

13   it turned out to be - and I don't want to elaborate a lot

14   because I don't know how much that could be deemed to be a

15   settlement discussion - but the essence of it was that the

16   suggestion was made to Mr. Samson that it would be best for

17   the estate if it considered working together with Western

18   Capital and Tim Blixseth with regard to the pursuit of

19   certain claims, one of which was the claim that became the

20   basis for our counterclaim.

21        At the meeting, a great -- great detail was

22   provided to Mr. Samson and myself with regard to the nature

23   of the claims that existed and the validity of claims.

24   That was presented directly by Mr. Flynn.  Frankly, his --

25   the detail he was provided was very convincing, and he led

08-61570-RBK 1 Doc#8204843/08 Filed 10/30/804 Entered 11/30/12 18:58:334 Page 19 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 76 of 291

18

1    us to believe that he had thoroughly analyzed the issues

2    and had documents to support his position.

3           Our pleading was due, if I recall, Judge, in

4    early February.  And by the time we filed that pleading, we

5    had just received a draft document from Mike Flynn, which

6    I've attached to the motion to amend.  And the essence of

7    that was:  Here's the draft pleading.  It's all supported

8    by facts.  We collectively, working together, can make some

9    successful claims with regard to this.

10          Now, the specifics weren't set forth in my

11   initial pleading, and that was frankly a matter of a timing

12   perspective.  And the timing perspective was:  I was out of

13   state, we needed to file an answer, and I did not put in

14   the detail into my initial answer.  Now --

15          THE COURT:  Mr. Cotner?

16          MR. COTNER:  Yes.

17          THE COURT:  We're getting static, and I'm

18   wondering:  Could I have you push the mic away just a

19   little bit?

20          MR. COTNER:  Sure.

21          THE COURT:  You might be too close to it.

22          MR. COTNER:  Is that better, Judge?

23          THE COURT:  Wonderful, yes.  Thank you.

24          MR. COTNER:  Sorry about that.  I seem to find

25   myself guilty of that a lot.

08-61570-RBK 1 Doc#828048-08/Filed: 10/30/2048 Entered 11/30/12 18:56:335 Page 20 of 83
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 77 of 291

19

```
 1              THE COURT:  Thank you.  Sorry to interrupt.

 2              MR. COTNER:  No, that's no problem.  In February,

 3    the other matter of significance that affects the

 4    communication line is:  Even though we filed our

 5    third-party complaint and initial counterclaim -- and,

 6    Judge, the essence of that pleading and the essence of our

 7    first amended pleading was:  Factually, the trustee was

 8    alleging that at the time of entering the settlement

 9    agreement, Edra Blixseth did not know that she had been

10    duped into making her investment.

11              And so from a factual perspective, I had heard

12    Edra tell me that she had been duped; from a factual

13    perspective at the time in my mind, I had nothing to

14    disprove that at that time she knew or did not know.

15              The question could be raised:  Why not follow up

16    with Edra?

17              Well, in February, the rules with respect to my

18    contact with Edra changed as well.  In February, there was

19    some disputes between, I'll say, Edra Blixseth's counsel

20    and myself and Mr. Samson with regard to issues relating to

21    the production of documents.  And as a result of that, we

22    were instructed by Mr. Deschenes, and for the right

23    reasons, that there was to be no further contact with Edra

24    Blixseth.  And so from February until late June, the rules

25    for me had changed and I no longer had the type of
```

20

```
1    communication that I had had earlier.  I had found and
2    still find Edra Blixseth to be forthcoming, to be candid
3    with her responses.  And at no time has she not been
4    willing to assist.  But with the instructions that were
5    provided and for obvious reasons, we followed that guidance
6    and I did not have further discussions with Edra Blixseth.
7           Judge, sometime in May, I think it was, we were
8    before you again on a motion to dismiss.  And at that time
9    you ruled that while the motion to dismiss would be denied,
10   we were ordered to amend our pleadings by, I believe the
11   date was July 5th.  Recognizing that I had that month to
12   get this amended pleading, the details then were provided,
13   which was what was requested by the Court, that under the
14   guidance provided by the Supreme Court more details were
15   necessary in the complaint.
16          Well, the details I had, and the details had come
17   from Mr. Flynn.  And despite what I now see as, as a lack
18   of solid backing for it, the statements were continuing to
19   be made that it was factually based; and therefore, based
20   upon that, attorneys in our office, with my oversight,
21   drafted the amended pleading.
22          Now in late June, I requested a meeting with Edra
23   Blixseth, and the purpose of that was for several purposes,
24   one of which was to review these specific allegations.  We
25   agreed to meet in the desert, as Edra calls it, either in
```

08-61570-RBK 1 Doc# 82049-08 Filed 10/30/804 Entered 11/30/12 18:50:337 Page 22 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 79 of 291

21

```
 1    Scottsdale, Arizona; or in Palm Springs.  And the reason
 2    for the meeting location, Judge, was that my wife was at
 3    the Mayo Clinic in Scottsdale.  She had been diagnosed with
 4    breast cancer before, and she was having her final surgery.
 5    So the hope was that while I was with her in that surgery
 6    and in her recuperation from that surgery, that Edra and I
 7    could find time to meet.
 8            Unfortunately for obvious reasons, I picked my
 9    wife over this case and I stayed with her.  Edra Blixseth
10    and I did not have an opportunity to meet in late June.
11    Had we met in late June, the second -- the first amended
12    pleading would not have been filed in its form.
13            On July 5th, prior to my meeting with Edra
14    Blixseth, it was filed.  And in that, there were specific
15    allegations that were made with regard to what I understood
16    to be in good faith the factual basis for the claims that
17    were asserted.  When meetings at the end of June did not
18    work out, I sat up a meeting with Edra Blixseth in Los
19    Angeles for, I believe it was July 12th.  I met with her.
20    The first agenda item was to discuss the status of the
21    pleading.
22            And the significance of the meeting that
23    developed was, I would say two principal issues that Edra
24    had with respect to the pleading that had been filed.  The
25    most important from the trustee's perspective was:  At the
```

08-61570-RBK 1 Doc# 82048-08/Filed. 10/30/08 48ntered 11/30/12 18:56:338 Page 23 of 83
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 80 of 291

22

1   time she negotiated the settlement document, she knew or

2   believed that she had been duped with respect to the

3   capabilities of the technology being marketed by

4   Mr. Sandoval.  And so the essence of that disclosure, if

5   accurate, was it, in essence, would take away all tort

6   claims that existed for the trustee.  And so I listened to

7   that.

8          And then the second issue that she had some

9   concerns about is that in the amended pleading, there were

10  allegations made with regard to Dennis Montgomery which she

11  believed to be false, and with regard to certain

12  noise-filtering technology which she also said was

13  unrelated to the Atigeo litigation.  After that meeting, we

14  discussed it much more.  I came back and immediately

15  reported to Mr. Samson what I had learned.  I confirmed the

16  representations that had been made with two third parties,

17  Judge, that at the time it was well-known that the

18  technology was not performing as represented.

19          Based upon that, I immediately advised Western

20  Capital, and shortly after that deadline I advised the

21  Atigeo parties that I intended to amend my pleadings again.

22  I was very specific with them in letting them know what had

23  happened; why it had happened, unfortunately; that despite

24  what is an embarrassment to myself, I needed to do what was

25  right ethically and right under the rules of professional

08-61570-RBK 1 Doc #820143-08/File3, 10/3078048ntered 11/3012, 18:58:339 Page 24 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 81 of 291

23

```
 1    conduct to, in essence, abandon a theory that I did not
 2    think was factually supported.  And so I advised them.
 3              And the Court could say, "Why didn't I file an
 4    immediate motion?"
 5              Well, and this, too, has some bearing on the kind
 6    of situation we were required to deal with.  Immediately
 7    when I announced that I was to amend the pleadings,
 8    Mr. Flynn contacted the U.S. Attorney's Office and, in
 9    essence, was critical of us for trying to amend our
10    pleadings, for abandoning claims, for abandoning the
11    estate.  And so for a period of weeks, the U.S. trustee
12    properly made the decision to look into the issues and ask
13    me to stand down.  They looked into those and ultimately
14    gave me the authority to do what I deemed to be appropriate
15    under the circumstances, which is to file the amended
16    pleading.  And I have the e-mails that were forwarded to
17    the U.S. trustee.
18              It was the same act of deception going on with
19    the U.S. trustee that had taken place with me.  You're
20    inundated with paper, you're inundated with statements,
21    you're given deposition transcripts in which things are
22    taken out of context.  And I know this now in hindsight.
23    But based upon that, frankly, Mr. Samson and I were being
24    scrutinized as to whether we were taking the right steps on
25    behalf of the estate.
```

```
 1          So as you can see, by July, things are somewhat
 2   of a mess.  We have filed a pleading that I do not believe
 3   to be in good faith -- filed in good faith, but with my new
 4   knowledge, could not be maintained in good faith.
 5   Secondly, an allegation that I believed to be factually
 6   based at the time that I now knew was not factually based.
 7          Now, it's easy to sit back and be critical of
 8   Trustee's counsel in a situation like this.  And, you know,
 9   while I've enjoyed the benefit of representing Mr. Samson
10   on this case and several others, I have also recognized how
11   difficult it puts you in, the position it puts you in.  We
12   are an adversary to Edra Blixseth, we do not see eye to eye
13   on all issues; and yet in a claim like this where the
14   assets are causes of action, you need to do the best you
15   can and rely upon what you know.
16          And so I -- it's not classic situation where my
17   client calls me up, schedules an appointment, comes to my
18   office, and says, "Here's the facts.  What can you do with
19   it?"  Here we get tidbits of information, and we try to
20   develop theories based upon what we know.
21          Judge, from my perspective, this hasn't happened
22   to me before.  I don't file repeated amended pleadings, I
23   don't file pleadings that I later say were not
24   well-grounded in fact.  And the reality is that at all
25   points in time, Mr. Samson and I were attempting to make
```

08-61570-RBK 1 Doc#82049-08 Filed 10/30/04 Entered 11/30/12 18:58:331 Page 26 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 83 of 291

25

1    the best decision we could do under the circumstances.   At

2    all times, we felt we took the appropriate steps.

3               In hindsight, can anyone do more?  Sure.

4               In hindsight, could have I filed a motion in

5    early July saying:   I don't want to file that until I have

6    an opportunity to meet with Edra?  Sure.

7               But by that date, our first pleading which had

8    alleged, in essence, the same theories had never been

9    contested by anyone - Edra, Gary Deschenes, anyone - with

10   regard to having a question to it.

11              So you learn as you go sometimes in life.  And

12   even when you're 27 years in the practice and you think

13   that you've seen it all, sometimes you haven't.  And this

14   case is one of those situations where I have not seen it

15   all, did what I thought was best at all times, and that's

16   why I'm here before you today on a motion to amend.

17              Judge, the motion to amend itself is pretty

18   simple - you've already heard about it - which is:  We do

19   not believe we have an active tort claim today based upon

20   the release that was signed by Edra Blixseth.  However, if

21   the release was set aside, the factual allegations from her

22   still rise to the level of creating tort claims that would

23   exist against Atigeo and xPatterns as well as Mr. Sandoval

24   and Mr. Sandoval's family.

25              And so the claims exist -- well, let me say it a

08-61570-RBK 1 Doc#: 82048-08 Filed: 10/30/10 Entered: 11/30/10 18:56:33 Page 27 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 84 of 291

26

1    different way.  If Count 1 was not in the complaint, there

2    would be no counterclaim and no third-party complaint

3    because the remaining counts, in my opinion, don't go to

4    the validity of the release.

5          My concern when I filed it was:  If I don't

6    assert it, is that a compulsory counterclaim?  And I talked

7    to Mr. Tellis and Mr. Parks yesterday, and we're hopeful of

8    resolving that issue without further Court involvement in

9    the near future.

10         With respect to the motion to amend, in fairness

11   to Atigeo and their position, I don't think they're taking

12   the position that the pleading is prejudicial from a

13   timeline that there's been undue delay or that there's been

14   other issues.  I think their issue is focused on:  How the

15   heck did this all happen?  And that's why I wanted to spend

16   some time letting the Court know precisely what did happen.

17         Attached to my motions are e-mails that confirm

18   what I've said.  Attached are motions that -- or excuse me,

19   e-mails that -- where representations were made.

20         One of the frustrating things that I now know in

21   hindsight, because this was a document that was provided in

22   discovery in an unrelated case, was the e-mail I attached

23   to our reply brief, Judge.  And in that, that's an e-mail

24   from Western Capital's representative, Jeff Adams, to Mike

25   Flynn and Tim Blixseth.  And the date's really important.

08-61570-RBK   Doc 882-03/04-08/Filed 10/30/04 Entered 11/30/12 18:58:333 Page 28 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 85 of 291

27

```
 1    It's mid February 2010.

 2            And if you compare that with the dates when I was

 3    receiving pleadings and documents to support the position,

 4    I at least can read that e-mail to say:

 5            Mr. Samson will only be left with tort claims.

 6    Mike, if you can blow out those claims, then all that's

 7    left is Western Capital with its contract and Tim Blixseth

 8    with his, with his claims.

 9            Now, was that announced to me?  Absolutely not.

10    In fact, the representations were to the contrary.  Why we

11    felt it was best for the estate to consider working

12    together with Western Capital was that they had a contract

13    claim.  If the contract claim was valid, then it would be

14    some sharing ratio with regard to how we would have

15    proceeds come to the estate.  If it was invalid, that would

16    re-trigger the tort claims, and the tort claims would then

17    become the basis for a damage award which could be split

18    between the parties.

19            To have those discussions at the same time I see

20    an e-mail which now I read as being somewhat of "let's set

21    these guys up for the fall" - and that's how I read it;

22    I'll let the judge make its own interpretation with regard

23    to the language - is disturbing.

24            So, Judge, you started this with "I'm disturbed."

25    I don't contest your right to be disturbed.  I would tell
```

28

```
 1    you I'm disturbed.  But I want to Court to know that at
 2    every step of the way, Mr. Cotner and Mr. Samson did what
 3    they felt was best for this estate with no effort to
 4    mislead the Court, with no effort to mislead any party, and
 5    unfortunately having been misled themselves.
 6            The issue today is a motion to amend.  As I
 7    mentioned, there's not prejudice.  We're about to enter
 8    into a scheduling order.  From yesterday's discussion, I
 9    think you will hear that the parties are seeking trial
10    sometime next fall.  If that's the case, it's not a
11    discovery issue, it's not a delay issue, it's not a
12    dilatory tactic.  I think the question that's come up is,
13    and I think I dealt with it more under Rule 11:  Under
14    these circumstances, is it appropriate that Mr. Cotner or
15    the trustee should pay the fees associated with the prior
16    amendments?
17            Now, I've set my arguments out in my brief and I,
18    you know, don't think you want to rehear everything that's
19    been said.  I felt what was more important was for you to
20    know factually where we were at each step of the occasion.
21    Judge, there's been requests made to strike certain
22    documents from the docket.  I don't see that as -- when I
23    read that order, I don't see it as a violation of the
24    order, but as I've mentioned, I don't have any objection to
25    this Court striking or sealing anything that it deems to be
```

ER001895

08-61570-RBK   Doc# 82043-08 Filed 10/30/10 Entered 11/30/10 18:56:335 Page 30 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 87 of 291

29

```
 1   appropriate, even if there's a question whether it should

 2   be sealed.  So we would stipulate to that.

 3            We just seek the motion to amend.  We don't

 4   believe that this is the type of circumstance that an award

 5   of fees is appropriate, especially in light of the reality

 6   of representing a trustee as opposed to the debtor.  That

 7   puts us in a difficult situation at times.

 8            There was a request made that no further

 9   amendments be issued.  While I would like to stipulate to

10   that, even yesterday's discussion with Roland and with

11   Brian led me to believe that there may be an amendment

12   that's necessary to just have me withdraw those claims as

13   long as I'm comfortable that the withdrawal won't prejudice

14   the reassertion of those claims at a future date.

15            So, Judge, in summary, I understand your concern.

16   I wish I wasn't here.  But you need to hear from the person

17   that created the issue.  That's why I've spent the time to

18   walk you through the steps.  I'm humbled by it, yes; kind

19   of saddened by the - (inaudible) - that that's where we

20   are; but also recognizing that in my heart and in my mind,

21   I took what I felt was appropriate steps at all times.

22            THE COURT:  Mr. Cotner, I have a couple of

23   questions for you.

24            MR. COTNER:  Yes, Judge.

25            THE COURT:  You had mentioned that you had been
```

**Case No. 12-35986 ER  318**

ER001896

```
 1   at a meeting here in Butte with Mr. Blixseth, Mr. Flynn,

 2   and Mr. Conant.  At that time, I assume that Mr. Flynn was

 3   representing Mr. Blixseth.  Who was Mr. Conant

 4   representing?

 5            MR. COTNER:  Judge, I believed at the time he was

 6   representing Western Capital.  I've since learned that

 7   there was at least some dialogue in which Mr. Conant's

 8   relationship may have been more than just representing

 9   Western Capital.  I cannot tell you today that I know.  I

10   do know today it's been represented that he represents, as

11   an independent contractor, Western Capital on some issues,

12   Tim Blixseth on some issues, and Mike Flynn on some issues.

13   Whether he was in that capacity at that meeting, I do not

14   know.

15            THE COURT:  Okay.  Then another statement that

16   was made, I believe in your brief, is you make some

17   reference to now you know Mr. Flynn's reputation.  What is

18   that?  What did you mean by that?

19            MR. COTNER:  You know, Judge, this is my opinion

20   and this is my observation, is -- and I'll cite to

21   yesterday's newspaper article as the most recent example.

22   What I see in this case is that when someone brings a valid

23   attack aimed, in part, at his client, Tim Blixseth, it

24   becomes a war of diversion, of media control, and an effort

25   to undermine the process.
```

08-61570-RBK 1 Doc#8204-08/18/ud, 10/38/30 4 Entered 11/30/10 18:56:337 Page 32 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 89 of 291

31

```
 1              I mean when I woke up on Monday and read the

 2      headlines that said:  "Edra Blixseth under investigation,

 3      criminal investigation," something to that effect, I knew

 4      the first thing I'd have to do is meet with my partners and

 5      tell them what I knew, which was true.  Most of them were

 6      in my office saying, "How does this impact my

 7      representation of Mr. Samson?"

 8              And what I was forced to tell them was, "Read the

 9      article."

10              Because if you read the article, there's nothing

11      that's substantive in the article, and yet the media spin

12      begins to put Edra in a bad light; a person who, frankly, I

13      find to be forthright, straightforward, has nothing to win

14      or lose in this situation, and has been a person that has

15      been, in my opinion, as honest as she could be at all

16      steps.

17              I believe Mr. Flynn has his own biases that arise

18      out of certain prior relationships.  It might have been

19      from an attorney relationship with a client that ended, it

20      might have been because of his son working for certain

21      companies.  But Mr. Flynn, in my opinion -- and he did it

22      with the U.S. trustee.  He is a very, very convincing

23      individual.  He's very articulate, he's precise with the

24      facts.  My observation with him, though, is, especially

25      now:  Listen, take it in, but confirm all before you rely
```

08-61570-RBK  Doc#: 2043-1  08/Filed: 10/30/04  Entered: 11/30/12 18:56:33  Page 33 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 90 of 291

32

```
 1   on it.

 2            And that was the mistake that I made, if any,

 3   between that January and June date.

 4            THE COURT:  Okay.  So the documents promised were

 5   never submitted and may not even exist?

 6            MR. COTNER:  There was multiple documents

 7   provided to the U.S. Attorney's Office after I announced my

 8   motion to make this most recent amendment.

 9            TRUSTEE SAMSON:  To the U.S. Trustee's Office.

10            MR. COTNER:  Did I say that wrong?  To the U.S.

11   Trustee's Office, I'm sorry.  Thanks, Dick.

12            I took a look at every one of those documents

13   because the representation was:  Those documents support

14   what Mr. Cotner had initially pled.

15            Needless to say, I had to argue at times with the

16   U.S. Attorney's Office with regard to the interpretation of

17   issues:  Questions taken out of context from Ms. Blixseth's

18   deposition, documents that may have something to do with

19   technology but not the right technology, an article written

20   by -- in Playboy that exposes this government fraud that

21   existed, documents that are -- some of which I had seen

22   before, some of which I had been told of before, but none

23   of which with a clear view of the facts now can be seen as

24   supporting the claim.

25            You could read an answer from Edra Blixseth where
```

08-61570-RBK 1 Doc # 82043-08 Filed 13, 10/30/04 Entered 11/30/12 18:58:33 Page 34 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 91 of 291

33

```
 1   she says:  I did not believe that the technology was valid.

 2               And that's true if you are talking about the

 3   Atigeo technology; however, as spun in the pleadings that

 4   were put together by Mr. Flynn, it is not true with regard

 5   to the Blxware technology, the technology that -- in which

 6   was the subject of this Playboy article, which was public.

 7               And I'm trying to be careful, Judge, because I

 8   don't know what's protected and what's not, but let's just

 9   put it like this:  She has never questioned the validity of

10   the Blxware technology, but yet you see that statement.

11               And the conclusion made by Mr. Flynn from it is:

12   See, Edra Blixseth is stating under oath that she questions

13   the Blxware technology.

14               That's not true.  You could read it and, unless

15   you have an opportunity to meet with Ms. Blixseth and

16   understand the differences between the Blxware technology

17   and the Atigeo technology, you would draw that same

18   conclusion.  That's the kind of allusions that I think I

19   was being subjected to and the U.S. Attorney's Office was

20   being subjected to as well.

21               THE COURT:  Could I have you move the mic away

22   just a little bit again?  Thanks.

23               MR. COTNER:  Sorry, Judge.

24               THE COURT:  I guess the other thing - and maybe I

25   need to refer this to Mr. Tellis - but the other question I
```

```
 1    have that came up in my reading of some of the documents is

 2    that there was, through the attachment that you made to the

 3    motion on the complaint that was the basis of the amended

 4    complaint that I believe was at Docket 109, was some of the

 5    material that may be contained within that is in violation

 6    of a secrecy order out of the court in Nevada.

 7           You kind of alluded to that, Mr. Cotner, I think,

 8    when you said you didn't know that that really was covered

 9    by whatever orders might exist in that court.  I guess I

10    just wanted to clarify that.  Because my concern is if, if

11    there's a violation of some order, court order, and I have

12    knowledge of it, I'm not so certain I don't have a

13    responsibility to inform that Court of my knowledge of that

14    and what has occurred for that Court to do whatever it

15    deems appropriate, if anything.  So I guess I just wanted

16    to kind of clarify on that issue as to where we're at.

17           MR. PARK:  Your Honor, this is Brian Park on

18    behalf of the plaintiffs.

19           It was Atigeo and xPatterns that raised this

20    issue with the trustee's counsel.

21           THE COURT:  Okay.

22           MR. PARK:  And so if it's agreeable to you, I

23    would be happy to address it now.

24           THE COURT:  That would be fine.

25           MR. PARK:  Your Honor, the court order from
```

08-61570-RBK 1 Doc#820491-08/Filed, 10/30/8048 ntered 11/30/12 78:58:331 Page 36 of 83
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 93 of 291

35

```
 1    Nevada arose in a litigation styled Etreppid v. Montgomery

 2    to which the Atigeo parties were pulled in eventually.

 3    Docket No. 109 in this action references the interest of

 4    certain parties and certain technologies.

 5            Now, Paragraph 6 of the Nevada court secrecy

 6    order is very clear, it's unambiguous, and it was entered

 7    at the behest of the director of national intelligence,

 8    Director Negroponte at the time.  Paragraph 6 reads as

 9    follows:

10            The parties shall not discuss, mention, question,

11    or introduce as evidence any actual or proposed

12    intelligence agency interest in, application, or use of the

13    technology.

14            And "technology" is defined as:  The computer

15    source code, software, programs, or technical

16    specifications relating to any technology owned or claimed

17    by any of the parties.

18            When that language is compared to the text of

19    certain passages of Docket 109, specifically at pages 18 to

20    19, 22, and 24, there seems to be a clear violation.

21    Docket 109 references specifically the same type of

22    technology being offered, allegedly, by Mr. Sandoval,

23    Atigeo, and xPatterns to certain interested parties within

24    the Government precisely of the nature that the Nevada

25    Court prohibited.
```

08-61570-RBK  1 Document 420-08-Filed 10/30/08 Entered 11/30/12 18:56:33 2 Page 37 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 94 of 291

36

1          And so when this issue was identified, we raised

2     it informally with the trustee's counsel.  I sent

3     Mr. Cotner a letter giving him a heads-up, basically,

4     saying:  There's this issue.  You may not know about it.

5     We'd ask that you fix it.

6          We didn't receive a response until the motion for

7     leave to amend was filed, at which point another attachment

8     was filed, Exhibit A-2 to the motion for relief, which goes

9     into even greater detail about that same potentially

10    interested parties' interest in the technology, which we

11    viewed as an even further violation of the Nevada secrecy

12    order.

13         And so that's, that's the reason we raise the

14    issue in our opposition brief and why we've raised the

15    issue before you, Your Honor, so that you can make your own

16    determination about whether you think it would be

17    appropriate to strike Docket 109 and Exhibit A-2 and

18    whatever else you think is appropriate.

19         THE COURT:  Okay.  Mr. Park, A-2 that you

20    referenced attached to the motion, as I recall, that's the

21    drafted complaint submitted to the trustee by Mr. Flynn

22    naming Mr. Blixseth as the plaintiff.

23         MR. PARK:  That's correct, Your Honor.  That is

24    the draft complaint that was never filed.  No counsel's

25    name was listed on the complaint, so we're not sure who

08-61570-RBK Doc#820-3 08/Filed: 10/30/14 Entered:11/30/10 18:58:33 Page 38 of 83
Case 2:11-cv-00073-SEH  Document 12-5  Filed 02/02/12  Page 95 of 291

37

```
 1    prepared -- not sure which party or attorney prepared it;

 2    although, it appears that it was drafted by Mr. Flynn.

 3            THE COURT:  Okay.  Well, just for the record,

 4    then --

 5            MR. PARK:  And based on the trustee's filing --

 6            THE COURT:  With that statement, then, Mr. Park,

 7    I guess I will withdraw my statement that it was

 8    Mr. Flynn's complaint, that he drafted the complaint,

 9    because I don't know -- you've just indicated you don't

10    know who drafted it.  So I clarify on that point.

11            MR. PARK:  That's correct, Your Honor, we don't

12    know for sure who drafted it, but we do know, based on our

13    conversations with the trustee, that Mr., that Mr. Cotner

14    was informed that it was drafted by Mr. Flynn.  We have

15    also had discussions directly with Mr. Flynn in connection

16    with this adversary action in which he identified a

17    complaint that he had drafted which, according to his

18    description, was consistent with Exhibit A-2, although he

19    never provided a copy to us.

20            THE COURT:  Okay.  Well, have you informed the

21    Nevada Court of this issue?

22            MR. PARK:  No, Your Honor, we have not.  We

23    thought the best course would be first to informally raise

24    it with the trustee's counsel and then with this Court in

25    light of the fact that the trustee feels that there was no
```

08-61570-RBK 1 Doc#820424-08/File 3, 10/30/10 48 Entered 11/30/10 18:58:334 Page 39 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 96 of 291

38

```
1   violation.
2            THE COURT:  Well, I guess Trustee's counsel, you
3   know, it appears may not have even known about the secrecy
4   order until it was raised by you, so I'm wondering if, in
5   fact, there's any issue that he -- obviously there's a
6   middle person in here that probably knew about the secrecy
7   order that released the information that may be covered by
8   the secrecy order, but I have nothing that indicates to me
9   who that person is because we don't know who drafted A-2.
10           Mr. Cotner, you rose to the podium.
11           MR. COTNER:  Thank you, Judge.  First of all,
12  with respect to the "secrecy order," as we're calling it,
13  no, I had no knowledge of it until it was brought to my
14  attention by Mr. Park.
15           THE COURT:  You need to speak a little louder.
16  I'm sorry.
17           MR. COTNER:  Okay.  What I'm saying, Judge, is
18  initially I had no knowledge of the secrecy order.
19  Mr. Parks brought it to my attention.  I do not know the
20  scope of it.  I do not know for sure whether anything in
21  the pleadings in contrary to the order.  I have indicated
22  that I think the right and prudent thing to do is:  When in
23  doubt, strike it or seal it so there's no further issue.
24  And I have no objection to that.
25           With regard to the author of the document, which
```

08-61570-RBK  Doc#820-8-08-Filed-10/30/08 Entered-11/30/09  18:58:335  Page 40 of 83
Case 2:11-cv-00073-SEH  Document 12-5  Filed 02/02/12  Page 97 of 291

39

```
 1    is A-2, it was attached to an e-mail sent to me.  The

 2    e-mail came from Mike Flynn.  Does anyone ever know the

 3    source of the e-mail or the document?  I can just represent

 4    to the Court it came as an attachment to an e-mail from

 5    Mr. Flynn which I think is also part of the record.

 6              THE COURT:  You've attached that e-mail to one of

 7    the motions together with the complaint?

 8              MR. COTNER:  Judge, give me one second, please.

 9              Judge, in Exhibit A, Exhibit A-1 is an e-mail

10    that was dated February 1st of 2010 from Michael Flynn to

11    Holly Helen, who's my paralegal; Tim Blixseth, Jeff Adams.

12    It's copied to CJ Conant, myself, and Mr. Samson.

13              I'll read it:  Attached is a preliminary and

14    incomplete (have not finished Claims 8 through 10 yet)

15    draft of a complaint in PDF and WordPerfect against

16    Sandoval -- (inaudible.)  This should give Dave's office

17    some facts to put together at least some reasonably

18    well-pled counterclaim for today's filing.  These are solid

19    claims.  We should discuss ASAP presenting a final version

20    of this draft to Sandoval before we file it because it will

21    be the beginning of the end for him.  Mike.

22              So that is part of the record as A-1, Judge.

23              THE COURT:  So was the amended complaint that was

24    filed as 109 discussed with Mr. Flynn as to -- in light of

25    what was said in the e-mail?
```

```
 1            MR. COTNER:  Judge, could you -- I'm sorry, I
 2   could not hear that question.
 3            THE COURT:  Okay.  In the e-mail, he referenced
 4   that he wanted to review the complaint prior to its being
 5   filed.  So did he have an opportunity to review Docket 109
 6   before it was filed?
 7            MR. COTNER:  I don't recall circulating that to
 8   Mr. Flynn before it was filed.  My recollection, Judge, is
 9   it is taken primarily from the facts alleged in
10   Document A-2 except that there were representations made
11   that were stricken from my pleading as being in my -- from
12   my position, something that wasn't pertinent to the
13   dispute.
14            THE COURT:  Okay.
15            MR. COTNER:  And, Judge, I am re-reading
16   Document A-1.  I don't know that he was asking to review
17   the final version.  Whether that's here or there, it
18   doesn't matter.
19            By the time it was filed, while I still maintain
20   the belief that the tort claims existed and had not been
21   released - this is Docket 109 - I don't believe that at
22   that time there was further discussion with regard to any
23   relationship on a sharing basis going forward that would
24   have involved Mr. Blixseth or his counsel.  And so the
25   communication at that point in time was probably less than
```

```
1    it had been before.
2            THE COURT:  Is that communication still going on?
3            MR. COTNER:  There's no communication going on at
4    this point with Mr. Flynn or myself, and hasn't been -- I
5    think the last communication I received from him was
6    shortly after I announced by intention of filing the second
7    amended pleading that's before this Court.
8            THE COURT:  Okay.  Well, the issue I have with,
9    you know, sealing 109 is the fact it's been out for --
10   since July.  I mean as you might expect, some of these
11   pleadings within CM/ECF have been, you know, reviewed from
12   all sources.  I mean we wouldn't even know who has all
13   reviewed them.  And it seems to me it's kind of like
14   putting the horse back in the barn when the horse is, you
15   know, 15 miles down the road.  I don't know what I can
16   accomplish there.
17           Certainly, I guess, going forward, we could seal
18   it.  It doesn't sound like there's an objection.  I am
19   quite concerned, as Mr. Park has raised, that this is some
20   violation of another Court's order, a secrecy order.
21           And I think, you know, the only issue I have is
22   when I alert the Court to the issue, other than providing
23   what documents have already been attached in this case as
24   to the pleadings, the e-mails, and whatever, it's about all
25   I can give the Court.  What the Court does with it, I don't
```

08-61570-RBK 1 Doc# 204 08/Filed: 10/30/804 Entered: 11/30/12 18:58:33 Page 43 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 100 of 291

42

```
 1   know.  And from that standpoint, I don't know if -- well,

 2   I'm not going to say anything more because it's not my

 3   prerogative to do that.  It's not an issue with my court;

 4   it's an issue with the other court for enforcement.  But I

 5   am concerned that having knowledge of it, that I need to

 6   inform that Court, at least, of this issue.  Now, what that

 7   Court does with it, I just don't know.

 8             Getting back to, then, the motion at hand,

 9   Mr. Cotner, did you have any further argument as it relates

10   to the second amended counterclaim and motion to file that?

11             MR. COTNER:  Judge, let me wrap it up with just a

12   few brief comments, if I can.

13             One:  The effort that's being made is not to

14   expand the case; it's to contract the case, it's to put it

15   in the proper standing of where it should have been from

16   Day 1.  And so it's not the classic amendment that we see

17   in my world where someone's trying to expand theories by

18   adding other claims that may exist for affirmative relief.

19   Frankly, this is to recast those claims as being a

20   contingent claim, as Mr. Tellis has previously stated.

21             Secondly:  With regard to the dismissal of the

22   pleading as it's sanctioned, if you will, for what's

23   happened, I stand by the representations I made, I stand by

24   my reputation, I stand by my adherence to ethical rules

25   that this was certainly not intended to be the outcome.
```

```
 1    And so a dismissal of claims, even including Western

 2    Capital's contract claims, would be quite a harsh outcome

 3    in light of how we got here today.

 4              The other sanctions, if you will, requested an

 5    award of attorney's fees.  Frankly, Judge, I've attempted,

 6    as you know, to bring this to the Court's attention as soon

 7    as possible.  There's not been a responsive pleading that's

 8    been filed; and, in fact, until the motion was filed by the

 9    Atigeo parties, I thought we were working towards a

10    stipulated filing.

11              I understand their frustration.  I too am

12    frustrated.  It's not as if we are being rewarded for the

13    efforts I'm taking.  And frankly, I'm removing the

14    trustee's claim to a spot where the likelihood of recovery

15    is probably none.  And so the trustee and I have spent a

16    great deal of time and effort on this claim ourselves

17    thinking we were pursuing it on a good-faith basis that was

18    factually supported.  Unfortunately, we now know that

19    that's not true.

20              I don't think this is the type of circumstance

21    that you see where attorney's fees are appropriate.

22    They've cited an MCI case in one of their footnotes, Judge,

23    and I took a quick look at that case this morning.  You

24    know, and I guess the best way I would describe it:  If

25    you're sitting with your client and you're told facts, and
```

08-61570-RBK  1 Doc# 82043-08/Filed. 10/30/08 4Entered. 11/30/12  18:56:30  Page 45 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 102 of 291

44

```
 1   you disregard those facts and file a pleading that isn't

 2   factually based or believe to be factually based,

 3   sanctions - (inaudible) - are appropriate.

 4          In MCI's case, they filed a counterclaim and I

 5   believe a third-party complaint, but some

 6   "counter-pleading," let's call it, and later just chose to

 7   dismiss it without leave of Court.  And the Court was

 8   critical of that, saying, "You shouldn't be able to

 9   backtrack."

10          And I think the main distinguishing feature of

11   MCI versus where I am on behalf of the trustee is the

12   access to the person with facts.  The trustee is put in an

13   almost impossible position of making decisions based on

14   limited facts with limited access to the debtor.  And while

15   I certainly now have had access and am attempting to cure

16   the problem, I don't think this type of situation is one

17   where an award of attorney's fees is appropriate.

18          (Inaudible) -- request has been, as I mentioned

19   earlier, was an order prohibiting further amendment.

20   Frankly, I really don't care if that's what the Court's

21   ruling is.  To the extent that I would need an amendment

22   based on a discussion with Mr. Tellis and Mr. Park and that

23   would be to resolve what's now cast as the third-party

24   complaint and -- the contingent third-party complaint and

25   the contingent counterclaim, then I'm certain we could
```

08-61570-RBK 1 Doc#:2048-08/Filed: 10/30/08 Entered: 11/30/12 18:56:31 Page 46 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 103 of 291

45

```
 1    resolve that through a stipulated order permitting that
 2    document to be filed.  So, Judge, that's all I have with
 3    respect to the motion to amend.
 4              THE COURT:  Okay.  Let me just try to get a broad
 5    picture here of the litigation.  We have the plaintiff
 6    filing the complaint under Count 1 wanting to repudiate the
 7    agreement, the settlement agreement, so as not to have to
 8    pay any monetary amounts that may be required under that
 9    count.  That, then, is used as collateral under -- well,
10    it's a contract right.  Western Capital acquires the
11    contract right, and that is part of its collateral.
12              So if, in fact, the agreement is not repudiated,
13    that leaves collateral to Western Capital.  If, in fact, it
14    is repudiated, it impacts Western Capital's collateral and
15    opens the door for the trustee's claims that would not
16    otherwise occur because of potential releases under the
17    existing settlement agreement.  Is that kind of a broad
18    statement of some of the litigation here?
19              MR. COTNER:  Yes, Judge.
20              MR. PARK:  Your Honor, this is Brian Park.  Your
21    broad statement is correct from a procedural standpoint in
22    that if the agreement is repudiated, the potential, at
23    least, of claims based on tort by the trustee would then
24    re-arise.  But substantively, our view is that those claims
25    would nevertheless be deficient and vulnerable to a renewed
```

08-61570-RBK 1 Doc#82043 08/Filed: 10/30/2048 Entered: 11/30/12 18:58:332 Page 047 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 104 of 291

46

 1   motion to dismiss under Rule 12(b)(6) for reasons that were

 2   previously briefed and subject to renewal of those motions.

 3          THE COURT:  Okay.

 4          MR. PARK:  So our view is that even if the

 5   agreement were repudiated and the trustee at some future

 6   date tried to resurrect those claims, they would still be

 7   improper substantively; but at least procedurally, that

 8   might be a more appropriate time than to style them now as

 9   "contingent claims" that some day may actually blossom into

10   actual claims.

11          THE COURT:  Okay.  And so then Mr. Hatch's

12   third-party complaint basically is to pursue recovery under

13   the contract right of the settlement agreement.  Is that a

14   fair statement, Mr. Hatch?

15          MR. HATCH:  Yes, Your Honor.  Western Capital

16   foreclosed on the contract right in March.  And so after

17   this litigation was already underway, Western Capital

18   became the owner of the contract right.  And we sought

19   leave of the Court intervene, and we have filed a motion

20   for leave to file a third-party complaint so that we could

21   assert that contract right.  And you're correct that that's

22   all we have.  We do not have any tort claims related to

23   this matter, and those would still rest with the trustee.

24          THE COURT:  And given that big picture, I'm not

25   suggesting the merits or lack of merit to any of the

47

```
 1    claims; I'm just trying to get a broad picture of all the

 2    claims.

 3              Mr. Parks or Mr. Tellis, do you wish to respond

 4    to the trustee's argument as to second motion?

 5              MR. PARK:  Yes, Your Honor.  This is Mr. Park of,

 6    for the record, Dorsey & Whitney on behalf of Plaintiff

 7    Atigeo and Plaintiff xPatterns.

 8              As Mr. Tellis alluded to at the beginning, the

 9    parties have filed a joint response to the motions for

10    leave filed by the trustee and Western Capital, and so we

11    thought it would be in the interest of efficiency for me to

12    handle the argument on both motions on behalf of all the

13    plaintiffs and the third-party claim defendants.

14              Your Honor, as you know, the complaint in this

15    adversary action was filed last year in December.  Since

16    then in the last 10 months, the bankruptcy trustee has not

17    been able to determine within the requirements of Rule 11

18    whether the trustee rightfully owns any actual

19    counterclaims or third-party claims; and if so, what they

20    are.

21              Where we are now is:  The trustee has taken a

22    number of steps through what I'll characterize as a

23    "shoot-first-ask-questions-later approach" that has engaged

24    the parties in 10 months of procedural wrangling, but the

25    initial pleadings still haven't been closed.  Mr. Cotner
```

08-61570-RBK 1 Doc#: 82043-08/Filec: 10/30/2048 Entered: 11/30/12 18:58:334 Page 049 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 106 of 291

48

```
1    suggested that it was easy for our side of the table to sit
2    back and criticize what has transpired, and that's not the
3    case.  It's not easy at all.  It's a very difficult issue.
4    It's offset our clients in a very uncomfortable and
5    prejudicial position.
6            And on the issue of prejudice, that's something
7    that I'll go into later, but it's simply not accurate to
8    characterize the prejudice as something only in the past.
9    It has been in the past, that's true - it's been
10   experienced over the last 10 months - but it's ongoing.
11   And if the trustee's request for leave to amend is granted,
12   it will continue into the future.
13           A little procedural history may be helpful to
14   help frame the issues.  The original version of the
15   counterclaims and third-party complaint were filed in
16   February, as Mr. Cotner outlined based on his discussions
17   in January with Ms. Blixseth.  Those claims by the trustee
18   were subject to motions practice for failure to state a
19   claim under Rules 8, 9(b), and 12(b)(6) as well as the
20   Supreme Court's legal authority in Twombly and Iqbal.
21           And just that motion to dismiss practice was
22   basically that the counterclaims and third-party complaint
23   did not articulate any actual facts that would support
24   their requested relief.  They contained legal conclusions
25   or elements of the causes of action, but no actual facts.
```

08-61570-RBK 1 Doc# 820-8 08/Filed 10/30/00-48Enthered 11/30/10 18:58:335 Page 50 of 83
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 107 of 291

49

 1   After oral argument on those motions to dismiss in June

 2   before Your Honor, the trustee came forward and said, "Your

 3   Honor, there are new facts that will largely moot the

 4   motions to dismiss, and we plan to unveil those new facts

 5   in the first amended counterclaim and third-party

 6   complaint," which they did in July.

 7            Now the trustee admits that those so-called "new

 8   facts" were false.  They were not grounded in actuality,

 9   they did not comply with Rule 11, and they resulted in the

10   first amended counterclaim and third-party complaint, which

11   was effectively bogus.

12            Our view is that this has gone on long enough.

13   Our clients have had to endure substantial prejudice in the

14   form of delay, expense, and potentially irreversible harm

15   to their damaged reputation by having these allegations and

16   these claims that have been filed and retracted out there

17   in the public record.  The court rules don't countenance

18   filing potential claims, or "contingent claims" as the

19   trustee calls them, in the hopes that some day under some

20   set of procedural facts they may materialize into actual

21   causes of action.

22            In the big picture - and I think it's important

23   to keep the big picture in mind - the so-called "contingent

24   counterclaims and third-party claims" are simply not ripe

25   for adjudication.  There is no case, there is no

```
 1    controversy defined by those claims under Article III,

 2    Section 2 of the U.S. Constitution.  And we believe it

 3    would be a violation of this Court's powers and the limits

 4    of its subject matter jurisdiction to allow those

 5    contingent claims to be entered just in case down the road

 6    they sometime -- they somehow materialize into actual

 7    causes.

 8              Stepping back for a moment, this case is

 9    exceptional in a number of ways, but one of those ways is

10    it's extraordinary to have a motion for leave filed and

11    leave to amend requested on the admission that a prior

12    filing was based on, quote/unquote, lies.  But that's

13    exactly the situation we have here.  On page 5 of the

14    trustee's motion for leave, it characterizes the

15    allegations in the prior amended complaint as "lies,"

16    clearly which don't meet the standard of Rule 11.

17              On that basis, though, the trustee now requests

18    leave for two reasons:  One, it says that the prior

19    baseless allegations were not at fault; and two, there is

20    no prejudice.

21              As to Point No. 1, it's the trustee's

22    responsibility to ensure that its filings are supported by

23    a reasonable, good-faith investigation under Rule 11.  That

24    obligation is ongoing.  And no matter what the sources of

25    the trustee's information are, that responsibility rests on
```

```
 1   the trustee's shoulders as the party to this litigation.
 2   The trustee had that obligation in January and February in
 3   connection with filing its original counterclaims and
 4   third-party complaint, it had that obligation when it filed
 5   Docket 109 in July relying on the allegations of
 6   Ms. Blixseth, it had the same obligation in July when
 7   relying on the allegations or accusations of Mr. Flynn, and
 8   it's also had that obligation since February and June of
 9   this year in response to the discovery requests of Atigeo
10   and xPatterns where we've been seeking the basis for these
11   alleged claims.
12        Now, during the hearing in June on the motions to
13   dismiss, there were some rather pointed and frankly
14   ad hominem comments that were made directed at the
15   plaintiffs and third-party complaint defendant's counsel.
16   Without going -- without belaboring the point too much,
17   Your Honor, I think it's worthwhile to examine some of
18   those statements in light of what we know now.
19        The statement that was made in June was basically
20   that the veracity of counsel of record was called into
21   question.  To quote, the trustee noted:
22        Sometimes when I come to court, I'm very
23   impressed with what lawyers can get up here and say to try
24   to convince you of their respective positions.  And I can
25   tell you that I have the upmost respect for the talents of
```

08-61570-RBK  1 Doc #: 2048-08 Filed: 10/30/08  Entered: 11/30/12  18:56:358  Page 53 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 110 of 291

52

1   my opposition; however, I do not respect them for being

2   truthful to the Court.

3          Your Honor, I respectfully submit that to the

4   extent that, in light of what we know now, that allegation

5   or accusation had any merit, it was directed incorrectly at

6   the wrong side of the table.  We're now in a situation

7   where our client has had to defend against these

8   allegations over and over again.

9          And when, as Counsel -- the objection was made

10  that the allegations are baseless, these accusations were

11  made in terms of the veracity of the representations to the

12  Court.  That's not how the rule works.  Rule 11 is supposed

13  to provide a gatekeeping function against this sort of

14  procedural entanglement and repeated litigation over and

15  over again.  But in this case, the rule has failed in its

16  purpose because the amended counterclaim was allowed and

17  now another contingent counterclaim is being requested.

18         At that same hearing in June, the representation

19  was made to the Court that there are binders and binders of

20  evidence supporting the amended counterclaim and that, in

21  light of the new facts that would see the light of day, the

22  motions to dismiss challenging the original counterclaim

23  and third-party complaint would be moot.

24         Where are those binders?  They've not been

25  submitted with the motion for leave.  We've never received

08-61570-RBK 1 Doc#28049-08/Piled 10/30/2048 Entered 11/30/19 18:58:339 Page 54 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 111 of 291

53

```
 1    them.  Based on the admissions in the motion for leave to

 2    amend, we're left with the conclusions that the binders

 3    don't exist.

 4            As to the blame of a third party, Mr. Flynn, for

 5    the predicament we're in, the trustee spends a substantial

 6    part of its brief and its -- its opening brief and its

 7    reply explaining why Mr. Flynn ultimately should bear

 8    responsibility for the allegations that were improperly

 9    made and now seek to be retracted.  According to the

10    trustee, it's Mr. Flynn's responsibility that an adequate

11    Rule 11 investigation was not done in January or February,

12    in June or July, and ultimately not until shortly before

13    this motion for leave to file was made.  With all due

14    respect, that's not how it works.

15            The court rules impose on the bankruptcy trustee

16    as well as all the parties the duty - and it's an ongoing

17    duty - to conduct a reasonable pre-filing investigation.

18    If that investigation reveals facts under the Twombly and

19    Iqbal standards as well as the court's rules that a

20    good-faith basis for facts exists, then the pleading can be

21    filed; but if not, the pleadings should not be filed, at

22    least not until such a good-faith basis through an

23    independent investigation can be revealed.

24            What we are in is precisely the type of scenario

25    the rules are intended to prevent, where pleadings are
```

54

```
1    amended in moving-target fashion while imposing significant

2    burden and expense and prejudice, yet after 10 months of

3    litigation the initial pleadings still have not been

4    decided upon and they're not closed.

5            This issue is particularly pointed in situations

6    where the party seeking leave to amend has already had the

7    opportunity to do so.  And this goes to the point made in

8    the Kaplan v. Rose case cited in our brief at 49 F 3d.

9    1363, page 1369 - that's a Ninth Circuit case from 1995 -

10   as well as the MIR v. Fosburg case, 646 F 2d. 342 at

11   page 347, Ninth Circuit, 1980.

12           In those situations, the Court's leave is greater

13   than normal to deny amendment when opportunity was already

14   given to one of the parties to correct or refine or narrow

15   its pleading and then it comes back to court another time

16   and says, "I need to backpedal some more, and I need to

17   correct something or adjust it for a second time."

18           In the big picture, what particularly amplifies

19   the point is that all the trustee had to do in this

20   instance was simply ask Ms. Blixseth back in January when

21   she knew what it is she knew about the technology in

22   question.  It's not as if she was denied -- the trustee was

23   denied access to Ms. Blixseth to ask the right questions.

24   All the other information was shared during that interview,

25   as far as we can tell, based on the motion to file --
```

ER001921

08-615703-RBK 1 Doc #820493-08 Filed: 10/30/004 3 Entered: 11/30/12 18:56:331 Page 56 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 113 of 291

55

 1   motion for leave to file, but the timing, as Mr. Cotner
 2   points out, was critical.  And there was nothing
 3   prohibiting that question regarding the timing from being
 4   asked, and there was no documentation needed from Mr. Flynn
 5   or anybody else to identify what the relevant timing was.
 6          So where are we left now?  On the issue of
 7   prejudice, the plaintiffs and the third-party claim
 8   defendants have suffered prejudice in at least three ways:
 9          First, obviously, there is the expense, the
10   attorney's fees and costs spent on needless motions
11   practice against now admittedly false and baseless
12   counterclaims, third-party claims, and amended
13   counterclaims and third-party claims.
14          Secondly, we have the defamatory business harm of
15   having some very sharp and untoward allegations made in the
16   original counterclaims and the amended counterclaims which
17   now are being sought to be retracted.  But as Your Honor
18   pointed out, once something is filed on the ECF record, it
19   becomes a public document; and it becomes very difficult to
20   identify who is looking at it and what repercussions the
21   fact that that document is filed on the court docket with
22   the privilege that -- a company's judicial filings, what
23   prejudice that may cause in the minds of readers towards
24   the parties they're filed against.
25          Thirdly, on an ongoing basis, if leave is

08-61570-RBK 1 Doc#: 82048-08 Filed: 10/30/18 48 Entered: 11/30/12 18:58:38 2 Page 57 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 114 of 291

56

1    granted, the plaintiffs and the third-party claim

2    defendants will have to expend further resources litigating

3    against, defending against, and explaining within their

4    relevant communities the contingent counterclaims and the

5    allegations set forth in them.  And an explanation will be

6    admittedly quite difficult because those contingent

7    counterclaims by their nature say that in the future, it is

8    possible that the plaintiffs and the third-party claim

9    defendants will have been determined retroactively to have

10   engaged in some tortious conduct even though in the here

11   and now, in the present day, those causes of action are not

12   ripe and they're premature.

13         So we appreciate Mr. Cotner's explanation

14   regarding how we got to where we are today.  Focusing on

15   the future and how the parties should proceed, we do not

16   think it's appropriate for leave to be granted on several

17   bases, but not the least of which is the fact that

18   the continued claims are not claims, they're not ripe,

19   there's no basis for them today.  If something happens in

20   the litigation where they arise later, that may be a

21   different story; although, as I mentioned before, we think

22   they would still be vulnerable in that instance to motions

23   to dismiss under Rule 12.  But certainly today the court

24   system does not, does not anticipate a place-saver claim so

25   that at some point in the future, especially in light of

08-61570-RBK 1 Doc# 82048-08/Filed, 10/30/804 Entered 11/30/12 18:50:363 Page 58 of 83
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 115 of 291

57

```
1    the prejudice that is caused by them, that they may be

2    resurrected as a later date.

3             I'd like to take a few moments, if I may, to

4    address the issue of the answer, shifting gears to Western

5    Capital.  Western Capital has indicated that it is not --

6    it doesn't object to filing an answer to the complaint.  I

7    think the parties have gotten bogged down a little bit in

8    the procedural ceremony of how exactly that should be

9    accomplished, but our position is very simple:  Western

10   Capital was an intervenor in this case.  It stepped into

11   the shoes on the contract claims of the trustee and, as a

12   result, it's seeking certain relief on that contract.  But

13   consequently, it should also be entitled to answer -- as

14   the real in interest on the contract claims, it should be

15   entitled and it should be required to answer the complaint

16   that Atigeo and xPatterns have filed on the same contract.

17            If the Court is agreeable to grant him leave this

18   time, we have asked that no more amendments be allowed as a

19   condition to that leave.  As Your Honor knows, it's now

20   been close to a year, 10 or 11 months since the adversary

21   action was filed, and this process has stretched on long

22   enough.  At some point, there has to be some certainty, and

23   the trustee has to make a decision, as does Western

24   Capital, as to what claims or counterclaims and third-party

25   claims they're going to assert so that parties can get on
```

 ER001924

58

```
 1   with the litigation.

 2           In the latter part of the hearing today, we know

 3   that Your Honor is going to hear the parties' position on

 4   the scheduling issues, but the fact that after 10 months

 5   there still hasn't even been a schedule entered speaks

 6   volumes about how much energy has gone into this pleading

 7   issue.

 8           Finally on the issue of conditions, we want to

 9   make it clear that we are not asking for sanctions under

10   Rule 11, and we submitted the sur-reply to that effect.

11   Under the MCI case that Mr. Cotner referenced, it is very

12   much within the Court's discretion to impose conditions

13   under Rule 15 on leave to amend.  And for precisely the

14   type of backpedaling - which is the term the Ninth Circuit

15   used in that case - for precisely the type of backpedaling

16   that we have here in this case, conditions are appropriate

17   basically to put the parties opposing leave in a fair

18   position for having had to expend significant resources

19   dealing with the counterclaims which were then retracted

20   and reset.

21           THE COURT:  Thank you, Mr. Park.

22           Mr. Cotner, did you wish to make any short reply?

23           MR. COTNER:  Very short, Judge.  Thank you.

24   First of all, while I recognize that the Atigeo parties

25   have said they're not seeking sanctions under Rule 11, they
```

08-61570-RBK 1 Doc#:2048-08 Filed: 10/30/04 Entered: 11/30/12 18:58:33 Page 60 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 117 of 291

59

1   do talk in terms of a reasonable, good-faith basis.  I have

2   kind of bared my soul and let this Court know, with

3   attachments to my motion and with the full disclosure to

4   Your Honor, precisely what happened.  I don't question my

5   mind-set at particular times.  I don't question why I did

6   what I did.  Certainly in hindsight as more things are

7   discovered, you have every obligation to and right to.

8           And one of the troubling issues that I've

9   wrestled with in this is:  When I was presented with what I

10  was presented with after I had met with Edra Blixseth in

11  July, what's a lawyer to do?  He feels in good faith that

12  claim can be pursued.  If the appropriate relief is a

13  sanction for making the record correct before any answers

14  had been filed, I don't know that that's the right message

15  to be sent, especially to attorneys that don't have

16  day-to-day contact with their clients and day-to-day

17  contact with the facts.

18          Comments were made with respect to the

19  discussions I had at the prior hearing.  Frankly, Judge,

20  the emotion and belief I had in my claim was such that it

21  created the need to make those comments.  It frankly, I

22  hope, shows to the Court exactly that I did believe those

23  claims to be made in good faith and had no doubt with

24  respect to the ability to prove up those claims at the

25  time.

08-61570-RBK  1:05-cv-08248-08-Filed-3, 10/30/804 Entered-11/30/10, 18:58:386 Page 61 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 118 of 291

60

```
1              Edra had told me she was fraudulently induced.

2   Edra had told me that money had been converted.

3   Unfortunately, and Brian Park is correct on this, one of

4   the key questions that I now knew, did not know in the

5   interview, was:  What was the timing of that knowledge?

6   And so for that oversight, absolutely, I wish my

7   investigation had been more complete.

8              Binders of evidence I do have.  We have

9   documents, some -- I thought the Atigeo parties had

10  received significant portions of that, screening off some

11  of the privileged information.  They exist, and I can make

12  those available to the Court if that's the Court's

13  preference.

14             If my brief is trying to pass the buck to

15  Mr. Flynn, I don't.  I take responsibility for my own

16  actions.

17             Did Mr. Flynn believe me -- mislead me?  I think,

18  yes.

19             Does that make him responsible for my actions?

20  I'm not asking the Court to make that decision.

21             I'm asking the Court to look at the bases for how

22  I was persuing and making decisions and determine whether

23  or not that was a reasonable, good-faith basis.

24             With respect to the relief requested, as I had

25  mentioned, I have no objection to the "no amendment" rule
```

61

1  going forward.  To the extent that an amendment is

2  necessary to deal with this contingent claim, I will do

3  that by agreement with counsel.  My concern with regard to

4  not having that claim asserted is:  As I stand here today,

5  I am not certain whether that's a compulsory counterclaim

6  or not.

7         And I mentioned that to counsel yesterday.  I

8  think we all understood and agreed that that's something

9  that needs to be looked at.  If it's not a compulsory

10  counterclaim, which means it can be refiled at a later

11  date, we won't need to be involved in this litigation.

12         In terms of the defamatory business arm, to the

13  extent there are allegations of misleading technology or

14  diversion of money, those are true according to Edra

15  Blixseth.  And so I stand by the representations made in my

16  new pleading.

17         With regard to the expense, I frankly wanted this

18  issue to be to the Court before there was needless expense.

19  Before there was discovery, before there were depositions,

20  and before we did anything down the typical procedural

21  track, I wanted the parameters of this case properly

22  defined.

23         You can call it "backpedaling," Judge, and I

24  guess that's a fair statement.  I would call it

25  "backpedaling in light of what I now know."  I did not have

62

```
 1    Edra Blixseth available, as I've explained.  I filed by

 2    pleadings in good faith.  I stand by that representation.

 3    And I'm glad I'm here today to set the record straight, and

 4    I'm glad I'm here today so that there's not further

 5    discovery and litigation with regard to issues that were

 6    needlessly raised based on representations made to me.

 7            Thanks, Judge.

 8            THE COURT:  Thank you.  I'll take up now Western

 9    Capital's motion to file third-party complaint.  Mr. Hatch.

10            MR. HATCH:  Thank you, Judge.  And some of what

11    I'll say will relate to what I've just heard, much of which

12    is news to me.

13            And we, Western Capital, became involved in this

14    case after it foreclosed on the contract claims at issue

15    and filed a motion within a matter of days intervene into

16    this litigation.  The motion was granted.  There was, as

17    the Court may recall, a status conference of sorts --

18    (inaudible, audio cuts out.)  We committed that we would

19    file our third-party complaint basically separating

20    ourselves from the trustee by August 31st, and we did that.

21            We filed our motion for leave, and attached to

22    the motion is a copy of our proposed complaint.  It sounds

23    entirely on contract theories.  It has nothing to do with

24    the discussion we had - (inaudible, audio cuts out) - about

25    the tort claims and the allegations made in the tort
```

Case No. 12-35986 ER 351

ER001929

```
 1   claims.  There's been no backpedaling by Western Capital.

 2   What we want to do is we just simply - (inaudible) - get on

 3   with this.  And we've been very eager to have the pleadings

 4   framed as well.

 5          We believe that our motion should be granted

 6   under Rule 15 as a matter of right.  And from my

 7   conversation yesterday with Mr. Park and Mr. Tellis, I

 8   understand that they don't necessarily disagree with that,

 9   that there ought to be a -- that the motion that we've

10   filed ought to be granted with respect to Western Capital

11   Partners so that we can get our, our pleadings framed and

12   get on with the show.

13          As far as the answer goes, Mr. Park made

14   mentioned to the fact that Western Capital has not filed an

15   answer.  And we'd really like to have some clarity on that

16   point because if you read the complaint that was filed by

17   the plaintiffs, there are no allegations made against

18   Western Capital; there are only allegations made against

19   other defendants.  Now, we recognize that we have, by

20   virtue of our foreclosure, acquired interests that were

21   previously held by the other defendants, but it's hard to

22   answer a complaint where the allegations are not asserted

23   against your client.

24          And so we are -- if the, if the Court directs us,

25   we will file an answer; although, I think procedurally it
```

08-61570-RBK 1 Doc #: 2043-08 Filed: 10/30/04 Entered: 11/30/12 18:58:330 Page 65 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 122 of 291

64

1    would make more sense for the plaintiff's complaint to

2    actually assert what claims it has against Western Capital

3    so that - (inaudible, audio cuts out) - answer the

4    complaint in a clear a way and we assert the appropriate

5    affirmative defenses to the claims asserted.  Because as

6    I've suggested, we have nothing to do with the tort claims

7    or the trustee's interests in this litigation.

8            And so in any case, let's go back to our motion.

9    Our motion for leave to file a third-party complain, it's

10   our position that under Rule 15, as adopted by FRBP 7015,

11   permits Western Capital to file its amended -- excuse me,

12   its third-party complaint as a matter of right.  There have

13   been no responsive pleadings filed - (inaudible) - anything

14   filed by Western Capital, and so we would ask that the

15   Court grant our motion.

16           With respect to some sort of limitation on there

17   being no further amendments, I will assume and encourage

18   counsel to clarify if I'm wrong that that request does not

19   apply to Western Capital with its third-party complaint.

20   Naturally, we don't want to amend our pleadings - we want

21   to get on with this too - but if there should be a reason

22   to file amended pleadings, I think the Court should, should

23   hear those reasons and make a determination in due course

24   as to whether those reasons are well-taken.

25           And so on the motion, we'd ask that the Court

08-61570-RBK 1 Doc# 2049-08/Filed: 10/30/004 Entered: 11/30/10 18:56:331 Page 66 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 123 of 291

65

```
 1    grant it and that our third-party complaint that was filed

 2    on August 31st be accepted and, and not have any sort of

 3    limitations on future amendments; although, we don't see

 4    the need for it and we anticipate there shouldn't be

 5    amendments on our part.

 6              THE COURT:  Mr. Hatch, in reference to your

 7    comment concerning any need for an answer, wouldn't you be

 8    objecting to the repudiation?

 9              MR. HATCH:  Judge, the -- yes, we would.  All of

10    the, all of the claims that have been filed by the

11    plaintiff naturally impact the contract rights that we have

12    foreclosed and that we intend to pursue.

13              What I'm saying to Your Honor is that we do have

14    an interest in answering and asserting appropriate

15    affirmative defenses, and we are eager to do that.  There's

16    just been some confusion because if you read the complaint,

17    Judge, there's no allegations asserted against our client.

18              Now, the Court could clarify that very quickly

19    and we would be happy to file that answer, but we were just

20    caught in a state of confusion, here, Judge, as to how to

21    handle, how to handle an answer where there's been no

22    allegations asserted against your client -- or no counts

23    asserted against your client.

24              THE COURT:  Okay, I understand.  Mr. Park.

25              MR. PARK:  Your Honor, this is Brian -- thank
```

08-61570-RBK 1 Doc#: 2048-08/Filed: 10/307804 Entered: 11/307802 18:58:332 Page 67 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 124 of 291

66

1    you, Your Honor. .

2          Your Honor, Mr. Hatch is correct that in terms of

3    Western Capital's motion for leave to amend, it is

4    substantially more simple and straightforward than the

5    trustee's, but there are some facts that should be pointed

6    out.

7          As the trustee's counsel has outlined today,

8    Western Capital, both through its counsel and its own

9    representatives, was involved in the discussions with the

10   trustee where they were trying to vet the facts since last

11   December in formulating their claims, whether they be

12   counterclaims or third-party claims.  For that reason, we

13   think it's appropriate for a prohibition on further

14   amendments to apply to Western Capital as well as the

15   trustee for the same reasons:  It's been 10 months, Western

16   Capital has formulated what claims it thinks it has.  And

17   granted, because they're based in contract, they should be

18   more straightforward and more easy to identify than any

19   tort claims the trustee seeks to assert.

20         So we do think that the condition for leave

21   should be that there be no further amendments.  Another

22   condition, and a very important one, is that the plaintiffs

23   and third-party defendant's right to file the motion to

24   dismiss under Rule 12(b)(6) be preserved.  Nothing in our

25   response to the motions for leave was intended to be viewed

**Case No. 12-35986 ER  355**

```
1   as letting that go; and to the contrary, we specifically
2   reserved it.  So I just wanted to point that out to Your
3   Honor.
4           Finally, on the point of the answer, we
5   understand Mr. Hatch's statements and we understand Western
6   Capital's position that they're just stepping into the
7   shoes of the bankruptcy trustee on the contract claims and
8   that the allegations in the complaint that the plaintiffs
9   filed don't allege any facts specifically against Western
10  Capital, but that's precisely the point.  Western Capital
11  was an intervenor in this case.  They had a contract right,
12  they purported to have foreclosed on it, and now they say
13  they own it.
14          As Your Honor points out, Cause of Action No. 1
15  in the complaint seeks rescission or repudiation of that
16  agreement, and certainly that's something that now bears
17  upon Western Capital.  So regardless of whether they were
18  the percipient actor of the facts alleged in the complaint
19  doesn't really make a difference.  They claim to be the
20  party in interest, and so as a result they step into the
21  shoes of the trustee and they should answer the complaint.
22          Thank you, Your Honor.
23          THE COURT:  Okay.  Any reply, Mr. Hatch?
24          MR. HATCH:  I don't disagree with Mr. Park.  I
25  mean I've indicated that we are happy and actually eager to
```

Case No. 12-35986 ER  356
ER001934

```
 1    get the pleadings framed.  We are very eager to get going

 2    here.  And it's just been this confusion - and we've

 3    expressed this for many months - that if there was a

 4    complaint alleged against our client, we could file an

 5    answer.  I just think it's procedurally confusing for both

 6    sides.  And there's no expectation on our part that we be

 7    excused from filing an answer.  We want to file one, and we

 8    are happy to do so as -- and we'll do it immediately.  But

 9    we just were confused as to how you file one where you're

10    an intervening party and the complaint alleges claims

11    against the trustee.

12          And by the way, the trustee is not out of the

13    picture here, so how can we answer a complaint that's been

14    asserted against a continuing party to the litigation?  It

15    just created confusion on our part, you know, as to how we

16    could step in and start answering complaints where the

17    other defendants continue to participate.  So we're, we are

18    happy to file an answer.  We'd like to do it, and we would

19    like to have our complaint accepted, and we don't believe

20    there should be any limitations posed upon us.

21          And Counsel suggests that somehow we've been on

22    notice about all of these things.  I mean those are just

23    allegations.  And I just heard Counsel talk.  I'm telling

24    you I've learned a great deal today that I've never heard

25    before.  And so I'm -- I don't understand how it is that we
```

```
 1   would somehow be subject to a limitation based on other
 2   parties' fraud claims that we've never participated in.
 3           So I hope that answers your question, Judge,
 4   on -- we, we don't have any problem with filing an answer.
 5           THE COURT:  Well, you know, I guess if there
 6   isn't a response, an answer filed to the complaint, I
 7   guess, as a defense by the plaintiffs in their answer to
 8   the third-party complaint, they can respond -- I mean if
 9   the contract's repudiated, obviously that goes directly to
10   your ability to enforce the agreement on a contract right,
11   correct?
12           MR. HATCH:  Correct.  If Count 1 were to be
13   successful, then the contract claim would go away.  And
14   that's what's caused, really, a lot of the -- I think a lot
15   of the confusion for the trustee.  But from our
16   perspective, it's very straightforward.  We believe there's
17   a contract claim, and we intend to pursue it.  And so, you
18   know, that eventuality may happen, but we don't believe so.
19           THE COURT:  Okay.  Counsel, I'm going to take
20   about a five-minute recess, and I'll be back.
21           (A brief recess was taken.)
22           THE COURT:  Please be seated, for those of you
23   who are standing.
24           Okay, let me go down through this.  We do still
25   have the pretrial scheduling and status conference
```

**Case No. 12-35986 ER  358**        ER001936

08-61570-RBK 1 Doc#: 2043-08 Filed: 10/30/10 Entered: 11/30/10 18:58:33 Page 71 of 83
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 128 of 291

70

```
1    depending upon the rulings I'm about ready to issue.
2             As it relates to the motion of Western Capital
3    Partners to file a third-party complaint, I'm granting
4    that.  The third-party complaint that was lodged as an
5    attachment August 31, 2010, I think it was in Docket 124,
6    will be allowed filed.
7             And I guess I'm just wondering:  Mr. Hatch, it
8    may be as clean for you just to take that complaint and
9    file it as a new docket entry, based upon my --
10            MR. HATCH:  I will -- (inaudible.)
11            THE COURT:  -- okay, based upon my order granting
12   leave to file that.
13            As it relates to answer, I guess I don't see why
14   Mr. Hatch, on behalf of WCP, can't make a statement or an
15   allegation that, in fact, they're the holder of the
16   contract right and then answer, well, whatever claims you
17   feel you need to answer in the complaint.  And then
18   certainly, third-party defendants can file affirmative
19   defenses as they see fit as it relates to any repudiation,
20   etc.  So I think that can be taken care of in that manner.
21            Because I think, Mr. Hatch, WCP is a successor on
22   the contract right through foreclosure.  You can just make
23   that statement in your answer.
24            MR. HATCH:  I agree, Judge.  And I could, I could
25   use that new pleading to also incorporate my answer so that
```

everything's in one, new complaint as well as the answer, if you'd like.

THE COURT: That's fine. I have no objection to that, and I grant you to do that.

So I think that takes care of the third-party complaint by Western Capital -- oh, Mr. Hatch, given some of the statements made here today - that are troubling to me, because I'm not sure who represents whom - there's been a statement made today that Mr. Conant represents Mr. Blixseth, he represents Mr. Flynn, he represents Western Capital. I don't know who he represents and in what time represents whom.

I'm just saying this to you so that you will know it and you'll see it coming, but I am inclined at this point in time to do an order to show cause why Mr. Conant's pro hac vice should not be revoked by this Court, given appearances of impropriety and this Court not knowing who he represents and at what time.

So I'm just letting you know. It doesn't affect you, but it does affect Mr. Conant. And I'm just concerned. I'll be honest, I just don't know who he represents and how parties can know who he represents at any given time. So you may expect that.

Let's see, as it relates to the trustee's motion to file second amended counterclaims, third-party

08-61570-RBK 1 Doc#820484-08/Filed. 10/30/804 Entered 11/30/12 18:56:338 Page 73 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 130 of 291

72

```
1   complaint, I'm denying that motion.
2           And I'm sealing Docket 109.  That will be sealed
3   by the clerk immediately upon conclusion of this hearing.
4   And that will leave the trustee with his original answer,
5   counterclaims, and third-party complaint, whatever he had
6   filed previously.  I just think there are methods and ways
7   that that investigation could have occurred - either
8   through the main case, through 2004, or through other
9   discovery means - that could have established these facts
10  and not to have had them be a surprise after the fact.  And
11  here we are, you know, 10 - 11 months down the road.  So
12  that's what I'm doing on that one.
13          As to any fees under Rule 15, or expenses, costs,
14  any of that sort of thing, I am denying.
15          Let's see if I've missed any of the other side's
16  motions here.  I'll issue an order on all of these things
17  as well.
18          Regarding the Nevada matter, just so you all
19  know, I am sending a letter -- and I'm not sure who the
20  judge with jurisdiction in the District Court is, but I am
21  sending that judge a letter informing him that certain
22  things were filed with this Court.  And I'm going to attach
23  Exhibits A-1, A-2, and 109 just to indicate those have been
24  filed with this Court.  And I have no way of knowing if
25  that constitutes any violation of any orders issued by that
```

08-61570-RBK 1 Doc#: 2040-08 Filed: 10/30/10 Entered: 11/30/10 18:58:33 Page 74 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 131 of 291

73

```
1    Court, but I am providing it to the Court for its
2    information and process of whatever it feels appropriate.
3    I mean I don't know what's covered by the secrecy order,
4    and I don't think it's for me to make that determination
5    anyway.  So I will do that.  And like I say, I have no idea
6    whether anything will come of it or not.  That's not my
7    position.
8             Now, as far as pretrial scheduling and status
9    conference, you did indicate that you had discussed dates,
10   possibly.  I'm not sure how extensive you were in that
11   discussion.  You talked about some trial the fall of 2011.
12   I guess I'm wondering:  Do we need to go that long, or
13   could we try this like the last week in June, the 27th
14   through the 2nd of July?  I don't know what your dates are,
15   what you've talked about.
16            MR. PARK:  Your Honor, this is Brian Park, if I
17   may.
18            We had talked last night about something in the
19   fall, perhaps the early part of October.  The reason was in
20   part because of the trial schedules of counsel of record,
21   but also because of the amount of time it may -- that may
22   be required to resolve the lingering pleadings issues even
23   in light of your order this afternoon.  So we didn't
24   discuss in detail a particular staggering of dates,
25   although we had agreed to one earlier in May.  But the key
```

1    date, of course, is the trial date.

2          Counsel of record has other trials in April, May,

3    and June of next year that are expected to proceed to

4    trial, and so our concern was that anything prior to the

5    latter part of the summer or the early part of the fall

6    could be problematic.

7          THE COURT:  What about the last week in August,

8    August 29th through the 2nd?

9          And let me do this, because maybe not all of you

10   have access to your calendars, etc., which I suddenly

11   realized:  Would it be better for you to have some time -

12   I've given you a couple of dates, and there may be some

13   other dates, as well, that would be available after August

14   - but for you to kind of think about those dates, look at

15   the other dates that -- you know, obviously I'm going to

16   want a formal discovery deadline; a time for pretrial

17   motions and briefs; time for resolution through settlement,

18   ADR, or whatever it might be.

19         It's fairly easy in my mechanical formula if we

20   set the date, the pretrial order and the exhibits and

21   witness lists need to be filed at least one week before.

22   If you want to do a pretrial memo on any fact or law,

23   that's usually, you know, two to three or four days ahead.

24   And so those would be primarily the dates.

25         Now, the other thing that I would need to raise

08-61570-RBK 1 Doc#8:204804-08/PiledG 10/30784048ntbred 11/30712 T8:58:331 Page076 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 133 of 291

75

```
 1    with you, depending upon when you conduct the trial, is:  I

 2    don't know what will be available for courtroom space.  I

 3    don't know what the schedule in Butte is.  And so if

 4    there's conflict, it may be that I would move that to

 5    Missoula where I would not have a conflict with District

 6    Court.  So keep that in mind.

 7            The other thing is, and I'll tell you I didn't

 8    look at the pleadings for this point:  Has there been any

 9    requests for jury trial on any issue?

10            MR. HATCH:  I don't believe so.

11            THE COURT:  I assumed there hadn't been, but I

12    guess I just raise that as a question.

13            The other thing is:  Given the allegations and

14    findings here, do we have noncore matters that are going to

15    require findings and conclusions submitted to the District

16    Court?  And again, maybe we don't know that without seeing

17    what the final pleadings are, and answers and counterclaims

18    and that sort of thing.

19            MR. HATCH:  Judge, I have my calendar with me.  I

20    don't know if the other counsel have their calendars.

21            THE COURT:  Mr. --

22            MR. PARK:  Your Honor, if it's -- I'm sorry, go

23    ahead.

24            THE COURT:  No, go ahead, Mr. Park.

25            Mr. Tellis, are you in a position where you know
```

08-61570-RBK 1 Doc# 20424-8 Filed: 11/30/10 48 Entered: 11/30/10 18:56:33 Page 77 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 134 of 291

76

1    your calendars?

2         MR. TELLIS:  I think we can meet and confer with

3    counsel and put together a broader schedule which plugs in

4    all the dates that Your Honor required.  And to answer the

5    direct question, I'm available the August 29th through

6    September 2nd block that you've suggested.

7         UNIDENTIFIED SPEAKER:  Your Honor, I think it

8    would be beneficial to be able to check calendars, meet and

9    confer with counsel, and put in basically a full package

10   for, for the Court's review.

11        THE COURT:  Yes.  And Mr. Cotner and Mr. Samson,

12   I think, would probably also want to, you know, be able to

13   confer.  So why don't I do this:  I gave you some dates and

14   I kind of gave you a formula as to how I derive some of

15   those dates.  You can meet and confer, come up with your

16   dates that meet those, and file a stipulation.

17        And if that comes in, I'll approve it, provided I

18   don't have a problem with a date; and otherwise, if I don't

19   see a stipulation and an order filed prior to November 3rd,

20   we will have a pretrial scheduling conference to set those

21   dates with an order being issued at that time.

22        Do you have a time, Lynn?

23        I'll give you an exact time for that pretrial.

24        THE CLERK:  For November 3rd.

25        THE COURT:  For November 3rd.

77

```
 1              THE CLERK:  Three-thirty.

 2              THE COURT:  At 3:30 p.m.

 3              MR. PARK:  Your Honor, may I ask two clarifying

 4    questions about your ruling today?

 5              THE COURT:  Yes.

 6              MR. PARK:  You had indicated that, in light of

 7    your denial of the trustee's motion for leave to amend,

 8    their operative pleading would be the one that was

 9    previously filed.  Were you referring to Docket No. 109,

10    the first amended counterclaim and third-party complaint?

11              THE COURT:  No, that one is out.

12              MR. PARK:  Okay.  So you're referring to the

13    original counterclaim.

14              THE COURT:  Right.  And as you will recall

15    procedurally, that's kind of what got us here where we are,

16    is that that was subject to motions for dismissal on

17    plausibility, as I recall, at least in part.  And then I

18    had denied the motion and allowed them time to amend.

19              MR. PARK:  So then, Your Honor, is the time

20    governing the plaintiff's deadline for a response the

21    normal time under the rules?

22              THE COURT:  Yes.

23              MR. PARK:  Thank you, Your Honor.

24              THE COURT:  So I suspect what we're going to

25    see --
```

**Case No. 12-35986 ER  366**

ER001944

78

```
 1              MR. PARK:  Secondly --

 2              THE COURT:  What I suspect we're going to see is

 3    renewed motions to dismiss, probably.

 4              MR. PARK:  Yes, Your Honor.  The second point of

 5    clarification was:  You had indicated that the Court is

 6    sealing Docket No. 109.  Does that also apply to

 7    Exhibit A-2 which contains the same issues regarding the

 8    Nevada order?

 9              THE COURT:  Oh, good point.  That will

10    include A-2.

11              MR. PARK:  Thank you, Your Honor.

12              MR. TELLIS:  Your Honor, this is Roland Tellis.

13              The pretrial scheduling conference on

14    November 3rd, we can make arrangements to participate by

15    videoconference or telephone on that one?

16              THE COURT:  Actually, we will give you a number

17    in the order to just call into.  That number offhand is --

18              MR. TELLIS:  Okay.

19              THE COURT:  Let me give you the number, but it

20    should be in the order as well.  It's 406-221-7510.

21              MR. TELLIS:  Thank you, Your Honor.

22              THE COURT:  Okay.  And when you dial in, it may

23    just sound like it's silent.  Just stay on there.  You'll

24    be joined by other people as well as myself at

25    three-thirty.
```

08-61570-RBK 1 Doc# 8 2048-08 Filed 10/30/804 Entered 11/30/12 18:58:335 Page 80 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 137 of 291

79

```
 1              MR. TELLIS:  Okay.

 2              THE COURT:  Okay?

 3              MR. HATCH:  Judge?

 4              THE COURT:  Yes.

 5              MR. HATCH:  Judge, this is Robert Hatch.

 6              What other -- we've got August 29th as a possible

 7    date.  I thought it might be useful if you threw out some

 8    other possibilities so we could target dates that work for

 9    Your Honor.

10              THE COURT:  Okay.  I get the feeling you didn't

11    like that June date.

12              MR. HATCH:  Well, I liked it, Judge, but I don't

13    think that --

14              THE COURT:  Well, I was hearing all of this

15    wanting to get it to trial, so, you know --

16              MR. HATCH:  Well, I'm ready to go in -- I'm

17    willing to go in June, Judge, but I don't think it works

18    for Mr. Park and Mr. Tellis.

19              UNIDENTIFIED SPEAKER:  That is correct, it

20    conflicts with our schedules.

21              THE COURT:  The last week of September, the 26th

22    through the 30th.  You should be able to work with those

23    dates.

24              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

25              THE COURT:  Anything else?
```

**Case No. 12-35986 ER  368**

1           MR. PARK:  I'm sorry, this is Brian Park again.

2           One last clarification:  One issue that you did

3    not address in your ruling was the availability of further

4    amendments to Western Capital Partners.

5           THE COURT:  Well, given the fact it was filed in

6    August -- you know what?  If, in fact, you don't come up

7    with a specific date by agreement, I'll set a date.

8           And if you don't know because you haven't

9    practiced before me that long, the time for amendments are

10   usually on a very short basis.  You know, I usually close

11   that deadline to amend within a week or six weeks at the

12   most after the complaint is filed.  Of course, most trials

13   I have trial within six months, so this one is stretched

14   out obviously.  But I think Mr. Hatch should know what his

15   allegations are and what the facts are at this point and

16   that there shouldn't be any need for amendment.  So it's

17   going to be a fairly short timeline.

18           MR. HATCH:  Judge, I think you threw out a

19   possible August 29th and a possible September 26th to 30th.

20           THE COURT:  Right.

21           MR. HATCH:  Okay, good.  I've got those, and

22   those work for us.  We'll confer with counsel and hopefully

23   reach an agreement.

24           THE COURT:  I'll be honest:  If we can do it

25   before that, I would welcome it, depending upon your

08-61570-RBK   Doc#20443-08   Filed 10/30/04   Entered 11/30/12 18:56:337   Page 82 of 83
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 139 of 291

81

```
 1   schedules.  So, you know, I'm looking at any dates, but at

 2   least I know those dates are open.

 3              MR. HATCH:  Thank you, Your Honor.

 4              THE COURT:  Thank you.  If there's nothing else,

 5   we'll be in recess.

 6

 7                              *  *  *  *  *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

08-61570-RBK 1 Doc# 82048-08/File3, 10/30/804 Entered: 11/30/12 18:56:338 Page 83 of 83
Case 2:11-cv-00073-SEH  Document 12-5  Filed 02/02/12  Page 140 of 291

82

```
 1                    C E R T I F I C A T E

 2

 3        I certify that the foregoing is a correct transcript

 4   from the electronic recording of the proceedings in the

 5   above-entitled matter, all done to the best of my skill and

 6   ability.

 7

 8        _____    _____

 9        Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 2**

**Case No. 12-35986 ER  372**

ER001950

08-61570-RBK Doc#2048-2 Filed: 11/19/10 Entered 11/19/10 16:58:30 Page 2 of 22
08-61570-RBK Doc#2048-2 Filed: 11/19/10 Entered 11/19/10 16:58:30 Page 2 of 22
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/20/14 Page 171 of 170
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/20/14 Page 171 of 170

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In Re: | ) |
|  | ) Case No. 08-61570-11 |
|  | ) |
| Yellowstone Mountain Club, LLC, | ) |
|  | ) |
| Debtor. | ) |
|  | ) |

(Complete caption on next page.)

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
February 11, 2010

Electronic Recording Operator:  Patti Mahoney

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

**Exhibit 2**

**Case No. 12-35986 ER  373**

ER001951

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| In Re: | ) | Case No. 08-61570-11 |
| | ) | |
| Yellowstone Mountain Club, LLC, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| CREDIT SUISSE and TIMOTHY L. | ) | Adv. Pro. 09-00014 |
| BLIXSETH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| MICHAEL SNOW, et al., | ) | Adv. Pro. 09-00018 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BLX GROUP, INC. f/k/a BLIXSETH | ) | |
| GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| Yellowstone Development, LLC, | ) | Case No. 08-61571-11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Big Sky Ridge, LLC, | ) | Case No. 08-61572-11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Yellowstone Club Construction | ) | Case No. 08-61573-11 |
| Company, LLC, | ) | |
| | ) | |
| Debtor. | ) | |

**Case No. 12-35986 ER  374**

ER001952

105

```
 1   lowest tranche, as you've testified - to a Class 4,

 2   fourth-priority tranche; is that right?

 3   A.   That's its effect, yes, sir.

 4   Q.   Okay.  Now, one thing that I think we could, we could

 5   clear up is that this term sheet and the deal, the

 6   settlement that you're reaching with the seven B's, that

 7   doesn't -- it is not intended by you to liquidate the

 8   amount of the recovery in AP 18, is it?

 9   A.   Could you repeat that again?  First of all, it faded

10   out a little; and, second, I'm not sure I understood it.

11   Q.   Okay, I'll rephrase it.  You're not, by entering into

12   this term sheet, liquidating and establishing the recovery

13   in AP 18 of $22 million, are you?

14   A.   No, absolutely not.  That's subject to litigation by

15   the trust, if this is approved, against Mr. Blixseth.

16   Q.   Okay.  So that remains open; is that correct?

17   A.   Success of that litigation certainly remains open.

18   Q.   And the amount of recovery remains open, right?

19   A.   Just as I indicated earlier, the entire trust

20   recoveries are contingent on litigation --

21   Q.   Okay, thank you.

22   A.   -- including this claim if it's folded into the trust.

23   Q.   Okay.  I'd like you to refer to your Exhibit No. 3,

24   please.

25   A.   Yes, sir.
```

08-61570-RBK-11 Doc#-3048-23/ Filed: 11/30/10 Entered 11/19/10 Page 393 Page 5 of 22
08-6 Case-RK1-Doc#0073-SE Filed 02/02/10 Document 12 Filed 02/02/10 12:18:03 Page Page 29 of 170

119

```
 1   Docket 1042, 1042.
 2            THE COURT:  Well, obviously, the record states
 3   the appeals.  I mean they're of record.
 4            MR. GUTHALS:  Yes.  Thank you, Your Honor.
 5            THE COURT:  Anything further on this matter?
 6            MR. GUTHALS:  Your Honor, may I make a brief
 7   statement regarding our position?
 8            THE COURT:  Haven't you already done that in your
 9   objection?
10            MR. GUTHALS:  Yes, I have, Your Honor.
11            THE COURT:  Thank you.
12            MR. GUTHALS:  Thank you.
13            MR. HINGLE:  Your Honor, may Mr. Kirschner be
14   excused?
15            THE COURT:  Yes, certainly.
16            THE WITNESS:  Thank you very much, Your Honor.
17            THE COURT:  On this matter, I'm going to take it
18   under advisement.
19            MR. GUTHALS:  Thank you, Your Honor.
20            MR. HINGLE:  Thank you, Your Honor.
21            THE COURT:  I believe that leaves -- well, other
22   than the fee app by Mr. Beckett, that leaves us with the
23   motion of Plaintiff for sanctions for intentional
24   spoliation and the response thereto.
25            Are parties ready to proceed?  This is a 9-14.
```

Case No. 12-35986 ER  376

```
 1              MR. FLYNN:  Yes, Your Honor.

 2              THE COURT:  Okay.  I'll have -- go ahead.

 3              MR. SULLIVAN:  Your Honor, for the record, Joe

 4     Sullivan.  I'm appearing personally for Gary Deschenes as a

 5     special appearance in this matter.

 6              THE COURT:  Okay, thank you.

 7              MR. TURNER:  And, Your Honor, John Turner

 8     appearing on behalf of the liquidating trust.

 9              THE COURT:  Okay, very good.  Mr. Flynn, I'll let

10     you proceed.

11              MR. FLYNN:  Thank you, Your Honor.  Mr. Banducci

12     is going to call the two forensic experts, and we'll begin

13     there, Your Honor.  And we'll forego an opening statement.

14              THE COURT:  Very good.

15              MR. SULLIVAN:  Your Honor, if I might, it would

16     seem appropriate that I go ahead and set forth what our

17     position is prior to any testimony being presented, if I

18     can have the permission of the Court.

19              THE COURT:  You may do that.

20              MR. SULLIVAN:  Thank you.  Your Honor, what you

21     have here is a motion that seeks to find sanctions against

22     three people that aren't actually before you.

23              And what you have here is, although in

24     Mr. Deschenes' situation, the accusations made against him

25     are totally false and he looks forward and welcomes the
```

08-61570-RBK12 Doc#820048/23/Filed: 11/30/10 Entered 11/19/10 Page 305 Page 7 of 22
08-61670-RBK11 Doc#0073 SEHed 02/22/10ent 1 EnteFiled 02/02/14 18:59ER Page 247 of 170

121

```
 1    opportunity to exonerate himself from any of those claims,

 2    the question this Court has to look at first is whether

 3    this is the correct forum and the correct proceeding to

 4    even move forward with this kind of an issue.

 5              And the fundamental questions come down to, one,

 6    a jurisdictional issue; and, two, and due process issue.

 7    Really, what's happening here is the movant is leading this

 8    Court into error.

 9              First, on the jurisdictional issue, this is

10    something that can be raised at any time.  This Court

11    itself, as a Court of limited jurisdiction, can look at it

12    at any time it wants to do it.  But it has to look at

13    whether it has jurisdiction over the person; in particular,

14    the three individuals here:  Mr. Deschenes, Ms. Blixseth,

15    and Mr. Russel.

16              And in this particular situation, none of them,

17    first, are parties to the action; second, other than having

18    the fortunate opportunity to have electronic filing, nobody

19    gave them notice that a motion was being made against them.

20              And so the question the Court has to look at is:

21    Can you enter an order against these individuals when,

22    basically, they're not here?

23              It's the basic reason why, in any civil

24    proceeding, you have the concept of service of process so

25    the person gets notice and the process begins.  That leads
```

```
 1   us right into the due process arguments, and it's as basic

 2   as it gets.  It's lack of notice and opportunity to be

 3   heard.  Again, you're not dealing with parties to this

 4   particular adversary proceeding -- (audio cuts out.)

 5            THE COURT:  Let's get the recording fixed so we

 6   have statements on the record.  We'll take a moment.

 7            THE CLERK:  Okay, it's back.  It's working

 8   correctly.

 9            THE COURT:  Okay.  How much of Mr. Sullivan's

10   argument did we miss?

11            THE CLERK:  No, just a few seconds.  An error

12   message came up, and that's when I interrupted.

13            THE COURT:  Okay, thank you.  You may proceed.

14            MR. SULLIVAN:  Thank you, Your Honor.  So what

15   you have here, then, is:  Even if we were talking in the

16   context of notice pleading, just the most basic form of

17   notice pleading, we don't have a clear statement in front

18   of us that we can respond to.  It's not being able to

19   address your accusers, not being able to have the

20   accusations - (inaudible) - criminal in nature, you'd be

21   talking about an arraignment.  We don't have that kind of

22   process here.

23            What you're doing is you're denying the

24   individual -- here, these three individuals the opportunity

25   to defend themselves.  They are not given that prior
```

 1   notice.

 2        They're supposedly, from what's been stated

 3   before -- at least three witnesses are going to take the

 4   stand testifying to different aspects.  But there has been

 5   no opportunity to do any discovery, no opportunity to even

 6   know who these people are or what claims are being made so

 7   you can discern what's going on.

 8        It's no different than in a proceeding when you

 9   talk about a Rule 26 disclosure of expert witnesses.  And

10   an expert witness cannot testify unless matters are fully

11   disclosed.  The rationale behind that is that it gives the

12   opposing side the opportunity to develop a proper defense

13   in the form of appropriate questions to be asking the

14   person.  Here, the parties that you're being asked to issue

15   sanctions against have not had any form of opportunity that

16   way.

17        The sole basis of this hearing is to enter those

18   sanctions, and so any testimony to that effect without the

19   proper opportunity and due process for these individuals is

20   asking this Court to directly deny them that due process.

21   The minute a witness takes that stand and starts

22   testifying, you've denied them due process.

23        So what should happen is these witnesses should

24   not be able to testify and this hearing should not go

25   forward.

ER001958

124

1          Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Sullivan.

3          Mr. Turner, do you have any statement in

4    opposition to the motion?

5          MR. TURNER:  Yes, I do, Your Honor - in fact, I

6    was moving toward the podium - if I could.

7          The trust is in a fairly unusual situation here,

8    Your Honor.  You know, spoliation is a serious issue, and

9    it's not an issue that this Court should take lightly, and

10   the trust doesn't want to make light of it.  But

11   respectfully, Your Honor, today, it's truly a waste of this

12   Court's time.  It's a waste of time for many of the reasons

13   Counsel said here.

14         The alleged spoliators are not here before you.

15   What the -- you know, what Counsel had indicated to you was

16   that they were seeking sanctions against three individuals.

17   It's true, they're not here.

18         But as I understand it, they're also seeking such

19   on extraordinary, extraordinary relief as to issue

20   sanctions against a party for alleged spoliation by a

21   nonparty.  Let's be clear on this:  The trust is not the

22   alleged spoliator.  The trust, in fact, has been

23   cooperative through this whole matter.  I think counsel for

24   Mr. Blixseth will agree.  We've produced documents on a

25   timely basis, we produced Mr. Kirschner for deposition on

1    very short notice.

2          The debtors that Mr. Kirschner has stepped into

3    the shoes of are not the alleged spoliator.

4          The alleged spoliator is a gentleman by the name

5    of Jory Russel.  And I've read all the pleadings and I've

6    read the documents that have been submitted by Mr. Flynn.

7    And the first thing I want the Court to understand is who

8    Jory Russel is not.  Jory Russel is not and was not an

9    employee of the debtors in any way, shape, or form.  He was

10   an employee of Edra Blixseth, he was an employee of

11   Blxware.  So whatever Jory Russel may or may not have

12   done - and I'm not here today to say what he did - that has

13   no effect on the trust.  And nothing that he could have

14   done or did do would be binding on the trust.

15         So this is just an inappropriate forum.  It does

16   not belong in AP 14.  Now, I anticipate what my worthy

17   opponent will say to that is, "Well, wait a second, though.

18   Mr. Russel did this at the direction of Edra Blixseth and

19   her counsel, Gary Deschenes."

20         Well, I've read the papers - and I guess, you

21   know, maybe the judge is going to hear some stuff on this

22   today - but there's two huge problems with that, Judge.

23   The first is:  There's absolutely zero evidence that Edra

24   Blixseth or Mr. Deschenes told Jory Russel to do anything.

25   Jory Russel said that, Edra Blixseth had said that, and I

1    would anticipate that Mr. Deschenes will say the same

2    thing.

3             But the bigger problem, just from a legal

4    standpoint, is whether Edra Blixseth did anything.  We've

5    got to remember the context in which this alleged

6    spoliation arose.  It didn't arise in AP 14; it arose in

7    the context of her personal bankruptcy, in the context of a

8    2004 exam that was taken in connection with her personal

9    bankruptcy.

10            So, Your Honor, to say and to argue that my

11   client, the liquidating trust, steps into the shoes of Edra

12   Blixseth in her personal bankruptcy I think would come as

13   quite a shock to Mr. Samson, the trustee in her Chapter 7

14   bankruptcy.  It's just -- it's nonsensical.  So what they

15   are asking you to do is to enter sanctions against the

16   trust, dismiss our case for the alleged spoliation of a

17   third party.

18            I also would like to point out, if I could,

19   Judge, the nature of the material that they claim has been

20   spoliated.  And I'm reading straight from their moving

21   papers.  They claim, they says -- they say:

22            As best Mr. Blixseth can determine from the files

23   that had been recovered by Mr. Blixseth's forensic computer

24   expert, hundreds of e-mails relate to at least two critical

25   areas directing -- directly impacting the defense of AP 14.

08-61570-RBK Doc#820-12/28/Filed: 10/307804 Entered: 11/3010 18:56:101 Page013 of 22
08-61570-RBK Doc#20073 SE Filed: 02/22/2014218 Page 153 of 231 170

127

1    One:  Communications between Edra Blixseth and

2    CrossHarbor Capital and Sam Byrne regarding their scheme

3    with Edra Blixseth to seize control of the assets of

4    Yellowstone Club through their $35 million, 40-day

5    "predatory loan" on Porcupine Creek knowing that Edra

6    Blixseth had no means to repay it.

7    Two:  Edra Blixseth's $40 million fraud involving

8    multiple banks and lenders to finance their scheme to

9    transfer over $700 million of Blixseth's marital community

10   assets to CrossHarbor and Byrne.

11   Your Honor, it's the conspiracy, the alleged

12   conspiracy that we've been hearing from Day 1.  And what

13   Mr. Blixseth claims is that there has been a conspiracy

14   between Credit Suisse, between Edra Blixseth, and between

15   CrossHarbor to steal Yellowstone from Mr. Blixseth, drive

16   it into the ground, and drive into bankruptcy.  According

17   to Mr. Blixseth, according to his pleadings, according to

18   his counsel, that is an intervening superseding cause.  So

19   it doesn't matter what Mr. Blixseth did; the fact that

20   these individuals then came in and truly caused the

21   bankruptcy is the nature of their defense.

22   Now, from a factual standpoint, I think the Court

23   is well aware of it.  And as the Court issued the order on

24   January 14th, Blixseth counters that:  Documents involving

25   the relationship between Edra and CrossHarbor are front and

```
1   center before this Court.

2         This Court, the Court disagrees.  Well, we

3   disagree as well, Your Honor.  The evidence just isn't

4   there.  Now, of course they're going to say, "Well the

5   evidence has been spoliated."

6         But let's be clear:  They are claiming that this

7   alleged conspiracy was an intervening cause that cut off

8   the causation for whatever Mr. Blixseth may or may not have

9   done.  And while that may work in a negligence cause of

10  action, as we've pointed out in our moving papers and as

11  you're going to hear next Tuesday, Judge, in more detail on

12  our motion -- on the motion to dismiss and the motion for

13  summary judgment, that kind of an analysis has no

14  application in connection with intentional torts.  And make

15  no mistake about it, that's what we have here.

16        If you look at the - (inaudible) - statement

17  which has been cited by the Court in its order, it talks in

18  terms of antecedent negligence.  And we've cited the Court

19  to some cases in, I believe, our response to the motion to

20  dismiss where the courts have said, "No, you're right.  In

21  the context of intentional torts, this whole notion of

22  intervening superseding cause has no application."

23        And while that may sound a little harsh, I kind

24  of think of it in this context, if you look at this fact

25  pattern:  Let's say an individual were to rob a bank, take
```

 1   away a bag of cash.  Two years later, he has a change of

 2   heart, throws that bag of cash back into his car, and is on

 3   his way back to the bank.  But on the way there, he gets

 4   shanghaied, he gets robbed.  Does that second robbery

 5   really -- does that really absolve him from liability on

 6   the first one?  No, it doesn't.

 7          And so, Your Honor, not only are they trying to

 8   sanction the trust for the actions of others, they're

 9   trying to sanction the trust for alleged spoliation of

10   irrelevant material.  And so I tend to agree, Judge, I

11   don't know why we're here in this action.

12          If they believe there's spoliation, there are

13   remedies available to them.  And if the trust proceeds

14   forward -- or if the Court proceeds forward and wants to

15   hear evidence, you're not going to hear a lot from me on

16   this issue because I'm not here to defend allegations of

17   spoliation; I'm only here to say the trust has nothing to

18   do with it and, therefore, it is simply inappropriate for

19   Court to enter any type of relief against the trust in

20   connection with these allegations.

21          Thank you, Your Honor.

22          THE COURT:  Thank you, Mr. Turner.

23          Mr. Flynn, I will -- since I allowed them to make

24   an opening comment, I will allow you to do that or your

25   counsel to do that as, well.

08-61570-RBK 1 Doc#2049-128 Filed: 11/30/18 04 Entered: 11/30/12 18:56:404 Page 16 of 22
08-61570-RBK 11 Doc#00730 SEFiled 02/02/10t EnterEd 02/02/14 18:5EPage 6691 170

130

```
 1              MR. FLYNN:  Thank you, Your Honor.  Mr. Banducci
 2      will address those points.
 3              MR. BANDUCCI:  Good afternoon, Your Honor.  My
 4      name is Tom Banducci.  I'm an attorney from Boise, Idaho.
 5      And this is my first opportunity to appear before you.
 6              THE COURT:  Welcome.
 7              MR. BANDUCCI:  Thank you very much, I think.  I
 8      had not planned to make argument on the legal issues.  I
 9      actually had intended to start this presentation with the
10      presentation of evidence through two forensic experts.
11      However, it occurs to me what has just been argued to this
12      Court are two basic premises.
13              The first, argued by Mr. Sullivan, is, "It's not
14      fair because somehow this Court does not have jurisdiction
15      over those who may have spoliated evidence."
16              The other argument that I heard from Mr. Turner
17      is, "It's not our problem because we didn't spoliate the
18      evidence."
19              I'd like to take those in turn, but before I do,
20      I think that we probably ought to take a step back and look
21      at what is being presented here.  The point of this hearing
22      is not -- the end game is not the imposition of sanctions.
23      We are not here for the purpose of imposing sanctions on
24      Mr. Deschenes or anyone else.
25              What has happened is that the playing field in
```

1    this dispute has been unleveled by spoliation.  Now, we

2    have to prove to you that there was spoliation in the sense

3    that important documents from the relevant time frame were

4    destroyed.

5            There is a presumption under the law, recognized

6    in the Ninth Circuit, that if there is evidence from the

7    appropriate time frame involving parties to the

8    litigation - here, Edra Blixseth - or involved in the

9    litigation, that there is a presumption of relevance.  The

10   simple reason for that, Your Honor, is because if evidence

11   is spoliated, the party against whom spoliation has

12   occurred, the party who has been disadvantaged by the

13   spoliation cannot prove the relevance of the spoliated

14   evidence because it's gone and, therefore, the presumption.

15           So this hearing is important for you.  You're

16   going to be hearing the evidence in AP 14.  Now, this Court

17   can do an awful lot of different things if it finds that

18   there was spoliation.  It can impose sanctions, it can

19   actually dismiss this case, as was the case in the -- and

20   I've forgotten the name of the case cited in the

21   briefing --

22           UNIDENTIFIED SPEAKER:  Leon.

23           MR. BANDUCCI:  -- the Leon case; or it can, of

24   course, treat the spoliation according to various rules of

25   evidence, including issue preclusion.  That is for this

ER001966

08-61570-RBK  Doc#820-8 Filed 10/30/18 Entered 11/30/12 13:58:46 Page 18 of 22
08-61570-RBK  Doc#0078 Filed 02/22/12 Entered 02/22/12 13:29 Page 18 of 170

132

```
1    Court to decide; that is not for the parties here to tell
2    you what you must do if you find there's spoliation.
3            The purpose, however, the overarching purpose of
4    this presentation is to show you that there was spoliation,
5    the playing field has been unleveled, and we are
6    disadvantaged by it.  And the Court has the responsibility
7    to do the right thing, to do the equitable thing to level
8    that playing field back.  And that's what the various
9    options are intended to allow.
10           Now, as far as Mr. Sullivan's argument that
11   there's a -- he made a jurisdictional argument and a due
12   process argument.  I'll address those briefly.  I don't
13   think that -- if indeed - and I'm not advancing any
14   argument that Mr. Deschenes spoliated evidence - but if he
15   did, he doesn't have to be a party in order for this Court
16   to do something about the spoliation.  Imposing sanctions
17   is one thing.  However, what is more important is that my
18   client should not be harmed by virtue of the alleged
19   spoliation, whether by Mr. Deschenes or someone else.
20           The same has to be considered in light of
21   Mr. Turner's statements.  Mr. Turner says, "We represent
22   the liquidating trust, we didn't spoliate, so this is a
23   waste of time."
24           That's easy for him to say if, indeed, this Court
25   does nothing with the fact of spoliation.  If this Court
```

```
 1    finds spoliation, then, indeed -- and does nothing, then
 2    what will happen is that the liquidating trust will be able
 3    to take advantage of that spoliation in its case against
 4    our client.
 5          So it matters less who committed the spoliation.
 6    What matters is whether there was spoliation of relevant
 7    information, which is presumed, and that the playing field
 8    has been unleveled.  And that is what the Court needs to
 9    fix here upon proof of spoliation.
10          And I think -- oh, one last point:  Intervening
11    cause.  What I heard was that there was a, that there was
12    an assumption of a finding of an intentional tort by our
13    client.  In other words, spoliation doesn't matter because
14    Mr. Blixseth committed an intentional tort.  I don't
15    believe there has been a decision there.
16          Moreover, what hasn't been addressed is competing
17    causation.  If, indeed, there are two intentional torts,
18    both of them resulting in harm alleged by the liquidating
19    trust, I think this Court has to take both of those into
20    consideration.  And so this is, in effect, a preview of
21    where the vulnerabilities are in the proof caused by
22    spoliation.
23          And I think that's all I have to say, Your Honor.
24    And with the Court's permission, I'll call the first
25    witness unless the Court has questions.
```

ER001968

134

```
1              MR. SULLIVAN:  Your Honor, may we respond?

2              THE COURT:  You may, Mr. Sullivan.

3              MR. SULLIVAN:  Your Honor, just briefly.  If I've

4     heard the argument correctly from the movant, they're

5     saying this is not a motion for sanctions.  They're saying

6     it's a motion to level the playing the field.  Then why in

7     their motion in their brief are they seeking sanctions?

8              The motion itself says it's a motion for

9     sanctions.  The page 18 of their motion:  Monetary

10    sanctions should be imposed.

11             It's directly contradictory to the argument

12    that's being made here.  If they want to bring something

13    that is called a "motion for sanctions" against people that

14    are not parties here - and actually the case that they

15    quote at page 18 talks about parties or counsel, neither of

16    which are here, no party nor counsel here among those three

17    individuals - then they're not being honest with this Court

18    and they're not telling this Court like it is.

19             We're talking about a due process argument.  If

20    they want to bring a claim against these individuals for

21    sanctions, let them do it, but let them do it correctly.

22    Let the people get the proper notice, let them have the

23    proper defense, and go forward that way.  If they want to

24    level the playing field, that's something to do in this

25    action between these parties with another form of motion,
```

ER001969

```
 1   but not sanctions against the supposed individuals that did

 2   something wrong.  And as such, there should not be any

 3   testimony today because this is a motion for sanctions.

 4            It's an improperly brought motion, and this Court

 5   should find that it's not going to listen to anything.  If

 6   they want to bring a proper motion, let them do it in the

 7   proper format.

 8            THE COURT:  Okay.  Since I gave Mr. Sullivan the

 9   opportunity, Mr. Turner, do you have anything further to

10   say on behalf of the trust?

11            MR. TURNER:  I would just reiterate what

12   Mr. Sullivan said.  I mean make no mistake about it, this

13   is a motion for sanctions.  All you've got to do is read

14   the pleading, read the first line of the pleading.

15            THE COURT:  Thank you.  Well, based upon the

16   arguments presented to me, both by Movant and by the

17   responding parties, I agree with the responding parties,

18   and the motion is denied.

19            We'll issue an opinion, an abbreviated opinion on

20   that.  It will be based upon the grounds set forth by the

21   responding parties.

22            MR. BANDUCCI:  Your Honor?

23            THE COURT:  The next matter --

24            MR. BANDUCCI:  Your Honor?  Your Honor?

25            THE COURT:  Yes.
```

08-61570-RBK1 Doc#8204-28 Filed 11/30/10 Entered 11/30/10 18:56:30 Page 22 of 22
08-61570-RBK11 Doc#0078 Filed 02/22/11 Entered 02/22/11 18:29 Page 162 of 170

136

```
 1              MR. BANDUCCI:  May I make an offer of proof, at

 2     least, as to what the expert witnesses would be testify to?

 3              THE COURT:  No.

 4              MR. BANDUCCI:  Thank you very much.

 5              THE COURT:  I will now take up the continuing --

 6     well, let me take about a five-minute break here, certainly

 7     for court staff and for people that have been involved in

 8     the most recent hearings.  Let's convene again at -

 9     actually, 10 minutes - 1:40.

10              We'll be in recess.

11              (A brief recess was taken.)

12              THE COURT:  Please be seated.

13              This is the continuation of the hearing on the

14     application of the creditors committee for fees and costs.

15     This is in Yellowstone Mountain Club, 08-61570.

16              Mr. Beckett is on the witness stand and within

17     his testimony and cross-examination by Mr. Mackey.

18              Mr. Mackey if you would like to proceed.

19              MR. MACKEY:  Thank you, Your Honor.

20                  CONTINUATION OF CROSS-EXAMINATION

21     BY MR. MACKEY:

22     Q.  I want to try to get a timeline here, Mr. Beckett.  You

23     would agree, would you not, that during your tenure and the

24     committee's tenure, the original committee, UCC's tenure, a

25     motion was filed for purpose of granting trade creditor
```

**EXHIBIT 3**

**Case No. 12-35986 ER  394**

ER001972

Joel E. Guthals, Attorney No. 589
Guthals, Hunnes & Reuss, P.C.
P.O. Box 1977
Billings, MT 59103-1977
Telephone: 406-245-3071
Facsimile: 406-245-3074
jeguthals@ghrtlawfirm.com

Benjamin A. Schwartzman
Thomas A. Banducci
Wade L. Woodard
*Admitted Pro Hac Vice*
Banducci Woodard Schwartzman PLLC
802 West Bannock, Suite 500
Boise, Idaho 83702
Telephone: 208-342-4411
Facsimile: 208-342-4455
bschwartzman@bwslawgroup.com
tbanducci@bwslawgroup.com
wwoodard@bwslawgroup.com

Michael J. Flynn
One Center Plaza, Suite 240
Boston, MA 02018
Telephone: 858-775-7624
Facsimile: 858-759-0711
mike@mjfesq.com

Attorneys for Defendant
Timothy L. Blixseth

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re:<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC, et al.,**<br><br>Debtors.<br>—————————————————<br>**Michael Snow, et al.,**<br><br>**Plaintiffs,**<br>vs.<br><br>**BLX Group, Inc., f/k/a/ Blixseth Group, Inc., et al.**<br>**Defendants.**<br>————————————————— | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | **Case No. 08-61570-11-RBK**<br><br>**Jointly Administered with 08-61571 and 08-61572, 08-61573**<br><br>**Chapter 11**<br><br><br>**Adv. Pro. No. 09-00018**<br><br>**Judge: Ralph B. Kirscher**<br><br>**SEPARATE STATEMENT OF UNDISPUTED FACTS** |

**Exhibit 3**

Pursuant to Local Rule 7056-1, Defendant Timothy Blixseth files this Statement of Undisputed Facts in Support of his Motion for Summary Judgment, which is filed concurrently herewith.  With respect to the citations to evidence below:

A.  All Exhibits cited below are attached to the Affidavit of Michael J. Flynn in Support of Defendant Timothy Blixseth's Motion for Summary Judgment ("Flynn Affidavit");

B.  The "Blixseth Affidavit" refers to the Affidavit of Timothy Blixseth in Support of Defendant Timothy Blixseth's Motion for Summary Judgment; and

C.  The Reference to the "Conant Affidavit" refers to the Affidavit of Christopher J. Conant.

D.  The reference to "Garikian Testimony" refers to the testimony of Attorney Ani Garikian in Adversary Proceeding 09-00014, pending in the matter of *In Re: Yellowstone Mountain Club, LLC, et al.*, Case No. 08-61570-11.

## UNDISPUTED FACTS

1.  On or around December 15, 2006, Edra Blixseth filed for divorce from Timothy Blixseth in the State of California, County of Riverside, in a case styled *In Re Marriage of Blixseth*, Case No. RIDIND91152.  Exhibit A-C.

2.  After a year-and-a-half of litigation in that divorce, on or around June 26, 2008, Edra Blixseth and Timothy Blixseth entered into a "Marital Settlement Agreement" ("MSA").  *See* Exhibit A, *generally* MSA.  Two amendments were made to this Marital Settlement Agreement: (1) an "Amendment to Marital Settlement Agreement dated June 26, 2008" (the "First Amendment"); and (2) a "Second Amendment to Marital Settlement Agreement," dated August 12, 2008 (the "Second Amendment").  *See* Exhibits B and C, respectively.

1

 ER001974

3. Among other things, the MSA provided:

    a. That Edra Blixseth was receiving all of Timothy Blixseth's interest in the stock and assets of Blixseth Group, Inc. ("BGI"), which was defined to include, among other things, all of BGI's controlling interest in the Yellowstone Club entities and Porcupine Creek. *See* the MSA at ¶ 16(A). Edra Blixseth was to take that interest "subject to all liabilities and obligations" of these entities. *Id.*; *See* the MSA at ¶ 16(C).

    b. That Edra Blixseth would provide to Tim Blixseth a release and waiver of all obligations and liabilities relating to BGI, and Yellowstone Mountain Club, LLC, among others. MSA at ¶¶ 16, 29 and 36.

    c. That the Blixseths waived any personal claim against the other relating to, *inter alia*, breach of fiduciary duty, failure to disclose income or assets, and failure to account for income, money, property or anything else. MSA at ¶ 36(A).

    d. That each entity received by one of the Blixseths pursuant to the MSA would also waive any claim against the transferring party relating to, *inter alia*, breach of fiduciary duty and "any similar type of potential liability based on failure to act properly on behalf of said entity." MSA at ¶ 36(B).

    e. That the parties would execute a release agreement in order to clearly evidence the releases and waivers in the MSA on behalf of the parties' respective entities. MSA at ¶ 36(C).

    f. That the waivers and releases would be provided by BGI and the Yellowstone Club entities, among others (through Edra Blixseth), and by Western Pacific Timber (through Timothy Blixseth). MSA at ¶ 36(D).

2

ER001975

g.   That the parties were represented by counsel, had an adequate amount of time to understand the ramifications of the MSA, and had seen all of the documents they felt were necessary in order to enter into the MSA.  MSA at ¶¶ 4(C) and 36(A).

h.   That the waivers in the MSA are material consideration for entering into the MSA. MSA at ¶ 36.

4.   Among other things, the First Amendment [Exhibit B] stated that:

a.   [Edra], as the sole shareholder of BGI, shall cause BGI in consideration for the assumption of liability by [Edra] and in recognition of her future management and control of BGI and the assets and entities over which it has the right of ownership and/or management, to release [Timothy] from any and all claims, obligations or liabilities associated with the BGI Indebtedness.  [See First Amendment, ¶ 16A(2)(j).]

And further that:

b.   . . . after The Closing there shall be no pending litigation by the Petitioner [Edra Blixseth], or any entity which she controls, against the Respondent [Timothy Blixseth] or any entity in which he has an ownership interest, . . .  The only possible litigation hereafter between the Petitioner and Respondent shall be that for enforcement of the terms and provisions of this Stipulation or the prior stipulations and orders or which relate to events or circumstances which occur subsequent to the date of The Closing that are not otherwise released by the terms and provisions of the Stipulation.  [Emphasis added.]  [See First Amendment, ¶ 5.]

5.   On or around July 3, 2008, and as a result of the execution of the MSA, the Hon. Sharon J. Waters of the Superior Court of the State of California for the County of Riverside, entered an "Order Approving Waivers and Releases" (the "Order").  See Exhibit D.  This Order was entered after an evidentiary hearing in which Edra was questioned item-by-item as to whether she knowingly and voluntarily agreed to the terms of the Order - and she did so confirm her agreement.  See Exhibit E, Garikian Testimony, 225:19 - 2227:25.  Among other things, the court found, and the Order concomitantly provided:

3

ER001976

a.  That the MSA was a result of competent negotiations between the parties. *See* the Order at, *e.g.*, ¶¶ 3-4, 6, 9, 10-12.

b.  That the Blixseths had ample opportunity to consult with their respective attorneys prior to execution of the MSA, and that, in fact, they did consult with their attorneys prior to the execution of the MSA. *See* the Order at, *e.g.*, ¶¶ 4-6, 9, 8-13.

c.  That either Blixseth might have obtained a different outcome in the divorce had the parties allowed the Court to render its own decision, but that, after having had the chance to perform discovery, they both considered the MSA to be a fair settlement. *See* the Order at, *e.g.*, ¶¶ 3-5, 9, 11-13.

d.  That the MSA was negotiated and compromised "in a manner satisfactory to" the parties and that "the overall division of assets is essentially a fair division of assets." *See* the Order at, *e.g.*, ¶¶ 3 and 4.

e.  That:

[E]xcept in connection with the representations and warranties contained in this Stipulation, each party shall cause (a) each entity which she/he receives as a result of this Stipulation, (b) or received as a result of the prior Stipulations and Orders, (c) or which she/he has the right to ownership of, or (d) is the majority stockholder of, or (e) manages, directs or controls, directly or indirectly, to waive, and on behalf of that entity does hereby waive, fully and absolutely, any claim, right or demand that entity has, or may have against the other party based on conduct from the beginning of time until the date this formal stipulation is signed by her/him relating to, or based on any fact, circumstance, event or document signed by the other including, but not limited to, (a) breach of fiduciary duty, (b) breach of corporate or business opportunities, (c) any similar type of potential liability based on failure to act properly on behalf of said entity or (d) any document signed by said party.

*See* the Order at ¶ 16 (emphasis in original).

f.  That:

[T]he Court finds and order that the waivers in this section of the Order relate to any conduct for which a claim of any nature could be based against a released

4

party, whether known or unknown as of the time of the signing of this Stipulation/MSA, which occurred prior to the signing of this Stipulation/MSA. *See* the Order at ¶¶ 17(F).

> g.   That the parties had represented to the Court that the facts they recited in the MSA were true, and that they had read and understood *California Evidence Code* § 622, which states that the "facts recited in a written instrument are conclusively presumed to be true as between the parties thereto." *See* the Order at ¶ 7.

> h.   That the parties agreed to waive their rights under *California Civil Code* § 1542, thus expressly waiving any defense that a claim was unknown to a party at the time of waiver. *See* the Order at ¶ 15(A).

6.   The closing date of the transfer of entities between the parties was August 12, 2008, and, as such, Edra formally took control of BGI and the Yellowstone Club entities, on August 12, 2008. *See* Exhibit C, Second Amendment, ¶ 1.

7.   The day after the closing date, and pursuant to ¶ 36 of the MSA and the Order entered by the divorce court, the Blixseths were required to and did on August 13, 2008, enter into a "Mutual Waiver and Release Agreement" (the "Release Agreement"), the contents of which were made part of the MSA. *See* Exhibit F, Release Agreement, at Recital C; and Exhibit A, MSA at ¶ 36.

8.   Among other things, the Release Agreement provided:

> a.   A general release by Edra Blixseth and her entities, including the Yellowstone Club entities, as to all claims against Timothy Blixseth including, but not limited to, claims for (a) breach of fiduciary duty, (b) breach of corporate or business opportunities, (c) any similar type of potential liability based on failure to act properly on behalf of said entity or (d) any document signed by Timothy. *See* the Release Agreement, at ¶ 4(b) and its Exhibit B.

5

ER001978

b.   The waivers and releases relate to any conduct for which a claim of any nature could be based against a released party or released entity, whether known or unknown as of the time of the signing of the Release Agreement, which occurred prior to the effective date of the Release Agreement.  *See* the Release Agreement, at ¶ 4(c).

c.   Each of the parties waived the provisions of California Civil Code Section 1542, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." *See* the Release Agreement, at ¶ 5.

d.   Each of the parties represents and warrants, among other things, that they have received and relied upon the legal advice of attorneys of their own choice, that the terms of the Release Agreement have been completely explained to them by their attorneys, and that those terms are fully understood and voluntarily accepted by them.  *See* the Release Agreement, at ¶ 6(e).

e.   That the Release Agreement shall be construed in accordance with and all disputes governed by the laws of the State of California.  *See* the Release Agreement, at ¶ 10(a).

f.   That the Release Agreement was being entered into pursuant to the requirement of Paragraph 36 of the MSA.  *See* the Release Agreement, at Recital C.

g.   The Yellowstone Club entities are among the releasing parties (through Edra) and is a signatory to the Release Agreement.  *See* the Release Agreement, at ¶ 3 and Exhibit B to the Release Agreement; signature at pp.11-12.

6

ER001979

9.  The divorce court rendered a final judgment on October 7, 2008. *See* Exhibit F. That document specifically incorporated the terms of the MSA. *See id.* at ¶¶ 8-11. Further, that final judgment was never appealed and remains in full force and effect. *See* Blixseth Affidavit, at ¶ 17.

10. Timothy Blixseth has performed, and continues to perform, all of the obligations required of him under the MSA and Release Agreement. *See* Blixseth Affidavit, at ¶ 18.

11. Edra attempted to restrain Timothy Blixseth's ability to market and sell the Yellowstone Club during the time of the divorce proceedings because Edra believed the price being offered for the property was too low. *See* Exhibit E, Garikian Testimony, 180:4 - 182:22. Edra further contended that she was very familiar with the Yellowstone Club's business and that she felt she could negotiate a sales transaction on better terms. *See* Exhibit E, Garikian Testimony, 184:7 - 186:11.

12. There was no "collusion, sandbagging, or irregularity" in the negotiation of the MSA or the Release Agreement. The MSA was only reached, and the releases executed, after extensive litigation in the divorce proceedings which was costly, contentious, and highly adversarial and acrimonious. Both parties were represented by and/or advised by numerous professionals in the divorce, including attorneys and tax and business advisors, and the patently arms-length negotiations resulted in both sides spending millions of dollars in legal and/or consulting fees. In fact, Timothy Blixseth's own cost of approximately $5 million in fees was a key component in his motivation to arrive at the settlement in the MSA. *See* Blixseth Affidavit, at ¶¶ 2 and 5.

13. Both parties engaged in extensive discovery in the divorce action, focusing largely on valuing the parties' marital assets. Timothy Blixseth provided to the attorneys for Edra Blixseth access to all documents concerning the marital assets and liabilities and he did not fail to disclose anything to them. Over 40,000 pages of documents were produced, and disclosures of assets and

7

**Case No. 12-35986 ER  402**

liabilities were exchanged. *See* Blixseth Affidavit, at ¶ 3; *See* Exhibit E, Garikian Testimony, 190:7 - 192:21.

14. In the negotiations leading up to the MSA, Timothy Blixseth offered to let Edra buy him out of his interest in the Yellowstone Club entities or he would buy her out - her choice. Timothy Blixseth never colluded with Edra regarding the MSA and, in fact, he would have been perfectly content to purchase her interest in the Yellowstone Club entities, rather than have Edra purchase his. However, it became clear that Edra wanted the Yellowstone Club entities as part of the split of marital assets because she believed that she could make hundreds of millions of dollars from those assets. *See* Blixseth Affidavit, at ¶¶ 4 and 10.

15. Timothy Blixseth did not intend to "hinder, delay, or defraud" any creditors of the entities transferred to Edra under the MSA. To the contrary, Edra represented that she had sufficient financing to properly operate the entities she obtained in the divorce and would satisfy the obligations of those entities. *See* Exhibit G, Affidavit of Edra Blixseth, ¶¶ 4 and 5. It was in reliance of these representations that Timothy Blixseth executed the MSA transferring to Edra the substantial properties/business entities. *See* Blixseth Affidavit, at ¶¶ 6, 7, 8 and 15.

16. The Yellowstone Club entities were themselves represented by counsel in the divorce proceedings and their attorney, Stephen Brown, was actively involved in the negotiation and finalizing of the MSA and Release Agreement. *See* Blixseth Affidavit, at ¶ 16. Further, Attorney Garikian testified that to the best of her knowledge Attorney Stephen Brown prepared the waivers and releases and that Mr. Brown handled that aspect of the closing. *See* Exhibit E, Garikian Testimony, 222:25 - 223:22.

17. Attorney Brown admitted in the AP 14 trial that he represented both the Yellowstone Club and Timothy Blixseth in the MSA transactions as they involved the following: the Yellowstone

8

**Case No. 12-35986 ER 403**

ER001981

Club; the LeMond parties; the CrossHarbor negotiations to provide a $35 Million loan to Edra Blixseth to consummate the MSA and obtain ownership and control over the Yellowstone Club; Edra Blixseth; the waivers and releases in the MSA; and related matters; and that he prepared the Assumption Agreement and the notes involved in Edra Blixseth's assumption of the approximately $181 Million note owed to BGI by Edra Blixseth. Exhibit QQQQ; Exhibit RRRR, pp. 1510:3-8; 1511:24-1514:21; 1554:1-1568:21. .

18. The Assumption Agreement and notes prepared by Attorney Brown on behalf of the Yellowstone Club replaced Timothy Blixseth's obligations to BGI, which, in turn, constituted the collateral and security for the BGI note to the Yellowstone Club in the amount of approximately $209 Million dollars. Approximately $40 Million in interest had been paid by BGI on its note to the Yellowstone Club between September 30, 2005 – the date of the Credit Suisse loan and accompanying loan to BGI in the amount of $209 Million – and June 26, 2008 – the date of the MSA. Approximately $28 Million in principal had been paid down on the Timothy Blixseth $209 Million note to BGI, leaving approximately $181 Million due as of June 26, 2008, which note was replaced by the $181 Million note from Edra Blixseth to BGI pursuant to the Assumption Agreement prepared by Attorney Stephen Brown. Exhibit QQQQ; Blixseth Affidavit at ¶ 2.

19. Timothy Blixseth and the Yellowstone Club relied on the advice of Stephen Brown to execute the MSA, agree to the Assumption Agreement transaction replacing his and the BGI notes; and both he and Stephen Brown relied on BGI's ownership of Porcupine Creek, valued at over $200 Million in June, 2008, to back the payment of BGI's note to the Yellowstone Club. Edra Blixseth received both BGI and Porcupine Creek in the MSA transaction by which Edra Blixseth obtained ownership of the Yellowstone Club based on CrossHarbor's $35 Million loan to her. Blixseth Affidavit at ¶ 3.

9

20. Attorney Brown had previously represented the Yellowstone Club in the Credit Suisse loan and provided a written opinion letter that the loan complied with "all laws" in the state of Montana. Exhibit SSSS, at p. 2, Section 5.

21. Individually, as the owner of BGI, and in his capacity as an officer and director of BGI and the Yellowstone Club through BGI, Timothy Blixseth relied on the advice of Stephen Brown to consummate the Credit Suisse loan; and to loan $209 Million to BGI. Blixseth Affidavit at ¶ 4.

22. In order to resolve his divorce proceedings with Edra Blixseth, and for the purpose of resolving all matters involving the Yellowstone Club - its ownership, and the interests of the minority "B" shareholders, and for the purpose of resolving all litigation matters adversely impacting the Yellowstone Club, and for the purpose of providing a peaceful, amicable environment for the Yellowstone Club to flourish, Timothy Blixseth relied on the advice and counsel of Stephen Brown, and executed the MSA and the attendant waivers and releases, releasing him from all obligations to the Yellowstone Club, the minority "B" shareholders, and to all related parties. Blixseth Affidavit at ¶ 5.

23. At the time of the execution of the MSA on June 26, 2008, and continuing until August 12-13, 2008 when it was consummated, Timothy Blixseth acted in good faith reliance on his attorneys, in good faith reliance on Edra Blixseth. Blixseth Affidavit at ¶ 6.

24. Cross Harbor Capital partners, and its principal, Samuel T. Byrne, in collusion with Edra Blixseth acted in bad faith in connection with the MSA and their agreements to obtain ownership and control over the Yellowstone Club from at least September, 2007 until the present. Blixseth Affidavit at ¶ 7.

25. CrossHarbor Capital Partners LLC through its subsidiaries and affiliates (collectively "**CrossHarbor**") signed a Letter of Intent ("**LOI**") on June 28, 2007 with Timothy L. Blixseth as

Case No. 12-35986 ER 405

ER001983

President of BGI and manager of the Yellowstone Club entities, to buy the Yellowstone Club for $510,000,000. See Exhibit I.

26. The Yellowstone Club is an exclusive 13,000 plus acre master-planned residential and recreational community/retreat for high net worth members only. Exhibit J, p. 5, Memorandum of Decision re Sale of Family Compound.

27. On August 9, 2007, Edra D. Blixseth filed an *ex parte* application in the Riverside County, California Superior Court, Case No. RIDIND91152, to enjoin Mr. Blixseth and Blixseth Group, Inc. from selling the Yellowstone Club. Exhibit K, August 9, 2008 Ex Parte Application.

28. Edra D. Blixseth has acknowledged that contemporaneously with Mr. Blixseth entering into the LOI with CrossHarbor, she was independently attempting to negotiate a sale of the Yellowstone Club to third parties. Exhibit L, March 21, 2008 Divorce Proceeding Transcript at p. 80:2-4; Exhibit M, August 14, 2007 Divorce Proceeding Transcript at 28:2-5.

29. On August 14, 2007, the Riverside County Superior Court specifically told Ms. Blixseth that she could not attempt to independently sell the Yellowstone Club to a third party, that only Mr. Blixseth had authority to market the Yellowstone Club to third parties. Exhibit M, p. 28:2-7.

30. On August 14, 2007, the Riverside County Superior Court specifically ordered Ms. Blixseth to not communicate with any third party, any information she learned from Mr. Blixseth regarding the sale of the Yellowstone Club to CrossHarbor. Exhibit M, at pp. 40-41.

31. On November 21, 2007, the Riverside County Superior Court denied Edra D. Blixseth's *ex parte* application referenced above. Exhibit N, Order on Ex Parte Application.

32. Following execution of the LOI, CrossHarbor and its principals, including Samuel T. Byrne (hereinafter "**Byrne**") underwent an extensive multimillion-dollar due diligence of the Club wherein it obtained the Club's proprietary and financial information. Blixseth Affidavit, at ¶ 8.

11

33. Following this due diligence, CrossHarbor executed a $455,690,000 Asset Purchase

Agreement (the "**APA**") on January 15, 2008. See Exhibit O, APA.

34. Between late January and March 21, 2008, Edra D. Blixseth contacted Byrne and

informed him that she was in possession of purported target letters from a federal grand jury

which indicated that Timothy L. Blixseth was being investigated for violating federal criminal

laws. Ms. Blixseth communicated the content of these purported grand jury target letters to

Byrne. Exhibit L at pp. 70:23-71:26, 73:12-74:17; Exhibit P, Deposition Transcript of Edra D.

Blixseth, December 17, 2009 at pp. 59:6-61:21; Exhibit Q, Byrne April 2, 2008 Email; Blixseth

Affidavit at ¶ 9 .

35. These grand jury target letters were complete fabrications. Blixseth Affidavit at ¶ 10.

36. As a result of Ms. Blixseth communicating the content of these fabricated grand jury target

letters to Byrne, the sale of the Yellowstone Club under the APA was jeopardized and the

purported Cross Harbor investors became "nervous." Exhibit L at pp. 70:23-71:26, 73:12-74:17.

37. Edra D. Blixseth communicated the content of these fabricated target letters to Byrne to

interfere with the sale of the Yellowstone Club under the APA, and Byrne claimed that it would

hurt the deal. Blixseth Affidavit at ¶ 11.

38. On March 21, 2008, Ms. Blixseth falsely testified before the Riverside County Superior

Court, State of California, that she did not discuss any grand jury target letters with Byrne, that she

had done nothing to interfere with the sale and that she was not attempting to create "competing

bids" for the Yellowstone Club. In fact, all such sworn statements were false and her agent, Gary

Peters, whom she described as "my guy" was on that very day negotiating with Byrne for the

Yellowstone Club on her in Byrne's office. Exhibit L at pp. 75:4-77:20; Exhibit Q; Exhibit P, at

pp. 59:6-61:21; Exhibit R; Exhibit S.

12

ER001985

39. On March 21, 2008, Ms. Blixseth was ordered by the Riverside County Superior Court to not communicate at all with Byrne. Exhibit L at p. 84:1-16.

40. Ms. Blixseth violated this California court order as she did communicate with Byrne on April 1, 2008 regarding the sale of the Yellowstone Club and her discussions with Byrne about the grand jury target letters. Exhibit Q.

41. On March 26, 2008, Cross Harbor terminated the APA. Exhibit T.

42. Just one week prior to terminating the APA, CrossHarbor through Byrne had proposed to Mr. Blixseth a pre-packaged bankruptcy for the Club. Exhibit U, March 25, 2008 Byrne Email re Pre-Packaged Bankruptcy; Blixseth Affidavit at ¶ 12. This proposal was made in bad faith for the purpose of terminating the APA, for the purpose of obtaining the Yellowstone Club for substantially less than its fair market value, and because CrossHarbor did not have the funds to consummate the sale. This proposal first made in March, 2008 , together with subsequent bad acts in collusion with Edra Blixseth, evidences Mr. Byrne's state of mind to acquire the Yellowstone Club through bankruptcy in a bad faith scheme to defraud the Yellowstone Club creditors and Edra Blixseth's creditors. Blixseth Affidavit at ¶ 12.

43. Byrne had expressly proposed this pre-packaged bankruptcy in an email for the purpose of eliminating certain of the Club's liabilities and for other purposes, including, the following (Exhibit U, Blixseth Affidavit at ¶ 14):

    a.  To get "leverage with Lemond and the Bs" (Exhibit U);

    b.  To "solve some tax issues with the with the deposits" (Exhibit U);

    c.  To "eliminate any Edra issues" (Exhibit U);

    d.  To reduce the debt that the Yellowstone Club owed to Credit Suisse. Blixseth Affidavit 14; Exhibit J, p. 5, n.2.

13

ER001986

44. Timothy L. Blixseth as President of BGI and manager of the Yellowstone Club entities rejected Byrne's bankruptcy proposal. Exhibit TTTT;.Blixseth Affidavit at ¶ 15.

45. Prior to terminating the APA, Byrne had been in discussions with the bondholders of the Credit Suisse loan and with Credit Suisse for the purpose of negotiating new terms for the loan in order to purchase the Yellowstone Club at a cheaper price than he had agreed upon in the APA. Exhibit U.

46. Following the termination of the APA on March 26, 2008, Edra D. Blixseth undertook a plan to gain control of the Yellowstone Club by blaming Timothy L. Blixseth for the termination and driving down the value of the Yellowstone Club, and leveraging Mr. Byrne; and thereafter acting in collusion with Mr. Byrne to acquire the Yellowstone Club in the MSA, and to put it into bankruptcy :

    a.  On March 26, 2008, Edra D. Blixseth sent an email to her associates, Gary Peters and James Fultz regarding Byrne's impending termination of the APA, stating, "PLEASE never tell them that I am sending you all of this. I do for positive reasons, as I think we are going to have to move fast here. When Sam does not close tonight, we have to be in a good position for this to come off right with members." Exhibit V.

    b.  On March 26, 2008, Edra D. Blixseth sent an email to her associate Gary Peters wherein Edra conspires with Mr. Peters to put pressure on Byrne relative to the sale of the Club and states: "we should use this to our advantage as I could trap Sam [Byrne] in a few lies about bankrupting the deal. ¶ I think we've got him on that . . . . . if you read the two notes where Tim asked him exactly what his idea about that

14

is, Sam [Byrne] does not answer like he should have 'I never said that or suggested that.' Instead he says, 'Not just that but . . . . .' Dumb shit." Exhibit W.

c. On March 27, 2008, Ms. Blixseth sent an email to her attorneys stating: "All – I think this goes more in Montana court then [sic] family court. ¶ I file (again, but this time in Montana) based on Tim's actions of the last year and of recent, that I take over as Manager of BGI and the YC's. That Tim, based on the e-mail that he sent to Sam and the one to me tonight, was threatening and colluding to put YC in BK. That he had driven down the asset to the point that we were going to get almost nothing out of it. That I came up with what Sam was trying to do and stopped it. That I have the money, through valid investors to come in and take care of paying the Lemonds, the B shares (if they want to), get payables current, have an operator and money to move YC forward . . . We hit him [Tim] from all sides . . ." Exhibit X.

d. On April 4, 2008, Edra D. Blixseth in her capacity as manager of Blixseth Family Investments LLC (a Montana limited liability company) attempted to gain control of the Yellowstone Club or interfere with its sale by filing an Emergency Motion to Intervene and an Emergency Motion for a Temporary Restraining Order in the Montana Fifth Judicial District Court, Case No DV-29-06-26, seeking to have Timothy L. Blixseth removed from managing the Yellowstone Club and have her appointed as the Chief Operating Officer of the Yellowstone Club (hereinafter "Lemond Intervention"). Exhibits Y, Z.

e. Edra D. Blixseth's actions in the Lemond Intervention violated the orders from the Riverside County Superior Court that she not interfere with Timothy L. Blixseth's

15

**Case No. 12-35986 ER  410**

ER001988

management of the Yellowstone Club, she learned from Timothy L. Blixseth about the sale of the Yellowstone Club to third parties. Exhibit Y. Z; Exhibit P at p. 138:18-21; Exhibit M at pp. 26:8-27:10, 28:6-7.

f.   In the Lemond Intervention, Edra D. Blixseth represented to the Court that the Yellowstone Club suffered from a "severe liquidity crisis." Exhibit Z, ¶ 9.

g.   Edra D. Blixseth's actions in the Lemond Intervention caused a "tremendous amount of value degradation" of at least $50 million to the Yellowstone Club. Exhibit UUUU, at p. 61:16-24; Blixseth affidavit at ¶ 16

h.   Shortly after the execution of the MSA on June 26, 2008, Edra D. Blixseth began communicating directly with Byrne to create a detailed "plan to move the club forward" through a "global deal" that would "involve further investment by CrossHarbor towards stabilizing the clu[b], and a consolidation of the real estate development into one enterprise in order to control product quality and delivery schedules." Exhibit AA.

47. In approximately April of 2008, while Mr. Blixseth owned the Family Compound, CrossHarbor and Byrne secured preliminary plat approval from the Madison County Board of Commissioners for 41 development units at the Family Compound. Exhibit J, pp. 7-8.

48. The Family Compound is a 160+ acre relatively flat and developable piece of real property situated in one of the more desirable locations within the Club. Exhibit J, pp. 7-8.

49. Prior to the execution of the MSA, the development rights to the Family Compound were owned by the Yellowstone Club entities. Blixseth Affidavit at ¶ 17.

16

--

ER001989

50. CrossHarbor's and Byrne's efforts in obtaining final plat approval of these 41 development units were made in conjunction with CrossHarbor's efforts to purchase the Family Compound from Mr. Blixseth for $56 million in as late as June of 2008. Exhibit J, pp. 7-8.

51. A $56 million Purchase and Sale Agreement between Mr. Blixseth and CrossHarbor was recorded against the Family Compound on or about August 28, 2007. Exhibit J, pp. 8.

52. The Family Compound is referred to in the documents associated with the $35M Loan as the "Settlement Property." Exhibit BB, p. 3, Section 3.

53. The $56 million Purchase and Sale Agreement for the Family Compound between Mr. Blixseth and CrossHarbor is referred to as the $35M Loan documents as the "Settlement P&S." Exhibit BB, p. 3, Section 3.

54. Beginning in at least July of 2008, Edra D. Blixseth began discussions with Byrne and CrossHarbor for CrossHarbor to obtain control over the Yellowstone Club and also financing Edra D. Blixseth's marriage settlement arrangement with Timothy L. Blixseth. Exhibit CC; Exhibit AA.

55. On or about July 21, 2008, Edra D. Blixseth attempted to obtain a $20 million loan from PEM Group but such financing was subject to approval from CrossHarbor. Exhibit EE.

56. On August 1, 2008, in bad faith faith, and as an inducement to enter into an agreement for the purpose of acquiring the Yellowstone Club in bankruptcy, CrossHarbor emailed to Edra Blixseth a "Discussion Memo" in which it made the following material representations and admissions: (Exhibit FF, GG)

    a.  CrossHarbor would provide Edra Blixseth and BGI a $35 Million loan payable in 60 days secured by Porcupine Creek and the Family Compound, and "implement a financial plan to stabilize the Yellowstone Club" based upon its previous receipt of

17

ER001990

"All divorce related documents. Detailed, updated financial statements for EB. All underwriting materials provided to PEM, Archer, and other potential sources of capital. Detailed, updated financial statements for the YC...."

b. CrossHarbor "will control distributions of YC working capital."

c. Edra Blixseth will secure "additional financing from Archer Capital Management ($55.1 MM, net)"

d. Edra Blixseth's additional investment "directly into YC totals $14.6 MM ... [to] cover current accounts payable and operations through 10 / 31/ 2008."

e. CrossHarbor would provide "$100 MM of Preferred Equity to invest into the Club" based on a "joint venture" in which CrossHarbor would serve as "agent / fiduciary party / managing member."

f. CrossHarbor represented that "Early stage analysis indicates future net cash flow to EB of $600+ MM."

g. CrossHarbor attached a "Summary of Proposed Ventures" to the Discussion Memo in which it represented and supported Edra's receipt of $600 MM "net cash flow" based on a "model" it created from its due diligence in connection with the APA.

h. The "Discussion Memo" and its representations and "Summary" constituted the basis for an "Agreement to Form" as herein recited.

57. At the time CrossHarbor emailed the "Discussion Memo" on August 1, 2008, it had possession, as recited therein, of "All divorce settlement related documents"; and financial statements of Edra Blixseth which it requested to be "updated." Edra Blixseth's previous, most recent financial statement was dated July 15, 2008, attached hereto as Exhibit HH, which CrossHarbor knew was grossly inflated as to her net worth, and fraudulently stated her liabilities

18

ER001991

and her ability to pay them. Thus, CrossHarbor knew all of Edra Blixseth's liabilities totaling approximately $50 Million in bank loans – all of which were in default; and it knew from the MSA that she was obligated to pay Timothy Blixseth approximately $24 Million as part of the distribution of marital assets; and that she was obligated to pay BGI approximately $181 Million on the note Assumption Agreement. Exhibit Based on an email written by Mr. Byrne on August 4, 2008, CrossHarbor knew that Ms. Blixseth was NOT "institutionally financeable" (Exhibit II). In an email dated July, 30, 2008 Edra Blixseth's financial advisor informed Mr. Byrne (Exhibit JJ):

    a.  The Western Capital Partners $13 Million loan required a $3 M payment to release certain liens and had been re-written in June based on six months of previous defaults;

    b.  the Porcupine Creek property taxes had not been paid and were past due;

    c.  The IRS taxes had not been paid, were past due and the IRS had placed a $2M lien on Porcupine Creek;

    d.  Ms. Blixseth's near term obligations were past due in the millions of dollars;

    e.  her MSA obligations totaled about $28 M, NOT including the $181 M note to BGI.

58. On August 2, 2008, Byrne met with Edra D. Blixseth, the Governor of Montana, the Governor's wife, Chris Wright, and individuals named Franklin Hall, Casey and John for a dinner at the Yellowstone Club. Exhibit KK.

59. On August 13, 2008, CrossHarbor entered into a $35 million loan transaction (hereinafter "**$35M Loan**") with Edra D. Blixseth and Blixseth Group, Inc., and various entities of Blixseth Group, Inc. Exhibit LL, MM, NN, OO, PP, QQ, BB, SS.

60. The $35M Loan was evidenced by two different promissory notes. Exhibit LL, MM.

19

ER001992

61. The first promissory note was in the face amount of $13 million and payable by the Debtor and Blixseth Group, Inc. to CIP Yellowstone Lending LLC, a Delaware limited liability company. Exhibit LL.

62. The second promissory note was in the face amount of $22 million and payable by the Debtor and Blixseth Group, Inc. to CIP Yellowstone Lending, LLC, a Delaware limited liability company. Exhibit MM.

63. Both Note 1 and Note 2 were to mature and in fact did mature on September 30, 2008. Exhibit LL MM.

64. Notes 1 and 2 were secured by the following security instruments on the below described assets which were owned at the time by either Edra D. Blixseth or Blixseth Group, Inc:

     a.  A first position deed of trust against Porcupine Creek (Exhibit OO);

     b.  A first position mortgage against the Family Compound (Exhibit NN);

     c.  A 3rd position mortgage against the Family Compound (Exhibit QQ); and

     d.  A first position deed of trust against Blixseth Group, Inc.'s Gardess Road properties (Exhibit OO).

65. In June of 2007, Porcupine Creek was appraised at $207,590,000. Exhibit TT.

66. Porcupine Creek is an estate that contains a 18,340 square foot primary residence, four 600 sq. ft. casitas, four 1,860 sq. ft. guest "cottages", a golf Pro Shop, and a 19 hole golf course which has been ranked by Golf Digest as one of the 12 nicest golf courses in California. Blixseth Affidavit at ¶ 18.

67. Edra D. Blixseth used Porcupine Creek as her primary residence from 2005 to early 2010. Blixseth Affidavit at ¶ 19.

20

--

ER001993

68. Prior to entering into the $35M Loan, CrossHarbor entered into a contract to purchase the Family Compound from Timothy L. Blixseth for $56 million. Exhibit UU.

69. As a component of the $35M Loan, CrossHarbor and Byrne required the borrowers thereunder to execute an Agreement to Form, which is incorporated by reference herein. Exhibit BB, Recital C.

70. The Agreement to Form provides in relevant part:

    a. "The parties acknowledge and agree that to complete the infrastructure and other capital needs of the Yellowstone Mountain Club and to pay for the operations of the Yellowstone Mountain Club, the EB Parties and YC Parties require additional capital of approximately One Hundred Million Dollars ($100,000,000) (the "Equity Funds")." Exhibit BB., Section 2;

    b. "Promptly after the execution of this Agreement, CH Acquisition shall commence the raising of Equity Funds . . ." Exhibit BB., Section 2.

    c. "The parties acknowledge and agree that notwithstanding that definitive documentation remains to be concluded to memorialize the joint venture contemplated by Schedule A hereto, the essential terms of such joint venture contemplated by Schedule A hereto and the parties agree to act expeditiously in good faith and in a reasonable manner in agreeing to the Equity JV Documentation." Exhibit RR Section 2.

    d. Schedule A to the Agreement to Form provides:

>     ➢ CH Acquisition seeks to raise approximately $100 MM of Preferrred Equity to invest into the club (all YC-affiliated entities).
>       – Joint Venture between new investors/club members and CH Acquisition.
>         • CH Acquisition serves as agent/fiduciary party/managing member.
>         • EB may propose parties to whom materials for the equity raise will be presented as potential members of the equity group subject to approval of CH Acquisition
>         • CH Acquisition agrees to not seek to raise the preferred equity from TB or any entity controlled directly or indirectly by TB

21

    – 10% Preferred Return (compounding monthly) and 20% Equity Participation in YC Parties.

    – Initial closing targeted for 11/30/2008 (CH Acquisition may raise the capital in several rounds).

➢   Yellowstone Mountain Club Executive Committee to be formed between EB, investor representative (from Preferred Equity investors) and CH Acquisition.

    – CH Acquisition and EB agree to mutually decide on member/investor representative.

       • Chris Wright shall be the initial member representative.

    – CH Acquisition and EB understand that in the event the Preferred Equity is raised outside the member group, a mutually approved representative from the Preferred Equity Capital Source or other Institutional Investor will be the third member of the Executive Committee.

➢   Executive Committee will govern the sales, operations and management of the Yellowstone Mountain Club, including:

    – Formation of business plan.

    – Club operating decisions (including potential hiring of 3rd-party management company).

    – Club marketing decisions (including potential hiring of outside sales agent).

    – Approval of final Master Plan outlining development plan for remaining density units.

    – Implementation of Capital Plan (including prioritizing common area improvements).

    – All material financing decisions of YC entities (including repayment/refinancing of CSFB Debt).

➢   Joe Harris will provide initial strategic oversight and control of operating cash flow.

    – Named interim COO, reporting to EB and Executive Committee.

    – YC can leverage off all CH Acquisition work to date.

➢   CH Acquisition receives 5% interest in YC Parties (pari-passu w/EB) as consideration for effort.

➢   References in this Schedule A to CH Acquisition shall mean CH Acquisition and/or affiliate thereof

71. CrossHarbor never undertook to raise the Equity Funds as promised in the Agreement to Form. Exhibit UU, at p. 49:6-9; Exhibit VV, at p. 209:22-210:24.

72. As a result of the Agreement to Form, CrossHarbor gained control over distributions of working capital for the Yellowstone Club. Exhibit BB, Schedule A; Exhibit FF.

--

ER001995

73. As a result of the Agreement to Form, CrossHarbor took over operating control of the Yellowstone Club. Exhibit BB; Exhibit WW.

    a.  On August 7, 2008, Byrne wrote an email to his colleagues, including Chris Wright, regarding the Agreement to Form and funding a loan for Edra D. Blixseth to close on the MSA, wherein Byrne stated "Assuming he [Mr. Blixseth] does close [the MSA], Joe Harris will be named interim COO of the YC, with all people reporting to him and him to Edra (subject to significant operating controls). Exhibit WW.

    b.  Joe Harris is an individual hired by CrossHarbor in September of 2007 to perform due diligence for CrossHarbor relative to its purchase of the Yellowstone Club. Exhibit UU at pp. 13-16.

    c.  The Agreement to Form appoints Joe Harris, an agent of CrossHarbor, as the interim Chief Operating Officer for the Yellowstone Club. Exhibit BB, Schedule A.

    d.  The Agreement to Form gives Joe Harris, an agent of CrossHarbor, the power to provide "initial strategic oversight and control of operating cash flow" over the Yellowstone Club. Exhibit BB, Schedule A.

    e.  The Agreement to Form created an executive committee for the Yellowstone Club which had control over the "sales, operation and management of the Yellowstone Mountain Club". Exhibit BB, Schedule A.

    f.  The executive committee consisted of three members, Edra D. Blixseth, CrossHarbor and a "member representative" known as Chris Wright. Exhibit BB, Schedule A.

23

ER001996

74. It was CrossHarbor's bad faith intention in entering into the $35M Loan and Agreement to Form to gain control over the Yellowstone Club for its development purposes through the MSA and to leverage and/or defraud Yellowstone Club and Edra Blixseth creditors, including numerous banks and lenders that Edra Blixseth had defrauded.

    a.  August 3, 2008, Joe Harris, and agent of CrossHarbor stated in an email: "Edra-¶ After lengthy discussions with Jim, we agreed that it would make sense for us to come to LA tomorrow to try to negotiate face-to-face a mutually acceptable deal regarding the YC. As we discussed, the hub of the issue is the level of specificity and commitment regarding the comprehensive development and management plan for the YC made by the parties at this stage versus a later stage. Using our Power Point presentation and financial model as a guide, it would be good to walk through the proposal in person and more fully explore each aspect with you and the London Group so we are sure there is thorough understanding on both sides that will ultimately lead to an agreement." Exhibit XX.

    b.  On August 7, 2008, Byrne wrote an email to his colleagues regarding the $35M Loan and Agreement to Form stating: "At 315 am LA time Edra and I executed loan documents and a binding Agreement to Form. The former allows her to close with Tim and the latter details a new long-term capital and development plan for the YC that will be documented and capitalized between now and November 30. This was a very difficult negotiation, largely due to undisclosed liabilities that have come to our attention and Edra?s [sic] highly levered financial situation." Exhibit WW.

24

c. On August 4, 2008, Byrne wrote an email to his colleague Chris Wright regarding his negotiations with Edra that led to the Agreement to Form and $35M Loan stating, "On my way to Los Angeles to meet face to face [with Edra D. Blixseth]. Chris, please understand that we are doing everything we can possibly do. Edra is way out over her skis on all fronts and it isn't going to be easy. I expect we will get there to fund a Tim closing, but she has a TON of things to fix and no capital. I don't believe she is institutionally financeable. It is important that she understands that we are offering a lifeline and expertise. I will try and impress that on her." [emphasis added]. Exhibit II.

d. In response to this August 4, 2008 email from Byrne, Chris Wright responded: "I sent her an email last night about why you need and must have control and why it was not a bad thing for her." Exhibit II.

e. On August 13, 2008, Byrne wrote an email to Joe Harris, his agent, referring to Edra D. Blixseth wherein Byrne told Joe Harris, "Don't let her out of your sight!." In response, Joe Harris stated "She is blowing me off completely on the announcement- don't know if it's because she doesn't want to acknowledge our control/involvement or if she is just too tired to deal- anyway, I have the senior crew on the deck- great conversation- they are totally pumped- looking forward to a great future but somewhat puzzled about the edra-CH relationship . . . . . as am I- not really off to a great start but Chris Wright is coming over so hopefully we can compel her to get the announcement out first thing tomorrow." In response Byrne wrote "She will come around – she has to." Exhibit YY.

25

 ER001998

75. The transaction involving the Agreement to Form and the $35M Loan contemplated CrossHarbor negotiating with Credit Suisse to restructure the existing debt owed to it from the Yellowstone Club.

    a. The Agreement to Form provides in relevant part: "The parties acknowledge and agree that it is likely that consent of the CS Lenders will be required to consummate the transactions contemplated by the Equity JV Documentation, the Phase I JV Documentation, and Section 6 hereof so as not to violate the CS Loan Agreement. All parties agree to cooperate and seek such consents as more fully provided in Section 7(a) hereof." Exhibit BB, Section 4(b).

    b. The Agreement to Form provides in relevant part: "Unless otherwise agreed by the parties, any and all discussions and negotiations with the CS Lenders with respect to the CS Loan Agreement and related loan documents . . . shall be conducted jointly with representatives of the EB Parties and CH Acquisition and there shall be no amendments thereof without the prior written consent of CH Acquisition." Exhibit BB, Section 7(a).

    c. The Agreement to Form called for the creation of the "Yellowstone Mountain Club Executive Committee to be formed between EB, investor representative [Chris Wright]. And CH Acquisition." Exhibit BB, Schedule A. The Yellowstone Club Executive Committee was to "govern the sales, operations and management of the Yellowstone Mountain Club, including: . . .All material financing decisions of YC entities (including repayment/refinancing of CSFB Debt)." *Id.*

26

    d.  The August 1, 2008 "Discussions between Edra/YC Entities and CrossHarbor

        Capital Partners" PowerPoint presentation created by CrossHarbor in connection

        with the $35M Loan and Agreement to Form states:

➢ **Yellowstone Club Executive Committee to be formed between EB, investor representative (from Preferred Equity investors) and CH. Executive Committee will govern the operations and management of the Yellowstone Club, including:**
    – Formation of business plan.
    – Club operating decisions (including potential hiring of 3rd-party management company).
    – Club marketing decisions (including potential hiring of outside sales agent).
    – Approval of final Master Plan outlining development plan for remaining density units.
    – Implementation of Capital Plan (including prioritizing common area improvements).
    – All financing decisions of YC entities (including repayment/refinancing of CSFB Debt).

Exhibit FF, p. 7.

➢ **Exclusivity/Confidentiality (until Executive Committee in place)**
    – EB/YC and CH mutually agree only to meet or have discussions with CSFB together.
    – EB/YC and CH mutually agree only to meet or have discussions with Discovery or any other potential Operators/Partners together.
    – EB/YC and CH agree to make only joint public statements, to be organized through Edelman, a nationally recognized public relations firm.
    – EB/YC and CH agree to work together on all employment decisions, including hirings, dismissals, and contract executions. CH shall have final approval for all decisions related to Development, Infrastructure, and Sales. EB/YC shall have final approval for all decisions related to Operations.
        In the case of related party transactions, mutual approval is required.

Exhibit FF, p. 10.

    e.  On November 11, 2008 Byrne wrote an email to one of his colleagues regarding

        discussions with the bondholders who were owed the debt under the Credit Suisse

        loan, stating: "<u>I do want Edra to get something here</u>, and I think we can help her get

        insulated at the end of the day, but tough love with the bondholders is going to be

        necessary. Hopefully she will understand that when it comes to DLC. ¶ I am still on

        calls on the bonds tonight. Let's talk with everyone before the hearing tomorrow

        and make sure we are all on message. Sky, Matt and Joe will be able to handle the

        other side easily and should come back with some insights.¶ The bondholders are

        asking to get together in NYC next week without CS for a "very frank discussion"

27

according to Babson. Sky and the boys just need to continue to hammer into them what a mess that they have and that we can get them out of it. Had some good calls today. When they realize that the State of MT and the Membership wants to kill them, I think they will be realistic in looking for a solution. ¶ There is a 9 am call with ALL bondholders tomorrow. Should be interesting." Exhibit ZZ [emphasis added].

76. Edra D. Blixseth's and Blixseth Group, Inc.'s performance obligations to CrossHarbor under the Agreement to Form were secured by a mortgage on the Family Compound. Exhibit PP.

77. As part of the $35M Loan, CrossHarbor represented that it would enter into certain joint ventures with Edra D. Blixseth and Blixseth Group, Inc. whereby these parties would jointly develop portions of the Yellowstone Club. Exhibit BB, FF, GG.

78. In connection with the $35M loan transaction, CrossHarbor represented to Edra D. Blixseth that she would gain a "future net cash flow to EB of 600+ MM." in connection with her developing the Yellowstone Club with CrossHarbor. Exhibit FF.

79. In connection with the $35M Loan transaction, CrossHarbor further represented to Edra D. Blixseth that she would profit $573,756,000 from a proposed venture known as YC – Land Sales. Exhibit GG, pg. 3.

80. In connection with the $35M Loan transaction, CrossHarbor further represented to Edra D. Blixseth that she and the Yellowstone Club entities would profit $135,052,000 from a proposed venture known as Real Estate Joint Venture 1. Exhibit GG, pg. 3.

81. In connection with the $35M loan transaction, CrossHarbor further represented to Edra D. Blixseth that she and the Yellowstone Club entities would profit $318,936,000 from a proposed venture known as Real Estate Joint Venture 2. Exhibit GG, pg. 3.

28

ER002001

82. Based on the representations and financial projections made to Edra D. Blixseth by CrossHarbor in connection with the $35M Loan, CrossHarbor made gross revenue projections for developing and building out the lots within the Family Compound totaling $179,264,000, with a total gross profit of $105,048,000. Exhibit GG, pg. 4.

83. Prior to CrossHarbor entering into the $35M Loan, Byrne knew that Edra D. Blixseth had no ability to repay the $35M Loan. Exhibit II.

    a. On August 7, 2008, Byrne wrote an email to his colleagues acknowledging "Edra?s [sic] highly leveraged situation." Exhibit WW.

    b. On August 4, 2008, Byrne wrote an email to his colleagues stating, "I don't believe she [Edra D. Blixseth] is institutionally financeable" and that Ms. Blixseth had "no capital." Exhibit II.

    c. Prior to August 13, 2008, Byrne knew that out of the MSA, Edra D. Blixseth had assumed a debt of $181 million owed to BGI. Exhibit FF.

84. Edra D. Blixseth entered into the Agreement to Form with no intentions of giving CrossHarbor control over the Yellowstone Club. Exhibit AAA.

85. CrossHarbor entered into the Agreement to Form with the intention of taking over control of the Club to leverage the B shareholders and Credit Suisse to reduce the liabilities the Club owed thereto and then own the Club without those liabilities.

86. Prior to CrossHarbor entering into the $35M Loan, CrossHarbor knew that the Yellowstone Club did not have sufficient operating capital and that asset sales could not be relied upon to provide operating capital. Exhibit WW.

--

**Case No. 12-35986 ER  424**

ER002002

87. On August 15, 2008, Edra D. Blixseth breached the Agreement to Form by sending out a communication to all the Yellowstone Club members without the prior approval of CrossHarbor. Exhibit AAA.

88. Sometime before August 23, 2008, Edra D. Blixseth had violated the Agreement to Form by meeting with Discovery Land Company "to negotiate the timing of DLC's takeover" of the Yellowstone Club, without the knowledge or consent of CrossHarbor. Exhibit AAA.

89. Sometime before August 23, 2008, Edra D. Blixseth had violated the Agreement to Form by having her agent Jory Russell change bank account authorizations for the Yellowstone Club bank accounts. Exhibit AAA.

90. By August 23, 2008, Byrne felt that notwithstanding the provisions in the Agreement to Form giving significant operating control of the Yellowstone Club to CrossHarbor, Edra D. Blixseth was attempting to "manage" the Yellowstone Club "around" CrossHarbor. Exhibit AAA.

91. By August 23, 2008, Byrne had his agent Joe Harris "policing" Edra D. Blixseth's conduct to make sure she was complying with the Agreement to Form. Exhibit AAA.

92. On August 29, 2008, CrossHarbor caused the Yellowstone Club to engage Discovery Land Company to become the operator and manager of the Yellowstone Club. Exhibit BBB; Exhibit AAA.

93. As part of the Yellowstone Club's engagement of Discovery Land Company, both Discovery Land Company and CrossHarbor promised to each immediately inject $10 million (for a total of $20 million) of working capital into the Yellowstone Club. Exhibit BBB.

94. Discovery Land Company failed to inject $10 million of working capital into the Yellowstone Club. Blixseth Affidavit at ¶ 20.

30

95. CrossHarbor failed to inject $100 million of working capital into the Yellowstone Club. Blixseth Affidavit 21.

96. On August 21, 2008, Byrne was attempting to force Edra D. Blixseth to liquidate one of her real estate assets for a price at 53% of its fair market value. Exhibit CCC.

97. On September 17, 2008, Byrne found that Edra D. Blixseth's management involvement in the Yellowstone Club was a "hindrance". Exhibit DDD.

98. CrossHarbor through its control of the Yellowstone Club caused the Yellowstone Club to go into bankruptcy so that CrossHarbor could own the Club without obligations to the B shareholders, or Credit Suisse and without Edra D. Blixseth in an ownership position in the Club. Exhibit U.

99. Eighty nine days after CrossHarbor entered into the $35M Loan, the Yellowstone Club filed for bankruptcy. CrossHarbor had scheduled and planned and manipulated Edra Blixseth by doing so.

100.      CrossHarbor, through its operating control of the Yellowstone Club, in bad faith, drove the Yellowstone Club into bankruptcy, creating Case No. 08-61570 in the United States Bankruptcy Court for the District of Montana ("Yellowstone Club Bankruptcy").

    a.  On October 13, 2008, Byrne and agents of CrossHarbor had a meeting to outline a pre-packaged bankruptcy plan for the Yellowstone Club. Exhibit EEE.

    b.  On October 27, 2008, referring to his plans to put the Club into bankruptcy, Byrne stated, "I am going to write the 'plan' tonight to solve the entire YC debacle. It could be brilliant." Exhibit FFF.

31

ER002004

 

c. An associate of Byrne's in response to this October 27, 2008 email stated, "Sounds dangerous . . . And possibly evil . . . It could be worth over 1 billion dollars . . . I hope it includes a dip and filing by Friday." Exhibit FFF.

d. Byrne ratified these statements of his associate by replying "It is brilliant." Exhibit FFF.

e. On October 15, 2008 Joseph Harris, an agent of CrossHarbor, wrote an email to Joey Arenson of Discovery Land Company, that was managing the Yellowstone Club, and referred to their planned bankruptcy filing, stating, "Hey Joey – Could you email Matt [Kidd] and I the current version of DLC's business plan as we get prepared for a pre-pack filing?" Exhibit GGG.

f. On October 21, Chris Wright emailed Edra D. Blixseth and copying Byrne and representatives of Discovery Land Company among others, stated "But right now we aren't even mentioning bankruptcy or a DIP loan". This "not mentioning" refers to a plan with CrossHarbor and Byrne not to disclose to the members the planned bankruptcy and the complete relinquishment by Edra D. Blixseth who replies: "thats a good point....i don't care you all decide the when of this." Exhibit HHH.

g. In referring to the Yellowstone Club bankruptcy that was to be filed the following day, Byrne wrote an email to one of his colleagues stating: "They will stuff her on a longer DIP without major concessions again (in addition to those in the current DIP). I thought you guys were discussing walking if it is only 4 weeks? Chechi is a good lawyer, but blustering and Edra's counsel is not able to stand up to him. She will be prohibited from filing any Plan without their consent, and then we are all

32

--

**Case No. 12-35986 ER 427**

ER002005

screwed. If she goes in this direction, Joe E can go screw himself for sending them our term sheet. We will be in a tough spot and we will have little choice but to join with the membership group in their intended adversarial moves against both ownership and CS." Exhibit III.

h.  On November 11, 2008, Byrne stated in an email to his colleague that Edra's plan for the Yellowstone Club bankruptcy should be to blame it's failing on Tim Blixseth: Mr. Byrne stated: "I wouldn't want to be Tim or Credit Suisse. The MT boys are not taking too kindly to those "New Yorkers". I am sorry you guys are getting mentioned - thankful ours is minimal. It's going to roast for a while, but will pass. Edra needs Edelman to give her some separation - she has the perfect play here, particularly given her view on Tim. <u>She can lay it all at his feet</u>." Exhibit JJJ [emphasis added].

i.  On November 9, 2008, Byrne stated in an email to his agents Joe Harris and Matt Kidd referring to the yet to be filed Yellowstone Bankruptcy, "We need to starting working the 'all hands in favor of the CrossHarbor DIP" program and PR around CS and the membership." Exhibit KKK.

j.  On November 9, 2008, Byrne stated in an email to his colleagues regarding the imminent Yellowstone Club bankruptcy: "I like the idea of the members supporting the alternative to CS and also putting some <u>political pressure</u> on CS. I think this could be effective. Everyone agreed yesterday to press forward with our DIP and it is being redrafted now to reflect a mechanism to fund the remainder of the ski season (assuming Edra can borrow another $8m in the bankruptcy on Farcheville) if a plan is not confirmed by February 13th. Exhibit KKK

33

k. On November 11, 2008, the Associated Press published an article regarding the Yellowstone Club bankruptcy and quoted the Governor of Montana as saying "Credit Suisse came in with $375 million, and now there's whole lot of contractors and subcontractors that have not been paid," "We'll be openly asking the question, 'Where did the money go?'". Exhibit JJJ.

l. On or about January 14, 2009, Byrne met with the Governor of Montana and Ron Burkle. Exhibit LLL.

m. On August 2, 2008, Byrne met with Edra D. Blixseth, the Governor of Montana, the Governor's wife, Chris Wright, and individuals named Franklin Hall, Casey and John for a dinner at the Yellowstone Club. Exhibit KK.

n. On November 9, 2008, Byrne stated in an email regarding the DIP financing arrangements for the Yellowstone Club, "I just need to think it through a bit. CS is all over the road here. ¶ The members are working on a con-conspirator [sic] in fraud case against CS for making the loan. Davidson thinks he can force them into an ugly trap -either they didn't do appropriate due diligence, or conspired with/enabled Tim to strip the club of assets. ¶ these [sic] guys are going to Kill Edra." Exhibit NNN.

o. On November 9, 2008, Michael Meldman of Discovery Land Company stated to Sam Byrne in regard to Credit Suisse potentially providing the DIP financing for the Yellowstone Club bankruptcy, "I will follow your lead on everything. We will walk on CS and I figure you will just buy it cheaper. I hope that doesn't happen." Exhibit NNN.

34

--

p. On November 9, 2008, Scott Prince, and agent of CrossHarbor sent an email to Byrne and Jim Davidson regarding the yet to be filed Yellowstone Club bankruptcy stating, "I am worried that the judge might approve a CS plan that could be bad for us so I think we might need to be more aggressive with CS to get them to back down. Here are some of my initial thoughts on the message that should be delivered to CS and possibly the judge in Virginia City...¶ Members were sold a construct whereby the member deposits and real estate sales were the important providers of capital used to fund the club's development and the operating deficits that were required until the club reached critical mass. The members have been shocked to learn that even with successful growth in membership to over 300 members and an additional $375mm raised in the debt market, the club is out of capital, the member's deposits are clearly at risk and there is discussion by the lender of increasing member dues. The members shouldn't be asked to pay twice members prepaid the additional dues with their deposits and are now being asked to pay again with increased dues. This is particularly egregious given the emerging facts that point to the lender's complicity in allowing funds to be diverted from the club. We understand that a significant portion of the proceeds from the bond raise never even hit the club's account and were immediately diverted for non-club use. ¶ Members won't agree to paying higher dues and can live with a missed ski season. Members are comfortable skiing Big Sky and Moonlight Basin and could live with a scenario where development of the club ceased as of today. Our current member dues could easily fund security, snow-plowing and other essential services enabling access to our homes. The real losers in that scenario are the equity and debt holders

35

--

**Case No. 12-35986 ER  430**

who will see the value of their 500 plus undeveloped lots disappear. ¶ CS thinks 10k is a small price for the members to pay for access to skiing and I think we need to play hardball right back. I would be inclined to let them know this right away and also bring up the fraudulent conveyance issue as well. ¶ Thoughts?" Exhibit KKK.

q. Wanting to take care of Edra D. Blixseth, immediately following the filing of the Yellowstone Club bankruptcy Byrne stated in an email, "I do want Edra to get something here, and I think we can help her get insulated at the end of the day, but tough love with the bondholders is going to be necessary." Exhibit ZZ.

r. Byrne's plan for putting the Yellowstone Club into bankruptcy was to obtain ownership of the Club at a discount to what it was willing to pay for the Club under the APA and with a reduced debt owed to Credit Suisse.

s. In an email dated December 29, 2009 email from Edra D. Blixseth to Byrne, Ms. Blixseth was asking Byrne about the details of his proposed bankruptcy plan and said "I know you keep saying it's pretty much like the plan that we talked about before the 11 [referring to the filing of a Chapter 11 bankruptcy]." Exhibit OOO.

t. In an email dated November 12, 2008 from Byrne to Michael Meldman of Discovery Land Company, Byrne discusses a hearing in Montana bankruptcy court that day where Edra D. Blixseth testified regarding the Yellowstone Club bankruptcy, Bryne stated "Edra also testified that DLC [Discovery Land Company] was never part of any CH [CrossHarbor] plan and that she brought them in. Said she studied our business plan (?) and DLC was not part of that equation." Exhibit

36

PPP.  In response to Byrne's email and the discussion of Edra's testimony therein, Michael Meldman stated "Perjury."  Exhibit PPP.

101.     In June of 2009 the Chapter 11 plan of reorganization for the Yellowstone Club was approved, which resulted in CrossHarbor purchasing the Yellowstone Club for approximately $115 million, consisting of $35 million in cash, and an $80 million note payable in priority to various classes of creditors as provided for in the reorganization plan. Exhibit VVVV, WWWW, XXXX.

102.     CrossHarbor's purchase of the Yellowstone Club was free and clear of the $300+ million debt owed to Credit Suisse and which was secured by the Yellowstone Club assets. Exhibit VVVV, WWWW, XXXX.

103.     In January of 2008, CrossHarbor contracted to pay $455,690,000 for the Yellowstone Club which was then encumbered by over $300+ million in debt owed to Credit Suisse.  Exhibit O.

104.     In June of 2009, CrossHarbor purchased the Yellowstone Club for only $115 million and free and clear of the $300+ million debt owed to Credit Suisse.

105.     Part of Edra D. Blixseth's and CrossHarbor's plan of reorganization for the Yellowstone Club bankruptcy was to blame Timothy L. Blixseth for the Club's bankruptcy.  Exhibit JJJ; RRR.

106.     The Third Amended Plan of Reorganization for the Yellowstone Club calls for a Liquidating Trust pursuing litigation against Timothy L. Blixseth to recover substantially all of the claims arising out of the Yellowstone Club bankruptcy.  Exhibit VVVV, WWWW, XXXX.

37

--

ER002010

107.     But for CrossHarbor breaching its obligations under the Agreement to Form, the Yellowstone Club would not have needed to file for bankruptcy.

108.     Concurrent with Edra D. Blixseth negotiating with Timothy L. Blixseth to obtain the Yellowstone Club as part of the MSA, she was negotiating with Byrne to obtain financing to fund her obligations to Timothy L. Blixseth to obtain the Yellowstone Club as part of the MSA.  Exhibit AA, CC.

109.     Byrne controlled Edra D. Blixseth's ability to obtain financing.  Exhibit EE.

110.     Byrne provided financing to Edra D. Blixseth to fund her obtaining the Yellowstone Club and Family Compound out of the MSA but he required her to entire into the Agreement to Form as a condition of that financing.  Exhibit BB.

111.     On August 13, 2008, Edra D. Blixseth was receiving no income.  Exhibit P, at p 349:9-10.

112.     On June 15, 2007, Edra D. Blixseth personally guaranteed a loan from Western Capital Partners LLC in the amount of $13,065,000 to various entities in which Ms. Blixseth owned an interest.  Exhibit TTT, UUU, VVV.

113.     In guarantying this $13,065,000 from WCP, Ms. Blixseth falsely represented that she was able to pay her bills as they became due, that she had never filed for bankruptcy and that she was not subject to any pending litigation.  Exhibit WWW; UUU; XXX,  pp. 1:9-11; 9, ¶ 3; YYY ¶ 29; ZZZ, ¶ 55(a), (d); JJJJ,.

114.     Edra D. Blixseth defaulted on her guaranty obligations under WCP's loan by at least December 6, 2007.  Exhibit AAAA.

115.     Edra D. Blixseth obtained a modification of the $13,065,000 loan that she guaranteed to WCP in June of 2008 wherein she again falsely represented that she was able

38

ER002011

to pay her bills as they came due and that she was not subject to any pending or threatened litigation. Exhibit BBBB, Section 2; ZZZ, ¶55(d)(i); YYY ¶¶ 32; IIII.

116.     On November 19, 2008, Edra D. Blixseth in fact confessed to $25 million in judgments arising out of litigation in the United States District Court for the District of Nevada, Case No. 06-00056. CCCC.

117.     Prior to May of 2008, Edra D. Blixseth was insolvent. Exhibit DDDD.

118.     Despite being insolvent, on or about March 3, 2008, Edra D. Blixseth as the sole manager of Blixseth Family Investments LLC ("BFI"), obtained an $8 million loan from First Bank ("First Bank Loan") for her own personal uses by pledging as collateral the primary assets of BFI which was a note in the face amount of $35,650,000 owed to BFI by S.P. Realty, L.P., a Montana limited partnership. Exhibit EEEE, Exhibit FFFF, Exhibit DDDD, ¶ 7.

119.     The members of BFI as of March 3, 2008 consisted of Edra D. Blixseth's natural and step-children: Beau Blixseth, Morgan Blixseth, Julie Barve and Matthew Crocker. Blixseth Affidavit at ¶ 22.

120.     The First Bank Loan matured on July 1, 2008 but was extended on July 30, 2008 and in the extension Edra D. Blixseth reaffirmed all the representations and warranties she made to First Bank when she first executed First Bank Loan. Exhibit EEEE, GGGG, Section 4.

121.     The First Bank Loan is in default.

122.     Edra obtained the First Bank Loan and the extension thereto by falsely representing to First Bank that she was not involved in any legal or arbitration proceedings, then

--

**Case No. 12-35986 ER  434**

ER002012

pending or threatened against her.  Exhibit HHHH, Section 2.09;Exhibit IIII; Exhibit CCCC.

123.     On March 6, 2008, Edra D. Blixseth obtained yet another loan in the amount of $5 million from Wachovia Bank, N.A., and then another $3 million from Wachovia on June 23, 2008.  Exhibit JJJJ; Exhibit KKKK.

124.     In obtaining the $5 million and $3 million loans from Wachovia, Edra D. Blixseth again falsely represented that she was not in default on other monetary obligations, or involved in any legal or arbitration proceedings, then pending or threatened against her. Exhibit JJJJ, Section 8(a); Exhibit KKKK, Section 8(a); Exhibit IIII; Exhibit CCCC; Exhibit DDDD.

125.     On March 26, 2009, Edra D. Blixseth filed for bankruptcy in the United States Bankruptcy Court for the District of Montana.

126.     Ms. Blixseth intentionally failed to list in her original and amended bankruptcy schedules and statement of financial affairs that she owed a $181 million debt to Blixseth Group, Inc.  Exhibit SSS, at p. 234:23-235:5.

127.     On April 15, 2009, creditor Western Capital Partners LLC ("WCP") in Edra D. Blixseth's bankruptcy obtained an Order from the bankruptcy court allowing it to perform a 2004 examination of Mr. Blixseth.  Docket # 120 in Case No. 09-60452).

128.     The April 15, 2009, 2004 exam order required Ms. Blixseth to produce to WCP, her books, records, financial documents and various email correspondence with Byrne and CrossHarbor.  Docket # 120 in Case No. 09-60452).

129.     By June 19, 2009, Ms. Blixseth had failed to produce a number of documents to WCP that she was obligated to produce pursuant to the April 15, 2009 2004 exam order,

ER002013

including her correspondence with Byrne and CrossHarbor, so WCP filed a motion to
compel Ms. Blixseth to produce such documents.  Exhibit LLLL,

130.     On July 6, 2009, the Montana bankruptcy court granted WCP's motion to compel.
Exhibit MMMM.

131.     On June 13, 2004, Jory Russell, Ms. Blixseth's primary business manager, was
served with a subpoena requiring his attendance on June 24, 2009 for a Rule 2004
examination and his production of "complete copies of computer hard drives and other
electronic storage media".  Exhibit NNNN, PPPP at pp. 44-49.  The subpoena duces tecum
also required Russell to produce all email correspondence between Russell and EB, any
and all books and records of EB and any of EB's entities, and complete copies of computer
hard drives and other electronic storage media which contained all accounting, email and
financial information of Edra Blixseth and any of the EB's entities.  Exhibit NNNN.

132.     On the evening of June 23, 2009, Jory Russell met with Edra D. Blixseth and her
attorney, Gary Deschenes, at Ms. Blixseth's residence and brought with him, the laptop
that Mr. Russell conducted his business on for Ms. Blixseth.  Even though Mr. Russell was
directed to produce that laptop pursuant to the subpoena that was served on him, Mr.
Deschenes demanded that Mr. Russell hand over the laptop and told Mr. Russell that the
laptop was Ms. Blixseth's property.  Believing that he would be accused of theft if he did
not hand over the laptop, Mr. Russell handed over the laptop to Mr. Deschenes.  Exhibit
PPPP, pp. 11:4-16:20; 34:9-35:22

133.     On the evening of June 24, 2009, Mr. Russell also printed out from his laptop a
large number of emails from one of his work email accounts in response to WCP's
subpoena until it became apparent to him that the volume of documents was just too large

41

--

ER002014

to continue printing. At that point, Mr. Deschenes took possession of these documents as well as the laptop. Mr. Russell handed these over to Mr. Deschenes because Mr. Deschenes told Mr. Russell that those documents were not his property. Exhibit PPPP, pp. 15:18-18:10.

134.     On June 24, 2009, Jory Russell appeared for his 2004 examination. However, Mr. Russell did not arrive with the laptop or his work emails and financial documents for which he was subpoenaed. Conant Affidavit at ¶ 5; Exhibit OOOO at p. 7.

135.     Instead, Mr. Russell appeared at his examination accompanied by Edra D. Blixseth's attorney, Gary Deschenes, and a 4 inch stack of printed emails that Mr. Russell had printed out from his personal Hotmail email account. Conant Affidavit at ¶ 6; Exhibit OOOO at p. 7.

136.     Neither Mr. Russell nor Mr. Deschenes made any mention of the existence of Mr. Russell's laptop or the printed stack of his work emails to counsel for WCP on June 24, 2010, despite the outstanding subpoenas and the order compelling Ms. Blixseth to produce her financial information. Conant Affidavit at ¶ 7.

137.     Prior to Mr. Russell being sworn in for his exam, Mr. Deschenes informed counsel for WCP that Ms. Blixseth had arranged for a man by the name of Jonathan Roselli to purchase WCP's $13 million note at a price that could be negotiated that day. Conant Affidavit at ¶ 8.

138.     Mr. Deschenes informed WCP that the only condition for Mr. Roselli engaging in these discussions was that WCP had to postpone the examinations of Jory Russell and Edra D. Blixseth scheduled for that day and the following day, and that WCP could not demand

42

that turnover of the documents that Mr. Russell and Edra D. Blixseth were otherwise required to produce. Conant Affidavit at ¶ 9.

139.     WCP agreed to those conditions and negotiated with Mr. Roselli and reached what WCP believed to be an agreement with Mr. Roselli for him to purchase WCP's $13 million note. Conant Affidavit at ¶ 10.

140.     Even though WCP reached an agreement with Mr. Roselli and delayed receiving discovery from Ms. Blixseth and Mr. Russell based on Ms. Blixseth's conditions, the arrangement with Mr. Roselli was simply a ruse. Conant Affidavit at ¶ 11; Exhibit VV at pp. 33:5-43:17.

141.     On June 24, 2009 when WCP excused Mr. Russell from his examination, counsel for WCP admonished Mr. Russell that he was not to destroy any documents that he had relative to Edra. D. Blixseth. Conant Affidavit at ¶ 12.

142.     On June 25, 2009, Mr. Russell disregarded his admonishment and deleted from his personal desktop computer at home, all remaining documents and emails that he had relative to Ms. Blixseth because he believed that such information was the property of Ms. Blixseth and he did not want to be accused of theft. Exhibit PPPP at p. 11:21-12:10, 23:23-24:17.

143.     On July 8, 2009, WCP re-commenced the exam of Mr. Russell and only when WCP fortuitously asked Mr. Russell during the exam about the existence of any information that he did not produce on the June 24, 2009 exam, did WCP learn of the laptop's existence. Only when Mr. Russell testified under oath that he had previously turned over the laptop to Mr. Deschenes, did Mr. Deschenes first acknowledge to WCP the existence of the laptop and that he had possession of the laptop even though his client,

43

--

ER002016

Edra D. Blixseth, was subject to an order to compel the information contained in the laptop. Conant Affidavit at ¶ 13; Exhibit PPPP a p. 11:4-16:19.

144.      On September 9, 2008, Edra D. Blixseth obtained a Senior Loan Commitment from Stockman Bank for a "Commercial Loan" to lend Ms. Blixseth $4.6 million secured by Lot 48 in the Yellowstone Club. Lot 48 had been owned by the Yellowstone Club but Edra Blixseth received it in the MSA. Exhibit YYYY, Exhibit ZZZZ.

145.      In funding this loan Stockman Bank received and relied upon Ms. Blixseth's financial statements which accounted for the income from her new partnership arrangement with CrossHarbor and the representations CrossHarbor made to her in Exhibit GG and FF, financial statements for the Yellowstone Club, marriage settlement documents. Exhibit ZZZZ; Exhibit DDDDD; Exhibit EEEEE.

146.      In making its decision to loan the $4.6 million to Ms. Blixseth, Stockman Bank relied on representations from Ms. Blixseth and CrossHarbor that Edra was entering into a "partnership" with Byrne: "The Branch was informed that Edra Blixseth plans to go into partnership with Sam Byrne of (Cross Harbor Capital Partners) regarding the Yellowstone Club." Exhibit AAAAA.

147.      Stockman Bank's underwriting decision on the $4.6 million was also based on the fact that on August 26, 2008 new deposit accounts for the Yellowstone Club were opened and received wire transfers of $3.3 million. The referenced $3.3 million "wired in" came from the $35M Loan CrossHarbor loan to Edra to obtain control over the YC through the MSA and their "partnership". The transfer of these accounts from American Bank to Stockman Bank constituted an event of default under the Credit Suisse loan agreement.

44

--

ER002017

Exhibit BBBBB at p. 5 (reference to $3.9 of $35M Loan going to Yellowstone Club working capital); Exhibit BB; Exhibit AAAAA.

148.     Not disclosed to Stockman Bank during its underwriting decision on this $4.6 million loan was that CrossHarbor and Edra knew that the Yellowstone Club had nearly $1 million in deficits in its deposit accounts at American Bank during this time.  Exhibit FFFFF.

149.   Exhbit ZZZZ, the Stockman Bank "Credit Summary" states in pertinent part that Byrne and CHC were purchasing the YC, but in "a somewhat surprising turn of events, Edra was awarded the Club in the divorce.  She funded the buy-out of Tim with money from Sam Byrne.  "Shortly after the divorce and change in ownership, Edra and her team began moving all accounts from American Bank to us.  The initial opening balances were above $3-4MM on a cumulative basis." The "team" referenced are Joe Harris and Matthew Kidd, agents of CHC, and signatories on the new accounts who "wired in" $3.1MM which Edra received from Byrne as part of the $35MM loan to obtain control over the YC.  At the time of the Stockman loan transaction on or before September 12, 2008, Byrne, Harris, Kidd, Edra and others were dealing with an approximately $1MM overdraft on American Bank accounts of the YC  which they collectively concealed from Stockman Bank  in the lot 48 loan  transaction, as well as concealing that the transfer of accounts between banks constituted an event of default under the Credit Suisse loan agreement which CHC  knew having analyzed the CS loan in a memo dated Sept. 5, 2008.  Exhibit FFFFF; GGGGG.

150.   Exhibit YYYY, the Stockman Bank email to Edra states that the $4.6MM loan was based on an appraised value of $7.1MM  making it a 65% loan to value ratio; and that the already defaulted Stockman loans would have to be "brought current" from the loan proceeds; and that

45

ER002018

the commitment was based on Edra's "financial condition." In fact, Byrne/CrossHarbor were trying to sell Lot 48 to Byrne's friends for about $4MM and knew that Lot 48 was not then worth the purported appraised value, that Edra had already defaulted on approximately $50MM in fraudulently procured loans; and that her August 15, 2008 financial statement jointly prepared with CHC was materially false and did not represent her true "financial condition." Exhibit CCC.

151. Exhibit DDDDD is the financial statement that Edra D. Blixseth in partnership with CrossHarbor at that time, provided to Stockman Back to obtain the $4.6 million loan. It is materially false because the liability section fails to list the $181 million note owed to Blixseth Group, Inc. that Edra D. Blixseth assumed out of the MSA (Exhibit QQQQ) and it shows that Edra D. Blixseth owed WCP only $3 million when in fact she owed WCP closer to $13 million. Exhibit DDDDD at p. 3-4. Byrne and CrossHarbor knew that the representations in Exhibit DDDDD were false as they knew what assets and liabilities she was assuming out of the MSA. It also fails to disclose the $26.5 MM in confessed judgments, Edra was then negotiating to resolve concealed litigation. Exhibit FF.

152. Exhibit EEEEE is the Stockman Bank "Commercial Loan Agreement" containing Edra's "Warranties and Representations", "Financial Statements" Certification and accuracy, and "Covenants." In fact, numerous representations, warranties, covenants, the financial statements and certification were grossly false when made and CHC / Byrne knew it. For example, Edra made representations about her non-involvement in law suits, when at that very time within a matter of days of the Stockman loan, she confessed $26.5MM in judgments in the Nevada cases involving her partner, Dennis Montgomery. Exhibit CCCC. That confession of judgment took place between September 5, 2008 and September 17, 2008

46

ER002019

straddling all material dates of the Stockman loan and materially adversely impacting both her

Financial Statements which contained no such disclosures and her ability to re-pay the loan.

153.    The CHC / Byrne involvement in the "Commercial Loan" transaction is also  evidenced in

Byrne's attempt to sell lot 48 to his friends for $4MM  in breach of the representations made

by his partner, Edra, to the Stockman Bank, in breach of his obligations under the Agreement

to Form, in breach of his representations made in the "Discussion Memo" and related

obligations.  Exhibit CCC, Exhibit BB, Exhibit FF.  Byrne and CHC knew that with the

additional $4.6MM in debt, there was no possibility she could repay his loan by its due date

September 30, 2008; and that he would not perform any of his obligations under the

Agreement to Form including inserting $100MM into the YC.  Exhibit UU, at p. 49:6-9;

Exhibit VV, at p. 209:22-210:24; Exhibit II; Exhibit WW.


Dated:  July 2, 2010                          Respectfully Submitted,


                                    /s/ *Michael J. Flynn*
                                    By:
                                    Michael J. Flynn
                                        *Attorneys for Timothy Blixseth*


                                    *Attorneys for Defendant*
                                    *Timothy L. Blixseth*

--
**Case No. 12-35986 ER  442**                                    ER002020

48

08-61570-RBK-1 Doc#820-3 Filed 11/30/04 Entered 11/30/04 13:58:41 Page 51 of 51
09-60452-RBK-1 Doc#2255 Filed 09/07/10 Entered 09/07/10 13:58:41 Page 51 of 51

Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 219 of 291

## CERTIFICATE OF SERVICE

I, the undersigned, certify under penalty of perjury that on July 2, 2010, or as soon as possible thereafter, copies of the foregoing were served electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities who are not ECF registered users: None.

By:     /s/Joel E. Guthals

EXHIBIT 4
ER002023

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In Re: | ) Case No. 08-61570 |
| | ) |
| Yellowstone Mountain Club, LLC, | ) |
| | ) |
| Debtors. | ) |
| | ) |

(Complete caption on next page.)

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Missoula, Montana
April 29, 2009

Electronic Recording Operator:   Patti Mahoney

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

ER002024
**Exhibit 4**

08-61570-RBK12 Doc#82048-48 Filed: 11/30/1048 Entered: 11/19/10 15:58:131 Page 3 of 18
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 216 of 291

11

```
 1    facts that people wish to raise, we can take that up
 2    without further ado, I think, through the proceedings and
 3    through the post-trial briefing.
 4              As I mentioned last week, we will also expect
 5    parties to submit proposed findings and conclusions and
 6    pretrial briefs after the conclusion of the trial.  So you
 7    might keep that in mind as we're going through the
 8    proceeding.
 9              There were a number of amended witness and
10    exhibit lists that were filed yesterday.  Before I get to
11    that, I want to go to the pretrial order.  These are at
12    Dockets 238 and 241, as I recall.  I went through to find
13    out what the differences are.  And on page 6, there were
14    Paragraphs 5 through 10 that were added by Mr. Blixseth
15    that apparently were not agreed to by any of the other
16    parties.  Is that still the same case, or have you all
17    reached resolution on these matters?
18              UNIDENTIFIED SPEAKER:  No resolution, Your Honor.
19              THE COURT:  Well, then we will in about two
20    minutes.  Paragraph 5 on page 6 of Docket 241 - this is
21    Mr. Blixseth's proposed pretrial - the marital settlement
22    agreement is out.
23              Paragraph 6 on page 6 is in, which relates to the
24    loan or a portion of the Credit Suisse loan proceeds to BGI
25    was not a fraudulent transfer.
```

08-61570-RBK12 Doc#82048-48/Filed: 11/30/1048Entered:11/19/10 Pa58:45 Page 4 of 18
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 217 of 291

12

```
 1          Seven, eight, nine, and ten are out.  Those are

 2    claims -- they may be defenses, they may be claims, but

 3    they're with parties that aren't even in this lawsuit.

 4    CrossHarbor's not a party to this lawsuit, Edra Blixseth is

 5    not a party to this lawsuit.  And those items are out.

 6          As it relates to marital property settlement

 7    agreement, those are claims that Mr. Blixseth can certainly

 8    raise in his State Court litigation.

 9          And as it relates to the hacking issue, the

10    violation of 18 USC 1030 and the civil action that's

11    allowed thereunder - I think it's under 1030(g) - is an

12    item that Mr. Blixseth certainly can bring against any

13    person he feels improperly accessed computers.  And so

14    there will be no prejudice to him on those claims; they

15    just won't be part of this trial.

16          And on page 7, last phrase of Paragraph 4, after

17    the words of "privileged communications" where it goes into

18    in pari delicti, judicial estoppel, it goes on through,

19    again, with references to the marital settlement agreement

20    and 18 USC 1030 and the civil claim thereunder, that last

21    phrase is out.  A period will be inserted after the word

22    "communications", which I think is in the text of Pretrial

23    238.  And I was reading from 241, Docket 241.

24          Down under the elements of claims, counterclaims,

25    defenses, Paragraph V - and this starts at pages 13, 14,
```

**Case No. 12-35986 ER  448**

ER002026

08-61570-RBK12 Doc#82048-48/Filed: 11/30/1048Entered: 11/19/10 Page5 of 18
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 218 of 291

13

```
 1    15, 16, 17 of Docket 241, which is Mr. Blixseth's proposed

 2    pretrial - has there been any agreement between the parties

 3    as to Items K through T?  There are still issues regarding

 4    those?

 5              UNIDENTIFIED SPEAKER:  Correct, Your Honor.

 6              THE COURT:  Well, "K" is out.

 7              I'm not sure what the dispute is over waiver,

 8    laches -- oh, "M" is out.  That's the marital matter.

 9              "N", "O", "P", "Q", "R", "S", and "T", I'm not

10    quite sure what the objections by parties are to that.

11    They're affirmative defenses, it appears.  We can deal with

12    that through the course of the trial.  If they're not

13    substantiated, they're not substantiated; if they are, I

14    can deal with them as I rule.  I don't know if there's a

15    big issue there.

16              Mr. Blixseth, you're shaking your head "no".

17    There isn't?

18              MR. BLIXSETH:  (Inaudible, out of range of

19    microphone.)

20              THE COURT:  Is that Credit Suisse's position, as

21    well?  There's not consensus there?

22              Mr. Flynn, I'm assuming you're wanting those

23    paragraphs in there.

24              MR. FLYNN:  Of course, Your Honor.

25              THE COURT:  And what about the debtors?
```

```
1                MS. MARTIN:  It's fine, Your Honor.

2                THE COURT:  So except for "K" and "M", those

3    paragraphs will be inserted.

4                Page 23, Paragraph XI, discovery documents.  And

5    I'm looking at 241, Docket 241.  Actually, there's a typo.

6    That first paragraph should be Paragraph A to be consistent

7    with 238.  "A", "B", and "C" -- well, "A" and "B" are the

8    same as in 238.

9                "C", Credit Suisse to -- and there was also a

10   deletion of Mr. Blixseth in that Paragraph C.

11               And then there was a new paragraph, "D", that

12   relates to:  We'll offer all of Mr. Blixseth's

13   interrogatories, requests for production, requests for

14   admissions to the committee and Debtors and their

15   objections, answers, and responses thereto.

16               Is there a big objection to that?  I'm not sure

17   why there is necessarily an objection to that provision.

18               MR. BECKETT:  No objection, Your Honor.

19               Mr. Blixseth, or I mean -- this could be a long

20   day.

21               UNIDENTIFIED SPEAKER:  It's still early.

22               THE COURT:  Mr. Beckett.

23               MR. BECKETT:  Very briefly, Your Honor.  What

24   happened was that the committee and Credit Suisse and all

25   of the parties had worked well together putting together
```

20

```
 1    if you're a reporter and here today on assignment?  Okay,

 2    thank you.

 3              Others are interested parties.  Mr. Grant, I see.

 4    Others are interested parties, I'm assuming, or just

 5    wanting to observe.  So if issues come up, we'll try to

 6    accommodate it as best we can.  Obviously, it's a full

 7    courtroom.  Bring anything that you feel should be brought

 8    to my attention through the recorder or through my law

 9    clerk, Kelli Harrington.

10              So with that, Mr. Flynn.

11              MR. FLYNN:  Thank you, Your Honor.  Your Honor,

12    we have a witness in the witness list, Gary Peters.  And

13    he's here from Paris.  And we requested yesterday to -- of

14    the committee and of the debtor to take Mr. Peters out of

15    order, and of Credit Suisse.  Credit Suisse has agreed; the

16    debtor and the committee have not.

17              He's here from Paris.  He's got to leave tonight

18    to go back to Paris.  Sometime today, we would like to take

19    him out of order.  I'm estimating an hour and a half on

20    direct, Your Honor; perhaps less in light of Your Honor's

21    ruling on the computer hacking.

22              THE COURT:  Okay.  Mr. Beckett.

23              UNIDENTIFIED SPEAKER:  (Inaudible, out of range

24    of microphone) -- and the debtors, Your Honor.

25              THE COURT:  Yes.
```

08-61570-RBK Doc#82948-43 Filed: 11/30/10 Entered 11/19/10 16:58:43 Page 8 of 18
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 221 of 291

21

```
 1              UNIDENTIFIED SPEAKER:  One very, very simple
 2     point:  Mr. Peters has absolutely nothing to add to this
 3     proceeding.  He was not around in 2005, and I don't believe
 4     he was around in 2006.  This simply goes to, I believe,
 5     Mr. Flynn's case, which is Edra Blixseth and Sam Byrne, and
 6     let's throw up some smoke, and so forth.  It has nothing to
 7     do with this case.  It would do nothing but interject into
 8     our case, which is very clean, very much in a line with the
 9     pleadings and a PTO that Your Honor just signed.  It would
10     add nothing to the case.
11              And so we would -- if he chooses to call him in
12     his case, that's his choice, but he shouldn't be allowed to
13     call him in our case.
14              MR. FLYNN:  I'm prepared to make an offer of
15     proof, Your Honor.
16              THE COURT:  I'll allow an offer of proof.
17              MR. FLYNN:  As Your Honor knows, the primary
18     issue before the Court is why we're here, why the club is
19     insolvent, and why we're in bankruptcy.  Mr. Peters will
20     offer direct testimony on that issue.
21              We're here, Your Honor, because CrossHarbor and
22     Mr. Byrne developed a scheme to acquire Porcupine Creek.
23     By acquiring Porcupine Creek for basically $35 million on a
24     30-day note, which they knew Ms. Blixseth could not pay,
25     they effectively took out the asset of BGI of $200 million
```

08-61570-RBK12 Doc#82048-48 Filed: 11/30/10 Entered: 11/19/10 18:58:40 Page 9 of 18
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 222 of 291

22

1    out of this bankruptcy estate.  Ms. Blixseth then added on

2    through loans - fraudulent and some not so fraudulent -

3    another $15 million onto the -- as mortgages onto Porcupine

4    Creek.  But for that fraudulent conduct, Porcupine Creek

5    would be reachable by this Court to satisfy the BGI note in

6    the amount of $209 million.  But Mr. Byrne has a

7    stranglehold over that property.  In fact, I believe he's

8    filed a notice of foreclosure.

9            Mr. Peters was in the heart of the discussions

10   relating to the deals made between Edra Blixseth and Sam

11   Byrne.  He met Mr. Byrne in Mr. Byrne's office on March 21,

12   the day the divorce court ordered Ms. Blixseth not to

13   communicate or interfere with the sale with Sam Byrne.

14   There was a direct court order by the divorce judge in

15   California.  Notwithstanding that, Ms. Blixseth, for the

16   weeks before that and for the period after that, continued

17   to negotiate with Sam Byrne.  Five days later, Mr. Byrne

18   cratered deal, terminated contract.  And the reason he

19   terminated the contract, Your Honor, is because he did not

20   have the money.

21           Mr. Peters had a conversation with Mr. Byrne on

22   March 21, the same day the divorce court issued the order,

23   where Mr. Peters basically confronted Mr. Byrne and asked

24   him, "Do you have the money to close?"

25           And Mr. Byrne basically waffled.  He give him the

23

```
1    names of two potential lenders who were going to loan him
2    the money:  One was WestLB and the other was Credit Suisse.
3             Neither party at that point in time was loaning
4    Mr. Byrne the money.  Mr. Byrne did not close this deal.
5    Notwithstanding everything he put out in the media, he did
6    not close this deal, Your Honor, because he did have the
7    money.  Mr. Byrne has -- Mr. Peters has direct testimony
8    with regard to that issue.
9             Secondly, Ms. Blixseth, when she knew that
10   Mr. Byrne was not going to close - which she knew in
11   advance because she knew he didn't have the money - then
12   made a deal with Mr. Peters.  And the deal was
13   misrepresented to the Montana court in the LeMond case.
14   The deal, Your Honor, was for Mr. Peters and his principals
15   from the Middle East to buy the club for $450 million,
16   including putting down $50 million in cash.  They went into
17   the LeMond case less than a week after the Byrne deal
18   cratered.  And Mr. -- Ms. Blixseth falsely represented in
19   her declaration in the LeMond case that she had $50 million
20   as capital infusion - excuse me, Your Honor - and funding
21   to put into the club.  It was misrepresented.  The $50
22   million was part of a proposed sale.
23             Mr. Peters has numerous e-mails relating to
24   everything I've just disclosed to the Court; the meetings
25   with Byrne, the e-mails back and forth, the meetings with
```

08-61570-RBK 1 Doc# 2043-48 Filed: 10/30/04 Entered: 11/30/12 18:56:43 Page 11 of 18
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 224 of 291

24

1    Ms. Blixseth.  And, in fact, Mr. Peters refused to get on

2    the witness stand on a TRO in the LeMond case because he

3    knew Deborah Klar and Ms. Blixseth were misrepresenting the

4    deal to the Court.  He has numerous e-mails relating to

5    this issue.

6              The reason it becomes important is because

7    Ms. Blixseth's fiduciary duty, once the Byrne deal cratered

8    because he didn't have the money, was to take the $450

9    million and solve the bankruptcy issues.  At that time that

10   all this took place as of April 15, 2008, as Mr. Moore

11   testified yesterday, the company was solvent.  All its

12   accounts payable were paid.  In fact, Mr. Moore - Mr. Moore

13   was the bookkeeper - Mr. Moore signed a declaration dated

14   April 15, '08, that all the accounts payable had been paid.

15             I know Your Honor does not want to get into the

16   computer hacking, but they -- through computer hacking into

17   Mr. Blixseth's computer, they found out that all the

18   accounts had been paid by Mr. Blixseth in advance of going

19   into the Montana court in LeMond on a TRO, and they shifted

20   their whole position.  Mr. Peters was part of that whole

21   discussion.  Over the ensuing two months, Mr. Peters

22   negotiated with Ms. Blixseth and came up with a deal for

23   $450 million.  He had the cash, he had the source of money.

24   He gave the source of money to Ms. Blixseth.  Something

25   that Mr. Byrne had never done between June 28, '07, when

08-61570-RBK   Doc#2049-8 Filed 11/30/10   Entered 11/30/10 16:56:43 Page 12 of 18
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 225 of 291

25

```
 1   the letter of intent was signed by Mr. Byrne and January

 2   15, '08, when the asset purchase agreement was signed, Your

 3   Honor, he never showed the source of funds because he never

 4   intended to close.  And Mr. Peters has direct evidence of

 5   that, that he never intended to close.

 6          He intended to drive down the price of the club,

 7   string the deal out until the value of the club and the

 8   bonds had decreased to the point where he could get it.

 9   And at some point along the way prior to the deal cratering

10   on March 26th, he planned the prepackaged bankruptcy to put

11   the club into bankruptcy.  Mr. Byrne discussed those issues

12   with Mr. Peters, he discussed them with Mr. Blixseth.  They

13   were e-mail -- there's e-mail traffic back and forth on

14   this point.  Mr. Blixseth adamantly opposed putting this

15   club into bankruptcy.

16          With his business judgment, Your Honor, over the

17   prior years, he had always paid the bills, always paid the

18   Credit Suisse loan.  All the accounts were -- perhaps there

19   was a little seasonal cyclical up and down in payments, but

20   basically all the payments had been made.  Through April of

21   '08, everything was current.  But what happened is Byrne

22   couldn't close the deal, Edra Blixseth turned to

23   Mr. Peters, Mr. Peters had the deal ready to go.  But what

24   would have happened is Ms. Blixseth would have lost control

25   of the Yellowstone Club.  And the reason we're here, Your
```

26

```
 1   Honor, when all is said and done, when this trial is over,
 2   what Your Honor is going to understand more than any one
 3   thing is Edra Blixseth's obsession to control the
 4   Yellowstone Club that caused this bankruptcy.
 5          She had deals she could have made to sell it,
 6   paid Credit Suisse, pay all the debts.  She rejected them
 7   because she would have lost control.  Sam Byrne offered her
 8   an opportunity in a joint venture for her to obtain some
 9   control, but he did it through a process of loans which he,
10   which he knew she couldn't pay.  Mr. Peters was in that
11   whole chain of events.  He has e-mails, he has direct
12   testimony through that whole course of events right up
13   through the $35 million loan by Mr. Byrne.  As Your Honor
14   knows, that $35 million loan was a 30-day note.
15   Ms. Blixseth had zero chance of paying that $35 million in
16   30 days, and CrossHarbor and Mr. Byrne knew it.  They did
17   it to get a stranglehold over her so they could put the
18   club into bankruptcy.
19          And the proof, Your Honor, which we were denied
20   in our deposition of Ms. Blixseth -- the deposition was
21   constantly obstructed.  We tried to get into the issue of
22   the five lenders that have loaned money to Ms. Blixseth
23   prior to the $35 million loan on August 14, 2008.  Those
24   loans, I'm telling you, Your Honor, are completely
25   fraudulent.  I've spoken to the banks, I've got some of the
```

27

```
 1   bank documents.  I went to Mr. McKay this past Monday, and

 2   I explained it to him.  Ms. Blixseth had borrowed

 3   $8 million from Wachovia bank in March of '08.  It was a

 4   completely fraudulent loan.  The loan applications were

 5   falsified.  She had no possibility of paying back the

 6   $8 million.  In March of '08, she also borrowed $8 million,

 7   as Your Honor knows, from First Bank & Trust because the

 8   UCC came in and got a restraining order to prevent her from

 9   borrowing more money.  Those loans defaulted within a

10   matter of weeks -- or months.

11           As of the time the $35 million was loaned by

12   Mr. Byrne - and he knew it - those loans were all in

13   default.  She rolled over a note with Western Capital

14   lending in June of '08.  She explicitly lied in the loan

15   application with regard to whether or not there was pending

16   litigation, as she did in the Wachovia loan.  In the

17   Wachovia loan, the money was loaned for her tech company,

18   Blxware.  Well, the tech company had -- was in litigation

19   in Nevada that I was peripherally involved in.  And the

20   tech company had a preliminary injunction against it from

21   borrowing, hypothecating any of its assets.  And yet she

22   borrowed $8 million from them without disclosing that there

23   was a preliminary injunction against the borrowing, let

24   alone the fact that the litigation even existed.

25   Mr. Peters was part and parcel and present when all of that
```

ER002036

08-61570-RBK 1 Doc# 820-8 Filed: 11/30/10 Entered: 11/30/10 18:58:43 Page 15 of 18
Case 2:11-cv-00073-SEH   Document 12-5   Filed 02/02/12   Page 228 of 291

28

 1   took place.

 2           There were other loans.  There was a $9.5 million

 3   loan involving American Bank.  And I won't get into the

 4   issues at the present time, but that loan is riddled with

 5   fraud, Your Honor, just like these others are riddled with

 6   fraud.

 7           The reason it's important for the Court here

 8   today is that Ms. Blixseth had zero chance of paying Sam

 9   Byrne $35 million, and he knew it.  Once he got the

10   $35 million mortgage on Porcupine Creek, he did essentially

11   what he did in this court when he primed the $20 million

12   DIP loan.  He got a stranglehold on the bankruptcy, he's

13   now got a stranglehold on Porcupine Creek.  That's at least

14   $35 million taken out of this estate.  And he tried to get

15   a $1.5 million loan on Farcheville, as Your Honor is aware,

16   to get a stranglehold on Farcheville.  So instead of paying

17   $450 million, which he was willing to pay as of January 15,

18   '08, basically he's got control of these assets, Your

19   Honor, for somewhere in the range of $55 million.  That's

20   why we're here.  Mr. Peters was an integral component of

21   all of that.

22           On the issue of proximate cause as to what caused

23   this bankruptcy, Mr. Peters has e-mails, he's got

24   testimonial evidence that will inform this Court as to why

25   we're here.

08-61570-RBK Doc#: 2048-8 Filed: 10/30/08 Entered: 11/30/09 18:56:43 Page 16 of 18
Case 2:11-cv-00073-SEH Document 12-5 Filed 02/02/12 Page 229 of 291

29

```
 1              Secondly -- or thirdly, these transactions are

 2    riddled with fraud.  This bankruptcy is based on a

 3    foundation of Ms. Blixseth's fraudulent lending

 4    transactions.  She is the DIP, for all intents and

 5    purposes.  In the marital settlement agreement - which I

 6    know Your Honor doesn't want to get into, but we do deal

 7    with release - she released Mr. Blixseth.  And

 8    Mr. Blixseth, as -- she signed on behalf of all the clubs,

 9    the debtor entity, completely releasing him.  Mr. Blixseth

10    offered her in May and June, before she made the deal with

11    Sam Byrne, he said, "Look, here's the deal:  You take it or

12    I'll take it.  It's your choice."

13              She made the decision to have control of the

14    club, so she's the one who made this financial --

15    financially riddled fraudulent bed that she's in.  And

16    that's why we're here.  And Mr. Peters probably has more

17    vital testimony and more e-mails that were never produced

18    in this courtroom than anyone else.

19              Thank you, Your Honor.

20              THE COURT:  Thank you, Mr. Flynn.  Well, given my

21    deletion of the - I'll just try to find it again, here -

22    Paragraphs 5, 7, 8, 9, 10, the claims by Mr. Blixseth, and

23    even though as much as I would really like to hear

24    Mr. Peters for a variety of reasons, I'm not going to allow

25    him to testify at this time.
```

**Case No. 12-35986 ER  460**

ER002038

30

```
1          MR. FLYNN:  Does that mean, Your Honor, if we can
2   get him back from Paris, I could call him in my case?  I'm
3   not quite unsure where the Court's -- (inaudible, out of
4   range of microphone.)
5          THE COURT:  Yeah.  I was headed to excluding him
6   entirely, and yet as I recall, I think Mr. Greenfield
7   didn't have a problem with he was called in your case.
8          UNIDENTIFIED SPEAKER:  Your Honor, I'm reserving
9   my objection.  If he's called in Mr. Flynn's case, you
10  can better bet that I'll be objecting, based on what I just
11  heard from Mr. Flynn -- (inaudible, out of range of
12  microphone.)
13         THE COURT:  Okay.  Well, I still think his
14  testimony goes to issues that I've taken out of this
15  litigation at this point.  They certainly may survive and
16  be valid issues at a later date in a different forum.  So
17  at this point, I'm going to exclude Mr. Peters completely.
18         UNIDENTIFIED SPEAKER:  Your Honor, you're taking
19  proximate cause out of the case?
20         THE COURT:  No.  Actually, I've added it.  It's
21  still in the pretrial.
22         UNIDENTIFIED SPEAKER:  Thank you.
23         THE COURT:  Your offer of judgment is part of the
24  record.
25         Mr. Peters, just for my own benefit, could I have
```

31

```
 1    you stand, please?  Thank you.
 2             I mean I think Mr. Peters probably has a wealth
 3    of information not only as Mr. Flynn may argue in his offer
 4    of proof -- or stated in his offer of proof, but as it
 5    relates to other matters that are going on as it relates to
 6    Farcheville and some things there as far as prospective
 7    sale that -- obviously, it's unrelated to this adversary
 8    proceeding, but it's certainly related to the main case as
 9    to what the status of everything is.
10             Mr. Chehi.
11             MR. CHEHI:  I'll just stand here.  We'd like to
12    just reserve rights to have Mr. Peters testify in
13    connection with confirmation, with approval of any sale on
14    the types of issue that go to that as Your Honor is
15    recognizing:  Good faith, the motivation of the parties,
16    the relationships between CrossHarbor and Edra Blixseth.
17             And whatever Mr. Peters knows about that we're
18    sure will be material to the good faith and merits of the
19    proposed transactions.
20             THE COURT:  Well, the other, the other problem I
21    have is, you know, I don't want Mr. Peters to be a
22    ping-pong ball and bouncing back and forth between here and
23    France all the time.  I don't think that's realistic or
24    fair to him, either.
25             Mr. Beckett, you kind of had a look like you
```

ER002040

Patrick T. Fox
Doubek, Pyfer & Fox LLP
PO Box 236
Helena MT
Telephone: 406-442-7830
Facsimile: 406-442-7839
patrickfox@doubekpyfer.com

Attorneys for Timothy L. Blixseth

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| | Case No. 08-61570-11-RBK |
| In re: | Jointly Administered with 08-61571, 08-61572, and 08-61573 |
| YELLOWSTONE MOUNTAIN CLUB, LLC, et al., | Chapter 11 |
| Debtors. | **TIMOTHY BLIXSETH'S NOTICE OF APPEAL** |

Pursuant to 28 U.S.C. § 158(a) or (b) and FRBP 8001 and 8002, Timothy Blixseth, interested party in the above-captioned Chapter 11 bankruptcy proceeding, files the instant Notice of Appeal,  Pursuant to 28 U.S.C. § 158(c)(1)A) and F.R.B.P 8001(e)(1), Mr. Blixseth also concurrently files separate written notice of election for his appeal to be heard by the district court.

Mr. Blixseth appeals the following:

1. **02/25/11 Memorandum of Decision** (Doc#: 2129, attached as Exhibit 1) and **02/25/11 Order** (Doc#: 2130, attached as Exhibit 2): "IT IS ORDERED that Timothy L. Blixseth's Amended Motion to Disqualify Judge Kirscher [… is] DENIED."

2. **07/26/11 Order** (Doc#: 2278, attached as Exhibit 3): "IT IS ORDERED that Blixseth's Motion to Reconsider Order on Disqualification Motion filed on March 14, 2011, at docket entry no. 2137, is DENIED."

ER00047

3.  **07/27/11 Order** (Doc#: 2281, attached as Exhibit 4): "IT IS ORDERED that any further hearing on this issue of whether Debtor's Third Amended Plan of Reorganization was proposed in good faith is vacated."

4.  **09/30/11 Memorandum of Decision** (Doc#: 2352, attached as Exhibit 5) and **09/30/11 Order** (Doc#: 2353. 2354, 2355, attached as Exhibit 6): "IT IS FURTHER ORDERED that the Court adopts and ratifies its Memorandum of Decision and Order entered June 2, 2009, approving the Settlement Term Sheet and confirming the Debtors' Third Amended Joint Plan of Reorganization."

5.  **09/30/11 Memorandum of Decision** (Doc#: 2352, attached as Exhibit 5) and **09/30/11 Order** (Doc#: 2353. 2354, 2355, attached as Exhibit 6): "IT IS FURTHER ORDERED that Blixseth's Motion for Relief from Order Confirming Third Amended Plan of Reorganization filed at docket entry no. 2054, is denied."

6.  **09/30/11 Memorandum of Decision** (Doc#: 2352, attached as Exhibit 5) and **09/30/11 Order** (Doc#: 2353. 2354, 2355, attached as Exhibit 6): "IT IS FURTHER ORDERED that Blixseth's Motion to Strike YCLT's Opposition to Motion for Relief From Order Confirming Third Amended Plan of Reorganization Filed at Docket No. 2164 filed June 10, 2011, at docket entry no. 2167, is denied."

7.  **10/11/11 Order** (Doc#: 2359, 2360, 2361, attached as Exhibit 7): "IT IS ORDERED that the Motion for Timothy Blixseth for Leave to Bring Claims of the Debtors Against Credit Suisse filed July 19, 2011, at docket entry no. 2247, is denied."

8.  **10/11/11 Order** (Doc#: 2359, 2360, 2361, attached as Exhibit 7): "IT IS FURTHER ORDERED that the Motion for Timothy Blixseth for Leave to Bring Claims of the Debtors Against CrossHarbor Capital Partners, LLC, its Principals and Affiliates filed July 20, 2011, at docket entry no. 2248, is denied."

Said Orders were entered by the Honorable Ralph B. Kirsher, Bankruptcy Judge for the United States Bankruptcy Court for the District of Montana.  Pursuant to 9th Cir. BAP R. 8001(a)-1, a copy of the referenced Orders and related Memoranda of Decisions are attached hereto as specified above.  The names of all parties to the Orders appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

//

ER00048

| **Party**: | Marc Kirschner |
| | Trustee of the Yellowstone Club Liquidating Trust |
| **Attorneys**: | Charles W. Hingle |
| | Shane P. Coleman |
| | HOLLAND & HART LLP |
| | 401 North 31st Street, Suite 1500 |
| | Billings, Montana 59101 |
| | Telephone: (406) 252-2166 |
| | Facsimile: (406) 252-1669 |
| **Party**: | CrossHarbor Capital Partners LLC/"Reorganized Debtors" (Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Yellowstone Club Construction, LLC, and Big Sky Ridge, LLC) |
| **Attorneys**: | William D. Lamdin, III |
| | Benjamin P. Hursh |
| | CROWLEY FLECK, PLLP |
| | PO Box 7099 |
| | Missoula MT 59807-7099 |
| | Telephone: 406-523-3600 |
| | Facsimile: 406-523-3636 |
| **Party**: | Credit Suisse |
| **Attorneys**: | J. Richard Orizotti |
| | POORE, ROTH, & ROBINSON, PC |
| | 1341 Harrison Ave. |
| | PO Box 2000 |
| | Butte MT 59702 |
| | Telephone: 406-497-1200 |
| | Facsimile: 406-782-0043 |

DATED this 12th day of October, 2011.


By:＿＿＿/s/ Patrick T. Fox＿＿＿＿＿＿＿

Attorneys for Timothy L. Blixseth

If a Bankruptcy Appellate Panel Service is authorized to hear this appeal, each party has a right to have the appeal heard by the district court. The appellant may exercise this right only by filing a separate statement of election at the time of the filing of this notice of appeal. Any other party may elect, within the time provided in 28 U.S.C. § 158(c), to have the appeal heard by the district court.

*If a child support creditor or its representative is the appellant, and if the child support creditor or its representative files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.*

ER00049

3

**Case No. 12-35986 ER 465**

## CERTIFICATE OF SERVICE

I, the undersigned, certify under penalty of perjury that on October 12, 2011 or as soon as possible thereafter, copies of the foregoing motion was served electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities who are not ECF registered users: None.

By: /s/ Patrick T. Fox
      Attorneys for Timothy L. Blixseth

ER00050

Patrick T. Fox
Doubek, Pyfer & Fox LLP
PO Box 236
Helena MT
Telephone: 406-442-7830
Facsimile: 406-442-7839
patrickfox@doubekpyfer.com

Attorneys for Timothy L. Blixseth

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In re: | Case No. 08-61570-11-RBK |
|  | Jointly Administered with 08-61571, 08-61572, and 08-61573 |
| YELLOWSTONE MOUNTAIN CLUB, LLC, et al., | Chapter 11 |
| Debtors. | **TIMOTHY BLIXSETH'S AMENDED NOTICE OF APPEAL** |

Pursuant to 28 U.S.C. § 158(a) or (b) and FRBP 8001 and 8002, Timothy Blixseth,

interested party in the above-captioned Chapter 11 bankruptcy proceeding, files the instant Notice

of Appeal, Pursuant to 28 U.S.C. § 158(c)(1)A) and F.R.B.P 8001(e)(1), Mr. Blixseth also

concurrently files separate written notice of election for his appeal to be heard by the district court.

Mr. Blixseth appeals the following:

1.  **02/25/11 Memorandum of Decision** (Doc#: 2129, attached as Exhibit 1) and **02/25/11 Order** (Doc#: 2130, attached as Exhibit 2): "IT IS ORDERED that Timothy L. Blixseth's Amended Motion to Disqualify Judge Kirscher [… is] DENIED."

2.  **07/26/11 Order** (Doc#: 2278, attached as Exhibit 3): "IT IS ORDERED that Blixseth's Motion to Reconsider Order on Disqualification Motion filed on March 14, 2011, at docket entry no. 2137, is DENIED."

ER00051

0

**Case No. 12-35986 ER 467**

3.  **07/27/11 Order** (Doc#: 2281, attached as Exhibit 4): "IT IS ORDERED that any further hearing on this issue of whether Debtor's Third Amended Plan of Reorganization was proposed in good faith is vacated."

4.  **09/30/11 Memorandum of Decision** (Doc#: 2352, attached as Exhibit 5) and **09/30/11 Order** (Doc#: 2353. 2354, 2355, attached as Exhibit 6): "IT IS FURTHER ORDERED that the Court adopts and ratifies its Memorandum of Decision and Order entered June 2, 2009, approving the Settlement Term Sheet and confirming the Debtors' Third Amended Joint Plan of Reorganization."

5.  **09/30/11 Memorandum of Decision** (Doc#: 2352, attached as Exhibit 5) and **09/30/11 Order** (Doc#: 2353. 2354, 2355, attached as Exhibit 6): "IT IS FURTHER ORDERED that Blixseth's Motion for Relief from Order Confirming Third Amended Plan of Reorganization filed at docket entry no. 2054, is denied."

6.  **09/30/11 Memorandum of Decision** (Doc#: 2352, attached as Exhibit 5) and **09/30/11 Order** (Doc#: 2353. 2354, 2355, attached as Exhibit 6): "IT IS FURTHER ORDERED that Blixseth's Motion to Strike YCLT's Opposition to Motion for Relief From Order Confirming Third Amended Plan of Reorganization Filed at Docket No. 2164 filed June 10, 2011, at docket entry no. 2167, is denied."

7.  **10/11/11 Order** (Doc#: 2359, 2360, 2361, attached as Exhibit 7): "IT IS ORDERED that the Motion for Timothy Blixseth for Leave to Bring Claims of the Debtors Against Credit Suisse filed July 19, 2011, at docket entry no. 2247, is denied."

8.  **10/11/11 Order** (Doc#: 2359, 2360, 2361, attached as Exhibit 7): "IT IS FURTHER ORDERED that the Motion for Timothy Blixseth for Leave to Bring Claims of the Debtors Against CrossHarbor Capital Partners, LLC, its Principals and Affiliates filed July 20, 2011, at docket entry no. 2248, is denied."

9.  **09/30/11 Order** (Doc. 2357 attach as Exhibit 8): "IT IS FURTHER ORDERED THE JOINT MOTION FOR ORDER PURSUANT TO BANKRUPTCY RULE 9019 AUTHORIZING AND APPROVING THE YELLOWSTONE CLUB SETTLEMENT TERM SHEET NUNC PRO TUNC IS DENIED AS MOOT"[1]

Said Orders were entered by the Honorable Ralph B. Kirsher, Bankruptcy Judge for the United

States Bankruptcy Court for the District of Montana.  Pursuant to 9th Cir. BAP R. 8001(a)-1, a

copy of the referenced Orders and related Memoranda of Decisions are attached hereto as specified

ER00052

above. The names of all parties to the Orders appealed from and the names, addresses, and

telephone numbers of their respective attorneys are as follows:

//

| | |
|---|---|
| **Party**: | Marc Kirschner<br>Trustee of the Yellowstone Club Liquidating Trust |
| **Attorneys**: | Charles W. Hingle<br>Shane P. Coleman<br>HOLLAND & HART LLP<br>401 North 31st Street, Suite 1500<br>Billings, Montana 59101<br>Telephone: (406) 252-2166<br>Facsimile: (406) 252-1669 |
| **Party**: | CrossHarbor Capital Partners LLC/"Reorganized Debtors" (Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Yellowstone Club Construction, LLC, and Big Sky Ridge, LLC) |
| **Attorneys**: | William D. Lamdin, III<br>Benjamin P. Hursh<br>CROWLEY FLECK, PLLP<br>PO Box 7099<br>Missoula MT 59807-7099<br>Telephone: 406-523-3600<br>Facsimile: 406-523-3636 |
| **Party**: | Credit Suisse |
| **Attorneys**: | J. Richard Orizotti<br>POORE, ROTH, & ROBINSON, PC<br>1341 Harrison Ave.<br>PO Box 2000<br>Butte MT 59702<br>Telephone: 406-497-1200<br>Facsimile: 406-782-0043 |

DATED this 14th day of October, 2011.

By: ___/s/ Patrick T. Fox_____

---

[1] Because this Amended Notice of Appeal simply amends that Notice of Appeal at Doc. 2362, Mr. Blixseth is attaching only Exhibit 8 to this Amended Notice of Appeal as Exhibit 1-7 were attached to the original Notice of Appeal and already transmitted to the District Court.

ER 00053

**Case No. 12-35986 ER 469**

Attorneys for Timothy L. Blixseth

If a Bankruptcy Appellate Panel Service is authorized to hear this appeal, each party has a right to have the appeal heard by the district court. The appellant may exercise this right only by filing a separate statement of election at the time of the filing of this notice of appeal. Any other party may elect, within the time provided in 28 U.S.C. § 158(c), to have the appeal heard by the district court.

*If a child support creditor or its representative is the appellant, and if the child support creditor or its representative files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.*

ER00054

3

**Case No. 12-35986 ER  470**

## CERTIFICATE OF SERVICE

     I, the undersigned, certify under penalty of perjury that on October 14, 2011 or as soon as possible thereafter, copies of the foregoing motion was served electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities who are not ECF registered users: None.


     By:/s/ Patrick T. Fox
        Attorneys for Timothy L. Blixseth

ER00055

# Yellowstone Club Settlement Term Sheet

**Privileged and Confidential**

5/17/09

Page 1 of 19

This is a term sheet (this "Term Sheet") proposal transmitted for discussion purposes only until fully executed by the Parties, at which point this Term Sheet shall be binding on all parties hereto subject only to the occurrence of the following (the "Effectiveness Conditions"): the Effective Date, the entry of an order vacating the Adversary Proceedings Order and the Valuation/Adequate Protection Orders and the dismissal with prejudice of the Adversary Proceedings against the Prepetition Agent and/or the Prepetition Lenders. Until fully executed by the Parties, this Term Sheet is for **Settlement Discussion Purposes** and shall be subject to Federal Rules of Evidence Section 408 and is being exchanged as a confidential document as part of settlement discussions. Until fully executed by the Parties, this Term Sheet and the contents hereof are Privileged and Confidential and shall not be distributed or disseminated by any Party other than with the prior consent of all of the Parties.

Terms not defined herein shall have the meanings given them in the Plan.

1. **Approval.** The Parties will promptly file a joint motion seeking expedited approval by the Court of the stipulations and agreements contained in this Term Sheet.

2. **Definitions.**

   a. "Adversary Proceeding Order" means that certain Partial & Interim Order dated May 13, 2009 entered by the Court.

   b. "Adversary Proceedings" means Adversary Proceeding Nos. 09-00014 and 09-00017 in case Nos. 08-61570-11, 08-61571-11, 08-61572-11 and 08-61573-11 filed in the Court.

   c. "BLX" shall mean BLX Group, Inc., f/k/a Blixseth Group, Inc.

   d. "Bridge Loan" means that certain $35,000,000 secured loan to Edra D. Blixseth and BLX made by CIP Yellowstone Lending LLC ("CIP Lending") on or about August 13, 2008 and secured by real property located in California and Montana.

   e. "CH DIP Loan" means that certain debtor-in-possession loan made by CIP Lending to Debtors in the principal amount of up to $23,306,701 as approved by the Court pursuant to those certain Orders issued by the Court on November 26, 2008, December 17, 2008 and January 22, 2009.

ER00103

# YELLOWSTONE CLUB SETTLEMENT TERM SHEET
## Privileged and Confidential
5/17/09

Page 2 of 19

f.  "CrossHarbor" means New CH YMC Acquisition LLC, a Delaware limited liability company.

g.  "Court" means United States Bankruptcy Court for the District of Montana.

h.  "Definitive Agreement" means that certain Definitive Agreement, dated as of March 17, 2009, by and among the Debtors and CrossHabor, as modified by the terms of this Term Sheet.

i.  "Excess Closing Proceeds" means the excess of the Cash Portion (hereinafter defined) over the sum of the Mandatory Payments plus $2,000,000.

j.  "Farcheville" means that certain property located outside of Paris, France and commonly referred to as Chateau de Farcheville.

k.  "Mandatory Payments" means the sum of the Required Plan Payments plus the Priority Tax Claims.

l.  "Modified Plan" means the Plan as modified to reflect the terms provided in this Term Sheet.

m.  "Non-Project Assets" are all assets of the Debtors that do not comprise or concern the Yellowstone Club, including without limitation, Farcheville, St. Andrews and the BGI Notes, but specifically excluding the Debt Portion (hereinafter defined).

n.  "Parties" are (i) Credit Suisse, Cayman Islands Branch (the "Prepetition Agent"), on behalf of itself and as agent for the prepetition lenders (the "Prepetition Lenders"), (ii) the Official Unsecured Creditors Committee (the "UCC"); (iii) the Debtors; and (iv) CrossHarbor.

o.  "Plan" means the Second Amended Joint Plan of Reorganization Proposed by the Debtors and dated as of April 3, 2009 [Docket #691].

p.  "Prepetition Loan" means that certain mortgage loan made to Yellowstone Mountain Club, LLC, Yellowstone Development, LLC and Big Sky Ridge, LLC on or about September 30, 2005 in the original principal amount of $375,000,000 held by the Prepetition Agent and the Prepetition Lenders.

ER00104

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 3 of 19

q. "Prepetition Loan Collateral" means all the assets of the Debtors that are collateral for the Prepetition Loan as identified in the documents evidencing and securing the Prepetition Loan.

r. "Project Assets" are all assets of the Debtors comprising or concerning the Yellowstone Club.

s. "Valuation/Adequate Protection Orders" means the Memorandum of Decision [Doc. 864] and related orders entered by the Court in the bankruptcy cases of the Debtors.

3. **Stipulations.** The Parties agree to the following stipulation (collectively, with all other terms of this Term Sheet when fully executed by the Parties, the "Stipulation"), subject to the approval and order of the Court, as follows:

a. The Parties will support the dismissal with prejudice of the pending appeal from the order authorizing the CH DIP Loan and will support confirmation of the Modified Plan. If resolicitation is required with respect to one or more classes of claims under the Modified Plan, the UCC will recommend that all unsecured creditors vote in favor of the confirmation of the Modified Plan, the Prepetition Agent will recommend that all Prepetition Lenders vote in favor of the confirmation of the Modified Plan, and the Debtors will recommend that all stakeholders vote in favor of the confirmation of the Modified Plan.

b. The Parties will support Court approval of the payment of all fees and expenses related to the Interim DIP Loan from payment of the funds reserved from the repayment of the Interim DIP loan.

c. The Debtors, the Reorganized Debtors and the UCC for themselves and the Debtors' estates shall, and shall be deemed to, dismiss, waive and forever release with prejudice all actual, potential or threatened claims, causes of action and challenges that have been, might have been or might be asserted by the UCC, the Reorganized Debtors, the Debtors or their estates against the Prepetition Agent and Prepetition Lenders with respect to any and all acts and omissions occurring prior to the satisfaction of the Effectiveness Conditions excluding, however, enforcement of this Term Sheet and the Modified Plan. The foregoing includes, without limitation, the release of any Reserved Actions, Retained Actions and

ER00105

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 4 of 19

Transferred Actions, the dismissal with prejudice of all claims, causes of action and challenges asserted in Adversary Proceedings against the Prepetition Lenders and Prepetition Agent or against their claims and liens under the Prepetition Loan and any adequate protection liens of the Prepetition Agent and Prepetition Lenders; and the waiver and release of all possible claims under 11 U.S.C. § 506(c) against the Prepetition Agent, the Prepetition Lenders, the Prepetition Loan Collateral and any adequate protection liens of the Prepetition Agent and Prepetition Lenders. Such dismissals, waivers and releases shall be binding on any chapter 11 or 7 trustee appointed in these chapter 11 cases, the Debtors as reorganized under the Modified Plan, the Reorganized Debtors under the Modified Plan, and any successors to the Debtors and their estates. The foregoing releases shall be incorporated into the Modified Plan and the Confirmation Order.

d.  The Parties will support Court approval of the payment of all fees and expenses related to the CH DIP Loan to the extent funded or available to be funded under the CH DIP Loan.

e.  CIP Lending, by its joinder to this Term Sheet, agrees not to complete a foreclosure sale as to the property commonly known as Porcupine Creek until the earlier to occur of (x) July 30 and (y) thirty (30) days after the Effective Date.

f.  The auction for the Project shall be suspended pending the satisfaction of the Effectiveness Conditions.

4.  **Modifications to Definitive Agreement**.  Each of CrossHarbor and Debtors agrees to modify the Definitive Agreement as follows:

a.  to provide that the debt portion of the purchase price being paid under the Definitive Agreement (the "Debt Portion") is increased to Eighty Million Dollars ($80,000,000) and the cash portion of the purchase price being paid under the Definitive Agreement is increased to Thirty-Five Million ($35,000,000) (the "Cash Portion"), thereby increasing the total purchase price under the Definitive Agreement to One Hundred and Fifteen Million Dollars ($115,000,000).

ER00106

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 5 of 19

b.  the definition of the term "Permitted Construction Financing" set forth
in the Mortgage and Security Agreement shall be changed to mean "(i)
vertical construction financing obtained from an Institutional Lender in the
ordinary course of business by Mortgagor for the development of up to
fifty (50) Residential Units in the aggregate at any time and from time to
time up to an aggregate amount of $45,000,000 at any time, provided that
(A) any Residential Unit to which this clause (i) applies shall continue to
be counted toward the foregoing 50 Residential Unit aggregate maximum
until Mortgagee has been paid the Unit Release Payment on account of
such Residential Unit, (B) the relevant Permitted Construction Financing
allowed pursuant to this clause (i) shall not encumber any Residential
Units or any other collateral for the Debt Portion other than those
Residential Units that are the subject of such Permitted Construction
Financing and common areas serving such Residential Units (provided
that improvement of such common areas is being funded by such
Permitted Construction Financing), and (C) the loan to cost ratio of any
Permitted Construction Financing allowed under this clause (i) shall not
exceed 1.0 based on the aggregate actual cost (including hard and soft
costs but excluding any cost or value attributed to the land which is the
subject of the relevant Permitted Construction Financing) to complete the
construction and pay all costs contemplated by the relevant Permitted
Construction Financing and prior to closing of the relevant Permitted
Construction Financing Mortgagor shall provide such evidence to
Mortgagee as Mortgagee may reasonably request to evidence compliance
with the foregoing loan to cost ratio and (ii) up to $25,000,000 in
government sponsored infrastructure bonds obtained by Mortgagor at any
time and from time to time on terms reasonably acceptable to Mortgagee
in connection with horizontal infrastructure improvements at the
Premises." Any hard or soft costs, including developer fees, payable to
the Reorganized Debtors, CrossHarbor, Discovery Land Company or their
respective affiliates that are funded with Permitted Construction Financing
shall not exceed the market rate costs or fees that would be payable to an
independent third party in an arms-length transaction. With respect to any
construction financing that constitutes a Permitted Construction Financing
contemplated under clause (i) above, the Mortgagee shall upon the request
of Mortgagor execute and deliver to Mortgagor and/or the lender under the
relevant Permitted Construction Financing a statement in form and
substance reasonably acceptable to Mortgagee that the applicable
construction financing constitutes a Permitted Construction Financing. If
requested by the lender under any Permitted Construction Financing, the
Mortgagee shall enter into an intercreditor agreement in form and
substance reasonably acceptable to Mortgagee.

ER00107

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 6 of 19

   c.  the Mortgage and Security Agreement shall be modified to include a definition of the term "Institutional Lender" that is acceptable to both CrossHarbor and Prepetition Agent, each acting reasonably.

   d.  the documents evidencing and securing the Debt Portion shall include (x) the credit agreement substantially in the form of <u>Schedule A</u> attached hereto and made a part hereof, the loan documents referenced in the credit agreement and the form of Promissory Note and Mortgage and Security Agreement attached to the Definitive Agreement shall, to the extent applicable, be superseded by such documentation, (y) a non-recourse pledge of 100% of the membership interests in the Reorganized Debtors, and (z) payment by Reorganized Debtors of an annual agent's fee to Prepetition Agent in an amount of $100,000 to cover administrative and reporting costs of Prepetition Agent.

   e.  the Promissory Note shall be amended to prohibit equity distributions by the maker thereof to its direct and indirect owners other than distributions on account of (i) tax liabilities and (ii) net proceeds from the sale of Residential Units (after payment of the applicable minimum release price on the Debt Portion) provided that in the case of distributions permitted under this clause (ii) immediately after such distribution the maker has a minimum liquidity (and the calculation thereof shall include, without limitation, unfunded capital commitments from its direct and indirect members and shall be after deduction for obligations more than 60 days past due) of at least $5,000,000 and to the extent any distribution is made under this clause (ii) then an amount equal to any such distribution shall also be paid to the payee of the Promissory Note as a principal prepayment thereof without premium or penalty. Fees payable to Reorganized Debtors, CrossHarbor, and Discovery Land Company or any of their respective affiliates shall not exceed normal and customary market-rate fees that would be payable to independent third parties in arms-length transactions.

   f.  the definition of "Unit Release Price" in the Mortgage and Security Agreement shall be modified in a manner reasonably acceptable to CrossHarbor and Prepetition Agent to reflect varying release prices depending on the nature of the Residential Unit and, if applicable,

ER00108

# YELLOWSTONE CLUB SETTLEMENT TERM SHEET
### Privileged and Confidential
5/17/09

Page 7 of 19

associated membership in the Yellowstone Club being sold (e.g. land, detached home condominium unit and location) provided that the weighted average release price shall equal $500,000.

g. Subsequent to the Effective Date, CrossHarbor shall cause Reorganized Debtors to use commercially reasonably efforts to obtain a one-time private rating of the loan for the Debt Portion from either Standard & Poors or Moody's which efforts shall include, without limitation, such modifications to the loan documents evidencing and securing the Debt Portion as may be requested by Prepetition Agent or the rating agency provided that such modifications do not increase the monetary obligations, materially increase the non-monetary obligations or materially decrease the rights of the borrower thereunder. Each of Reorganized Debtors and Prepetition Agent shall pay their respective legal fees in connection with obtaining such rating letter, and Reorganized Debtors shall be responsible for any fees charged by or costs incurred at the request of the relevant rating agency (e.g. due diligence reports and appraisal) up to a maximum aggregate amount of $200,000 with Prepetition Agent being responsible for all such rating agency costs in excess of $200,000. Prepetition Agent shall reasonably cooperate with Reorganized Debtors to obtain such rating letter.

h. the closing date under the Definitive Agreement shall be extended to June 30, 2009

5. **Plan Modifications.** The Parties will jointly seek an order of the Court modifying the Plan to provide the following:

a. The amount of the Trade Creditor Fund shall be increased to Fifteen Million Dollars ($15,000,000) plus the Excess Closing Proceeds and shall be administered by the UCC after consultation with CrossHarbor and the Ad Hoc Committee of Members.

b. In addition to the $375,000 paid to the Liquidating Trusts as part of the Required Plan Payments, the Disbursing Agent shall contribute to the Liquidating Trusts contemporaneously with the closing under the Definitive Agreement from the Excess Closing Proceeds the sum of $2,000,000 to pay expenses of the Liquidating Trusts.

ER00109

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 8 of 19

c.  The Liquidating Trusts shall be governed by seven (7) member
    boards appointed as follows until such time as the Allowed Class 4
    Claims are paid in full (and no further Class 4 Claims are pending):
    four (4) by the Prepetition Agent, two (2) by the UCC and one (1)
    by the Ad Hoc Class B Members Committee.  Holland & Hart LLP
    shall be designated as the initial legal counsel for the Liquidating
    Trusts. Decision making by the board shall be by majority vote
    provided that any change or selection of any additional legal
    counsel for the Liquidating Trusts shall require a unanimous vote
    of the boards of the Liquidating Trusts.  Settlement of the claims
    identified on Schedule C attached hereto and made a part hereof
    (collectively, the "Designated Claims") shall require the vote of at
    least five (5) members of the board.   The UCC shall have the
    exclusive right for forty-five (45) days after the Effective Date to
    negotiate proposed terms of any settlement of the Designated
    Claims for approval by the board.  Such board shall appoint the
    trustees of the Liquidating Trusts.  Enforcement of the BGI Notes
    shall be transferred to the Liquidating Trusts.   Following the
    payment in full of Allowed Class 4 Claims, the boards of the
    Liquidating Trusts shall have three (3) members appointed by the
    Prepetition Agent and one (1) member appointed by the Ad Hoc
    Class B Members Committee.

d.  The distribution provisions of the Liquidation Trusts shall be
    modified to provide that funds received after the Effective Date
    (net of reserves for expenses) with respect to Non-Project Assets
    (excluding Farcheville) shall be paid first, the amount of $2,000,000
    to the Trade Creditor Fund; second, up to the amount of
    $15,000,000 to pay CIP Lending or its assignees on account of
    Allowed Class 4 Claims paid by the Trade Creditor Fund; third, up
    to the next $10,000,000 to pay any Allowed Class 4 Claims; and
    fourth, the balance shall be paid pro rata among all unpaid
    Allowed Claims including all unpaid Allowed Claims of the
    Prepetition Agent and Prepetition Lenders after application from
    the Project Assets and Farcheville, all on a pari passu basis.

e.  The Debt Portion shall be used exclusively to pay Class 3 Claims
    and shall be the property of the Pre-Petition Agent and Pre-Petition
    Lenders.

ER00110

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 9 of 19

f.   Similarly, until such time as all Class 3 and Class 8 Claims are paid
in full any recovery from Farcheville shall be the exclusive property
of the Prepetition Agent and Prepetition Lenders, and the
Prepetition Agent shall have all decision-making authority as to the
handling of Farcheville (including, without limitation, the
marketing and sale thereof).

g.   Provide that: (i) the Prepetition Agent and the Prepetition Lenders
shall be added as additional "Exculpated Parties" identified in
Section 8.4 of the Plan and (ii) subject to the occurrence of and upon
the Effective Date, CrossHarbor, CrossHarbor Institutional
Partners, L.P., CIP Lending, CrossHarbor Capital Partners LLC
(and their affiliates with interests in the Yellowstone Club)
(collectively, the "CrossHarbor Entities"), the UCC (and as to the
UCC also the members of such committee but solely in their
capacities as members thereof for their acts or omissions relating to
the UCC), the Debtors, the Reorganized Debtors, the Prepetition
Agent and the Prepetition Lenders shall be deemed to have
exchanged mutual releases with respect to any and all acts or
omissions on or before the Confirmation Date relating to the
Yellowstone Club or the Debtors; provided, however, that the
foregoing mutual releases shall not (v) apply to any willful
misconduct by any individual person with fiduciary duties to the
UCC, the Debtors or the Debtors' estates, (w) release the Parties'
respective rights and obligations under the Definitive Agreement,
this Term Sheet and the Modified Plan, (x) extend to or include any
claims, rights or causes of action against BLX, Big Springs Realty,
LLC, or Sunrise Ridge at Yellowstone Club, LLC, (y) rights to
enforce or defenses to the enforcement of the BGI Notes or the
Bridge Loan (including, without limitation, the liens and
documents relating thereto), or (z) impair CIP Lending's rights
under the CH DIP Loan until such time as such loan is paid in full
or the rights of CrossHarbor Institutional Partners, L.P. to receive
distributions under the Modified Plan in its capacity as a
Prepetition Lender (the matters specified in clauses (x) through (z)
collectively, the "Reserved Matters").   Except as to enforcement of
the Term Sheet and the Modified Plan, the Reserved Matters shall
not include any actions, claims or causes of action (but not
defenses) against the Prepetition Agent or Prepetition Lenders. ER00111

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
**Privileged and Confidential**
5/17/09
Page 10 of 19

h.  The Modified Plan and the Confirmation Order each shall expressly reference, incorporate and approve the Term Sheet and the transactions contemplated thereby as a compromise and settlement under Fed. Rule Bankr. Pro. 9019 and the Modified Plan that is reasonable and in the best interest of creditors.

i.  Section 9.1.2 of the Modified Plan shall provide that the Confirmation Order shall be reasonably acceptable to the Prepetition Agent. Section 9.2 of the Modified Plan shall provide that the following shall be a non-waiveable condition precedent to the occurrence of the Effective Date: "The Debtors and UCC shall have filed a dismissal with prejudice of their claims and causes of action asserted against the Prepetition Agent and the Prepetition Lenders (but not their claims and causes of action asserted against Timothy L. Blixseth) in Adversary Proceeding Nos. 09-00014 and 09-00017." Upon the occurrence of the Effective Date, the causes of action asserted against the UCC and the Debtors in the Adversary Proceeding brought by the Prepetition Agent and Prepetition Lenders shall be deemed settled and resolved by the Modified Plan in accordance with this Term Sheet.

j.  The Modified Plan shall incorporate the terms of this Term Sheet and shall be in form reasonably acceptable to the Parties.

k.  For the purposes set forth in this Term Sheet, the UCC shall remain in existence for sixty (60) days after the Effective Date.

6.  **Ability to Co-Invest**.  The Prepetition Lenders shall have the right to invest in CrossHarbor's acquisition of the New Membership Interests in an aggregate amount up to 15% of the equity capitalization of the Acquirer (estimated to be approximately $30,000,000) on the same terms as members of the Yellowstone Club, which right shall terminate if not exercised on or before June 22, 2009; provided, however, if CrossHarbor gives Prepetition Agent at least seven (7) business days advance notice that the closing under the Definitive Agreement is to occur prior to June 26, 2009 then such date of June 22, 2009 shall be changed to seven (7) business days after Prepetition Agent's receipt of such notice; provided, further, Prepetition Agent shall request that Prepetition Lenders provide CrossHarbor with non-binding expressions of interest to exercise this right to invest on or before June 1, 2009. Promptly following the execution of this Term Sheet, CrossHarbor shall provide the Prepetition Agent and

ER00112

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 11 of 19

Prepetition Lenders with copies of all applicable offering and subscription materials subject to execution by the recipients of a reasonable confidentiality agreement.

7. <u>Maturity of CH DIP Loan</u>.  The Parties agree to seek such Court approval as may be necessary to cause the maturity date of the CH DIP Loan to be extended to the earlier to occur of (x) June 30, 2009 and (y) the closing under the Definitive Agreement.

8. <u>Orders</u>.  This Term Sheet and the agreements contemplated hereby are conditioned upon (i) the Court vacating the Adversary Proceeding Order and the preliminary and interim findings of fact and conclusions of law therein and (ii) the Court vacating or amending the Valuation/Adequate Protection Orders and all rulings, decisions and orders of the Court to the extent they reference or incorporate the findings of fact and conclusions of law against the Prepetition Agent and Prepetition Lenders in the Adversary Proceeding Order. The foregoing shall not prejudice any claims and causes of action asserted against Timothy L. Blixseth.

9. <u>Authority of Prepetition Agent</u>.  Prepetition Agent represents and warrants to the other Parties hereto that (a) it has been directed by Requisite Lenders (as such term is defined in the documents evidencing the Prepetition Loan) to execute and deliver this Term Sheet and (b) Requisite Lenders have informed Prepetition Agent that, to the extent re-voting is required, they intend vote in favor of the Modified Plan.  If and to the extent that any Prepetition Lender ever asserts that it is not bound by the terms of this Term Sheet or challenges the validity hereof, then such Prepetition Lender shall not be entitled to any of the benefits of this Term Sheet and the transactions contemplated hereby including, without limitation, any releases set forth or contemplated herein.

10. <u>Additional Documentation</u>.  In order to effectuate the transactions contemplated by this Term Sheet, the Parties shall promptly file a joint emergency motion for immediate Court approval of this Term Sheet and all Parties shall take such actions and enter into such agreements reasonably necessary to effectuate the terms of this Term Sheet.

11. <u>Valuation/Adequate Protection Orders</u>.  This Term Sheet and the agreements contemplated herein are conditioned upon the Court entering ER00113

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 12 of 19

one or more orders that (i) the Prepetition Lenders' claims are allowed in
the amount of $309,376,110.42, (ii) the Prepetition Lenders have a secured
claim in the amount of $232,000,000, (iii) the value of the Prepetition
Lenders' collateral is set at $232,000,000 and (iv) the Prepetition Lenders'
liens, mortgage and security interests extend to the Prepetition Loan
Collateral.

12. **Amendments; Miscellaneous.** This Term Sheet may not be modified
without the prior written agreement of the Parties. Each of the entities
comprising the Parties shall be severally but not jointly liable for the
obligations and liabilities of the Parties hereunder. This term sheet shall
be governed by Montana law and may be executed in counterparts.

13. **Termination of Term Sheet.** This Term Sheet shall terminate and be of no
further force or effect if the Modified Plan is not confirmed by the Court.
Each of the Effectiveness Conditions shall be satisfied prior to the effective
date of the Modified Plan.

ER00114

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 13 of 19

YELLOWSTONE MOUNTAIN CLUB, LLC

By: BLX GROUP, INC., its manager

By: _____
Name: Edra Blixseth
Title:


YELLOWSTONE DEVELOPMENT, LLC

By: BLX GROUP, INC., its manager

By: _____
Name: Edra Blixseth
Title:


BIG SKY RIDGE, LLC

By: _____
Name: Edra Blixseth
Title:


YELLOWSTONE CLUB CONSTRUCTION
COMPANY, LLC
By: _____
Name: Edra Blixseth
Title:

ER00115

Case No. 12-35986 ER 484

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 14 of 19

THE   OFFICIAL   COMMITTEE   OF   UNSECURED
CREDITORS

By: _____
Name:
Title:

CREDIT SUISSE, CAYMAN ISLANDS BRANCH,
as Administrative Agent for the Prepetition Lenders

By: _____
Name:   Bryan J. Matthews
Title:   Director

By: _____
Name:
Title:   STEPHEN YANKAUER
        MANAGING DIRECTOR

NEW CH YMC ACQUISITION LLC

By: _____
Name:
Title:

For good and valuable consideration and in exchange for the agreements set forth in this
Term Sheet, the undersigned on behalf of themselves and each of the CrossHarbor
Entities join in this Term Sheet to evidence their consent to, and agreement to be bound
by, the release provisions of this Term Sheet:

CIP YELLOWSTONE LENDING LLC

By: _____
Name:
Title:

CROSSHARBOR CAPITAL PARTNERS LLC

By: _____
Name:
Title:

ER00116

**Case No. 12-35986 ER  485**

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 14 of 19

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By: _____
Name: Stephen R. Brown
Title: Chair

CREDIT SUISSE, CAYMAN ISLANDS BRANCH,
as Administrative Agent for the Prepetition Lenders

By: _____
Name:
Title:

By: _____
Name: Stephen Yankauer
Title: Managing Director

NEW CH YMC ACQUISITION LLC

By: _____
Name:
Title:

For good and valuable consideration and in exchange for the agreements set forth in this Term Sheet, the undersigned on behalf of themselves and each of the CrossHarbor Entities join in this Term Sheet to evidence their consent to, and agreement to be bound by, the release provisions of this Term Sheet:

CIP YELLOWSTONE LENDING LLC

By: _____
Name:
Title:

CROSSHARBOR CAPITAL PARTNERS LLC

By: _____
Name:
Title:

ER00117

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 15 of 19

CROSSHARBOR INSTITUTIONAL PARTNERS, L.P

By:  CrossHarbor Institutional Partners GP, L.P.

By: _____

Name:

Title:

ER00118

GSDOCS\1913864.9

Case No. 12-35986 ER  487

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 16 of 19

ER00119

GSDOCS\1913864.9

# YELLOWSTONE CLUB SETTLEMENT TERM SHEET
**Privileged and Confidential**
5/17/09
Page 17 of 19

SCHEDULE A

FORM OF CREDIT AGREEMENT

ER00120

**Case No. 12-35986 ER  489**

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 18 of 19

SCHEDULE B

Intentionally Omitted

ER00121

YELLOWSTONE CLUB SETTLEMENT TERM SHEET
Privileged and Confidential
5/17/09
Page 19 of 19

SCHEDULE C

SETTLEMENT MATTERS FOR COMMITTEE APPOINTEES

1. The suit commonly known as LeMond 1 (the settlement-related claims of
   Greg LeMond, Jorge V. Jasson, Sacia & David Morris, and Sacia Enterprises,
   Inc.),

2. The suit commonly known as LeMond 2 (an action currently filed and stayed
   in Madison County, Montana),

3. Michael Snow's individual lawsuit (an action currently filed and stayed in
   Madison County, Montana),

4. YCW-deposit claims similar to those held by Yoav Rubinstein,

5. Those claims made by Eric Ladd.

ER00122

GSDOCS\1913864.9

**Case No. 12-35986 ER  491**

# Exhibit 5

# DISCLOSURE STATEMENT

## INFORMATION CONCERNING THE DEBTORS AND THE DEBTORS' PROPOSED PLAN OF REORGANIZATION

# Yellowstone Mountain Club, LLC
# Yellowstone Development, LLC
# Big Sky Ridge, LLC
and
# Yellowstone Club Construction Company, LLC

Debtors in Chapter 11 Cases
No. 08-61570
No. 08-61571
No. 08-61572
No. 08-61573
in the United States Bankruptcy Court for the
District of Montana
April 6, 2009

| PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC<br>2817 2nd Avenue North, Suite 300<br>Billings, MT 59101<br>(406) 252-8500<br>James A. Patten | BULLIVANT HOUSER BAILEY PC.<br>2300 Westlake Office Tower<br>1601 Fifth Avenue<br>Seattle, Washington 98101-1618<br>(206) 292-8930<br>Lawrence R. Ream<br>Richard G. Birinyi |

Reorganization Counsel for Debtors and Debtors in Possession

ER00123

## Table of Contents

|                                                                                                  | Page |
|--------------------------------------------------------------------------------------------------|------|

**I.** INTRODUCTION ..................................................................................5

**II.** SUMMARY OF THE PLAN .....................................................................5
    **A.** General Discussion ..........................................................................5
    **B.** Classification and Treatment of Claims and Interests ...................... 9
    **C.** Effective Date ............................................................................. 15
    **D.** Acceptance of the Plan ................................................................. 15
    **E.** Credit Suisse Requested Disclosures ............................................. 15
    **F.** Yellowstone Club World Trustee Requested Disclosures .................. 15

**III.** DESCRIPTION OF THE DEBTORS, THEIR BUSINESS AND FINANCIAL
      CONDITION. ..................................................................................16
    **A.** The Yellowstone Club ................................................................. 16
        1. Ownership and Senior Management ......................................... 16
        2. Location ............................................................................. 17
        3. Yellowstone Club Facts ........................................................ 17
    **B.** Organization And Ownership. ....................................................... 19
        1. Yellowstone Mountain Club, LLC .......................................... 19
        2. Yellowstone Development, LLC ............................................. 20
        3. Big Sky Ridge, LLC ............................................................ 20
        4. Ownership of Yellowstone Mountain Club and Yellowstone Development ......... 20
    **C.** Debtors' Business And Operations. ................................................ 21
    **D.** Employees. ................................................................................. 21
    **E.** Real Property And Personal Property. ............................................ 21
    **F.** Valuations ................................................................................. 23
    **G.** Causes Of Action. ....................................................................... 23
        1. Non-Bankruptcy Causes of Action. ......................................... 23
        2. General Bankruptcy Avoiding Power Causes of Action. ............... 25
        3. Causes of Action Related to the 2005 Financing. ....................... 26
    **H.** Debtors' Principal Liabilities. ...................................................... 28
        1. Liabilities Generally. ............................................................ 28
        2. Secured Creditors. ............................................................... 28
        3. Administrative and Other Priority Creditors. ............................ 30
        4. Unsecured Creditors ............................................................ 31
    **I.** SIGNIFICANT PRE-PETITION EVENTS ..................................... 32
        1. EPA Consent Decree ............................................................ 32
        2. CrossHarbor/Club Transactions ............................................. 32
        3. CrossHarbor and Credit Suisse/Skadden Arps Relationships and Dealings. ......... 35
        4. Other Skadden Relationships. ................................................ 37
        5. Events Leading to the Filing. ................................................. 37

**IV.** SUMMARY OF BANKRUPTCY PROCEEDINGS .............................37
    **A.** DIP Financing ............................................................................ 38
    **B.** Retention of Debtors' Professionals .............................................. 39

ER00124

i

| | | |
|---|---|---|
| **C.** | Appointment of the Creditors' Committee | 40 |
| 1. | Members of the Creditors' Committee | 40 |
| 2. | Counsel to the Creditors' Committee | 41 |
| **D.** | Marketing Efforts | 41 |
| **E.** | Post-Petition Operations | 42 |
| **F.** | Claims Process and Bar Date | 42 |
| 1. | Schedules of Assets and Liabilities and Statements of Financial Affairs | 42 |
| 2. | Bar Date | 43 |
| **G.** | The Plan of Reorganization | 43 |
| 1. | Negotiations Concerning the Plan of Reorganization | 43 |
| 2. | The Exclusivity Period | 43 |
| 3. | Description of Definitive Agreement | 44 |
| **H.** | Investigation of Avoidance Actions | 46 |
| **I.** | Court Ordered Mediation | 46 |
| **J.** | Other Matters | 47 |
| **V. THE PLAN** | | 47 |
| **A.** | Unclassified Claims - Administrative Expenses and Priority Tax Claims | 47 |
| 1. | Administrative Expenses | 47 |
| **B.** | Classification and Treatment of Claims and Interests | 49 |
| 1. | Class 1 - Allowed Priority Non-Tax Claims | 49 |
| 2. | Class 2 - Allowed Other Secured Debt | 50 |
| 3. | Class 3 - Allowed First Lien Lender Secured Claim | 50 |
| 4. | Class 4 – General Unsecured Claims | 51 |
| 5. | Class 5 – Convenience Class Claims | 52 |
| 6. | Class 6 – Intercompany Claims | 52 |
| 7. | Class 7 – Equity Interests | 52 |
| 8. | Class 8 - Allowed First Lien Lender Deficiency Claim | 52 |
| 9. | Class 9—Pioneer/Frontier Members Rejection Claims | 53 |
| 10. | Class 10-- American Bank Claims | 53 |
| 11. | Class 11-- Prim Secured Claims | 53 |
| 12. | Class 12 – Honorary Member Rejection Claims | 54 |
| 13. | Class 13 – Founder's Circle Member Rejection Claims | 54 |
| 14. | Class 14 – Company Member Rejection | 54 |
| **C.** | Contested Claims and Interests | 54 |
| 1. | Procedures for Treating and Resolving Disputed and Contingent Claims | 54 |
| 2. | Disputed Claim Estimation Procedure | 54 |
| **D.** | Means for Implementation of the Plan | 55 |
| 1. | Continued Entity Existence | 55 |
| 2. | Amended LLC Agreements | 55 |
| 3. | New Membership Interests | 55 |
| 4. | Cancellation of Equity Interests and Other Instruments | 55 |
| 5. | Corporate Action | 56 |
| 6. | Dissolution of the Committee | 56 |
| 7. | Pre-Effective Date Injunctions or Stays | 56 |
| 8. | Preservation of Retained Actions | 56 |

ER00125

|     |     |     |
| --- | --- | --- |
| 9.  | Exemption From Certain Transfer Taxes. | 56 |
| 10. | Section 1123(a)(5)(J) Issuance of New Membership Interests | 57 |
| 11. | Vesting of Assets | 57 |
| 12. | Effective Date Payments | 57 |
| 13. | Creation and Funding of Yellowstone Club Liquidation Trusts. | 58 |
| 14. | Discharge of Claims and Termination of Equity Interests. | 59 |
| 15. | Exculpation and Limitation of Liability. | 60 |
| 16. | Effect of Confirmation. | 60 |
| 17. | Order of Steps on the Effective Date and Knowledge of Restructure of Indebtedness. | 60 |
| 18. | Creation of Trade Creditor Fund. | 61 |
| 19. | Substantive Consolidation | 61 |
| E.  | Ownership and Management of Reorganized Debtors | 63 |
| F.  | Executory Contracts and Unexpired Leases | 64 |
| 1.  | Assumption or Rejection of Executory Contracts and Unexpired Leases. | 64 |
| 2.  | Payment of Cure Amounts. | 69 |
| 3.  | Objections to Assumption and Proposed Cure Amounts. | 69 |
| 4.  | Rejection Claims Bar Date. | 70 |
| 5.  | Post-Petition Contracts and Leases. | 70 |
| G.  | Retention of Jurisdiction | 71 |
| 1.  | Claims and Actions | 71 |
| 2.  | Retention of Additional Jurisdiction. | 71 |
| 3.  | Modifications of the Plan. | 71 |
| 4.  | Revocation and Withdrawal of the Plan | 71 |
| VI. | CONFIRMATION AND CONSUMMATION PROCEDURE | 71 |
| A.  | Disclosure and Solicitation | 71 |
| B.  | Acceptance of the Plan | 72 |
| C.  | Classification | 72 |
| D.  | Confirmation | 72 |
| 1.  | Acceptance | 72 |
| 2.  | Feasibility | 73 |
| 3.  | Best Interests Test | 73 |
| 4.  | Confirmation Without Acceptance By All Impaired Classes | 73 |
| VII. | MATTERS RELATING TO FEDERAL AND STATE SECURITIES LAWS | 74 |
| A.  | No Registration of New Membership Interests | 74 |
| VIII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 74 |
| A.  | Liquidating Trusts | 76 |
| B.  | Tax Consequences To Creditors. | 76 |
| 1.  | Introduction | 76 |
| 2.  | Class 1 - Allowed Prepetition Non-Tax Priority Debt | 77 |
| 3.  | Class 2 - Allowed Prepetition Other Secured Claims | 77 |
| 4.  | Class 3 - Allowed First Lien Lender Claims | 77 |
| 5.  | Class 4, 5 and 8 - Allowed General Unsecured Claims, Convenience Class Claims, and Lender Deficiency Claims | 78 |
| 6.  | Class 7 - Allowed Interests | 78 |

ER00126

iii

    7.    Class 9, 12, 13, and 14 – Rejected Membership Claims ........................... 78
    8.    Federal Income Tax Consequences to Debtors. ...................................... 79
    9.    Tax Consequences to Equity Interest Holders. ....................................... 80
  **C.**    Withholding and Reporting............................................................... 81
**IX.** CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS ............................ 81
  **A.**    Business Risks ............................................................................. 81
    1.    Economic Downturn ............................................................. 81
    2.    Capital Expenditures ............................................................ 82
    3.    World Events ....................................................................... 82
    4.    Unfavorable Weather Conditions ............................................. 82
    5.    Seasonality of Operations ...................................................... 82
  **B.**    Risks Specific to Real Estate Development and this project in particular ................. 83
  **C.**    Competition................................................................................. 84
  **D.**    Forward-looking Statements in This Disclosure Statement May Prove to Be
Inaccurate. ........................................................................................... 85
  **E.**    Credit Suisse Possible Administrative Claim ....................................... 86
  **F.**    Credit Suisse Confirmation Objections .............................................. 86
    1.    Plan Violates Terms of Prior Order. ........................................ 86
    2.    The Plan Fails to Contain Adequate Means for Implementation. ...... 86
    3.    Prohibited Non-Debtor Releases. ............................................ 86
    4.    Not "Fair and Equitable" ....................................................... 87
    5.    Impermissible Classification Scheme/Gerrymandering. ................. 87
    6.    Unfair Discrimination. .......................................................... 87
    7.    Improper Classification And Treatment of Convenience Class Claims. ......... 87
    8.    Violates "Best Interests of Creditors" Test. ................................ 88
**X.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .. 88
  **A.**    Liquidation Under Chapter 7 ........................................................... 88
  **B.**    Alternative Plan(s) of Reorganization .............................................. 88
**XI.** VOTING INSTRUCTIONS ...................................................................... 89
  **A.**    Classes Entitled to Vote ................................................................. 89
  **B.**    Classes Not Entitled to Vote ........................................................... 89
  **C.**    Ballots ...................................................................................... 89
  **D.**    Voting Multiple Claims and Interests ................................................ 89
  **E.**    Incomplete Ballots ....................................................................... 90
  **F.**    Expiration Date ........................................................................... 90
**XII.** CONCLUSION ................................................................................... 90

ER00127

iv

# I. INTRODUCTION

Yellowstone Mountain Club, LLC ("YC"), Yellowstone Development, LLC ("YD"), Big Sky Ridge, LLC ("Big Sky"), and Yellowstone Club Construction Company, LLC ("YCC")(collectively the "Yellowstone Club" or "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on November 10, 2008 ("Petition Date").

The Debtors continue to operate their business as Debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. The Debtors' cases are pending in the United States Bankruptcy Court for the District of Montana (the "Bankruptcy Court" or "Court") under Cases No. 08-61570, No. 08-61571, No. 08-61572, and No. 08-61573 (the "Bankruptcy Cases" or the "Cases"). The Bankruptcy Court entered an order providing for the joint administration of the Cases on November 13, 2008. An Official Committee of Unsecured Creditors (the "Committee" or the "Creditors' Committee") was appointed on December 4, 2008. An examiner with no duties has been appointed in the Bankruptcy Cases.

The Debtors' proposal for reorganization of its businesses is set forth in the Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code (the "Plan"), proposed by the Debtors.

A copy of the Plan is attached hereto as Exhibit I. This Disclosure Statement is intended to describe the Plan and provide you with adequate information to allow you to make an informed judgment regarding the Plan.

Capitalized terms used in this Disclosure Statement have the meaning ascribed to them in the Plan unless otherwise defined in this Disclosure Statement.

The Plan is summarized in Section II below and described in more detail in Section V below. Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims or Interests that are Impaired and that receive or retain property pursuant to the Plan are entitled to vote to accept or reject the Plan. A description of the requirements for acceptance of the Plan is set forth in Section VI below.

# II. SUMMARY OF THE PLAN

## A. General Discussion

For a more detailed description of asserted Claims and available assets, see Section III below. These Sections also describe certain other features of the Plan and implementing provisions thereof.

Among other things, the Plan provides that most of the Debtors' contractual obligations under Club membership agreements will be assumed and honored in accordance with the terms of those agreements and as provided for in the schedule of assumed obligations. Some members will have their existing contracts rejected, but are offered the

ER00128

5

**Case No. 12-35986 ER 498**

election to enter into new uniform contracts in full satisfaction of any rejection claims. Development of the Project will continue. The Plan will fund payments to Convenience Class Unsecured Creditors, and if the present bidder for the Debtors' Membership Interests is the successful bidder, there will be provided a Trade Creditor Fund of up to $7,500,000 for payment of certain Allowed Claims of local trade and other unsecured creditors. The identity of the persons or entities entitled to receive payments from this Fund is discretionary with the Acquirer after consultation with the Unsecured Creditors' Committee and the Ad Hoc Members' Committee.

The Plan is supported by the Creditors' Committee appointed in Development's Chapter 11 Case by the Office of the United States Trustee, the Ad Hoc Committee of Members, and the Current Equity Owners. The Committee, the Ad Hoc Committee and the Current Equity Owners urge all secured creditors, unsecured creditors, and Club members to support the Plan.

The factual representations contained in this Disclosure Statement are made by the Debtors, except as otherwise indicated. Court approval of this Disclosure Statement does not constitute the Bankruptcy Court's verification of the accuracy of those factual representations.

The Plan provides for the reorganization of the Debtors and the continued development and operation of the Project through the issuance of 100% of the membership interest in the Reorganized YC, YD and Big Sky in exchange for the payment of at least $30 million in cash by the successful bidder plus payments on a secured promissory note with a face amount of $70 million payable by the Reorganized Debtor or the successor to the Debtor. As set forth below, the Bankruptcy Court has approved the Bidding Procedures for an auction of the new membership interests or sale of the assets of the Project. The successful bidder at the auction ("Acquirer") will then operate the Reorganized Debtors or acquire the assets of the Project and provide adequate assurance of future performance of the Assumed Obligations.

To facilitate the reorganization, the Debtors, in consultation with the Committee, Ad Hoc Committee of Members, and the Ad Hoc Group of Class B Unit Holders will market the New Membership Interests or the assets of the Project through the Debtors' broker, CB Richard Ellis. The Bankruptcy Court has entered an order setting forth bid procedures that will govern the terms and conditions of the Sale of the New Membership Interests or the assets of the Project, which will include requirements that:

(i)     the entity acquiring the New Membership Interests or the assets of the project (the "Acquirer") shall have the right to assume (or have the Reorganized Debtors assume) those Club membership agreements, and other "Assumed Obligations" as provided under the Plan;

(ii)     the Acquirer shall agree to provide the same treatment for the Debtors' existing employees as is provided for in the Plan and the Definitive Agreement;

ER00129

6

**Case No. 12-35986 ER 499**

(iii)    the proposed alternative Acquirer shall make a deposit of immediately available funds or provide a letter of credit to the Debtors in an amount equal to $5,000,000 upon being invited to participate in the auction; and

(iv)    the Acquirer shall provide written evidence reasonably satisfactory to the Debtors, after consultation with the Committees,  that it has the financial wherewithal to close and become the new owner of the Reorganized Debtors or the assets, to fund ongoing operations and construction of the Project and the Club, and to satisfy the Assumed Obligations when such obligations become due for the purpose of demonstrating the feasibility of the Plan and adequate assurance of future performance of the Assumed Obligations.

(v)    the closing and issuance of the New Membership Interests or transfer of the Project assets shall occur on the Effective Date.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES EQUAL OR GREATER VALUE TO CREDITORS AND MORE RAPID DISTRIBUTIONS THAN AVAILABLE ALTERNATIVES.  A LIQUIDATION ANALYSIS CONTAINING A COMPARISON OF RECOVERIES UNDER THE PLAN VERSUS A CHAPTER 7 LIQUIDATION IS ATTACHED HERETO AS <u>EXHIBIT II</u>.  THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN AND RECOMMEND THAT EACH CREDITOR AND INTEREST HOLDER VOTE TO ACCEPT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS GOOD FAITH ESTIMATES AND ASSUMPTIONS, WHICH ARE BASED ON FACTS CURRENTLY KNOWN TO THE DEBTORS AND WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH CREDITOR AND INTEREST HOLDER SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS OR INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES FOR A FULL UNDERSTANDING OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY FEDERAL OR STATE SECURITIES AGENCIES.

ER00130

**Case No. 12-35986 ER  500**

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF SEVERAL OTHER DOCUMENTS, INCLUDING, BUT NOT LIMITED TO, THE DIP FINANCING FACILITY AND VARIOUS EXHIBITS. THE DESCRIPTIONS CONTAINED HEREIN OF SUCH DOCUMENTS ARE ONLY SUMMARIES AND ARE QUALIFIED ENTIRELY BY REFERENCE TO SUCH DOCUMENTS. COPIES OF THOSE DOCUMENTS ARE ON FILE WITH THE BANKRUPTCY COURT AND HOLDERS OF CLAIMS OR INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW SUCH DOCUMENTS. IF ANY INCONSISTENCY EXISTS BETWEEN THIS DISCLOSURE STATEMENT AND ANY SUCH DOCUMENT, THE TERMS OF SUCH DOCUMENT WILL CONTROL OVER THIS DISCLOSURE STATEMENT.

General information regarding the Debtors and the business and material events leading to and during the Cases is set forth in Sections III and IV below. Except where otherwise noted, this information is provided by the Debtors and their management. **THE STATEMENTS AS TO THE DEBTORS' FINANCIAL CONDITION CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF FEBRUARY 13, 2009 (UNLESS ANOTHER TIME IS SPECIFIED), AND THERE IS NO REPRESENTATION OR IMPLICATION THAT THE INFORMATION CONTAINED HEREIN WILL NOT HAVE CHANGED AS OF ANY TIME SUBSEQUENT TO THAT DATE NOR WILL YOU RECEIVE ANY NOTICE OF SUCH CHANGES.**

Alternatives to confirmation and consummation of the Plan are described in Section X below. Certain matters relating to federal and state securities laws are described in Section VII below. Certain federal income tax consequences associated with the Plan are described in Section VIII below. Certain risk factors and other considerations are described in Section IX below. Historical financial statements of the Debtors are attached as Exhibit III hereto. Projections for the years 2009 through 2014 are attached as Exhibit IV hereto. The Debtors' liquidation valuation is attached as Exhibit II hereto.

BALLOTS WITH RESPECT TO THE PLAN MUST BE RECEIVED AT THE ADDRESS SET FORTH ON THE ENCLOSED BALLOT ON OR BEFORE _____, 2009. FOR YOUR CONVENIENCE, A BALLOT AND PREADDRESSED ENVELOPE ARE ENCLOSED. ANY BALLOTS RECEIVED AFTER THE EXPIRATION DATE SHALL NOT CONSTITUTE VALID BALLOTS AND SHALL NOT BE COUNTED IN DETERMINING THE VOTE OF ANY CLASS. FURTHER VOTING INSTRUCTIONS ARE SET FORTH IN SECTION XI BELOW.

If you have questions concerning the procedure for voting, if you did not receive the appropriate Ballot or Ballots, if you received a damaged Ballot or have lost your Ballot, or if you have any questions concerning the Disclosure Statement and/or the Plan, please call Andy Patten at (406) 252-8500 or Larry Ream at (206) 521-6470.

THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE ACQUIRER OR THE

ER00131

**Case No. 12-35986 ER 501**

DEBTORS AS TO CERTAIN FUTURE MATTERS, WHICH REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT.  NEITHER THE DEBTORS NOR THE ACQUIRER UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.

*[AWAITING APPROVAL:* THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE HONORABLE RALPH B. KIRSCHER, BANKRUPTCY JUDGE OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MONTANA.  APPROVAL BY JUDGE KIRSCHER DOES NOT CONSTITUTE A RECOMMENDATION BY THE COURT AS TO THE MERITS OF THE PLAN, BUT INCLUDES A FINDING THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO ENABLE YOU TO DECIDE WHETHER TO VOTE FOR OR AGAINST THE PLAN.  YOU SHOULD CONSULT WITH COUNSEL AND/OR OTHER ADVISORS REGARDING THE PLAN AS YOU DETERMINE APPROPRIATE.] [A LETTER STATING THE POSITION OF THE COMMITTEE WITH RESPECT TO THE PLAN IS ENCLOSED SEPARATELY WITH THE SOLICITATION PACKAGE.]

**B.    Classification and Treatment of Claims and Interests**

The following table summarizes the classification and treatment of Claims and Interests under the Plan.  This summary is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Section V below.

| Class Description | Treatment under the Plan |
|---|---|
| **Allowed Administrative Expenses.** Allowed costs of the Cases, including, without limitation, professional fees and other expenses of operation during the Cases, including any cure costs under Assumed Contracts and Leases as determined by the Court pursuant to the procedures approved by the Court to fix such cure costs. | Allowed Administrative Expense Claims (including the DIP Financing Facility and cure costs on Assumed Contracts and Leases) shall be paid in full in Cash on or promptly after the Effective Date or, where applicable, when otherwise Allowed or due after the Effective Date; provided, however, that such Claim may be satisfied on such other terms as may be agreed to by the holder of such Claim and the Disbursing Agent.  The Debtors estimate of the amounts required to make the payments for these Claims is shown on Exhibit VIII. |

ER00132

| Class Description | Treatment under the Plan |
|---|---|
| **Ordinary Course Allowed Administrative Expenses.** Ordinary course of business expenses incurred after the filing of the Cases. | Allowed Administrative Expense Claims incurred by the Debtors (other than YCC) in the ordinary course of business to the extent relating to the Project (including pro rated Administrative Expense Claims of governmental units for real estate taxes) and for which the initial invoice on account thereof has not been received in the ordinary course on or before the Effective Date will be assumed by the applicable Reorganized Debtor on the Effective Date and paid, performed or otherwise settled by the Reorganized Debtors when due in accordance with the terms and conditions of the particular agreement or non-bankruptcy law governing such obligation. Allowed Administrative Expense Claims incurred in the ordinary course of business by the Debtors since the Petition Date and for which the initial invoice on account thereof was received in the ordinary course by the Reorganized Debtors on or before the Effective Date shall be paid by the Disbursing Agent in accordance with the agreed terms between the parties. |
| **Allowed Priority Tax Claims.** Allowed Claims entitled to priority under Code § 507(a)(8). | Any holder of an Allowed Priority Tax Claim shall receive at the Debtors' option (i) the amount of the Allowed Priority Tax Claim in one Cash payment on or immediately after the Effective Date or (ii) such other payments as will satisfy the requirements of 11 U.S.C. § 1129(a)(9) with respect to such claims.  That section requires that all such claims receive payments over time together with interest such that the present value of the  payments is equal to the amount of the Allowed Priority Tax Claim.  The Debtors estimate that there will be approximately $1.2 million of priority tax claims. |

ER00133

**Case No. 12-35986 ER  503**

| Class Description | Treatment under the Plan |
|---|---|
| **Class 1 – Allowed Prepetition Priority Claims.** Allowed Claims entitled to priority under Code § 507(a)(3) & (4). | Allowed Prepetition Priority Claims shall be Paid in full in Cash on or promptly after the Effective Date or, where applicable, when otherwise Allowed or due after the Effective Date; provided, however, that such Claim may be satisfied on such other terms as may be agreed to by the holder of such Claim and the Disbursing Agent.  These claims are primarily composed of wage claims of employees.<br><br>The Debtors estimate that there will be approximately $212 thousand of prepetition priority claims. |
| **Class 2- Allowed Prepetition Other Secured Debt.** Class 2 consists of Allowed Secured Claims of Other Secured Lenders. This Class is further subdivided into sub-classes with respect to each person or entity which holds such a Claim. | **Class 2 is Unimpaired**  Each and every Holder of a Claim that is a Subclass of Class 2 will be dealt with according to one of the following alternatives: (i) the rights of the holder will not be modified by the Plan, (ii) the collateral will be surrendered, or (iii) any default prior to the Plan's Effective Date will be cured and the original obligation reinstated.<br><br>The Debtors estimate that there will be approximately $1.6 million of Class 2 Claims. |
| **Class 3 – Allowed Prepetition First Lien Claims.** Class 3 consists of all Allowed Secured Claims of the First Lien Lenders, whose agent in these proceedings is Credit Suisse. | **Class 3 is Impaired.**  Class 3 will be paid its Allowed Secured Claim related to the Project based on the allocated portion of the Equity Purchase Payment attributable to the Collateral.  The Holders of the Class 3 Claims will retain their liens on any other Collateral.  Based on the allocation of value between unencumbered Project Assets and the Project Assets that serve as Collateral for the Class 3 Claim, the portion of the Claim secured by Project Assets will receive some or all of the promissory note paid to the Estates for the issuance of new equity in the Reorganized Debtors.  The Bankruptcy Court |

ER00134

11

| Class Description | Treatment under the Plan |
|---|---|
| | has scheduled a hearing for May 8 to allocate the value of the Project between the encumbered and unencumbered assets. The note will be secured by all the Collateral currently securing the Claim plus all the Debtors' presently unencumbered property. No payments shall be made to the First Lien Lenders until the final resolution of Avoidance Claims against them on account of actions prior to the filing of the Bankruptcy Cases. The Plan includes provisions that addresses the impact of an election by the Holders of Class 3 Claims to have their Allowed Claims treated in accordance with Section 1111(b) of the Bankruptcy Code. |
| **Class 4 – General Unsecured Claims.** Class 4 consists of Allowed General Unsecured Claims. | **Class 4 is Impaired.** Following the Effective Date, the Holders of Allowed General Unsecured Claims shall receive periodic distributions from the Liquidation Trusts which will pursue the liquidation of all the Estates' non-operating assets and all Avoidance Actions. In the event CrossHarbor, or an affiliate, becomes the Acquirer, some Holders of General Unsecured Claims may be able to participate in a pool of funds which will be used for payments to preserve the reputation and standing of the Club in the community. The persons or entities participating in the Trade Creditor Fund will be chosen by the Reorganized Debtors in consultation with the Unsecured Creditors' Committee and the Ad Hoc Members' Committee. |
| **Class 5 – Convenience Class Claims.** Class 5 consists of Convenience Class Claims. These are defined as Allowed General Unsecured Claims that total less than $5,000 or as to which the Holder elects to voluntarily reduce the claim to $5,000. | **Class 5 is Unimpaired.** Following the Effective Date, the Holders of Convenience Class Claims shall receive cash equal to 100% of such claim in full and complete satisfaction of such claim. |

ER00135

12

**Case No. 12-35986 ER  505**

| Class Description | Treatment under the Plan |
|---|---|
| **Class 6 – Intercompany Claims.** Class 6 consists of Intercompany Claims. | **Class 6 is Impaired.** These claims shall receive periodic distributions from the Liquidation Trusts which will pursue the liquidation of all the Estates' non-operating assets and all Avoidance Actions. |
| **Class 7 – Equity Interests.** Class 7 consists of the Allowed Equity Interests of the owners of the Debtors. | **Class 7 is Impaired.** The existing equity interests shall be cancelled on the Effective Date. The Holders of such interests shall be residual beneficiaries of the Liquidation Trusts and shall be entitled to receive distributions from the Liquidation Trusts after the full payment of all prior Allowed Claims. |
| **Class 8 – Lender Deficiency Claims.** Class 8 consists of the Allowed Unsecured Claims, if any, of the First Lien Lenders. | **Class 8 is Impaired.** Class 8 will receive Pro Rata Payments from the Liquidation Trusts on a par with other Allowed General Unsecured Claim Holders. No payments shall be made to the Holders of the Lender Deficiency Claims until the final resolution of Avoidance Claims against them on account of actions prior to the filing of the Bankruptcy Cases. |
| **Class 9 – Pioneer/Frontier Member Rejection Claims.** Class 9 consists of the Allowed Unsecured Claims, if any, of Pioneer/Frontier Members whose contracts are being rejected under the Plan. | **Class 9 is Impaired.** Class 9 will receive Pro Rata Payments from the Liquidation Trusts on a par with other General Unsecured Claim Holders. The Holders will also have the option to waive all their Claims against the Debtors and the Estates in exchange for a new membership agreement with the Reorganized Debtor. |
| **Class 10 – American Bank Claims.** Class 10 consists of the Allowed Secured Claims of the American Bank. | **Class 10 is Impaired.** Class 10 will receive interest only payments at the existing non default rate under its loan documents for 23 months and will receive the entire balance of the Claim on the 24th month after the Effective Date. The lien will remain in place. In the event sales take place prior to the 24th month, the existing contract terms for |

ER00136

13

| Class Description | Treatment under the Plan |
|---|---|
| | deed releases will apply. |
| **Class 11 – Prim Secured Claims.** Class 11 consists of the Allowed Secured Claims of Prim Vintage Development, L.P. | **Class 11 is Unimpaired.** The Collateral securing the Prim Secured Claim will not revest in the Reorganized Debtors on Confirmation and the Holder of the Secured Claim will retain its lien and be free to exercise all its rights with respect to the Collateral in accordance with Montana law. |
| **Class 12 – Honorary Member Rejection Claims.** Class 12 consists of the Allowed Unsecured Claims, if any, of Honorary Members whose contracts are being rejected under the Plan. | **Class 12 is Impaired.** Class 12 will receive Pro Rata Payments from the Liquidation Trusts on a par with other General Unsecured Claim Holders.  The Holders will also have the option to waive all their claims against the Debtors and/or the Estate in exchange for a new membership agreement with the Reorganized Debtor. |
| **Class 13 – Founders Circle Member Rejection.** Class 13 consists of the Allowed Unsecured Claims, if any, of Founders Circle Members whose contracts are being rejected under the Plan. | **Class 13 is Impaired.** Class 13 will receive Pro Rata Payments from the Liquidation Trusts on a par with other General Unsecured Claim Holders.  Each Holder will also have the option to request a new membership agreement, which request may be denied by the Reorganized Debtor.  If the Reorganized Debtor accepts a Holder's request for a new membership agreement, said Holder will waive all its claims against the Debtors and/or the Estate in exchange for a new membership agreement with the Reorganized Debtor. |
| **Class 14 – Company Member Rejection Claims.** Class 14 consists of the Allowed Unsecured Claims, if any, of Company Members whose contracts are being rejected under the Plan. | **Class 14 is Impaired.** Class 14 will receive Pro Rata Payments from the Liquidation Trusts on a par with other General Unsecured Claim Holders.  Each Holder will also have the option to request a new membership agreement, which request may be denied by the Reorganized Debtor.  If the Reorganized Debtor accepts a Holder's request for a new membership agreement, said Holder will waive all its claims against the Debtors |

ER00137

14

**Case No. 12-35986 ER 507**

| Class Description | Treatment under the Plan |
|---|---|
| | and/or the Estate in exchange for a new membership agreement with the Reorganized Debtor. |

### C.     Effective Date

The Effective Date shall be the date not more than five days after the later of the Confirmation Date or the date on which all conditions to the effectiveness of the Plan have been satisfied or waived.  A notice of the Effective Date shall be filed with the Bankruptcy Court.

### D.     Acceptance of the Plan

A Class of Claims or Interests shall have accepted the Plan if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of the Claims or Interests that are Allowed or deemed Allowed for voting purposes and that have actually voted on the Plan. Classes of Claims or Interests that are entitled to vote on the Plan are identified in Section XI of this Disclosure Statement.  The votes of insiders are not counted in determining whether at least one class of impaired creditors has accepted the Plan for purposes of Section 1129(a)(10) of the Bankruptcy Code.  The requirements for Confirmation of the Plan are discussed in Section VI of this Disclosure Statement.

### E.     Credit Suisse Requested Disclosures

Credit Suisse has requested additional disclosures with respect to a myriad of matters. Where relevant to other creditors' understanding of the Plan, the Debtors have included the information.  For the absence of doubt, the Debtors address each item in Credit Suisse's requested additional disclosure in Exhibit VI.

### F.     Yellowstone Club World Trustee Requested Disclosures

Certain alleged creditors of Yellowstone Club World filed an involuntary bankruptcy petition against Yellowstone Club World.  No party defended against the involuntary petition and an order for relief was entered by the Bankruptcy Court.  Ross Richardson has been appointed as trustee.  His counsel has filed an objection to the adequacy of the Disclosure Statement. Where relevant to other creditors' understanding of the Plan, the Debtors have included the requested information.  For the absence of doubt, the Debtors address each item in the Yellowstone Club World's Trustee's requested additional disclosure in Exhibit IX.

ER00138

## III. DESCRIPTION OF THE DEBTORS, THEIR BUSINESS AND FINANCIAL CONDITION.

A.   **The Yellowstone Club**

   1.   **Ownership and Senior Management**

On the Petition Date, Edra Blixseth was the indirect owner of a majority of the equity interests in the Debtors. The notion of forming Yellowstone Club began in the mid 1990's. Edra wanted a place where she could relax and enjoy her family. As more friends came to visit, it became apparent that there was an opportunity to share the wonderful experience with others of like mind, with a strong family orientation. Since its inception in the mid 1990's, Edra has worked closely with each operation responsible for the formation and growth of Yellowstone Club. She was intimately involved in the planning and implementation of the day-to-day experience at the Club. Since its inception and until August 2008, Tim Blixseth was in control of the day-to-day operations of the Yellowstone Club.

The Vice President of Club Operations and General Manager is Hans Williamson. He joined the Yellowstone Club team in 2007 as Vice President of Procurement and Technology. In 2008, Hans was named Vice President of Club Operations and General Manager. Hans came to YC with an extensive background in hotel and restaurant procurement, where he most recently served as Senior Vice President, Operational Excellence with Levy Restaurants' Global Group. Prior to joining Levy Restaurants, Hans started his career in 1983 in hospitality management with Hilton Hotels Corporation. Throughout his 11-year career with Hilton, Hans served in various management positions, most notably, as the Director of Purchasing for the central region of the United States for a period of seven years. Hans graduated with a B.S. in Hotel Administration from Cornell University and earned a certificate in Purchasing Management from DePaul University.

The Vice President of Sales and Marketing is Charlie Callander. He joined the Yellowstone Club management team in 2001 after completing a 20-year commitment to the development, marketing, and selling of The Vintage Club in Indian Wells, California. The Vintage Club is a multiple golf course, high-end, private community which has become a landmark project, and has since been emulated by a number of similar developments around the country. His interest in being involved with what was clearly going to be another ground-breaking community – in the mountains instead of the desert – brought him to the Yellowstone Club. Aside from his role as Vice President of Sales & Marketing, Charlie has been actively involved with many additional leadership roles including President of DreamCatcher Endowment, Inc. – Yellowstone Club's charitable giving affiliate which is dedicated to raising funds and improving education and awareness to support local organizations that contribute to the overall well-being of the Big Sky Community and Southwest Montana. Charlie currently serves as President of YC's Property Owners Association and the Architectural Review Committee, as well as the Club's exclusive

ER00139

16

Broker. Under his direction, the Sales office and Marketing team recently exceeded one billion dollars in sales of YC property.

### 2. **Location**

Yellowstone Club is located in the heart of the Rocky Mountains, adjacent to Big Sky, Montana, and Yellowstone National Park. These landmarks give orientation:

TO THE NORTH: Big Sky Ski Area and the Spanish Peaks, most notably, Lone Peak

TO THE EAST: Yellowstone National Park and the Gallatin Mountains

TO THE SOUTH: National Forest Lands, Cinnamon Ridge, The Sphinx and The Helmet

TO THE WEST: Lee Metcalf Wilderness Area, Muddy Creek Drainage, Cedar and Fan Mountains

### 3. **Yellowstone Club Facts**

The heart and soul of the Yellowstone Club is the community of families with like interests and a desire to share them with each other in the great Montana outdoors. One cannot put a finger on the whole that comprises Yellowstone Club membership. Naturally, it varies for each individual, but a common word often heard at the Club is 'Freedom!' Freedom from daily routines that are left behind at home and at the office. It is the freedom to connect with "Mother Nature" at her finest, whether the ground is covered with a blanket of white snow or the fairways are lush and green. It is the sound of running water in the rivers and streams and the sound of children's laughter. It is the enjoyment of a fine meal and a great bottle of wine with friends. There are approximately 13,500 acres of land within the Club boundaries under the master plan.

#### a. **General**

• Yellowstone Club, "The World's Only Private Ski and Golf Community", is located in Big Sky, Montana, on 13,500 acres of private land near the northwest corner of Yellowstone National Park;

• The Club was established by Tim and Edra Blixseth in late 2000.

• Yellowstone Club is limited to 864 residential properties, and membership is by invitation only. Club amenities are available exclusively to Yellowstone Club members and their guests.

#### b. **Community**

• There are a wide variety of options for member residences at Yellowstone Club. They include generous home-sites with spectacular views, on-mountain chalets, lodges,

ER00140

17

**Case No. 12-35986 ER  510**

private ranches, single-family custom residences, and condominiums in Sunrise Ridge and The Enclave. Many of these options offer ski access or golf course frontage.

• Families are what make Yellowstone Club so special, and children of all ages enjoy a wide variety of guided activities. Individual attention coupled with group fun offer children a comfortable, enjoyable environment and a terrific opportunity to immerse themselves in everything 'Montana.'

• Dining opportunities include three classic lodges: Rainbow Lodge, Warren Miller Lodge, and Timberline Café. All feature a wonderful mountain-elegant atmosphere, with a broad range of menu items from ultra-gourmet to "Montana casual," any of which can be paired with selections from a world-class wine list.

• At the base of Pioneer Mountain is the substantially complete 110,000-square-foot Warren Miller Lodge. This grand structure includes 21 condominium units, a dining room, lounge, retail and office space, a spa, an exercise room, casual café, lobby bar, ski shop, business center, three level parking structure and teen center.

• SnoCat Dinners at the mountain-top restaurant, Timberline Café, offers an adventurous and very special opportunity to enjoy an exceptional YC dining experience. A person can ride in comfort in one of YC's deluxe snow coaches, each fully-equipped with XM Radio, bucket seats, carpeting, a small wet bar, drink holders and heated windows.

• The rustic-yet-refined Guest Cabins provide a memorable lodging experience for members and guests. These twenty, custom-designed and attractively-furnished log cabins are located mid-mountain, they feature ski access, and are an easy walk from the breakfast, lunch, and dinner service, pool, and the inviting hot tub found at the Rainbow Lodge.

• Yellowstone Club employs a professional public safety and security staff to ensure privacy for all members.

• Yellowstone Club maintains its own on-property, 24/7 Fire Department and EMT for immediate response to medical and structural emergencies.

• Annual Club events include, among many others: golf tournaments, winemaker weekends, a spectacular New Year's Eve celebration with fireworks, a member ski race series, wine tastings, and Camp YC (our family-oriented summer camp).

c.      Skiing

• Skiing at the Yellowstone Club matches many of the world's top ski resorts, thanks to 60+ powder-drenched trails dropping 2,700 vertical feet over more than 2,200 acres—all receiving an average annual snowfall of well over 300 inches.

• Multiple Doppelmayr high-speed bubble-equipped detachable quad lifts and fixed grip double and triple chairs service both Pioneer (9860') and Andesite (8850') mountains.

ER00141

18

• The front side of Pioneer Mountain features an array of cruising corduroy groomed trails, knee-deep powder on moderate pitches and steep above-timberline chutes. The backside of the mountain boasts unparalleled gladded skiing and more powder.

• Yellowstone Club features its own children's instruction area complete with a Magic Carpet surface lift. A terrain park also offers a variety of jumps, rollers, rails, and boxes to challenge those who want to add excitement to their run while skiing or snowboarding.

• Four lifts swiftly deliver members to 1,350 vertical feet of groomed skiing on adjacent Andesite Mountain, while providing convenient ski access to many of the homes.

• Big Sky Ski Resort's 3,812 acres and Moonlight Basin Ski Area's 1,900 acres are interconnected with the Yellowstone Club's two peaks, for a combined total of over 7,500 total acres of skiing terrain available for members and their guests.

• Yellowstone Club features its own Ski Patrol and Snow Safety Department. Additionally, the Snowsports Department's guides and certified ski instructors are available upon request, for all ages and abilities. Other guided or unguided winter activities include cross-country skiing, snowshoeing and sleigh rides.

### d.     Golf

• Yellowstone Club offers an 18 hole championship golf course (with separate practice facilities) designed by former British Open and Senior Open champion Tom Weiskopf. The views are breathtaking, and the variety of terrain and multiple tee placements make the course challenging for players of all abilities.

• The spectacular mountain layout features unbelievable vistas, with stunning yet extremely playable elevation changes, creating what is one of the most celebrated mountain golf courses in the world.

• Temporary facilities are being utilized until a clubhouse is completed.

### B.     Organization And Ownership.

The Debtors are all limited liability companies incorporated and existing under the laws of the state of Montana.

### 1.     Yellowstone Mountain Club, LLC

Yellowstone Hotel Management LLC, which owns the hotel and restaurant operation known as Bucks T-4, is a wholly owned subsidiary of YC. Under the Plan and the Definitive Agreement, as presently drafted, the membership interests in this entity will be transferred to the YC Liquidation Trust and none of the assets owned by Yellowstone Hotel Management, LLC will be part of the Project after the Effective Date. Certain employees are housed at the

ER00142

19

**Case No. 12-35986 ER  512**

hotel owned and operated by Yellowstone Hotel Management LLC.  The Acquirer and/or the affected employees will have to find replacement housing if the Plan is confirmed.

## 2. **Yellowstone Development, LLC**

Yellowstone Utilities, LLC is a wholly owned subsidiary of YD and acts as the billing entity for utility service within the Yellowstone Club property.  Under the Plan, the membership interests in this entity will be retained by the Reorganized Debtors.

Yellowstone Club Construction Company LLC is a wholly owned subsidiary of YD that performed construction services at the Club.  It is one of the Debtors.  Under the Plan, all its assets will be transferred to the YCC Liquidation Trust.

St. Andrews International Golf Club Limited  is a wholly owned subsidiary of YD.  It is a UK company which owns 265 acres in St. Andrews, Fife, Scotland with existing entitlement for the development of a private golf club and condos.  Under the Plan, the membership interests in this entity will be transferred to the YD Liquidation Trust.  The Yellowstone Club World Trustee has filed a $50,000,000 claim based on an alleged right of use and option agreement.  The Debtors dispute that there is any valid claim.  To the extent there is a valid executory contract, however, it would be rejected by the Plan.  The Yellowstone Club World Trustee has requested that other creditors be informed of his claims with respect to the use of and right to buy the St. Andrews property.Cosburn Investments B.V. is a wholly owned subsidiary of YD.  It is a Netherlands company which owns 100% of the equity interest of Jaroup Investments B.V.,  another Netherlands company which owns 100% of the equity interest of Danika Investments Limited – an Irish company that owns the Châteaux de Farcheville, a majestic 14th-century chateau half an hour outside Paris and situated on over 1000 acres of land.  Under the Plan, the ownership interest in this entity will be transferred to the YD Liquidation Trust.  The Châteaux served as additional collateral for the DIP Loan and under the Plan the DIP Loan is being repaid in full in cash on the Effective Date.  The mortgage on the Châteaux, therefore, will be released as part of the Effective Date closing transactions.  The Yellowstone Club World Trustee has filed a $50,000,000 claim based on an alleged right of use and option agreement.  The Debtors dispute that there is any valid claim.  To the extent there is a valid executory contract, however, it would be rejected by the Plan.  The Yellowstone Club World Trustee has requested that other creditors be informed of his claims with respect to the use of and right to buy the Farcheville property.

## 3. **Big Sky Ridge, LLC**

This entity is 50% owned by YD and 50% owned by Edra Blixseth.  It is a Debtor and under the Plan, all of the existing membership interests are being cancelled and new membership interests are being issued to the Acquirer.

## 4. **Ownership of Yellowstone Mountain Club and Yellowstone Development**

BLX Group, Inc. (an Oregon company) is the majority shareholder possessing 95% of the class A shares in both YC and YD with the remaining 5% of the Class A shares held by

ER00143

20

Blixseth Family Investments, LLC (60% of which is controlled by Edra Blixseth).  The class B shares are held by JVB Properties with 2%; along with Blixseth Family Investments, LLC, Bankers Financial Corporation, MTN Vistas Properties, A.C. and Linda K. Markkula Trustees of the Arlin Trust, Michael Snow, Spano Yellowstone Holdings, Robert Watson, Gregory C. Branch Family Limited Partnership each owning a 1% interest in the Class B shares.

**C.      Debtors' Business And Operations.**

The Debtors are the owners, developers, and operators of a master planned unit development located in Madison County, Montana known as the Yellowstone Club.

The Project is an approximately  13,500 acre vacation home community that includes one championship golf course, clubhouses, an equestrian center, ski lodges, and other recreational amenities.  The Project's master plan provides for a density of 864 residential units, of which 439 residential units have been sold to date.  The Project is marketed toward sophisticated, high end consumers who desire first class operations and amenities.

During the case, the Debtors believe that the members have had a positive reaction to the operations.  Discovery Land Company was hired by the Debtors on September 1, 2008, and has managed the day to day operations since that date.  Post-petition, the amount of delinquent dues payments has decreased from levels experienced during 2007 and the first half of 2008.  After the filing and approval of the DIP Loan, the Debtor was able to collect over 90% of the dues payments for the first half of 2008, a collection level far higher than historical collection.   The Debtors collection rates with respect to the second half dues payments has not been as high and members have failed to pay the second half dues in the amounts that were required to be paid under the terms of the DIP Financing.  Such failure is a default under the terms of the DIP Loan.

**D.      Employees.**

As of December 31, 2008, the Debtors employed a total of approximately 566 employees.  Of these employees, approximately 280 work year-round and serve in many different important capacities, including, without limitation, development, marketing, accounting, and Club operations.  Approximately 42 of the year-round employees are salaried and approximately 238 are paid hourly.  In addition, the Debtors typically hire approximately 300 employees to work on a seasonal basis (generally December through April) for the Debtors and in connection with the skiing operations.

**E.      Real Property And Personal Property.**

The Project occupies approximately 13,500 acres, with over 85% of the land preserved as open space for year-round outdoor recreational activities and natural habitat.  The allowable density under the Project's master plan is 864 residential units (both single family lots and condominium units) and 439 units have been sold or transferred to date.  This

ER00144

**Case No. 12-35986 ER  514**

does not include any of the property commonly known as the Settlement, which is owned by
Edra Blixseth.

The balance of the Project's real property is either owned by the Debtors or dedicated
for public infrastructure and common area use.  The Project includes the real property
improvements that comprise the multi-generational resort-like amenities described in detail
in Section III.A.3 above, including the ski facilities and the championship golf course
designed by Tom Weiskopf, an Equestrian Center, the Warren Miller Lodge, and 20 Guest
Cabins.

The master plan document does not provide for any allocation of the remaining
available density units to individual parcels of property.  Rather, the future development of
individual parcels must comply with applicable zoning requirements with respect to
densities.  As of the date of filing of the bankruptcy cases, the following table represents the
Debtors' understanding of the remaining permissible density units for the property included
in the master plan boundaries.

| Subdivisions | Unit Type | Platted | In-Process | TBD | Total |
|---|---|---|---|---|---|
| Ranches | Res. Lots | 4 | | | 4 |
| Overlook | Res. Lots | 5 | | | 5 |
| Pine Ridge (Phase 3) | Res. Lots | 38 | | | 38 |
| Yellowmule (Golf Course) | Res. Lots | 42 | | | 42 |
| Big Sky Ridge (Phase 3A) | Res. Lots | 70 | | | 70 |
| Andesite (Phases 1 & 2) | Res. Lots | 187 | | | 187 |
| Pioneer | Res. Lots | | | 35 | 35 |
| SlopeSide | Condominium | 12 | | | 12 |
| Sunrise Ridge | Condominium | 58 | | | 58 |
| Parkade | Condominium | | | | 10 |
| American Spirit | Condominium | | 40 | | 40 |
| Corral | Condominium | | | 35 | 35 |
| Lower Golf | Condominium | | | 30 | 30 |
| Eglise Ridge | Condominium | | | 100 | 100 |
| Big Springs Village | Condominium | | | 53 | 53 |
| Eglise Chalets | Condominium | | | 80 | 85 |
| Phases 4, 5 & 6 | 53 Condo / 7 Lot | 60 | | | 60 |
| | | 476 | 40 | 333 | 864 |

In addition to the real property, the Debtors own personal property used in connection
with the development and operation of the Project.  This personal property includes furniture,
fixtures, and equipment for the Club and Project development, vehicles , and other
machinery and equipment (including lawn mowers, grooming and trimming equipment,
blowers, snowmobiles, Clubcar carryalls, Trucksters, radios, rollers, and other similar
equipment).

ER00145

22

**Case No. 12-35986 ER  515**

Approximately 320 individuals and their families are members in the Club. Prior to the Petition Date, there were seven different available memberships: (1) National, (2) Pioneer, (3) Frontier, (4) Company, (5) Founders' Circle, (6) Honorary and (7) Ordinary/Residential. All dues are paid in advance, and thus are for the future use of the Club. The current Club membership structure requires all Resident Members to own a lot at Yellowstone Club and to pay an initial membership deposit that is refundable (with certain conditions) upon the earlier of (i) resignation and reissuance of the membership or (ii) thirty (30) years. Memberships are acquired in conjunction with purchases of a residential unit.

## F.      Valuations

The Debtors' Plan contemplates that 100% of the Equity Interests in YC, YD, and Big Sky will be issued to an entity, or the assets that comprise the Project will be sold to an entity. The Plan and the Court's Plan Solicitation Order provides for detailed procedures that will govern the Debtors' efforts to obtain higher and better offers for the issuance of the equity interests or the sale of the assets of the Project. Despite repeated requests from Credit Suisse and other parties to require the Debtors to include valuation opinions in this Disclosure Statement, the Bankruptcy Court agreed that the Debtors would not be required to include such information. Accordingly, this Disclosure Statement does not include any opinions of value by the Debtors, who prefer to rely on the marketplace to set the value for the Project. On March 2, 2009, Credit Suisse filed a motion asking the Bankruptcy Court to value its alleged Secured Claim at an amount of not less than $310 million dollars. The Bankruptcy Court scheduled a hearing on that valuation motion for April 6, 2009. The Debtors filed a motion to strike the hearing based on their argument that the market place should fix the value of Credit Suisse's interest in the estate's interest in the Credit Suisse collateral. The Bankruptcy Court denied the Debtors' motion, but did reschedule the hearing for May 8, 2009, ten days prior to the Confirmation Hearing. The Debtors anticipate that the Bankruptcy Court will conclude that the value of the collateral securing the Credit Suisse lien claim under section 506(a) of the Bankruptcy Code is only a portion of the proposed sale price under the Plan after the completion of the marketing process.

## G.      Causes Of Action.

### 1.      Non-Bankruptcy Causes of Action.

The Debtors may have rights and causes of action against third parties, including those that arise in the ordinary course of the Debtors' business. Such rights and causes of action include, among others: (i) actions against contractors, subcontractors, suppliers, manufacturers, and other third parties on account of defective, substandard, or non-conforming goods and services, or for failure to provide goods and services as required by contract; (ii) actions for indemnity, contribution, and subrogation against third parties in connection with Claims made against the Debtors; and (iii) other types of rights and causes of action that may arise from time to time in the course of the Debtors' operations. At the present time, the Debtors are unaware of any such actions that would be material to the future operations or recoveries for the Liquidating Trusts. The Plan expressly preserves the

ER00146

Case No. 12-35986 ER 516

Debtors', Reorganized Debtors', and Estates' rights with respect to all such causes of action, whether or not asserted prior to the Plan's Effective Date, and whether or not described in the Plan, this Disclosure Statement, or the Debtors' Schedules, except to the extent such causes of action are expressly waived and/or released in the Plan. If such causes of action relate to the operation of the Club, or its retained property, the Reorganized Debtors reserve the right to bring such actions and enforce such rights, regardless whether a potential defendant in such an action has filed a proof of claim in the Cases, voted (or not voted) to accept or reject the Plan, or retained or received any consideration under the Plan. If such causes of action are unrelated to the operation of the Club, then they are transferred to the Liquidation Trusts and the Trustees reserve the right to bring such actions and enforce such rights, regardless whether a potential defendant in such an action has filed a proof of claim in the Cases, voted (or not voted) to accept or reject the Plan, or retained or received any consideration under the Plan

The following is a list of causes of action that the Debtors contend they may have against third parties, which list is not intended to be exhaustive:

• Collection Actions. The Debtors have causes of action for the nonpayment of amounts owed by the following categories of people/entities: (i) Members on account of past due amounts owing with respect to their memberships and under their respective membership agreements; and (ii) Vendors on account of outstanding credits that have not been applied or refunded to the Debtors.

• Warranty and other Contractual Rights. The Debtors have ongoing rights under contracts and other agreements with third parties, including, but not limited to, potential warranty and other claims or rights against contractors, subcontractors, suppliers, manufacturers, and other third parties. Nothing in the Plan is intended in any way to constitute a waiver or release of such claims or rights.

• Note Collections. The Debtors have causes of action for the collection of promissory notes against BGI, the owner of a majority of the Membership Interests in YC and YD. Among these notes are notes having a face amount of approximately $275,000,000.00. The Bankruptcy Court has authorized the Committee to pursue collection of these notes and the Committee has commenced an Adversary Proceeding. This cause of action will be transferred to the Liquidation Trusts. The First Lien Lenders claim a security interest in the Notes. Depending on the outcome of the Avoidance Actions against the First Lien Lenders discussed below, there may be no realizable value associated with the BGI notes for Unsecured Creditors. In such events, it is likely that the Trustee will abandon any interest in the BGI notes.

• Another potential action would be related to the collection of a note payable by Edra Blixseth in the face amount of Thirty Nine Million Nine Hundred Ninety Five Thousand and no/100 U.S. Dollars $39,995,000.00 related to the August, 2008 transfer of the YD's interest in Tamarindo to Tim Blixseth. Tamarindo is a resort outside Manzanillo, Mexico that was transferred from YD to Ms. Blixseth in exchange for a note from Ms.

ER00147

Blixseth and then immediately transferred to Mr. Blixseth for no consideration as a part of the Blixseths' marital property settlement agreement executed in connection with the dissolution of their marriage. Ms. Blixseth recently filed her own chapter 11 proceeding and it is not known what, if any amounts will be paid to creditors in connection with that proceeding. As a result, the collectable amount of the Tamarindo note is impossible to predict.

### 2.      General Bankruptcy Avoiding Power Causes of Action.

The Debtors' Schedules reflect that various payments were made to creditors during the ninety day period prior to the Petition Date. The Debtors currently are investigating the extent to which such payments might be avoidable under Bankruptcy Code sections 547 or 548. The Debtors currently believe, however, that many potentially preferential payments may be subject to valid defenses, including ordinary course, subsequent new value, and contemporaneous exchange for new value.

The Plan provides that, from and after the Effective Date, the Trustees of the Liquidation Trusts will be responsible for the enforcement of any preference or other Avoidance Actions under the Bankruptcy Code. Specifically included in such Avoidance Actions are actions seeking affirmative and defensive relief against the First Lien Lenders with respect to all of the remaining First Lien Lender Obligations. As indicated earlier, the Bankruptcy Court has scheduled a trial in the matters relating to the avoidance actions against the First Lien Lenders for April 22, 2009.

Credit Suisse has also alleged in pleadings that there may be some Avoidance Actions capable of being asserted against Cross Harbor or its affiliates in connection with the Debtors' transfers to those entities as detailed in Section H.2. below. Any and all such Avoidance Actions would be transferred to the Liquidation Trust.

As noted in the preceding section, the Debtors also transferred certain assets to Edra and Tim Blixseth in transactions that were part of the Blixseths' marital property settlement agreement executed in connection with the dissolution of their marriage. The actual transfer of the Tamarindo property to Tim Blixseth may be avoidable in whole or in part and an Avoidance Action on account of that transfer may be brought by the Trustee of the Liquidation Trust. The Yellowstone Club World Trustee has filed a $50,000,000 claim based on an alleged right of use and option agreement. The Debtors dispute that there is any valid claim. To the extent there is a valid executory contract, however, it would be rejected by the Plan. The Yellowstone Club World Trustee has requested that other creditors be informed of his claims with respect to the use of and right to buy the Tamarindo property in the event the Trustee recover the property from Mr. Blixseth.

Any recoveries or other proceeds received by the Trustees in connection with the prosecution of Transferred Actions shall be distributed in accordance with the provisions of the Plan.

ER00148

25

The Debtors have not included any opinions of the value of any Avoidance Actions in this Disclosure Statement because they have no ability to predict with any type of accuracy the approach to such actions that the Trustee will take or the possible defenses that will be asserted to such claims.

**3.      Causes of Action Related to the 2005 Financing**

Credit Suisse made the First Lien Loan to the Debtors in September, 2005.  That loan, for $375 million, was made for purposes of, among other things, refinancing the Club's outstanding secured debt and distributing a return of capital and/or dividend to Edra and Tim Blixseth, the former equity owner of the Debtors.  Credit Suisse, acting for itself and as the administrative and syndication agent, structured the First Lien Loan and arranged for a group of participating lenders to provide those funds, secured by a first priority lien in some, but not all, of the Debtors' assets.

Some of the proceeds of the First Lien Loan were distributed to the equity Holders of the Debtors or transferred to the Debtors' subsidiaries.  Section 2.6 A. of the Credit Agreement states:

> The proceeds of the Loans made to the Borrower shall be applied, (i) pursuant to Section 6.5(iii), for distributions or loans up to $209,000,000 to members of the Borrower for purposes unrelated to the Yellowstone Development, (ii) pursuant to Section 6.3(ii), for investments or loans of up to $142,000,000 into any Unrestricted Subsidiaries, (iii) to pay the Transaction Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and construction costs associated with the Yellowstone Development in accordance with the Financial Plan.

The Committee contends that Credit Suisse and the Blixseths structured the 2005 financing to leverage the Club and its properties in a manner that harmed the Club's legitimate creditors and members.   Moreover, the Committee contends that the First Lien Lenders were knowing and active participants in the true underlying purposes of the 2005 First Lien Loan.

Montana's Fraudulent Transfer Act and section 544 of the Code provide for avoidance of certain transfers and obligations, including liens and loans.  If the 2005 First Lien Loan was a fraudulent conveyance or otherwise avoidable transfer, the Committee contends it would be just as avoidable against the First Lien Lenders as it would be against the former Equity Owners.  In this case, avoidance of the obligation is especially compelling because the Debtors may have repaid 100% of the loans that actually benefited the Club, together with interest.  Indeed, based on preliminary calculations, the Committee believes that the First Lien Lenders should be obligated to make substantial repayments to the Trust, which, pursuant to the Plan, would be distributed to Allowed Unsecured Claims.

ER00149

26

**Case No. 12-35986 ER  519**

15.     **Exculpation and Limitation of Liability.**

None of (a) the Debtors or the Reorganized Debtors, (b) the Committee, (c) the individual members of the Committee in their capacities as such, (d) the DIP Lenders, any other lenders of (or participants in) the DIP Loan and any agent thereof, (e) the Current Equity Owners, (f) CrossHarbor Capital Partners LLC and all affiliates thereof, (g) the Acquirer and (h) with respect to each of the foregoing Persons, each of their respective directors, officers, employees, agents (including Edra Blixseth, as managing member of the Current Equity Owners), representatives, shareholders, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Person for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan; provided, however, that nothing in this Section V(D)(14) shall be construed to release or exculpate any Exculpated Party from willful misconduct or gross negligence as determined by a Final Order or any breach of the Definitive Agreement or any documents entered into in connection therewith.

16.     **Effect of Confirmation.**

On the Confirmation Date, the provisions of the Plan shall become binding on the Debtors, the Estates, the Acquirer, the Reorganized Debtors, all Holders of Claims against or Equity Interests in the Debtors, and all other parties in interest in the Chapter 11 Cases whether or not such Holders of Claims or Equity Interests are impaired and whether or not such Holders of Claims or Equity Interests have accepted this Plan.

17.     **Order of Steps on the Effective Date and Knowledge of Restructure of Indebtedness.**

Notwithstanding anything to the contrary contained herein, all steps taken in implementation of the Plan and effective on the Effective Date shall be deemed to occur sequentially such that, for all purposes of the Plan and the Confirmation Order, the following actions occur in the following order: (1) discharge of any Claims or other indebtedness; (2) cancellation of Equity Interests, and (3) issuance of New Membership Interests in the Reorganized Debtors to Acquirer.  Further, the Debtors are deemed to have acknowledged and agreed that for federal income tax purposes, (i) Acquirer is purchasing the assets of the Debtors and that (ii) the Debtors are aware that the indebtedness to which they are subject with respect to their assets is being restructured in connection with the Acquirer's acquisition and for federal tax purposes the modifications and cancellation of any Claims are treated as taking place prior to Acquirer's purchase, consistent with Treas. Reg. §1.1274-5(b)(1).

ER00183

**Case No. 12-35986 ER  520**

E.    **Credit Suisse Possible Administrative Claim**

As set forth above, Credit Suisse has asserted that it might have an Administrative Expense Claim under the provision of § 507(b) of the Bankruptcy Code. If that Claim is ultimately Allowed in an amount that exceeds the available cash being received by the Debtors under the Definitive Agreement or an alternative Definitive Agreement, the Confirmation may not occur.

F.    **Credit Suisse Confirmation Objections**

In connection with the approval of this Disclosure Statement Credit Suisse raised several objections to the confirmation of the Plan. Their counsel has advised the Debtors that Credit Suisse presently intends to vigorously oppose the Confirmation. The Court did not rule on these objections at the time of the hearing on the Disclosure Statement. The Debtors do not believe that any of the objections represent an accurate view of the application of applicable law to the facts of this case and that none of the objections will be sustained by the Court at the Confirmation hearing. According to the pleadings they filed these objections include the following.

1.    **Plan Violates Terms Of Prior Order.**

Credit Suisse alleges that the proposed Plan provides for subordination of the Prepetition Lenders' Deficiency Claim and treats the Claims as disputed claims and liens for purposes of their Plan, and to extinguish them with the Plan. Credit Suisse alleges that the Plan therefore violates fundamental terms of the Interim Order Authorizing Debtors To Obtain Postpetition Financing [Dkt. No. 40] (the "Order") whereby the Debtors explicitly waived their rights to propose a plan with those terms and that the Debtors' should be estopped from taking positions and advancing a Plan and Disclosure Statement where that violates the Order.

2.    **The Plan Fails to Contain Adequate Means for Implementation.**

Credit Suisse alleges that the Plan fails to satisfy Code section 1123(a)(5), because: (i) the Plan seeks to satisfy and extinguish the Prepetition Lenders' liens on Project Assets purportedly in accordance with Code section 1123(a)(5)(E) without a proper legal determination of lien validity pursuant to an adversary proceeding; (ii) the feasibility of the Plan depends upon the success of inchoate litigation against the Prepetition Lenders and their claims and liens; and (iii) the confirmability of the Plan depends upon whether the Prepetition Lenders' exercise their Code section 1111(b) election.

3.    **Prohibited Non-Debtor Releases.**

Credit Suisse asserts that the Plan provides for unlawful releases of "insiders" (including without limitation, Edra Blixseth, her affiliates, BLX Group, Inc., and CrossHarbor Capital Partners and its affiliates) through purported "exculpation and limitation of liability" terms (Plan § 8.4) and also through purported "no recourse" terms (Plan § 7.75).

ER00209

86

**NO. 12-35986**

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appeallate CM/ECF system on April 8, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CB/ECF system

April 8, 2013                          s/ Christopher J. Conant

                                       Christopher J. Conant, Esq

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

## NO. 12-35986

---

TIMOTHY L. BLIXSETH

Appellant,

v.

YELLOWSTONE MOUNTAIN CLUB, LLC
YELLOWSTONE DEVEOPMENT, LLC
BIG SKY RIDGE, LLC
YELLOWSTONE CLUB CONSTRUCTION CO., LLC

Appellees.

---

## APPELLANT'S EXCERPTS OF RECORD
### Volume IV of V
### Pages 522 through 816

---

Appeal from the United States District Court for the District of Montana
Case No. 2:11-73-BU-SEH

---

Phillip H. Stillman
Stillman & Associates
300 South Poine Drive,
Suite 4206
Miami Beach, FL 33139
Telephone: (888) 235-4279
*pstillman@stillmanassociates.com*

Patrick T. Fox
Doubek Pyfer & Fox, LLP
PO Box 236
Helena, MT 59624
Telephone: (406) 442-7830
*patrickfox@douberpyfer.com*

Christopher J. Conant
Conant Law LLC
730 17th Street
Suite 200
Denver, CO 80202
Telephone: (303) 298-1800
*cconant@conantlawyers.com*

Michael J. Ferrigno
Law Office of Michael Ferrigno,
PLLC
1200 N. Main Street, Suite 486
Meridian, ID 83680
Telephone: (208) 319-3561
*michael.ferrigno@ferrigno-law.com*

Attorneys for Appellant Timothy L. Blixseth

# INDEX

## APPELLANT'S EXCERPTS OF RECORD

### TIMOTHY L. BLIXSETH

**Appellant,**

**v.**

### YELLOWSTONE MOUNTAIN CLUB, LLC
### YELLOWSTONE DEVEOPMENT, LLC
### BIG SKY RIDGE, LLC
### YELLOWSTONE CLUB CONSTRUCTION CO., LLC

**Appellees.**

### NO. 12-35986

| Docket No. | Date | Description | Volume | Pages |
|---|---|---|---|---|
| 51 | 11/16/2012 | Order Denying Blixseth's Appeal | I | 1-5 |
| 6.1, Ex. 1 | 1/3/2012 | Memorandum of Decision | I | 6-47 |
| 6.1, Ex. 3 | 1/3/2012 | Memorandum of Decision | I | 48-94 |
| 52 | 11/28/2012 | Notice of Appeal to Ninth Circuit | II | 95-153 |
| 43 | 8/24/2012 | Transcript of Motion Hearing | II | 154-209 |
| 39 | 8/24/2012 | Post Hearing Brief | II | 210-212 |
| 17-1, Ex. 26 | 2/16/2012 | Motion for Summary Judgment Concerning Derivative Claims, Alter Ego, Fiduciary Duty, and Statute of Limitation and Memorandum in Support | II | 213-215 |
| 17-2, Ex. 27 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses | II | 216-217 |

| 17-3, Ex. 28 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation and Supporting Memorandum | II | 218-220 |
|---|---|---|---|---|
| 17-4, Ex. 29 | 2/16/2012 | Ominbus Response to Motions for Summary Judgment | II | 221-223 |
| 18-1, Ex. 30 | 2/16/2012 | August 4, 2010 Memorandum of Decision | II | 224-228 |
| 18-2, Ex. 31 | 2/16/2012 | August 4, 2010 Order | II | 229-231 |
| 12-5 | 2/2/2012 | Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) | III | 232-462 |
| 6.1, Ex. 2 | 1/3/2012 | Notice of Appeal | III | 463-466 |
| 6.1, Ex. 2 | 1/3/2012 | Amended Notice of Appeal | III | 467-471 |
| 6.1, Ex. 4 | 1/3/2012 | Yellowstone Club Settlement Term Sheet | III | 472-491 |
| 6.2 | 1/3/2012 | Yellowstone Club Disclosure Statement | III | 492-521 |
| 7.3, Ex. 7 | 1/3/2012 | Am. Affidavit Of Timothy L. Blixseth in Support of Motion to Disqualify | IV | 522-549 |
| 7.3, Ex. 8 | 1/3/2012 | December 10, 2010 Hearing Tr. | IV | 550-552 |
| 8.1 | 1/3/2012 | Supplemental Affidavit of Timothy L. Blixseth | IV | 553-584 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Cash Collateral Email | IV | 585 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Generic Order Email | IV | 586 |
| 10-1. Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington at Home Email | IV | 587 |
| 10-1, Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Cell Phone Email | IV | 588 |

2

| 10-1, Ex. 8 | 1/3/2012 | Supp. Affidavit, Ex. 8 Peterson Email | IV | 589-590 |
|---|---|---|---|---|
| 10-1, Ex. 9 | 1/3/2012 | Supp. Affidavit, Ex. 9 Harrington "Heads Up" Email | IV | 591-592 |
| 10-1, Ex. 10 | 1/3/2012 | Supp. Affidavit, Ex. 10 Richardson Email | IV | 593-594 |
| 10-2. Ex. 12 | 1/3/2012 | Bankruptcy Court Memorandum of Decision in BLX Group, Inc., Nov. 22, 2011 | IV | 595-609 |
| 10-2, Ex. 13 | 1/3/2012 | AP-88 Complaint | IV | 610-622 |
| 10-2 | 1/3/2012 | Hearing Transcript Disqualification Hearing, Jan. 18, 2011 | IV | 623-680 |
| 10.3, Ex. 14 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, August 16, 2010 | IV | 681-816 |
| 10.3, Ex. 15 | 1/3/2012 | Memorandum of Decision in AP 09-100, September 27,2010 | V | 817-843 |
| 10.3, Ex. 16 | 1/3/2012 | AP-14 Judgment | V | 844-846 |
| 10.3, Ex. 17 | 1/3/2012 | YCLT Motion to Reconsider AP-14 | V | 847-850 |
| 10.3, Ex. 18 | 1/3/2012 | Affidavit of Charles Hingle in Support of YCLT's Motion to Reconsider AP-14 | V | 851-858 |
| 10-3, Ex. 19 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, Sept. 7, 2010 | V | 859-868 |
| 10-3, Ex. 20 | 1/3/2012 | YCLT Motion to Certify for Direct Appeal in AP-14 | V | 869-871 |
| 10-3, Ex. 21 | 1/3/2012 | YCLT Motion to Expedite Hearing on Motion to Certify for Direct appeal | V | 872-874 |
| 10-3, Ex. 22 | 1/3/2012 | Order granting Motion to Expedite Hearing | V | 875-877 |
| 10-3, Ex. 24 | 1/3/2012 | Order granting Motion to Certify Order | V | 878-880 |

3

| 10-4, Ex. 25 | 1/3/2012 | Memorandum of Decision in AP-88, January 3, 2012 | V | 881-900 |
|---|---|---|---|---|
| | | U.S. District Court, District of Montana - Docket Report | V | 901-909 |

Timothy L. Blixseth, in *pro per*
Blixseth Group of Washington, LLC
1000 Second Avenue, 30th Floor
Seattle, WA 98104
Phone: (206) 624-9549
Fax: (206) 386-7343

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re:<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC, et al.,**<br><br>**Debtors.** | **Case No. 08-61570-11-RBK**<br><br>**Jointly Administered with 08-61571 and 08-61572, 08-61573**<br><br>**Also applicable to Adv. Case Nos. 09-64, 09-18, 10-15, 10-88**<br><br>**Chapter 11**<br><br>**AMENDED AFFIDAVIT OF TIMOTHY L. BLIXSETH IN SUPPORT OF MOTION TO DISQUALIFY BANKRUPTCY JUDGE KIRSCHER (WITH EXHIBITS)** |

ER00506

**Case No. 12-35986 ER  522**

I, Timothy L. Blixseth, declare under penalty of perjury of the laws of the United States follows:

1.     I am a resident of the State of Washington.

2.     I have personal knowledge of the facts testified to herein. I am filing my accompanying Motion to Disqualify Bankruptcy Judge in good faith. I believe this Motion is being timely filed because many of the facts that have given rise to Judge Kirscher's appearance of bias against me have come to light only in the last couple of months. I am having to file my Motion to Disqualify Bankruptcy Judge because no Montana attorney would so for fear of retaliation.

3.     I am and have been a defendant or defensive litigant in numerous adversary proceedings within the U.S. Bankruptcy Court for the District of Montana since Sam Byrne of CrossHarbor Capital Partners LLC and my ex-wife, Edra D. Blixseth, put the Yellowstone Club into bankruptcy on November 9, 2008.

4.     One of the bankruptcy cases in which I am defensive litigant is the Yellowstone Club World LLC ("YCW") bankruptcy case. In that case, I was sued by the Chapter 7 Trustee of that estate, Ross Richardson. Mr. Richardson is represented in that case by attorney John Amsden.

5.     In late-Spring of 2010 I reached a potential settlement with Mr. Richardson of the claims that he brought against me on behalf of the YCW estate. The settlement will yield millions in fees to the lawyers for Mr. Richardson and a substantial sum for Mr. Richardson himself.

6.     Even though I had arrived at a potential settlement with Mr

ER00507

1

**Case No. 12-35986 ER  523**

Richardson, we had not finalized and documented the settlement by June 10, 2010.

7.     On June 10, 2010, I received a phone call from Mr. Amsden regarding my settlement with his client, Ross Richardson as Trustee for YCW.  During that phone conversation, Mr. Amsden related to me that Mr. Richardson had talked on the phone with Terry Healow who is one of Judge Kirscher's law clerks.  During this conversation between Mr. Richardson and Mr. Healow, Mr. Healow asked Mr. Richardson if he had finalized his settlement with me.  Mr. Richardson responded by saying that the settlement was almost complete but that a few matters needed to be addressed before it could be finalized.  In response, Mr. Healow told Mr. Richardson to hurry up and get it finalized before I could "renege."

8.     I had this phone conversation with Mr. Amsden on June 10th, during the following days I had several text message exchanges with Mr. Amsden regarding this conversation.  This text message correspondence between myself and Mr. Amsden is evidenced in the string of text messages attached hereto as **Exhibit A**.  Based on my personal knowledge of Mr. Amsden's cell phone number, I can truthfully represent to this Court that his cell phone number is the phone number indicated in Exhibit A as starting with the area code 406.  Out of respect for Mr. Amsden's privacy interests, his full cell phone number has been redacted from Exhibit A.  When I pressed Mr. Amsden via text messages for more details concerning Mr. Richardson's conversation with Judge Kirscher's law clerk, Mr. Amsden acknowledged that Mr. Richardson had this conversation with Kirscher's law clerk but tried to diminish its significance by simply saying that "Ross tells me

ER00508

2

he cannot read anything into clerk's call."

9.      Mr. Amsden has informed one of my attorneys that if I move to disqualify or reassign Judge Kirscher based on the above facts regarding the conversation between Judge Kirscher's law clerk and Ross Richardson, that Mr. Amsden would move to revoke the *pro hac vice* admission of my attorney Michael J. Flynn in the U.S. Bankruptcy Court for the District of Montana.

10.      In April of this year, Christopher J. Conant began providing legal services for me in connection with the litigation that I am subject to in the U.S. Bankruptcy Court for the District of Montana.  Mr. Conant also provides legal services for me in other contexts.  Mr. Conant is an attorney based out of Denver, Colorado.  I have known Mr. Conant since approximately January of 2009 but not until April of 2010 did he become my attorney.  I first met Mr. Conant because he was representing another creditor of Edra Blixseth's, Western Capital Partners LLC ("WCP").  Edra Blixseth is in personal bankruptcy in Montana in Judge Kirscher's court.  In WCP's collection efforts to locate and identify Ms. Blixseth's assets, Mr. Conant contacted one of my attorneys because he thought that my attorneys might have some useful information for WCP in this regard.

11.      Within the last several months, I have been interviewed by federal criminal investigators who have been investigating the bankruptcy and financial crimes of Edra Blixseth and others who might be involved with the collapse of the Yellowstone Club, its bankruptcy and Edra Blixseth's bankruptcy and her rampant bank fraud that she perpetrated for the years leading up to her bankruptcy.  Ms.

ER00509

3

**Case No. 12-35986 ER  525**

Blixseth is also aware of these criminal investigations because she contacted me

within the previous two months after she learned about the existence of these

investigations against her.  Ms. Blixseth learned about these on-going criminal

investigations against her because on September 13, 2010 CrossHarbor conducted a

deposition of a principal of WCP, Jeff Adams, and asked Jeff Adams if he was aware

of a federal criminal investigation of Ms. Blixseth in Montana.  Mr. Adams

confirmed for CrossHarbor under oath that is he aware of such a criminal

investigation because he has been contacted by federal authorities requesting

information about WCP's loan to Ms. Blixseth and that the federal authorities

believe that Ms. Blixseth provided material false information to WCP to induce to

advance funds under its loan.  The evening after CrossHarbor deposed Mr. Adams,

Ms. Blixseth contacted me by phone and was absolutely distraught to have learned

of this criminal investigation of her.  Clearly Ms. Blixseth learned of this

investigation of her after someone at CrossHarbor (likely Sam Byrne) filled her in

on the details of Mr. Adams' deposition testimony.  Based on the continued close

relationship between Ms. Blixseth and CrossHarbor, it is my belief that the reason

why CrossHarbor questioned Mr. Adams about the criminal investigation in

Montana is because its principals (i.e., Sam Byrne) are concerned that should Ms.

Blixseth be indicted, that she will implicate and provide evidence and testimony

against CrossHarbor and Sam Byrne in connection with their criminal conduct

arising from the bankruptcy of the Yellowstone Club.

     12.    The Honorable John L. Peterson, senior, retired bankruptcy judge for

ER00510

**Case No. 12-35986 ER  526**

the District of Montana has acted as a mediator in the many cases within the Montana bankruptcy court in which I am a defendant.  In this capacity he has became intimately familiar with all the facts and circumstances surrounding the Yellowstone Club bankruptcy case and Edra D. Blixseth's bankruptcy case.  As a result, Judge Peterson became familiar with Sam Byrne's and Edra D. Blixseth's role in putting the Yellowstone Club into bankruptcy.

13.     Once Judge Peterson became familiar with these facts, he asked my attorneys to prepare a letter to him detailing the bad faith, and frankly, criminal conduct of Edra Blixseth and Sam Byrne within the Yellowstone Club bankruptcy and Ms. Blixseth's bankruptcy case pending in the Montana bankruptcy case.

14.     At Judge Peterson's request, my attorneys prepared this letter and supported all the factual allegations therein by attaching the relevant document as exhibits thereto.  A true and correct copy of this letter is attached hereto as **Exhibit B**.  However, because the exhibits to that letter are extremely voluminous, I have not included the attachments to the letter but can do so upon request.

15.     Based on my follow-up discussions with Judge Peterson in connection with the above-referenced mediations, he informed me that he forwarded my attorney's letter along to the U.S. Attorney for the District of Montana as part of a criminal referral relative to Edra D. Blixseth and the Yellowstone Club bankruptcy case.

16.     The bankruptcy auction for the Yellowstone Club assets occurred around May 13th 15th of 2009.  The auction for the sale of the Club assets occurred

ER00511

5

**Case No. 12-35986 ER  527**

at the Billings Crowne Plaza Hotel.  The bidders at the auction were Credit Suisse

and CrossHarbor (Byrne's company).  However, also present and participating in

the auction were the Debtor (i.e., the Yellowstone Club which was effectively

controlled by Byrne), and the Unsecured Creditors Committee.  Judge Kirscher

rented a room at the hotel to facilitate ex parte communications between the

bidders.  The auction itself was not public.  Instead it was conducted in closed door

negotiations between CrossHarbor and Credit Suisse, with the Unsecured Creditors

Committee being allowed to participate to some limited extent.  Although my local

counsel Joel Guthals, was present at the hotel, he was not allowed to participate in

the auction, had no participation in the bidders' ex parte communications with

Judge Kirscher, and was otherwise locked out from the negotiations.  Even though

the negotiations were "closed door", Judge Kirscher nevertheless met with the

CrossHarbor and Credit Suisse at the hotel during their negotiations to resolve

bidding issues as they arose.  Immediately following these closed door negotiations

with CrossHarbor and Credit Suisse, Judge Kirscher approved the Plan of

Reorganization for the Yellowstone Club and sale of the Club's assets to

CrossHarbor on May 18, 2009 with no formal notice to me, or other interested

parties.  The altered Plan substantially affected creditors' rights.

17.    As part of the Yellowstone Club plan of reorganization approved by

Judge Kirscher shortly after his closed door meetings with CrossHarbor and Credit

Suisse, the YCLT, which is controlled by four of seven board members appointed by

Credit Suisse, was formed to pursue a massive litigation strategy on behalf of

ER00512

6

**Case No. 12-35986 ER  528**

Credit Suisse against me in adversary cases before Judge Kirscher to collect over

$300 million from me based on a loan that Credit Suisse made to the Yellowstone

Club but was not personally guaranteed by me. That proceeding is Case No. 09-14

in the U.S. Bankruptcy Court for the District of Montana, commonly referred to as

"AP-14."

18.      During the initial phase of AP-14, I raised the obvious problem that

Stephen R. Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula,

Montana was at the time of the filing of the Yellowstone Club bankruptcy, my

counsel in Montana. Yet, Mr. Brown was also a voting member and chairman of the

Yellowstone Club Unsecured Creditors Committee, which was suing me in AP-14

for the recovery of $209 million. Further, Mr. Brown in his capacity as a member of

the UCC had turned over to the UCC and its counsel over 400 email

communications between his firm and me or my other attorneys which could

potentially contain attorney-client privileged discussions. When Mr. Brown turned

over these emails to the UCC, Mr. Brown failed to inform me of this as required by

the ABA Model Rules of Professional Conduct. When I learned of this disclosure, I

raised before Judge Kirscher the gross problem that my current counsel had turned

over to my adversary, the UCC, over 400 potentially privileged communications.

Instead of Judge Kirscher allowing me to review these communications, Judge

Kirscher reviewed these documents *in camera* without giving me a chance to review

them and determine what Judge Kirscher reviewed or opinions he potentially

formed by this *in camera* review. To date, Judge Kirscher has never given me the

ER00513

7

opportunity to review these potentially attorney-client privileged documents.

19. The day before trial was to commence in phase 1 of AP-14, the Yellowstone Club filed a counterclaim against me and both the Club and the Unsecured Creditors Committee dumped in excess of 400,000 pages of discovery on my attorneys.

20. Despite the new lawsuit against me seeking hundreds of millions in damages filed on the eve of trial implicating numerous new defenses and required discovery, the bankruptcy court merely continued the trial *for one week*, then subsequently and scurrilously accused me of delaying tactics by insisting on my due process rights, and most significantly refused to accept my pre-trial order with the new defenses to the one week old law suit.

21. In phase 1 of AP-14, I was given only three weeks for taking discovery and preparing for trial, trial commenced on April 20, 2009, literally seventeen days after the UCC filed its $209 million counterclaim against me.

22. Currently pending before Judge Kirscher are the following adversary cases in which I am a defendant:

      (a)     Adv. No. 09-14

      (b)     Adv. No. 09-18

      (c)     Adv. No. 10-15

      (d)     Adv. No. 09-64

      (e)     Adv. No. 10-17 (Mr. Blixseth is a witness only)

      (f)     Adv. No. 10-88

ER00514

Case No. 12-35986 ER  530

23.     During phase 1 of the trial in AP-14 an issue arose on some question on the impact of the Releases associated with the Marital Settlement Agreement ("MSA") wherein Edra Blixseth on behalf of all the Yellowstone Club entities released me of all liability to the Club entities, in exchange for her obtaining 100% ownership of the Yellowstone Club and Porcupine Creek, which was our residence in Rancho Mirage, California valued at over $200 million.  When my attorneys attempted to introduce the Releases as evidence in trial to establish that I was released from all liability, there was extensive argument over whether the MSA and Releases were included as exhibits within the Unsecured Creditors Committee's ("UCC") Pre-Trial Order - that the court had approved.  The court had previously deprived us of critical defenses by excluding the MSA and Releases from my proposed Pre-Trial Order.  The other side's lawyers argued that the releases were not in their Pre-Trial Order and Judge Kirscher commented that he specifically recalled not including the Releases in the PTO.  My attorney directed Judge Kirscher to where the Releases were inadvertently left in the UCC's Pre-Trial Order as a trial exhibit.  Judge Kirscher paused to thumb through his copy of the PTO and upon discovering that the Releases were included, he leaned back in his chair, gave a glaring stare at the Debtor's attorney, Andy Patten, and then threw the PTO across his desk with great force saying "Yes, it's still in" as if he had relied upon the manipulation of the UCC and the Debtor keeping my critical affirmative defenses out of the PTO.  The manner in which Judge Kirscher showed disgust with having the Releases included in the PTO inadvertently, gave the appearance that his intent

ER00515

**Case No. 12-35986 ER  531**

and the intent of the Debtor's and the UCC was to deprive me a critical affirmative defense in a lawsuit in which I was sued literally only few days before trial commenced.

24.     Edra D. Blixseth is my ex-spouse.  In August of 2008 we ended nearly two years of bitter divorce proceedings where we both spent millions of dollars on attorneys and accountants to divide up our marital assets.  Out of the divorce, Edra obtained the Yellowstone Club and our former residence in Rancho Mirage, California known as Porcupine Creek.  In the summer of 2008, Porcupine Creek was appraised at over $200 million and in 2008 I had a contract to sell the Yellowstone Club to CrossHarbor Capital Partners LLC for approximately $450 million.  Edra also got additional assets out of the divorce that were worth tens of millions of dollars.  Eighty-nine (89) days after the divorce, Edra and Sam Byrne of CrossHarbor put the Yellowstone Club into bankruptcy.  CrossHarbor purchased the Club out of bankruptcy for only $115 million.  Edra Blixseth, CrossHarbor and the YCLT are trying to strip me of my marital assets in spite of Edra Blixseth and CrossHarbor already having over $650 million in marital assets that Edra got out of the divorce.

ER00516

25. Based on the facts discussed herein and in the accompanying motion asking this Court to disqualify or reassign Judge Kirscher, it is my opinion that Judge Kirscher appears to have a deep-seated bias against me.

I declare under penalty of perjury of the laws of the United States the foregoing is true and correct.

Dated November _16_, 2010

Timothy L. Blixseth

1:

ER00517

**Case No. 12-35986 ER 533**

ER00518

EXHIBIT A

Case No. 12-35986 ER  534

----- SMS Text -----
To: +1406580
Sent: Jun 12, 2010 9:27 AM
Subject: John,

John, help me out here a little more. When terry called ross and told him to get his deal done so I can't renege, ross must have asked....why? Curious to know if ross learned a little more which would be helpful to know
Sent via BlackBerry by AT&T


----- SMS Text -----
From: +1406580
Sent: Jun 12, 2010 9:30 AM
Subject: Ross was out friday.

Ross was out friday. Have not spoken to him. Will try this weekend.
Sent via BlackBerry by AT&T



From: 406580
Date: June 15, 2010 9:21:37 AM PDT
To: TIMBLIXSETH@aol.com
Subject: Ross tells me he cannot

Ross tells me he cannot read anything into clerk's call.  How are we doing on debenture?


**Exhibit A to Blixseth Affidavit**

ER00519

Wednesday, October 27, 2010 AOL: TIMBLIXSETH

---

**Case No. 12-35986 ER  535**

ER00520

**EXHIBIT B**

**Case No. 12-35986 ER  536**

# MICHAEL J. FLYNN
PO BOX 690
6156 LA FLECHA
RANCHO SANTA FE, CALIFORNIA  92067

TELEPHONE (858) 756-0771
FACSIMILE (858) 759-0711
CELL: 858 775 7624

MICHAEL J FLYNN
ADMITTED ONLY IN MASSACHUSETTS

ONE CENTER PLAZA, SUITE 240
BOSTON, MASSACHUSETTS 02108
TELEPHONE  617 720 2700
FACSIMILE  617 720 2709
CELL  617 710 8100

March 30, 2010

Hon. John L. Peterson
U.S. Bankruptcy Judge
Mike Mansfield Federal Building and U.S. Courthouse
400 North Main Street
Butte, MT 59701

Re: **Potential Bankruptcy Crimes Committed by Edra D. Blixseth; Samuel T.
Byrne; CrossHarbor Capital Partners LLC and its affiliates, and others**

Dear Judge Peterson:

It was my understanding from our recent conversation that you wanted me to
write a letter to you explaining in detail the facts and circumstances surrounding the
Yellowstone Club bankruptcy, the BLX Group, Inc. bankruptcy, and Edra D. Blixseth's
bankruptcy.  I understood that from our letter, you would forward on some or all of the
information contained herein to the U.S. Attorney for the District of Montana as you
found appropriate.

As you know, it is our opinion that much of the conduct engaged in by Edra D.
Blixseth, Samuel T. Byrne, CrossHarbor Capital Partners LLC (and its affiliates) and
others, including Credit Suisse in connection with, *inter alia,* Mr. Byrne's status as a
noteholder, constitute potential violations of federal law.  The particular federal laws that
I believe may have been violated include, although are probably not limited to, 18 U.S.C.
§§ 152 and 157.  Potentially, violations of the aforementioned statutes may also present
violations of applicable federal mail and wire fraud statutes.

To help organize the different facts and circumstances giving rise to these
potential violations, I have organized the allegations in a manner that I believe to be the
most logical and as set forth below.

ER00521

**Exhibit B to Blixseth Affidavit**

1.   **POTENTIAL VIOLATIONS OF 18 U.S.C. § 157**

    A.    **Evidence Supports the Conclusion that CrossHarbor Capital and Samuel T. Byrne Defrauded Legitimate Creditors for their Pecuniary Gain, and Used the Bankruptcy Court as the Means to do so.**

As I am sure you are aware, 18 U.S.C. § 157 prohibits any person from filing a bankruptcy petition in connection with a scheme or artifice to defraud. As an initial matter, I would refer to the complaint filed in the U.S. Bankruptcy Court for the District of Montana, Case No. 10-00026 and which I previously provided to you. I believe many of the allegations in that complaint to be true. As you can see from the complaint, beginning in 2007 a private equity group known as CrossHarbor Partners LLC, led by its founder and manager, Samuel T. Byrne, began negotiating with Timothy L. Blixseth and his entities to purchase the exclusive Yellowstone Club located near Bozeman, Montana.

On January 15, 2008, Mr. Byrne executed an Asset Purchase Agreement ("APA") to purchase the Yellowstone Club for $455 million. See **Exhibit 1**. Mr. Byrne also contracted separately with Mr. Blixseth to purchase a 160 acre developable lot within the Yellowstone Club, known as the Family Compound, for $56 million. See **Exhibit 2**. Thus, in total, Mr. Byrne had contracted to pay over $511 million for the assets of the Yellowstone Club.

Notwithstanding the $455 million APA, on March 25, 2008, Mr. Byrne urged Tim Blixseth to place the Yellowstone Club into bankruptcy for the purpose of reducing the $300+ million debt obligation owed by the Club to Credit Suisse, and/or to leverage the equity positions of certain minority shareholders. See email from Byrne to Blixseth attached hereto as **Exhibit 3**. Mr. Blixseth refused to do so. Credible evidence suggests, although it remains a contested issue, that when Mr. Byrne wrote his email on March 25, 2008, the Yellowstone Club was not insolvent under any of the traditional solvency tests, nor unable to pay its bills as they matured. Moreover, the very next day, after Mr. Blixseth rejected the proposal, Mr. Byrne terminated the sale while conducting negotiations with Ms. Edra Blixseth who was then involved in divorce proceedings in California with Mr. Blixseth.

Not able to convince Mr. Blixseth to place the Club into bankruptcy, between at least January and August of 2008 Mr. Byrne was admittedly negotiating and/or discussing with Ms. Blixseth to obtain ownership and control over the Club, even though Mr. Byrne had already executed the $455 million APA with Mr. Blixseth. Mr. Byrne was involved in separate discussions with Edra Blixseth in the context of the Blixseth contentious divorce proceedings.

It is apparent from multiple email exchanges between Ms. Blixseth, Mr. Byrne and others, including Mr. Byrne's agents and representatives, and from multiple documents prepared by Cross Harbor that Mr. Byrne and Ms. Blixseth intended to obtain "control" over the Yellowstone Club notwithstanding Mr. Blixseth's $455 million APA with Mr. Byrne; and that Ms Blixseth and Mr. Byrne collaborated to obtain joint "control" of the Club notwithstanding the need of the marital Community to sell the Club in order to pay off marital Community debt, including the Credit Suisse loan. See **Exhibit 4**. The Yellowstone Club represented approximately 80% of the Blixseth marital

ER00522

Community assets.  Thus, an equal division of marital assets and the payment of the marital Community debt necessitated the sale of the Club.

Significantly, during the divorce proceedings, as part of Ms. Blixseth's on-going plan to obtain "control" over the Yellowstone Club, Ms. Blixseth had borrowed over $40 million from multiple banks and lenders based on loan applications and financial statements bearing indicia of fraud.  The evidence suggests as recited herein, that as of July-August, 2008, within several months after terminating the APA, Mr. Byrne knew or had compelling reasons to know, as well as having access to Ms. Blixseth's financial records, that she was engaged in a scheme to defraud her creditors and to obtain loans based on fraud in order to obtain control over the Club.  At that time, Mr. Byrne became complicit with her in a joint scheme to defraud hers and the Club's creditors by loaning her an additional $35 million as a means of obtaining ownership of the Yellowstone Club and Family Compound at enormous discounts to what he originally agreed to pay.  Unfortunately, the means by which Mr. Byrne implemented his scheme was to defraud the creditors of the Yellowstone Club and Edra Blixseth, in violation of 18 U.S.C. § 157.

Additionally, at the time Mr. Byrne was negotiating with Ms. Blixseth between at least January and March 21, 2008, he knew that she had twice been enjoined by the Los Angeles Superior Court in the divorce proceedings from interfering with the sale, first on August 14, 2007 and again on March 21, 2008, just five days before Mr. Byrne terminated the sale.  See transcripts of divorce proceedings attached hereto as **Exhibits 5 and 6.**  On the same day of the second injunction, March 21, 2008, Ms. Blixseth's agent, Gary Peters, who she referenced in an email dated March 20, 2009 as "My guy", was meeting with Mr. Byrne in his office in Boston, seeking to negotiate a separate "deal" with Mr. Byrne.  See **Exhibit 7** attached hereto and compare with Ms. Blixseth's sworn testimony on that same date while appearing before the Los Angeles Superior Court in Exhibit 6.

During this same time frame, at the time that Mr. Byrne terminated the sale, Ms. Blixseth exchanged a series of emails with Mr. Peters and his colleague, Mr. James Fultz suggesting a scheme to interfere with the sale and falsely accuse Mr. Blixseth of the demise of the Yellowstone Club.  See email chain attached hereto as **Exhibit 8**.  These emails and related documents also support Ms. Blixseth's scheme to obtain control over the Club by using sworn affidavits filed in the Montana Superior Court to the effect that Ms. Blixseth, Mr. Peters and Mr. Fultz had $500 million in funds available to purchase the Club.  See **Exhibit 9.**  This appears to be a fraudulent sub-plot to the scheme given the involvement of Mr. Peters and Ms. Blixseth in what appears to be the fabrication of fraudulent wire transfers.  See **Exhibit 10.**  At the same time Ms. Blixseth was making these representations in a Montana court in March-April, 2008, she was in default on approximately $8 million in a loan with American Bank, in default on approximately $13 million with Western Capital Partners, and in the process of then obtaining another $5 million from Wachovia Bank based on a fraudulent loan application.  See **Exhibit 11**.

Thereafter, Mr. Byrne and Ms. Blixseth partnered together to obtain control over the Club by means of Mr. Byrne loaning her an additional $35 million in order to purchase the Club out of the divorce proceedings.  Mr. Byrne was able to induce Ms. Blixseth to partner with him by enticing her not only with the $35 million "bridge loan" *but also* by presenting her with detailed financial projections and PowerPoint    ER00523

3

**Case No. 12-35986 ER 539**

presentations wherein, based on his analysis, she could expect to profit by over $600 million, and potentially over $1.27 billion. See *infra* references to the August 1, 2008 "Discussion Memo," attached hereto as **Exhibit 12.**

Within days after Ms. Blixseth obtained ownership and control over the Club pursuant to their marital settlement agreement dated June 26, 2008, she thereafter collaborated with Mr. Byrne and publicly distributed to Yellowstone Club members on July 6, 2008 a document containing what appears to be egregiously false statements concerning her source of funds, financial ability to fund the Club, and her relationship with Mr. Byrne. **See Exhibit 13.** These statements had to be known to be false by Mr. Byrne, yet he then proceeded to make the statements in Exhibit 12 to induce Ms. Blixseth into making the loan and giving him control of over $700 million in marital Community assets including the Yellowstone Club.

However, because Edra Blixseth was receiving the Yellowstone Club and a number of other very valuable assets out of the divorce proceedings, she needed to provide Mr. Blixseth with a sizeable amount of cash and also to payoff some existing debt owed by the marital community to various creditors. To fund these obligations and finalize the division of marital assets, Mr. Byrne offered the aforementioned "bridge loan" in the amount of $35 million to Edra, payable in 48 days. Among the assets that Ms. Blixseth obtained out of the divorce was a holding company known as BLX Group, Inc. BLX Group owned a 220+ acre palatial estate, mansion, and personal PGA golf course located in Rancho Mirage, California known as Porcupine Creek and valued in June, 2008 at over $200 million. BLX Group through various entities also held a castle in France known as Chateau de Farcheville, as well as the Yellowstone Club. Finally, Ms. Blixseth was awarded ownership of the Family Compound, which is currently titled in her name.

In my view, this $35 million "loan" was structured in such a way that it really was not a loan at all, but a vehicle for Mr. Byrne to obtain complete ownership and control over the Yellowstone Club, the Family Compound and Porcupine Creek, all for the purpose of defrauding the Yellowstone Club creditors, as well as Edra Blixseth's numerous personal creditors, including the lenders who she had defrauded out of at least $40 million. As developed more fully below, the structure of Byrne's $35 million "loan" ensured that he obtained ownership and control over the Yellowstone Club and the Family Compound (assets he had previously contracted to pay over $511 million for) before Credit Suisse and Ms. Blixseth's creditors did so, and so that he could obtain those assets for less than 25% of what he was originally going to pay for them.

Specifically, when Mr. Byrne made the $35 million loan to Ms. Blixseth, he knew that she was insolvent, that she had numerous creditors who were pursuing her for tens of millions of dollars, and that she had no means of paying off his $35 million loan. Mr. Byrne nevertheless made the loan to Edra to shield Ms. Blixseth's assets from her creditors, while at the same time ensuring that he obtained ownership of the Yellowstone Club, the Family Compound and Porcupine Creek when Edra inevitably defaulted on her $35 million loan obligations only 48 days after Byrne made the loan. To accomplish this, Mr. Byrne structured the loan as follows.

ER00524

4

**Case No. 12-35986 ER  540**

First, Mr. Byrne required Edra to execute an Agreement to Form wherein Edra ceded control of the Yellowstone Club to Byrne and CrossHarbor. I have attached the Agreement to Form as **Exhibit 14** for your review. The Agreement to Form and the tacit understanding between Edra and Byrne required Edra to hand over all capital control of the Yellowstone Club to Byrne. Once the $35 million was executed, Edra could no longer write any checks for Yellowstone Club, she could no longer hire and fire employees, she could not negotiate with Credit Suisse regarding the $300+ debt that encumbered the Club, nor could she enjoy any executive management control over the Club. Instead, all the aforementioned responsibilities were transferred to Mr. Byrne and CrossHarbor.

Perhaps, most egregious about Byrne's conduct is that in the Agreement to Form, he agreed to raise over $100 million in capital for the Yellowstone Club. Mr. Byrne never raised the $100 million in capital but instead placed the Yellowstone Club into bankruptcy only 89 days after the $35 million loan was executed. In fact, on October 27, 2008, Byrne sent an email to one of his associates wherein he referred to his plans to put the Club into bankruptcy, and stated, "I am going to write the 'plan' tonight to solve the entire YC debacle. It could be brilliant." Byrne's associate in response to this October 27, 2008 email stated, "Sounds dangerous . . . And possibly evil . . . It could be worth over 1 billion dollars . . . I hope it includes a dip and filing by Friday." Byrne ratified these statements of his associate by replying "It is brilliant." I have attached this email chain as **Exhibit 15** for your review. The proposed plan of Mr. Byrne may have also included plans to falsely accuse Mr. Blixseth for the need to file a bankruptcy petition as suggested in several emails referenced below. On November 10, 2008, Mr. Byrne, through Edra, formally placed the Club into bankruptcy.

Second, as part of the $35 million loan, Mr. Byrne obtained a 1st position mortgage on the Family Compound. This 1st position mortgage encumbered the Family Compound for only $13 million of the $35 million loan. The remaining $22 million was secured by a 3rd position mortgage on the Family Compound. By having this 1st position mortgage and 3rd position mortgage on the Family Compound, and knowing that Edra was insolvent and that the loan was in default from the moment she signed the loan documents, Byrne virtually ensured himself of being able to foreclose on the Family Compound and own that property for only $13 million. Keep in mind, of course, that only eight months prior, Byrne had contracted to pay over $56 million for the Family Compound. In addition, Byrne placed yet another mortgage on the Family Compound to secure Edra's obligations under the Agreement to Form. Thus, if Edra ever waffled in her partnership agreement with Byrne, he could use that to foreclose on the Family Compound and own that property for himself. For your information, the Family Compound is the crown jewel of the Yellowstone Club in terms of development potential and is critical to Byrne's growth and profit plans for the Club.

Third, in addition to securing the $35 million loan with the Family Compound (valued by him at $56 million), Byrne also secured his $35 million loan with a first position deed of trust on Porcupine Creek. At that time, Porcupine Creek was appraised at over $200 million. Porcupine Creek was also a key marketing tool for the Yellowstone Club because Tim and Edra Blixseth would "wine and dine" high net worth individuals at Porcupine Creek in their efforts to sell memberships to the Yellowstone Club. The allure

ER00525

5

**Case No. 12-35986 ER 541**

of Porcupine Creek was often enough to secure membership sales to the Yellowstone Club because Porcupine Creek had a golf course which was ranked by Golf Digest as the 12th nicest course in California, and in conjunction with the main-residence/mansion and other features, the property was a world class estate. In short, a membership in the Yellowstone Club carried with it the promise of access to the Blixseths and their assortment of luxury estates throughout the world.

Again, because Byrne knew that the $35 million loan was in default the moment Edra signed the loan documents, he assured himself of obtaining ownership of Porcupine Creek.

Although the making of the $35 million loan in and of itself may not constitute a crime, in these circumstances, the loan became part of a scheme to defraud legitimate creditors and the bankruptcy court; and to obtain ownership and control of over $700 million in marital Community assets (including the Club and Porcupine Creek) when Mr. Byrne knew Ms. Blixseth had no means to pay it, was already in default on over $40 million in loans; and his company had misrepresented to her that she would make approximately $600 million by partnering with him. The loan was structured and made for the purpose of ensuring that Byrne obtained the Yellowstone Club, the Family Compound and Porcupine Creek for his own pecuniary gain, yet to the detriment of Edra's and the Yellowstone Club's legitimate creditors.

In particular, for at least the month before Byrne made his $35 million loan in July-August, 2008, the evidence suggests that he knew that Edra had at least $40 plus million in loans to lenders which were in various stages of default; that she appears to have made multiple and patently false statements to these lenders to obtain loans; and that she may have then been engaged in an on-going scheme to defraud said lenders and numerous creditors who were pursuing her to collect tens of millions of dollars. Notwithstanding this knowledge, in the remarkable "Discussion Memo" prepared by Mr. Byrne's company dated August 1, 2008, approximately 13 days before making the $35 million loan, Mr. Byrne's company represented to Ms. Blixseth that she would make $600 million in future income by partnering with him, as stated in the attached Exhibit 12. Knowing that Edra's creditors could soon liquidate the Yellowstone Club, Porcupine Creek and the Family Compound; and thereby frustrate his otherwise lucrative plans for the Yellowstone Club, Byrne offered Edra this $35 million "loan" that he knew would shield those assets from her creditors and the creditors of the Yellowstone Club, while at the same time ensuring that he obtained ownership and control of those assets.

I have collected numerous documents relating to Ms. Blixseth's fraud on lenders and will forward them to you upon request.

Having obtained control over the Yellowstone Club on August 13, 2008, Mr. Byrne only 89 days later used Ms. Blixseth to place the Club into bankruptcy, as he had planned to do since at least March of 2008. As a result of the Yellowstone Club bankruptcy, Mr. Byrne became the official owner of the Club by purchasing it out of bankruptcy for only $115 million. Again, not even 11 months earlier he had contracted to pay $455 million for the Club. This was only accomplished by defrauding the legitimate creditors of the Yellowstone Club.

ER00526

6

Case No. 12-35986 ER  542

Moreover, with respect to the Family Compound, in Edra Blixseth's bankruptcy Mr. Byrne attempted to "purchase" the Family Compound from Edra's bankruptcy estate by providing a "credit bid" off of its $35 million of only $8 million. That is, Mr. Byrne tried to obtain the Family Compound by reducing its $35 million loan by $8 million. The rest of the debt would be shifted to Porcupine Creek. Again, just over a year earlier Byrne contracted to pay $56 million for the Family Compound. Fortunately, Bankruptcy Judge Kirsher stopped this egregious abuse of the Bankruptcy Code and invited one of Edra's creditors to initiate a lawsuit against Byrne under the Uniform Fraudulent Transfer Act. I have attached a copy of Judge Kirsher's Memorandum of Decision on this point for your review. It is attached hereto as **Exhibit 16**.

As you can see, Mr. Byrne appears to have engaged in a pattern and scheme to obtain the Yellowstone Club assets and Edra's assets at significant discounts to their true value, but has done so by knowingly defrauding the legitimate creditors of the Yellowstone Club and Edra Blixseth.

Finally, I think it is important to point out that $35 million was not actually advanced under that loan. The funds advanced were in fact much less. $13 million of the $35 million "loan" actually went directly back to Byrne and CrossHarbor to re-pay an antecedent debt owed to them by Tim Blixseth. In addition, it appears that Byrne and CrossHarbor held back approximately $4 million for itself, as this amount of money remains unaccounted for in the final disbursement schedule, which I have attached hereto as **Exhibit 17**. After all sums were disbursed under the loan, Ms. Blixseth obtained only $1 million in loan proceeds. Unfortunately, Edra's creditors received nothing from this loan. Instead, the loan intentionally shielded Edra's assets from her creditors.

### B.   Mr. Byrne's Insider "Noteholders" Relationship with Credit Suisse and their Yellowstone Club Bankruptcy Settlement.

Significantly, throughout the period between March and August, 2008 when Mr. Byrne was engaged in the conduct described herein, he was a "noteholder" for the Credit Suisse syndicated Yellowstone Club loan with access to inside information in the possession of Credit Suisse, which at all times was functioning as the "Administrative Agent" for all of its syndicated "noteholders." Thus, Mr. Byrne was in a position to not only obtain inside information from Credit Suisse, he was in a position to negotiate with them as an insider in the ultimate resolution of the Yellowstone Club bankruptcy. It appears that he was engaged in this process while threatening a "pre-packaged bankruptcy" months before the actual filing in November, 2008, and possibly as early as March, 2008 when he terminated the APA. Mr. Byrne is also on the Board of Directors of Babson Capital, which, in turn, is on the Board of Directors of the Liquidating Trust. The Liquidating Trust constitutes a key component of Mr. Byrne's "brilliant" and "evil" scheme to obtain ownership of the club for a fraction of its value by using Ms. Blixseth to first obtain ownership and control of the Club, and then to sue Mr. Blixseth. There is substantial evidence suggesting that Mr. Byrne and Credit Suisse have "teamed up" with Ms. Blixseth to pursue Mr. Blixseth with false charges and claims lacking in factual and legal substance, but arising out of Ms. Blixseth's previous false charges made to government agencies.

ER00527

7

**Case No. 12-35986 ER 543**

Credit Suisse and their "noteholders" are now in the extraordinary – and inequitable - position, with Mr. Byrne, of re-capturing their investments pursuant to Mr. Byrne's "evil" plan subsequently memorialized in their joint "term sheet" in which the Credit Suisse "noteholders" and Mr. Byrne recover back from Mr. Blixseth their investment in the original Credit Suisse loan; and recover Mr. Byrne's payments to the trade creditors. Additionally, Credit Suisse and the noteholders achieve a double recovery because pursuant to the "term sheet," approved as part of the reorganization plan, they recover $500,000 for each lot sold going forward. Even the equities of the barnyard forbid such chicanery. It is an understatement to suggest that the dealings between Credit Suisse, Mr. Byrne and Ms. Blixseth should be scrutinized by a Grand Jury, particularly where Ms. Blixseth previously attempted to use federal agencies to falsely accuse Mr. Blixseth.

**C.    Byrne and CrossHarbor Consummated The Yellowstone Club Reorganization Plan Through a Conspiracy and Scheme Using Fraud and Deception**

I believe a further and perhaps more insidious fraud has occurred with respect to the plan of reorganization for the Yellowstone Club. The conduct of Mr. Byrne and CrossHarbor, later joined in by Credit Suisse and its Liquidating Trust, in using the bankruptcy process to obtain the Yellowstone Club and Edra's assets at significant discounts to their true values, while at the same time prejudicing legitimate creditors is fairly transparent. However, Mr. Byrne and CrossHarbor have thus far successfully avoided accountability for their conduct by using fraud and deception.

In particular, Byrne and CrossHarbor have successfully deflected any meaningful investigation into their conduct through a pre-planned strategy of blaming Timothy L. Blixseth for the Club's financial distress. A financial distress that CrossHarbor created. Specifically, I have attached as **Exhibit 18**, an email dated November 14, 2008 from Discovery Land Company to Byrne and CrossHarbor indicating that the strategy going forward would be to "get all fingers pointing at Tim". In other emails, Byrne specifically acknowledges that he has created a situation where Timothy L. Blixseth is the one being blamed for the Club's woes. See **Exhibit 19**. The earlier emails in March, 2008 when they were interfering with the sale between Mr. Fultz, Mr. Peters and Ms. Blixseth, suggest that this was their plan all along. **See Exhibit 8.**

In consummation of his plan to deflect attention from his fraud, Mr. Byrne successfully drafted a reorganization plan that created a liquidating trust to prosecute litigation claims on behalf of the Club against Timothy L. Blixseth, for Mr. Blixseth's purported wrongdoing that supposedly led to the Club's collapse. As further called for in the reorganization plan, any success that this liquidating trust enjoys against Mr. Blixseth will provide a direct monetary benefit to Byrne and CrossHarbor.

Finally, shortly after Byrne executed the $455 million APA, Ms. Blixseth admittedly communicated with Mr. Byrne about Mr. Blixseth allegedly being the "target" of a federal grand jury for the purpose of interfering with the sale. The verifiably faked grand jury target letters allegedly from the U.S. Department of Justice were admittedly in Ms. Blixseth's possession at the time she and her agent, Mr. Peters, were seeking to stop

ER00528

8

**Case No. 12-35986 ER  544**

the sale. Mr. Byrne referenced these fake letters in a conversation with Mr. Blixseth in which he stated that he would have to report the matter to his investors which would impact the price he had contracted to pay for the Yellowstone Club. I believe Ms. Blixseth may have been instrumental in creating these fake grand jury target letters and I further believe that Mr. Byrne knew that these grand jury target letters were in fact fabricated. These fabricated target letters purported to implicate Tim Blixseth in a scheme to corrupt federal officials in exchange for favorable land exchanges between him and the U.S. Forest Service among other crimes. See **Exhibit 20**.

Mr. Byrne and Edra used these fabricated grand jury target letters as a means to gain leverage over Tim Blixseth to reduce the purchase price contained in the $455 million APA. Mr. Byrne specifically told Mr. Blixseth that because he had knowledge of these purported grand jury target letters, he had a fiduciary duty to report these purported grand jury target letters to his investors who were going to back down on the $455 million APA. The goal of this extortion was obviously to force Mr. Blixseth in reducing the $455 million sale price to something more favorable for Byrne. As Mr. Byrne's partner, Edra Blixseth helped facilitate this extortion by fabricating the target letters.

Significantly, the evidence suggests that Ms. Blixseth and others, including Mr. Greg LeMond, one of the minority shareholders of the Club, and their agents, sought to have Mr. Blixseth indicted by filing false reports relating to IRS tax issues and other matters to the Montana FBI, including assertions that Mr. Blixseth was involved in the death of Denise Tuohy, the Yellowstone Club bookkeeper. Mr. Blixseth's financial transactions with the Yellowstone Club have since been approved by the IRS after a substantial audit. When this type of misconduct failed in the fall of 2007, it appears that Ms. Blixseth resorted to the fabrication of the fake target letters to undermine the APA sale.

Again, what emerges is a pattern of conduct by Mr. Byrne in collusion with Ms. Blixseth to defraud third parties in an effort to obtain a valuable asset on the cheap through the bankruptcy process.

2.   **POTENTIAL VIOLATION OF 18 U.S.C. § 152**

In a number of ways, Edra Blixseth, in concert with her attorneys, and perhaps Mr. Byrne, have committed perjury and have spoliated evidence, all in violation of 18 U.S.C. § 152.

A.   **Edra Blixseth Committed Perjury While Testifying in Hearings Related to the Yellowstone Club Bankruptcy**

At the initial hearings involving the Yellowstone Club bankruptcy, many parties were concerned about some form of collusion or pre-arranged "sweetheart" deal between Edra as manager of the Yellowstone Club, CrossHarbor and the proposed property manager for the Club, Discovery Land Company. While on the stand, Edra testified that she independently identified Discovery Land Company as a potential candidate to manage the Club. This is verifiably false. CrossHarbor and Byrne brought in Discovery

ER00529

9

**Case No. 12-35986 ER  545**

Land Company to manage the Yellowstone Club shortly after the $35 million loan was executed. I have attached various emails demonstrating that Edra Blixseth perjured herself on the stand in Montana bankruptcy court, including one email where a representative of Discovery Land Company acknowledges that Edra committed perjury. See **Exhibit 21**.

## B.   <u>Spoliation of Evidence</u>

In connection with Edra Blixseth's bankruptcy, one of her creditors, Western Capital Partners LLC ("WCP"), served a subpoena *duces tecum* on Edra's former executive assistant, Jory Russell. I have attached a copy of that subpoena as **Exhibit 22**. The subpoena requested, among other things, "Complete copies of computer hard drives and other electronic storage media which contain any and all accounting, email, and financial information of the Debtor and or entities owned in whole or in part by the Debtor."

According to the subpoena, Mr. Russell was to produce all the requested documents and computers to WCP and appear for a deposition in Rancho Mirage, California on June 23, 2009. Mr. Russell did appear for the deposition but produced to WCP only a small fraction of what he had in his possession. The reason why Mr. Russell did not produce everything that was responsive to WCP's subpoena was because Edra Blixseth, her attorney, and most likely Byrne, knowingly interfered with Mr. Russell's production responsibilities under the subpoena.

Unbeknownst to WCP, on June 22, 2009, Mr. Russell met with Edra Blixseth and her attorney Gary Deschenes at Porcupine Creek to discuss his deposition the following day. Mr. Russell brought with him to this meeting the laptop computer that contained all of his emails, Edra's emails, correspondence, business documents and files that he had stored during his employment with Edra Blixseth. Edra Blixseth has testified that all of her financial documents, transactional documents, bank records, correspondence and emails would be stored on Jory's laptop computer.

In violation of 18 U.S.C. § 152, during that June 22nd meeting at Porcupine Creek, Edra Blixseth and her attorney instructed Mr. Russell to turnover his laptop computer to them because the laptop was purportedly the property of one of Edra's companies and belonged to her. This request was made for the first time on June 22nd even though Mr. Russell terminated his employment with Edra several months prior to this meeting.

On June 23rd when Mr. Russell appeared for his deposition, he was accompanied by Gary Deschenes. Mr. Deschenes stated on the record that he was not there to represent Mr. Russell but was there only to represent Ms. Blixseth's interests. At the deposition, Mr. Russell produced only a handful of emails that he had previously printed out from his Hotmail email account which he believed to be responsive to the subpoena.

Remarkably, neither Mr. Russell, nor Gary Deschenes revealed to WCP's attorneys at the June 23rd deposition that the laptop computer existed, let alone that Edra Blixseth and Mr. Deschenes gained possession of the laptop from Mr. Russell the night before. In fact, at the June 23rd deposition, Mr. Russell stated that the small stack of emails that he brought with him was all that he possessed which was responsive to the

ER00530

10

subpoena. All the while, Mr. Deschenes sat next to Mr. Russell and said nothing about the laptop.

To add further intrigue to this matter, Edra Blixseth and Gary Deschenes, in concert with Byrne, concocted a ruse to delay the deposition of Mr. Russell and Edra Blixseth, which was to occur the same day. The purpose of this ruse is now clear; that it was designed to buy time so they could hide, if not destroy, damaging evidence from Edra Blixseth's creditors. Specifically, prior to Mr. Russell's deposition, Edra's attorneys told WCP's attorneys that Edra had found an individual who was interested in purchasing the note that Ms. Blixseth owed to WCP. The only catch was that this person would not purchase WCP's note if WCP moved forward with its deposition of Mr. Russell or of Edra, or if WCP even reviewed any of the documents produced by Mr. Russell. Immediately before WCP met with this individual and Edra, WCP's attorneys and representatives were present in the deposition when Edra Blixseth called Gary Deschenes and, as heard through Mr. Deschenes's cell phone by all in the deposition room, Edra stated that Sam Byrne was on board with the offer to WCP. After that call, WCP and Mr. Deschenes left the deposition room to meet with Edra and the person who was going to purportedly purchase WCP's note.

WCP apparently fell for the ruse as it did not meaningfully depose Mr. Russell, did not take possession of the small number of documents that he produced, and instead spent the better part of the day negotiating with this individual. This individual is named John Roselli, III and is connected with the Italian mafia. See http://foia.fbi.gov/foiaindex/roselli.htm. Mr. Roselli did negotiate a deal with WCP but Edra and Byrne's cooperation in closing the deal was required. Mr. Roselli informed WCP that despite repeated calls to Gary Deschenes and Byrne, they never returned his calls and therefore the deal with WCP never closed.

As a result of Mr. Roselli purportedly purchasing WCP's note, WCP and Ms. Blixseth agreed to continue her deposition and the deposition of Mr. Russell to July 8th and 9th. However, before WCP dismissed Mr. Russell from his June 23rd deposition, its attorneys admonished Mr. Russell that he had a duty to not delete or otherwise destroy any emails or information he had that might be responsive to the subpoena.

Immediately prior to the July 8th deposition of Mr. Russell, WCP learned that Mr. Russell handed over his laptop to Edra and Gary Deschenes on the evening of June 22nd. On that information, at Mr. Russell's July 8th deposition WCP asked Mr. Russell about his laptop. This time, Mr. Russell was represented by independent counsel. At this point, Mr. Russell admitted that he turned over his laptop to Edra and Gary Deschenes on the evening of the 22nd. With Edra and Mr. Deschenes again sitting in the deposition at that time, and being subject to an order on a motion to compel (See Docket # 331 in Case No. 09-60452) they for the first time acknowledged the existence of the laptop to WCP and informed WCP that they brought it with them to the deposition. Prior to this, Edra and Gary Deschenes did not mention one word of the laptop to WCP. And but for WCP asking Mr. Russell about the laptop incident on July 8th, I doubt Edra or Mr. Deschenes would have ever disclosed its existence to WCP. More shocking, during his deposition, Mr. Russell admitted that immediately after his June 23rd deposition, he proceeded to delete all files pertaining to Edra Blixseth on the desktop computer that he maintained at his house. According to him, he did so because apparently believed he would be subject ER00531

11

to allegations of theft by Edra's entities if he retained possession of her information. According to Mr. Russell's testimony, the information on his desktop was largely duplicative of what was on the laptop that he handed over to Edra and Gary Deschenes.

A forensic examination of the laptop computer reveals that after Mr. Russell handed over the laptop to Edra and Gary Deschenes on June 22nd, a number of files were deleted from the laptop. Given all the facts and circumstances surrounding this Jory Russell laptop incident, it is apparent that Mr. Russell, Edra Blixseth and Gary Deschenes committed a number of crimes under 18 U.S.C. § 152. It is also apparent that Mr. Roselli's involvement in this matter was a ruse intended by Edra D. Blixseth and likely Mr. Byrne to buy time to destroy and conceal damaging evidence from WCP and other creditors.

Please review the motion and supporting documents filed by Timothy L. Blixseth in AP-14 in connection with his motion seeking sanctions for the spoliation of evidence that occurred relative to Mr. Russell's laptop computer.

3. **DENNIS MONTGOMERY AND POTENTIAL VIOLATIONS OF FEDERAL INCOME TAX LAWS AND OTHER CRIMINAL STATUTES**

    A. **Edra Blixseth's Collusion with Mr. Montgomery To Violate Federal Income Tax Laws**

On or about April, 2006, Ms. Blixseth and her company Opspring made an agreement with Mr. Montgomery to hire him as a purported computer programmer. A copy of that agreement is attached as **Exhibit 23.** Although the agreement recites that $2.3 million would be paid to Mr. Montgomery as a "loan," it appears that the money was paid in consideration of Mr. Montgomery conveying certain software technology to Ms. Blixseth's company that he may have taken from his former employer, and which was then the subject of on-going litigation in the Nevada Federal Court. Evidence suggests that Mr. Montgomery may not have reported the receipt of this money from Ms. Blixseth on his federal income tax returns while Ms. Blixseth was attempting to use the purported, conveyed software to obtain a federal contract; and that Ms. Blixseth was repeatedly requesting Mr. Montgomery to deliver the "Source Codes" for the software to her so that she could obtain the contract. See **Exhibit 24.** Evidence suggests that the obtainment of a federal contract with non-existent source codes was in itself a fraud. See **Exhibit 25.**

Ms. Blixseth continued to pay Mr. Montgomery $100,000 per month between April 2006 and March, 2009 for what appears to be non-existent software raising allegations that the money was really being paid for Mr. Montgomery to hack into computers for Ms. Blixseth in connection with her divorce proceedings and other litigation; and that the $100,000 monthly payments may relate to this conduct and / or to secure his silence. See **Exhibit 26.** It appears that the existence of the software may in itself be a hoax. See attached **Exhibit 27.**

Mr. Montgomery is currently under indictment in Nevada for a $2 million casino fraudulent check scheme, and he has secured his bail by purportedly borrowing $455 thousand from his son-in-law. See **Exhibit 28** attached. He has also been referred to the

ER00532

12

**Case No. 12-35986 ER  548**

U.S. Attorney in Nevada by the Federal Court for perjury in connection with the litigation relating to his taking of software from his former employer. See *Montgomery v eTreppid*, 2009 U.S. Dist. LEXIS 35543 (D.Nev. March 31, 2009).

Also, Mr. Montgomery has since filed bankruptcy in California, and allegations have been made that he received approximately $6 million from Ms. Blixseth, most of which remains unaccounted for and undisclosed in his bankruptcy proceedings. See **Exhibit 26**.

## 4. CONCLUSION

I have presented a lot of information for you to consider. I have erred on the side of inclusiveness in order to insure an adequate record pertaining to these matters. Much of the information is complicated and has been learned through several years of involvement in the matters. Please feel free to contact me at your convenience with any questions you may have.

Sincerely,

**Michael J. Flynn, Esq.**

Michael J. Flynn, Esq.

ER00533

13

**Case No. 12-35986 ER  549**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                                            )
In Re:                                      ) Case No. 08-61570
                                            )
Yellowstone Mountain Club, LLC,             )
                                            )
          Debtor(s).                        )
_____            )
(Complete caption on next page.)

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
December 2, 2010

Electronic Recording Operator:  Patti Mahoney

Transcript Services:

Jonny B. Nordhagen
Nordhagen Court Reporting
1734 Harrison Avenue
Butte, Montana
(406) 494-2083

Proceedings recorded by electronic recording;
transcript produced by reporting service.            ER00551

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

_____

| | |
|---|---|
| In Re: | ) Case No. 08-61570 |
| | ) |
| Yellowstone Mountain Club, LLC, | ) |
| | ) |
|       Debtor(s). | ) |
| _____ | ) |
| | ) |
| CREDIT SUISSE and TIMOTHY L. | ) |
| BLIXSETH, | ) Adv. Pro. 09-00014 |
| | ) |
|       Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| OFFICIAL COMMITTEE OF | ) |
| UNSECURED CREDITORS, | ) |
| YELLOWSTONE MOUNTAIN CLUB, | ) |
| LLC, YELLOWSTONE DEVELOPMENT, LLC, | ) |
| BIG SKY RIDGE, LLC and YELLOWSTONE | ) |
| CLUB CONSTRUCTION COMPANY, LLC, | ) |
| | ) |
|       Defendants. | ) |
| _____ | ) |
| | ) |
| | ) |
| MARC S. KIRSCHNER, AS TRUSTEE OF THE | ) Adv. Pro. 10-00015 |
| YELLOWSTONE LIQUIDATING TRUST, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
|       vs. | ) |
| | ) |
| DESERT RANCH LLP, et al., | ) |
| _____ | ) |

ER00552

**Case No. 12-35986 ER 551**

08-61570aRBK12D5dR62109808/2Piled:IM/457d148EnteredtO1/13/11Pi62d558 oPage 3 of 3
Case 2:11-cv-00073-SEH   Document 7-3   Filed 01/03/12   Page 50 of 50

18

1   evidentiary hearing on that motion.  It's just a matter of

2   setting date and time.  And certainly, I would -- I

3   encourage Mr. Flynn's or counsel's, you know, appearance

4   and presentation at that as it relates to other parties.  I

5   guess I'll let Mr. Flynn comment.

6          MR. FLYNN:  Our view, Your Honor, is set forth in

7   our papers, particularly in our motion to vacate this

8   Court's order.  The credibility is not an issue in

9   connection with the recusal motion, so there's no necessity

10  for an evidentiary hearing.  The law seems to be pretty

11  clear that the allegations set forth in the motion and

12  accompanying affidavit and exhibits for purposes of the

13  motion have to be accepted by this Court or another Court

14  as being true.

15         So in effect, the way we view -- the way we read

16  these cases, it's, in effect, a burden that shifts to the

17  Court rather than a third party that would respond to some

18  of the issues in the amended motion for recusal.  So we

19  don't believe that evidentiary hearing is either

20  necessary -- we believe a hearing is necessary, but not an

21  evidentiary hearing.

22         THE COURT:  Well, I guess I'm not so certain that

23  the case law supports -- as you know from prior

24  appearances, we don't try things in this court by

25  affidavit.  Certainly, the parties have the opportunity to

ER00553

**Case No. 12-35986 ER  552**

Patrick T. Fox (#8071)
DOUBEK & PYFER LLP
PO Box 236
Helena MT 59624
406 442 7830 ph
406 442 7839 fax
patrickfox@doubekpyfer.com

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| YELLOWSTONE MOUNTAIN CLUB, LLC, et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-61570<br><br>Also applicable to Adv. Case No. 09-64, 09-18, 09-14, 10-15, 10-88<br><br>**SUPPLEMENTAL AFFIDAVIT OF TIMOTHY L. BLIXSETH** |

I, Timothy L. Blixseth, declare under penalty of perjury of the laws of the United States follows:

1.      I am a resident of the State of Washington.

2.      I have personal knowledge of the facts testified to herein.

3.      I make this affidavit to supplement the affidavit I have previously filed in support of the Motion to Disqualify Judge Ralph Kirscher.

4.      After reviewing the recent deposition testimony of Edra Blixseth's business partner, Dennis Montgomery, who is out on bail for $2 million in check fraud and was referred to the U.S. Attorney for perjury, and recently discovered emails forensically recovered from the Jory Russell computers, I am certain that Montgomery and Edra Blixseth have engaged in an extensive scheme to defraud the U.S. Government, other Governments, and Banks, and private lenders; and that Judge Kirscher's agenda to approve the Yellowstone Club bankruptcy ER00554

1

**Case No. 12-35986 ER  553**

regardless of the evidence, including evidence showing that it is a fraudulent bankruptcy planned and perpetrated by Edra Blixseth and Sam Byrne, has caused Judge Kirscher's appearance of bias and actual bias toward me because I have attempted to show the true cause of the bankruptcy.  As recited herein, the evidence of these frauds and Judge Kirscher's conduct regarding his and his clerk's ex parte communications, and his refusal to let me file pleadings the law permits, and more as recited in my Motion, not only appears to support an *apparent* bias against me, and that he is not impartial, but that he also has an *actual* bias against me.  His bias has not only resulted in a violation of my right to have a fair and impartial judge, it has, so far, effectively protected Edra Blixseth from criminal prosecution for her financial frauds of millions of dollars; attempted to undermine the effectiveness of my lawyers, Michael Flynn, and C.J. Conant, by advancing inaccurate issues involving the States Secrets Privilege resulting in the cover up the frauds of Edra Blixseth on the U.S. government and others including myself and creditors of her Estate, and continued concealment of *ex parte* communications with my adversaries.

5.      Consistently, Judge Kirscher has employed *ex parte* communications, false attacks on my credibility and character,  distortions of the facts, and repeated deprivations of my due process rights within multiple bankruptcy proceedings resulting in the protection of Edra Blixseth and Samuel Byrne, and others, while seeking to undo specific Orders, the releases, discovery and hearings matters in expansively contested divorce proceedings involving my divorce from Ms. Blixseth, and also involving millions of dollars of attorney fees, CPA's fees, thousands of pages of discovery in connection with EVERY discovery request ordered by the Court and given to Ms. Blixseth and her army of lawyers.  He has effectively substituted himself for the divorce judge in California which resulted in Edra Blixseth's use of the divorce

proceedings with Sam Byrne to obtain the Yellowstone Club for a $35 million "predatory loan", which has stopped Ms. Blixseth from "blowing the whistle" on her financial relationship with Mr. Byrne - and others - in the bad faith filing of these bankruptcy matters.  The Montana bankruptcy proceedings have been used by them to effectively steal over $700 million of Blixseth Marital Community assets divided up during the divorce proceedings, then seek recovery from me of other Community assets and blame me for their blatant frauds. Collectively, the evidence supports actual bias resulting in bankruptcy proceedings where the appearance of impartiality is completely lost.

6.      In December, 2006, I separated from Edra Blixseth and she filed for divorce. Before our separation, Edra Blixseth became involved with Dennis Montgomery and Michael Sandoval in what is now a demonstrably fraudulent scheme to defraud the United States government and its taxpayers.  This scheme has continued from at least April, 2006 to the present.  In addition to her attempts, and actual frauds on our government, she also attempted to defraud the governments of Bahrain and Israel, as well as private investors.  Conclusive evidence of this fraud is contained within the recent deposition of Dennis Montgomery taken on Nov. 18, 2010 and the exhibits attached thereto, as well as recently discovered documents and emails from the Russell computers and third parties.  See Exhibit 68 to Supplemental List of Exhibit. Additionally, there are numerous emails contained on the Jory Russell and Edra Blixseth computers evidencing this fraud – all available to Mr. Samson and Mr. Cotner BEFORE the October 12, 2010 hearing hereinafter discussed.  The essence of the fraud is contained within the draft complaint against the Sandoval parties (explained in detail together with the Nevada litigation *and U.S. Protective Order in February, 2010 to Mr. Cotner), and then the complaint was* given to Richard Samson, and his lawyer, David Cotner on February 1, 2010.  See Exhibit

ER00556

3

**Case No. 12-35986 ER  555**

65 to List of Exhibits [filed under seal] Docket No. 2115-2. They both knew or had access to extensive documentary evidence of both the technology fraud and the Bank fraud – specifically Wachovia Bank fraud *involving the technology pledged as collateral long before the Sandoval complaint was given to them.* They had possession of the Russell and Blixseth computers and had duties as Trustee of the Estate, and under Rule 11 to investigate these matters. The fraud involves Mr. Montgomery's purported "noise filtering software technology" which was pledged to Wachovia Bank in March, 2008 in violation of a Federal preliminary injunction – which was the subject of Ms. Blixseth's Dec. 17, 2009 deposition *attended by Mr. Cotner.* The technology does not exist, yet has been used repeatedly by Edra Blixseth and Montgomery to commit financial frauds including the $8 million fraud on Wachovia Bank. See Deposition of Edra Blixseth, December, 17, 2009, attended by Mr. Cotner, particularly at page 124-135 at Docket No. 486-8, Case No. 09-14. This Court had possession of this deposition as of January 22, 2010 when it was filed in support of the Mr. Blixseth's motion for summary judgment in AP-14. See Docket No. 486-8, Case No. 09-14.

7.     Documentary evidence of some of these financial frauds involving the fraudulent technology, including the Wachovia fraud, is contained within the Edra Blixseth deposition transcript. The exhibits attached thereto were available to Mr. Cotner, including the Wachovia loan fraud documents immediately upon preparation of Ms. Blixseth's deposition transcript. These facts were also available to Mr. Cotner in the Flynn affidavit filed in connection with Mr. Blixseth's spoliation motion in AP-14. See Docket Nos. 473-1, pp. 11-17, Case No. 09-14. These facts are also set forth in the Statement of Undisputed Facts ¶¶ 123-124 (Docket No. 2042-3, Case No. 08-61570 as well as Docket No. 309, Case No. 09-18) to the Motion to Disqualify. And because the technology was pledged fraudulently as detailed in the documents referenced

ER00557

4

herein and in Docket No. 204-2, Case No. 09-60452, then it is impossible for this technology to have been subject to the States Secret privilege.

8.      Notwithstanding this overwhelming evidence sufficient to support a criminal referral by the Senior bankruptcy judge, a multi-agency federal criminal investigation now on-going in Montana, of which I believe Judge Kirscher is informed, and conclusive documentary evidence evidencing the bank frauds, the software frauds, the destruction of evidence *in these bankruptcy proceedings*, bankruptcy fraud involving non-disclosure of millions in debt, the procurement of over $50 million in fraudulent loans *which Ms. Blixseth never intended to pay based on her schemed intention to file bankruptcy proceedings with Judge Kirscher even though she did not reside in Montana*, Judge Kirscher appears to have improperly attempted to disrupt the criminal investigation by ruling that he has NOT seen any of this evidence, and that Ms. Blixseth did not have the requisite "*mens rea*" (criminal intent) given the applicable standard of proof— "beyond a "reasonable doubt."  Judge Kirscher improperly applied a criminal standard to the bankruptcy civil proceedings then before him.  Knowing of the pending criminal investigation, WHY did Judge Kirscher do this?  See Docket No. 40, p 25, Case No. 09-100.

9.      Despite the fact that Edra Blixseth is being criminally investigated, her and Sam Byrne's bankruptcy fraud is the subject of a criminal referral by another judge, and despite the incontrovertible evidence of Edra Blixseth's bank and tax fraud and that she attempted to get a black budget defense contract based on fraudulent technology, and defrauded multiple creditors of hundreds of millions of dollars in the process, Judge Kirscher has injected gratuitous or unnecessary findings in his rulings which protect her and thus Sam Byrne.  The Judge either denied the introduction of or ignored all evidence proving the Byrne/Edra Blixseth "bad faith" bankruptcy filing of the Yellowstone Mountain Club.  See Docket No. 309, Case No. 09-18;

ER00558

5

Docket Nos. 484, 532, Case No. 09-14, Transcript of April 29, 2009 Trial in Case No. 09-14, pp.

20:11-29:25 filed at Docket No. 2110-7, Case No. 08-6157-. The Judge denied the introduction

of all evidence relating to the destruction and spoliation of evidence. Transcript of February 11,

2010 hearing, Case No. 09-14, pp. 119-136, attached as Exhibit 2 to Motion to Disqualify,

Docket No. 2042-2, Case No. 08-61570. And to top off all of this on-going cover-up, the Judge

has most recently employed the "State Secrets Privilege" and a "U.S. Protective Order" issued by

the Nevada Federal Court which results in attempting to cover up the Edra Blixseth "noise

filtering" software frauds, and also attacks my counsel, Michael Flynn and C.J. Conant. See

Transcripts of October 12, 2010 Proceedings in Case No. pp. 30-42:7, 71-73, attached as Exhibit

1 to the Motion to Disqualify (Docket No. 2042-1) [hereinafter Oct. 12 Transcript].

     10.    On October 12, 2010, as recited in the Amended Motion to Disqualify, Judge

Kirscher invited David Cotner , *sua sponte,* in the absence of Mr. Flynn and Mr. Conant, and

with Mr. Park, counsel for Sandoval assisting, and Mr. Samson present, to attack the

"reputation" of Mr. Flynn (*Id.* at pp. 30-33); and Judge Kirscher *sua sponte* challenged the

representation of me by Mr. Conant based on his representation of Western Capital Partners (*Id.*

at pp. 71-73), again, resulting in the concealing Edra Blixseth's frauds. The Judge engaged in

these plainly biased tactics with full knowledge of all of the facts recited in the foregoing

paragraphs. The Judge intentionally used the tactic of blaming Mr. Flynn and Mr. Conant in a

scheme by Mr. Cotner and Mr. Samson to cover up the frauds of Edra Blixseth and Dennis

Montgomery involving the fraudulent software. With knowledge of all of Ms. Blixseth's

financial frauds and her deposition testimony on the bogus software, which was introduced in its

entirety at the trial of AP 14, Judge Kirscher assisted in creating a false record in favor of Ms.

Blixseth then made rulings depriving the creditors of her Estate of an estimated $100 million

ER00559

6

**Case No. 12-35986 ER 558**

claim against the Sandoval parties (which was plead in the Complaint and draft pleadings that

Judge Kirscher struck from the record in Case No. 09-105).  It is likely that the Judge knew that

if Edra Blixseth was indicted or her Trustee pursued these claims, *Montgomery would squeal on*

*Edra Blixseth and Edra Blixseth's and Sam Byrne's entire charade would unravel.*  To create

this record, the Judge used the Nevada Protective Order.  In the October 12, 2010 hearing, Judge

Kirscher and Mr. Cotner engaged in the following extended colloquy:

> THE COURT: Okay, okay. I'll tell you, In reviewing these papers - and I wasn't going to lead with this and let you state your respective arguments on these matters, but let me start with this because I think it's important - in reading through the briefs, the replies, the responses, and the attachments, I'll be quite candid with you: I'm very concerned about representations and filings that have been made with this Court that maybe didn't have a sufficient factual basis prior to their filing.  (Oct. 12 Transcript a p. 6:4-12)
>
> . . .
>
> And I will have some questions for all of you as to what's going on, why these things are happening, and if we have inappropriate conduct being done. I'm very concerned.  (*Id*. at p. 6:18-21)
>
> . . .
>
> [DAVE COTNER]: And in mid January, I interviewed her with regard to the basis of the claims, as I understood them to be, and understood from Edra that she believed that she had been duped into the investment; and secondly, at one point in time she alleged that Mr. Sandoval had wrongfully diverted money to his benefit. Unfortunately for me, Judge, the focus of that discussion, because it was early in the proceeding did not focus on a precise timeline. (*Id*. at p. 16:11-19).
>
> . . .
>
> [DAVE COTNER]: At the meeting, a great -- great detail was provided to Mr. Samson and myself with regard to the nature of the claims that existed and the validity of claims. That was presented directly by Mr. Flynn.  (*Id*. at p. 17:21-24).
>
> . . .

ER00560

7

**Case No. 12-35986 ER  559**

[DAVE COTNER]: And so from a factual perspective, I had heard Edra tell me that she had been duped; from a factual perspective at the time in my mind, I had nothing to disprove that at that time she knew or did not know. (*Id.* at p. 19:11-14).

. . .

[DAVE COTNER]: Well, the details I had, and the details had come from Mr. Flynn. And despite what I now see as, as a lack of solid backing for it, the statements were continuing to be made that it was factually based; and therefore, based upon that, attorneys in our office, with my oversight, drafted the amended pleading. (*Id.* at p. 20:16-21)

. . .

[DAVE COTNER]: And the significance of the meeting that developed was, I would say two principal issues that Edra had with respect to the pleading that had been filed. The most important from the trustee's perspective was: At the time she negotiated the settlement document, she knew or believed that she had been duped with respect to the capabilities of the technology being marketed by Mr. Sandoval. (*Id.* at pp. 21:22-22:4).

. . .

[DAVE COTNER]: And then the second issue that she had some concerns about is that in the amended pleading, there were allegations made with regard to Dennis Montgomery which she believed to be false, and with regard to certain noise-filtering technology which she also said was unrelated to the Atigeo litigation. (*Id.* at p. 22:8-13)

. . .

[DAVE COTNER]: Well, and this, too, has some bearing on the kind of situation we were required to deal with. Immediately when I announced that I was to amend the pleadings, Mr. Flynn contacted the U.S. Attorney's Office and, in essence, was critical of us for trying to amend our pleadings, for abandoning claims, for abandoning the estate. (*Id.* at p. 23:5-11)

. . .

[DAVE COTNER]: It was the same act of deception going on with the U.S. trustee that had taken place with me. You're inundated with paper, you're inundated with statements, you're given

ER00561

8

deposition transcripts in which things are taken out of context. And I know this now in hindsight.  But based upon that, frankly, Mr. Samson and I were being scrutinized as to whether we were taking the right steps on behalf of the estate.  (*Id*. at 23:18-25)

. . .

THE COURT: Mr. Cotner, I have a couple of questions for you.

MR. COTNER: Yes, Judge.

THE COURT: You had mentioned that you had been at a meeting here in Butte with Mr. Blixseth, Mr. Flynn, and Mr. Conant. At that time, I assume that Mr. Flynn was representing Mr. Blixseth. Who was Mr. Conant representing?

MR. COTNER: Judge, I believed at the time he was representing Western Capital. I've since learned that there was at least some dialogue in which Mr. Conant's relationship may have been more than just representing Western Capital. I cannot tell you today that I know. I do know today it's been represented that he represents, as an independent contractor, Western Capital on some issues, Tim Blixseth on some issues, and Mike Flynn on some issues. Whether he was in that capacity at that meeting, I do not know.

THE COURT: Okay. Then another statement that was made, I believe in your brief, 1S you make some reference to now you know Mr. Flynn's reputation. What is that? What did you mean by that?  (*Id*. at pp. 29:22-30:18)

. . .

[DAVE COTNER]: Because if you read the article, there's nothing that's substantive In the article, and yet the media spin begins to put Edra in a bad light; a person who, frankly, I find to be forthright, straightforward, has nothing to win or lose in this situation, and has been a person that has been, in my opinion, as honest as she could be at all steps.

[DAVE COTNER]: I believe Mr. Flynn has his own biases that arise out of certain prior relationships. It might have been from an attorney relationship with a client that ended, it might have been because of his son working for certain companies. But Mr. Flynn, In my opinion -- and he did it with the U.S. trustee. He is a very, very convincing individual. He's very articulate, he's precise with

ER00562

9

**Case No. 12-35986 ER  561**

the facts. My observation with him, though, is, especially now:
Listen, take it in, but confirm all before you rely on it.

And that was the mistake that I made, if any, between that January
and June date.

THE COURT: Okay. So the documents promised were never
submitted and may not even exist?

MR. COTNER: There was multiple documents provided to the
U.S. Attorney's Office after I announced my motion to make this
most recent amendment.

TRUSTEE SAMSON: To the U.S. Trustee's Office. (*Id*. at 31:10-
32:8)

. . .

[DAVE COTNER]: And that's true if you are talking about the
Atigeo technology; however, as spun in the pleadings that were put
together by Mr. Flynn, it is not true with regard to the Blxware
technology, the technology that -- in which was the subject of this
Playboy article, which was public. And I'm trying to be careful,
Judge, because I don't know what's protected and what's not, but
let's just put it like this: She has never questioned the validity of
the Blxware technology, but yet you see that statement. And the
conclusion made by Mr. Flynn from it is: See, Edra Blixseth is
stating under oath that she questions the Blxware technology.
That's not true. You could read it and, unless you have an
opportunity to meet with Ms. Blixseth and understand the
differences between the Blxware technology and the Atigeo
technology, you would draw that same conclusion. That's the kind
of allusions that I think I was being subjected to and the U.S.
Attorney's Office was being subjected to as well.

THE COURT: Could I have you move the mic away just a little bit
again? Thanks.

MR. COTNER: Sorry, Judge.

THE COURT: I guess the other thing - and maybe I need to refer
this to Mr. Tellis - but the other question I have that came up in my
reading of some of the documents is that there was, through the
attachment that you made to the motion on the complaint that was
the basis of the amended complaint that I believe was at Docket
109, was some of the material that may be contained within that is

in violation of a secrecy order out of the court in Nevada. You kind
of alluded to that, Mr. Cotner, I think, when you said you didn't
know that that really was covered by whatever orders might exist
in that court. I guess I just wanted to clarify that. Because my
concern is if, if there's a violation of some order, court order, and I
have knowledge of it, I'm not so certain I don't have a
responsibility to inform that Court of my knowledge of that and
what has occurred for that Court to do whatever it deems
appropriate if anything. So I guess I just wanted to kind of clarify
on that issue as to where we're at.  (*Id*. at pp. 33:2-34:16)

. . .

[BRIAN PARK]: The parties shall not discuss, mention, question,
or introduce as evidence any actual or proposed intelligence
agency interest in, application, or use of the technology. And
"technology" is defined as: The computer source code, software,
programs, or technical specifications relating to any technology
owned or claimed by any of the parties. When that language is
compared to the text of certain passages of Docket 109,
specifically at pages 18 to 19, 22, and 24, there seems to be a <u>clear
violation</u>.  (*Id*. at p. 35:10-20)

. . .

THE COURT: Okay. Mr. Park, A-2 that you referenced attached to
the motion, as I recall, that's the drafted complaint submitted to the
trustee by Mr. Flynn naming Mr. Blixseth as the plaintiff.  (*Id*. at p.
36:19-22)

. . .

MR. COTNER: Thank you, Judge. First of all, with respect to the
"secrecy order," as we're calling it, no, I had no knowledge of it
until it was brought to my attention by Mr. Park.

THE COURT: You need to speak a little louder. I'm sorry.

MR. COTNER: Okay. What I'm saying, Judge, is initially I had no
knowledge of the secrecy order. Mr. Parks brought it to my
attention.  (*Id*. at p. 36:19-22)

. . .

[MR. PARK]: As to the blame of a third party, Mr. Flynn, for the
predicament we're in, the trustee spends a substantial part of its
brief and its -- its opening brief and its reply explaining why Mr.

ER00564

11

Flynn ultimately should bear responsibility for the allegations that were improperly made and now seek to be retracted. According to the trustee, it's Mr. Flynn's responsibility that an adequate Rule 11 investigation was not done in January or February, in June or July, and ultimately not until shortly before this motion for leave to file was made. With all due respect, that's not how it works. (*Id*. at p. 53:4-14)

. . .

[MR. COTNER] If my brief is trying to pass the buck to Mr. Flynn, I don't. I take responsibility for my own actions. Did Mr. Flynn believe me -- mislead me? I think, yes. Does that make him responsible for my actions? I'm not asking the Court to make that decision. (*Id*. at p. 60:14-20)

11.      After engaging in these tactics, Judge Kirscher then stated that he would be issuing an order to show cause why the *pro hac* admission of C.J. Conant should not be revoked, he struck from the docket all pleadings and documents submitted by Cotner that implicated Ms. Blixseth and Mr. Montgomery in their software and financial frauds, and then sent a letter to Judge Pro of the U.S. District Court for the District of Nevada informing Judge Pro that Mr. Flynn potentially violated the Protective Order entered by Judge Pro.

12.      While engaging in the foregoing tactics on October 12, 2010, Judge Kirscher knew, as of January 2010--from the Spoliation Motion, and the Flynn affidavit in support thereof and the exhibits attached to the Flynn affidavit (Docket No. 473-01), and the Edra Blixseth deposition of Dec17, 2009, and the exhibits, thereto, and from the Russell depositions and Rule 2004 exams *in Edra Blixseth's Estate proceedings,* in which the Russell computer destruction of evidence was thoroughly explicated--Mr. Cotner had full access to these transcripts and to the Edra Blixseth's and Jory Russell's computers, particularly in his capacity as counsel for the Trustee, and that Russell and Blixseth had attempted to destroy evidence on the computers including emails relating to the bogus technology (Judge Kirscher had conducted the spoliation

ER00565

12

**Case No. 12-35986 ER  564**

motion hearing on February 11, 2010 with full access to all of the documentary exhibits attached
thereto including the Edra Blixseth financial statements and documents relating to the bogus
technology, and he had denied my Motions for Summary Judgment and Reconsideration of the
Edra Blixseth/Sam Byrne Bad Faith frauds); that Judge Kirscher already had full access to all of
Edra Blixseth's deposition testimony on December 17, 2009, discussing the bogus technology
and Ms. Blixseth's role in the financial frauds and software frauds (the deposition and exhibits
also included Ms. Blixseth's fraudulent financial statements and the FBI reports proving the
technology was bogus, introduced into evidence in AP 14 in February, 2010 together with all of
the exhibits); and most significantly, Judge Kirscher knew that Ms. Blixseth, Samson and Cotner
all knew that the bogus technology was NOT protected by the state secrets privilege because the
Nevada Court had entered rulings, orders and penalties that it was NOT protected by the
privilege (thus Mr. Park had not told the Court the truth when he said the technology was
protected and there was a "clear violation"). Judge Kirscher likely knew on October 12, 2010
that Mr. Flynn did not "mislead" or deceive Mr. Cotner or Mr. Samson about the bogus "noise
filtering" technology, that it was not protected by any privilege, that the technology was
fraudulent and that Ms. Blixseth had engaged in yet more lies and concealment when she flip-
flopped on Mr. Cotner regarding the "noise filtering" technology as described by Cotner in the
above colloquy.  It is likely that Judge Kirscher knew that Ms. Blixseth's flip-flop was designed
to protect Montgomery, and that if Ms. Blixseth exposed Montgomery, he would then expose her
and then all of the *ex parte* communications which have controlled these bankruptcy proceedings
would be exposed.

      13.    Dennis Montgomery's deposition testimony and exhibits (Docket Nos. 2115-5 to
2115-21, Case No. 08-61570) and attendant assertion of the 5th amendment privilege against

self-incrimination—which was attended by four representatives from the DOJ charged with protection of the state secrets privilege who NEVER ONCE OBJECTED TO DETAILED QUESTIONS CONCERNING THE TECHNOLOGY AND THE WAR ON TERROR FAR SURPASSING ANY PURPORTED "CLEAR VIOLATION" IN THE SANDOVAL COMPLAINT WHICH JUDGE KIRSCHER ORDERED SEALED AND IN CONNECTION WITH WHICH HE THEN COMMUNICATED WITH THE NEVADA COURT—provides conclusive evidence that: (a) the technology is bogus (a fact of which Mr. Cotner should have been well aware, as opposed to accepting Edra Blixseth's lies as the truth); (b) that Edra Blixseth and Montgomery attempted to sell it to the U.S., twice to Israel, to Bahrain as part of a $50M loan scam by Ms. Blixseth (see **Exhibit 1**) and a fake wire transfer by Ms, Blixseth for another $5 million fraud on Palm Desert National Bank (see **Exhibit 2**), both of which are attached hereto; (c) that the technology is NOT protected by any protective order; and (d) that Judge Kirscher continues to use the privilege and protective order to protect Edra Blixseth and cover over her frauds.  Judge Kirscher knew on October 12, 2010 that these facts have been given to the multi-agency task force investigating Edra Blixseth; and he knew when he issued multiple orders involving Ms. Blixseth that his orders would have the practical result of protecting her and her criminal conduct.

14.  For all of the foregoing reasons, Judge Kirscher "set up" the foregoing record, and then used the state secrets privilege and the Nevada protective order to conceal and gloss over Ms. Blixseth's years of on-going frauds.  Judge Kirscher then entered the following Findings and Orders found in **Exhibit 3** (Docket No. 147, Case No. 09-105):

(a)  In connection with the filing of an "Answer, Amended Counterclaim and Amended Third Party- Complaint" and a pending "Motion for Leave to File Answer, and Second

ER00567

14

Amended Counterclaim and Second amended Third Party Complaint and his Motion to

Bifurcate" the Trustee and Cotner were also receiving assistance from Debtor's ex-spouse,

Timothy L. Blixseth ('Blixseth')".

(b)     "The record reflects that Christopher J. Conant ("Conant") of Denver,

Colorado was appearing at hearings and filing pleadings on behalf of WCP.[fn 1: "The Court

notes that Conant did not seek leave of the Court to appear *pro hac vice* in this adversary

proceeding."] In addition, Conant also represents Blixseth in certain matters. The Trustee's

counsel, David B. Cotner ("Cotner"), represented that he was working with counsel for WCP and

counsel for Blixseth in the joint prosecution of claims against the Plaintiffs and Third Party

Defendants. Cotner maintains that another of Blixseth's attorneys, Michael J. Flynn ("Flynn") of

Boston, Massachusetts, was encouraging the Trustee to pursue certain claims against the

Plaintiffs and Third Party Defendants, making repeated representations and assurances that

Debtor had been fraudulently induced to invest money into or with the Plaintiffs and/or Third

Part Defendants, and that the fraudulent inducement was unknown to Debtor at the time she

executed a certain Letter Agreement and a Release contained therein."

(c)     The Court then describes Cotner's interactions with Edra Blixseth and

Nick Rhoades and his interview with them on January 19, 2010 relating to the "fraudulent

inducement claim" (which was recited IN PART in the Sandoval complaint) leading up to a July

12, 2010 meeting with Edra Blixseth - SEVEN MONTHS AFTER THE JANUARY MEETING.

(d)     Judge Kirscher then enters the following Findings (found on pp. 5-9 in

**Exhibit 3**):

At the July 12, 2010, meeting with Debtor, Cotner learned that his
Amended Counterclaim and Amended Third-Party Complaint
contained numerous inaccuracies, which Cotner outlines as
follows:

ER00568

15

**Case No. 12-35986 ER  567**

- At the time of the execution of the Letter Agreement, which included the Release, Debtor was aware that the xPatterns technology did not perform as represented. Therefore, any claim based on fraudulent inducement would have been released by the terms of the document.

- Allegations made with respect to Dennis Montgomery are unrelated to the xPatterns technology. More importantly, they were alleged not to be accurate.

- Allegations provided by Mr. Flynn with respect to the capability of the software did not relate to the software technology of xPatterns. Additionally, such allegations were not true. After learning of Debtor's position, Cotner confirmed such representations through communications with third parties. As a result of these disclosures, Cotner chose to file a request to file a second amended pleading.

Since filing the present Motion to Amend on August 31, 2010, Cotner received more troubling information consisting of a copy of an email exchange between WCP's representative Jeff Adams, Blixseth, Flynn and Conant. Cotner attached a copy of the email as Exhibit A to his Reply Brief filed October 5, 2010. In the email dated February 20, 2010, Jeff Adams responds as follows to an inquiry by Blixseth:

"On Liner, Samson will argue that we are only perfected in the proceeds after his expenses."

"On Sandoval, Samson cannot over-ride our ownership of the contract, only the Tort Claim. If we foreclose on the Claim, he can still go after the tort but that money is also ours after he pays his bills. If Mike can blow out the tort claims between Edra/Estate and Sandoval/Atiegeo, then only Mike/Tim Claim and our Contract will remain."

Cotner maintains that the forgoing exchange suggests an intention by WCP, Blixseth and their counsel to lead the Trustee and Cotner astray. Cotner explains that by doing so, WCP and Blixseth could effectively remove the Trustee from this action so that the benefit of claims against Atiegeo/Sandoval would flow directly to WCP and Blixseth.

Unfortunately, the Trustee's position may not be aligned with WCP and Blixseth, and the Trustee and Cotner relied too much on

ER00569

16

**Case No. 12-35986 ER 568**

information supplied by WCP, Blixseth and Flynn.  The alliance between WCP, Blixseth and Flynn is demonstrated by the fact that Conant represents not only WCP, but also Blixseth. Cotner further contends that Conant represents Flynn personally in certain unrelated matters.  The Court agrees that Conant's representation of multiple parties raises an inference of impropriety.  After such expressing concern at the hearing on October 12, 2010, Conant, immediately following conclusion of the hearing, withdrew as WCP's counsel in this Adversary Proceeding and other related proceedings.

Cotner also expressed his frustration with Flynn's role in these proceedings, explaining that he would have pursued a different course of action had he known Flynn's reputation.  To elaborate, Cotner characterized Flynn as articulate, precise and convincing, and opined that when someone levies an attack on Blixseth, Flynn launches a masterful "war of diversion, of media control and an effort to undermine the process."  Cotner cautioned that one must listen carefully, digest and then confirm Flynn's statements because the truth is not always exactly as Flynn appears to represent.

For example, Cotner asserts that he was convinced by Flynn and Blixseth that certain facts existed showing Debtor had a valid tort claim against the Plaintiffs and third-party defendants.  To that end, Flynn sent an email to Cotner's paralegal on February 1, 2010, wherein Flynn writes: "Attached is a preliminary and incomplete (have not finished claims 8-10 yet) draft of a complaint in pdf and WP against Sandoval and his Board.  This should give [Cotner's] office some facts to put together at least some reasonably well plead counterclaim for today's filing."  Flynn also purportedly provided Cotner with multiple documents that supported the preliminary and incomplete drafted complaint.

According to Cotner, Flynn presented Cotner with a set of facts that were detailed, consistent and seemingly credible.  However, after carefully reviewing all the documents and following his second interview with Debtor, Cotner discovered that facts he took to be true were not necessarily true as against the Plaintiffs and third-party defendants in this Adversary Proceeding.

Under the circumstances, Cotner's reliance was not unreasonable particularly where Flynn, a fellow attorney and officer of the

ER00570

17

**Case No. 12-35986 ER  569**

Court, had a historical relationship with Debtor and various of the entities involved in this Proceeding. Upon learning the complete truth, Cotner sought to do what he could by immediately amending the inaccurate pleadings.

Cotner also explained that his failure to secure all the facts prior to filing his amended pleadings on July 6, 2010, was due, in part, to his decision to stay with a family member during a surgery in Arizona in June. Cotner explains that absent that decision, he would have met with Debtor and discovered the truth prior to filing the amended pleading.

The Court recognizes that the Trustee and Cotner sought to retract their inaccurate pleadings by filing the second amended counterclaim and third-party complaint in a timely manner. The Court agrees with Cotner that Plaintiffs will suffer little, if any, harm if the Trustee is allowed to file the second amended counterclaim and third-party complaint. Indeed, attempting to correct the error was professionally responsible and was ethically the correct step to take. Amendment of the pleadings clearly has no prejudicial effect on the Plaintiffs as the Plaintiffs will no longer have to litigate facts and circumstances arising prior to Debtor's execution of the Letter Agreement.

In addition to Cotner being torn between the needs of both family and work, the Trustee in this case is faced with a potentially insolvent estate with little money available to pursue claims. Given the circumstances surrounding the claim, and the Trustee's limited resources, Cotner acted reasonably under the circumstances.

At the hearing, Cotner accepted complete responsibility for the inaccuracies contained in his pleadings filed July 6, 2010. In his defense, Cotner argued at the hearing that by signing the pleadings he was only certifying to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that the claims were warranted, were not presented for any improper purpose, were not intended to raise or cause unnecessary delay or result in a needless increase in the cost of litigation. While the Court does not doubt Cotner's veracity, the Court cannot and will not condone the filing of inaccurate pleadings. The appropriate sanction in this case is denial of the Trustee's motions. However, given the unique facts in this case

ER00571

18

**Case No. 12-35986 ER 570**

and because the parties have not yet engaged in any meaningful discovery, the Plaintiffs' request to prohibit any future amendment of the pleadings by the Trustee is denied. This Court allows liberal amendment of pleadings, particularly where a trial date is not yet set. For the reasons discussed above, the request for fees and costs by the Plaintiffs and Third-Party Defendants are denied.

In addition to the foregoing, the Plaintiffs brought to the Court's attention the fact that some of the Trustee's pleadings may violate a secrecy order issued by a court in Nevada.  The parties agree that neither the Trustee nor Cotner knew of the secrecy order until the Plaintiffs advised them of the secrecy order, but the Plaintiffs have requested that the Court strike certain documents on grounds they violate the Nevada Court's secrecy order. To prevent any further violation of the Nevada secrecy order, Cotner agreed that such pleadings should be stricken from the record.  By agreement of the parties, this Court removed from its docket the Trustee's Answer, Amended Counterclaim and Amended Third-Party Complaint filed July 6, 2010, at docket entry no. 109, and the Trustee's Exhibits A-1 and A-2 filed August 31, 2010, at docket entry no. 125.  The Court would note that Exhibit A-2 is a copy of the preliminary and incomplete complaint provided to Cotner by Flynn.  This Court will inform the Nevada court of the issue so it can deal with the matter as it deems appropriate.

15.     The foregoing Findings and Orders reflect actual bias towards myself and my counsel, Mr. Conant and Mr. Flynn.  We were never given any opportunity to be heard on these issues (Mr. Conant was not at the hearing from which this order was derived, nor were he or Mr. Flynn given notice that Mr. Cotner would be given free reign by the Court to malign their reputation).  Yet Judge Kirscher adopted as truth the representations of Mr. Cotner that Mr. Flynn committed a fraud on him.  I am a $20 million creditor of the Edra Blixseth estate.  There are numerous creditors owed in excess of $100 million dollars. As recited therein, as proven from all of the evidence, as proven in the Montgomery deposition, as supported by the FBI reports, as reflected in the on-going Grand Jury proceedings, the Sandoval Complaint is accurate in all particulars.  Incredibly, with no hearing or opportunity to present evidence, Judge Kirscher

ER00572

19

maligned myself, my lawyers, and strongly suggested that Mr. Flynn violated the Nevada

Orders, and deprived the Blixseth Estate of an approximate $100 million claim against Sandoval

based on misrepresentations of Cotner, which the COURT KNEW WERE NOT ACCURATE.

16.     In addition to the plain evidence of bias above, Judge Kirscher ignored the

undisputed facts in the "Statement of Undisputed Facts" in AP 18, which are not only undisputed

but unrebutted and incontrovertible. No unbiased observer of the following facts could possibly

conclude that Edra Blixseth is credible and that I am not.  Nor have any facts been raised by any

party that Edra Blixseth and Sam Byrne did NOT engage in a scheme in bad faith to use the

bankruptcy process based on this Court's bias and possible political agenda to turn over to Mr.

Byrne $700 million in Community assets by judicial fiat.  All of the following facts were known

by Judge Kirscher to be true and accurate before he rendered his decision in AP 14, before he

issued his Order on October 21 attacking my counsel, before he ruled on WCP's Motion for

Summary Judgment in Case No. 09-100 seeking non-dischargability of Edra Blixseth's debt;

before he ruled that Ms. Blixseth  was "frozen out", and before he ruled that Ms. Blixseth did not

have the "requisite intent beyond a reasonable doubt" to defraud lenders and federally regulated

banks of over $50 million.  See Docket No. 40, Case No. 09-100.  That is, the undisputed facts

regarding the genesis of the Yellowstone Club bankruptcy are as follows (see also Docket No.

309, Case No 09-18):

(a)     Sam Byrne and Edra Blixseth entered into an "Agreement to Form" on or

about August 12, 2008 in which Byrne agreed to make a $100 million equity investment into the

Yellowstone Club which would have precluded bankruptcy; and which Agreement coupled with

the "$35 million predatory loan" enabled Byrne to take over control of the Yellowstone Club and

put it into bankruptcy in bad faith.  Docket No. 309, Case No 09-18.

ER00573

(b)     On August 13, 2008, Mr. Byrne loaned Ms. Blixseth $35 million on a 48-day note to consummate the MSA secured by Porcupine Creek and the Family Compound, which was approved by Steve Brown as the Yellowstone Club lawyer.  Mr. Byrne loaned Ms. Blixseth these monies knowing that Ms. Blixseth had defaulted on over $50 million in fraudulently procured loans, that she was not "institutionally financeable" and that the "money doesn't exist" to pay the loan – both direct quotes from Sam Byrne before and after he provided the "predatory loan."  He knew this "predatory loan" would enable him to control Edra Blixseth, control the Club, put it into bankruptcy, and remove Porcupine Creek and the Family Compound—representing over $250 million in assets that could have been used to satisfy the BGI notes payable to the Club. Nonetheless, Mr. Byrne ended up owning all of these substantial assets together with the Club for less than $40 million. See Docket No. 309, Case No 09-18, and particularly ¶¶ 16-23, 42-100.

(c)     For the purpose of interfering with the $455 million sale of the Club to Byrne and to make her own deal with Byrne, and in violation of two court orders, Edra Blixseth fabricated with Dennis Montgomery, an adjudicated perjurer and Ms. Blixseth's business partner (Judge Kirscher had possession of Montgomery's adjudicated perjury findings and orders by the Nevada Court in April, 2009, when said Orders were filed in AP 14) two "GRAND JURY TARGET LETTERS" fabricated by Montgomery and purporting to implicate me. Both letters were immediately provided to the FBI and other investigative agencies investigating the Edra Blixseth frauds and were quickly determined to be fakes. See Montgomery Deposition, pp. 115-118; Docket No. 309, Case No 09-18 ¶ 34.

(d)     That Edra Blixseth had in fact executed fraudulent loan applications and fraudulent financial statements to defraud banks and lenders of over $50 million dollars.  See

Exhibit 7 to List of Exhibits (Docket No. 2106-7, Case No. 08-61570; Docket No. 309, Case No 09-18, ¶¶ 112-124).

(e)     That Edra Blixseth, Deborah Klar, and Dennis Montgomery had in fact defrauded Wachovia Bank of $8 million dollars using the fraudulent "noise filtering" software as collateral, knowing that it was then subject to a preliminary injunction in the Nevada litigation involving the Protective Order (in which Klar was representing both Edra Blixseth and Montgomery). When Mr. Cotner and Mr. Park misrepresented facts to the Court on October 12, 2010, Cotner and Samson knew that this "technology" allegedly subject to the state secrets privilege had been "pledged" as collateral in the fraudulent Wachovia loan and that Edra Blixseth and Klar had lied to the Bank stating that Ms. Blixseth had an approved $100 million contract with the U.S. Government.  See Edra Blixseth, deposition particularly at page 127-135 at Docket No. 486-8, Case No. 09-14; see also Docket No. 204, and 204-2, Case No. 09-60452.

(f)     When Judge Kirscher made the findings and Order that he did on October 25, 2010 (Exhibit 3) attacking Mr. Flynn and Mr. Conant, he knew from numerous documents before him including the spoliation motion, the AP 18 SUF, the Wachovia Bank claim adversary proceedings (Docket No. 204, Case No. 09-60452), and in numerous other pleadings, that the fraudulent software technology that Mr. Park said was a "clear violation" of the Protective Order could NOT possibly be a violation because: IT HAD BEEN PLEDGED AS COLLATERAL BY EDRA BLIXSETH WITH WACHOVIA BANK; (NEITHER EDRA NOR THE BANK HELD ANY SECURITY CLEARANCES) AND HAD BEEN SUBJECT TO PRODUCTION IN NEVADA COURT ORDERS; WAS PART OF AN ONGOING SCHEME TO DEFRAUD HER CREDITORS AND THE U.S. GOVERNMENT; AND HAD BEEN THE SUBJECT OF WIDESPREAD MEDIA.  See **Exhibit 4**; Docket Nos. 204 et seq., Case No. 09-60452.

ER00575

(g)      Knowing that: (1) the bogus "noise filtering" software had been pledged to Wachovia in March 2008 and June 2008 to secure $8 million after representing that they had in fact a $100 million contract with our government; (2) knowing they were subject to a DAILY $2,500 penalty to produce the source codes in Nevada federal court (see **Exhibit 5**), thus, obviating any possibility that such information was subject to the Protective Order, Ms. Blixseth and Mr. Montgomery then schemed to defraud the government between September 2008 and March 2009, JUST BEFORE SHE FILED BANKRUPTCY IN THIS COURT, with a scheme to obtain a $3 million contract with the government to return archives Mr. Montgomery had stolen to TEST the fake software.  The Nevada Federal Court Sanctions Order, and the multiple court orders and hearings relating to these matters in the Nevada cases, conclusively establish, contrary to Mr. Park's representations, and this Court's seizing on these issues to attack my counsel, **that the technology has never been protected by the U.S. Protective Order.**  The "TESTING" of the software had been scheduled on numerous prior occasions but every time the testing was scheduled Montgomery fled and tried to find another victim because he knew it was fake.  See emails and documents attached hereto as **Exhibit 6**.

(h)      When Cotner made his false representations to the Court on October 12, 2010, and the Court entered its findings and Order on October 25, 2010, Cotner knew that the foregoing facts were true because he had possession of documents, and had discussions with me and Mr. Flynn, proving the truth of said facts.  See emails referenced above.  Judge Kirscher had sufficient knowledge of all of these facts BEFORE he entered his Order on October 25, 2010.

(i)      Edra Blixseth and Montgomery tried to sell the fake technology to Israel (twice - first in December 2006 and again in 2010 when they were both in bankruptcy. This raises the issues of who owns the technology (Edra Blixseth or Montgomery, or both), which

ER00576

23

**Case No. 12-35986 ER  575**

Estate owns this technology; and whether the two of them have engaged in bankruptcy fraud on the ownership issues, notwithstanding Ms. Blixseth paying approximately $25 million for the "noise filtering" technology and then posturing conflicting positions on ownership between her and Montgomery ) See Edra Blixseth deposition transcript at Docket No. 486-8, Case No. 09-14 at pp. 138-144.  At the October 12 hearing, Cotner knew either that the Protective Order did NOT protect the technology; and/or that Edra Blixseth and Montgomery were violating multiple U.S. statutes involving classified technology, and/or that the "noise filtering" was a complete fraud.

(j)     Montgomery and Edra Blixseth tried to sell the "noise filtering" technology to Bahrain as part of a $50 million loan fraud; and as part of a $5 million fabricated wire transfer.  See **Exhibit 1**.

17.     Richard Samson, David Cotner and Edra Blixseth have used the bankruptcy process to defraud her creditors of a $100 million claim as recited in the Sandoval complaint sealed by Judge Kirscher.  The evidence shows that Judge Kirscher had full knowledge of, or all of the evidence at his disposal, before effectively destroying these claims, attacking my lawyers, seeking to effectuate the discharge and exculpation of Edra Blixseth, all while seeking to use the State Secrets Privilege to cover over these facts.  The fact that Dave Cotner has stated that he believed Edra, based on his interview with her, is dubious. Dave Cotner has had possession of volumes of emails and documents in the form of Jory Russell's' emails and computer hard drives which corroborate the above facts.  He appears to have refused to investigate and review all this information, and instead chose to believe the statements and representations of Edra Blixseth, who lied in loan applications, as recited in her December 17, 2009 deposition, and who has given repeated testimony involving numerous instances of apparent perjury. Edra Blixseth repeatedly

ER00577

**Case No. 12-35986 ER  576**

attempted to assert the State Secrets Privilege in support of alimony requests involving the

technology and Blxware in the amount of approximately $36 million per year, but then attempted

to hide behind the privilege and evade discovery based on the privilege into the validity of the

technology. Ms. Blixseth refused to answer questions about the technology.  The divorce court

judge, Sharon Waters, then ruled that if Ms. Blixseth continued to hide behind the privilege,her

alimony hearing would be taken off calendar.  At the same time, in April 2008, Ms. Blixseth's

CEO, Steve Crisman was deposed by my divorce lawyers, and he admitted there was no

"product" after over $25 million had been paid out by Ms. Blixseth, of which $23 million went

to Sandoval and others, and approximately $6 million went to Montgomery, who had –just

asserted his 5th Amendment rights in connection with almost all aspects of these frauds. See

Montgomery Deposition and exhibits, Docket Nos. 2115-5 to 2115-21, Case No. 08-61570.  Mr.

Crisman's testimony regarding "no product" meant no "noise filtering" technology.

18.    In preparation for the hearing on my Motion to Disqualify, my attorneys

subpoenaed the records of several people who I was informed would have documentary evidence

of *ex parte* communications between opposing parties and Judge Kirscher.  The people who my

attorneys subpoenaed were Andy Patten (counsel for the Yellowstone Club debtors), Ross

Richardson (Chapter 7 Trustee for the Yellowstone Club World bankruptcy estate), John

Amsden (attorney for Ross Richardson) and Terry Healow (law clerk for Judge Kirscher).

19.    Of these individuals, my attorneys received documents from Andy Patten and

Ross Richardson.

20.    Andy Patten provided my attorneys with a host of email communications between

him and Judge Kirscher, between him and Judge Kirscher's law clerk, Kelli Herrington, and him

and Senior Bankruptcy Judge Peterson.  These emails from Andy Patten are attached hereto as

**Exhibit 7**.  As a whole, these emails reflect a close and confidential relationship between Mr. Patten and the Chambers of the Montana bankruptcy court.  More troubling for a party who would be an opponent of Mr. Patten's client, as I am, is the fact that specific emails display a relationship between Mr. Patten and the bench of the Montana bankruptcy court that a reasonable person would view as preferential toward Mr. Patten.

21.      In particular, on April 20, 2009, one week before Phase I of the trial in AP-14 where the Yellowstone Club Debtors (Mr. Patten's client) were seeking to impose a $200+ million judgment against me, Senior Judge Peterson sent an email to Mr. Patten regarding this trial and provided Mr. Patten with citations to two cases, apparently that Judge Peterson thought would be helpful to Mr. Patten.  This email is attached hereto as **Exhibit 8**.

22.      In relevant part, Judge Peterson states: "Is the case [AP-14] going forward on the 22nd? Also as to that you may want to see Schubent case at 554 f3d 382, appeal from 348 br 234 as well as 391 br 626, 631 (9 BAP) on non statutory insiders applying equitable subordination [sic].  It was bought to my attention last week in a Vegas mediation dealing with lender conduct such as Cs/Blixeth [sic]. Judge."

23.      This email demonstrates that the Montana bankruptcy bench has affirmatively assisted my opposing party in AP-14 on the eve of trial.  It is absolutely antithetical of due process for the Montana bankruptcy bench to engage in *ex parte* communications for the purpose of affirmatively advising, on the eve of trial, the party that has sought a $200 million judgment against me and has obtained a bench verdict against me of over $40 million.

24.      Also indicative of a preferential and confidential relationship between Mr. Patten and Judge Kirscher is found in an email exchange of November 19, 2009 between Andy Patten and Judge Kirscher's law clerk, Kelli Herrington.  See **Exhibit 9** attached hereto.  In this

ER00579

**Case No. 12-35986 ER  578**

exchange, Mr. Patten asks Kelli Herrington: "Kelli - if I give the court a heads up about a new case can it be kept confidential until the actual filing?"  Kelli Herrington responds by saying "Absolutely Andy."

25.     This email demonstrates two things.  First, that Mr. Patten enjoys a confidential relationship with the Montana bankruptcy bench and presumably Judge Kirscher in particular. This would lead any opposing party of Mr. Patten, as I am, to believe he or she will not be afforded impartiality from Judge Kirscher or the Montana bankruptcy court as a whole.  Second, this email implies that Mr. Patten and Judge Kirscher had a private conversation wherein Mr. Patten discussed this "new case" with Judge Kirscher.  For any party who finds himself opposing a client of Mr. Patten's, as I am, this is incredibly troubling as it would cause that party to question Judge Kirscher's impartiality in any case involving Andy Patten.  How many other private or "confidential" conversation has Mr. Patten had with Judge Kirscher regarding cases before Judge Kirscher?  Has Mr. Patten had private conversations with Judge Kirscher regarding AP-14?  I, and I think anyone else in my position, would have these questions, and, as a result, would question Judge Kirscher's impartiality in a case where Mr. Patten represents a client before him.

26.     My attorneys also received documents from Ross Richardson in response to a subpoena my attorneys served on him.  In my original affidavit, I discussed how, on or around June 10, 2010,  John Amsden told me that Ross Richardson had a phone conversation with Terry Healow (Judge Kirscher's other law clerk) and during this conversation, Mr. Healow asked about the status of a settlement between myself and Mr. Richardson.  Mr. Healow urged Mr. Richardson to hurry up and finalize the settlement before I could renege or change my mind.  In the documents my attorneys received from Mr. Richardson, is an email dated June 10, 2010 from

Mr. Healow, confirming the fact that he and Mr. Richardson in fact had an *ex parte* phone conversation that day.  See **Exhibit 10** attached hereto.  Mr. Amsden and I discussed several scenarios as to why Mr. Healow would have said this.  Mr. Amsden said it must mean that Judge Kirscher is about to rule in AP 14.  Mr. Amsden and I discussed that, if Judge Kirscher was about to rule, how that ruling could impact Mr. Richardson's settlement. JUDGE KIRSCHER RULED ON AUGUST 16, 2010 in a 135 page decision in an apparent attempt to protect and insulate Ms. Blixseth while decimating my position in related proceedings (as described in detail in the preceding paragraphs).

27.     As an additional grounds for perceiving that Judge Kirscher has a bias against me are the facts and circumstances surrounding supplementing the record in my appeal of AP-14 with over 400 emails that Judge Kirscher purportedly reviewed when denying my motion to dismiss AP-14 on the grounds that my former counsel, Stephen Brown, became my adversary in 2009 regarding the very matters for which he previously represented me (i.e., the Credit Suisse loan and the waivers and releases associated with my division of marital assets with Edra Blixseth).  Judge Kirscher has twice stated that he reviewed these email communications involving Mr. Brown in denying my motion to dismiss (see Docket Nos. 292, 626, Case No. 09-14).  When I asked that these emails be included in the record on appeal so that I could challenge whether Judge Kirscher appropriately denied my motion to dismiss, he denied my request, even though the request was unopposed.  See Docket No. 626, Case No. 09-14.  From my perspective, from the first half of AP 14 when Judge Kirscher refused to allow me to look at the 400 emails and thereby precluded me from reviewing relevant discovery to the continued protection of the emails, a reasonable person would wonder what could possibly be in these emails that would warrant Judge Kirscher refusing to allow even an appellate court to review them.  It seems to me

that Judge Kirscher has purposefully insulated his rulings on these emails from appellate review

for some inexplicable reason that suggests bias. My question is WHY??  We have obtained

several emails suggesting that "political pressure" was to be applied; that meetings took place

with the governor of Montana; and that the state secrets privilege and government protection was

to be used.  See **Exhibit 11** attached hereto; see also Exhibit 67 to List of Exhibits [filed under

seal], Docket No. 2115-4, Case No. 08-61570.

28.    Also indicative of bias is the objective double-standard that Judge Kirscher seems

to impose on me with respect to weighing evidence and judging credibility.  At the December 2,

2010 status conference before Judge Kirscher, Michael Flynn, argued that under applicable law,

there should be no evidentiary hearing on my Disqualification Motion because my affidavit was

sufficient to support my motion.  In response, Judge Kirscher stated: "THE COURT: Well, I

guess I'm not so certain that the case law supports -- as you know from prior appearances, we

don't try things in this court by affidavit."  Transcript of December 2, 2010 Hearing at p. 18:22-

25 (emphasis added) **Exhibit 12**.

29.    Notwithstanding Judge Kirscher's proclamation that "we don't try things in this

court by affidavit," he nevertheless entered a $40 million judgment against me in AP-14 based

solely on the affidavit of Charles Hingle and did so before my opportunity to oppose Mr.

Hingle's affidavit expired.  See Disqualification Motion § 4.G.  What makes the Court's

proclamation that "we don't try things in this court by affidavit" even more indicative of

pervasive bias against me, is that when Judge Kirscher entered the $40 million judgment against

me based solely on Mr. Hingle's affidavit, Judge Kirscher acknowledged that there was no other

evidence in the record other than Mr. Hingle's affidavit upon which to base that $40 million

judgment.  See Docket No. 580, Case No. 09-14, at p. 4 ("While the Court would have certainly

ER00582

29

**Case No. 12-35986 ER  581**

preferred to enter a more definite Judgment, the Court did not have enough facts to determine what was owed to each of the aforementioned classes.").

30.     From a reasonable person's perspective, the message manifested by the Court in its treatment of me is that it adjudicates matters against me based on affidavits, but if I seek relief from Judge Kirscher, affidavits are insufficient.  From my perspective, this is just one manifestation of the pattern and practice Judge Kirscher has employed against me, which is to find facts against me based on his "credibility" assessment of me and my witnesses and therefore effectively insulate those findings from appellate review, while at the same time ignoring all undisputed facts that would favor a resolution of a disputed issue in my favor.  For example, Judge Kirscher employed this method in his 135-page memorandum of decision in AP-14 wherein he throughout states that he views me and my witnesses as not credible, while ignoring the undisputed facts of the bad faith and Sam Byrne and Edra Blixseth, the undisputed fact that my marital assets were not divided in collusion with Edra Blixseth but were divided after years of contentious divorce proceedings, the undisputed fact that the releases I received from the Yellowstone Club entities were a material consideration for me relinquishing my ownership of those entities to Edra Blixseth (so that Ms. Blixseth, on behalf of the Yellowstone Club entities, could receive a promised $100 million capital infusion from CrossHarbor, which of course never happened).

ER00583

**Case No. 12-35986 ER  582**

I, Timothy L. Blixseth, declare under penalty of perjury of the laws of the United States follows:

DATED this 17th day of January, 2011.

Timothy L. Blixseth

ER00584

31

**CERTIFICATE OF SERVICE**

I, Patrick Fox, hereby certify under penalty of perjury that on the 17th day of January, 2011, copies of the above document were served electronically by ECF notice to all persons/entities requesting special notice or otherwise entitled to same and that in addition, I hereby certify that I have mailed or served the document to the following non-ECF participants in the manner indicated by the non-participant's name:

No manual recipients.

By /s/ *Patrick Fox*

ER00585

**Case No. 12-35986 ER 584**

**Andy Patten**

| | |
|---|---|
| **From:** | Kelli_Harrington@mtb.uscourts.gov |
| **Sent:** | Thursday, January 22, 2009 10:29 AM |
| **To:** | Andy Patten |
| **Subject:** | Yellowstone Club |

Andy, the Judge has authorized me to approve your motion for additional cash collateral at
211 if you obtain the consent to Credit Suisse (who has filed a written objection),
CrossHarbor (as the lender) and the Official Committee of Unsecured Creditors.  Please let me
know when your pleading is filed and the order is ready.  Kelli

ER00771

**Andy Patten**

| | |
|---|---|
| **From:** | Kelli_Harrington@mtb.uscourts.gov |
| **Sent:** | Tuesday, February 03, 2009 11:13 AM |
| **To:** | Andy Patten |
| **Subject:** | Yellowstone Club |

Andy, items 279 and 280 on the docket in 08-61570 were ripe and ready for orders last Friday.
We have not received proposed orders on the aforementioned 2 items and the Judge is ready to
issue generic orders approving the same given the absence of any opposition.  Do you have any
opposition to generic orders or do you want to submit proposed orders?
Kelli

ER00768

**Case No. 12-35986 ER 586**

## Andy Patten

| | |
|---|---|
| From: | Kelli_Harrington@mtb.uscourts.gov |
| Sent: | Monday, November 10, 2008 6:23 PM |
| To: | Andy Patten |
| Subject: | RE: Yellowstone Club |

Andy, I will be at home tomorrow, but if you need anything, please feel free to call and I can handle any issue from there, including contacting the Judge, if necessary.  494-3375. Kelli

"Andy Patten"
<APatten@ppbglaw.com>                                                          To
                                     <Kelli Harrington@mtb.uscourts.gov>
11/10/2008 06:19                                                              cc
PM
                                                          Subject
                           RE: Yellowstone Club

Thanks Kelli - we have kept everyone in the loop and will be talking to Dan McKay in the morning.

-----Original Message-----
From: Kelli Harrington@mtb.uscourts.gov
[mailto:Kelli Harrington@mtb.uscourts.gov]
Sent: Monday, November 10, 2008 6:19 PM
To: Andy Patten
Cc: McKay, Dan (USTP)
Subject: Re: Yellowstone Club

Andy, I will let the Judge know that you are filing your petitions and that you want to proceed with the hearing at 3:00 p.m. on Wednesday, November 12th.  Kelli

"Andy Patten"

<APatten@ppbglaw.

**Andy Patten**

| | |
|---|---|
| **From:** | Kelli_Harrington@mtb.uscourts.gov |
| **Sent:** | Friday, November 07, 2008 3:55 PM |
| **To:** | Andy Patten |
| **Subject:** | Fw: New chapter 11 filing |

Andy, if you file your new cases this weekend and need anything done from this end, you can
reach me on my cell phone at 491-7130.   Kelli


----- Forwarded by Kelli Harrington/MTB/09/USCOURTS on 11/07/2008 03:54 PM
-----

| | | | |
|---|---|---|---|
| "Andy Patten"<br><APatten@ppbglaw.<br>com> | | To | |
| | | <Ralph_Kirscher@mtb.uscourts.gov>,<br><Kelli_Harrington@mtb.uscourts.gov><br>, <Terry_Healow@mtb.uscourts.gov> | |
| 11/06/2008 04:32<br>PM | | cc | |
| | | "Chuck Hingle"<br><CHingle@hollandhart.com>, "Jensen,<br>Neal (USTP)"<br><Neal.G.Jensen@usdoj.gov> | |
| | | Subject | |
| | | RE: New chapter 11 filing | |


Negotiations are on going. I have given Neal a head's up and will certainly keep him, or Dan,
to whom he has passed the ball, up to speed.
Andy

-----Original Message-----
From: Ralph_Kirscher@mtb.uscourts.gov
[mailto:Ralph_Kirscher@mtb.uscourts.gov]
Sent: Thursday, November 06, 2008 4:30 PM
To: Kelli_Harrington@mtb.uscourts.gov; Terry_Healow@mtb.uscourts.gov
Cc: Andy Patten; Chuck Hingle; Jensen, Neal (USTP)
Subject: Re: New chapter 11 filing

Greetings,

Also any motions filed or other documentation for the hearing on Wednesday need to be shared
in advance with Neal Jensen as the assistant UST and any affected creditors.  If stipulations
exist please file them prior to Wednesday unless negotiations are on-going.  Also, to the
extent applicable consider the limitations of Rule 6003.  Thanks

# Exhibit 8

ER00843

**Andy Patten**

| | |
|---|---|
| **From:** | John_L_Peterson@mtb.uscourts.gov |
| **Sent:** | Monday, April 20, 2009 2:46 PM |
| **To:** | Andy Patten |
| **Subject:** | Yellowstone Club |

Andy; Judge Kirscher has the UCC v. CS and Blixeth scheduled to start in Missoula on Wed. 4/22/09. The staff here has to travel and your fax to me indicates @9. all litigation will be stayed and dismissed with prejudice upon the effective date of the plan,with Blixeth cause to be dismissed without prejudice . Is the case going forward on the 22nd? Also as to  that case you may want to see Schubert case at 554 f3d 382,appeal from 348 br 234 as well as 391 br 626,631(9 BAP) on non statutory insiders applying equitable subourdation. It was brought to my attention last week in a Vegas mediation dealing with lender conduct such as CS/Blixeth. Judge

ER00844

# Exhibit 9

ER00845

**Andy Patten**

| From: | Kelli_Harrington@mtb.uscourts.gov |
|-------|-----------------------------------|
| Sent: | Monday, November 16, 2009 3:12 PM |
| To: | Andy Patten |
| Subject: | Re: new case |

Absolutely Andy.  Kelli


```
            "Andy Patten"
            <APatten@ppbglaw.
            com>                                              To
                                 "Kelli L. Harrington"
            11/16/2009 02:50     <kelli_harrington@mtb.uscourts.gov>
            PM                                               cc

                                                         Subject
                                 new case
```


Kelli - if I give the court a heads up about a new case can it be kept confidential until the
actual filing?

James A. Patten | Attorney at Law
Patten, Peterman, Bekkedahl & Green, PLLC
2817 2nd Avenue North, Suite 300
Billings, MT  59101
T:   406.252.8500
F:   406.294.9500
E:   japatten@ppbglaw.com

ER00846

# Exhibit 10

ER00847

## Ross Richardson

| | |
|---|---|
| **From:** | Terrence Healow [healow6@▮▮▮▮▮▮▮] |
| **Sent:** | Thursday, June 10, 2010 1:23 PM |
| **To:** | ross richardson |
| **Subject:** | Ross:   This is just a follow to our phone call t... |

Ross:

This is just a follow to our phone call today.  Thanks for updating your email address, and for filing a report per the MOU

Terry

---

The New Busy is not the too busy. Combine all your e-mail accounts with Hotmail.
http://www.windowslive.com/campaign/thenewbusy?
tile=multiaccount&ocid=PID28326::T:WLMTAGL:ON:WL:en-US:WM_HMP:042010_4=

ER00848

1

RPR2 006

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**BLX GROUP INC**,

Debtor.

Case No.  **09-61893-11**

# MEMORANDUM of DECISION

At Butte in said District this 22nd day of November, 2011.

In this Chapter 11 bankruptcy, after due notice, a hearing was held October 17, 2011, in Missoula on confirmation of the Trustee's Third Amended Plan of Liquidation filed September 8, 2011, as supplemented by the Addendum filed October 7, 2011 (the "Plan").  Vincent J. Marriott, III of Philadelphia, Pennsylvania, James P. Bickford of Denver, Colorado and Michael P. Talia of Great Falls, Montana appeared at the hearing on behalf of Carl A. Eklund, the Chapter 11 Trustee for the estate of BLX Group, Inc.; Patrick T. Fox of Helena, Montana appeared at the hearing on behalf of Timothy Blixseth ("Blixseth"); and Charles W. Hingle of Billings, Montana appeared on behalf of Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust ("YCLT").  Carl A. Eklund testified in support of confirmation.  The Trustee's Exhibits 1 through 19 and Blixseth's Exhibits 1 through 6 were admitted into evidence.

### JURISDICTION and VENUE

The Bankruptcy Court has jurisdiction over the Debtor's chapter 11 case pursuant to 28

**Case No. 12-35986 ER  595**

U.S.C. § 1334.  Venue is proper before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) as it arises in and under the Bankruptcy Code, and this Bankruptcy Court has exclusive jurisdiction to enter a final order with respect to confirmation of the Plan.  The Debtor is an eligible debtor under section 109 of the Bankruptcy Code.  The Trustee is a proper plan proponent under section 1121(c) of the Bankruptcy Code.

BALLOT REPORT, VOTING and OBJECTIONS TO THE PLAN

The Chapter 11 Ballot Report filed October 13, 2011, reflects that all creditors who returned ballots voted to accept the Trustee's Plan.  As provided in a summary prepared by the Trustee, Class 1 was not entitled to vote; the Trustee received no Class 2 Ballots; Class 3 was not entitled to vote; the Trustee received one Class 3A Ballot from the California Franchise Tax Board, who  voted to accept the Plan; the Trustee received no Class 4 Ballots; the Trustee received three Class 5 Ballots, one each from West Coast Turf, the California Franchise Tax Board, and YCLT, all of whom voted to accept the Plan; and Class 6 was not entitled to vote.  Votes to accept or reject the Trustee's Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Montana, and applicable nonbankruptcy law.

The sole objection to confirmation of the Plan was lodged by Blixseth, who claims he is a party in interest.  Blixseth filed a claim in this case, asserting an unsecured  claim in the amount of $999,996 for management services stemming from Blixseth's marital settlement agreement with Edra Blixseth.  Blixseth maintains in his objection to confirmation filed October 7, 2011, at

Case No. 12-35986 ER  596

docket entry no. 801, p.7, that he "has not filed a Proof of Claim[.]" as previously mentioned, contrary to the assertion in Blixseth's objection to confirmation, the Court's claims register shows Blixseth filed Proof of Claim No. 14 on April 14, 2010.  Whether a party in interest or a creditor, Blixseth objects to confirmation arguing the Trustee's plan is infeasible and that the Plan violates Ninth Circuit law.

Blixseth's argument that the Trustee's Plan is not feasible has two components.  First, Blixseth argues the Plan is not feasible because the claims of the estate against Blixseth are without merit.  Second, Blixseth argues the Trustee's Plan unfairly treats YCLT's claim as valid, when the Trustee should have brought such a contested matter before the Court in accordance with F.R.B.P. 9014.  Blixseth's second argument, that the Plan violates Ninth Circuit law, consists of basically three components.  First, Blixseth argues the plan improperly assigns to YCLT, for purposes of collection, the claims of the estate against Blixseth.  Next, Blixseth argues the Plan improperly provides for jurisdiction by this Court over the Estate Blixseth claims, and finally, Blixseth argues the that the exculpation clause in the Plan is impermissibly broad.

DISCUSSION

After reviewing the Plan and after considering Carl A. Eklund's testimony, the Court makes the following findings:

a.      The Plan satisfies 11 U.S.C. § 1122(a) as the classification scheme is reasonable and necessary to implement the Plan, and each of the claims or interests within each particular class is substantially similar to the other claims or interests in such class;

b.      The Plan satisfies 11 U.S.C. § 1123(a) as the Plan fully complies with each of the applicable requirements set forth therein;

ER00977

Case No. 12-35986 ER  597

c.      The Trustee, as proponent of the Plan, has complied with 11 U.S.C. §1125 in connection with disclosures and solicitation of acceptances of the Plan;

d.      The Plan has been proposed in good faith and not by any means forbidden by law, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(3);

e.      The Plan provides that all costs and expenses incurred during the course of the chapter 11 proceeding remain subject to final review for reasonableness under Bankruptcy Code section 330, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(4);

f.      To the extent possible, the Plan discloses sufficient information on the Agent, as successor to the Debtor, including the identity of the Agent, and such disclosure is consistent with the interests of creditors and equity security holders and public policy, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(5)(A);

g.      11 U.S.C. § 1129(a)(6) is not applicable in this case;

h.      Each holder of a claim or interest has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date, and accordingly, the Plan satisfies the "best interests of creditors" test found at 11 U.S.C. § 1129(a)(7);

i.      All impaired classes of claims or interests have voted to accept the Plan, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(8);

j.      The Plan provides that all allowed claims under 11 U.S.C. §§ 507(a)(2) and (3), as applicable, are administrative claims to be paid in cash on the earlier of the Effective Date or when they become allowed claims, unless otherwise agreed by the holder of the Administrative

4

**Case No. 12-35986 ER  598**

Claim and the Debtor or Agent, as applicable, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(9)(A);

k.      The Plan provides that all allowed claims under 11 U.S.C. §§ 507(a)(1), (4), (5), (6), or (7), as applicable, are priority claims to be paid in cash on the earlier of the Effective Date or when they become allowed claims, unless otherwise agreed by the Holder of the claim and the Debtor or Agent, as applicable, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(9)(B);

l.      11 U.S.C. §§ 1129(a)(9)(C) and (D) are not applicable in this case;

m.      As evidenced by the ballot report submitted by the Trustee, the Plan has been accepted by at least one impaired class that does not include the claims of insiders, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(10);

n.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(11);

o.      The Plan provides that the filing fees and the United States Trustee fees listed in 28 U.S.C. § 1930 will be paid in full, and accordingly, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(12);

p.      11 U.S.C. § 1129(a)(13) is not applicable in this case;

q.      11 U.S.C. § 1129(a)(14) is not applicable in this case; and

r.      11 U.S.C. § 1129(a)(15) is not applicable in this case.

Having determined that the Plan satisfies the above provisions of the Bankruptcy Code,

ER00979

**Case No. 12-35986 ER  599**

the Court next turns to Blixseth's objections to confirmation.  Blixseth argues the Plan violates

Ninth Circuit law because "the language of ¶ 5(a), whatever its intended scope is, goes well

beyond the limitation of 11 U.S.C. § 524(e)."  The Court disagrees.

The exculpation clause at issue in the Plan reads as follows:

Exculpation and Limitation of Liability.

(a) Neither the Estate, the Trustee, or the Agent, nor any of their respective
present or former advisors, Professionals, or agents, shall have or incur any
liability to any Holder of a Claim or Equity Interest, or any other party-in-interest,
or any of their respective agents, employees, managers, representatives, advisors,
attorneys, or affiliates, or any of their successors or assigns, for any act or
omission in connection with, relating to, or arising out of, the Chapter 11 Case,
the formulation, negotiation, or implementation of this Plan, the solicitation
of acceptances of this Plan, the pursuit of Confirmation of this Plan, the
Confirmation of this Plan, the consummation of this Plan, or the administration of
this Plan or the property to be distributed under this Plan, except for acts or
omissions that are the result of fraud, breach of fiduciary duties, gross negligence,
or willful misconduct; provided, however, that the foregoing is not intended to
limit or otherwise impact any defense of qualified immunity that may be available
under applicable law.

(b) Notwithstanding any other provision of this Plan, no Holder of a Claim
or Equity Interest, no other party-in-interest, none of their respective agents,
employees, representatives, advisors, attorneys, or affiliates, and none of their
respective successors or assigns shall have any right of action against any of the
Estate, the Trustee, the Agent, or any of their respective present or former
advisors, Professionals, or agents, for any act or omission in connection with,
relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation,
or implementation of this Plan, solicitation of acceptances of this Plan, the pursuit
of Confirmation of this Plan, the Confirmation of this Plan, the consummation of
this Plan, or the administration of this Plan or the property to be distributed under
this Plan, except for acts or omissions which are the result of fraud, breach of
fiduciary duties, gross negligence, or willful misconduct; provided, however, that
the foregoing is not intended to limit or otherwise impact any defense of qualified
immunity that may be available under applicable law.

The Ninth Circuit, in *In re American Hardwoods, Inc.,* 885 F.2d 621, 626 (9th Cir. 1989),

and *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394 (9th Cir. 1995), held

that under § 524(e), a bankruptcy court does not have the authority to permanently enjoin a creditor from continuing with and enforcing a state court judgment against non-debtor guarantors.[1]  The ruling articulated in *American Hardwoods,* as reiterated in *Lowenschuss*, is not implicated here.

In *American Hardwoods*, a chapter 11 debtor sought to permanently enjoin a creditor from enforcing a state court judgment against the debtor's guarantors, who also happened to be the debtor's president and vice president.  The Ninth Circuit held that the bankruptcy court lacked jurisdiction and power to permanently enjoin a creditor, beyond confirmation of the plan, from enforcing a state court judgment against the nondebtor guarantors.  In reaching its decision, the Ninth Circuit explained:

> Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105 empowers the court to enjoin preliminarily a creditor from continuing an action or enforcing a state court judgment against a nondebtor prior to confirmation of a plan.  *In re A.H. Robins Co.*, 828 F.2d 1023, 1026 (4th Cir.1987), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002–03 (4th Cir.) ( *Piccinin* ), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). Furthermore, section 105 permits the court to issue both preliminary and permanent injunctions after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate. *See Burstein–Applebee*, 63 B.R. at 1020–21 (principals of debtor permanently enjoined from continuing state court action against creditors' committee); *In re Askew*, 61 B.R. 87, 89 (Bankr. S.D.Ohio 1986) (creditor permanently enjoined from continuing state court action regarding discharged debt).  American, however, points to no case, and we are aware of none, in which

---

[1]  In bankruptcy, a discharge is an involuntary release by operation of law of asserted and non-asserted claims by a creditor against an entity who has filed a petition under the Bankruptcy Code and who has abided by its rules.  *In re Arrowmill Development Corp.*, 211 B.R. 497, 504 (Bankr. D.N.J. 1997).  Upon confirmation of a plan, a Chapter 11 debtor receives a discharge of its debts which arose before confirmation. 11 U.S.C. § 1141(d)(1).  Subsection § 524(e) limits the scope of the discharge.  A "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt." 11 U.S.C. § 524(e).

ER00981

a court permanently enjoined, past confirmation of a plan, a creditor from
enforcing a state court judgment against a nondebtor guarantor of a contract
liability.  Deutsche argues, and the district court held, that its power under section
105(a) to order the relief sought by American ends at confirmation of the plan.

*American Hardwoods*, 885 F.2d at 624-25.  The analysis in *American Hardwoods* focused on §

105 of the Bankruptcy Code, which the Court concluded "does not authorize relief inconsistent

with more specific law."  *Id.*, at 625, citing with approval *In re Golden Plan of California, Inc.*,

829 F.2d 705, 713 (9th Cir.1986); and *Johnson v. First National Bank of Montevideo, Minnesota*,

719 F.2d 270, 273 (8th Cir.1983), *cert. denied* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245

(1984).  The Court rejected the semantic distinction between a permanent injunction and a

discharge and viewed a permanent injunction of actions against the debtor's guarantors as being

contradictory to the specific provisions of § 524(e).  The Court in *American Hardwoods* thus

concluded the court had no power to issue the injunction sought by the debtor:

> As we succinctly explained in *Underhill v. Royal*, 769 F.2d 1426 (9th Cir.1985):
>
> > Generally, discharge of the principal debtor in bankruptcy will not
> > discharge the liabilities of codebtors or guarantors.... [Section 524(e) ] of
> > the 1978 Bankruptcy Reform Act was a reenactment of Section 16 of the
> > 1898 Act which provided that "[t]he liability of a person who is a
> > co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall
> > not be altered by the discharge of such bankrupt." Act of July 1, 1898, ch.
> > 541, § 16, 30 Stat. 550 (formerly codified at 11 U.S.C. § 34 (1976)).
> >
> > In addition, the Bankruptcy Act of 1898, as amended, provided that
> > a corporation's discharge in bankruptcy "shall not release its officers, the
> > members of its board of directors or trustees or of other similar controlling
> > bodies, or its stockholders or members, as such, from any liability under
> > the laws of a State or of the United States." Act of June 22, 1938, ch. 575,
> > § 4(b), 52 Stat. 845 (formerly codified at 11 U.S.C. § 22(b) (1976)). Thus,
> > under the old Act, stockholders or directors could remain liable for
> > substantive violations despite discharge of the corporate entity. 1A J.
> > Moore COLLIER ON BANKRUPTCY ¶ 16.14, at 1551 (14th ed. 1978).

ER00982

*Id*. at 1432; *see also id*. ("The bankruptcy court 'has no power to discharge the liabilities of a bankrupt's guarantor.' "), *quoting Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982); *id*. (" 'The bankruptcy court can affect only the relationships of debtors and creditor. It has no power to affect the obligations of guarantors.' "), q*uoting R.I.D.C. Industrial Development Fund v. Snyder*, 539 F.2d 487, 490 n. 3 (5th Cir.1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977).  Section 524(e), therefore, limits the court's equitable power under section 105 to order the discharge of the liabilities of nondebtors[.]

*Id*. at 625-26.  At that time, the Ninth Circuit reasoned, in dicta, that adoption of the rationale discussed in in *Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989), would not dictate a different result because the facts in *American Hardwoods* were distinguishable from the unusual facts found in *A.H. Robins*.  *Id*. at 626.  In so stating, the Ninth Circuit enumerated five factors which it considered critical to the *A.H. Robins* holding:

(1) the reorganization plan, which included the injunction, was approved by over 94% of the claimants ..., (2) the plan provided for full payment of creditors' claims, ...; (3) the injunction affected only about 1.5% of the claimants, ...; (4) it was "essential" to the plan that claimants "either resort to the source of funds for them in the Plan ... or not be permitted to interfere with the reorganization and thus with all other creditors, ...; and (5) "the entire reorganization hing[ed] on the debtor being free from indirect claims such as suits against parties who would have indemnity or contribution claims against the debtor."

*American Hardwoods*, 885 F.2d at 626.

Six years later, in *In re Lowenschuss*, 67 F.3d 1394, the Ninth Circuit again revisited the scope of § 524(e) and reiterated "that bankruptcy courts do not have the equitable power under § 105(a) to discharge the liabilities of nondebtors through chapter 11 plan confirmation, contrary to the provisions of § 524(e)."  *Id*. at 1401-02.  The Ninth Circuit clarified that in *American Hardwoods*, it "expressly declined to adopt the approach set forth in *In re A.H. Robins*[.]"

This Court is bound by, and does not dispute the legal precedent established in *Lowenschuss*, *American Hardwoods*, and *Underhill*, that liabilities of nondebtors cannot be discharged through a plan.  Such legal precedent, however, is inapplicable here because, unlike in *Lowenschuss*, *American Hardwoods*, and *Underhill,* the exculpation clause in the Plan is not a broad sweeping provision that seeks to discharge or release nondebtors from any and all claims that belong to others.

The exculpation clause in the Plan before the Court is narrow in both scope and time, and applies only to an "act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of this Plan, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan[.]"  Blixseth maintains in his Supplemental Memorandum filed November 7, 2011, that he "will have substantial claims against exculpated parties based on their willful and malicious prosecution of frivolous claims against him."  Such claims are not barred by the exculpation clause because the exculpation clause, by its plain terms, does not protect any party, beyond a quasi-judicial immunity defense, "for acts or omissions which are the result of fraud, breach of fiduciary duties, gross negligence, or *willful misconduct*."  The exculpation clause here is no broader than the clause examined in *In re Lighthouse Lodge, LLC,* (slip opinion) 2010 WL 4053984 (Bankr. N.D.Cal. 2010).

As noted earlier, the exculpation clause in the Plan does not implicate 11 U.S.C. § 524(e) and is not barred by Ninth Circuit Law.  The exculpation clause is limited in both time and scope, and under the circumstances, is appropriate.

ER00984

**Case No. 12-35986 ER  604**

Blixseth next argues the Plan improperly provides for jurisdiction by this Court over the Estate Blixseth claims.  Blixseth does not address such objection in his Supplemental Objection filed November 7, 2011, and thus, the Court deems said objection waived.  The Court would note, however, that whether this Court has jurisdiction over the Estate Blixseth claims will be determined at the appropriate time and as the Trustee noted at the hearing, YCLT has already commenced its litigation against Blixseth on the Estate Blixseth claims in the United States District Court for the Central District of California.  Given recent developments, it may be prudent for the Trustee to delete such provision from his Plan prior to confirmation so as to avoid any potential hassle such provision might cause in the future.  *See In re BearingPoint, Inc.*, 453 B.R. 486 (Bankr. S.D.N.Y.  2011).

Blixseth also argues the Plan improperly assigns to YCLT, for purposes of collection, the Bankruptcy Estate's claims against Blixseth.  In a prior motion filed August 12, 2011, the Trustee sought authorization to assign, for purposes of collection, certain claims of the Bankruptcy Estate to YCLT.  Blixseth's counsel Philip J. Stillman was served with a copy of the Trustee's August 12, 2011, motion and did not file a timely response.  After receiving no objections after notice, the Court entered an Order on August 30, 2011, granting the Trustee's motion to assign claims to YCLT.  The Court will not, at this late date, grant Blixseth a second bite at the apple.

Blixseth also argues the Plan is not feasible because the claims of the estate against Blixseth are without merit.  The Trustee's Plan is a liquidating plan, not a plan or reorganization.  The Court agrees with the Trustee that "[d]istributions, if any, will be allocated according to specified priorities, and within priorities, on a pro rata basis, if, as, and when assets become available."  No set of circumstances exist which would permit the Trustee to file a more feasible

**Case No. 12-35986 ER  605**

Plan.

Finally, Blixseth takes issue with the Trustee's attempt, through the Plan, to treat YCLT's claim as valid, when the Trustee should have brought such a contested matter before the Court in accordance with F.R.B.P. 9014. In particular, Article II, paragraph 8(c) provides that "[t]he YCLT shall be deemed to have an Allowed Claim in Class 5 in the amount of $234,535,594.92[.]" The Trustee counters that 11 U.S.C. § 1123(b)(3)(A) specifically provides that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate[.]"

Blixseth's objection to Article II, paragraph 8(c) of the Plan raises a potentially troubling issue that causes the Court to pause and review the proprietary of what the Plan, and more particularly YCLT, is attempting to achieve through the confirmation process in this case. YCLT's Allowed Claim, as set forth in the Plan, corresponds with Proof of Claim No. 26 filed by YCLT on April 15, 2010, wherein YCLT asserts a total claim of $234,535,594.92. The attachments to the Proof of Claim show that the claim relates primarily to three Promissory Notes dated September 30, 2005; the first between Blixseth Group, Inc., now known as BLX Group, Inc.,[2] and Yellowstone Mountain Club, LLC in the original principal amount of $208,831,158.45, the second between Blixseth Group, Inc. and Yellowstone Mountain Club, LLC in the original

---

[2] Debtor, an Oregon sub-S corporation, was owned solely by Blixseth as President and CEO from 1999 to August 12, 2008, and did business under the name Blixseth Group, Inc. Blixseth and his spouse, Edra Blixseth ("Edra"), separated in December of 2006, and effective August 12, 2008, Edra and Blixseth agreed, pursuant to a Marital Settlement Agreement, that Edra would receive Blixseth Group, Inc. and the Yellowstone Club entities, which included Yellowstone Mountain Club, LLC and Yellowstone Development, LLC. On August 19, 2008, just days after obtaining control of Blixseth Group, Inc., Edra changed the name of Blixseth Group, Inc. to BLX Group, Inc.

**Case No. 12-35986 ER  606**

principal amount of $7,800,000, and the third between Blixseth Group, Inc. and Yellowstone

Development, LLC in the original principal amount of $55,798,796.68.  At that time, Debtor

owned 82.6532 percent of the Class A stock in Yellowstone Mountain Club, LLC and

Yellowstone Development, LLC.

Yellowstone Mountain Club, LLC and Yellowstone Development, LLC, along with

related entities Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC, have a

consolidated Chapter 11 bankruptcy case pending before this Court.  In litigation originally

involving Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge,

LLC, and Yellowstone Club Construction Company, LLC, and now involving YCLT following

confirmation of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky

Ridge, LLC, and Yellowstone Club Construction Company, LLC's Third Amended Joint Plan of

Reorganization, this Court entered on August 16, 2010, a Memorandum of Decision that

concluded the three Promissory Notes attached to YCLT's Proof of Claim No. 26 were a sham to

disguise what were in fact distributions.  That decision was on appeal to the United States

District Court of Montana.  The Honorable Sam E. Haddon entered an Order on October 11,

2011, concluding this Court's Amended Judgment of September 7, 2010, which related to the

Court's August 16, 2010, Memorandum of Decision, was not a final judgment from which an

appeal may be taken.  This Court's determination that the three Promissory Notes were nothing

but a sham to disguise what in fact were distributions is not a final and binding decision.

Nevertheless, in the not too distant future, the Court intends to enter a final judgment from which

an appeal may be taken.  Such final judgment will be based in part on the Court's finding in the

August 16, 2010, Memorandum of Decision that the Promissory Notes were prepared in an effort

**Case No. 12-35986 ER  607**

to disguise distributions.

Paragraph 8(c) of Article II of the Plan before the Court in this case seeks to treat the Promissory Notes as valid.  If this Court were to confirm the Plan, it would be entering an order that in effect deems the Promissory Notes valid.  Such decision would fly in the face of this Court's findings as expressed in the August 16, 2010, Memorandum of Decision entered in Adversary Proceeding 09-00014.

The Court is not willing, without more information or evidence, to enter an order in one case that is entirely antithetical to a decision entered in another case.  Quoting *In re BearingPoint, Inc.*, 453 B.R. 486 (Bankr. S.D.N.Y.  2011), Blixseth correctly argues "[i]t would be manifestly improper for me to determine adjudicative facts on evidence from outside that record, or based on knowledge or perceptions developed in the course of the earlier chapter 11 case."  In other words, it would be improper to grant or deny confirmation in this case based upon facts it learned through over two weeks of trial in Adversary Proceeding 09-00014.  But as stated earlier, this Court is also not willing to enter decisions that come to the exact opposite conclusion on whether the three Promissory Notes at issue are valid.

The Trustee, as the Plan proponent, has the burden of proof with respect to confirmation. The Trustee must reconcile the decision he seeks in this case with the decision reached by this Court in Adversary Proceeding 09-00014.  At this time, the Court finds the Trustee has not sustained his burden of proof with respect to paragraph 8(c) of Article II of the Plan. Accordingly, the Court will issue a separate order providing as follows:

IT IS ORDERED confirmation of the Trustee's Third Amended Plan of Liquidation shall be held in abeyance; and absent a consent to confirmation by Blixseth in the interim, an

**Case No. 12-35986 ER  608**

additional hearing on approval of paragraph 8(c) of Article II of the Trustee's Third Amended

Plan of Liquidation shall be held **Tuesday, December 20, 2011, at 10:00 a.m.**, or as soon

thereafter as the parties can be heard, in the 5TH FLOOR COURTROOM, FEDERAL

BUILDING, 316 NORTH 26TH, BILLINGS, MONTANA.


BY THE COURT


HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana


15                                           ER00989

# Exhibit 13

David B. Cotner
Datsopoulos, MacDonald & Lind, P.C.
201 West Main, Ste. 201
Missoula, MT  59802
Tel: 406-728-0810
Fax: 406-543-0134
dcotner@dmllaw.com

Bradley R. Duncan
Hugh R. McCullough
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Tel: 206-622-3150
Fax: 206-757-7700
bradleyduncan@dwt.com
hughmccullough@dwt.com

Dennis Holahan
Law Offices of Dennis Holahan
2049 Century Park East, Suite 3180
Los Angeles, CA  90067
Tel: 310-286-3344
Fax: 310-286-2299
dholahan@holahanlaw.com

Attorneys for Richard J. Samson,
Chapter 7 Trustee for Edra D. Blixseth

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| EDRA D. BLIXSETH, | Case No. 09-60452-7 |
| Debtor. | |
| RICHARD J. SAMSON, as Chapter 7 Trustee of the Estate of Edra Blixseth, | Adversary No. _____ |
| Plaintiff, | |
| v. | COMPLAINT |
| TIMOTHY BLIXSETH, DESERT RANCH LLLP, DESERT RANCH MANAGEMENT LLC, and DOES 1–5, | |
| Defendants. | |

ER00990

Complaint                                                                                   Page 1

**Case No. 12-35986 ER  611**

COMES NOW Richard J. Samson, the chapter 7 trustee for the bankruptcy estate of Edra D. Blixseth, by and through his counsel of record, David B. Cotner of the law firm of Datsopoulos, MacDonald & Lind, P.C., Bradley R. Duncan and Hugh R. McCullough of the law firm of Davis Wright Tremaine LLP, and Dennis Holahan of the Law Offices of Dennis Holahan, and for his Complaint against the above-named Defendants, does state and allege as follows:

<u>JURISDICTION AND VENUE</u>

1.     Jurisdiction over this adversary proceeding is based on 28 U.S.C. §§ 157, 1334, and 1367.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(A), (b)(2)(B), (b)(2)(C), (b)(2)(F), (b)(2)(H), and (b)(2)(O).  Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

2.     On March 26, 2009, Edra D. Blixseth filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Montana.  On May 29, 2009, the Court ordered the case converted to chapter 7.  Her case is now pending under case number 09-60452-7.

<u>PARTIES</u>

3.     Plaintiff Richard J. Samson, the chapter 7 trustee ("Plaintiff" or "Trustee"), was appointed to serve as trustee for the Debtor's chapter 7 bankruptcy estate on May 29, 2009, and is now the duly-qualified and acting trustee.

4.     Debtor Edra D. Blixseth ("Debtor" or "Edra") is an individual currently domiciled in the State of California.

5.     Defendant Timothy Blixseth ("Tim"), an individual, is the Debtor's former spouse and, upon information and belief, now resides in the State of Washington.

6.      Defendant Desert Ranch LLLP ("Desert Ranch") is a Nevada limited liability limited partnership.

7.      Defendant Desert Ranch Management LLC ("Desert Ranch Management") is a Nevada limited liability company and the general partner of Desert Ranch.

8.      Does 1–5 are other individuals or business entities, still unknown to Plaintiff, which may have received assets from Tim or his alter-ego entities, for no value or for less than reasonably equivalent value.

FACTS COMMON TO ALL COUNTS

A.      <u>Background of the Relationship Between Edra and Tim</u>.

9.      Edra and Tim were married on May 21, 1983.  During their marriage, the Blixseths acquired significant assets and developed many businesses, including the Yellowstone Club, an exclusive high-end resort located in Madison County, Montana.  Tim and Edra began to develop the Yellowstone Club in the late 1990s.

10.      Edra and Tim were listed on the Forbes 400 list of richest individuals in 2006 and 2007.  In the 2007 listing, according to information provided to Forbes by Tim, the Blixseths represented themselves as having a net worth in excess of $1.3 billion.

11.      The Blixseths' assets were, however, burdened with significant liabilities.  Among other things, Credit Suisse and the Blixseths, on behalf of Yellowstone Club, entered into a loan dated as of September 30, 2005, for $375 million.  The proceeds of $351 million (after payment of $24 million for loan costs, including $7.5 million in Credit Suisse fees) were paid to Yellowstone Development, LLC on September 25, 2005, but immediately were disbursed as follows: (1) $209 million as loans or distributions to members of the

Case No. 12-35986 ER  613

who is one of the important witnesses to the events described in this complaint.  One of the messages refers to Edra and others as people who "wanted my half . . . ."  Copies of transcriptions of those messages are attached as Exhibit E.

G.      The Bankruptcy, Tim's Claims, and This Action.

38.      The Yellowstone Club filed bankruptcy on November 10, 2008, shortly after the MSA was approved, and Edra filed personal bankruptcy on March 25, 2009.  Most of the other Yellowstone Club entities followed into bankruptcy.  BGI was put in involuntary bankruptcy on September 24, 2009.

39.      Tim was listed on Edra's Amended Schedules of Assets and Liabilities as having a disputed claim of $5,750,000.  Although the bar date for filing proofs of claim was set by the Court for October 5, 2009, Tim never filed a proof of claim against Edra's estate.

40.      Samson, as Edra's Trustee, has all of the rights of a creditor to bring avoidance claims under applicable state and federal/bankruptcy law.

**FIRST CLAIM FOR RELIEF**
Sections 2122 and 2105(d) of the California Family Code

41.      The Trustee realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 above.

42.      Section 2122 of the California Family Code provides as follows:

The grounds and time limits for a motion to set aside a judgment, or any part or parts thereof, are governed by this section and shall be one of the following:
        (a) Actual fraud where the defrauded party was kept in ignorance or in some other manner was fraudulently prevented from fully participating in the proceeding. An action or motion based on fraud shall be brought within one year after the date on which the complaining party either did discover, or should have discovered, the fraud.
        (b) Perjury.  An action or motion based on perjury in the preliminary or final declaration of disclosure, the waiver of the final declaration of disclosure, or in the current income and expense statement

Complaint                                                                                       Page 14

shall be brought within one year after the date on which the complaining party either did discover, or should have discovered, the perjury.

(c) Duress. An action or motion based upon duress shall be brought within two years after the date of entry of judgment.

(d) Mental incapacity. An action or motion based on mental incapacity shall be brought within two years after the date of entry of judgment.

(e) As to stipulated or uncontested judgments or that part of a judgment stipulated to by the parties, mistake, either mutual or unilateral, whether mistake of law or mistake of fact. An action or motion based on mistake shall be brought within one year after the date of entry of judgment.

(f) Failure to comply with the disclosure requirements of Chapter 9 (commencing with Section 2100). An action or motion based on failure to comply with the disclosure requirements shall be brought within one year after the date on which the complaining party either discovered, or should have discovered, the failure to comply.

43.    As set forth above, Edra was mistaken, was kept in ignorance and/or was fraudulently prevented from learning about the value of the assets and liabilities that she received under the MSA.  Additionally, Edra did not receive a proper disclosure with respect to the assets, liabilities, and income of entities awarded to her.

44.    The MSA, and the Divorce Judgment entered on October 7, 2008, was a "stipulated or uncontested judgment" within the meaning of Cal. Fam. Code § 2122(e).  The resulting division and distribution of the Blixseths' community property pursuant to the MSA was highly inequitable to Edra Blixseth.  Edra was left insolvent, with assets and liabilities that created significant risk.  These mistakes of fact are adequate grounds to set aside the MSA under California law.

45.    As a separate and independent basis for setting aside the MSA, a stipulated mutual waiver of the final declaration of disclosure—which is required by Cal. Fam. Code § 2105 in the absence of a waiver—does not relieve the parties of their statutory fiduciary disclosure obligations.  A waiver of the section 2105 final declaration is authorized only if the

parties have fully satisfied their disclosure obligations.  Any breach of those disclosure

obligations may justify setting aside the judgment.  Cal. Fam. Code § 2105(d)(5).

46.     The judgment approving the MSA and the Mini-Settlements should be set aside

on the grounds of actual fraud or mistake.  The judgment should also be set aside because of

Tim's breach of his statutory disclosure obligations.

**SECOND CLAIM FOR RELIEF**
For Avoidance and Recovery of Fraudulent Transfers
Cal. Civ. Code § 3439.04 and 11 U.S.C. §§ 544 and 550

47.     The Trustee realleges and incorporates by reference the allegations contained in

paragraphs 1 through 40 above.

48.     Cal. Civ. Code § 3439.04 provides, in pertinent part, as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent
> as to a creditor, whether the creditor's claim arose before or after the
> transfer was made or the obligation was incurred, if the debtor made the
> transfer or incurred the obligation as follows:
> (1) With actual intent to hinder, delay, or defraud any creditor of
> the debtor.
> (2) Without receiving a reasonably equivalent value in exchange
> for the transfer or obligation, and the debtor either:
> (A) Was engaged or was about to engage in a business or a
> transaction for which the remaining assets of the debtor were
> unreasonably small in relation to the business or transaction.
> (B) Intended to incur, or believed or reasonably should have
> believed that he or she would incur, debts beyond his or her ability to pay
> as they became due.

49.     The transfers made by Edra and persons and entities controlled by Edra to Tim

and persons and entities controlled by Tim, as described herein, as well as the obligations

incurred by Edra pursuant to the Divorce Proceedings, are fraudulent transfers under Cal. Civ.

Code § 3439.04.  Each transfer and obligation should be avoided pursuant to Cal. Civ. Code

§ 3439.04 and 11 U.S.C. § 544(b).

ER01005

50.     Pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover, for the benefit of Edra's estate and creditors, the property transferred or the value of that property from Tim and each other direct and indirect beneficiary of those transfers.

### THIRD CLAIM FOR RELIEF
For Avoidance and Recovery of Fraudulent Transfers
11 U.S.C. §§ 548 and 550

51.     The Trustee realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 above.

52.     The transfers made by Edra and persons and entities controlled by Edra to Tim and persons and entities controlled by Tim, as described herein, as well as the obligations incurred by Edra pursuant to the Divorce Proceedings, are fraudulent transfers under 11 U.S.C. § 548.  Each transfer and obligation should be avoided pursuant to 11 U.S.C. § 548.

53.     Pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover, for the benefit of Edra's estate and creditors, the property transferred or the value of that property from Tim and each other direct and indirect beneficiary of those transfers.

### FOURTH CLAIM FOR RELIEF
For Avoidance and Recovery of Preferential Transfers
11 U.S.C. §§ 547 and 550

54.     The Trustee realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 above.

55.     Within one year prior to the filing of the petition, Tim and entities owned or controlled by Tim received property from Edra through the Divorce Proceedings and pursuant to the MSA in the form of cash or its equivalent and other assets.  Those transfers were made on account of antecedent debts.  Those transfers include the payment of $4,944,396.17 made to Tim by Edra on or about August 13, 2008, and the payment for Tim's

benefit of a loan owed by Tim to CrossHarbor in the amount of $13,094,973.33 on about August 13, 2008.

56.     Tim was married to Edra at the time of those transfers.  Edra was insolvent on the date of those transfers.

57.     As a result of these transfers, Tim received more than he would have received from Edra if: (a) the case were a case under chapter 7 of the Bankruptcy Code; (b) the transfers had not been made; and (c) Tim received payment of the debt to the extent provided by the provisions of the Bankruptcy Code.

58.     Each preferential transfer should be avoided pursuant to 11 U.S.C. § 547.

59.     Upon avoidance, the Trustee is entitled to recover the property that Tim received through those transfers, or the value thereof, pursuant to 11 U.S.C. § 550.

## FIFTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty

60.     The Trustee realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 above.

61.     Tim owed to Edra various fiduciary duties in the management of their community property during the pendency of the Divorce Proceedings.  Those duties included a duty of the highest good faith and fair dealing and a duty not to take any unfair advantage of Edra.  Tim also owed Edra a continuing fiduciary duty to disclose the true value of the assets under his control, even though the Blixseths had agreed to waive final disclosures regarding the value of the community property in the marital estate.

62.     Tim breached the fiduciary duties that he owed to Edra during the pendency of the litigation.

ER01007

Case No. 12-35986 ER  618

63.     Edra was damaged as a direct result of Tim's breach of fiduciary duties in an amount that will be established at the time of trial.

## SIXTH CLAIM FOR RELIEF
For Avoidance and Recovery of Fraudulent Transfers
Cal. Civ. Code § 3439.04, 11 U.S.C. §§ 544(b), 548 and 550 (Desert Ranch)

64.     The Trustee realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 above.

65.     The transfers made by Tim and persons and entities controlled by Tim to Desert Ranch, LLLP, Desert Ranch Management, LLC, and/or Does 1-5, as described herein, are fraudulent transfers under Cal. Civ. Code § 3439.04 and 11 U.S.C. § 548.  Each transfer should be avoided pursuant to Cal. Civ. Code § 3439.04 and 11 U.S.C. § 548.

66.     Pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover, for the benefit of Edra's estate and creditors, the property transferred or the value of that property from Desert Ranch, LLLP and/or Desert Ranch Management, LLC and each other direct and indirect beneficiary of those transfers.

## SEVENTH CLAIM FOR RELIEF
Constructive Trust

67.     The Trustee realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 above.

68.     A constructive trust is a remedial device created to prevent unjust enrichment.  It is appropriate when equity compels the restoration to another of property to which the holder is not justly entitled.

69.     Tim's transfers of property to Desert Ranch, LLLP, Desert Ranch Management, LLC, and/or Does 1-5 were intended to deprive Edra, and other creditors, of those assets.

70.     Edra requests the imposition of a constructive trust over all assets transferred by Blixseth to Desert Ranch, LLLP, Desert Ranch Management, LLC, and/or Does 1-5, and thereafter to restore such assets to Tim or Edra as necessary to remedy the wrongful acts.

### EIGHTH CLAIM FOR RELIEF
Equitable Subordination

71.     The Trustee realleges and incorporates by reference the allegations contained in paragraphs 1 through 40 above.

72.     Although the Trustee believes that Tim has no claim against Edra's estate, including as a result of his failure to file a proof of claim by the deadline established by the Court, to the extent that Tim asserts a claim, that claim should be equitably subordinated. Among other things, Tim's conduct as a fiduciary in connection with the Credit Suisse loan inflicted substantial damage on the Yellowstone Club, which was one of the most significant assets of Tim and Edra's marital community, thus harming Edra and creditors of Edra's estate. Tim's conduct in connection with the management of community assets in the period before the dissolution of the marital community (while owing fiduciary duties to Edra) also inflicted significant damage on the interests of Edra and creditors, including through the diversion of monies otherwise payable to employees and creditors of the businesses under his control.  Tim's misrepresentations and failures to disclose material assets (also while owing fiduciary duties to Edra) harmed Edra and creditors by facilitating an unfair division of assets and liabilities between Tim and Edra, leaving Edra's creditors with an inadequate pool of assets to look to for repayment.  Under principles of equitable subordination, Tim, as a matter of equity, is not entitled to any distribution on any claim he may allege against the estate before all other creditors are paid in full.

ER01009

Complaint

Page 20

**WHEREFORE, PLAINTIFF PRAYS AS FOLLOWS:**

A.      That the Decree of Dissolution dated October 7, 2008 incorporating the MSA and Mini-Settlements No. 1 and No. 2 be set aside;

B.      That the transfers to Tim, and obligations incurred by Edra, be avoided pursuant to Cal. Civ. Code § 3439.04 and 11 U.S.C. § 544(b);

C.      That the transfers to Tim be avoided pursuant to 11 U.S.C. § 547;

D.      That the transfers to Tim, and obligations incurred by Edra, be avoided pursuant to 11 U.S.C. § 548;

E.      That the transfers from Tim to Desert Ranch, LLLP, Desert Ranch Management, LLC, and Does 1–5 be avoided pursuant to Cal. Civ. Code § 3439.04 and 11 U.S.C. § 548;

F.      That Plaintiff recover from Tim the property transferred by Edra to Tim or damages equal to the value of the transfers, together with prejudgment interest as permitted by law;

G.      To the extent that the properties involved in the transfers have been transferred to person or another entity, that those properties be traced and that all such properties be recovered by the Plaintiff, or the value thereof paid by the transferee;

H.      That if any other parties or entities have accepted or received any of the properties transferred, that they be named as additional defendants, and that they be deemed as constructive trustees of estate property;

I.      For damages, in an amount to be established at the time of trial, to compensate Plaintiff for breaches of fiduciary duty by Tim.

J.      For the imposition of a constructive trust over all transferred assets.

  K.  That any claim that Tim may assert against Edra's estate be equitably

subordinated.

  L.  For reasonable attorneys' fees pursuant to applicable law;

  M.  For cost of suit incurred herein; and

  N.  For such other relief as the Court deems appropriate.

Dated this 1st day of October, 2010.

        DATSOPOULOS, MacDONALD & LIND, P.C.
        201 West Main, Suite 201
        Missoula, MT 59802


        By: _/s/ David B. Cotner_____
          David B. Cotner
          Attorney for Richard J. Samson, Chapter 7
          Trustee for Edra D. Blixseth

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                                     )
In Re:                               ) Main Case No. 08-61570
                                     )
Yellowstone Mountain Club, LLC,      )
                                     )
           Debtors.                  )
_____     )

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
January 18, 2011

Electronic Recording Operator:  Patti Mahoney

Transcript Services:
Jonny B. Nordhagen
Nordhagen Court Reporting
1734 Harrison Avenue
Butte, Montana
(406) 494-2083

Proceedings recorded by electronic recording;
transcript produced by reporting service.                ER00895

**Case No. 12-35986 ER  623**

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 647 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 3 of 121

2

```
 1                         APPEARANCES

 2

 3      FOR TIMOTHY J. BLIXSETH:

 4          MICHAEL J. FLYNN

 5          Attorney at Law

 6          One Center Plaza, Suite 240

 7          Boston, MA  02108

 8

 9          CHRISTOPHER J. CONANT

10          Attorney at Law

11          Conant Law, LLC

12          730 Seventeenth Street, Suite 200

13          Denver, CO  80202

14

15          PATRICK T. FOX

16          Attorney at Law

17          Doubek & Pyfer, LLP

18          P.O. Box 236

19          Helena, MT  59624

20

21

22

23

24

25                                          ER00896
```

```
 1                 YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

 2                         BUTTE, MONTANA

 3                            - - -

 4             BE IT REMEMBERED THAT this matter came on for

 5    hearing on January 18, 2011, in the United States

 6    Bankruptcy Court, District of Montana, The Hon. Ralph B.

 7    Kirscher, presiding:

 8

 9    The following proceedings were had:

10

11             THE COURT:  Good morning.  Please be seated.

12    This is the time set for a motion to disqualify.  It's been

13    filed in In Re:  Yellowstone Mountain Club, 08-61570.  It's

14    also been filed in Adversary Proceedings 9-14, 9-18, 9-64,

15    10-15, and 10-88.

16             Is there anyone that wishes to argue the motion,

17    or deem it submitted?

18             Mr. Flynn.

19             MR. FLYNN:  Good morning, Your Honor.  We're

20    prepared to argue the motion.

21             THE COURT:  Okay.  You may proceed.  Mr. Flynn?

22             MR. FLYNN:  Thank you, Your Honor.

23             Well, as the Court can discern, this is an

24    extremely difficult task for an attorney, particularly one

25    like myself who's been litigating for 40 years all over the
```

                                                ER00897

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 649 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 5 of 121

4

1    United States in multiple jurisdictions.  And neither

2    myself nor my law firm, I think, have ever filed a motion

3    to disqualify a judge except for one prior in which the

4    judge, in fact, disqualified herself.

5              And particularly with a small local bankruptcy

6    bar here in Montana, it's -- that basically makes its

7    living off this Court's ruling, it makes the task even more

8    difficult, particularly understanding that this Court has

9    under -- has had a distinguished reputation.  And the

10   parties, the attorneys that have to argue this are

11   essentially attorneys from outside Montana, except for

12   Mr. Fox, who does not practice before this Court.

13             Fundamental to our jurisprudence, as the Court

14   knows from the first year in law school, is the separation

15   of powers in this country between the legislative, the

16   judicial, and the executive.  The way these proceedings in

17   this court have developed, it appears from Mr. Blixseth's

18   perspective and, we submit, from the perspective of any

19   reasonable person - which is the standard under Section 455

20   in questioning the impartiality of a Court, of a judge -

21   any reasonable person would conclude from the record that

22   we have presented that this Court has not been impartial to

23   Mr. Blixseth.  The scales of justice with blinders on,

24   which should be equal when any litigant walks into a

25   courtroom, is not what happened here.

                                              ER00898

1          The record is clear that Mr. Blixseth walked into

2     what is, in effect, prejudged judicial proceedings, perhaps

3     initially to preserve the Yellowstone Club, with Mr. Byrne

4     -- or on behalf of Mr. Byrne in obvious collusion with

5     Ms. Blixseth.

6          Last night - and I don't know whether the Court

7     has had the opportunity to read it yet - Mr. Blixseth filed

8     a supplemental declaration, supplemental affidavit.  So I

9     would ask the Court:  Has the Court had the opportunity to

10    read that affidavit?

11          THE COURT:  I have.

12          MR. FLYNN:  With exhibits attached.

13          THE COURT:  Yes.

14          MR. FLYNN:  And just prefatory to my argument, I

15    would say that it is absolutely obvious not only to a

16    reasonable person in assessing partiality, bias, or

17    impartiality, it is abundantly obvious that Ms. Blixseth

18    committed over $50 million of bank fraud.  The documents

19    are extensive and have been presented to Your Honor

20    repeatedly in the form of her deposition, in the AP-14

21    trial, in subsequent motions for summary judgment.

22          It is obvious not only beyond a reasonable doubt,

23    but the loan documents themselves prove that she committed

24    $50 million of bank fraud, and yet this Court ignored it

25    and bootstrapped her credibility with findings, for

ER00899

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 651 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 7 of 121

6

1    example, in Western Capital Partners' summary judgment

2    saying she didn't have a requisite intent beyond a

3    reasonable doubt, knowing that there's a federal criminal

4    investigation in place on that precise issue.

5              The appearance is, Your Honor, that the Court did

6    this to protect Ms. Blixseth, because if she makes some

7    type of a deal and squeals on Mr. Byrne, this whole charade

8    will unravel that the Court -- occurred in these Montana

9    bankruptcy proceedings.

10             This whole charade that was -- for example, most

11   recently on the timeliness issue, occurred before this

12   Court on October 12th with Mr. Cotner and Mr. Samson where

13   this Court unilaterally, arbitrarily, without giving

14   Mr. Cotner or myself an opportunity to be heard, piled

15   double layers of hearsay and then issued findings that

16   Ms. Blixseth is credible and believable on the issue of the

17   bank frauds and the technology frauds and that Mr. Cotner

18   was misled by me.

19             Your Honor, it is a technology fraud.  The

20   documents are on the Russell computers that were in the

21   possession of Mr. Cotner for the seven months when he

22   failed to fulfill his Rule 11 obligations.  And yet let me

23   read to you what this Court ruled, without having allowing

24   Mr. Conant or myself to appear and present the facts that

25   there is technology, that there was a 100 and is a

ER00900

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 652 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 8 of 121

7

1    $100 million claim against the Sandoval parties.  But if

2    the Court pursued the claim or allowed the pursuit of that

3    claim, Ms. Blixseth would be exposed.

4           Ms. Blixseth knew on March 5, 2006 -- March 5th,

5    a Sunday.  I was present with her, and Michael Sandoval,

6    and Dennis Montgomery.  The FBI had raided Montgomery's on

7    March 1 and March 3rd.  I got a call from Montgomery to

8    meet with Ms. Blixseth, who I had never heard of before, on

9    that Sunday.  She knew everything.

10          She didn't care what the FBI did, she didn't care

11   whether there was a preliminary injunction in place.  She

12   intended to sell the technology to the Bush administration.

13   She had all her political contacts, including political

14   contacts here in Montana, with the then senator from

15   Montana; Jack Kemp, her lobbyist.  And they had all went to

16   Vice President Cheney's office in July '06 to sell the

17   property.  She knew then it was bogus.

18          And there have been -- this differentiation

19   between xPatterns, the predator camera, noise filtering,

20   it's all nonsense.  (Inaudible) -- paid over $25 million,

21   Your Honor - I was there - for the noise filters which

22   don't exist.  It's a complete fraud.

23          I didn't discover it was a complete until a year

24   later when I went to Washington and met with head staffers

25   for the Senate Intelligence Committee in Harry Reid's

ER00901

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 653 of 940
Case 2:11-cv-00073-SEH Document 10-2 Filed 01/03/12 Page 9 of 121

8

1    office.  And then I confirmed to myself when Judge Crow,

2    the Nevada Federal Court, on April 9th issued an order

3    unsealing the FBI reports on the technology to me and

4    Mr. Peek, counsel for Warren Trepp.

5           It's obvious in those FBI reports, which were

6    given to Your Honor and which I gave to Ms. Blixseth on

7    April 10, 2007, that the technology is fraudulent.  And yet

8    this Court, in a proceeding without us, issued the

9    following orders -- and this goes, Your Honor, also to the

10   timeliness issue of this motion to DQ.  The Court ruled as

11   follows, after hearing only from hearing only from

12   Mr. Cotner and Mr. Park -- and Mr. Park stood up in this

13   courtroom, and he said the following.  He said:  The

14   technology is protected by the U.S. Protective Order and

15   the State Secrets Privilege.

16          It was complete nonsense for him to say that.

17   The technology is not protected.  I was involved in two

18   years of litigation, litigation which has now been ongoing

19   for over four years, in which the technology was never

20   protected.  Judge Pro issued $2500-a-day sanctions for the

21   non-production of the source code on the noise filters.

22   All of this is in the Jory Russell computers.  All of it is

23   in the docket in the Nevada federal court.

24          Mr. Cotner knew, Mr. Samson knew.  They had to

25   know.  All they had to do was look in the dockets and the

ER00902

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 654 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 10 of 121

9

1   pleadings and the $2500-a-day order that the technology

2   didn't exist and is a, and is a complete fraud.  And yet he

3   went to Ms. Blixseth, apparently in January of '09, and she

4   said to him -- or January in 2010, and she apparently gave

5   him some confusing statement.

6          Then in July, believing her -- and I submit to

7   the Court that the reason she believed -- he believed her,

8   the reason he believed her, because during that time frame,

9   he knew and Ms. Blixseth knew that if she said the

10  technology was fraudulent, Montgomery would turn against

11  her and unravel everything that's occurred here up in

12  Montana.  Because Montgomery was hacking into her

13  computers, and he knew the deals that Byrne, Mr. Byrne and

14  Ms. Blixseth were engaged in that has been put into

15  evidence before this Court.

16         But here's what the Court did without hearing

17  from Mr. Conant or Mr. Flynn:  According to Cotner, Flynn

18  presented Cotner with a set of facts that were detailed,

19  consistent, and seemingly credible; however, after

20  carefully reviewing all the documents - whatever that

21  means - and following his second interview with the debtor,

22  Cotner discovered the facts he took to be true were not

23  necessarily true as against the plaintiffs and third-party

24  defendants in the adversary proceeding.

25         That finding, Your Honor, is just plain erroneous

ER00903

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 655 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 11 of 121

10

1   with no evidence before the Court to support it and in

2   violation of Mr. Blixseth's, mine, and Mr. Cotner's due

3   process rights.  We had the opportunity to be heard.

4        This was -- Mr. Blixseth is a $20 million

5   creditor of the Edra Blixseth estate.  We should have been

6   given the opportunity to be heard on this issue before this

7   Court issued rulings basically discarding a $100 million

8   claim against the Sandoval parties based on

9   misrepresentations by Mr. Cotner that were -- the Court had

10  to see.

11       How could he rely on Edra Blixseth, who had

12  stolen $50 million from banks, who had perjured hers in the

13  divorce proceedings?  How could he realistically rely on

14  her on an issue that's so clearly documented in the Nevada

15  proceedings, and then this have Court rely on, in effect, a

16  double level of hearsay and impugn myself, Mr. Conant, and

17  their -- and adversely impact my client, Mr. Blixseth, in

18  order to protect Ms. Blixseth?

19       The Court goes on:  Under the circumstances,

20  Cotner's reliance was not unreasonable.

21       To believe Ms. Blixseth?

22       (Quoted as recorded):  "Particularly where Flynn,

23  a fellow attorney and officer of the court, had a

24  historical relationship with Debtor and various of the

25  entities involved in this proceeding.  Upon learning the

ER00904

**Case No. 12-35986 ER  632**

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 656 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 12 of 121

11

1    complete truth" -- the complete truth.

2           The Court never heard the complete truth.  We

3    were denied and my client was denied due process.  And this

4    Court bootstrapped Ms. Blixseth's credibility with these

5    findings, a credibility that she does not deserve.  And on

6    that basis, the Court has entered all of the orders in

7    AP-14, in AP-18, in the main bankruptcy proceeding.

8           When I tried to present this Court the bad faith

9    evidence of Ms. Blixseth in the very first day of the

10   trial, the Court excluded it all.  When I then filed the

11   motion for reconsideration to have that evidence heard

12   before the Court, the Court excluded it all.  And yet the

13   Court then entered orders saying that there is no evidence

14   of bad faith, but the Court had excluded it all.  But in

15   the spoliation motion and the motion for reconsideration

16   and the motion for summary judgment in AP-18 and the motion

17   for summary judgment in AP-14, all of that information was

18   documented, and yet the Court said it hadn't seen any.

19          The Court goes on:  Cotner also explained that

20   his failure to secure all of the facts prior to filing his

21   amended pleading on July 6th was due, in part, to his

22   decision to stay with his family.

23          So he couldn't fulfill his Rule 11 obligations,

24   apparently over seven months, to simply read the Russell,

25   Russell computers - Russell, now negotiating immunity with

ER00905

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 657 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 13 of 121

12

1    the U.S. Government - he couldn't read the documents in the

2    computers which evidence the fraud which are attached to

3    the Exhibit 6, in part, to the Blixseth affidavit filed

4    last night.

5            And if the Court reads those 20 or 25 e-mails

6    between Jory Russell, Dennis Montgomery, Edra Blixseth, and

7    several individuals in the Federal Government, it is

8    obvious there is no technology.

9            When, when Ms. Blixseth paid the 25 million, or

10   so, to Montgomery and Sandoval, the issue was that the

11   technology had been used, the noise filtering, to decode

12   al-Qaeda for the prior years.  And it was that Montgomery

13   was then decoding al-Qaeda when they went to Vice President

14   Cheney's office.  So obviously, the representation was set

15   in cement that the technology existed and they were

16   decoding al-Qaeda.

17           Well, the Government and portions of the

18   intelligence community known by the vice president, as set

19   forth in an NBC show back in June of '05, had already

20   rejected the technology, all of which Ms. Blixseth knew.

21   But she intended to use her political contacts to try to

22   rip off a $100 million contract.  That's what happened.

23   She and Sandoval and Montgomery attempted to do that.

24           All of that evidence was available to Mr. Cotner,

25   and yet this Court asked him, "Well, did Mr. Flynn not

                                                    ER00906

**Case No. 12-35986 ER  634**

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 658 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 14 of 121

13

1    present the documents to you?"

2          I told Mr. Cotner exactly where the documents

3    were, that they were in the Russell computers.  I gave

4    them -- I gave him a timeline, I gave him all the evidence

5    that any reasonable person needed in a civil proceeding to

6    bring an action against Mr. Sandoval.  And yet it's been

7    swept under the rug, and the $100 million claim has been

8    discarded to the detriment of my client with no opportunity

9    to be heard.  And that was only done when Your Honor

10   entered these orders on October 25th, several weeks before

11   we filed the motion for disqualification.

12         The Court goes on:  The Court recognizes that the

13   trustee and Cotner sought to retract their inaccurate

14   pleadings.

15         The pleadings were accurate, Your Honor.  All of

16   the evidence supports the fact that the pleadings are, are

17   accurate.  It's simply that Mr. Cotner took Ms. Blixseth's

18   word and then this Court took Mr. Cotner and Ms. Blixseth's

19   word without any evidence being presented to it whatsoever

20   and discarded a $100 million claim.

21         (Quoted as recorded):  "The Court agrees with

22   Cotner that Plaintiffs will suffer little, if any, harm if

23   the trustee is allowed to file the second amended

24   counterclaim and third-party complaint.  Indeed, attempting

25   to correct the error was professionally responsible and was

ER00907

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 659 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 15 of 121

14

1    ethically the correct step to take.

2              "At the hearing, Cotner accepted complete

3    responsibilities for the inaccuracies contained in his

4    pleadings."

5              Well, the Court has never heard any evidence

6    whatsoever of any inaccuracies in the Sandoval complaint.

7    It simply accepted Blixseth's word because she was afraid

8    that Montgomery was going to turn on her, which is

9    happening right now today as I stand in this courtroom.

10             (Quoted as recorded):  "Cotner argued at the

11   hearing that by signing the pleadings, he was only

12   certifying to the best of his knowledge," etc., etc.

13             (Quoted as recorded):  "While the Court does not

14   doubt Cotner's veracity, the Court cannot and will not

15   condone the filing of inaccurate pleadings."

16             And the Court goes on.  There were numerous

17   statements of this type in the Court's order.

18             Reading the transcript of the October 12th

19   hearing, it's like a kangaroo court has been set up and

20   prearranged to bootstrap Mr. -- Ms. Blixseth; attack me;

21   attack Mr. Cotner, because Mr. Cotner represented,

22   represented both Western Capital Partners and Mr. Blixseth.

23   So what?

24             They had a common adversary who had basically

25   committed bankruptcy fraud by filing a petition in bad

ER00908

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 660 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 16 of 121

15

1    faith in, in this Court, all of which evidence has been

2    excluded by the Court.

3              And then Mr. Blixseth -- Mr. Conant, because he's

4    a four-year lawyer, he got nervous knowing that this Court

5    would issue any order against Mr. Blixseth, myself, or

6    Mr. Conant, because that's what the Court has consistently

7    done throughout all of these proceedings.  So he withdrew

8    in fear that this Court would issue some order against him

9    because he was trying to protect his client, Mr. Blixseth.

10             Under the case law we have submitted in our

11   brief, Your Honor, that is condemned.  Invited advocacy by

12   a Court against counsel for, in this position,

13   Mr. Blixseth, is condemned.  And yet this Court requested

14   Mr. Cotner to go into my reputation.  Well, I've been

15   litigating for 40 years, Your Honor.  I have never been

16   sanctioned by a Court except by one judge who was then

17   removed from the bench, removed from the bench for taking

18   money from the other side.  And yet this Court invited

19   Mr. Cotner to go into my reputation, to attack my

20   reputation, and thereby undermine my advocacy for my

21   client.  That was done within weeks before we filed and

22   made the decision to file the motion for disqualification.

23             Now if we go into the procedure that, the

24   procedures that have occurred in connection with these

25   proceedings.  As we understand the rules and as the Court

                                              ER00909

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 661 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 17 of 121

16

1    ruled last Friday, under the applicable bankruptcy rules,

2    the Court proceeds without an evidentiary hearing; and then

3    within 14 days after this Court decides, any interested

4    party can come in and request a hearing, an evidentiary

5    hearing.

6            Well, if this Court denies this motion, we intend

7    to request an evidentiary hearing, and we will call all the

8    witnesses that are currently on our witness list to support

9    all of the facts that are set forth in our pleadings.

10           So the proceedings that have occurred so far go

11   like this, Your Honor:  We filed the motion for

12   disqualification in November.  The Court then issued an

13   order saying we had violated the rule for the 14-day notice

14   requirement to all interested parties.  Well, as it turns

15   out, the Court erred because on disqualifications motions,

16   that rule doesn't apply.

17           So the Court then, on our motion to vacate that

18   order, vacated that order, and then it issued an order --

19   or strike that; then it said in the December 2 hearing that

20   this Court does not try cases by affidavit.  And yet this

21   Court issued a $40 million judgment against my client,

22   Mr. Blixseth, solely on the basis of the Chuck Hingle

23   affidavit without giving Mr. Blixseth an opportunity to

24   respond.

25           And as we now know from the Ninth Circuit when

ER00910

**Case No. 12-35986 ER  638**

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 662 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 18 of 121

17

1    this Court approved a petition for certification of the

2    AP-14 decision, Judge Reinhardt has just recently rejected

3    that, based on 28 USC 152(d)(2)(A).  Well, that section,

4    Your Honor, relates to the lack of finality in a judgment,

5    exactly what Mr. Blixseth argued, because we never -- we

6    were denied our due process rights.

7           We never got an opportunity to respond to the

8    Hingle affidavit.  And yet the Hingle affidavit includes

9    $22 million for the B's after this Court ruled in AP-14

10   that the Credit Suisse predatory loan was a distribution,

11   was illegal.  And the liquidating trust and Mr. Kirschner

12   had admitted that if a liquidating -- if the loan was

13   illegal, they couldn't get any part of a percentage of the

14   loan proceeds based on their, their shares.  And yet this

15   Court entered a $40 million judgment of which 22 million is

16   for the B's in which Mr. Blixseth never had an opportunity

17   to respond.  And the AP-18 case involving the B's hasn't

18   even been tried yet.

19          Any reasonable person in dealing with those due

20   process violations would conclude that this Court is

21   biased.

22          So now we have a procedural history where the

23   Court first said anyone can come in and -- knowing the

24   entire Montana bar, bankruptcy bar, is going to support

25   Your Honor.  That's how they make their living.  But then

ER00911

**Case No. 12-35986 ER  639**

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 663 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 19 of 121

18

1    the Court vacated that order.

2              And by the way, for example, in the YCW

3    bankruptcy, the Court just approved, three days before

4    objections were due on what they determined to be -- what

5    they characterized as the "final report," the Court

6    approved $1.5 million in fees before the objections were

7    even due.  And as it turns out, in the YCW case,

8    1.5 million of that claim is just outright fraudulent, as

9    has been presented in an objection.

10             Gary di Silvestri, unlike the other seven

11   shareholders who each put in $1.5 million for YCW, Gary

12   di Silvestri never paid a cent, and yet he got slipped into

13   the, with the seven B's to make an eighth shareholder.  And

14   the Court approved that, basically that payment to, to

15   di Silvestri and the accompanying attorney's fees based on

16   a percentage.  And it's just completely fraudulent.

17             So after the Court vacated its order on the 14

18   days, then these other parties - the liquidating trust,

19   CrossHarbor, Ms. Blixseth - then filed all their responses

20   to the motion for disqualification.

21             And then just last Friday after we filed a reply

22   to that and our witness and exhibit lists - thinking that,

23   based on the December 2 comment, the Court has going to

24   have an evidentiary hearing because it said it didn't try

25   cases by affidavit - we then mailed our reply and our

                                                      ER00912

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 664 of 940
Case 2:11-cv-00073-SEH Document 10-2 Filed 01/03/12 Page 20 of 121

19

1    objection indicating to the Court that that was improper.

2    On Friday, this Court vacated -- this Court basically ruled

3    that there would be no evidentiary hearing, first there

4    would be this hearing.

5              Now, let's go into the issues involving the

6    linkage between bias, ex parte communications, and due

7    process.  Common sense tell the Court that if you have ex

8    parte communications, one party is having the ear, getting

9    the ear of the Court to the exclusion of the other party.

10   Right off the bat, you've implicated due process because

11   due process requires notice and an opportunity to be heard.

12             This Court was recently confronted with Judge

13   Haddon's ruling where Judge Haddon cited the violation of

14   Rule 9019 because it -- what this Court did is it got a

15   room at the Crowne Plaza Hotel, then it conducted ex parte

16   communications with parties at the Crowne Plaza Hotel

17   during the supposed, so-called "bidding procedures."  But

18   who knows what the extent of those ex parte communications

19   are except this Court?

20             Then the parties made a deal.  Mr. Blixseth and

21   his counsel were excluded from all of that.  The parties

22   then made a deal and entered into a term sheet on May 18,

23   2009, right after Phase 1 of the AP-14 case when this case

24   had excluded all the bad faith evidence.  And that term

25   sheet basically set up a system of going after Mr. Blixseth

                                            ER00913

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 665 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 21 of 121

20

1   and exculpating everybody with no notice to Mr. Blixseth,

2   as just ruled by Judge Haddon.

3          The term sheet was brought in, apparently read by

4   the Court.  No one else could see it except apparently the

5   CrossHarbor folks and the Credit Suisse folks.  The Court

6   approved it on the spot.  That term sheet called for the

7   exculpation of Edra Blixseth, the exculpation of Sam Byrne

8   and CrossHarbor Capital Partners, the exculpation of Steve

9   Brown.

10         Mr. Blixseth's lawyer, who in the middle of first

11  phase of AP-14 did a flip-flop, he had been Mr. Blixseth's

12  lawyer and the Yellowstone Club's lawyer.  He had written

13  an opinion letter that the loan was proper when the Credit

14  Suisse was taken out on September 30, 2005; that it did not

15  violate any of the Montana laws.  He had been paid

16  approximately $90,000 during the marital settlement

17  agreement and approved and helped draft the releases and

18  waivers that this Court has stricken.  And then when he

19  was -- and then he became head of the, chairman of the UCC.

20         In the face of all this, he flip-flopped,

21  rejected his opinion letter, violated all of his loyalties

22  and duties under the Montana professional canons, joined

23  the other side, and testified against Mr. Blixseth while he

24  was still Mr. Blixseth's lawyer.  We filed a motion to

25  dismiss, and the Court ignored it.  The Court then, on May

ER00914

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 666 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 22 of 121

21

1    18th, exculpated Mr. Brown.

2          It turns out that in the 400 e-mails that this

3    Court will not allow Mr. Blixseth and its counsel to

4    review, having just now rejected that -- and we're taking a

5    writ to the Ninth Circuit on that issue.  This Court is in

6    the possession of four diskettes involving these 400

7    e-mails, or so.  The Court put on the record that it had

8    reviewed all of the e-mails and said that they were

9    protected by the attorney-client privilege between

10   Mr. Beckett and others.

11         Well, if the Court just reviews the, the

12   privilege log, you'll find e-mails, Your Honor, for

13   example, that are between Mr. Conant and Mr. Beckett,

14   between Mr. -- between CrossHarbor lawyers and Mr. Beckett.

15   They could not possibly fall within the scope of the

16   attorney-client privilege.  And yet that whole issue of

17   Brown's involvement was swept under the rug even though

18   Mr. Blixseth relied on his attorneys in September 2005,

19   relied on his attorneys during the marital settlement

20   negotiations and agreement in 2008.

21         And Ms., Ms. Blixseth had her own army of

22   lawyers, CPAs, forensic accountants.  That, as you heard

23   from Judge -- from Ms. Corikian [phonetic], that divorce

24   proceeding was heavily contested.  Mr. Blixseth spent over

25   $5 million in legal fees for Mr. Kolodny, who testified

ER00915

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 667 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 23 of 121

22

1    before this Court.

2          That judge had everything involving the Blixseth

3    marital community assets before her.  She had litigated,

4    Ms. Blixseth had litigated every single document request,

5    she got every document she wanted, and yet she then came to

6    this Court - which this Court has apparently accepted - and

7    said she was frozen out.  And so when she tried to steal

8    the 50 million from the banks, it was because she was

9    frozen out.

10         Any bank robber could say, "Oh, I got in a fight

11   with my wife this morning, so I went and robbed the bank."

12         One, Ms. Blixseth was not frozen out.  She was

13   being paid throughout that period of time millions of

14   dollars by Mr. Blixseth to support the marital community

15   per orders of the divorce judge, Sharon Waters, in the

16   divorce proceedings.  So for this Court to rule in the

17   Western Capital Partners summary judgment proceeding that

18   Ms. Blixseth was frozen out and did not have the requisite

19   intent beyond a reasonable doubt to steal the $50 million

20   from these banks, Your Honor, that is an indication of

21   bias.

22         If you link that with the due process violations

23   that took place in May 18th; and you link that to the ex

24   parte communications that took place at the Crowne Plaza;

25   and you link that to the fact that Mr. Blixseth was denied

ER00916

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 668 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 24 of 121

23

1   due process; and you then exculpated, with no opportunity

2   to be heard by Mr. Blixseth, Ms. Blixseth, Samuel Byrne,

3   Steve Brown, that reflects to any impartial person, to any

4   reasonable person, that this Court is not impartial.  Now,

5   because of the recent Judge Haddon ruling, we believe

6   everything is going to be remanded to this Court.

7           Well, this Court, among other things, even after

8   five days of trial which Mr. Blixseth had roughly 30 days

9   to prepare, this Court ruled in June 2009 and basically

10  prejudged Mr. Blixseth's credibility, basically said that

11  he was not credible.

12          Then because of the due process implications that

13  you, the Court, intended to hit him with a huge judgment,

14  it gave him six - seven more months to conduct discovery,

15  but in its order said:  But he can't conduct discovery on

16  any issues that I've already decided, which included the

17  Steve Brown conflict.

18          I submit to the Court:  Most federal judges in

19  this country faced with a conflict of that type, as

20  indicated in the Rodisbocker [phonetic] case, which was

21  presented to the Court on the motion to dismiss, most

22  federal judges would have immediately dismissed all actions

23  against Mr. Blixseth for that level of conflict.

24          Even Mr. Patten wrote an e-mail to Steve Brown,

25  which this Court had, basically saying in January 2009:

ER00917

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 669 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 25 of 121

24

1    Mr. Brown has a conflict of interest.

2              Mr. Brown wrote back and said:  Yes.  Well, but

3    I've got loads of information because I've been

4    representing Mr. Blixseth all these years.

5              That is a violation of the Montana Rules of

6    Professional Conduct, regardless of whether he divulged

7    confidential information, because a lawyer cannot take

8    information received from the representation of one client

9    and use it in the representation or involvement with

10   another client, regardless of the divulgence of

11   confidential information.

12             Even Mr. Patten knew that that conflict was

13   wrong.  And yet this Court ignored it, swept it under the

14   rug, exculpated Mr. Brown, and then proceeded to issue an

15   order that:  Mr. Blixseth was not credible, we'll give him

16   a few more months to do some discovery.

17             And throughout that time frame, the Court

18   basically took the position that Mr. Blixseth was trying to

19   derail these proceedings because he was trying to get due

20   process help that he is entitled under the United States

21   Constitution, the Montana Constitution, and the Federal

22   Rules of Civil Procedure, all of which he was denied.

23             So on the linkage between the ex parte

24   communications and the bias and the due process, as the

25   cases indicate, regardless of the general requirement of an

ER00918

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 670 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 26 of 121

25

1    extrajudicial source to support disqualification or the

2    appearance of bias, if that linkage exists, as the cases

3    cited in our briefs say -- the United States Supreme

4    Court case - (inaudible) - and the Furst case, F-U-R-S-T,

5    as those cases make clear, if that type of evidence exists

6    on a record, the Court must disqualify itself.

7                Now the Court is faced with a remand of the, of

8    the main bankruptcy proceedings, depending upon what the

9    Ninth Circuit now does; it's faced with the estate

10   proceedings against Mr. Blixseth.  This Court has already

11   ruled - we submit improperly, which will be reversed - that

12   the marital settlement releases somehow -- somehow this

13   Court has circumvented the marital settlement releases.

14               And for the record, Your Honor, I remember,

15   respectfully, I remember in the first day of the trial when

16   we were a Phase 1, AP-14 -- and myself and all my cocounsel

17   counsel commented to this at the time, and we didn't know

18   to make of it.  The issue was the pretrial orders.  That

19   Monday night, we were up until 10 or 11 at night trying to

20   do the pretrial orders with the other side, with the

21   debtors and the UCC.  They refused to put in the bulk of

22   our defenses, including the releases and the waivers.  But

23   fortunately, the releases and waivers were in another

24   section of the pretrial order that they had already

25   approved and apparently overlooked.

ER00919

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 671 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 27 of 121

26

1          I was then examining a witness.  The UCC and the

2     debtors objected, and they basically said, "Well, Your

3     Honor has already rejected the releases and waivers as a

4     defense."

5          The Court then took the time, leaned back in its

6     chair in the quadrangle desk over in Missoula; leaned back

7     in his chair; read through the pretrial order that they had

8     submitted, having already rejected ours.  And it had been

9     taken out of one location and was still in the other

10    location.  The Court then took it, threw it across the

11    desk, looked over at Mr. Patten, and said, "It's in there."

12         We submit, Your Honor, that in -- that that is

13    evidence of demeanor.  Now, at the time, admittedly, we

14    gave the benefit of the doubt to the Court thinking, Well,

15    the clear inference to be drawn is the Court didn't want

16    the waivers and releases in there, in the pretrial order,

17    but given the ups and downs of litigation, we'll keep

18    going.

19         It was only after this continuum, Your Honor, of

20    due process violations; the discovery of the Crowne Plaza

21    ex parte communications; the discovery of the Terry Helo

22    [phonetic] conversation with Mr. Richardson passed on to

23    Mr. Amsden, which, by the way, has not been refuted on the

24    record.  The Crowne Plaza ex parte communications,

25    notwithstanding the liquidating trust, CrossHarbor, the

ER00920

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 672 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 28 of 121

27

1  debtors, and Ms. Blixseth filing responses, no one has

2  refuted those ex parte communications.

3        Now, in connection with the approval, the Crowne

4  Plaza ex parte communications; and the appearance of bias;

5  and the linkage with due process; the Court having approved

6  the May 18 term sheet with no notice to Mr. Blixseth, the

7  Court then consistently from that point forward excluded

8  all evidence in AP-14 of the Brown, Byrne, Edra Blixseth

9  collusion to file a bankruptcy in bad faith.

10        And I include Mr. Brown because Mr. Brown was

11  paid $90,000 to basically negotiate the marital settlement

12  agreement with Kolodny and all the other parties.  In one

13  e-mail, it indicates he met with privately with

14  Ms. Blixseth, and then they arrived at this global

15  settlement to solve the Yellowstone Club's debacle.

16        Well, at the time, as known by Mr. Byrne, namely

17  in August 2008, Ms. Blixseth had defrauded all these banks,

18  was in default on all those loans.  Let's take, for

19  example, two loans, the Western Capital Partners loan and

20  the Wachovia loan.  They're both instructive because all of

21  the documents relating to both were placed before this

22  Court.

23        Let's take the Western Capital Partners loan.  On

24  the loan application and the loan affirmations of

25  Ms. Blixseth, she said she had never filed bankruptcy.

ER00921

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 673 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 29 of 121

28

1    These are all under oath.  A lie.  This Court ignored it.

2           She was able to pay her bills as they matured, a

3    fundamental question in a loan application on which the

4    lender relies, in this case, to loan $13 million.  "Yes."

5           That same month, she had filed -- and this Court

6    saw it in the motion for summary judgment by Western

7    Capital Partners.  That same month, she filed under seal in

8    the divorce proceedings, because of her lifestyle - which

9    she later admitted in other affidavits - that she was

10   $2 million in arrears and unable to pay her bills.  This

11   Court had all those documents, ignored, and then said

12   Ms. Blixseth was credible and she didn't have the requisite

13   intent to steal this money.

14          Let's take the Wachovia loan.  The Wachovia loan

15   must be one of the most fraudulent loans in my 40 years of

16   litigating, having represented bank presidents and CEOs and

17   white-collar criminals, that I've ever seen.  They were, my

18   clients were indicted for a fraction of what is in these

19   loan, loan documents, all of which were on the Jory Russell

20   computers, all available to Mr. Cotner, all available to

21   this Court when they were presented to this Court in the

22   deposition of Ms. Blixseth, the Wachovia loan documents.

23          They pledged the technology, the fraudulent

24   technology, which I will place my representation on doesn't

25   exist, is a complete fraud.  They pledged this nonexistent

ER00922

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 674 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 30 of 121

29

1  fraudulent technology.  They met in the Liner law firm's

2  offices with the, with VJ Shondron [phonetic], the vice

3  president of credit affluent services from Wachovia; told

4  him emphatically that they had a $100 million black budget

5  contract with the United States Government - a complete

6  fabrication - based on the noise-filtering technology that

7  they were filtering out from Al-Jazeera digital satellite

8  broadcasts, particularly in the crawl, what they call the

9  "crawl," these al-Qaeda encoded target coordinates,

10  latitude/longitude coordinates.  It's just complete

11  nonsense.

12          They told this to Wachovia, and they agreed to

13  pledge -- they couldn't show Wachovia the contract, but

14  they agreed to pledge the collateral, this fraudulent

15  collateral.

16          Well, the lawyers were then -- the lawyers for

17  Ms. Blixseth were then litigating in a Nevada Federal Court

18  the very issue of the production of the source codes, which

19  don't exist, for that technology.  And Ms. Blixseth and

20  Mr. Montgomery just filed document after document until

21  finally Judge Cooke issued an order to show cause in May

22  2008 for the non-production of these source codes and for

23  basically just a stream of misrepresentations that had been

24  put in the court file, including false declarations of

25  Montgomery which, two months later, his lawyer had to stand

ER00923

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 675 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 31 of 121

30

1   up and admit were false.

2          So what happened, Your Honor:  They pledged this

3   collateral.  They never informed Wachovia on the loan

4   application - same as Western Capital Partners, by the way

5   - is there litigation pending which would adversely impact

6   your ability to pay this loan?  A typical loan question.

7   "No."  Same as Western Capital Partners.

8          Well, not only was there litigation pending that

9   had been going for two years at that -- three -- two years

10  at that point in the Nevada Federal Court, there was a

11  preliminary injunction prohibiting the pledging of the

12  collateral.  All of that was available to Mr. Cotner.  All

13  of that was available to this Court before it issued the

14  October 25th order that I read into the record.  It was a

15  completely fraudulent loan.  Wachovia handed over

16  $8 million on these representations, and the loan fell into

17  default almost immediately.

18         So when the marital settlement agreement was

19  being negotiated by Steve Brown with Mr. Byrne and

20  Ms. Blixseth in August of 2008, the Wachovia $8 million had

21  fallen into default, the First Bank & Trust $8 million loan

22  had fallen into fault.  As a matter of fact, there's a

23  whole stream of e-mails which were presented to this Court

24  from, among other people, representatives of the First Bank

25  & Trust relating to this issue.

                                              ER00924

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 676 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 32 of 121

31

1          The American Bank for 7.5 million, a bank here in

2     Montana, had fallen into default.  And a whole series of

3     events took place in the American Bank loan in the summer

4     of 2008, which had been presented to this Court, which

5     represent fraud by Ms. Blixseth.

6          The Stockman Bank loan, the loans from other

7     individuals - altogether they total about $50 million, Your

8     Honor - were all in default when Mr. Byrne knowingly gave

9     the $35 million to Ms. Blixseth in order to get control of

10    the Yellowstone Club.

11         Well, he got control of the Yellowstone Club the

12    day after he made the $35 million loan on a 48-day note

13    when he knew that Ms. Blixseth had zero ability to pay it,

14    was, quote -- this is a quote from Mr. Byrne in July 2008

15    two weeks before he made the loan:  Ms. Blixseth is not

16    institutionally financeable.

17         That's in an e-mail that has been presented to

18    this Court.  And then shortly after he makes the loan when

19    the loan immediately false into default, Mr. Byrne writes

20    (quoted as recorded):  "The money doesn't exist," meaning

21    Ms. Blixseth's ability to, to pay anything, to pay money

22    into the Yellowstone Club, to pay the loan.

23         If there ever was a predatory loan -- which this

24    Court characterized Credit Suisse correctly as, because

25    Mr. Blixseth was defrauded in that transaction too.  He

                                              ER00925

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 677 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 33 of 121

32

1    didn't know.  Mr. Brown never told him that that loan

2    violated FIRREA.  And yet this Court used FIRREA correctly

3    to say that that loan was an illegal loan.  But

4    Mr. Blixseth was defrauded.  His own lawyers - Mr. Brown,

5    Mr. Doyle - his banking representatives, no one advised him

6    that that loan violated FIRREA.  That's unrebutted evidence

7    before this Court.

8            And yet going back -- Mr. Byrne, as soon as, as

9    soon as the marital settlement agreement was consummated on

10   August 12th having been signed on June 26th, as soon as --

11   he took control of all the Yellowstone Club bank accounts.

12   This Court knew that.

13           But perhaps the most specific, unquestionable,

14   indisputable evidence of fraud that was before this Court

15   in connection with that transaction and then the subsequent

16   bad faith filing is the discussion memo which was put

17   before this Court in the spoliation motion - I believe it's

18   Exhibit 3 or 4 - and the agreement to form, which was

19   repeatedly put before this Court.

20           And in those documents, Mr. Byrne and CrossHarbor

21   basically said that they had the underwriting documents

22   relating to Mr. -- Ms. Blixseth's financial health.  They

23   stated that, that she was going -- in the discussion memo,

24   if she made the deal with them, she'd make $600 million.

25   They stated that they would put in -- they promised to

ER00926

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 678 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 34 of 121

33

1    inject $100 million into the Yellowstone Club in the

2    agreement to form.  They put a provision in that

3    Ms. Blixseth would inject some amount of money.

4            They knew Ms. Blixseth not only had no money, had

5    no prospects of getting any money, was in default on all

6    these loans, and yet they promised to inject $100 million

7    which, had it been injected, there never would have been a

8    Yellowstone Club bankruptcy.  That's how they got control.

9    That fraudulent representation in the agreement to form is

10   per se evidence of bad faith in the bankruptcy filing that

11   took place in November.

12           They took immediate control of all the bank

13   accounts.  Ms. Blixseth basically handed it over to them

14   pursuant to the prior scheme of Mr. Byrne, which is

15   evidenced in e-mails before this Court as early as March

16   2008 when Mr. Byrne proposed to Mr. Blixseth to put the

17   club into bankruptcy.

18           And as a -- on that point alone, twice I put in

19   front of this Court in AP-14 and in other proceedings, I

20   put in front of this Court that on March 21, 2008,

21   Ms. Blixseth was brought into the divorce proceedings,

22   brought into, into a divorce hearing because Mr. Blixseth

23   had learned that Ms. Blixseth and Montgomery had presented

24   fabricated grand jury target letters to Mr. Byrne.

25           Mr. Byrne told Mr. Blixseth, "Well" -- and they

ER00927

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 679 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 35 of 121

34

1    actually fabricated the -- there was no grand jury on

2    Mr. Blixseth.  They fabricated these documents.  They

3    signed the name of Ronald Sharpe, an assistant U.S.

4    attorney in Washington.  They then presented it to

5    Mr. Byrne.  Mr. Byrne told Mr. Blixseth, "Well, I'm going

6    to have to tell my investors."

7           So on March 21 - because Ms. Blixseth was already

8    in violation of a restraining order, an injunction the

9    Divorce Court had entered into August of 2007 where she

10   tried to interfere with the $455 million sale to Mr. Byrne

11   - Mr. Kolodny and Ms. Blixseth -- Mr. Blixseth brought her

12   back in.  She took the oath under Judge -- with Judge

13   Waters, and she swore that she was doing nothing to

14   interfere with the Yellowstone Club sale, even though she

15   had fabricated with Montgomery these target letters.

16          And that day, that morning, Gary Peters, her

17   agent - which I tried to present to this Court as bad faith

18   evidence, and I made an offer of proof in AP-14 in Phase 1

19   - that day, Gary Peters, her agent, according to her own

20   e-mails:  My guy - which was presented to this Court - was

21   sitting in be Byrne's office trying to make a separate

22   deal.

23          And she's under oath in the divorce proceedings

24   in California saying, "I'm not, I'm not doing anything to

25   interfere with the sale.  I'm not even talking to Mr., Mr.

                                                    ER00928

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 680 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 36 of 121

35

1    Byrne.  He calls me"; outright perjury contained in the, in

2    the divorce proceeding transcripts.

3            And then five days later after this circus,

4    Mr. -- on March 26th, Mr. Byrne terminated the $455 million

5    sale.  Then he turns around within months and makes this

6    deal with this predatory loan with Ms. Blixseth promising

7    to inject $100 million into the club.

8            If that isn't in bad faith and fraudulent -- I

9    don't know what else any reasonable person could conclude

10   but that was intended to defraud the creditors of

11   Ms. Blixseth, the creditors of the Yellowstone Club, and

12   enable Mr. Byrne to take over control of the club.  And

13   that is exactly what happened.

14           One of the most malignant aspects of that fraud

15   is that, as Mr. Blixseth testified before this Court, for

16   the months before that, he was trying to sell Porcupine

17   Creek to pay off the BGI notes, which then had a value of

18   $207 million, which would have injected that money into the

19   Yellowstone Club.

20           And on that point, notwithstanding what this

21   Court did on the BGI notes, Ms. -- Mr. Blixseth had paid

22   over $40 million in interest on those notes.  Those notes

23   conform to every Internal Revenue Service protocol for

24   loans and notes.  And after a two-year audit, the IRS

25   concluded that those notes were a legitimate loan.  And yet

ER00929

1    this Court ignored that, swept that under the rug, and

2    ruled that, "no," it wasn't a legitimate loan, it was a

3    distribution, even after the IRS, in every document that

4    Mr. Blixseth and BGI had, analyzed every aspect of that, of

5    that transaction.

6            That in itself, Your Honor, reflects an

7    inclination of bias to, whatever it took, bootstrap up

8    Ms. Blixseth and undermine Mr. Blixseth.  It was simply,

9    Your Honor, unfair, improper, and not judicious.

10            Mr. Blixseth built the club.  Mr. Blixseth does

11   not lie.  As a client -- I've now known him for several

12   years.  The man does not lie, no matter what.

13   Ms. Blixseth, who I've also known, is a pathological liar.

14   And yet this Court has bootstrapped Ms. Blixseth and

15   attacked Mr. Blixseth on every front.

16            So then Mr. Byrne puts the club into bankruptcy.

17   The evidence is all over the record that it was all planned

18   and all schemed.  We repeatedly tried to put that evidence

19   in front of this Court.  The evidence seeped in in nooks

20   and crannies, but in AP-14, the Court never allowed it into

21   evidence.  But in other proceedings, which the Court

22   references in its AP-14 order, in its 135-page order, it

23   references that it is taking judicial notice of other

24   proceedings.  Well, the Court excluded all that evidence in

25   AP-14, so we don't even know going up on appeal, we don't

ER00930

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 682 of 940
Case 2:11-cv-00073-SEH Document 10-2 Filed 01/03/12 Page 38 of 121

37

1    even know what the Court is referencing that it took

2    judicial notice from other proceedings, particularly to

3    rule, for example, that Ms. Blixseth is credible and

4    Mr. Blixseth is not credible.

5            The AP-18 statement of undisputed facts.  Under

6    Rule 56, we were -- Mr. Blixseth was absolutely entitled

7    under the rules to file a reply to the response of the

8    liquidating trust to our motions for summary judgment,

9    which this Court basically in a couple paragraphs

10   dismissed, including derivative defenses that were just

11   ironclad, causation defenses which were ironclad, bad faith

12   defenses.

13           This Court dismissed it in several paragraphs,

14   and yet the Court never gave Mr. Blixseth the opportunity

15   under Rule 56 to file a reply and tell the Court, among

16   other things, that the liquidating trust had never disputed

17   the 50 pages of undisputed facts that are laid out in

18   detail - the bank frauds, the Wachovia fraud, the bad faith

19   collusion, the Steve Brown conflict - all documented with a

20   foot thick of documents, all of which prove before any

21   impartial fact finder that there was bad faith in that

22   bankruptcy filing and that Mr. Blixseth is really the

23   victim of those frauds, and that Ms. Blixseth all along --

24   and this Court was given specific evidence of Ms. Blixseth.

25           As soon as she signed the June 26th marital

ER00931

**Case No. 12-35986 ER  659**

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 683 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 39 of 121

38

1    settlement agreement, she appeared in front of -- she sent

2    a memo to everybody at the Yellowstone Club, when she was

3    in default on 50 million dollars in loans:  I've now -- I

4    know own the Yellowstone Club.

5          This was introduced into evidence in AP-14

6    (quoted as recorded):  "I now own the Yellowstone Club.  I

7    have all the money I need.  I don't need any partners";

8    just a complete fabrication.

9          And much to the detriment of the Yellowstone

10   Club, because Mr. Byrne knew her financial condition, he

11   knew he had, quote, a pigeon, and he knew he could take

12   advantage of Ms. Blixseth, he promised her $600 million in

13   that discussion memo, he promised to inject $100 million,

14   none of which was real, all of which was fraudulent.

15         That evidence, by one means or another, was in

16   front of this Court.  The Court ignored it.

17         Now, as the Court knows under the Manoa case --

18   which we believe this Court should scrupulously adhere to

19   the reasoning of the In Re:  Manoa case.  In Manoa, the

20   Ninth Circuit basically said -- I suppose somewhat

21   sympathetic to bankruptcy judges who were trying to do the

22   right thing and get an administrative proceeding in the

23   bankruptcy accomplished and, in this case, to apparently

24   keep the survival of the Yellowstone Club -- although, I

25   will submit in that point:  Had this Court immediately

ER00932

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 684 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 40 of 121

39

1     dismissed or dismissed within the time frames the

2     bankruptcy petition of the Yellowstone Club with

3     Ms. Blixseth and Mr. Byrne at the helm, the money would

4     have come forward.

5              Mr. Byrne had promised to pay 455 million, he

6     then promised to pay 100 million.  The money would have

7     been there, and we wouldn't be in this courtroom today.  If

8     the rules had been followed, the evidence had been

9     addressed, we would not be in this courtroom today.

10             But the Court, under Manoa, recognizes that a

11    bankruptcy judge, in doing -- in following the

12    administrative requirements of administering, administering

13    the bankruptcy, could get boxed in with its rulings in the

14    main bankruptcy in attendant adversarial proceedings.

15             Well, Your Honor, regardless of the intent issue

16    and what this Court's intent was or agenda was, and even

17    aside from demonstrable or actual bias, clearly it is

18    obvious from this record that for the Court to maintain the

19    May 18 term sheet in which it exculpated everybody contrary

20    to all Ninth Circuit cases, in order to maintain that term

21    sheet and create a liquidating trust to go after

22    Mr. Blixseth - who was apparently their sole target - and

23    to confirm the plan, the Court had to and was boxed into

24    affirming the legitimacy with no bad faith of what

25    Ms. Blixseth and Sam Byrne did.  It was boxed in.  It had

                                                    ER00933

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 685 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 41 of 121

40

1   to do that.  It had to accept the good faith of

2   Ms. Blixseth and the good faith of Mr. Byrne in all of the

3   subsequent adversary proceedings, including the AP-14

4   proceeding.

5          If the Court, notwithstanding this mountain of

6   evidence that we've been going through, in part, if the

7   Court had begun to undermine the credibility of

8   Ms. Blixseth or Mr. Byrne, it would have eroded and

9   undermined the main bankruptcy term sheet and subsequent

10  plan.  So therefore, the Court was virtually required

11  through all the subsequent adversary proceedings to paint

12  Mr. Blixseth with a completely black hat, notwithstanding

13  that Mr. Blixseth had sustained the Yellowstone Club for

14  three years after the, after the Credit Suisse loan, never

15  defaulted on a payment, had paid all of the creditors.

16          And then Ms. Blixseth wanted to be the queen of

17  the Yellowstone Club.  And in negotiations that took place

18  in May 2008 where Mr. Blixseth had lined up financing -

19  (inaudible) - to purchase the club out of the marital

20  community, Ms. Blixseth insisted she wanted to be the queen

21  of the Yellowstone Club, and she wanted to own it, even

22  though she was in default in all these loans, had no money,

23  and the only means she could do it was by fraud, which is

24  exactly what she did.

25          So this Court was boxed in in all subsequent

ER00934

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 686 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 42 of 121

41

1    adversary proceedings, including the AP-14 rulings, to

2    basically attack Mr. Blixseth, bootstrap up Ms. Blixseth

3    and Mr. Byrne, ignore all this mountain of evidence.  And

4    that is what the Court has done.  That is why the Ninth

5    Circuit, in its wisdom, has said:  A bankruptcy judge under

6    these circumstances should recuse him or herself.

7            So just on the Manoa case, Your Honor,

8    particularly with the remands, the remand that's already

9    occurred and the likely remands that are coming, in all

10   fairness, in deference to Mr. Blixseth and all the Federal

11   Rules of Civil Procedure, this Court should recuse itself

12   and allow a new impartial judge, who is not boxed in, to,

13   on remand, determine some of the these issues and the

14   ultimate outcome on these adversary proceedings.

15           For example, now with Judge Haddon's order, when

16   the Yellowstone Club case goes forward, now that the

17   exculpation clauses are out, under the Federal Rules of

18   Civil Procedure Mr. Blixseth is going to sue Credit Suisse,

19   Steve Brown, CrossHarbor, and everyone that was involved

20   with cross-claims and third-party claims that are a part of

21   our system of jurisprudence so that Mr. Blixseth, in front

22   of an impartial finder of fact, can say, "I didn't know

23   about the Credit Suisse FIRREA violations.  Ms. Blixseth

24   and Mr. Byrne are the ones who engineered this entire

25   bankruptcy.  All of the divorce proceedings support me."

ER00935

**Case No. 12-35986 ER  663**

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 687 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 43 of 121

42

1          The judge, Sharon Waters there, had everything

2    before her and made the rulings and entered the judgment

3    that she did, which this Court is trying to undue in favor

4    of Ms. Blixseth.  An impartial finder of fact should be the

5    judge who now deals with all those third-party claims and

6    cross-claims.

7          I indicated to the Court there's no refutation --

8    perhaps the Court -- I would invite the Court to put on the

9    record:  Does the Court have any knowledge that Mr. Helo

10   did not say to Mr. Richardson what Mr. Amsden said to Mr.,

11   Mr. Blixseth?

12         I would invite the Court to put on the record all

13   of, any or all of ex parte communications it has had in

14   this case with anyone, including those at the Crowne Plaza.

15   And I will say that the rumor mill out there with regard to

16   the magnitude of the ex parte communications is

17   substantial, but we have conducted no hardcore discovery as

18   of yet to get into the extent of those ex parte

19   communications.

20         But I will say this:  We will -- we have put -- I

21   believe it's, it's one of the exhibits attached to

22   Mr. Blixseth's affidavit.  And we have more, but there are

23   three e-mails that we put into the record.  And in a

24   November 9 e-mail, Mr. Byrne says he's going to put

25   political pressure on the situation involving the

ER00936

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 688 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 44 of 121

43

1    bankruptcy proceedings.

2           There's a January 14 or 15 e-mail from, I think

3    it was Matthew Kidd to Sam Byrne saying:  How did your

4    meetings with Ron Burkle, the governor, and Mr. Byrne go?

5           There's an e-mail in August of 2008 when

6    Ms. Blixseth and Mr. Byrne knew they were taking control of

7    the Yellowstone Club involving a meeting with, with

8    Governor Schweitzer.

9           Now, what this means, Judge, at this point, we

10   don't know.  What we do know is that from in mid January of

11   2009 in the middle of the bankruptcy proceedings, the issue

12   of Ms. Blixseth having gotten fraudulently another

13   $2 million from the First Bank & Trust and then gave a

14   mortgage on Porcupine Creek -- this Court had in front of

15   it the issues involving all of the BGI notes which

16   Ms. Blixseth was then responsible for, to which nothing has

17   ever been done.

18          In fact, this Court ruled that the $181 million

19   note meant nothing because it was a note to herself.  Well,

20   the $181 million note, Your Honor, could have been paid

21   with Porcupine Creek.  And Mr. Byrne ended up in control of

22   Porcupine Creek with his $35 million predatory loan, taking

23   that asset of the Blixseth marital community.

24          But we do know that after January 14th of 2009,

25   after this Burkle - who now owns one-third of the

ER00937

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 689 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 45 of 121

44

1    Yellowstone Club - after this Burkle, Byrne, Schweitzer

2    meeting, nothing ever happens to the BGI notes.  No effort

3    is ever made to collect on the BGI notes.  There's a

4    complete direction away from Ms. Blixseth, there's a

5    complete direction by this Court and in all the pleadings

6    toward Mr. Blixseth.

7             What the extent of those meetings and what was

8    involved in those meetings -- we know, we do know that they

9    relate in some way to the bankruptcy proceedings because

10   the e-mails say that.

11            These, these types of things, Your Honor, create

12   a record with an appearance that Mr. Blixseth does not have

13   an impartial finder of fact or trier.  They create the

14   appearance of overwhelming favoritism to Mr. Byrne and

15   Ms. Blixseth, an overwhelming antagonism to Mr. Blixseth.

16            There are some e-mails that we recently attached

17   to Mr. Blixseth's affidavit involving Mr. Patten, Ms. --

18   one of this Court's law clerks and Mr. Patten.  It says at

19   the, basically the beginning of these bankruptcy

20   proceedings that he wants to have a confidential

21   communication with you.  What does that mean?

22            There's another e-mail that's attached to

23   Mr. Blixseth's affidavit in which apparently the senior

24   bankruptcy judge sent an e-mail with case law to Mr. Patten

25   a day or two before the Phase 1 of AP-14 began.

                                             ER00938

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 690 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 46 of 121

45

1          Mr. Amsden told Mr. Blixseth and me on several

2   occasions that this whole bankruptcy proceeding was, quote,

3   a predetermined train wreck.

4          The spoliation motion.  In my 40 years of

5   litigating, I've filed a bunch of spoliate -- destruction

6   of evidence during bankruptcy proceedings.  Most federal

7   judges go -- they don't allow it.  If there's anything that

8   seemingly infuriates federal judges, it's the destruction

9   of evidence during the pendency of bankruptcy proceedings,

10  even small items of destruction.  I've seen judges issue

11  orders that just basically would not allow an iota of

12  destruction of evidence.

13         In my 40 years, I have never seen a stronger

14  spoliation motion than the one submitted to this Court.

15  Mr. Russell, as this Court knows, admitted -- he admitted

16  that the day after he was being deposed in which this

17  entire charade took place, which is all over the record --

18  there is nothing else that it can be called but a

19  "charade."  Mr. Russell admitted that he destroyed the

20  e-mails and -- on the hard drives of the laptop and the

21  desktop.  It's in his testimony.

22         We then had to hire a forensic expert, and we are

23  still uncovering those e-mails.  I would encourage the

24  Court to look at Exhibit 6 attached to the Blixseth

25  affidavit.  Some of these e-mails have just been uncovered

                                                    ER00939

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 691 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 47 of 121

46

1    in the last 30 days relating to the fraudulent technology,

2    e-mails that show beyond a question of a doubt that the

3    technology doesn't exist, that a fraud is being perpetrated

4    on the U.S. Government that paid $2.5 million for the

5    return of these basically 20 boxes of stolen hard drives by

6    Mr., Mr. Blixseth -- I mean by Mr. Montgomery that were

7    hidden in Porcupine Creek.

8           The e-mails indicate that Mr. Montgomery was

9    probably responsible -- and I would encourage the Court to

10   read Mr. Montgomery's deposition in which he asserts his

11   fifth amendment privilege against self-incrimination

12   repeatedly - I'll guess over 100 times - including

13   attempted fraudulent sales to Israel, fraudulent sale to

14   Bahrain, fraudulent sale to the United States.

15          But in one e-mail, Mr. Blixseth --

16   Mr. Montgomery, on February 26, 2009, just before

17   Ms. Blixseth filed bankruptcy in this Court, writes to

18   Ms. Blixseth.  The next day, he's supposed to bring the

19   source codes in for testing.  And this particular thing had

20   happened repeatedly over the prior two - three years.

21          For example, in May 2007, he was supposed to

22   bring the source codes in for testing before an individual

23   named Mr. Salvatori [phonetic] within the United States

24   Government.  He bolted.

25          He was supposed to bring the source codes in for

ER00940

**Case No. 12-35986 ER  668**

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 692 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 48 of 121

47

1  testing in November of 2005 when he was at Etreppid.  He

2  bolted.

3          So the Government forks over the 2.5 million to

4  get the 20 boxes of hard drives back, and then Montgomery's

5  supposed to go to Washington to produce the codes for

6  testing.  He writes this February 26th e-mail.

7          And there's some prior e-mails, one of which

8  relates to something about the target coordinates and the

9  information Montgomery has given on the metro D.C. area.

10  Well, if you read everything together, it appears that

11  Mr. Montgomery may have injected into this Vancouver

12  terrorist website, that he was -- knew, knew was being

13  monitored by our intelligence agencies, fake target

14  coordinates related to the Obama inauguration.

15          So, of course, the Secret Service got interested.

16  And you'll see an e-mail relating to Mr. Montgomery and the

17  Secret Service where he's supposed to meet with the Secret

18  Service.  The inauguration's already taken place.  And he's

19  supposed to appear the next day to produce the source codes

20  for testing.

21          Mr. -- Ms. Blixseth -- who, on about February 1,

22  got the 2.5 million -- because the whole charade was that

23  Blxware owned the noise filters, even though Ms. Blixseth

24  and Montgomery have gone back and forth playing games with

25  owns them depending on whatever's convenient at the time.

ER00941

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 693 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 49 of 121

48

1          Mr. Montgomery bolts, and he writes to

2    Ms. Blixseth on February 26th:  I'm leaving Washington.

3          And Ms. Blixseth I think writes back:  Why?

4          Well, the reason -- the answer to the "why" is,

5    is the fake targets coordinates on the Obama inauguration

6    were fraudulent.

7          If Your Honor looks at the June, for example,

8    June -- which we could produce to the Court.  I believe it

9    may be an exhibit.  I'm not sure whether it was attached to

10   the Blixseth affidavit.  But we got the transcript of the

11   NBC piece done in June 9th of 2005 by NBC in which Tom

12   Ridge is being interviewed by Lisa Myers.  And Tom Ridge,

13   then the head of the Homeland Security, admits that the

14   bogus target coordinates given by Mr. Montgomery -

15   basically, they came from Etreppid at the time - were

16   false.

17         Ms. Blixseth knew all of that throughout this

18   whole period of time.  The problem is, she's got to

19   continue.  Like any coconspirator in a criminal enterprise,

20   she's got to continue to support Mr. Montgomery because

21   Mr. Montgomery will turn on her.

22         So if the Court reads, for example, in Exhibit 6

23   those chain of e-mails, there is no rational conclusion

24   except that the -- all of which come from the Russell

25   computers in the possession of Mr. Cotner and Mr. Samson.

                                          ER00942

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 694 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 50 of 121

49

1   The Court will see that it's all a fraud.

2        Under the Ninth Circuit rules, the Ninth Circuit

3   has power, pretty much sua sponte, to reassign.  We've

4   asked the Ninth Circuit -- for example, in the petition for

5   certification, we asked the Ninth Circuit to take judicial

6   notice of the motion to disqualify Your Honor.  Judge

7   Reinhardt granted that motion and denied the petition for

8   certification citing that 28 USC 152.

9        When these motions to dismiss and/or appeal

10  issues on Judge Haddon's order are resolved by the Ninth

11  Circuit, the issue of reassignment will then come up on a

12  fully explicated record, as we have set forth with this

13  Court.  The fair thing to do with, with Mr. Blixseth, with

14  all of the still-pending proceedings is for Your Honor to

15  recuse himself under the Manoa standard.

16       Oh, another -- which if you look into the Michael

17  West affidavit, which is among the documents that have been

18  submitted, the FBI agent, another one of the remarkable

19  frauds.  We easily discovered it.  As a matter of fact, I

20  may have given the West affidavit - he's the head of the

21  Reno FBI - to Mr. Cotner.  I'll have to check my e-mails.

22       But it goes like this, Your Honor:  When

23  Mr. Montgomery bolts Etreppid on January 18, 2006, he takes

24  about 20 boxes of hard drives with him.  And then on

25  February 7th, the State Superior Court enters the

ER00943

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 695 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 51 of 121

50

```
 1   preliminary injunction, and then the Federal Court

 2   intervenes because the Federal Government intervenes

 3   because of the State Secrets Privilege.

 4            And I'll represent on the record that I

 5   voluntarily handed over my five computers to the particular

 6   arm of the Government involved in these proceedings

 7   voluntarily so they could redact and remove from my

 8   computers all references to particular employees of the

 9   Federal Government whose names - because of

10   Mr. Montgomery's fraud particularly during the years

11   September 2003 to May 2004 - who had been dealing with

12   Mr. Montgomery; and because of the protection of those

13   names, which was really the assertion of the State Secrets

14   Privilege.  So those names have been redacted and taken off

15   every computer, including mine, including their cell phone

16   records, fax numbers, pager numbers, etc.

17            That particular arm of the Government discovered

18   very early on that the thing was a fraud after an FBI

19   investigation which concluded in May of 2004.  So when --

20   Mr. Montgomery had the preliminary injunction issued

21   against him on February 7th, but Mr. -- Ms. Blixseth, with

22   Mr. Kemp and other politicians, was trying peddle the

23   fraudulent technology to our Government using the terrorist

24   threat outrageously to extract taxpayer moneys.

25            Ms. Blixseth and Mr. Sandoval came up with a
```

ER00944

1   solution which is alluded to by Mr. Cotner.  But all he had

2   to do was look into the documents, and he would have found

3   the actual truth.  The solution that they gave to

4   Mr. Cheney -- or, actually, Samantha Ravich from

5   Mr. Cheney's office, was that, "Oh, we had -- Mr. Sandoval

6   had 95 percent of the technology as a platform on the noise

7   filters before Mr. Montgomery ever bolted Etreppid";

8   complete nonsense.

9          That's what was used to try to bypass the

10  preliminary injunction, that Sandoval really only had

11  95 percent of the technology.  Well, not only did he not

12  have 95 percent of the technology, there is no technology.

13         So when Mr. -- Ms. Blixseth got frantic after

14  basically she was rejected by the vice president's office,

15  she had Mr. Sandoval go to a particular agency of the

16  Government in Seattle, Washington, to an agent named

17  Gunderson, and he tried to basically peddle that same

18  fraud.  Well, Mr. Gunderson immediately called the FBI in

19  Reno.  And the outcome of that is in FBI Agent West's

20  declaration which this Court should review.

21         And then this Court should review - which was

22  given to Mr. Cotner - the FBI reports released by Judge Pro

23  on April 9, 2007.  And in those FBI reports, there is the

24  following, among other things:  Mr. Montgomery, when he was

25  at Etreppid, was trying to peddle pattern recognition

ER00945

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 697 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 53 of 121

52

1    software and facial recognition software which would

2    purportedly take the geometry of a human face and pick up

3    in a prearranged database or preset database of known

4    terrorists, on a satellite scan would pick up the location

5    of particular terrorists.

6            For example, Mr., Mr., Montgomery filed a

7    declaration which is now before the Court, none of which

8    has been protected by the State Secrets Privilege.  And

9    four agents of the Department of Justice were at his

10   deposition just a month or so ago in which detailed about

11   what Mr. Montgomery has been doing are on that transcript,

12   which I would encourage the Court to read.  Not one

13   objection under the State Secrets Privilege by any of these

14   four individuals of which two individuals would only give

15   their first name, from which the Court could infer that

16   they might have belonged to a particular agency of our

17   Government, not one objection in light of detailed

18   questions.

19           For example, Mr. Montgomery claiming when

20   al-Zarqawi was pinned under the bridge in Baghdad, that

21   that was because Montgomery had intercepted with the facial

22   recognition technology Zarqawi's facial geometry, alerted

23   our Government, and then they nailed him there.  It's just

24   a complete fraud.

25              Or on the predator camera -- and none of this is

ER00946

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 698 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 54 of 121

53

1    protected.  It's in Mr. Montgomery's declaration, which has

2    been redacted by our Government and which was a part of the

3    Montgomery deposition.  And yet this Court was buffaloed

4    and eager, eager to accept that, "Oh, State Secrets

5    Privilege protected the Sandoval complaint," and then

6    immediately sent everything to the Nevada Federal Court

7    which, I submit, probably feels duty-bound now to protect

8    this Court.

9            But the bottom line, Your Honor, on the

10   95 percent:  As soon as it was rejected by the vice

11   president, Ms. Blixseth then used all her contacts at the

12   Wall Street Journal, Robert Franks and John Wilke, to get

13   the Wall Street Journal to write articles that Warren Trepp

14   had bribed the then governor, who was up for election in

15   November of '06.  And that is typical of the MO of

16   Ms. Blixseth, to use the media to attack.

17           So Mr. Wilke wrote, I believe, two front-page

18   articles and a second-page article that Trepp had bribed

19   Gibbons based on the testimony of Montgomery.  And she did

20   that right after the vice president had rejected the

21   technology.

22           So then she -- they came up with this scheme,

23   "Well, Mr. Sandoval had 95 percent of it, so we didn't --

24   of the technology."

25           And the bottom line to all of that, Your Honor,

ER00947

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 699 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 55 of 121

54

1    as I indicated, is it's all fraudulent.  So when Mr. Cotner

2    went to Ms. Blixseth and accepted, apparently, on whatever

3    Ms. Blixseth said, which he then passed on to this Court,

4    which this Court accepted, that, "Oh, there's a difference

5    between the xPatterns technology fraudulently inducing a

6    payment by Ms. Blixseth" -- which was actually $10 million,

7    which was then -- 8 million of which was embezzled by

8    Mr. Sandoval.  Ten million dollars for the xPatterns.  And

9    the other 15-plus million - of which 6.1 million went to

10   Montgomery - was for this other Blxware technology.  It's

11   just all nonsense, Your Honor.

12          If, if the documents were fully presented, if

13   Mr. Blixseth had the opportunity to be heard as a

14   $20 million creditor of the estate, the Sandoval complaint

15   would have gone forward and all of this would have been

16   proven as the complaint lays out in detail.

17          Oh, in March, Mr. -- in March, on or about

18   March 26th, with some suggestion that perhaps the

19   Government was monitoring some telephones, two things

20   occurred March 25 -- 24, 25, 26.  Judge Pro schedules an --

21   the Government files an emergency motion to redact some

22   documents and unseal other documents from the FBI reports,

23   which I alluded to.  And Judge Pro did that just to counsel

24   on April 9, to me and Mr. Peek.

25          And then I flew to Washington in the end of

ER00948

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 700 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 56 of 121

55

1    April.  And at that time, my message -- my instructions

2    from Ms. Blixseth and Mr. Montgomery were, "If they unseal

3    these FBI reports," which basically show that the

4    technology is bogus -- for example, in the FBI reports,

5    Mr. Montgomery had Homeland Security coming in in one test.

6    This happened twice.  And this is on the pattern

7    recognition technology where the predator camera is

8    supposed to recognize, for example, a Soviet tank or a

9    bazooka, or whatever.

10            So the testing protocols he set up were for a toy

11   bazooka to pass in front of the camera; and the camera,

12   with it's software database, would see that it's a military

13   weapon, a bazooka.  And it would immediately red-flag it,

14   and it would show up on a software screen presumably in

15   some arm of our military who would then say, "Okay, there's

16   military hardware there."

17            Well, it was a complete fake, as the FBI reports

18   recite, which were available to Mr. Cotner.  What

19   Mr. Montgomery did is, as the FBI report recites, when the

20   fake bazooka comes within the range, the camera range of

21   this particular camera, supposedly a predator camera,

22   Mr. Montgomery had a little wire to the computer operator

23   inside the building, and he would press the button on the

24   wire to tip off the computer operator with the Homeland

25   Security person standing behind them that it was picking up

ER00949

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 701 of 940
Case 2:11-cv-00073-SEH  Document 10-2  Filed 01/03/12  Page 57 of 121

56

1    the bazooka.

2            Ms. Blixseth, on April 9, 2007, when the judge

3    released all this -- and I immediately got Ms. Blixseth and

4    Mr. Montgomery on the telephone - shortly after this, Your

5    Honor, I withdraw - and I said, "We have a serious

6    problem."

7            And then I had several conference calls with the

8    United States Government in which Mr. Montgomery and

9    Ms. Blixseth said, "I beg you.  If this information is

10   released, al-Qaeda will kill us"; again, more nonsense.

11           So I flew the Washington, tried to convince the

12   Government, "At least don't unseal the al-Qaeda target

13   coordinates" - which, of course, were all fake - "because

14   al-Qaeda will kill Ms. Blixseth and Mr. Montgomery."

15           The Government said, "No.

16           That was all available to Mr. Cotner.

17           Going forward, Your Honor, in light of the

18   remands, in light of the reassignment issues, in light of

19   the Manoa case, all of the facts and the documents I've put

20   before the Court, it may well be that this Court, simply to

21   protect the Yellowstone Club, got boxed in in these

22   adversarial proceedings, as the Manoa case and the Ninth

23   Circuit judicially recognizes.  I submit to the Court

24   respectfully it is now time for the Court to be boxed out

25   and let an impartial fact finder determine the rest of

ER00950

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 702 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 58 of 121

57

1    these proceedings.

2            Thank you for letting me go on, Your Honor.  With

3    all due respect, we respect that the motion for

4    disqualification be granted.

5            THE COURT:  Thank you, Mr. Flynn.

6            Anyone else arguing?  Mr. Fox?  Mr. Conant?

7            UNIDENTIFIED SPEAKER:  No, Your Honor.

8            THE COURT:  Okay.  That will conclude the

9    hearing, and we'll be in recess.  Thank you.

10

11                        *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ER00951

Case: 12-35986, 04/08/2013, ID: 8581488, DktEntry: 13-2, Page 703 of 940
Case 2:11-cv-00073-SEH   Document 10-2   Filed 01/03/12   Page 59 of 121

58

1                    C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4     from the electronic recording of the proceedings in the

5     above-entitled matter, all done to the best of my skill and

6     ability.

7

8     _____    _____

9     Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ER00952

# Exhibit 14

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC,**<br><br>    Debtor. | Case No.  **08-61570-11** |
| **TIMOTHY L BLIXSETH**,<br><br>        Plaintiff.<br><br>-vs-<br><br>**MARC S KIRSCHNER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**,<br><br>        Defendant. | Adv No.  **09-00014** |

## *MEMORANDUM of DECISION*

At Butte in said District this 16th day of August, 2010.

### INTRODUCTION

Rule 9017, F.R.B.P., provides that the Federal Rules of Evidence apply in cases under the Bankruptcy Code.  It is a commonly-accepted practice to take "judicial notice" of a court's records.  *See* 3 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶¶ 201 [03] at 201-35 to -40 (1992).  The practice is particularly useful in bankruptcy litigation in which individual adversary

1

ER01012

**Case No. 12-35986 ER  682**

proceedings and contested matters, each of which is procedurally distinct and has its own record, all occur within, and are affected by, the context of the parent bankruptcy case. *See id.* For the reasons discussed above, this Court takes judicial notice of the proceedings in the related bankruptcy cases and adversary proceedings discussed in this Memorandum of Decision for the purpose of providing additional background regarding the nature of the dispute and the relationship of the parties.

Timothy L. Blixseth ("Blixseth"), the plaintiff-in-intervention and the now captioned Plaintiff in this matter, and his former spouse, Edra Blixseth ("Edra"), were the founders of Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC ("YD"), Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC.  The four aforementioned limited liability companies comprise the Yellowstone Club and will be referred to generally as the Debtors or the Yellowstone Club entities.  Through the Yellowstone Club entities, Blixseth and Edra began development in the late 1990's of the Yellowstone Club on land that Blixseth acquired through various transactions.  The parties maintain that the Yellowstone Club is the world's only private ski and golf community.  The Yellowstone Club is a members only master-planned unit development, situated on 13,500 acres of private land in Madison County near Big Sky, Montana.  At its conclusion, the Blixseths contemplated that the Yellowstone Club would consist of roughly 864 dwelling units situated in seven planned residential areas or neighborhoods.

Members join the Yellowstone Club because of its amenities, including the Warren Miller Lodge, 17 ski runs, equestrian center, Tom Weiskopf 18-hole golf course, kids' facilities

ER01013

**Case No. 12-35986 ER  683**

and other various amenities such as food and retail shops.[1]  The Blixseths anticipated that the Yellowstone Club would eventually have in the neighborhood of 900 members.  As of the Debtors' petition date, the Yellowstone Club had roughly 340 members.  To get the Yellowstone Club off the ground, Blixseth sold equity interests in the Yellowstone Club to various persons who were referred to as Pioneer and Frontier Members.  The 25 Pioneer and 15 Frontier Members were permitted to purchase their lots at the Yellowstone Club and their Yellowstone Club memberships at substantially reduced prices.

      YMC was formed on November 7, 1997, and is primarily engaged in operating the Yellowstone Club.  YD was formed on June 10, 1999, and is engaged primarily in the business of retail and land sales and development of residential lots in the Yellowstone Club.  Big Sky Ridge, LLC was formed in 2002 for the purpose of acquiring and developing land located outside but contiguous to the boundaries of the Yellowstone Club.  YMC and YD had two classes of members; Class A members who had voting rights, and Class B members who had no voting rights.  Yellowstone Club Construction Company, LLC is owned by YD and was formed in 2006 for the purpose of constructing various buildings within the boundaries of the Yellowstone Club.  Each of the Debtors is a limited-liability company organized under Montana law.

---

[1]  Cushman & Wakefield's appraisal as of July 1, 2005, states that the Yellowstone Club "appeals to ultra-wealthy families as a second-home (or third-home) location for its private recreational facilities (particularly the ski area), views, and proximity to winter and summer recreation.  Prospective buyers are required to have a net worth of over $3 million, but based on the costs of membership and housing, we would expect nearly all buyers to have investable assets of at least $5 million, if not $10 million.  The membership price for residents is $250,000 for a 30-year refundable deposit.  The price is expected to be increased during the sell-out period.  Annual dues . . . were recently raised from $10,600 to $16,000 per year.  Property owners association (POA) dues are currently $5,100 per year."  During the course of the trial, more than one witness referred to the Yellowstone Club members as "penta millionaires."

**Case No. 12-35986 ER  684**

From its inception to August 12, 2008, Blixseth was the sole managing member of Big Sky Ridge, LLC.  From their inception to August 12, 2008, YMC and YD were controlled by Blixseth through his holding company, Blixseth Group, Inc. ("BGI").  Since August of 2001, BGI has owned 82.6532 percent of the Class A stock in YMC and YD, and Blixseth Family Investments, LLC has owned 5.1020 percent of Class A stock.  The Class B Members, or Class B Shareholders--consisting of the following twelve entities or individuals: Bankers Financial Corporation, Gregory C. Branch Family Limited Partnership, Blixseth Family Investments, LLC, Jorge V. Jasson, Greg LeMond, A.C. Markkula and Linda K. Markkula Trustees of the Arlin Trust, Mountain Vista Properties AG, David L. Morris and Sacia B. Morris, Sacia Enterprises, Inc., Michael L. Snow, Spano Yellowstone Holdings Limited Partnership and Robert P. Watson and Katharine M. Watson--each owned 1.0204 percent of YMC and YD, or a total of 12.25 percent of YMC and YD.

BGI, an Oregon sub-S corporation, was owned solely by Blixseth as President and CEO from 1999 to August 12, 2008.  Blixseth and Edra separated in December of 2006, and effective August 12, 2008, Edra and Blixseth agreed, pursuant to a June 26, 2008, confidential Marital Settlement Agreement ("MSA"), that Edra would receive BGI and the Yellowstone Club entities. On August 19, 2008, just days after obtaining control of BGI, Edra changed the name of BGI to BLX Group, Inc. ("BLX").

Various creditors filed an involuntary Chapter 11 bankruptcy petition on behalf of BLX Group, Inc. on September 21, 2009.  *See* Bankruptcy Case No. 09-61893.  Edra filed a voluntary Chapter 11 bankruptcy petition on March 26, 2009.  *See* Bankruptcy Case No. 09-60452.  Edra's case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009.

ER01015

**Case No. 12-35986 ER  685**

Blixseth and Edra were also the founders of Big Springs Realty, LLC and Yellowstone Club World, LLC, both of which were awarded to Edra under the couples' MSA. On January 31, 2001, Charles Callander ("Callander") went to work for Blixseth and Edra as the Director of Marketing and Sales at the Yellowstone Club. Callander explained that in 2005, Blixseth decided to split the marketing and sales departments at the Yellowstone Club, placing the sales department under Big Springs Realty, LLC. However, the sales department at the Yellowstone Club did not change its office, letterhead or business cards. According to Callander, the only change he noticed was the addition of a signature line for Big Springs Realty, LLC on resale listings and resale purchase and sale agreements. Because sales at the Yellowstone Club had grown from $10 million in 2001 to somewhere in the neighborhood of $150 million in 2005, Callander believed that Blixseth formed Big Springs Realty, LLC for the purpose of spreading his risk of liability. In Callander's words, Big Springs Realty, LLC "became a private bank account for someone, for Mr. Blixseth, that was segregated from other accounts at the [Yellowstone] Club."

Edra caused Big Springs Realty, LLC to file a voluntary Chapter 7 bankruptcy petition on June 5, 2009. *See* Bankruptcy Case No. 09-61079. The Chapter 7 Trustee in the Big Springs Realty, LLC bankruptcy filed a complaint against Blixseth on September 3, 2009, alleging that Blixseth took in excess of $5 million from Big Springs Realty, LLC between August of 2007 and June of 2008, which precluded Big Springs Realty, LLC from paying its other obligations as they became due.

Blixseth had a conceptual idea of Yellowstone Club World in 2005 but he did not have a functioning business plan. Blixseth formed Yellowstone Club World, LLC with the vision of

5                                                    ER01016

**Case No. 12-35986 ER  686**

taking the Yellowstone Club concept worldwide.  High-wealth individuals who purchased

memberships in Yellowstone Club World were promised "access to life's most luxurious

amenities, activities and services."  In particular, Yellowstone Club World members had access

to "premier properties," including the Yellowstone Club, a castle near Paris, France (Chateau de

Farcheville), a 30,000 square foot mansion in the Turks and Caicos Islands, a golf course resort

in Manzanillo, Mexico, Blixseth's private golf course estate in Rancho Mirage, California

(Procupine Creek), a luxury ranch near Cody, Wyoming, and a Tom Weiskopf golf course in St.

Andrews, Scotland, among others.  The use of various yachts and private jets, and access to

"[s]mall scale world class properties in exquisite locations" were also held out as benefits to

members of Yellowstone Club World.  Blixseth testified that Yellowstone Club World ended up

with eight members who each paid a membership deposit of $1.5 million each.

An involuntary Chapter 7 bankruptcy petition was filed against Yellowstone Club World,

LLC on January 25, 2009.  *See* Bankruptcy Case No. 09-60061.  The Chapter 7 Trustee in the

Yellowstone Club World, LLC bankruptcy filed an action against Blixseth on October 20, 2009,

alleging that Blixseth owed Yellowstone Club World, LLC at least $2.8 million for inappropriate

transfers from Yellowstone Club World, LLC to Blixseth's personal accounts.

FACTUAL BACKGROUND

CREDIT SUISSE[2] and the YELLOWSTONE CLUB

Sometime prior to 2004, a team at Credit Suisse First Boston crafted a new syndicated

loan product that allowed Credit Suisse to offer a loan product the size of which had previously

---

[2] "Credit Suisse" is used synonymously throughout this Memorandum with "First Lien Agent" as defined in Art. I, § 1.63 of  Debtors' Third Amended Joint Plan of Reorganization.

**Case No. 12-35986 ER  687**

been unavailable to borrowers in the corporate bank loan market. The loan product was designed to allow owners of high-end master-planned residential and recreational communities to realize their anticipated future profits from their developments through distributions made possible by Credit Suisse's syndicated equity recapitalization loan. Credit Suisse's new loan product had several unique aspects. For instance, the loan product relied on an appraisal methodology that was based on future gross revenues, without any discount to current dollar value. The new loan product was not tied to an as-is appraisal that set forth the fair market value of the real estate securing the loan. To syndicate such loans, Credit Suisse targeted investors who were described as highly sophisticated parties who were more than qualified to perform their own quantitative analysis to assess the risk of the loans that were being offered to entities such as the Yellowstone Club.

In December of 2004 and early 2005, Jeffrey Barcy ("Barcy"), a Director in Credit Suisse's Investment Banking Division, began actively pursuing Blixseth in an effort to sell Credit Suisse's equity recapitalization loan to the Yellowstone Club. Barcy first attempted to contact Blixseth via teaser emails, providing Blixseth with a brief overview of Credit Suisse and its equity recapitalization or syndicated term loan, which was described to Blixseth as something akin to a "home-equity loan." Blixseth initially rebuffed Barcy's emails but eventually developed an interest in the loan product and contacted Barcy to learn more.

Barcy and another person from Credit Suisse met Blixseth and Chris Campbell ("Campbell"), Yellowstone Club's Vice President of Finance, at Blixseth's home in Rancho

ER01018

Mirage, California ("Porcupine Creek").[3]  Barcy explained that Credit Suisse's syndicated loan product had previously been marketed to other master-planned residential and recreational communities such as Tamarack Resort, Promontory, Ginn, Turtle Bay and Lake Las Vegas.  Each of the aforementioned entities accepted a syndicated loan from Credit Suisse's Cayman Islands branch.  In a Memorandum dated January 6, 2005, and addressed to "Bank and High Yield Finance Committee" regarding "Project Powder - Potential Recapitalization Opportunity," Barcy and his team at Credit Suisse reported that "Blixseth made clear that he and the other owners of the Yellowstone Club (the 'Partners') were eager to proceed with a financing transaction so that they could take a dividend and use the capital to finance a separate transaction."  Exhibit D-50. At that time, Barcy and his team were projecting a loan amount of $225 million with a dividend to the partners of $219.5 million.

After numerous discussions, Blixseth originally agreed to accept a loan of $150 million from Credit Suisse.  To assist with the Credit Suisse loan process, Blixseth formed an in-house team that consisted of Blixseth, Edra (who was serving as Chief Operating Officer of the Yellowstone Club), Campbell (who Blixseth referred to as the point guard on the deal, and an ex-Wall Streeter from Smith Barney), Robert Sumpter (Vice President of Real Estate Development, who Blixseth said was "pretty savvy in the financial world"),[4] Callander (Vice President of

---

[3]  The Porcupine Creek property, together with the two homes located on Gardess Road, is 264.77 acres.  On that acreage is a 18,380 sq. ft. estate residence with four guest suites (casitas), four additional guest houses, 2 service houses and a private 19-hole PGA golf course.

[4]  Blixseth hired Sumpter to do consulting work at the Yellowstone Club in the summer of 1999.  Sumpter transitioned to an employee of the Yellowstone Club in September of 1999. Sumpter was originally hired as vice president of real-estate development as well as vice president of sales and marketing but in approximately January of 2001, Blixseth hired Callander to handle sales and marketing.

Sales), Bill Griffon (Vice President of Operations), Hank Kashiwa (Vice President of Marketing), Bruce Bales (Director of Privacy) and Denise Tuohy (Comptroller).  Blixseth's team also included lead attorney Michael W. Doyle ("Doyle"), two attorneys from Doyle's law firm, Montana attorney Stephen R. Brown ("Brown"), and Blixseth and the Debtors' accountant, George Mack ("Mack").  Interestingly, Moses Moore ("Moore"), who went to work as a Senior Accountant for Yellowstone Development in July of 2005 and was promoted to Comptroller of the Yellowstone Club in October of 2006,[5] did not learn of the Credit Suisse loan until $342 million showed up in the Debtors' bank account on September 30, 2005.

As negotiations between Credit Suisse First Boston and Blixseth progressed, the proposed amount of the loan grew from $150 million to $375 million and the language of the credit agreement evolved.  For instance, similar to the syndicated loans to Tamarack Resort, Promontory, Ginn, Turtle Bay and Lake Las Vegas, and consistent with the purpose for which the Credit Suisse loan was developed, the Yellowstone Club credit agreement was initially drafted to provide that the proceeds of the Yellowstone Club's loan could be used, in part, for "distributions" to members for purposes unrelated to the Yellowstone Club.  However, Credit Suisse's standard credit agreement language that allowed for the loan proceeds to be used for "distributions' was problematic for Blixseth.  According to Blixseth, the problem was two-fold.  First, Blixseth would incur a substantial tax liability if he took the loan proceeds as a distribution.  Second, Blixseth testified that recording such a large distribution on the Debtors's books would leave Blixseth with a negative balance in his owner's equity account.  According to Blixseth,

---

[5]  Moore was appointed Comptroller after Denise Tuohy died in an accident at the Yellowstone Club.

Mack informed him approximately 30 to 45 days prior to September 30, 2005, that "if we took a distribution, that we would have a negative capital account to the point where he didn't think that an audit firm would or could audit the Debtor companies."

Although disputed by Blixseth, the "distribution" language was also problematic because characterizing a disbursement of the Credit Suisse loan proceeds as a distribution would require Blixseth to share the loan proceeds with the "B" shareholders. In an attempt to eliminate the issues attendant to the "B" shareholders, Blixseth, during the spring and summer of 2005, sought to buy the interests of the "B" shareholders under the guise that Blixseth wanted to repurchase the "B" shares for estate planning purposes and to involve his children in ownership of the Yellowstone Club. Exhibit D-270 is a letter dated May 25, 2005, signed by Blixseth and addressed to Michael Snow wherein Blixseth proposed to buy Michael Snow's interest in the Yellowstone Club for "$1.25 million in cash, and one lot in phase 3A[.]" *See also* Exhibit D-263E, letter from Blixseth to Jorge Jasson. Blixseth contends he was offering the "B" shareholders an opportunity to triple or quadruple their $750,000 investments.

Blixseth's letter advised the "B" shareholders: "This proposal will be held open and valid until June 15, 2005. At such time if all 'B' holders have agreed to this proposal, we will commence the paperwork." Also in the May 25th letter, Blixseth represented that he had "arranged financing that would allow [him] to re-purchase these outstanding shares and will take this financing on only if [he could] reacquire all of the outstanding 'B' shares."[6] Blixseth intended to purchase the "B" shareholders' interests with proceeds from the Credit Suisse loan.

---

[6] Blixseth wrote in his letter that "[c]losing [was] to be on September 6, 2005," yet Blixseth testified that he would not have been in a position to buy the B shareholder's interests until the Credit Suisse loan closed.

ER01021

**Case No. 12-35986 ER  691**

Blixseth's accountant Mack assisted Blixseth with his efforts to purchase the "B" shareholders' interests in the Yellowstone Club. Debtors' Exhibit 263D is a letter dated July 14, 2005, addressed to "Mike" from Mack. In the letter, Mack informs Mike, a "B" shareholder, "that between 2005 and 2011 sales will be approximately $1.4 billion with net income before taxes of $900 million. Hence, after taxes at a 40% rate, the net income is $540 million. So, with this analysis, each 1% member's equity would be $5,400,000." Mack goes on to explain that "[o]n a present value basis at an 8% return over seven years, each share would be worth approximately $4,500,000. However, as we both know, with marketability and monetary discounts between 30% and 55%, each share could be valued at between $2,025,000 and $3,150,000." Mack's letter concluded that Blixseth's "offer is a tremendous offer which yields an excellent return."

Attorney Doyle also weighed in on Blixseth's efforts concerning the "B" shareholders. Blixseth recalled telling Doyle during the negotiations with Credit Suisse, that "this would be a good opportunity to try and buy the 'B' shares back." In fact, while Blixseth's May 25, 2005, letter was on BGI letterhead, Blixseth could not recall whether the letter was sent by Blixseth or whether it came from Doyle's office. Doyle also recalled discussing with Mack the fact that if the money was removed from the Debtors as a distribution that Blixseth would have to share such distribution with the "B" shareholders. Consistent with his discussion with Mack, Doyle sent Blixseth correspondence on August 31, 2005, stating:

> With regard to the Class B investors, the Operating Agreement does not provide for any way to expel those people. Moreover, you are required under Montana law and the Operating Agreement to treat the Class B people equally with you, or at least not discriminate against them.

Case No. 12-35986 ER  692

As far as cash distributions are concerned, (as opposed to taxable profit) the Operating Agreement provides that all Net Cash Flow is to be distributed to the Members pro rata as to their ownership interest.  However, the Net Cash Flow is the amount of money left over after all of the operating expenses, debt service and reasonable reserves for construction and operations are held back as determined at the sole discretion of the manager.

Therefore, you can decide as Manager not to make any cash distributions over tax obligations, if you want to, but you have to do that for all the Members.  You could not make a cash distribution to just the Class A Members and not make a proportional cash distribution to the Class B Members.

The result of the above quickly leads one to the conclusion that it only makes good sense to get rid of all the Class B Members as soon as reasonably possible.  So long as you have even one Class B Member hanging around, you will forever be having to deal with that person and not be able to take distributions without also making a proportional distribution to that investor.

Exhibit D-263F.[7]

Unfortunately for Blixseth, not all "B" shareholders agreed to accept Blixseth's offer and Blixseth ultimately purchased none of the "B" shareholders' interests because, as Blixseth testified, the offer was an all or nothing deal.  Blixseth subsequently made the decision, "the sole decision," that any transfer of money from the Debtors to BGI would be in the form of a loan rather than a distribution.  Blixseth contends that he thought a loan was better for the Yellowstone Club because the "Yellowstone Club would receive interest" from BGI.  However,

---

[7]  Consistent with Doyle's comments, Debtors' Exhibit 20, the Operating Agreement of Yellowstone Development, LLC and Exhibit 21, the Operating Agreement of Yellowstone Mountain Club, LLC, provide in paragraph 7.4 that "[d]istributions may be made annually or more frequently, in the reasonable judgment of the Manager, and will be allocated among the Members, *pro rata*, in proportion to a Member's percentage ownership interest in the Company." Yellowstone Development, LLC's Operating Agreement was later amended to, in part, delete paragraph 3.6 and add 3.6.1 and 3.6.2.  Paragraph 3.6.2 provides that "Class A Members may not vote to decrease the ownership percentage interest of any Class B Member or substantially and materially alter the Class B rights or the business purpose of the Company without a two-thirds consent of Class B Members."

ER01023

**Case No. 12-35986 ER  693**

the interest that Blixseth and BGI ultimately paid on the notes was minuscule.  Moreover, despite Blixseth's assertion that "the [Debtors] had an unconditional intention to seek repayment of the loans," the Debtors, under Blixseth' direction, never made demand of BGI on the notes, even when the Yellowstone Club desperately needed cash.

Blixseth contends that the "B" shareholders did not factor into his decision to take the Credit Suisse loan proceeds as a loan rather than a distribution, but Blixseth's testimony on this matter is not credible and is controverted by the evidence.  Contrary to his testimony, Blixseth sent Edra an email on or about September 5, 2005, stating that "[w]ith the 6 B's now starting to nose around we must make sure we have not made any 'distributions' to BGI as the 'B's' would be entitled to their equal share, loans are OK in the operating agreement."  Exhibit D-266.  Edra also testified that the Yellowstone Club loan team had several discussions about whether Blixseth would take the loan proceeds as a distribution or a loan.  Edra could not recall any discussion about Blixseth having to take the money in the form of a loan in order to avoid creating a negative equity position.  Consistent with the evidence, Edra testified that Blixseth wanted to take the money in the form of a loan because Blixseth could then avoid paying the "B" shareholders their fair share.  Edra also testified that Blixseth was not overly concerned about having to repay the loan because he intended to find creative ways to avoid any meaningful repayment.  Edra testified that Blixseth never intended to repay the $209 million that he took out of the Yellowstone Club for personal purposes.

At or about the time that Blixseth realized that he would not be able to purchase the "B" shareholder's interests, Blixseth contacted Credit Suisse and requested that the proposed credit agreement be modified to provide that the majority of Credit Suisse loan proceeds could be used

**Case No. 12-35986 ER  694**

for either a distribution or a loan.[8]  At Blixseth's request, the loan agreement was amended to

reflect that the Credit Suisse loan proceeds could be used "(i) for distribution *or loans* up to [$

____ ] to affiliates of the borrower for purposes unrelated to the Yellowstone Development[.]"

Blixseth Exhibit 30.  Between September 4, 2005, and September 30, 2005, the recitals were

once again amended to finally provide that the proceeds of the loan would be used "(i) for

distribution or loans up to $209,000,000 to members of the Borrower for purposes unrelated to

the Yellowstone Development, (ii) for investments up to $142,000,000 into Unrestricted

Subsidiaries for purposes unrelated to the Yellowstone Development, (iii) to pay the Transaction

Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and

construction costs associated with the Yellowstone Development in accordance with the

Financial Plan[.]" YCLT Exhibit 71A.

As previously noted, the transfer of loan proceeds out of the Yellowstone Club was a key

feature used to sell the Credit Suisse loan product.  Steve Yankauer ("Yankauer"), a Managing

Director at Credit Suisse Securities, USA, testified that the cornerstone of Credit Suisse's loan

product was that it allowed preferred resort owners, such as Blixseth, to capitalize on the value of

their asset.[9]  For example, under the agreement between the Yellowstone Club and Credit Suisse,

Blixseth was allowed to in essence realize in 2005 the revenue stream he hoped the Debtors

would achieve in the years to come.  How Blixseth elected to capitalize on his asset and his

dilemma with the "B" shareholders was not a concern to Credit Suisse.  Barcy testified that it

---

[8]  As shown by Exhibit CS-54, the term "loan" appeared as an acceptable use of proceeds in a red-line version of the Credit Agreement prepared August 23, 2005.

[9]  Yankauer reviews new loans from the real estate industry that come in for approval and also recovers loan proceeds for troubled loans.

**Case No. 12-35986 ER  695**

was Blixseth's "responsibility to figure out what he had to do internally to make those distributions or not make those distributions.  And as a controlling shareholder of the Yellowstone Club, that was in his court."  As far as Barcy was concerned, Blixseth could have taken the entire $375 million of loan proceeds as a distribution.

Even though Blixseth's efforts with the "B" shareholders were not going as hoped, Blixseth was nonetheless proceeding full speed ahead in his negotiations with Credit Suisse.  As of August 22, 2005, the loan amount had grown to $330 million.  Also, in addition to allowing Blixseth to use a substantial amount of the loan proceeds for a distribution or loan, Credit Suisse had also agreed that Blixseth could use another substantial amount of the loan proceeds for purposes unrelated to the Yellowstone Club.

Blixseth was also negotiating the transaction costs charged by Credit Suisse.  Credit Suisse generally charged borrowers a transaction fee equal to 3 percent of the loan amount but Blixseth wanted the transaction costs reduced to 2 percent.  Blixseth and Barcy thus met at the Yellowstone Club sometime during the summer of 2005 and determined the applicable loan fee with the toss of a coin.  Blixseth won the coin toss and the transaction fee was set at 2 percent, rather than Credit Suisse's customary 3 percent.

Credit Suisse did its initial offering of the Yellowstone Club loan in early September 2005.  The loan amount at that time was $300 million and the syndication was 400 percent oversubscribed.  Because the Yellowstone Club was deemed creditworthy, the loan amount crept up to $375 million.  Yankauer testified that the loan increased to $375 million because one, Blixseth wanted more money and two, lenders were clamoring to get a piece of the loan.

After months of negotiations, Credit Suisse and Blixseth reached an agreement on the

final terms of a credit agreement.  Credit Suisse, Cayman Islands Branch, and Blixseth, on behalf

of YMC, YD and Big Sky Ridge, LLC entered into a First Lien Credit Agreement dated

September 30, 2005 ("Credit Agreement").[10]  As negotiated by Blixseth, paragraph 2.6 of the

Credit Agreement, Use of Proceeds, provided that "[t]he proceeds of the Loans made to the

Borrower shall be applied, (i) pursuant to Section 6.5(iii), for distributions or loans up to

$209,000,000 to members of the Borrower for purposes unrelated to the Yellowstone

Development, (ii) pursuant to Section 6.3(ii), for investments or loans up to $142,000,000 into

any Unrestricted Subsidiaries, (iii) to pay the Transaction Costs, (iv) to refinance the Existing

Indebtedness, (v) to finance a portion of the development and construction costs associated with

the Yellowstone Development in accordance with the Financial Plan."  YCLT Exhibit 71A.  The

Credit Suisse loan was secured by substantially all of the Debtors' assets, but the Warren Miller

Lodge was carved out of the Credit Suisse Credit Agreement and was not subject to Credit

Suisse's first position security interest.[11]  The Credit Agreement provided the Debtors with a

$375 million Senior First Lien Credit Facility that was funded in its entirety on September 30,

2005.

BLIXSETH'S USE OF THE LOAN PROCEEDS

Blixseth argued that he sought the Credit Suisse loan on behalf of the Debtors, in part, to

fund development and construction of the Yellowstone Club properties and to acquire worldwide

resorts.  Contrary to Blixseth's arguments, the Credit Suisse loan was created so that resort

---

[10]  Debtor Yellowstone Club Construction Company, LLC, was not a party to the Credit Agreement.

[11]  Blixseth testified that the Yellowstone Club was not required to pay off the Warren Miller Lodge debt with funds from the Credit Suisse loan.

16

**Case No. 12-35986 ER  697**

owners, such as Blixseth, could extract large distributions from their development projects, without the need for any personal guarantee. Thus, the overall purpose of the loan was not for development of the Yellowstone Club, but instead, the purpose was to permit Blixseth to take money out of the Yellowstone Club and in fact, the record shows that very little, if any, of the Credit Suisse loan proceeds were used to fund development and construction at the Yellowstone Club.

Pursuant to the Disbursement Authorization dated September 30, 2005, UCC Exhibit 222, Blixseth approved use of the $375 million Credit Suisse loan proceeds as follows:

| | |
|---|---|
| $7.5 million | To Credit Suisse in payment of its 2 percent Arrangement Fee |
| $100,000.00 | To Credit Suisse in payment of its First Annual Administration Fee |
| $45,077.89 | To Credit Suisse for payment of its out-of-pocket expenses |
| $10,000.00 | To Credit Suisse for payment of Syndtrak |
| $380.00 | To Credit Suisse for payment of Cusip |
| $70,500.00 | To Credit Suisse for payment of Clear Par Settlement[12] |
| $15,500.00 | To Credit Suisse for payment of Cushman Wakefield Appraisal |
| $325,000.00 | To Latham & Watkins LLP in payment of estimated legal fees incurred to date[13] |

---

[12] Even though Blixseth signed the Disbursement Authorization on behalf of YMC, YD and Big Sky Ridge, LLC, Blixseth, when questioned about the payment of $70,500 "for payment of Clear Par Settlement" testified that he had "never seen this before."

[13] Latham & Watkins LLP was the legal firm that represented Credit Suisse in connection with the $375 million loan to the Yellowstone Club.

ER01028

**Case No. 12-35986 ER 698**

| $581,368.60 | To Security Title of Montana for payment of title fees, endorsements and recording costs |
| $19,758,458.93 | To American Bank in repayment in full of the Existing Indebtedness |
| $4,483,452.05 | To Silver Ridge, Inc. in repayment in full of the Existing Indebtedness[14] |
| $342,110,262.53 | To Yellowstone Mountain Club, LLC, a Montana limited liability company |

The $342.1 million disbursed to the Debtors was distributed in two significant ways. First, the Credit Agreement designated up to $209 million of the loan proceeds to be used as "distributions or loans" for "purposes unrelated" to the Yellowstone Club. Additionally, up to $142 million was authorized to be used for investments in "unrestricted subsidiaries" for "purposes unrelated" to Yellowstone Club development. As the numbers show, the bulk of the loan proceeds were designated to be used for purposes outside of, and unrelated to, the Yellowstone Club.

Specifically, of the $342,110,262.53 that went to YMC, UCC Exhibits 213 and 218 show that as contemplated, $209 million went to BGI and the remainder of $133,110,262.53 stayed with YMC. Of the latter amount, Blixseth put $100 million in a 6 month CD at US Bank, $30 million in a 6 month CD at American Bank and $3,110,262.53 went into a checking account. In 2006, portions of the remaining funds held by YMC were used to purchase the Chateau de Farcheville in France for approximately $28 million, Tamarindo in Mexico for $40 million, the Turks and Caicos property for $28 million and a down payment of $12 million on the St.

---

[14]  This payment went to Wayne Prim for his one-half interest in Big Sky Ridge, LLC ($3.5 million plus interest).

ER01029

Andrews property in Scotland.

On the same date that Credit Suisse transferred $342,110,262.53 to the Debtors, Blixseth transferred approximately $209 million out of the Yellowstone Club to BGI. Almost all of the $209 million proceeds transferred to BGI were disbursed to various personal accounts and payoffs benefitting Blixseth and Edra personally; Blixseth put $25 million into a 6 month CD at First Bank, used $11,939,598.24 to payoff an existing obligation owed to First Bank on a line of credit that Blixseth had used to build his and Edra's residence at Porcupine Creek in California, purchased a $17 million 6 month CD at Palm Desert National Bank, put $14,018,227.87 in a money market account, used $4,133,623.50 to payoff an existing obligation owed to Palm Desert National Bank ($3,169,118.75 related to Blixseth's real estate development project in the Palm Springs area of California, $79,629.54 was used to pay off a condo owned by Edra and $884,875.21 was used to pay off two lines of credit), purchased a $15 million 6 month CD at Jackson State Bank, paid off five existing obligations owed to American Bank totaling $7,434,226.76, purchased a 3 month CD at U.S. Bank for $100 million, purchased a 6 month CD for $5 million at Pacific Western Bank, paid off an existing obligation owed to Pacific Western Bank in the amount of $2,971,443.02, and paid off existing obligations owed to Union Bank totaling $336,142.06. Blixseth also set aside $2,007,930.55 for a payoff to Commercial Bank on October 3, 2005, and paid the balance of $3,888,321.00 owed to GECC on two aircraft owned by Yellowstone Aviation & Marine, LLC and $272,590.00 owed to World Savings. Blixseth testified that the Debtors had no interest in any of the aforementioned accounts or payoffs.

Blixseth testified that he "absolutely" would not have taken the $209 million from the Debtors if anyone on his legal or consulting team or anyone from Credit Suisse, would have told

Blixseth that it was illegal or a breach of his fiduciary duty to take the money out of the Debtors. Relying on a letter dated September 30, 2005, Blixseth asserts the advice of legal counsel defense. The September 30, 2005, letter was written by Brown of the Garlington, Lohn & Robinson, PLLP law firm, and was addressed to Credit Suisse. In the letter, Brown states that "as of [September 30, 2005] . . . [e]ach Loan Party has the requisite power and authority to execute, deliver and perform its obligations under the Loan Documents[;] . . . [and] [e]xecution and delivery by the Loan Parties, and performance of their respective obligations under, the Loan Documents does not: violate any of their organizational documents; violate any laws; to the best of our knowledge violate any orders, judgments, or decrees; to the best of our knowledge, breach any material contract or create liens or encumbrances; or require filing or registration with any governmental agency." Blixseth's Exhibit 4. Blixseth interpreted Brown's third-party opinion letter to Credit Suisse to also mean that Blixseth would not be breaching any laws in the State of Montana.

THE B SHAREHOLDERS and the LeMOND LITIGATION

Prior to September 30, 2005, the "B" shareholders were not aware that Blixseth was pursuing a loan on behalf of the Yellowstone Club. However, the "B" shareholders were trying to obtain financial information from Blixseth regarding the Yellowstone Club. Doyle sent Blixseth an email on October 10, 2005, advising Blixseth that it "would serve nobody's best interests to have some kind of legal action taken to force the disclosure of financial information that is very clearly required to be provided under the Operating Agreement. It is your call, but I would think it would make a lot of sense to authorize George [Mack] to release all of the prior reviewed financial statements through 2004, and then put a concerted effort into getting the

20

insurgents bought out." Exhibit 263Z.

The "B" shareholders eventually learned of the Credit Suisse loan and in early May 2006, "B" shareholders Greg LeMond, Jorge V. Jasson, David L. Morris, Sacia B. Morris, and Sacia Enterprises, Inc., threatened suit against Blixseth. After the "B" shareholders threatened suit, Blixseth's counsel conferred and on May 8, 2006, Doyle sent Blixseth an email stating that the attorneys were in agreement that the main thrust of the "B" shareholders' complaint involved the $209 million loan from the Yellowstone Club to BGI and that the Montana attorneys, while they agreed that a loan was permitted under the operating agreement, they "were a bit dismayed when I had to tell them that this loan was not evidenced by a Promissory Note." Debtors' Exhibit 263G.

The immediate transfer of funds out of the Yellowstone Club to BGI and then to Blixseth was not memorialized in any contemporaneous loan documents. The $209 million was originally recorded in a suspense account though a journal entry, and was later reclassified as a note receivable from the managing member.[15] As a result of the threatened suit by the "B" shareholders, Blixseth drafted a two-page promissory note in the amount of $209 million. The $209 million unsecured demand note, payable by BGI to the Debtors was drafted in May 2006, but was backdated to September 30, 2005. At or about the same time, BGI also executed a promissory note, payable on demand and dated September 30, 2005, in favor of YMC in the amount of $7.8 million, exhibit D-263L, and a third promissory note, payable on demand and dated September 30, 2005, in favor of YMC in the amount of $55,798,796.68. In 2007, Doyle, on behalf of Blixseth, drafted notes evidencing BGI's transfer of funds to Blixseth.

---

[15] Per Exhibit D-263K, the exact amount of the Promissory Note is $208,831,158.45.

On May 31, 2006, Greg LeMond, Jorge V. Jasson, David L. Morris, Sacia B. Morris, and

Sacia Enterprises, Inc. (the "LeMond Plaintiffs"), filed a complaint in Madison County,

Montana, captioned *LeMond v. Blixseth Group, Inc.*, C.V. No. DV-29-06-26 (the "LeMond

Litigation"). In general, the LeMond Plaintiffs complained that the $209 million loan Blixseth

took from the Debtors was a distribution, not a loan. Therefore, the LeMond Plaintiffs argued

that they were entitled to a proportionate distribution under the Debtors' applicable operating

agreements. Blixseth, on behalf of himself and the Debtors, settled the above-referenced

litigation for $38 million.

The remaining "B" shareholders consisting of Michael L Snow, Gregory C. Branch

Family Limited Partnership, A.C. and Linda K. Markkula, Spano Yellowstone Holdings Limited

Partnership, Robert P. And Katharine M. Watson , Bankers Financial Corporation, and Mountain

Vista Properties AG commenced Adversary Proceeding No. 09-00018 against Blixseth on March

3, 2009. The claims in Adversary Proceeding No. 09-00018 are similar to the claims previously

asserted by the LeMond Plaintiffs. Trial in Adversary Proceeding No. 09-00018 is scheduled to

commence on August 23, 2010.

### THE YELLOWSTONE CLUB'S FINANCIAL CONDITION and the CUSHMAN & WAKEFIELD APPRAISALS

In the years leading up to 2005, the Yellowstone Club had receivables due from BGI and

other affiliates of approximately $55 million. The Yellowstone also carried an additional debt

load ranging from a low of approximately $4 to $5 million to a high of approximately $60

million on a revolving line of credit. Such debt load was in addition to the membership deposits

that the Yellowstone Club listed as a liability on its balance sheet, along with equipment leases

**Case No. 12-35986 ER  703**

and a myriad of other small items.  According to Blixseth, the day before the Loan Transaction with Credit Suisse, the Yellowstone Club carried, in addition to any amounts owed to BGI and its affiliates, approximately $19 to $20 million in debt on its books, consisting of a combination of a revolving line of credit and a term loan with American Bank.[16]  In all, prior to the Credit Suisse loan, Blixseth thought the Yellowstone Club's membership deposits and other miscellaneous liabilities totaled "well over $100 million[.]"

Although the Yellowstone Club had a reputation of being slow to pay its debts, Edra testified that in her opinion, the Yellowstone Club did not need the Credit Suisse loan for operations or development.  Edra explained that during the period of time from 2004 to 2005, the Yellowstone Club's debt was "revenue-driven."   For example, the Yellowstone Club took on debt to build the Warren Miller Lodge, but Blixseth intended to sell condominiums in the Warren Miller Lodge to repay the debt.  In Edra's words, the Yellowstone Club was playing catch up in 2005 because of certain capital expenditure decisions that had been made, such as building the Warren Miller Lodge, more roads, and more infrastructure.

In September of 2004, Cushman & Wakefield did a limited appraisal of the Debtors' property for American Bank.  In that limited appraisal, as of September 21, 2004, Cushman & Wakefield determined that the "as-is market value" of those assets that later served as collateral for Credit Suisse's $375 million loan was $420 million.  Just a year later, Credit Suisse commissioned Cushman & Wakefield to perform a total net value appraisal of the Yellowstone Club.  Cushman & Wakefield's "total net value" appraisal of the Yellowstone Club as of

---

[16]  According to Blixseth, the Yellowstone Club had a construction loan of approximately $20 million associated with the Warren Miller Lodge and a revolving line of credit that the Debtor "could draw up and down on."

ER01034

**Case No. 12-35986 ER  704**

September 30, 2005, was $1,165,000,000.00.[17]  In Cushman & Wakefield's July 1, 2005,

appraisal, the Debtors had purportedly sold 243 lots or units, and another 42 lots were listed

under contract. The lot sales for 2000 through 2005 are summarized by closing date, lot number,

price and type in Addendum B to the appraisal.[18]

Cushman & Wakefield's 2005 "total net value" appraisal was based in large part on

revenue and expense projections provided by Blixseth.  In 2005, Callander was employed as vice

president of sales and Campbell was vice president of finance.  However, it was Sumpter – the

vice president of real estate development[19] – who Blixseth selected to help prepare the Debtors'

revenue and expense projections for Cushman & Wakefield and Credit Suisse.  Sumpter

explained that when preparing the projections for Credit Suisse, "the valuation wasn't just done

on developer transactions with the Club, it was done on third-party transactions within the Club,

as well."  In other words, the projections that Blixseth provided to Credit Suisse included not

only sales that the Debtors anticipated, but also the resale of other properties by third parties

within the Yellowstone Club.  Historically, Sumpter testified that the Yellowstone Club sold

between $315 and $320 million of property between 2000 and 2005, or roughly $50 million per

year.  According to Sumpter, sales in 2005 were roughly $93 to $96 million.  Sumpter and

---

[17]  Blixseth testified that in the fall of 2005, he would have sold the Yellowstone Club for $800 million.

[18]  Addendum B shows 19 lots sales in 2000, 40 lots sales in 2001, 28 lots sales in 2002, 52 lots sales in 2003, 56 lots sales in 2004 and 45 year-to-date lots sales in 2005.

[19]  Up until 2006, Sumpter reported to Blixseth.  Starting in 2006, Sumpter reported to Blixseth and Dieter Huckestein, who was a minority shareholder of Yellowstone Club World, LLC.  As vice president of real estate development, Sumpter was responsible for taking the Yellowstone Club's raw land through the entitlement process to the point where the Yellowstone Club had a marketable piece of property.

ER01035

**Case No. 12-35986 ER  705**

Blixseth's revenue projections, which apparently included monies that would go to third parties as opposed to the Yellowstone Club, also did not include any interest revenue projections. In other words, Blixseth was not anticipating any interest payments from BGI or its affiliates.

When questioned about the projections, Sumpter attempted to explain that the Debtors missed their projections in 2005 because the Debtors pushed some of the 2005 sales into 2006 for tax purposes. According to Sumpter, developer sales were roughly $93 to $96 million in 2005. Blixseth testified that deferred revenue for 2005 was $17 million (and also testified that deferred revenue in 2005 could have been as high as $40 to $45 million) and deferred revenue in 2006 was roughly $50 million. Sumpter testified that 2006 was better because "almost $425 million that came into the Yellowstone Club that year." But as Sumpter later clarified, $299 million of the $425 million was attributable to third party sales that did not directly benefit the Yellowstone Club, other than the commissions paid to the sales staff, leaving the Yellowstone Club with only $135 to $136 million in developer sales. In 2007, developer sales were just under $100 million, with third party sales totaling between $250 and $260 million.

Charles Bradley Foster ("Foster"), a Managing Director for FTI Consulting–the consulting company hired to serve as the Debtors' post-petition financial advisor –gave a simplistic, but enlightening, explanation of the impact the Credit Suisse loan had on the Debtors' cash flow. Under the Credit Suisse Credit Agreement, the Yellowstone Club was required to pay Credit Suisse $800,000 from the sale of each dwelling unit for principal curtailment. Foster testified that between September 30, 2005, and February of 2009, the Debtors sold a total of 85 dwelling units at an average sales price of $2.4 million per dwelling unit. From the $2.4 million realized from each unit, Foster did a rudimentary calculation to ascertain the "free cash flow"

from each of the sales.  In simple terms, Foster subtracted from $2.4 million the $800,000 that

the Debtors were required to pay Credit Suisse for principal curtailment,[20] $835,000 in interest

costs for each of the lots, along with $120,000 of closing costs for each of the lots, which initially

left the Debtors with cash of $765,000 from each of the sales.  However, the Debtors also had

$51 million in development costs.  After completing his calculations, Foster concluded that the

Debtors were generating under $50,000 of free cash flow from the sale of each of its lots.

It is clear that the Debtors began a downward spiral on September 30, 2005, that took

them to the inevitable bankruptcy filing on November 10, 2008.  At the end of 2005, the

Debtors's audited financial statements showed $130 million in cash or cash equivalents.  The

Debtors spent $70 to $80 million in 2006 acquiring assets outside the confines of the

Yellowstone Club.  Factoring in the Debtors' annual cash needs of $25 to $30 million a year,

above and beyond land sales, the Debtors were left with just under $29 million of cash or cash

equivalents at the end of 2006 and only $5 million at the end of 2007.

From 2005 through the filing of the bankruptcy case, the Yellowstone Club was

persistently behind on its accounts payable.  When the Yellowstone Club needed cash, Moore,

who took over as Comptroller at the Yellowstone Club in October of 2006, would make a request

for money to Mack, who acted as the intermediary between Blixseth and Moore when Moore

needed money to pay bills at the Yellowstone Club.  After making a plea for money, Moore

testified that funds might or might not appear in the Yellowstone Club's accounts.  Moore

---

[20]  Edra testified that when the original amount of the Credit Suisse loan was $150
million, the release price or pay-down per lot was $500,000.   Based upon the numbers that
Denise Tuohy was putting together, with input from Campbell, the $150 million loan "seemed to
pencil out okay."  However, the release price increased to $800,000 per lot as the loan amount
ratchetted up.

**Case No. 12-35986 ER  707**

testified that it was not uncommon to have to shuffle the Yellowstone Club's accounts payable due to a lack of money, with creditor and vendor invoices often going unpaid for 90 days or more.

Even though the Yellowstone Club was consistently struggling to pay its creditors, Blixseth continued to siphon money from the Debtors.  In addition to the Credit Suisse loan proceeds, Blixseth took approximately $90 million in distributions from the Debtor entities and later reclassified such distributions as loans.  For instance, Blixseth and BGI took $4 million plus of distributions from YD in 2003.  Also, the Debtors' 2004 year end financial statements show a distribution of $19,000,617.51 to Blixseth.  In 2005, Blixseth or BGI took total disbursements of $35,478,750.24 out of YMC.   Of the foregoing amount, $23,853,0000 was reclassified as a loan on March 13, 2006.  The evidence suggests that the 2004 and 2005 distributions were eventually reclassified as a $55 million note payable from BGI.

Despite the Debtors' consistent and often desperate need for cash from the time of the Credit Suisse loan to the date of the Debtors' bankruptcy petition, neither Blixseth nor Edra made a demand of BGI for payment on any of the BGI notes.  BGI also never made any type of consistent payment on the obligations.  The evidence shows that after September of 2005, the Debtors were only able to meet their financial obligations by selling bulk pieces of property at deep discounts.

Samuel T. Byrne ("Byrne") is one person who purchased bulk property from the Yellowstone Club.  Byrne, the founder and managing partner of CrossHarbor Capital Partners,

27                                                    ER01038

**Case No. 12-35986 ER  708**

LLC ("CrossHarbor"),[21] first visited the Yellowstone Club in 2004 or 2005 as a guest of another Yellowstone Club member. Following Byrne's visit, Byrne and/or CrossHarbor sponsored the acquisition of four single-family lots at the Yellowstone Club in 2005. Blixseth later approached Byrne and asked whether he would be interested in making a bulk purchase of Yellowstone Club lots at a substantially reduced price. Byrne made his first bulk purchase in 2006 by taking over the 43 remaining Sunrise Ridge Condominium units for a price of $60 million. According to Byrne, CrossHarbor bought the Sunrise Ridge units from an entity controlled by Blixseth. Either the Yellowstone Club or Blixseth had started construction on the Sunrise Ridge Condominiums but because the Yellowstone Club and Blixseth were struggling with construction financing, Byrne agreed to "buy out the balance of the project."[22] Byrne, through CrossHarbor, spent in excess of over $100 million improving the Sunrise Ridge property. At the time Byrne purchased the Sunrise Ridge Condominiums, he was not aware that there was significant leverage against the Yellowstone Club. Byrne did a title search before buying the Sunrise Ridge Condominiums, but because the condominiums were not subject to Credit Suisse's lien, Byrne did not discover the Credit Suisse obligation. Byrne understood from Blixseth that the Yellowstone Club was, except for construction financing associated with the Warren Miller Lodge, debt free. Byrne later heard, as a result of the LeMond Plaintiffs' litigation, that the Yellowstone Club was not debt free, but was in fact indebted to Credit Suisse for $375 million. Blixseth assured Byrne at

---

[21] CrossHarbor is in the business of real estate and real estate related investment management.

[22] In February 2005, Blixseth acquired 50 percent of Sunrise Ridge from YD in exchange for a $5 million note to be paid back out of the sale of properties. Blixseth then turned around and sold Sunrise Ridge to Byrne for $60 million in 2006, taking one-half the sales proceeds.

**Case No. 12-35986 ER  709**

that time that the referenced debt belonged to Yellowstone Club World and not the Yellowstone

Club.  Byrne later purchased 31 golf course lots in August of 2007 for $54 million.[23]

Consistent with the foregoing, Moore testified that the Yellowstone Club was only

current on its payables during the first few months of 2006, in early 2007, in August of 2007 and

again in April or May of 2008.  Moore explained that Byrne's $60 million bulk purchase in 2006

allowed the Debtors to bring their payables current in 2006.  Also, the Debtors sold a Gulfstream

jet in January of 2007 for approximately $45 million and received roughly $20 million of the

proceeds.  Those monies were sufficient to bring the Yellowstone Club's accounts payable

current for a brief period of time.  The Debtors then sold 31 golf course lots to Byrne in August

of 2007 for $54 million.  That bulk sale allowed the Yellowstone Club to once again brings its

obligations current.  Moore also testified that the Debtors sold five lots to Overlook Partners in

March or April of 2008 for $15 million, which allowed the Debtors to bring their accounts

payable current and still leave $5.6 million in the bank accounts.  The Debtors also drew down a

line of credit at American Bank in 2008 to meet their financial obligations.  That cash was used

to bring the Yellowstone Club's accounts payable current at that time.  The Debtors were not

current on their accounts payable in August of 2008.  To further frustrate the Yellowstone Club's

financial plight, testimony at trial indicated that perhaps the Office of the Comptroller of the

Currency had instructed American Bank not to loan any more money to the Debtors and U.S.

National Bank had told its branches not to extend more credit to the Debtors.

---

[23]  While it is not clear whether some or none of the Sunrise Ridge units belonged to the
Yellowstone Club at the time they were sold to Byrne, it is clear that the 31 golf course lots
belonged to the Yellowstone Club.  Said 31 lots are presumably part of the 85 dwelling units that
were sold post-September 30, 2005, as referenced by Foster.

ER01040

**Case No. 12-35986 ER  710**

Without denying the Debtors' dire financial condition, Blixseth testified that the Credit Suisse loan was current in August of 2008 when he relinquished control of the Yellowstone Club to Edra. While Blixseth may be technically correct, the evidence also shows that Blixseth was almost three years into a five year note but had repaid only $65 million of principal; all arguably attributable to the required release price of $800,000 per lot. Blixseth was able to make the interest payments on the Credit Suisse loan obligation by essentially cannibalizing the Yellowstone Club. Blixseth then left the Yellowstone Club to Edra in August of 2008, saddled with enormous debt that the Yellowstone Club had no prospect of repaying.

Also noteworthy is the fact that the Debtors' audited financial statements show that the outstanding balance owed by BGI and its affiliates to the Debtors was $272 million on December 31, 2005, $254.8 million on December 31, 2006, and $243.7 million on December 31, 2007. Approximately $18 million of the $28.3 million paid on the BGI notes was the result of a payment made by BGI toward the $38 million settlement with the LeMond Plaintiffs. Moore recalled that BGI only paid $5 million toward principal on the $209 million note.

Blixseth also seeks refuge in various audits performed by KPMG. With respect to the BGI notes, no evidence exists in the record that KPMG audited BGI to determine the true value of the BGI notes. Notably, KPMG did not assign a value of the BGI notes, but merely noted under paragraph 1(p) of the Notes to [the Debtors'] Combined Financial Statements of December 31, 2007 and 2006, that "[t]he fair value of the [note] due from managing member company and affiliates has not been determined as it is not practical to estimate." YCLT Exhibit 81.

Various aspects of the Debtors' financial condition were also examined by several experts:

**Case No. 12-35986 ER  711**

<u>David Abshier</u>

David Abshier ("Abshier") performs financial advisory services for LECG and specializes in credit and risk management.  Abshier was retained in this case to evaluate the Debtors' loan transaction with Credit Suisse in accordance with regulatory and customary banking industry standards.  Abshier began his testimony by noting that the Credit Suisse Loan Agreement did not comport with the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").[24]  Because the new loan product was not FIRREA-compliant, Credit Suisse First Boston had to syndicate the loan through its newly formed Credit Suisse, Cayman Island Branch.  As previously noted, Credit Suisse created the loan product at issue with a view toward marketing the loan to sophisticated non-U.S. Bank investors, such as private equity and hedge funds, CDOs (collateralized debt obligation), CLOs (collateralized loan obligation) and similar funds that were not interested in FIRREA-compliant appraisals because such sophisticated parties did their own assessment of risk and applied their own discount rates.[25]  The 2005 appraisal done by Cushman & Wakefield in contemplation of the Credit Suisse Loan Agreement looked only at projected future gross revenues without any type of present value discount.  Abshier explained that a fair market value appraisal is "common sense" because it protects not only the lender, but also the borrower by ensuring that a borrower does not borrow more money than their collateral is worth.  Abshier saw absolutely no benefit to providing

---

[24]  FIRREA requires an appraisal in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP").

[25]  FIRREA requires that federal regulated entities who contemplate originating a loan in excess of $1 million must perform a market value appraisal.  Abshier later testified that federally regulated banks, including foreign banking organizations that have an insured branch, could not participate or invest in the Credit Suisse loan because it did not comply with FIRREA.

ER01042

**Case No. 12-35986 ER  712**

investors with a "total net value" appraisal as opposed to the traditional market value appraisal required under FIRREA.

Abshier also observed that Credit Suisse's loan product was nonconforming in that 100 percent of the loan proceeds were disbursed on the closing date. Abshier testified that it is not customary for lending institutions to lend 100 percent of approved loan funds at the closing date for large real-estate development projects. Instead, projects, such as the Yellowstone Club, are generally done in phases and the associated loan is funded accordingly. Furthermore, Credit Suisse's loan product allowed the bulk of the loan proceeds to flow directly to the borrower's principal, in this case BGI and Blixseth, for purposes unrelated to the underlying development. Yankauer countered that 100 percent funding of the loan in this case was appropriate because the loan was not a construction loan and Blixseth had already invested a substantial amount of equity into the project.

Abshier went on to observe that Credit Suisse did not require any type of reserve account with which to fund future payments on the Credit Suisse Loan Agreement. As explained by Abshier, a reserve requirement, which is typical in a land development case, allows a developer to remain current on a loan, even when costs increase or when there is a slowdown in development or absorption. Credit Suisse also did not require a secondary source of repayment. In fact, paragraph 9.20 of the September 30, 2005, Credit Agreement specifically provides that "[n]otwithstanding anything in any of the Loan Documents to the contrary, no partner or member or managing member in the Borrower shall be personally liable for the payment of the Obligations; provided, however, nothing contained herein shall release, diminish or impair the obligations of the Borrower to pay in full when due all Obligations in accordance with the

provisions of the Loan Documents." (Emphasis in original)

Finally, Abshier noted that while Credit Suisse First Boston provided all the marketing materials, made all the contacts in the United States, and engaged a United States appraiser, the signatory on the Credit Agreement was Credit Suisse, Cayman Island branch.[26]  Abshier found Credit Suisse's arrangement highly "unusual."

<u>Kent Mordy</u>

Kent Mordy ("Mordy") is a certified public accountant and a certified insolvency and reorganization advisor.  Mordy examined the Debtors' financial performance both pre- and post-September 30, 2005.  Mordy testified that the Debtors experienced negative cash flows in several of the years leading up to the Debtors' September 30, 2005, agreement with Credit Suisse.  Several witnesses used the term EBITDA, which is earnings before interest, taxes, depreciation and amortization.[27]  Mordy testified that Credit Suisse's offering memorandum included cash EBITDA projections.  Using Credit Suisse's methodology, Mordy calculated that the Debtors' cash EBITDA in 2002 was a negative $15,701,772, in 2003 was a positive $20,369,766 and in 2004 was a negative $45,910,598.

In the offering memorandum, Credit Suisse projected cash EBITDA for the Debtors of $83,500,000 in 2005, $97.6 million in 2006, $135 million in 2007 and $269 million in 2008.

---

[26]  Yankauer explained that the New York Branch of Credit Suisse that created the loan product at issue was federally regulated.  Yankauer also stated that Credit Suisse was not participating in the Yellowstone Club loan, but was only "arranging" the loan.

[27]  EBITDA can be used to analyze and compare profitability between companies and industries because it eliminates the effects of financing and accounting decisions. However, this is a non-GAAP measure that allows a greater amount of discretion as to what is, and is not, included in the calculation.  EBITDA is a good metric to evaluate profitability, but not cash flow.

**Case No. 12-35986 ER  714**

Reducing the above numbers for interest expense, Mordy testified that Credit Suisse's true cash EBITDA projections were $60 million in 2005, $72 to $73 million in 2006 and $113 million in 2007, yet Debtors' actual cash EBITDA in such years was woefully short of Credit Suisse's projections. The Debtors missed the Credit Suisse projections by $42,660,000 in 2005 because Debtors in fact had only $17 million with which to repay debt in that year. In 2006, Debtors missed the mark by $46 million because cash EBITDA was only $25 million. Similarly, in 2007, Debtors missed the mark by $90 million because cash EBITDA was $23 million rather than $113 million. Mordy characterized Credit Suisse's projections as a "leap of faith."

Mordy noted several deficiencies in Credit Suisse's projections. First, Credit Suisse failed to consider the Warren Miller Lodge, which was a major undertaking.[28] As of September 30, 2005, the Debtors had spent approximately $38 million on construction of the Warren Miller Lodge. However, by the petition date, the Debtors had spent a total of $101 million on the Warren Miller Lodge, which was an additional $63 million above and beyond what had been spent as of September 30, 2005. Also, the Credit Suisse offering memorandum stated that the Warren Miller Lodge was 90% complete and the Debtors expected to close on 21 of the Warren Miller Lodge condominium units in the fourth quarter of 2005 for $42 million. In reality, the Warren Miller Lodge, according to Sumpter, was a shell in September of 2005 and Debtors collected revenues of about only $1.6 million in 2005 and $1.2 million in 2006 from the Warren Miller Lodge. The Warren Miller Lodge units finally started closing more quickly in 2007.

---

[28] UCC Exhibit 50 is a Confidential Information Memorandum that states: "Any management projections or forward-looking statements included in the Confidential Information Memorandum are based on assumptions and estimates developed by management of the Company in good faith and management believes such assumptions and estimates to be reasonable as of the date of the Confidential Information Memorandum." P.6.

**Case No. 12-35986 ER  715**

Credit Suisse's projections also failed to account for the $140 million that was used to purchase Yellowstone Club World assets. Instead, Credit Suisse's projections showed $140 million as staying in the Debtors' bank accounts for reserves to pay interest and principal on the Credit Suisse loan.

Mordy also pointed out that the Debtors, and thus Credit Suisse, were including in their income projections the anticipated revenues from Big Sky Ridge. However, the record shows that Big Sky Ridge was wholly-owned by Blixseth in 2002. In April of 2002, Big Sky Ridge paid $3.5 million for some land. Blixseth then sold 50% of Big Sky Ridge to Voyager Group, LP for $2.5 million. In September of 2003 Blixseth sold the other 50% of Big Sky Ridge to Yellowstone Development for $17 million. That same month, Blixseth bought back Voyager Group, LP's 50% interest in Big Sky Ridge for $3 million. Thus, in September of 2005, Blixseth owned 50% of Big Sky Ridge and Yellowstone Development owned the other 50%, entitling Blixseth to 50% of Big Sky Ridge's profits, yet Blixseth was including his profits from Big Sky Ridge in the revenue projections that he was supplying to Credit Suisse.

Mordy concluded that in exchange for a possible $164 million benefit, the Debtors undertook an obligation to repay $375 million plus interest. Mordy arrived at his $164 million calculation by adding the $133 million cash that stayed in the Yellowstone Club on September 30, 2005, the $6 million of principal payments from BGI on the $209 million note and approximately $25 million paydown on the $375 obligation by the Debtors.

Yankauer countered Mordy's testimony, arguing that EBITDA was in the neighborhood of $55.5 million. Yankauer considered 2005 income of $39,299,732 and added interest of $6,442,264 and depreciation and amortization of $9,868,957. Yankauer then included deferred

**Case No. 12-35986 ER  716**

income from 2004 to reach the $83.5 million number used by Credit Suisse.  Mordy apparently did not consider deferred income and subtracted real estate under development of roughly $13,660,000.  Mordy also excluded $17.9 million for the purchase of property and equipment, and $9.6 million from construction in process.  Mordy found Credit Suisse's assumptions unreasonable based upon the Yellowstone Club's historical performance.

After performing his forensic review of the Debtors' books, Mordy concluded that the purported $209 million loan to BGI and its affiliates was not in fact a loan under generally accepted accounting principles, but rather, was a distribution and a return of capital to BGI and its then owner, Blixseth.  Six factors led Mordy to his conclusion.  First, Mordy referred to the Credit Agreement which referred to funds that were earmarked as a return of capital.  Second, repayment of the BGI notes payable, which were due on demand, was controlled by Blixseth, who controlled BGI.  Third, the $209 million note payable included no scheduled principal payments and in fact, only minimal principal reductions were made.  Moreover, the principal reduction payments that were made also benefitted BGI and Blixseth.  Fourth, the Debtors continued to finance acquisitions and fund operations through bulks sales of lots rather than make demand on the BGI note payable.  Next, Blixseth used funds from the Debtors, rather than BGI as contemplated, to purchase St. Andrews in Scotland.  Finally, KPMG indicated in the footnotes of Debtors' 2006/2007 audited financial statements that the fair value of BGI's notes payable was not determined because it was not practical to estimate the value of such notes.

Based on his determination that the $209 million was a distribution rather than a loan, Mordy determined that as of December 31, 2005, the Debtors's books should have reflected

negative equity of approximately $141 million.[29]  In sum, Mordy concluded that the $209 million distribution left the Debtors highly leveraged and with too little capital with which to fund their financial plans and projections.

John S. Hekman

Dr. John S. Hekman ("Hekman") has a Ph.D in economics and is employed by LECG to provide expert witness testimony in the area of real estate and real estate finance.  Hekman was hired to examine Cushman & Wakefield's September 30, 2005, appraisal and tailor the appraisal to more accurately reflect Debtors' historical reality.  Hekman, like Mordy, also performed EBITDA calculations.

Hekman testified that the Debtors' had very small losses or profits in 2001 and 2002. Debtors' income in 2003 and 2004 was slightly higher with the Debtors' having $24 million in the best of the two years to service debt.  Hekman's EBITDA calculation for 2005 was $39 million.

Hekman observed that Cushman & Wakefield's cash flow projections went through 2012, and required the sale of 89 lots in a single year.  Credit Suisse, in turn, compressed Cushman & Wakefield's absorption period by two years, thereby effectively and unrealistically increasing the appraiser's cash flow projections for 2006 through 2010.  Hekman testified that Credit Suisse's cash flow projections were completely out of proportion to the Yellowstone Club's historical performance.  Hekman believed that Credit Suisse's aggressive projections warranted a 20 to

---

[29]  This amount represents the audited owners' equity balance of $67,701,812 as of December 31, 2005, less the $209 million, leaving roughly a negative $141 million.

30% discount rate.[30] Hekman noted that Dean R. Paauw ("Paauw"), the appraiser who

performed the September 30, 2005, Cushman & Wakefield appraisal, used a discount rate of

15% and Credit Suisse's expert, Christopher T. Donaldson ("Donaldson"), used a discount rate

of 20%. Using 2003 and 2004 as the baseline prices and sales (which increased Credit Suisse's

compressed absorption period)--and Paauw's discount rate of 15%, Hekman determined that the

Yellowstone Club had a value of $469 million in 2005 and a loan-to-value ratio of 80 percent.[31]

Using Donaldson's 20% discount rate, Hekman calculated that the Yellowstone Club had a value

of only $396 million and a loan-to-value ratio of 97 percent. Hekman's calculations were in

stark contrast to Cushman & Wakefield's "total net value" of $1,165,000,000, which produced a

loan-to-value ratio of approximately 32 percent.

    Interestingly, the total net value of the Club in 2005 was $1,165,000,000 but as of March

31, 2006, that value increased to $1,222,000,000. In the total net proceeds report as of June 30,

2006, such amount increased to $1,225,000,000 and in the report as of September 30, 2006, the

value was $1,250,000,000 and as of March 31, 2007, and June 30, 2007, that value was

$1,361,000,000. The total net value, according to Cushman & Wakefield, did not decline until

late 2007. As of September 30, 2007, the total net value decreased to $1,268,000,000.

Consistent with the updated appraisals, which suggest that the value of the Club was increasing,

Certificates of Compliance required under the Credit Agreement indicated that the loan to value

ratio was consistently dropping. The Credit Agreement specifically provided that the loan to

---

[30] Blixseth's accountant Mack, in his July 14, 2005, letter to the "B" shareholders was
representing that "marketability and monetary discounts" were between 30 and 55 percent.

[31] Hekman's calculation also assumed a 3 percent increase in lot prices starting at the
beginning of the absorption period.

**Case No. 12-35986 ER  719**

value ratio could not exceed 45%.  Per the compliance certificates, the loan to value ratio continued to decrease, going from 29.6%, Exhibit 18, to 28.4% on November 29, 2006, to 24.85% on May 29, 2007, and to 25.8% on May 29, 2008, and then to 27.6% on August 26, 2008.

Ignoring Cushman & Wakefield's "total net value" appraisals and the attendant loan-to-value ratio, Hekman found the more realistic loan-to-value ratio of 20% troubling because it left little room for fluctuations in the real estate market.  Hekman explained that while it is difficult to predict a downturn in the real estate market, experts agree that downturns always come. Hekman testified that the real estate market was very strong in the late 1990's but real estate went down during the recession in 2001.  In order to keep the economy moving during the recession, the Federal Reserve aggressively lowered interest rates which set off a wave of real estate investment and increases in real estate prices because the cost of financing was so low.  Hekman characterized 2003 and 2004 as the peak years for real estate.  However, due to concerns about a real estate bubble, the Federal Reserve began raising interest rates in 2005, which caused the beginning of a slowdown in the real estate markets.  Indeed, the July 1, 2005, appraisal prepared by Cushman & Wakefield for Credit Suisse First Boston, LLC, UCC Exhibit 144, acknowledges on page 33 that "[t]he years 2003 and 2004 were record years for the national housing market. The housing market has continued to remain very strong in 2005.  While price appreciation and sales activity have started to moderate in most markets across the country, continued low mortgage rates and strong housing demand have kept prices and sales at levels which are still near record highs in an historical perspective."

Other than using historical reality to reach a valuation determination, Hekman did not

**Case No. 12-35986 ER  720**

change any other assumptions used in the 2005 appraisal. For example, Hekman did not change

Paauw's projections for membership sales revenues. Similarly, Hekman did not adjust Paauw's

projected development costs because he did not have enough information to determine whether

Paauw's other assumptions were reasonable.

To illustrate, Hekman looked at funds available to service debt. The Yellowstone Club's

best year for income was 2005. In that year, the Club had $39 million available to service debt.

Credit Suisse projected that the Yellowstone Club would have interest expense of $25 million in

2006. On top of the interest expense, the Yellowstone Club was also required to pay a release

payment of $800,000 as each lot was sold. Using the 48 lots sold in 2005 as a gauge, Hekman

calculated that the Yellowstone Club would be required to make release payments of

approximately $38 million. Adding the interest expense of $25 million and the release payments

of $38 million meant that the Yellowstone Club needed to generate revenues of $63 million in

2006 just to service the Credit Suisse obligation.[32] Hekman concluded that the Yellowstone

Club's historical cash flow were not sufficient to service the Credit Suisse loan going forward.

The Yellowstone Club's ability to service the Credit Suisse debt was only possible if the

Yellowstone Club had enormous increases in lot prices and/or lot sales. Hekman highly doubted

that probability in a real estate market that was beginning to decline.

Hekman prepared a demonstrative exhibit showing actual lot sales at the Yellowstone

Club from 2001 through 2005. *See also,* Addendum B to Cushman & Wakefield's September

30, 2005, appraisal. On his demonstrative exhibit, Hekman also plotted projected lot sales from

---

[32] Such debt service projection of $63 million does not include the 1% paydown of the
loan as required under the Credit Agreement.

**Case No. 12-35986 ER  721**

2006 through 2012, which Hekman referred to as the absorption period.  Hekman pointed out the obvious; that projected lot sales were significantly higher than actual lot sales.  Hekman found the absorption period simply unrealistic because the absorption period was not based on historical lot sales, was not justified by looking at comparable sales in other developments, and it was not justified given the somewhat weakening economy, which was recognized in Cushman & Wakefield's 2005 appraisal.  According to Hekman, in 2005, the Debtors' projected future lot sales or absorption period should have mirrored historical sales.  Credit Suisse then took Debtors' lofty projections and reduced the absorption period from 2012 to 2010 to comport with Credit Suisse's proposed five-year loan.[33]  Hekman also criticized Cushman & Wakefield's 2005 appraisal because it projected prices that were significantly higher than historical prices.

Mordy explained that his cash EBITDA numbers differed from Hekman's 2003, 2004 and 2005 EBITDA calculations because Hekman did not subtract capital expenditures and development costs.  Mordy subtracted capital expenditures and development costs in order to more closely parallel Credit Suisse's cash EBITDA projections.  As discussed earlier, Yankauer disputed Hekman's and Mordy's EBITDA calculations for 2005, arguing that such figure was

---

[33]  Paauw in 2005 and Donaldson when later doing his retrospective appraisal in 2009, had the absorption period running to 2012 and 2013, and by June 30, 2008, Donaldson had extended the absorption period out to 2016, clearly showing the error of Credit Suisse's projected absorption period that ended in 2010.  The perverse effect of the total net value methodology is illustrated by considering a 3% rate of inflation:  A lot carried on the books today at $1 million, is growing in value by 3% for each year it is held, without any corresponding discount for the time value of money or risk.  In contrast, a lot valued at $1 million today under a FIRREA appraisal that is projected to sell three years from today's date would have a lower fair market value, not higher value, because of the time value of money.

ER01052

closer to $55,610,953.[34]  Whatever the accurate number, it is clear that even though the Debtors'

had experienced nine months of operations as of September 30, 2005, they missed their

profitability projections by a substantial amount.  Such numbers show that Debtors' projections

for the future, upon which Credit Suisse relied, had no foundation in historical reality.

Christopher T. Donaldson

Donaldson is a real estate appraiser employed as the managing director of the Utah office

of the global real estate firm of Cushman & Wakefield of Colorado.[35]  Donaldson took over

Paauw's appraisals of the Yellowstone Club in mid-2007.  In preparation for trial, Donaldson did

a retrospective appraisal of the Yellowstone Club and set the value at $571 million.  The

methodology that Donaldson used was a development analysis for a discounted cash flow, which

generally calculates discounted cash flows over a projected selling period.  Donaldson explained

that his approach involves four components: (1) revenue, which would be lot sales and

memberships sales and perhaps unit sales; (2) absorption, projecting anticipated sellout over a

certain period of time; (3) expenses such as developments costs, selling costs, and holding costs;

and (4) discount rate.  Donaldson consulted and included excerpts from Paauw's July 1, 2005,

and December 31, 2005, appraisals in his retrospective appraisal.

Donaldson's retrospective appraisal continued to assume that the Debtors would sell their

national memberships at a price of $650,000 each, even though Debtors had not previously sold a

---

[34]  The Debtors' combined audited financial statements show that the Debtors' operating income for the year ending December 31, 2005, was $37,819,067.  Debtors' operating income for the year ending December 31, 2006, dropped to $9,020,546.  *See* CS Exhibit 34.

[35]  Donaldson is a Member of the Appraisal Institute ("MAI") and is also a Certified Commercial Investment Member ("CCIM").

single national membership and even though the highest membership fee that Donaldson could find at any comparable membership club was $125,000. Donaldson similarly calculated that the Pioneer Mountain condos would sell for $3.5 million, or roughly $1,000 per square foot, even though no Pioneer Mountain condo had ever sold for $1,000 per square foot. Finally, Donaldson assumed that 325 single-family lots could be sold, but the 325 number was not based on engineered drawings. Donaldson also did not contemplate any bulk sales.

Regardless of whose numbers are utilized, in conjunction with the Credit Suisse loan, Moody's Investors Service reviewed the business fundamentals and financial condition of YMC and YD in 2005 and assigned a private rating of B1 to the Credit Suisse Loan as of September 30, 2005.[36] Debtors' Exhibit 235. Such rating was based on the assumption that $16 million of the Credit Suisse loan proceeds would be used to refinance existing debt, $209 million would be distributed to shareholders and $142 million would fund a development reserve. Under such scenario, Moody's concluded that "the debt leverage figures look as follows: first-lien debt/total net value of 32.2% and total debt/total net value of 39.0%." Debtor's Exhibit 235. As the parties concede, $142 million was earmarked for investments and unrestricted use by subsidiaries unrelated to the Yellowstone Club, and not a development reserve. Such fact would have undoubtedly reduced Moody's rating even lower to either "substantial risks" or "extremely speculative."

Robert Reilly

---

[36] According to Moody's rating system, the Credit Suisse loan rating was at the high end of "Highly Speculative," but below the non-investment grade speculative (Ba3 to Ba1), lower medium grade (Baa3 to Baa1), upper medium grade (A3 to A1), high grade (Aa3 to Aa1) and prime ratings (Aaa) and just above the substantial risks (Caa1) , extremely speculative (Caa2), in default with little prospect for recovery (Caa3 to Ca) and in default ratings (C).

ER01054

**Case No. 12-35986 ER  724**

Although Blixseth called not a single expert witness at Part I of this trial held in 2009, Blixseth called two expert witnesses to testify in February of 2010; Robert Reilly and Joanne Sheridan.  Robert Reilly ("Reilly") is an expert in the area of business valuations and solvency opinions and was retained to offer testimony solely as to the solvency of Blixseth and BGI as of September 30, 2005, December 31, 2006 and December 31, 2007.

As background, Reilly explained the Statement on Standards for Valuations Services No. 1 ("SSVS1")[37] as promulgated by the American Institute of Certified Public Accountants ("AICPA"), and then outlined the three solvency tests: the balance sheet test (does the value of an entity's assets exceed its liabilities); the cash flow test (based on an entity's income and the longest term of debt instruments, can the entity generate enough cash to pay the principal and interest on its obligations as they become due); and the capital adequacy test (on the solvency date, does the entity have enough capital to continue operating as a going concern business for a period of approximately one year).  Reilly testified that an entity is considered insolvent if it fails any one of the three solvency tests.

Reilly explained that a certified public accountant ("CPA") can give solvency opinions without complying with SSVS1 but if CPAs have the appropriate credentials and experience, and if they comply with SSVS1, they can give independent valuation opinions as well.  If an independent valuation opinion is contained within a solvency opinion, CPAs must comply with the AICPA standards, including SSVS1.

Reilly examined the solvency of Blixseth as of September 30, 2005, December 31, 2006,

---

[37] Reilly was a member of the Business Valuation Committee that developed SSVS1 and a member of the Executive Committee that approved SSVS1.

ER01055

and December 31, 2007, using all three of the solvency tests and concluded that Blixseth was

solvent on such dates.  Reilly also examined the solvency of BGI as of September 30, 2005, the

end of 2006 and the end of 2007 using all three solvency tests and concluded that BGI was

solvent on all three of the aforementioned dates.

       Based upon information that Reilly received from Mack and Blixseth's counsel, Reilly's

balance sheet test for BGI originally included the assumption that BGI had cash of $242 million

on September 30, 2005.  Reilly later learned that BGI did not have cash on hand of $242 million

on September 30, 2005, because such money had gone directly to Blixseth, and that the $242

million "really should be a note receivable."  In addition, to complete his balance sheet tests for

BGI and Blixseth, Reilly relied upon Sheridan's balance sheet test of the Yellowstone Club.  As

for Blixseth, Reilly was initially provided with a balance sheet as of 2004 and had to inform

Blixseth's counsel that he would need starting balance sheets for 2005, 2006 and 2007.  On

November 5, 2009, Blixseth's counsel forwarded Blixseth's and BGI's balance sheets to Reilly

with a note that "[a]ll attached are 'WAG' balance sheets for [Blixseth] personally and BGI for

the valuation period.  As part of the call this morning we hope to fill in some of the blanks."[38]

Reilly proceeded to explain that he and his colleague continued to receive a number of revised

balance sheets from November 7th or 8th of 2009 up until the date that they issued their final

report.  Reilly's draft expert report was distributed to Blixseth's counsel on November 12, 2009,

and his final report was dated November 13, 2009.  Interestingly, Blixseth's personal financial

statements provided to Reilly for 2006 and 2007 both show "Cash & Securities" of $5,046,000,

"Inventory" of $1,125,000 and "Automobiles" of $900,000 for total current assets of $7,071,000.

---

[38]  The suggestion of counsel at the hearing is that "WAG" stands for wild a– – guess.

Reilly testified that he also performed a cash flow test and the capital adequacy test of the Yellowstone Club as of September 30, 2005, the end of 2006 and the end of 2007, and concluded that the Yellowstone Club was solvent on the three dates examined.  Reilly could not give an overall solvency opinion of the Yellowstone Club because he did not perform the third solvency test, the balance sheet test.[39]  Reilly did not see the need to perform a balance sheet test on the Yellowstone Club because one, the balance sheet test would not effect his solvency analysis of either BGI or Blixseth and two, Reilly understood that another expert was going to perform the balance sheet test for the Debtors and "it just wasn't part of [his] assignment."  Reilly was confident in his solvency opinions, testifying that "my entities were not close to the zone of insolvency until, for example, the discount rates were well into the 20 percent range[.]"

Reilly's due diligence with respect to the two solvency tests he performed on the Yellowstone Club consisted of interviewing Blixseth, Mack and Sumpter.[40]  Reilly testified that he relied on historical financial statements, tax returns, appraisals, management projections and business plans for the Yellowstone Club, and his own independent research, but testified later that he ignored the 2001, 2002, 2003 or 2004 financials, or actual historical performance of the Yellowstone Club when doing his analysis.  Even though Reilly ignored the Yellowstone Club's historical performance, Reilly concluded overall that the Yellowstone Club's projections for

---

[39]  Later, Reilly gave conflicting testimony that "there is no doubt in my mind that the three entities that I talked passed the three tests that I described on the dates that I described."

[40]  As read into the record, Reilly qualifies his report: "The information I relied on in this analysis was provided to me by legal counsel and by the accounting firm Mack Roberts & Co., the accountants.  I have not independently verified the accuracy and completeness of the information supplied by legal counsel or by the accountants, and I do not assume any responsibility with respect to that information.  I have not made any physical inspection or independent appraisal of any of the properties or assets owned by YC, BGI, or Mr. Blixseth."

**Case No. 12-35986 ER  727**

2005, 2006 and 2007 were "fairly reasonable" because on average, the projections for the Yellowstone Club were off by only about 7.5 percent.[41]

Reilly criticized Mordy's solvency opinion on grounds that Mordy was making critical assumptions that equated to an independent valuation. As explained by Reilly earlier in his testimony, when an expert gives a valuation opinion within a solvency opinion, the expert must comply with SSVS1. Also, Reilly contends that Mordy violated the "known or knowable rule." However, Reilly's criticisms were directed to Mordy's December 11, 2009, report and not Mordy's subsequent addenda and Reilly conceded that SSVS1 does not apply to the typical solvency analysis in the bankruptcy context. Reilly also acknowledged that violation of SSVS1 or the known and knowable rule does not render a solvency opinion invalid or unsupportable.

Joanne Sheridan

Joanne D. Sheridan ("Sheridan") was retained by Blixseth to perform the balance sheet test portion of the solvency analysis by examining the Debtors' financial statements as of December 31, 2005, December 31, 2006, and December 31, 2007. For example, using Cushman & Wakefield's September 30, 2005, appraisal, Sheridan concluded that the fair market value of Debtors' total assets was $1,120,089,177.00 as of December 31, 2005. Sheridan's asset number included cash and cash equivalents in excess of $120 million, property and equipment in excess of $696 million[42] and receivables in excess of $272 million due from the managing member

---

[41] Reilly testified that he tested the Yellowstone Club's 2005 projections by comparing them to the numbers the Debtors actually achieved in 2005, 2006 and 2007.

[42] Sheridan applied a discount rate of 14.5 percent to Cushman & Wakefield's 2005 appraisal to reach her fair market value of $696,300,000 for property and equipment. In their various appraisals, Cushman & Wakefield's discount rates ranged from 18 to 20 percent.

Case No. 12-35986 ER  728

company and affiliates. Sheridan listed the value of the members' equity at $572,648,475.00. Subtracting members' equity from total assets puts current and long-term liabilities at roughly $547,440,702.00.

### CROSSHARBOR'S PRE-PETITION EFFORTS TO PURCHASE the YELLOWSTONE CLUB

On June 28, 2007, Byrne, on behalf of CIP Yellowstone Acquisition LLC ("CIP") and Blixseth, on behalf of YMC, YD and Big Sky Ridge, LLC, entered into a letter of intent wherein Byrne and CrossHarbor, through CIP, agreed to purchase all of the assets of YMC, YD and Big Sky Ridge, LLC for the sum of $510 million.  As part of the anticipated purchase, Byrne and his group proceeded with a due diligence analysis of the Yellowstone Club.  Byrne explained that given the state of the Yellowstone Club's books, coupled with the lack of cooperation by employees at the Yellowstone Club, CIP was forced to build its own financial models from the ground up.  CIP spent roughly $4 million on its due diligence.

Edra, upon learning of Blixseth's agreement with CIP, sought to enjoin the sale, believing that the Yellowstone Club was worth far more than $510 million.  Upon request by Blixseth, Judge Waters of the Superior Court of California, Riverside, who was presiding over the Blixseths' divorce, enjoined Edra from interfering with the sale.

After signing the letter of intent, Blixseth approached Byrne in August of 2007, to see if Byrne would be interested in purchasing 31 golf course lots at the Yellowstone Club.  Byrne explained that "there was a lot of pressure put on us in the summer [of 2007] to make a purchase that would pay off the past-due payables, allow them to do some capital spending, and pay down [Credit Suisse First Boston]."  According to Byrne, "we were solicited for virtually everything

**Case No. 12-35986 ER  729**

that was available to be purchased at different points in time from probably the first quarter of

2006 right up until April of 2008. . . . [C]learly when it came time to purchase the golf course

lots, there was a desperate cash need.  And, you know, that was really the only reason that that

transaction was effected, was to provide the club enough cash to continue to operate."  The golf

course lot sale was consummated in August of 2007 at a price of $54 million.  Byrne viewed the

purchase of the 31 golf course lots as a bridge to CIP's overall purchase of the entire

Yellowstone Club.

      Following purchase of the golf course lots, another Byrne entity, Club YC Acquisition

LLC entered into an Asset Purchase Agreement dated January 15, 2008, with YMC, YD, Big Sky

Ridge LLC and Big Springs Realty LLC, agreeing to purchase the Yellowstone Club for

$455,690,000, subject to various adjustments as set forth in the Asset Purchase Agreement.[43]  *See*

Debtors' Exhibit 94.  In late March of 2008, Byrne and Blixseth were negotiating a $30 million

discrepancy attributable to a purported utility easement and the nature and extent of the refund

obligations of the Yellowstone Club under the Pioneer and Frontier memberships.  Byrne

testified that he was "ready, willing and able" to close the deal in March of 2008 at a price

between $403 to $408 million.  Byrne contends that Blixseth was not able to close the deal at

$403 to $408 million because Blixseth would not be able to satisfy all the Yellowstone Club's

liabilities with the sales proceeds.  In Byrne's words, Blixseth and the Yellowstone Club "would

either have to write a big check or come up with a different way to move forward."  Byrne

believed that if he purchased the Yellowstone Club for $403 million that Blixseth would have

---

[43]    Because Byrne had already purchased the golf course lots, the $510 million purchase
price reflected in the letter of intent was reduced to account for the $54 million golf course sale.

had to bring $50 to $60 million to closing to satisfy the Yellowstone Club's liabilities. As Byrne expressed in an email to Edra, "it is clear to all that the termination of the sale was the result of there simply not being enough money at the closing to deal with all of the liabilities." In an effort to protect his financial deposit, Byrne terminated the sale by letter dated March 26, 2008.

Byrne obviously wanted the sale to go through because as the sale began to unravel, Byrne proposed to Blixseth that the Yellowstone Club file bankruptcy. In an email dated April 1, 2008, Byrne told Edra that he "understood from a number of people . . . that you are telling them that I intended to bankrupt the Yellowstone Club and that I don't have the interest of the Club at heart and this is conclusive proof." To address Edra's apparent concern over Byrne's "fleeting" solution to the Club's financial problems, Byrne explained, "the discussions on the prepackaged bankruptcy were so that an entity and not an asset deal could be done that would eliminate the trigger on all the tax liabilities and eliminate the need for the reps and warranties, and hold backs of $10 million." The discussion of a possible bankruptcy was also addressed with Credit Suisse as a way to get around a 100% approval requirement but according to Byrne, Blixseth was adamant that bankruptcy was not a path he wanted to pursue.

Like the letter of intent, Edra undertook to undermine the Asset Purchase Agreement. From 2005 through August 12, 2008, Edra believed that the Yellowstone Club was worth far in excess of $510 million, the price that CIP originally agreed to pay for the Club. Edra testified that her belief that the Yellowstone Club was worth far in excess of $510 compelled her to oppose Blixseth's sale of the Yellowstone Club to Byrne.

In July of 2008, after the proposed sale of the Yellowstone Club fell through, Byrne threatened suit against the Yellowstone Club. Debtors' Exhibit 101, an email that Byrne sent to

Edra dated July 17, 2008, shows that Byrne was proposing to settle his claims under the Asset Purchase Agreement for his actual out-of-pocket costs associated with the due diligence of the Yellowstone Club purchase. Byrne also stated in his email that "YC has real liability to us under this agreement, including our perspective that we pursue specific performance at the net price of approx $407 million."

Although Blixseth was negotiating to sell the Yellowstone Club to Byrne, CrossHarbor and CIP as late as March of 2008, Blixseth contends he remained current on the Credit Suisse loan agreement up until August 12, 2008. Blixseth testified that CIP's termination of the Asset Purchase Agreement negatively impacted the Yellowstone Club's ability to repay the Credit Suisse loan. This latter contention of Blixseth's is not supported by any credible evidence, other than the evidence showing that the Yellowstone Club simply did not have the ability to pay any of its bills in a timely fashion.

THE BLIXSETHS' DIVORCE

Blixseth and Edra separated sometime in 2006 and Blixseth retained sole control of the Debtors and the Yellowstone Club until August of 2008, when Edra was awarded BGI and the Debtors as part of the MSA. During Blixseth and Edra's "bitter" divorce, Edra made several attempts to gain control of the Yellowstone Club, arguing that the Yellowstone Club was going broke under Blixseth's control. Blixseth was successful in obtaining two orders against Edra restraining her from meddling in the Yellowstone Club's affairs. Edra also tried to intervene in the action filed by the LeMond Plaintiffs against Blixseth and the Yellowstone Club. Blixseth

**Case No. 12-35986 ER  732**

contends that Edra's actions devastated sales at the Yellowstone Club.[44]

Even though Blixseth had "frozen" Edra out of the Yellowstone Club since December of 2006, Edra knew the Yellowstone Club was in a tough financial position in July and August of 2008. Edra testified that the revenues at the Club were "hurt extensively" by the LeMond litigation, the Blixseths' divorce and the failed sale to CrossHarbor. However, she did not know the exact nature of the financial condition. The information that Edra had during the summer of 2008 was coming from Byrne and what he was learning through his due diligence.

As mentioned above, after a long and acrimonious divorce, Blixseth and Edra divided their marital property pursuant to the June 2008 MSA that was approved and incorporated into a California Superior Court final Judgment, Riverside County Case No. RIDIND91152. As part of the MSA, both parties received full and comprehensive releases from the other party and those corporate entities to which the party obtained ownership. The Debtors are listed as signatories on the releases, releasing Blixseth "from any claim, right or demand that any such Edra Entity has, or may have against any of the Timothy Released Parties."

After receiving his portion of the marital assets free and clear of any claims by, among others, the Debtors, Blixseth transferred his marital assets to Desert Ranch LLLP, and in return, received 98% of the limited partnership interests in the LLLP. The LLLP is a Nevada LLLP. The LLLP's general partner is Desert Ranch Management, LLC, a Nevada LLC. The LLC owns 2% of the LLLP and its membership interests are owned 40% by Blixseth, 30% by Blixseth's son, and 30% by two Trusts, whose Trustee is Mack.

---

[44] However, in an email to Doyle dated May 8, 2006, Blixseth said that if the LeMond Plaintiffs "actually file a suit and if they lose, I want to pursue them ALL with vengeance as it will likely cause the club some harm." Exhibit 263I.

**Case No. 12-35986 ER  733**

The Debtors were not parties to the MSA or any of its amendments.  The Debtors were similarly not parties to the divorce proceedings and were not present at a divorce hearing held July 3, 2008, wherein that Waivers and Releases were approved at a perfunctory, non-confrontational hearing.  At that hearing, the divorce court did not make any type of determination that the values on each side of the transaction between the Debtors and Blixseth (i.e. the Release) were equal.  Indeed, the divorce court did not even make a determination as to equality in the value of the transaction as between Blixseth and Edra.

To finalize the MSA, Edra was required to make a cash payment to Blixseth.  Edra originally secured a commitment for funding but that commitment would not allow Edra to consummate the MSA in mid-August of 2008.  Edra thus approached Byrne asking for a 15-day loan so she could finalize the MSA.   Edra and Byrne reached an agreement whereby CIP would loan Edra $35 million ("CIP Loan").  The CIP Loan was part of a larger transaction that was meant to bring financial stability to the Yellowstone Club.  The CIP Loan was intended to be a short-term bridge loan that would provide Edra time to secure longer-term financing. The CIP Loan was evidenced by two notes:

> 1.  A Promissory Note in the principal sum of $13,000,000.00 made by BLX and Edra to CIP; and

> 2.  A Promissory Note in the principal sum of $22,000,000.00 made by BLX and Edra to CIP.

The CIP Loan was secured in part by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing granted by BGI for the benefit of CIP.  The BGI Deed of Trust encumbers the Porcupine Creek Property as well as two single family houses (and associated personal property) located outside of the gates of the Porcupine Creek Property and commonly

**Case No. 12-35986 ER  734**

known and numbered as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage,

California. The CIP Loan is also secured by real property commonly referred to as the 160-acre

Blixseth Family compound located within the Yellowstone Club. The CIP Loan became due and

payable in full on September 30, 2008.

Edra believed that she would be able to repay the CIP Loan within 15 to 30 days because

she had been promised long-term financing from another financial institution. Edra also believed

that she would receive a cash infusion from the sale of Chateau de Farcheville, which Edra

thought she could sell for $50 to $60 million. The CIP Loan reached maturity and neither BLX

nor Edra were able to repay the CIP Loan in full. Once it was clear that Edra would not be able

to secure long-term financing, Byrne once again suggested that the Yellowstone Club file

bankruptcy. Blixseth maintains that this bankruptcy is nothing but a sham concocted by Edra and

Byrne so Byrne could purchase the Yellowstone Club at a deep discount.

Blixseth seeks to discredit Edra's testimony claiming Edra overstated the value of her

assets in various pleadings before this Court. Based upon what she knew in 2008, Edra believed

that Porcupine Creek was worth $207 million; Chateau de Farcheville was worth $64 million;

Casa Captiva in Mexico was worth $22.5 million; and the Family Compound at the Yellowstone

Club was worth $40 million. While it is clear now that the aforementioned assets are worth far

less than what Edra believed in 2008, her mistaken belief as to value does not undermine her

credibility. Unfortunately for Edra, she mistakenly believed that the assets she was acquiring

under the MSA were worth much more than they really were.

Blixseth also seeks to discredit Edra by pointing out that Edra failed to list BLX in her

personal bankruptcy schedules as one of her 20 largest unsecured creditors. As part of the MSA,

ER01065

Edra assumed the obligation that Blixseth owed BGI stemming from Blixseth's personal use of the Credit Suisse loan proceeds.  Blixseth contends that Edra owed BLX $181 million on her petition date and that it was incumbent upon her to list BLX as a creditor.  The Court is not going to discredit Edra's testimony simply because she essentially failed to list herself as a creditor on the list of 20 largest unsecured creditors.

### CONFIRMATION of the YELLOWSTONE CLUB ENTITIES' THIRD AMENDED JOINT PLAN of REORGANIZATION

On May 17, 2009, the Debtors and the Unsecured Creditors Committee settled and released their claims against Credit Suisse.  Shortly thereafter, the Debtors filed their Third Amended Joint Plan of Reorganization on May 22, 2009.  Following a hearing held June 1, 2009, the Court entered an Order on June 2, 2009, confirming the Debtors' Third Amended Joint Plan of Reorganization.  Under the Yellowstone Club entities' confirmed Third Amended Joint Plan of Reorganization, the bankruptcies of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, and Yellowstone Club Construction Company, LLC were substantively consolidated, and are being jointly administered with the Chapter 11 bankruptcy of Big Sky Ridge, LLC.  Bankruptcy Case Number, 08-61570 was designated by this Court as the lead case number for the consolidated and jointly administered cases.

Pursuant to Debtors' confirmed Third Amended Joint Plan of Reorganization, YCLT was created on July 17, 2009.  As contemplated by the Debtors' confirmed Third Amended Joint Plan or Reorganization and pursuant to an Assignment and Assumption Agreements, the claims of the Debtors' were assigned to YCLT.  On September 18, 2009, YCLT was substituted in place of the Debtors and the Unsecured Creditors Committee in this consolidated Adversary Proceeding.

**Case No. 12-35986 ER  736**

PROCEDURAL POSTURE of this ADVERSARY PROCEEDING

During several debtor-in-possession financing hearings, the $375 million Credit Suisse loan and Blixseth's personal use of the loan proceeds was a popular topic of discussion.  Those discussions eventually prompted the Court to schedule a show cause hearing on January 13, 2009, for parties in interest to appear and show cause why the Court should not lift the automatic stay to allow enforcement of the three Promissory Notes between the Debtors and BGI (now BLX) in the approximate stated amount of $275,000,000.  Following the January 13, 2009, hearing, the Court entered an Order on January 16, 2009, lifting the automatic stay to allow "[the Official Committee of Unsecured Creditors], as fiduciary of the bankruptcy estate, [to] conduct a full review of the causes of action belonging to [the Yellowstone Club entities] that are related to the Promissory Notes to determine how [the Yellowstone Club entities'] bankruptcy estates should best proceed to recover the divested proceeds of the Credit Suisse loan[.]"

Shortly thereafter, the Official Committee of Unsecured Creditors (the "Committee"), on February 11, 2009, filed a combined "Notice of Claim Against Credit Suisse, Objection to Claim of Credit Suisse, and Motion for Authorization to File Complaint Against Credit Suisse." Blixseth's counsel received notice of the Committee's February 11, 2009, combined pleading, including the proposed complaint attached thereto.  In anticipation of the Committee's complaint and as a protective measure, Credit Suisse filed a complaint against the Yellowstone Club entities and the Committee on February 25, 2009, thereby commencing this Adversary Proceeding.  Credit Suisse's complaint was accompanied by a Motion to Expedite Proceedings and Set an Immediate Scheduling Conference.

The Committee then filed a separate complaint against Credit Suisse and John Does 1-15

56

ER01067

**Case No. 12-35986 ER  737**

on March 3, 2009, thereby commencing Adversary Proceeding 09-00017.  This Adversary

Proceeding and Adversary Proceeding 09-00017 were consolidated by the Court on March 3,

2009.  Blixseth's counsel, along with the other attorneys involved in the Yellowstone Club

entities' bankruptcies, including counsel for the Yellowstone Club entities, the Committee and

Credit Suisse, appeared at a hearing held March 4, 2009.  At the March 4, 2009, hearing, counsel

for the Yellowstone Club entities, the Committee and Credit Suisse discussed the need for an

expedited trial in this consolidated Adversary Proceeding because of the Debtors' need to secure

confirmation of a Chapter 11 plan before their already extended debtor-in-possession financing

expired.  At the conclusion of the March 4, 2009, hearing, the Court directed the parties to

submit a proposed scheduling order.  On March 11, 2009, the Yellowstone Club entities, the

Committee and Credit Suisse filed a Stipulated Scheduling Order, which the Court adopted as the

Scheduling Order governing this consolidated Adversary Proceeding.  The Scheduling Order set

April 22, 2009, as the date for commencement of trial.

On March 16, 2009, Blixseth filed a Motion to File Complaint in Intervention.  Following

an expedited hearing held March 24, 2009, the Court granted Blixseth's motion to intervene.

While the Court advised Mr. Guthals, one of Blixseth's attorneys, that it would entertain requests

to extend discovery and other such deadlines, the Court made it very clear to Mr. Guthals that

trial would commence on April 22, 2009, as scheduled, and that Blixseth would not be permitted

to delay the proceedings.

Blixseth's counsel promptly filed Blixseth's complaint in intervention on March 24, 2009,

and on March 25, 2009, Blixseth filed a request for shortened time for the other parties-in-

interest to respond to his complaint in intervention, which the Court granted.  Despite the Court's

ER01068

**Case No. 12-35986 ER  738**

prior directive to Blixseth and his counsel that they be ready for trial on April 22, 2009, Blixseth

filed a Motion to Amend Scheduling Order and Continue Trial Date on March 26, 2009.

arguing:

> 11. On behalf of Mr. Blixseth, the undersigned requests that the present trial date
> be continued to a date and time convenient to the Court and counsel, but not
> earlier than May 11, 2009 and that the pretrial deadlines be adjusted and the time
> for parties to respond to discovery requests be shortened, all to allow Mr. Blixseth
> to have a fair opportunity in the trial of this consolidated adversary proceeding.

> 12. Mr. Blixseth and his lawyers appreciate the Court's need to promptly decide
> the issues in this case, prior to confirmation of the Chapter 11 Plan, and are
> willing and able to handle this litigation in an expeditious fashion, as they have so
> far demonstrated.

Following a hearing held March 27, 2009, the Court entered an Order denying Blixseth's motion

for continuance.

Prior to commencement of trial, Blixseth filed on April 14, 2009, an emergency motion to

dismiss the Committee's claims against Blixseth.  In said emergency motion, Blixseth claimed

that the Committee had violated Blixseth's attorney-client relationship and gained confidential

attorney-client information from attorney Brown on matters that were the subject of the litigation

in this consolidated Adversary Proceedings.  Blixseth argued that he had been damaged by

Brown's alleged divulgence of information that was protected by Blixseth's attorney-client

privilege.

Brown admittedly represented the Debtors in various matters between the late 1990's

through 2008.[45]  Doyle testified that Brown was "prime" Montana counsel for the Yellowstone

---

[45]  The Debtors explicitly waived the attorney-client privilege with regard to the Debtors
and Credit Suisse loan or communications with counsel.  Also, Brown withdrew as the Debtors'
counsel in the fall of 2008.

ER01069

**Case No. 12-35986 ER  739**

Club, and as Sumpter explained, during the Credit Suisse transaction "[Brown] was our Montana counsel.  And so everything, basically – Mike Doyle basically managed [Brown] because [Doyle] managed our attorneys at that point in time."  Brown also represented Blixseth personally in a separate action brought by Greg LeMond against certain of the Debtor entities and Blixseth starting in October of 2007[46] and then also from June of 2008 to sometime in the fall of 2008 in connection with Blixseth's divorce from Edra as it pertained to the division of Montana assets.  Both the LeMond Plaintiffs' litigation and LeMond's separate litigation were stayed on November 10, 2008, as a result of the Debtors' bankruptcies and thus, Brown has not done any work for Blixseth personally since that time.

Brown and his law firm, Garlington, Lohn & Robinson, PLLP ("GLR"), have a substantial unsecured claim against the Debtors for work that Brown and GLR did for the Debtors prepetition.  Because of the substantial claim, Brown agreed to serve as Chairman of the Committee.  Brown was one member on an eleven member committee and testified that he served as a layperson on the Committee, performing no legal work for the Committee.[47]  The Committee was represented by various attorneys from Parsons, Behle & Latimer of Salt Lake City, Utah and by attorney James H. Cossitt of Kalispell, Montana.

Blixseth claims Brown's alleged violations of Blixseth's attorney-client privilege has tainted every aspect of the trial in this matter.  Given the seriousness of the allegations, the Court

---

[46]  Brown did some initial work in the LeMond Group litigation, but that suit named only Yellowstone Mountain Club, LLC and Yellowstone Development, LLC.  Blixseth was not named as a defendant in the LeMond Group litigation.

[47]  Jorge V. Jasson of the LeMond Group also served on the Committee but Greg LeMond was not on the Committee, despite suggestions by Blixseth that Greg LeMond was a member of the Committee.

instructed the Committee to initially produce copies of those email communications on Blixseth's Exhibit 8 that originated from Brown. The Committee complied with the Court's request by producing, on May 1, 2009, copies of various email communications between December 22, 2008, and March 19, 2009.[48] The Court carefully reviewed each of the emails and found that the emails in question were protected by the Committee's attorney-client privilege. Moreover, and more importantly, the Court found absolutely no evidence that Brown violated Blixseth's attorney-client privilege. In sum, Blixseth failed to show any actual disclosure of attorney-client communication. Blixseth's arguments on this point were nothing but baseless allegations intended to derail these proceedings.

Blixseth's counsel also took every opportunity to complain that Blixseth was denied due process because of his inability to properly prepare for trial given the speed with which the matter went to trial. For example, on the eve of trial, Blixseth's counsel filed an expedited motion to bifurcate trial of claims regarding Blixseth arguing that Blixseth had not had an opportunity to conduct and complete adequate discovery and trial preparation. In response to that argument, the Court wrote:

> The Committee and the Debtors oppose Blixseth's motion for bifurcation arguing that this case has been a monumental undertaking for every party, not just Blixseth. Once Blixseth asked to be a part of this case, the parties worked with Blixseth–including delaying Blixseth's deposition while he was on his honeymoon–and now Blixseth is an integral part of this proceeding. Credit Suisse similarly opposes Blixseth's request arguing that Credit Suisse could potentially be collaterally estopped from proceeding with its claims against Blixseth.
>
> The Court agrees with the positions of the Committee, Debtors and Credit Suisse regarding bifurcation. Particularly as Blixseth's counsel filed a notice of

---

[48] The Committee later provided the Court with four disks that contained all the privileged communications identified on Exhibit 8.

ER01071

**Case No. 12-35986 ER  741**

appearance on November 24, 2008.  Moreover, Blixseth's counsel received notice of the Committee's proposed complaint as early as February 11, 2009, and while Blixseth is not specifically named as a defendant in said complaint, as Blixseth's counsel argues, it's quite apparent from a reading of the complaint that Blixseth is one of the John Does. Blixseth's request for bifurcation would put this entire proceeding into a tailspin at this juncture, resulting in a vicious circle of piecemeal litigation.

Blixseth next complained on April 22, 2009, the date trial was scheduled to commence, that the other parties in this matter had not formally produced all their exhibits to Blixseth.  After considering Blixseth's numerous grievances, the Court, for Blixseth's benefit, delayed the trial for a period of one week, explaining:

> [T]he Court is troubled by the parties' lackadaisical attitude toward producing their exhibits to each other. While the Committee did not have a great deal of documents to produce in this case, the Committee . . . established an FTP server where all the parties could deposit all documents relevant to this case. That server contains thousands and thousands of pages of documents. Because all the parties, including Blixseth, had access to the FTP server, the parties failed to produce their exhibits to each other under the time set forth in the Scheduling Order, as amended on April 16, 2009. To be specific, even though exhibits were to be provided to opposing parties on April 20, 2009, Blixseth did not receive some exhibits until 11:00 p.m. on the eve of trial. Moreover, as of 09:00 a.m. on the day of trial, this Court did not yet have a pretrial order from the parties. The Court will not allow this case to go forward if it would deny a party its Constitutional right to fundamental due process.
>
> Blixseth now has copies of the Debtors' Exhibits, the Committee's Exhibits and Credit Suisse's Exhibits. Because bifurcation is not a viable option, the Court's only alternative is to delay the trial to afford Blixseth time to review and digest the exhibits from other parties.

Blixseth's counsel also argued on a regular basis that Blixseth was being denied due process because the Committee, the Debtors and Credit Suisse had a full month more to prepare for trial.  The evidence showed otherwise.  The parties all agreed that Blixseth was originally named as a defendant in the Committee's complaint and in fact, on or about February 7, 2009, the

ER01072

Committee's counsel contacted Blixseth's counsel, Michael Flynn, as a courtesy, prior to the date the Committee filed its Complaint, to apprise Blixseth that he was going to be named as a defendant. About this same time, Blixseth was making noise that he was going to possibly put an end to the increasing litigation associated with the Debtors' bankruptcy cases by proposing to pay many of the unsecured creditors in full.  Blixseth's statements obviously prompted Brown to send an email to the Committee's counsel asking the Committee to hold off on filing the Complaint against Blixseth stating "we need to hear what Tim Blixseth has to say first[.]"  Sometime between February 7, 2009, and March 3, 2009, Blixseth was removed from the Committee's Complaint as a named defendant.

Still, as Blixseth's counsel explained, the complaint filed in Adversary Proceeding No. 09-17 contained numerous references to Blixseth. Thus, Blixseth felt compelled to intervene. While Blixseth was not granted leave to officially intervene until March 24, 2009, Blixseth knew the Committee had its sights on him as early as February 7, 2009.  Accordingly, Blixseth had just as much time as the other parties to prepare for trial, yet Blixseth continued to complain that he was being denied due process under the deadlines and trial date set forth in the stipulated scheduling order.

Part I of the trial in this consolidated Adversary Proceeding finally commenced on Wednesday, April 29, 2009.  Part I of the trial was held in Missoula on April 29, April 30, May 1, May 4, 5 and 6, 2009.  At Part I of the trial, the Debtors were represented by Tom Hutchinson, Troy Greenfield, Connie Sue Martin and David A. Ernst of Seattle, Washington, and James A. Patten of Billings, Montana; Credit Suisse was represented by Mark S. Chehi, Robert S. Saunders and Joseph O. Larkin of Wilmington, Delaware, George A. Zimmerman, Evan R. Levy

and Jeremy M. Falcone of New York, New York, Edward J. Meehan of Washington, D.C. and Shane Coleman of Billings, Montana; the Committee was represented by J. Thomas Beckett, Chris P. Wangsgard, Derek Langton, Sean D. Reyes and Mark W. Dykes of Salt Lake City, Utah, and James H. Cossitt of Kalispell, Montana; and Blixseth was represented by Michael J. Flynn of Boston, Massachusetts, Joseph M. Grant of Houston, Texas, and Joel E. Guthals of Billings, Montana.  The Court heard expert testimony from David Abshier, John Hekman, Kent Mordy and Christopher Donaldson.  The Court heard fact testimony from Blixseth, Michael W. Doyle (currently in-house counsel for Blixseth Group of Washington, LLC), Stephen R. Brown, Moses Moore, Brad Foster, Samuel T. Byrne, Edra Blixseth, Steve Yankauer, and Robert Sumpter.  The testimony of the following witnesses was submitted through deposition transcript:[49] Jeff Barcy, Dean R. Paauw and William G. Griffon.

Following conclusion of Part I of the trial on May 6, 2009, the Court entered a Partial and Interim Order on May 12, 2009.  The Partial and Interim Order dealt solely with the Debtors' and the Committee's claims against Credit Suisse.  The Court specifically noted in the Partial and Interim Order that the Court was issuing "an interim ruling for purposes of facilitating the upcoming auction of the Debtors' assets" and that a detailed memorandum of decision and order would be entered at a later date to decide all matters heard at trial.  On June 11, 2009, the Court

---

[49] Blixseth listed George Mack as a trial witness in his Amended List of Witnesses filed April 27, 2009.  Blixseth testified at trial that George Mack was in Missoula at the time of trial and available to testify.  However, Blixseth did not call George Mack as a witness.  After trial, a question arose regarding the admission into evidence of George Mack's deposition.  Because George Mack was available to testify, but was not called, the Court declines to consider George Mack's deposition under Fed.R.Civ.P. 32(a), made applicable to this proceeding by F.R.B.P. 7032.  For the reasons just stated, and because Stephen R. Brown testified, the Court will similarly not consider the deposition testimony of Stephen R. Brown.

**Case No. 12-35986 ER  744**

entered its subsequent Memorandum of Decision in which it denied Blixseth's then pending motions to dismiss.  The Court also "found absolutely no evidence that Brown violated Blixseth's attorney-client privilege" concluding that "Blixseth's arguments on this point are nothing but baseless allegations intended to derail these proceedings."[50]  GLR has a substantial claim against the Debtor entities stemming from the legal services provided by GLR to the Debtors.  It thus made sense for Brown to serve on the Committee.  Although Brown had also represented Blixseth personally in some very specific matters, the evidence showed that Blixseth encouraged Brown to serve on the Committee, Blixseth understood the constraints under which Brown was proceeding, that Blixseth was fully aware that Brown could not represent him in the Debtors' bankruptcy cases and that Brown recused himself from any Committee activities that might conflict with his prior representation of Blixseth.  For instance, Brown recused himself from participating in the subcommittee of the Committee that made the decision to file suit against Credit Suisse and Blixseth.  Blixseth did not produce any evidence to show that Brown's involvement on the Committee in any way compromised Blixseth or tainted these proceedings.

The Court also wrote in the June 11, 2009, Memorandum of Decision:

> The evidence to date is not favorable for Blixseth. However, this Court is very cognizant of how fast this matter went to trial, and thus, the Court will keep

---

[50]  Blixseth also sought in another motion the "imposition of sanctions and contempt for intentional spoliation of books, records and electronic evidence of Edra Blixseth."  Blixseth, in the spoliation motion sought, in part, dismissal of this Adversary Proceeding because of Edra's alleged spoliation of evidence.  In denying such motion, which contained not a single allegation of wrongdoing by the Debtors or YCLT, the Court concluded that Blixseth had failed "to show how the alleged destruction of emails, particularly 'a gap of sent emails from October 2008 through December 2008,' ha[d] any relevance to the Credit Suisse loan in 2005 or the use of proceeds therefrom."  Dkt. 546, p.5.  Many of Blixseth's claims to date have been nothing more than unsubstantiated rhetoric meant to divert this Court's attention away from the controlling facts.

the record open and will set a further scheduling conference in August. At that time, the Court will schedule a continued trial date at which the parties will be afforded additional time to present additional evidence for and against Blixseth. By keeping this record open and allowing Blixseth additional time to prepare for trial, the Court will permit Blixseth an opportunity to further develop the merits of his case with new, not cumulative, evidence and will further permit and authorize Blixseth to immediately pursue any additional new, not cumulative, discovery that may be permissible under the Federal Rules of Bankruptcy Procedure, without waiting for the August scheduling conference.

After the Court entered the above Memorandum of Decision on June 11, 2009, the Court entered an Order on June 29, 2009, dismissing all claims brought by or against Credit Suisse in this consolidated Adversary Proceeding.  The Court also vacated its Partial and Interim Order entered May 12, 2009.

Following a scheduling conference held August 12, 2009, the Court entered a further scheduling order which directed that Part II of the trial in this Proceeding would commence on February 24, 2010.  After entry of the further scheduling order on August 12, 2009, the now-named Defendant/counter claimant, Yellowstone Club Liquidating Trust ("YCLT"), filed a Motion for Party Substitution on September 3, 2009, seeking to substitute YCLT in place of the Committee and the Debtors on grounds that YCLT is the successor-in-interest to the claims brought by the Committee and the Debtors in this action, which were transferred to YCLT on July 17, 2009, pursuant to the Debtors' confirmed Third Amended Joint Plan of Reorganization and an Assignment and Assumption Agreement.  YCLT's motion for substitution was granted on September 18, 2009.

Part II of the trial was held February 24, 25 and 26, 2010, in Missoula.  Blixseth was represented at Part II of the trial by Michael J. Flynn of Boston, Massachusetts, Benjamin A. Schwartzman, Thomas A. Banducci and Wade L. Woodard of Boise, Idaho, and Joel E. Guthals

ER01076

of Billings, Montana.  YCLT was represented at Part II of the trial by Steven L. Hoard and John

G. Turner, III of Amarillo, Texas, Brian A. Glasser and Athanasios A. Basdekis of Charleston,

West Virginia, and Shane P. Coleman of Billings, Montana.  The Court heard additional

testimony from Marc S. Kirschner, Ani Garikian of Kolodny & Anteau, Richard Samson, Robert

Reilly, Joanne B. Sheridan, David Thornton, Blixseth, Moses Moore, Michael Snow, Kent

Mordy and Harry Potter.

Following Part II of the trial, the parties participated in a post-trial mediation in May of

2010.  The Court has been advised that the mediation was not successful in resolving the pending

matters in this Adversary Proceeding.

## JURISDICTION and VENUE

This consolidated Adversary Proceedings arises under title 11 of the Bankruptcy Code,

and arises in and is related to the Debtors' substantively consolidated and jointly administered

bankruptcy cases, which are pending in this Court.  This Court has jurisdiction over these

proceedings under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

Venue is proper under 28 U.S.C. § 1409.  Blixseth withdrew his request for a jury trial after

YCLT withdrew its claim for punitive damages.

## CONTENTIONS OF THE PARTIES

The parties contend that there are two central unresolved issues in this case: "(i) whether

Mr. Blixseth breached his fiduciary duties to the Debtors by causing the Borrowers to enter into

the Credit Suisse Loan and by subsequently using the proceeds for his personal benefit and for

the benefit of third parties, and the damage, if any, caused by the alleged breaches; and (ii)

whether the Credit Suisse Loan and the subsequent transfers of those loan proceeds were

Case No. 12-35986 ER  747

fraudulent transfers under Montana state law."

Notwithstanding his actions, Blixseth claims that Edra, in the period of time between mid-August of 2008 and November 10, 2008, concocted a scheme with Byrne to drive the Debtors into bankruptcy so that Byrne could purchase the Debtors at a deep discount, with no apparent benefit to Edra. The Court is not persuaded by Blixseth's attempts to lay blame at Edra's doorstep, particularly when Blixseth was the driving force behind the Credit Suisse transaction.

Blixseth attempts to justify his use of the money arguing that Blixseth knew he needed to reach a bigger market if the Yellowstone Club was going to succeed financially. Thus, he sought to take the Yellowstone Club international and that is why Yellowstone Club World was created. But those properties, with perhaps the exception of Chateau de Farcheville and the Scotland property, ended up in the hands of Edra and Blixseth personally. Blixseth's counsel summarized in oral argument that Blixseth "built it, he owned it, he was absolutely entitled to take this money out, and it was part of his business vision to go international.

Blixseth contends, and Mordy agrees, that BGI paid back approximately $6 million of the $209 million note. Interest was also paid over a period of time, but eventually stopped. There was no real distinction between Blixseth and BGI, other than BGI's corporate structure and Blixseth agrees that he had sole control of BGI's affairs in 2005.

In his complaint-in-intervention, Blixseth seeks declaratory judgments: (1) that the Committee's and the Debtors' claims are barred by the statute of limitations; (2) that the Credit Suisse Loan was not a fraudulent transfer; (3) that Blixseth has been released from liability for any claim asserted by the Debtors; (4) that Blixseth did not have a fiduciary duty to the Debtors'

creditors; (5) that the loan or a portion of the Credit Suisse Loan proceeds to BGI was not a fraudulent transfer; and (6) that YCLT's claims assigned from the Debtors' and its amended claims are based on defective assignments under Montana law, that said claims are based on the bad faith of the Debtors, Cross Harbor Capital and Edra, that said claims are barred as a matter of law, and that the real party in interest of YCLT is Credit Suisse, which is contractually prohibited from pursuing claims against Blixseth on a nonrecourse loan.

YCLT counterclaims that in directing the Debtors to enter into the Credit Suisse Loan and immediately transferring a substantial portion of those proceeds to BGI (for Blixseth's personal use), Blixseth breached his fiduciary duties to the Debtors, entitling YCLT to damages and/or disgorgement of all funds received by Blixseth from the Credit Suisse loan proceeds.  Also, YCLT claims that in directing Debtors to purchase certain assets for the benefit of third parties using proceeds from the Credit Suisse Loan, Blixseth breached his fiduciary duties to Debtors, entitling YCLT to damages and/or disgorgement of all funds received by Blixseth from the Credit Suisse loan proceeds.  Next, counsel for YCLT asserts that YCLT is entitled to recover damages in the amount of at least $286.4 million for Blixseth's breaches of fiduciary duties. YCLT maintains that pursuant to 11 U.S.C. § 544(b), the transfer of proceeds from the Credit Suisse Loan to BGI and Blixseth for the benefit of Blixseth was a constructively fraudulent transfer under MONT. CODE ANN. ("MCA") § 31-2-333(1)(b), and can be avoided pursuant to 11 U.S.C. § 550 and MCA § 31-2-339(1)(a).  YCLT argues that the transfers/distributions described above constitute a violation of MCA § 35-8-604(1)(a) and (b).  YCLT also claims that pursuant to 11 U.S.C. § 544(b), the purchase of certain assets for the benefit of third parties using proceeds from the Credit Suisse Loan were constructively fraudulent transfers under MCA §

68                                                                    ER01079

**Case No. 12-35986 ER  749**

31-2-333(1)(b), and can be avoided pursuant to 11 U.S.C. § 550 and MCA § 31-2-339(1)(a).

Next, YCLT contends that the transfer/distribution described above constitute a violation of

MCA § 35-8-604(1)(a) and (b).  YCLT argues that it is entitled to a judgment against Blixseth

for the value of the transfers in the amount of at least $286.4 million.  According to YCLT, the

transfers of Credit Suisse loan proceeds constitute conversion.  Furthermore, YCLT argues that

Blixseth has been unjustly enriched by such transactions.  Therefore, YCLT argues that it is

entitled to a judgment against Blixseth for the value of the loan proceeds that he converted in the

amount of at least $286.4 million.  YCLT states that this is also the amount by which Blixseth

has been unjustly enriched.  Finally, YCLT maintains that Blixseth and BGI were the alter egos

of one another at all times prior to August 13, 2008.

The parties also assert additional defenses.  With respect to the alleged release of claims

purportedly given to Blixseth on behalf of the Debtors and/or BGI, YCLT asserts that such

release is a fraudulent transfer that should be set aside and declared to be unenforceable as a

matter of law.  YCLT argues that the claims against Blixseth constitute a valuable asset of the

Debtors' consolidated estate. The release of such claims would constitute a fraudulent transfer

under MCA §§ 31-2-333 and 31-2-334 and 11 U.S.C. § 548(a)(1), and can be avoided pursuant

to 11 U.S.C. § 550 and MCA § 31-2-339(1)(a).  YCLT asserts that the releases were obtained by

Blixseth with the actual intent to hinder, delay, or defraud the creditors of the Debtors.  Likewise,

the Debtors did not receive a reasonably equivalent value in exchange for the release.  No

consideration was given to the Debtors in return for the release.  The Debtors were engaged or

were about to be engaged in a business or transaction for which their remaining assets were

unreasonably small in relation to the business or transaction, and Blixseth knew that Debtors had

Case No. 12-35986 ER  750

incurred debts beyond the Debtors' ability to pay as they became due. The Debtors were insolvent within the meaning of MCA § 31-2-329 and 11 U.S.C. § 548(a)(1)(B) at the time the release was given. Blixseth was an insider of the Debtors, and he either knew the Debtors were insolvent or had reasonable cause to believe that the Debtors were insolvent. The release is unenforceable under California law, Montana law and federal bankruptcy law.

YCLT asserts that it has stated claims upon which relief can be granted. YCLT also asserts that its claims are not barred by any statute of limitations either because the limitations period had not run by the time this adversary proceeding was filed or because accrual of its claims was tolled under the adverse domination doctrine, the discovery rule and/or fraudulent concealment. Also, YCLT asserts that Blixseth's defenses of waiver, estoppel, laches, and unclean hands are not supported by the facts in this case and, in any event, these defenses may not be asserted against YCLT as a matter of law.

YCLT also counters that it has standing to assert the claims herein by virtue of the Debtors' Third Amended Joint Plan of Reorganization and certain assignments executed by the Debtors. According to YCLT, because the breach of fiduciary duty claims asserted by YCLT are intentional torts, Blixseth's arguments regarding proximate causation and intervening/superseding cause fail as a matter of law. Also, YCLT argues that because the relevant time period for analyzing fraudulent transfer claims is the time of the transfer, Blixseth's causation arguments fail as a matter of law. In addition, the causation arguments are not relevant or applicable to YCLT's fraudulent transfer claims against Blixseth. YCLT asserts that the self-dealing actions of Blixseth are not protected by the business judgment rule; the alleged reliance on experts defense asserted by Blixseth is not supported by the facts of this case; and

**Case No. 12-35986 ER  751**

Blixseth never received any expert advice relating to his breaches of fiduciary duty or the fraudulent transfers at issue herein.  Furthermore, such defense is not applicable as a matter of law because of Blixseth's self-dealing and conflicts of interest.  YCLT argues that the allegations made by Blixseth relating to alleged breaches of Blixseth's attorney-client confidences and privileged communications do not warrant dismissal of YCLT's claims.  YCLT also asserts that Blixseth's defenses of accord and satisfaction, payment and assumption of the risk are not supported by the facts.  YCLT further incorporates all the legal arguments made in its Response in Opposition to Blixseth's Motion for Summary Judgment including without limitation the arguments regarding the unenforceability of the release, YCLT's standing, the doctrine of issue preclusion, the Rooker-Feldman doctrine, the statute of limitations, and the alleged reliance on advice of counsel.  YCLT further incorporates herein all the legal arguments made in its Response in Opposition to Blixseth's Motion for Reconsideration of his prior motions to dismiss, including without limitation the arguments regarding Blixseth's claims of intervening or superseding cause.

In his reply to YCLT's amended counterclaim, Blixseth denies the Committee's counterclaims and further asserts that the Committee's counterclaims are barred in whole or in part by failure to state a claim upon which relief can be granted; statute of limitations; MCA §§ 1 -3-208, 1-3-215, 27-1-703; waiver; release; estoppel; laches; unclean hands; *in pari delicto*; accord and satisfaction; payment; settlement with Credit Suisse and accompanying offset; the doctrine of issue preclusion; the Rooker-Feldman doctrine and federalism principles; YCLT's lack of standing because Debtors are not creditors entitled to relief; YCLT's lack of standing because the creditors were not creditors at the time of the Credit Suisse loan transactions;

**Case No. 12-35986 ER  752**

YCLT's lack of standing because the Debtors unlawfully transferred their claims; YCLT's lack of standing because the Debtors' transfer of claims was void *ab initio*; YCLT's lack of standing because it is controlled by a party who participated in the allegedly bad behavior; assumption of risk by creditors who advanced credit after the Credit Suisse loan transactions; Blixseth's lack of proximate cause for the Committee's claims and damages; proximate causation by the conduct of other persons, including but not limited to, the collusion of Edra, Sam Byrne and CrossHarbor Capital to thwart a purchase of the Debtors by the filing of a Chapter 11 petition in bad faith; causation by unforeseen and unforeseeable events over which Blixseth had no control; Blixseth's conduct and transactions are protected by the business judgment rule; Blixseth's conduct and transactions were based upon Blixseth's reasonable reliance on advice of qualified professionals, including legal and accountant opinions; Blixseth is only subject to liability equal to that which could have been distributed without violating the Montana Limited Liability Act; and the claim for unjust enrichment is barred by the existence of legal remedies including, but not limited to, contractual, tort and statutory remedies.

This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.  For the reasons discussed below, judgment is entered in favor of YCLT, in part and in favor of Blixseth, in part.

## DISCUSSION

At the commencement of Part I of the trial in this matter, Blixseth's counsel argued that when this trial was over, the Court would understand that the primary reason the Yellowstone Club went into bankruptcy was because of Edra's "obsession to control the Yellowstone Club[.]" Blixseth failed to make any such showing.  Instead, the evidence shows that, as a threshold

matter, Blixseth removed funds from the Debtor entities and attempted to disguise the removal of

such funds as a loan, when in fact, the money was a distribution to BGI and then Blixseth.

Blixseth's removal of funds from the Debtors was the primary, and perhaps the sole reason the

Debtors are in bankruptcy today.

       1.     **Loan versus Distribution.**

The evidence in this case shows beyond any doubt that Blixseth took a substantial amount

of money from the Debtor entities with no intention whatsoever of repaying those monies back to

BGI or the Debtors.  In that vein, Blixseth did whatever was necessary to disguise his taking of

over $200 million as a loan.  A substance over form analysis puts matters in perspective by

highlighting Blixseth's efforts to dress up his dividend/distributions as loans.  *Bergersen v.*

*Commissioner*, 109 F.3d 56, 60 (1st Cir. 1997).  As explained by the First Circuit Court of

Appeals, the ultimate issue is "whether the owner is trying to smuggle earnings out of the

company without paying personal income tax[,]" for "if a 'loan' by the company to an owner is

not intended to be repaid, then allowing that label to control would effectively deprive the

government of its tax bite on dividends and salaries."  *Id.* at 59.

> The heart of the inquiry – intent to repay – is measured by objective factors:

> The conventional test is to ask whether, at the time of the withdrawal in question,
> the parties actually intended repayment.  Explaining that "intent" is difficult to
> discern, courts regularly resort to objective criteria, asking whether the transaction
> bears the traditional hallmarks of a loan or of a dividend.

*Id*. (citations omitted).  Thus, even allegedly heartfelt claims of an intent to repay cannot survive

the weight of adverse evidence:

> At the most, the mentioned testimony shows a subjective intent of the taxpayers to
> repay. A declared intent to repay is insufficient if it fails to jibe with the
> undisputed facts indicating the intrinsic economic nature of the transaction. The

**Case No. 12-35986 ER  754**

self-serving declarations must be balanced against the surrounding circumstances.
*Williams v. Commissioner*, 627 F.2d 1032, 1034 (10th Cir..1980).

The objective facts reveal a distribution, not a loan.  First, the BGI Notes were not created until mid-2006, months after Blixseth, through BGI took $209 million from the Debtors.  Until months later, the purported "loan" was evidenced by nothing more than a journal entry, and Blixseth admitted that a portion of the monies taken from the Debtors was previously classified as dividends.  Second, the notes from BGI to the Debtors were not created until after the LeMond parties threatened litigation.  *See Williams*, 627 F.2d at 1035 (citing a "failure to execute notes until the tax problems became acute").

Third, the promissory notes from BGI contained no terms of repayment.  *See Bergersen,* 109 F.3d at 59 ("no fixed repayment schedule").  Fourth, for the BGI Notes to be paid, Blixseth – who repeatedly testified to his sole control of BGI – would have had to make demand on himself for payment.  *See Bergersen,* 109 F.3d at 60 ("at the very outset of the loans, the Bergersens knew that there was no effective corporate constraint to induce repayment.").

Also, the BGI Notes were unsecured.  Even though Porcupine Creek had been paid off with Credit Suisse proceeds and thus easily could have been pledged as collateral for the BGI Notes, it was not.  *See Bergersen*, 109 F.3d at 59 ("the loans had no collateral").  In response to his counsel's questions, Blixseth testified that he owned 100% of BGI so it "never crossed his mind" to mortgage Porcupine Creek to secure the notes.  He further testified he did not believe that he needed "security for himself," and that the security was "his promise to pay," although "in hindsight" he thought perhaps Porcupine Creek should have been pledged.  Sixth, Blixseth used the money for personal purposes.  *Williams*, 627 F.2d at 1035 ("Use of the withdrawals for

personal interests and repayment after the start of an audit are incompatible with an intent to repay when the withdrawals were made."); *Bergersen*, 109 F.3d at 69 ("the proceeds were used by the Bergersens for personal purposes.")

Furthermore, Blixseth's alleged repayments are not controlling. *See Williams*, 627 F.2d at 1035 ("[r]epayment is a factor to be taken into consideration along with all pertinent circumstances attending the transactions."); *Bergersen*, 109 F.3d at 60 ("Here, the payments had some of the traditional indicia of loans (notes existed, interest was paid). In other respects, formalities were absent (no fixed repayment date, no collateral, no credit limit)"). The payments in this case were nothing more than capital contributions. The payments were not made in regular amounts, but varied in relation to the intensity of Moses Moore's pleas for cash. Sam Byrne confirmed – in unrebutted testimony – that Blixseth repeatedly asked Byrne to make bulk purchases of lots to keep the Debtors afloat. The Debtors sold an aircraft to pay bills. The Debtors were cannibalizing their assets in order to meet their financial obligations. Yet Blixseth did not pay the BGI Notes. *See Williams*, 627 F.2d at 1034 (shareholder had ability to pay, yet did not).

Moreover, Credit Suisse's new loan product was created as a mechanism for resort owners to realize their profits up front, which is the equivalent of a transfer of retained earnings (before they were earned). *See Bergersen,* 109 F.3d at 60 ("regardless of formalities, the nominal loans, paid by a controlled company that was accumulating large earnings but paying its main owners no dividends, effectively gave the Bergersens permanent tax-free control over the moneys.") Also, the Debtors' financial projections for the Credit Suisse loan failed to account for an interest payment on any loans to related entities.

**Case No. 12-35986 ER  756**

The Court is similarly not persuaded that KPMG's audit somehow creates validity in the BGI Notes. KPMG did not audit BGI/Blixseth and refused to certify the BGI Notes' value in 2006 and 2007. *See Murphy v. Meritor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370, 409 (Bankr. D. Mass. 1991) ("clean audit report" not dispositive on debtor's finances).

In his testimony, Blixseth claimed that he had relied heavily on Mack's opinion that a transfer to BGI "had" to be a loan to avoid negative capital accounts. Blixseth's testimony was not credible on this point. The evidence shows that Blixseth was not concerned about avoiding negative capital accounts. Instead, Blixseth was driven by the sole desire to take all the money and avoid having to share anything with the "B" shareholders. In sum, the "objective factors . . . outweigh" Blixseth's claims of "subjective intent." *William*s, 627 F.2d at 1035.

Blixseth's efforts to avoid paying anything to the "B" shareholders further bolsters the Court's finding that Blixseth took a distribution from the Debtors, not a loan. Doyle told Blixseth in an August 30, 2005, memo that if the money came out as a distribution, it would have to be shared with the minority holders. Blixseth later warned Edra in a September 5, 2005, e-mail – right in the thick of the Credit Suisse negotiations – that the "B" shareholders were "nosing around" and a distribution must be avoided lest those holders claim a share. The Debtors' credit agreement with Credit Suisse was the only one of the similar resort loans that added the language of "or loans" ; even though, the purported "loan" was not documented until the LeMond case was filed. Blixseth's goal in calling his distribution a "loan" was to evade minority interests, not to provide reassurance to the Debtors of repayment. The BGI Notes were nothing more than phantom obligations created by Blixseth in an effort to avoid sharing the Credit Suisse loan proceeds with the "B" shareholders.

**Case No. 12-35986 ER  757**

In a final attempt to convince this Court that the distributions were in fact true loans, Blixseth introduced correspondence to and from the Internal Revenue Service.  The Court finds that any determination the Internal Revenue Service may have made with respect to the BGI notes is not binding on this Court.  26 U.S.C. § 6110(j)(3); *see also Disabled American Veterans v. C.I.R.*, 942 F.2d 309, 314-15 (6th Cir. 1991); *Mercantile Bank & Trust Co. v. U.S.*, 441 F.2d 364, 368 (8th Cir.1971); *B.F. Goodrich Co. v. U.S.*, 94 F.3d 1545, 1550 (Fed. Cir. 1996); *In re. Comp.*, 134 B.R. 544, 556 (Bankr. M.D. Pa. 1991); *In re Pulley*, 111 B.R. 715, 742 (Bankr. N.D. Ind. 1989).  The evidence clearly shows that the BGI notes were nothing but a sham to disguise Blixseth's distributions.

Correctly characterizing the three notes at issue as distributions, as opposed to loans, basically renders the expert opinions of Reilly and Sheridan moot because the expert opinions of Reilly and Sheridan were premised on the belief that the Debtors had a legitimate $272 million receivable on their books from BGI.  However, even if the BGI notes were legitimate, which they clearly were not, the Court would still not rely on Reilly and Sheridan's opinions in this case because Blixseth's counsel masterfully divided the work between Reilly and Sheridan so as to cast Blixseth in a light that simply does not shine in this Court.

Reilly did not give a solvency opinion as to the Debtors nor did he testify to such.  Moreover, on cross-examination, Reilly confirmed that he had not been retained to render a solvency opinion on the Debtors.  Reilly's opinion as to the Debtors was confined to whether the Debtors passed the cash flow and the capital adequacy tests.  Moreover, Reilly's solvency opinions as to Blixseth and BGI were to some extent dependent upon Sheridan's opinion as to whether the Yellowstone Club passed the balance sheet test.

Case No. 12-35986 ER  758

Blixseth retained Sheridan to perform one prong of a three-prong test, the balance sheet

test.  In order to perform that test, Blixseth provided Sheridan with Cushman & Wakefield's

September 30, 2005, appraisal.  Utilizing that appraisal and Debtors' 2005 income tax return,

Sheridan concluded that the fair market value of Debtors' total assets was $1,120,089,177.00 as

of September 30, 2005, which far exceeded Debtors' liabilities of $547,440,702.00.  The Court is

not persuaded by Sheridan's opinion regarding the balance sheet test.  While Sheridan ostensibly

based her solvency opinion as of September 30, 2005, on the discounted present value of the cash

flow projections contained in the September 30, 2005, Cushman & Wakefield appraisal, the

evidence is uncontroverted that Cushman & Wakefield's cash flow projections are based on

Yellowstone Club's management's over-inflated cash flow projections for 2005[51] that had no

basis in historical reality and appeared to be nothing more than unsupported puffery.

The Court, however, made no finding whatsoever at Part I of the trial with respect to

whether the Debtors were insolvent from a balance sheet perspective as of September 30, 2005.

Accordingly, the opinions of Ms. Sheridan (even if accepted by the Court) do not cause this

Court to disturb its findings of insolvency as to the Debtors on a cash flow basis and capital

adequacy basis as of September 30, 2005.

Rejecting Sheridan's opinion on the balance sheet test leaves Blixseth with the expert

opinion of Reilly.  Reilly was an extremely qualified and compelling expert.  But Reilly, for

reasons unexplained, did not perform a solvency analysis of the Yellowstone Club and Reilly's

---

[51]  The Court also notes that the discount rate used by Sheridan is substantially less than
the discount rate used by Cushman & Wakefield in both 2004 and 2008 – the only two occasions
on which Cushman &Wakefield did a discounted cash flow analysis.  In 2004, Cushman &
Wakefield used a discount rate of 18%, and in 2008 they used a rate of 20%.

solvency opinions regarding Blixseth and BGI were, to some extent, dependent upon Sheridan's flawed balance sheet conclusions regarding the Yellowstone Club.

Moreover, Reilly acknowledged that in giving his opinions, the information that he was relying upon was provided to him by Blixseth's legal counsel and accounting firm. Reilly also acknowledged the he had not "independently verified the accuracy and completeness of the information supplied by Legal Counsel or by the Accountants." Reilly conceded that he had heard and did not disagree with the concept of "garbage in/garbage out." After considering the information relied upon by Reilly, the Court finds that the information relied upon is not reliable and in fact that the garbage in/garbage out maxim is applicable. Indeed, by e-mail dated November 5, 2009, a mere eight days before Reilly issued his opinion, counsel for Blixseth provided Reilly "WAG" balance sheets for Blixseth and BGI. The unrealistic nature of the information provided to and relied upon by Reilly and the limited scope of his engagement leads this Court to conclude that his opinion, while generally credible, was so restricted by Blixseth and his counsel as to render his opinion in this case simply inapplicable.

Reilly testified that he did his own analysis of Yellowstone Club's management's cash flow projections in conjunction with his cash flow and adequate capital solvency opinions on Tim Blixseth and BGI. Like Sheridan, Reilly relied on the cash flow projections provided by the Yellowstone Club's management. However, Reilly's, like Sheridan's, reliance on such faulty projections is flawed and unpersuasive. To test the reliability of the projections, Reilly chose to compare projected gross revenues to actual gross revenues, as opposed to projected cash flows to actual cash flows as was done by Mordy and attempted to be done by Sheridan. Reilly chose to compare gross revenues even though a company could theoretically be on target with its

**Case No. 12-35986 ER  760**

projected gross revenues but still miss its cash flow projections by a large number.

Reilly testified that he compared gross revenues, instead of cash flows, because there was too much "noise" in the cash flow numbers, by which he meant too many non-recurring, non-operating expense and income items. Reilly conceded, however, that the only two such items he specifically mentioned, the LeMond settlement and the gain on sale of an airplane, were itemized on the actual financials and could have easily been accounted for by a "normalization adjustment."

In any event, Reilly's comparative analysis of projected gross revenues to actual gross revenues is fraught with the same type of mistakes as Sheridan's comparative analysis of cash flows. It is also noteworthy that Reilly chose to ignore, or was instructed to ignore or not consider, the actual historical financial performance of the Debtors in the period prior to September 30, 2005. The reason is obvious. Debtors' actual historical financial performance did not support Debtors' future projections and, in fact, Debtors' historical financial performance demonstrates conclusively that the Debtors would not be able to sustain the burden of the Credit Suisse debt, especially after Blixseth extracted his large distributions.

Reilly testified that Yellowstone Club's management's projections represented "the best then available estimates of future results of operations." He also testified that the Cushman & Wakefield cash flow projections were "well supported and not materially different from management's projections prior to 2008. In fact, as shown on the following chart, the Cushman & Wakefield projections for 2007 and 2008 were substantially lower than management's projections for those same time periods:

**Case No. 12-35986 ER  761**

|  | **2007 Cushman & Wakefield** | **2007 Yellowstone Management** | **Variance** |
|---|---|---|---|
| Lot Sales | 35 | 53 | (18) |
| Gross Proceeds from Sale of Home sites | $99 Million | $148.5 Million | ($49.5 million) |
| Cash Flow | $34.6 Million | $137.9 Million | ($103.3 million) |

|  | **2008 Cushman & Wakefield** | **2007 Yellowstone Management** | **Variance** |
|---|---|---|---|
| Lot Sales | 35 | 53 | (18) |
| Gross Proceeds from Sale of Home sites | $99 Million | $148.5 Million | ($49.5 million) |
| Cash Flow | $34.6 Million | $137.9 Million | ($103.3 million) |

Given Reilly's acknowledgment that Cushman & Wakefield had substantial experience in doing these types of cash flows and that Blixseth had no experience, Reilly's decision to rely on management's projections for his opinions is highly questionable. Confronted with this issue, Reilly asserted that the Cushman & Wakefield projections were done on an accrual, as opposed to a cash basis, and that they were based on "a different business model." However, since the Cushman & Wakefield projections are based on management's own projections and purport to project actual lot sales and cash flow, Reilly's assertions appear to be unfounded. Mordy confirmed that Reilly's assertions were unfounded.

The Court also rejects Blixseth's argument that YCLT's case must fail because KPMG gave the Debtors clean, unqualified audit opinions in 2005, 2006 and 2007. Those unqualified audit opinions were based upon the assumption that the BGI notes were fully collectible. As

ER01092

**Case No. 12-35986 ER  762**

determined above, the notes were in fact distributions that should not have appeared as an asset

on BGI's balance sheet.  Moreover, nothing in the evidence suggests that KPMG audited BGI to

determine whether the BGI notes were collectible.  Blixseth seeks to convince the Court that BGI

paid down roughly $70 million on the BGI notes, thereby proving that the BGI notes were

collectible.  That alleged pay down was nothing more than an infusion of cash by Blixseth in an

attempt to keep the Debtors afloat.

Having concluded that the purported loans from the Debtors to BGI were in fact

distributions, the Court now turns to various contentions set forth in the Amended Pretrial Order

filed February 17, 2010, at docket entry no. 538:

### 2.    Statute of Limitations.

The burden of proof on an affirmative defense such as the statute of limitations rests with

the party asserting the defense.  F.R.B.P. Rule 7008; Fed.R.Civ.P. 8(c); *E.F. Matelich*

*Construction Co., Inc. v. Goodfellow Brothers, Inc.*, 217 Mont. 29, 32, 702 P.2d 967, 969 (1985).

MCA § 27-2-204 provides a three-year statute of limitations on claims "not founded upon an

instrument in writing[,]" such as a claim for breach of fiduciary duty.  The statute of limitations

for conversion and violation of the MCA § 35-8-604 is two years.  MCA §§ 27-2-207 and

35-8-605(4).  The parties disagree as to accrual.  YCLT argues that Montana common law

applies the discovery rule towards this statute of limitations.  *See Shupak v. N.Y. Life Ins. Co.*,

780 F. Supp. 1328, 1339 (D. Mont. 1991) (applying MCA § 27-2-102 to breach of fiduciary duty

claim); *Burgett v. Flaherty*, 663 P.2d 332, 334 (Mont. 1983); *Stanley L. and Carolyn M. Watkins*

*Trust v. Lacosta*, 92 P.3d 620, 629-30 (Mont. 2004) (legal malpractice claim in which attorney

owed fiduciary duties to client); *Estate of Watkins v. Hedman, Hileman & Lacosta*, 91 P.3d 1264,

1270 (Mont. 2004) (same). *See also Orr v. State*, 106 P.3d 100, 117 (Mont. 2004).

Blixseth argues that "[l]ack of knowledge of the claim or cause of action, or of its accrual, by the party to whom it has accrued does not postpone the beginning of the period of limitation." MCA § 27-2-102(2); *see also Bennett v. Dow Chemical Co.*, 713 P.2d 992 (Mont. 1986) ("The fact that a party with a cause of action has no knowledge of his rights, or even the facts out of which the cause arises, does not delay the running of the statute of limitations until [the party] discovers the facts or learns of his rights under those facts." (citing *Carlson v. Ray Geophysical Division*, 481 P.2d 327, 329 (Mont. 1971)). Blixseth further argues no concealment of YCLT's alleged claims occurred as everything about the loan transaction was done in the open and cites to the fact that other members—such as the LeMond Plaintiffs—were able to file suit within months of the September 30, 2005, Credit Suisse loan transaction. Additionally, Blixseth asserts that the discovery rule does not extend to YCLT's claim under MCA § 35- 8-604 because section 605 of that statute contains a statute of repose that provides that a "proceeding under this section is barred unless it is commenced within 2 years after the date of the distribution." MCA § 35-8-605(4).

MCA § 27-2-102(3) provides that "[t]he period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if: (a) the facts constituting the claim are by their nature concealed or self-concealing; or (b) before, during or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause." YCLT also argues that the doctrine of adverse domination tolls the statute of limitations period on a cause of action against a

corporation while wrongdoers control the corporation. *United States v. First National Bank & Trust*, 1994 WL 775440, *5 (D. Mont. 1994). "Under the doctrine of adverse domination, a statute of limitations is tolled on an action against director/officer misconduct so long as a majority of the board is controlled by the alleged wrongdoers. The doctrine rests on the theory that if the wrongdoers control the corporation through a majority of stock ownership and control the directorate[,] there [would] consequently [be] no one to sue them." *Id*. Finally, YCLT contends that the discovery rule prevented the running of limitations in this case.

Blixseth asserts that the doctrine of adverse domination does not apply. In order to prove adverse domination, "the wrongdoer's control [must] result[] in the concealment of causes of action from those who otherwise might be able to protect the corporation." *Frazer v. U.S.* 49 Fed.Cl. 734, 737 (Fed.Cl., 2001). Because of this standard, if a derivative action is possible and the facts giving rise to the claim are available, the adverse domination doctrine cannot be asserted, since an ability to "protect the corporation" existed. *Id.*; *Rx.com v. Medco Health Solutions*, Inc. 322 Fed.Appx. 394, 398-99 (5th Cir. 2009). Under Montana law, a derivative action is available to the members of a limited liability corporation. *See* MCA §35-8-1104; *Elf Atochem North America, Inc. Jaffari*, 727 A.2d 286, 293-94 (Del.Supr., 1999). Because a derivative suit was open to members of the Debtors, Blixseth concludes that adverse domination is not a viable theory in this matter. *Frazer*, 49 Fed.Cl. at 737; *Rx.com*, 322 Fed.Appx. at 398-99.

The evidence does not support Blixseth's position on this issue. The Debtors in this case filed bankruptcy on November 10, 2008. Thus, if the applicable statute of limitations had not expired by November 10, 2008, the claims were timely asserted because two years had not

**Case No. 12-35986 ER  765**

passed since the filing of the bankruptcy before the claims asserted herein were filed.[52]  Blixseth

argues that since many of YCLT's claims arise out of the Credit Suisse loan transaction that

occurred on September 30, 2005, that the statute of limitations bars recovery.  However, many of

YCLT's claims involve transfers that occurred in April and May of 2006, which breach of

fiduciary duty claims would clearly not be barred by the statute of limitations.  Nevertheless, for

the reasons set forth below, the Court finds that none of YCLT's claims accrued on September

30, 2005.  YCLT's causes of action have been timely asserted.

Pursuant to Montana's codified discovery rule, a "cause of action for an injury to person

or property [does not commence] until the facts constituting the claim have been discovered or,

in the exercise of due diligence, should have been discovered by the injured party if: (a) the facts

constituting the claim are by their nature concealed or self-concealing; or (b) before, during or

after the act causing the injury, the defendant has taken action which prevents the injured party

from discovering the injury or its cause."  MCA § 27-2-102(3).

Blixseth's actions that form the basis of the claim are by their nature concealed.  On

September 30, 2005, Credit Suisse transferred $342,110,262.52 to the Yellowstone Club and on

that same date, Blixseth transferred approximately $209 million out of the Yellowstone Club to

BGI.  The funds were then transferred from BGI to Blixseth, individually.  The transfer of funds

out of the Yellowstone Club to BGI and then to Blixseth was not memorialized in any

contemporaneous loan documents, but was simply recorded in the Yellowstone Club's books

with a journal entry.  It was not until the "B" shareholders threatened litigation in May 2006 that

---

[52] 11 U.S.C. § 108(a) extends a period to the later of the end of the period, or 2 years
after the order for relief.

ER01096

**Case No. 12-35986 ER  766**

Blixseth drafted his two-page unsecured promissory notes which were executed by BGI and

payable to Yellowstone Club on demand.  Even though the promissory notes were dated

September 30, 2005, they were admittedly not drafted and executed until May of 2006.

The overwhelming evidence shows a pattern of deception as it relates to the use of the

Credit Suisse loan proceeds.  One of the minority shareholders, Michael Snow, testified that he

was led to believe that the proceeds from the Credit Suisse loan were going to be used for

operating expenses and capital expenditures at the Club.  Notably, when Blixseth later took the

stand on rebuttal he did not deny Mr. Snow's testimony in this regard.  Moore, who at the time

was second in command of finances at the club, testified that he did not learn of the actual

disposition of the Credit Suisse proceeds until February 2006.  William G. Griffon, who was

Vice President of Operations at the time, testified that he did not learn of the disposition of the

loan proceeds until after the LeMond litigation was filed, around June of 2006.  Brown, former

counsel for the Debtors, testified that he was unaware of the use of the loan proceeds until May

2006.  And finally, Byrne testified that Blixseth originally represented that the Yellowstone Club

was essentially debt free and when Byrne later learned of the Credit Suisse loan, Blixseth

explained that the loan was related to Yellowstone Club World and not the Yellowstone Club.

Because the transfers from the Debtors to BGI were not documented until May of 2006,

the facts forming the basis of the claim against Blixseth were concealed.  As such, the statute of

limitations is tolled "until the facts constituting the claim have been discovered or, in the exercise

of due diligence, should have been discovered by the injured party . . . ."  Discovery could not

have occurred until May of 2006, at the earliest.

However, the Court finds that Blixseth was in sole control of the Debtors until they were

Case No. 12-35986 ER  767

transferred to Edra in August 2008. Given Blixseth's total control and domination of the Debtors until August 2008, the statute of limitations did not begin to run, and in fact was tolled, on YCLT's claims until August of 2008, a mere three (3) months prior to the bankruptcy filing. *See Rands, LLC v. Young (In re Young)*, 384 B.R. 94 (Bankr. D.N.J. 2008).[53] Blixseth has failed his burden of showing that the statute of limitations has expired. YCLT may assert its claims.

### 3. Ownership of the claims in this Adversary Proceeding.

Blixseth asserts that the assignment of the Debtors' claims to YCLT is invalid and that, as a result, YCLT does not own the claims it asserts herein. The Court disagrees and concludes that YCLT does in fact own the claims.

A hearing under 11 U.S.C. § 1128(a) and Bankruptcy Rule 3020(b)(2) was held May 18, 2009, in Butte on approval of the Debtors' Second Amended Joint Plan of Reorganization filed April 3, 2009, at docket entry no. 691. Prior to the May 18, 2009, confirmation hearing, the

---

[53] In discussing the discovery rule and equitable tolling as it applies to a statute of limitations, the court in Young explained:

> The discovery rule mandates that "the limitations period does not commence until the injured party actually discovers or should have discovered through reasonable diligence the fact essential to the cause of action." *R.A.C. v. P.J.S.*, 192 N.J. 81, 98, 927 A.2d 97 (2007). Equitable tolling applies in certain limited circumstances where the wrongful conduct of one party warrants tolling the running of the statute of limitations period. *Id*. at 100, 927 A.2d 97. An example of such conduct would be "where 'the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.' " *Freeman v. State*, 347 N.J.Super. 11, 31, 788 A.2d 867 (App.Div.2002) (quoting *Dunn v. Borough of Mountainside*, 301 N.J.Super. 262, 280, 693 A.2d 1248 (App.Div.1997)). "State common law tolling doctrines are incorporated by 11 U.S.C. § 108 and are, therefore, applicable in bankruptcy proceedings." *Levitt v. Riddell Sports, Inc. (In re MacGregor Sporting Goods, Inc.)*, 199 B.R. 502, 513 (Bankr.D.N.J.1995).

*Young*, 384 B.R. at 104.

**Case No. 12-35986 ER  768**

Debtors filed a ballot report compiled by Kurtzman Carson Consultants LLC which showed that Classes 4, 6, 9, 10, 12 and 14 voted to accept Debtors' Second Amended Joint Plan of Reorganization, while classes 3, 7, 8 and 13 voted to reject Debtors' Second Amended Joint Plan of Reorganization. However, in the hours leading up to the May 18, 2009, confirmation hearing, the Debtors; Credit Suisse, Cayman Islands Branch; the Committee; New CH YMC Acquisition LLC; CIP Yellowstone Lending LLC; CrossHarbor Capital Partners LLC; and CrossHarbor Institutional Partners, L.P. agreed in principal to a global settlement termed "Yellowstone Club Settlement Term Sheet" ("STS"). A signed copy of the STS was presented to the Court on May 18, 2009, but was not filed until May 22, 2009, when the Debtors filed their Third Amended Joint Plan of Reorganization, at docket entry no. 995.

The STS, because it was a settlement that included Credit Suisse, arguably impacted whether Class 3 and Class 8 creditors would accept or reject the Debtors' Plan. Counsel for the Debtors, the Committee, CrossHarbor and Credit Suisse thus agreed that the Debtors should have an opportunity to re-solicit the votes of Class 3 and Class 8 creditors. Moreover, while amendment of the Debtors' proposed joint plan was not required by the STS, the Court, in an effort to provide clarity to all parties going forward, directed the Debtors to amend their plan to specifically incorporate the STS.

Also at the May 18, 2009, confirmation hearing, counsel for YCW, the Montana Department of Revenue and the Internal Revenue Service noted that their objections to confirmation were not insurmountable and in fact, counsel for YCW made the statement that YCW may withdraw its objection to confirmation. The Debtors also sought to cure the objections of various other parties and concluded that the three remaining substantive objections to

ER01099

confirmation were those of Sumpter, Blixseth and Desert Ranch, LLP.  No appearance was made

at the May 18, 2009, confirmation hearing by or on behalf of Sumpter.  Thus, in an Order entered

May 18, 2009, the Court summarily overruled Sumpter's objection to confirmation.

The STS was filed separately with a new Credit Agreement on May 28, 2009, at docket

entry number 985.  Highland Capital Management, L.P., although not objecting to Debtors'

Second Amended Joint Plan of Reorganization or appearing at the confirmation hearing, filed an

Objection to Confirmation of the Debtors' Third Amended Joint Plan of Reorganization and

approval of the STS on May 22, 2009, at docket entry number 943.  Blixseth objected to

Debtors' Third Amended Joint Plan on May 26, 2009, at docket entry no. 969, by referencing his

prior objection filed May 11, 2009, at docket entry no. 860.  In his May 11, 2009, objection,

Blixseth incorporated Credit Suisse's objections to confirmation and also objected to the

Debtors' Third Amended Joint Plan "on the grounds that the Chapter 11 Plan is not filed in good

faith, but is a continuation of prepetition and post-petition acts of bad faith by the CEO of the

Debtors-in-Possession, Edra Blixseth, in concert with others, all is more fully described in

evidence previously presented or proffered to this Court in proceedings in the above captioned

main bankruptcy case and in Adv. Pro. 09-00014/09-00017."

While the Court considered the record on confirmation closed at the conclusion of the

May 18, 2009, confirmation hearing, the Court held an additional hearing on June 1, 2009.

Following the June 1, 2009, hearing, the Court entered an Order Confirming Debtors' Proposed

Plan of Reorganization on June 2, 2009.  The Court also entered Findings of Fact and

Conclusions of Law in connection with its approval of the Plan, wherein the Court specifically

held that the Plan was proposed in good faith.  Blixseth has appealed confirmation of the

Debtors' Plan, again maintaining that the Debtors' bankruptcy cases and the Third Amended Joint Plan were not filed in good faith. Blixseth also filed a motion to stay the order confirming the Debtors' Plan pending the appeal. The Court denied Blixseth's motion to stay the confirmation order, specifically concluding that the Plan was filed in good faith.

Debtors' Third Amended Joint Plan provides for the disposition of the assets of the Debtors in two major components. First, the "Project" was transferred to the "Reorganized Debtors" on the "Effective Date." Second, the non-Project Assets, including "Transferred Actions," were transferred by the Debtors on the Effective Date to the "Liquidation Trust" created under the terms of the Plan and organized pursuant to a Trust Agreement in substantially the form set forth in Schedule 1.85 to the Plan.

Section 8.2.2 of the Plans provides that "pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, on the Effective Date, all Transferred Actions of any kind or nature whatsoever against third parties arising before the Confirmation Date shall be transferred by the Debtors to the Liquidating Trust." The "Transferred Actions" include the claims asserted by YCLT against Blixseth in this Adversary Proceeding. The Court finds that the claims asserted by YCLT against Blixseth were assigned by virtue of the specific terms of the Plan, which was approved by the Court.

In addition to the foregoing, on July 17, 2009, Edra in her capacity as manager/president of BLX, the Manager of each of the Debtor limited liability companies, executed a certain Assignment and Assumption Agreement on behalf of the Debtors. The Assignment and Assumption Agreement includes the assignment of the Transferred Actions to YCLT. At the time Edra executed the assignments she was in personal bankruptcy. The Court does not find

**Case No. 12-35986 ER 771**

this fact significant since, as stated above, the Assignment was not executed in her individual capacity.  Nevertheless, out of an abundance of caution, the parties obtained a Consent and Authorization from Richard Samson, Edra's Chapter 7 bankruptcy trustee, authorizing Edra to "take such actions" as necessary to "complete and carry out the transactions contemplated by the [Plan]."  Richard Samson confirmed his consent in testimony before the Court.

After Debtors' Third Amended Joint Plan was confirmed, Marc S. Kirschner was appointed Trustee by the vote of the Trust Advisory Board (the "Board").  Subsequently, the Yellowstone Club Liquidating Trust Agreement was entered into and executed.  Section 1.1 of the Trust Agreement states that YCLT is organized for "the purposes of holding and liquidating Trust Claims and Trust Assets."  The Trustee has all the "rights, powers, and duties . . . that are necessary and proper to fulfill the purposes of the Trust" pursuant to Section 5.3.1 of the Trust Agreement.  The Trustee's duties include prosecution of "all suits as may be necessary, appropriate or incident to the purposes of the Trust" as set forth in Section 5.3.2.4.

Pursuant to Debtors' confirmed Third Amended Joint Plan and the Assignment and Assumption Agreement, Kirschner, as Trustee of YCLT, succeeds to "all Causes of Action that the Debtors or their Estates could assert immediately prior to the Effective Date," except certain claims released by the Confirmed Plan of Reorganization.  YCLT owns the claims asserted in this case and is the proper party to be asserting the claims being asserted against Blixseth.  Kirschner testified that he believed that the assignment was confirmatory only to give notice to third parties instead of asking bankers and vendors to review a complex plan.

As contemplated by the Debtors' confirmed Plan, on September 3, 2009, YCLT filed its Rule 25 Motion for Party Substitution seeking to substitute YCLT in place of the Committee and

**Case No. 12-35986 ER  772**

Debtors.  Blixseth did not object to this Motion, and on September 18, 2009, the Court entered

an ordered substituting YCLT for the Committee and the Debtors in this action.

After reviewing applicable law, the Court finds that YCLT owns the claims asserted

against Blixseth in this case.  In a prior Order, this Court addressed Blixseth's standing

arguments in the context of a motion for summary judgment wherein the Court noted:

> Blixseth argues that the Trust lacks standing to bring the Debtors' claims
> because the assignment of the claims are void as a matter of law, as tort claims are
> not assignable under Montana law.  The Trust responds that it stands in the
> Debtors' shoes under Bankruptcy Code § 1123(b)(3)(B) as a representative of the
> estate appointed for the purpose of retention and enforcement of any claim or
> interest belonging to the Debtors or to the estate under the confirmed Chapter 11
> Plan. The Trust cites provisions of the confirmed Plan which transferred non-
> Project Assets to the Trust, which under its Trust Agreement authorizes it to hold
> and liquidate Trust Claims, including prosecution of all suits as may be necessary.

> The Trust argues that, by contesting the validity of the assignment of
> causes of action to the Trust, Blixseth is inappropriately contesting the validity of
> the Plan, citing *In re Sherman*, 491 F.3d 948, 967 (9th Cir. 2007) (a timely filing of
> a notice of appeal typically divests a bankruptcy court of jurisdiction over those
> aspects of the case involved in the appeal, [but] the bankruptcy court retains
> jurisdiction over all other matters that it must undertake to implement or enforce
> the judgment or order, although it may not alter or expand upon the judgment).
> Based upon the authority granted the Trust under the confirmed Plan and §
> 1123(b)(3)(B), the Court declines to grant Blixseth summary judgment based
> upon state law barring assignment of tort claims.

Memorandum of Decision entered February 17, 2010, at docket entry no. 535.  As previously

discussed, under the Debtors' confirmed Third Amended Joint Plan of Reorganization including

the Liquidation Trust Agreement, YCLT is the owner of the claims asserted against Blixseth and

asserted in this suit.  Moreover, 11 U.S.C. § 1123(b)(3)(B) specifically allows a plan of

reorganization to provide for "the retention and enforcement by the debtor, by the trustee, or by a

representative of the estate appointed for such purpose" any claim belonging to the Debtors.  *See*

*also Collins & Aikman v. Stockman*, 2010 Lexis 3818 (D.C. Del. 2010).  Furthermore, the

assignment later executed by Edra as Manager for the Debtors is valid.  Finally, the Debtors are "creditors" of Blixseth by virtue of their claims for breach of fiduciary duty and thus can seek to set aside fraudulent transfers under the UFTA as well as the applicable bankruptcy provisions.

4.    **Fraudulent Transfers**.

YCLT's avoidance action was brought under 11 U.S.C. § 544(b), which gives trustees the right to avoid transfers voidable by unsecured creditors under state law.  YCLT asserts, and Blixseth denies, that Blixseth's use of funds from the Yellowstone Club, and in particular the Credit Suisse loan proceeds, was a fraudulent transfer under MCA § 31-2-333(1)(b).  YCLT also argues that execution of the Releases in the MSA was a fraudulent transfer under MCA § 31-2-33(1)(a) and (1)(b).

a.    **Blixseth's use of the Credit Suisse loan proceeds was a fraudulent transfer**.

YCLT's first fraudulent transfer claim pertains to Blixseth's use of the Yellowstone Club's funds and implicates Montana's Uniform Fraudulent Transfer Act ("UFTA") 31-2-333(1)(b).  UFTA provides, in relevant part, that transfer of an asset by a debtor is fraudulent as to existing and future creditors if the debtor transferred the asset without receiving a reasonably equivalent value in exchange for the transfer and the debtor (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.  MCA § 31-2-333(1)(b).  The language of MCA § 31-2-333(1)(b) implies that constructive fraud does not require proof of intent.

Prior to being diverted to BGI and Blixseth, the Credit Suisse loan proceeds rested

for a moment in the Debtors' accounts. The Court deems it appropriate to collapse the constituent

parts and treat the various transfers that occurred on September 30, 2005, as phases of a single

transaction for analysis under fraudulent transfer law, *HBE Leasing Corp. v. Frank*, 48 F.3d 623,

635 (2d Cir.1995), especially in a case such as this where Credit Suisse's own Credit Agreement

was designed to remove the funds from the Debtors.

Collapsing the constituent parts is also appropriate where BGI was Blixseth's alter ego.

The "law of the forum state" determines whether a corporation is an alter ego of its shareholder.

*Towe Antique Ford Found. v. Internal Revenue Serv.*, 999 F.2d 1387, 1391 (9th Cir. 1993).  In

*Towe*, the Ninth Circuit Court of Appeals explains:

> In Montana, "no concrete formula exists under which a court will disregard the
> separate identity of the corporate entity." [*Hando v. PPG Indus., Inc.*, 236 Mont.
> 493, 771 P.2d 956, 960 (1989)].  The factors relevant to a finding of alter ego
> include, but are not limited to:
>
> 1.  Whether the individual is in a position of control or authority over the
>     entity;
> 2.  Whether the individual controls the entity's actions without need to consult
>     others;
> 3.  Whether the individual uses the entity to shield himself from personal
>     liability;
> 4.  Whether the individual uses the business entity for his or her own financial
>     benefit;
> 5.  Whether the individual mingles his own affairs in the affairs of the
>     business entity;
> 6.  Whether the individual uses the business entity to assume his own debts,
>     or the debts of another, or whether the individual uses his own funds to
>     pay the business entity's debts.
>
> *See generally Hando*, 771 P.2d at 960; *Drilcon, Inc. v. Roil Energy Corp., Inc.*, 230
> Mont. 166, 749 P.2d 1058, 1063-64 (1988); *Meridian Minerals Co. v. Nicor Minerals,*
> *Inc.*, 228 Mont. 274, 742 P.2d 456, 462 (1987); Jody J. Brewster, *Piercing the Corporate*
> *Veil in Montana*, 44 Mont.L.Rev. 91, 95-97 (1983); *see also Valley Finance*, 629 F.2d at
> 172-73.

*Towe Antique*, 999 F.2d at 1391.

ER01105

**Case No. 12-35986 ER  775**

During the time that Blixseth was the controlling shareholder of BGI, Blixseth dominated and controlled the affairs of BGI to such an extent that BGI had no separate corporate identity apart from Blixseth. Blixseth and BGI were one in the same. Blixseth's accountant Mack testified that no real distinction existed between Blixseth and BGI, other than corporate structure. Blixseth was BGI's sole owner and had sole control of BGI's affairs. Corporate formalities were not followed as is illustrated by the fact that promissory notes in connection with the alleged "loans" were not executed until well after the transactions took place. Finally, Blixseth held himself out as the owner of the Yellowstone Club, when in fact the Yellowstone Club entities were owned by BGI. BGI was clearly Blixseth's alter ego.

Because of the alter ego relationship between BGI and Blixseth, Blixseth was able to fix liability to the Debtors and to his alter ego, BGI, and not himself as primary beneficiary of the Credit Suisse loan. Because of the control he exercised over BGI, and the Debtors (through BGI), Blixseth was able to ensure that BGI would never have demand made on it by the Debtors and in turn that BGI would not make demand on Blixseth even though there were numerous times after the disbursement of the Credit Suisse loan proceeds where a demand would have been in the best interest of the Debtors.

Turning to the merits of YCLT's claim under MCA § 31-2-333(1)(b), MCA § 31-2-328 defines the term "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance." Blixseth cannot argue in good faith that the $209 million he appropriated to himself was anything other than a transfer. Thus, YCLT must next show that Blixseth's transfer of $209 million to himself lacked

Case No. 12-35986 ER  776

reasonably equivalent value.  The Court concludes that YCLT has done so, despite Blixseth's

contention that BGI's notes constitute reasonably equivalent value.  Blixseth claims that the BGI

notes protected the Debtors against loss arising from the transfers of loan proceeds to

BGI/Blixseth, and that the secondary transfer from BGI to Blixseth enjoyed similar safeguards

from other "notes."

In a lengthy discussion, supported by an abundance of evidence, the Court previously

concluded that the transfer of money from the Debtors to BGI was a distribution and not a loan.

It is thus obvious that Debtors did not receive reasonably equivalent value for the transfer of their

assets, namely in the form of money, to BGI and ultimately Blixseth.

The third element of constructive fraudulent transfer requires that the Debtors were either

insolvent when the transfer occurred, or that the transfer made Debtors insolvent.  In analyzing

whether a debtor was left with unreasonably small assets following the transaction at issue, "[t]he

test is aimed at transfers that leave the transferor technically solvent but doomed to fail."

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944

(S.D.N.Y. 1995).

At trial, Credit Suisse repeatedly asked witnesses rote questions taken from the text of the

fraudulent transfer statute, such as whether Mr. Foster, who came onto the scene later, had any

evidence of a contemporaneous Debtor intent or belief that bills would not be paid as they came

due, or whether witnesses "believed" that the transaction left the Debtors with unreasonably

small assets.  The proof in this case lies in objective results, not subjective beliefs.  That proof is

uncontestable.

First, the use of a "Total Net Value" (later changed to "Total Net Proceeds," undoubtedly

**Case No. 12-35986 ER  777**

to avoid the impression that actual "value" was being addressed) appraisal was devastating to the Yellowstone Club. Paauw explained that he had never heard of a total net value appraisal until he was asked to perform one by Credit Suisse. Donaldson testified that he had no idea why a loan participant would want such an appraisal. Neither Hekman (a real estate economist and professor) nor Abshier (a former financial institution regulator) knew of such a vehicle. A FIRREA-compliant market value appraisal (unlike the Credit Suisse appraisals) would contain all the information contained in the Credit Suisse appraisal, including undiscounted cash flows. The reasonable inference is that Credit Suisse, with Blixseth's tacit approval, wanted to bulk up the alleged value of the Yellowstone Club in order to inflate the size of the loan. It is highly probable that the loan amount to the Yellowstone Club would have been substantially less than $375 million had Credit Suisse asked Cushman & Wakefield to perform a FIRREA-compliant appraisal.

Even if Credit Suisse's "sophisticated foreign hedge-fund investors" did not want a FIRREA-compliant appraisal (with a discount rate), Abshier explained that fair market value appraisals also benefit the borrower by assuring that loan sizes remain reasonable in connection with the collateral's value. Yet the Debtors, represented by Blixseth (whose duty of loyalty was hopelessly conflicted), never asked for that kind of appraisal. The result, as Abshier again explained, was a loan that failed to comply with good real estate loan practice, that was suffused with excessive risk of failure, and that was unsafe, unsound, and imprudent.

Blixseth's exuberant financial projections exacerbated the problem. As explained by the Third Circuit Court of Appeals:

> Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the

**Case No. 12-35986 ER  778**

relevant data are cash flow, net sales, gross profit margins, and net profits and
losses . . . . However, reliance on historical data alone is not enough.  To a degree,
parties must also account for difficulties that are likely to arise, including interest
rate fluctuations and general economic downturns, and otherwise incorporate
some margin for error.

*Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992).

Sumpter, who prepared the projections, offered nothing at trial to substantiate them.

Blixseth confirmed that projections of lot sales were based on the assumption that the economy

would continue at then current levels.  Hekman confirmed that such an assumption was foolhardy

at the time given that real estate investment was fueled in 2002 and 2003 by Federal Reserve

interest rate cuts, and that by 2004 the Federal Reserve was raising interest rates to avoid a

bubble, thus causing a market slowdown, just as the Credit Suisse loan was being pursued.

Indeed, Credit Suisse's own appraisal confirmed that the market was already slowing, and Credit

Suisse knew, given Yankauer's testimony, that real estate is the first victim of any downturn.

Hekman also testified that Sumpter's projections contained extremely optimistic

assumptions concerning the prices to be obtained from future lot sales, including projections that

were 36% higher than Debtors' historical performance, and with no buffer in case those

unprecedented and unsupported projections were not met, thus leaving the Debtors with an

enormous balloon payment in 2010.  *See In re O'Day Corp.*, 126 B.R. at 412 ("The projections

prepared by the Bank had no cushion, no room for error.").

Mordy deemed the projections seriously erroneous with critical omissions, such as the

Warren Miller Lodge overruns and information available at the time about the Debtors' prior

performance, as well as being replete with factual errors, such as claims that the $142 million

was still somehow part of the Debtors' cash reserves.  Mordy confirmed that proper projections

would have shown that there was insufficient cash flow from operations to pay the debt being

undertaken. *See In re O'Day Corp.*, 126 B.R. at 381 ("Notwithstanding the availability of current

information about the company's financial performance, neither Funston nor Meritor took steps

to revise the reduced sales scenario projections, which implicitly assumed a gross profit margin

of 21.84 percent.")

Despite all this, Credit Suisse accepted the Debtors' unfounded optimism, and agreed to

provide a five-year loan to the Debtors, even though Cushman & Wakefield knew the Debtors'

claimed absorption rate was far too optimistic, and provided its appraisal based on a seven-year

absorption rate. *See In re O'Day Corp.*, 126 B.R. at 407 ("In the face of such unequivocal

financial information, Jones and Funston projected that, in a *worst case scenario*, O'Day would

somehow match or exceed its best financial performance of the 1980's.") (emphasis original).

Moreover, subsequent appraisals were forced to continually extend the absorption rate into the

future when the original projections were proven to be unrealistic.

All these facts notwithstanding, Credit Suisse blames the Debtors' downfall on the

allegedly unanticipated financial calamities of 2007.  Lenders have tried this argument before:

> The projections employed by Funston and O'Day were imprudent.  Although
> Meritor points to a variety of unpredictable, internal and external problems, such
> as poor management, bad marketing decisions, decline in the number of dealers
> and sales people, and the stock market crash of October 1987 as the causes of
> O'Day's dismal performance following the LBO . . . . the Court finds that labor
> problems, cost variances and cyclicality in the industry were the major
> contributors to O'Day's fiscal woes and were manifest and readily predictable
> prior to the LBO. Thus, using the Credit Managers test outlined above, the Court
> concludes that O'Day was left with unreasonably small capital.

*In re O'Day Corp.,* 126 B.R. at 412.  This case presents the same result.  Blixseth blames the

Debtors' downfall on the lawsuit filed by the LeMond Plaintiffs, the alleged conspiracy between

**Case No. 12-35986 ER  780**

Edra and Byrne, and Byrne's failure to follow through with purchase of the Yellowstone Club in 2008.  Given the evidence, Blixseth's arguments are without support.

Also, the KPMG audits provide no support for Blixseth's arguments.  Nonetheless, at trial, Credit Suisse and Blixseth repeatedly invoked the KPMG audits as the touchstone of the Debtors' alleged financial condition, forgetting that neither "book value" nor "generally accepted accounting principles" control a court's decision on projections or value.  *In re O'Day Corp.*, 126 B.R. at 398.  Particular emphasis at trial was placed on KPMG's failure to include a "going concern" qualification.  However, "the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern."  *Codification of Accounting Standards and Procedures, U.S. Auditing Standards* § 341 (Am. Inst. of Certified Pub. Accountants 2005).  *See also O'Day Corp.*, 126 B.R. at 409 (rebuffing lender's efforts to rely on "Arthur Andersen's failure to include a going concern qualification in its fiscal year end 1988 audit.").  The KPMG audit does not absolve Blixseth of liability in this case.

Finally, both Credit Suisse, in Part I of the trial, and Blixseth, in Part II of the trial, were careful not to produce a solvency opinion with respect to the Yellowstone Club.  However, history confirms what a proper solvency opinion would have revealed.  As a result of the Credit Suisse transaction, the Debtors were unable to pay their bills as they became due.  Blixseth testified that the Credit Suisse loan was current until mid-August of 2008.  While the Yellowstone Club may have avoided any default until August of 2008, the term "current" simply means that the Debtors were paying interest, the applicable lot release price and the required annual paydown.  As Hekman confirmed, in 2010 an enormous principal balance – far beyond

the Debtors' ability to repay – would have remained because of the Debtors' failure to meet their unfounded projections.

Hekman opined that the Debtors never had sufficient cash flows following the Credit Suisse loan. Cash flows in 2005 were $39 million, yet in 2006 the Debtors needed $63 million simply to pay anticipated lot release payments and interest to Credit Suisse, a number that does not include the money needed to operate the Yellowstone Club. Foster testified that because the Club was burning between $25 and $30 million a year, it obviously could not afford this loan.

Moore corroborated this with testimony that Debtors were rarely current with bills, and had to sell assets (such as an airplane) to provide cash. *See In Re O'Day Corp.*, 126 B.R. at 407 ("Clearly, the 45 day payable stretch anticipated by Funston and Jones in their projections was a fiction after September of 1987. In short, O'Day was not paying its trade debt as it came due, particularly given the testimony establishing that most payment terms were net 30 days."). Byrne also testified that Blixseth repeatedly asked Byrne to make bulk purchases of lots to fund the Yellowstone Club. Again without rebuttal from Blixseth, Byrne testified that Blixseth told Byrne that the Yellowstone Club had no debt and that the Credit Suisse loan was related to Yellowstone Club World assets. Byrne also recounted the disarray of the Debtors' books, and the millions he spent recreating solid and reliable financial data.

Byrne's bulk purchases, coupled with the drastic measures undertaken by the Debtors to pay bills, created the illusion that Debtors had the ability to pay their debts. In a similar case, the United States District Court for the Southern District of Texas convincingly explained:

> The fact that ASARCO did not file bankruptcy until over two years after the transfer is not dispositive. In this case, ASARCO was not regularly paying its creditors, not only before the transfer, but also between the time of the transfer and filing for bankruptcy two years later. Additionally, ASARCO survived for

**Case No. 12-35986 ER  782**

over two years primarily because it took drastic measures to do so, such as highgrading mines, monetizing insurance policies, and stopping some operations altogether. Therefore, ASARCO's ability to avoid a total collapse for over two years after the transfer does not persuade this Court that ASARCO's cash flow was sufficient to meet its capital needs. In 2003, ASARCO might accurately have been described as insolvent and "doomed to failure."

*ASARCO LLC, v. Americas Mining Corp.*, 396 B.R. 278, 398–99 (S.D. Tex. 2008). For the reasons discussed above, the Court finds that Blixseth's transfer of funds from the Debtors to BGI, and ultimately himself, was a fraudulent transfer under MCA § 31-2-333(1)(b). Pursuant to 11 U.S.C. § 544(b), Blixseth's misappropriation of the Credit Suisse loan proceeds for his own use and directing the Debtors to purchase assets with the Credit Suisse loan proceeds for the benefit of himself and related third parties were constructively fraudulent transfers under 11 U.S.C. § 548(a)(1) and MCA §§ 31-2-333(1)(b) and 31-2-334(1), and can be avoided pursuant to 11 U.S.C. § 550 and MCA § 31-2-339(a). Additionally, the Court heard substantial evidence with respect to transfers concerning Unit 304 at the Warren Miller Lodge, Overlook, Sunrise Ridge and Big Sky Ridge transactions. Blixseth attempted to explain these transactions, but his testimony in this regard was simply not credible.

However, the foregoing were not Blixseth's only fraudulent transfers. The Release set forth in Blixseth and Edra' MSA was also fraudulent.

**b.    The Release in the MSA was a fraudulent transfer by Blixseth.**

YCLT next asserts that the MSA Release was both constructively fraudulent under MCA § 31-2-333(1)(b) and actually fraudulent under MCA § 31-2-333(1)(a). The applicable law under § 333(1)(b) is set forth above and need not be restated here. Pursuant to § 333(1)(a):

> (1)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or

incurred the obligation:

> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

Actual intent may be established either by direct or circumstantial evidence.

Circumstantial evidence can be used to establish the existence of "badges of fraud," with

consideration given, among other factors, to whether:

> (a) the transfer or obligation was to an insider;

> (b) the debtor retained possession or control of the property transferred after the transfer;

> (c) the transfer or obligation was disclosed or concealed;

> (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

> (e) the transfer was of substantially all the debtor's assets;

> (f) the debtor absconded;

> (g) the debtor removed or concealed assets;

> (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

> (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

> (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; or

> (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

MCA § 31-2-333(2).

Blixseth contends that California law permits release of fraudulent transfer claims,

particularly in a case such as this where Blixseth secured a § 1542 release under California Civil

Code § 1542.[54]   The applicable Release reads:

> The Release by the Edra Entities at paragraph 4(b) reads in part: "[E]ach of the Edra Entities hereby fully and absolutely releases and discharges Timothy and each of the Timothy entities (collectively, the "Timothy Released Parties"), from any claim, right or demand that any such Edra Entity has, or may have against any of the Timothy Released Parties based on conduct from the beginning of time until the Effective Date relating to, or based on any fact, circumstance, event or document signed by Timothy or any of the Timothy Released Parties, including, but not limited to, (a) breach of fiduciary duty, (b) breach of corporate or business opportunities, (c) any similar type of potential liability based on failure of any of the Timothy Released Parties to act properly on behalf of any said Timothy Entity or (d) any document signed by Timothy or any of the Timothy Released Parties.

The MSA is to be construed under California law which permits the release to be set aside if it is determined to be a fraudulent transfer.  *Mejia v. Reed*, 74 P.3d 166 (Cal. 2003) and *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221 (9th Cir. BAP 2007), *aff'd,* 551 F.3d 1092 (9th Cir. 2008).  *Mejia* noted that "[i]t is settled California law that a transfer accomplished through an MSA can be avoided as a fraudulent transfer pursuant to UFTA."  *Mejia*, 74 P.3d at 173-174; *Beverly*, 374 B.R. at 233-34.  Specifically the California Supreme Court noted its expectation that a bankruptcy trustee could "set aside the property division of a dissolution judgment on the ground of fraud."  *Beverly*, 374 B.R. at 234, quoting *Mejia*, 74 P.3d at 174.  In this Court's view *Mejia* and *Beverly* are dispositive.

At the outset, the Court notes that the fairness and appropriateness of the Release as it relates to the Debtors were not actually, fully and fairly litigated.  The Release was not an arms length transaction between the Debtors and Blixseth because Blixseth was negotiating the

---

[54]  Cal.Civ.Code § 1542 reads: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

ER01115

**Case No. 12-35986 ER  785**

Release while he was in control of the Debtors.  Furthermore, neither the Debtors nor any of Blixseth's creditors had an opportunity to contest or litigate the MSA or the Release.  As such, this Court concludes that nothing that occurred in the Blixseth divorce proceeding is binding upon the Debtors.

Considering the factors set forth in MCA § 31-2-333(2), the Release at issue in this case was obtained with the actual intent to hinder, delay and defraud the Debtors and their creditors. The Release was clearly a "transfer" as contemplated under § 333(1).  At the time the Release was negotiated, Blixseth was an insider of the Debtors as that term is defined in the Montana Fraudulent Transfer Statute as well as the United States Bankruptcy Code.  The Release was in a confidential court proceeding (hence concealed), Blixseth gave no value to the Debtors in exchange for the Release, the Debtors were insolvent at the time of the release, Blixseth transferred all his investment assets into a Nevada entity as an additional measure to avoid liability, Blixseth was aware of numerous claims against him, and the Debtors received no tangible or concrete value in exchange for the Release.

In addition to the above badges of fraud, at the time Blixseth obtained the Release, he was fully aware of the serious financial problems faced by the Debtors.  Blixseth was also cognizant of the material and negative changes in the real estate market, testifying that "prices ha[d] stopped escalating and buyers ha[d] dried up."  In pleadings filed in connection with the divorce, Blixseth recognized that dramatic changes had occurred and were occurring in the economy and stock markets in the United States and the world, creating "change and uncertainty in the financial and lending markets."  Further, according to Blixseth, "[b]ecause of the overall slow-down in the real estate market, sales at Yellowstone Club, which ha[d] been the primary

Case No. 12-35986 ER  786

source of cash funding . . . ha[d] diminished dramatically."  While acknowledging the changing economy and the decline in the real estate market, according to Blixseth, the LeMond Plaintiffs' litigation, coupled with Edra's efforts to thwart any sale of the Yellowstone Club and then the eventual termination of the purchase agreement by Byrne is what really hurt the Yellowstone Club.

The Debtors's cash flow issues were directly attributable to slow lot sales and the payments that the Debtors were making to Credit Suisse.  As a result of Debtors' cash crunch, Blixseth testified the Yellowstone Club was unable to pay BGI's "management fee."  No funds were available to fund Porcupine Creek or to pay taxes without borrowing money in 2007.  The Debtors were forced to do bulk sale transactions because, according to Blixseth, the Yellowstone Club "needed the money."  To further compound the Debtors' financial problems, testimony suggest that in 2008, the Office of the Comptroller of the Currency had instructed American Bank to not loan more money to the Debtors and U.S. National Bank had told all of its branches not to extend more credit to the Debtors.

Edra testified that she was insolvent at the time she and Blixseth executed the MSA.  As discussed below, evidence also shows that Blixseth knew that the Debtors and Edra, were on the brink of bankruptcy.

As discussed below, at the time the Release was executed, Blixseth was also aware the Debtors possessed potential claims against him.  Blixseth was also aware at the time of the Release was executed that CIP had terminated its agreement to purchase the Yellowstone Club. Blixseth maintained throughout this litigation that Byrne pulled out of the sale because he was conspiring with Edra and others to bankrupt the Debtors so that Byrne could purchase the

**Case No. 12-35986 ER  787**

Debtors at a deep discount.  The Court has not yet seen any credible evidence to support this particular conspiracy theory asserted by Blixseth.

Instead, the evidence shows that Blixseth did not want to consummate the proposed sale to CIP because the proceeds from the sale would not have been sufficient to pay off all the Yellowstone Club's outstanding obligations.  According to Blixseth's divorce attorney, Ari Garikian ("Garikian"), Blixseth testified at a March 21, 2008, hearing in the divorce proceeding that he estimated that he and Edra would owe between $50 to $100 million in taxes as a result of the CIP sale and that "the proceeds may not have been sufficient to pay everything and all of the taxes."  Blixseth thus understood that if the CIP transaction was consummated, he would not have received any money from the sale and would have, in fact, had to find additional funds to close the sale.

Blixseth's own emails contradict his testimony.  On March 26, 2008 at 10:10 p.m., Blixseth e-mailed Doyle indicating that he was "in 100% opinion NOT to extend" the closing date for the transaction.  Blixseth Exhibit 23, page 46.  Less than an hour later, Doyle sent an e-mail indicating that "we will be sending a termination notice shortly." *Id.* p.47.  Subsequently, Club YC Acquisition LLC sent its termination letter in order to preserve its right to a refund of its deposit.  Blixseth Exhibit 33.  The evidence establishes that Blixseth had no intention of proceeding with the sale to CIP.

After the sale to CIP fell through, Blixseth agreed to transfer the Debtors to Edra as part of the MSA.  By doing so, Blixseth avoided a $50 to $100 million tax liability by foisting the potential tax liability on Edra.  Blixseth and his professional team examined the impact on Blixseth if Edra and/or the Debtors filed bankruptcy.  In a June 17, 2008, e-mail between

**Case No. 12-35986 ER  788**

Blixseth and eight of his legal and financial advisors the "potential for a tax liability arising if

Yellowstone Club, BGI and/or Mrs. Blixseth declared bankruptcy and defaulted on the [Credit

Suisse] loan after the property settlement and divorce were final" was discussed.  YCLT Exhibit

232

  Also, during the course of his divorce, Blixseth sought legal advice from the law firm of

Thornton Byron LLP (Blixseth's so-called "wealth preservation" lawyers) for alleged estate

planning purposes, but the invoices from that firm indicate Blixseth was also seeking a means to

avoid any liability to the Debtors for his many breaches of fiduciary duty, including but not

limited to, the Credit Suisse loan transaction and subsequent transfers.  The invoices from

Thornton Byron are replete with references to analyzing ways to shield Blixseth from potential

liability to Debtors and BGI.  For example, a June 17, 2008, in the Thornton Byron invoices

provides:

> [D]iscussion with George Mack regarding particular concern regarding
> Mr. Blixseth's possible liability to creditors of Mrs. Blixseth, Blixseth Group, Inc.
> or the Yellowstone Club entities i[f] Mrs. Blixseth were to assume liabilities of
> business entities and the marital community on which Mr. Blixseth is currently
> obligated; revise correspondence to client and representatives regarding same;
> analysis of documentation and transactional steps to limit Mr. Blixseth's exposure
> on subsequent efforts with respect to liabilities assumed by Mrs. Blixseth;
> discussion to analyze same; draft correspondence regarding recommendation for
> limiting Mr. Blixseth's liability after Mrs. Blixseth's assumption of debt; draft
> multiple correspondence responding to questions and concerns raised by Mr.
> Blixseth and other representatives regarding same.

YCLT Exhibit 149A.

  As illustrated above, Blixseth and his advisors were contemplating the financial demise

of the Yellowstone Club and Edra and they were developing a plan to shield Blixseth from the

fallout.  Blixseth's plan involved not only obtaining releases from the Debtors, it involved the

creation of Desert Ranch LLLP, a structure referred to by his attorney as a "personal Berkshire Hathaway" that provided "general creditor protection." Desert Ranch LLLP ("Desert Ranch") is a Nevada limited liability limited partnership. Blixseth owns a 98% limited partnership interest in Desert Ranch. The remaining 2% is held by the general partner of Desert Ranch, Desert Ranch Management, which is a Nevada limited liability company. Blixseth owns 40% of Desert Ranch Management and his son, Beau Blixseth, owns 30% of this entity. The remaining 30% of Desert Ranch Management is owned by two trusts. Blixseth's long-time accountant and trusted advisor, Mack, serves as Trustee of the trusts. As admitted by his own lawyer, one of the purposes of this structure is to remove assets from the reach of creditors. Virtually all of Blixseth's assets were transferred into this vehicle. Interestingly, Desert Ranch LP was converted to Desert Ranch LLLP on November 12, 2009; a mere two days after the Debtors filed bankruptcy.

The Desert Ranch structure was an integral part of Blixseth's plan to shield himself from the consequences of his breaches of fiduciary duty and fraudulent transfers in connection with the Debtors. Securing a Release was another integral part of Blixseth's plan. Indeed, in the first phase of the trial, Blixseth testified unequivocally that getting a release from any claims for breach of fiduciary duty or fraudulent transfer was the "cornerstone" of the MSA.

Blixseth's fraudulent intent could not be more clear. Blixseth obtained the Release with the actual intent to hinder, delay and defraud his creditors, including the Debtors. As such, the Release is, for purposes of this Adversary Proceeding, voidable pursuant to MCA § 31-2-333(1)(a).

YCLT also asserts a meritorious claim under § 31-2-333(1)(b). First, the Debtors did not

**Case No. 12-35986 ER  790**

receive reasonably equivalent value in exchange for the Release.  YCLT, through expert testimony, established that the Release was worth approximately $420 million.  Of that amount, $133.6 million was attributable to Blixseth's transactions involving Big Sky Ridge, Sunrise Ridge, Overlook, Unit 304 and the LeMond Plaintiffs' settlement.  The remaining $286.4 million was attributable to Blixseth's use of the Credit Suisse loan proceeds.  The Debtors received little or no direct consideration from Blixseth in connection with giving up $420 million in claims. This is confirmed by many sources, including Edra and Blixseth's testimony.

Edra Blixseth testified as follows:

A.      Yellowstone Club did not get benefit from the things that were taken.

Q.      - - Yellowstone Development - -

A.      Correct.

Q.      - - BSR - -

A.      Correct.

Q.      - - none of those entities got a single thing from releasing him [Tim Blixseth] of all this and giving him all these assets; is that right?

A.      That's correct.

Similarly, Blixseth testified that at the time of the MSA release he knew of no claims he was releasing against YMC or Big Sky Ridge, LLC.  With respect to YD, Blixseth testified that he knew of two potential claims he was releasing:  one dealing with a note owed American Bank on the Warren Miller Lodge; and the other dealing with some bonds with Madison County.  He believed that the value of those bonds were around $750,000.   Blixseth testified that no lawsuits existed against YD at the time of the Release.

However, with respect to the American Bank note, YD's accountant Moore testified that on the eve of the MSA deal, Blixseth caused BGI to take the one unsold unit from the Warren Miller Lodge at a loss to YD of over $700,000, leaving only two units under that American Bank note, both secured by the real estate and subject to sales agreements that subsequently closed. Accordingly, as it turns out, the value of those claims was, in fact, zero and did not approximate $420 million.  Even using Blixseth's value of the potential claim against YD ($750,000) relating to the Madison County bonds, the Court concludes that this does not constitute reasonably equivalent value for the Release, which is valued at $420 million.

YCLT proved that none of the Debtors received reasonably equivalent value in exchange for the Release.  In fact, no direct value was received in exchange for the Release of over $400 million of claims against Blixseth.  The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc*., 129 F.3d 382, 387 (7th Cir. 1997).  "By its terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." *Advanced Telecommunication Network, Inc. v. Allen*, 490 F.3d 1325, 1336 (11th Cir. 2007).  Furthermore, in reaching its conclusion herein, the Court has also considered that the transaction between the Debtors and Blixseth involving the Release was not an arm's length transaction. *Grigonis v. U.S. West Communications, Inc.*, 208 B.R. 950, 956 (Bank. D. Mont. 1997) (a factor of considerable importance in assessing reasonably equivalent value is whether the transaction was arm's length).

Two types of benefits need to be considered in analyzing reasonably equivalent value: benefits that the debtor receives directly ("direct benefits") and those it receives indirectly

ER01122

("indirect benefits").  To make out the elements of a fraudulent conveyance claim, a plaintiff

must prove that a debtor did not receive direct benefits reasonably equivalent to the value which

it gave up.  If the plaintiff meets that burden, the burden is then on defendants to produce (if they

can) evidence that the debtors indirectly received sufficient, concrete value. *See Welt v. Jacobsen*,

361 B.R. 567, 582 (Bankr. S.D. Fla. 2007) ("[o]nce the Trustee has made his prima facie case

that a transfer constitutes a fraudulent transfer . . . the burden of producing evidence shifts to the

transferee to demonstrate that the debtor received a benefit or that there was some legitimate

purpose for the transfer.").  The burden of proof for Blixseth includes a requirement to show that

the "indirect benefits" were tangible and concrete, and to quantify their value with reasonable

precision.  *See, e.g., Pummill v. Greensfelder, Hemker & Gale*, 267 B.R. 602, 614 (8th Cir. BAP

2001) ("party claiming to have delivered value must quantify it."); *Official Committee of*

*Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am. Inc.*, 422 B.R. 783 (Bankr. S.D. Fla.

2009).

  Blixseth contends that the Release bestowed an indirect benefit on the Debtors by

bringing "peace in the valley."  Blixseth testified that all the litigation, including his divorce

proceedings, had a very negative impact on the Debtors and that settling matters between he and

Edra bestowed a great benefit upon the Debtors.  Thus, according to Blixseth, the Debtors

received "peace in the valley" in exchange for the Release.  It is a dubious proposition that one

can create a negative situation and then claim that he has bestowed a benefit by eliminating the

negative situation that he created.  Nevertheless, the Court finds that an intangible and ephemeral

"benefit" such as "peace in the valley" as a result of Blixseth's divorce settlement does not

constitute reasonably equivalent value to the Debtors under the circumstances of this case.

ER01123

Blixseth has failed to carry his burden of producing evidence of indirect benefits that were tangible and concrete, and of quantifying the value of those benefits with reasonable precision. *In re Richards & Conover Steel, Co.* 267 B.R. 602, 614 (8th Cir. BAP 2001) (party claiming to have delivered value must have quantified it); *In re Minnesota Utility Contracting, Inc.*, 110 B.R. 414, 418 (D. Minn. 1990) (it is transferee's burden to produce evidence of indirect benefit); *Official Committee of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am. Inc.*, 422 B.R. 783 (Bankr. S.D. Fla. 2009). Not a single expert or fact witness for Blixseth attempted to quantify the value of the indirect benefits he claims were received by the Debtors. For that reason alone, it is appropriate to rule in favor of YCLT on the issue of reasonably equivalent value.

YCLT has convincingly demonstrated by a preponderance of the evidence that the Debtors did not receive any type of consideration that would constitute reasonably equivalent value. Claims of approximately $420 million were given up and nothing was received by the Debtors in exchange. Blixseth has wholly failed to produce any credible evidence that constitutes a tangible and concrete value flowing to the Debtors. In fact, the evidence in this case is just the opposite. Less than three (3) months after entering into the MSA transaction, the Debtors filed bankruptcy. This hardly constitutes "peace in the valley" or concrete and tangible value to the Debtors. Indeed, the Debtors' bankruptcy has disrupted the lives of hundreds of employees, creditors, and members. The Court thus concludes that the Debtors did not receive reasonably equivalent value in exchange for the Release.

The Court also finds that the Debtors were insolvent upon consummation of the Release. Mordy testified the Debtors were insolvent upon consummation of the MSA on August 13, 2008.

**Case No. 12-35986 ER  794**

While certain aspects of Mordy's opinions were challenged by Blixseth's counsel, the Court finds on whole that Mordy's testimony was credible and his opinions reliable for purposes of this Adversary Proceeding.

In analyzing the Debtors' solvency, Mordy utilized the Balance Sheet test, the Cash Flow test and the Adequate Capital test. All experts in this case agreed that if a debtor fails any one of the three solvency tests, the debtor is considered insolvent for all purposes relevant to this case. Mordy concluded that as of August 13, 2008, the Debtors were insolvent under all three of the solvency tests.

Blixseth failed to offer any evidence to refute Mordy's opinion regarding the Debtors' solvency as of August 13, 2008. Instead, Blixseth's expert Reilly criticized certain adjustments that Mordy made to asset values in connection with his balance sheet solvency analysis. Reilly contends that Mordy did not comply with the requirements of SSVS1. Reilly testified that, in his opinion, Mordy inappropriately adjusted asset values. Conversely, Mordy testified that he did not believe that SSVS1 applied to his balance sheet analysis because of the exception to SSVS1 that applies to typical solvency opinions. Mordy also testified that he did not intend to perform any independent valuation of assets or offer a valuation opinion. The Court, however, need not dwell on this issue because Mordy also performed the balance sheet test without making any adjustment to values. Mordy's revised analysis demonstrates that the Debtors were insolvent under the Balance Sheet test on August 13, 2008.

The criticisms offered by Reilly in connection with Mordy's original balance sheet insolvency have no bearing on Mordy's cash flow analysis or his adequate capital analysis. Mordy found the Debtors to be insolvent under both of these tests and as all the experts agreed,

**Case No. 12-35986 ER  795**

the Debtors were insolvent if they failed any one of the solvency tests.

In summary, Blixseth produced no credible evidence that the Debtors were solvent as of August 13, 2008.  Mordy's opinions on cash flow insolvency and adequate capital insolvency were not rebutted, and even if the Court were to find Mordy's conclusions deficient or faulty as to the Balance Sheet test, which it does not, the Court would still conclude that the Debtors were insolvent upon consummation of the Release under the Cash Flow test and the Adequate Capital test.  In sum, the Release set forth in the MSA was clearly a fraudulent transfer by Blixseth.

Contrary to Blixseth's assertions, the Rooker-Feldman doctrine does not insulate the Release from an attack as a fraudulent transfer.  The Rooker-Feldman doctrine states that a federal district court does not have subject matter jurisdiction to hear a direct appeal from the final judgment of a state court.  The Rooker-Feldman doctrine is not applicable, however, because YCLT is seeking to set aside fraudulent transfers under §§ 544 and 548.  *In re Gruntz*, 202 F.3d 1074, 1079 (9th Cir. 2000) (en banc).  Furthermore, the Rooker-Feldman doctrine has no application because YCLT was not a party to the divorce proceedings.  *In re Erlewine*, 349 F.3d 205, 210 (5th Cir. 2003).  Judicial estoppel and issue preclusion do not bar YCLT's claims regarding the Release because neither YCLT nor the Debtors were parties to the Blixseths' divorce proceeding or in privity with any one who was a party.  *Kubacki v. Molcha*, 172 P.3d 594, 597 (Mont. 2007).  Furthermore, YCLT's fraudulent transfer claims under the Bankruptcy Code were not and could not have been actually litigated or decided in the divorce court.

The language of section 548 of the Bankruptcy Code clearly states that "the debtor" must receive reasonably equivalent "value" "in exchange for" the transfer or obligation.  11 U.S.C. § 548(a)(1)(B)(I) (trustee may avoid transfer or obligation "if the debtor . . . received less that a

ER01126

reasonably value in exchange for such transfer or obligation" (emphasis added)).  That language

means that a benefit is cognizable only if three requirements are satisfied.  First, the benefit must

be received, even if indirectly, by the debtor, and the touchstone of a cognizable benefit is whether

the "debtor's net worth has been preserved and the interests of the creditors will not have been

injured by the transfer.  *General Electric Credit Corp. v. Murphy*, 895 F.2d 725, 727 (11th Cir.

1990) (quoting *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991).  Second, any

purported benefits must also be limited to cognizable "value."  Section 548 does not refer to

"benefits" whether direct or indirect.  It requires reasonably equivalent "value" and includes a

precise definition of "value" that encompasses only "property" and "satisfaction or securing of a

present or antecedent debt of the debtor."  11 U.S.C. §§ 548(a) (1)(B)(I), (d)(2)(A).  Since this

case does not concern the satisfaction of debt, "property" received by the Debtors is the only value

relevant here.  Third, property must have been received by the debtors "in exchange for" the

transfers or obligation.  Any "property" that the debtors would have enjoyed regardless of the

MSA and the Release cannot be regarded as property received "in exchange for" the transfer or

obligation.

Just like the Bankruptcy Code, MCA § 31-2-330 provides that "value" is given when

"property" is transferred or an antecedent debt is secured or satisfied.  Section 31-2-328 of the

Montana code defines "Property" as "anything that may be the subject of ownership."

The Debtors' claims against Blixseth constituted a valuable asset of the Debtors' estate.

Uncontested testimony demonstrated that the Debtors had $286.4 million in claims against

Blixseth.  Furthermore, the Court heard testimony regarding an additional $133.6 million in

claims the Debtors had against Blixseth.  The Debtors received absolutely nothing in exchange for

releasing their $420 million claims against Blixseth.  The Release was, therefore, a constructively fraudulent transfer under § 333(1)(b).

**5.      Fiduciary Duties.**

YCLT's remaining substantive claim is that Blixseth breached his fiduciary duties.  MCA § 35-8-310 sets forth the fiduciary duties of limited-liability-company members as follows:

> (1)  The only fiduciary duties that a member owes to a member-managed company and the other members are the duty of loyalty imposed by subsection (2) and the duty of care imposed by subsection (3).

> (2)  A member's duty of loyalty to a member-managed company and its other members is limited to the following:

>> (a) to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity;

>> (b) to refrain from dealing with the company in the conduct or winding up of the company's business on behalf of a party or as a person having an interest adverse to the company; and

>> (c) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

> (3)  A member's duty of care to a member-managed company and the other members in the conduct of and winding up of the company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

> (4)  A member shall discharge the duties under this chapter or the operating agreement to a member-managed company and its other members and exercise any rights consistently with the obligation of good faith and fair dealing.

> (5)  A member of a member-managed company does not violate a duty or obligation under this chapter or under the operating agreement merely because the member's conduct furthers the member's own interest.

**Case No. 12-35986 ER  798**

(6)  A member of a member-managed company may lend money to and transact other business with the company. As to each loan or transaction, the rights and obligations of the member are the same as those of a person who is not a member, subject to other applicable law.

(7)  This section applies to a person winding up the limited liability company's business as the personal or legal representative of the last-surviving member as if the person were a member.

(8) In a manager-managed company:

> (a) a member who is not also a manager owes no duties to the company or to the other members solely by reason of being a member;

> (b) a manager is held to the same standards of conduct as those prescribed for members in subsections (2) through (6);

> (c) a member who pursuant to the operating agreement exercises some or all of the rights of a manager in the management and conduct of the company's business is held to the standards of conduct prescribed for members in subsections (2) through (6) to the extent that the member exercises the managerial authority vested in a manager by this chapter; and

> (d) a manager is relieved of liability imposed by law for violation of the standards prescribed for members by subsections (2) through (6) to the extent of the managerial authority delegated to the members by the operating agreement.

Blixseth owed fiduciary duties of loyalty and care to the Debtors under the Montana Limited Liability Company Act ("MLLC Act").  Officers and directors must discharge their duties in good faith, with the care an ordinarily prudent person in a similar position would exercise under similar circumstances, and in a manner the director or officer reasonably believes is in the companies' best interests.  *Trifad Entertainment Inc. v. Anderson*, 306 Mont. 499, 508, 36 P.3d 363 (2001).  While *Trifad* discusses the duty of care and loyalty under Montana's Business Corporation Act, the Court finds its analysis applicable to limited liability companies.  Blixseth

ER01129

**Case No. 12-35986 ER  799**

breached these duties when he caused the Debtors to pledge nearly all of their assets for loan

proceeds that he applied for his own use, and by using the proceeds of the Credit Suisse loan for

his own benefit rather than for the benefit of Debtors.  Blixseth did not act in the Debtors' best

interests.

Pursuant to MCA § 35-8-310, Blixseth, as an owner of the Debtors, owed fiduciary duties

to the Debtors, the minority owners of those entities, and the Yellowstone Club to protect their

interests in connection with the Credit Suisse Loan Transaction.  Blixseth breached those duties

by entering into the Credit Suisse loan transaction and simultaneously siphoning those proceeds

from the Debtors for his own personal benefit or the benefit of other entities in which he held an

interest.  The Court finds Blixseth's conduct to be intentional misconduct.   As a result of the

Credit Suisse loan transaction and Blixseth's breach of his fiduciary duties, Debtors and their

creditors have been damaged.

Blixseth's actions also violate MCA § 35-8-604(1)(a) and (b), which prohibit distributions

to the members of a limited liability company ("LLC") if such distributions render the LLC unable

to pay its debts as they become due in the usual course of business and/or if such distributions

cause the LLC's total assets to be less than the sum of its total liabilities.  Mordy testified that the

damages incurred by the Debtors as a result of Blixseth's breaches of fiduciary duty exceed $286.4

million.  YCLT also presented convincing testimony from the Debtors' comptroller, Moore,

regarding additional breaches of fiduciary duties and self-dealing by Blixseth in connection with

the transactions known as Big Sky Ridge, Sunrise Ridge, Overlook Partners and Unit 304 at the

Warren Miller Lodge.

For example, on April 1, 2002, Big Sky Ridge, LLC purchased property contiguous to the

**Case No. 12-35986 ER  800**

Yellowstone Club.  The property was purchased from Silver Ridge, Inc. in the amount of

$3,500,000.  At that time the owner of Big Sky Ridge was Blixseth.  The consideration was in the

form of a Note.  Blixseth's capital contribution to Big Sky Ridge was only $50,000.  On May 7,

2002, Blixseth sold a 50% interest in Big Sky Ridge to Voyager Group, LP for $2,500,000.

Blixseth then sold his remaining 50% interest in Big Sky Ridge to Yellowstone Development on

September 17, 2003, for $17,000,000.  Two years later, in September 2005, Blixseth purchased

Voyager's 50% interest for $3,000,000.  Subsequent to September 2005, Big Sky Ridge was

owned 50% by Blixseth and 50% by YD.  When Big Sky Ridge sold certain lots, Big Sky Ridge

would pay the sales proceeds as dividends to Blixseth and YD.  Blixseth received at least

$26,541,818.60 in distributions from Big Sky Ridge by virtue of his ownership.

      Next, on February 1, 2005, YD transferred its interest in the Sunrise Ridge Condominium

Development at Yellowstone Club to Blixseth in exchange for a $5 million promissory note.

Subsequently, on June 28, 2006, the Sunrise Ridge Condominium Development was sold to CIP

Sunrise Ridge Owner, LLC for $60 million.

      Blixseth's pattern of self-dealing continued in 2008 when Blixseth and Wayne Prim

formed Overlook Partners, LLC ("OP").  The Yellowstone Club was in desperate need of cash.

Wayne Prim loaned OP $15,000,000 and OP turned around and purchased five lots from YD for

$3,000,000 each.  This sale closed on or around May 7, 2008.  The lots were appraised by

Cushman & Wakefield for $5 million and were being marketed by the Yellowstone Club for

$6,000,000 each, making the value of this transaction for OP between $10,000,000 and

$15,000,000.  Blixseth confirmed this value by immediately contracting on behalf of OP to cause

the same lots to be sold for no less than $5,500,000 each.  The net result was a benefit to Blixseth

of between $5 and $7.5 million at the expense of YD.

Blixseth also committed acts of self dealing in connection with the sale of Warren Miller Lodge Unit 304.  Prior to August 2008, this Unit was owned by YD and had a value of approximately $3.2 million.  YD owed American Bank a debt of $2,511,000 that was secured by Unit 304.  Blixseth caused YD to convey Unit 304 to BGI.  BGI, in return, assumed the debt to American Bank.  Blixseth thus immediately benefitted from this deal in an amount of at least $700,000.

Blixseth again breached his fiduciary duty in connection with the LeMond Plaintiffs' litigation and the settlement thereof.  After the LeMond Plaintiffs filed suit against Blixseth, Blixseth engineered a settlement in the amount of $38 million.  But Blixseth did not pay that amount personally.  Instead, as reflected in Debtors' financial statements, Blixseth had the Debtors pay at least $18 million of that settlement amount on his behalf.

The record is riddled with instances where Blixseth breached his fiduciary duties.  Such breaches caused substantial harm to the Debtors.

**6.    Advice of Counsel.**

Blixseth asserts the advice of counsel defense with respect to his use of the Credit Suisse loan proceeds and as to the MSA Release.  With respect to his use of the Credit Suisse loan proceeds, Blixseth testified that he discussed the need to take the money out as a loan with his accountant Mack because that "was in the lane of the accounting department[.]"  Blixseth did not discuss the matter specifically with counsel because it "wasn't in their lane, it wasn't their bailiwick."  Nevertheless, Blixseth asserts the advice of counsel defense based upon Brown's September 30, 2005 opinion letter and Doyle's email of May 8, 2006.

**Case No. 12-35986 ER  802**

Brown's opinion letter was drafted pursuant to Paragraph J of the executed September 20, 2005, Credit Agreement, which reads: "The Administrative Agent and its counsel shall have received the written opinions of (i) Stephen R. Brown, of Garlington, Lohn & Robinson, PLLP and (ii) McDermott, Will & Emery, counsel for the Loan Parties (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated as of the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent."  Doyle, who was Blixseth's lead attorney on the Credit Suisse transaction, explained that Brown's responsibility was to deal with environmental matters, entitlements and title issues that dealt specifically with Montana law.

Credit Suisse's Due Diligence Request List, Exhibit 263Q, shows that as of July 7, 2005, Brown, because he was already representing the Debtors on various matters, was in charge of "[d]ocumentation relating to any past and present litigation, arbitration or other dispute proceedings relating to the project or involving a member of company management (also include any threatened proceedings)," "[l]ist of existing entitlements/approvals and any future entitlements/approvals required to be obtained in the future," "[d]ocumentation evidencing existing entitlements, including documentation relating to any of the following: Permits, Specific plan, Subdivision maps, Water rights," "[c]opy of any public financing or assessment district in place or contemplated to finance infrastructure or other public improvements," "Environmental a. Schedule or material environmental licenses, permits and authorizations held by any of the Entities," and "Third Party Approvals/Consents (including governmental approvals)[.]"  When questioned about Credit Suisse' checklist and whether anyone was assigned the responsibility of determining whether a distribution or loan of money by the Debtors to BGI would be a breach of

**Case No. 12-35986 ER  803**

fiduciary duty, Doyle testified that the purpose of the due diligence requested by Credit Suisse "was just to gather documentation that was needed for Credit Suisse to go ahead with the loan. So it's title insurance, copies of master-plan development, you know, reliance letters and so forth."

Doyle believed that the final form of Brown's opinion letter may have even been provided by Credit Suisse, but Brown testified that he used his law firm's standard form opinion letter used for loan transactions. Brown's opinion letter states that it "is governed by and shall be interpreted in accordance with the Legal Opinion Accord ('Accord') of the ABA Section of Business Law (1991), as modified by the ABA/ACREL Real Estate Report ('Report')." Section 19 of the Accord specifically states that "an Opinion does not address any of the following legal issues unless the Opinion Giver has explicitly addressed the specific legal issue in the Opinion Letter: . . . (f) compliance with fiduciary duty requirements; . . . (i) fraudulent transfer and fraudulent conveyance laws[.]" Consistent with the foregoing, Brown testified that he did not give any opinion with respect to compliance with fiduciary duty requirements or fraudulent transfer and fraudulent conveyance laws because he is not qualified to do such. The only item under § 19 of the ABA Accord that Brown opined on was 19(h) dealing with the creation of a security interest in property.[55] Moreover, Brown was not requested to opine on the use of the proceeds of the Credit Suisse loan, or on whether the loan would result in a breach of fiduciary duty, and he was not asked to give a fraudulent transfer opinion. Brown's opinion letter to Credit Suisse contained not a single shred of financial analysis, which analysis would generally appear in a fraudulent

---

[55] Section 19(h) deals with "the characterization of [the] Transaction as one involving the creation of a lien on real property or a security interest in personal property, the characterization of a contract as one in a form sufficient to create a lien or a security interest, and the creation, attachment, perfection, priority or enforcement of a lien on real property or a security interest in personal property[.]"

**Case No. 12-35986 ER  804**

transfer opinion.

Interestingly, while Blixseth claims he relied on Brown's September 30, 2005, opinion letter, Blixseth could not recall whether he read Brown's opinion letter prior to entering into the credit agreement. Blixseth's only specific memory was that Doyle and the people on Blixseth's team advised Blixseth "that the opinion letter that was required to do the deal from Montana counsel was prepared and was ready to sign." Such letter was signed by Brown, and recites at paragraph 7 that Brown's "opinion is being delivered solely to the addressees (i.e., the Administrative Agent and the Lenders) named in [the] letter, their successors and assigns, and may not be relied upon by any other person or entity and may not be disclosed, quoted, filed with a governmental agency or otherwise referred to without [Brown's] written consent."

Based upon the evidence, the advice, if any, that was given by Brown to Blixseth pertained to whether it was permissible for the Debtors to enter into a loan agreement with Credit Suisse. Brown did not take, and was not asked to take, the next step to determine whether Blixseth's withdrawal of funds from the Debtors violated any law.

Blixseth cannot rely upon an opinion letter he received from Brown that speaks to the validity of the Credit Suisse loan to absolve him from any liability for his conduct in connection with that loan. The case against Blixseth is not about the validity of the Credit Suisse loan, in the abstract, but about Blixseth's breach of his fiduciary duty in procuring the loan and fraudulently transferring the bulk of the loan proceeds to himself for his personal benefit. No evidence exists in the record that Blixseth received any advice from Brown regarding Blixseth's ability to use the proceeds of the Credit Suisse loan for his own purposes.

Blixseth also claims that he relied on advice of counsel in connection with the MSA and

124

the Release although it is not entirely clear to the Court exactly what advice Blixseth received in this regard.  Blixseth's divorce attorney, Ari Garikian, testified her firm did not warrant that the Release would protect Blixseth from claims by the Debtors.  The Court fails to see how any advice Blixseth may have received from any counsel relating to the Release would change the Court's opinion that the Release should be set aside as a fraudulent transfer.  Blixseth has wholly failed to carry his burden in this regard.

       **7.**      **Unclean Hands and *In Pari Delicto*.**

Originally, when Blixseth's interests were aligned with Credit Suisse, Blixseth's counsel argued that "Blixseth is an honest man" who wanted more than anyone to see the unsecured creditors in this case get paid, but Blixseth could not get that done because the Committee was controlled by the LeMond Plaintiffs, who trumped up and fabricated this proceeding in order to get money from Blixseth.  Blixseth also argued that the Yellowstone Club bankruptcy was cleverly orchestrated by Byrne and CrossHarbor in order to obtain the Yellowstone Club and other properties at substantial discounts.  Now that the Committee is out of this proceeding, Blixseth complains that he is not getting a fair shake because YCLT is controlled by Credit Suisse.  Blixseth's latest complaint stems from events that transpired subsequent to Part I of the trial in this matter.

Following Part I of the trial in this matter, Credit Suisse on behalf of itself and the Prepetition Lenders[56], the Official Creditors Committee and the Debtors negotiated a Third Amended Joint Plan of Reorganization Plan, and related Settlement Term Sheet to deal with the

---

[56] "Prepetition Lenders" is used synonymously throughout this Memorandum with "First Lien Lenders" as defined in Art. I, § 1.66 of  Debtors' Third Amended Joint Plan of Reorganization.

ER01136

**Case No. 12-35986 ER  806**

fact that this Court had subordinated Credit Suisse's $375 million loan.  In other words, the Plan

effectuated the Court's subordination ruling against Credit Suisse and the Prepetition Lenders.

Under Debtors' confirmed Third Amended Joint Plan, the claims of the Prepetition

Lenders (who actually advanced the loan funds to the Debtors under the Credit Agreement) were

allowed in the amount of $309,376,110.42, less $80 million paid at Plan closing as a participation

in an Equity Note distributed under the Plan.  The Prepetition Lenders' allowed claim was divided

into a secured portion under Class 3 and a deficiency claim under Class 8, per this Court's

Memorandum of Decision Setting Forth Findings of Fact and Conclusions of Law Regarding

Debtors' Proposed Plan of Reorganization of June 2, 2009.  As partial distribution on the Class 3

claims, the Prepetition Lenders were to receive "100% of the net proceeds from the sale or other

disposition of the Debtors' interest in its Farcheville property"  Plan § 3.3.

Under Section 6.14 of the Plan, YCLT was created and funded.  All of the property and

assets of the Debtors, including all of their claims and causes of actions, including this

then-pending Adversary Proceeding, were transferred to YCLT.  In turn, the Plan provided broad

releases to the Committee and the Debtors.  Credit Suisse contends the Plan also provides broad

releases to Credit Suisse and the Prepetition Lenders.  The Prepetition Lenders released any

claims they may have had against Credit Suisse for its bad conduct or otherwise.

The Yellowstone Club Settlement Term Sheet approved as Schedule 1.123 of the Plan set

out the governance and distribution provisions of YCLT.  Paragraph 5(c) of the Settlement Term

Sheet provides that YCLT would be governed by a seven-member Trust Advisory Board

appointed as follows:

> The Liquidating Trusts shall be governed by seven (7) member boards appointed
> as follows until such time as the Allowed Class 4 Claims are paid in full (and no

**Case No. 12-35986 ER  807**

further Class 4 Claims are pending): four (4) by the Prepetition Agent, two (2) by the UCC and one (1) by the Ad Hoc Class B Members Committee. Holland & Hart LLP [previously Credit Suisse's local counsel] shall be designated as the initial legal counsel for the Liquidating Trusts. Decision making by the board shall be by majority vote provided that any change or selection of any additional legal counsel for the Liquidating Trusts shall require a unanimous vote of the boards of the Liquidating Trusts. Settlement of the claims identified on Schedule C attached hereto and made a part hereof (collectively, the "Designated Claims") shall require the vote of least five (5) members of the board. The UCC shall have the exclusive right for forty-five (45) days after the Effective Date to negotiate proposed terms of any settlement of the Designated Claims for approval by the board. Such board shall appoint the trustees of the Liquidating Trusts. Enforcement of the BGI Notes shall be transferred to the Liquidating Trusts. Following the payment in Full of Allowed Class 4 Claims, the boards of the Liquidating Trusts shall have three (3) members appointed by the Prepetition Agent and one (1) member appointed by the Ad Hoc Class B Members committee.

(Docket No. 985-1, Settlement Term Sheet § 5(c).)

The parties built into the Trust majority, super-majority and unanimity voting provisions. Also, YCLT was required to hire the Holland & Hart law firm that represented Credit Suisse as local counsel in Part I of the trial, and was not permitted to hire another law firm without unanimous approval. The Settlement Term Sheet provided a waterfall for the distribution of any funds to be collected by the YCLT. The specifics were as follows:

The distribution provisions of the Liquidation Trusts shall be modified to provide that funds received after the Effective Date (net of reserves for expenses) with respect to Non-Project Assets (excluding Farcheville) shall be paid first, the amount of $2,000,000 to the Trade Creditor Fund; second, up to the amount of $15,000,000 to pay CIP Lending or its assignees on account of Allowed Class 4 Claims paid by the Trade Creditor Fund; third, up to the next $10,000,000 to pay any Allowed Class 4 Claims; fourth, the balance shall be paid pro rata among all unpaid Allowed Claims including all unpaid Allowed Claims of the Prepetition Agent and the Prepetition Lenders after application from the Project Assets and Farcheville, all on a pari passu basis.

Settlement Term Sheet § 5(d).

Since its inception, the largest creditor in this case has been Credit Suisse and the

Prepetition Lenders.[57]  YCLT is only a successor of the Debtors.  Blixseth has shown no evidence

to suggest any wrong doing by the Debtors.  Similarly, YCLT is not a successor in interest to Edra

and the Court, to date, has not agreed with Blixseth's grand conspiracy theory regarding Byrne

and Edra.  Thus, the Court is not convinced that YCLT has unclean hands in this matter.

Moreover, while Credit Suisse was permitted to appoint four of the seven members to the Trust

Advisory Board, the Court is not convinced that Credit Suisse controls YCLT.[58]  The Court also

agrees with YCLT that no basis exists whatsoever upon which any misconduct that may have

been engaged in by Credit Suisse should be imputed upon YCLT.

However, under the unique facts of this case, the Court finds merit in Blixseth's *In Pari*

*Delicto* defense.   *In Pari Delicto* is an "at equal default" defense that relieves a defendant from

liability where a court determines that the plaintiff bore equal responsibility for the alleged harm.

In the context of federal securities law, the United State Supreme Court discussed the *in pari*

*delicto* defense:

> The equitable defense of *in pari delicto*, which literally means "in equal
> fault," is rooted in the common-law notion that a plaintiff's recovery may be

---

[57]  According to Kirschner, and indeed Credit Suisse's Proof of Claim No. 633 filed
March 16, 2009, Credit Suisse Loan Funding, LLC retained 5.5% of the loan with other entities
owning the remainder of the loan.

[58]  According to the terms of the confirmed Plan, Credit Suisse, as agent for the
Prepetition Lenders, was entitled to appoint four of the seven members of the Board.  Two of its
designees are representatives of independent hedge funds (Scoggin and Babson) who are
Prepetition Lenders that vote in their own economic interest.  Scoggin has a 5% interest in the
loan and Babson has an 11% interest.  The Prepetition Lenders are the entities, funds and others
who purchased the debt placed by Credit Suisse.  The other two Credit Suisse designees on the
Board are Messrs. Hunt and McGloin, who are independent businessmen.  The remaining three
members represent other constituencies not aligned with the Prepetition Agent or the Prepetition
Lenders — Yellowstone Club World, LLC, the LeMond Plaintiffs, and the non-settling Class B
shareholders.

barred by his own wrongful conduct. *See* [*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, and nn. 12 and 13, 105 S.Ct. 2622, 2626, and nn. 12 and 13, 86 L.Ed.2d 215]. Traditionally, the defense was limited to situations where the plaintiff bore "at least substantially equal responsibility for his injury," *id.,* at 307, 105 S.Ct., at 2627, and where the parties' culpability arose out of the same illegal act. 1 J. Story, Equity Jurisprudence 399-400 (14th ed. 1918). Contemporary courts have expanded the defense's application to situations more closely analogous to those encompassed by the "unclean hands" doctrine, where the plaintiff has participated "in some of the same sort of wrongdoing" as the defendant. *See Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968).

*Pinter v. Dahl*, 486 U.S. 622, 632, 108 S.Ct. 2063, 2070-71, 100 L.Ed.2d 658 (1988).[59]

In the Partial & Interim Order entered May 13, 2009, which Order was later vacated by agreement of the Debtors, the Committee, Credit Suisse and the Court, the Court wrote:

> Credit Suisse, Barcy, Yankauer and others on the Credit Suisse team only earned fees if they sold loans. Credit Suisse thus devised a loan scheme whereby it encouraged developers of high-end residential resorts, such as Blixseth, to take unnecessary loans. The higher the loan amount, the fatter the fee to Credit Suisse. This program essentially puts the fox in charge of the hen house and was clearly self-serving for Credit Suisse.

> The fee structure was undoubtedly the catalyst that led to the most shocking aspect of Credit Suisse's newly developed loan product. As noted earlier, Credit Suisse's new loan product was marketed to developers on grounds that developers were authorized to take a substantial portion of their Credit Suisse loan proceeds as a distribution, or as Blixseth argues, a loan. In this case, Credit Suisse had not a single care how Blixseth used a majority of the loan proceeds, and in fact authorized Blixseth to take $209 million and use it for any purpose unrelated to the Yellowstone Club. Blixseth, however, had a problem in this case because he was not the sole owner of the Yellowstone Club and he did not want to share the loan proceeds with the B shareholders. Thus, Blixseth booked the $209 proceeds that he took from the Yellowstone Club as a loan months after he

---

[59] In actions brought by securities investors under the Securities Exchange Act, the *in pari delicto defense* is available "where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman Eichler*, 472 U.S. at 310-311, 105 S.Ct., at 2629.

ER01140

actually took the proceeds.  Blixseth claims he always intended to repay the $209 million BGI note, but Blixseth's former wife Edra testified to the contrary.

Blixseth testified that he always intended to take the $209 loan proceeds as a loan rather than a distribution because booking the transaction as a distribution would have caused his owner's equity account to have a negative balance.  The negative owner's equity would have appeared as a qualification on the Debtors' audited financial statements and may have caused the Debtors' to be out of compliance with the Credit Agreement.  A sophisticated lender such as Credit Suisse had to have known what a distribution would do to the Debtors' financial statements, and in particular, their balance sheets, yet Credit Suisse proceeded with the loan, and thus earned its large fee.

In addition to turning a blind eye to Debtors' financial statements, Credit Suisse's due diligence with respect to the $375 million loan was almost all but non-existent.  Credit Suisse spent a fair amount of money on legal bills to ascertain that the Debtors did in fact own the property at the Yellowstone Club, and Credit Suisse also spent a fair amount ensuring that it was not violating any laws with its loan product.  Credit Suisse, however, did little financial due diligence.  Barcy testified that Credit Suisse was aware that Cushman & Wakefield had appraised Debtors' assets in 2004 and thus either knew or should have known that the collateral that Blixseth proposed for the Credit Suisse loan had a fair market value of $420 million in 2004.  The Court highly doubts that Credit Suisse could have successfully syndicated the Yellowstone Club loan if the loan to value ratio was 90 percent.  Thus, Credit Suisse instead commissioned Cushman & Wakefield to employ its newly devised valuation methodology.  In applying the new valuation methodology, Credit Suisse relied almost exclusively on the Debtors' future financial projections, even though such projections bore no relation to the Debtors' historical or present reality.

Moreover, the Debtors' past debt had bounced between $4 to $5 million on the low end to $60 million on the high end.  Credit Suisse proposed to increase the Debtors' debt load by at least six times.  Barcy, Yankauer and the rest of the Credit Suisse syndicated loan team could not have believed under any set of circumstances that the Debtors could service such an increased debt load, particularly when the Debtors had several years of net operating losses, mixed with a couple years of net operating revenues.

The only plausible explanation for Credit Suisse's actions is that it was simply driven by the fees it was extracting from the loans it was selling, and letting the chips fall where they may.  Unfortunately for Credit Suisse, those chips fell in this Court with respect to the Yellowstone Club loan.  The naked greed in this case combined with Credit Suisse's complete disregard for the Debtors or any other person or entity who was subordinated to Credit Suisse's first lien position,

shocks the conscience of this Court. While Credit Suisse's new loan product resulted in enormous fees to Credit Suisse in 2005, it resulted in financial ruin for several residential resort communities. Credit Suisse lined its pockets on the backs of the unsecured creditors. The only equitable remedy to compensate for Credit Suisse's overreaching and predatory lending practices in this instance is to subordinate Credit Suisse's first lien position to that of CrossHarbor's superpriority debtor-in-possession financing and to subordinate such lien to that of the allowed claims of unsecured creditors.

While the Court agreed to vacate its Partial & Interim Order, the Court cannot and will not ignore the findings therein. Barcy testified that Credit Suisse cared not one iota what Blixseth did with the loan proceeds once Credit Suisse got its fat fees. That same sentiment applies to the Prepetition Lenders who snatched up the syndicated notes hoping to reap huge profits. The Prepetition Lenders had information available to them, had they bothered to look, indicating that the Yellowstone Club loan was very risky. For example, the Prepetition Lenders surely had access to the underlying Credit Agreement, which plainly disclosed that Blixseth could take $209 million as a distribution and could use another $142 million in unrestricted subsidiaries for purposes wholly unrelated to the Yellowstone Club. Moreover, the Prepetition Lenders surely had access to the fact that Moody's assigned a rating of B1 to the Yellowstone Club loan. And perhaps most important, Credit Suisse and the Prepetition Lenders knew the Yellowstone Club Credit Agreement was nonrecourse. Despite all the red flags, the Prepetition Lenders nevertheless clamored to get a piece of Credit Suisse's syndicated loan product.

In this case, Credit Suisse and the Prepetition Lenders are just as a culpable as Blixseth and as aptly noted by the U.S. Supreme Court, "[r]egardless of the degree of scienter, there may be circumstances in which the statutory goal of deterring illegal conduct is served more effectively by preclusion of suit than by recovery. In those circumstances, the *in pari delicto* defense should be afforded. Cf. *A.C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38,

43-44, 61 S.Ct. 414, 417, 85 L.Ed. 500, and n. 2 (1941)."  Pinter, 486 U.S. at 634, 108 S.Ct. at

2072.

In a clever legal maneuver, counsel for Credit Suisse negotiated to insulate Credit Suisse

from claims by the Prepetition Lenders and also negotiated a position that allowed YCLT to step

in and seek payment on behalf of Credit Suisse on a nonrecourse loan.  If Credit Suisse had

wanted to go after Blixseth in the event of a default, it should have included such provision in the

Credit Agreement.  This it did not do.

Blixseth and Credit Suisse have done a lot of finger pointing in this case, but in the end,

their conduct prompted Debtors' bankruptcies.  Following Part I of the trial in this matter, the

Court was not inclined to enter an order that would benefit the people who took the funds out of

the Debtor entities and the Court will not at this time enter an order that would in any way benefit

Credit Suisse, the Prepetition Lenders or other parties who have speculated on a monumental

award against Blixseth.  The parties who suffered compensable damages in this case are the

parties who have legitimate claims against the Debtors and who did not participate in the Credit

Suisse loan debacle.

In an attempt to deflect Blixseth's unclean hands and *in pari delicto* defense, YCLT

argues the Montana Supreme Court recently recognized that "there is no statutory basis in

Montana for an offset of damages arising from the commission of intentional torts." *Ammondson*

*v. Northwestern Corporation*, 220 P.3d 1, 59 (Mont. 2009).  Montana law provides for several

liability that allocates damages in proportion to the amount of fault, but not in the case of

intentional torts.  *Id.; Cartwright v. Equitable Life Assur. Soc. of U.S.*, 276 Mont. 1, 36, 914 P.2d

976, 998 (1996).  Generally, each person who commits a tort that requires intent is jointly and

severally liable for any indivisible injury legally caused by the tortious conduct.  RESTATEMENT (3d) of Torts § 12.

Contrary to YCLT's above argument, the Court is not apportioning liability between Blixseth and Credit Suisse.  Rather, the Court is precluding Credit Suisse and the Prepetition Lenders from benefitting from their participation in the Yellowstone Club loan.  More importantly, the Court is prohibiting Credit Suisse and the Prepetition Lenders from converting a nonrecourse loan into a recourse loan through crafty legal negotiations with the Debtors and the Committee.

While Blixseth caused substantial harm to the Debtors through his self dealings, the only compensable damages in this case are repayment of remaining legitimate allowed claims as of the date of the bankruptcy and as allowed under Debtors' confirmed Third Amended Joint Plan of Reorganization, together with any amounts already paid, including amounts paid through the Trade Creditor Fund established under ¶ 6.17 of Debtors' confirmed Third Amended Joint Plan of Reorganization.  Payment of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4 (general unsecured claims, except those of the First Lien Lender), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Blixseth claims are "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571.  The damage award against Blixseth only includes the amounts that creditors in the above classes would be entitled under the terms of Debtors' confirmed Third Amended Joint Plan of Reorganization.  For

**Case No. 12-35986 ER  814**

instance, Blixseth is not required to pay membership rejection damages if the memberships were assumed by the purchaser of the Yellowstone Club.

Also, YCLT has spent a considerable amount of time objecting to various claims in this case. Blixseth shall also be required to compensate YCLT for the fees and costs it has incurred, and will incur, objecting to and liquidating such claims. With respect to this litigation, each party shall pay their own fees and costs.

Commensurate with prior "scorched earth" trial tactics, the parties have included various other claims and defenses. Those claims and defenses require no discussion by this Court, other than to express that they are denied.

Blixseth testified at trial that he wanted to see the creditors of the Yellowstone Club paid and that the buck stopped with him. The Court agrees. Thus, in accordance with the forgoing, the Court will enter a separate judgment providing as follows:

IT IS HEREBY ORDERED and ADJUDGED that Judgement is entered in favor of Blixseth, in part, and YCLT, in part, with each party to pay their own fees and costs of suit; and YCLT is awarded that amount of money required to pay: (1) all allowed claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4 (general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571, and (2) YCLT for

Case No. 12-35986 ER  815

the fees and costs it has incurred, and will incur, objecting to and liquidating such claims.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

ER01146

**Case No. 12-35986 ER  816**

**NO. 12-35986**

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appeallate CM/ECF system on April 8, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CB/ECF system

April 8, 2013                                    s/ Christopher J. Conant

                                                 Christopher J. Conant, Esq

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

## NO. 12-35986

---

TIMOTHY L. BLIXSETH

Appellant,

v.

YELLOWSTONE MOUNTAIN CLUB, LLC
YELLOWSTONE DEVEOPMENT, LLC
BIG SKY RIDGE, LLC
YELLOWSTONE CLUB CONSTRUCTION CO., LLC

Appellees.

---

## APPELLANT'S EXCERPTS OF RECORD
### Volume V of V
### Pages 817 through 909

---

Appeal from the United States District Court for the District of Montana
Case No. 2:11-73-BU-SEH

---

Phillip H. Stillman
Stillman & Associates
300 South Poine Drive,
Suite 4206
Miami Beach, FL 33139
Telephone: (888) 235-4279
*pstillman@stillmanassociates.com*

Christopher J. Conant
Conant Law LLC
730 17th Street
Suite 200
Denver, CO 80202
Telephone: (303) 298-1800
*cconant@conantlawyers.com*

Patrick T. Fox
Doubek Pyfer & Fox, LLP
PO Box 236
Helena, MT 59624
Telephone: (406) 442-7830
*patrickfox@douberpyfer.com*

Michael J. Ferrigno
Law Office of Michael Ferrigno,
PLLC
1200 N. Main Street, Suite 486
Meridian, ID 83680
Telephone: (208) 319-3561
*michael.ferrigno@ferrigno-law.com*

Attorneys for Appellant Timothy L. Blixseth

**INDEX**

**APPELLANT'S EXCERPTS OF RECORD**

**TIMOTHY L. BLIXSETH**

**Appellant,**

**v.**

**YELLOWSTONE MOUNTAIN CLUB, LLC**
**YELLOWSTONE DEVEOPMENT, LLC**
**BIG SKY RIDGE, LLC**
**YELLOWSTONE CLUB CONSTRUCTION CO., LLC**

**Appellees.**

**NO. 12-35986**

| Docket No. | Date | Description | Volume | Pages |
|---|---|---|---|---|
| 51 | 11/16/2012 | Order Denying Blixseth's Appeal | I | 1-5 |
| 6.1, Ex. 1 | 1/3/2012 | Memorandum of Decision | I | 6-47 |
| 6.1, Ex. 3 | 1/3/2012 | Memorandum of Decision | I | 48-94 |
| 52 | 11/28/2012 | Notice of Appeal to Ninth Circuit | II | 95-153 |
| 43 | 8/24/2012 | Transcript of Motion Hearing | II | 154-209 |
| 39 | 8/24/2012 | Post Hearing Brief | II | 210-212 |
| 17-1, Ex. 26 | 2/16/2012 | Motion for Summary Judgment Concerning Derivative Claims, Alter Ego, Fiduciary Duty, and Statute of Limitation and Memorandum in Support | II | 213-215 |
| 17-2, Ex. 27 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses | II | 216-217 |

1

| 17-3, Ex. 28 | 2/16/2012 | Motion for Summary Judgment on Affirmative Defenses "K" and "L" on Causation and Supporting Memorandum | II | 218-220 |
|---|---|---|---|---|
| 17-4, Ex. 29 | 2/16/2012 | Ominbus Response to Motions for Summary Judgment | II | 221-223 |
| 18-1, Ex. 30 | 2/16/2012 | August 4, 2010 Memorandum of Decision | II | 224-228 |
| 18-2, Ex. 31 | 2/16/2012 | August 4, 2010 Order | II | 229-231 |
| 12-5 | 2/2/2012 | Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) | III | 232-462 |
| 6.1, Ex. 2 | 1/3/2012 | Notice of Appeal | III | 463-466 |
| 6.1, Ex. 2 | 1/3/2012 | Amended Notice of Appeal | III | 467-471 |
| 6.1, Ex. 4 | 1/3/2012 | Yellowstone Club Settlement Term Sheet | III | 472-491 |
| 6.2 | 1/3/2012 | Yellowstone Club Disclosure Statement | III | 492-521 |
| 7.3, Ex. 7 | 1/3/2012 | Am. Affidavit Of Timothy L. Blixseth in Support of Motion to Disqualify | IV | 522-549 |
| 7.3, Ex. 8 | 1/3/2012 | December 10, 2010 Hearing Tr. | IV | 550-552 |
| 8.1 | 1/3/2012 | Supplemental Affidavit of Timothy L. Blixseth | IV | 553-584 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Cash Collateral Email | IV | 585 |
| 10-1, Ex. 7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Generic Order Email | IV | 586 |
| 10-1. Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington at Home Email | IV | 587 |
| 10-1, Ex.7 | 1/3/2012 | Supp. Affidavit, Ex. 7 - Harrington Cell Phone Email | IV | 588 |

2

| 10-1, Ex. 8 | 1/3/2012 | Supp. Affidavit, Ex. 8 Peterson Email | IV | 589-590 |
|---|---|---|---|---|
| 10-1, Ex. 9 | 1/3/2012 | Supp. Affidavit, Ex. 9 Harrington "Heads Up" Email | IV | 591-592 |
| 10-1, Ex. 10 | 1/3/2012 | Supp. Affidavit, Ex. 10 Richardson Email | IV | 593-594 |
| 10-2. Ex. 12 | 1/3/2012 | Bankruptcy Court Memorandum of Decision in BLX Group, Inc., Nov. 22, 2011 | IV | 595-609 |
| 10-2, Ex. 13 | 1/3/2012 | AP-88 Complaint | IV | 610-622 |
| 10-2 | 1/3/2012 | Hearing Transcript Disqualification Hearing, Jan. 18, 2011 | IV | 623-680 |
| 10.3, Ex. 14 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, August 16, 2010 | IV | 681-816 |
| 10.3, Ex. 15 | 1/3/2012 | Memorandum of Decision in AP 09-100, September 27,2010 | V | 817-843 |
| 10.3, Ex. 16 | 1/3/2012 | AP-14 Judgment | V | 844-846 |
| 10.3, Ex. 17 | 1/3/2012 | YCLT Motion to Reconsider AP-14 | V | 847-850 |
| 10.3, Ex. 18 | 1/3/2012 | Affidavit of Charles Hingle in Support of YCLT's Motion to Reconsider AP-14 | V | 851-858 |
| 10-3, Ex. 19 | 1/3/2012 | Bankruptcy Court Memorandum of Decision AP-14, Sept. 7, 2010 | V | 859-868 |
| 10-3, Ex. 20 | 1/3/2012 | YCLT Motion to Certify for Direct Appeal in AP-14 | V | 869-871 |
| 10-3, Ex. 21 | 1/3/2012 | YCLT Motion to Expedite Hearing on Motion to Certify for Direct appeal | V | 872-874 |
| 10-3, Ex. 22 | 1/3/2012 | Order granting Motion to Expedite Hearing | V | 875-877 |
| 10-3, Ex. 24 | 1/3/2012 | Order granting Motion to Certify Order | V | 878-880 |

| 10-4, Ex. 25 | 1/3/2012 | Memorandum of Decision in AP-88, January 3, 2012 | V | 881-900 |
|---|---|---|---|---|
| | | U.S. District Court, District of Montana - Docket Report | V | 901-909 |

Exhibit 15

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **EDRA D BLIXSETH**, | Case No.  **09-60452-7** |
| Debtor. | |
| **WESTERN CAPITAL PARTNERS, LLC**, | |
| Plaintiff. | |
| -vs- | Adv No.  **09-00100** |
| **EDRA D BLIXSETH**, | |
| Defendant. | |

# MEMORANDUM of DECISION

At Butte in said District this 27th day of September, 2010.

In this Adversary Proceeding, Plaintiff Western Capital Partners, LLC ("WCP") filed a

Motion for Summary Judgment to Determine the Non-Dischargeability of a Debt on August 20,

2010.  *See* docket entry no. 26.  WCP's Motion for Summary Judgment was accompanied by a

Brief in support thereof, a Statement of Uncontroverted Facts and various affidavits and

supporting exhibits.  The following are WCP's purported uncontroverted facts:

### STATEMENTS OF UNCONTROVERTED FACTS/GENUINE ISSUES

1.  On March 26, 2009 (the "Petition Date") Edra D. Blixseth ("Debtor") filed a voluntary

petition for relief under Chapter 11, of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Montana. (*See,* Complaint at ¶1 and Answer at ¶1).

2.  The filing of the above-referenced petition created the case in this District entitled *In re Edra D. Blixseth*, Case No. 09-60452. (*See*, Complaint at ¶2 and Answer at ¶1).

3.  On or about June 15, 2007, WCP entered into a certain Loan Agreement with certain borrowers and guarantors, whereby WCP loaned $13,065,000.00 ("$13 Million Loan") to various entities in which Debtor had a direct, indirect, and/or familial relationship (the "Loan Agreement").  (*See* the Affidavit of Jeffrey Adams ("Adams Affidavit"), filed concurrently herewith, at ¶ 1, and Exhibit 1 to Adams Affidavit).

4.  The $13 Million Loan by WCP was evidenced by a Commercial Promissory Note ("Note").  (Adams Affidavit at ¶ 2, and Exhibit 2 to same).

5.  As a material condition to entering into and advancing funds under the Loan Agreement, WCP required the Debtor to execute a Loan Affidavit in which Debtor made certain affirmative representations regarding her financial and legal condition (the "Loan Affidavit"). (Adams Affidavit at ¶ 3).

6.  A true and correct copy of the Loan Affidavit is attached to the Complaint as Exhibit 1 and is also attached to the Adams Affidavit as Exhibit 3.  (Adams Affidavit at ¶3).

7.  The affirmative representations made by the Debtor, as a guarantor, in the Loan Affidavit include, but are not limited to the following ("Affirmative Representations"):

        a.      As of June 15, 2007, the Debtor was neither: (i) currently insolvent on a balance sheet basis; or (ii) unable to pay her debts as they came due (*see* ¶ 3 of Exhibit 3 to Adams Affidavit);

ER01148

**Case No. 12-35986 ER  819**

     b.      As of June 15, 2007, the Debtor had no judgments pending against her, jointly or severally (see ¶ 7 of Exhibit 3 to Adams Affidavit);

     c.      As of June 15, 2007, the Debtor had no delinquent tax obligations, including, without limitation, federal income tax, state income tax, withholding tax, sales tax, or personal property tax obligations (*see* ¶ 8 of Exhibit 3 to Adams Affidavit);

     d.      As of June 15, 2007, the Debtor was not being threatened with any suit or arbitration (*see* ¶ 11 of Exhibit 3 to Adams Affidavit); and

     e.      The Debtor understood that WCP was relying on her representations, and that it would not have advanced the contemplated loan if any one of the representations were inaccurate or misleading in any way.  Further, the Debtor understood that she was warranting that the above statements and representations were accurate in all respects and not misleading in any manner. (*See* ¶ 61 of Exhibit 3 to Adams Affidavit)

8.  WCP reasonably relied on the truth and accuracy of the Affirmative Representations in the Loan Affidavit by Debtor when it advanced funds under the Loan Agreement. (Adams Affidavit at ¶ 4).

9.  Had WCP known that any of the Debtor's Affirmative Representations were false or misleading in any way, WCP would not have advanced funds under the Loan Agreement. (Adams Affidavit at ¶ 5).

10.  Debtor admitted under oath that the Affirmative Representation in the Loan Affidavit stating that Debtor was able to pay her debts as they came due was only partially correct.  Debtor

ER01149

**Case No. 12-35986 ER  820**

testified that she was only intermittently able to pay her debts when they came due. (*See* the

Affidavit of Christopher J. Conant ("Conant's Affidavit"), at ¶ 1 . . .; and Deposition Transcript

of Edra D. Blixseth, dated December 17, 2009 "Edra Deposition", Tr. P. 87 at l.1-4 attached as

Exhibit 1 to Conant Affidavit).

11.  Debtor was aware that Western Capital Partners was relying on the information she

provided in the Loan Affidavit when it advanced funds under the $13 Million Loan, and

acknowledged that lenders rely on this type of information when contemplating whether or not to

loan money to a borrower. (*See* Conant Affidavit at ¶ 2, and Edra Deposition, Tr. P. 96-97 at l. 25

& 1-12, attached as Exhibit 2 to Conant Affidavit).

12.  As an additional material condition of advancing funds under the Loan Agreement,

WCP required Debtor to personally guaranty repayment of the borrowers' obligations under the

Loan Agreement. (Adams Affidavit at ¶ 6).

13.  On June 15, 2007, Debtor executed a Guaranty Agreement for the benefit of WCP

(the "Guaranty Agreement") pursuant to which Debtor guaranteed repayment of the $13 Million

Loan. (Adams Affidavit at ¶ 7, and Exhibit 4 same).

      a.  The Guaranty Agreement specifically provides that it "shall be construed

and enforced in accordance with the laws of the State of Colorado." (*See* ¶

11 of Exhibit 4 to Adams Affidavit).

14.  Based on Debtor's representations regarding her financial condition and wealth to

WCP, WCP understood that Debtor had sufficient funds to satisfy her guaranty obligations, and

WCP underwrote the Loan on Debtor's guaranty and purported wealth.  (Adams Affidavit at ¶ 8).

15.  Certain "Recitals" specifically set forth in the Guaranty Agreement stated that:

Case No. 12-35986 ER  821

    a.      Debtor held an ownership interest in the borrowers and wished to have the borrowers obtain the Loan from WCP (*see* ¶ C of Exhibit 4 to Adams Affidavit); and

    b.      WCP was unwilling to make the Loan to the borrowers unless payment of the borrower's liabilities and other sums arising under the Note and other Loan Documents were unconditionally, independently, and directly guaranteed by Debtor pursuant to the terms of the Guaranty Agreement (*see* ¶ D of Exhibit 4 to Adams Affidavit).

16.  Had Debtor not executed the Guaranty Agreement, or had WCP known that Debtor lacked sufficient funds to satisfy her guaranty obligations, WCP would not have entered into the Loan Agreement and advanced funds thereunder. (Adams Affidavit at ¶ 9).

<u>May 24, 2007 Letter from Jaffe & Clemens</u>

17.  As a condition of entering into the Loan Agreement under the $13 Million Loan, WCP required Debtor to provide a written statement regarding her financial and legal condition from her legal counsel so that WCP could evaluate and corroborate the same and be assured that Debtor was in a financial position to guaranty repayment of the Note. (Adams Affidavit at ¶ 10).

18.  Debtor's divorce attorneys at the law firm of Jaffe & Clemens in Los Angeles, California provided WCP's counsel with a letter explaining Debtor's financial condition and expected financial condition following the resolution of her divorce from Tim Blixseth (the "May 24, 2007 Letter").  (*See* Adams Affidavit at ¶ 11, and Exhibit 5 to same).

19. In the May 24, 2007 Letter, Debtor's counsel, Mr. Ryden, stated:

    "It appears from a preliminary review of the assets of the estate, all of

**Case No. 12-35986 ER  822**

which were accumulated by Mr. and Mrs. Blixseth since their marriage, which would make them community property, total in excess of $500 million dollars.

One of the assets which we anticipate being received by Mrs. Blixseth is the residential property known as "Porcupine Creek." Our best estimate of the value of that property exceeds $200 million dollars.

I do not believe that [WCP] should have any concerns in making this loan to Mrs. Blixseth." (Exhibit 5 to Adams Affidavit).

20.  WCP reasonably relied on the statements of Debtor's agent, Mr. Ryden, when it entered into the Loan Agreement and advanced funds thereunder. (Adams Affidavit at ¶ 12).

21.  Had the true facts been revealed to WCP by the Debtor's agent, Mr. Ryden, WCP would not have made the loan. (Adams Affidavit at ¶ 13).

22.  On July 27 2007, just weeks after WCP advanced funds under the Loan Agreement, Debtor signed a declaration under penalty of perjury in her divorce proceedings in which she represented to the California Superior Court that she was several months in arrears to her creditors and that such arrears totaled $2 million. (*See* Conant Affidavit at ¶ 3, and Edra Deposition, Exhibit 15 at pp. 1:9-10, 9, ¶ 3, attached as Exhibit 3 to Conant Affidavit).

    a.    In her July 27, 2007, sworn declaration under oath, Debtor specifically stated, "…I am presently in arrears to creditors in the approximate amount of two million dollars, even after using all of the proceeds from the sale of my real estate parcel. These debts are primarily due to the ordinary expenses of Porcupine Creek, and they are increasing by the hundreds of thousands of dollars per month." (P.10, ¶ 3 of Exhibit3 to Conant Affidavit).

ER01152

**Case No. 12-35986 ER  823**

23.  Had WCP known that the Debtor was misrepresenting material facts concerning her financial position, it would not have entered into the Loan Agreement and would not have advanced funds thereunder. (Adams Affidavit at ¶ 14).

<u>June 2008 Loan Modification</u>

24.  In May of 2008, the borrowers and Debtor defaulted on their respective obligations under the Loan Agreement and Guaranty Agreement by failing to make their required interest payment under the $13 Million Loan. (Adams Affidavit at ¶ 15).

25.  In June of 2008, Debtor approached WCP and requested modification of the $13 Million Loan. As an accommodation to the borrowers and Debtor, WCP agreed to modify the terms of the Loan Agreement and Note rather than pursue its collection remedies under the Loan Agreement for the borrowers' and Debtor's default. (Adams Affidavit at ¶ 16).

26.  Specifically, on June 25, 2008, Debtor and the borrowers executed that certain First Promissory Note, Loan Agreement, Trust Deed and Security Agreement Modification ("Loan Modification") wherein Debtor conveyed to WCP as additional collateral to secure repayment of the Note, a first position deed of trust on her condominium in Bellevue, Washington. (Adams Affidavit at ¶ 17, and Exhibit 6 to same).

27.  When Debtor executed the Loan Modification, she specifically reaffirmed each and every Affirmative Representation that she made to WCP when she executed the Loan Affidavit. Specifically, the Loan Modification provides in relevant part:

> "Also, that certain Loan Affidavit, dated June 15, 2007, which is part of the Loan Documents (the "Affidavit") is hereby amended to include the Additional Collateral and the Borrower and Guarantor hereby reconfirm and remake all of the

Case No. 12-35986 ER  824

representations and warranties made in the Affidavit . . . ." (*See* ¶ 2 of Exhibit 6 to Adams Affidavit).

28.  Again, WCP reasonably relied on the truth and accuracy of Debtor's Affirmative Representations in the Loan Affidavit as reaffirmed by her in the Loan Modification. (Adams Affidavit at ¶ 18).

29.  However, on May 30, 2008, just 25 days before Debtor approached WCP and requested modification of the Loan, Debtor executed a sworn declaration under oath, in which she specifically admitted to having total combined bank balances of less than zero (*see* page 2, ¶ 7h of Exhibit 4 to Conant Affidavit), being over $8 million in arrears to her creditors, and owing over $3 million to federal and state tax authorities for her community income tax liability in 2006. (*See generally* Conant Affidavit at ¶¶ 4-5).  Specifically, Debtor declared:

a.  "The Internal Revenue Service (IRS) is threatening to levy against my property. I still owe $3,177,921 in 2006 community income tax liability to the federal and state taxing authorities . . . ." "The California Franchise Tax Board (FTB) has threatened to file a lien against my property because I have not paid outstanding 2006 community income tax liability . . . ." (See page 2, ¶¶4(f)-7 of Exhibit 4 to Conant Affidavit).

b.  "At this time, I have $8,154,007.05 in outstanding bills and invoices that I owe to various vendors, many of which are past due. Attached . . . collectively as Exhibit C is a small sample of the many past-due invoices and delinquency notices I have received but have not been able to pay. There are far too many such notices and invoices for me to submit with

this ex parte application, so I am only providing a small sample." (*See*
page 2, ¶ 7i of Exhibit 4 to Conant Affidavit).

30.  Debtor also misrepresented the fact that she was involved in pending litigation when
she executed the Loan Affidavit and Loan Modification, and when she provided the May 24,
2007, Letter, as follows:

    a.  When Debtor executed the Loan Affidavit and the Loan Modification, she was
either already involved in litigation or knew that she was being threatened with
imminent litigation. Specifically, Debtor was a defendant in at least the following
cases:

        i. Case Nos. 3:06-cv-00056 and 3:06-cv-00145 in the United States
District Court for the District of Nevada (hereinafter "Nevada Litigation");
ii. Cause Nos. DV-29-2006-26 and DV-29-2007-5 in the Montana 5th
Judicial District, Madison County.
*See*, Complaint at ¶55(d) and Answer at ¶32.

31.  In the Nevada Litigation, Debtor personally executed a Confession of Judgment in
favor of Warren Trepp in the amount of $5 million (*see* Edra Deposition, Exhibit 33, at p. 5,
attached as Exhibit 5 to Conant Affidavit), and a Confession of Judgment in favor of eTreppid
Technologies, LLC, in the amount of $20 million (*see* Edra Deposition, Exhibit 34, at pp 1-2,
attached as Exhibit 6 to Conant Affidavit). (*See generally* Conant Affidavit at ¶ 6).

32.  Had WCP known that any of the Debtor's Affirmative Representations as reaffirmed
by her in the Loan Modification were false or misleading in any way, WCP would not have
agreed to modify the Loan Agreement. (Adams Affidavit at ¶ 19).

9

**Case No. 12-35986 ER  826**

In a separate Statement of Genuine Issues filed September 24, 2010, Edra stipulates to WCP's Uncontroverted Fact numbers 1 and 2. Edra then proceeds to assert the following in her Statement of Genuine Issues:

2. Edra stipulates to WCP's Uncontroverted Facts numbers 3, 4, 13, and 15 to the extent they reflect a loan agreement was entered with Edra's son, Matthew Crocker, and that she was a guarantor on that loan. Further, the documents speak for themselves and any interpretation of their contents amounts to an issue of law as to contractual interpretation and, thus, are not appropriate as "Uncontroverted Facts".

3. Edra stipulates to WCP's Uncontroverted Facts numbers 5, 6, 7, 12 and 14 to the extent the Loan Affidavit is a true and correct copy and that it was part of the loan application process. Edra disputes the claim of the material nature of the Loan Affidavit as a condition to entering into the loan and advancing funds and WCP's reliance thereon. Further, Edra disputes the claimed false nature of these representations. Edra disputes these supposed undisputed facts on the following bases:

    a.    WCP's position is based on the Affidavit of Jeffery Adams which merely reiterates the opinion of the material nature of the information provided in the affidavit. No actual factual basis is provided. Facts exist reflecting WCP's knowledge of the falsity of at least some of the alleged representations and the loan was entered and funds advanced despite this knowledge. This, at a minimum, raises a question of fact as to whether the representations by Edra were actually treated as material in the issuance of the loan.

    b.    WCP has failed to provide responses to discovery propounded on January 19,

**Case No. 12-35986 ER  827**

2010. A Motion to Compel these answers is currently pending (dkt #24 and #25).
On good faith and belief, Blixseth understands there potentially exists documents
reflecting witnesses and knowledge of communications showing WCP knew of
the facts contrary to the alleged wrongful representations and entered the loan and
advanced the funds irregardless of that knowledge rendering the representations
immaterial. Until such time as WCP properly responds to the discovery requests
propounded, it should not be permitted to take advantage of its own improper
conduct to create a situation where Edra cannot set forth disputed issues. To
permit such conduct on the part of WCP would be to deny Edra due process.

c.    WCP also relies on the Affidavit of Christopher J. Conant who represents that he
is the attorney for WCP in this adversary action. Mr. Conant is currently also the
attorney for Tim Blixseth. As a matter of basic agency principal, the knowledge of
the principal is imputed to the agent and the knowledge of the agent is imputed to
the principal. Applying that basic concept here, all knowledge of Tim Blixseth is
imputed to Mr. Conant as principal of the agent and all knowledge of Mr. Conant
is imputed to WCP as agent principal. Clearly, all knowledge of Tim Blixseth as
to all aspects of his fraudulent activity as outlined by this Court in its
Memorandum of Decision (MOD) dated August 16, 2010, is imputed to WCP.
Accordingly, WCP is deemed to have been aware of the negative financial aspects
of everything Tim Blixseth had knowledge. In proceeding to agree to the loan in
this matter and produce the funds WCP is deemed to have done so with that
knowledge and, as such falsely claims here that had they known that information

11

ER01157

**Case No. 12-35986 ER  828**

they would not have proceeded.

d.     The representations made as to the financial condition, tax obligations, and related matters are directly tied to Edra's then existing knowledge. This Court is asked to take judicial notice of its own Memorandum of Decision of August 16, 2010, in *Blixseth, et al. v. Blixseth, et al.*, Adversary Proceeding No. 09-00014.  In particular, this Court is reminded of its findings of fraudulent conduct by Tim Blixseth, his freezing out of Edra Blixseth as to control of certain businesses (referred to therein as "Debtors"), and Tim Blixseth's maintaining control of those entities, thus, misleading Edra Blixseth as to the true financial condition she was in.  Further, this Court found Edra Blixseth mistakenly had underestimated her assets, but found this underestimation reasonable under the circumstances and, thus, did not undermine her credibility. This only shows that the combination of the fraud and Edra Blixseth's justified reliance on the information provided, led to a belief as to the representations made in the loan application process at issue herein.

4.  Edra disputes WCP's Uncontroverted Facts numbers 8, 9, 11 and 16 and asserts there is a genuine issue for the following reasons:

a.     The claim for "reasonable reliance", is opinion and not fact. No actual factual basis is provided.  Facts exist reflecting WCP's knowledge of the falsity of at least some of the alleged representations and the loan was entered and funds advanced despite this knowledge. This, at a minimum, raises a question of fact as to whether the representations made by Edra were actually treated as material in the issuance

**Case No. 12-35986 ER  829**

of the loan.

b.      WCP has failed to provide responses to discovery propounded on January 19,

2010. A Motion to Compel these answers was filed (dkt #24 and #25). On good

faith and belief, [Edra] understands there potentially exists documents reflecting

witnesses and knowledge of communications showing WCP knew of the facts

contrary to the alleged wrongful representations and entered the loan and

advanced the funds irregardless of that knowledge rendering the representations

immaterial. Until such time as WCP properly responds to the discovery requests

propounded, it should not be permitted to take advantage of its own improper

conduct to create a situation where Edra cannot set forth disputed issues. To

permit such conduct on the part of WCP would be to deny Edra due process.

c.      WCP claimed in its alleged undisputed fact that "any" false or misleading

representation would have resulted in the loan not be[ing] given and the funds not

advanced. This is contrary to WCP's own actions. In fact, WCP was aware of

facts contrary to those set forth in the representations and proceeded with the loan

anyway.

d.      WCP's claimed reliance is not valid because the loan in fact was based on the

assets of Edra's son Matthew Crocker which at the time the loan was granted and

the collateral provided more than adequately covered the loan amount.  It was

only after the market drastically changed did the values of the assets diminish and

WCP looked to Edra.

5. Edra disputes WCP's Uncontroverted Fact #10 and asserts there is a genuine issue

Case No. 12-35986 ER  830

for the following reasons:

    a.    WCP claims as an undisputed fact their interpretation of Edra's testimony. At a minimum, they take liberties with this interpretation. The actual testimony reads:

> Q. Were you able to pay your debts as they came due on June 15th of 2007?
>
> A. I think I was intermittently able to based on how I was making loans and how cash flow came in.

Edra Blixseth's Affidavit, page 87, lines 1-4.

Whether such testimony can be interpreted as contrary to a representation in the loan affidavit is a question of fact for the trier of fact.

    b.    Even WCP needs to qualify its claim that such a statement is false or misleading by conceding the response is "partially correct". Statement of Uncontested Facts, page 3, paragraph 10. If WCP concedes the statement is at least partially correct, clearly WCP has conceded that a question of fact exists. Further, this testimony must be viewed in a light most favorable to Edra. In so doing, it clearly raises a disputed issue of fact.

6. Edra disputes WCP's Uncontroverted Facts numbers 17 through 23 and asserts there is a genuine issue for the following reasons:

    a.    The letter sought and obtained by WCP and supposedly relied upon by WCP sets forth opinion, not fact. WCP apparently accepted opinion as sufficient to meet its required needs. As such, their claim of reliance on facts provided, when in actuality they were willing to rely on opinion, negates any assertion of rightful

reliance on fact.

b.    The opinions made in the letter of May 24, 2007, as to financial conditions, tax

obligations, and related matters are directly tied to Edra's counsel's then existing

knowledge. The Court is asked to take judicial notice of its own Memorandum of

Decision of August 16, 2010, in *Blixseth, et al. v. Blixseth, et al.*, Adversary

Proceeding No. 09-00014. In particular, this Court is reminded of the findings of

fraudulent conduct of Tim Blixseth, his freezing out of Edra Blixseth as to control

of certain business (referred to therein as "Debtors"), and Tim Blixseth's

maintaining of control of those entities, thus, misleading Edra Blixseth as to the

true financial condition she was in. This Court specifically found fraudulent

conduct by Tim Blixseth with regard to the Martial Settlement Agreement which

reflects the same knowledge Edra Blixseth's divorce attorney would have been

relying upon to provide the May 24, 2007, letter. Further, this Court found that

Edra Blixseth mistakenly had underestimated her assets, found this

underestimation reasonable under the circumstances and, thus, did not undermine

her credibility. This only shows that the combination of the fraud and Edra

Blixseth's justified reliance on the information provided led to the belief as to the

representations made, not only as to the loan application but as to the opinions

provided by Edra Blixseth's divorce attorney in his letter of May 24, 2007.

7. Edra disputes WCP's Uncontested Facts numbers 24 through 32 and asserts there is a

genuine issue. The remaining claimed uncontested facts deal with the 2008 loan modification.

This loan modification, on Edra's part, was a reiteration of the prior representations. At the time

**Case No. 12-35986 ER  832**

of the loan modification, WCP was aware of all the factual issues set forth above and, as such, was without a reasonable basis for reliance as previously set forth.

## SUMMARY JUDGMENT

Summary judgment is governed by F.R.B.P. 7056. Rule 7056, incorporating FED.R.CIV.P. 56(c), states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)). The manner in which this burden is proven depends on which party has the burden on a particular claim or defense at the time of trial.

> If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence–using any of the materials specified in Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial. Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan dissent) (citations omitted). *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

ER01162

*Companies, Inc.*, 210 F.3d 1099, 1102-06 (9th Cir. 2000) (discussing burdens for withstanding summary judgment).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED. R. CIV. P. 56(e). *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute"). That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby*, 477 U.S. at 247-48, 106 S.Ct. at 2509. However, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). "A 'material' fact is one that is relevant to an element of a claim or

**Case No. 12-35986 ER  834**

defense and whose existence might affect the outcome of the suit.  The materiality of a fact is thus determined by the substantive law governing the claim or defense." *Id*.

If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986).  Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.  *T.W. Elec. Serv.*, 809 F.2d at 631.  In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

### 11 U.S.C. § 523(a)(2)(A)

It is well-settled that the Bankruptcy Code's central purpose is to provide a fresh start to the honest but unfortunate debtor. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).  However, under certain circumstances, a creditor may seek to except from a debtor's discharge certain debts.  *See* 11 U.S.C. §§ 523(a).  Nevertheless, consistent with effectuating the underlying purposes of the Bankruptcy Code, exceptions to discharge under § 523 are to be narrowly construed.  *See Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).  Notwithstanding the weighty burden, a creditor, in order to prevail, need only establish the elements of nondischargeability under 11 U.S.C. § 523, by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. at 287-88.

ER01164

**Case No. 12-35986 ER  835**

To establish nondischargeability as a result of fraud under § 523(a)(2)(A)[1], courts in the Ninth Circuit employ the following five-part test:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;
> (2) knowledge of the falsity or deceptiveness of his statement or conduct;
> (3) an intent to deceive;
> (4) justifiable reliance by the creditor on the debtor's statement or conduct; and
> (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001*); American Express Travel Related Services Co. Inc. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996); *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996). The determination of nondischargeability under § 523(a)(2)(A) is a question of federal, not state law and since the elements of § 523(a)(2)(A) mirror the common law elements of fraud, courts must interpret these elements consistent with the common law definition of "actual fraud" as set forth in the Restatement (Second) of Torts (1976) §§ 525-557A.  *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443-44, 133 L.Ed.2d 351 (1995) ("'false pretenses, a false representation, or actual fraud,'. . . are common-law terms, and...in the case of 'actual fraud,'...they imply elements that the common law has defined them to include.").

1.  Intent to Deceive

---

[1]  11 U.S.C. § 523(a)(2)(A) reads:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–

\* \* \*

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

19                                                      ER01165

**Case No. 12-35986 ER  836**

The first three elements of § 523(a)(2)(A), when taken together, establish the element of intent to deceive, which the creditor must establish by a preponderance of the evidence. In other words, a creditor must establish that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor. In a two-party transaction, as distinguished from a three-party credit card transaction, the alleging party must prove the elements of misrepresentation and reliance directly and by a preponderance of the evidence and not by reference to the totality of the circumstances. *Compare Turtle Rock Meadows Homeowners Assoc. v. Slyman (In re Slyman)*, 234 F.3d 1081, 1086 (9th Cir. 2000) *with Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996). As to the remaining elements, a creditor sustains its burden of proof under § 523(a)(2)(A), if a Court, after considering the facts and circumstances of a particular case, answers the following two inquiries in the affirmative: 1) did the creditor justifiably rely on the debtor's representation–reliance; and 2) was the debt sought to be discharged proximately caused by the first two elements–causation.

## 2. Reliance

A creditor must establish that it relied on the false representations made by the debtor. *Field*, 116 S.Ct at 438 (1995). Such reliance need not be reasonable, but it must be justifiable. *Id*. As the Supreme Court held in *Field*, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id*. at 444 (quoting § 540 Restatement (Second) of Torts (1976)). This standard depends upon the knowledge and experience of the person to whom the representations were made. As the Supreme Court in *Field* further explained:

[A] person is "required to use his senses, and cannot recover if he blindly relies

ER01166

**Case No. 12-35986 ER  837**

upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.  Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect.  On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses.  Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id*. (quoting § 541, Comment a., RESTATEMENT (SECOND) OF TORTS (1976)).  Interpreting this standard, the Ninth Circuit Court of Appeals teaches:  "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud."  *Apte*, 96 F.3d at 1322.

### 3.  Causation

Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must establish that a claim sought to be discharged arose from an injury proximately resulting from his or her reliance on a representation that was made with the intent to deceive.  *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991).  "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible."  *Id*. at 604.  Moreover, as the United States Supreme Court explained in *Field*, a court may turn to the Restatement (Second) of Torts (1976), "the most widely accepted distillation of the common law of torts" for guidance on this issue.  *Field*, 116 S.Ct. at 443.

The RESTATEMENT (SECOND) OF TORTS (1976) explains that proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in loss, § 546; and (2) legal causation, which

**Case No. 12-35986 ER  838**

requires a creditor's loss to "reasonably be expected to result from the reliance." § 548A.  *See also In re Creta*, 271 B.R. 214, 220 (1st Cir. BAP 2002).  In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud.  *Siriani v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. (In re Siriani),* 967 F.2d 302, 306 (9th Cir. 1992).

As discussed above, the WCP, as the Plaintiff, has the threshold burden of showing that the Debtor/Defendant had an intent to deceive WCP.

## 11 U.S.C. § 523(a)(2)(B)

Section 523(a)(2)(B) excepts from discharge debt for money obtained by the use of a written statement concerning a debtor's (or insider's) financial condition.  The statute reads:

   (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

* * *

   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

* * *

   (B) use of a statement in writing–
        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial condition;
        (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
        (iv) that the debtor caused to be made or published with intent to deceive[.]

The Ninth Circuit has reworded these requirements as follows:

   (1) a representation of fact by the debtor,
   (2) that was material,
   (3) that the debtor knew at the time to be false,

(4) that the debtor made with the intention of deceiving the creditor,
(5) upon which the creditor relied,
(6) that the creditor's reliance was reasonable,
(7) that damage proximately resulted from the representation.

*Siriani v. Northwestern Nat'l Ins. Co., of Milwaukee, Wis. (In re Siriani)*, 967 F.2d 302, (9th Cir. 1992); *In re Gertsch*, 237 B.R. 160, 167 (9th Cir. BAP 1999) (adopting the elements required under the companion section 523(a)(2)(A), with the additional and obvious requirement that the alleged fraud stem from a false statement in writing); *Candland v. Insurance Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996); *Avco Fin. Services of Billings v. Kidd (In re Kidd)*, 219 B.R. 278, 282 (Bankr. D. Mont. 1998); *In re Osborne*, 257 B.R. 14, 20 (Bankr. C.D. Cal. 2000).

In discussing the difference between §§ 523(a)(2)(A) and 523(a)(2)(B), the Supreme Court instructs that § 523(a)(2)(B) applies where the debt at issue "follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied." *Field v. Mans*, 516 U.S. 59, 66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). On the issue of materiality, a financial statement that leaves "any discrepancy" between the overall impression left by the statement and the endorser's true financial status gives rise to a material falsehood for purposes of § 523(a)(2)(B). *North Park Credit v. Harmer (In re Harmer)*, 61 B.R. 1, 5 (Bankr. D.Utah 1984) (citing cases); *accord Texas Am. Bank, Tyler, N.A. v. Barron, (In re Barron)*, 126 B.R. 255 (Bankr. E.D. Texas 1991) (citing cases). A "long line of cases" has held that in a personal financial statement, the "omission, concealment, or understatement of any of [a] debtor's material liabilities constitutes a 'materially false' statement." *Harmer*, 61 B.R. at 5.

Case No. 12-35986 ER  840

Moreover, even if a debtor does not know of inaccuracies contained in a written financial statement, the Ninth Circuit has held that reckless disregard for the truth satisfies the knowledge element of § 523 and its predecessor. *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9ᵗʰ Cir. 1996). *See also Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490, 492 (6th Cir. 1986) (gross recklessness to the truth also satisfies the fourth element of intention of deceiving).

## DISCUSSION

In the pending matter, WCP has two hurdles to overcome: (1) all reasonable doubt as to the existence of genuine issues of material fact must be resolved against WCP; and (2) exceptions to discharge under § 523 are narrowly construed. Additionally, the Court does not consider WCP's motion in a vacuum, but rather, undertakes this case after having over 22 months of time on task with the Yellowstone Club and the associated proceedings, including Debtor's bankruptcy case.

The Court has heard a lot of testimony over the past 22 months about Debtor and her ex-spouse's long and bitter divorce. Debtor and Timothy L. Blixseth separated in December of 2006 and following the separation, Debtor claims she was "frozen out" of various business affairs for about two years, or until approximately mid-August of 2008, when Debtor was awarded various assets, including BLX Group, Inc. – which owned the ultra exclusive Yellowstone Club -- under the terms of a Marital Settlement Agreement.

Debtor has testified previously that she believed that her share of the marital assets were worth well in excess of $100 million between December of 2006 and August of 2008. The 2007 Loan Agreement at issue in this Adversary Proceeding and a modification of the Loan Agreement

Case No. 12-35986 ER  841

made in June of 2008 were all done during a period of time when Debtor was frozen out of the majority of the marital business dealings. Such fact precludes this Court from making a summary ruling that Debtor possessed the requisite intent to deceive WCP under either § 523(a)(2)(A) or § 523(a)(2)(B).

Moreover, WCP contends that it relied on certain representations made by Debtor. However, Debtor counters that WCP has not fully responded to discovery propounded in January of 2010. Debtor asserts that WCP has delayed responding to all Debtor's discovery requests on grounds WCP has information showing it knew Debtor's true financial position, but nevertheless proceeded to make the loan and modification at issue. The foregoing allegations raise a material issue of fact as to whether WCP relied on any statements made by Debtor. Such conclusion is buttressed by the fact that one of WCP's attorneys, Christopher J. Conant, also serves as counsel for Debtor's ex-spouse.

Finally, Debtor asserts that WCP has received payments in excess of $41 million toward the $13 million Loan Agreement. Under such scenario, WCP may already be fully compensated, thus putting WCP's damages at zero.

In sum, after construing § 523(a)(2) narrowly, the Court cannot determine beyond a reasonable doubt that Debtor made any statements, whether oral or in writing, with the intent to deceive WCP. The Court similarly cannot conclude that WCP relied on statements made by Debtor. Finally, WCP has not shown that any of its alleged damages were the proximate result of statements made by Debtor. WCP has simply failed to satisfy its burden of proof at this stage of the litigation. Therefore, the Court will enter a separate order as follows:

IT IS ORDERED that Western Capital Partners, LLC's Motion for Summary Judgment to

**Case No. 12-35986 ER  842**

Determine the Non-Dischargeability of a Debt filed August 20, 2010, is DENIED.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

ER01172

# Exhibit 16

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC**, | Case No.  **08-61570-11** |
| Debtor. | |
| **TIMOTHY L BLIXSETH**, | |
| Plaintiff. | |
| -vs- | Adv No.  **09-00014** |
| **MARC S KIRSCHNER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**, | |
| Defendant. | |

## *J U D G M E N T*

At Butte in said District this 16th day of August, 2010.

The issues of this proceeding having been duly considered by the Honorable Ralph B. Kirscher, United States Bankruptcy Judge, and a decision having been reached after trial on the merits,

IT IS HEREBY ORDERED and ADJUDGED that Judgement is entered in favor of Timothy L. Blixseth, in part, and Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust, in part, with each party to pay their own costs of suit; and Marc S. Kirschner,

1

ER01173

**Case No. 12-35986 ER  845**

Trustee of the Yellowstone Club Liquidating Trust, is awarded that amount of money required to pay: (1) all allowed claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4 (general unsecured claims, except claims attributable to the First Lien Lender[1], if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571, and (2) YCLT for the fees and costs it has incurred, and will incur, objecting to and liquidating such claims.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

---

[1] "First Lien Lenders," as defined in Art. I, § 1.66 of Debtors' Third Amended Joint Plan of Reorganization is used synonymously with "Prepetition Lenders" as used throughout the Memorandum entered in this Adversary Proceeding on this date.

ER01174

Charles W. Hingle (1947)
Shane P. Coleman (3417)
Michael P. Manning (8669)
HOLLAND & HART LLP
401 North 31st Street, Suite 1500 P.O. Box 639
Billings, Montana 59103-0639
(406) 252-2166 (telephone)
(406) 252-1669 (facsimile)
chingle@hollandhart.com
spcoleman@hollandhart.com
mpmanning@hollandhart.com

Brian A. Glasser
Athanasios Basdekis
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 (telephone)
(304) 342-1110 (facsimile)
bglasser@baileyglasser.com
tbasdekis@baileyglasser.com

Steven L. Hoard
John G. Turner, III
Robert R. Bell
MULLIN HOARD & BROWN, LLP
500 South Taylor, Suite 800, LB# 213
Amarillo, Texas 79120-1656
(806) 372-5050 (telephone)
(806) 371-6230 (facsimile)
shoard@mba.com
jturner@mhba.com
rbell@mhba.com

ATTORNEYS FOR MARC S. KIRSCHNER, AS
TRUSTEE OF THE YELLOWSTONE CLUB
LIQUIDATING TRUST

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| Yellowstone Mountain Club, LLC, | ) |
| et al.,[1] | ) |
| Debtors. | ) |
|  | ) |
|  | ) |
| TIMOTHY BLIXSETH, | ) |
|  | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| v. | ) |
|  | ) |
| MARC S. KIRSCHNER, AS | ) |
| TRUSTEE OF THE YELLOWSTONE | ) |
| CLUB LIQUIDATING TRUST, | ) |
|  | ) |
| Defendant/Counterclaimant. | ) |

Chapter 11
Case No. 08-61570-11-RBK

Adversary No. 09-00014

**MOTION FOR RECONSIDERATION
AND TO ALTER OR AMEND THE
MEMORANDUM OF DECISION AND
ORDER OF JUDGMENT OF
AUGUST 16, 2010, PURSUANT TO
FEDERAL RULES OF BANKRUPTCY
PROCEDURE 9023 AND 7052, AND
MEMORANDUM IN SUPPORT
THEREOF**

---

[1] The Debtors are the following entities: Yellowstone Mountain Club, LLC, Yellowstone Development, LLC and Big Sky Ridge, LLC, which entities are substantively consolidated, and Yellowstone Club Construction Co., LLC, which is jointly administered with the other Debtors.

4810-1175

**MOTION FOR RECONSIDERATION AND TO ALTER OR AMEND THE
MEMORANDUM OF DECISION AND ORDER OF JUDGMENT OF AUGUST 16, 2010
PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 9023 AND 7052
AND MEMORANDUM IN SUPPORT THEREOF**

Marc S. Kirschner ("Trustee"), as Trustee of the Yellowstone Club Liquidating Trust

("YCLT"), files this Motion for Reconsideration and to Alter or Amend the Memorandum of

Decision and Order of Judgment of August, 16, 2010, Pursuant to Federal Rules of Bankruptcy

Procedure 9023 and 7052, and Memorandum in Support Thereof ("Motion"), and in support

respectfully states as follows:

**DISCUSSION**

The YCLT seeks reconsideration and clarification of the Court's Memorandum of

Decision (Docket No. 575) and Order of Judgment (the "Judgment") (Docket No. 576) or to alter

or amend the judgment:  (1) to affix damages in an amount certain in this case; (2) to confirm

that the Court's Memorandum of Decision was not intended to modify the Third Amended Joint

Plan of Reorganization ("Plan") (Docket No. 995) or the "waterfall" of payment priorities set

forth in Section 7.17 thereof; (3) to address the applicability of the *in pari delicto* and unclean

hands defenses; and (4) to address whether the doctrine of apportionment has been or should be

applied here.  These issues are addressed below.

A.    **Legal Standards**

Federal Rule of Civil Procedure 59 — which is incorporated into the Federal Rules of

Bankruptcy Procedure by Rule 9023 — governs motions to alter or amend a judgment. Fed. R.

Civ. P. 59(e); see Fed. R. Bankr. P. 9023 ("Except as provided in Rule 3008, Rule 59 F.R. Civ.

P. applies in cases under the Code."); In re Teron Trace, LLC, 2010 WL 2025564 (Bankr. N.D.

Ga.  2010) (providing that Bankruptcy Rule 9023 applies to adversary proceedings).  Rule 59(e)

includes motions for reconsideration.  Backlund v. Barnhart, 778 F.2d 1386, 1388 (9th Cir.

1985); 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2810.1.

ER01176

Reconsideration under Rule 59(e) and Bankruptcy Rule 9023(e) is appropriate "if (1) the district

2

at the time the Court's Memorandum of Decision was entered, see Friend v. Kolodzieczak, 72 F.3d 1386, 1391 (9th Cir. 1995), calculation of the amount of that interest is impossible for YCLT to compute until the amount of the judgment is definitely quantified. Moreover, there is a circuit split as to whether interest on the judgment actually attaches if the amount of damages is not fixed.  See, e.g., Eaves v. County of May, 239 F.3d 527 (3d Cir. 2001) (holding that post-judgment interest under 28 U.S.C. § 1961(a) does not begin accruing until the amount owed pursuant to a judgment is quantified by the court).

In an effort to affix the damages amount, YCLT submits this Motion and states that it believes that the following damages are covered by the Court's Judgment:

| | |
|---|---|
| Class 1 | $352,654.00 |
| Class 2 | $193,113.00 |
| Class 4 | $34,993,355.43 (including general unsecured claims of the 7Bs) |
| Class 5 | $673,023.00 |
| Class 9 | $0.00 |
| Class 10 | $3,855,817.00 |
| Class 11 | $0.00 |
| Class 14 | $0.00 |
| **Total** | **$40,067,962.43** |

The attached affidavit from Charles W. Hingle ("Hingle Affidavit") sets forth in detail the basis of YCLT's calculations. (See Ex. 1, Hingle Affidavit, ¶¶ 3-5, and Ex. A attached to Hingle Affidavit.) As set forth below, YCLT seeks entry of (1) an Order fixing damages in the amount of $286.4 million, based on the arguments set forth in Sections C, D, and E *infra*; or in the alternative, (2) an Order fixing damages in the amount of $40,067,962.43 plus such other amount(s) as may be hereafter determined by the Court as additional claims (in the above classes) are resolved (see Ex. 1, Hingle Affidavit, ¶ 6) and all fees and costs incurred in objecting to and liquidating claims have been fully earned or incurred. YCLT also notes that Blixseth

himself has admitted that the damages assessed against him in this case are in excess of $30 million.[3]

Accordingly, YCLT asks this Court to alter or amend its Judgment to fix damages in this case in the amount of $286.4 million, or in the alternative, $40,067,962.43 for the reasons set forth above and in the Hingle Affidavit, and such additional amount(s) as may hereafter be determined when all allowed claims and all fees and costs associated with adjudication of all filed and scheduled claims become known.

## C.   The Confirmed Plan Cannot Now Be Modified

YCLT assumes that the Court did not intend *sua sponte* to modify the Confirmed Plan, the Confirmation Order, or the Settlement Term Sheet. (See Bankr. No. 08-61570-11, Docket Nos. 995 (Plan), 1026 (Confirmation Order), Schedule 1.123 to Docket No. 995 (Settlement Term Sheet), and 865 (Order fixing the Prepetition Lenders' Allowed Secured Claim at $232 million).)[4] This is because the legal authorities set forth below demonstrate there is no power to do so. However, in its Memorandum of Decision, the Court stated that "the Court will not enter an order that would in any way benefit Credit Suisse . . . [or] the Prepetition Lenders." (Adversary Proceeding 09-00014, Docket No. 576, at 132.) This statement is inconsistent with

---

[3] In a recently filed pleading in Blixseth v. Byrne, et al., Case No. 10-CV-03063 (C.D. Cal.), Blixseth has admitted that he believes that he is liable for a minimum of $30 million in damages, if not more, pursuant to the Court's Memorandum of Decision and Judgment. See Ex. 2, 10-CV-03063, Docket No. 20, at 20 ("Pursuant to the Bankruptcy Court's August 16, 2010 Memorandum of Decision in Adv. Proc. 09-00014, *Mr. Blixseth is liable for over $30 million in damages.*" (emphasis added)).  Blixseth also added this footnote: "Neither the Judgment nor the Memorandum of Decision contain any actual dollar amounts. However, Mr. Blixseth estimates the value of the claims in total as *over* $30 million." Id. at 20, n.12 (emphasis added).

[4] The First Lien Lender Deficiency Claims are fixed in the Plan (Docket No. 995, Sections 1.66, 3.8.2) at $309,376,110.42 less the Equity Purchase Note or $80,000,000 and "the dollar amount of any other distributions actually made on account of the First Lien Lenders' secured claim," if anything, so the claim is currently $229,376,110.42. There is also an order Dated May 12, 2009 (Docket No. 865) fixing the Lenders Allowed Secured Claim at $232mm — this is essentially what they gave up in the Settlement Term Sheet for the Equity Purchase Note and the right to participate in the fourth level of priority for their unsecured deficiency claim.

6

# Exhibit 18

# EXHIBIT 1

ER01193

# EXHIBIT 1

Charles W. Hingle (#1947)
Robert L. Sterup (#3353)
Shane P. Coleman (#3417)
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
Billings, Montana 59101
Telephone: (406) 252-2166
Facsimile: (406) 252-1669
Email: chingle@hollandhart.com
Email: rsterup@hollandhart.com
Email: spcoleman@hollandhart.com

Brian A. Glasser
Athanasios Basdekis
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110
Email: bglasser@baileyglasser.com
Email: tbasdekis@baileyglasser.com

Steven L. Hoard
John G. Turner, III
Robert R. Bell
MULLIN HOARD & BROWN, LLP
500 South Taylor, Suite 800, LB# 213
P.O. Box 31656
Amarillo, Texas 79120-1656
Telephone: (806) 372-5050
Facsimile: (806) 371-6230
Email: shoard@mhba.com
Email: jturner@mhba.com
Email: rbell@mhba.com

**ATTORNEYS FOR MARC S. KIRSCHNER, AS
TRUSTEE OF THE YELLOWSTONE CLUB
LIQUIDATING TRUST**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re: | Chapter 11 |
| Yellowstone Mountain Club, LLC, et al.,[1] | Case No. 08-61570-11-RBK |
| Debtors. | |
| **TIMOTHY BLIXSETH,** | Adversary No. 09-00014 and consolidated with Adversary No. 09-00017-RBK |
| Plaintiff/Counterclaim Defendant, | |
| v. | |
| **MARC S. KIRSCHNER, AS TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST,** | **AFFIDAVIT OF CHARLES W. HINGLE** |
| Defendant/Counterclaimant. | |

---

[1] The Debtors are the following entities: Yellowstone Mountain Club, LLC, Yellowstone Development, LLC and Big Sky Ridge, LLC, which entities are substantively consolidated, and Yellowstone Club Construction Co., LLC, which is jointly administered with the other Debtors. The cases are collectively referred to herein as the "Yellowstone Club Cases".

STATE OF MONTANA )
                    : ss.
County of Yellowstone )

       I, Charles W. Hingle, being first duly sworn on my oath depose and say:

       1.     I am the counsel for the Yellowstone Club Liquidating Trust (the "Trust"). I submit this Affidavit in connection with the Trust's Motion for Reconsideration and to Alter or Amend the Memorandum of Decision and Order of Judgment of August 16, 2010, in order to provide the basis for the Court to fix a definitive amount of the Judgment entered August 16, 2010 (Dkt. 576) (the "Judgment").

       2.     Pursuant to Section 7.4.2 of the Third Amended Joint Plan of Reorganization (the "Plan") (Dkt. 995), the Trust has reviewed, objected to, compromised and/or litigated many proofs of claim filed or scheduled in the Yellowstone Club Cases.

       3.     Pursuant to the Court's Judgment, I directed the preparation of a chart of claims organized by class which is attached to this Affidavit as Exhibit A. The chart in Exhibit A is a summary of all filed or scheduled claims allowed to date, which in the aggregate equals $40,067,962.43.

       4.     With respect to Exhibit A, I have made the following assumptions:

           a.     The allowed claim of the 7B Equity Holders (the "7Bs") is treated as an allowed claim under Class 4 in Exhibit A because it is to be treated as a general unsecured claim under the terms of Section 6 of the agreement between the 7Bs and the Trust approved by this Court April 19, 2010 (Dkt. 1806).

           b.     All other claims not previously classified have been classified as provided in the Plan for purposes of Exhibit A.

       5.     The Trust did not have any basis to object to the claims of Advanced Chemical Solutions, Border States Electric and Horny Toad Activewear, Inc. Those claims are deemed allowed.

ER01195

2

6.       Certain claims have been objected to but have not yet been settled or adjudicated by the Court and, therefore, are not yet allowed in any amount. Such claims are listed in Exhibit A with an allowed amount of zero. Such claims and the amounts claimed in each instance are filed as follows:

| | |
|---|---|
| Edra Blixseth Estate | $466,666.62 |
| Arnold Kleinsasser | $3,000,000.00 |
| Overlook Partners, LLC (rejection claim) | $1,250,000.00 |
| Overlook Partners, LLC (indemnity claim) | $1,000,000.00 |
| James Rozon | $750,000.00 |
| Spanish Peaks Holdings, LLC | $67,500.00 |
| Robert Sumpter (rejection claim) | $4,316,000.00 |
| Thornton Byron LLP | $35,978.00 |
| The Club at Spanish Peaks, LLC | $52,963.56 |
| Voyager Construction, LLC | $39,530.30 |
| Yellowstone Jet Center, LLC | $84,682.47 |
| James J. Dolan | $250,000.00 |
| James J. Dolan | $529,450.00 |
| Beau Blixseth | $250,000.00 |
| Morgan Blixseth | $250,000.00 |
| Tim Blixseth | $250,000.00 |
| Brian P. Dolan | $300,000.00 |
| Charles D. Dolan | $300,000.00 |
| Gregory F. Dolan | $300,000.00 |
| James J. Dolan, Jr. | $300,000.00 |
| Michael D. Dolan, II | $300,000.00 |
| Peter J. Dolan | $300,000.00 |
| **TOTAL** | **$14,392,770.95** |

ER01196

3

**Case No. 12-35986 ER 855**

Upon settlement or adjudication of each of the foregoing claims, the Trust will request supplementation of the Judgment with the allowed amounts of each such claim.

7. The aggregate claims allowed to date, paid and unpaid, equal $40,067,962.43.

FURTHER AFFIANT SAYETH NOT.

Dated this 27th day of August, 2010.

_____
Charles W. Hingle

STATE OF MONTANA    )
                      : ss.
County of Yellowstone    )

I, _Marita D. Hauck_, a Notary Public, do hereby certify that on this 27th day of August, 2010, Charles W. Hingle personally appeared before me, who, being first duly sworn by me, declared that he read and signed the foregoing affidavit and that the statements therein contained are true.

In witness whereof, I have hereunto set my hand and seal this 27th day of August, 2010.

_____
_Marita D. Hauck_ (Print Name)
Notary Public for the State of Montana
Residing at _Billings MT_
My Commission expires: _9/10/2012_

4897563_3.DOC

## CLAIMS BY CLASS                          EXHIBIT A

| Class | Description | Allowed Amount | Dkt. # |
|---|---|---|---|
| 1 | Priority Wage and Employee Benefit (Paid by Disbursing Agent) | $352,654.00 | 1192 |
| **Total Class 1** | | **$352,654.00** | |
| | | | |
| 2 | Other Secured Claims (Paid by Disbursing Agent) | $193,113.00 | 1192 |
| **Total Class 2** | | **$193,113.00** | |
| | | | |
| 4 | Advanced Chemical Solutions (Argo Partners) | $6,358.13 | |
| | Bales, Bruce | $30,000.00 | 213 |
| | Baumann Family Trust | $200,000.00 | 1809 |
| | Big Springs Realty - Intercompany Claim | $133,385.73 | 1610 |
| | Blixseth, Edra | $0.00 | |
| | Border States Electric | $71,322.68 | |
| | Bradley, Steven | $200,000.00 | 1904 |
| | Coleman, Matt | $300,000.00 | 1920 |
| | Craft, Joy | $57,767.67 | 1671 |
| | Edwards, Frickle & Culver | $312,500.00 | 1449 |
| | Go Build, Inc. | $3,316.60 | 71 |
| | Hagen O'Connell LLP (Creditor Liquidity) | $17,818.00 | 1821 |
| | Henry, Daniel R. | $200,000.00 | 1815 |
| | Horny Toad Activewear, Inc. | $13,185.23 | |
| | K&L Gates LLP | $91,640.03 | 1769 |
| | Kleinsasser, Arnold | $0.00 | |
| | LeMond, Greg | $650,000.00 | 1875 |
| | Mack Roberts & Company LLC | $35,324.60 | 1834 |
| | Murphy, James T. | $200,000.00 | 1889 |
| | Overlook Partners, LLC (rejection claim) | $0.00 | |
| | Overlook Partners, LLC (indemnity claim) | $0.00 | |
| | Red Rock Investments | $136,174.00 | 1850 |
| | Rozon, James | $0.00 | |
| | Snell, Chris | $225,000.00 | 1844 |
| | Spanish Peaks Holdings, LLC | $0.00 | |
| | Sumpter, Robert (wage claim) | $393,908.20 | 1600 |
| | Sumpter, Robert (rejection claim) | $0.00 | |
| | The Club at Spanish Peaks, LLC | $0.00 | |
| | Thornton Byron LLP | $0.00 | |
| | Venable LLP | $507,578.25 | 1810 |
| | Voyager Construction, LLC | $0.00 | |
| | WLW Realty Partners LLC | $225,000.00 | 1894 |
| | Yellowstone Club World | $666,860.00 | 45 YCW |
| | Yellowstone Jet Center, LLC | $0.00 | |
| | Y&O Holdings, Inc. | $35,000.00 | 1843 |
| | CrossHarbor Trade Creditor Fund | $8,281,216.31 | |
| | 7Bs General Unsecured Claims | $22,000,000.00 | 1806 |
| **Total Class 4** | | **$34,993,355.43** | |
| | | | |
| 5 | Convenience Claims (Paid by Disbursing Agent) | $673,023.00 | 1192 |
| **Total Class 5** | | **$673,023.00** | |
| | | | |
| 9 | Dolan, James J. | $0.00 | |
| | Dolan, James J. | $0.00 | |
| **Total Class 9** | | **$0.00** | |

ER01198

## CLAIMS BY CLASS                    EXHIBIT A

| Class | Description | Allowed Amount | Dkt. # |
|-------|-------------|----------------|--------|
|       |             |                |        |
| 10 | American Bank (Paid by Reorganized Debtor) | $3,855,817.00 | 995 |
| **Total Class 10** | | **$3,855,817.00** | |
|       |             |                |        |
| 14 | Blixseth, Beau | $0.00 | |
|    | Blixseth, Morgan | $0.00 | |
|    | Blixseth, Tim | $0.00 | |
|    | Dolan, Brian P | $0.00 | |
|    | Dolan, Charles D. | $0.00 | |
|    | Dolan, Gregory F. | $0.00 | |
|    | Dolan, James J. Jr. | $0.00 | |
|    | Dolan, Michael D. II | $0.00 | |
|    | Dolan, Peter J. | $0.00 | |
| **Total Class 14** | | **$0.00** | |
|       |             |                |        |
| **GRAND TOTAL** | | **$40,067,962.43** | |
|       |             |                |        |
|       |             |                |        |

ER01199

# Exhibit 19

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No.  **08-61570-11** |
| Debtor. | |
| **TIMOTHY L BLIXSETH**, | |
| Plaintiff. | |
| -vs- | Adv No.  **09-00014** |
| **MARC S KIRSCHNER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**, | |
| Defendant. | |

# MEMORANDUM of DECISION

At Butte in said District this 7th day of September, 2010.

In this Adversary Proceeding, the now-captioned Defendant, Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust ("YCLT"), filed on August 27, 2010, and in response to a Memorandum of Decision and Judgment entered by this Court on August 16, 2010, a Motion for Reconsideration and to Alter or Amend the Order of Judgment of August 16, 2010, Pursuant to Federal Rules of Bankruptcy Procedure 9023 and 7052.  The matter is scheduled for hearing on September 20, 2010.  For the reasons discussed herein, the Court grants YCLT's Motion in part, denies said Motion in part, and vacates the September 20, 2010, hearing.

1

In the pending Motion, YCLT seeks reconsideration and clarification of the Court's
Memorandum of Decision (Docket No. 575) and Judgment (the "Judgment") (Docket No. 576)
or to alter or amend the judgment: (1) to affix damages in an amount certain in this case; (2) to
confirm that the Court's Memorandum of Decision was not intended to modify the Third
Amended Joint Plan of Reorganization ("Plan") (Docket No. 995) or the "waterfall" of payment
priorities set forth in Section 7.17 thereof; (3) to address the applicability of the in *pari delicto*
and unclean hands defenses; and (4) to address whether the doctrine of apportionment has been
or should be applied here.

Rule 59, Fed.R.Civ.P., incorporated into the Federal Rules of Bankruptcy Procedure by
Rule 9023, provides in pertinent part: "A new trial may be granted to all or any of the parties and
on all or part of the issues . . . (2) in an action tried without a jury, for any of the reasons for
which rehearings have heretofore been granted in suits in equity in the courts of the United
States.  On a motion for a new trial in an action tried without a jury, the court may open the
judgement if one has been entered, take additional testimony, amend findings of fact and
conclusions of law or make new findings and conclusions, and direct the entry of a new
judgment."  Under Rule 59(e), "[a]ny motion to alter or amend a judgment must be filed not later
than 10 days after entry of the judgment."  Rule 59(e) includes motions for reconsideration.
*Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985); 11 Wright, Miller & Kane, FEDERAL
PRACTICE AND PROCEDURE: Civil 2nd § 2810.1.

In *Brandt v. Esplanade of Central Montana, Inc., et al.* (*"Brandt"*), 19 Mont. B.R. 401,
403 (D. Mont. 2002), the United States District Court for the District of Montana, in affirming
this Court's decision, discussed amendment of an order under Rule 59(e):  "Amendment or

alteration is appropriate under Rule 59(e) if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law. *School Dist. No. 1J, Mutnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)." *See also In re Teigen*, 11 Mont. B.R. 91, 92 (Bankr. D.Mont. 1992). A motion for reconsideration should not be granted if the above test is not met, absent highly unusual circumstances. *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999). Finally, a Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation. *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

As YCLT correctly argues, on August 16, 2010, this Court issued a Memorandum of Decision and Judgment in this Adversary Proceeding ordering and adjudging that "Judgement is entered in favor of Blixseth, in part, and YCLT, in part, with each party to pay their own fees and costs of suit; and YCLT is awarded that amount of money required to pay: (1) all allowed claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4 (general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571, and (2) YCLT for the fees and costs it has incurred, and will incur, objecting to and liquidating such claims."

ER01202

YCLT now requests that the Court reconsider four aspects of its August 16, 2010, Memorandum of Decision and Judgment.

### DAMAGES CALCULATION

YCLT argues it is necessary and appropriate to fix a definitive amount of damages lest the parties be in a constant dispute over the exact amount of the Judgment. While the Court would have certainly preferred to enter a more definite Judgment, the Court did not have enough facts to determine what was owed to each of the aforementioned classes. While YCLT maintains that the damages in this case total $286.4 million, in the alternative, YCLT now submits after the fact that the appropriate damage calculation for the Court's current Judgment is $40,067,962.43 plus such other amounts as may later be determined by this Court as owing on allowed claims, together with all fees and costs incurred by YCLT in objecting to and liquidating claims. If $40,067,962.43 is the amount that the Debtors owed to all creditors, save Credit Suisse, Cayman Island Branch, on their petition date, the Court will grant YCLT's request by amending the Judgment to reflect an exact dollar amount.

### DID THE COURT MODIFY DEBTORS' CONFIRMED PLAN

YCLT next seeks confirmation that this Court's August 16, 2010, Memorandum of Decision and Judgment did not *sua sponte* modify Debtors' Third Amended Joint Plan of Reorganization, the Order confirming such Plan or the Settlement Term Sheet. This Court in no way intended to nor did it modify the Debtor's Third Amended Joint Plan of Reorganization, the Order confirming such Plan or the Settlement Term Sheet. Indeed, "the [Debtors'] Plan has been substantially consummated. YCLT has been in existence for more than one year, the Yellowstone Club has been sold, and substantial claims and adversary proceedings have been settled and

ER01203

allowed."

YCLT asserts that Credit Suisse, Cayman Island Branch, has received an Equity Purchase Note in the amount of $80 million and is currently owed $229,376,110.42. Under the Debtors' confirmed Third Amended Joint Plan of Reorganization and the Settlement Term Sheet, Credit Suisse is to receive pro rata payment on the $229,376,110.42 at the lowest level of priority, the "fourth tranche" of the confirmed Plan.

This Court agrees with YCLT that "[a] confirmed reorganization plan operates as a final judgment with res judicata effect." *Unsecured Creditors Comm. v. Southmark ( In re Robert L. Helms Construction & Development Co., Inc.)*, 139 F.3d 702, 704 (9th Cir.1998). Indeed, the strong policy favoring finality in reorganization cases has led courts to give preclusive effect to a confirmation order, even if the confirmed bankruptcy plan contains illegal provisions. *See Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*, 193 F.3d 1083, 1086 (9th Cir.1999). Although the BAP's ruling in *In re Pardee* was affirmed, a subsequent decision of the Ninth Circuit Court of Appeals held that "[a]lthough confirmed plans are res judicata to issues therein, the confirmed plan has no preclusive effect on issues that must be brought by an adversary proceeding, or were not sufficiently evidenced in a plan to provide adequate notice to the creditor." *Enewally v. Washington Mutual Bank (In re Enewally)*, 368 F.3d 1165, 1173 (9th Cir 2004); *see also Adair v. Sherman*, 230 F.3d 890, 894-95 (7th Cir. 2000) (the confirmation order is res judicata and binding upon the debtor and creditors as to all issues which have been decided or which could have been decided before confirmation); and *Cen-Pen Corp. v. Hanson*, 58 F.3d 89, 93 (4th Cir.1995) (confirmation of chapter 13 plan is res judicata only as to issues that can be raised in less formal procedure for contested matters, not matters that must be resolved in

Case No. 12-35986 ER 864

adversary proceeding).

At the time of confirmation, the Court had concluded Part I of the trial in this Adversary Proceeding.  The parties in Part I of the trial were Credit Suisse, Blixseth, the Debtors and the Official Committee of Unsecured Creditors.  The Debtors, the Official Committee of Unsecured Creditors and Credit Suisse had presented their cases in Part I of the trial.  As explained in the August 16, 2010, Memorandum of Decision, the Court continued the trial following Part I for the sole purpose of affording Blixseth due process.

The Settlement Term Sheet, on the other hand, was an agreement between Credit Suisse, the Debtors, the Official Committee of Unsecured Creditors and CrossHarbor Capital Partners.  Blixseth was not a party to the Settlement Term Sheet.  Blixseth also objected to confirmation of Debtors' Third Amended Joint Plan of Reorganization.  In fact, Blixseth appealed the Order confirming Debtors' Third Amended Joint Plan of Reorganization and that appeal is still pending.

Credit Suisse now appears to argue, through YCLT, that it can have no culpability for the $375 million loan with the Debtors and Blixseth because an agreement with Debtors, the Official Committee of Unsecured Creditors and CrossHarbor Capital Partners paved the way to confirmation of Debtors' Third Amended Joint Plan of Reorganization.  YCLT's argument would have merit in a normal case, but this case is anything but normal.  With no meaningful due diligence and a noncompliant appraisal, Credit Suisse loaned $375 million to the Debtors so that the Debtors could make loans or distributions to its members.  In other words, the loan was for purposes wholly unrelated to the Debtors' business.   The loan at issue was not normal under any circumstances, and the greed of not only Blixseth, but also Credit Suisse, shocked the conscience

ER01205

of the Court.

Notwithstanding this pending Adversary Proceeding and the shocking facts herein, YCLT makes the crabbed argument that because of confirmation, this Court should reward Credit Suisse for its greedy antics. Neither Blixseth nor Credit Suisse deserve to benefit from their actions. To that end, the Court determined that Blixseth should pay every single cent that was owed to anybody, other than Credit Suisse, on the date Debtors filed their bankruptcy petitions. While such ruling arguably impacts the lowest tranche of creditors, the Court did not intend to alter the Debtors' confirmed Plan. The Court would note that YCLT asserts in its Motion that "substantial claims and adversary proceedings have been settled and allowed. For example, claims and adversary proceedings exceeding in the aggregate over $150 million involving the Yellowstone Club World, LLC ("YCW"), Greg LeMond and his affiliated group, the castle in France known as Chateau de Farcheville, and numerous claims and adversary proceeding involving CrossHarbor and the estates of Edra Blixseth and Big Springs Realty, LLC have been extensively litigated, then resolved." Under the Debtors' confirmed Plan and in light of this Court's Judgment, Credit Suisse is entitled to all the proceeds from resolution of the aforementioned claims.

<em>IN PARI DELICTO</em>, UNCLEAN HANDS and APPORTIONMENT

YCLT next argues that *in pari delicto* and unclean hands are not applicable in this case because such defenses only apply when a plaintiff is at equal fault with the defendant. YCLT conveniently ignores the fact that Credit Suisse was the only Plaintiff in this Adversary Proceeding when it filed the complaint against the Official Committee of Unsecured Creditors on February 25, 2009. As the Court stated earlier, this has not been a typical case involving a

7

plaintiff and a defendant.  During Part I of the trial, this Court had four parties before it; Credit Suisse and Blixseth versus the Debtors and the Official Committee of Unsecured Creditors. Following Part I of the trial, the Court entered a partial and interim order against Credit Suisse so Debtors' confirmation could move forward.  The Court reserved entering any ruling involving Blixseth and instead set the stage for Part II of the trial.  Between entry of the partial and interim order against Credit Suisse and Part II of the trial, the Debtors' Third Amended Joint Plan of Reorganization was confirmed, the Official Committee of Unsecured Creditors was dissolved and YCLT stepped into the shoes of the Debtors.  Following this Court's partial and interim order, Credit Suisse, through negotiations, successfully placed itself behind the shield of YCLT so that parties who were once adversaries, namely the Debtors and Credit Suisse, were now allies.  In addition, Credit Suisse's Montana counsel in Part I of the trial became YCLT's Montana counsel for Part II of the trial.

While YCLT is the now named Defendant in this action, YCLT is also advocating for the original Plaintiff in this action, Credit Suisse.  Given the unique facts in this case, the Court will not enter judgment in favor of Credit Suisse and against Blixseth, or vice versa.  Blixseth and Credit Suisse were partners in the loan debacle and the Court is not inclined to enter a judgment that would benefit either of the wrongdoers to the other's detriment.  The Court has not entered any judgment, other than subordination, against Credit Suisse and the Court is not apportioning blame between Credit Suisse and Blixseth.  Rather, this Court has entered a Judgment that simply precludes Credit Suisse from sharing in any judgment against Blixseth.  For the reasons discussed herein, the Court will enter a separate order providing as follows:

IT IS ORDERED that Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating

Trust's Motion for Reconsideration and to Alter or Amend the Order of Judgment of August 16, 2010, Pursuant to Federal Rules of Bankruptcy Procedure 9023 and 7052 filed August 27, 2010, is GRANTED, in part and DENIED, in part; the Court will amend its August 16, 2010, Judgment to reflect that Judgment is entered against Blixseth in the amount of $40,067,962.43; and YCLT's Motion for Reconsideration and to Alter or Amend the Order of Judgment is DENIED in all other respects.

IT IS FURTHER ORDERED that the hearing scheduled for September 20, 2010, on Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust's Motion for Reconsideration and to Alter or Amend the Order of Judgment of August 16, 2010, Pursuant to Federal Rules of Bankruptcy Procedure 9023 and 7052, is VACATED.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

# Exhibit 20

Charles W. Hingle (No. 1947)
Shane P. Coleman (No. 3417)
Michael P. Manning (No. 8669)
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
Billings, Montana 59101
Telephone: (406) 252-2166
Facsimile: (406) 252-1669

Steven L. Hoard
John G. Turner, III
Robert R. Bell
MULLIN HOARD & BROWN, LLP
500 South Taylor, Suite 800, LB# 213
P.O. Box 31656
Amarillo, Texas 79120-1656
Telephone: (806) 372-5050
Facsimile: (806) 371-6230

Brian A. Glasser
Athanasios Basdekis
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MONTANA

In re:

YELLOWSTONE MOUNTAIN CLUB,
LLC, *et al.*,[1]

    Debtors.

TIMOTHY BLIXSETH,

    Plaintiff/Counterclaim Defendant,

    v.

MARC S. KIRSCHNER, AS TRUSTEE OF
THE YELLOWSTONE CLUB
LIQUIDATING TRUST,

    Defendant/Counterclaimant.

Chapter 11

Case No. 08-61570-11

Adversary No. 09-00014

**REQUEST FOR CERTIFICATION
PURSUANT TO 28 U.S.C. § 158(d)(2)
FOR DIRECT APPEAL TO UNITED
STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT**

---

[1]The Debtors are the following entities: Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC and Big Sky Ridge, LLC, which entities are substantively consolidated, and Yellowstone Club Construction Co., LLC, which is jointly administered with the other Debtors.

ER01209

**Case No. 12-35986 ER 870**

**REQUEST FOR CERTIFICATION PURSUANT TO 28 U.S.C. § 158(d)(2) FOR DIRECT APPEAL TO UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

Marc S. Kirschner, Trustee of Yellowstone Club Liquidating Trust ("YCLT"), in the above styled Chapter 11 case, respectfully submits this request for certification, pursuant to 28 U.S.C. §158(d)(2) and Rule 8001(f) of the Federal Rules of Bankruptcy Procedure, of its appeal of certain orders and judgments described more particularly herein.

**Summary of Argument**

1.      YCLT submits this request for certification to permit the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") to address the important legal questions presented by the Bankruptcy Court's determination of the applicability of the *in pari delicto* or unclean hands defense as well as the damage reduction in this proceeding. A direct appeal is appropriate in this instance as the Court's determination "involves a question of law as to which there is no controlling decision [of the Ninth Circuit] or the Supreme Court of the United States," "involves a question of law . . . [that] involves a matter of public importance" and "an immediate appeal . . . may materially advance the progress of the case . . ." 28 U.S.C. §§ 158(d)(2)(A)(i),(iii); *see, e.g., In re Ransom*, 380 B.R. 809, 812 (9th Cir. B.A.P. 2007).

**Facts Necessary to Understand Issues Presented**

**A.  Underlying Facts**

2.      Having decided countless motions and sat through two phases of trial spanning a nine day period, this Court is intimately aware of the facts and circumstances surrounding this litigation.  Accordingly, YCLT will not review, in the detail, the facts and circumstances of this case again.

ER01210

# Exhibit 21

Charles W. Hingle (1947)
Shane P. Coleman (3417)
Michael P. Manning (8669)
HOLLAND & HART LLP
401 North 31st Street, Suite 1500 P.O. Box 639
Billings, Montana 59103-0639
(406) 252-2166 (telephone)
(406) 252-1669 (facsimile)
chingle@hollandhart.com
spcoleman@hollandhart.com
mpmanning@hollandhart.com

Brian A. Glasser
Athanasios Basdekis
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 (telephone)
(304) 342-1110 (facsimile)
bglasser@baileyglasser.com
tbasdekis@baileyglasser.com

Steven L. Hoard
John G. Turner, III
Robert R. Bell
MULLIN HOARD & BROWN, LLP
500 South Taylor, Suite 800, LB# 213
Amarillo, Texas 79120-1656
(806) 372-5050 (telephone)
(806) 371-6230 (facsimile)
shoard@mba.com
jturner@mhba.com
rbell@mhba.com

**ATTORNEYS FOR MARC S. KIRSCHNER, AS
TRUSTEE OF THE YELLOWSTONE CLUB
LIQUIDATING TRUST**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re:<br><br>Yellowstone Mountain Club, LLC,<br>et al.,[1]<br>            Debtors. | Chapter 11<br>Case No. 08-61570-11-RBK |
| TIMOTHY BLIXSETH,<br><br>      Plaintiff/Counterclaim Defendant,<br>v.<br><br>MARC S. KIRSCHNER, AS<br>TRUSTEE OF THE YELLOWSTONE<br>CLUB LIQUIDATING TRUST,<br><br>      Defendant/Counterclaimant. | Adversary No. 09-00014<br><br>**MOTION TO EXPEDITE YCLT'S<br>REQUEST FOR CERTIFICATION** |

---

[1] The Debtors are the following entities: Yellowstone Mountain Club, LLC, Yellowstone Development, LLC and Big Sky Ridge, LLC, which entities are substantively consolidated and Yellowstone Club Construction Co., LLC, which is jointly administered with the other Debtors.

Marc S. Kirschner, as Trustee (the "Trustee") for the Yellowstone Club Liquidating Trust ("YCLT"), by and through counsel of record, hereby moves the Court for an order setting an expedited hearing on *YCLT's Request for Certification Pursuant to 28 U.S.C. § 158(d)(2) for Direct Appeal to the United States Court of Appeals for the Ninth Circuit* (the "Certification Motion") (Dkt. #587), filed on September 16, 2010.

This Motion to Expedite is made on the basis that an appeal of this matter is pending in this matter and certification is proper for the reasons stated in the Trustee's Certification Motion. Counsel for the parties are presently scheduled to attend a hearing on September 20, 2010, in Billings, which will concern other issues related to the judgment and appeal, namely the Trustee's Motion for Preliminary Injunction in case no. AP 10-00015.

YCLT requests that the hearing be held on September 20, 2010, or as soon thereafter as counsel can be heard.

ER01228

# Exhibit 22

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

|  |  |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC**, | Case No.  **08-61570-11** |
| Debtor. | |
| **TIMOTHY L BLIXSETH**, | |
| Plaintiff. | |
| -vs- | Adv No.  **09-00014** |
| **MARC S KIRSCHNER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**, | |
| Defendant. | |

**ORDER & NOTICE**

At Butte in said District this 16th day of September, 2010.

Upon review of the motion for expedited hearing filed on September 16, 2010, by Marc

S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust ("YCLT") (Docket No. 588),

and good cause appearing,

**IT IS ORDERED** YCLT's  motion for expedited hearing filed on September 16, 2010

(Dkt. 588) is granted; notice is hereby shortened and **NOTICE IS HEREBY GIVEN** that a

hearing will be held on expedited notice on **Monday, September 20, 2010, at 9:00 o'clock a.m.**,

1

or as soon thereafter as counsel can be heard, in the **5TH FLOOR COURTROOM, FEDERAL BUILDING, 316 NORTH 26TH, BILLINGS, MT**, on YCLT's "Request for Certification Pursuant to 28 U.S.C. Sec. 158(d)(2) For Direct Appeal to United States Court of Appeals for the Ninth Circuit (Dkt. 587), and any objection thereto.

BY THE COURT

*Ralph B Kirscher*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

**Case No. 12-35986 ER  877**

# Exhibit 24

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC**,<br><br>        Debtor. | Case No. **08-61570-11** |
| **TIMOTHY L BLIXSETH**,<br><br>        Plaintiff.<br><br>-vs-<br><br>**MARC S KIRSCHNER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**,<br><br>        Defendant. | Adv No. **09-00014** |

# O R D E R

At Butte in said District this 23rd day of September, 2010.

In this Adversary Proceeding, the now-named Defendant, Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust ("YCLT") filed on September 16, 2010, at docket entry no. 587, a Request for Certification Pursuant to 28 U.S.C. § 158(d)(2) for Direct Appeal to United States Court of Appeals for the Ninth Circuit.  An expedited hearing on YCLT's request for certification was held September 20, 2010, in Billings.  YCLT was represented at the hearing by Athanasios A. Basdekis of Charleston, West Virginia and Shane P. Coleman of Billings,

1

ER01237

Blixseth's argument is logical.  However, 28 U.S.C. § 158(d)(2) permits this Court to certify matters on its own motion, without response from the parties or the need for a hearing. Accordingly,

IT IS ORDERED that the now-named Defendant, Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust's Request for Certification filed September 16, 2010, at docket entry no. 587, is hereby GRANTED; and the Court certifies the following orders, decrees and judgments for direct appeal to the Ninth Circuit Court of Appeals pursuant to 28 U.S.C. § 158(d)(2):  (1) Memorandum of Decision dated August 16, 2010 (Doc. # 575); (2) Judgment dated August 16, 2010 (Doc. # 576); (3) Memorandum of Decision dated September 7, 2010 (Doc #580); (4) Order dated September 7, 2010 (Doc. # 581); and (5) Amended Judgment dated September 7, 2010 (Doc. #582).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

ER01240

# Exhibit 25

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**EDRA D BLIXSETH**,

      Debtor.

Case No. **09-60452-7**

**RICHARD SAMSON**,

      Plaintiff.

-vs-

**TIMOTHY L. BLIXSETH**, **Desert Ranch LLLP**, **DESERT RANCH MANAGEMENT LLC**, and **DOES 1-5**,

      Defendants.

Adv No. **10-00088**

# MEMORANDUM of DECISION

At Butte in said District this 3rd day of January, 2012.

Pending in this Adversary Proceeding is Defendant Timothy Blixseth's ("Tim") "Motion for Reconsideration of This Court's August 1, 2011 Order Denying Motion to Dismiss Adversary Complaint Pursuant to Fed.R.Bankr.P. 7012(b)" filed August 15, 2011. Tim's motion is accompanied by a request for judicial notice. On the same date that Tim filed his motion for reconsideration, the Court entered an Order agreeing to hold all matters in this Adversary

Proceeding in abeyance pending resolution of a motion to withdraw the reference filed with the

United States District Court for the District of Montana ("District Court"). The District Court

declined to withdraw the reference. Thus, Tim's motion for reconsideration is ready for decision.

This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.

For the reasons discussed below, Tim's request for reconsideration is denied.

BACKGROUND

On October 1, 2010, the Plaintiff Richard Samson ("Samson") commenced this

Adversary Proceeding by filing a complaint against Tim and other parties, alleging certain

unlawful acts related to Tim and Debtor Edra Blixseth's ("Edra") Marital Settlement Agreement

("MSA").[1] Tim responded to Samson's complaint on November 11 and 12, 2010, by filing

motions to dismiss for lack of personal jurisdiction, for lack of subject matter jurisdiction under

Civil Rule 12(b)(1), and for failure to state a claim upon which relief can be granted under Civil

Rule 12(b)(6). Tim also filed a motion for mandatory and/or permissive abstention.

Shortly thereafter, on November 19, 2010, Tim filed a *pro se* "Amended Motion to

Disqualify Bankruptcy Judge Kirscher." Tim, through counsel, filed another "Motion to

Disqualify Bankruptcy Judge Kirscher" on December 14, 2010. Following a hearing held

January 18, 2011, I entered a decision on February 25, 2011, denying Tim's request that I

---

[1] Edra filed for divorce in the Riverside Superior Court in December 2006, *In re Marriage of Blixseth*, Riverside Superior Court Case No. RIDINDO91152. As part of the divorce proceeding, Tim and Edra entered into the MSA on June 26, 2008. The MSA consists of 42 pages plus exhibits. The MSA was amended by an Amendment to Marital Settlement Agreement dated July 2, 2008, consisting of 4 pages, and was again amended by a Second Amendment to Marital Settlement Agreement dated August 12, 2008, consisting of 7 pages plus exhibits and certain side letters. Property was transferred pursuant to the MSA on or about August 20, 2008.

ER01242

**Case No. 12-35986 ER  883**

disqualify myself from this and various other proceedings.

Following the hearing on Tim's request for disqualification, a hearing on Tim's motion to dismiss was held February 14, 2011.  After the February 14, 2011, hearing and before the Court entered a ruling on Tim's request for dismissal, the Court was advised that an involuntary bankruptcy had been filed against Tim in the United States Bankruptcy Court for the District of Nevada.  Because of the involuntary bankruptcy proceeding, the Court held Tim's motion to dismiss in abeyance.  Upon later learning that the involuntary proceeding was dismissed, this Court entered a Memorandum of Decision and Order on August 1, 2011, denying Tim's motion to dismiss Count I (to set aside the MSA), Count IV (preferential transfer), Count V (breach of fiduciary duty), Count VII (constructive trust), and Count VIII (equitable subordination).  The Court *sua sponte* ruled in the same Memorandum of Decision and Order that it would grant the motion to dismiss as to Counts II, III, and VI (the fraudulent conveyance claims), but in lieu of dismissal, granted the parties leave to file a motion with the District Court requesting that it withdraw the reference as to all or part of Adversary Proceeding 10-00088.

As instructed, Samson filed a motion to withdraw the reference in District Court.  On October 5, 2011, United States District Court Judge Sam E. Haddon entered a brief order denying the motion to withdraw reference.

While Judge Haddon was considering Samson's request for withdrawal of the reference, Samson filed a motion for leave to file brief regarding procedural status and memorandum in support, which motion the Court granted on October 26, 2011.  Thereafter, Tim filed a response to the Trustee' brief and attached thereto the transcript of a hearing held before Judge Haddon on September 30, 2011, a brief and transcript for a proceeding wholly unrelated to this proceeding,

ER01243

and the transcript of the hearing held October 21, 2011, before Judge Sharon J. Waters of the Superior Court of California, County of Riverside ("Superior Court"). Tim also filed a suggestion of lack of subject matter jurisdiction over Counts II, III, and VI. Given Judge Haddon's October 5, 2011, ruling and upon consideration of the recent pleadings filed by the parties, the Court deems it appropriate to now consider Tim's pending request for reconsideration.[2]

### APPLICABLE LAW

In the pending request for reconsideration, Tim does not seek reconsideration of that portion of the Court's August 1, 2011, decision finding that it lacked subject matter jurisdiction over Samson' fraudulent conveyance claims. Rather, Tim seeks partial reconsideration of this Court's August 1, 2011, Order under F.R.B.P. 7012(b). Rule 7012 sets forth the time and procedures for serving responsive pleadings, for asserting factual and legal defenses and objections, and for making preliminary motions and motions for judgment on the pleadings. Rule 7012 is, by its plain language, not a rule that provides for reconsideration. Tim's reference to such Rule is thus obviously a reference to the title of Tim's original motion to dismiss.

Other than F.R.B.P. 7012(b), Tim's motion for reconsideration cites not a single rule or code section. While it is obvious Tim is requesting that this Court reconsider a portion of its August 1, 2011, ruling, it is not clear whether Tim is requesting relief under F.R.B.P. 9023 or 9024. The Court deems Tim's motion a request under Rule 59. Rule 59, Fed.R.Civ.P.,

---

[2] On September 19, 2011, Tim appealed this Court's February 25, 2011, Order denying his Amended Motion to Disqualify filed December 14, 2010, at docket entry no. 39. Tim has not sought a stay pending appeal, and thus, this Court concludes it can proceed with pending matters in this Adversary Proceeding.

ER01244

### Case No. 12-35986 ER 885

incorporated into the Federal Rules of Bankruptcy Procedure by Rule 9023, provides in pertinent

part: "A new trial may be granted to all or any of the parties and on all or part of the issues . . .

(2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore

been granted in suits in equity in the courts of the United States."  Under Rule 9023, "[a] motion

to alter or amend a judgment must be filed no later than [14] days after the entry of the

judgment."[3]  Rule 59(e) includes motions for reconsideration.  *Backlund v. Barnhart*, 778 F.2d

1386, 1388 (9th Cir. 1985); 11 Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE:

Civil 2nd § 2810.1.

In *Brandt v. Esplanade of Central Montana, Inc., et al.* (*"Brandt"*), 19 Mont. B.R. 401,

403 (D. Mont. 2002), the District Court, in affirming this Court's decision, discussed amendment

of an order under Rule 59(e):  "Amendment or alteration is appropriate under Rule 59(e) if (1)

the district court is presented with newly discovered evidence, (2) the district court committed

clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening

change in controlling law.  *School Dist. No. 1J, Mutnomah County v. ACandS, Inc.*, 5 F.3d 1255,

1263 (9th Cir. 1993)."  *See also In re Teigen*, 11 Mont. B.R. 91, 92 (Bankr. D.Mont. 1992).

Absent highly unusual circumstances, a motion for reconsideration should not be granted if the

above test is not met.  *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999).

Finally, a Rule 59(e) motion may not be used to raise arguments or present evidence for the first

time when they could reasonably have been raised earlier in the litigation.  *Kona Enterprises, Inc.*

---

[3]  Rule 59, Fed.R.Civ.P, was amended in 2009 to extend the deadline for filing such
actions to 28 days after the entry of judgment.  However, in the context of bankruptcy
proceedings, the deadline for filing a notice of appeal is 14 days. Thus, Bankruptcy Rule 9023
was amended to shorten the 28 day period in Rule 59 to 14 days so that Bankruptcy Rule 9023
would not override the notice of appeal deadline under Rule 8002(a).

ER01245

**Case No. 12-35986 ER  886**

*v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

DISCUSSION

Tim first argues this Court made a factual error when it refused to abstain because this "Court was under the erroneous impression that no parallel action had been commenced in the California Superior Court to enforce the terms of the Marital Settlement Agreement entered between Mr. Blixseth and the Debtor, Edra Blixseth." The Court's impression, if erroneous, was formed from the argument and evidence presented by Tim's counsel. In the brief filed in support of the motion to abstain filed November 11, 2010, Tim did not assert the existence of a parallel action but instead argued that the California Superior Court,

> specifically retained jurisdiction to adjudicate disputes arising out of the MSA. Morever, California has a statutory mechanism in place to rapidly adjudicate and enforce settlements, Cal. Code. Civ. P. § 664.6. The statutory procedure is "an expeditious, valid alternative statutorily created." *Nicholson v. Barab*, 233 Cal. App. 3d 1671, 1681 (1991). Finally, the California Superior Court has jurisdiction over the parties pursuant to the MSA.

Brief in support of Motion for Mandatory Abstention or Permissive Abstention, docket entry no. 9, p.6. Similarly, Tim's counsel argued at the February 14, 2011, hearing: "[T]here is an action in state court. Judge Waters specifically retained jurisdiction. And there's an expedient method by which Mr. Samson can go to California and get answers to the questions that he poses by way of his complaint."

The statements by Tim's counsel regarding the California Superior Court's retained jurisdiction do not establish the existence of a parallel state court action. Indeed, it appeared from other statements made by the parties that as of November 18, 2011, the date Tim filed his motion, and February 14, 2011, the date of the hearing on Tim's motion to dismiss, that nothing

6                                              ER01246

**Case No. 12-35986 ER  887**

had transpired in Tim and Edra's California Superior Court divorce proceeding since approximately the date of Tim and Edra's judgment of dissolution, which was October 7, 2008. Given the absence of any evidence of a parallel state court action, this Court was precluded from exercising its discretion to abstain. *See Security Farms v. International Board of Teamsters*, 124 F.3d 999, 1009 (9th Cir. 1997). As alluded to earlier, this Court did not learn that Tim had filed a request for money judgment in the Superior Court action until after this Court entered its August 1, 2011, decision.

Furthermore, the evidence presented to date does not conclusively establish that the California Superior Court retained jurisdiction to consider the matters at issue in this Adversary Proceeding. Judge Waters commented at the October 21, 2011, California Superior Court hearing that the MSA between Tim and Edra "was, and remains, the most unusual settlement agreement that I never put on the record, because I never heard the terms of the settlement." Not knowing the terms of the MSA, Judge Waters issued a judgment on October 7, 2008, providing that the Superior Court of California would retain "jurisdiction as provided for in the MSA in accordance with the terms and provisions of the MSA." Through this Court's review of the MSA, it found two provisions addressing the California Superior Court's continuing jurisdiction:

> J.    Jurisdiction over Tax Matters: The Court shall retain jurisdiction to make further orders as necessary to enforce these tax provisions[; and]
>
> * * *
>
> 64.    Except as otherwise provided herein, the Court shall not retain jurisdiction to modify or alter this Stipulation in any fashion whatsoever. The Court will retain jurisdiction <u>only</u> to enforce the terms of this stipulation in the event of a breach by either party.

Pages 28 and 41of the MSA. The relief sought by Samson in his complaint does not appear to

fall within either of the aforementioned passages from the MSA. Provided the MSA is not set aside, the Court agrees that the California Superior Court has continuing jurisdiction to consider Tim's pending request for entry of judgment. However, vague statements regarding retained jurisdiction do not show the existence of a parallel state court action.

Moreover, the Court is not persuaded that Tim's July 5, 2011, request for money judgment is a parallel proceeding. As noted earlier, unbeknownst to this Court and between the time of the February 14, 2011, hearing and entry of the Memorandum of Decision and Order on August 1, 2011, Tim sought on or about July 5, 2011, a money judgment against Edra in the sum of $999,996, which amount Tim alleges was to be paid "by November 12, 2008 to satisfy his claim for unpaid management fees (relative to BLX Group, Inc.) [paragraph 16.A.(b) of MSA][.]"

Upon learning of Tim's July 5, 2011 motion in California, Samson filed a motion in Edra's main bankruptcy case on September 26, 2011, requesting that this Court issue an injunction to preclude Judge Waters from deciding Tim's request for money judgment. Before this Court entered a decision on Samson's request for an injunction, Judge Waters held a hearing on October 21, 2011, after which she entered a decision on November 16, 2011, staying all proceedings with respect to the MSA, including Tim's request for a money judgment. As a result of Judge Waters' decision, Samson withdrew his request for an injunction.

Notwithstanding Judge Waters' decision to stay all proceedings with respect to the MSA, Tim's request for a money judgment is not the same as Samson's request to set aside the MSA. Rather, the outcome of Tim's request for a money judgment is dependent in large part on whether the MSA is ultimately upheld or set aside. In any event the Court is not persuaded that a

parallel state court action exists even at this time.  Absent a parallel state court action, this Court is precluded from exercising its discretion to abstain.

Tim also argues in this request for reconsideration that this Court is precluded from evaluating the validity of the MSA.  As this Court explained in its August 1, 2011, Memorandum of Decision in Adversary Proceeding 10-00088, the *Rooker-Feldman* doctrine is not an issue because when a state court merely adopts a marital property settlement without adjudicating the property division, such as it appears Judge Waters did with respect to the MSA, subsequent claims alleging misconduct by the former spouse in obtaining that settlement are not barred by *Rooker-Feldman* because the plaintiff is alleging misconduct by the spouse rather than error by the state court.  This Court also *sua sponte* examined the domestic relations exception and concluded such exception did not apply to the Samson's claims, including Samson's claim to set aside the MSA.

While apparently not disputing the foregoing, Tim argues this Court committed a legal error by failing to require that Samson plead restitution.  In support of such argument, Tim argues "Cal. Code Civ. P. § 1691 requires the 'party seeking rescission to . . . restore all consideration or 'everything of value which he has received' under the contract.  The statute's language is clear.' *Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.*, 50 Cal. 4th 913, 921-922 (2010)."  Without addressing the merit or applicability of such law or argument, the evidence this Court has seen in other related proceedings shows that several of the assets Edra received through the MSA, such as the Yellowstone Club, consisting of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC, along with Big Springs Realty, LLC, and Yellowstone Club

9

World, LLC, were financially insolvent as of the effective date of the MSA. According to Tim's argument, if the assets had no value, requiring Samson to plead restitution would be a pointless exercise.

Finally, Tim argues this Court erred when it labeled various of his defenses as affirmative defenses which were inappropriate to consider in a motion to dismiss. Tim argues this Court failed to take judicial notice of certain court filings and other matters of public record, which filings and documents, such as the MSA, would establish the absence of a disputed issue of fact. More specifically, Tim argues the MSA is "central to the Trustee's Claim" and that the MSA, along with the order approving the MSA and the transcript of the July 8, hearing on approval of the MSA "establish res judicata, statutory, equitable and judicial estoppel, as well as waiver and release." A reading of the Court's August 1, 2011, Memorandum of Decision shows the Court did consider various filings and documents, such as the MSA. Therefore, the Court finds Tim's latter argument without merit.

The Court doubts that either Tim or Edra anticipated the volume of litigation their complicated web of corporations, real estate holdings and operating companies, and their subsequent acrimonious divorce, would produce. For instance, the Yellowstone Club entities, consisting of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC sought bankruptcy protection on November 10, 2008. *See* Bankruptcy Case Nos. 08-61570, 08-61571, 08-61572 and 08-61573. The hours of hearings generated by the foregoing bankruptcies was unprecedented in this Court. In addition, the Yellowstone Club entities' bankruptcy generated eight associated adversary proceedings. Later, the bankruptcy of Big Springs Realty, LLC, *see* Bankruptcy Case

ER01250

No. 09-61079, produced one adversary proceeding; the bankruptcy of Yellowstone Club World,

LLC, *see* Bankruptcy Case No. 09-60061, generated three adversary proceedings; Edra's personal

bankruptcy produced 24 adversary proceedings; and the bankruptcy of BLX Group, Inc., f/k/a

Blixseth Group, Inc.'s bankruptcy, *see* Bankruptcy Case No. 09-61893, generated three adversary

proceedings.  This Court's decisions in the above matters have, in turn, produced numerous

appeals.

Notwithstanding the foregoing, Tim argues the California Superior Court is better

acquainted with the facts and is better equipped to expeditiously deal with various of the issues

raised in this Adversary Proceeding.  For instance, Tim argues in a brief that "California has a

statutory mechanism in place to rapidly adjudicate and enforce settlements, Cal. Code. Civ. P. §

664.6. The statutory procedure is 'an expeditious, valid alternative statutorily created.'"  Brief in

support of Motion for Mandatory Abstention or Permissive Abstention, docket entry no. 9, p.6.

Additionally, at that hearing, Tim's counsel stated:

> But it's important to note as well that Counts 1, 5, and 7 are the noncore
> components of the bankruptcy complaint. They are all based upon the same basic
> allegation which is that Mr. Blixseth misrepresented facts to Ms. Blixseth,
> induced her into this agreement, and that the trustee now wants to go back and
> rescind that agreement.
>
> So California actually has an expedited procedure by which the trustee
> standing in Ms. Blixseth's shoes could go to California, ask Judge Waters to
> entertain these three counts, and get a ruling. And in doing so, one of two things
> would happen: Judge Waters would either reinforce what she painstakingly set
> forth and unequivocally set forth in the order on waivers and releases, or she
> would agree with the trustee.
>
> * * *
>
> So with respect to Subpart 5 - and I apologize, Your Honor, because it's all
> interrelated - there is an action in state court. Judge Waters specifically retained

ER01251

**Case No. 12-35986 ER  892**

jurisdiction. And there's an expedient method by which Mr. Samson can go to
California and get answers to the questions that he poses by way of his complaint.

* * *

So if the trustee contends that the orderly administration of the estate,
which is an element under permissive abstention, is -- would be frustrated, that's
not the case. I mean it may be and probably is the case that the trustee could go
and file his claim in California and have an adjudication before discovery even
closed in these AP proceedings.

The Court agrees with Tim that Judge Waters is fully qualified and capable to rule on

various of the issues raised in this Adversary Proceeding.  However, the Court questions the

ability of any court to fashion an expeditious ruling on any issue until they are fully apprised of

the inner workings of Tim and Edra' business dealings, and the impact thereon caused by the

various bankruptcy proceedings.

For instance, Tim is, in the California Superior Court, seeking a money judgment against

Edra in the sum of $999,996, yet Tim did not file a claim in Edra's bankruptcy case for the above

debt and would thus not participate in any distribution from her bankruptcy estate.  Instead, Tim

filed Proof of Claim No. 14 in the bankruptcy case of BLX Group, Inc.  That claim is listed as an

unsecured claim in the amount of $999,996 stemming from "management services."  Tim

attached 4 pages and paragraph 16b of the 42-page MSA to Proof of Claim No. 14.  Paragraph

16b recites that "[t]he Yellowstone Entities owe BGI management fees that were to be paid for

the months from July 2007 to June 2008, at the rate of $83,333 per month, a total of $999,996.

The Petitioner shall cause BGI to make said payments to Respondent, for his management

services during said month, on or before the 90th day after The Closing.  Said payments shall be

taxable to Respondent and deductible to BGI.  The Petitioner shall have no obligation to

ER01252

**Case No. 12-35986 ER  893**

contribute money to the Yellowstone Entities or BGI to fund such payments to Respondent."  To

date, the Chapter 11 Trustee in the BLX Group, Inc. bankruptcy case has not objected to the

allowance of Tim's Proof of Claim No. 14.  A court deciding whether Tim is entitled to a money

judgment against Edra may be interested to know that Tim filed a claim against BLX, but not

Edra.

Keeping matters in one court also prevents parties from inadvertently misstating events in

another court.  For instance, in discussing this Court's scheduling of the hearing on Samson's

motion to stay the California proceedings, Tim's counsel stated to Judge Waters:

> It is a reasonable assumption when bankruptcy Judge Kirscher set the
> matter in Blixseth for a hearing before this hearing, and then continued it to a
> hearing after this hearing, that there was a reason for doing that.  And the reason, I
> think, that is logically and reasonably inferable from that is he wanted your input
> as to whether or not you thought you should hear this matter, and then he would
> take his cue from that.

While the Court certainly appreciates Judge Waters' input on the matter, what the record

before this Court reflects is that Samson filed his motion for injunction and requested an

expedited hearing on September 26, 2011.  On September 27, 2011, this Court entered an Order

setting the matter for expedited hearing October 4, 2011.  On September 30, 2011, Tim, through

counsel, filed a request to continue the October 4, 2011, hearing to October 17, 2011, "to enable

Mr. Blixseth to properly research and respond to the Trustee's Motion and to subpoena the

Debtor and other key witnesses whose testimony is directly relevant to the Trustee's Motion.

Because there is no hearing scheduled in the state court on Mr. Blixseth's Motion for a Money

Judgment, there is no reason to expedite the hearing at this time."  Because the Court's schedule

would not accommodate Tim's request to continue the matter to October 17, 2011, the Court

**Case No. 12-35986 ER  894**

entered an Order on October 3, 2011, continuing the hearing on Samson's motion to November 8, 2011.  This Court could not have continued the hearing on Samson's motion for the purpose of allowing Judge Waters to weigh in on the matter because this Court was not aware that Judge Waters had scheduled a hearing on Tim's request for money judgment.

For the reasons discussed above, Tim's motion for reconsideration is denied.  However, denial of Tim's request for reconsideration does not bring finality to the Court's August 1, 2011, Memorandum of Decision and Order, and this Court must bring finality to such decision so the parties may move forward.

As a court of equity, this Court has broad discretion under Rules 59(e) and 60(b), Fed.R.Civ.P., to *sua sponte* reconsider, vacate, or modify past orders so long as no intervening rights have become vested in reliance on the order.  *Meyer v. Lenox (In re Lenox)*, 902 F.2d 737, 739–40 (9th Cir. 1990).  No party's intervening rights have vested in reliance on the Court's initial decision made August 1, 2011.  Fed.R.Civ.P. 59(e) refers to "judgments."  "Judgment" is defined in Fed.R.Civ.P. 54(a) as "a decree and any order from which an appeal lies."  In other words - a "final" order.  Fed.R.Civ.P. 60(b) also refers to relief from "final" orders.

As instructed by this Court on August 1, 2011, the parties filed a motion for withdrawal of the reference with Judge Haddon.  Judge Haddon denied such request on October 5, 2011, and the matter has sat since that time awaiting a ruling by this Court on Tim's pending request for reconsideration.  Given the state of the record, including Judge Haddon's comments made September 30, 2011, this Court's August 1, 2011, decision does not yet constitute entry of a judgment or final order.  As such, the court has inherent power to modify, alter, or vacate the August 1, 2011 decision.  *See United States v. Martin*, 226 F.3d 1042, 1048-49 (9th Cir. 2000)

ER01254

(authority of district courts to reconsider their own orders before they become final absent some

contrary rule or statute allows them to correct decisions based on shifting precedent); *Reswick v.*

*Reswick (In re Reswick)*, 446 B.R. 362, 373 (9th Cir. BAP 2011).

     The Court *sua sponte* amends its August 1, 2011, Memorandum of Decision and Order in

accordance with this Memorandum of Decision.  In particular, I find the Court erred when it

made reference to subject matter jurisdiction in its August 1, 2011, ruling.  Subject matter

jurisdiction "refers to a tribunal's ' "power to hear a case." ' " *Union Pacific R. Co. v. Locomotive*

*Engineers and Trainmen Gen. Comm. of Adjustment, Central Region*, 558 U.S. ——, ——, 130

S.Ct. 584, 596, 175 L.Ed.2d 428 (2009) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514,

126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006), in turn quoting *United States v. Cotton*, 535 U.S. 625,

630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)).  The Supreme Court in *Stern v. Marshall*

specifically stated its decision did not implicate questions of subject matter jurisdiction:

> Section 157 allocates the authority to enter final judgment between the bankruptcy
> court and the district court. See §§ 157(b)(1), (c)(1). That allocation does not
> implicate questions of subject matter jurisdiction. See § 157(c)(2) (parties may
> consent to entry of final judgment by bankruptcy judge in non-core case). By the
> same token, § 157(b)(5) simply specifies where a particular category of cases
> should be tried.

*Stern v. Marshall*, 131 S.Ct. at 2607.  The Supreme Court then went on to conclude only that

bankruptcy courts lack the constitutional authority to enter final judgments on state law

counterclaims that are not resolved in the claims allowance process.  *Id.* at 2620.

     Having now had the benefit of more time to reflect on *Stern v. Marshall*, I find the

Court's August 1, 2011, decision in this Adversary Proceeding was flawed in one respect.  The

"jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited

by, statute." *Battleground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1130 (9th Cir. 2010)

(quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)).  A bankruptcy court's jurisdiction

is, generally, prescribed by 28 U.S.C. § 1334(b).  In addition to granting jurisdiction to

bankruptcy courts over bankruptcy cases, the statute provides that  "the district courts [and by

reference pursuant to 28 U.S.C. § 157, the bankruptcy courts] shall have original but not

exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to

cases under title 11."

        In a 5-4 decision, the Supreme Court in *Stern v. Marshall* concluded that -- even though

the proceeding was core under 28 U.S.C. § 157(b)(2)(C) and that the bankruptcy court had the

statutory authority to resolve the matter --the bankruptcy court nevertheless lacked the

constitutional power to finally decide a state-law counterclaim where the counterclaim was not so

closely related to the creditor's claim that it could be adjudicated as part of the claims resolution

process.  Shortly after the Supreme Court entered its decision in *Stern v. Marshall*, this Court

entered its August 1, 2011 decision concluding:

> Since this Court may not constitutionally hear the fraudulent conveyance claim as
> a core proceeding, and this Court does not have statutory authority to hear it as a
> non-core proceeding, it may in no case hear the claim. Therefore, this Court grants
> the parties fourteen days in which to move the District Court to withdraw its
> reference, in whole or in part, pursuant to 28 U.S.C. § 157(e), or else it will
> dismiss the fraudulent conveyance claims for lack of subject matter jurisdiction.

        Such decision was flawed.  In March of this year, the United States Supreme Court

entered a decision that provides instructful guidance on the matter addressed here.  *See*

*Henderson ex rel. Henderson v. Shinseki*, ––– U.S. ––––, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159

(2011).  In an attempt to "bring some discipline" to the use of the term "jurisdictional" the

ER01256

Supreme Court in *Henderson* wrote:

> Branding a rule as going to a court's subject-matter jurisdiction alters the
> normal operation of our adversarial system. Under that system, courts are
> generally limited to addressing the claims and arguments advanced by the parties.
> *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356-357, 126 S.Ct. 2669, 165
> L.Ed.2d 557 (2006). Courts do not usually raise claims or arguments on their
> own. But federal courts have an independent obligation to ensure that they do not
> exceed the scope of their jurisdiction, and therefore they must raise and decide
> jurisdictional questions that the parties either overlook or elect not to press. *See
> Arbaugh, supra*, at 514, 126 S.Ct. 1235.

> Jurisdictional rules may also result in the waste of judicial resources and
> may unfairly prejudice litigants. For purposes of efficiency and fairness, our legal
> system is replete with rules requiring that certain matters be raised at particular
> times. *See Sanchez-Llamas, supra*, at 356-357, 126 S.Ct. 2669.  Objections to
> subject-matter jurisdiction, however, may be raised at any time. Thus, a party,
> after losing at trial, may move to dismiss the case because the trial court lacked
> subject-matter jurisdiction. *Arbaugh*, 546 U.S., at 508, 126 S.Ct. 1235.  Indeed, a
> party may raise such an objection even if the party had previously acknowledged
> the trial court's jurisdiction. *Ibid*  And if the trial court lacked jurisdiction, many
> months of work on the part of the attorneys and the court may be wasted.

> Because the consequences that attach to the jurisdictional label may be so
> drastic, we have tried in recent cases to bring some discipline to the use of this
> term. We have urged that a rule should not be referred to as jurisdictional unless it
> governs a court's adjudicatory capacity, that is, its subject-matter or personal
> jurisdiction. *Reed Elsevier, supra*, at ----, 130 S.Ct., at 1243-1244; *Kontrick,
> supra*, at 455, 124 S.Ct. 906.  Other rules, even if important and mandatory, we
> have said, should not be given the jurisdictional brand.  *See Union Pacific*, 558
> U.S., at ----, 130 S.Ct., at 596.

In *Stern v. Marshall,* the Supreme Court reiterated:

> Because "[b]randing a rule as going to a court's subject-matter jurisdiction alters
> the normal operation of our adversarial system," *Henderson v. Shinseki*, 562 U.S.
> ——, —— – ——, 131 S.Ct. 1197, 1201–03, 179 L.Ed.2d 159 (2011), we are not
> inclined to interpret statutes as creating a jurisdictional bar when they are not
> framed as such. *See generally Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516, 126
> S.Ct. 1235, 163 L.Ed.2d 1097 (2006) ("when Congress does not rank a statutory
> limitation on coverage as jurisdictional, courts should treat the restriction as
> nonjurisdictional in character").

ER01257

**Case No. 12-35986 ER  898**

Section 157(b)(5) does not have the hallmarks of a jurisdictional decree. To begin, the statutory text does not refer to either district court or bankruptcy court "jurisdiction," instead addressing only where personal injury tort claims "shall be tried."

The statutory context also belies Pierce's jurisdictional claim. Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. *See* §§ 157(b)(1), (c)(1). That allocation does not implicate questions of subject matter jurisdiction. *See* § 157(c)(2) (parties may consent to entry of final judgment by bankruptcy judge in non-core case). By the same token, § 157(b)(5) simply specifies where a particular category of cases should be tried. Pierce does not explain why that statutory limitation may not be similarly waived.

Consistent with the above, several courts have recently concluded that *Stern v. Marshall* does not deprive bankruptcy courts of subject matter jurisdiction. *See, e.g., In re Wilderness Crossings, LLC,* 2011 WL 5417098, *1 (Bankr. W.D.Mich. Nov 08, 2011); *In re Bujak*, 2011 WL 5326038, *2 (Bankr. D.Idaho Nov 03, 2011); *In re Sunra Coffee LLC*, 2011 WL 4963155, *4 (Bankr. D.Haw. Oct 18, 2011); and *In re Citron*, 2011 WL 4711942, *2 (Bankr. E.D.N.Y. Oct 06, 2011).

Following the express language of *Henderson* and *Stern v. Marshall*, this Court concludes that because the United States District Court for the District of Montana would have the requisite subject-matter jurisdiction to adjudicate the claims in this Adversary Proceeding, so too does this Court. Consistent with the foregoing, the Court will enter a separate order providing as follows:

IT IS ORDERED that Defendant Timothy Blixseth's Motion for Reconsideration of This Court's August 1, 2011 Order Denying Motion to Dismiss Adversary Complaint Pursuant to Fed.R.Bankr.P. 7012(b) filed August 15, 2011, at docket entry no. 57 is DENIED.

IT IS FURTHER ORDERED that the Court's Order of August 1, 2011, is amended to read as follows:

Case No. 12-35986 ER  899

IT IS ORDERED Defendant Timothy Blixseth's Motion for Mandatory Abstention or Permissive Abstention, filed November 11, 2010 at docket entry no. 9, is denied.

IT IS FURTHER ORDERED that Defendant Timothy Blixseth's Motion to Dismiss Adversary Complaint Pursuant to Fed.R.Bankr.P. 7012(b), filed November 12, 2010 at docket entry no. 12, is denied.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

ER01259

**Case No. 12-35986 ER  900**

# U.S. District Court
## District Of Montana (Butte)
## CIVIL DOCKET FOR CASE #: 2:11-cv-00073-SEH

Blixseth v. Yellowstone Mountain Club, LLC et al

Assigned to: Judge Sam E Haddon

Case in other court: Ninth Circuit, 12-35986

US Bankruptcy Court Montana, BAP# MT-11-01441

Cause: 28:0158 Notice of Appeal re Bankruptcy Matter (BAP)

Date Filed: 11/23/2011

Date Terminated: 11/16/2012

Jury Demand: None

Nature of Suit: 422 Bankruptcy Appeal (801)

Jurisdiction: Federal Question

**Appellant**

**Timothy L. Blixseth**

represented by **Patrick T. Fox**
DOUBEK & PYFER
PO Box 236
Helena, MT 59624
406-442-7830
Fax: 406-442-7839
Email: patrickfox@doubekpyfer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Appellee**

**Yellowstone Mountain Club, LLC**

represented by **James A. Patten**
PATTEN PETERMAN BEKKEDAHL & GREEN
2817 Second Ave North
Suite 300
Billings, MT 59101
406-252-8500
Fax: 406-294-9500
Email: japatten@ppbglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appellee**

**Ad Hoc Group of Class B Unit Holders**

represented by **Ronald A. Bender**
WORDEN THANE
PO Box 4747

**Case No. 12-35986 ER 901**

Missoula, MT 59806-4747
406-721-3400
Fax: 721-6985
Email: rbender@wordenthane.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appellee**

**CIP Sunrise Ridge Owner LLC**            represented by **Benjamin P. Hursh**
CROWLEY FLECK
305 South 4th Street East
Suite 100
Missoula, MT 59801
406-523-3600
Fax: 406-523-3636
Email: bhursh@Crowleyfleck.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appellee**

**CIP Yellowstone Lending LLC**            represented by **Benjamin P. Hursh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appellee**

**Crossharbor Capital Partners, LLC**            represented by **Benjamin P. Hursh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael R. Lastowski**
DUANE MORRIS
222 Delaware Avenue
Suite 1600
Wilmington, DE 19801
302-657-4900
Fax: 302-657-4901
Email: mrlastowski@duanemorris.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Appellee**

**Case No. 12-35986 ER  902**

**Marc S. Kirschner**                represented by  **Charles W. Hingle**
HOLLAND & HART
PO Box 639
Billings, MT 59103-0639
406-252-2166
Fax: 252-1669
Email: chingle@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shane Coleman**
HOLLAND & HART
401 North 31st Street
Suite 1500
PO Box 639
Billings, MT 59103-0639
406-252-2166
Fax: 252-1669
Email: spcoleman@hollandhart.com
*ATTORNEY TO BE NOTICED*

<u>Appellee</u>

**Credit Suisse AG, Cayman Islands**      represented by  **Evan R. Levy**
**Branch**
SKADDEN ARPS SLATE MEAGHER &
FLOM
Four Times Square
New York, NY 10036-6522
212-735-3889
Fax: 917-777-3889
Email: evan.levy@skadden.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Richard Orizotti**
POORE ROTH & ROBINSON
1341 Harrison Ave
Butte, MT 59701-4898
406-497-1200
Fax: 782-0043
Email: jro@prrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George A. Zimmerman**

**Case No. 12-35986 ER  903**

SKADDEN ARPS SLATE MEAGHER &
FLOM
Four Times Square
New York, NY 10036-6522
212-735-2047
Fax: 917-777-2047
Email: George.Zimmerman@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/23/2011 | 1 | Notice of Transfer and Order of APPEAL FROM BANKRUPTCY COURT. Bankruptcy Court case number 08-6157. File received, filed by Timothy L. Blixseth. Appellant Brief due by 1/3/2012. (Attachments: # 1 BAP Docket Sheet, # 2 USBC Docket Sheet, # 3 Certificate of Readiness) (ELL, ) (Additional attachment(s) added on 11/30/2011: # 4 Notice of Appeal and Order) (ELL, ). (Entered: 11/29/2011) |
| 11/23/2011 | 2 | Bankruptcy Scheduling Order Appellant Brief due by 1/3/2012. Appellee Brief due by 2/2/2012. Appellant Reply Brief due by 2/16/2012. (ELL, ) (Entered: 11/29/2011) |
| 12/13/2011 | 3 | Unopposed MOTION for Hearing /*Status Conference* Patrick T. Fox appearing for Appellant Timothy L. Blixseth (Attachments: # 1 Text of Proposed Order) (Fox, Patrick) (Entered: 12/13/2011) |
| 12/20/2011 | 4 | ORDER granting in part 3 Motion for Hearing. ORDERED: 1. Appellant's Motion to Set a Status Conf is GRANTED IN PART. 2. The Court will sched a status conf as soon as feasible. 3. In the interim, all existing brief scheds remain in effect and are expected to be met. 4. The parties in this bankruptcy appeal are encouraged to meet and confer w/parties in the related bank appeals and to propose to the Court an agreed upon format and sched for "how to most productively move forward" with all appeals. Signed by Judge Sam E Haddon on 12/20/2011. (ELL, ) (Entered: 12/20/2011) |
| 01/03/2012 | 5 | Appellant's BRIEF by Timothy L. Blixseth. Appellee Brief due by 2/2/2012. (Fox, Patrick) (Entered: 01/03/2012) |
| 01/03/2012 | 6 | APPENDIX re 5 Appellant's Brief by Timothy L. Blixseth. (Attachments: # 1 Exhibit Exhibits 1-4 to Appendix, # 2 Exhibit Exhibit 5 to Appendix, # 3 Exhibit Exhibit 6 part 1 to Appendix) (Fox, Patrick) (Entered: 01/03/2012) |
| 01/03/2012 | 7 | APPENDIX re 5 Appellant's Brief by Timothy L. Blixseth. (Attachments: # 1 Exhibit Exhibit 6 part 2 to Appendix, # 2 Exhibit Exhibit 6 part 3 to Appendix, # 3 Exhibit Exhibits 7-8 to Appendix) (Fox, Patrick) (Entered: 01/03/2012) |
| 01/03/2012 | 8 | APPENDIX re 5 Appellant's Brief by Timothy L. Blixseth. (Attachments: # 1 Exhibit Exhibit 9 part 1 to Appendix, # 2 Exhibit Exhibit 9 part 2 to Appendix) (Fox, Patrick) (Entered: 01/03/2012) |
| 01/03/2012 | 9 | APPENDIX re 5 Appellant's Brief by Timothy L. Blixseth. (Attachments: # 1 Exhibit |

| | | |
|---|---|---|
| | | Exhibit 9 part 3 to Appendix, # 2 Exhibit Exhibit 9 part 4 to Appendix) (Fox, Patrick) (Entered: 01/03/2012) |
| 01/03/2012 | 10 | APPENDIX re 5 Appellant's Brief by Timothy L. Blixseth. (Attachments: # 1 Exhibit Exhibit 9 part 5 to Appendix, # 2 Exhibit Exhibits 10-13 to Appendix, # 3 Exhibit Exhibits 14-24 to Appendix, # 4 Exhibit Exhibit 25 to Appendix) (Fox, Patrick) (Entered: 01/03/2012) |
| 02/02/2012 | 11 | Appellee's BRIEF by CIP Sunrise Ridge Owner LLC, CIP Yellowstone Lending LLC, Crossharbor Capital Partners, LLC, Marc S. Kirschner, Yellowstone Mountain Club, LLC. Appellant Reply Brief due by 2/16/2012. (Coleman, Shane) (Entered: 02/02/2012) |
| 02/02/2012 | 12 | APPENDIX re 11 Appellee's Brief by CIP Sunrise Ridge Owner LLC, CIP Yellowstone Lending LLC, Crossharbor Capital Partners, LLC, Marc S. Kirschner, Yellowstone Mountain Club, LLC. (Attachments: # 1 Exhibit 26 - Memorandum of Decision dated February 25, 2011, # 2 Exhibit 27 - Memorandum of Decision dated August 16, 2010, # 3 Exhibit 28 - Order Confirming Third Amended Plan dated June 2, 2009, # 4 Exhibit 29 - Hearing Transcripts of May 12-15, 2009, # 5 Exhibit 30 - Amended Motion to Disqualify Bankruptcy Judge Kirscher (with exhibits)) (Coleman, Shane) (Entered: 02/02/2012) |
| 02/10/2012 | 13 | Unopposed MOTION Michael R. Lastowski to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1012550.) Benjamin P. Hursh appearing for Appellee Crossharbor Capital Partners, LLC (Attachments: # 1 Exhibit Lastowski Affidavit, # 2 Exhibit Proposed Order) (Hursh, Benjamin) (Entered: 02/10/2012) |
| 02/13/2012 | 14 | ORDER granting 13 Motion to Appear Pro Hac Vice for Attorney Michael R. Lastowski for Crossharbor Capital Partners, LLC. Signed by Judge Sam E Haddon on 2/13/2012. (CRM, ) (Entered: 02/13/2012) |
| 02/13/2012 | 15 | Copy of Letter to register for PHV attorney along with a copy of order 13 (CRM, ) (Entered: 02/13/2012) |
| 02/16/2012 | 16 | Appellant's REPLY BRIEF by Timothy L. Blixseth. (Fox, Patrick) (Entered: 02/16/2012) |
| 02/16/2012 | 17 | APPENDIX *Volume 1 to Appellant's Reply Brief* by Timothy L. Blixseth. (Attachments: # 1 Appendix Ex. 26 -Motion for Summary Judgment Concerning Derivative Claims, Alter Ego, Fiduciary Duty, and Statutes of Limitation and Memorandum in Support, # 2 Appendix Ex. 27 - Motion for Summary Judgment of Affirmative Defense, # 3 Appendix Ex. 28 - Motion for Summary Judgment of Affirmative Defenses K and L On Causation and Supporting Memorandum, # 4 Appendix Ex. 29 - Omnibus Response to Blixseths Motion for Summary Judgment) (Fox, Patrick) (Entered: 02/16/2012) |
| 02/16/2012 | 18 | APPENDIX *Volume 2 to Appellant's Reply Brief* by Timothy L. Blixseth. (Attachments: # 1 Appendix Ex. 30 - August 4, 2010 Memorandum of Decision, # 2 Appendix Ex. 31 - August 4, 2010 Order, # 3 Appendix Ex. 32 - June 16, 2011 Order, # 4 Appendix Ex. 33 - Docket Activity Report Mar. 1, 2011, # 5 Appendix Ex. 34 - |

**Case No. 12-35986 ER 905**

| | | Objection to Timothy Blixseths Motion to Disqualify Judge Kirscher, # 6 Appendix Ex. 35 - Objection of CrossHarbor Capital Partners LLC And Its Affiliates To Motion To Disqualify Bankruptcy Judge Kirscher) (Fox, Patrick) (Entered: 02/16/2012) |
|---|---|---|
| 02/21/2012 | 19 | NOTICE of Acknowledgment of Pro Hac Vice Order by Crossharbor Capital Partners, LLC re 14 Order on Motion to Appear Pro Hac Vice *Michael R. Lastowski* (Hursh, Benjamin) (Entered: 02/21/2012) |
| 07/03/2012 | 20 | Order Setting: Evidentiary Hearing set for 8/24/2012 at 10:00 AM in Butte, MT before Judge Sam E Haddon. Signed by Judge Sam E Haddon on 7/3/2012. (ELL, ) (Entered: 07/03/2012) |
| 07/17/2012 | 21 | NOTICE of Appearance by J. Richard Orizotti on behalf of Credit Suisse AG, Cayman Islands Branch (Orizotti, J.) (Entered: 07/17/2012) |
| 07/17/2012 | 22 | MOTION Evan R. Levy to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1097447.) J. Richard Orizotti appearing for Appellee Credit Suisse AG, Cayman Islands Branch (Attachments: # 1 Affidavit Affidavit of Evan R. Levy for Admission Pro Hac Vice, # 2 Text of Proposed Order [Proposed] Order Granting Motion for Admission of Evan R. Levy as Counsel for Appellant Credit Suisse) (Orizotti, J.) (Entered: 07/17/2012) |
| 07/17/2012 | 23 | MOTION George A. Zimmerman to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1097456.) J. Richard Orizotti appearing for Appellee Credit Suisse AG, Cayman Islands Branch (Attachments: # 1 Affidavit Affidavit of George A. Zimmerman for Admission Pro Hac Vice, # 2 Text of Proposed Order [Proposed] Order Granting Motion for Admission of George A. Zimmerman as Counsel for Appellant Credit Suisse) (Orizotti, J.) (Entered: 07/17/2012) |
| 07/20/2012 | 24 | Unopposed MOTION Michael J. Flynn to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1100355.) Patrick T. Fox appearing for Appellant Timothy L. Blixseth (Attachments: # 1 Affidavit Declaration of Flynn, # 2 Text of Proposed Order) (Fox, Patrick) (Entered: 07/20/2012) |
| 07/20/2012 | 25 | ERRATA 24 Unopposed MOTION Michael J. Flynn to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1100355.) . (Fox, Patrick) (Entered: 07/20/2012) |
| 07/20/2012 | 26 | AMENDED DOCUMENT by Timothy L. Blixseth. Amendment to 24 Unopposed MOTION Michael J. Flynn to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1100355.) *Amended Declaration of Michael J. Flynn in Support of Pro Hac Vice Application*. (Fox, Patrick) (Entered: 07/20/2012) |
| 07/31/2012 | 27 | ORDER granting 22 Motion to Appear Pro Hac Vice for Attorney George R. Zimmerman,Evan R. Levy for Credit Suisse AG, Cayman Islands Branch.; granting 23 Motion to Appear Pro Hac Vice for Attorney George R. Zimmerman,Evan R. Levy for Credit Suisse AG, Cayman Islands Branch. Signed by Judge Sam E Haddon on 7/31/2012. (CRM, ) (Entered: 07/31/2012) |
| 08/01/2012 | 28 | Unopposed MOTION to participate in hearing on appeal by video conference J. Richard Orizotti appearing for Appellee Credit Suisse AG, Cayman Islands Branch (Attachments: |

| | | |
|---|---|---|
| | | # 1 Text of Proposed Order Proposed Order Granting Unopposed Motion to Participate in Hearing on Appeal by Video Conference) (Orizotti, J.) (Entered: 08/01/2012) |
| 08/01/2012 | 29 | ORDER granting 28 Unopposed Motion to Participate in Hearing on Appeal by Video Conference. Signed by Judge Sam E Haddon on 8/1/2012. (LJF, Lisa) (Entered: 08/01/2012) |
| 08/01/2012 | 30 | Brief/Response to Order re 27 Order on Motion to Appear Pro Hac Vice,,, *Acknowledgment of Admission of Evan R. Levy Pro Hac Vice* filed by Credit Suisse AG, Cayman Islands Branch. (Orizotti, J.) (Entered: 08/01/2012) |
| 08/01/2012 | 31 | Brief/Response to Order re 27 Order on Motion to Appear Pro Hac Vice,,, *Acknowledgment of Admission of George A. Zimmerman Pro Hac Vice* filed by Credit Suisse AG, Cayman Islands Branch. (Orizotti, J.) (Entered: 08/01/2012) |
| 08/03/2012 | 32 | ORDER re 24 Unopposed MOTION Michael J. Flynn to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1100355.) filed by Timothy L. Blixseth. Mr. Flynn shall provide to the Court all relevant docs releating to the ref state court sanction. Signed by Judge Sam E Haddon on 8/3/2012. (ELL, ) Modified on 8/3/2012 to indicate that a copy of the Order was mailed to cnsl Flynn by US Mail(ELL, ). (Entered: 08/03/2012) |
| 08/17/2012 | 33 | Mail Returned as Undeliverable. Mail sent to Michael J. Flynn (CRM, ) (Entered: 08/17/2012) |
| 08/17/2012 | | Remark Re-mailed cpy Order #32 to Michael J. Flynn - One Center Plaza - Suite 240 - Boston, MA 02108 (CRM, ) (Entered: 08/17/2012) |
| 08/17/2012 | 34 | AFFIDAVIT/DECLARATION re 32 Order, *Declaration of Michael J. Flynn* by Timothy L. Blixseth. (Attachments: # 1 Exhibit 1) (Fox, Patrick) (Entered: 08/17/2012) |
| 08/17/2012 | 35 | AFFIDAVIT/DECLARATION re 32 Order, *Declaration of Christopher J. Conant* by Timothy L. Blixseth. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Fox, Patrick) (Entered: 08/17/2012) |
| 08/20/2012 | 36 | RESPONSE to Motion re 24 Unopposed MOTION Michael J. Flynn to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1100355.) filed by Yellowstone Mountain Club, LLC. (Patten, James) (Entered: 08/20/2012) |
| 08/21/2012 | 37 | REPLY to Response to Motion re 24 Unopposed MOTION Michael J. Flynn to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1100355.) filed by Timothy L. Blixseth. (Fox, Patrick) (Entered: 08/21/2012) |
| 08/24/2012 | 38 | Minute Entry for proceedings held before Judge Sam E Haddon: Oral Argument held on 8/24/2012. Hearing commenced at 10:00 am and concluded at 11:20 am. Present in courtroom are Patrick T. Fox for Appellant and for Appellees are Evan Levy and George Zimmerman by Video, J. Richard Orizotti, James A. Patten, Ronald A. Bender, Shane Coleman, Benjamin P. Hursh, Michael R. Lastowski and David B. Cotner. Stmts by Fox, Coleman, Lastowski, Hursh and Patten. Atty Fox to submit to Court information and due one week from today. Responses will be allowed. Matter is deemed submitted. Court is recessed (Court Reporter Tina Brilz.) (ELL, ) (Entered: 08/24/2012) |

**Case No. 12-35986 ER  907**

| 08/24/2012 | 39 | Brief/Memorandum in Support re 38 Evidentiary Hearing,, *Post-Hearing Brief* filed by Timothy L. Blixseth. (Fox, Patrick) (Entered: 08/24/2012) |
|---|---|---|
| 08/30/2012 | 40 | Brief/Response to Order re 38 Evidentiary Hearing,, *Jointly Submitted by Yellowstone Mountain Club, LLC, Yellowstone Club Liquidating Trust, and CrossHarbor Capital Partners, LLC* filed by Crossharbor Capital Partners, LLC. (Hursh, Benjamin) (Entered: 08/30/2012) |
| 09/05/2012 | 41 | NOTICE by Crossharbor Capital Partners, LLC, Yellowstone Mountain Club, LLC re 36 Response to Motion (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Patten, James) (Entered: 09/05/2012) |
| 09/06/2012 | 42 | ORDER Setting Hearing on Motion 24 . The Court will conduct a hearing on Appellant's Motion to Admit Michael J. Flynn as Pro Hac Vice Cnsl at 10:00 am on 9/14/12 at the Mike Mansfield Federal Courthouse in Butte, Montana. Mr. Flynn and Mr. Patrick T. Fox, Esq. are expected to attend the hearing in person. **Contract Court Reporter is Needed**, Motion Hearing set for 9/14/2012 at 10:00 AM in Butte, MT before Judge Sam E Haddon. Signed by Judge Sam E Haddon on 9/6/2012. (ELL, ) Modified on 9/7/2012 Cpy mailed to cnsl Flynn (ELL, ). Modified on 9/7/2012 <span style="color:red">Wayrynen and Lively procured for hearing.</span>(ELL, ). Modified on 9/7/2012 (ELL, ). (Entered: 09/07/2012) |
| 09/07/2012 | 43 | TRANSCRIPT of MOTION HEARING PROCEEDINGS held on August 24, 2012, before Judge Sam E. Haddon. Tape Number: TRANSCRIPT OF MOTION HEARING PROCEEDINGS. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER, the Clerks Office or the court reporter. NOTICE: A NOTICE OF INTENT TO REQUEST REDACTION MUST BE FILED WITHIN 14 DAYS OF THIS FILING. Contact Court Reporter Tina Brilz, 406-899-8912, tinabrilz@hotmail.com. Transcript Redaction Procedures . Redaction Request due 9/28/2012. Redacted Transcript Deadline set for 10/9/2012. Release of Transcript Restriction set for 12/6/2012. (TCB, ) (Entered: 09/07/2012) |
| 09/11/2012 | 44 | Unopposed MOTION to participate in 9/14/2012 hearing by video conference J. Richard Orizotti appearing for Appellee Credit Suisse AG, Cayman Islands Branch (Attachments: # 1 Text of Proposed Order Proposed Order Granting Unopposed Motion to Participate in Hearing by Video Conference) (Orizotti, J.) (Entered: 09/11/2012) |
| 09/11/2012 | 45 | ORDER granting 44 Motion to Participate in Hearing by Video Conf. Signed by Judge Sam E Haddon on 9/11/2012. (ELL, ) (Entered: 09/11/2012) |
| 09/12/2012 | 46 | Unopposed MOTION for Leave to Appear by Video Conference *of Michael R. Lastowski* Benjamin P. Hursh appearing for Appellee Crossharbor Capital Partners, LLC (Attachments: # 1 Text of Proposed Order) (Hursh, Benjamin) (Entered: 09/12/2012) |
| 09/12/2012 | 47 | ORDER granting 46 Motion for Leave to Appear Video Signed by Judge Sam E Haddon on 9/12/2012. (ELL, ) (Entered: 09/12/2012) |

**Case No. 12-35986 ER 908**

| 09/12/2012 | 48 | Unopposed MOTION TO PARTICIPATE IN HEARING BY VIDEO CONFERENCE re 42 Order Setting Hearing on Motion,, Shane Coleman appearing for Appellee Marc S. Kirschner (Attachments: # 1 Text of Proposed Order) (Coleman, Shane) (Entered: 09/12/2012) |
| --- | --- | --- |
| 09/13/2012 | 49 | WITHDRAWAL of Motion re 24 Unopposed MOTION Michael J. Flynn to Appear Pro Hac Vice ( Filing fee $ 250 receipt number 0977-1100355.) filed by Timothy L. Blixseth . (Attachments: # 1 Exhibit A, # 2 Exhibit 1 (to Declaration)) (Fox, Patrick) (Entered: 09/13/2012) |
| 09/13/2012 | 50 | ORDERED: Appellant filed a Notice of Withdrawal of Application of Michael J. Flynn to be Admitted PHV on 9/13/12. 1. The application is recognized as withdrawn without determination as to the validity of objections to the application filed and of record. 2. The hearing previously set for 9/14/12 is VACATED. 3. Appellee Marc S. Kirschner's Motion to Participate in Hearing by Video Conf is DENIED as moot. Signed by Judge Sam E Haddon on 9/13/2012. (ELL, ) (Entered: 09/13/2012) |
| 11/16/2012 | 51 | MEMORANDUM AND ORDER. The February 25, 2011 Memorandum of Decision of the United States Bankruptcy Court is AFFIRMED. Signed by Judge Sam E Haddon on 11/16/2012. (ELL, ) (Entered: 11/16/2012) |
| 11/28/2012 | 52 | NOTICE OF APPEAL as to 51 Memorandum & Opinion by Timothy L. Blixseth. Filing fee $ 455, receipt number 0977-1158387. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Fox, Patrick) (Entered: 11/28/2012) |
| 11/28/2012 | 53 | USCA Case Number 12-35986 for 52 Notice of Appeal filed by Timothy L. Blixseth. (CRM, ) (Entered: 11/28/2012) |
| 11/28/2012 | 54 | USCA Scheduling Order as to 52 Notice of Appeal filed by Timothy L. Blixseth. (CRM, ) (Entered: 11/28/2012) |
| 12/28/2012 | 55 | TRANSCRIPT DESIGNATION ORDER FORM by Timothy L. Blixseth for proceedings held on 8/24/2012 before Judge Sam E. Haddon, Court reporter Tina Brilz, re 52 Notice of Appeal. Transcript due by 1/28/2013. (Fox, Patrick) (Entered: 12/28/2012) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 01/28/2013 13:27:42 | | |
| PACER Login: | mf2159 | Client Code: | blixseth-ferrigno |
| Description: | Docket Report | Search Criteria: | 2:11-cv-00073-SEH |
| Billable Pages: | 7 | Cost: | 0.70 |

**Case No. 12-35986 ER  909**

**NO. 12-35986**

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appeallate CM/ECF system on April 8, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CB/ECF system


April 8, 2013                                   s/ Christopher J. Conant

                                                Christopher J. Conant, Esq

## PROOF OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 8, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that the following individuals are not participants in this appeal but will receive service of the foregoing as they are interested parties to this appeal. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Evan R. Levy
George A. Zimmerman
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

April 8, 2013                                        /s/ Christopher J. Conant

                                                     Christopher J. Conant, Esq.