# Exhibit K

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 2 of 186

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 2 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
                                    Exhibit 2   Page 1 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 1 of 54

|   |   |
|---|---|
| 1 |   |
| 2 | **UNITED STATES DISTRICT COURT** |
|   | **DISTRICT OF NEVADA** |
| 3 |   |

DENNIS MONTGOMERY, et al.,    )    3:06-CV-0056-PMP (VPC)

      Plaintiffs,    )

      vs.    )    **ORDER RE: MOTION**
          )    **FOR SANCTIONS (#545)**

ETREPPID TECHNOLOGIES, LLC, et al.,    )

      Defendants.    )

Before the court is Michael Flynn's ("Mr. Flynn") motion for sanctions against Dennis Montgomery ("Mr. Montgomery"), the Montgomery Family Trust and Brenda Montgomery ("Montgomery parties"), their counsel of record, Deborah Klar, and her firm, Liner Yankelevitz Sunshine Regenstreif, LLP ("Liner firm")[1] pursuant to 28 U.S.C. § 1927 and/or pursuant to the court's inherent power (Case No. 06-56, #545). The parties filed the following papers in regard to this motion: Docket #s 545, 546, 547, 566, 567, 568, 571, 574, 589, 593, 595, 596, 597, 598, 599, 600, 601, 602, 603, 610, 613, 614, 620-25, 632, 633, 635-38, 649, 661, 664, 667, 674, 680, 683, 691, 698, 714, and 735.

This motion concerns Mr. Flynn's withdrawal as counsel for the Montgomery parties in July 2007, two declarations Mr. Montgomery filed with this court, and the litigation conduct of Deborah Klar ("Ms. Klar") and Teri Pham ("Ms. Pham") of the Liner firm as it concerns events in this action in the late summer and fall of 2007. After extensive briefing, this court held a day-long evidentiary hearing (Case No. 06-56, #826). The court concludes that the conduct of the Liner firm and its attorneys, Ms. Klar and Ms. Pham, was willfully reckless, intended to harass, done for an improper purpose, and was suffused with bad faith. The court also concludes that Ms. Klar and Ms. Pham unreasonably and vexatiously multiplied these proceedings, which resulted in an increased cost to Mr. Flynn, and that their conduct was in contempt of this court's orders. Finally, the court concludes that Mr. Montgomery's September 2007 declaration contained untrue statements, which he knew were untrue, and that this

---

[1] The Liner firm has since changed its name to Liner Grode Stein Yankelevitz Regenstreif & Taylor LLP.

EXHIBIT
2

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 3 of 186

09-00014-RBK  Doc#: 724-9  Filed: 12/21/12  Entered: 12/21/12 16:53:38  Page 3 of 55

Case 2:10-ap-01305-BB  Doc 54-2  Filed 07/16/10  Entered 07/16/10 13:40:06  Desc
Exhibit 2  Page 2 of 54
Case 3:06-cv-00056-PMP-VPC  Document 985  Filed 03/31/09  Page 2 of 54

1 | declaration was filed in bad faith and for the improper purposes of attempting to manipulate these

2 | proceedings, to gain a tactical advantage, to harass Mr. Flynn, his former counsel, and to subvert orders

3 | of this court. Therefore, Mr. Flynn' motion for sanctions pursuant to 28 U.S.C. § 1927 and/or pursuant

4 | to the inherent power of the court (Case No. 06-56, #545) is **GRANTED**.

5 | ## I. <u>FINDINGS OF FACT</u>

6 | **A.**  **The State District Court Proceeding – U.S. District Court Case No. 06-145**

7 |    1.   On January 19, 2006, eTreppid filed a complaint in the state district court against the

8 |      Montgomery parties, alleging in part that Mr. Montgomery misappropriated eTreppid's

9 |      trade secrets when he departed from the company in January 2006 (Case No. 06-145,

10 |      #16).

11 |    2.   This case was removed to this court on March 20, 2006 (Case No. 06-145, #1).

12 |    3.   Prior to the removal, the state district court held a hearing on February 7, 2006

13 |      concerning eTreppid's motion for preliminary injunction. *See* Ex.10, August 21, 2008

14 |      sealed evidentiary hearing in Case No. 06-56 ("sealed hearing").

15 |    4.   Appearing at the preliminary injunction hearing on behalf of the Montgomery parties

16 |      were local counsel, Ronald Logar and Eric Pulver, as well as Michael J. Flynn and Philip

17 |      Stillman. *Id.* Mr. Montgomery was also present and testified at the hearing. *Id.*

18 |    5.   At the beginning of that hearing, Mr. Logar advised the court as follows:

19 |         Mr. Flynn is a member of the Massachusetts Bar. The

20 |         application for *pro hac vice* has been made. The
Massachusetts Bar has sent a certificate of good standing

21 |         to the State Bar of Nevada. The State Bar of Nevada has
issued its approval. It was over-nighted yesterday to my

22 |         office. It should be received by Federal Express about
10:00 or 10:30 this morning, having complied with the

23 |         Supreme Court rule as to admission, and we ask that Mr.
Flynn be permitted to appear in this matter on behalf of

24 |         the defendant.

     *Id.*

25 |    6.   Mr. Montgomery was seated at counsel table with his attorneys at this hearing. Tr.

26 |      130:17-23, sealed hearing.

27 |

28 | 2

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 4 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 4 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 3 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 3 of 54

7.   The state district court allowed Mr. Flynn to appear based upon those representations. Ex. 10, sealed hearing. That same day, Mr. Logar filed the motion to associate counsel and provided Mr. Flynn's application, as well as his certificate of good standing with the State Bar of Massachusetts. Ex. 11, sealed hearing.

8.   The day before the state court preliminary injunction hearing, Mr. Montgomery met with his local and out-of-state counsel, Mr. Flynn, Mr. Stillman, and Mr. Logar, at Mr. Logar's law offices in Reno. Tr. 130:23-25:131:1-4, sealed hearing. Mr. Montgomery testified that he did not recall the exact nature of the problem, but remembered there was "a problem about the *pro hac vice* application or the mechanism or whatever." Tr. 131:5-12, sealed hearing.

9.   The day after the preliminary injunction hearing, Mr. Montgomery's counsel provided him with a fee agreement, which Mr. Montgomery never signed. Tr. 118:5-25; Ex. 14, sealed hearing.

10.   Messrs. Flynn, Logar, Stillman, and Pulver were present at the meeting, and Mr. Montgomery testified that it was Mr. Logar who actually gave him the agreement. Tr. 116:5-12, sealed hearing.

11.   Page two of the fee agreement provides: "Senior partners (Michael Flynn, only licensed in MA, Ron Logar) $200/hour (reg. $400)." Ex. 14, sealed hearing.

12.   The unsigned fee agreement also provides the following information:

   a)   a California address for Flynn & Stillman;
   b)   Flynn & Stillman are to be admitted *pro hac vice* in Nevada; and
   c)   any fee dispute is subject to jurisdiction of the State Bar of California.

   *Id.*

13.   Mr. Montgomery testified at the sealed hearing that he did not understand what "licensed," or "admitted" means in the context of the practice of law. Tr. 121:5-9; 148:4-5, sealed hearing.

14.   On March 20, 2006, the United States Department of Defense removed this action to the United States District Court (Case No. 06-145, #1).

3

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 5 of 186

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 5 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 4 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 4 of 54

15.   Messrs. Flynn and Stillman applied for *pro hac vice* admission, which this court approved (Case No. 06-145, #s 9 and 14). Mr. Flynn stated in his application he is licensed to practice law in Massachusetts and resides in California (Case No. 06-145, #9).

16.   Pursuant to the District Court's order of March 15, 2007, Case No. 06-145 was consolidated with a companion case originally filed with this court, Case No. 06-56 (Case No. 06-56, #123).

**B.   *The U.S. District Court Trade Secrets Proceeding – Case No. 06-56***

17.   On January 31, 2006, the Montgomery parties filed a parallel action in this court alleging copyright infringement and related claims against eTreppid and Warren Trepp (Case No. 06-56, #1).

18.   Once again, Messrs. Flynn and Stillman filed applications for *pro hac vice* admission, which this court approved (Case No. 06-56, #s 9, 10, 20). As with Mr. Flynn's prior *pro hac vice* application in Case No. 06-145, he attested that he is licensed to practice law in Massachusetts and resides in California (Case No. 06-56, #9).

19.   Mr. Flynn served as lead counsel for the Montgomery parties in these consolidated actions and all other proceedings pending in this court for approximately nineteen months until September 4, 2007, when the District Court granted Mr. Flynn's motion to withdraw as counsel (Case No. 06-56, #256).

20.   Just as these civil actions were underway, the United States sought and obtained a search warrant to search Mr. Montgomery's home and storage units. The court now turns to that proceeding.

**C.   *The Search Warrant Proceeding - Case No. 06-263.***

21.   On February 28, 2006 and on March 3, 2006, this court issued search warrants for the search of Mr. Montgomery's home and storage units (Case No. 06-263, #s 2, 5, 7, 9, 11, and 12).

4

22.  On March 10, 2006, Mr. Flynn, as lead counsel for Mr. Montgomery, filed a motion to unseal search warrant affidavits, for the return of the property, and for the segregation and sealing of all attorney-client and trade secrets materials seized (Case No. 06-263, #21).

23.  From March 2006 until November 2006, this court presided over motions and evidentiary hearings concerning these disputes, and on November 28, 2006, the court issued its order granting in part and denying in part Mr. Montgomery's motion to unseal the search warrants (Case No. 06-263, #86).

24.  Throughout this period, Mr. Flynn served as lead counsel for Mr. Montgomery in the search warrant proceeding.

25.  The United States filed its objection to this court's November 28, 2006 order, and the District Court affirmed that order on March 19, 2007 (Case No. 06-263, #122).

26.  During this interim period, several events occurred which are relevant to the court's consideration of Mr. Flynn's motion for sanctions.

27.  On February 7, 2007, Mr. Flynn, on behalf of Mr. Montgomery, sent a letter to the following:  United States Attorney General, Alberto R. Gonzalez; Deputy Attorney General, Paul J. McNulty; Edward Nucci, Acting Chief of the Public Integrity Section, U.S. Department of Justice; and Daniel Bogden, Nevada United States Attorney. Ex. 30, sealed hearing. The letter concerned the status of the search warrant proceedings and matters concerning the United States Attorney's office. *Id.*

28.  On February 9, 2007, Mr. Flynn sent another letter to Messrs. Gonzalez, McNulty, and Nucci concerning the status of the search warrant proceedings, Mr. Montgomery's work on behalf of the United States, and related matters.  Ex. 28, sealed hearing.

29.  Both letters expressed concerns about the Nevada United States Attorney's handling of the search warrant proceeding. Exs. 28 & 30, sealed hearing.

30.  Email communications among Mr. Flynn, his co-counsel, Carla DiMare, Mr. Montgomery, and Edra Blixseth ("Ms. Blixseth") indicate that these persons discussed

5

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 7 of 186

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 7 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 6 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 6 of 54

|    |     |     |
|----|-----|-----|
| 1  |     | the drafting of these letters and that Mr. Flynn sent final copies of the letters to Mr. |
| 2  |     | Montgomery via email.  *Id.*  The letterhead on these letters stated, "Michael J. Flynn, |
| 3  |     | admitted only in Massachusetts." Exs. 28 & 30, sealed hearing. |
| 4  | 31. | On February 13, 2007, just days after the letters were sent, the United States filed a |
| 5  |     | motion to strike pleadings filed by Mr. Flynn and to preclude his *pro hac vice* admission |
| 6  |     | to this court in the search warrant proceeding. Ex. 6, sealed hearing; (Case No. 06-263, |
| 7  |     | #110). |
| 8  | 32. | The United States challenged Mr. Flynn's representation of Mr. Montgomery in the |
| 9  |     | search warrant proceeding because although Mr. Flynn had been admitted *pro hac vice* |
| 10 |     | in the civil actions, he had not been admitted to appear in the search warrant proceeding. |
| 11 |     | Ex. 6, sealed hearing. The United States also directly challenged Mr. Flynn's statements |
| 12 |     | in his other *pro hac vice* applications that: (1) he regularly practices law in |
| 13 |     | Massachusetts; (2) he has a law office in Boston; (3) he actually resides in California; (4) |
| 14 |     | he has conflicting addresses for law offices in both California and Massachusetts; and |
| 15 |     | (5) although his letterhead states, "admitted only in Massachusetts," it appeared that Mr. |
| 16 |     | Flynn was practicing law in California.  *Id.* |
| 17 | 33. | In response, Mr. Flynn filed an opposition memorandum (Case No. 06-263, #113), and |
| 18 |     | both Mr. Flynn and Mr. Montgomery filed detailed declarations in support of the |
| 19 |     | opposition (Case No. 06-263, #s 114 & 115); Exs. 3 & 4, sealed hearing. |
| 20 | 34. | In both the opposition memorandum and Mr. Flynn's declaration, Mr. Flynn recited that |
| 21 |     | he is only licensed in Massachusetts, that he has appeared in jurisdictions throughout the |
| 22 |     | United States, that he maintains a Boston office address and a personal residence in |
| 23 |     | Massachusetts, and that he also has a residence in California. Ex. 4, sealed hearing. In |
| 24 |     | addition, Mr. Flynn stated that he has litigated cases in Massachusetts since 1991.  *Id.* |
| 25 | 35. | Mr. Flynn asserted in his opposition memorandum that the challenge to his |
| 26 |     | representation of Mr. Montgomery was in retaliation for his success in the search warrant |
| 27 |     | proceeding and for exposing alleged political corruption.  *Id.* |
| 28 |     |     |

6

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 8 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 8 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 7 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 7 of 54

36.     Mr. Montgomery's declaration, eight pages in length, recounted in great detail his work on national security matters, meetings with government officials at the highest levels, Mr. Negroponte's declaration in support of invocation on the military and state secrets privilege in the consolidated civil actions, and his concerns for the safety of United States military personnel. Ex. 3, sealed hearing.

37.     Attached to his declaration were two exhibits: a March 1, 2006 letter to Secretary of Defense Donald Rumsfeld, Secretary of Homeland Security Michael Chertoff, and Attorney General Alberto Gonzales, as well as several pages of written questions directed to Mr. Negroponte. *Id.*

38.     Mr. Montgomery testified that he recalled this letter, that it went through several drafts, but stated he did not recall seeing Mr. Flynn's letterhead, which states Mr. Flynn is only admitted in Massachusetts. Tr. 56:5-25; 57:1, sealed hearing. However, Mr. Montgomery then conceded that it was *not* his testimony that he never received Mr. Flynn's letterhead, but that he could not recall if he saw the final draft of this letter on Mr. Flynn's letterhead. Tr. 57:2-9, sealed hearing. Mr. Montgomery then stated he could not recall whether he knew Mr. Flynn was only licensed in Massachusetts as of the March 1, 2006 date of the letter. Tr. 57:10-12, sealed hearing.

39.     Mr. Montgomery made the following important attestations in his declaration:

   a)    that he had personal knowledge of the matters stated in his declaration, Ex. 3, sealed hearing;
   b)    that he had read the motion to disqualify his attorney, as well as the letters Mr. Flynn sent to government officials on Mr. Montgomery's behalf concerning the search warrant proceeding, *Id.* at ¶ 4;
   c)    that the "recent attempt to disqualify my attorney would gravely damage my constitutional protections. It is borne out of ignorance of the facts by the USAO, an agenda to attack me, and disregard for not only my rights, but the security of our Country" *Id.* at ¶ 13; and
   d)    "Given [Mr. Flynn's] experience, integrity, and litigation expertise, he is my counsel of choice, I strongly believe he will stand up to the corrupting influences of Warren Trepp, vigorously protecting my rights, and achieve justice in this matter." *Id.* at ¶ 14.

40.     At the sealed hearing, Mr. Montgomery testified that his February 2007 declaration was truthful when he signed it. Tr. at 24:8-10, sealed hearing. However, when asked about

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 9 of 186

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 9 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 8 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 8 of 54

specific statements in his own declaration or the motion to disqualify, Mr. Montgomery repeatedly testified he could not recall whether he had read the entire motion, that Mr. Flynn may have read portions of the motion to him, and that he really didn't recall whether the government's motion concerned the question whether Mr. Flynn was licensed to practice law only in Massachusetts, and was practicing law in California. Tr. 25:3-7; 27: 6-10; 31:4-22, sealed hearing.

41. When asked specifically whether the contents of paragraph four of the declaration were true, Mr. Montgomery testified that those statements were true. Tr. 53:13-25; 54:1-14, sealed hearing.

42. When asked whether he knew at the time that Mr. Flynn was licensed to practice law only in Massachusetts, Mr. Montgomery testified, "What's that mean to me? That didn't mean to me that you couldn't practice in California." Tr. 29:10-13; 42:8-13, sealed hearing.

43. Mr. Montgomery also reviewed Mr. Flynn's declaration in opposition of the government's motion to disqualify, which states: "Both Mr. Stillman and [Mr. Flynn] are licensed attorneys in Massachusetts where the firm was originally based. Mr. Stillman is licensed to practice in California, Mr. Sherdian, and Tab (phonetic), my former partners through 2002, were only licensed in Massachusetts." Ex. 4, sealed hearing. At the hearing, Mr. Flynn asked him, "Did you read that at the time the government was trying to throw your lawyer out and disqualify him in the middle of the search proceedings?" and Mr. Montgomery replied, "Probably." Tr. 26:7-10, sealed hearing.

44. The entire basis for Mr. Flynn's disqualification in the search warrant proceedings hinged on Mr. Flynn's bar licensure and the letters sent to high government officials just prior to the filing of the motion. Mr. Montgomery either read these critical papers, or he did not.

**D.**   ***Resumption of the Civil Proceedings in March 2007 and the Liner Firm's Entry as Counsel for the Montgomery Parties in July 2007***

45.   In September 2006, this court issued its order staying proceedings in the two civil cases pending disposition of the search warrant proceedings (Case No. 06-56, #84). It was not until March 2007, that the civil cases were consolidated and the case proceeded (Case No. 06-56, #123).

46.   On July 9, 2007, Mr. Flynn and his co-counsel, Ms. DiMare, moved to withdraw as counsel for the Montgomery parties based upon nonpayment of legal fees and the assertion that Mr. Montgomery had engaged in conduct that made continued representation unusually difficult (Case No. 06-56, #s 205 & 206).

47.   Since the United States had invoked the military and state secrets privilege, the withdrawal of counsel was not a routine motion, and it drew a response from the United States who sought to impose conditions on the withdrawal of former counsel concerning documents in the client file subject to the state secrets privilege (Case No. 06-56, #209).

48.   When the Liner firm stepped in to represent the Montgomery parties, Ms. Klar was designated as lead counsel, and she acted in that capacity until August 18, 2008, when Randall Sunshine and Ellyn Garofalo assumed the roles of lead counsel (Case No. 06-56, #815).

49.   Ms. Pham also initially represented the Montgomery parties, but only did so from July through November 2007, as she went on family leave (Case No. 06-56, #599). Thereafter, Ms. Pham made no appearances in the case, apart from the sanction proceedings.

50.   At the inception of their representation of the Montgomery parties, Ms. Klar and Ms. Pham knew that the United States had invoked the state secrets privilege and that it greatly affected the dissemination of documents relating to this proceeding, which might limit or prevent the Liner firm's access to Mr. Flynn's client files (Case No. 06-56, #213). The Liner firm strenuously objected to the government's potential access to client

9

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 11 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 11 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 10 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 10 of 54

files, and they also asked that Mr. Flynn and Ms. DiMarc be ordered to surrender the client files to new counsel upon entry of the order granting the motion to withdraw. *Id.* It was in this filing on July 26, 2007 that the Liner firm first raised a question about Mr. Flynn's residence in California and communications with the clients from California. *Id.*

51. On July 31, 2007, the District Court set a hearing on the motion to withdraw for August 17, 2007 (Case No. 06-56, #223).

52. Although neither this court nor the District Court had any reason to know of the escalating disputes among Mr. Montgomery, Mr. Flynn, and the Liner firm, the court now understands more fully what transpired.

53. Mr. Flynn wished to be paid past due attorney's fees and costs in excess of $635,000, and the Montgomery parties did not wish to pay him. As new counsel, the Liner firm wanted Mr. Flynn's client files, but on its terms and in a forum of its choosing.

54. The court now turns to the events that occurred in this action in Nevada, California and Massachusetts.

55. In July and August 2007, the Liner firm and Mr. Flynn communicated about transferring representation of the Montgomery parties to the Liner firm, a routine practice among counsel; however, they could not agree on surrender of the client files or the fee dispute (Case No. 06-56, #s 599 & 600).

56. On July 31, 2007, Mr. Flynn and Ms. Pham had a telephone conference concerning Mr. Flynn's withdrawal as counsel (Case No. 06-56, #240). Counsel discussed Mr. Flynn's claim to a retaining lien under Nevada law, as well as the government's position concerning the propriety of any transfer of client files until redaction issues were resolved. *Id.* Mr. Flynn attests that Ms. Pham would not acknowledge the effect of the retaining lien or the government's position concerning the client files *vis-a-vis* the state secrets privilege. *Id.* Based upon this communication, Ms. Pham and Ms. Klar had notice of the Nevada retaining lien.

57.    Presumably, Ms. Klar and Ms. Pham immediately researched Nevada law and discovered that unlike many jurisdictions, including California, Nevada law allows attorneys to file a retaining lien over client files until the client either pays the outstanding fees or posts a bond to obtain the files.

**E.**    ***August 2007 – United States District Court and Los Angeles Superior Court***

58.    **August 1, 1007** – The Montgomery parties terminated Mr. Flynn as counsel. *Id.*

59.    **August 3, 2007 – The Los Angeles County Superior Court Complaint:** Ms. Klar and Ms. Pham filed a complaint for preliminary and injunctive relief in Los Angeles Superior Court on behalf of the Montgomery parties. Ex. 16, sealed hearing. The complaint alleged in relevant part:

     a)    The plaintiffs met with Mr. Flynn on January 26, 2006, but do not state where the meeting occurred;

     b)    Mr. Flynn led the parties to believe that he was a California lawyer and that he had a law firm in California;

     c)    Mr. Flynn held himself out as a California lawyer "[t]hroughout the course of his representation," that invoices were sent from California, and that Mr. Flynn listed a California address on all pleadings filed with this court;

     d)    At no time did Mr. Flynn ever advise the plaintiffs he was *not* licensed to practice law in California (emphasis added);

     e)    Mr. Flynn never provided the plaintiffs with a written fee agreement.

60.    Plaintiffs alleged that notwithstanding their demand to turn over client files, Mr. Flynn refused to do so in violation of the California Rules of Professional Conduct. *Id.*

61.    However, when Ms. Klar and Ms. Pham filed this complaint, they knew the following: 1) that the turnover of the client files and matters concerning the state secrets privilege were pending before this court; 2) that the District Court had set Mr. Flynn's motion to withdraw for hearing on August 17, 2007, at which time the Court would consider the client file dispute in light of the state secrets privilege (Case No. 06-56, #223); and, 3) Mr. Flynn claimed a retaining lien under Nevada law (Case No. 06-56, #240).

62.    Mr. Montgomery testified that he reviewed this complaint before it was filed, but could not recall whether he conducted any investigation concerning the allegations in the complaint. Tr. 111:19-25; 112:1-12, sealed hearing.

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 13 of 186
09-00014-RBK    Doc#: 724-9    Filed: 12/21/12    Entered: 12/21/12 16:53:38    Page 13 of 55

Case 2:10-ap-01305-BB    Doc 54-2    Filed 07/16/10    Entered 07/16/10 13:40:06    Desc
Exhibit 2    Page 12 of 54
Case 3:06-cv-00056-PMP-VPC    Document 985    Filed 03/31/09    Page 12 of 54

63. However, Mr. Montgomery did acknowledge he knew before the complaint was filed that Mr. Flynn's letterhead stated, "admitted only in Massachusetts." Tr. 111:15-18, sealed hearing.

64. Mr. Montgomery also testified that Mr. Flynn was representing him in Nevada and that he knew of no legal proceedings in which Mr. Flynn represented him in California. Tr. 40:7-12, sealed hearing.

65. With regard to the allegation in the complaint that Mr. Flynn never informed Mr. Montgomery that he was not a licensed to practice law in California, Mr. Montgomery could not recall whether he ever actually asked Mr. Flynn whether he was a California lawyer. Tr. 113:15-25; 114:1-4, sealed hearing.

66. **August 8, 2007 – Mr. Flynn Files Notice of Lodgement:**    Mr. Flynn removed the California Superior Court action to the United States District Court for the Central District of California, accompanied by a notice of lodgment of exhibits. Ex. 7, sealed hearing. This filing provided the Liner firm with extensive documentation about Mr. Flynn's admission to the State Bar of Massachusetts, and related papers concerning his relationship with Mr. Montgomery during their attorney-client relationship. *Id.*

67. Ms. Pham testified that she reviewed the materials Mr. Flynn provided. Tr. 217:7-13, sealed hearing.

68. **August 17, 2007 – District Court Hearing on Mr. Flynn and Ms. DiMare's Motion to Withdraw:**

The District Court heard Mr. Flynn's motion to withdraw and considered the government's concerns about the United States protective order. This hearing was the court's first real inkling of the dispute over fees and the client file (Case No. 06-56, #247). Ms. Klar of the Liner firm advised the court that she had filed suit against Mr. Flynn in California on behalf of the Montgomery parties, but neither the District Court nor this court had an understanding of exactly how that proceeding related to the events unfolding in this action. Given the complexity of the matters before the court, the

12

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 14 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 14 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 13 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 13 of 54

1    District Court was unclear whether it should become embroiled in this dispute, or

2    whether the matter ought to be addressed by a California court (Case No. 06-56,

3    Transcript of August 17, 2007 hearing, pages 25-28 (#267). The District Court took Mr.

4    Flynn's motion to withdraw under submission. At the August 17th hearing, Mr. Flynn

5    told the Court and counsel that he and Mr. Montgomery communicated very extensively

6    via email correspondence over the nineteen months of his representation (Case No. 06-

7    56, #267, Transcript of August 17, 2007 hearing, p. 20:19-25, p. 21-23). Mr. Flynn

8    estimated that they exchanged in excess of one thousand emails and that apart from very

9    few original documents, they transmitted all other documents in this fashion. *Id.* The

10   Court asked Ms. Klar whether she had access to Mr. Montgomery's emails, and she

11   replied that she did. *Id.* at 23:24-25; 24:1-3.

12   69.   **August 17, 2007 – Mr. Flynn and Ms. DiMare File Lien Notices:**

13   Mr. Flynn and Ms. DiMare filed "notices of lien and/or retaining lien pursuant to N.R.S.

14   § 18.015 and cases over the papers and property of the Montgomery parties for unpaid

15   fees and costs" (Case No. 06-56, #s 243, 245 & 246).

16   70.   **August 21, 2007 – Mr. Flynn Files Motion for Attorney's Fees and Costs:**

17   Mr. Flynn filed a motion for attorney's fees (Case No. 06-56, #248), and it is Mr.

18   Montgomery's declaration filed in opposition to this motion (Case No. 06-56, #261),

19   which is, in part, the subject of Mr. Flynn's motion for sanctions.

20   71.   **August 29, 2007 – District Court Issues United States Protective Order:**

21   The District Court issued the United States protective order (Case No. 06-56, #252). The

22   United States supported its motion under the military and state secrets privilege with the

23   declaration of John Negroponte, formerly Director of National Intelligence, and a

24   classified declaration, which the District Court reviewed *in camera* (#252). A

25   companion order concerned protocols for information subject to disclosure or discovery

26   in the action (Case No. 06-56, #253).

27

28                                    13

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 15 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 15 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 14 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 14 of 54

72.     **August 31, 2007 – Liner Firm Files Notice of Objection to Retaining Liens:**

Ms. Klar and Ms. Pham filed a notice of objection to the retaining lien (Case No. 06-56, #254) and objected to the lien on the ground that the California Superior Court had jurisdiction over the matter because they had already filed the complaint.

F.     *September 2007*

73.     **September 4, 2007 – District Court Grant's Mr. Flynn and Ms. DiMare's Motion to Withdraw:**

Having considered the arguments of the parties on August 17, 2007, the District Court granted Mr. Flynn and Ms. DiMare's motion to withdraw and further ordered:

> that to the extent the Montgomery Plaintiffs seek to condition the withdrawal of Flynn and DiMare on Flynn and DiMare surrendering their complete "client file" to new counsel of record for Plaintiffs (Doc. #213), said precondition is rejected by the Court. In this regard, the record before the Court does not support the finding that Flynn and DiMare have withdrawn "voluntary" as counsel for Montgomery Plaintiffs, In the Matter of Kaufman, 93 Nev. 452, 567 P.2d 857 (1977), nor does it appear on the record before the Court that Flynn and DiMare should be compelled to surrender their files to new counsel of record. Figliuzzi v. Fed. Dist. Court, 111 Nev. 338, 890 P.2d 798 (1995).

(Case No. 06-56, #256, p. 4:12-20).

74.     At the sealed hearing, Ms. Pham testified that she had not actually read *Kaufman* or *Figliuzzi* at the time the District Court issued its order, but she agreed that these cases stand for the proposition that where a lawyer has not withdrawn voluntarily, Nevada law provides that the lawyer is not compelled to surrender the client file. Tr. 195:24-25; 196:1-25; 197:1-19, sealed hearing.

75.     Ms. Pham also agreed that at the August 17, 2007 hearing, the District Court was very concerned about the disputed client files insofar as it concerned the United States Protective Order. Tr. 198:18-25; 199:1-3, sealed hearing.

14

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 16 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 16 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 15 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 15 of 54

76. **September 7, 2007 – Liner Firm Submits Application for Arbitration of Fee Dispute with San Diego County Bar Association:**

Ms. Klar and Ms. Pham submitted an application for arbitration of a fee dispute to the San Diego County Bar Association and stated the amount in dispute as $1,838,959.50 (Case No. 06-56, #597-6, Ex. 11). Ms. Pham and Ms. Klar's statement of the facts allege that Mr. Flynn held himself out as a California lawyer, as set forth in their California Superior Court complaint, but they disclosed no information whatsoever concerning the pending proceedings in this court. *Id.*

77. Mr. Montgomery knew Ms. Klar and Ms. Pham filed this application for arbitration of the fee dispute. Tr. 140:16-18, sealed hearing.

78. Three months later, on December 3, 2007, the San Diego Bar Association responded that it had no jurisdiction and stated:

> Based on the Court Orders of the United States District Court, District of Nevada and the Superior Court of California for Los Angeles County, it is clear that the District of Nevada has taken control of the entire case filed by the applicants . . . including the issue of attorney fees and costs. The Superior Court for the County of Los Angeles has declined jurisdiction.
>
> In a matter where there is a court determination of attorney fees and costs between the application and his, her or its attorney, this committee has no jurisdiction to hear the matter. . . . In this matter, the US District Court for the District of Nevada has clearly indicated that it will make that determination. The matter is dismissed without prejudice.

(Case No. 06-56, #597-6, footnotes omitted).

79. After submitting the September arbitration application, Ms. Pham did not notify the San Diego Bar Association of this court's October 12, 2007 order (Case No. 06-56, #296), nor did she notify them of the Los Angeles Superior Court's November 21, 2007 order (Case No. 06-56, #597-6), as she believed Mr. Flynn had done so. Tr. 218:13-23; 220:3-12, sealed hearing. When asked why she did not withdraw the fee arbitration application after these orders were issued, Ms. Pham responded that she believed she had a

15

1   conversation with someone at the Bar Association, she was under the impression the

2   application would be denied, and Mr. Flynn had already submitted the orders.  Tr.

3   219:18-25; 220:1-12, sealed hearing.

4   80.   **September 10, 2007 – Mr. Montgomery's September 10, 2007 Declaration**

5   The Liner firm filed an opposition to Mr. Flynn's motion for attorney's fees and attached

6   Mr. Montgomery's declaration, which attested in relevant part as follows:

7       a)    In January 2006, I was introduced to attorney Michael J. Flynn by my local counsel, Ronald Logar;

8       b)    Mr. Flynn led me to believe at that time and throughout his representation that he was a California attorney, and I believed that I was engaging a California

9              lawyer to represent me. Specifically, he told me that he had a law firm, Flynn & Stillman, in California, and I met with him at his offices in Cardiff, California;

10       c)    All of his invoices were sent from California, and all payments were remitted to California;

11       d)    All of the papers Mr. Flynn filed with the court listed a California address; and

    e)    At no time did Mr. Flynn ever inform me that he was not and is not licensed to

12              practice in the State of California *or that he is licensed to practice only in Massachusetts.* I only learned of this when I retained new counsel.

13   (Case No. 06-56, #261) (emphasis added).

14   81.   At the sealed hearing, Mr. Montgomery testified that although he initially met Mr. Flynn

15   in Reno in January 2006, he believed Mr. Flynn was a California lawyer because he had

16   offices in California. Tr. 17:23-25; 18:1, sealed hearing.  Although he testified he went

17   into a law office in Cardiff, California, Mr. Montgomery could not recall on what floor

18   the office was located, whether the office had any desks, and he could not recall who else

19   was in the office. Tr. 18:2-9 & 14-18, sealed hearing. When pressed about the details of

20   this office visit, Mr. Montgomery stated, "I didn't say I met you *in* the office," but could

21   not recall who was in the office Mr. Montgomery visited. Tr. 18:24-25; 19:1, sealed

22   hearing (emphasis added).  When asked to explain additional details of this visit, Mr.

23   Montgomery's responded six times that he could not remember or recall. Tr. 19:9-20;

24   20:1-2, sealed hearing.  Later, Mr. Montgomery testified he recalled meeting Mr. Flynn

25   in an office, but could not recall whether it was "inside" or "outside" the office. Tr. 21:7-

26   14, sealed hearing.

27

28

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 18 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 18 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 17 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 17 of 54

82. The court finds that paragraph seven of Mr. Montgomery's declaration is particularly important because he attested "[a]t no time did Mr. Flynn ever inform me that he was not licensed and is not licensed to practice in the State of California, *or* that he is licensed to practice only in Massachusetts." Ex. 1, sealed hearing (emphasis added).

83. Mr. Flynn examined Mr. Montgomery extensively about paragraph seven of his declaration and offered several exhibits about their communications prior to his withdrawal as counsel. Exs. 5, 9, 15, 20, 21, 23, 28, 29, 30, 31, & 32, sealed hearing.

84. These exhibits demonstrate a pattern in Mr. Flynn and Mr. Montgomery's attorney-client relationship of extremely frequent and detailed communications about every aspect of the actions pending in this court, and given the gravity of the letters sent to high ranking government officials and the papers filed with this court, it is difficult to imagine that Mr. Montgomery did not know that Mr. Flynn was "admitted only in Massachusetts," as his letterheads states.

85. Prior to signing his September 10, 2007 declaration, Mr. Montgomery could not recall whether he reviewed or discussed the notice of lodgement sent to his new counsel, whether he reviewed the search warrant docket sheet provided to Ms. Pham and Ms. Klar, whether he reviewed letters Mr. Flynn provided to his new counsel stating he was admitted only in Massachusetts, whether he reviewed the transcript of the February 2006 preliminary injunction proceeding provided to his new counsel, or whether he did anything to confirm that Mr. Flynn was admitted to practice law only in Massachusetts. Tr. 106:18-25; 107:1; 107:20-25; 108:1-25; 109:1-5; 14-25; 110:1-23; 132:4-25, sealed hearing. However, he conceded that he "must have seen" the title pages of papers filed with this court, which identify Mr. Flynn as having a Massachusetts bar number. Tr. 128:20-25; 130:1-8, Ex. 9, sealed hearing.

86. Mr. Montgomery's testimony about his understanding of the words "admitted" and "licensed" as they concern bar admission is inconsistent and not credible. Mr. Montgomery testified that he did not know what the term "admitted" or "licensed"

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 19 of 186

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 19 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 18 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 18 of 54

1    meant, and that although he saw Mr. Flynn's letterhead which stated "only admitted in

2    Massachusetts," Mr. Flynn never told him he was only licensed to practice in

3    Massachusetts, and they never discussed what it meant. Tr. 148:4-23; 153:25; 154:1

4    However, Mr. Montgomery could not recall if he asked Mr. Flynn whether he was

5    licensed in California. Tr. 152:15-19, sealed hearing. He only learned after he retained

6    new counsel that a lawyer admitted in one state had to be approved by another state to

7    appear in a particular case. Tr. 148:24-25; 149:1-7, sealed hearing.

8    87.   When pressed to recall the time frame in which Mr. Montgomery first understood the

9          meaning of "admitted" and "licensed," he could not recall whether he learned this from

10         Ms. Klar or Ms. Pham before or after he signed his September 10, 2007 declaration, and

11         he then testified that he did not understand these words when he signed his declaration.

12         Tr. 149:15-25; 150:1-19; 151:23-25; 152:1-14, sealed hearing.

13   88.   The court finds that there is a very simple reason that Mr. Flynn and Mr. Montgomery

14         never discussed whether Mr. Flynn was licensed to practice law in California:  Mr.

15         Montgomery hired Mr. Flynn to represent him in the search warrant proceedings and the

16         trade secret litigation pending in the District of Nevada.  There was no reason to discuss

17         Mr. Flynn's admission to practice law in California, Florida, New York, or any other

18         state, as long as Mr. Flynn was properly admitted to practice law before this court, which

19         he was.

20   89.   The court finds that as of September 10, 2007, Mr. Montgomery *knew* that Mr. Flynn had

21         been admitted to practice in the District of Nevada because he was in the courtroom in

22         February 2006 when Judge Perry allowed Mr. Flynn to proceed, and *knew*, or reasonably

23         should have known, that Mr. Flynn was admitted to practice law in Massachusetts,

24         because it was discussed in open court and appeared in letters and court filings.  Even if

25         Mr. Montgomery may not have appreciated the importance of Mr. Flynn's admission to

26         practice in the state court and his status as a Massachusetts lawyer at that time, he surely

27

28                                              18

understood the significance of this issue in February 2007, when the United States tried to disqualify Mr. Flynn as his counsel in the search warrant proceeding.

90.   Ms. Pham also testified about Mr. Montgomery's September 10, 2007 declaration. She told the court that she drafted the declaration based on her discussions with Mr. Montgomery and believed that she had completed proper due diligence to draft it. Tr. 165:4-23, sealed hearing.

91.   Although Ms. Pham acknowledged Mr. Flynn's Massachusetts bar number on papers routinely filed in all proceedings in this court, and his "admitted only in Massachusetts" letterhead, she concluded that Mr. Montgomery had not understood what it meant to be "admitted" or "licensed" in a state, nor had he understood that Mr. Flynn was not licensed to practice law in California. *Id.*

92.   Based on her discussions with Mr. Montgomery, Ms. Pham believed that since Mr. Montgomery thought Mr. Flynn was a California lawyer, California law governed the attorney-client relationship. Tr. 166:2-20, sealed hearing.

93.   In drafting paragraph seven of Mr. Montgomery's declaration, Ms. Pham believed it was truthful because Mr. Montgomery did not clearly understand what being licensed, admitted or authorized to practice law in a jurisdiction actually meant. Tr. 176:6-17, sealed hearing.

94.   Although Ms. Pham saw Mr. Flynn's "admitted only in Massachusetts" letterhead, she believed that since it did not say "licensed only," and Mr. Flynn never affirmatively told Mr. Montgomery he was *not* licensed to practice law in California, this created confusion in the mind of a layperson like Mr. Montgomery. Tr. 167:19-25; 168:1-9, sealed hearing.

95.   Ms. Pham testified that she believed paragraph seven to be accurate, notwithstanding that she reviewed Mr. Flynn's papers filed with the court and Mr. Flynn's "admitted only in Massachusetts" letterhead for more than a year and a half. Tr. 181:25; 182:1-24, sealed hearing.

19

96.    **September 12, 2007– Liner Firm's *ex parte* Application for Writ of Possession:** Two days after they filed the opposition to Mr. Flynn's motion for attorney's fees, Ms. Klar and Ms. Pham filed *an ex parte* application for writ of possession in the Los Angeles Superior Court proceedings (Case No. 06-56, #597-2, Ex. 1). Mr. Montgomery's September 10, 2007 declaration was also attached to the application. *Id.*

97.    The application states:

> Flynn's sole purpose in retaining those [client] files, is to extort money from the Montgomery parties, which he claims he is owed under some alleged fee agreement. California does not allow attorneys performing functions in this state to take such abusive positions, and this Court should enter an immediate routine order and Writ of Possession under these circumstances.

*Id.* at p. 2.

98.    The application further states that good cause exists for an *ex parte* order or, alternatively, an order shortening time, because this court ordered parties to prepare a joint case management report in the trade secrets action, Case No. 06-56. *Id.* Ms. Pham noted that Mr. Flynn claimed a right to a retaining lien under Nevada law and alluded to the District Court's order granting a retaining lien over the files and the United States protective order in footnotes. *Id.* at p. 3, n. 1 & 2. Ms. Pham added, "Accordingly, it is now crucial that the Montgomery Parties obtain all of their client files immediately in order to comply with the Nevada District Court's Order." *Id.* at p. 4. The majority of the application is devoted to a discussion of California law and the California Rules of Professional Conduct. *Id.*

99.    Ms. Pham testified that since the Liner firm filed the California action in early August, and she believed nothing had occurred in District Court here in Nevada insofar as the client files were concerned, she filed the *ex parte* application for writ of possession, gave Mr. Flynn proper notice, and appeared the next morning before Commissioner Greenberg. Tr. 168:16-25; 169:1-7, sealed hearing.

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 22 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 22 of 55

Case 2:10-ap-01305-BB    Doc 54-2    Filed 07/16/10   Entered 07/16/10 13:40:06    Desc
Exhibit 2    Page 21 of 54
Case 3:06-cv-00056-PMP-VPC    Document 985    Filed 03/31/09   Page 21 of 54

100.   Ms. Pham had attached the District Court's September 4, 2007 order to her *ex parte* application, but she nevertheless believed that she had a right to seek a turnover of the files from a California court. Tr. 169:18-25; 170:1-1-2, sealed hearing.

101.   Ms. Pham sought the writ of possession on an *ex parte* basis because she was concerned that the Liner firm would not have the client files in time to meet case management deadlines in this action. Tr. 170:1-10, sealed hearing. Ms. Pham's testimony and the representations made in the *ex parte* application are inconsistent with Ms. Klar's admission to the District Court in Nevada on August 17, 2007, that she had access to Mr. Montgomery's files.

102.   Ms. Pham testified that *ex parte* applications for writs of possession are routinely held in chambers, and she outlined the basis for her application with Commissioner Greenberg who decided an emergency did not exist to warrant issuance of a writ of possession. Rather, he suggested Ms. Pham file the application as a fully noticed motion, which she did. Tr. 169:18-20; 170:10-20, sealed hearing.

103.   **September 18, 2007– Liner Firm's emergency *ex parte* application for clarification of order re motion to withdraw by Michael Flynn:**

       Ms. Klar and Ms. Pham sought clarification of the District Court's September 4, 2007 order, and made two important statements (Case No. 06-56, #274). First, they contended that no specific motion had been made to this court concerning the client files, and the issue had not been fully briefed. *Id.* Specifically, no argument or briefing was provided on the issue of choice of law and whether California, Nevada, or Massachusetts law applied. *Id.* Second, they asserted that if the court intended to adjudicate these issues, the Liner firm requested leave to file a brief and present oral argument. *Id.*

104.   The tenor of this motion was clear: to the extent the Liner firm sought clarification about these issues, it implicitly asked this court to consider the issue, not another forum. *Id.* In fact, they even asked to submit briefs on the choice of law issue to this court. *Id.*

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 23 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 23 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 22 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 22 of 54

105. In response, the District Court issued its October 4, 2007 order and denied the motion for clarification. The Court found its prior order clear and unambiguous and further stated, "Montgomery has not moved *in this Court for a return of his client files under Nevada or any other applicable law.* The Court's denial of Montgomery's Motion . . . therefore is without prejudice to file a fully briefed motion for return of the file, including argument that law other than Nevada's applies to such an inquiry" (Case No. 06-56, #291) (emphasis added).

106. Notwithstanding the District Court's invitation to file a motion *in this court* concerning the choice of law issue, the Liner firm never did so.

107. Ms. Pham testified that the District Court's October 4, 2007 order denying the motion for clarification made it clear that even though the District Court had earlier stated that Nevada law (*Kaufman* and *Figliuzzi*) did not require former counsel to surrender the client files to new counsel, the Liner firm could actually take possession of the client files pursuant to this most recent order. Tr. 199:16-25; 200:1-15, sealed hearing.

108. In addition, Ms. Pham testified that the October 4, 2007 order indicated that no determination had been made as to what law applied, so she construed this to mean that any law could apply to the matter of the client files, including Nevada, California, or Massachusetts. Tr. 200:16-25; 201:1-25; 202:1-4, sealed hearing.

109. The District Court's September 4, 2007 order granted Mr. Flynn and Ms. DiMare a retaining lien on the client files under Nevada law, and the District Court made its conclusion abundantly clear by its citation to *Kaufman* and *Figliuzzi*. As a result, Mr. Flynn retained possession of the files until such time as the Montgomery parties either paid the attorney's fees or posted a bond. Ms. Klar and Ms. Pham did neither.

110. The October 4, 2007 order did not alter the *status quo;* rather, the District Court stated that if the Montgomery parties wished to contest what state's law applied to the client files, they could file a motion *in this court.* Ms. Klar and Ms. Pham never did so.

22

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 24 of 186

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 24 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 23 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 23 of 54

111.   The court finds that Ms. Pham and Ms. Klar did not do so because they already knew that Mr. Flynn had a retaining lien under Nevada law, and they did not want to litigate the choice of law issue in a forum that might rule against their cause, namely, to get the client files without posting a bond or paying Mr. Flynn. Ms. Pham and Ms. Klar also apparently did not wish to be hampered by the United States protective order and the District Court's imposition of conditions for the turnover of the client files, so they continued to pursue their litigation strategy for the client files in California.

112.   **September 25, 2007 - Request for Investigation to Office of Bar Counsel for the Commonwealth of Massachussetts (Case No. 06-56, #597-6, Ex. 13):**

In addition to the proceedings now pending in this court, Los Angeles County Superior Court, and the San Diego Count Bar Association, Ms. Pham next submitted a request for investigation of Mr. Flynn with the Massachusetts Bar Counsel. *Id.* Most telling about this request is what Ms.Pham *failed* to include in this request. The statement of facts summarizes Mr. Flynn's failure to surrender client files, the allegation that Mr. Flynn improperly held himself out as a California lawyer, and attached are the Montgomery parties' termination letter to former counsel and the Los Angeles County Superior Court complaint. *Id.* However, there is no disclosure whatsoever concerning any orders that this court issued. *Id.*

113.   Although Mr. Montgomery authorized the Liner firm to file this bar complaint, he could not recall the basis for the complaint, nor did he know whether Bar Counsel was notified of this court's orders concerning the client files. Tr. 139:20-25; 140:4-9, sealed hearing.

114.   Ms. Pham testified that the timing of the submission of the bar complaint in Massachusetts had nothing to do with this court's orders concerning the client files at about the same time; rather, it was simply a function of the time it took to obtain the form and submit the complaint. Tr. 172:13-25; 173:1-11, sealed hearing.

115.    Mr. Flynn was admitted *pro hac vice* to practice before this court, and the client files and fee dispute concerned cases pending in this court; however, Ms. Pham never filed any complaint with the Nevada State Bar because she believed that the only tribunal that could discipline Mr. Flynn was Massachusetts. Tr. 215:14-25; 216:1-25; 217:1-6, sealed hearing.

116.    The court finds that Ms. Klar and Ms. Pham did not avail themselves of procedures afforded attorneys admitted *pro hac vice* in this court because it was inconsistent with their litigation strategy to remove the issues concerning possession of client files and attorney's fees from this court's jurisdiction.

117.    On October 31, 2007, the Assistant Massachusetts Bar Counsel responded to the bar complaint (Case No. 06-56, #597-5, Ex. 14). It states,

> You did not mention in your complaint that the United States District Court, District of Nevada, entered detailed and comprehensive orders with respect to the transmission of the files. Attorney Flynn was admitted *pro hac vice* in the Nevada Court and as such, in connection with that proceeding, is subject to the standards of professional conduct as adopted by the Nevada Supreme Court.

*Id.*

118.    The Assistant Bar Counsel also noted that he had learned the file may contain military or states secrets, making this court the proper forum "to determine procedures and restrictions with respect to transfer of the files in these circumstances, and *it appears they have maintained jurisdiction over that precise issue." Id.* (emphasis added).

119.    The letter concludes by stating that the only connection Massachusetts had to the matter is that Mr. Flynn is licensed in that state; however, it was for other courts to sort out, especially in light of national security issues, and Assistant Bar Counsel declined to interfere in pending litigation. *Id.* As for claims that Mr. Flynn held himself out as a

24

California lawyer, the proper forum to address such concerns was the California State Bar. *Id.*[2] The filed was closed. *Id.*

120.  Ms. Pham testified that upon receipt of this court's October 12, 2007 order (Case No. 06-56, #296), the Liner firm "commenced" no further actions, but did not notify Massachusetts Bar Counsel of this court's order, as she believed Mr. Flynn had done so. Tr. 222:10-25; 223:1.

121.  When asked why Ms. Pham did all of this, she offered this explanation:

   a)   Because the client files were located in California, she thought it was proper to file the August 2007 complaint in California;
   b)   Three weeks later, Mr. Flynn filed a motion for attorney's fees in this court, and Ms. Pham believed that notwithstanding the District Court's orders, she could proceed in California; and
   c)   It was not until this court's October 12, 2007 order that Ms. Pham understood that the District Court in Nevada had jurisdiction over these issues, and she "commenced" no further proceedings.

Tr. 223:2-20, sealed hearing.

122.  **October 12, 2007-- Order on Motion by Mr. Flynn for Attorney's Fees and Costs:** Having in mind the District Court's August 29, 2007 orders granting the United States' motion for protective order governing military and state secrets (Case No. 06-56, #s 252 & 253), its September 4, 2007 order granting Mr. Flynn's motion to withdraw, and its October 4, 2007 order denying the Montgomery parties' motion for clarification (Case No. 06-56, #s 252, 253, 256 & 291), this court issued an order concerning Mr. Flynn's motion for attorney's fees and costs (Case No. 06-56, #296).

123.  By this time, this court was keenly aware of the Liner firm's litigation strategy, which included the California Superior Court action, an application for fee arbitration with the San Diego County Bar Association, and the Massachusetts State Bar complaint. In fact, this court noted in its order:

---

[2]There is nothing in the record indicating that Ms. Pham and Ms. Klar referred this matter to the California State Bar; they only sought arbitration of the fee dispute with the San Diego County Bar Association.

> The court observes that in the face of the District Court's September 4, 2007 order that Flynn and DiMare would not be compelled to surrender their files to new counsel of record, *see* #256, Montgomery has continued to pursue another forum to adjudicate the fee dispute, namely California. In his California Superior Court action, Montgomery seeks relief that is contrary to the District Court's order.

*Id.* at p. 3, n. 3.

124.    This court took jurisdiction of the fee dispute and observed that because the fee dispute implicated Mr. Flynn's conduct as the Montgomery parties' counsel as a lawyer admitted *pro hac vice*, this court was "the obvious and proper forum" for resolution of this fee dispute. *Id.* at p. 5.    Furthermore, the court reiterated that the District Court had earlier concluded that Mr. Flynn's withdrawal was not voluntary and did not revisit that issue. *Id.* at 3, n. 4. This court noted – just in case the Liner firm still did not understand – that this court took jurisdiction of both the attorney's fee dispute and the client file dispute. *Id.* at 5, n. 5.

125.    Because the Liner firm had initiated this flurry of proceedings concerning the client files and the fee dispute, the court went to great lengths to discuss Nevada law insofar as charging liens and retaining liens are concerned, and it discussed in detail the two Nevada cases cited in the District Court's September 4, 2007 order: *Figliuzzi v. Eighth Judicial District Court*, 111 Nev. 338 (1995) and *In re Kaufman*, 93 Nev. 452 (1977). *Id.* These are the two pivotal cases that Ms. Pham later testified she had not read at the time.

126.    This court did so for the simple reason that despite several orders of this court, Ms. Klar and Ms. Pham either did not appear to understand the import of these orders, or they elected to ignore them and shop for a friendlier forum.

127.    The court suspected the latter was true, and it knew that the writ of possession was scheduled for hearing on October 18, 2007.    Therefore, it took the unusual step of ordering the Liner firm to deliver of copy of its order to the presiding judge in the

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 28 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 28 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 27 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 27 of 54

California Superior Court action. *Id.* Unfazed and undaunted, Mr. Klar and Ms. Pham pressed on with the October 18, 2007 hearing.

128.   **October 18, 2007 Hearing on Writ of Possession in Los Angeles County Superior Court (Case No. 06-56, #597-5, Ex. 8):**

On October 18, 2007, Ms. Pham and Ms. Klar appeared before Commissioner Victor Greenberg, Ms. DiMare appeared on behalf of Mr. Flynn and herself, and Ms. Wells appeared on behalf of the United States. *Id.* The court recounts Ms. Pham and Ms. Klar's statements *verbatim* because their own words most aptly demonstrate why their conduct warrants sanctions.

129.   Commissioner Greenberg stated at the outset of the hearing that it was his inclination to deny the writ of possession based upon his understanding that the District Court for the District of Nevada had already determined that Mr. Flynn was not required to turn over his file, and that it had also entered protective orders relating to the client files. *Id.* at p 2:17-28.

130.   Ms. Pham told the court:

> I understand that your Honor's ruling is probably based on this late order that was just issued last Friday by the magistrate judge in Nevada, and with all due respect to the magistrate judge in Nevada, the issue of whether or not the files should get turned over to the client, the Montgomery party was not addressed to that Nevada court and the Nevada magistrate did acknowledge in her order, that no motion has been made in the Nevada court.
>
> And both the Nevada magistrate judge and the actual presiding judge there, Judge Pro, indicated that no request has been made and no determination has been made as to which state's law should apply. That's squarely before this court and this is the only court with jurisdiction to decide whether or not the files should get turned over because the files are located here in California. And the court in Nevada has not determined which law should apply. That has not been address[ed] today here and that motion has not been made in Nevada.

*Id.* at p. 3:1-19.

27

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 29 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 29 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 28 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 28 of 54

131.   In response, the Commissioner remarked that the Nevada court *did* discuss that under Nevada law Mr. Flynn was entitled to keep the client files subject to being paid, and Ms. Pham replied:

> If Nevada law were to apply that would be correct, but there has been no determination as to whether or not Nevada law applies or not and that was made clear by Judge Pro's recent order with respect to our request for clarification. Judge Pro indicated that no motion has been made and no determination has been made and had indicated that we were denied without prejudice to making that motion as well as arguments as to which state's law should apply. And the proper court to make that determination would be this court where the files are located. Only this court could order the files to get turned over because the files are located here in California.

> Mr. Flynn, under both the law – the jurisdiction where Mr. Flynn is licensed and where he practices and maintains his office and resides and where the files are located are in California, and Massachusetts law requires the files to be turned over, the Nevada law cannot apply. These arguments have never been addressed to the Nevada court so Judge Cook's (sic) – the magistrate judge's order was not a determination of which law should apply it was simply a statement that if Nevada law were to apply then in fact he would have a retaining lien because the only other issue before the magistrate judge at this time is a fee dispute as to how much would be owed to Mr. Flynn under the party's (sic) attorney-client relationship and fee arrangement. And in that event the fees are determined and Nevada law were to apply then Mr. Flynn would have a retaining lien but no determination has been made and to what law should apply at this point. That issue is only before your Honor.

*Id.* at p. 3:25-28; 4:1-27.

132.   Ms. DiMare argued that the Commissioner's understanding of this court's prior orders was correct: under Nevada law, Mr. Flynn could retain the file, and that if the Montgomery parties wished to challenge that order based on a choice of law argument, they had leave to do so. Otherwise, the order stood. She also noted that the Nevada federal court required Ms. Pham and Ms. Klar to deliver the October 12, 2007 order to the California court because the Nevada court knew that they were attempting to circumvent orders issued by the Nevada federal courts. *Id.* at 5:2-26.

28

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 30 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 30 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 29 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 29 of 54

133.   In reply, Ms. Pham quoted the conclusion of the District Court's October 4, 2007 order, and then stated:

> At the time this [District Court order] was filed this action in California had already been filed. This motion was already pending before the court. Judge Pro was aware of that. Judge Pro specifically did not order that we must file in Nevada. He simply said that if we would *like* to file in Nevada he will address and he will determine the issue of which law should apply. He consistently refrained from making any order with respect to the turnover of the files because he knew there was an action pending in California.

> *   *   *   *   *

> What the magistrate judge did was simply – based on, I have to say misrepresentation[s] about what these proceeding today entail, I believe the magistrate judge was under the [mis]apprehension of what exactly was taking place before the court based on some statement made by Mr. Flynn which we were not allowed to respond to. Those statements seem to suggest that we were somehow circumventing the jurisdiction or going around the court in terms of the motion or attorney's fees or protective order that are already in place in the Nevada court.

*Id.* at p. 7:5-15. Ms. Pham went on to say that the only issue before the Nevada District Court was the issue of attorney's fees, and there had been no decision in this court concerning turnover of the client files. *Id.* at 7:20-28.

134.   After hearing from Ms. Pham and Ms. DiMare, the Commissioner noted that counsel for the United States, Ms. Carlotta Wells, was also present, and he inquired whether he ought to hear from her. Ms. Klar then stated:

> Your Honor, on behalf of the Montgomery parties we do object. Our position is there is a protective order that has been issued by the court in Nevada. Of course in connection with any order that this court would issue mandating transfer of the files, we would comply with that order. We believe that the government is here to take yet another bite at the apple and to try to circumvent that court's order. That order, we believe, is clear in terms of what we are required to do in connection with the transfer of the files, and I think . . . I think they are here to muddy the waters and to somewhat intimidate your Honor to refrain in giving us the relief that we believe Mr.

29

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 31 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 31 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 30 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 30 of 54

Montgomery and Mrs. Montgomery and the Montgomery Trust is (sic) entitled to.

*Id.* at 8:3-22. Ms. Wells responded that the United States took no position on the merits of the application for writ of possession; rather, the government's interest "is that the information that's contained in those files that's subject to the military and state secrets, present and intact, be protected." *Id.* at 8:28; 10:1-7.

135.   The Commissioner denied the writ of possession. *Id.* at 13:17-24.

136.   The court finds that at least by October 12, 2007, Ms. Klar and Ms. Pham knew or reasonably should have known that this court not only reaffirmed its jurisdiction over the client files, but also formally retained jurisdiction over the fee dispute.

137.   Ms. Pham made several intentional misrepresentations to the Commissioner at the October 18, 2007 hearing. She told the court that the California Superior Court was the only court that had jurisdiction to decide whether the files should be turned over to the Liner firm. This is not true. She told the court that the Montgomery parties had not had an opportunity to argue which state's law should apply as it concerns the client files. This is not true. *See, e.g.,* Case No. 06-56, #s 254, 261. Ms. Pham told the Commissioner that this Court had not taken jurisdiction over the matter of the client files. This is not true. *See* Case No. 06-56, court order #s 256, 291, & 296, n. 5 ("By this order, this court only takes jurisdiction over the attorney's fees and client file dispute."). Ms. Pham told the Commissioner that this court misapprehended the nature of the writ of possession proceedings before the Commissioner. This is not true. The court most assuredly knew exactly what Ms. Pham and Ms. Klar were up to, which is why this court *ordered* the Liner firm to deliver its October 12, 2007 order to the California court. This court finds that Ms. Klar and Ms. Pham intentionally failed to file their choice of law motion in this court because they knew they might lose, and instead attempted to argue – albeit improperly and unsuccessfully – in California, that since they declined this District Court's invitation to file such a motion, they could do so in California.

30

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 32 of 186
09-00014-RBK    Doc#: 724-9    Filed: 12/21/12    Entered: 12/21/12 16:53:38    Page 32 of 55

Case 2:10-ap-01305-BB    Doc 54-2    Filed 07/16/10    Entered 07/16/10 13:40:06    Desc
Exhibit 2    Page 31 of 54
Case 3:06-cv-00056-PMP-VPC    Document 985    Filed 03/31/09    Page 31 of 54

138. Ms. Klar's statements to the Commissioner that counsel for the United States was present at the hearing to "take another bite at the apple," to "circumvent that court's order," "muddy the waters," and to "intimidate your Honor" are misrepresentations of what Ms. Klar knew had transpired in this court.

139. Both Ms. Pham and Ms. Klar knew that the United States had a compelling interest in insuring that documents in the client files that were subject to the state secrets privilege be protected, yet by their conduct, attempted to undermine the effect of the United States protective order.

140. Ms. Pham later testified that once this court issued its October 12, 2007 order by which it took jurisdiction over the client files and attorney's fees, she did not "commence" any further proceedings. Tr. p. 223:17-20, sealed hearing. The court finds that testimony disingenuous. In the face of no less than three orders of this court, Ms. Klar and Ms. Pham continued to engage in a litigation strategy in violation of those orders and made misrepresentations to the Commissioner on October 18, 2007. Had Ms. Klar and Ms. Pham intended to act in good faith, they would have terminated the writ of possession proceedings as soon as they received this court's October 12, 2007 order, at the very least.

141. **November 21, 2007 – Los Angeles County Superior Court's Order of Dismissal on the Basis of Forum Non Conveniens:**

Undaunted by this court's orders, the writ commissioner's order denying a writ of possession, and the Massachusetts Bar Counsel's dismissal of the bar complaint, the Liner firm pressed on with its California Superior Court complaint to obtain the client files and obtain injunctive relief against Mr. Flynn. On November 21, 2007, the Superior Court heard oral argument on Mr. Flynn's motion to quash service of summons and motion to dismiss/stay (Case No. 06-56, #548, Ex. 1; #597-9, Ex. 8).

142. At the hearing, another lawyer from the Liner firm, continued to make the identical arguments the Liner firm had made before this court, the writ commissioner, the San

1    Diego Bar Association, and the Massachusetts Bar Counsel. *See* transcript of November

2    21, 2007 hearing, p. 9:20-28; 10: 1-28; 11:1-23, (Case No. 06-56, # 597-5, Ex. 10).

3    143.   The court granted Mr. Flynn's motion to dismiss on the basis of *forum non conveniens*

4    and stated:

5          California is only involved in this matter due to an
           unsubstantiated allegation by plaintiff that defendant
6          misrepresented to him that defendant was licensed in
           California. *The case is before a California court for the*
7          *transparent purpose of having this court countermand the*
           *orders of the Nevada District Court. California has no*
8          *interest in doing so.*
           Nevada, on the other hand, has a great public interest in
9          adjudicating this dispute. Defendant Flynn is a
           Massachusetts licensed lawyer, who appeared pro hac
10         vice in Nevada on behalf of plaintiffs, solely in Nevada
           cases, before Nevada courts, applying Nevada law. The
11         Nevada District Court has already made substantial orders
           concerning the subject matter of this action by giving
12         defendant a 'retaining lien' over the 'client files' that
           plaintiff seeks, by this action, to have returned to him.
13         The Nevada District court case concerns allegations of
           wrongdoing against the current Nevada Governor and
14         allegations that the plaintiffs in this case made
           misrepresentations in Nevada.

15   Case No. 06-56, #548, Ex. 1 (emphasis added).

16                              **II.  LEGAL DISCUSSION**

17   **A.    Sanctions Pursuant to the Court's Inherent Authority**

18   A federal court has inherent power to levy sanctions, including attorney's fees, for "willful

19   disobedience of a court order . . . or when the losing party has acted in bad faith, vexatiously, wantonly,

20   or for oppressive reasons. . . ." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980) (internal

21   quotations and citations omitted).   A court "certainly may assess [sanctions] against counsel who

22   willfully abuse judicial processes." *Id.*  In *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1980), the Court

23   reaffirmed the *Roadway* principles and "left no question that a court may levy fee-based sanctions when

24   a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting

25   litigation, or has taken actions in the litigation for an improper purpose." *Fink v. Gomez*, 239 F.3d 989,

26   992 (9th Cir. 2001) (citing *Chambers*, 501 U.S. at 45-46, n. 10).  In *Fink,* the Ninth Circuit made clear

27

28                                         32

that imposition of sanctions under the court's inherent power requires a specific finding of bad faith or "conduct tantamount to bad faith:"

> Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose . . . An attorney's reckless misstatements of law and fact, when coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case, are sanctionable under the court's inherent power.

*Id.* at 994.

In *In re Itel Securities Litigation,* 791 F.2d 672 (9th Cir. 1986), the court examined the court's inherent authority to impose sanctions for bad faith where the attorney filed objections in one case to obtain fee concessions in an action pending before another court. Although the court found the objections were not frivolous or meritless, the attorney's goal was to gain an advantage in another case, which the court concluded was sufficient to support a finding of bad faith. *Id.* at 675. "For purposes of imposing sanctions under the inherent power of the court, a finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*, the assertion of a colorable claim will not bar assessment of attorney's fees.'" *Id.* (quoting *Lipsig v. Nat'l Student Mktg. Corp.,* 663 F.2d 178, 182 (D.C. Cir. 1980). In *Fink,* the court cited *Itel* for the proposition that "sanctions are justified when a party acts *for an improper purpose* – even if that act consists of making a truthful statement or a non-frivolous argument or objection." *Fink,* 239 F.3d at 992 (emphasis in original).

The burden of proof is clear and convincing evidence (*Roadway Express,* 447 U.S. at 764); however, a finding of bad faith may not be required when an "attorney acts recklessly . . . [with] an improper purpose." *Fink,* 239 F.3d at 993.

**B.   Sanctions Pursuant to 28 U.S.C. § 1927**

28 U.S.C. § 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

33

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 35 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 35 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 34 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 34 of 54

1    Although Section 1927 has a clear compensatory purpose because it permits an award of

2    attorney's fees and costs, "it is in reality a penal statute designed to discourage unnecessary delay in

3    litigation by requiring attorneys 'or other persons' to compensate personally other litigants who incur

4    excess costs due to their misconduct." GEORGENE M. VAIRO, RULE 11 SANCTIONS 765 (3d ed. 2003),

5    citing *Roadway Express,* 447 U.S. at 759-62 (noting the importance of Section 1927 sanctions in that

6    "lawyers who multiply legal proceedings [are] taxed with the extra 'costs' they generate.")

7    To warrant sanctions pursuant to Section 1927, a court must find the attorney acted with

8    recklessness or subjective bad faith. *New Alaska Dev. Corp. v. Guetschow,* 869 F.2d 1298, 1306 (9th Cir.

9    1989), *Estate of Blas ex re. Chargualaf v. Winkler,* 792 F.2d 858, 860 (9th Cir. 1986); *United States v.*

10   *Blodgett,* 709 F.2d 608, 610 (9th Cir. 1983). "Bad faith is present when an attorney knowingly or

11   recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an

12   opponent." *W. Coast Theater Corp. v. City of Portland,* 897 F.2d 1519, 1528 (9th Cir. 1990). Section

13   1927 sanctions may only be imposed on attorneys and *pro se* litigants. *Wages v. Internal Revenue Serv.,*

14   915 F.2d 1230, 1235-36 (9th Cir. 1990). However, Section 1927 "cannot reach conduct of a party who

15   is not involved in an action before the sanctioning court at the time of the conduct." *Grid Systems Corp.*

16   *v. John Fluke Mfg. Co., Inc.,* 41 F.3d 1318, 1319 (9th Cir. 1994). Because imposition of Sections 1927

17   sanctions is penal in nature, it requires the court to make specific findings of fact. *Trulis v. Barton,* 107

18   F.3d 685, 692 (9th Cir. 1995). "'Prior to sanctioning an attorney, a court must provide the party to be

19   sanctioned with notice and some reasonable opportunity to respond to the charges' in order to satisfy

20   the requirements of due process." *In re Deville,* 361 F.3d 539, 548 (9th Cir. 2004), quoting *Jones v.*

21   *Pittsburgh Nat'l Corp.,* 899 F.2d 1350, 1357 (3d Cir. 1990).

22   **C.      Local Rule IA 10-7(a)**

23   Local Rule ("LR") IA 10-7(a) of the Local Rules of Practice for this court provides that an

24   attorney admitted to practice before this court is subject to the standards of conduct prescribed by the

25   Model Rules of Professional Conduct as adopted by the Nevada Supreme Court. LR IA 10-7 further

26   states, "Any attorney who violates these standards may be disbarred, suspended from practice before this

27

28                                                  34

1  court for a definite time, reprimanded or subjected to such other discipline as the court deems proper.

2  This subsection does not restrict the court's contempt power."

3    **D.    Nevada Rules of Professional Conduct**

4       **1.    Rule 8.4**

5  Nevada Rule of Professional Conduct 8.4 reads: "It is professional misconduct for a

6  lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce

7  another to do so, or do so through the acts of another;...(c) Engage in conduct involving dishonesty,

8  fraud, deceit, or misrepresentation."

9       **2.    Rule 3.1**

10  Nevada Rule of Professional Conduct 3.1 reads: "A lawyer shall not bring or defend a

11  proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so

12  that is not frivolous...."

13       **3.    Rule 3.3**

14  Nevada Rule of Professional Conduct 3.3 reads:

15       (a) A lawyer shall not knowingly:
            (1) Make a false statement of fact or law to a tribunal or fail to

16          correct a false statement of material fact or law previously made
            to the tribunal by the lawyer;

17          (2) Fail to disclose to the tribunal legal authority in the controlling
            jurisdiction known to the lawyer to be directly adverse to the

18          position of the client and not disclosed by opposing counsel; or
            (3) Offer evidence that the lawyer knows to be false. If a lawyer,

19          the lawyer's client, or a witness called by the lawyer, has offered
            material evidence and the lawyer comes to know of the its falsity,

20          the lawyer shall take reasonable remedial measures, including, if
            necessary, disclosure to the tribunal. A lawyer may refuse to offer

21          evidence, other than the testimony of a defendant in a criminal
            matter, that the lawyer reasonably believes is false.

22       (b) A lawyer who represents a client in an adjudicative proceeding and
            who knows that a person intends to engage, is engaging or has engaged

23          in criminal or fraudulent conduct related to the proceeding shall take
            reasonable remedial measures, including, if necessary, disclosure to the

24          tribunal...

25

26

27

28                                     35

### 4. Rules 5.1 and 5.2

Nevada Rule of Professional Conduct 5.1 reads:

> ...(b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.
> (c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:
> (1) The lawyer orders, or with knowledge of the specific conduct, ratifies the conduct involved; or
> (2) The lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Nevada Rule of Professional Conduct 5.2 reads:

> (a) A lawyer is bound by the Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person.
> (b) A subordinate lawyer does not violate the Rules of Professional Conduct if the lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.

### 5. Imposition of Sanctions for a Violation of a Rule of Professional Conduct

The ABA has adopted standards that courts should consider for the imposition of sanctions. AMERICAN BAR ASS'N, JOINT COMMITTEE ON PROFESSIONAL SANCTIONS, STANDARDS FOR IMPOSING LAWYER SANCTIONS (1992). Under the ABA standards, the court may consider four factors:

1. Whether the duty violated was to a client, the public, the legal system, or the profession;

2. Whether the lawyer acted intentionally, knowingly, or negligently;

3. Whether the lawyer's misconduct caused a serious or potentially serious injury;

4. Whether there are aggravating and/or mitigating circumstances.

### III. SANCTIONS ANALYSIS

#### A. Ms. Klar and Ms. Pham

1.   The Litigation Strategy

Trial counsel owe an undivided allegiance to their clients, but they also owe important duties of candor and honesty to opposing counsel and to any court or tribunal before whom they appear. If a lawyer disagrees with an order of the court, that lawyer does not have leave to violate, disregard, or

36

1   subvert that order; his or her recourse is to take appropriate steps to test the validity of that ruling

2   pursuant to the Federal Rules of Civil Procedure, and observing at all times the Rules of Professional

3   Conduct.

4        Based upon the chronology of events described at length herein, the court finds there is clear and

5   convincing evidence that Ms. Klar and Ms. Pham acted in bad faith or conduct tantamount to bad faith

6   with the intention to undermine this court's orders for the improper purpose of obtaining a more

7   favorable forum for resolution of the fee dispute and the turnover of the client files. Ms. Klar and Ms.

8   Pham willfully abused the judicial processes in this court and elsewhere, and they did so to delay or

9   disrupt this litigation to gain a tactical advantage. *Fink*, 239 F.3d at 993. As a result of their conduct,

10  Ms. Klar and Ms. Pham multiplied these proceedings, and they did so unreasonably and vexatiously,

11  resulting in an increase in the cost of the proceedings to Mr. Flynn and a tremendous burden on the court

12  to sort through this byzantine web of misconduct. 28 U.S.C. § 1927. Even if Ms. Klar and Ms. Pham's

13  conduct was not totally frivolous, the court finds they were motivated by vindictiveness and bad faith.

14  There is clear and convincing evidence that Ms. Klar and Ms. Pham acted recklessly and with an

15  improper intent. *Fink*, 239 F.3d at 993; 28 U.S.C. § 1927.

16        The court also finds that Ms. Klar's conduct constitutes violations of Rules 8.4, 3.1, 3.3, and 5.1

17  of the Nevada Rules of Professional Conduct. As the senior attorney and lead counsel in this case, Ms.

18  Klar abdicated her duties to the court and the attorneys she supervised by engaging in a consistent pattern

19  of gamesmanship, misrepresentations, and outright contempt of this court and its orders. She was

20  unrelenting in her campaign to achieve her desired end – to wrest jurisdiction from this court over the

21  fee dispute and client files – and she was willing to do so at any cost to her client, to her junior partner,

22  to the Liner firm, to Mr. Flynn, and to the court.

23        The court finds that Ms. Pham's conduct violates Rules 8.4, 3.1, 3.3, and 5.2 of the Nevada Rules

24  of Professional Conduct. "Following orders" does not excuse her own, independent ethical duties to her

25  client and the court.

26        From the inception of the Liner firm's representation of the Montgomery parties in August 2007

27  until she was replaced one year later, Ms. Klar acted as lead counsel. Ms. Klar directed the litigation

28                                              37

1    strategy for her clients, and it was evident from the outset of her appearance that although subordinate

2    attorneys from the Liner firm performed legal services in this case, it was Ms. Klar who directed those

3    attorneys and the management of this case. Ms. Klar was ordered to appear at the sealed hearing on the

4    motion for sanctions, and although she was present, she did not testify.

5          Ms. Pham's representation of the Montgomery parties was generally limited to the events giving

6    rise to Mr. Flynn's motion for sanctions, as she was on leave from October 22, 2007 until February 25,

7    2008 (Case No. 06-56, #599). At the time Ms. Klar and Ms. Pham became the Montgomery parties'

8    counsel of record, both were partners with the Liner firm; Ms. Klar was admitted to the California Bar

9    in 1986, and Ms. Pham was admitted to the California Bar in 1997 (Case No. 06-56, #s 233 & 234).

10         It was Ms. Pham whom the Liner firm called to testify at the sealed hearing in this matter. Based

11   upon Ms. Pham's testimony and the court's understanding of this case, the court concludes that although

12   Ms. Pham is most certainly responsible for her conduct in this action, Ms. Klar was the ultimate

13   decision-maker and chief strategist.  However, a lawyer is not excused from her ethical duties because

14   she is practicing under the direction of a senior attorney. The Nevada Rules of Professional Conduct

15   require that a lawyer abide by the Rules of Professional Conduct "notwithstanding that the lawyer act[s]

16   at the direction of another person." NEV. RULES OF PROF'L CONDUCT R. 5.2(a); see also In re Hector

17   Martinez, 393 B.R. 27, 40-41 (Bankr. D. Nev. 2008).

18         When Ms. Klar and Ms. Pham undertook representation of the Montgomery parties, they did not

19   have Mr. Flynn's client files.  However, they did have access to Mr. Montgomery's files, and Ms. Klar

20   so advised the District Court at the August 17, 2007 hearing (Case No. 06-56, #247 (minutes), #267, p.

21   23-24 (transcript)). Ms. Klar's admission confirms Mr. Flynn's contention that the Liner firm had access

22   to virtually all communications between Mr. Montgomery and Mr. Flynn.  Mr. Flynn and Mr.

23   Montgomery communicated very extensively via email, and this included discussions of draft

24   documents, letters, court papers, and Mr. Montgomery's February 28, 2007 declaration (Case No. 06-

25   263, #115).  Therefore, even though Ms. Klar made representations to this court and the California

26   Superior Court that she needed Mr. Flynn's client files to properly represent her clients, she had access

27

28                                                      38

1   to the thousands of emails and attached documents in Mr. Montgomery's possession, as well as access

2   to court filings via PACER.

3       Ms. Klar and Ms. Pham knew that Mr. Flynn did not represent the Montgomery parties in any

4   matters pending in California and that he was properly admitted to practice before this court *pro hac*

5   *vice*. Ms. Klar and Ms. Pham also knew that Mr. Flynn and Mr. Montgomery were embroiled in a fee

6   dispute over unpaid attorney's fees in excess of $600,000. As early as July 31, 2007, they knew that Mr.

7   Flynn intended to claim a retaining lien over the client files under Nevada law. Ms. Klar and Ms. Pham

8   knew, or upon reasonable inquiry should have known, that the retaining lien would allow Mr. Flynn to

9   keep the client files until the lien was adjudicated.  Faced with the prospect of a Nevada retaining lien

10  that prevented them from obtaining the client files and also required their clients either to pay the

11  disputed fees or post a bond, Ms. Klar devised a different strategy.  She sought a new forum where she

12  and her clients would not be so encumbered.

13      Ms. Klar and Ms. Pham knew, or upon reasonable inquiry should have known, that during Mr.

14  Flynn's representation of Mr. Montgomery and the Montgomery parties, there was no reason whatsoever

15  for Mr. Montgomery to concern himself with the state in which Mr. Flynn was admitted to practice law.

16  Mr. Flynn and Ms. DiMare were both duly admitted *pro hac vice* to represent the Montgomery parties

17  in *these* cases before *this* court.[3] As Ms. Klar and Ms. Pham well know, this is a routine practice for

18  lawyers who appear in federal courts throughout the country.  Lawyers are typically admitted to the bar

19  in one or two states, but they are excused from state bar admission requirements by the *pro hac vice*

20  application. This issue was a red herring and only became an issue when those in opposition to Mr.

21  Flynn – first the United States, and then Ms. Klar – seized upon it as a means to disqualify or discredit

22  Mr. Flynn for different motives.  The papers filed by the United States to disqualify Mr. Flynn in the

23  search warrant proceeding in February 2007, and the papers filed by Ms. Klar and Ms. Pham six months

24

25      [3]Since all of these lawyers were admitted *pro hac vice* before this court in these proceedings,
    including Ms. Klar and Ms. Pham, it is curious that Ms. Klar and Ms. Pham filed no complaint against
26  Mr. Flynn with the Nevada State Bar.  LR IA 10-7(a) specifically authorized them to do so.  However,
    this would have been inconsistent with their strategy to avoid Nevada insofar as these matters were
27  concerned.

28                                          39

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 41 of 186

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 41 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 40 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 40 of 54

1   later in California and Massachusetts allege strikingly similar facts concerning Mr. Flynn's bar

2   admission, the location of his law offices, his residence, and so on.

3         When Ms. Klar and Ms. Pham filed their complaint in California Superior Court in early August

4   2007, they may arguably have had a reasonable, good faith belief based on the law and facts that they

5   were entitled to seek a turn over of the client files in California. Mr. Flynn's California address appeared

6   on all papers filed in this court, he sent invoices to the Montgomery parties from California, Mr. Flynn's

7   client files were in California, he has a California residence, and he identified himself as a member of

8   Flynn & Stillman, which had a California address. Ms. Klar and Ms. Pham may have also arguably had

9   a reasonable, good faith belief that they were entitled to seek arbitration of the fee dispute before a

10   California bar entity based on this same information. The District Court here had not ruled on Mr.

11   Flynn's motion to withdraw or the United States' motion for protective order. Mr. Flynn and Ms.

12   DiMare had not yet filed their notices of retaining lien or their motion for attorney's fees.

13         However, the chronology of events that occurred, as well as Mr. Montgomery's inconsistent

14   declarations and his lawyers' complicity in drafting the untruthful September 10, 2007 declaration,

15   convince the court that Ms. Klar and Ms. Pham's actions were part of a litigation strategy designed to

16   remove both the client file and fee dispute from this court's jurisdiction, deny Mr. Flynn the disputed

17   attorney's fees, and force him to expend significant attorney's fees defending his interests in three other

18   forums. Even more disturbing, as events unfolded and this court issued orders that were contrary to Ms.

19   Klar's litigation strategy, she and Ms. Pham engaged in a continuous pattern of contempt of this court.

20         Ms. Pham drafted Mr. Montgomery's September 2007 declaration, the California Superior Court

21   complaint, the *ex parte* application for writ of possession, and it was she who met with the writ

22   commissioner in chambers on September 12, 2007. Ms. Pham also made the principal argument at the

23   October 18, 2007 hearing on the writ of possession. Ms. Klar appeared as counsel of record on the

24   California Superior Court complaint, the *ex parte* application for writ of possession, the papers filed in

25   support of the writ of possession, and she attended the October 18, 2007 hearing and made arguments

26   concerning the Justice Department's presence at that hearing.

27

28

40

1    Both Ms. Klar and Ms. Pham submitted the application for fee arbitration to the San Diego

2   County Bar Association on September 7, 2007, and three days later, filed their opposition to Mr. Flynn's

3   motion for attorney's fees, attaching Mr. Montgomery's September 10, 2007 declaration. Two days

4   later, September 12, 2007, they filed their *ex parte* application for writ of possession and once again,

5   attached Mr. Montgomery's September 10, 2007 declaration.

6    Assuming *arguendo* that Ms. Klar and Ms. Pham were ignorant of Mr. Montgomery's February

7   28, 2007 declaration in opposition to the United States' motion to disqualify Mr. Flynn and had a good

8   faith belief that they were justified in seeking disposition of the client files and fee dispute in California,

9   Mr. Flynn's notice of lodgement dated August 6, 2007, gave notice to Ms. Klar and Ms. Pham that they

10   should reconsider their strategy. They did not.

11    Even though the District Court recognized Mr. Flynn's retaining lien under Nevada law on

12   September 4, 2007, Ms. Klar and Ms. Pham were undaunted and filed their *ex parte* writ of possession

13   of the client files in the California Superior Court, claiming Mr. Flynn was attempting to "extort money"

14   from the Montgomery parties. They also made the odd assertion that Mr. Flynn "claimed" a retaining

15   lien even though "he was never licensed to practice in Nevada . . ." (Case No. 06-56, #597-2, Ex. 2).

16   Mr. Flynn never made such a claim. Then, on September 25, 2007, Ms. Pham filed a bar complaint in

17   Massachusetts, adding a third forum where Mr. Flynn was required to defend himself, this time for

18   misconduct.

19    As Ms. Klar and Ms. Pham pursued their strategy to remove the client file and fee disputes from

20   this court's jurisdiction to avoid the retaining lien, this court began to understand what was afoot. The

21   District Court issued a second order on October 4, 2007, and declined to clarify its prior order, but

22   suggested that if Ms. Klar and Ms. Pham wished to adjudicate a choice of law question on these issues

23   *to this court,* they could do so. They never did. This court hastened to issue its October 12, 2007 order

24   to state, once and for all, that the District of Nevada had retained jurisdiction over the client files and

25   the fee dispute. It even took the unusual step of requiring Ms. Klar and Ms. Pham to deliver its order

26   to the California Superior Court. The court hoped its message to Ms. Klar and Ms. Pham was clear: Stop

27   forum shopping. They did not.

28

1    Ms. Klar and Ms. Pham did not voluntarily dismiss the California action, nor did they withdraw

2    their clients' application for arbitration of the fee dispute with the San Diego Bar Association. Instead,

3    they proceeded with the October 18, 2007 hearing before the writ commissioner and engaged in stunning

4    misrepresentations of this court's orders. The court has earlier quoted these misrepresentations *verbatim*

5    and will not repeat them.  The court notes that in her zeal to advance her clients' cause, Ms. Pham

6    engaged in a tortured analysis of this court's three orders to support her claims that somehow, California

7    had jurisdiction over the client files. She further suggested that this court misapprehended "exactly what

8    was taking place." To the contrary, this court understood very well what Ms. Klar and Ms. Pham were

9    attempting to do, which is why it unequivocally stated that the District of Nevada had jurisdiction of

10   these issues and ordered them to provide its October 12, 2007 order to the California court.

11   Ms. Klar's remarks to the writ commissioner about the presence of Department of Justice counsel

12   at the writ hearing were a complete distortion.  Ms. Klar accused Justice Department counsel of

13   attempting to "muddy the waters," to "take yet another bite at the apple to try to circumvent [the District

14   Court's] order," and to intimidate the court when Ms. Klar knew very well that Justice Department

15   counsel was present to protect the interests of the United States concerning the protective order. The writ

16   commissioner denied the writ. (Case No. 06-56, #597-5, Ex. 8).

17   Despite these events, Ms. Klar and Ms. Pham did not voluntarily dismiss the California Superior

18   Court action, nor did they dismiss the fee arbitration.  Ms. Pham testified that the Liner firm

19   "commenced" no further actions upon receipt of the October 12, 2007 order, and she believed Mr. Flynn

20   had notified both the San Diego and Massachusetts Bar of what had occurred; therefore, presumably

21   neither she nor Ms. Klar had an affirmative duty to do anything more. Their view appears to be that they

22   were entitled to create havoc for Mr. Flynn in three different forums, and if they did not succeed, it was

23   for Mr. Flynn and this court to clean up the mess. Their disdain for the legal process and for their duties

24   as officers of the court is disheartening and sanctionable.

25   At the sealed hearing, Ms. Pham was unwavering in her belief that she, and presumably Ms. Klar,

26   at all times acted ethically, in good faith, and in no way misconstrued this court's orders. Having heard

27   Ms. Pham's testimony, the court concludes that Ms. Pham was so focused on her assigned tasks    to

28                                                      42

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 44 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2    Page 43 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 43 of 54

1    remove the fee dispute and turnover of client files from this court's jurisdiction – that she suspended her

2    own independent judgment and failed to critically consider any legal, factual, or ethical impediments to

3    her assignments. What Ms. Pham did was, in essence, only half of her task as a lawyer and officer of

4    the court. She uncovered every piece of information and advanced every legal argument she could

5    muster to advance her position; however, she failed to consider any defects or weaknesses in her

6    analysis. As a result, Ms. Pham, under the supervision of Ms. Klar, engaged in a consistent pattern of

7    material misrepresentations and the omissions of material facts from her court papers, oral arguments,

8    and bar complaints. Conveying half truths and only part of the record in matters is a misrepresentation

9    and a breach of her ethical duties as a lawyer. In addition, when presented with this court's orders that

10    were contrary to her assigned goals, she engaged in tortured analyses of the plain meaning of those

11    orders to justify her conduct and to press on, undeterred. Even after this court's definitive October 12,

12    2007 order, Ms. Pham went into California Superior Court and intentionally misrepresented the import

13    of this court's orders.

14       Every single court or bar entity that ultimately considered Ms. Klar and Ms. Pham's campaign

15    to divest this court of jurisdiction over these matters and to force Mr. Flynn to defend his interests

16    concluded they were wrong. The California Superior Court Writ Commissioner stated, "Evidently the

17    Federal District Court in Nevada has already determined that based upon the Nevada laws Mr. Flynn is

18    not required to turn over the file at this time. And the District Court in Nevada has also made protective

19    orders regarding the information in the materials and that court could deal with any issues arising from

20    any further requests for possession from the [Montgomery parties]" (Case No. 06-56, #597-5, Ex. 8).

21    In dismissing the complaint against Ms. Flynn in Massachusetts, Bar Counsel noted, "You did not

22    mention in your complaint that the United States District Court, District of Nevada, entered detailed and

23    comprehensive orders with respect to the transmission of the [client] file. Attorney Flynn was admitted

24    *pro hac vice* in the Nevada court and as such, in connection with that proceeding, is subject to the

25    standards of professional conduct as adopted by the Nevada Supreme Court"(Case No. 06-56, #597-5,

26    Ex. 14). The San Diego Bar Association also dismissed the petition and said. "[I]t is clear that the

27    District of Nevada has taken control of this entire case filed by the applicants . . . including the issue of

28

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 45 of 186

09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 45 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 44 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 44 of 54

attorney fees and costs" (Case No. 06-56, #597-6, Ex. 12)   Most telling is the California Superior

Court's order dismissing that case: "The case is before this court for the transparent purpose of having

this court countermand the orders of the Nevada District Court.  California has no interest in doing so"

(Case No. 06-56, #548, Ex. 1).

Ms. Klar did not testify at the sealed hearing, but the misconduct discussed herein did not occur

in a vacuum; instead, it was a part of a vexing pattern of conduct throughout her tenure as lead counsel

until she was replaced in July 2008.  In its March 2008 order granting in part Mr. Flynn's and Ms.

DiMare's motion for attorneys' fees, this court noted:

> [T]he initial strategy of the Montgomery parties and the
> Liner firm was to challenge former counsels' fee dispute
> in every forum but this one and to compel former counsel
> to expend substantial time and attorneys' fees in
> defending themselves, even in the face of clear orders
> issued by the District Court and this court to the contrary.
> This conduct resulted in the expenditure of many
> thousands of dollars in attorneys' fees for all concerned,
> but also in even greater delays in the disposition of the
> instant motion. The Montgomery parties have repeatedly
> complained to this court that they have been prejudiced
> because they do not have former counsels' client files.
> Had they not pursued these protracted attempts to wrest
> jurisdiction from this court, . . . the court would have been
> in a far better position to decide this motion sooner rather
> than later.

(Case No. 06-56, #502, page 17).[4]

As the case progressed, Ms. Klar continued to invite sanctions against her clients and herself.

The court issued a May 7, 2008 order that stated: "[T]he court's patience for abusive, bad faith discovery

gamesmanship is ended. The court finds that the Montgomery parties have deliberately violated this

court's February 21, 2008 order by failing to produce the documents as ordered, and sanctions for this

misconduct are warranted. . ." (Case No. 06-56, #582). On May 21, 2008, this court issued this minute

order: "Ms. Klar is admonished that attorneys appearing in his Court shall not unilaterally set hearings

and that this Court will manage its docket. Ms. Klar is further admonished that she shall abide by the

---

[4] The court did not award Mr. Flynn and Ms. DiMare any attorneys' fees in connection with this
motion for sanctions. *Id.*

44

1    local rules of practice for this Court, as well as related court orders, and that future violations will not

2    be tolerated" (Case No. 06-56, #628).  On May 29, 2008, this court issued an order to show cause why

3    the Montgomery parties should not be held in contempt of court for their failure to abide by this court's

4    May 21, 2008 order (Case No. 06-56, #646).  On July 24, 2008, this court issued another order to show

5    cause why the Montgomery parties *and* Ms. Klar should not be held in contempt of this court for failure

6    to comply with a prior order concerning discovery (Case No. 06-56, #769).  On August 18, 2008, the

7    District Court imposed a monetary sanction against Mr. Montgomery in the amount of $2,500.00 per

8    day until he complied with a prior discovery order (Case No. 06-56, #815), and this court convened a

9    two-day hearing on its order to show cause issued against Ms. Klar and Mr. Montgomery (Case No. 06-

10   56, #s 816 & 817).  It was only after repeated sanction orders and orders to show cause that the Liner

11   firm substituted in new lead counsel for the Montgomery parties.  Thereafter, the court presided over

12   a settlement conference in September 2008, and matters between the Montgomery parties and eTreppid

13   were settled (Case No. 06-56, #s 854, 855, & 856).

14          Ms. Klar needlessly multiplied and manipulated these proceedings for the tactical advantages

15   described herein, and increased the cost and complexity of this action exponentially.  Apart from the

16   litigation misconduct and contempt of this court described above, there is another very disturbing subtext

17   about what occurred.  It is evident that when Mr. Flynn and Mr. Montgomery parted company in July

18   2007, there was tremendous animosity between the two.  The court knows that Ms. Blixseth – although

19   not yet a party to the action at that time – was intimately involved behind the scenes in these cases, as

20   the evidence presented in support of this motion for sanctions so plainly reveals.[5]  When Mr. Flynn fell

21   out of accord with Mr. Montgomery, he also fell out of accord with Ms. Blixseth.  The court concludes

22   that the animosity Mr. Montgomery and Ms. Blixseth harbored for Mr. Flynn was a catalyst for the

23   litigation strategy to insure – through any means possible – that Mr. Flynn would never be paid and to

24   crush him into submission in the process.  By her conduct as lead counsel in these proceedings, Ms. Klar

25   allowed  her clients to involve the Liner firm, Ms. Pham and herself in a scheme to exploit legitimate

26   ───────────────

27          [5]The court also notes that Ms. Klar was not unacquainted with Ms. Blixseth in 2007.  She
     represented Ms. Blixseth in an unrelated matter (Case No. 06-56, #600).

28                                                    45

1  legal proceedings to harass and punish Mr. Flynn. Ms. Klar crossed over the line as a zealous advocate

2  for her clients' interests and abdicated her ethical and professional duties to the court in advancing this

3  strategy. "'Following orders' of a client or a superior or employer is no defense to filing a pleading in

4  bad faith or for an improper purpose." In re *Aston-Nevada Ltd. P'ship*, 391 B.R. 84, 106 (Bankr. D.

5  Nev. 2006) (citations omitted). *See also In re TCI Ltd.*, 769 F.2d 441, 446 (7th Cir. 1985) (rejecting

6  argument that sanctions could not be imposed because attorney acted at the insistence of the client);

7  *Steinle v. Warren*, 765 F.2d 95, 101 (7th Cir. 1985) (imposing sanctions on attorney, even though acted

8  at client's insistence); *Blair v. Shenandoah Women's Ctr., Inc.*, 757 F.2d 1435, 1438 (4th Cir. 1985)

9  (attorney does not escape sanctions "just because his client's behavior was even worse" than attorney's

10 behavior).

11        2.     Mr. Montgomery's September 10, 2007 Declaration

12        Mr. Montgomery's February 28, 2007 declaration in the search warrant proceeding directly

13 conflicts with his September 10, 2007 declaration. The attestation in the September 10, 2007 declaration,

14 filed both in this court and in the California court, was an essential piece of evidence in support of Ms.

15 Klar and Ms. Pham's assertion that there was a factual basis to file the California Superior Court action,

16 the San Diego fee arbitration, and the Massachusetts Bar complaint.

17        On August 1, 2007, Mr. Montgomery's local counsel filed notice of termination of Mr. Flynn

18 and Ms. DiMare, and Ms. Klar subsequently signed the stipulation to dismiss the action (Case No. 06-

19 263, #s130 & 134); therefore, Ms. Klar knew, or upon reasonable inquiry, should have known, the

20 details of that proceeding, which most particularly included the United States' unsuccessful attempt to

21 disqualify Mr. Flynn only five months earlier. Although the court's file in the search warrant proceeding

22 was not unsealed until September 17, 2007 (Case No. 06-263, #131), Mr. Montgomery would have had

23 a copy of his February 2007 declaration in his own files. Ms. Klar told the District Court on August 17,

24 2007 that she had access to these files.

25        Through apparent inadvertence, Mr. Montgomery's declaration was not unsealed pursuant to the

26 District Court's September 17, 2007 order (Case No. 06-56, #270). It is curious that when the United

27 States requested that the declaration be unsealed, it drew Ms. Klar's objection (Case No. 06-56, #331).

28                                                    46

1    This is odd because the United States, as holder of the state secrets privilege, was the only party who

2    could assert the privilege, and Justice Department counsel presumably determined the declaration should

3    be unsealed, or they would not have made the request.

4           On November 9, 2007, the court held a brief hearing and noted Ms. Klar's objection; however,

5    she did not appear (Case No. 06-56, #331). Instead, local counsel appeared, and he was understandably

6    unable to articulate a basis for keeping this declaration sealed. The court unsealed Mr. Montgomery's

7    declaration, and it has become a centerpiece of this sanction litigation. The court reasonably infers that

8    Ms. Klar objected to the unsealing of Mr. Montgomery's February 28, 2007 declaration because it so

9    clearly contradicted the September 10, 2007 declaration, which was drafted for the purposes outlined

10   herein.

11          Ms. Klar and Ms. Pham knew, or upon reasonable inquiry, should have known that in February

12   2007, Mr. Montgomery attested under penalty of perjury that he had read court filings, which disclosed

13   (1) that Mr. Flynn is only licensed to practice law in Massachusetts, (2) that he maintains a Boston law

14   office address, (3) that he has residences in Massachusetts and California, (4) that Mr. Flynn and Mr.

15   Stillman were partners, and Mr. Stillman opened a West Coast office of the firm in 1992, and (5) that

16   Mr. Flynn regularly practices law in Massachusetts, but also maintains a multi-state practice. Ms. Klar

17   and Ms. Pham knew, or upon reasonable inquiry, should have known that in his own declaration, Mr.

18   Montgomery attested that the "recent attempt to disqualify my attorney would gravely damage my

19   constitutional protections. It is borne out of ignorance of the facts by the USAO, an agenda to attack me,

20   and disregard for not only my rights, but the security of our Country."

21          Mr. Montgomery's September 10, 2007 declaration is directly contrary to these attestations, and

22   the court concludes that the September 10, 2007 declaration is perjured. It is the most damaging

23   document because without it, Ms. Klar would have had no basis to remove the client file and fee disputes

24   from the District of Nevada. Mr. Montgomery either lied to his lawyers to assist in effectuating Ms.

25   Klar's litigation plan, or Ms. Pham, the declaration's author, orchestrated the subornation of perjury.

26   Having heard the testimony of both Mr. Montgomery and Ms. Pham and considered their credibility, the

27   court does not believe Ms. Pham intentionally suborned perjury; rather, it finds that Mr. Montgomery

28                                                          47

1   voluntarily tailored this latest declaration to achieve his lawyers' goals and may well have done so at the

2   direction of Ms. Klar.

3         The conduct of Ms. Klar and Ms. Pham epitomizes the scorched earth litigation tactics that

4   undermine citizens' confidence in our courts and our system of justice. The court cannot allow attorneys

5   who practice before it to operate as hired bounty hunters who – armed with extensive resources – take

6   it upon themselves to manipulate the legal system with impunity. Ms. Klar and Ms. Pham are sanctioned

7   as more fully set forth below.

8       **B.**    **The Liner Firm**

9         The Liner firm also bears responsibility for what occurred in this proceeding. Ms. Klar utilized

10   the Liner firm's substantial resources to engage in the litigation misconduct described herein, and she

11   was not the only attorney who signed misleading pleadings and ignored repeated orders of this court.

12   Ms. Klar certainly utilized Ms. Pham to carry out her strategy, but also assigned tasks to other junior

13   attorneys in the firm.[6] Ms. Klar was allowed to operate in the Liner firm unchecked and unquestioned,

14   and this conclusion is supported by her pattern of sanctionable conduct that ensued long after the fall

15   of 2007. It was not until matters came to a head in the summer of 2008 that senior partners finally

16   stepped in to this case. The court finds that the Liner firm acquiesced to or willingly carried out Ms.

17   Klar's litigation strategy; therefore, sanctions against the Liner firm are warranted pursuant to 28 U.S.C.

18   § 1927. *See, e.g., Moser v. Bret Harte Union High School District,* 366 F. Supp. 2d 944 (E.D. Cal.

19   2005); *Avirgan v. Hull,* 125 F.R.D. 189 (S.D. Fla. 1989).

20       **C.**    **Mr. Montgomery**

21         Mr. Montgomery's role in this matter revolves around his two declarations. The court considers

22   Mr. Montgomery's conduct and credibility in light of his testimony at the sealed hearing and at other

23   hearings in this action. Mr. Montgomery was no bystander to these events; he had a pivotal role in both

24   the search warrant proceeding and the trade secrets litigation. The evidence is clear that Mr. Flynn and

25   Mr. Montgomery were in constant contact concerning every aspect of these proceedings, and it is

26

27      [6]The court does not identify these attorneys in this order because it concludes their participation
in the misconduct was minimal.

28                          48

1   obvious that Mr. Montgomery's participation was essential to his effective representation.   The

2   characterization of Mr. Montgomery as an unsophisticated client who could not appreciate the

3   importance of these two declarations is not in the least credible.

4          Mr. Montgomery knew in January 2005 that Mr. Flynn was a Massachusetts lawyer, but his

5   concern at the time was whether Mr. Flynn could appear before courts in Nevada.   Mr. Flynn was

6   admitted *pro hac vice* in state court and in this court, and this was the extent of Mr. Montgomery's

7   interest in the matter. Mr. Montgomery's alleged confusion over nineteen months later about what it

8   meant to be "admitted," a "member," or "licensed" in a particular jurisdiction is a chimera.   Mr

9   Montgomery knew very well that Mr. Flynn's admission to a state bar meant nothing to him until he

10  either wanted Mr. Flynn as his counsel (February 28, 2007 declaration), or he did not (September 10,

11  2007 declaration).   The court finds there is clear and convincing evidence that Mr. Montgomery

12  committed perjury when he signed the September 10, 2007 declaration, and that he signed the

13  declaration in bad faith, vexatiously, wantonly, and for oppressive reasons. Ms. Klar and Ms. Pham filed

14  this perjured declaration in the court and in California Superior Court.   They also used the allegations

15  contained therein in the San Diego fee arbitration petition and the Massachusetts Bar complaint. This

16  not only resulted in the delay and disruption of this proceeding; it was motivated by vindictiveness and

17  bad faith and demonstrates contempt of this court.

18                                    **IV. SANCTIONS**

19          This court has considered the American Bar Association's standards, *supra* at p. 36, for the

20  imposition of sanctions against Ms. Klar, Ms. Pham, and the Liner firm.

21          Ms. Klar: Ms. Klar violated her duties to the public, the legal system and the legal profession

22  by her conduct.   She acted intentionally and knowingly.   The aggravating circumstances of her

23  misconduct are set forth herein, and the court will only note that Ms. Klar is a seasoned trial lawyer who

24  has practiced in state and federal courts. Ms. Klar did not testify at the sealed hearing in this matter, and

25  there are no factors in mitigation of sanctions.

26          Ms. Pham: Ms. Pham is a junior partner in a large metropolitan law firm, and she had been

27  admitted to practice law for ten years at the time of these events.   In the fall of 2007, Ms. Pham was

28                                          49

1 preparing for family leave, which may have caused her to follow the path of least resistance and accede

2 to Ms. Klar's directions. It may have been part of the "large firm" culture at the Liner firm that junior

3 partners were unaccustomed to challenging senior litigators about matters of strategy, and she may also

4 not have had Ms. Klar's level of understanding about the complexity of these proceedings. During her

5 tenure as lead counsel, this court observed Ms. Klar's demeanor toward the court and opposing counsel,

6 which was frequently uncivil and lacking in collegiality. The court imagines that those junior to Ms.

7 Klar might well suffer intimidation and trepidation if compelled to challenge her legal strategy. Ms.

8 Pham may have been no exception. These factors weigh in mitigation of sanctions.

9        However, Ms. Pham *did* testify at the sealed hearing and was quite adamant that the course of

10 conduct outlined herein was proper, not done in bad faith, and she insisted that she had a proper legal

11 basis for her actions throughout all of the proceedings. This factor weighs in favor of sanctions.

12        The Liner Firm:   As noted above, the Liner firm is a large Los Angeles law firm and employs

13 many attorneys. The Liner firm failed their clients, the legal system, and the legal profession by allowing

14 Ms. Klar to engage unchecked in scorched earth litigation tactics. Even senior partners must be held

15 accountable for their conduct, and it is the law firm's responsibility to insure this occurs. Ms. Pham and

16 other lawyers junior to Ms. Klar should have been able to rely on the firm's senior management to

17 intercede when the firm knew, or reasonably should have known, that Ms. Klar was following such a

18 course. It is also the law firm's responsibility to insure that its junior lawyers are trained to consider

19 their assignments from both ethical and legal perspectives. It appears to the court that the Liner firm did

20 not meet these obligations and this failure contributed to what occurred here. These factors weigh in

21 favor of sanctions.

22        In July 2008, senior partners in the Liner firm finally stepped into this case, but this was only

23 after several sanction orders had been issued, and both Ms. Klar and Mr. Montgomery were facing very

24 serious allegations unrelated to the issues currently before this court. It was also many months after Ms.

25 Klar's unsuccessful campaign to divest this court of jurisdiction and to defeat Mr. Flynn at any cost.

26 This factor weighs in mitigation of sanctions, since it ultimately resulted in settlement of the underlying

27 cases between the Montgomery parties and eTreppid.

28

50

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 52 of 186
09-00014-RBK   Doc#: 724-9   Filed: 12/21/12   Entered: 12/21/12 16:53:38   Page 52 of 55

Case 2:10-ap-01305-BB   Doc 54-2   Filed 07/16/10   Entered 07/16/10 13:40:06   Desc
Exhibit 2   Page 51 of 54
Case 3:06-cv-00056-PMP-VPC   Document 985   Filed 03/31/09   Page 51 of 54

1    Mr. Montgomery: The American Bar Association factors in mitigation of sanctions set forth

2  herein do not apply to parties, but the court observes that during his testimony at the sealed hearing, as

3  well as other hearings in this action, Mr. Montgomery demonstrated a consistent inability to recall

4  pivotal facts, and the court did not find his testimony credible. Mr. Montgomery was also sanctioned

5  for his failure to comply with other court orders in this action. *See, supra* at ¶¶ 44-45. These factors

6  weigh in favor of sanctions.

7    Based upon the foregoing, the court finds that pursuant to its inherent powers and 28 U.S.C. §

8  1927, the following sanctions shall issue:

9  **A.   Monetary Sanctions**

10   Pursuant to LR 54-16, Mr. Flynn submitted a declaration, a summary description of his work

11  associated with the motion for sanctions, and an itemized statement of his and Ms. DiMare's legal

12  services (Case No. 06-56, #s 547 & 552, Exs. 11-A & 11-B). Mr. Flynn and Ms. DiMare seek a total of

13  $361,275.00 in attorney's fees and $3,303.00 in costs.

14   The court has reviewed all of these papers and has made certain adjustments. First, Mr. Flynn

15  and Ms. DiMare's request the court adopt respective hourly rates of $450 and $350; however, their

16  hourly rates for their prior fee application were $400 and $300, respectively. The court believes these

17  hourly rates are proper for this fee application as well. Second, the court has not only reviewed the task

18  summaries, but it has reviewed, line-by-line, each of the time entries. The court will not award

19  attorney's fees for work performed on the fee application that resulted in an award of attorney's fees and

20  costs in March 2008. *See* Case No. 06-56, #502. Nor will the court awards attorney's fees for the

21  motion to withdraw as counsel, the filing of the retaining lien, and similar matters. The court has also

22  reduced some of the time allocated to preparation of Mr. Flynn's declaration, the time line, and entries

23  that may be, in part, attributable to Mr. Flynn's Rule 3.3 motion. Finally, the court has deducted time

24  for entries that are vague and duplicative. The court awards Mr. Flynn attorney's fees in the amount of

25  $159,840 and Mr. DiMare the sum of $42,150, for a total of $201,990.00.

26

27

28

1   Mr. Flynn and Ms. DiMare itemize costs in the amount of $3,303.00. The court excludes the

2   monthly cost of LEXIS for September 2007 to April 2008 ($882.00), as this is an attorney's normal cost

3   of doing business. The court awards costs in the amount of $2,421.00.

4   Based upon the foregoing, the monetary sanctions imposed upon Ms. Klar, Ms. Pham, the Liner

5   firm, and Mr. Montgomery total $204,411.00. Mr. Montgomery is sanctioned pursuant to the court's

6   inherent power, and Ms. Klar, Ms. Pham, and the Liner firm are sanctioned pursuant to the court's

7   inherent power and 28 U.S.C. § 1927 as follows:

8       1.    Ms. Klar    $102,205.50    50%

9       2.    Mr. Montgomery    $ 61,323.30    30%

10      3.    Ms. Pham    $ 20,441.10    10%

11      4.    The Liner Firm    $ 20,441.10    10%

12  Those sanctioned are jointly and severally liable for these sanctions.

13  **B.     Bar Discipline – Ms. Klar and Ms. Pham**

14  The court believes that Mr. Klar and Ms. Pham violated the Rules of Professional Conduct and

15  refers this matter to the Nevada State Bar and California State Bar. The Clerk of Court is directed to

16  send this order to Bar Counsel for both Nevada and California.

17  **C.     *Pro Hac Vice* Appearances in the United States District Court, District of Nevada**

18  Local Rule IA 10-2 authorizes attorneys who are not members of this court to apply for

19  admission to practice in a particular case at the court's discretion. In light of their misconduct in this

20  proceeding, Ms. Klar and Ms. Pham shall be prohibited from applying for *pro hac vice* admission to this

21  court for a period of five years. At the expiration of five years, they may apply for admission pursuant

22  to Local Rules, but shall attach a copy of the court's order, and they shall provide a declaration

23  identifying all courses they have completed on legal ethics during the interim period. The court shall

24  retain its discretion whether they shall be admitted *pro hac vice.*

25  **D.     Publication of this Opinion**

26  The court believes the maximum deterrence will result from publication of this order, which will

27  constitute a public reprimand of Ms. Klar, Ms. Pham, and the Liner firm in the form of an opinion in

28

1  West's Federal Supplement. *See* William W. Schwartzer, *Sanctions Under the New Federal Rule 11-*

2  *A Closer Look,* 104 F.R.D. 181, 201 (1985).

3      **E.**    **Community Legal Service**

4      The court has already imposed substantial monetary sanctions in this matter; however, the court

5  believes that additional sanctions against Ms. Klar and Ms. Pham are warranted for their pattern of

6  contempt for this court's orders and the legal system in which they are privileged to serve as officers of

7  the court. This type of professional misconduct not only damages the legal system and requires courts

8  to divert substantial resources to discipline attorneys and parties; it undermines citizens' confidence in

9  attorneys who are given a public trust to conduct themselves ethically and preserve the rule of law. To

10  remediate this violation, the court fashions a sanction that it believes will restore to Ms. Klar and Ms.

11  Pham a sense of their responsibilities as officers of the court in our system of justice. Ms. Klar and Ms.

12  Pham shall perform *pro bono* legal services, of 200 hours and 100 hours, respectively, to benefit those

13  who are indigent and otherwise unable to afford legal services.

14      Within ten days of entry of the final order in this matter, Ms. Klar and Ms. Pham shall submit

15  to this court for its approval their proposed plans for completion of *pro bono* legal services, which shall

16  be completed within two years of the date of entry of the final order. On the first anniversary of the final

17  order, Ms. Klar and Ms. Pham shall submit declarations to this court attesting to the number of hours

18  of *pro bono* service completed, and a description of those services. On the second anniversary of the

19  final order, Ms. Klar and Ms. Pham shall submit a final declaration containing the same information.

20      **F.**    **Mr. Montgomery**

21      A copy of this order shall be sent to the Office of the United States Attorney.

22          **V. CONCLUSION**

23      Apart from depriving a citizen of his or her life, liberty or property, there is no more difficult task

24  for a judge than sanctioning an attorney for misconduct. The court has devoted many, many hours of

25  time in reviewing the papers filed, reading transcripts of relevant hearings, listening to recordings of

26  hearings, and considering carefully the facts and law before it. It is this court's sincere hope that those

27  subject to the sanctions issued herein will never repeat this misconduct and that they will renew their

28

1   professional commitment to abide by the highest ideals of the legal profession and the rule of law.

2      **IT IS ORDERED** that Mr. Flynn' motion for sanctions pursuant to 28 U.S.C. § 1927 and/or

3   pursuant to the inherent power of the court (Case No. 06-56, #545) is **GRANTED**. Pursuant to LR 1B

4   3-1(a), a party may file an objection to the District Court of this order within ten days of service of this

5   order. Therefore, this order is **STAYED** until Friday, April 10, 2009. If objections are filed, this stay

6   shall remain in effect until the District Court issues its final order. If no objections are filed, the effective

7   date of this order shall be **April 10, 2009.**

8      **IT IS SO ORDERED.**

9      DATED:   March 31, 2009.

10                                   UNITED STATES MAGISTRATE JUDGE

54

# Exhibit L

# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH, AMY KOENIG, VERN JENNINGS, MARK MUSHKIN, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, JUDY LAND, and CHARLES DOMINGUEZ, each individually, and on behalf of others similarly situated<br><br>    Plaintiffs,<br><br>    vs.<br><br>CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive,<br><br>    Defendants. | Case No.: CV 10-1-EJL-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**CUSHMAN & WAKEFIELD'S MOTION FOR SANCTIONS**<br><br>**(Docket No. 246)**<br><br>**CREDIT SUISSE'S MOTION FOR ORDER TO SHOW CAUSE**<br><br>**(Docket No. 253)**<br><br>**PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES RE: MOTIONS BY DEFENDANTS**<br><br>**(Docket No. 302)** |

Currently pending before the Court are the following related motions: (1) Cushman & Wakefield's Motion for Sanctions (Docket No. 246); (2) Credit Suisse's Motion for Order to Show Cause (Docket No. 253); and (3) Plaintiffs' Motion for Award of Attorneys' Fees Re: Motions by Defendants (Docket No. 302). Having carefully considered the record (including the parties' supplemental briefing at Docket Nos. 315, 321, and 322), participated in oral argument on January 5, 2012, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

**MEMORANDUM DECISION AND ORDER - 1**

# I. BACKGROUND

1.      Plaintiffs initiated this action on January 3, 2010 and, on January 25, 2010 and January 28, 2010, filed their First and Second Amended Complaints respectively.  *See* Compl., First Am. Compl., and Second Am. Compl. (Docket Nos. 1, 12, & 18).

2.      On March 29, 2010, Defendants Cushman & Wakefield, Inc. ("C & W") and Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse Cayman Island Branch (collectively "Credit Suisse") moved to dismiss Plaintiffs' Second Amended Complaint.  *See* C& W & Credit Suisse Mots. to Dismiss (Docket Nos. 48 & 51).

3.      On May 11, 2010, this Court stayed discovery until Defendants' motions to dismiss were resolved.  *See* 5/11/10 MDO, pp. 7-8 (Docket No. 73).

4.      On February 17, 2011, the undersigned issued a Report and Recommendation relating to Defendants' motions to dismiss.  *See* 2/17/11 Rpt. & Recomm. (Docket No. 106).

5.      On March 25, 2011, while the parties' respective objections to the undersigned's Report and Recommendation were pending before United States District Judge Edward J. Lodge, Plaintiffs filed a motion for an order authorizing the emergency/expedited issuance of two subpoenas duces tecum, including one for Michael Miller.  *See* Mot. for Order (Docket No. 118). Plaintiffs represented to the Court that Mr. Miller had been employed by C & W for 17 years, including the time period of the appraisals that are one of the central pieces of Plaintiffs' liability theories in this case.  Plaintiffs' March 25, 2011 motion stated that Mr. Miller's testimony "is highly critical and central to the issues in this case and must be immediately preserved for the benefit of the class members in their prosecution of this case." *See id.* at p. 2.

**MEMORANDUM DECISION AND ORDER - 2**

6.      In support of Plaintiffs' March 25, 2011 motion, Plaintiffs' counsel, Robert C.

Huntley, submitted his affidavit, identifying Mr. Miller as a "key 'whistle blower-type' witness,"

while making the following, related representations:

- Mr. Miller "was willing to come forward with testimony which incriminates both [C & W] and Credit Suisse of knowingly and intentionally developing and utilizing the misleading, and likely illegal, Total Net Value (TNV) and Total Net Proceeds (TNP) appraisal methodologies for the loans to be made to approximately twenty-two (22) developments in the United States (including Lake Las Vegas, Yellowstone Club, Tamarack, and Ginn Sur Mer, located in the Bahamas)."

- Mr. Miller "was and is of the opinion that the appraisal methodologies were unique, unaccepted in the industry, and were violative of both FIRREA and USPAP."

- Mr. Miller provided testimony in person to Mr. Huntley and Christopher Conant, another of Plaintiffs' multiple attorneys, in a four-hour-long meeting in Denver, Colorado on March 19, 2011. "Mr. Miller dictated his affidavit" and Mr. Conant "transcribed [Mr. Miller's] testimony into his laptop as both men viewed the monitor and edited his testimony. A copy of [Mr. Miller's] transcribed testimony is attached hereto as Appendix A."

- "Mr. Miller did not sign the affidavit at that time because he was concerned that his doing so might result in subjecting himself to retaliation or litigation against him by C & W. Therefore, he is unwilling to sign his affidavit, but will respond to a subpoena for a deposition."

*See* Huntley Aff. at ¶ 1-5 (Docket No. 118, Att. 2).  As referenced above, Mr. Huntley attached to

his own affidavit the unsigned March 19, 2011 "Declaration of Michael L. Miller, MAI" as

Appendix A to his affidavit.  *See id.* at ¶ 4.  In essence, then, Plaintiffs requested that the May 11,

2010 discovery stay be lifted to accommodate Mr. Miller's testimony.  *See id.* at ¶ 6.

7.      On March 31, 2011, Judge Lodge adopted in part and rejected in part the

undersigned's February 17, 2011 Report and Recommendation.  *See* 3/31/11 Order (Docket No.

**MEMORANDUM DECISION AND ORDER - 3**

126). As to those claims that Judge Lodge dismissed without prejudice, the Court afforded

Plaintiffs an opportunity to amend their complaint by April 21, 2011. *See id.* at pp. 29-30.

8.    On April 4, 2011, the undersigned denied Plaintiffs' March 25, 2011 motion. *See*

4/4/11 Order, pp. 2-3 (Docket No. 128) ("Plaintiffs offer no compelling reason supporting the

need to immediately proceed with Mr. Miller's deposition . . . – there is no urgency . . ., when

recognizing the action remains stubbornly positioned at the motion to dismiss stage and, thus, is

not particularly dependent upon any discovery, let alone the requested discovery. Further, there

is no indication that Mr. Miller's deposition . . . will not be available once the boundaries of the

parties' claims and defenses are understood after the pleadings are once-and-for-all filed and the

stay is lifted.").

9.    On April 21, 2011, Plaintiffs filed their Third Amended Complaint. *See* Third

Am. Compl. (Docket No. 129 & 131). Plaintiffs' Second Amended Complaint made no mention

of Mr. Miller; however, Plaintiffs' Third Amended Complaint repeatedly referenced Mr. Miller's

alleged involvement in matters contributing to Plaintiffs' claims against Defendants. *Compare*

Second Am. Compl. (Docket No. 18) *with* Third Am. Compl. at ¶¶ 60-74, 91-93, & 190 (Docket

No. 129 & 131).

10.    Also on April 21, 2011, Plaintiffs sought to amend their pleadings to resuscitate a

breach of fiduciary duty claim against C & W, despite Judge Lodge's April 4, 2011 dismissal of

that claim, with prejudice. *See* Mot. for Leave to Am. Third Cause of Action (Docket No. 130).

In support of their attempt to do so (and consistent with Plaintiffs' March 25, 2011 motion and

Plaintiffs' Third Amended Complaint), Plaintiffs stated that "it is appropriate to revive that claim

at this early stage in the case on the basis of the evidence which has come forward from former

**MEMORANDUM DECISION AND ORDER - 4**

[C & W] employee, Michael Miller." *See id.* at p. 2; *see also* Mem. in Supp. of Mot. to Am., p. 2 (Docket No. 130, Att. 1) ("Very clearly, unknown to Plaintiffs until this past March of 2011, were the details of [C & W's] knowing and intentional participation . . . with Credit Suisse to plan, agree to implement, and implement the appraisal and lending scheme perpetrated against the Plaintiffs and others.").

11.     Apparently unbeknownst to either Credit Suisse or C & W (and unbeknownst to this Court), on or around May 4, 2011, Mr. Miller faxed to Mr. Huntley a copy of an undated "Affidavit of Michael L. Miller, MAI." *See* Ex. 2 to Morrow Decl. in Supp. of C& W's Mot. for Recons. (Docket No. 227, Att. 2).[1] This affidavit was signed before a notary public licensed in Missouri. Defendants contend that the *signed* affidavit is substantively different from Mr. Miller's *unsigned* March 19, 2011 declaration. *See id.* and *compare with* Appx. A to Huntley Aff. (Docket No. 118, Att. 2); *see also* Ex. 4 to Morrow Decl. in Supp. of C & W's Mot. for Recons. (Docket No. 227, Att. 2) (containing red-lined comparison of Mr. Miller's signed, May 2011 affidavit with Mr. Miller's unsigned March 19, 2011 declaration).

12.     Also unbeknownst to either Credit Suisse or C & W, Mr. Miller soon thereafter delivered a second signed "Affidavit of Michael L. Miller, MAI" to his boss Doug Haney, who is also an expert retained by Plaintiffs. *See* Exs. 1 & 3 to Morrow Decl. in Supp. of C & W's Mot. for Recons. (Docket No. 227, Att. 2). Mr. Haney then forwarded this second signed version to

---

[1] Between the time that (1) Mr. Huntley filed Mr. Miller's unsigned March 19, 2011 declaration, and (2) Mr. Miller faxed his undated affidavit to Mr. Huntley on or around May 4, 2011, Mr. Miller testified that Plaintiffs' attorneys – including Mr. Huntley, James C. Sabalos, and Michael J. Flynn – were calling often (a few times a week), urging Mr. Miller to sign the unsigned March 19, 2011 declaration as quickly as possible. *See* 5/31/12 Miller Dep. at 249:13-250:9, attached as Ex. A to Abdollahi Decl. in Supp. of C & W's Mot. for Recons. (Docket No. 245).

**MEMORANDUM DECISION AND ORDER - 5**

Plaintiffs' counsel. *See id.* This subsequent affidavit was signed before a notary public licensed in Texas and is dated May 9, 2011; however, it appears to be identical in content to the earlier affidavit faxed to Mr. Huntley on May 4, 2011. For the purposes of this Memorandum Decision and Order, the Court considers Mr. Miller's two signed affidavits to be one and the same.[2]

      13.     On May 5, 2011, Defendants C & W and Credit Suisse moved to dismiss Plaintiffs' Third Amended Complaint. *See C & W & Credit Suisse Mots. to Dismiss* (Docket Nos. 134-139).

      14.     On May 25, 2011, Plaintiffs, in response to C & W's emergency motion to strike Plaintiffs' May 13, 2011 motion for partial summary judgment (Docket Nos. 140 & 145), relied upon Mr. Miller's unsigned March 19, 2011 declaration in these particulars:

- "For example, during the Montana Bankruptcy proceedings in *In re Yellowstone Mountain Club*, Credit Suisse and [C & W] were well aware of the complaints, concerns and objections to the lending and appraisal scheme raised by Michael Miller, a senior appraiser with [C & W]. Miller raised his concerns and objections regarding the "Total Net Value" appraisal method to his superiors in New York . . . . Miller also raised the same objection directly with several members of the Credit Suisse team in Los Angeles who participated in the creation of the scheme described in the [Third Amended Complaint]."

- Identifying Mr. Miller as "the person who directly links Credit Suisse and [C & W] to both the planning and implementation of the scheme."

- "The current motions before this Court are therefore not merely procedurally improper, but a concerted effort to prevent any court from learning what else Miller will tell this Court (and there is more), and a determined effort to make sure no court ever concludes that the Defendants violated the laws of the United States ("FIRREA") and the laws of the states of Idaho, Montana, Nevada, and Florida ("USPAP"), which they did."

---

    [2] Although both of the signed documents are labeled as "affidavits," neither contains a notary public's jurat. Rather, both use an acknowledgment form. However, both contain penultimate language at the end of the document that is in sufficient form to meet the requirements of a declaration under 18 U.S.C. § 1746.

**MEMORANDUM DECISION AND ORDER - 6**

- "In connection with the illegal lending and appraisal scheme in Idaho and at Yellowstone, Cushman & Wakefield's appraiser, Dean Paauw, told Miller: '. . .*[I'm] not in jail yet and still continuing to write these appraisals . . .*'"

*See* Pls.' Opp. to Emergency Mot. to Strike, pp. 7-8 (Docket No. 148) (citing Third Am. Compl. at ¶¶ 57-59 & 70 (Docket Nos. 129 & 131) (emphasis in original)).

15.     On May 31, 2011, Plaintiffs opposed Defendants' renewed motions to dismiss. *See* Pls.' Opp. to Mots. to Dismiss (Docket Nos. 152-153).  In doing so, Plaintiffs relied, in part, on the allegations raised in their Third Amended Complaint relating to the testimony given in Mr. Miller's unsigned March 19, 2011 declaration.  *See e.g.*, Pls.' Opp. to Credit Suisse Mot. to Dismiss, pp. 24-26 (Docket No. 152); Pls.' Opp. to C & W Mot. to Dismiss, pp. 8, 10-12, 21-24 (Docket No. 153).

16.     During the January 12, 2012 oral argument on Plaintiffs' April 21, 2011 motion to amend and Defendants' renewed motions to dismiss, Plaintiffs' counsel, Messrs. Huntley and Sabalos, made the following arguments vis à vis Mr. Miller and his unsigned March 19, 2011 declaration:

- "The issue presented by this motion is whether the – with the advent of the new information we have through the whistle blower and other new allegations in that Third Amended Complaint, this Court should reinstate the Plaintiffs' cause of action against [C & W] for a breach of fiduciary duty . . . ."

- "The Third Amended Complaint adds information provided by the whistle blower, Michael Miller. And I won't – I mention only a couple of highlights here. . . . ."

- "At paragraph 57 [of the Third Amended Complaint], and I want to talk just a little bit about what wasn't here. What wasn't here before in the last proceeding. We knew nothing about Mr. Miller. We knew nothing about the conversations that took place and the meetings and agreements. This is all unique. And one of the problems with conspiracy we had last time with [C & W] was, in fact, we didn't know about Miller and we didn't have all the details."

**MEMORANDUM DECISION AND ORDER - 7**

- In response to the Court's question concerning whether Plaintiffs' breach of fiduciary duty claim against C & W "has become more plausible than it was at the time that Plaintiffs [originally] conceded the claim . . . .," Plaintiffs' counsel responded: "That and the whistle blower. And also the affidavit of Mike Haney, and the affidavits of Miller that they can be considered in connection with this motion."

- "Paragraph 61. Miller begins to raise red flags regarding these new inflated appraisals. Miller is the senior vice-president or senior executive in charge of the developments for [C & W] out of Houston, and he's got many people that work for him. He now is raising red flags. [C & W] is raising red flags because they are their employees, they're authorized agents."

- "Paragraph 62, all the things we didn't know before when Judge Lodge and Your Honor had us before this Court, Miller, only five months or so after he had previously appraised Lake Las Vegas, pursuant to USPAP and FIRREA, through the discounted market value that I just told you about, learns of what is going on, wants to know why . . . ."

- At 65 through 69 under the conspiracy, which we didn't know about before, even [C & W] changes its TNV to total net proceeds, thinking geez, this could be alleged to be misleading."

- "And I just want to – I'll just represent, you know, Judge, I know you know conspiracy. I'm not going to sit here and tell you, but we represent that if it were conspiracy alone, not just the other materials we have, conspiracy alone we would have enough to hold [C & W] in here, if the Court lets us come back because we didn't know about Miller. We didn't know about Dean Paauw saying I'm still doing these appraisals, not yet in jail, telling that to his executive, senior executive, Mr. Miller, who's reported to us, who's coming to this court sooner or later."

*See* 1/12/12 Tr. at 10, 14, 22-23, 70-73, 78 (Docket No. 194).

17.     On February 17, 2012, the undersigned issued a (1) Memorandum Decision and Order relating to Plaintiffs' April 21, 2011 motion to amend, and (2) Report and Recommendation relating to Defendants' renewed motions to dismiss. *See* 2/17/12 MDO & Rpt. & Recomm. (Docket Nos. 197 & 198). Within the February 17, 2012 Memorandum Decision and Order, the undersigned granted Plaintiffs' April 21, 2011 motion to amend, stating in relevant part:

**MEMORANDUM DECISION AND ORDER - 8**

- "Since [dismissing Plaintiffs' breach of fiduciary duty claim against C & W], however, Plaintiffs claim that new information in the form of an insider account – namely, from Mr. Michael Miller – reveals a conspiracy between Credit Suisse and [C & W] to support a breach of fiduciary duty claim against not only Credit Suisse, but also [C & W]."

- "Finally, Plaintiffs' counsel represent as officers of the court that Mr. Miller has insider knowledge of [C & W's] alleged coordination with Credit Suisse that presents a new, different, factual backdrop to Plaintiff's current breach of fiduciary duty claim against [C & W]."

*See* 2/17/12 MDO, pp. 10 & 13 (Docket No. 197). Additionally, within the February 17, 2012 Report and Recommendation, the undersigned recommended that Plaintiffs' breach of fiduciary duty claim against C & W not be dismissed. *See* 2/17/12 Rpt. & Recomm., pp. 32-33 (Docket No. 198).

18. On March 30, 2012, Judge Lodge adopted in part and rejected in part the undersigned's February 17, 2012 Report and Recommendation. *See* 3/30/12 Order (Docket No. 210). Of some note here, although Judge Lodge found that Plaintiffs' Third Amended Complaint alleged the existence of a conspiracy between Credit Suisse and C & W, he nonetheless dismissed with prejudice Plaintiffs' breach of fiduciary duty claims against both Credit Suisse and C & W. *See id.* at pp. 15-16 & 23.

19. On April 27, 2012, C & W first received a copy of the signed, May 2011 Miller affidavit. *See* Ex. 1 to Morrow Decl. in Supp. of C & W's Mot. for Recons. (Docket No. 227, Att. 2). The copy was obtained from Mr. Miller's personal attorney, not from counsel for Plaintiffs. *See id.*

20. Also on or around April 27, 2012, Credit Suisse and C & W answered Plaintiffs' Third Amended Complaint. *See* Credit Suisse and C & W Ans. to Third Am. Compl. (Docket Nos. 218, 219, 222 & 235).

**MEMORANDUM DECISION AND ORDER - 9**

21.     On May 11, 2012, C & W moved for reconsideration of Judge Lodge's March 30, 2012 Order. *See* C & W's Mot. for Recons. (Docket No. 227). In support of its motion to reconsider, C & W stated that "Plaintiffs' counsel for a full year have been in possession of a signed affidavit from supposed 'whistle blower' Michael Miller that is materially different from the 'unsigned declaration' Plaintiffs' counsel drafted and submitted to the Court on March 25, 2011." *See* Mem. in Supp. of C & W's Mot. for Recons., p. 1 (Docket No. 227, Att. 1). According to C & W, "had the Court known the truth about what [Mr.] Miller actually had signed, it would have granted C & W's motion to dismiss in its entirety . . . ." *See id.* at p. 3. Thus C & W sought reconsideration of that portion of Judge Lodge's Order regarding C & W's renewed motion to dismiss the Third Amended Complaint that allowed certain claims to proceed against it. *See id.*

22.     On June 4, 2012, C & W filed a motion for sanctions, arguing that Plaintiffs should be sanctioned due to their (and/or their counsel's) "misconduct in failing to disclose for more than one year the existence of a signed affidavit from Michael Miller, while at the same time submitting to the Court and relying on a different, unsigned declaration." *See* C & W's Mot. for Sanctions, p. 2 (Docket No. 246).

23.     On June 15, 2012, Credit Suisse also moved for reconsideration of Judge Lodge's March 30, 2012 Order. *See* Credit Suisse's Mot. for Recons. (Docket No. 253). In support of its motion to reconsider, Credit Suisse also highlighted Plaintiffs' counsel's reliance upon Mr. Miller's unsigned March 19, 2011 declaration up to that point in the litigation when, in fact, they were in possession of a later-in-time, signed affidavit from Mr. Miller that was substantively different from Mr. Miller's earlier declaration. *See* Mem. in Supp. of Credit Suisse's Mot. for

**MEMORANDUM DECISION AND ORDER - 10**

Recons., pp. 1-2 (Docket No. 253, Att. 1) ("What Plaintiffs did not reveal to the Court, even while relying repeatedly on the supposed testimony of Mr. Miller in the [u]nsigned [declaration], was that Miller had actually *signed* an [a]ffidavit . . . – a modification of the [u]nsigned [declaration] drafted for him by Plaintiffs' counsel – in which he deleted key paragraphs, sentences, and phrases that supposedly supported Plaintiffs' claims, and substituted materially different language.") (emphasis in original).  In turn, Credit Suisse moved the Court to (1) reconsider its denial of Credit Suisse's renewed motion to dismiss Plaintiffs' negligence claim in light of the "Miller revelations," and (2) order Plaintiffs to show cause as to why they should not be sanctioned "for misleading the Court in violation of their duty of candor."  *See id.* at p. 3.

24.      On October 26, 2012, Judge Lodge granted Defendants' respective motions for reconsideration, reconsidered its March 30, 2012 Order, but then determined that the Court "correctly decided the matter in its prior order . . . which remains the decision of this Court on the motions decided therein."  *See* 10/26/12 Order, pp. 14-15 (Docket No. 297).  However, in reaching this conclusion, Judge Lodge neither "condone[d] nor ma[de] any ruling one way or another concerning the actions of counsel" regarding the stated bases for seeking reconsideration. *See id.* at p. 13.  In other words, the question of whether any sanctions are warranted in relation to Plaintiffs' counsel's handling of Mr. Miller's declaration/affidavit was referred to the undersigned for decision.

25.      On November 19, 2012, Plaintiffs moved for an award of attorneys' fees relating to unnecessarily having to respond to C & W's June 4, 2012 motion for sanctions and Credit Suisse's June 15, 2012 motion for order to show cause.  *See* Pls.' Mot. for Award of Att'ys Fees & Expenses (Docket No. 302).

**MEMORANDUM DECISION AND ORDER - 11**

26.     On December 5, 2012, the undersigned heard oral argument on (1) C & W's June 4, 2012 motion for sanctions, (2) Credit Suisse's June 15, 2012 motion for order to show cause, and (3) Plaintiffs' motion for award of attorneys' fees and expenses. *See* 12/5/12 Minute Entry (Docket No. 309).

27.     On December 6, 2012, Plaintiffs filed a motion for leave to file expedited five-page brief regarding the order to show cause hearing, arguing that "[t]he issue before the Court has serious consequences, particularly to the integrity and reputation of Plaintiffs' attorneys as well as the other considerations articulated in court," that "[n]o pre-hearing briefs were requested by either the Court or the parties and the issues are now focused for a meaningful brief," and that "[t]here were issues propounded at the hearing which deserve a meaning ful and thoughtful input from counsel." *See* Pls.' Mot. for Leave, pp. 1-2 (Docket No. 308).

28.     On December 6, 2012, the undersigned granted Plaintiffs' motion for leave, reasoning:

> The Court struggles with any assessment of the pending motions for sanctions that does not immediately raise significant issues for Plaintiffs requiring a thorough and careful response. However, it is possible that the seriousness of the issue raised by the motions for sanctions, and the sanctions requested by Defendants, were not apprehended by Plaintiffs' counsel to the appropriate degree. Given the implications of the pending motions for all of Plaintiffs' counsel, and for the claims made in the lawsuit, the Court will grant the Motion.

*See* 12/6/12 MDO, p. 2 (Docket No. 311).

29.     On December 10, 2012, Plaintiffs filed their post-hearing brief regarding the order to show cause hearing, arguing that sanctions should not be imposed. *See* Pls.' Post-Hearing Brief (Docket No. 315).

**MEMORANDUM DECISION AND ORDER - 12**

30.     On December 13, 2012, Defendants responded to Plaintiffs' post-hearing brief, arguing that sanctions should be imposed against Plaintiffs. *See* Credit Suisse & C & W Resps. (Docket Nos. 321 & 322).

## II. DISCUSSION

The motions decided in this Memorandum Decision and Order concern a nettlesome and troubling dispute between the parties regarding statements made by Michael Miller – a witness described by Plaintiffs' counsel as a "whistle blower" – and a decision made by Plaintiffs' counsel not to file Mr. Miller's signed May 2011 affidavit with the Court. When that affidavit was signed by Mr. Miller, Plaintiffs' counsel had already presented, relied upon, and filed with the Court Mr. Miller's previous, unsigned, and arguably substantively different March 19, 2011 declaration. Defendants contend that by not filing with the Court Mr. Miller's *signed* May 2011 affidavit (while consistently relying upon Mr. Miller's earlier, unsigned March 2011 declaration), Plaintiffs and their counsel breached duties required of them by Court rules, federal statutes, and ethical standards.

**A.      Imposing Sanctions: Applicable Standards**

      1.      Federal Rule of Civil Procedure No. 11

In presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney certifies that "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation" and that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(1) & (3).

**MEMORANDUM DECISION AND ORDER - 13**

In general, if the court determines that FRCP 11(b) has been violated, the court may impose an appropriate sanction. *See* Fed. R. Civ. P. 11(c)(1).[3] Sanctions under FRCP 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated" and may include "[(1)] nonmonetary directives;[4] [(2)] an order to pay a penalty into court; or [3] if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)( 4).

FRCP 11 does not enumerate the factors a court should consider in deciding whether to impose a sanction or what sanctions would be appropriate in any given circumstance. Still, the

---

[3] However, FRCP 11 requires that a party filing a motion for sanctions must serve the motion on the opposing party 21 days before filing the motion with the court. *See* Fed. R. Civ. P. 11(c)(1) ("The motion [for sanctions] must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper . . . is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."). This is FRCP 11's "safe harbor" provision. The Ninth Circuit has held that the procedural requirements of FRCP 11(c)(1) are mandatory and that the safe harbor provision must be strictly enforced. *See Holgate v. Baldwin*, 425 F.3d 6671, 677 (9th Cir. 2005). It is not clear whether FRCP 11's safe harbor provision applies (or, if it did, whether the parties complied with its procedural protocols) – C & W does not cite to FRCP 11 in support of its motion for sanctions and, while Credit Suisse references FRCP 11 (*see* Credit Suisse's Mot. for Order to Show Cause, pp. 14-15 (Docket No. 253, Att. 1)), its motion is not for sanctions per se but, rather, a motion for order to show cause why Plaintiffs should not be sanctioned.

[4] A non-monetary sanction of dismissal "is an available sanction when 'a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings' because 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'" *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)). "Before imposing the 'harsh sanction' of dismissal, however, the district court should consider the following factors: '(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.'" *See id.*

**MEMORANDUM DECISION AND ORDER - 14**

Advisory Committee Notes to FRCP 11 provide that courts have "significant discretion" in such respects, and may consider "[w]hether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; [and] what amount is needed to deter similar activity by other litigants[.]" Fed. R. Civ. P. 11, Adv. Comm. Notes (1993).

  2. <u>28 U.S.C. § 1927</u>

  Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The use of the word "may" – rather than "shall" or "must" – gives district courts the discretionary authority "to hold attorneys personally liable for excessive costs for unreasonably multiplying proceedings." *Gadda v. Ashcroft*, 377 F.3d 934, 943 n.4 (9th Cir. 2004). While the Ninth Circuit has "'been less than a model of clarity regarding whether a finding of mere recklessness alone may suffice to impose a sanction for attorneys' fees'" under 28 U.S.C. § 1927, or whether there must be a finding of subjective bad faith, what is clear from the case law is that "a finding that the attorney recklessly or intentionally misled the court is sufficient to impose sanctions under [28 U.S.C.] § 1927 . . . ." *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010)

**MEMORANDUM DECISION AND ORDER - 15**

(quoting *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002) and citing *In re*

*Keegan Mgmt. Co. Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996)).

        3.      Idaho Rule of Professional Conduct 3.3[5]

       "In addition to case law and applicable court rules, courts may consider codes of

professional conduct in determining whether an attorney's conduct falls below the standards of

the profession and is sanctionable. *See Girardi*, 611 F.3d at 1035. Idaho Rule of Professional

Conduct 3.3(a)(1) provides that a lawyer shall not knowingly "make a false statement of fact or

law to a tribunal or fail to correct a false statement of material fact or law previously made to the

tribunal by the lawyer." IRPC 3.3(a)(1); *but compare with* IRCP 3.3(a)(3) & cmt. 8 ("The

prohibition against offering false evidence only applies if the lawyer knows that the evidence is

false. A lawyer's reasonable belief that evidence is false does not preclude its presentation to the

trier of fact."). Consistent with this, a lawyer's failure to make a disclosure can be the equivalent

of an affirmative misrepresentation. *See* IRCP 3.3, cmt. 3. Moreover, given a "lawyer's

obligation as an officer of the court to prevent the trier of fact from being misled by false

evidence" (*see* IRCP 3.3, cmt. 5), when previously-offered materials turn out to be

false/misleading, a lawyer's "duty of candor to the tribunal" warrants "reasonable remedial

measures" (*see* IRCP 3.3, cmt. 10).

---

     [5] Under the Local Civil Rules of the District of Idaho, "[a]ll members of the bar of the District Court . . . for the District of Idaho (hereafter the "Court") and all attorneys permitted to practice in this Court must familiarize themselves with and comply with the Idaho Rules of Professional Conduct of the Idaho State Bar and decisions of any court interpreting such rules. These provisions are adopted as the standards of professional conduct for this Court but must not be interpreted to be exhaustive of the standards of professional conduct." Dist. Idaho Loc. Civ. R. 83.5.

**MEMORANDUM DECISION AND ORDER - 16**

4.    Court's Inherent Powers

"District courts have the inherent power to sanction a lawyer for a 'full range of litigation abuses.'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1035 (9th cir. 2012) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991)).  While a district court's authority to impose sanctions under its inherent powers is broad, it is not limitless.  "Before awarding sanctions under its inherent powers . . . the court must make an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith.'" *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980).  A finding of bad faith may be appropriate when, among other things, a party engages in behavior that has the effect of "delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* at 649 (internal quotation marks omitted).

**B.    Analysis**

There are, perhaps, some courts in the country where motions of this nature are an unremarkable occurrence, and where there is no particular noteworthiness attached to either the bringing of such motions, or to the defense of such motions, or perhaps even to the deciding of such motions.  That is not true in this federal district court, nor in any Idaho state court with which the undersigned has been associated.  The motions present matters of great seriousness, and the Court has given its full attention to the issues raised, as they implicate threats to the integrity of the adversarial process, and questions about the proper conduct of lawyers who serve as officers of the court in seeking a fair and just adjudication of their clients' disputes.

The Court is convinced, after considering the written and oral argument of counsel, that there has been a material failure on the part of Plaintiffs' counsel in their responsibilities to this

**MEMORANDUM DECISION AND ORDER - 17**

Court, as officers of this Court, in the circumstances underlying the pending motions. The Court finds that Plaintiffs' counsel made dramatic, strident, and repeated written and oral representations to the Court regarding Mr. Miller's purported testimony, with the unmistakable intention that such representations be relied upon the Court as it considered dispositive motions and motions to amend, all motions which were of great significance concerning the claims which Plaintiffs might be permitted to further pursue against Defendants in this lawsuit.

In addition, the representations made by Plaintiffs' counsel were cloaked in the credence of sworn testimony. Plaintiffs' counsel filed a prepared declaration in the name of Mr. Miller, but lacking his signature under oath only because of his alleged unwillingness on his part to sign the declaration for fear of retaliation from his former employer, Defendant C & W. Indeed, *that* purported reason was emphasized by Plaintiffs' counsel as a basis for which the Court should attach even greater credibility to the testimonial details of Mr. Miller's unsigned declaration. According to Plaintiffs, this witness was a whistle blower, privy to the alleged misdeeds of both Defendants, who considered himself in danger of personal repercussions if he were to talk about what otherwise might remain unspoken.

There is no question but that Plaintiffs' counsel sought to color the record before the Court as such motions were considered and decided, with the particulars of Mr. Miller's testimony alleged already to have been obtained, and ready to be cemented into sworn testimony, but for the fear of retaliation. The unsworn testimony of Mr. Miller was repeatedly referenced in the Plaintiffs' filings, and in oral argument to the Court. Whether or not Plaintiff's characterization of Mr. Miller's testimony becomes the smoking gun Plaintiffs contend it to be, or something less than that, remains to be seen. But once Plaintiffs' counsel chose to put such a

**MEMORANDUM DECISION AND ORDER - 18**

box of evidence in front of the Court, they also had an absolute responsibility to inform the Court and opposing counsel when the shape of that evidence box changed.  Having made explicit representations about the nature of "good as sworn" testimony to the Court, and having made explicit representations about such testimony not being made under oath because of Mr. Miller's alleged whistle blower fears, Plaintiffs' counsel had a responsibility to inform the Court and opposing counsel when Mr. Miller placed his testimony under oath.

The argument of Plaintiffs' counsel that the actual sworn testimony was not substantively different than the "would be sworn, but for" testimony is unavailing here.  The duties of Plaintiffs' counsel were to correct the misshapen record before the Court, having once made that record.  If Plaintiffs' counsel had never presented any unsigned and unsworn declaration to the Court as if it was as good as sworn upon, as if it carried the same evidentiary reliability as a sworn affidavit or signed declaration, and if Plaintiffs' counsel had not repeatedly and vociferously argued that such evidence should persuade the Court of the rightness of Plaintiffs' claims, then this issue could be easily dispensed.  Plaintiffs' counsel could have kept silent (in the limited circumstances at play here, and assuming that there were no discovery requests that otherwise might have required the production of such a statement), about the fact of the unsigned declaration, as well as the fact of the later signed documents.  But Plaintiffs' counsel made the unsigned declaration, and their  representations about the integrity and significance of such evidence, a key part of the record.  Once that was done, they also had the immediate and unmistakable responsibility to make the later-signed affidavit a part of the record, when they first became aware of its existence.

**MEMORANDUM DECISION AND ORDER - 19**

Plaintiffs' counsel also argues that they were justified in deciding not to file the sworn testimony with the Court, even though they previously had filed the unsworn testimony while emphasizing that the sworn testimony was unavailable because Mr. Miller feared retaliation. They argue that the sworn testimony is not substantively different than the unsworn testimony, a conclusion that is, of course, unilaterally drawn. Neither the Court nor opposing counsel were made aware of, or provided with a copy of the sworn testimony. Further, the representation that sworn testimony could not be obtained for fear of retaliation was no longer true at the moment Mr. Miller signed his affidavit. Whatever rationalizations may have justified that decision in the minds of Plaintiffs' counsel, the plain fact is that the decision was mistaken and wrong.

Similarly, the argument that Plaintiffs were prohibited from filing any affidavits because of the procedural posture of the case (dealing with pending motions to dismiss and a stay upon discovery while such motions – and motions to amend – were considered and decided) is also unavailing. Plaintiffs did not follow such a close line when the unsigned declaration was submitted to the Court in the context of a motion seeking relief from the discovery stay. The nature of the manner in which the unsigned declaration, and the affidavit of counsel submitted with it, and then the later written and oral argument based upon it, make clear that the Plaintiffs intended for the purported testimony of Mr. Miller to be part of what the Court would consider in deciding then pending motions, and later filed, motions. In fact, as this Memorandum Decision and Order describes at the outset and as also set forth in Defendants' motions, the Court *did* consider such evidence and argument in making certain of its rulings. Having once muddied that water, Plaintiffs' counsel cannot reasonably argue that the Court's order staying discovery and

**MEMORANDUM DECISION AND ORDER - 20**

the civil rules' prohibitions upon consideration of evidence from outside the pleadings on motions to dismiss constituted a clear barrier to filing Mr. Miller's signed affidavit.

Accordingly, the Court makes the following specific findings in regard to the failure of Plaintiffs' counsel to file the signed statement of Mr. Miller at the time it came into their possession:

1.       Such a failure is an abuse of the duties owed to the Court, and constituted or was tantamount to bad faith. Such a failure delayed and hampered the litigation process by presenting a flawed and arguably false record before the Court, while at the same time asking the Court to focus upon the flawed portion of that same record as a basis for deciding critical motions in the case. The Court properly can sanction such failures by Plaintiffs' counsel under its inherent powers.

2.       Plaintiffs' counsel had a duty under Idaho Rule of Professional Conduct 3.3(a)(1) not to knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Plaintiffs' counsel's failure to file the signed statement of Mr. Miller, once it was received and in the context of representations in writing and orally about the facts and circumstances of Mr. Miller's unsworn testimony, constituted the equivalent of an affirmative misrepresentation. *See* IRCP 3.3, cmt. 3. The signed "affidavit" was not the same document as the unsigned declaration. The statement of fact that the witness, Mr. Miller, would not sign a statement under oath because of fear of retaliation was no longer true, even if true at the outset, at the moment he did sign the affidavit. Further, Plaintiffs' counsel's failure to remedy such matters is a breach of a lawyer's

**MEMORANDUM DECISION AND ORDER - 21**

duty "duty of candor to the tribunal" which warrants "reasonable remedial measures." *See* IRCP 3.3, cmt. 10.

3.      Plaintiffs' counsel's failure to file the signed statement when it came into their possession had the inevitable, and intended, effect of unreasonably multiplying the proceedings in this case pertaining to briefing, argument, consideration and decision upon motions to dismiss, and motions to amend. Whether or not Judge Lodge ultimately changed any of his decision upon objections (or reconsideration of his decision) to the undersigned's Report and Recommendation dated February 17, 2012 does not change this analysis or the finding made here. The failure to file the signed affidavit necessarily meant that the nature of the briefing and the argument, and the court's consideration of the evidence and decision upon the same, was different than it would have been with the addition of such evidence to the record. The Court acknowledges that Plaintiffs' counsel would have been free to argue, and no doubt would have argued, that the signed statement was of no different evidentiary importance than the unsigned affidavit. But, defense counsel would also have the argument that the signed statement was substantively different, that the characterization of a whistle blower witness worried about retaliation was unfounded, and the Court would have had that full panoply of evidence and argument to consider. When the signed statement came to light, a new round of motion practice ensued and even the very fact of this Memorandum Decision and Order is evidence that proceedings have been multiplied and additional resources of the parties and the court have been drawn upon.

4.      The Court finds that the failure of Plaintiffs' counsel to file the signed, sworn affidavit in the circumstances described in this Decision was done recklessly at a minimum, and

**MEMORANDUM DECISION AND ORDER - 22**

that such reckless conduct on the part of lawyers to this case, as officers of the court, justifies a finding that the attorneys are personally liable for excessive costs associated with such conduct. There is no question but that Plaintiffs' counsel were aware of the signed, sworn affidavit. Indeed, the record indicates that they were in repeated contact with Mr. Miller requesting him to make the sworn statement, so that it could be submitted to the Court. Yet, after submitting an unsworn declaration, and representing that a sworn statement could not be obtained because of the witness's fear of retaliation, they failed to file the actual sworn affidavit when it came into their possession. Such conduct is reckless at a minimum. Therefore, the Court finds that an award of sanctions against Plaintiffs' counsel is also appropriate under 28 U.S.C. § 1297.

5.      The Court makes no finding as to whether sanctions are appropriate under FRCP 11.

6.      Having determined that an award of sanctions against Plaintiffs' counsel is justified under the inherent powers of the Court, Idaho Rule of Professional Conduct 3.3, and 28 U.S.C. § 1297, the Court orders as follows:

(A)     Plaintiffs' counsel may not use the testimonial evidence of Michael Miller in this case for any purpose, other than as obtained in deposition or courtroom testimony. The Court has considered barring the use of Michael Miller's testimony in any form, but concludes that to do so would disproportionately affect the individual Plaintiffs for the failings of their counsel. However, given the decisions and conduct of Plaintiffs' counsel in regard to Mr. Miller's prior testimonial evidence, the Court will require that any evidence to be obtained or otherwise used in this lawsuit may only be elicited in a deposition setting or courtroom testimony, where the Defendants will have the full adversarial process available to them.

**MEMORANDUM DECISION AND ORDER - 23**

(B)     With respect to monetary sanctions imposed upon Plaintiffs' counsel individually (*see infra*), the undersigned hereby identifies attorneys Huntley, Conant, Sabalos, and Flynn as being absolutely subject to this Memorandum Decision and Order.  To the extent any one of Plaintiffs' remaining counsel believes that he should not be subject to this Memorandum Decision and Order, he is to file a motion seeking relief from the same on or before April 12, 2013, detailing the good cause for said relief.  Defendants are permitted (but not required) to file a response on or before April 19, 2013.  Soon thereafter (in any event, before Plaintiffs are to respond to any request by Defendants' for recovery of fees and costs (*see infra*)), the Court intends to issue a subsequent order setting out those additional attorneys who are (and who are not, if any) subject to the sanctions set out in this Memorandum Decision and Order.

(C)     Subject to the terms of subparagraph 6(B), Plaintiffs' counsel, jointly and severally, shall pay a sum to each Defendant – Credit Suisse and C & W – to be determined upon consideration of appropriate evidence, to recompense said Defendants for the attorneys' fees and costs necessitated by the motions filed seeking sanctions as a result of the failure to file the sworn affidavit of Mr. Miller.[6]  If a Defendant seeks to recover such expenses, by April 19, 2013, it is to seek recovery of such costs in the same manner as if the Defendant were seeking to recover costs

---

[6] The Court considered a ruling that would allow for Defendants to seek recovery of any attorneys' fees and costs expended as a result of the fact of the failure to file the signed affidavit of Mr. Miller, in the context of additional or different briefing and motion practice that would not have been done but for the fact of the filing of the unsigned declaration and argument made upon the same.  Ultimately, the Court concluded that the difficult and time-consuming exercise of trying to extract such threads from the much more extensive weave of the briefing and argument that was submitted by Defendants would be extraordinarily difficult and not worth the price of admission for the parties to pursue or defend, or for the Court to decide.  Whether or not any party will have an independent right to seek recovery of such fees and costs at a future date will have to await the denouement of the lawsuit.

**MEMORANDUM DECISION AND ORDER - 24**

of suit, including attorney fees, as a matter of right under FRCP 54(d). Any such request shall carry sufficient detail and explanation so as to allow the Court to find, by a preponderance of the evidence submitted to it, that the requested costs are directly connected to the motion for sanctions, and to the follow-up work in response to this ruling. If there is any doubt left by the evidence in that regard, the Court will not award any costs represented by the doubtful evidence. Plaintiffs shall have the right to respond and oppose the request for costs, if any is filed, in the ordinary manner in response to an FRCP 54(d) motion.

(D)     Subject to the terms identified in subparagraph 6(B), Plaintiffs' counsel are each individually sanctioned in the sum of $6,000.00. The Court arrives at that sum by considering the very serious nature of the decision not to file the sworn affidavit of Mr. Miller, or to advise opposing counsel of the existence of that sworn affidavit, all as further previously discussed in this Decision. Such failure unnecessarily multiplied the proceedings in this lawsuit, caused an unnecessary and unjustifiable use of the resources of the parties and the Court, constituted a material misrepresentation of the evidentiary record, and violated an attorney's duty of candor to the Court. Any sanction for those serious professional failings must serve both as sanction for the fact of the improper conduct and as a deterrent to the lawyer, and other lawyers, who might consider taking such actions in the future. As to the amount of the individual sanction, the Court considers the following facts:

(1)     That each lawyer is established in his practice, and each lawyer willingly came into the representation of the plaintiffs in this case (this is not a situation where a lawyer has been appointed at the order of the Court to represent a particular party, nor are any of the attorneys involved in this case on a *pro bono* basis);

**MEMORANDUM DECISION AND ORDER - 25**

(2)      That other than Mr. Huntley and Benjamin Schwartzman, each of Plaintiffs' counsel has come to the District of Idaho asking to be admitted to this Court on a *pro hac vice* basis, in order to be one of the many counsel representing Plaintiffs in this case, and by doing so, they have agreed to be governed by the same professional rules of conduct as apply to lawyers admitted to the practice of this Court;[7]

(3)      That Plaintiffs' counsel have represented to the Court in their pleadings and filings in this case, that Plaintiffs' claims carry millions of dollars of alleged damages, involving transactions occurring at high-end resort properties in multiple geographic locations, and with claims that conceivably could have been brought in courts other than the District of Idaho;

(4)      That in order for a sanction to have a deterrent effect, it should carry a significant enough economic impact upon the individual receiving the sanction so as to cause that individual, and others who may learn of the sanction, to make decisions in the future that are not likely to expose one to the possibility of receiving such a sanction;

(5)      That the Court considers a sanction which has the effect of depriving an attorney of a week's worth of earned fee income, as having a sufficient economic deterrent effect to have the intended impact upon an attorney's future decision-making about his responsibilities as a licensed professional and as an officer of the Court.

(6)      That, assuming an average billing rate of $300 an hour for the plaintiffs' attorneys, which the Court believes is a conservative estimate, a 40 hour work week will yield a gross earned income of $12,000.00.

---

[7] The Court considered, but ultimately decided against, revoking the *pro hac vice* status of those counsel who have been admitted to practice before this Court on that basis.

**MEMORANDUM DECISION AND ORDER - 26**

(7)    That, acknowledging that most attorneys do not earn a full billing rate for every hour in a 40 hour rate, and acknowledging that not every attorney among those in the list of Plaintiffs' counsel has the same number of years of experience or reputation in practice, which also can affect the gross income of an attorney;

(8)    That, after considering those factors described in paragraph 6(D)(7), the Court concludes that it is more appropriate to lessen the sanction as because it may have a disproportionate impact upon certain of plaintiffs' counsel in comparison to others, even though to do so may lessen the deterrent effect upon those counsel of greater incomes;

(9)    That, therefore, the Court will reduce the $12,000 amount by one-half, so as to make the sanction $6,000 for each of Plaintiffs' counsel.  In doing so, the Court recognizes that for some of Plaintiffs' counsel the amount may seem of small consequence; however, the Court also points out that for those counsel, they also have the deterrent consequence of knowing that any one of them could have stepped in to insist upon a different decision in these circumstances, that could have protected not only themselves, but also their co-counsel who might be of lesser means, from the risk of the sanctions that the Court imposes in this Order.  Further, to the extent that there are disproportionate impacts upon the relative economic resources of Plaintiffs' counsel, they have the opportunity to equalize such impacts in the context of satisfying their joint and several liabilities for any award of costs that the Court may make in favor of the Defendants, as part of the follow-up to this decision.

(10)    As to attorneys Huntley, Conant, Sabalos, and Flynn, such payments shall be made into the Registry of the Court on or before April 12, 2013.  If, pursuant to the subsequent order referenced in subparagraph 6(B), additional Plaintiffs' attorneys are also

**MEMORANDUM DECISION AND ORDER - 27**

determined to be the proper subjects of this Memorandum Decision and Order, those attorneys shall make their $6,000 payment to the Registry of the Court within 14 days of that subsequent Order.

### III. <u>ORDER</u>

For the foregoing reasons, IT IS HEREBY ORDERED that (1) Cushman & Wakefield's Motion for Sanctions (Docket No. 246) and (2) Credit Suisse's Motion for Order to Show Cause (Docket No. 253) are GRANTED.  The analysis contained within this Memorandum Decision and Order with respect to granting these motions, likewise operates as the support for denying Plaintiffs' Motion for Award of Attorneys' Fees Re: Motions by Defendants (Docket No. 302). Therefore, Plaintiffs' Motion for Award of Attorneys' Fees Re: Motions by Defendants (Docket No. 302) is DENIED.

DATED:  **March 29, 2013**



_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 28**

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 85 of 186

# Exhibit M

# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH, AMY KOENIG, VERN JENNINGS, MARK MUSHKIN, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, JUDY LAND, and CHARLES DOMINGUEZ, each individually, and on behalf of PROPOSED Plaintiff CLASS Members of Tamarack Resort, Yellowstone Club, Lake Las Vegas, and Ginn sur Mer, <br><br>　　　　Plaintiffs, <br><br>　　vs. <br><br> CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive, <br><br>　　　　Defendants. | Case No.: CV 10-1-EJL-REB <br><br> **ORDER RE: PLAINTIFFS' MOTION FOR STAY OF SANCTIONS MEMORANDUM DECISION AND ORDER ECF 352, PENDING RESOLUTION OF RULE 72 OBJECTIONS** <br><br> **(DOCKET NO. 358)** |

Currently pending before the Court is Plaintiffs' unopposed[1] "Motion for Stay of Sanctions Memorandum Decision and Order ECF 352, Pending Resolution of Rule 72 Objections" ("Motion to Stay") (Docket No. 358).  Having carefully considered the record and otherwise being fully advised, the Court HEREBY GRANTS  Plaintiffs' Motion for Stay,

---

[1] Defendant Cushman & Wakefield "takes no position" on Plaintiffs' Motion to Stay, responding to it "only to address certain of the outrageous statements contained" therein.  *See* C&W Resp. to Mot. to Stay, p. 1 (Docket No. 371).  Defendant Credit Suisse files no response to Plaintiffs' Motion to Stay.

**ORDER - 1**

pending resolution of Plaintiffs' April 12, 2013 "Opposition to Sanctions Order ECF 352"

(Docket No. 367).  Therefore, the Court stays those deadlines relating to (1) Defendants'

recovery of costs and fees as referenced in Paragraph 6(C) of the Court's March 29, 2013

Memorandum Decision and Order at pages 24-25 (Docket No. 352) (amended at Docket Nos.

381 and 382), and (2) the deadline for sanctions payments as referenced in Paragraphs 6(D)(1-

10) of the Court's March 29, 2013 Memorandum Decision and Order at pages 25-27 (Docket

No. 352) (amended at Docket No. 360).

IT IS SO ORDERED.

DATED:  **April 22, 2013**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**ORDER - 2**

# Exhibit
# N

Find Contacts or Companies          Advanced Search

**You have saved this search as "kirscher".** You can access this saved search anytime by using the saved searches menu on this page or by going to My Saved Searches under My Account in the navigation bar.

Saved Searches  | Help

Contact Results     Company Results

**Search Options**

- [ ] Hide My Owned Contacts
- [ ] Show Only Direct Dials
- [ ] Show Inactive Contacts

**Show only contacts updated:**

Anytime ∨

**Refine Your Results**

Industry

Department

Level

Title

Company Name

Employees

Revenue

Fortune Rank

Ownership

### 17 contacts found for "Worden, Thane &amp; Haines,..." Revise search»

Save this Search          Show : 50 ∨  1 - 17 of 17    Page 1  of 1

| | Name | Company | Title | City | State | Country | Updated |
|---|---|---|---|---|---|---|---|
| [ ] | Bender, Ronald | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 05/07/13 |
| [ ] | Cowley, Jane | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 05/07/13 |
| [ ] | Cuffe, Matthew | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 10/01/08 |
| [ ] | Dayton, Peter S | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 05/06/13 |
| [ ] | Dowdall, Colleen | Worden, Thane & Haines, P.C. | Partner | Missoula | MT | United States | 05/09/13 |
| [ ] | Frank, Patrick G | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 12/14/09 |
| [ ] | Hanenburg, Lacinda | Worden, Thane & Haines, P.C. | Paralegal/Legal Assistant | Missoula | MT | United States | 03/08/11 |
| [ ] | King, Martin S | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 12/17/09 |
| [ ] | Kirscher, Ralph | Worden, Thane & Haines, P.C. | Vice President | Missoula | MT | United States | 09/19/12 |
| [ ] | McCarthy, William | Worden, Thane & Haines, P.C. | Associate | Missoula | MT | United States | 02/24/07 |
| [ ] | Mendenhall, W. Carl | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 05/07/13 |
| [ ] | Morris, Sean Michael | Worden, Thane & Haines, P.C. | Associate | Missoula | MT | United States | 11/28/05 |
| [ ] | Smith, Amy | Worden, Thane & Haines, P.C. | Second Year Associate | Missoula | MT | United States | 06/13/12 |
| [ ] | Smith, Amy | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 10/19/12 |
| [ ] | Terrazas, Robert | Worden, Thane & Haines, P.C. | Vice President | Missoula | MT | United States | 08/30/12 |
| [ ] | Vannatta, Shane A | Worden, Thane & Haines, P.C. | Attorney | Missoula | MT | United States | 05/06/13 |
| [ ] | Williams, Benjamin | Worden, Thane & Haines, P.C. | First year Associate | Missoula | MT | United States | 08/10/12 |

Save this Search          Show : 50 ∨  1 - 17 of 17    Page 1  of 1

Community   Are You in Data.com?   Developers   Enterprise Solutions
Email Marketing   Privacy   Terms of Use   Site Map   Contact

Copyright © 2013 data.com. All Rights Reserved. Patents Pending.
Data.com is a salesforce.com® company.

# Exhibit
# O



**MERITAS**

406/721-3400 Local                          111 N. Higgins, Suite 600

800/337-3567 Toll-Free                       PO Box 4747

406/721-6985 Fax                             Missoula, Montana 59806

- Home
- Practice Areas
  - Access Disputes & Easements
  - Administrative Law
  - Arbitration
  - Banking
  - Bankruptcy & Creditor Rights
  - Business & Transactional Law
  - Collections
  - Commercial Law
  - Consumer Protection
  - Contract Law
  - Copyright Law
  - Elder Law
  - Employment Law
  - Environmental & Natural Resources
  - Estate Planning, Probate & Trusts
  - Foreclosures
  - Hospital & Healthcare Law
  - Insurance Defense Law
  - Labor Law
  - Mediation
  - Medical & Professional Malpractice
  - Personal Injury
  - Products Liability
  - Real Estate Law
  - School Law

- Taxation
- Trademark Law
- Water Law
- Workers' Compensation
- Attorneys
  - Ronald A Bender
  - Patrick G Frank
  - Martin S King
  - Patrick Dougherty
  - W Carl Mendenhall
  - Gail M Haviland
  - Shane A Vannatta
  - Peter S Dayton
  - Sean M Morris
  - Reid J Perkins
  - William E McCarthy
  - Matthew J Cuffe
  - Jane E Cowley
  - Colleen M Dowdall
  - Amy M Scott Smith
  - Jeremy G Thane, Retired
  - Jori L. Quinlan
- Why Choose Us
- Contact Us

- Home
- Practice Areas
  - Access Disputes & Easements
  - Administrative Law
  - Arbitration
  - Banking
  - Bankruptcy & Creditor Rights
  - Business & Transactional Law
  - Collections
  - Commercial Law
  - Consumer Protection
  - Contract Law
  - Copyright Law
  - Elder Law
  - Employment Law
  - Environmental & Natural Resources
  - Estate Planning, Probate & Trusts
  - Foreclosures
  - Hospital & Healthcare Law
  - Insurance Defense Law
  - Labor Law

- Mediation
- Medical & Professional Malpractice
- Personal Injury
- Products Liability
- Real Estate Law
- School Law
- Taxation
- Trademark Law
- Water Law
- Workers' Compensation
- Attorneys
  - Ronald A Bender
  - Patrick G Frank
  - Martin S King
  - Patrick Dougherty
  - W Carl Mendenhall
  - Gail M Haviland
  - Shane A Vannatta
  - Peter S Dayton
  - Sean M Morris
  - Reid J Perkins
  - William E McCarthy
  - Matthew J Cuffe
  - Jane E Cowley
  - Colleen M Dowdall
  - Amy M Scott Smith
  - Jeremy G Thane, Retired
  - Jori L. Quinlan
- Why Choose Us
- Contact Us
- Copyright & Disclaimer
- Sitemap

SEARCH

- Copyright & Disclaimer
- Sitemap

©Copyright 2011-2013, Worden Thane P.C., All Rights Reserved

WB | CREVIN

# Exhibit P

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 95 of 186

**406-541-2550**

HOME    ABOUT US    AREAS OF PRACTICE    HOURS & LOCATION

# Terrazas Law Office



Terrazas Law Offices employs a full s
legal interns, and three attorneys. W
legal assistants and interns pursue hi
interests in order to better serve our
also remain current with continuing l
invest in our community through offic
including Destination Missoula, Leade
Leadership High School, and numero
and service activities.

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 96 of 186

# ATTORNEYS



## Robert Terrazas, (P.C.)

**Practice Areas:**

Civil Trials; Insurance; Personal Injury; Employment; Re
Property; Domestic Relations and Family Law; Wills; Pro
Formations; Adoptions

E-mail: **rterrazas@terrazaslaw.com**

**Admitted:**

1980, Montana and U.S. District Court

**College:**

Santa Clara University, B.A., 1973.

**Law School:**

Santa Clara University, J.D., 1978.

**Member:**

Western Montana and American Bar Associations (Sections on: Tort and Ins
Litigation, Real Property, Probate, Trusts); State Bar of Montana; Montana
Association; The American Association for Justice

**Biography:**

Deputy Missoula County Attorney, 1980-1986.

**Born:**

El Paso, Texas

## Andre Gurr

**Practice Areas:**

Personal Injury; Employment Law; Landlord-
Tenant; Real Estate; Water Law; Adoptions;
Wills; Family Law

## Julie D. Goodkind

**Practice Areas:**

Personal Injury, Insurance L
Employment, Family Law, R



**Admitted:**

2004, Montana and U.S. District court, District of Montana

**Law School:**

University of Montana School of Law, J.D., with honors, May 2004.

**College:**

University of Nevada at Reno, B.A., with honors, 1998.

**Member:**

State Bar of Montana

**Born:**

Kirkland, Washington

E-mail: **agurr@terrazaslaw.com**



**Admitte**

2008, Mc District C Montana

**Law Sch**

Universit School, J

**College**

University of Vermont, May

**Member:**

Montana State Bar, America Justice, Montana Trial Lawye

**Born:**

Birmingham, Alabama

E-mail: **jgoodkind@terraz**



## Elizabeth A. Clark

**Practice Areas:**

Personal Injury, Employment, Real Estate, Family Law, Probate, Collections

**Admitted:**

2012, Montana and U.S. District Court, District of Montana

**Law School:**

University of Montana School of Law, J.D. with Honors, May 2012

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 98 of 186

**College:**

Wilmington University, B.S., Magna Cum
Laude, January 2007

**Member:**

State Bar of Montana, Western Montana Bar
Association, Montana Trial Lawyers
Association

**Born:**

Quarryville, Pennsylvania

**Email:**

**bclark@terrazaslaw.com**

---

# PARALEGAL



## Jennifer Allen – Paralegal

**Education:**

Western Montana College – B.S., Elementary Education,

University of Great Falls – B.S., Paralegal Studies, gradu
certified 2002

Employed with Terrazas Law Offices since 2010

**Born:**

Forsyth, Montana

**E-mail: jallen@terrazaslaw.com**

---

# SUPPORT STAFF



### Mary Cole - Office Manager

**College:**

University of Montana, College of Technology - Legal Secretary Program, graduated 1998

Employed with Terrazas Law Offices since 1999

University of Montana, College of Technology - Legal Assistant Program, graduated 2003

**Born:**

Missoula, Montana

**E-mail: mcole@terrazaslaw.com**



### Jennif... Wade

**College**

Universi... In Psych... Human ... Develop... 1999.

Employed with Terrazas Law...

**Born:**

Killeen, Texas

**E-mail: jene@terrazasla...**



1923 South Higgins Ave.    Missoula, Montana 59801  |  406.541.2550  |  Contact Us

© 1986 - 2013 Terrazas Law Offices    11.6.26.0

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 100 of 186

# Exhibit Q

ATTORNEYS AT LAW

⊞ MERITAS

406/721-3400 Local

800/337-3567 Toll-Free

406/721-6985 Fax

111 N. Higgins, Suite 600

PO Box 4747

Missoula, Montana 59806

- Home
- Practice Areas
    - Access Disputes & Easements
    - Administrative Law
    - Arbitration
    - Banking
    - Bankruptcy & Creditor Rights
    - Business & Transactional Law
    - Collections
    - Commercial Law
    - Consumer Protection
    - Contract Law
    - Copyright Law
    - Elder Law
    - Employment Law
    - Environmental & Natural Resources
    - Estate Planning, Probate & Trusts
    - Foreclosures
    - Hospital & Healthcare Law
    - Insurance Defense Law
    - Labor Law
    - Mediation
    - Medical & Professional Malpractice
    - Personal Injury
    - Products Liability
    - Real Estate Law
    - School Law
    - Taxation
    - Trademark Law
    - Water Law
    - Workers' Compensation

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 103 of 186

- Attorneys
  - Ronald A Bender
  - Patrick G Frank
  - Martin S King
  - Patrick Dougherty
  - W Carl Mendenhall
  - Gail M Haviland
  - Shane A Vannatta
  - Peter S Dayton
  - Sean M Morris
  - Reid J Perkins
  - William E McCarthy
  - Matthew J Cuffe
  - Jane E Cowley
  - Colleen M Dowdall
  - Amy M Scott Smith
  - Jeremy G Thane, Retired
  - Jori L. Quinlan
- Why Choose Us
- Contact Us

# Amy M. Scott Smith

Associate

Contact

## Legal Affiliations:

State Bar of Montana

Western Montana Bar Association

Montana Defense Trial Lawyers

## Civic Activities:

United Way of Missoula County

Child Care Resources

## Practice Areas:

Estate Planning

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 104 of 186

Probate

Commercial Transactions

Business Law

Contract Law

Real Estate Transactions

Family Law

General and Civil Litigation

## Bar Admissions:

State of Montana (2008)

U.S. District Court, District of Montana (2008)



Amy Scott Smith joined Worden Thane P.C. in 2008 after interning with the firm through law school. Amy earned her J.D. from the University of Montana in 2008. While in law school she served as Editor in Chief of the Public Land and Resources Law Review and president of the Montana Public Interest Law Coalition. Prior to law school, Amy received a Masters in Public Administration (2005) and a B.A. in Anthropology (2003), both from the University of Montana.

Amy has a diverse practice with a primary focus on estate planning, probate, business planning, formation, operation and dissolution, commercial transactions and real estate matters. She also has experience with collections and family law matters.

When not working, Amy enjoys playing hockey and softball, and camping with her family. Amy, her husband, Matt and daughter, Morgan are avid sports fans, and are often found watching Grizzly football, Lady Griz basketball and Missoula Osprey baseball.

SEARCH          [ Submit Query ]

- Copyright & Disclaimer

Case: 12-35986, 08/19/2013, ID: 8748363, DktEntry: 55-3, Page 105 of 186

- Sitemap

©Copyright 2011-2013, Worden Thane P.C., All Rights Reserved

WB | CREVIN

# Exhibit R

# Instant Email Lookup Report for Ralph Kirscher

Here is the order number associated with your purchase. Your credit/debit card statement will reflect the charge shown.

Instant Email Lookup Order #72507046 INO*INTELIUS.COM/RT

*Questions about these charges? Call us at (888) 445-2727.*

## Email Lookup Results for Ralph Kirscher in MT

### What is an Email Lookup?

This section lists current and historical records that share the same email address. The Email Address Report can be helpful in providing a consolidated view of matching records for your subject's email address across multiple public and publicly available sources. The name, address and phone number data may provide useful information to help you locate an individual.

### What is a current phone and address check?

We checked the phone numbers and addresses in this report with utility companies. Addresses and phone numbers that are on utility bills are considered current and marked in red. Not all phone numbers and addresses can be checked but they may still be current.

**Record 1 of 1**

RALPH KIRSCHER

Attorneys At Law
Missoula, MT 59806
Property Report

rkirscher@wthlaw.net

## Business People Search

### What is a Business Profile Summary?

This section lists current and historical business people profile records that share the same name and state as your search subject. The Business Profile Summary can be helpful in providing a consolidated view of matching current and historical records for your subject's name across multiple public and publicly-available record sources. The title, employment history, education and company data may provide useful professional information for the individual.

### What is a current phone and address check?

We checked the phone numbers and addresses in this report with utility companies. Addresses and phone numbers that are on utility bills are considered current and marked in red. Not all phone numbers and addresses can be checked but they may still be current.

## Record 1 of 1

Profile Info

**JUDGE RALPH B KIRSCHER**
Education

- **University Of Montana School Of Law**
  Law Degree

- **University Of Montana At Missoula**
  Undergraduate Degree

**Ex. 2**

# Exhibit

# S

**Robert Bell**

**From:** Ronald A. Bender [rbender@wordenthane.com]
**Sent:** Thursday, August 15, 2013 12:06 PM
**To:** Robert Bell
**Subject:** testing testing

Ronald A. Bender



Phone: (406) 721-3400
rbender@wordenthane.com

# Exhibit

# T

### Notes on the MSA, including amendments and the mini settlements
### (Edra's comments in Green)

<u>Full MSA – Pages 1 – 42 – Case No. RIDIND91152 in the Riverside County, CA</u>

- ■ 1 of Page 1 says, "This Stipulation is entered into for the purpose of compromising and settling contested issues between the parties. If for any reason the waivers and releases in this Stipulation are not accepted by the Court and this Stipulation becomes null and void, or this Stipulation fails for any other reason whatsoever, nothing contained herein shall be an admission of fact or a statement against interest. Each party has refrained from making contentious statements, or asserting positions, which might cause the other to be upset, so that compromise and settlement could be promoted and achieved."

Doesn't this right here give us the "out" to go after anything we want and to have the entire MSA null and void?

Also, remember that I was completely frozen out of all the companies and any information from shortly after I filed for divorce (Dec 06) until just at before the closing of the final MSA.

- ■ 4 of Page 2 – Read all of it and A – C

They could use this as an argument that we agreed not to go back to the values of the assets we agreed to take. I will go into the different assets as we go through this, but one thing that should be pointed out here, is Tim's very own testimony in the family court. He made many false statements. When I would point that out to the Judge Waters, her response was always that Tim, being given the Caption of the Ship title for our assets by her, had a fiduciary responsibility to me, if it was found that he was not telling the truth.

A few examples of this would be Tim stating that their was no community cash flow, when he was taking funds from Big Springs Reality (not paying commissions to the sales people), Sunrise Ridge (not paying the partners their share when he took funds), selling community assets and using the funds without a division given to me, and there are more examples.

Tim also lied in a hearing when I was trying to stop CH from buying the golf course lots. First, he had a sales person, Eric Ladd, not the VP of Sales, which would be more standard, submit an affidavit supporting Tim's claim of the value of the Lots. Tim stated that no commissions were being paid for the sale of these Lots to CH. Yet, later we find out that none other then Eric Ladd was promised 500k, of which 250k was paid to him. Eric later filed a suit and got a judgment against me for greater then this amount.

- ■ 8 of Page 4 all of page 5 – Can you read and tell me if you think this is binding or it goes to the fraud that we talked about?

**DM - Exhibit 11**

■ **16 of Page 6 and all references to BGI stock below**

This is where things could get a little grey to what is written, what was said and what was intended. Me taking the BGI stock was the way to finally get PC and Casa Captiva into my legal ownership after being awarded it in the second mini settlement. If you will go back and read those, you will find that Tim and his accountants were to find a way to get both of these assets into my name without creating tax issues. Taking the BGI stock now, in the final MSA, I was told would resolve this. Also, since I was also taking the YC entities, it seemed like a natural to simply take Tim's ownership of the stock. (Remember, if though all of the stock was in Tim's name, it was still a community property asset.)

I went into this agreement still with the understanding that both Tim and George Mack had told me that the BGI notes to YDI as well as the Tim Blixseth notes to BGI (which I ended up with as well.) would have a way of working them out as years went along as "forgiven" when we needed the tax write offs. Tim had always said that. I will go into this in more detail when I talk about the Tamerendo transfer, but Tim also said that about the 40mm for that.

If the above would have been as it was told to me, then the YC's would have paid the CS loan off with the proceeds from Lot sales.

Upon the closing of the MSA, the bank accounts had been drained and/or were overdrawn. Pat can go into more details of that as well. I, of course, was not counting on this. Both American Bank and Palm Desert accounts were like this.

In addition, the books and records that were turned over cannot be reconciled. The trail balances do not jave. Again, Pat can go into more detail on this.

There were contracts and payables that Tim entered into after knowing we were going to be closing the MSA. Bob Sumpter employment contract for one.

■ **(a) of Page 7**

CB Sunrise Partners, LLC is the one that Moses Moore (YC's controller) told me that Tim had taken the funds when things sold and had not paid the partners in this.

Tim had also signed agreements fro some management for St. Andrews after our signing of knowing I was getting this. He did this both in YDI and in YCW.

■ **(c) of Page 7** – This did not happen and we had issues trying to make it happen.

☒ **(e) of Page 7** – Talk to Andy Patten about this. It was brought up in the UCC vs. CS and Tim Blixseth with how Tim bought and sold this to himself By the time I got it, he had taken the value out of it during the time I was frozen out of the businesses. YC had an expert testify with how this was handled.

2

**DM - Exhibit 11**

- **B. of Page 9** – YCW was insolvent when I received it. The way this is written, I would have no way of knowing that.

- **C of Page 10 and (1) – (3)**

Again, Andy Patten will be helpful here. Tim did not disclose that he had taken millions out of Big Springs Reality before this and had not paid commissions. There has been something filed against him on this. Andy will have the details. This is also where he states that Eric Ladd was paid a commission for the Golf Course Lot sale to CH. In family court he testified that there was no commissions to be paid, but he already had the deal with Eric, which I believe is how he got Eric to give the statement of value. The VP of Sales should have done that, if it were to be done, but he could not be "bought". AND 500k was not nearly what was owed to the sales people. I know that Charlie would be happy to talk with you about the exact amounts, but this should also be in what was filed. At the time Tim did not pay them, which was much longer then "30 – 60 days in arrears" he told them that the money was needed to YC operations. They later found out that the funds were used for boat slips and other things for Tim. This was also during the "frozen out" part for me, but Big Springs was in Tim's name and therefore a community property asset. At the time he was taking funds out of Big Springs for his use, he was also stating in family court that there was no community cash flow.

- **D of Page 10** I already addressed Big Sky Ridge, above. Please note that Big Sky Ridge was part of the YC Chapter 11.

- **E of Page 11** Again this was already addressed regarding Sunrise Ridge and Moses Moore stating that Tim told the funds as "his own personal piggy bank" and did not pay the partners. Tim did not disclose this. This was also community cash flow.

- **G of Page 11** This is a good one for the Western claims.

- **H of Page 11** This did not happen and ended up being part of the YC BK.

- **All of the assets listed that Tim got, starting on I. of page 12, had the value that was perceived and no unforeseen liability.**

- **17. of Page 14**

At the time of signing this, Tim told me that the LeMond group would do this, just to be rid of him, by getting 1.0 to 2.0mm on closing. I ended up having to pay them 8mm of the 35mm I got from CH, to get them to sign off. I was to get this back from YC, as they were going to be the owners of these B shares and not me personally. Of course you know that did not happen. (Remember as well, I did not really get 35mm from CH, but only 22mm. Tim had borrowed 13mm from them in 2007 and I took over that promissory note when I got the Family Compound back.)

3

DM - Exhibit 11

■ **20. of Page 14** This is not a big deal, but Tim took most of this out. Somethings were brought back by the YC employees that removed it per his direction once they knew that he was not to take it, but not nearly all. (Maybe this is where he got the idea that I would take more out of 176?)

■ **(3) of Page 15 including (a) – (d)**

This is where Tim transferred Tamarindo to himself, before the final divorce decree. He stated to me that George could help me do the same on this promissory note to YDI as they had intended to do with the other notes for the money that was taken from the CS loan. He went out of his way to make this clear, as he also stated that he did not want to have any tax issues from getting Tamarindo in his name when the funds that purchased it were from the CS loan. Of course no taxes were paid on any of that money, 208mm, as it was booked as a loan and not a dividen. This is the point of the UCC filing against Tim. That suit continues in Feb 2010. Andy Patten and Troy Greenfield can be helpful here.

■ **C of Page 16**

Turks and Caiscos property was also purchased with CS loan funds, yet Tim was awarded this without having to pay back the funds for the purchase price. I think this, Tamerndo and the other things go to show that, having me take on the entire promissory notes for all the funds taken out by BGI and then Tim, would not be a fair division of property. I in fact, I had to pay back those notes and Tim got all of those properties. In other words, just Turks and Tamerendo alone account for over 70mm of the 208mm taken out, plus the other things that he got in the final MSA and the two mini settlements. If he had not told me that those notes could be worked out another way and they were never intended to be paid back, would I have thought taking that on AND giving him these assets free and clear was a fair division? NO.

■ **O. of Page 18**

I later found out that who that was transferred to was Jim Dolan. There are several things that were transferred to him during the time of my "frozen out". Jim Dolan is also a third partner of Tim's in Western Pacific Timber Company. He is also who Tim sold, well under valued, our personal interest in the FBO in Bozeman. Jim Dolan is also the one that promised to be paying the BFI note on time, yet admitted to me and others that he was talking with Tim at the same time about the payment. Tim was telling others that Jim was not going to be making the payment to keep me out of money.

I don't know where this fits in, but there is not any part of my assets that I was awarded that Tim did not call people and interfere with me being able to do things for the good and benefit of myself. He contacted Alan Rye about my loans, which put Alan in fear of his collateral in my share of BFI. Tim had no current business with Alan and his bank.

He contacted Warren Trepp regarding Blxware and caused all kinds of issue there where we could not move forward. He hired Mike Flynn, who was Dennis M lawyer and

4

**DM - Exhibit 11**

handled things for Blxware. He and Mike Flynn started a press campaign against me. Many reporters have confirmed that Tim or Flynn would call them and tell them where to go and look things up that were filed in the Reno courts. These were filed by Flynn. Many times Judge Cook would not let them stand, but the damage was done as the reporting had already happened. We must knock Mike Flynn off the MSA matter. We need to do whatever it takes, nor matter what we have to file.

He does still have business with Palm Desert National Bank, but continued to give them misinformation about my businesses and me.

As you guys well know I had to borrow money from my friends like Burt Sugarman and others to stay alive during this time.

- **25. of Page 20**

This is another area that Andy Patten can help you understand. There has been something filed against Tim in regard to the handling of this Lot. He had just before he "sold it to himself with no cash down and a promissory note of 2mm" had placed a value of 3.4mm on it. YC has filed this against him. Paul Moore might also have additional information.

After the closing of the MSA, I found out that Tim ended up somehow getting this Lot to the man that he purchased Tamerndo from. I believe that Tim never intended to pay this 2mm to YC, just like all the other promissory note he had signed with YC/YDI.

- **C. of Page 22** Read and tell me what you think of this one.

- **E./F.G. of Pages 22/23**

We never received proper books and records, minutes and other things. Pat can go into this more. We still, a year later, have not been able to figure much of this out with how they turned what they did over.

- **J. of Page 23**

It states here that as of June 1, 2008 I was to receive all cash etc.............again. Pat can tell you how things were turned over to us. Tim also entered into several contracts that I two of which I have mentioned already. Tim also told me that he had paid all of YC payables current with a deal he did with Wayne Prim (the other third owner of WPT) This turned out not to be true. I talked to Wayne about this. In Judge Tuckers courtroom, Bob Sumpter, on Tim's behalf, in April or May of 2008, stated as much as well.

- **Pages 24/25/26/27 in reference to taxes I want to talk about in our meeting, as it is too hard to put in all in this overview.**

**DM – Exhibit 11**

■ (a) of Page 27

Interesting that they admit here that there was community cash flow from Big Springs, Big Sky Ridge LLC and Sunrise Ridge LLC and that Tim took all of that money. This was during the time that he was stating that there was no community cash flow. I had to borrow money to just live during this time, as I did not get a penny of temporary spousal support nor long term after. I did not catch this before.

■ 33. of Page 29

This is where Troy Greenfield had a "field" day during the UCC vs CS and Tim Blixseth. Tim stated on the stand that the "cornerstone of the MSA for him" was me taking over his fiduciary responsibility for any and all of his actions in the business that he had run and I got. It would be worth a phone call to him on this one. Andy Patten was there as well. Troy told me that he did not think that this area of the MSA would stand up as I could not hold Tim harmless nor take on his actions if there were fraud and other things involved. I, of course, until Tim stated that in court, did not think in anyway that the "cornerstone" of the MSA, but I was surely aware that it was important to him. How can I get around this issue ??

■ 35. of Page 30

Here is where I think we have a HUGE upside if you can find in the law where this waiver cannot stand. As I told you, when Jaffe put together the filing for spousal support, it penciled out at over 2.0mm per month, but I never expected to get that.

Tim repeatedly said at some point that there was no more community cash flow. We have since found out that this was not true. He just kept all the money for himself. Because he was saying there was no cash flow, I had to borrow money to live on, when there was in fact funds for the community.

If the assets would have been what I was lead to believe they were AND if Tim had not started his campaign to "crush and destroy her"……..(it then turned into "keep after her until she is crushed or dead")……..I would not have needed the spousal support.

But the facts are now clear that there was cash flow that I should have received at the time I was frozen out. The assets and more over the liabilities that I was mislead about, were such (or not such as far as assets go) to maintain my lifestyle, which is the letter of the family law, let alone, any lifestyle. I am sitting here in a Chapter 7.

Last year at about this time, just before signing the MSA, I had manageable liabilities, no money borrowed against Porcupine Creek nor Casa Captiva. The fact is that Tim knew exactly what he was doing and what I was getting myself into, which is why the cornerstone of the MSA to him, was what it was.

DM - Exhibit 11

If I had known any of this, I would not have settled in the way I did. I would have been granted both temp and long-term spousal support. I would not have had to continue to borrow money to live. I would not have borrowed 35mm to get the MSA closed. Remember, of the 35mm, I personally only got just over 1.0mm of that. The rest went to Tim or to YC. The part that went to YC should have been paid back to me, if things there were as they were presented.

In CA family law, a 25 year marriage with the income and tax returns that we had, would have given me a very nice annual income from spousal support.

- ☒ **36. – 44. of Pages 30 – 34** You guys are going to have to read and tell me what you think.

- ■ **Really for you guys..........it's all the reps and warranties you will have to tell me what you think.**
- ■ 64. of Page 41

I think this helps us to justify why we are filing our motions on the MSA in the BK courts in Montana, don't you? Remember we have added help there from the BK Judge who loves us, and hates Tim and Mike Flynn. At this point they could not get a decent ruling in their favor from that Judge if they tried. Either way, SB and BS have things in place in that courtroom to help us. We need to make sure the validity of the MSA never ends up being decided by Judge Waters. That would be a nightmare for all of us.

Obviously I have not mentioned the collapse of the US economy in this document, and don't want to go down that road. Don't let that become an issue in the MSA matter.

Okay, I most likely gave you more then you wanted and it's not in great order. Sorry. Let me know if something does not make sense. I think Joe E might be of some help here too.

You guys should also read the Assignment Of Company Interests Agreement and the Assumption Agreement. There are several things in the mini settlements, like Tim was to keep paying the overhead for PC, but that ended as he said there was no community cash flow. We now know there was, so I am not sure where we can fit that in.

Hope this helps. Edra

**DM - Exhibit 11**

# Exhibit U

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

|  |  |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No. **08-61570-11** |
| Debtor. | |

## MEMORANDUM of DECISION

At Butte in said District this 25th day of February, 2011.

In this Chapter 11 bankruptcy, after due notice, a hearing was held January 18, 2011, in

Butte on Timothy L. Blixseth's ("Mr. Blixseth") Amended Motion to Disqualify Bankruptcy

Judge Kirscher (With Exhibits) filed November 30, 2010, at docket entry no. 2042. Mr.

Blixseth's Motion is accompanied by an Amended Affidavit of Timothy L. Blixseth in Support

of Motion to Disqualify. *See* docket entry no. 2043. Mr. Blixseth filed a Supplemental Affidavit

on January 17, 2011, at docket entry no. 2117. Mr. Blixseth also filed his Amended Motion and

Amended affidavit on December 14, 2010, in Adversary Proceeding Nos. 09-00014, 09-00018,

09-00064, 10-00015, and 10-00088. Mr. Blixseth was represented at the January 18, 2011,

hearing by Michael J. Flynn ("Mr. Flynn") of Boston, Massachusetts, Christopher J. Conant of

Denver, Colorado and Patrick T. Fox of Helena, Montana. Mr. Blixseth's other counsel of

record in these proceedings include Benjamin A. Schwartzman, Brent Bastian, Wade L.

1

Woodard, Thomas A. Banducci and Jennifer Schrack Dempsey of Boise, Idaho, Joel E. Guthals

of Billings, Montana, Philip H. Stillman of Encinitas, California, and Daniel D. Manson and

Gregory C. Black of Butte, Montana. At the conclusion of Mr. Flynn's oral argument, the Court

took the matter under advisement.

BACKGROUND

Mr. Blixseth and his former spouse, Edra Blixseth ("Ms. Blixseth"), were the founders of

Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC ("YD"), Big Sky

Ridge, LLC, and Yellowstone Club Construction Company, LLC. The four aforementioned

limited liability companies comprise the Yellowstone Club and will be referred to generally as

the Debtors or the Yellowstone Club entities. Through the Yellowstone Club entities, Mr.

Blixseth and Ms. Blixseth began development in the late 1990's of the Yellowstone Club; an

exclusive and private ski and golf community located in Big Sky, Montana.

Mr. Blixseth was the sole managing member of Big Sky Ridge, LLC from its inception to

August 12, 2008. From their inception to August 12, 2008, YMC and YD were controlled by

Mr. Blixseth through his holding company, Blixseth Group, Inc. ("BGI"). Since August of 2001,

BGI owned 82.6532 percent of the Class A stock in YMC and YD, and Blixseth Family

Investments, LLC owned 5.1020 percent of Class A stock. The Class B Members, or Class B

Shareholders—consisting of twelve individuals or entities unrelated to Mr. Blixseth or Ms.

Blixseth—collectively owned the remaining 12.25 percent of YMC and YD.

BGI, an Oregon sub-S corporation, was owned solely by Mr. Blixseth as President and

CEO from 1999 to August 12, 2008. Mr. Blixseth and Ms. Blixseth separated in December of

2006, and effective August 12, 2008, Ms. Blixseth and Mr. Blixseth agreed, pursuant to a June

2

26, 2008, confidential Marital Settlement Agreement ("MSA"), that Ms. Blixseth would receive BGI and the Yellowstone Club entities.

To finalize the MSA, Ms. Blixseth was required to make a cash payment to Mr. Blixseth. Ms. Blixseth originally secured a commitment for funding but that commitment would not allow Ms. Blixseth to consummate the MSA in mid-August of 2008. Ms. Blixseth thus approached Samuel T. Byrne ("Byrne"), the founder and managing partner of CrossHarbor Capital Partners, LLC ("CrossHarbor") and CIP Yellowstone Acquisition LLC ("CIP"), asking for a 15-day loan so she could finalize the MSA. Ms. Blixseth and Byrne reached an agreement whereby CIP would loan Ms. Blixseth $35 million ("CIP Loan"). The CIP Loan was intended to be a short-term bridge loan that would provide Ms. Blixseth time to secure longer-term financing. Ms. Blixseth was not able to secure long-term financing and defaulted on the CIP Loan.

Subsequently, Ms. Blixseth caused the Yellowstone Club entities to seek protection under Chapter 11 of the Bankruptcy Code on November 10, 2008. Various creditors filed an involuntary Chapter 11 bankruptcy petition on behalf of BLX on September 21, 2009. *See* Bankruptcy Case No. 09-61893. Ms. Blixseth filed a voluntary Chapter 11 bankruptcy petition on March 26, 2009. *See* Bankruptcy Case No. 09-60452. Ms. Blixseth's case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009.

Mr. Blixseth and Ms. Blixseth were also the founders of Big Springs Realty, LLC and Yellowstone Club World, LLC, both of which were awarded to Ms. Blixseth in August of 2008 under the couple's June 26, 2008, MSA. Ms. Blixseth caused Big Springs Realty, LLC to file a voluntary Chapter 7 bankruptcy petition on June 5, 2009. *See* Bankruptcy Case No. 09-61079. An involuntary Chapter 7 bankruptcy petition was filed against Yellowstone Club World, LLC

3

on January 25, 2009.  *See* Bankruptcy Case No. 09-60061.  This Court generally refers to all the aforementioned bankruptcies as the Yellowstone Club related bankruptcies.

Mr. Blixseth made his first appearance in these proceedings on November 12 or 13, 2010, when one of Mr. Blixseth's counsel of record, Joel E. Guthals of Billings, Montana, appeared at a hearing on the Debtors' request for joint administration and on the Debtors' request for an interim order approving debtor-in-possession financing.  However, Mr. Blixseth did not take an active role in the Debtors' bankruptcies until February 2009 when he filed an objection to the Debtors' proposed bidding and solicitation procedures regarding the sale of 100% of the equity interests in the Debtors.  Subsequently, Mr. Blixseth sought to intervene in Adversary Proceeding 09-14 in March of 2009.

The remainder of the facts are set forth fairly extensively in the Court's Memorandum of Decision dated August 16, 2010, found at docket entry no. 575 in Adversary Proceeding 09-14.  Rather than recite the facts once again, the Court instead incorporates by reference that Memorandum of Decision.

## MR. BLIXSETH'S CONTENTIONS

In the Amended Motion filed November 30, 2010, and for the following reasons, Mr. Blixseth requests that I disqualify myself from all matters in which Mr. Blixseth is a litigant:

1. Without considering the evidence, Judge Kirscher has pre-judged that the Yellowstone Club bankruptcy petition was filed and plan was proposed in good [sic;]

2. Judge Kirscher has invited and entertained ex parte advocacy against Mr. Blixseth's counsel and Mr. Mr. Blixseth[;]

3. Judge Kirscher had ex parte communications in a hotel with Cross Harbor [sic] Capital Partners LLC concerning Cross Harbor's agenda for the

4

Yellowstone Club bankruptcy, which depends upon successful litigation against Mr. Blixseth;

    4.  Judge Kirscher's law clerk has engaged in ex parte communications with one of Mr. Blixseth's adversaries, urging his adversary to finalize a settlement with Mr. Blixseth before Mr. Blixseth could renege;

    5.  Numerous times Judge Kirscher ruled on important motions against Mr. Blixseth before Mr. Blixseth had an opportunity to file a response permitted under the rules;

    6.  Judge Kirscher entered a $40 million judgment against Mr. Blixseth before Mr. Blixseth had an opportunity to respond to the motion to reconsider upon which the $40 million judgment was based;

    7.  Judge Kirscher has made impermissible and disparaging comments about Mr. Blixseth and his attorneys, including one comment that essentially compared Mr. Blixseth's meritorious summary judgments to garbage and unworthy of the Judge's time. Such statements do not uphold the integrity of the judiciary or avoid the appearance of impartiality;

    8.  After learning that Mr. Blixseth would be moving this Court to reassign him, Judge Kirscher appears to have retaliated against one of Mr. [sic][;]

    9.  Judge Kirscher is so invested in the success of the Yellowstone Club bankruptcy case that he is "boxed in" to ruling against Mr. Blixseth no matter the merits of the claims against him;

    10.  Judge Kirscher has demonstrably pre-judged adversary proceedings against Mr. Blixseth[;]

    11.  Judge Kirscher sitting as a trier of fact cannot reasonably be expected to provide Mr. Blixseth a fair trial; he has consistently maligned Mr. Blixseth's credibility and found Mr. Blixseth culpable for the demise of the Yellowstone Club.

Amended Motion to Disqualify, docket entry no. 2042, pp 2-3.  In support of the foregoing

allegations, Mr. Blixseth filed an Amended Affidavit of Timothy L. Blixseth.  Only the following

paragraphs from Mr. Blixseth's Amended Affidavit arguably pertain to me, my conduct or my

rulings:

7.     On June 10, 2010, I received a phone call from Mr. Amsden regarding my settlement with his client, Ross Richardson as Trustee for YCW. During that phone conversation, Mr. Amsden related to me that Mr. Richardson had talked on the phone with Terry Healow who is one of Judge Kirscher's law clerks. During this conversation between Mr. Richardson and Mr. Healow, Mr. Healow asked Mr. Richardson if he had finalized his settlement with me. Mr. Richardson responded by saying that the settlement was almost complete but that a few matters needed to be addressed before it could be finalized. In response, Mr. Healow told Mr. Richardson to hurry up and get it finalized before I could "renege."

\* \* \*

16.    The bankruptcy auction for the Yellowstone Club assets occurred around May 13th 15th of 2009. The auction for the sale of the Club assets occurred at the Billings Crowne Plaza Hotel. The bidders at the auction were Credit Suisse and CrossHarbor (Byrne's company). However, also present and participating in the auction were the Debtor (i.e., the Yellowstone Club which was effectively controlled by Byrne), and the Unsecured Creditors Committee. Judge Kirscher rented a room at the hotel to facilitate ex parte communications between the bidders. The auction itself was not public. Instead it was conducted in closed door negotiations between CrossHarbor and Credit Suisse, with the Unsecured Creditors Committee being allowed to participate to some limited extent. Although my local counsel Joel Guthals, was present at the hotel, he was not allowed to participate in the auction, had no participation in the bidders' ex parte communications with Judge Kirscher, and was otherwise locked out from the negotiations. Even though the negotiations were "closed door", Judge Kirscher nevertheless met with the CrossHarbor and Credit Suisse at the hotel during their negotiations to resolve bidding issues as they arose. Immediately following these closed door negotiations with CrossHarbor and Credit Suisse, Judge Kirscher approved the Plan of Reorganization for the Yellowstone Club and sale of the Club's assets to CrossHarbor on May 18, 2009 with no formal notice to me, or other interested parties. The altered Plan substantially affected creditors' rights.

18.    During the initial phase of AP-14, I raised the obvious problem that Stephen R. Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula, Montana was at the time of the filing of the Yellowstone Club bankruptcy, my counsel in Montana. Yet, Mr. Brown was also a voting member and chairman of the Yellowstone Club Unsecured Creditors Committee, which was suing me in AP-14 for the recovery of $209 million. Further, Mr. Brown in his capacity as a member of the UCC had turned over to the UCC and its counsel over 400 email communications between his firm and me or my other attorneys which could potentially contain attorney-client privileged discussions. When Mr. Brown

turned over these emails to the UCC, Mr. Brown failed to inform me of this as required by the ABA Model Rules of Professional Conduct. When I learned of this disclosure, I raised before Judge Kirscher the gross problem that my current counsel had turned over to my adversary, the UCC, over 400 potentially privileged communications. Instead of Judge Kirscher allowing me to review these communications, Judge Kirscher reviewed these documents *in camera* without giving me a chance to review them and determine what Judge Kirscher reviewed or opinions he potentially formed by this *in camera* review. To date, Judge Kirscher has never given me the opportunity to review these potentially attorney-client privileged documents.

\* \* \*

20.  Despite the new lawsuit against me seeking hundreds of millions in damages filed on the eve of trial implicating numerous new defenses and required discovery, the bankruptcy court merely continued the trial for one week then subsequently and scurrilously accused me of delaying tactics by insisting on my due process rights, and most significantly refused to accept my pre-trial order with the new defenses to the one week old law suit.

\* \* \*

23.  . . . The court had previously deprived us of critical defenses by excluding the [Marital Settlement Agreement] MSA and Releases from my proposed Pre-Trial Order. The other side's lawyers argued that the releases were not in their Pre-Trial Order and Judge Kirscher commented that he specifically recalled not including the Releases in the PTO. My attorney directed Judge Kirscher to where the Releases were inadvertently left in the UCC's Pre-Trial Order as a trial exhibit. Judge Kirscher paused to thumb through his copy of the PTO and upon discovering that the Releases were included, he leaned back in his chair, gave a glaring stare at the Debtor's attorney, Andy Patten, and then threw the PTO across his desk with great force saying "Yes, it's still in" as if he had relied upon the manipulation of the UCC and the Debtor keeping my critical affirmative defenses out of the PTO. The manner in which Judge Kirscher showed disgust with having the Releases included in the PTO inadvertently, gave the appearance that his intent and the intent of the Debtor's and the UCC was to deprive me a critical affirmative defense in a lawsuit in which I was sued literally only few days before trial commenced.

Mr. Blixseth's Supplement Affidavit, like the Amended Affidavit, alleges that this Court

denied Mr. Blixseth due process and that the Court failed to address whether the Yellowstone

7

Club bankruptcies were filed in good faith.  Mr. Blixseth similarly argues that the Court deprived

Ms. Blixseth's bankruptcy estate of $100 million and that the Court used a states secrets privilege

and a Nevada protective order to conceal Ms. Blixseth's on-going fraud.

APPLICABLE LAW

Two provisions of the U.S. Code address recusal, 28 U.S.C. § 144 and 28 U.S.C. § 455.

In 1974, § 455 was amended to read in pertinent part:  "(a) Any . . . judge . . . shall disqualify

himself in any proceeding in which his impartiality might reasonably be questioned.  (b) He shall

also disqualify himself in the following circumstances:  (1) Where he has a personal bias or

prejudice concerning a party, or personal knowledge or disputed evidentiary facts concerning the

proceeding . . . ."  The other provisions of §455, (b)(2) through (b)(5), objectively and

specifically set forth the "interest" and "relationship" grounds of recusal covered by § 455 prior

to the 1974 amendment.  Subsection (b)(1) duplicated the grounds of "bias or prejudice" for

recusal contained in § 144, without the procedural requirements.   Subsection (a) is a "catchall"

provision covering "interest and relationship" and "bias and prejudice" requiring an objective

evaluation.  *See generally Liteky v. U.S.*, 510 U.S. 540, 114 S.Ct. 1147, 1153-54, 127 L.Ed.2d

474 (1994).  The test for disqualification under either §§ 455(a) or 455(b)(1) is "whether a

reasonable person with knowledge of all the facts would conclude that [his] impartiality might

reasonably be questioned."  *In re Focus Media, Inc.*, 378 F.3d 916, 929 (9th Cir. 2004), quoting

*United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000); and *In re Goodwin*, 194 B.R. 214,

222 (9th Cir. BAP 1996).  Given the 1974 amendment, courts have concluded that § 144 only

applies to district court judges.  *Goodwin*, 194 B.R. at 221.  *See also* FED. R. BANKR. P. 5004(a)

("A bankruptcy judge shall be governed by 28 U.S.C. § 455, . . .").  The consequence of § 144

8

not applying is that "the judge is not required to take the factual allegations as true." *Goodwin*,

194 B.R. at 222. The obligation to recuse, if warranted, is juxtaposed with the corresponding

obligation to not recuse and to serve on assigned cases when no reason to recuse exists. *Hinman*

*v. Rogers*, 831 F.2d 937, 339-40 (10th Cir. 1987). Given the foregoing, I will consider the cases

presented by Mr. Blixseth and discuss whether they apply to the pending motion.

     Mr. Blixseth, in his amended motion, seeks my disqualification under 28 U.S.C. § 455(a),

which reads: "Any justice, judge, or magistrate judge of the United States shall disqualify himself

in any proceeding in which his impartiality might reasonably be questioned." Relying on *United*

*States v. Furst*, 886 F.2d 558, 582 (3rd Cir. 1989); *United States v. Balistrieri*, 779 F.2d 1191,

1199 (7th Cir. 1985), *cert. denied sub nom. DiSalvo v. United States*, 475 U.S. 1095, 106 S.Ct.

1490, 89 L.Ed.2d 892 (1986); *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976), *cert.*

*denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976); *United States v. Dodge*, 538 F.2d

770 (8th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); *Parrish*

*v. Board of Comm'rs. of Alabama State Bar*, 524 F.2d 98 (5th Cir. 1975), *cert. denied*, 425 U.S.

944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); and *People v. Julien*, 47 P. 3d 1194, 1199 (Colo.

2002), Mr. Blixseth argues in his Amended Motion that "the factual allegations made in support

of the motion are true [sic] are assumed as true." Amended Motion, p.7. While the above-cited

cases are instructive, they are distinguishable.

     In *Furst*, the defendant sought recusal of the presiding judge under § 455 because of ex

parte communications with defense counsel. The presiding judge denied the defendant's request

for recusal. On appeal and after noting that § 455 does not establish any form of procedure for

consideration of recusal motions, the Third Circuit looked first to the procedures established

under 28 U.S.C. § 144:

> 28 U.S.C. § 144[1] sets forth a procedure by which a party may seek a judge's recusal. Thus, we will look to section 144 and our case law under that recusal provision for guidance as to procedure. *Cf. Johnson v. Trueblood*, 629 F.2d 287, 290 (3d Cir.1980) ( "both statutes require the same type of bias for recusal"), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *id.* (" § 455(a) was intended only to change the standard the district judge is to apply to his or her conduct").[2]  This seems particularly appropriate as Furst's attorney's affidavit filed with the motion for disqualification complied with the procedure set forth in section 144, and so, had the motion merely included a reference to section 144, we would have analyzed the motion directly under that section.

*Furst*, 886 F.2d at 582.  However, the presiding judge in *Furst* acknowledged his ex parte communications with defendant's counsel and thus, the Third Circuit concluded:

> As a result of the extent to which the district court confirmed the underlying facts upon which the recusal motion relied, we need not resolve the issue of whether a judge need accept as true the allegations presented in a motion for disqualification under section 455 which asserts a basis as to which section 144 is applicable and which includes an affidavit sufficient under section 144. It is

_____

[1]  Section 144 states:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of an adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

[2]  The major benefit that a party receives by filing a motion for disqualification under section 455 instead of section 144 is that section 455(a) obviates the need to assert actual bias-if it is shown that the judge's impartiality might reasonably be questioned recusal is required.  To the extent that Furst's motion asserted only actual bias under section 455(b) he would have received no discernable benefit from filing under this section.

10

> sufficient that we state that where the basic underlying facts as set forth in the
> affidavit supporting a recusal application are not in dispute, the district court
> should not minutely examine the movant's characterization of them, and weigh the
> court's memory of what happened against that of the affiant. We think it simply
> inappropriate in the circumstances here for the court to have made a credibility
> assessment of itself. Consequently, we hold that the district judge improperly
> considered the truth of the asserted grounds for his recusal.

*Id.* at 583.

In this case, Mr. Blixseth's Amended Motion does not reference 28 U.S.C. § 144 and

more importantly, Mr. Blixseth's Amended Motion is not accompanied by a certificate of

counsel of record stating that it is made in good faith.  Under the facts of this case, it is not clear

whether the *Furst* Court would apply the § 144 take-as-true requirement to Mr. Blixseth's §

455(a) motion.

The discussion of § 144 and § 455 by the court in *Balistrieri* is more relevant.  In

addressing § 144, the court in *Balistrieri* first noted that a judge is allowed to pass only on the

timeliness and sufficiency of a party's affidavit.  "[I]n passing on the legal sufficiency of the

affidavit, the judge must assume that the factual averments it contains are true, even if he knows

them to be false."  779 F.2d at 1199.  However, the factual averments, to be accepted as true,

must be more than

> mere conclusions, opinions, or rumors. *United States v. Haldeman*, 559 F.2d 31,
> 134 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250
> (1977). They must be stated with particularity, *id*. at 131, and must be definite as
> to times, places, persons, and circumstances. *Id*. at 134. The factual averments
> must show that the bias is personal rather than judicial, *United States v. Patrick*,
> 542 F.2d 381, 390 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51
> L.Ed.2d 775 (1977), and that it stems from an extrajudicial source-some source
> other than what the judge has learned through participation in the case. *United
> States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778
> (1966).

11

*Id.* The *Balistrieri* Court went on to conclude that the judicial interpretations of "personal bias or prejudice" under § 144 were equally applicable to § 455(b)(1), even though § 455(b)(1) is not a reenactment of § 144. The court in *Balistrieri* specifically found that a judge was not required to take all factual averments in an affidavit as true under § 455(b)(1), but rather, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his own personal knowledge." *Id.* at 1202.

The Court in *Balistrieri* provided little guidance with respect to § 455(a) other than its holding that an application for a writ of mandamus was a party's sole avenue of recourse when a judge denied a motion under § 455(a). 779 F.2d at 1205. The court reasoned that § 455(a) was "not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process." *Id.* at 1204. The court therefore concluded that denial of a motion under § 455(a) was not reviewable on appeal because § 455(a) did not affect a substantial right of the appellant. *Id.* Rather, "if a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole and not to the substantial rights of the parties. The parties in fact receive a fair trial, even though a reasonable member of the public might be in doubt about its fairness, because of misleading appearances." *Id.* at 1204-05.

In *Ritter*, the government appropriately filed a mandamus petition under §§ 144 and 455(a). 540 F.2d 459. The court in *Ritter* first noted that § 144 "allows a party to request disqualification of a district judge when he has a personal bias or prejudice either against him or in favor of any adverse party. It also prescribes procedure. The filing of the affidavit does not bring about the disqualification. The trial court determines its sufficiency. The review is,

12

however, restricted to its legal sufficiency and does not include the truth of the allegations. There

must be facts, however, to establish personal bias. Section 455(a) is broader. It applie[s] to any

judge and includes that he 'shall disqualify himself in any proceeding in which his impartiality

might be reasonably questioned.'" *Ritter*, 540 F.2d at 461-62. The court continued:

> Under the broader standard of revised Section 455(a), disqualification is
> appropriate not only where there is actual or apparent bias or prejudice, but also
> when the circumstances are such that the judge's "impartiality might be reasonably
> questioned." *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure:
> Jurisdiction, Section 3549. Thus, the grounds for disqualification set out in
> Section 144 "personal bias or prejudice either against (a party) or in favor of any
> adverse party" are included in Section 455. Moreover, the language of Section
> 455(a) allows a greater flexibility in determining whether disqualification is
> warranted in particular situations. 13 Wright, Miller & Cooper, Section 3542.

*Id.* at 462. Although the Tenth Circuit found that the government had failed to show actual bias,

the Tenth Circuit did find that given the broad language of § 455(a), disqualification of the

presiding judge was appropriate because based upon all the facts, it was not reasonably likely that

the matter could be tried with the impartiality that litigants have a right to expect.

   *U.S. v. Dodge* dealt in part with a trial judge's denial of a request to recuse himself. 538

F.2d 770. The court in *Dodge* considered the appeal under both § 144 and § 455. Without

providing any meaningful discussion, but instead citing only to the applicable language of §§ 144

and 455, the court in *Dodge* accepted the truth of the facts recited in the affidavits and concluded

that allegations that the trial judge had recused himself in the trials of two other defendants

arising from the same incident, that the judge had made derogatory comments about certain

Indian spectators at an earlier civil trial, that the judge had made derogatory comments about

certain members of a group to which the particular defendant belonged, that the judge had made

allegedly improper rulings in other prosecutions arising out of the same incident, and that the

13

judge had failed to grant temporary injunctive relief sought by an Indian organization during the time of the incident, did not indicate that the judge possessed a personal bias or prejudice against the moving defendant sufficient to require the judge to recuse himself.

The first topic of discussion in *Parrish* was § 144. Similar to every case this Court has read on § 144, the court in *Parrish* recognized that,

> [t]he threshold requirement under the § 144 disqualification procedure is that a party file an affidavit demonstrating personal bias or prejudice on the part of the district judge against that party or in favor of an adverse party. Once the affidavit is filed, further activity of the judge against whom it is filed is circumscribed except as allowed by the statute. In terms of the statute, there are three issues to be determined: (1) was the affidavit timely filed; (2) was it accompanied by the necessary certificate of counsel of record; and (3) is the affidavit sufficient in statutory terms? *See generally* 13 Wright, Miller & Cooper, Federal Practice and Procedure ss 3541-53 (1975).
>
> We are concerned only with the third issue. As we said in *Davis v. Board of School Commissioners of Mobile County*, 5 Cir., 1975, 517 F.2d 1044:
>
> > "Once the motion is filed under § 144, the judge must pass on the legal sufficiency of the affidavit, but may not pass on the truth of the matters alleged. *See Berger v. United States*, 1921, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; *United States v. Roca-Alvarez*, 5 Cir., 1971, 451 F.2d 843, 847-48; *United States v. Townsend*, 3 Cir., 1973, 478 F.2d 1072."
>
> 517 F.2d at 1051.

*Parrish*, 524 F.2d at 100.

After concluding that the factual bases alleged for recusal were legally insufficient under § 144, the court in *Parrish* proceeded to examine § 455. In discussing § 455(a), the court wrote:

> There are now several standards in § 455. Some go to specific conduct, but one, set out in § 455(a), is general and does not rest on the personal bias and prejudice stricture of §§ 144 and 455(b)(1). As we noted in *Davis, supra*, 517 F.2d at 1052, the language of § 455(a) was intended to displace the subjective "in the opinion of the judge" test for recusal under the old statute, and the so-called "duty to sit decisions". We also noted that § 455(a) was intended to substitute a

14

> "reasonable factual basis reasonable man test" in determining whether the judge
> should disqualify himself. *See* 13 Wright, Miller & Cooper, Federal Practice and
> Procedure s 3542 (1975). *See also*, Frank, Commentary on Disqualification of
> Judges-Canon 3c, 1972, Utah L.Rev. 377, 379. Note, Disqualification of Judges
> and Justices in the Federal Courts, 86 Harv.L.Rev. 736, 745-50 (1973).

*Parrish*, 524 F.2d at 103. Applying the reasonable man test, the *Parrish* Court concluded that "a

reasonable man would not infer that [the presiding judge]'s 'impartiality might reasonably be

questioned'." *Id.*

Finally, Mr. Blixseth relies on *People v. Julien* to support his contention that the factual

allegations made in support of his motion must be assumed as true. The issue in *Julien* was two-

fold. First, "whether the trial judge's previous employment with the district attorney's office

constituted an appearance of impropriety mandating reversal of the defendant's judgment of

conviction where the judge had no involvement in the defendant's case while employed with the

district attorney" and second, "[w]hether, assuming there was an appearance of impropriety, the

trial judge's failure before trial to disclose to the defendant his previous employment with the

district attorney's office and to recuse himself when a motion to recuse was filed before

sentencing constituted harmless error." *Julien*, 47 P.3d at 1195. Resolution of the issue

involving prior governmental association turned in part on the language of Canon 3 of Colorado's

Code of Judicial Conduct, which language was identical to the American Bar's Association's

Model Code of Professional Responsibility and Code of Judicial Conduct. In construing

Colorado's Code of Judicial Conduct, the court in *Julien* looked to cases interpreting § 455(a)

and (b)(3).

The second issue in *Julien* dealing with disqualification was governed by C.R.S.A. § 16-

6-201, which read:

> A motion for change of judge on any ground must be verified and supported by
> the affidavits of at least two credible persons not related to the defendant, stating
> facts showing the existence of grounds for disqualification. If the verified motion
> and supporting affidavits state facts showing grounds for disqualification, the
> judge must enter an order disqualifying himself. After disqualifying himself, the
> judge may require a full hearing upon the issues raised by the affidavits and shall
> request that another judge conduct the hearing. The other judge shall make
> findings of fact with regard thereto, and such findings shall be included as a part
> of the trial court record.

*Julien*, 47 P.3d at 1199. The court in *Julien* noted that: "In ruling on the disqualification motion,

a judge must accept as true the factual statements contained in the motion and affidavits. *People*

*v. Botham*, 629 P.2d 589, 595 (Colo.1981). The judge must determine as a matter of law whether

they allege legally sufficient facts for disqualification. *S.S. v. Wakefield*, 764 P.2d 70, 73

(Colo.1988)." *Id.* Although the presiding judge in *Julien* had been employed by the district

attorney's office five weeks before his assignment to the moving party's case, the court in *Julien*

found that the record did not support disqualification of the presiding judge where the moving

party did not contend that the presiding judge had any actual bias or prejudice against him or any

disqualifying interest in the case. *Id.* at 1200. C.R.S.A. § 16-6-201 requires that a motion for

disqualification be verified and supported by the affidavits of at least two credible persons not

related to the defendant. Section 455, unlike C.R.S.A. § 16-6-201, does not require that Mr.

Blixseth file any affidavits, particularly affidavits of unrelated persons. If anything, C.R.S.A. §

16-6-201 is more similar to § 144, which requires that a motion for disqualification be

accompanied by a certificate of counsel stating that the motion is made in good faith. This Court

fails to see *Julien's* relevance to this case.

Instead, this Court agrees with the court's observation in *United States v. Eisenberg*, 734

F.Supp. 1137, 1160 (D. N.J. 1990), that the procedural requirements of § 144 and § 455 differ.

This is so because § 455 does not contain the same procedural safeguards as § 144. *State of Idaho v. Freeman*, 507 F.Supp. 706, 715 (D. Ida. 1981) (In discussing § 21 of the Judicial Code of 1911, which was the predecessor to § 144, the court noted that it appeared "that Congress intended the perjury statute available against a false affidavit and disciplinary proceedings against the attorney to be sufficient to deter trivial and speculative allegations."). As the foregoing discussion illustrates, this Court is not required to accept all facts in Mr. Blixseth's Amended and Supplemental Affidavits as true. *In re American Ready Mix, Inc.*, 14 F.3d 1497 (10th Cir. 1994), *cert. denied*, 513 U.S. 818, 115 S.Ct. 77, 130 L.Ed.2d 31 (1994) (Under § 455, "factual allegations do not have to be taken as true," and "[t]here is as much obligation for a judge not to recuse when there is no occasion ... to do so as there is ... to [recuse] when there is."); *Goodwin*, 194 B.R. at 221("the requirement of section 144 that the judge assume that the facts asserted in the affidavit are true and examine them only to determine their legal sufficiency" does not apply to bankruptcy judges). However, even if the Court did accept all allegations as true, which it does not, Mr. Blixseth's alleged facts are not legally sufficient for recusal because the applicable factual averments in Mr. Blixseth's Amended and Supplement Affidavits are either based upon heresay or reflect Mr. Blixseth's personal conclusions and opinions.

The Ninth Circuit Court of Appeals notes that although "section 455 is stated in terms of a self-enforcing obligation upon the judge, it may be invoked by a party." *Klenske v. Goo (In re Manoa Finance Co., Inc.)*, 781 F.2d 1370, 1373 (9th Cir. 1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). The test for determining whether a judge should recuse "himself under section 455(a) is 'whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant

17

doubt about the judge's impartiality.'" *U.S. v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989),

quoting *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988).  The Tenth Circuit

Court of Appeals in *Frates v. Weinshienk*, 882 F.2d 1502, 1504 (10th Cir. 1989) further instructs

that:

> A bankruptcy judge may preside over both the administrative and
> adversarial portions of a bankruptcy case.  *See* 28 U.S.C. § 157.  But recusal is
> necessary if there is evidence of actual bias, if the bankruptcy judge by words or
> actions reasonably appears to have prejudged adversarial proceedings over which
> he is to preside, or if the judge appears "boxed in" by prior rulings such that he
> will be forced to reach a certain result in an adversarial proceeding regardless of
> the merits.  We do not, however, read our cases or any other authorities to require
> a judge who approves a Chapter 11 reorganization plan automatically to disqualify
> himself from presiding over adversarial proceedings that will affect the total
> recovery of the bankrupt's creditors.

The Court also recognizes that "familiarity with defendants and/or the facts of a case that

arises from earlier participation in judicial proceedings is not sufficient to disqualify a judge from

presiding at a later trial." *Steering Committee v. Mead Corp. (In re Corrugated Container*

*Antitrust Litigation)*, 614 F.2d 958, 965 (5th Cir. 1980) (footnote omitted), *cert. denied*, 449 U.S.

888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).  In many ordinary litigation situations judges make

preliminary decisions on offers of evidence, or make decisions otherwise affecting the parties,

that familiarize the judge with the facts in that case or in related cases in which the judge must

rule.  The Bankruptcy Code and 28 U.S.C. § 157, by permitting the presiding judge in a

reorganization to preside over adversary proceedings affecting the assets, contemplate that

bankruptcy judges will encounter situations similar to the case *sub judice* with some frequency.

In such situations, the Ninth Circuit Court of Appeals suggests "that judges sitting in bankruptcy

be especially solicitous in maintaining both the appearance and reality of impartiality when

adjudicating matters with which they have had close involvement, erring on the side of recusing

themselves when appropriate." *Manoa*, 781 F.2d at 1373.

The foregoing comports with the Supreme Court of the United States' decision in *Liteky*,

510 U.S. 540, wherein the Supreme Court addressed the question of whether the so-called

extrajudicial source doctrine applied by lower courts under § 144 also applied to motions brought

under § 455(a). In *Liteky*, the Supreme Court concluded that the "extrajudicial source" doctrine,

to the extent it exists, does indeed apply to § 455(a). *Id.* 510 U.S. at 554. In reaching its

decision, the Supreme Court explained:

> The fact that an opinion held by a judge derives from a source outside judicial
> proceedings is not a necessary condition for "bias or prejudice" recusal, since
> predispositions developed during the course of a trial will sometimes (albeit
> rarely) suffice. Nor is it a sufficient condition for "bias or prejudice" recusal,
> since some opinions acquired outside the context of judicial proceedings (for
> example, the judge's view of the law acquired in scholarly reading) will not
> suffice. Since neither the presence of an extrajudicial source necessarily
> establishes bias, nor the absence of an extrajudicial source necessarily precludes
> bias, it would be better to speak of the existence of a significant (and often
> determinative) "extrajudicial source" factor, than of an "extrajudicial source"
> doctrine, in recusal jurisprudence.

> The facts of the present case do not require us to describe the
> consequences of that factor in complete detail. It is enough for present purposes to
> say the following: First, judicial rulings alone almost never constitute a valid basis
> for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S., at
> 583, 86 S.Ct., at 1710. In and of themselves (*i.e.*, apart from surrounding
> comments or accompanying opinion), they cannot possibly show reliance upon an
> extrajudicial source; and can only in the rarest circumstances evidence the degree
> of favoritism or antagonism required (as discussed below) when no extrajudicial
> source is involved. Almost invariably, they are proper grounds for appeal, not for
> recusal. Second, opinions formed by the judge on the basis of facts introduced or
> events occurring in the course of the current proceedings, or of prior proceedings,
> do not constitute a basis for a bias or partiality motion unless they display a
> deep-seated favoritism or antagonism that would make fair judgment impossible.
> Thus, judicial remarks during the course of a trial that are critical or disapproving
> of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support

19

a bias or partiality challenge.  They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.  An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted).  Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune.

510 U.S. at 554-56, 114 S.Ct. at 1157.

Lastly, the Ninth Circuit Court of Appeals held in *United States v. Studley*, 783 F.2d 934, 939 (9th Cir.1986), "that a [§ 144] motion for recusal filed weeks after the conclusion of a trial is presumptively untimely absent a showing of good cause for its tardiness."  Section 455 does not contain such time limitations.  Furthermore, I do not regard Mr. Blixseth's delay as fatal because a recusal motion should be permitted at any time it becomes apparent that a judge is biased or suffers from the appearance of bias.  Mr. Blixseth's delay, though, suggests that Mr. Blixseth did not regard my prior rulings as greatly debilitating to his position.

As noted previously, after reviewing the applicable law under § 455(a), the Court disagrees with Mr. Blixseth's position that the Court must accept his factual averments as true.  Rather, the Court may assign to the evidence what it believes to be its proper weight.  I may also contradict the evidence with facts drawn from my own personal knowledge.  After reviewing Mr. Blixseth's Amended and Supplemental Affidavits, I conclude that recusal is not necessary.  The matters about which Mr. Blixseth complains occurred in the course of these proceedings and do

20

not show that I relied upon knowledge acquired outside these proceedings or that I have a deep-

seated and unequivocal antagonism that would render fair judgment impossible. *See Liteky*, 510

U.S. at 556, 114 S.Ct. at 1158.

DISCUSSION

Mr. Blixseth's complaints fall into four general categories: (1) ex parte communications;

(2) the Stephen Brown emails; (3) favoritism toward Ms. Blixseth and Byrne; and (4) denial of

Mr. Blixseth's due process. Mr. Blixseth's complaints regarding ex parte communications fall

into three separate sub-categories: that my law clerk, Terry Healow, had an ex parte

communication with Ross Richardson, and that during such communication, Mr. Healow used a

word that shows bias against Mr. Blixseth; that I held ex parte meetings with parties involved in

the Yellowstone Club bankruptcy; and that I and my staff have had numerous email

communications with attorneys involved in this case which show that I have a close, personal

relationship with said attorneys, which relationship precludes me from entering fair and unbiased

decisions.

Ex Parte Communications.

Mr. Blixseth first argues that on June 10, 2010, he received a phone call from Mr.

Amsden regarding Mr. Blixseth's settlement with his client, the Chapter 7 Trustee in the

Yellowstone Club World bankruptcy, Ross Richardson. During that phone conversation, Mr.

Amsden apparently relayed to Mr. Blixseth the fact that my law clerk, Terry Healow, had

telephoned Mr. Richardson inquiring as to whether Mr. Richardson had finalized a settlement

with Mr. Blixseth. Mr. Blixseth asserts that Mr. Richardson advised Mr. Healow that the

settlement was almost complete but that a few matters needed to be addressed before it could be

finalized.  In response, Mr. Healow allegedly told Mr. Richardson to hurry up and get the settlement finalized before Mr. Blixseth could "renege."

First, it is not clear from Mr. Blixseth's Affidavit and the attached Exhibit A whether my law clerk Terry Healow used the word "renege" in his conversation with Mr. Richardson, or whether that is Mr. Blixseth's interpretation of what was relayed to him through Mr. Amsden. Second, I do not recall asking Mr. Healow to place a call to Mr. Richardson and I similarly do not recall waiting for any settlement involving the Yellowstone Club World bankruptcy estate and Mr. Blixseth.

There are essentially five bankruptcies (one consisting of the four Yellowstone Club entities; the second being BLX Group, Inc.; the third being Ms. Blixseth's personal bankruptcy; the fourth being Big Springs Realty, LLC; and the fifth being Yellowstone Club World, LLC) and 28 associated Adversary Proceedings.  In an attempt to refresh my recollection, I reviewed the applicable cases and do not see anywhere in the records where the Court would have been anticipating the receipt of a settlement between the trustee of Yellowstone Club World bankruptcy and Mr. Blixseth at or around June 12, 2010, the date Mr. Amsden and Mr. Blixseth were exchanging text messages.  While the Court has not reviewed the docket in each of the 36 separate cases, the Court has reviewed the dockets in Yellowstone Mountain Club, LLC and Yellowstone Club World, LLC, including its 3 associated adversary proceedings.  The Court sees nothing in the Yellowstone Mountain Club bankruptcy that would prompt me to inquire about a stipulation between Mr. Blixseth and Mr. Richardson.  Two of the adversary proceedings tied to the Yellowstone Club World bankruptcy do not involve Mr. Blixseth.  In the third adversary proceeding, adversary proceeding no. 09-00086, it appears the Honorable John L. Peterson

conducted a mediation on February 11, 2010, and May 5, 2010.  As noted earlier, the Court sees

no reason why it would have anticipated a settlement in Adversary Proceeding 09-86, and in fact,

the Court entered a Memorandum of Decision and Order on June 9, 2010, granting Mr.

Blixseth's motion to dismiss for lack of subject matter jurisdiction thereby dismissing a third

party complaint filed against Mr. Blixseth.  It was not until June 29, 2010, when Mr. Richardson

and Mr. Blixseth filed a joint motion to vacate deadlines, that the parties mentioned a settlement

in that matter.  Learning of a settlement on June 29, 2010, would not have prompted a telephone

call from the Court on or before June 12, 2010.

Finally, the Court can find nothing in 09-60061, the main Yellowstone Club World

bankruptcy case, that would have prompted a telephone call to the parties in early June of 2010.

The Court entered an Order on June 1, 2010, setting a telephonic status conference for June 2,

2010, on several matters, including Mr. Richardson's February 12, 2010, motion for order

approving a settlement with Mr. Blixseth.  I reviewed the transcript of the June 2, 2010, hearing

and see nothing in that transcript which would indicate that I was waiting for a further settlement

from Mr. Richardson and Mr. Blixseth.  To the contrary, I orally ruled on that date that

CrossHarbor did not have standing to object to Mr. Richardson's proposed settlement with Mr.

Blixseth.  Following the June 2, 2010, hearing and in accordance with my June 2, 2010, oral

ruling, the Court entered a Memorandum of Decision and Order on June 10, 2010, overruling

CrossHarbor Capital Partners' objection to Mr. Richardson's settlement with Mr. Blixseth,

granting Mr. Richardson's motion for order approving settlement, and approving the

"Memorandum of Understanding" between Mr. Richardson and Mr. Blixseth.

Furthermore, another law clerk in my Chambers, Kelli Harrington, has assisted me almost

23

exclusively on this case.  I would not generally ask one law clerk to make an inquiry about a case

in which another law clerk is or was assisting me.  Given the fact that Mr. Healow has not

generally assisted me with the Yellowstone Club bankruptcies and given the date of the text

messages between Mr. Amsden and Mr. Blixseth and their proximity to a May 2010 mediation

that was conducted by the Honorable John L. Peterson, I determined that perhaps Mr. Healow

made the referenced telephone call to Mr. Richardson's office at the direction of Judge Peterson,

and not me.  To confirm my suspicions, I posed such question to Mr. Healow and he specifically

recalled placing a telephone call to Mr. Richardson regarding the whereabouts of a settlement.

However, the call was placed at the request of Judge Peterson, and not me.[3]

Next, Mr. Blixseth asserts: "The bankruptcy auction for the Yellowstone Club assets

occurred around May 13th 15th of 2009.  The auction for the sale of the Club assets occurred at the

Billings Crowne Plaza Hotel.  The bidders at the auction were Credit Suisse and CrossHarbor

(Byrne's company).  However, also present and participating in the auction were the Debtor (*i.e.*,

the Yellowstone Club which was effectively controlled by Byrne), and the Unsecured Creditors

Committee.  Judge Kirscher rented a room at the hotel to facilitate ex parte communications

between the bidders.  The auction itself was not public.  Instead it was conducted in closed door

negotiations between CrossHarbor and Credit Suisse, with the Unsecured Creditors Committee

being allowed to participate to some limited extent.  Although my local counsel Joel Guthals,

---

[3] Mr. Healow advised me that he placed the telephone call to Mr. Richardson from his
work phone in the Butte Federal building.  However, as a result of that one call, Mr. Blixseth
subpoenaed not only Mr. Healow's calls for the January 18, 2011, hearing, but also requested
that Mr. Healow produce his cell phone records and various email communications.  The
subpoena was administratively denied as it was not in compliance with the Subpoena
Regulations Adopted by the Judicial Conference.

was present at the hotel, he was not allowed to participate in the auction, had no participation in the bidders' ex parte communications with Judge Kirscher, and was otherwise locked out from the negotiations. Even though the negotiations were 'closed door', Judge Kirscher nevertheless met with CrossHarbor and Credit Suisse at the hotel during their negotiations to resolve bidding issues as they arose. Immediately following these closed door negotiations with CrossHarbor and Credit Suisse, Judge Kirscher approved the Plan of Reorganization for the Yellowstone Club and sale of the Club's assets to CrossHarbor on May 18, 2009 with no formal notice to me, or other interested parties. The altered Plan substantially affected creditors' rights."

A little background adds context to Mr. Blixseth's above claim. At a hearing held April 4, 2009, the Court approved the Debtors' Disclosure Statement and scheduled the hearing on confirmation of the Debtors' Amended Joint Plan of Reorganization for May 18, 2009, in Butte. The confirmation hearing was scheduled for May 18, 2009, to accommodate not only the Court's schedule but also the Debtors' expiring debtor-in-possession financing. Before confirmation could occur, the Court had to resolve at least a portion of the issues in Adversary Proceeding 09-00014. Phase one of the trial in Adversary Proceeding 09-00014 commenced on April 29, 2009, and concluded on May 5, 2009. The Court then granted the parties in Adversary Proceeding 09-00014 until May 11, 2009, to file post-trial briefs. Thereafter, on May 12, 2009, the Court entered a partial and interim order equitably subordinating Credit Suisse's claim. The Court's partial and interim order left unresolved the issues involving Mr. Blixseth, the issues regarding valuation of Debtors' assets and the question of whether Credit Suisse, whose collateral was subsequently valued on May 12, 2009, at $232 million, could credit bid at an auction of Debtors' assets.

25

The Court's May 12, 2009, partial and interim order in Adversary Proceeding 09-00014 and the Court's valuation order of that same date, set off a frenzy of activity, particularly as an auction of either Debtors' assets or 100% of the Debtors' equity was scheduled for May 13, 2009.  The minute entries of the so-called closed meetings that allegedly took place at the Crowne Plaza Hotel can be found at docket entry nos. 1047 for May 12th, 1048 for May 13th, 1049 for May 14th and 1054 for May 15th.  Those hearings, which Mr. Blixseth refers to as closed meetings, which included much of the actual bidding process between CrossHarbor and Credit Suisse, were held in the Federal Courthouse in Billings, not the Crowne Plaza Hotel.  I must concede, however, that because my duty station is not in Billings and because I do not live in Billings, I did rent a hotel room at the Crowne Plaza Hotel, which is two blocks from the Federal Courthouse.  I rented a room so I would have a place to sleep and shower and not a single person, other than myself, visited the room which I rented at the Crowne Plaza Hotel.  Thus, Mr. Blixseth's statement that hearings were held in the Yellowstone Club entities' bankruptcies on May 12, 13, 14 and 15, 2009, is correct.  Mr. Blixseth is also correct that I rented a room at the Crowne Plaza Hotel.  However, Mr. Blixseth's contention that I rented a room at the Crowne Plaza Hotel to facilitate ex parte communications with parties involved in this bankruptcy proceeding is simply false.

The transcripts show that the parties were using a conference room at the Hotel to facilitate bidding.  However, they lost access to that conference room and the ongoing negotiations concerning bidding naturally moved to the Federal courthouse in Billings where I was conducting ongoing hearings in the case.  I recall during a recess from a hearing at the courthouse, I believe on May 13th, while I was visiting with court security officers that I greeted

Mr. Blixseth's counsel, Mr. Guthals, as he was walking through the lobby on the 5th floor of the courthouse. Mr. Guthals informed me that he was leaving the courthouse as none of the bidding parties wished to consult with him. I do not recall if Mr. Guthals returned. I also do not recall Mr. Blixseth personally attending any of the hearings during that week. The exchange between Mr. Guthals and myself occurred while parties were negotiating and determining who would be qualified bidders in various courtrooms and conference rooms at the courthouse. I was not involved in those meetings or discussions. From time to time the various parties would provide an update on their progress so I could plan when we would continue with any auction or required hearing. Also, they were attempting to keep me informed as to whether they were making any progress resolving contested issues involving confirmation.

The transcripts of the hearings held May 12th through May 15th show that the auction of the Debtors' assets was a collaborative effort between the Debtors, the Official Committee of Unsecured Creditors and the Ad Hoc Committee of Yellowstone Club Members. *See* docket entry nos. 1047, 1048, 1049 and 1054. Parties were working virtually around the clock to determine the extent of Credit Suisse's credit bid, to qualify bidders and to conclude an auction of the Debtors' assets prior to the May 18, 2009, confirmation hearing date.[4]

The long hours were taking a toll and patience was wearing thin. During that time, the parties would think they were on the brink of a global resolution, only to discover that they might be at an impasse. In fact, counsel for Credit Suisse commented on May 14th that there had to be an alternative to not reaching a resolution. The credit versus cash bidding process reached

---

[4] The hearing on confirmation of the Debtors' joint Chapter 11 plan was scheduled pursuant to an Order entered April 7, 2009.

27

another impasse on May 15th when neither Credit Suisse nor CrossHarbor would move from their respective positions. At that time, I suggested that perhaps I should have a brief talk with Byrne from CrossHarbor and Mr. Yankauer from Credit Suisse to see whether a resolution was at all possible and whether the attorneys for the parties involved or the parties themselves were the obstacles to some resolution. I inquired on the record if there was any objection to me talking with Byrne and Yankauer on a limited basis and all parties present at the hearing voiced their lack of objection. It was apparent during my brief discussion with Byrne and Yankauer that the parties were close to a resolution, but at the same time, they were still very far apart. Court reconvened only to take another recess so the parties could further negotiate and try to reduce to writing any agreement in principle. When the Court once again reconvened, the remaining issues between Credit Suisse and CrossHarbor related to one, Credit Suisse obtaining authority from its lender groups to reach a resolution with CrossHarbor and two, the terms of a note from CrossHarbor to Credit Suisse.

Unfortunately, the parties did not come to a meeting of the minds and finally, late on Friday, May 15, 2009, at about 7:00 p.m. if my memory serves me correctly, and after the parties had gone back and forth numerous times in clearly an adversarial process and tone, I instructed all the parties to gather their belongings and leave the Billings courthouse. I immediately left Billings to return to Butte, fully expecting that nothing would be resolved by Monday, May, 18, 2009.

During those four long days and because the parties were working almost around the clock, it became clear that the bidding parties might need the Court's assistance outside normal business hours. I did not want to give the parties information about where I was staying or how

they could contact me, so I advised the parties in open court that they could contact me through Ms. Harrington if they had an emergency. As previously noted, the bidding process had to be concluded so the Court could move forward with confirmation on Monday, May 18, 2009. On the evening of either May 13th or May 14th, or perhaps both, the parties involved in the bidding process, through Ms. Harrington, contacted me after hours to provide a status update regarding their negotiations and to notify the Court whether the bidding process could be concluded by May 15. I met with the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Yellowstone Club Members and the two qualified bidders, CrossHarbor Capital Partners and Credit Suisse, at the Crowne Plaza Hotel. Any meeting was very brief and did not in any way involve Mr. Blixseth. My brief presence at the meeting obviously was not effective because we continued with bidding and auction issues through May 15th, when the auction was to have been completed on May 13th. In fact, when I left the courtroom late on May 15th, I was not convinced that any auction or any discussion of global resolution would occur prior to the confirmation hearing scheduled for May 18th.

The meeting did not and could not have involved Mr. Blixseth because Mr. Blixseth did not seek to qualify himself as a bidder, was not a qualified bidder and was thus not involved in the actual bidding process. Because Mr. Blixseth was not part of the bidding process and was not involved in the last minute bidding negotiations, my brief meeting with the bidding parties was not ex parte:

> The prohibition against ex parte contacts is based upon notions of procedural due process. *Guenther v. Commissioner of Internal Revenue*, 889 F.2d 882, 884 (9th Cir.1989). Procedural due process requires that a party be provided notice and an opportunity to respond. *Id.* If the party has no right to notice or an opportunity to respond, then it follows that the communication is not ex parte.

*Goodwin*, 194 B.R at 222.

Moreover, the facts asserted by Mr. Blixseth with regard to the so-called ex parte communication do not establish bias or prejudice by the undersigned toward Mr. Blixseth. Mr. Blixseth's apparent displeasure with the fact that the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Yellowstone Club Members, Credit Suisse, and CrossHarbor Capital Partners did not include him in all aspects of the actual bidding process between Credit Suisse and CrossHarbor Capital Partners, does not now bootstrap the parties' request for guidance from the Court during the bidding process into a demonstration of prejudice. Such allegation by Mr. Blixseth is simply false.

Mr. Blixseth filed a Supplemental Affidavit on January 17, 2011. In the Supplemental Affidavit, Mr. Blixseth once again takes issue with this Court's alleged ex parte communications with various partes. In support of his claims of bias and prejudice, Mr. Blixseth filed a host of email communications between myself and various parties and Ms. Harrington and various parties.

Many of the emails are wholly unrelated to the Yellowstone Club bankruptcies or any of the related proceedings. For instance, the first string of email communications relate to the status of two adversary proceedings stemming from the Brenda Burkhartsmeier bankruptcy and two other bankruptcy proceedings. The email communication is between all counsel involved in those cases and is not ex parte communication. As stated earlier, neither the Kuntz nor the Burkhartsmeier bankruptcies have any connection to the Yellowstone Club cases.

The next string of emails was initiated by the individual in charge of organizing continuing legal education seminars for the Bankruptcy Law Section of the State Bar of Montana.

The email appears to have gone to all individuals who were doing presentations at the Montana Bankruptcy CLE held October 21 and 22, 2010, in Missoula, Montana. Each year, I and several other bankruptcy judges participate in the CLE. The next email communications are between me and Andy Patten regarding an article I wrote for the Bankruptcy Law Section's newsletter.

Next are emails between myself, Andy Patten and Doug James concerning the case of *Lehman Commercial Paper, Inc. v. Moonlight Basin Ranch, LP*, Adversary Proceeding No. 10-9. The email communications are administrative in nature and include counsel for the plaintiff and the defendant in that matter. The communications are not ex parte. Furthermore the communications have nothing to do with the Yellowstone Club bankruptcies.

The following string of emails relate once again to the preparation of the Bankruptcy Law Section newsletter, which is prepared by Andy Patten and other members of his firm. The next email is from Andy Patten to Ms. Harrington. The email is administrative in nature and merely transmits a proposed order concerning a matter in the case of *In re Glacier Stone Supply, Inc.*, Case No. 10-61638. It appears the email was sent to not only my law clerk, but also other interested parties in that case. The same holds true for the email that follows.

The next email was sent by my law clerk, Kelli Harrington, to Andy Patten. It appears that Mr. Patten was inquiring about my availability for a hearing regarding a new case. Counsel, including Mr. Blixseth's counsel, have been known to call my law clerks inquiring as to my availability to hold expedited hearings in various matters. This email appears to be a response to such an inquiry.

The next emails once again relate to either the 2009 Montana Bankruptcy CLE or my submission for the 2009 bankruptcy newsletter. The next emails are once again administrative

31

emails, generally pertaining to the submission of proposed orders in accordance with Mont. LBR

9013-1(i).  When motions contain unique language, such as property descriptions, my law clerks

often call or email counsel and request that a proposed order be filed in accordance with our

Local Rules.

In the midst of the foregoing email exchange is an email from Ms. Harrington to a person

in Andy Patten's office.  At the beginning of the hearing on confirmation of Debtors' Chapter 11

plan held May 18, 2009, the Court was advised that bidding parties had, over the weekend and in

the hours leading up to the confirmation hearing, reached a global settlement.  The parties had a

single copy of an executed term sheet, which executed term sheet the parties presented to the

Court.  At the request of Mr. Patten, the Court emailed a copy of the signed settlement term sheet

to his office so that someone other than just the Court had a copy of the executed term sheet.

The next email string involves my law clerk's inability to locate a deposition.  The email

was not ex parte as it includes most if not all counsel involved at that time in Adversary

Proceeding 09-14, including Mr. Blixseth's counsel of record; Michael Flynn at

mike@mjfesq.com and Joel E. Guthals at jeguthals@ghrtlawfirm.com.  The next emails are

between Andy Patten and Judge Peterson.  I was not privy to those emails until Mr. Blixseth filed

them on January 11, 2011.

As for the remaining emails, they, like numerous of the earlier emails, involve

administrative, as opposed to substantive matters.  In most instances, it appears parties are trying

to either schedule emergency hearings or my law clerk is trying to obtain proposed orders.  None

of the emails contain inappropriate ex parte communications and I certainly do not find any bias

or prejudice in the emails.

As discussed above, the emails, in and of themselves, do not establish bias or prejudice. However, the argument at the January 18, 2011, hearing shows that Mr. Blixseth seeks to show that I favor in-state counsel to the detriment of out-of-state counsel:

> And particularly with a small local bankruptcy bar here in Montana, it's -- that basically makes its living off this Court's ruling, it makes the task even more difficult, particularly understanding that this Court has under -- has had a distinguished reputation. And the parties, the attorneys that have to argue this are essentially attorneys from outside Montana, except for Mr. Fox, who does not practice before this Court.

The problem with such argument is that almost all parties involved in this case have or had out-of-state counsel, including the Debtors, the unsecured creditors' committee, CrossHarbor and Credit Suisse. Moreover, Mr. Blixseth has Montana counsel who have been active in this case, namely, Joel E Guthals of Billings, Montana and Daniel D. Manson of Butte, Montana. In addition, Mr. Blixseth has produced emails between me and Debtors' local counsel, Mr. Patten, seeming to suggest that we have some relationship beyond that of judge and attorney. If one were to look, one could undoubtedly find emails between myself and Mr. Blixseth's attorney, Joel E. Guthals, because in the past, Mr. Guthals, like Mr. Patten, has been an active participant in the Montana Bankruptcy CLE. My relationship with Mr. Patten is exactly the same as my relationship with Mr. Guthals; purely professional.

<u>The Stephen R. Brown emails</u>.

Mr. Blixseth claims that during the initial phase of Adversary Proceeding 09-14, he raised his concern that Stephen R. Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula, Montana, was at the time of the filing of the Yellowstone Club bankruptcy, Mr. Blixseth's counsel in Montana. Yet, Mr. Brown was also a voting member and chairman of the

Yellowstone Club's unsecured creditors committee, which was suing Mr. Blixseth in Adversary Proceeding 09-14 for the recovery of $209 million. Brown testified, without contradiction from Mr. Blixseth, that Mr. Blixseth had encouraged Brown to be on the unsecured creditors' committee. Notwithstanding his prior encouragement, Mr. Blixseth argues that Mr. Brown, in his capacity as a member of the unsecured creditors' committee, turned over to the unsecured creditors' committee and its counsel over 400 email communications between his firm and Mr. Blixseth or Mr. Blixseth's other attorneys which could potentially contain attorney-client privileged discussions.

Mr. Blixseth's counsel conceded at a hearing held December 2, 2010, that the emails referenced in Mr. Blixseth's Amended Affidavit are in fact emails between Mr. Brown as a member of the unsecured creditors' committee and the committee's counsel. This Court previously found that Mr. Brown had not disclosed any information protected by Mr. Blixseth's attorney-client privilege. Rather, the Court found that the emails contained information that was protected by the unsecured creditors' committee's attorney-client privilege. As set forth in an Order entered by this Court on December 6, 2010, in Adversary Proceeding 09-14, "Mr. Blixseth has not cited any legal authority which would permit this Court to violate the Official Committee of Unsecured Creditors' attorney-client privilege without the Official Committee of Unsecured Creditors' consent." The Court stands by such ruling.

Favoritism toward Ms. Blixseth and Byrne.

In his brief and at the hearing held January 18, 2011, Mr. Blixseth's counsel argued extensively that this Court's bias and prejudice is evident by the leniency this Court has showed toward Ms. Blixseth. Mr. Blixseth's argument is interesting because this Court has basically had

34

only one opportunity in which it was required to rule for or against Ms. Blixseth. That one instance arose when the Office of the United States Trustee filed a motion to convert Ms. Blixseth's Chapter 11 bankruptcy to one under Chapter 7 of the Bankruptcy Code. Over Ms. Blixseth's vigorous objection, this Court did in fact convert Ms. Blixseth's case to Chapter 7 on May 29, 2009. Over Ms. Blixseth's objection, this Court has also entered orders extending the deadline for the Chapter 7 trustee in Ms. Blixseth's bankruptcy to object to entry of Ms. Blixseth's discharge. Pursuant to a stipulation filed January 5, 2011, Ms. Blixseth and the trustee resolved Ms. Blixseth's then pending objection, agreeing that the trustee would have through January 21, 2011, to file a complaint objecting to Ms. Blixseth's discharge.

Mr. Blixseth also argues that this Court has turned a blind eye to the fact that the Yellowstone Club bankruptcies were filed in bad faith. In support of such contention, Mr. Blixseth cites to the transcript of April 29, 2009, from Adversary Proceeding 09-14, to a statement of uncontroverted facts filed July 2, 2010, by Mr. Blixseth in Adversary Proceeding 09-18, and a memorandum that Mr. Blixseth filed in Adversary Proceeding 09-18 on January 22, 2010. Mr. Blixseth, however, fails to acknowledge that he called not a single witness to rebut the witness testimony presented by the Debtors at the May 18, 2009, confirmation hearing. Also notable is that fact that Mr. Blixseth sought neither the dismissal nor conversion of either Ms. Blixseth's bankruptcy or the Yellowstone Club bankruptcies for bad faith.

Mr. Blixseth next maintains that this Court has entered rulings to protect Ms. Blixseth, even though Ms. Blixseth has committed millions of dollars of fraud on numerous parties. More specifically, Mr. Flynn argues that Ms. Blixseth committed over $50 million of bank fraud which this Court ignored. As examples, Mr. Blixseth referred to Ms. Blixseth's loans with Western

35

Capital Partners and Wachovia Bank. Mr. Flynn characterized Ms. Blixseth's loan with Wachovia as "one of the most fraudulent loans in my 40 years of litigating, having represented bank presidents and CEOs and white-collar criminals." Mr. Flynn represented that "they" pledged nonexistent technology as collateral for the Wachovia loan. Mr. Flynn then asserts Ms. Blixseth pledged certain noise filtering technology software technology to Wachovia Bank in March of 2008 in violation of a Federal preliminary injunction.

Whether Ms. Blixseth pledged non-existent technology or whether she pledged technology in violation of an injunction, Wachovia Bank filed an adversary complaint against Ms. Blixseth on June 10, 2009, seeking to except the Wachovia obligation from Ms. Blixseth's discharge under 11 U.S.C. § 523(a)(2). *See* Adversary Proceeding 09-00034. Wachovia Bank and Ms. Blixseth eventually stipulated to the dismissal of that action on November 18, 2009. This Court entered three orders in that action: an order setting a pretrial scheduling conference, an order setting trial and an order approving the parties' stipulation for dismissal.

Before leaving this particular matter, the Court must comment on Mr. Blixseth's assertion that Ms. Blixseth's deposition testimony from the trial in Adversary Proceeding 09-14 sets forth the facts surrounding the bogus software. At the trial in Adversary Proceeding 09-14, Ms. Blixseth testified in person on May 4, 2009. Ms. Blixseth was not asked any questions about any software, bogus or otherwise, and because Ms. Blixseth testified in person, the Court had no reason to allow Ms. Blixseth's deposition testimony into evidence.

Continuing with Ms. Blixseth's fraud, Western Capital Partners filed an adversary complaint against Ms. Blixseth on November 30, 2009, seeking to except its debt from Ms. Blixseth's discharge under 11 U.S.C. § 523(a)(2). *See* Adversary Proceeding 09-00100. Mr.

36

Flynn argues that this Court is bootstrapped by prior rulings casting Ms. Blixseth's credibility in

a favorable light, such as the Court's September 27, 2010, twenty-six page Memorandum of

Decision in Adversary Proceeding 09-00100 wherein the Court denied Western Capital Partners'

request for summary judgment. The Court's discussion on the matter is as follows;

> In the pending matter, WCP has two hurdles to overcome: (1) all reasonable doubt as to the existence of genuine issues of material fact must be resolved against WCP; and (2) exceptions to discharge under § 523 are narrowly construed. Additionally, the Court does not consider WCP's motion in a vacuum, but rather, undertakes this case after having over 22 months of time on task with the Yellowstone Club and the associated proceedings, including Debtor's bankruptcy case.

> The Court has heard a lot of testimony over the past 22 months about Debtor and her ex-spouse's long and bitter divorce. Debtor and Timothy L. Blixseth separated in December of 2006 and following the separation, Debtor claims she was "frozen out" of various business affairs for about two years, or until approximately mid-August of 2008, when Debtor was awarded various assets, including BLX Group, Inc. – which owned the ultra exclusive Yellowstone Club -- under the terms of a Marital Settlement Agreement.

> Debtor has testified previously that she believed that her share of the marital assets were worth well in excess of $100 million between December of 2006 and August of 2008. The 2007 Loan Agreement at issue in this Adversary Proceeding and a modification of the Loan Agreement made in June of 2008 were all done during a period of time when Debtor was frozen out of the majority of the marital business dealings. Such fact precludes this Court from making a summary ruling that Debtor possessed the requisite intent to deceive WCP under either § 523(a)(2)(A) or § 523(a)(2)(B).

> Moreover, WCP contends that it relied on certain representations made by Debtor. However, Debtor counters that WCP has not fully responded to discovery propounded in January of 2010. Debtor asserts that WCP has delayed responding to all Debtor's discovery requests on grounds WCP has information showing it knew Debtor's true financial position, but nevertheless proceeded to make the loan and modification at issue. The foregoing allegations raise a material issue of fact as to whether WCP relied on any statements made by Debtor. Such conclusion is buttressed by the fact that one of WCP's attorneys, Christopher J. Conant, also serves as counsel for Debtor's ex-spouse.

> Finally, Debtor asserts that WCP has received payments in excess of $41 million toward the $13 million Loan Agreement. Under such scenario, WCP may already be fully compensated, thus putting WCP's damages at zero.
>
> In sum, after construing § 523(a)(2) narrowly, the Court cannot determine beyond a reasonable doubt that Debtor made any statements, whether oral or in writing, with the intent to deceive WCP. The Court similarly cannot conclude that WCP relied on statements made by Debtor. Finally, WCP has not shown that any of its alleged damages were the proximate result of statements made by Debtor. WCP has simply failed to satisfy its burden of proof at this stage of the litigation.

This Court disputes Mr. Blixseth's contention that it made any credibility finding in the above ruling. In said ruling, this Court merely denied Western Capital Partners' request for summary judgment. The Court did not dismiss Western Capital Partners' complaint nor did it enter any type of ruling that precluded Western Capital Partners from pursuing its claim against Ms. Blixseth.

The Western Capital Partners adversary proceeding, however, never made it to trial. Rather, Western Capital Partners filed a joint motion to dismiss its action against Ms. Blixseth on October 26, 2010, which the Court granted. Mr. Blixseth's counsel, Christopher J. Conant, should know that said action was dismissed by agreement of the parties because he was one of Western Capital Partners' counsel of record in that proceeding.

At the January 18, 2011, hearing Mr. Flynn also referred to another action involving Western Capital Partners as a "charade": "most recently on the timeliness issue, occurred before this Court on October 12th with Mr. Cotner and Mr. Samson where this Court unilaterally, arbitrarily, without giving Mr. Cotner or myself an opportunity to be heard, piled double layers of hearsay and then issued findings that Ms. Mr. Blixseth is credible and believable on the issue of the bank frauds and the technology frauds and that Mr. Cotner was misled by me." Mr. Flynn

38

obviously makes reference to a hearing held October 12, 2010, in Adversary Proceeding 09-00105 and the Court's resulting order entered October 25, 2010.  Contrary to what Mr. Flynn argues, Mr. Cotner, who was retained as counsel by the Chapter 7 trustee in Ms. Blixseth's bankruptcy, was heard at the October 12, 2010, hearing and the Court's subsequent Order of October 25, 2010, makes not a single credibility finding as to Ms. Blixseth.  Rather, that Order sets forth how Mr. Cotner came to file an amended counterclaim and amended third-party complaint that Mr. Cotner now believes contains numerous inaccuracies.  The Court Order of October 25, 2010, found at docket entry no. 147 speaks for itself.  In the above noted passage from the transcript of the January 18, 2011 hearing when Mr. Flynn makes reference to "Mr. Cotner or myself", I believe Mr. Flynn meant to say Mr. Conant and not Mr. Cotner.

As far as other matters involving Ms. Blixseth, other parties, including the Yellowstone Club World trustee, Source Capital, Palm Desert National Bank, Casa Captiva, Mr. Blixseth, Mr. Blixseth's attorney, Michael Flynn, and Mr. Blixseth's sons, Beau and Morgan Blixseth, have filed dischargeability complaints against Ms. Blixseth.  Stipulations were reached in the Source Capital and Casa Captiva actions, and Palm Desert National Bank dismissed its action.  Similarly, Ms. Blixseth and the Yellowstone Club World trustee just recently entered into a stipulation for dismissal of Adversary Proceeding 09-44.  The adversary proceeding commenced by Beau and Morgan Blixseth has not yet gone to trial.  Finally, both Mr. Blixseth and Mr. Flynn advised this Court during the respective pretrial scheduling conferences that they intended to voluntarily dismiss their actions against Ms. Blixseth.  True to their representations, Mr. Blixseth and Mr. Flynn filed motions to dismiss their adversary proceedings against Ms. Blixseth on February 24, 2010.  This Court entered orders granting the motions to dismiss on March 16,

2010. Ms. Blixseth's discharge was, subject to Beau and Morgan Blixseths' still pending

adversary proceeding, entered on February 8, 2011. As the facts demonstrate, other than the

United States Trustee's motion to convert, this Court has not been presented with an instance

where it had to rule either for or against Ms. Blixseth.

Having made few, if any credibility findings as to Ms. Blixseth, the Court fails to see how

it disrupted a criminal investigation, of which I would have no knowledge nor should I have any

knowledge, as Mr. Blixseth alleges. Similarly, this Court fails to understand how it used a states

secrets privilege or a Nevada protective order to conceal and gloss over Ms. Blixseth's ongoing

fraud. My knowledge of the Nevada secrecy order is limited to the facts presented to the Court

by the parties in preparation for and at the October 12, 2010, hearing.

Denial of Mr. Blixseth's due process.

Finally, Mr. Blixseth contends that this Court has denied him due process. Under this

umbrella Mr. Blixseth asserts that this Court has precluded him from presenting facts relating to

Ms. Blixseth's spoliation of evidence. The Court's Order of January 22, 2010, entered at docket

entry no. 546 in Adversary Proceeding 09-14 speaks for itself. The Court would simply note that

in that Order, the Court instructed that the matter needed "to be brought before the Court in the

correct proceeding with service upon the appropriate parties." The Court noted therein that  Mr.

Blixseth had "wholly failed to show any misconduct by YCLT or the Debtors in th[at] case.  This

Court agrees with YCLT that a first party defendant is not, and should not be, responsible for the

actions of a third party spoliator who is not a party to the litigation before the Court."

Next, Mr. Blixseth claims this Court denied him due process in Adversary Proceeding 09-

14 because he was given only weeks to defend himself.  In a Memorandum of Decision entered

40

June 11, 2009, at docket entry no. 292 in Adversary Proceeding 09-14, the Court explained why it was not persuaded by Mr. Blixseth's argument.  Mr. Blixseth intervened into Adversary Proceeding 09-14, knowing at the time that the proceeding was scheduled for trial on an expedited bases.  Moreover, Mr. Blixseth fails to mention that he called not a single witness in his defense at phase one of the trial in Adversary Proceeding 09-14.  Having mounted a minimal defense after six days of trial, the Court entered its June 11, 2009, Memorandum of Decision suggesting to Mr. Blixseth that his trial tactics at the trial in April and May of 2009 were not particularly effective.  The Court thus proceeded to leave the record open and continued the trial to February 24, 2010.  That continuance was for the sole benefit of Mr. Blixseth.  For the reasons discussed, the Court finds no bias or prejudice in Mr. Blixseth's statement that "the bankruptcy court merely continued the trial for one week then subsequently and scurrilously accused me of delaying tactics by insisting on my due process rights[.]"

Mr. Blixseth also avers that: "The court had previously deprived us of critical defenses by excluding the [Marital Settlement Agreement] MSA and Releases from my proposed Pre-Trial Order.  The other side's lawyers argued that the releases were not in their Pre-Trial Order and Judge Kirscher commented that he specifically recalled not including the Releases in the PTO. My attorney directed Judge Kirscher to where the Releases were inadvertently left in the UCC's Pre-Trial Order as a trial exhibit.  Judge Kirscher paused to thumb through his copy of the PTO and upon discovering that the Releases were included, he leaned back in his chair, gave a glaring stare at the Debtor's attorney, Andy Patten, and then threw the PTO across his desk with great force saying "Yes, it's still in" as if he had relied upon the manipulation of the UCC and the Debtor keeping my critical affirmative defenses out of the PTO.  The manner in which Judge

41

Kirscher showed disgust with having the Releases included in the PTO inadvertently, gave the appearance that his intent and the intent of the Debtor's and the UCC was to deprive me a critical affirmative defense in a lawsuit in which I was sued literally only few days before trial commenced."

My frustrations in Adversary Proceeding 09-14 were numerous, but those frustrations were directed at all parties, not just Mr. Blixseth, and they do not equate to bias or prejudice.  For instance, the original parties in Adversary Proceeding 09-14 consisting of the Debtors, the unsecured creditors' committee and Credit Suisse had requested that trial in that matter be set on an expedited basis because the Debtors' financing was scheduled to mature on April 30, 2009.  The Court's calendar was quite full and after some rearrangement, the Court set April 22, 2009, as the date trial was to commence in Adversary Proceeding 09-14.  However, after all the parties were seated in the courtroom on April 22, 2009, the Court was advised that not all the parties had provided paper copies of their exhibits to Mr. Blixseth.[5]  The Court's calendar was very full in May and June of 2009 and any continuance of the trial in Adversary Proceeding 09-14 left the Court with very little time to issue its ruling in Adversary Proceeding 09-14 prior to the scheduled May 18, 2009, confirmation hearing.  However, to give the parties time to produce their exhibits to Mr. Blixseth in hard copy and with the understanding that the debtor-in-possession financing would be extended for a short period of time, the Court continued the first phase of trial in Adversary Proceeding 09-14 to April 29, 2009.  Thus, the Court was upset when trial finally started on April 29, 2009, and it became apparent that the parties did not know what

---

[5] The exhibits were available to Mr. Blixseth by electronic means, but Mr. Blixseth's counsel stated they were unable to retrieve the electronic version of the exhibits.

was and was not in the final pretrial order prepared by the parties and submitted to the Court for approval. But as noted earlier, that frustration does not equate to bias or prejudice and it certainly does not equate to bias or prejudice toward Mr. Blixseth.

Mr. Blixseth then argues that this Court entered its August 16, 2010, ruling in Adversary Proceeding 09-14 on the eve of trial in Adversary Proceeding 09-18, effectively "precluding Mr. Blixseth from establishing at trial why the B shareholder claim against him failed both legally and factually and therefore why he should not be required to satisfy their $22 million claim either through being included within a judgment in AP-14, or in AP-18." Entry of my decision in Adversary Proceeding 09-14 was driven solely by my workload. The second phase of the trial in Adversary Proceeding 09-14 concluded on February 26, 2010. I generally strive to enter rulings within 60 days after matters are deemed submitted and ready for decision.[6] In the case of Adversary Proceeding 09-14, post-trial briefs and proposed findings of fact and conclusions of law were submitted on March 19, 2010. Thus, I would have generally tried to have a decision entered by mid-May of 2010. However, the parties had advised me that they planned to participate in a mediation in early May of 2010. I thus turned my efforts to other matters, with the hopes that the mediation would resolve the issues in Adversary Proceeding 09-14.

I later learned from the parties at a status conference held June 2, 2010, that the mediation

---

[6] The 60-day period is consistent with Mont. LBR 901-2, which reads:

> In the event a Judge has under advisement any matter, including, but not limited to, a motion or decision in a bench trial, for a period of more than sixty (60) days, each party affected by the undecided matter shall send to the Judge a letter particularly describing the matter under advisement and stating the date the matter was taken under advisement. As long as the matter remains under advisement, at intervals of forty-five (45) days thereafter, each affected party shall send a similar letter to the Judge.

43

did not resolve Adversary Proceeding 09-14. So, I and my law clerk once again turned our

efforts to the decision in Adversary Proceeding 09-14 with the tacit understanding that summer

vacations would be put on hold until the decision in Adversary Proceeding 09-14 was completed.

To that end, my law clerk scheduled her summer family vacation for the week of August 16,

2010, and the two of us worked on drafting the decision. As the record reflects, the decision in

Adversary Proceeding was entered on August 16, 2010, the same date that Ms. Harrington started

her summer vacation. Contrary to what Mr. Blixseth may believe, workload and the scheduling

of time off were the only factors that determined when the decision was entered in Adversary

Proceeding 09-14.

Mr. Blixseth's final complaint stemming from Adversary Proceeding 09-14 is that this

Court amended its judgment against Mr. Blixseth, without giving Mr. Blixseth an opportunity to

respond. The Court agrees that Mr. Blixseth did not have any opportunity to respond to the

Yellowstone Club Liquidating Trust's motion to alter or amend the judgment and that the Court

entered an judgment against Mr. Blixseth for a specific dollar amount. The Yellowstone Club

Liquidating Trust was seeking judgment against Mr. Blixseth in the amount of $286.4 million.

The Court ultimately entered an amended judgment in the amount of $40,067,962.43. Such

amount is a moving target because the Yellowstone Club Liquidating Trustee was still in the

process of liquidating claims when Mr. Blixseth filed his motion for recusal. The judgment

against Mr. Blixseth is necessarily decreased as claims are either disallowed or reduced. The

Court considered the amended judgment as nothing more than a more definitive embodiment of

its original judgment wherein Mr. Blixseth would pay "that amount of money required to pay all

allowed: (1) claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4

44

(general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Mr. Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571, and (2) YCLT for the fees and costs it has incurred, and will incur, objecting to and liquidating such claims."

Moreover, entry of a judgment in a specific amount in Adversary Proceeding 09-14 paved the way for the Court to enter an Order on October 20, 2010, in Adversary Proceeding 10-15 denying the Yellowstone Club Liquidating Trust's request for a preliminary injunction wherein the Yellowstone Club Liquidating Trust sought an order enjoining Mr. Blixseth, and two of his entities, Desert Ranch, LLLP and Desert Ranch Management, LLC, from transferring any assets in an amount or of a value in excess of $5,000.00.  There, the Court reasoned:

> What the pending Adversary Proceedings show is that: (1) Plaintiff in this matter has a $40,067,962.43 judgment against Mr. Blixseth; and (2) Mr. Blixseth stipulated to the entry of an injunction which prohibits Mr. Blixseth from selling, transferring, disposing of, encumbering or otherwise liquidating, or causing any entity owned or controlled by him to sell, transfer, dispose of, encumber or otherwise liquidate, property valued at $40 million without prior order of the Court.
>
>     . . . The Plaintiff's judgment of $40,067,962.43 is, as Mr. Blixseth's counsel stated, in perfect congruity with the stipulated injunction already in place.

Mr. Blixseth next takes issue with a decision entered by the Court on August 4, 2010, in Adversary Proceeding 09-18 wherein the Court denied four motions for summary judgment filed

45

by Mr. Blixseth. As the Court explained, it was 69 pages into drafting that decision when it elected to scrap the 69-pages and opted instead to issue a four page memorandum. The Court had a firm grasp on the facts and was fully convinced that there were disputed issues of material fact that precluded summary judgment.

In addition to the above allegations, Mr. Blixseth's counsel made the additional argument at the January 18, 2011, hearing that "[t]here's a January 14 or 15 e-mail from, I think it was Matthew Kidd to Sam Byrne saying: How did your meetings with Ron Burkle, the governor, and Mr. Byrne go? There's an e-mail in August of 2008 when Ms. Blixseth and Mr. Byrne knew they were taking control of the Yellowstone Club involving a meeting with, with Governor Schweitzer." Mr. Flynn clearly implies that Ron Burkle, whom I have never heard of, Governor Schweitzer, whom I have never met, and Mr. Byrne, who I would recognize only from his appearances in my courtroom, met and somehow exerted pressure on me. This Court has not and will not succumb to any pressure, political or otherwise. This Court is an independent and unbiased member of the Federal judiciary. To the best of my ability, I strive to enter decisions that are based solely on the facts presented and the applicable law.

Applying the applicable law to the facts presently before me, I conclude that my disqualification in this case is neither required nor appropriate because Mr. Blixseth has not established actual bias nor has he shown any facts which establish an appearance of such impartiality as to require recusal.

It appears that Mr. Blixseth's ultimate goal is to upset what has already been done in the cases in which he is involved. Such is not the appropriate consequence of a recusal motion, particularly where Mr. Blixseth's remedies are adequately addressed through the appellate

process. Therefore, consistent with the foregoing, the Court will enter separate orders in this case and in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088 providing as follows:

IT IS ORDERED that Timothy L. Blixseth's Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) filed November 30, 2010, at docket entry no. 2042, together with the same Amended Motion filed December 14, 2010, in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088 are DENIED.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

47

# Exhibit V

ATTORNEY CLIENT PRIVILEDGED

HOLAHAN MSA BULLETT POINTS

Does a federal bankruptcy court trump California family court?

TB and MF are judge shopping. Start with that

Judge Waters clearly liked TB, and believed TB over me.

Need to ask Judge Waters to stay any discovery or depositions in these matters, until she has ruled. This is important. Otherwise it could cause problems for what I am doing with SB in the next few months.

Need to emphasize to Judge Waters that years of litigation have taken place in bankruptcy court in Montana, and her family court is not in a position to hear all of the evidence that has already been presented.

Need to remind Judge Waters, the Montana judge has already ruled that "there have been illegal transfer of martial assets by TB."

Need to remind Judge Waters that she appointed TB "as captain of the ship"

Need to remind Judge Waters that TB stated in his previous depositions "there was no community cash flow", when everyone now knows there was.

Need to get MF knocked off this case one way or another. There are documents in DM possession that might contradict my position that MF was my attorney. I will ask DM for a copy of all of MF emails. I have done that in the past, but he has never produced them to me.

We need this case moved back to Montana at all cost. SB and BS have spent enormous capital and political favors to ensure they get the right outcome from the Montana bankruptcy judge. I suspect TB and MF have known this for some time, and gave up fighting that battle. They must have decided to try this end run

I am sure Judge Waters will not let you get some of this information into the record, but get as much as you can.

Good Luck,

Edra

**DM Exhibit 10**

# Exhibit W

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA **FILED**

## BUTTE DIVISION

**NOV 16 2012**

Clerk, U.S. District Court
District Of Montana
Butte

In re:

YELLOWSTONE MOUNTAIN
CLUB, LLC,

                    Debtor.

—————————————

TIMOTHY L. BLIXSETH,

                    Appellant,

vs.

YELLOWSTONE MOUNTAIN
CLUB, LLC; CREDIT SUISSE; AD
HOC GROUP OF CLASS B UNIT
HOLDERS; CIP SUNRISE RIDGE
OWNER LLC; ROBERT SUMPTER;
NORMANDY HILL CAPITAL LP;
MARC S. KIRSCHNER; CIP
YELLOWSTONE LENDING LLC;
CROSSHARBOR CAPITAL
PARTNERS LLC,

                    Appellees.

No. CV-11-73-BU-SEH

**MEMORANDUM AND ORDER**

On appeal from Bankruptcy
Case No. 08-61570-11

## INTRODUCTION

Timothy L. Blixseth (Blixseth) moved to disqualify the Honorable Ralph B.

Kirscher, United States Bankruptcy Judge, in the Chapter 11 bankruptcy In re

Yellowstone Mountain Club, LLC, Cause No. 08-61570-11, and in five related

adversary proceedings.[1]  All were opposed.  Judge Kirscher denied the motions on

February 25, 2011.  Blixseth moved for reconsideration.   Judge Kirscher denied

the motions for reconsideration on July 26, 2011.  This appeal followed.[2]

## ISSUE

The single substantive issue raised by the appeal is whether under

28 U.S.C. § 455 Judge Kirscher should have disqualified himself as requested.[3]

## DISCUSSION

The disqualification statute, 28 U.S.C. § 455, provides, in pertinent part:

> "[a]ny justice, judge, or magistrate of the United States shall
> disqualify himself in any proceeding in which his impartiality
> might reasonably be questioned."

28 U.S.C. § 455(a).

Disqualification is to be granted or ordered only when the record,

appropriately assessed, so warrants.  Clemens v. U.S. Dist. Court for the Dist. of

---

[1] Adversary Proceeding Nos.  09-00014, 09-00018, 09-00064, 10-00015 and 10-00088.

[2] Similar appeals were filed in Cause Nos. CV-11-74-BU-SEH, CV-11-75-BU-SEH, CV-11-76-BU-SEH, CV-77-BU-SEH and CV-11-78-BU-SEH.

[3] The separately stated issue of whether Judge Kirscher erred in denying Blixseth's motion for reconsideration is subsumed by resolution of the substantive appeal issue.

Cal., 428 F.3d 1175, 1179 (9th Cir. 2005) (a judge has a strong duty to sit when there is no legitimate reason to recuse).  The test to be applied is "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned."  Pesnell v. Arsenault, 543 F.3d 1038, 1043 (9th Cir. 2008).  The reasonable person, in this context, means a "well-informed, thoughtful observer," and not a "hypersensitive or unduly suspicious person."  Clemens, 428 F.3d at 1178.[4]

Judge Kirscher's February 25, 2011, Memorandum of Decision contains an exhaustive and detailed analysis and discussion of Blixseth's involvement with the Yellowstone Mountain Club entities,[5] the history of the Yellowstone Club related bankruptcies, Blixseth's participation in those proceedings, Blixseth's contentions in seeking disqualification, and the law to be applied in addressing the motion for disqualification.  Factual matters within the Bankruptcy Court's personal knowledge are articulated in detail.

---

[4] Blixseth argues this Court adopt a standard of review grounded in the proposition that the judge's actions should be assessed from the "perspective of a reasonable person who is predisposed to suspicions about the inner workings of the judiciary."  See Blixseth's Opening Brief at 5-6.  This suggested standard is rejected as it finds no support in the law of this Circuit, and is so lacking in specificity as to be incapable of meaningful application.

[5] The Yellowstone Club entities consist of: Yellowstone Mountain Club, LLC; Yellowstone Development, LLC; Big Sky Ridge, LLC; and Yellowstone Club Construction Company, LLC.

By contrast, the factual assertions advanced by Blixseth, both before Judge Kirscher and in this appeal, are grounded in his self-serving affidavits which he claims must be accepted as true. He is mistaken. The Court is not obliged to adopt, and does not adopt, the assertions of fact in the affidavits as true. In re Stasz, 2011 WL 6934442 *4 (9th Cir. BAP 2011); In re American Ready Mix, Inc., 14 F.3d 1497, 1501 (10th Cir. 1994). Moreover, many of the assertions of "fact" recited by Blixseth simply cannot be reconciled with the record. To give weight to such unsupported, or outright contradicted by the record, declarations would be entirely unwarranted.

No detailed point by point discussion of Blixseth's characterization of events occurring in the underlying bankruptcy proceeding, or of the many and frequent flaws in those characterizations, is necessary. Having carefully considered the record as a whole, including the rulings and findings made by Judge Kirscher and the bases for those rulings and findings, I conclude that no showing of bias, or prejudice or any lack of impartiality by Judge Kirscher has been demonstrated. Rather, dispassionate assessment reveals that extraordinary consideration was accorded Blixseth and his position throughout the proceedings.

## CONCLUSION

I find no basis in the record upon which to conclude that Judge Kirscher

4

erred in refusing to disqualify himself.

## **ORDER**

The February 25, 2011, Memorandum of Decision[6] of the United States

Bankruptcy Court is AFFIRMED.

DATED this _16th_ day of November, 2012.

SAM E. HADDON
United States District Judge

---

[6] Case No. 08-61570-11

# Exhibit X

LINKS: 73, 74

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 11-08283-GAF-SP | Date | December 11, 2012 |
| Title | Marc S Kirschner v. Timothy L Blixseth | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Renee Fisher | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| None | | None |

**Proceedings:**      **(In Chambers)**

<u>**ORDER RE: MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS**</u>

**I.**
**INTRODUCTION**

    Trustee in bankruptcy, Marc S. Kirschner, moves for an award of attorney's fees after successfully obtaining dismissal of the pending counterclaims, defeating a motion to amend the counterclaim, and succeeding on a motion for imposition of sanctions against Timothy Blixseth, the founder of the bankrupt Yellowstone Mountain Club ("the Club"). The present motion for a fee award has been brought in response to the Court's order issued in its ruling on the foregoing three motions. The Court concludes that a fee award is appropriate and **GRANTS** the motion. The Court's reasoning is discussed in detail below.

**II.**
**BACKGROUND**

    This lawsuit arises out of a bankruptcy proceeding filed in the District of Montana. The suit is brought by Marc S. Kirschner, the trustee in bankruptcy, against Timothy Blixseth, the founder of the bankrupt Yellowstone Mountain Club ("the Club"). During its operations, the Club borrowed $375 million from Third Party Defendants, various Credit Suisse entities ("Credit Suisse"), and thereafter transferred approximately $200 million to Blixseth through his former business entity, BLX Group ("BLX"). In return for the funds, Blixseth executed two promissory notes (the "Notes") in favor of BLX. BLX later purportedly cancelled the notes and

LINKS: 73, 74

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 11-08283-GAF-SP | Date | December 11, 2012 |
| Title | Marc S Kirschner v. Timothy L Blixseth | | |

released Blixseth from any liability to repay the $200 million. Those notes were later transferred to the Club, which was BLX's creditor, and the Club's bankruptcy estate, through the present lawsuit, seeks to set aside, under federal and state law, the allegedly fraudulent release and to recover the $200 million.

Blixseth unsuccessfully sought dismissal of the pending complaint. When that tactic failed, Blixseth filed a Counterclaim and Third Party Complaint in which he contended that Credit Suisse and related entities, Blixseth's ex-wife, Edra Blixseth, and now Kirschner have participated in a RICO conspiracy with the object of gaining control of the Club and its assets through predatory lending practices, the transfer of ownership of the Club to Edra during the Blixseths' divorce proceedings, and the pending bankruptcy proceedings against the Club. Blixseth also made three contract-based counterclaims against Kirschner related to his attempt to collect on the Notes. (Docket No. 26 (Countercl.).) In the Third Party Complaint, Blixseth sought recovery from five Credit Suisse entities, in the event that he was found liable on the Notes, on theories of contribution and unjust enrichment. (Docket No. 27 [Third Party Compl.].)

Kirschner filed a Motion to Dismiss Blixseth's Counterclaim (the "Motion to Dismiss"), a Motion for Sanctions, and an Opposition to Defendant and Counterclaimant's Motion to Amend the Counterclaim. (Docket Nos. 29, 30, 52.) On November 1, the Court issued an order granting all three of these motions and ordering Kirschner "to file a specific request for fees and costs incurred in moving to dismiss the Counterclaim, moving for sanctions, and opposing Blixseth's motion for leave to amend the Counterclaim, supported by billing records and other appropriate documentation." (11/1/12 Order at 38–39.) In response to the Order, Kirschner filed his present Motion for Attorneys' Fees and Costs. (Docket No. 73 [Mem.].) Kirschner requests $85,014.75 in attorneys' fees. (Mem. at 6.) Kirschner's request for attorneys' fees is itemized by attorney, three of whom work for Bailey & Glasser, LLP ("B&G"), and three of whom are with the firm of Bienert, Miller & Katzman ("BMK"). (Id.) Kirschner also requests $5,167.96 in costs, related to online legal research expenses. (Id. at 9.)

Blixseth filed a late Opposition to Kirschner's motion for attorneys' fees, objecting to Kirschner's requested figure on a number of grounds: (1) Kirschner never properly met and conferred with Blixseth prior to filing the Motion to Dismiss and Motion for Sanctions, (2) the attorneys' billing "contains countless entries that are block-billed, which brings the reasonableness of each block-billed entry into question," (3) the billing records "contain significant entries where the description of work rendered is partially redacted," (4) the billing records reveal duplicative billing by B&G and BMK, (5) B&G and BMK's hours for the Motion

LINKS: 73, 74

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-08283-GAF-SP | Date | December 11, 2012 |
|---|---|---|---|
| Title | Marc S Kirschner v. Timothy L Blixseth | | |

to Dismiss the Counterclaim and Motion for Sanctions are grossly excessive, (6) Kirschner improperly seeks fees for BMK's preparation of an Opposition to Blixseth's Ex Parte Motion for Continuance, and (7) Kirschner request for computer research costs is improper because the billing records are unclear and because "this Court's local rules do not specify computer research as a taxable cost." (Docket No. 75 [Opp.].) Under Local Rule 7–12, "[t]he failure to file any required document, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion." C.D. Cal. Rule 7–12. Because the Court favors decisions on the merits, the Court nevertheless **GRANTS** Blixseth's ex parte request for consideration of the belatedly-filed Opposition.

In spite of the Opposition, however, and for reasons discussed in further detail below, the Motion for Attorneys' Fees and Costs is **GRANTED**.

III.
DISCUSSION

**A. LEGAL STANDARD**

"Reasonableness is the benchmark for sanctions based on attorneys' fees." Mirch v. Frank, 266 Fed. App'x. 586 (9th Cir. 2008) (citing 28 U.S.C. § 1927 (authorizing fees 'reasonably incurred')). A two-step approach is employed in assessing whether attorneys' fees are reasonable. Intel Corp. v. Terabyte Int'l, 6 F.3d 614, 622 (9th Cir. 1993)(citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). First, the court calculates the lodestar figure by multiplying the hours reasonably spent on the litigation by a reasonable hourly rate. Costa v. Commissioner of Social Sec. Admin., 690 F.3d 1132, 1135 (9th Cir. 2012) (quotation omitted); Morales v. City of San Rafael, 96 F.3d 359, 363 (9th Cir. 1996). Second, after computing the "lodestar," the district court may then adjust the figure upward or downward taking into consideration twelve "reasonableness" factors:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to the acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

LINKS: 73, 74

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-08283-GAF-SP | Date | December 11, 2012 |
|---|---|---|---|
| Title | Marc S Kirschner v. Timothy L Blixseth | | |

Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1033 (9th Cir. 2012) (quoting Morales, 96 F.3d at 363 n.8.) "The most critical factor is the degree of success obtained." Hensley, 461 U.S. at 436. Furthermore, "[t]here exists a 'strong presumption' that the fee determined by multiplying a reasonable billing rate by the number of hours justifiably expended on a litigation constitutes an appropriate fee award." Chandler v. Koon, 996 F.2d 1223, at *3 (9th Cir. 1993) (citing United Steelworkers of America v. Phelps Dodge Corp., 896 F.2d 403, 406 (9th Cir. 1990)). And, finally, the Ninth Circuit has made clear that reasonable fees "are to be calculated according to the prevailing market rates in the relevant community." Van Skike v. Director, Office of Workers' Compensation Programs, 557 F.3d 1041, 1046 (9th Cir. 2009) (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984).) "The relevant community is generally defined as 'the forum in which the district court sits.'" Id. (quoting Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997)).

**B. APPLICATION**

**1. ATTORNEYS' FEES**

Here, Kirschner requests only the lodestar figure at issue—$85,014.75—with no upward adjustment, and the Court concludes that such an award is appropriate, particularly in light of Kirschner's success with respect to each of the three motions filed. Kirschner's requests for attorneys' fees is as follows: (1) $9,800.00 for 24.5 hours worked by Brian A. Glasser of B&G at $400/hour; (2) $30,920.00 for 77.3 hours worked by J.B. Perrine of B&G at $400/hour; $24,333.75 for 108.15 hours worked by Leona Goldshaw of B&G at $225/hour; (4) $7,371.00 for 11.7 hours worked by Steven Jay Katzman of BMK at $630/hour; (5) $3,750.00 for 10 hours worked by Susann K. Narholm at $375/hour; and (6) $8,840.00 for 27.2 hours worked by Tony Bisconti at $325/hour. (Mem. at 6.)

"[I]n most cases, [t]he lawyers' actual billing rates reflect market rates—they provide an efficient and fair short cut for determining the market rate." Student Public Int. Research Group of N.J., Inc. v. AT&T Bell Labs., 842 F.2d 1436, 1445 (3d Cir. 1988). Here, the billing rates listed for each of these attorneys is reasonable given the market rate in Los Angeles, and the ample experience of each of the attorneys, as detailed by Kirschner in his request. (See Mem. at 6–8 (describing qualifications of each of the above-referenced attorneys, including law school, additional education, and former employment).) The Court thus concludes that the $85,014.75 lodestar calculation is based on a reasonable billing rate.

LINKS: 73, 74

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 11-08283-GAF-SP | Date | December 11, 2012 |
|---|---|---|---|
| Title | Marc S Kirschner v. Timothy L Blixseth | | |

The time spent drafting the three motions in question—258.95 hours—is also reasonable especially considering the complexity of the issues presented and the vexatious conduct of the opposition. (Mem. at 6.)  As the Supreme Court noted in Hensley, in determining both a reasonable billing rate and a reasonable number of hours, "[t]here is no precise rule or formula . . . ."  Hensley, 461 U.S. at 436.  However, "the most critical factor is the degree of success obtained."  Id.  Here, Kirschner filed three motions and the Court granted all three.  (11/1/12 Order.)  The motions were complex, involving "hundreds of pages of pleadings," "thousands of pages of exhibits," and requiring the Court to issue an order spanning some thirty-nine pages to dispose of the case. (Mem. At 2; 11/1/12 Order)  Finally, Kirschner has voluntarily excluded the "time of two partners and two paralegals at B&G" and Mr. Glasser's time "was reduced from 47.70 to 24.50 hours."  (Mem. at 7.)

Blixseth's Opposition does not alter the Court's conclusion that Kirschner's request for attorneys' fees is reasonable.  His argument that Kirschner failed to meet and confer as required by Local Rule 7–3 is utterly unpersuasive.  Not only is Blixseth raising this argument nearly eight months after the filing of the motions in question, but Kirschner effectively rebuts these allegations with Mr. Glasser's billing records, which demonstrate that the parties did, in fact, meet and confer.  (Reply at 2 (citing Glasser Decl., Exhibit A, entry item dated March 27, 2012 ("Call to Conant [Blixseth's attorney], left message re: our desire for him not to refile the spurious counterclaim.").)

Furthermore, Blixseth's arguments with respect to block-billing, redactions, duplicative hours, and "grossly excessive" hours are too vague to be persuasive.  As the Ninth Circuit recognized in Beltran Rosas v. County of San Bernardino, objections to a fee request should be specific. 260 F. Supp. 2d 990, 996 n.4 (citing Gates, 39 F.3d 1439 (9th Cir. 1994) (stating as a reason for rejecting the defendants' contention that an attorney's fee award was invalid, that the defendants failed to make adequate specific objections)); see also Lawyers' Mut. Ins. Co. v. Home Ins. Co., No. 93-3839, 1995 WL 150556, at *1 (N.D. Cal., Mar. 20, 1995).  The potential pitfalls of block-billed or redacted entries is that they will prevent the Court from determining precisely how attorneys spent particular hours.  Here, Blixseth fails to point to even one block-billed or redacted entry that would cause this purported confusion.  And the Court does not find the billing records unintelligible or opaque as a result of Kirschner's minor redactions and the block-billing in some of the entries.

With respect to the allegation that BMK and B&G have duplicative time entries, a review of the billing records substantiates Kirschner's explanation that

LINKS: 73, 74

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-08283-GAF-SP | Date | December 11, 2012 |
|---|---|---|---|

| Title | Marc S Kirschner v. Timothy L Blixseth |
|---|---|

> [c]ontrary to the Opponents' suggestion, BMK and B&G were not simply
> reviewing each other's work and communicating without any substantive
> response. Rather, extensive strategy, review, analysis, and communications
> performed by both BMK and B&G were substantive in nature and
> necessary, addressing complex substantive and procedural issues arising in
> this case due to several factors, including but not limited to: the nature of
> the specious claims asserted by Mr. Blixseth; the preexisting litigation
> across several forums; and complex legal questions of intersecting state,
> federal, and bankruptcy law.

(Reply at 7.)  Furthermore, the one case Blixseth cites in support of the proposition that the
number of hours at issue here is excessive—Maughan v. Google Tech., Inc.—involved an
attorney who billed over 200 hours for the preparation of *one* motion. 143 Cal.App.4th 1242,
1251 (2006). Here, Kirschner's counsel spent 258.95 hours preparing *three* motions. (Mem. at
6.) Thus, Blixseth's Opposition does not alter the Court's conclusion that these hours are
reasonable in light of the complexity of the case and the degree of success Kirschner obtained.

Finally, Blixseth's argument that the fees relating to the preparation of Kirschner's
Opposition to Blixseth's Ex Parte Application to continue the hearing on the Motion to Dismiss
and Motion for Sanctions was unnecessary is also unavailing.  The Court agrees with
Kirschner's assessment that "[t]he time incurred opposing the Ex Parte Application directly
relates to both the Motion to Dismiss and the Motion for Sanctions, as the Ex Parte Application
was filed by Blixseth in an attempt to delay the Court's ruling on those matters for the strategic
purpose of having Blixseth's Motion to Amend heard first." (Reply at 8.)

**2. COSTS**

In addition to attorneys' fees, Kirschner requests $5,167.96 in costs "related to online
legal research expenses." (Mem. at 9 (citing Glasser Decl. ¶ 7; Exhibit B).)  The Court finds this
figure reasonable and Blixseth's contention that Local Rule 54–4 "do[es] not specify computer
research as a taxable cost" is inapposite. (Opp. at 7.)  The type of cost recovery permitted or
prohibited under Local Rule 54–4 is not dispositive of the determination of appropriate costs
here because these costs are being imposed as a form of sanctions pursuant to 28 U.S.C. § 1927.

LINKS: 73, 74

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-08283-GAF-SP | | Date | December 11, 2012 |
|---|---|---|---|---|
| Title | Marc S Kirschner v. Timothy L Blixseth | | | |

### III. CONCLUSION

Accordingly, the Court **GRANTS** Blixseth's Motion for Extension of Time to File Response to Plaintiff's Motion for Attorneys' Fees.  Notwithstanding Blixseth's Opposition, the Court **GRANTS** in its entirety Kirschner's Motion for Attorneys' Fees and Costs, awarding Kirschner a total of **$90,182.71**.  As set forth in the Court's November 1 Order, Blixseth is "responsible for two-thirds of the total award and Conant[, Blixseth's attorney, is] responsible for one-third." (11/1/12 Order at 39.)

The hearing set for Monday, December 17, 2012 is **VACATED**.

**IT IS SO ORDERED.**

# Exhibit
# Y

# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH, AMY KOENIG, VERN JENNINGS, MARK MUSHKIN, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, JUDY LAND, and CHARLES DOMINGUEZ, each individually, and on behalf of others similarly situated<br><br>    Plaintiffs,<br><br>    vs.<br><br>CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive,<br><br>    Defendants. | Case No.: CV 10-1-EJL-REB<br><br>**ORDER RE:**<br><br>**PLAINTIFFS' MOTION TO RECONSIDER**<br><br>**(Docket No. 392)** |

Now pending before the Court is Plaintiffs' Motion to Reconsider (Docket No. 392). Having carefully considered the record and otherwise being fully advised, the undersigned enters the following Order:

## I. BACKGROUND

On March 29, 2013, the undersigned issued a Memorandum Decision and Order granting Cushman & Wakefield's Motion for Sanctions (Docket No. 246) and Credit Suisse's Motion for Order to Show Cause (Docket No. 253). *See* 3/29/13 MDO (Docket No. 352). On April 12, 2013, Plaintiffs opposed the March 29, 2013 Memorandum Decision and Order. *See* Pls.' Opp.

ORDER - 1

to Sanctions Order (Docket No. 367).[1]  On April 24, 2013, Plaintiffs filed the at-issue Motion to

Reconsider, pursuant to FRCP 59.  *See* Pls.' Mot. to Recon. (Docket No. 392).  Plaintiffs'

Motion to Reconsider merely attempts to supplement the record vis à vis the underlying motion

for sanctions and motion for order to show cause, stating in full (excluding a footnote):

> Plaintiffs' counsel are of the opinion that this Court would not have entered its
> Order ECF 352 re: Sanctions had it been fully informed of the facts, and
> considerations flowing therefrom, had the Court then been apprised of the
> information contained in the filings of Plaintiffs' counsel during the last two
> weeks.
>
> Plaintiffs' will not be presenting a memorandum and argument in support of
> this request, but simply invite the Court to revisit its decision in light of the
> following:
>
> (1)    ECF 367 - Response (Objections) re Memorandum Decision and Order
> (2)    ECF 355 - Motion for Relief -- Schwartzman
> (3)    ECF 358-2 - Douglas Haney Declaration
> (4)    ECF 358-3 - Robert C. Huntley First Declaration
> (5)    ECF 358-4 - Michael J. Flynn Declaration
> (6)    ECF 364 - Motion for Relief from Sanctions by Chris and John Flood
> (7)    ECF 368 - Motion for Relief by Philip H. Stillman [and related filings]
> (8)    ECF 383 - Sealed Declaration of James C. Sabalos
> (9)    ECF 385 - Second Declaration of Robert C. Huntley
> (10)   ECF 386 - Second Declaration of Benjamin Schwartzman

*See id.* at pp. 1-2.  Both Credit Suisse and Cushman & Wakefield oppose Plaintiffs'

reconsideration efforts.  *See* Defs.' Opps. to Pls.' Mot. to Recon. (Docket Nos. 400 & 401).

## II.  DISCUSSION

A motion to reconsider an interlocutory ruling requires an analysis of two important

principles: (1) error must be corrected, and (2) judicial efficiency demands forward progress.

---

[1] Plaintiffs' April 12, 2013 Opposition cites to FRCP 72 and, therefore, the undersigned understands that its consideration is for U.S. District Judge Edward J. Lodge. *See* Fed. R. Civ. P. 72(a) ("The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."); 28 U.S.C. § 636(b)(1)(A).

ORDER - 2

The former principle has led courts to hold that a denial of a motion to dismiss or for summary judgment may be reconsidered at any time before final judgment. *See Preaseau v. Prudential Ins. Co.*, 591 F.2d 74, 79-80 (9th Cir. 1979). While even an interlocutory decision becomes the "law of the case," it is not necessarily carved in stone.

Justice Oliver Wendell Holmes concluded that the "law of the case" doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power. *Messinger v. Anderson*, 225 U.S. 436, 444 (1912). "The only sensible thing for a trial court to do is to set itself right as soon as possible when convinced that the law of the case is erroneous. There is no need to await reversal." *In re Airport Car Rental Antitrust Litigation*, 521 F. Supp. 568, 572 (N.D. Cal. 1981) (Schwartzer, J.). However, the need to be right must co-exist with the need for forward progress. A court's opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Allow Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988).

Reconsideration of a court's prior ruling under FRCP 59(e) is appropriate "if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1100 (9th Cir. 2010) (citation omitted). If the motion to reconsider does not fall within one of these three categories, it must be denied.

Here, even assuming that Plaintiffs' Motion to Reconsider is timely (*see* Cushman & Wakefield's Opp. to Pls.' Mot. to Recon., pp. 1-2 (Docket No. 401)), they have not met their burden. First, Plaintiffs attempt to offer altogether new evidence by way of adding to the factual

**ORDER - 3**

record ten subsequent filings (*see supra*), yet have not shown (nor do they argue) that the evidence was unavailable or could not have been discovered at the time they originally submitted their arguments to the Court. *See Lainez-Ortiz v. INS*, 96 F.3d 393, 400 (9th Cir. 1996) (requiring newly discovered evidence to have been previously unavailable, in order to warrant reopening proceedings). Still, where Plaintiffs flesh out some additional facts not otherwise addressed in the Court's March 29, 2013 Memorandum Decision and Order, they do not change the undersigned's opinion on the matter, and the Court will not reconsider its earlier decision.[2] Second, any alleged "clear error" or manifest injustice resulting from the March 29, 2013 Memorandum Decision and Order (to the extent not considered just a "second bite at the apple") is arguably presented within Plaintiffs' April 12, 2013 Opposition to the same, currently before Judge Lodge. *See supra.* Third, Plaintiffs do not identify any intervening change in controlling law and, likewise, this Court aware of none. Therefore, Plaintiffs' Motion to Reconsider is denied.

### III.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' Motion to Reconsider (Docket No. 392) is DENIED.

DATED:  **August 15, 2013**

Honorable Ronald E. Bush
U. S. Magistrate Judge

---

[2] However, consistent with the March 29, 2013 Memorandum Decision and Order, the undersigned *will* consider the relief sought within the motions for relief filed by attorneys (1) Benjamin Schwartzman and Wade Woodard (Docket No. 355); (2) Chris Flood and John Flood (Docket No. 364); and (3) Philip Stillman (Docket No. 368).

**ORDER - 4**